**Nos. 2025-1812, -1813**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MI-CROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OF-FICE OF THE PRESIDENT, UNITED STATES, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection, in his official capacity as Acting Commissioner of the United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTA-TIVE, HOWARD LUTNICK, UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Defendants-Appellants.*

THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF VERMONT,

*Plaintiffs-Appellees,*

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECU-RITY, KRISTI NOEM, Secretary of Homeland Security, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTEC-TION, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protec-tion, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection, UNITED STATES,

*Defendants-Appellants.*

On Appeal from the United States Court of International Trade
Nos. 25-66, -77, Judges Katzmann, Reif, and Restani

# EMERGENCY MOTION FOR A STAY PENDING APPEAL
# AND AN IMMEDIATE ADMINISTRATIVE STAY

YAAKOV M. ROTH
*Acting Assistant Attorney General*

*Signature block continued
on inside cover*

MICHAEL S. RAAB
BRAD HINSHELWOOD
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

# TABLE OF CONTENTS

**Page**

STATEMENT ................................................................................................ 4

    A.    Statutory Background ......................................................... 4

    B.    Factual Background ............................................................ 7

    C.    This Litigation ................................................................... 11

ARGUMENT .............................................................................................. 13

I.    The Government Is Likely To Prevail On The Merits ......................... 13

    A.    IEEPA Clearly Authorizes These Tariffs ...................... 13

    B.    The Contraband-Drug-Related Tariffs Are Reasonably
            Related To The Emergencies The President Identified .............. 20

    C.    The CIT Ignored Equitable Requirements For Injunctive
            Relief ............................................................................... 22

II.    The Equitable Factors Favor A Stay ..................................................... 23

CONCLUSION ............................................................................................ 27

CERTIFICATE OF COMPLIANCE

ADDENDUM

Yesterday evening, the Court of International Trade (CIT) issued an unprecedented and legally indefensible injunction permanently barring the United States from implementing tariffs involving dozens of countries, from the United Kingdom to the People's Republic of China to the European Union—tariffs that are central to the President's foreign-policy and economic agendas. The court permanently enjoined the President's executive orders regarding tariffs and compelled the Executive Branch to issue administrative orders unwinding the tariffs in 10 calendar days.

This Court should immediately stay that judgment, which is rife with legal error and upends President Trump's efforts to eliminate our exploding trade deficit and reorient the global economy on an equal footing. The injunction unilaterally disarms the United States in the face of the longstanding predatory trade practices of other countries—who, notwithstanding the injunction, remain free to impose punitive tariffs on American products and hobble our economy. The injunction threatens to unwind months of foreign-policy decision-making and sensitive diplomatic negotiations, at the expense of the Nation's economic well-being and national security. The political branches, not courts, make foreign policy and chart economic policy, yet the injunction injects the CIT into the center of our Nation's foreign policy and

disables the President from using a critical tool that Congress authorized him to wield, in the middle of time-sensitive negotiations with multiple foreign countries over future trade agreements.

So grave are the stakes for the Nation that four members of the President's Cabinet took the extraordinary step of submitting declarations to the CIT, before its ruling, substantiating the immediate, catastrophic harms that would flow from enjoining the President's tariff authority. The Secretary of Commerce explained that an injunction would "undermine" recent agreements and "jeopardiz[e] the dozens of similar arrangements" that are being negotiated. A76. The Secretary of the Treasury agreed that an injunction "could shatter" ongoing "negotiations with dozens of countries" and embolden others to retaliate against the United States. A86. The U.S. Trade Representative feared that an injunction could leave trading partners free "to further distort the conditions of competition for U.S. exporters." A90-91. And the Secretary of State warned that an injunction would "cause significant and irreparable harm to U.S. foreign policy and national security." A80. If the injunction remains in effect, the successful agreements the President has reached with multiple countries could be immediately unraveled.

Yet, remarkably, the CIT issued a permanent injunction without any consideration of these declarations, which document quintessential irreparable harms. Nor did the court even discuss the equitable requirements for issuing a permanent injunction—a textbook error that alone warrants vacating or staying the injunction. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 351 (2024); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

On the merits, the injunction rests on a dangerously flawed interpretation of the President's tariff authority. Since 1941, Congress has authorized the President to "regulate importation" of foreign goods whenever he declares a national emergency. This Court's predecessor, in an opinion by this Court's first Chief Judge, upheld President Nixon's invocation of that authority to impose broad tariffs in response to a global balance-of-payments deficit. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975) (Markey, C.J.). And Congress knew of that holding when it incorporated the operative 1941 statutory language into the current statute, which gives the President "essentially the same" power. *Regan v. Wald*, 468 U.S. 222, 228 (1984); *see Dames & Moore v. Regan*, 453 U.S. 654, 671-672 (1981). It is difficult to imagine clearer authority for the President to invoke the current statute—the International Emergency Economic Powers Act (IEEPA)—to impose just

the sort of broad tariffs that President Nixon imposed.  Yet the CIT, flouting *Yoshida*, enjoined tariffs that President Trump determined are imperative to protect America's economy and national security.

A stay pending appeal, and an immediate administrative stay, are necessary to prevent immediate, irreparable harm to the Nation.  And a stay would not harm plaintiffs, who can be made whole through a refund, including interest, if tariffs paid during these appeals are ultimately held unlawful.  Absent at least interim relief from this Court, the United States plans to seek emergency relief from the Supreme Court tomorrow to avoid the irreparable national-security and economic harms at stake.  Plaintiffs oppose this motion.[1]

## STATEMENT

### A.    Statutory Background

1.    Congress has long delegated to the President authority to regulate importation during national emergencies.  The 1917 Trading With the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411, authorized the President to "regulat[e]" "import[ation]" of foreign goods during wartime.  *Id.* § 11, 40

---

[1] The government last night filed a stay motion in the CIT.  Given the extraordinary harms the CIT's order imposes, the government cannot wait for a ruling before filing this motion.

Stat. at 422-423.  Later, Congress amended TWEA to allow the President to "regulate … importation" of foreign goods not just in wartime but "during any other period of national emergency" he declares.  First War Powers Act, Pub. L. No. 77-354, tit. III, § 301, 55 Stat. 838, 839-840 (1941).

In 1971, President Nixon invoked TWEA to impose tariffs in response to a balance-of-payments deficit.  Finding that "a prolonged decline in the international monetary reserves of the United States" had "seriously threatened" the Nation's "trade and international competitive position," and thus its "security," he "declare[d] a national emergency" and assessed a 10% supplemental tariff on eligible imports.  Pres. Proc. No. 4074, 85 Stat. 926 (1971).  In *Yoshida*, this Court's predecessor upheld that tariff.

2.     In the 1970s, Congress revised the TWEA framework by enacting two statutes.  *First*, the National Emergencies Act (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976), "authorize[s] the President "to declare [a] national emergency" for the purpose of all "Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power."  50 U.S.C. § 1621(a).

The NEA does not substantively limit the President's determination of when a national emergency exists.  Instead, Congress retained oversight of

such determinations through its power to "terminate[]" a declared emergency through "a joint resolution," 50 U.S.C. § 1622(a)(1), on a set timetable, *id.* § 1622(b). Otherwise, an emergency "terminate[s] on the anniversary of the declaration of that emergency" absent a renewed Presidential determination. *Id.* § 1622(d).

*Second*, Congress amended TWEA by removing the President's peacetime emergency powers under that Act, Pub. L. No. 95-223, § 101(a), 91 Stat. 1625, 1625 (1977), and replaced them with IEEPA. *Id.* tit. II, §§ 201-208, 91 Stat. at 1626-1629. IEEPA's operative provision authorizes the President to "regulate … any … importation … of … any property in which any foreign country or a national thereof has any interest … or … any property[] subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B).

Section 1702's language "directly draw[s]" from TWEA, *Dames & Moore*, 453 U.S. at 671-672, and the authority it confers is "essentially the same as" under TWEA, *Regan*, 468 U.S. at 228. But IEEPA specifies somewhat "different" "conditions and procedures for" the "exercise" of that authority. *Id.* IEEPA provides that the President's § 1702 authority "may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national

security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).

## B.    Factual Background

These cases concern various presidential emergency declarations and actions taken by the President to address those emergencies.

1.    *Canada and Mexico.*  In January 2025, the President declared the flow of contraband drugs like fentanyl, and the resulting public-health crisis, to be a national emergency.  Pres. Proc. 10,886, 90 Fed. Reg. 8,327 (Jan. 29, 2025).  The President "expanded the scope of the national emergency declared in that proclamation to cover" conduct by the Canadian and Mexican governments that in his judgment had contributed to the crisis and thus constituted "an unusual and extraordinary threat . . . to the national security and foreign policy of the United States."  Exec. Order No. 14,193, 90 Fed. Reg. 9,113, 9,114 (Feb. 7, 2025); Exec. Order No. 14,194, 90 Fed. Reg. 9,117, 9,118 (Feb. 7, 2025).  The President invoked his power under IEEPA to impose a 25% tariff on most Canadian and Mexican imports in response to that emergency, concluding "that action under other authority to impose tariffs [was] inadequate to address this unusual and extraordinary threat."  *Id.*

The President subsequently issued additional executive orders pausing most of the tariffs, citing Canada and Mexico's immediate steps to alleviate their role in the emergency and the need for additional time to assess those measures.  Exec. Order No. 14,197, 90 Fed. Reg. 9,183 (Feb. 10, 2025); Exec. Order No. 14,198, 90 Fed. Reg. 9,185 (Feb. 10, 2025).  The President later exempted from tariffs all Canadian and Mexican goods that qualify for duty-free entry under the United States-Mexico-Canada Agreement (USMCA). Exec. Order No. 14,231, 90 Fed. Reg. 11,785 (Mar. 11, 2025); Exec. Order No. 14,232, 90 Fed. Reg. 11,787 (Mar. 11, 2025).

2.    *China.*  The President further "expand[ed] the scope of the national emergency declared in" the initial proclamation to include conduct by the government of the People's Republic of China (PRC).  Exec. Order No. 14,195, 90 Fed. Reg. 9,121 (Feb. 7, 2025).  The President found that the PRC "has subsidized and otherwise incentivized PRC chemical companies to export fentanyl and related precursor chemicals that are used to produce synthetic opioids sold illicitly in the United States"; that "the PRC provides support to and safe haven for PRC-origin transnational criminal organizations (TCOs) that launder the revenues from the production, shipment, and sale of illicit synthetic opioids"; that "[m]any PRC-based chemical companies …

- 8 -

go to great lengths to evade law enforcement"; and that "[t]he flow of con-traband drugs like fentanyl to the United States through illicit distribution networks has created a national emergency, including a public health crisis in the United States." *Id.* at 9,121.

As with Canada and Mexico, the President determined that the PRC's conduct "constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States." *Id.* at 9,122. He accord-ingly imposed a 10% duty on most goods imported from the PRC, *id.* at 9,122-9,123, then increased the duty to 20% when he determined that "the PRC has not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions," Exec. Order. No. 14,228, 90 Fed. Reg. 11,463, 11,463 (Mar. 7, 2025). The President later imposed duties on low-value imports from the PRC because many PRC-based shippers "hide illicit substances and conceal the true contents of shipments sent to the United States through deceptive shipping practices" and may "avoid detection" if low-value shipments are exempt from tariffs. Exec. Order. No. 14,256, 90 Fed. Reg. 14,899, 14,899 (Apr. 7, 2025).

3.   *Reciprocal Tariffs.*  The President declared an additional emergency in April, citing "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits."  Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,041 (Apr. 2, 2025).  The President further determined that "large and persistent annual U.S. goods trade deficits have led to the hollowing out of our manufacturing base" and a litany of other serious harms—deficits "caused in substantial part by a lack of reciprocity in our bilateral trade relationships."  *Id.*

The President accordingly acted "to rebalance global trade flows" by imposing a 10% tariff (effective April 5) "on all imports from all trading partners," with certain exceptions.  *Id.* at 15,045.  The President also imposed additional country-specific tariffs (effective April 9).  *Id.*

On April 9, the President suspended most country-specific tariffs for 90 days, citing many countries' steps "toward remedying non-reciprocal trade arrangements."  Exec. Order No. 14,266, 90 Fed. Reg. 15,625, 15,626 (Apr. 15, 2025).  But he raised the tariff rate for imports from the PRC to respond to retaliation by the PRC.  *Id.*; *see also* Exec. Order No. 14,259, 90 Fed.

Reg. 15,509 (Apr. 14, 2025).  More recently, the President suspended the additional PRC tariffs for 90 days "[i]n recognition of the intentions of the PRC to facilitate addressing the national emergency."  Exec. Order No. 14,298, 90 Fed. Reg. 21,831 (May 21, 2025).

### C.    This Litigation

1.    These appeals concern two cases.  In *V.O.S. Selections*, companies challenged the reciprocal tariffs, seeking a temporary restraining order, a preliminary injunction, and summary judgment.  A three-judge CIT panel denied a temporary restraining order, *V.O.S.* Dkt. 13, then consolidated briefing on the preliminary injunction and summary judgment.  Meanwhile, a group of States led by Oregon separately sued in the CIT, seeking to enjoin both the reciprocal tariffs and the contraband-drug-related tariffs.  The same CIT panel consolidated briefing in that case, A25, and held hearings in both.

2.    Yesterday evening, the CIT issued a single opinion in *V.O.S.* and *Oregon*.  The CIT held that IEEPA's authorization to "regulate … importation" did not support the reciprocal tariffs (which the CIT dubbed the "Worldwide and Retaliatory Tariffs," A22).  The CIT noted *Yoshida*'s holding that the phrase "regulate … importation" as used in TWEA "includes the power to 'impos[e] an import duty surcharge,'" A38 (quoting 526 F.2d at

576), but nonetheless concluded that that language did not authorize "the President to impose whatever tariff rates he deems desirable" because "such a reading would create an unconstitutional delegation of power." A39. The CIT further held that Congress's enactment of the Trade Act of 1974, which includes authority to address certain balance-of-payments issues, implicitly "removes the President's power to impose remedies in response to balance-of-payments deficits, and specifically trade deficits, from the broader powers granted to a president during a national emergency under IEEPA." A43.

As to the contraband-drug-related tariffs (the so-called "Trafficking Orders"), the CIT focused on IEEPA's provision that the President's powers under that statute "may be exercised to deal with" foreign threats as to which a national emergency is declared. A45. The CIT held that whether the President's chosen means of addressing the declared emergencies "deal with" those emergencies was judicially reviewable, A46-52, and that the contraband-drug-related tariffs "do not 'deal with' their stated objectives" because they do "not evidently relate to foreign governments' efforts 'to arrest, seize, detain, or otherwise intercept' bad actors within their respective jurisdictions," but instead "aim to create leverage to 'deal with' those objectives" through negotiation. A54; *see* A55.

- 12 -

Turning to remedy, the CIT stated that the tariff orders would "be vacated and their operation permanently enjoined."  A57.  The CIT further compelled the United States to restore prior tariff rates within 10 days.  *Id.*  The CIT declared that "[t]here is no question here of narrowly tailored relief" because the challenged orders "are unlawful as to all."  *Id.*

## ARGUMENT

A stay pending appeal depends on "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"  *Nken v. Holder*, 556 U.S. 418, 426 (2009).  Here, those factors strongly favor the government.

## I.    The Government Is Likely To Prevail On The Merits

### A.    IEEPA Clearly Authorizes These Tariffs

The statutory text, history, and binding precedent confirm that Congress empowered the President to impose tariffs in response to declared emergencies, and that these tariffs fall well within the bounds of the President's broad powers under IEEPA.

1.   *Yoshida* interpreted the substantively identical statutory text of IEEPA's predecessor statute—the power "to 'regulate importation'"—and held that it includes the power to "impos[e] an import duty surcharge." 526 F.2d at 576; *see id.* at 575.  That holding tracks the ordinary meaning of "regulate": to "fix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws." *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979).  That interpretation controls here, since this Court follows *Yoshida* and other holdings of its predecessor court.  *See South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (en banc).

Congress removed any doubt about this interpretation by incorporating the "regulate importation" language into IEEPA after *Yoshida*.  "Congress is presumed to be aware of an administrative or judicial interpretation of a statute," *Lorillard v. Pons*, 434 U.S. 575, 580 (1978), and "when Congress 'adopt[s] the language used in [an] earlier act,'" courts "presume that Congress 'adopted also the construction given'" to that language, *Georgia v. Public.Resource.Org*, 590 U.S. 255, 270 (2020).  Indeed, the House Report on IEEPA cited *Yoshida* and explained its holding.  H.R. Rep. No. 95-459, at 5.

2.    The CIT seemingly agreed that IEEPA authorizes the President to impose *some* tariffs, yet held that IEEPA does not authorize the President to impose *these* tariffs based on major-questions doctrine and nondelegation concerns.  A35.  That is manifestly wrong.

a.    The major questions doctrine addresses the "particular and recurring problem" of "*agencies* asserting highly consequential power beyond what Congress could reasonably be understood to have granted."  *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (emphasis added).  But those concerns dissipate when, as here, Congress delegates authority directly to the President—"the most democratic and politically accountable official in Government," *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020).  *See, e.g.*, *Mayes v. Biden*, 67 F.4th 921, 933 (9th Cir.), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023).

Further, the concerns animating the major questions doctrine are inapplicable.  That doctrine counsels "skepticism" where "an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), particularly where there is an apparent "'mismatch[]'" between the breadth of the asserted power and the "narrow[ness]" of the statute in which the agency claims to have discovered it, *Biden v. Nebraska*,

600 U.S. 477, 517-518 (2023) (Barrett, J., concurring), and where the asserted power falls outside the agency's "wheelhouse," *id.* But IEEPA is on its face a broad, deliberate delegation of power for the President in the domains of foreign policy and national security — areas that implicate the President's expertise and independent constitutional authority, *see, e.g.*, *Department of the Navy v. Egan*, 484 U.S. 518, 529-530 (1988). *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-637 (1952) (Jackson, J., concurring in the judgment).

b.      Similarly, the nondelegation doctrine poses no obstacle. The constitutional avoidance canon applies only when an interpretation raises "serious constitutional doubts" and the statutory is "susceptible" to another interpretation. *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). Neither is true here.

*First*, there is no serious nondelegation concern because Congress has not delegated unintelligible or unbounded power in IEEPA. *Yoshida* rejected a nondelegation challenge to IEEPA's predecessor. 526 F.2d at 580-581. And this Court rejected a nondelegation challenge to a similar delegation of tariff authority: Section 232 of the Trade Expansion Act of 1962, which "'empowers and directs the President to act to alleviate threats to national security

from imports.'"  *PrimeSource Building Prods. v. United States*, 59 F.4th 1255, 1257-1257, 1263 (Fed. Cir. 2023).  Every court of appeals to have considered the question has upheld IEEPA against nondelegation challenges.  *See United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (collecting cases), *cert. denied*, 144 S. Ct. 820 (2024).

For good reason:  The Supreme Court has long held that the nondelegation doctrine is inapplicable in the foreign-affairs context.  *See, e.g.*, *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 314-329 (1936).  When Congress delegates "authority over matters of foreign affairs," it "must of necessity paint with a brush broader than that it customarily wields in domestic areas."  *Zemel v. Rusk*, 381 U.S. 1, 17 (1965).  Regardless, the powers IEEPA grants "are explicitly defined and circumscribed," *United States v. Arch Trading Co.*, 987 F.2d 1087, 1093 (4th Cir. 1993); *see United States v. Dhafir*, 461 F.3d 211, 217 (2d Cir. 2006)—conditioned on the President's determination of a particular type of threat to the Nation and limited to measures of the type Congress determined were potentially appropriate.  The President asserts not unlimited tariff authority but tariff authority to deal with emergencies once certain conditions are met.  And Congress retained the power to oversee the President's determination of an emergency and his chosen response.

- 17 -

*United States v. Amirnazmi*, 645 F.3d 564, 576 (3d Cir. 2011). "[T]hese statutory restrictions strike 'a careful balance between affording the President a degree of authority to address the exigencies of national emergencies and restraining his ability to perpetuate emergency situations indefinitely.'" *Shih*, 73 F.4th at 1092.

*Second*, the CIT did not identify a "plausible construction" of the statutory text, *Jennings*, 583 U.S. at 296, that would avoid its nondelegation concern. As discussed above, the CIT gave no consistent meaning at all to the phrase "regulate … importation." Rather, the CIT concluded that the imposition of tariffs sometimes qualifies as "regulat[ing] … importation … of … property," 50 U.S.C. § 1702(a)(1)(B), and sometimes does not, depending on the nature of the tariffs. But "[i]n all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning." *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019). If the power to "regulate … importation" includes the power to impose tariffs—as the CIT recognized it could—then the court should have proceeded to deferentially assess whether these tariffs related to the declared emergencies. Instead, the court asserted the power to refashion IEEPA's core operative provision so that tariffs sometimes constitute "regulat[ions]" of "importation" and

sometimes not.  The avoidance canon does not allow courts to "rewrite" stat-

utes in that manner.  *Jennings*, 583 U.S. at 286.

3.     Finally, the CIT construed Section 122 of the Trade Act of 1974,

which "grants the President authority to impose restricted tariffs in response

to 'fundamental international payment problems,' including 'large and seri-

ous balance-of-payments deficits,' and unfair trading practices," as im-

pliedly "limiting any such authority in the broader emergency powers under

IEEPA."  A40.

That reasoning fails.  Courts "approach federal statutes touching on

the same topic with a 'strong presumption' they can coexist harmoniously.

Only by carrying a 'heavy burden' can a party" establish "that one statute

'displaces' a second."  *Department of Agric. Rural Dev. Rural Hous. Serv. v.*

*Kirtz*, 601 U.S. 42, 63 (2024).  That burden is not satisfied here.  IEEPA's emer-

gency powers are "merely complementary," *id.*, to the powers in Section 122,

which are both narrower (in being limited to tariffs that respond to only one

type of concern) and broader (in not being limited to declared emergencies).

The CIT flouted basic statutory-interpretation principles in reading Section

122 as an implied exception to the later-enacted IEEPA's broad powers.

### B. The Contraband-Drug-Related Tariffs Are Reasonably Related To The Emergencies The President Identified

The CIT further erred in second-guessing the President's judgment that these tariffs are needed to address the national emergencies he declared.

1. Courts cannot properly review the President's decision to declare a national emergency, which implicates quintessential foreign-policy and national-security judgments entrusted to the Executive. As *Yoshida* recognized, "courts will not review the bona fides of a declaration of an emergency by the President." 526 F.2d at 581 n.32; *accord Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988); *Shih*, 73 F.4th at 1092. "Matters relating 'to the conduct of foreign relations … are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Regan*, 468 U.S. at 242. And the President's determination of what constitutes an "extraordinary and unusual" threat is incapable of meaningful judicial review, because of both its discretion-laden nature and the lack of judicially manageable standards. *See Webster v. Doe*, 486 U.S. 592, 599-601 (1988); *Baker v. Carr*, 369 U.S. 186, 217 (1962).

2. The CIT did not question the President's judgment as to the existence of national emergencies, yet invalidated the contraband-drug-related

tariffs for purportedly not "deal[ing] with" those emergencies, 50 U.S.C. § 1701. But courts cannot scrutinize "[w]hether the President's chosen method of addressing perceived risks is justified from a policy perspective." *Trump v. Hawaii*, 585 U.S. 667, 686 (2018). Such scrutiny is "inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere." *Id.*; *accord Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010).

Thus, in *PrimeSource*, this Court refused to "second-guess the facts found and measures taken by the President" under Section 232, which "'empowers and directs the President to act to alleviate threats to national security from imports.'" *Id.* at 1257-1258, 1263; *see id.* at 1263. And where this Court has entertained statutory challenges to a Presidential action "[i]n international trade controversies of this highly discretionary kind" implicating "foreign affairs," it limited the scope of those challenges and emphasized that "'the President's findings of fact and the motivations for his action are not subject to review.'" *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985). To be sure, *Yoshida* suggested broader review of the "extent to which the action taken" by the President bore "a reasonable relation to the power delegated" by Congress "and to the emergency giving rise to the

action," 526 F.2d at 578-579.  But that aspect of *Yoshida* has been superseded, and even if it had not, it still would not support the CIT's intrusive analysis.

The CIT thus manifestly erred in flyspecking the nexus between the contraband-drug-related tariffs and the emergencies the President declared. The CIT held that the tariffs "do not 'deal with' their stated objectives" because they merely "aim to create leverage to 'deal with' those objectives." A54.  But creating leverage "in negotiating the resolution of a declared national emergency," *Dames & Moore*, 453 U.S. at 673, is a central point of IEEPA.  The CIT did not dispute that the tariffs were imposed for that purpose or that they have had that effect, and its conclusion that the creation of leverage to negotiate over solutions to a crisis is not a way of "dealing with" that crisis is profoundly incorrect.

### C.     The CIT Ignored Equitable Requirements For Injunctive Relief

This Court could also stay the injunction for a simple, independent reason:  The CIT issued a sweeping, unprecedented, economy-threatening permanent injunction against the challenged tariffs without applying the traditional four-factor test for injunctive relief that requires considering the equities and public interest.  Indeed, the CIT said not a word about the

equitable requirements of irreparable harm or balancing the equities.  *See Starbucks*, 602 U.S. at 346; *eBay*, 547 U.S. at 391.  The Supreme Court has repeatedly held that courts lack authority to depart from the traditional equitable factors unless Congress provides otherwise, and Congress did not do so here.

## II.     The Equitable Factors Favor A Stay

The remaining stay factors overwhelmingly favor the government.  A stay is necessary to prevent the injunction from causing extraordinary, immediate, irreparable harm to our economy and national security, and a stay would not harm plaintiffs.  The equitable factors thus weigh decisively in the government's favor, and "the public interest and balance of equities factors merge" where "the government is the party" against whom an injunction is sought, *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).

1.     As members of the President's Cabinet have attested, the CIT's order would irreparably harm the economic and national security of the United States.  The Secretary of Commerce explained that the injunction "would undermine the United States-United Kingdom trade deal that was negotiated in reliance on the President's emergency tariff authority," plus the recent "China trade agreement," and "would jeopardize the dozens of

similar arrangements with foreign-trading partners that" are being negoti-

ated. A76. "Each of these negotiations," the declaration explained, "is prem-

ised on the credible threat of enforcement of the IEEPA tariffs," and the in-

junction could compromise that threat, so that "foreign counterparts will

have reduced incentives to reach meaningful agreements[]." *Id.* That could

"leave the American people exposed to predatory economic practices by for-

eign actors[] and threaten national security." A78.

The Secretary of State, Secretary of the Treasury, and U.S. Trade Rep-

resentative similarly explained that the trade negotiations "currently ongo-

ing … with dozens of countries" are "in a delicate state" and could be "shat-

ter[ed]" by an injunction against the tariffs. A85-86 (Treasury); *see* A81

(State); A90 (Trade). Some negotiations, like those with the United King-

dom, have led to "framework agreements" subject to further "negotiat[ion]

on details," while others "have not yet reached a framework agreement."

A86 (Treasury); *see* A90 (Trade); A81 (State). Those negotiations "are prem-

ised on the ability of the President to impose tariffs under IEEPA." A81

(State). Worse, those Cabinet members projected, an injunction could lead

trading partners to take retaliatory actions that the credible threat of further

tariffs would otherwise have deterred. A86 (Treasury); A82 (State). The

Trade Representative described that prospect as "a foreign policy disaster scenario," A91, and the Secretary of State observed that it "would cause significant and irreparable harm to U.S. foreign policy and national security," A80.

These harms are plainly irreparable. Absent a stay, even if this Court ultimately upholds the tariffs, the CIT's permanent injunction may have compromised delicate, time-sensitive foreign negotiations, perhaps irrevocably. And, absent a stay, the government will receive reduced revenue that it will be unable to recoup if the tariffs are ultimately upheld—another irreparable harm. *See Department of Educ. v. California*, 145 S. Ct. 966, 968-969 (2025) (per curiam).

2. Conversely, a stay would not cognizably harm plaintiffs. If tariffs imposed on plaintiffs during these appeals are ultimately held unlawful, then the government will issue refunds to plaintiffs, including any post-judgment interest that accrues. *See Sunpreme Inc. v. United States*, 2017 WL 65421, at *5 (C.I.T. Jan. 5, 2017) ("there is virtually no risk to Plaintiff that it would not be made whole should it prevail"). The balance of harms is not close.

3.     At a minimum, this Court should stay the injunction as to non-parties.  Article III requires that "a plaintiff's remedy must be 'limited to the inadequacy that produced his injury,'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018), and traditional equitable principles require that injunctions be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  The Supreme Court has thus stayed relief running solely to nonparties that was unnecessary to provide relief to the plaintiffs.  *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024).

The CIT ran roughshod over those principles, declaring that there is "no question here of narrowly tailored relief" because the tariffs would be equally unlawful as to both plaintiffs and non-plaintiffs.  A57.  The mere fact that a court might reach the same legal conclusion as to non-parties does not justify the entry of relief wholly unnecessary to remedy a plaintiff's injury.

# CONCLUSION

This Court should stay the CIT's judgment pending appeal and grant

an immediate administrative stay.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

MICHAEL S. RAAB
BRAD HINSHELWOOD

 */s/ Daniel Winik*
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*
  *Daniel.L.Winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,193 words. This motion also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik

ADDENDUM

# TABLE OF CONTENTS

Notice of Appeal, *V.O.S. Selections* (Dkt. 57)................................................... A1

Notice of Appeal, *Oregon* (Dkt. 67)................................................... A4

Judgment of the Court of International Trade (*V.O.S.* Dkt. 56) .................. A7

Opinion of the Court of International Trade (*V.O.S.* Dkt. 55).................... A10

Declarations in Opposition to Motion for a Preliminary Injunction
and Summary Judgment (*V.O.S.* Dkt. 53) .......................................... A68

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
THE HONORABLE TIMOTHY M. REIF, JUDGE
THE HONORABLE JANE A. RESTANI, JUDGE

———————————————————————

|  |  |  |
|---|---|---|
| V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) ) | Court No. 25-00066 |
| v. | ) ) |  |
| DONALD J. TRUMP in his official capacity, EXECUTIVE OFFICE OF THE PRESIDENT, THE UNITED STATES, U.S. CUSTOMS AND BORDER PROTECTION, PETE R. FLORES in his official capacity, JAMIESON GREER in his official capacity, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, and HOWARD LUTNICK in his official capacity, | ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) ) ) |  |

———————————————————————

**DEFENDANTS' NOTICE OF APPEAL**

Notice is hereby given that defendants appeal to the United States Court of Appeals for

the Federal Circuit from the Court's opinion and final judgment of May 28, 2025.  *See* ECF Nos.

55-56.


DATED: May 28, 2025                Respectfully submitted

OF COUNSEL:                    YAAKOV M. ROTH
Acting Assistant Attorney General
ALEXANDER K. HAAS
Director                        ERIC J. HAMILTON
Deputy Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Sosun Bae
SOSUN BAE
Senior Trial Counsel
LUKE MATHERS
CATHERINE M. YANG
BLAKE W. COWMAN
COLLIN T. MATHIAS
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 305-7568
sosun.bae@usdoj.gov


*Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on May 28, 2025, I caused the foregoing "NOTICE OF APPEAL"

to be filed and served electronically via the Court's CM/ECF system.

<u>/s/Claudia Burke</u>

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:      THE HONORABLE GARY S. KATZMANN, JUDGE
                    THE HONORABLE TIMOTHY M. REIF, JUDGE
                    THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) |
| | )      Court No. 25-00077 |
| v. | ) |
| | ) |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**DEFENDANTS' NOTICE OF APPEAL**

Notice is hereby given that defendants appeal to the United States Court of Appeals for

the Federal Circuit from the Court's opinion and final judgment of May 28, 2025. *See* ECF Nos.

65-66.

DATED: May 28, 2025

OF COUNSEL:

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

Respectfully submitted

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Sosun Bae
SOSUN BAE
Senior Trial Counsel
LUKE MATHERS
CATHERINE M. YANG
BLAKE W. COWMAN
COLLIN T. MATHIAS
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 305-7568
sosun.bae@usdoj.gov

*Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on May 28, 2025, I caused the foregoing "NOTICE OF APPEAL"

to be filed and served electronically via the Court's CM/ECF system.


<u>/s/ Claudia Burke</u>

### UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE; MICROKITS, LLC; FISHUSA INC.; and TERRY PRECISION CYCLING LLC;<br><br>        **Plaintiffs,**<br><br>     v.<br><br>THE UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; and HOWARD LUTNICK, in his official capacity as Secretary of Commerce;<br><br>        **Defendants.** | Before: Gary S. Katzmann, Judge<br>       Timothy M. Reif, Judge<br>       Jane A. Restani, Judge<br><br>Court No. 25-00066 |
| THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE STATE OF ILLINOIS, THE STATE OF MAINE; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; and THE STATE OF VERMONT;<br><br>        **Plaintiffs,**<br><br>     v. | Before: Gary S. Katzmann, Judge<br>       Timothy M. Reif, Judge<br>       Jane A. Restani, Judge<br><br>Court No. 25-00077 |

Court Nos. 25-00066 & 25-00077                                                    Page 2

---

**UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; KRISTI NOEM,
in her official capacity as Secretary of the
Department of Homeland Security; U.S.
CUSTOMS AND BORDER PROTECTION;
PETE R. FLORES in his official capacity as
Acting Commissioner for United States
Customs and Border Protection; and THE
UNITED STATES OF AMERICA;**

          **Defendants.**

---

## JUDGMENT

Dated: <u>May 28, 2025</u>

In accordance with the court's opinion of this date, it is hereby

**ORDERED** that Executive Order 14193, <u>Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border</u>, 90 Fed. Reg. 9113 (Feb. 1, 2025); Executive Order 14194, <u>Imposing Duties To Address the Situation at Our Southern Border</u>, 90 Fed. Reg. 9117 (Feb. 1, 2025); Executive Order 14195, <u>Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China</u>, 90 Fed. Reg. 9121 (Feb. 1, 2025); Executive Order 14257, <u>Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits</u>, 90 Fed. Reg. 15041 (Apr. 2, 2025) (collectively, the "Challenged Tariff Orders"); and all modifications and amendments thereto; be, and hereby are, declared to be invalid as contrary to law; it is further

**ORDERED** that the operation of the Challenged Tariff Orders and all modifications and amendments thereto be, and hereby is, permanently enjoined; it is further

Court Nos. 25-00066 & 25-00077                                      Page 3

 **ORDERED** that within 10 calendar days necessary administrative orders to effectuate the

permanent injunction shall issue; and it is further

 **ORDERED** that each party shall bear its own costs.

<u>By the panel.</u>

Dated: <u>May 28, 2025</u>
   New York, New York

Slip Op. 25-66

### UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE; MICROKITS, LLC; FISHUSA INC.; and TERRY PRECISION CYCLING LLC;** | |
| **Plaintiffs,** | |
| **v.** | |
| **THE UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; and HOWARD LUTNICK, in his official capacity as Secretary of Commerce;** | **Before:  Gary S. Katzmann, Judge**<br>        **Timothy M. Reif, Judge**<br>        **Jane A. Restani, Judge**<br><br>**Court No. 25-00066** |
| **Defendants.** | |

|  |  |
|---|---|
| **THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE STATE OF ILLINOIS, THE STATE OF MAINE; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; and THE STATE OF VERMONT;** | **Before: Gary S. Katzmann, Judge**<br>        **Timothy M. Reif, Judge**<br>        **Jane A. Restani, Judge**<br><br>**Court No. 25-00077** |
| **Plaintiffs,** | |
| **v.** | |

- A10 -

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; KRISTI NOEM,
in her official capacity as Secretary of the
Department of Homeland Security; U.S.
CUSTOMS AND BORDER PROTECTION;
PETE R. FLORES in his official capacity as
Acting Commissioner for United States
Customs and Border Protection; and THE
UNITED STATES OF AMERICA;

              Defendants.

## OPINION

[ The court grants Plaintiffs' Motions for Summary Judgment and denies Plaintiffs' Motions for Preliminary Injunction as moot. ]

Dated: <u>May 28, 2025</u>

<u>Jeffrey M. Schwab</u>, Liberty Justice Center, of Austin, Tex., argued for Plaintiffs V.O.S. Selections, Inc; Plastic Services and Products, LLC d/b/a Genova Pipe; MicroKits, LLC; FishUSA Inc.; and Terry Precision Cycling LLC.  With him on the briefs were <u>Reilly Stephens</u>, <u>James McQuaid</u>, <u>Bridget F. Conlan</u>, and <u>Ilya Somin</u>, Antonin Scalia Law School, George Mason University, of Arlington, Vir.

<u>Brian Simmonds Marshall</u>, Senior Assistant Attorney General, Oregon Department of Justice, of Portland, Or., argued for Plaintiffs The State of Oregon, The State of Arizona, The State of Colorado, The State of Connecticut, The State of Delaware, The State of Illinois, The State of Maine, The State of Minnesota, The State of Nevada, The State of New Mexico, The State of New York, and The State of Vermont.  With him on the briefs were <u>Dan Rayfield</u>, Attorney General of State of Oregon, <u>Benjamin Gutman</u>, Solicitor General, <u>Dustin Buehler</u>, Special Counsel, <u>Christopher A. Perdue</u>, <u>Leigh Salmon</u>, and <u>Nina R. Englander</u>, Senior Assistant Attorneys General, <u>YoungWoo Joh</u> and <u>Alexander C. Jones</u>, Assistant Attorneys General, of the State of Oregon; <u>Kristin K. Mayes</u>, Attorney General of the State of Arizona, <u>Joshua D. Bendor</u>, Solicitor General, <u>Syreeta A. Tyrell</u>, Senior Litigation Counsel, of the State of Arizona;  <u>Keith Ellison</u>, Attorney General of the State of Minnesota and <u>Peter J. Farrell</u>, Deputy Solicitor General of the State of Minnesota; <u>Philip J. Weiser</u>, Attorney General of the State of Colorado and <u>Sarah H. Weiss</u>, Senior Assistant Attorney General of the State of Colorado; <u>William Tong</u>, Attorney General of the State of Connecticut, and <u>Michael K. Skold</u>, Solicitor General of the State of Connecticut; <u>Kathleen Jennings</u>, Attorney General of the State of Delaware, and <u>Ian R. Liston</u>, Director of Impact Litigation, <u>Vanessa L. Kassab</u>, Deputy Attorney General of the Delaware Department of Justice; <u>Aaron D. Ford</u>, Attorney General of the State of Nevada, and <u>Heidi Parry Stern</u>, Solicitor General

of the Office of the Nevada Attorney General; Raúl Torrez, Attorney General of the State of New Mexico, James W. Grayson, Chief Deputy Attorney General, and Amy Senier, of the New Mexico Department of Justice; Letitia James, Attorney General of the State of New York, Rabia Muqaddam, Special Counsel for Federal Initiatives, and Mark Ladov, Special Counsel, of the State of New York; Kwame Raoul, Attorney General of the State of Illinois, Cara Hendrickson, Assistant Chief Deputy Attorney General, and Gretchen Helfrich, Deputy Chief, Special Litigation Bureau of the Office of the Illinois Attorney General; Aaron M. Frey, Attorney General of the State of Maine, and Vivian A. Mikhail, Deputy Attorney General, of the State of Maine; and Charity R. Clark, Attorney General of the State of Vermont, and Ryan P. Kane, Deputy Solicitor General of the State of Vermont.

Eric J. Hamilton, Deputy Assistant Attorney General, U.S. Department of State, of Washington, D.C., argued for Defendants The United States Of America; U.S. Customs and Border Protection; Pete R. Flores in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; Jamieson Greer, in his official capacity as United States Trade Representative; Office of the United States Trade Representative; and Howard Lutnick, in his official capacity as Secretary of Commerce. With him on the briefs were Yaakov M. Roth, Acting Assistant Attorney General, Patricia M. McCarthy, Director, Claudia Burke, Deputy Director, Justin R. Miller, Attorney-in-Charge, International Trade Office, and Sosun Bae, Senior Trial Counsel. Of counsel, Alexander K. Haas, Director, and Stephen M. Elliott, Assistant Director, U.S. Department of Justice, Civil Division, Federal Programs Branch, of Washington D.C; and Luke Mathers and Blake W. Cowman, Trial Attorneys, U.S. Department of Justice Civil Division, Commercial Litigation Branch, of Washington, D.C.

Brett A. Shumate, Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendants U.S. Department of Homeland Security; Kristi Noem, in her official capacity as Secretary of the Department of Homeland Security; U.S. Customs and Border Protection; Pete R. Flores in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and the United States. With him on the briefs were Yaakov M. Roth, Acting Assistant Attorney General, Eric J. Hamilton, Deputy Assistant Attorney General, Patricia M. McCarthy, Director, Claudia Burke, Deputy Director, Justin R. Miller, Attorney-in-Charge, International Trade Office, Sosun Bae, Senior Trial Counsel, Luke Mathers, Catherine M. Yang, Blake W. Cowman, and Collin T. Mathias, trial attorneys. Of counsel, Alexander K. Haas, Director, and Stephen M. Elliott, Assistant Director, U.S. Department of Justice, Civil Division, Federal Programs Branch, of Washington D.C.

Per Curiam: The Constitution assigns Congress the exclusive powers to "lay and collect Taxes, Duties, Imposts and Excises," and to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cls. 1, 3. The question in the two cases before the court is whether the International Emergency Economic Powers Act of 1977 ("IEEPA") delegates these powers to the President in the form of authority to impose unlimited tariffs on goods from nearly every country

Court Nos. 25-00066 & 25-00077                                              Page 4

in the world.  The court does not read IEEPA to confer such unbounded authority and sets aside

the challenged tariffs imposed thereunder.

**BACKGROUND**

I.      *Legal Background*

A.      *The Constitution*

While "Congress . . . may not transfer to another branch powers which are strictly and

exclusively legislative . . . Congress . . . may confer substantial discretion . . . to implement and

enforce the laws." Gundy v. United States, 588 U.S. 128, 135 (2019) (internal quotation marks

and citation omitted).  Thus, courts have consistently upheld statutory delegations as long as

Congress "lay[s] down by legislative act an intelligible principle to which the person or body

authorized to [exercise that authority] is directed to conform." Mistretta v. United States, 488 U.S.

361, 372 (1989) (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)).

This reflects the idea that in modern government, "[t]he legislative process would frequently bog

down if Congress were constitutionally required to appraise before-hand the myriad situations to

which it wishes a particular policy to be applied and to formulate specific rules for each situation."

American Power & Light Co. v. SEC, 329 U.S. 90, 105 (1946).

B.      *Tariffs*

Early in the nation's history, tariffs were a key means by which the federal government

raised money to pay wages and to fund the national debt.  See John M. Dobson, Two Centuries of

Tariffs: The Background and Emergence of the U.S. International Trade Commission 6 (U.S. Int'l

Trade Comm'n 1976).  The revenue-raising purpose of tariffs has declined significantly since the

ratification of the Sixteenth Amendment in 1913 permitted the imposition of income taxes.  See

id. at 1, 70.  Since then, and with the increasing complexity and interconnectedness of the global

economic landscape, tariffs have served more diverse purposes including restricting the importation of certain goods, protecting American industry, and leveraging negotiations with foreign counterparts.  See, e.g., id. at 80 (describing the use of tariffs to restrict Japanese textile imports).

As global economic relations grew in volume and complexity, Congress saw a need for specialized, nonpartisan assistance in administering tariffs.  See id. at 87.  Congress accordingly passed legislation creating the United States Tariff Commission, later renamed the United States International Trade Commission ("ITC").  See id.; Revenue Act of 1916, Pub. L. 64-271, §§ 700–09, 39 Stat. 756, 795–98.  To provide this assistance, the Commission "shall have the power to investigate the tariff relations between the United States and foreign countries, commercial treaties, . . . the volume of importations compared with domestic production and consumption, and conditions, causes, and effects relating to competition of foreign industries with those of the United States."  19 U.S.C. § 1332.  The ITC is responsible for maintaining the United States Harmonized Tariff Schedule ("HTSUS"), which sets tariff rates for all merchandise imported into the United States.  See id. § 1202.  The HTSUS itself "is indeed a statute but is not published physically in the United States Code."  Libas, Ltd. v. United States, 193 F.3d 1361, 1364 (Fed. Cir. 1999).  Congress's enactment of the HTSUS provided that its terms "shall be considered to be statutory provisions of law for all purposes."  Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1204(c)(1), 102 Stat. 1107, 1149.

In addition to forming the ITC, Congress has responded to the growing complexity of global economic relations by delegating trade authority to the President.  These delegations have included clear limitations that retain legislative power over the imposition of duties and over

Court Nos. 25-00066 & 25-00077                                              Page 6

foreign commerce.  See, e.g., Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 305

(1933) ("What is done by the Tariff Commission and the President in changing the tariff rates to

conform to new conditions is in substance a delegation, though a permissible one, of the legislative

process.").

　　　　For example, in 1962, Congress delegated to the President the power to take action to adjust

imports when the Secretary of Commerce finds that an "article is being imported into the United

States in such quantities or under such circumstances as to threaten to impair the national security."

Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232(b), 76 Stat. 872, 877 (codified as

amended at 19 U.S.C. § 1862(c)(1)(A)).  This delegation is conditioned upon an investigation and

findings by the Secretary of Commerce, and agreement by the President.  See id.  Section 301 of

the Trade Act of 1974, as amended, requires that the U.S. Trade Representative ("USTR") take

action, which may include imposing tariffs, where "the rights of the United States under any trade

agreement are being denied" or "an act, policy, or practice of a foreign country" is "unjustifiable

and burdens or restricts United States commerce."  19 U.S.C. § 2411(a)(1)(A)–(B).  The USTR

may impose duties also where the USTR determines that "an act, policy, or practice of a foreign

country is unreasonable or discriminatory and burdens or restricts United States commerce."  Id.

§ 2411(b)(1).  This power is conditioned on extensive procedural requirements including an

investigation that culminates in an affirmative finding that another country imposed unfair trade

barriers under § 2411(a)(1)(A) or (B) or § 2411(b), and a public notice and comment period.  See

id. § 2414(b).

### C.    Presidential Authority to Regulate Importation During National Emergencies

In 1917, Congress passed the Trading with the Enemy Act ("TWEA") to grant the President powers to regulate international transactions with enemy powers following the entry of the United States into World War I.  See Trading with the Enemy Act, Pub. L. No. 65-91, § 2, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. §§ 4301 to 4341); see also Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45168, The International Emergency Economic Powers Act: Origins, Evolution, and Use 2–3 (2024).  The Great Depression then led Congress to expand the President's authority under TWEA to declare states of emergency and exercise authority over international trade even outside times of war.   See Emergency Banking Relief Act, Pub. L. No. 73-1, § 2, 48 Stat. 1, 1–2 (1933) (amending TWEA).  TWEA, as amended, grants the President the broad authority to "regulate . . . importation or exportation of . . . any property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 4305(b)(1)(B).

In 1974, the United States Customs Court, the predecessor to the United States Court of International Trade, heard a challenge to President Nixon's imposition of a supplemental duty on all dutiable merchandise imported into the United States.  See Yoshida Int'l, Inc. v. United States, 378 F. Supp. 1155 (1974) ("Yoshida I"); see also Proclamation No. 4074, Imposition of Supplemental Duty for Balance of Payments Purpose, 85 Stat. 926 (Aug. 15, 1971).  The Government argued that President Nixon's actions were lawfully authorized by TWEA.  Yoshida I, 378 F. Supp. at 1157.  The U.S. Customs Court construed TWEA "so as to preserve its constitutionality" and held that TWEA "precludes the President from laying the supplemental duties provided by [President Nixon]."  Id. at 1173.  The United States Court of Customs and Patent Appeals, the predecessor to the United States Court of Appeals for the Federal Circuit

("Federal Circuit"), reversed the lower court's decision, holding that President Nixon's duties were "within the power constitutionally delegated to him." United States v. Yoshida Int'l. Inc., 526 F.2d 560, 584 (C.C.P.A. 1975) ("Yoshida II"). The court reasoned that "Congress, in enacting [TWEA], authorized the President, during an emergency, to exercise the delegated substantive power, i.e., to 'regulate importation,' by imposing an import duty surcharge or by other means appropriately and reasonably related . . . to the particular nature of the emergency declared." Id. at 576.

Shortly after this decision and following a review by a Senate bipartisan special committee, Congress reformed the President's emergency powers. As part of this reform, Congress cabined the President's powers under TWEA to wartime. See Amendments to the Trading with the Enemy Act, Pub. L. No. 95-223, § 101–03, 91 Stat. 1625, 1625–26 (1977) ("[TWEA] is amended by striking out 'or during any other period of national emergency declared by the President' in the text preceding subparagraph (A)."). Congress also enacted a new statute, IEEPA, to confer "upon the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to more procedural limitations, including those of the National Emergencies Act." Comm. on Int'l Rels., Trading with the Enemy Act Reform Legislation, H.R. Rep. No. 95-459, at 2 (1977); see also International Emergency Economic Powers Act, Pub. L. No. 95-223, § 201–08, 91 Stat. 1625, 1626–29 (1977) (codified as amended at 50 U.S.C. §§ 1701–10). Congress drew much of the relevant language in IEEPA from TWEA, including language authorizing the President to "regulate . . . importation . . . of . . . any property in which any foreign country or a national thereof has any interest by any person . . . subject to the jurisdiction of the United States . . . ." 50 U.S.C. § 1702(a)(1)(B). In full, the relevant provision

of IEEPA provides that the President may:

> (A) investigate, regulate, or prohibit—
>
>> (i) any transactions in foreign exchange,
>>
>> (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
>>
>> (ii) the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States;
>
> (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

Id. § 1702.  IEEPA further provides that these authorities "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose."  Id. § 1701(b).

### D.     The National Emergencies Act

As part of Congress's reform of the President's emergency powers and in addition to amending TWEA and enacting IEEPA, Congress enacted the National Emergencies Act ("NEA") in 1976.  See National Emergencies Act, Pub. L. No. 94-412, § 201, 90 Stat. 1255, 1255–56 (1976) (codified as amended at 50 U.S.C. § 1622).  That act provided for the termination of all existing emergencies in 1978, except those making use of TWEA, and placed new restrictions on the declaration of emergencies.  Id.  First, the NEA requires the President to transmit to Congress a notification of the declaration of a national emergency.  Id.  Second, the act requires a biannual review whereby "each House of Congress shall meet to consider a vote on a . . . resolution to

determine whether that emergency shall be terminated." Id.  At the time of its enactment in 1976, the NEA afforded Congress the means to terminate a national emergency by adopting a concurrent resolution in each chamber.  See id.  However, the Supreme Court later found Congress's use of unicameral legislative vetoes, which terminated executive determinations without presentment, to be unconstitutional.  See INS v. Chadha, 462 U.S. 919 (1983).  Congress subsequently amended the NEA to require a joint resolution rather than a concurrent resolution to align the statutory scheme with the implicit logic of Chadha.  See Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 801, 98 Stat. 405, 448 (1985) (codified as amended at 50 U.S.C. § 1622).  Following Chadha, congressional action terminating a national emergency is still subject to presidential veto, making congressional review no more than the ordinary power to legislate.

## II.    Factual Background

Since taking office on January 20, 2025, the President has declared several national emergencies and imposed various tariffs in response.  The President has subsequently issued a number of pauses and modifications to those tariffs, as outlined in detail below.

### A.    Trafficking Tariffs

On the date of his inauguration, the President issued Executive Order 14157, declaring a national emergency under IEEPA to deal with the threats posed by international cartels that "have engaged in a campaign of violence and terror throughout the Western Hemisphere that has not only destabilized countries with significant importance for our national interests but also flooded the United States with deadly drugs, violent criminals, and vicious gangs."  Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, 90 Fed. Reg. 8439, 8439 (Jan. 20, 2025).  The President

Court Nos. 25-00066 & 25-00077                                         Page 11

issued Proclamation 10886 on the same day, declaring a national emergency at the southern border caused by "cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans." Proclamation 10886, Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025).

Shortly thereafter, the President expanded the national emergency "to cover the threat to the safety and security of Americans, including the public health crisis of deaths due to the use of fentanyl and other illicit drugs, and the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." Executive Order 14193, Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9113, 9114 (Feb. 1, 2025) ("Canada Tariff Order"). Similarly, the President expanded the national emergency "to cover the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9121, 9122 (Feb. 1, 2025) ("China Tariff Order").

In response to these emergencies, the President imposed 25 percent ad valorem duties on articles that are products of Canada and Mexico, see Executive Order 14193, 90 Fed. Reg. at 9114; Executive Order 14194, Imposing Duties to Address the Situation at Our Southern Border, 90 Fed. Reg. 9117, 9118 (Feb. 1, 2025) ("Mexico Tariff Order"), and a 10 percent ad valorem duty on articles that are the products of China, see Executive Order 14195, 90 Fed. Reg. at 9122. The President imposed a lower 10 percent ad valorem rate on energy and energy resources from

Canada.  See Executive Order 14193, 90 Fed. Reg. at 9114.  These duties were to take effect on February 4, 2025.  See id.  The President later raised the trafficking tariffs on Chinese products from 10 percent to 20 percent.  See Executive Order 14228, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 11463, 11463 (Mar. 3, 2025).

On February 3, shortly after imposing the trafficking tariffs, the President issued two additional executive orders, finding that the governments of Mexico and Canada "ha[ve] taken immediate steps designed to alleviate the illegal migration and illicit drug crisis through cooperative actions."  Executive Order 14198, Progress on the Situation at Our Southern Border, 90 Fed. Reg. 9185, 9185 (Feb. 3, 2025); Executive Order 14197, Progress on the Situation at Our Northern Border, 90 Fed. Reg. 9183, 9183 (Feb. 3, 2025).  As a result, the President imposed a pause on the 25 percent duties on Mexican and Canadian products and on the 10 percent duties on Canadian energy and energy resources, moving the effective date of those duties to March 4, 2025.  See id.

Since the trafficking tariffs took effect on February 4 for China and March 4 for Canada and Mexico, the President has modified the rates further.  The President lowered the duty rate for potash[1] from Canada and Mexico to 10 percent.  See Executive Order 14231, Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 11785, 11785 (Mar. 6, 2025); Executive Order 14232, Amendment to Duties To Address the Flow of

---

[1] Potash is a soluble source of potassium and is primarily used as an agricultural fertilizer.  See National Minerals Information Center, Potash Statistics and Information, U.S. Geological Service, https://www.usgs.gov/centers/national-minerals-information-center/potash-statistics-and-information (last visited May 28, 2025).

Illicit Drugs Across Our Southern Border, 90 Fed. Reg. 11787, 11787 (Mar. 6, 2025). Additionally, the President implemented duty-free de minimis treatment for otherwise eligible covered articles. See Executive Order 14226, Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 11369, 11369 (Mar. 2, 2025); Executive Order 14227, Amendment to Duties to Address the Situation at Our Southern Border, 90 Fed. Reg. 11371, 11371 (Mar. 2, 2025); Executive Order 14200, Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9277, 9277 (Feb. 5, 2025). The President later removed this duty-free de minimis treatment for Chinese products. See Executive Order 14256, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports, 90 Fed. Reg. 14899, 14899 (Apr. 2, 2025).

Currently, the trafficking tariffs all remain in place, set at 25 percent for Mexican and Canadian products and at 20 percent for Chinese products. The tariffs on Canadian energy and energy resources remain at the lower 10 percent rate. All of these tariffs, including the modifications listed here, are hereafter referred to as the "Trafficking Tariffs."

### B.     Worldwide and Retaliatory Tariffs

On April 2, 2025, the President issued Executive Order 14257, invoking IEEPA to impose a general 10 percent ad valorem duty on "all imports from all trading partners," which "shall increase for" a list of 57 countries to higher rates ranging from 11 percent to as high as 50 percent ad valorem. Executive Order 14257, Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90 Fed. Reg. 15041, 15045 (Apr. 2, 2025). The President imposed these tariffs in response to a national emergency with respect to "underlying conditions, including a lack of reciprocity in our

Court Nos. 25-00066 & 25-00077                                          Page 14

bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners'

economic policies that suppress domestic wages and consumption, as indicated by large and

persistent annual U.S. goods trade deficits." Id. at 15041. The President stated that these "large

and persistent annual U.S. goods trade deficits" constitute an "unusual and extraordinary threat to

the national security and economy of the United States," having "its source in whole or substantial

part outside the United States in the domestic economic policies of key trading partners and

structural imbalances in the global trading system." Id. On April 9, 2025, the President issued

another Executive Order that paused, for all countries but China, the implementation of the higher

country-specific tariffs for 90 days, moving their effective date to July 9, 2025. See Executive

Order 14266, Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and

Alignment, 90 Fed. Reg. 15625, 15626 (Apr. 9, 2025).

      As China responded to the various country-specific tariff adjustments by adjusting its own

tariff rates on U.S. goods, the President has amended the duty rate on Chinese goods several times

in retaliation. The President first increased the China-specific duty rate from 34 to 84 percent

effective April 8, see Executive Order 14259, Amendment to Reciprocal Tariffs and Updated

Duties as Applied to Low-Value Imports From the People's Republic of China, 90 Fed. Reg.

15509, 15509 (Apr. 8, 2025), and then from 84 to 125 percent effective April 10, 2025, see

Executive Order 14266, 90 Fed. Reg. at 15626.

      Currently, the worldwide tariffs remain in place at 10 percent for all countries, while the

country-specific higher rates are set to take effect on July 9, 2025. The China-specific rate is now

Court Nos. 25-00066 & 25-00077                                                    Page 15

also at 10 percent[2] after President Trump lowered the 125 percent retaliatory tariffs in response to China, taking "a significant step . . . toward remedying non-reciprocal trade arrangements and addressing the concerns of the United States relating to economic and national security matters." Executive Order 14298, Modifying Reciprocal Tariff Rates To Reflect Discussions With the People's Republic of China, 90 Fed. Reg. 21831, 21831 (May 12, 2025). This lower rate is effective until August 12, 2025. See id. All of these tariffs, including the modifications listed here, are hereafter referred to as the "Worldwide and Retaliatory Tariffs."

### III.    Procedural Background

The V.O.S. Plaintiffs brought an action against Defendants the United States, the President, and certain agencies and officials (collectively, "the Government") on April 14, 2025, challenging the President's imposition of the Worldwide and Retaliatory Tariffs in Executive Orders 14257 and 14266. See Compl., V.O.S. v. United States, No. 25-00066, Apr. 14, 2025, ECF No. 2 ("V.O.S. Compl."), and subsequently filed an application for a temporary restraining order alongside motions for preliminary injunction and summary judgment. See Application for TRO & Mot. for Prelim. Inj., and or Summ. J., V.O.S. v. United States, No. 25-00066, Apr. 18, 2025, ECF No. 10 ("Pls.' V.O.S. Mots."). After the court denied the motion for a temporary restraining order, see Order Denying TRO, V.O.S. v. United States, No. 25-00066, Apr. 22, 2025, ECF No. 13, the Government filed its combined response, see Resp. in Opp'n to Mot. for Summ. J. and Prelim. Inj., V.O.S. v. United States, No. 25-00066, Apr. 29, 2025, ECF No. 32 ("Gov't Resp. to V.O.S. Mots."), and the V.O.S. Plaintiffs replied on May 6, 2025, see Reply in Supp. of Mots. for

---

[2] This 10 percent rate is in addition to the 20 percent Trafficking Tariff addressed above. The total rate on Chinese goods is thus currently set at 30 percent (subject to various exemptions not discussed here).

Prelim. Inj. and Summ. J., <u>V.O.S. v. United States</u>, No. 25-00066, May 6, 2025, ECF No. 35 ("Pls.'

<u>V.O.S.</u> Reply").[3]

      After the <u>V.O.S.</u> Plaintiffs filed their motions and during briefing in that case, the State

Plaintiffs brought a similar action against the Government on April 23, 2025, challenging the

President's Worldwide and Retaliatory Tariffs along with the President's imposition of Trafficking

Tariffs in Executive Orders 14193, 14194, and 14195.  <u>See</u> Compl., <u>Oregon v. United States</u>, No.

25-00077, Apr. 23, 2025, ECF No. 2 ("<u>Oregon</u> Compl.").   The plaintiffs in <u>Oregon</u> ("State

Plaintiffs") filed their own motion for preliminary injunction on May 7, 2025, <u>see</u> Or. Pls.' Mot.,

<u>Oregon v. United States</u>, No. 25-00077, May 7, 2025, ECF No. 14 ("Pls.' <u>Oregon</u> Mot.").  The

court construed the State Plaintiffs' motion for preliminary injunction as a motion for summary

judgment, <u>see</u> Order Construing Mot. for Prelim. Inj. as Mot. for Summ. J., <u>Oregon v. United

States</u>, No. 25-00077, May 8, 2025, ECF No. 18, the State Plaintiffs filed a supplemental brief, <u>see</u>

Supp'l Resp. to Mot. for Summ. J., <u>Oregon v. United States</u>, No. 25-00077, May 13, 2025, ECF

No. 32 ("Pls.' <u>Oregon</u> Supp'l Br."), the Government responded, <u>see</u> Gov't Resp. in Opp'n to Mot.

for Summ. J., <u>Oregon v. United States</u>, No. 25-00077, May 16, 2025, ECF No. 41, and the State

Plaintiffs replied, <u>see</u> Reply in Supp. of Summ. J., <u>Oregon v. United States</u>, No. 25-00077, May

20, 2025, ECF No. 47 ("Pls.' <u>Oregon</u> Reply").  The Government filed an amended response shortly

thereafter.  <u>See</u> Order for Amended Resp., May 17, 2025, <u>Oregon v. United States</u>, No. 25-00077,

ECF No. 42; Amended Resp., <u>Oregon v. United States</u>, No. 25-00077, May 19, 2025, ECF No. 46

---

[3] Several entities filed amicus briefs in support of the Plaintiffs in <u>V.O.S.</u>  <u>See</u> Amici Curiae Br.,
<u>V.O.S. v. United States</u>, No. 25-00066, Apr. 28, 2025, ECF No. 31 ("Legal Scholars Amicus Br.");
Mot. for Leave to File an Amici Curiae Br., <u>V.O.S. v. United States</u>, No. 25-00066, May 12, 2025,
ECF No. 49 ("Princess Awesome Amicus Br."); Amicus Curiae Br., <u>V.O.S. v. United States</u>, No.
25-00066, May 9, 2025, ECF No. 44 ("Inst. for Pol. Integrity Amicus Br.").

Court Nos. 25-00066 & 25-00077                                              Page 17

("Gov't Resp. to <u>Oregon</u> Mots.").[4]  The court held oral argument in <u>V.O.S.</u> on Tuesday, May 13, 2025, and in <u>Oregon</u> on Wednesday, May 21, 2025.

### JURISDICTION

The Court of International Trade has exclusive jurisdiction to hear this action under 28 U.S.C. § 1581(i), which gives the court:

> exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for--
>
> (A) revenue from imports or tonnage;
>
> (B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;
>
> (C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or
>
> (D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section.

<u>Id.</u> § 1581(i)(1); <u>see also</u> <u>id.</u> § 1337(c) ("The district courts shall not have jurisdiction under this section of any matter within the exclusive jurisdiction of the Court of International Trade . . . .").

Here, the plaintiffs in both cases (collectively, "Plaintiffs") challenge tariffs imposed by the President under IEEPA, which provides that the President, under certain conditions and with some

---

[4] Several entities filed amicus briefs in support of the Plaintiffs in <u>Oregon</u>.  <u>See</u> Amicus Curiae Br., <u>Oregon v. United States</u>, No. 25-00077, May 16, 2025, ECF No. 40 ("Members of Congress Amicus Br."); Amicus Curiae Br., <u>Oregon v. United States</u>, No. 25-00077, May 15, 2025, ECF No. 38 ("Cal. Amicus Br."); Amicus Curiae Br., <u>Oregon v. United States</u>, No. 25-00077, May 20, 2025, ECF No. 53 ("Wash. Amicus Br.").  One party filed an amicus brief in support of the Government in <u>Oregon</u>.  <u>See</u> Amicus Curiae Br., <u>Oregon v. United States</u>, No. 25-00077, May 20, 2025, ECF No. 51 ("America First Legal Found. Amicus Br.").

Court Nos. 25-00066 & 25-00077                                              Page 18

elsewhere-enumerated exceptions, may:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B).  The challenged Executive Orders, in turn, invoke this statute to impose tariffs (alternatively referred to as "duties") on merchandise from both specific countries and a list that includes "all trading partners" of the United States.  See, e.g., Executive Order 14266, 90 Fed. Reg. at 15645.  The Executive Orders made amendments to the HTSUS, which are set forth in subheading 9903.01.  The HTSUS is the law of the United States setting tariffs.[5]

For the purpose of locating jurisdiction under 28 U.S.C. § 1581(i), an action involving a challenge to a presidential action that imposes tariffs, duties, or other import restrictions is one that arises from a "law providing for" those measures.  See Luggage & Leather Goods Mfrs. of Am., Inc. v. United States, 7 CIT 258, 267, 588 F. Supp. 1413, 1419–21 (1984); U.S. Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 200–01, 544 F. Supp. 883, 886 (1982), aff'd, 683 F.2d 399 (C.C.P.A. 1982); see also 28 U.S.C. § 255 (contemplating "civil action[s]" falling under this court's jurisdiction that "raise[] . . . issue[s] of the constitutionality of . . . a proclamation of the

---

[5] This does not mean that Plaintiffs' ultra vires claims must instead route through 28 U.S.C. § 1581(a), which provides for "any civil action commenced to contest the denial of a protest" to "the . . . amount of duties chargeable" on an entry, 19 U.S.C. § 1514(a)(2).  As the Supreme Court has explained, "protests are not pivotal" in circumstances where Customs operates under a binding external directive—as where "Customs performs no active role, it undertakes no analysis or adjudication, issues no directives, imposes no liabilities; instead, Customs merely passively collects . . . payments."  United States v. U.S. Shoe Corp., 523 U.S. 360, 365 (1998) (internal quotation marks, alterations, and citation omitted).

President or an Executive order"). The Federal Circuit has confirmed that presidential action creates an appropriate basis for (i) jurisdiction, noting without disapproval that there are "numerous cases in which the Court of International Trade has . . . considered challenges to the actions of the President pursuant to the grant of jurisdiction in § 1581(i)." Humane Soc'y of United States v. Clinton, 236 F.3d 1320, 1327 (Fed. Cir. 2001) (citing, inter alia, Luggage & Leather Goods, 7 CIT 258, 588 F. Supp. 1413 and U.S. Cane Sugar Refiners' Ass'n, 3 CIT 196, 544 F. Supp. 883).

This means that Plaintiffs' various challenges to the presidential actions here, successful or not, fall under this court's exclusive jurisdiction. And while "section 1581(i) does not authorize proceedings directly against the President," meaning the President must be dismissed from the two cases before the court, Corus Grp. PLC. v. ITC, 352 F.3d 1351, 1359 (Fed. Cir. 2003), the court retains "jurisdiction to consider challenges to the President's actions in suits against subordinate officials who are charged with implementing the presidential directives," USP Holdings, Inc. v. United States, 36 F.4th 1359, 1366 (Fed. Cir. 2022). That group covers the rest of the named Defendants in both cases. All relief will run against the United States and its "officers," a category which for jurisdictional purposes does not include the President. See 28 U.S.C. § 1581(i).

## STANDING

Article III of the Constitution requires plaintiffs in federal court to have standing to sue.[6] "[T]he plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and

---

[6] The Government does not appear to contest statutory or "prudential" standing, which unlike Article III standing can be waived. See Brooklyn Brewery Corp. v. Brooklyn Brew Shop, 17 F.4th 129, 140 (Fed. Cir. 2021).

likely to be redressed by the lawsuit." Biden v. Nebraska, 600 U.S. 477, 489 (2023) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). "A plaintiff may establish its injury-in-fact 'in the same way as any other matter on which the plaintiff bears the burden of proof.'" Canadian Lumber Trade All. v. United States, 517 F.3d 1319, 1333 (Fed. Cir. 2008) (quoting Lujan, 504 U.S. at 561).

## I.    *Article III Standing of V.O.S. Plaintiffs*

A non-importer plaintiff may "fairly employ economic logic" to establish a concrete and particularized injury-in-fact that is fairly traceable to a challenged tariff. Id. at 1333. A plaintiff that takes that route must show that the challenged tariff is "likely to cause [the plaintiff] an economic injury," and that "this injury would be prevented by a declaratory judgment and injunction" setting that tariff aside. Id. at 1334. The V.O.S. Plaintiffs have done so here.

The businesses that bring the V.O.S. action—V.O.S. Selections, Genova Pipe, MicroKits, FishUSA, and Terry Cycling—allege and aver[7] that they have suffered (and will continue to suffer) economic injuries as a result of the Worldwide and Retaliatory Tariffs. See V.O.S. Compl. ¶¶ 52–56. V.O.S. alleges that the Worldwide and Retaliatory Tariffs have occasioned difficulties with sourcing and pricing, and also that "[t]he reduction in cash flow caused by increased tariffs also necessarily reduces the company's inventory and the level of business that V.O.S. can conduct, leading to an overall reduction in purchase orders placed with both foreign

---

[7] To establish standing at the summary judgment stage, a plaintiff "must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." Lujan, 504 U.S. at 561 (internal quotation marks and citation omitted). Executives of the various V.O.S. Plaintiffs have submitted declarations with their companies' motions. See Pls.' V.O.S. Mots. at Exs. A–E (Decls. of Victor Schwartz, Andrew Reese, David Levi, Dan Pastore, & Nikolaus Holm).

Court Nos. 25-00066 & 25-00077                                                    Page 21

and domestic suppliers." <u>Id.</u> ¶ 52.  Its CEO avers in a declaration that "[t]ariffs must be paid by

V.O.S. upon arrival at the Port of New York, putting a large, immediate, strain on its cash flow."

Schwartz Decl. ¶ 25.  Genova Pipe alleges major sourcing problems stemming from the

Worldwide Tariffs, and also that "[t]he tariffs will directly increase the cost of raw materials,

manufacturing equipment, and resale goods imported from abroad by Genova Pipe." <u>V.O.S.</u>

Compl. ¶ 53; <u>see generally</u> Reese Decl.  MicroKits alleges that "[a]t the current rates" of the

Worldwide and Retaliatory Tariffs it "cannot order parts from China and will have to pause

operations when it runs out of parts," and also that as a result it "will likely be unable to pay its

employees, will lose money, and as a result may go out of business." <u>V.O.S.</u> Compl. ¶ 54; <u>see also</u>

Levi Decl. ¶ 13.  FishUSA alleges that "[t]he tariffs have caused [it] to delay shipment of finished

goods from China due to the unpredictability of the tariff rate that will be imposed when the

product arrives, and [that] it has also paused production of some products," and states that these

conditions inhibit its business growth. <u>V.O.S.</u> Compl. ¶ 55; <u>see generally</u> Pastore Decl.  Terry

Cycling alleges that it "has already paid $25,000 in unplanned tariffs this year for goods for which

Terry was the importer of record," and "projects that the tariffs will cost the company

approximately $250,000 by the end of 2025." <u>V.O.S.</u> Compl. ¶ 56; <u>see generally</u> Holm Decl.

     These allegations and declarations establish the Article III standing of all <u>V.O.S.</u> Plaintiffs.

While the Government objects that "no plaintiff has offered evidence that it has <u>actually paid</u> tariffs

pursuant to the Executive Orders," Gov't Resp. to <u>V.O.S.</u> TRO Application at 17, Apr. 21, 2025,

ECF No. 12, the Government does not meaningfully contest the "economic logic" tracing the

Worldwide and Retaliatory Tariffs to the <u>V.O.S.</u> Plaintiffs' showings of downstream harm. <u>See</u>

<u>Canadian Lumber</u>, 517 F.3d at 1333.

Court Nos. 25-00066 & 25-00077                                             Page 22

While the Government further objects that "[a]t the very least, the Court should hold that FishUSA and MicroKits lack standing, given that they do not even allege that they intend to import articles subject to the tariffs within any particular period of time," Gov't Resp. to <u>V.O.S.</u> TRO Application at 18, this point rests on an unsupported import-only rule of standing.[8]  To suffer an economic injury from a tariff it is not necessary to incur direct liability to Customs, or even to directly import an article of dutiable merchandise.  Fair traceability is more flexible than that.  <u>See</u> <u>Invenergy Renewables LLC v. United States</u>, 43 CIT __, __, 422 F. Supp. 3d 1255, 1273 (2019) ("The court determines that this 'economic logic' applies here: the duty on bifacial panels will increase—and, with it, likely Plaintiffs' costs—if the <u>Withdrawal</u> goes into effect.").  Here, injuries like (1) the prohibitively high price of operationally necessary components, <u>see</u> Levi Decl., and (2) the stoppage of orders and product production, <u>see</u> Pastore Decl., are "concrete and imminent harm[s] to a legally protected interest, like property or money—that [are] fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  <u>Biden v. Nebraska</u>, 600 U.S. at 489.

## II.    *Article III Standing of State Plaintiffs*

The standing inquiry is even simpler for the State Plaintiffs.  The State Plaintiffs allege "direct financial harm" from the challenged tariffs' impact on the cost of imported goods that are "essential" to the states' provision of public services, <u>see</u> <u>Oregon</u> Compl. ¶¶ 94–112, and also from

---

[8] Responding to the State Plaintiffs' Motions, the Government argues that "[w]hile importers have standing to challenge tariffs, purchasers of imported goods do not."  Gov't Resp. to <u>Oregon</u> Mots. at 11.  For that proposition the Government quotes <u>Totes-Isotoner Corp. v. United States</u>, where the Federal Circuit held that "purchasers have no remedy to challenge the tariff classification." 594 F.3d 1346, 1352 (Fed. Cir. 2010).  This reference to a lack of a remedy, however, had nothing to do with the purchasers' Article III standing.  It instead had to do with the fact that a purchaser could not have "sought a refund of duties" that it never paid to Customs, a fact that in turn supported an importer's claim of third-party standing on the purchaser's behalf.  <u>See id.</u> at 1350.

their impact on "Plaintiff States' ability to procure goods and services and to budget for and audit

price adjustments," id. ¶ 114.

The Government implicitly concedes that Oregon, Arizona, Colorado, and Connecticut are

"importers who have personally paid tariffs" who thus "have standing to challenge tariffs." Gov't

Resp. to Oregon Mots. at 11. The Government is right to make this concession: challenged conduct

that "directly injures" a state can also "confer[] standing on that State." Biden v. Nebraska, 600

U.S. at 489. And an importer's allegation that it pays unlawful U.S. duties "typically would satisfy

constitutional standing requirements." Totes-Isotoner, 594 F.3d at 1351.

Since "[i]f at least one plaintiff has standing, the suit may proceed," Biden v. Nebraska,

600 U.S. at 489 (citation omitted), there is no need to go further. The State Plaintiffs seek only

broad injunctive and declaratory relief. That means that even if the non-importer states among

them were to hypothetically lack standing, the contours of available relief would not change. See

Oregon Compl. at 35–36.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT

R. 56(a).

28 U.S.C. § 2640(e) provides that "[i]n any civil action not specified in this section," which

includes actions under 28 U.S.C. § 1581(i), "the Court of International Trade shall review the

matter as provided in section 706 of title 5." This references the "[s]cope of review" section of

the Administrative Procedure Act ("APA"), codified at 5 U.S.C. § 706, which provides that "[t]he

reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions

Court Nos. 25-00066 & 25-00077                                                    Page 24

found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

       28 U.S.C. § 2640(e) does not address what happens when an action under 28

U.S.C. § 1581(i) challenges actions by the President, which unlike agency actions "are not subject

to [the APA's] requirements." Franklin v. Massachusetts, 505 U.S. 788, 800–01 (1992).  But the

court "presume[s] that review is available when a statute is silent," Patel v. Garland, 596 U.S. 328,

346 (2022).  Also, "claims that the President's actions violated the statutory authority delegated to

him . . . are reviewable."  USP Holdings, 36 F.4th at 1365.  The Federal Circuit has observed that

"[i]t is enough to say that some non-APA review remains available for constitutional issues,

questions about the scope of statutory authority, and compliance with procedural requirements."

Am. Inst. for Int'l Steel, Inc. v. United States, 806 F. App'x 982, 991 (Fed. Cir. 2020)

(nonprecedential); see also Florsheim Shoe Co. v. United States, 744 F.2d 787, 795 (Fed. Cir.

1984) ("[T]he Executive's decisions in the sphere of international trade are reviewable only to

determine whether the President's action falls within his delegated authority, whether the statutory

language has been properly construed, and whether the President's action conforms with the

relevant procedural requirements."); Maple Leaf Fish Co. v. United States, 762 F.2d 86, 89 (Fed.

Cir. 1985) ("For a court to interpose, there has to be a clear misconstruction of the governing

statute, a significant procedural violation, or action outside delegated authority."); United States

v. Sears, Roebuck & Co., 20 C.C.P.A. 295, 305 (1932) (reviewing the President's issuance of a

proclamation "for the purpose of determining whether he has exceeded the powers delegated to

him.").

As it undertakes this review function, "[t]he Court of International Trade shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States." 28 U.S.C. § 1585.

## DISCUSSION

Underlying the issues in this case is the notion that "the powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other departments." Federalist No. 48 (James Madison). Because of the Constitution's express allocation of the tariff power to Congress, see U.S. Const. art. I, § 8, cl. 1, we do not read IEEPA to delegate an unbounded tariff authority to the President. We instead read IEEPA's provisions to impose meaningful limits on any such authority it confers. Two are relevant here. First, § 1702's delegation of a power to "regulate . . . importation," read in light of its legislative history and Congress's enactment of more narrow, non-emergency legislation, at the very least does not authorize the President to impose unbounded tariffs. The Worldwide and Retaliatory Tariffs lack any identifiable limits and thus fall outside the scope of § 1702. Second, IEEPA's limited authorities may be exercised only to "deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . and may not be exercised for any other purpose." 50 U.S.C. § 1701(b) (emphasis added). As the Trafficking Tariffs do not meet that condition, they fall outside the scope of § 1701.

### I.    50 U.S.C. § 1702 Does Not Authorize the Worldwide and Retaliatory Tariffs

Plaintiffs in both cases argue that the words "regulate . . . importation" do not confer the power to impose tariffs. See Pls.' V.O.S. Reply at 3; Pls.' Oregon Mot. at 15. Any other interpretation, according to Plaintiffs, would run afoul of both the nondelegation doctrine and the major questions doctrine. See Pls.' V.O.S. Mot at 15; Pls.' Oregon Mot. at 18–19. The

Government counters that the words "regulate . . . importation" have the same meaning that they did in TWEA, an older statute that was found to delegate a power to impose tariffs.  See Gov't Resp. to V.O.S. Mots. at 17–19; Gov't Resp. to Oregon Mots. at 17–18.

Plaintiffs are correct in the narrow sense that the imprecise term "regulate . . . importation," under any construction that would comport with the separation-of-powers underpinnings of the nondelegation and major questions doctrines, does not authorize anything as unbounded as the Worldwide and Retaliatory Tariffs.  See Jennings v. Rodriguez, 583 U.S. 281, 286 (2018) ("[W]hen statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead . . . adopt an alternative that avoids those problems.").  The court in Yoshida II recognized that a case involving a claim to such unlimited authority might arise, observing that "[w]hether a delegation of such breadth as to have authorized [the tariffs here] would be constitutionally embraced, is determined . . . by the nature of the particular surcharge herein and its relationship to other statutes, as well as by its relationship to the particular emergency confronted."  526 F.2d at 576–77; see also Proclamation No. 4074, 85 Stat. 926.  That case has arisen here.

### A.   An Unlimited Delegation of Tariff Authority Would Be Unconstitutional

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const. art. 1, § 1.  Congress is empowered "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its general powers.  Id. § 8, cl. 18.  The Constitution thus establishes a separation of powers between the legislative and executive branches that the Framers viewed as essential to the preservation of individual liberty.  See, e.g., The Federalist No. 48 (James Madison).  To maintain this separation of powers, "[t]he Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative

functions with which it is thus vested." Pan. Refining Co. v. Ryan, 293 U.S. 388, 421 (1935); see

also Marshall Field & Co. v. Clark, 143 U.S. 649, 692 (1892).

The parties cite two doctrines—the nondelegation doctrine and the major questions

doctrine—that the judiciary has developed to ensure that the branches do not impermissibly

abdicate their respective constitutionally vested powers.  Under the nondelegation doctrine,

Congress must "lay down by legislative act an intelligible principle to which the person or body

authorized to fix such [tariff] rates is directed to conform." J.W. Hampton, Jr., 276 U.S. at 409

(1928); see also Pan. Refining, 293 U.S. at 429–30.  A statute lays down an intelligible principle

when it "meaningfully constrains" the President's authority. Touby v. United States, 500 U.S.

160, 166 (1991); see also Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 559–60

(1976).  Under the major questions doctrine, when Congress delegates powers of "'vast economic

and political significance,'" it must "speak clearly." Ala. Ass'n of Realtors v. HHS, 594 U.S. 758,

764 (2021) (quoting Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 324 (2014)); Indus. Union Dep't,

AFL-CIO v. Am. Petrol. Inst., 448 U.S. 607, 645 (1980).  The doctrine applies in "'extraordinary

cases' . . . in which the 'history and the breadth of the authority that [the executive branch] has

asserted,' and the 'economic and political significance' of that assertion, provide 'a reason to

hesitate before concluding that Congress meant to confer such authority.'" West Virginia v. EPA,

597 U.S. 697, 721 (2022) (quoting FDA v. Brown & Williamson Tobacco Co., 529 U.S. 120,

159–60 (2000)); see also Biden v. Nebraska, 600 U.S. at 501.

Plaintiffs and some Amici argue that the Government's interpretation transforms IEEPA

into an impermissible delegation of power because "[t]he President's assertion of authority here

has no meaningful limiting standards, essentially enabling him to impose any tariff rate he wants

Court Nos. 25-00066 & 25-00077                                        Page 28

on any country at any time, for virtually any reason."  Pls.' V.O.S. Mots. at 25; see also Pls.'

Oregon Mots. at 19; Pls.' V.O.S. Reply at 22.  Similarly, Plaintiffs suggest that Congress's use of

the words "regulate . . . importation" does not indicate the clear mandate necessary to delegate

"such unbounded authority to the President to make such decisions of 'vast economic and political

significance,'" as the wide-scale imposition of tariffs.  Pls.' Oregon Mot. at 18; see also Pls.'

V.O.S. Reply at 17; Inst. for Pol. Integrity's Amicus Br. at 16–18.  The Government counters that

IEEPA contains sufficient limitations: the President must declare a national emergency, the

emergency expires after one year unless renewed, the emergency must be declared with respect to

an "unusual and extraordinary threat," and the powers must extend only to property in which a

foreign country or foreign national has an interest.  Gov't Resp. to V.O.S. Mots. at 28–29.

    The separation of powers is always relevant to delegations of power between the branches.

Both the nondelegation and the major questions doctrines, even if not directly applied to strike

down a statute as unconstitutional, provide useful tools for the court to interpret statutes so as to

avoid constitutional problems.  These tools indicate that an unlimited delegation of tariff authority

would constitute an improper abdication of legislative power to another branch of government.

Regardless of whether the court views the President's actions through the nondelegation doctrine,

through the major questions doctrine, or simply with separation of powers in mind, any

interpretation of IEEPA that delegates unlimited tariff authority is unconstitutional.

            **1.    The Words "Regulate . . . Importation" Do Not Authorize the
                    President to Impose Unlimited Tariffs**

    With these principles in place, the court turns to the interpretive question at hand.  Recall

that both TWEA and IEEPA authorize the President to "regulate . . . importation."  See 50 U.S.C.

§ 4305(b)(1)(B); id. § 1702(a)(1)(B).  The court in Yoshida II noted that "[t]he express delegation

Court Nos. 25-00066 & 25-00077                                    Page 29

in [TWEA] is broad" and includes the power to "impos[e] an import duty surcharge."  Yoshida II,

526 F.2d at 573, 576.  While the words "regulate . . . importation" may exist in identical form in

IEEPA, those words do not confer unlimited tariff authority.

    In interpreting TWEA, the appellate court in Yoshida II recognized the importance of the

separation of powers, noting the lower court's warning that "a finding that the President has the

power under [TWEA] to impose whatever tariff rates he deems desirable simply by declaring a

national emergency would not only render our trade agreements program nugatory, it would

subvert the manifest Congressional intent to maintain control over its Constitutional powers to

levy tariffs."  Yoshida II, 526 F.2d at 577 (quoting Yoshida I, 378 F. Supp. at 1182 (Maletz, J.,

concurring)).  Though the appellate court in Yoshida II interpreted TWEA so as to include tariff

authority, the court also repeatedly noted the constitutional concerns that would arise if the

President exercised unlimited tariff authority based on the words "regulate . . . importation."  For

example, the court stated that "[t]he mere incantation of 'national emergency' cannot, of course,

sound the death-knell of the Constitution."  Id. at 583.  Indeed, according to the court, "[t]he

declaration of a national emergency is not a talisman enabling the President to rewrite the tariff

schedules."  Id.[9]  While the court in Yoshida II ultimately reversed the lower court's decision and

upheld President Nixon's tariffs, it upheld the tariffs on the basis that they were limited, "which is

quite different from imposing whatever tariff rates he deems desirable."  Id. at 578 (internal

---

[9] This concern is even more significant today given the limited nature of Congress's review over
national emergencies.  Recall that the NEA originally provided Congress with the means to
terminate a national emergency by adopting a concurrent resolution.  See National Emergencies
Act, Pub. L. No. 94-412, § 201, 90 Stat. 1255, 1255–56 (1976) (codified as amended at 50 U.S.C.
§ 1622).  Today the NEA is much less restricted, requiring Congress to act with a veto-proof
majority of both houses.  See Foreign Relations Authorization Act, Fiscal Years 1986 and 1987,
Pub. L. No. 99-93, § 801, 98 Stat. 405, 448 (1985) (codified as amended at 50 U.S.C. § 1622).

Court Nos. 25-00066 & 25-00077                                    Page 30

quotation marks omitted).

The limitations of President Nixon's tariffs were essential to the court's determination that "regulate . . . importation" permitted the President's actions in Yoshida II.  For example, the court noted that President Nixon did not "fix[] rates in disregard of congressional will." Id. at 577.  The court emphasized that President Nixon "imposed a limited surcharge, as a temporary measure calculated to help meet a particular national emergency, which is quite different from imposing whatever tariff rates he deems desirable." Id. at 578 (internal quotation marks and citation omitted) (emphasis added).  The court emphasized further that it was not deciding a case in which the President exerted unlimited tariff authority, and that "presidential actions must be judged in the light of what the President actually did, not in the light of what he could have done." Id. at 577.  The court also explicitly stated that its decision did not "approve in advance any future surcharge of a different nature," id., and its decision did "not here sanction the exercise of an unlimited power, which, we agree with the Customs Court, would be to strike a blow to our Constitution," id. at 583.

Like the court in Yoshida II, this court does not read the words "regulate . . . importation" in IEEPA as authorizing the President to impose whatever tariff rates he deems desirable.  Indeed, such a reading would create an unconstitutional delegation of power.  See id.  Importantly, President Trump's tariffs do not include the limitations that the court in Yoshida II relied upon in upholding President Nixon's actions under TWEA.  Where President Nixon's tariffs were expressly limited by the rates established in the HTSUS, see Proclamation No. 4074, 85 Stat. at 927, the tariffs here contain no such limit.  Absent these limitations, this is exactly the scenario

that the lower court warned of in Yoshida I—and that the appellate court acknowledged in Yoshida II.

In sum, just as the court recognized in Yoshida II, the words "regulate . . . importation" cannot grant the President unlimited tariff authority. Thus, this court reads "regulate . . . importation" to provide more limited authority so as to avoid constitutional infirmities and maintain the "separate and distinct exercise of the different powers of government" that is "essential to the preservation of liberty." The Federalist No. 51 (Alexander Hamilton or James Madison).

**B.      Congress Delegated Narrower Authority to the President Through IEEPA than It Delegated Through TWEA**

While TWEA and IEEPA both grant the President the power to "regulate . . . importation," see 50 U.S.C. § 4305(b)(1)(B); id. § 1702(a)(1)(B), Congress enacted IEEPA with the intent of limiting presidential power. The legislative history surrounding IEEPA confirms that the words "regulate . . . importation" have a narrower meaning than the power to impose any tariffs whatsoever. Id. § 1702(a)(1)(B). Congress's enactment of Section 122 of the Trade Act of 1974, see Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1987 (codified at 19 U.S.C. § 2132), and Section 301 of the Trade Act of 1974, see Pub. L. No. 93-618, § 301, 88 Stat. 1978, 2041 (codified at 19 U.S.C. § 2411), grants the President authority to impose restricted tariffs in response to "fundamental international payment problems," including "large and serious balance-of-payments deficits," and unfair trading practices, thereby limiting any such authority in the broader emergency powers under IEEPA. Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1987 (1974).

In enacting reform legislation including IEEPA, Representative John Bingham, Chair of the House International Relations Committee's Subcommittee on Economic Policy, described

TWEA as conferring "on the president what could have been dictatorial powers that he could have used without any restraint by the Congress."  House Committee on International Relations, 95th Cong., Revision of the Trading with the Enemy Act: Markup before the Committee on International Relations 5 (Comm. Print 1977).  Similarly, the House report on the reform legislation called TWEA "essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review."  Comm. on Int'l Rels., Trading with the Enemy Act Reform Legislation, H.R. Rep. No. 95-459, at 7 (1977).

Congress reformed the President's emergency powers in part by enacting IEEPA to provide "the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to various procedural limitations, including those of the [NEA]."  Id. at 2; see also International Emergency Economic Powers Act, Pub. L. No. 95-223, §§ 201–08, 91 Stat. 1625, 1626–29 (1977) (codified as amended at 50 U.S.C. §§ 1701–10).  Thus, Congress enacted IEEPA to limit executive authority over international economic transactions, not merely to continue the executive authority granted by TWEA.

        **1.**        **Congress Cabined the President's Authority to Impose Tariffs in Response to Balance-of-Payments Deficits to Non-Emergency Legislation**

When President Nixon imposed in 1971 the tariffs challenged in Yoshida II, he was responding to a monetary crisis—brought on by the peg of the U.S. dollar to a fixed price of 35 dollars per ounce of gold—as reflected in part in growing balance-of-payments deficits.  See The Office of the Historian, Nixon and the End of the Bretton Woods System, 1971-1973, U.S. Dep't of State, https://history.state.gov/milestones/1969-1976/nixon-shock (last visited May 28, 2025).  External values of foreign currencies were fixed in relation to the U.S. dollar, whose value was in

Court Nos. 25-00066 & 25-00077                                         Page 33

turn expressed in gold at a congressionally set price.  See id.  A surplus of U.S. dollars threatened

the ability of the United States to meet its obligations and, thereby, the entire Bretton Woods

system, as the United States did not have enough gold to cover the volume of dollars in worldwide

circulation.  See id.  Accordingly, on August 15, 1971, President Nixon immediately cancelled the

direct international convertibility of the U.S. dollar to gold, took a series of other actions such as

the imposition of wage and price controls, and issued Proclamation 4074 in which he declared a

national emergency and introduced a ten percent import surcharge.[10]  See Christopher A. Casey &

Jennifer K. Elsea, Cong. Rsch. Serv., R45168, The International Emergency Economic Powers

Act: Origins, Evolution, and Use 2 (2024).

In 1974, Congress enacted the Trade Act, including Section 122 dealing with remedies for

balance-of-payments deficits.  See Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978,

1987–89 (codified at 19 U.S.C. § 2132).  Section 122 is titled "[b]alance-of-payments authority"

and specifically addresses Presidential proclamations of "temporary import surcharge[s]" and

"temporary limitations through the use of quotas" in situations of "fundamental international

payments problems."  Id.  Section 122 sets specific limits on the President's authority to respond

to balance-of-payments problems, such as a 15 percent cap on tariffs and a maximum duration of

150 days.  See id.  Congress's enactment of Section 122 indicates that even "large and serious

United States balance-of-payments deficits" do not necessitate the use of emergency powers and

justify only the President's imposition of limited remedies subject to enumerated procedural

constraints.  See id.; see also Yoshida II, 526 F.2d at 578 ("Congress has said what may be done

with respect to foreseeable events in the Tariff Act, the [Trade Expansion Act], and in the Trade

---

[10] Notably, Proclamation 4074 did not mention TWEA.  See generally 85 Stat. 926.

Court Nos. 25-00066 & 25-00077                                                          Page 34

Act of 1974 (all of which are in force) and has said what may be done with respect to unforeseeable

events in the TWEA.").  In these ways, Section 122 removes the President's power to impose

remedies in response to balance-of-payments deficits, and specifically trade deficits, from the

broader powers granted to a president during a national emergency under IEEPA by establishing

an explicit non-emergency statute with greater limitations.[11]

The President's imposition of the Worldwide and Retaliatory Tariffs responds to an

imbalance in trade—a type of balance-of-payments deficit—and thus falls under the narrower,

non-emergency authorities in Section 122.  The balance-of-payments is the "[r]ecord of

transactions between U.S. residents and foreign residents during a given time period . . . includ[ing]

transactions in goods, services, income, assets, and liabilities," and always balances to zero.

Balance of Payments, Bureau of Econ. Analysis (last modified Apr. 11, 2018),

https://www.bea.gov/help/glossary/balance-payments.  The term "balance-of-payments deficits"

within Section 122 refers, necessarily, to deficits within the various accounts comprising the

---

[11] The court in Yoshida II recognized that before Section 122 was in effect, the Nixon surcharge "did not run counter to any explicit legislation" and there existed no statute "other than the TWEA, providing procedures for dealing with a national emergency involving a balance of payments problem such as that which existed in 1971."  United States v. Yoshida Int'l, Inc., 526 F.2d 560, 578 (C.C.P.A. 1975) (internal quotation marks omitted).  The court in Yoshida II recognized further that after Section 122 was in effect, Section 122's limits would apply regardless of whether an emergency declared was extant.  Id. at 582 n.33.  The court noted that the balance-of-payments emergency declared by President Nixon had not been terminated, in contradiction with the expectation that "emergencies are expected to be shortlived."  Id. at 582.  However, the court found that "the failure to terminate the emergency has been rendered moot by Congressional enactment of [Section 122], specifically requiring the President, within certain parameters, to impose a surcharge or quotas in response to balance of payments problems."  Id. at 582 n.33.  The court concluded that "[a] surcharge imposed after Jan. 3, 1975 must, of course, comply with the statute now governing such action."  Id.  Thus, the court reasoned that any tariffs imposed in response to the balance-of-payments problem after the enactment of Section 122, including any imposed in response to the balance-of-payments emergency declared by President Nixon, must comply not with a broad emergency statute, but with Section 122.

balance-of-payments (including the trade of goods) rather than to an overall summary deficit, because there cannot be a balance-of-payments deficit per se. Trade deficits are one of the key balance-of-payment deficits and can be directly impacted by mechanisms such as import quotas and tariffs, as authorized by Section 122. As a result, tariffs responding to a trade deficit fit under Section 122 because they "deal with [a] large and serious United States balance-of-payments deficit[]." 19 U.S.C. § 2132(a)(1). Thus, the President's Worldwide and Retaliatory Tariffs, imposed in response to a balance-of-payments deficit, must conform with the limits of Section 122.

The legislative history surrounding IEEPA confirms that Congress cabined any presidential authority to impose tariffs in response to balance-of-payments deficits to a narrower, non-emergency statute. To prevent IEEPA from becoming another "essentially . . . unlimited grant of authority," the House International Relations Committee suggested that "whenever possible, authority for routine, non[-]emergency regulation of international economic transactions which has heretofore been conducted under [TWEA] should be transferred to other legislation," and further stated that IEEPA "does not include authorities more appropriately lodged in other legislation . . . ." H.R. Rep. No. 95-459 at 7, 10–11. This reflects that in enacting Section 122, Congress narrowed the President's emergency authority to impose tariffs in response to balance-of-payments deficits. The words "regulate . . . importation" within IEEPA do not, therefore, permit the President to impose tariffs in response to balance-of-payments deficits.

Because the Worldwide and Retaliatory Tariffs deal with "large and persistent annual U.S. goods trade deficits," Executive Order 14257, 90 Fed. Reg. at 15041, these actions address a balance-of-payments deficit and therefore must comply with the limitations in Sections 122. The

Court Nos. 25-00066 & 25-00077                                                        Page 36

Worldwide and Retaliatory Tariffs do not comply with the limitations Congress imposed upon the

President's power to respond to balance-of-payments deficits.   The President's assertion of

tariff-making authority in the instant case, unbounded as it is by any limitation in duration or scope,

exceeds any tariff authority delegated to the President under IEEPA.   The Worldwide and

Retaliatory tariffs are thus <u>ultra vires</u> and contrary to law.

### II.    *50 U.S.C. § 1701 Does Not Authorize the Trafficking Tariffs*

IEEPA does not authorize the Trafficking Tariffs for the separate reason that they do not

satisfy the conditions that Congress imposed in 50 U.S.C. § 1701:

> (a) Any authority granted to the President by section 1702 of this title may be
> exercised to deal with any unusual and extraordinary threat, which has its source in
> whole or substantial part outside the United States, to the national security, foreign
> policy, or economy of the United States, if the President declares a national
> emergency with respect to such threat.

> (b) The authorities granted to the President by section 1702 of this title may only
> be exercised to deal with an unusual and extraordinary threat with respect to which
> a national emergency has been declared for purposes of this chapter and may not
> be exercised for any other purpose.   Any exercise of such authorities to deal with
> any new threat shall be based on a new declaration of national emergency which
> must be with respect to such threat.

This provision limits the President's exercise of IEEPA powers to a limited set of situations.   <u>Cf.</u>

<u>Silfab Solar, Inc. v. United States</u>, 892 F.3d 1340, 1346 (Fed. Cir. 2018) (identifying a statutory

"condition necessary for the President to take action").   Under it, IEEPA powers are available only

where all of the following conditions pertain:   First, there must be a "threat . . . which has its source

in whole or substantial part outside the United States, to the national security, foreign policy, or

economy of the United States."   50 U.S.C. § 1701(a).   Second, this threat must be "unusual and

extraordinary."   <u>Id.</u> § 1701(b).   Third, a national emergency must be declared with respect to the

threat.   <u>Id.</u>   And fourth, the President's exercise of IEEPA authority must "deal with" the threat.

- A45 -

Court Nos. 25-00066 & 25-00077                                                    Page 37

Id.

Both sets of Plaintiffs assert that the orders implementing the Worldwide and Retaliatory Tariffs ("Worldwide and Retaliatory Tariff Orders") do not meet the "unusual and extraordinary" condition[12] imposed by this section, see Pls.' V.O.S. Mots. at 18; Pls.' Oregon Mot. at 20, and the State Plaintiffs argue that the orders implementing the Trafficking Tariffs ("Trafficking Tariff Orders") do not meet the "deal with" condition, see Pls.' Oregon Mot. at 25.

By the Government's telling, the court cannot ever question the President's assertion that his IEEPA authority "deal[s] with an unusual and extraordinary threat."  See Gov't Resp. to Oregon Mots. at 33.  The Government invokes the "political question doctrine," under which "a controversy is nonjusticiable . . . where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'"  Nixon v. United States, 506 U.S. 224, 228 (1993) (alteration omitted) (quoting Baker v. Carr, 369 U.S. 186, 217 (1962)).  The court concludes, however, that the question of the scope of § 1701 is (1) a justiciable question of statutory construction that (2) resolves in favor of Plaintiffs' contention that the Trafficking Tariff Orders do not "deal with an unusual and extraordinary threat."  50 U.S.C. § 1701(b).  Those Orders thus lie outside the bounds of Congress's delegation of authority to the executive branch.

### A.    The Political Question Doctrine Does Not Preclude Judicial Review of the Trafficking Orders' Compliance with 50 U.S.C. § 1701

The political question doctrine bars judicial review in a number of different scenarios.  The

---

[12] As the court holds that the Worldwide and Retaliatory Tariffs are unlawful for the reasons set forth in Section I of this opinion, the court does not reach the argument that their implementing Orders separately fail to invoke an "unusual and extraordinary threat."  50 U.S.C. § 1701.

Court Nos. 25-00066 & 25-00077                                              Page 38

Supreme Court has listed them as follows:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker, 369 U.S. at 217; see also Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 195, (2012) (explaining that "a court lacks the authority to decide the dispute before it" when one of the Baker factors pertains). The Court clarified, however, that this is not a "doctrine . . . of 'political cases,'" Baker, 369 U.S. at 217, and that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," id. at 211.

The Government argues that two Baker factors preclude the court's review of whether the challenged Tariff Orders are permissible under § 1701's "deal with an unusual and extraordinary threat" standard. The Government asserts "a profound 'lack of judicially discoverable and manageable standards for resolving' the validity of the President's threat assessment," and also the "impossibility of deciding [the question] without an initial policy determination of a kind clearly for nonjudicial discretion." Gov't Resp. to Oregon Mots. at 30–31 (quoting Baker, 369 U.S. at 217).

This reliance on the political question doctrine is misplaced. The court can "manage" the standards for applying 50 U.S.C. § 1701's "deal with an unusual and extraordinary threat" language just as it "manages" the standards for any other statutory enactment that constrains independent executive action. See Feliciano v. Dep't of Transp., 605 U.S. __, __, 145 S. Ct. 1284, 1291 (2025) (listing instances of substantive conditions that federal statutes impose on the exercise

Court Nos. 25-00066 & 25-00077                                        Page 39

of executive authority).  "[U]nder the Constitution, one of the Judiciary's characteristic roles is to

interpret statutes, and we cannot shirk this responsibility merely because our decision may have

significant political overtones."  Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230

(1986).

Even when it goes unmentioned, this principle is a common feature of statutory

construction.  In the trade context, for example, the antidumping statute permits the imposition of

duties only where "the Commission determines that . . . an industry in the United States . . . is

threatened with material injury."  19 U.S.C. § 1673.  The court does not automatically uphold

every material injury determination of the ITC on lack-of-manageable-standards grounds simply

because "threatened with material injury" is an imprecise term that sounds in foreign affairs.

Instead, the court consults "the traditional tools of statutory construction" to ascertain the term's

meaning and applies that meaning to specific cases.  Loper Bright Enters. v. Raimondo, 603 U.S.

369, 403 (2024); see, e.g., Rhone Poulenc, S.A. v. United States, 8 CIT 47, 50–54, 592 F. Supp.

1318, 1322–25 (1984) (citing legislative history for the proposition that while "[i]t is true that

threat of material injury may not be based on supposition or conjecture . . . [t]he threat must be

real and imminent").  As the Supreme Court explained in Zivotofsky, "[r]esolution of Zivotofsky's

claim demands careful examination of the textual, structural, and historical evidence put forward

by the parties regarding the nature of the statute and of the passport and recognition powers.  This

is what courts do.  The political question doctrine poses no bar to judicial review of this case."  566

U.S. at 201.

Indeed, that "[t]rade policy is an increasingly important aspect of foreign policy, an area in

which the executive branch is traditionally accorded considerable deference . . . is not to

Court Nos. 25-00066 & 25-00077                                                          Page 40

say . . . that courts will unthinkingly defer to the Government's view of Congressional

enactments." Fed.-Mogul Corp. v. United States, 63 F.3d 1572, 1581 (Fed. Cir. 1995).  This is

especially so where the relevant congressional enactment is exactly what determines how much

deference the President is entitled to in the first place.  See U.S. Cane Sugar Refiners' Ass'n, 3

CIT at 212, 544 F. Supp. at 895 ("[I]f the President's action is authorized by the statutes relied

upon, the judiciary may not properly inquire or probe into the President's reasoning or into the

existence of the facts calling for the action taken." (emphasis added)).  Either § 1701 entails that

the President invokes IEEPA "pursuant to an express or implied authorization of Congress," which

would mean that "his authority is at its maximum," or § 1701 entails that he invokes it

"incompatibl[y] with the expressed or implied will of Congress," which would mean that "his

power is at its lowest ebb." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635–37

(1952) (Jackson, J., concurring).  If a court could never question the President's interpretation of

statutory language to place himself in Justice Jackson's first zone, there would only be one zone.

"[T]he issue here . . . involves the apportionment of power between the executive and legislative

branches," and "[t]he duty of courts to decide such questions has been repeatedly reaffirmed by

the Supreme Court." Crockett v. Reagan, 558 F. Supp. 893, 898 (D.D.C. 1982), aff'd, 720 F.2d

1355 (D.C. Cir. 1983) (per curiam).

        The Government's position on the unreviewability of § 1701 is also at odds with IEEPA's

text.  Section 1701 is not the particular type of "statute [that] gives a discretionary power to any

person, to be exercised by him upon his own opinion of certain facts," such that "it is a sound rule

of construction, that the statute constitutes him the sole and exclusive judge of the existence of

those facts." Martin v. Mott, 25 U.S. 19, 31–32 (1827).  That may be true of the NEA, whose

operation requires only that the President "specifically declare[] a national emergency." 50 U.S.C. § 1621(b); see also Yoshida II, 526 F.2d at 581 n.32.[13] But IEEPA requires more than just the fact of a presidential finding or declaration: "The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b) (emphasis added). This language, importantly, does not commit the question of whether IEEPA authority "deal[s] with an unusual and extraordinary threat" to the President's judgment. It does not grant IEEPA authority to the President simply when he "finds" or "determines" that an unusual and extraordinary threat exists. Cf., e.g., Silfab Solar, 892 F.3d at 1349 (collecting cases involving "statute[s] authoriz[ing] a Presidential 'determination'"); United States v. George S. Bush & Co., 310 U.S. 371, 376–77 (1940).

Section 1701 is not a symbolic festoon; it is a "meaningful[] constrain[t] [on] the President's discretion," United States v. Dhafir, 461 F.3d 211, 216 (2d Cir. 2006) (internal quotation marks, alteration, and citation omitted). It sets out "the happening of the contingency on which [IEEPA powers] depend," and the court will give it its due effect. The Aurora, 11 U.S. (7 Cranch) 382, 386 (1813).

Congress enacted § 1701, after all, as a substantive addition to TWEA's basic framework. And "[w]hen Congress amends legislation," courts must "presume it intends the change to have real and substantial effect." Ross v. Blake, 578 U.S. 632, 641–42 (2016) (internal quotation marks,

---

[13] The State Plaintiffs confirm that they "are not challenging the President's declaration of an emergency under the National Emergencies Act." Pls.' Oregon Mot. at 21.

alteration, and citation omitted).  Thus, although "[w]here a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available," Dalton v. Specter, 511 U.S. 462, 477 (1994), § 1701 is a statute that conditions this commitment on factors that the court retains the power to review.

In doing so, the court does not ask whether a threat is worth "deal[ing]" with, or venture to "review the bona fides of a declaration of an emergency by the President." Yoshida II, 526 F.2d at 581 n.32; see also United States v. Am. Bitumuls & Asphalt Co., 246 F.2d 270, 276–77 (C.C.P.A. 1957) ("No doubt the courts cannot substitute their discretion for that of the President in proclaiming trade agreements, but where, as here, the President bases his action on an incorrect interpretation of the effect of a law or proclamation, the courts are not bound to accept that interpretation as correct.").

Indeed, "[t]he question here is not whether something should be done; it is who has the authority to do it." Biden v. Nebraska, 600 U.S. at 501.  The court simply asks whether the President's action "deal[s] with an unusual and extraordinary threat."  Congress provided the necessary standards for resolving this inquiry when it enacted IEEPA, and the court's task is to apply them.  "This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said." United States v. Am. Trucking Ass'ns, 310 U.S. 534, 544 (1940).  The duty does not abate when foreign economic conduct forms part of the issue. See Totes-Isotoner, 594 F.3d at 1352–53.

According to the Government, there are two ways that the "deal with an unusual and extraordinary threat" provision retains its meaning despite its unreviewability.  The first is that "it . . . binds the President." V.O.S. Oral Arg. Tr. at 47:11–12 (statement of E. Hamilton), May

27, 2025, ECF No. 54.  This means, the Government states, that "[t]he President still has to look at and faithfully apply that statute . . . ."  V.O.S. Oral Arg. Tr. at 47:11–13 (statement of E. Hamilton).  But what happens if the President does not do so?  Does the court still have no role?  Even if Congress could hypothetically undo the President's invocation of IEEPA powers by passing a law to that effect (over the President's likely veto, see generally Chadha, 462 U.S. 919), Congress's inherent power to legislate is no substitute for the "judicial function" of "determining the limits of statutory grants of authority."  Stark v. Wickard, 321 U.S. 288, 310 (1944).  "The supremacy of law," moreover, "demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied."  St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 84 (1936) (Brandeis, J., concurring).

The Government also argues that § 1701 "informs legislative review of any national emergency declared under IEEPA."  V.O.S. Oral Arg. Tr. at 47:16–18 (statement of E. Hamilton).  But Congress has already legislated on the relevant question by enacting IEEPA "to limit the President's emergency power in peacetime."  Dames & Moore v. Regan, 453 U.S. 654, 672–73 (1981).  Congress should not have to enact new statutes to enforce the statutory constraints it has already enacted.

### B.      The Trafficking Orders Fall Outside 50 U.S.C. § 1701's Delegation of Authority

The court proceeds to adjudicate the justiciable question of whether the Trafficking Orders satisfy the statutory requirement that IEEPA powers be exercised only to "deal with an unusual and extraordinary threat."  50 U.S.C. § 1701.

Court Nos. 25-00066 & 25-00077                                                    Page 44

The State Plaintiffs[14] do not argue that the Trafficking Orders fail to invoke "unusual and extraordinary threat[s]," as they do regarding the Worldwide and Retaliatory Tariffs (an argument that the court does not reach). Instead, the State Plaintiffs argue that the Trafficking Tariffs do not "deal with" the specific threats[15] they invoke. See Pls.' Oregon Mot. at 25–26; Pls.' Oregon Supp'l Br. at 4. The Government responds that "the President's actions are reasonably related to the desired change in behavior the President seeks from Mexico, Canada, and China because the President's actions pressure those countries to address the crisis." Gov't Resp. to Oregon Mots. at 39.[16]

By this description, and by their own language, the Trafficking Tariff Orders rest on a construction of "deal with" that is at odds with the ordinary meaning of the phrase.

"Deal with" connotes a direct link between an act and the problem it purports to address. A tax deals with a budget deficit by raising revenue. A dam deals with flooding by holding back a river. But there is no such association between the act of imposing a tariff and the "unusual and

---

[14] The V.O.S. Plaintiffs do not seek to enjoin the operation of the Trafficking Tariff Orders. See V.O.S. Compl. at 24.

[15] The Canada Tariff Order purports to "address" an "unusual and extraordinary threat" in the form of "the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." Executive Order 14193, 90 Fed. Reg. at 9113. The Mexico Tariff Order identifies a threat in the form of "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." Executive Order 14194, 90 Fed. Reg. at 9118. And the China Tariff Order refers to the "failure of the PRC government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other TCOs, criminals at large, and drugs." Executive Order 14195, 90 Fed. Reg. at 9122.

[16] Counsel for the Government stated at oral argument that "[t]he purpose of these tariffs is to create pressure, to tariff-pressure other countries to change bad behaviors that the President believes are hurting Americans and our national security." Oregon Oral Arg. Tr. at 31:19–22 (statement of B. Shumate), May 27, 2025, ECF No. 64.

- A53 -

Court Nos. 25-00066 & 25-00077                                            Page 45

extraordinary threat[s]" that the Trafficking Orders purport to combat.  Customs's collection of

tariffs on lawful imports does not evidently relate to foreign governments' efforts "to arrest, seize,

detain, or otherwise intercept" bad actors within their respective jurisdictions.  The Government's

only suggested connection between these two activities—that "[t]he President's action . . . deters

importation of illicit drugs concealed within seemingly lawful imports," Gov't Resp. to Oregon

Mots. at 40—has no apparent basis in the Trafficking Orders themselves.  The Orders cite the

general problem of a failure to thwart trafficking and other crime as their target "unusual and

extraordinary threat[s]," not the specific problem of drugs smuggled within shipments of dutiable

merchandise.[17]  And if this specific problem were really what the Trafficking Tariff Orders aimed

to "deal with," the Orders would have to "deal with" that specific problem, not create "leverage"

ostensibly to do so.  50 U.S.C. § 1701(b).

  The Trafficking Orders do not "deal with" their stated objectives.  Rather, as the

Government acknowledges, the Orders aim to create leverage to "deal with" those objectives.  See

Oregon Oral Arg. Tr. at 31:19–25, 33:7–16 (statements of B. Shumate).  That approach differs

from what the Yoshida II court identified was Proclamation 4074's "direct effect on our nation's

balance of trade and, in turn, on its balance of payments deficit and its international monetary

reserves."  526 F.2d at 580.  The approach also differs from the relationship identified in Regan v.

Wald, where the Supreme Court sustained on constitutional grounds "the President's decision to

curtail the flow of hard currency to Cuba—currency that could then be used in support of Cuban

adventurism—by restricting travel."  468 U.S. at 243.

---

[17] The Trafficking Tariffs, of course, do not change the effective rate of duty (zero percent ad valorem) for smuggled drugs themselves.

The Government's "pressure" argument effectively concedes that the direct effect of the country-specific tariffs is simply to burden the countries they target. It is the prospect of mitigating this burden, the Government explains, that will induce the target countries to crack down on trafficking within their jurisdictions. See Gov't Resp. to Oregon Mots. at 39. But however sound this might be as a diplomatic strategy, it does not comfortably meet the statutory definition of "deal[ing] with" the cited emergency. It is hard to conceive of any IEEPA power that could not be justified on the same ground of "pressure."

The Government's reading would cause the meaning of "deal with an unusual and extraordinary threat" to permit any infliction of a burden on a counterparty to exact concessions, regardless of the relationship between the burden inflicted and the concessions exacted. If "deal with" can mean "impose a burden until someone else deals with," then everything is permitted. It means a President may use IEEPA to take whatever actions he chooses simply by declaring them "pressure" or "leverage" tactics that will elicit a third party's response to an unconnected "threat." Surely this is not what Congress meant when it clarified that IEEPA powers "may not be exercised for any other purpose" than to "deal with" a threat.

The court in Yoshida II explained that "[w]hether a delegation of such breadth as to have authorized Proclamation 4074 would be constitutionally embraced" was a function of the surcharge's "relationship to the particular emergency confronted." 526 F.2d at 576–77. The court further explained that "[a] standard inherently applicable to the exercise of delegated emergency powers is the extent to which the action taken bears a reasonable relation . . . to the emergency giving rise to the action," and that "the nature of the emergency restricts the how of its doing, i.e., the means of execution." Id. at 578–79.

Court Nos. 25-00066 & 25-00077                                              Page 47

The Government's concept of "leverage" would sap these words of their meaning.  The President's chosen "means of execution" here are tariffs on "[a]rticles that are products of Canada," Executive Order 14193, 90 Fed. Reg. at 9114, "[a]ll articles that are products of Mexico," Executive Order 14194, 90 Fed. Reg. at 9118, and "[a]ll articles that are products of the PRC," Executive Order 14195, 90 Fed. Reg. at 9122.  If leverage were all it took to establish a "reasonable relation" between these means and the "particular emergency" of trafficking, Yoshida II's means-end test would be trivially easy to pass.  See 526 F.2d at 578–79.

In so holding, the court does not pass upon the wisdom or likely effectiveness of the President's use of tariffs as leverage.[18]  That use is impermissible not because it is unwise or ineffective, but because § 1701 does not allow it.  Rather, the Trafficking Orders' "clear misconstruction" of § 1701's "deal with" condition renders them "action[s] outside delegated authority."  Maple Leaf Fish, 762 F.2d at 89.

Soon after joining the Supreme Court, Justice Story declared invalid a proclamation by President Madison that revived an embargo on trade with Britain and France in the Non-Intercourse Act of 1809.  The proclamation lacked statutory authority because it relied on an

---

[18] Another three-judge panel of this court made a similar point in Tembec, Inc. v. United States:

> Consideration of the USTR's authority to order implementation of affirmative section 129(a) determinations does not depend on the court's evaluation of the wisdom of a given implementation. The court is neither called upon to make trade policy, nor to direct the USTR as to whether any section 129 determination should be implemented.  Rather, the court is merely asked to determine the bounds of the USTR's authority to order implementation.

30 CIT 958, 982–83, 441 F. Supp. 2d 1302, 1326–27 (2006), judgment vacated as moot by 31 CIT 241, 251, 475 F. Supp. 2d 1393, 1401–02 (leaving prior decision in place for precedential purposes despite vacatur of judgment).

Court Nos. 25-00066 & 25-00077                                                Page 48

expired embargo provision in the Act.  The young Justice's account of the judicial role in that case

applies undiminished today:

> I take it to be an incontestable principle, that the president has no common law
> prerogative to interdict commercial intercourse with any nation; or revive any act,
> whose operation has expired.  His authority for this purpose must be derived from
> some positive law . . . . For the executive department of the government, this court
> entertain the most entire respect; and amidst the multiplicity of cares in that
> department, it may, without any violation of decorum, be presumed, that sometimes
> there may be an inaccurate construction of a law.  It is our duty to expound the laws
> as we find them in the records of state; and we cannot, when called upon by the
> citizens of the country, refuse our opinion, however it may differ from that of very
> great authorities.  I do not perceive any reasonable ground to imply an authority in
> the president to revive this act, and I must therefore, with whatever reluctance,
> pronounce it to have been, as to this purpose, invalid.

The Orono, 18 F. Cas. 830, 830–31 (C.C.D. Mass. 1812) (No. 10,585).

## CONCLUSION

The court holds for the foregoing reasons that IEEPA does not authorize any of the

Worldwide, Retaliatory, or Trafficking Tariff Orders.  The Worldwide and Retaliatory Tariff

Orders exceed any authority granted to the President by IEEPA to regulate importation by means

of tariffs.  The Trafficking Tariffs fail because they do not deal with the threats set forth in those

orders.  This conclusion entitles Plaintiffs to judgment as a matter of law; as the court further finds

no genuine dispute as to any material fact, summary judgment will enter against the United States.

See USCIT R. 56.  The challenged Tariff Orders will be vacated and their operation permanently

enjoined.

There is no question here of narrowly tailored relief; if the challenged Tariff Orders are

unlawful as to Plaintiffs they are unlawful as to all.  "[A]ll Duties, Imposts and Excises shall be

uniform throughout the United States," U.S. Const. art. I, § 8, cl. 1, and "[t]he tax is uniform when

it operates with the same force and effect in every place where the subject of it is found."  Head

Court Nos. 25-00066 & 25-00077                                        Page 49

Money Cases, 112 U.S. 580, 594 (1884); see also Siemens Am., Inc. v. United States, 692 F.2d

1382, 1383 (Fed. Cir. 1982); Nat'l Corn Growers Ass'n v. Baker, 10 CIT 517, 521, 643

F. Supp. 626, 630–31 (1986) (noting "the statutory and constitutional mandate of uniformity in the

interpretation of the international trade laws").

      Plaintiffs' Motions for Summary Judgment are granted, and their Motions for Preliminary

Injunction are denied as moot.  Judgment will enter accordingly.


                                              By the panel.


Dated: May 28, 2025
       New York, New York

**Web Pages Cited in the Opinion**

Case: 25-1812     Document: 6     Page: 93     Filed: 05/29/2025

5/28/25, 10:50 AM   Case 1:25-cv-00066-GSK-TMR-JAR   Document 55-1   Filed 05/29/25   Page 2 of 9
Potash Statistics and Information | U.S. Geological Survey



# Potash Statistics and Information

By **National Minerals Information Center**

Statistics and information on the worldwide supply of, demand for, and flow of the mineral commodity *potash*

Potash is used primarily as an agricultural fertilizer (plant nutrient) because it is a source of soluble potassium, one of the three primary plant nutrients; the others are fixed nitrogen and soluble phosphorus.  Potash and phosphorus are mined products, and fixed nitrogen is produced from the atmosphere by using industrial processes.  Modern agricultural practice uses these primary nutrients in large amounts plus additional nutrients, such as boron, calcium, chlorine, copper, iron, magnesium, manganese, molybdenum, sulfur, and zinc, to assure plant health and proper maturation.  The three major plant nutrients have no substitutes, but low  nutrient  content, alternative sources of plant nutrients, such as animal manure and guano, bone meal, compost, glauconite, and "tankage" from slaughterhouses, can be used. Potash denotes a variety of mined and manufactured salts, all containing the element potassium in water  soluble form.

*Subscribe to receive an email notification when a new publication is added to this page. On the Questions tab of the subscriber preferences page, please select "Potash" and any other options in which you may be interested. Please see the list services page for more information.*

## Annual Publications

Mineral Commodity Summaries

- Potash

   PDF Format:

   | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007

Was this page helpful?

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | **2025** |

- Appendixes

## Minerals Yearbook

- Potash
  PDF Format:

  | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |

  XLS Format:

  | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 tables   only release | 2021 tables   only release | 2022 tables–only release | **2023 tables–only release** |

- Archive
  | 1932–1993 |

## Mineral Industry Surveys

- Potash, Crop Year
  PDF Format:

  | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | **2023** | **2024** |

  XLS Format:

  | 2003 | 2004 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | **2023** | **2024** |

# Special Publications

- Earth Mapping Resources Initiative (Earth MRI)   Focus areas for data acquisition for potential domestic resources of 13 critical minerals in the conterminous United States and Puerto Rico — Antimony, barite, beryllium, chromium, fluorspar, hafnium, helium, magnesium, manganese, potash, uranium, vanadium, and zirconium

- Fertilizers   Sustaining Global Food Supplies

- Historical Statistics for Mineral and Material Commodities in the United States Data Series 140

Was this page helpful?

Case: 25-1812    Document: 6    Page: 95    Filed: 05/29/2025

5/28/25, 10:50 AM    Case 1:25-cv-00066-GSK-TMR-JAR    Potash Statistics and Information | U.S. Geological Survey    Page 4 of 9
Document 55-1    Filed 05/28/25

- Potash

- Potash--A Global Overview of Evaporite-Related Potash Resources, Including Spatial Databases of Deposits, Occurrences, and Permissive Tracts

- Potash  A Vital Agricultural Nutrient Sourced from Geologic Deposits Open-File Report 2016-1167

- Technical Announcement: Plenty of Potash, but Some Regions Lack Low Cost Sources for Crop Production

# Contacts

## Stephen Jasinski

**Mineral Commodity Specialist**

National Minerals Information Center

Email: sjasinsk@usgs.gov

Phone: 703-648-7711

---

SCIENCE

Science Explorer

Mission Areas

Programs

Regions

Science Centers

Observatories

Laboratories

Frequently Asked Questions

Educational Resources

Special Topics

PRODUCTS

Data

Maps

Publications

Multimedia Gallery

Web Tools

Software

U.S. Board on Geographic Names

The National Map

USGS Library

USGS Store

Park Passes

NEWS

Featured Stories

News Releases

Science Snippets

Technical Announcements

Employees in the News

Get Our News

Media Contacts

I'm a Reporter

Newsletters

Was this page helpful?

Case: 25-1812     Document: 6     Page: 96     Filed: 05/29/2025

5/28/25, 10:50 AM    Case 1:25-cv-00066-GSK-TMR-JAR    Potash Statistics and Information | U.S. Geological Survey    Document 55-1    Filed 05/29/25    Page 5 of 9

## CONNECT

Headquarters

Locations

Staff Profiles

Social Media

Careers

Contact Us

## ABOUT

About Us

Survey Manual

Organization

Key Officials

Congressional

Budget

Careers and Employees

Doing Business

Emergency Management

## LEGAL

Accessibility

FOIA

Site Policies

Privacy Policy

Site Map

DOI and USGS link policies apply

No FEAR Act

USA.gov

Vulnerability Disclosure Policy



**U.S. Geological Survey**
U.S. Department of the Interior

### Contact USGS

1-888-392-8545

answers.usgs.gov

Was this page helpful?

5/28/25, 10:4 Case 1:25-cv-00066-GSK-TMR-JAR   Document 55-1   Filed 05/26/25   Page 6 of 9
Milestones in the History of U.S. Foreign Relations - Office of the Historian



## OFFICE OF THE
## Historian

**MILESTONES: 1969–1976**

> **NOTE TO READERS**
>
> "Milestones in the History of U.S. Foreign Relations" has been retired and is no longer maintained. For more information, please see the full notice.

# Nixon and the End of the Bretton Woods System, 1971–1973

On August 15, 1971, President Richard M. Nixon announced his New Economic Policy, a program "to create a new prosperity without war." Known colloquially as the "Nixon shock," the initiative marked the beginning of the end for the Bretton Woods system of fixed exchange rates established at the end of World War II.



*Secretary of the Treasury John Connally on the day that President Richard Nixon announced his New Economic Policy, August 15, 1971. (Nixon Presidential Library)*

Under the Bretton Woods system, the external values of foreign currencies were fixed in relation to the U.S. dollar, whose value was in turn expressed in gold at the congressionally-set price of $35 per ounce. By the 1960s, a surplus of U.S. dollars caused by foreign aid, military spending, and foreign investment threatened this system, as the United States did not have enough gold to cover the volume of dollars in worldwide circulation at the rate of $35 per ounce; as a result, the dollar was overvalued. Presidents John F. Kennedy and Lyndon B. Johnson adopted a series of measures to support the dollar and sustain Bretton Woods: foreign investment disincentives; restrictions on foreign lending; efforts to stem the

- A64 -

official outflow of dollars; international monetary reform; and cooperation with other countries. Nothing worked. Meanwhile, traders in foreign exchange markets, believing that the dollar's overvaluation would one day compel the U.S. government to devalue it, proved increasingly inclined to sell dollars. This resulted in periodic runs on the dollar.

It was just such a run on the dollar, along with mounting evidence that the overvalued dollar was undermining the nation's foreign trading position, which prompted President Richard M. Nixon to act. On August 13, 1971, Nixon convened a meeting of his top economic advisers, including Secretary of the Treasury John Connally and Office of Management and Budget Director George Shultz, at the Camp David presidential retreat to consider a program of action. Notably absent from the meeting were Secretary of State William Rogers and President's Assistant for National Security Affairs Henry Kissinger. After two days of talks, on the evening of August 15, Nixon announced his New Economic Policy in an address to the nation on "The Challenge of Peace." Asserting that progress in bringing an end to U.S. involvement in the war in Vietnam meant that it was time for Americans to turn their minds to the challenges of a post-Vietnam world, Nixon identified a three-fold task: "We must create more and better jobs; we must stop the rise in the cost of living; we must protect the dollar from the attacks of international money speculators." To achieve the first two goals, he proposed tax cuts and a 90-day freeze on prices and wages; to achieve the third, Nixon directed the suspension of the dollar's convertibility into gold. He also ordered that an extra 10 percent tariff be levied on all dutiable imports; like the suspension of the dollar's gold convertibility, this measure was intended to induce the United States' major trading partners to adjust the value of their currencies upward and the level of their trade barriers downward so as to allow for more imports from the United States.

A success at home, Nixon's speech shocked many abroad, who saw it as an act of worrisome unilateralism; the assertive manner in which Connally conducted the ensuing exchange rate negotiations with his foreign counterparts did little to allay such concerns. Nevertheless, after months of negotiations, the Group of Ten (G–10) industrialized democracies agreed to a new set of fixed exchange rates centered on a devalued dollar in the December 1971 Smithsonian Agreement. Although characterized by Nixon as "the most significant monetary agreement in the history of the world," the exchange rates established in the Smithsonian Agreement did not last long. Fifteen months later, in February 1973, speculative market pressure led to a further devaluation of the dollar and another set of exchange parities. Several weeks later, the dollar was yet again subjected to heavy pressure in financial markets; however, this time there would be no attempt to shore up Bretton Woods. In March 1973, the G–10 approved an arrangement wherein six members of the European Community tied their currencies together and jointly floated against the U.S. dollar, a decision that effectively signaled the abandonment of the Bretton Woods fixed exchange rate system in favor of the current system of floating exchange rates.

Home (/)  |  Help (/help)  |  Glossary (/help/glossary)  |  Balance of payments

# Balance of payments

## Glossary

**A-Z:**

- Any -

**Search Glossary term:**

Apply

Record of transactions between U.S. residents (/help/glossary/us-residents) and foreign residents (/help/glossary/foreign-residents) during a given time period. Includes transactions in goods, services (/help/glossary/services), income, assets, and liabilities. It is broken down into the current accounts (international), capital accounts (international) (/help/glossary/capital-account-international), and financial accounts (international) (/help/glossary/financial-account-international).

Download Acrobat Reader (http://get.adobe.com/reader/)

Page last modified on 4/11/18

## Bureau of Economic Analysis   4600 Silver Hill Road • Suitland, MD 20746

Contact Us (//www.bea.gov/contact-us)

Working at BEA (//www.bea.gov/about/working-at-bea)

Frequently Asked Questions (//www.bea.gov/help/faq)

Our Policies (//www.bea.gov/about/policies-and-information)

Privacy (/privacy)

Commitment to Scientific Integrity (//www.bea.gov/statement-commitment-scientific-integrity-principal-statistical-agencies)

Data Dissemination Practices (//www.bea.gov/about/policies-and-information/data-dissemination)

Open Data (//www.bea.gov/open-data)

USA.gov (https://www.usa.gov/)

Business USA (https://business.usa.gov/)

No FEAR Act (http://www.osec.doc.gov/ocr/nofear/nofear.htm)

FOIA (https://www.commerce.gov/opog)

U.S. Department of Commerce (https://www.commerce.gov/)

Emergency Status (https://apps.bea.gov/status/)

The BEA Wire | BEA's Official Blog (//www.bea.gov/news/blog)

News Release Feed (RSS) (https://apps.bea.gov/rss/rss.xml)

Sign up for Email Notifications (/_subscribe/)

(https://www.linkedin.com/company/bureau-of-economic-

### UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., PLASTIC ) | |
| SERVICES AND PRODUCTS, LLC d/b/a ) | |
| GENOVA PIPE, MICROKITS, LLC, ) | |
| FISHUSA INC., TERRY PRECISION ) | |
| CYCLING LLC, ) | Court No. 25-00066 |
| ) | |
|       Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| DONALD J. TRUMP in his official capacity, ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, ) | |
| THE UNITED STATES, U.S. CUSTOMS AND ) | |
| BORDER PROTECTION, PETE R. FLORES ) | |
| in his official capacity, JAMIESON GREER ) | |
| in his official capacity, OFFICE OF THE ) | |
| UNITED STATES TRADE ) | |
| REPRESENTATIVE, and HOWARD ) | |
| LUTNICK in his official capacity, ) | |
| ) | |
|       Defendants. ) | |

### NOTICE OF ADDITIONAL EXHIBITS

Defendants respectfully submit the attached declarations in support of their response in

opposition to plaintiffs' motion for a preliminary injunction and summary judgment.  The

declarations were made by four members of the President's cabinet: Marco Rubio, Secretary of

State; Scott K. H. Bessent, Secretary of the Treasury; Howard W. Lutnick, Secretary of

Commerce; and Jamieson Lee Greer, United States Trade Representative.  They provide up-to-

date information on sensitive negotiations with trading partners and describe the catastrophic

harm to American foreign policy and national security that would ensue from granting the relief

requested in plaintiffs' motions.  These facts establish the unavailability of preliminary or permanent injunctive relief, which requires showings on both the balance of the equities and public interest.

DATED: May 23, 2025

OF COUNSEL:

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Sosun Bae
SOSUN BAE
Senior Trial Counsel
LUKE MATHERS
CATHERINE M. YANG
BLAKE W. COWMAN
COLLIN T. MATHIAS
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 305-7568
sosun.bae@usdoj.gov

*Attorneys for Defendants*

# ATTACHMENTS

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, <br><br> Defendants. | Court No. 25-00078 |

### DECLARATION OF HOWARD W. LUTNICK, UNITED STATES SECRETARY OF COMMERCE

I, HOWARD W. LUTNICK, hereby state and declare as follows:

1.  I am the Secretary of Commerce for the United States and the head of the United States Department of Commerce, an Executive Department of the United States.  *See* 5 U.S.C. § 101.  The purpose of this declaration is to assert, in my official capacity and opinion, the

1

irreparable harm that a ruling for plaintiffs in this case will have on President Donald J. Trump's constitutional power to conduct foreign affairs. Such a ruling will fundamentally impede President Trump's foreign-policymaking abilities to address national emergencies that threaten the national-security and economic-security interests of the United States and the American people. The statements made herein are based on my personal knowledge and on information provided to me in my official capacity as Secretary of Commerce.

2. I have been tasked by President Trump to lead his tariff and trade agenda. *See* Statement by President-elect Donald J. Trump Announcing the Nomination of Howard Lutnick as Secretary of Commerce, The American Presidency Project, https://www.presidency.ucsb.edu/node/375586. As part of my duties as Secretary of Commerce, I have strategized with President Trump and members of his cabinet, including United States Trade Representative Jamieson Greer, on policies to conduct trade diplomacy and address grave national emergencies. Many of these national emergencies, ranging from the hollowing out of our defense-industrial and manufacturing base to the illicit flow of narcotics and the national-security threats posed by authoritarian regimes, are caused by our foreign-trading partners.

3. For example, on February 1, 2025, President Trump found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal immigrants across our southern and northern borders is a national emergency, threatening the lives of our citizens.

4. Likewise, on the same day, President Trump found in Executive Order 14,195 that the People's Republic of China has encouraged Chinese businesses to export illegal drugs and

precursors for manufacturing those drugs to the United States, which constitutes a national emergency that threatens the lives of our citizens.

5. Then, on April 2, 2025, President Trump found in Executive Order 14,257 that our foreign-trading partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have produced persistent annual U.S. goods trade deficits, which has hollowed out our domestic manufacturing and defense-industrial base and has resulted in a lack of advanced domestic manufacturing capacity, a defense-industrial base dependent on inputs from foreign adversaries, vulnerable domestic supply chains, and a sensitive geopolitical environment. President Trump found the persistent annual U.S. goods trade deficits have resulted in a national emergency, threatening our national and economic security.

6. President Trump determined that it was in the foreign-policy interests of the United States to levy a 10 percent tariff for all trading partners. In addition, depending on the significance of the trade imbalances with foreign-trading partners, President Trump determined that some trading partners would receive higher duties.

7. Following President Trump's April 2, 2025, announcement, scores of countries immediately reached out to the Department of Commerce and the Office of the United States Trade Representative. President Trump's 10 percent tariffs for all trading partners went into effect at 12:01 a.m. on April 5, 2025—over two days after President Trump announced them. The country-specific tariff rates went into effect at 12:01 a.m. on April 9, 2025—nearly a week after they were announced. The vast majority of these countries saw it in their own national interests not to retaliate against the United States, as a matter of their own foreign-policy objectives. In short, the preliminary U.S. foreign-policy objectives of the tariffs worked—foreign-trading partners that have run trade deficits in

3

goods for years, and helped hollow out the American manufacturing base, immediately came to the negotiating table.

8. On April 9, 2025, after consultation with me and other members of his cabinet, President Trump announced a 90-day pause and lowered the country-specific tariffs on most countries to a temporary flat rate of 10 percent. *See* Exec. Order No. 14,266, 90 Fed. Reg. 15625. In that same announcement, President Trump declared that the tariff rate on China would increase to 125 percent. In doing this, President Trump furthered the foreign-policy objectives of the United States in two important ways.

9. *First*, countries that had approached his administration, including the Department of Commerce, without retaliating received the benefit of a pause designed to allow for substantive negotiations to remedy the national emergency. The pause has been a success.

10. On May 8, 2025, President Trump and Prime Minister Keir Starmer of the United Kingdom announced the terms of the first trade deal—a deal that had been illusory for years—which directly benefits the U.S. manufacturing base. These terms—which I helped construct— reflect extensive diplomatic effort to align United States and allied supply chains and eliminate foreign dependencies in sensitive sectors. The deal would not have happened but for the International Emergency Economic Powers Act tariffs.

11. Further, because of the IEEPA tariffs and the 90-day pause, I am, together with Ambassador Greer, participating in dozens of ongoing negotiations with foreign-trading partners. Again, such negotiations would not have happened but for the IEEPA tariffs.

12. *Second*, the increased tariff rate against China applied additional pressure to achieve the foreign-policy objective of bringing China—the greatest contributor to the national emergency and a well-known strategic adversary—to the negotiating table. In 2024 alone,

4

the United States had a trade deficit of $295 billion with China, and China's total trade surplus of nearly $1 trillion created excess export capacity that flooded the United States through other countries, as well. Yet, because of the IEEPA tariffs, the United States and China reached a 90-day agreement on May 12, 2025, to reduce China's tariffs on U.S. exports while the Trump administration works to address longstanding disputes with China. Under that asymmetrical agreement, reached because of the pressures of the IEEPA tariffs, China lowered its universal tariff rate on U.S. goods to 10 percent, while the United States maintained a higher rate of 30 percent.

13. An adverse ruling by this Court, enjoining the implementation of these IEEPA tariffs or circumscribing the President's authority to act in this domain, threatens all of these foreign-policy accomplishments and objectives. IEEPA gives the President of the United States a pivotal tool to express his foreign policy promptly and decisively to address national emergencies that manifest through economic and commercial channels. An adverse ruling would take away one of the most important tools the President possesses that is broad, immediate, and adaptable enough to counter emergency threats in real time.

14. IEEPA is a necessary tool given to the President to broadly and swiftly respond to national emergencies caused by the economic and commercial machinations of our foreign-trading partners. Other tools afforded to the President are not designed for national emergencies. For example, while Section 232 of the Trade Expansion Act of 1962 and Section 301 of the Trade Act of 1974 are indispensable tools of U.S. trade law, they are procedurally time-consuming and do not allow for immediate action, as IEEPA does. Under Section 232, the Department of Commerce has up to 270 days to conduct an investigation and submit a report to the President, who then has up to 90 additional days to decide whether to act, and

5

up to 15 additional days to implement that action. 19 U.S.C. §§ 1862(b)(3)(A), (c)(1)(B). Similarly, under Section 301, the United States Trade Representative must complete an investigation within 12 months, with additional time to implement any retaliatory action. 19 U.S.C. §§ 2414(a)(2)(B), 2415(a)(1). IEEPA is different and authorizes the President to take immediate action to protect national interests where all of IEEPA's conditions are satisfied. Without this tool, the President's foreign-policymaking abilities would be severely constrained and our national security would be threatened.

15. Beyond the practical effects that enjoining or circumscribing the President's IEEPA authority would have on addressing ongoing national emergencies, the real-world foreign-policy effects on this set of IEEPA tariffs would be monumental. For one, an adverse ruling would undermine the United States-United Kingdom trade deal that was negotiated in reliance on the President's emergency tariff authority. In addition, an adverse ruling would jeopardize the dozens of similar arrangements with foreign-trading partners that I am negotiating. Each of these negotiations is premised on the credible threat of enforcement of the IEEPA tariffs. If this Court limits that authority, foreign counterparts will have reduced incentives to reach meaningful agreements—resulting in the status quo that led to the national emergency. It would destroy the carefully crafted China trade agreement, which is asymmetric in America's favor, in order to address the emergency of our persistent goods trade deficit.

16. What's more, an adverse ruling by this Court also will affect President Trump's authority to invoke IEEPA to address other national emergencies of significant concern. For example, on February 1, 2025, President Trump invoked IEEPA to impose tariffs on China, Mexico, and Canada, respectively, due to the national emergency caused by "the sustained

6

influx of synthetic opioids," which "kill[] approximately two hundred Americans per day." Exec. Order No. 14,195, 90 Fed. Reg. 9121; Exec. Order No. 14,194, 90 Fed. Reg. 9117; Exec. Order No. 14,193, 90 Fed. Reg. 9113. And, on March 24, 2025, President Trump invoked IEEPA to place "secondary" tariffs on countries that purchase oil from the Maduro regime in Venezuela, given the threat that the regime's policies pose to U.S. national security. Exec. Order No. 14,245, 90 Fed. Reg. 13829. Without IEEPA, the President could not quickly and effectively address grave national emergencies—caused by foreign actors—that directly threaten the lives of Americans.

17. The imposition of IEEPA tariffs signals to foreign governments that certain conduct— whether economic predation, trade manipulation, or narcotics trafficking—will incur serious consequences. Diluting this authority would not only unravel the current IEEPA actions but also would undermine future deterrence. Allies and adversaries alike monitor U.S. courts for signs of constraint on presidential power. A ruling that narrows IEEPA would have ripple effects across every domain in which economic instruments are used for strategic effect.

18. For example, India and Pakistan—two nuclear powers engaged in combat operations just 13 days ago—reached a tenuous ceasefire on May 10, 2025. This ceasefire was only achieved after President Trump interceded and offered both nations trading access with the United States to avert a full-scale war. An adverse ruling that constrains presidential power in this case could lead India and Pakistan to question the validity of President Trump's offer, threatening the security of an entire region and the lives of millions.

19. All told, an invalidation of President Trump's ability to use IEEPA would dismantle a cornerstone of President Trump's national security architecture, irreparably harm the

government's ability to respond to evolving foreign threats, and severely disrupt the Department of Commerce's coordination of foreign policy-related economic actions on behalf of the President. It would jeopardize vital trade agreements, collapse ongoing negotiations, allow for Chinese aggression during a period of strategic competition, leave the American people exposed to predatory economic practices by foreign actors, and threaten national security. It also would come after the democratically elected United States Senate failed to garner the necessary votes to revoke President Trump's IEEPA emergency declaration on April 30, 2025.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 23 day of May, 2025, in the City of Washington, District of Columbia.

_____
Howard W. Lutnick
41st United States Secretary of Commerce

8

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
THE HONORABLE TIMOTHY M. REIF, JUDGE
THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA,<br><br>        Defendants. | Court No. 25-00078 |

## DECLARATION OF SECRETARY OF STATE MARCO RUBIO

I, Marco Rubio, hereby state as follows:

1.    I am the Secretary of State of the United States and head of the United States Department of State, an Executive Department of the United States. *See* 22 U.S.C. § 2651. As Secretary of State, I am the President's chief foreign affairs advisor. I carry out the

1

President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2. The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, State Department employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3. The purpose of this Declaration is to confirm, in my capacity as Secretary of State and head of the Department of State, that a ruling for the plaintiffs in this case would cause significant and irreparable harm to U.S. foreign policy and national security. Such a ruling would derail critical ongoing negotiations with our foreign trading partners and threaten broader U.S. strategic interests internationally.

4. In the International Emergency Economic Powers Act (IEEPA), *see* 50 U.S.C. § 1701 *et seq.*, Congress granted to the President dynamic, flexible authority to respond to crises on a global scale. President Trump has exercised that authority to impose tariffs in response to crises threatening America's national security.

5. In particular, the President found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal aliens across our southern and northern borders is an emergency for the United States and its citizens.

6. Likewise, the President found in Executive Order 14,195 that the encouragement by the People's Republic of China (PRC) of PRC businesses to export illegal drugs and precursors

2

for manufacturing those drugs in the United States is an emergency for the United States and its citizens.

7. Last, the President found in Executive Order 14,257 that our trade partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, and resulting large and persistent annual U.S. goods trade deficits have given rise to acute national security threats driven by our hollowed-out manufacturing base, lack of advanced domestic manufacturing capacity, vulnerable supply chains, a defense-industrial base that depends on foreign adversaries, and the sensitive geopolitical environment.

8. The United States is presently pursuing potential trade deals with Mexico, Canada, PRC, and dozens of other countries. These negotiations could address the urgent threats of mass migration at our northern and southern borders, the flow of fentanyl into our country, and the erosion of our domestic production capacity caused in substantial part by the large and persistent annual U.S. goods trade deficient stemming from our trade partners' non-reciprocal trading practices.

9. The negotiations are currently in a delicate state, with discussions ongoing and final deals not yet reached. In some cases, we have reached frameworks with our trading partners, while we continue to negotiate on details. In other cases, we have not yet reached a framework agreement or arrangement.

10. These negotiations have been one of the country's top foreign policy priorities since the reciprocal tariffs were announced on April 2. Reflecting the urgency of the emergency, much of U.S. global diplomacy in the last six weeks has been focused on these negotiations.

11. In each case, the negotiations are premised on the ability of the President to impose tariffs under IEEPA. If the President is enjoined or limited from exercising his authority under

3

IEEPA to impose tariffs to address these urgent threats, that would cause irreparable harm to our efforts to secure the U.S. production and manufacturing base through our ongoing negotiations and other diplomatic efforts.

12. For example, if the Court were to enjoin the President from imposing tariffs, our trade partners would likely believe that the President lacks power under IEEPA to promptly respond to their actions during the ongoing negotiations. They may also perceive such a ruling as a vulnerability and encourage them to retaliate against the United States for attempting to impose tariffs and negotiate agreements to protect our national security. *See* Executive Order 14,266, § 3. Notably, other countries declined to retaliate against the United States after the President made clear he would exercise his authority under IEEPA to impose additional tariffs, as he did with PRC.

13. The political branches, not the courts, are appropriately situated to handle and intervene in matters of foreign policy and national security. This case and the real-world diplomacy inherent in it exemplify why the courts must not interfere in such foreign affairs. U.S. foreign policy has an exceptional need for consistent implementation of the decision the President has already made under IEEPA. A conflicting pronouncement by this Court on the same issue would lead to embarrassment of the United States on a global stage.

14. Beyond diplomatic embarrassment, which itself is dangerous as it emboldens allies and adversaries alike, the Court's interference would perpetuate the United States' industrial decline and unsustainable trade deficits. The President found in Executive Order 14,257 that the United States' large and persistent trade deficits are a structural imbalance in the global trading system that has hollowed out a number of critical industries. Without robust domestic production capacity, the United States will not be able to produce the weapons

4

and other resources necessary to defend itself or support the critical industries necessary to avoid being held hostage by foreign adversaries. That weakened position will have a direct impact on the President's ability to conduct foreign policy and advance the United States' interests.

15. Congress has reserved for itself the power to review the President's exercise of his powers under IEEPA. Exercising that role, Congress considered whether to terminate the President's emergency declaration, and it has appropriately declined to do so, recognizing the appropriateness of the President's exercise of powers and the delicate, ongoing international diplomacy that is unfolding as a result.

16. It is critical to the foreign policy and national security of the United States for the Court to decline to enjoin or restrain the President from exercising his power under IEEPA to impose tariffs in recognition of the unusual and extraordinary threats at issue in this litigation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 23rd day of May, 2025.

_____

Marco Rubio
Secretary of State

5

### UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

| | | |
|---|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Court No. 25-00078 |
| v. | ) ) ) | |
| UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

### __DECLARATION__

I, Scott K. H. Bessent, hereby state as follows:

1.  I am the Secretary of the Treasury.  I have been the Secretary of the Treasury since January

    28, 2025.

1

2. President Trump has exercised his IEEPA authority to impose tariffs in response to crises threatening America's national security and economy.

3. In particular, the President found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal immigrants across our southern and northern borders is an emergency for the Nation and its citizens.

4. The President also found in Executive Order 14,257 that our trading partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have given rise to a presently acute national security threat of large and persistent annual U.S. goods trade deficits, which have led to the hollowing out of our manufacturing base, lack of advanced domestic manufacturing capacity, vulnerable supply chains, and a defense-industrial base that depends on foreign adversaries.

5. Tariffs are a crucial tool for protecting America's national security and advancing American foreign policy by addressing the unusual and extraordinary threats the President has identified.

6. The tariffs have proven to be well-tailored to bring trading partners to the table to address these urgent threats. The United States is presently negotiating agreements with Mexico, Canada, PRC, and many of our key trading partners, in order to address the urgent threats at our northern and southern borders, posed by illegal drugs, and to our domestic production capacity caused in substantial part by the large and persistent annual U.S. goods trade deficient stemming from our trade partners' non-reciprocal trading practices.

7. There are currently ongoing negotiations to address this emergency with dozens of countries. Those negotiations are presently in a delicate state, with discussions ongoing

2

- A85 -

and formal, final deals not yet reached.  In some cases, we have reached framework agreements with our trading partners, while we continue to negotiate on details.  In other cases, we have not yet reached a framework agreement.

8.  For example, on May 8, 2025, the United States and the United Kingdom announced a framework agreement as a result of such negotiations. The U.S.-UK framework agreement will bolster U.S. economic and national security by enhancing market access for American exporters and lowering tariff and non-tariff barriers.

9.  These negotiations have been one of the country's top foreign policy priorities since the reciprocal tariffs were announced on April 2.

10.  In each case, those ongoing, delicate negotiations are premised on the President's tariffs at issue in this case.  If the President is enjoined from imposing these tariffs, it could shatter our negotiations with dozens of countries.

11.  If the Court were to enjoin the President from imposing tariffs, our trading partners may feel a renewed boldness to take advantage of that new vulnerability by retaliating against the United States for attempting to impose tariffs and negotiate agreements to protect our national security.

12.  In short, the maintenance of the tariffs is crucial to the President's ability to conduct real-world diplomacy and his ability to protect the national security and economy of the United States.

13.  Congress considered whether to terminate the President's emergency declaration, and declined to do so.  *See* H.J.Res. 72 (2025); H.J.Res.73 (2025).  It is critical to the national security and economy of the United States for the Court to decline to block the President from imposing these tariffs as well.

3

- A86 -

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this day of May 23, 2025.

/s/_____

Scott K. H. Bessent
Secretary
Department of the Treasury

4

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
                THE HONORABLE TIMOTHY M. REIF, JUDGE
                THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, <br><br> Defendants. | Court No. 25-00078 |

## **DECLARATION**

I, Ambassador Jamieson Lee Greer, hereby state as follows:

1.  I am the United States Trade Representative.  I have been the United States Trade

     Representative since February 26, 2025.  In this capacity, I serve as the principal advisor

to the President on international trade policy and the chief representative for the United States in international trade negotiations. *See* 19 U.S.C. § 2171(c)(1)(B)(C).

2. In IEEPA, Congress granted to the President dynamic, flexible authority to respond to crises on a global scale.

3. President Trump has exercised that authority to impose tariffs in response to crises threatening America's national security and the economy.

4. The President found in Executive Order 14,257 that our trade partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have been an important driver of large and persistent annual U.S. goods trade deficits, which have grown over 40 percent in the past five years, and created a presently acute threat to national security and the economy. The President found that structural asymmetries in our bilateral trade relationships significantly constrain U.S. exports and artificially incentivize foreign production. The President found further that these conditions have led to a hollowing out of the U.S. manufacturing and defense-industrial base, leaving the United States dependent upon foreign supply chains for national-security-sensitive products and with insufficient domestic manufacturing capacity to remain competitive in the global economy.

5. Tariffs imposed under IEEPA are a crucial tool for protecting America's national security and advancing American foreign policy by addressing the unusual and extraordinary threats the President has identified.

6. This case does not present an abstract question of law. The Court's ruling will have a concrete and immediate effect on United States national security and foreign policy.

2

7. The tariffs have proven to be well tailored to address these urgent threats. The United States is presently negotiating with Mexico, Canada, and the PRC in order to address the urgent threats at our northern and southern borders.

8. Furthermore, on April 9, the President issued a 90-day pause of the country-specific reciprocal tariffs so that he might negotiate with trading partners who are willing to take significant steps to remedy their non-reciprocal trading practices and align with the United States on national and economic security matters.

9. The United States is currently negotiating with dozens of countries regarding the terms of that alignment. Those negotiations are presently in a delicate state, with discussions ongoing and final deals not yet reached.  For example, on May 8, President Trump and United Kingdom (UK) Prime Minister Keir Starmer announced the general terms of an agreement that will provide U.S. companies with more than US$5 billion in expanded access to the UK market while bolstering United States national security.  Similarly, on May 12, President Trump reached an agreement with China to reduce retaliatory tariffs and non-tariff barriers imposed after his April 2 Executive Order and set a path for future discussions to open the Chinese market to more U.S. exports.  In many other cases, the United States continues to negotiate agreements in principle to structure final deals.

10. These negotiations have been one of the country's top foreign policy priorities since the tariffs were announced on April 2. Reflecting the urgency of the emergency, much of U.S. global diplomacy in the last six weeks has been focused on these negotiations.

11. In each case, those ongoing, delicate negotiations are premised on the ability of the President to impose tariffs under IEEPA. If the President is enjoined from exercising his

3

authority under IEEPA to impose tariffs to address these urgent threats, the premise of these important negotiations will be eliminated.

12. A decision enjoining the President from imposing tariffs under IEEPA would create a foreign policy disaster scenario.

13. If the Court disrupts U.S. trade policy imperatives by enjoining the President from imposing tariffs, the United States' ability to address national and economic security matters would suffer serious damage.

14. If the Court were to enjoin the President from imposing tariffs, it will signal to our trading partners that the President *lacks* power to promptly respond to future emergencies under IEEPA, and they may feel emboldened to further distort the conditions of competition for U.S. exporters.

15. It is critical to the national security of the United States for the Court to decline to enjoin the President from exercising his power under IEEPA to impose tariffs in recognition of the unusual and extraordinary threats at issue in this litigation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 27th day of May, 2025.

/s/ _____

Ambassador Jamieson Lee Greer
United States Trade Representative

4