**Nos. 2025-1812, -1813**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

---

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

*Plaintiffs – Appellees*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection, in his official capacity as Acting Commissioner of the United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, in his official capacity as Secretary of Commerce, UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Defendants – Appellants.*

---

STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF VERMONT,

*Plaintiffs – Appellees*

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection, in his official capacity as Acting

Commissioner for U.S. Customs and Border Protection, UNITED STATES,

Defendants – Appellants.

On Appeal from the United States Court of International Trade, Nos. 25-66, -77, Judges Katzmann, Reif, and Restani

## BRIEF OF *AMICI CURIAE* AMERICA FIRST LEGAL FOUNDATION AND COALITION FOR A PROSPEROUS AMERICA IN SUPPORT OF DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR A STAY PENDING APPEAL

DANIEL Z. EPSTEIN
AMERICA FIRST LEGAL
  FOUNDATION
611 Pennsylvania Ave. SE #231
Washington, DC 20003
202-964-3721
daniel.epstein@aflegal.org

R. TRENT MCCOTTER
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW
Suite 900
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com

*Counsel for Amici Curiae*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2025-1812, 2025-1813 |
| **Short Case Caption** | V.O.S. Selections, Inc. v. Trump |
| **Filing Party/Entity** | America First Legal Foundation & Coalition for a Prosperous America |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/04/2025

Signature: /s/ R. Trent McCotter

Name: R. Trent McCotter

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| America First Legal Foundation | | |
| Coalition for a Prosperous America | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

---

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| R. Trent McCotter, Boyden Gray PLLC | Daniel Z. Epstein, America First Legal Foundation | |
| | | |
| | | |

---

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☐   No    ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iii

AUTHORITY TO FILE ........................................................................... 1

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................... 1

SUMMARY OF ARGUMENT .................................................................. 2

ARGUMENT ........................................................................................ 2

    I.   Precedent Dictates That IEEPA Authorizes Tariffs ................... 2

    II.  Use of IEEPA for Tariffs Does Not Violate the Major-Questions Doctrine ....................................................................... 6

    III.  IEEPA Does Not Violate the Nondelegation Doctrine ............... 9

    IV.  The Court Cannot Second-Guess the President's Determinations Under IEEPA ................................................. 16

    V.  Any Relief Should Be Limited to Plaintiffs ............................. 18

CONCLUSION .................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ...................................................................... 19

*The Aurora,* 11 U.S. 382 (1813) ............................................................ 12

*Chang v. United States,*
    859 F.2d 893 (Fed. Cir. 1988) ..................................................... 17

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.,*
    603 U.S. 799 (2024) ...................................................................... 19

*Dalton v. Specter,*
    511 U.S. 462 (1994) ...................................................................... 19

*DOT v. Ass'n of Am. R.R.s,* 575 U.S. 43 (2015) ................................. 12

*Federal Energy Administration v. Algonquin SNG, Inc.,*
    426 U.S. 548 (1976) ............................................................. 3, 4, 9, 10

*Florsheim Shoe Co., Div. of Interco, Inc. v. United States,*
    744 F.2d 787 (Fed. Cir. 1984) ....................................................... 7

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ...................................................................... 19

*Georgia v. Public.Resource.Org, Inc.,*
    590 U.S. 255 (2020) ........................................................................ 6

*Gundy v. United States,*
    588 U.S. 128 (2019) ...................................................................... 11

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ...................................................................... 20

*Marshall Field & Co. v. Clark,*
    143 U.S. 649 (1892) ...................................................................... 12

*Murthy v. Missouri*,
603 U.S. 43 (2024) ................................................................. 20

*Nat'l Cable & Television Ass'n, Inc. v. United States*,
415 U.S. 336 (1974) ............................................................... 10

*NFIB v. Sebelius*,
567 U.S. 519 (2012) ................................................................. 4

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ................................................................. 7

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935) ............................................................... 11

*Regan v. Wald*,
468 U.S. 222 (1984) ................................................... 3, 16, 17

*South Corp. v. United States*,
690 F.2d 1368 (Fed. Cir. 1982) ............................................. 3

*Trump v. Hawaii*,
585 U.S. 667 (2018) ............................................................... 18

*United States v. Curtiss-Wright Exp. Corp.*,
299 U.S. 304 (1936) ..................................................... 7, 8, 12

*United States v. Mazurie*,
419 U.S. 544 (1975) ............................................................... 11

*United States v. Rock Royal Co-Op.*,
307 U.S. 533 (1939) ............................................................... 16

*United States v. Spawr Optical Rsch., Inc.*,
685 F.2d 1076 (9th Cir. 1982) ............................................. 17

*United States v. Yoshida Int'l, Inc.*,
526 F.2d 560 (C.C.P.A. 1975) ........................................... 3, 5

*West Virginia v. EPA*,
597 U.S. 697 (2022) ....................................................... 6, 8, 9

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ...................................................................... 7

## Constitutional & Statutory Provisions

U.S. Const. art. I, § 8, cl. 1 ...................................................... 14

50 U.S.C. § 1701 ...................................................................... 10

50 U.S.C. § 1702 ............................................................... 2, 5, 15

Ch. 41, 1 Stat. 372 (1794) ...................................................... 14

## Other Authorities

*Adjust*, Merriam-Webster Thesaurus, https://www.merriam-
    webster.com/thesaurus/adjust ............................................. 4

The Federalist No. 23 (1787) (Alexander Hamilton) .............................. 14

H.R. Rep. No. 95-459 (1977) ..................................................... 5

Michael W. McConnell, *The President Who Would Not Be
    King: Executive Power Under the Constitution* (2020) ...................... 13

Paul Einzig, *The Control of the Purse: Progress and Decline
    of Parliament's Financial Control* (1959) ............................... 13

*Regulating Imports With a Reciprocal Tariff to Rectify Trade
    Practices That Contribute to Large and Persistent Annual
    United States Goods Trade Deficits*, Exec. Order No.
    14,257, 90 Fed. Reg. 15,041 (Apr. 7, 2025) ............................. 18

## AUTHORITY TO FILE[1]

*Amici curiae* have sought leave of Court to file this brief.

## IDENTITY AND INTEREST OF *AMICI CURIAE*

America First Legal Foundation is a nonprofit organization dedicated to promoting the rule of law in the United States and defending individual rights guaranteed under the Constitution and federal statutes. As part of *Amicus*'s commitment to the rule of law, it seeks to ensure that principles of jurisdiction are strictly enforced.

*Amicus curiae* the Coalition for a Prosperous America ("CPA") is a national organization focused on representing the tax and trade policy interests of domestic manufacturers, farmers, and workers. Founded in 2007, CPA seeks to promote domestic self-sufficiency, quality job opportunities, and the nation's security by advocating for policy that best supports those concerns.

---

[1] No person other than *amici curiae* and their counsel assisted with or made a monetary contribution for preparing or submitting this brief. *Amici curiae* have filed a motion for leave to file this brief.

## SUMMARY OF ARGUMENT

The International Emergency Economic Powers Act (IEEPA) authorizes the President to (among other things) "regulate … importation … of … any property" under specified conditions. 50 U.S.C. § 1702(a)(1)(B). The primary merits question is whether this language authorizes the imposition of tariffs on such property. Under binding precedent, it does. *See* Part I, *infra*. Nor does that view violate—or require narrowing from—the major-questions or nondelegation doctrines. *See* Parts II & III, *infra*. Moreover, the Court lacks authority to second-guess the President's determinations under IEEPA. *See* Part IV, *infra*.

Accordingly, the Court should stay the Court of International Trade's ruling below. But if this Court does not do so, it should at least narrow the relief to the parties themselves as (alleged) tariff payors. *See* Part V, *infra*.

## ARGUMENT

## I. Precedent Dictates That IEEPA Authorizes Tariffs.

This Court has already answered the question of whether the statutory phrase "regulating importation" includes the power to impose

a monetary charge like a tariff. In construing identical language in the Trading With the Enemy Act (TWEA), this Court's predecessor for customs matters held the President was authorized to "impos[e] an import duty surcharge" because "impos[ing] duties can be to 'regulate'" the importation of the items on which duties are imposed. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 575–76 (C.C.P.A. 1975). Not only does that decision remain binding, *see South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982), but the Supreme Court has held that IEEPA and the TWEA gave the President "essentially the same" powers, *Regan v. Wald*, 468 U.S. 222, 225–28 (1984). The binding interpretation of TWEA is equally binding in the context of IEEPA.

Supreme Court caselaw on other trade statutes supports the view that IEEPA authorizes tariffs. Most notably, in *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976)—a decision cited only in passing below—the Supreme Court interpreted the Trade Expansion Act of 1962, as amended by the Trade Act of 1974, where the relevant statutory language authorized the President to "take such action" as he deemed necessary "to adjust the imports of" specified articles. *Id.* at 550. The Court held there was "no support in the language

of the statute for [the] contention that the authorization to the President to 'adjust' imports should be read to encompass only quantitative methods, i.e., quotas as opposed to monetary methods, i.e., license fees of effecting such adjustments." *Id.* at 561. In that case, the President had imposed increasing "license fees" on certain petroleum imports, and the Supreme Court held that he clearly had that authority as a form of "action … to adjust imports." *Id.* at 550.

That relevant statutory language in *Algonquin* did not specify license fees or tariffs, yet the Court held the President had the power to impose such "monetary methods." "[L]imiting the President to the use of quotas would effectively and artificially prohibit him from directly dealing with some of the very problems against which [the statute] is directed." *Id.* at 561–62.

IEEPA similarly allows the President to "regulate … import[s]." 50 U.S.C. § 1702(a)(1)(B). "Regulate" is a synonym for "adjust" (i.e., the word at issue in *Algonquin*). *See Adjust*, Merriam-Webster Thesaurus, https://www.merriam-webster.com/thesaurus/adjust (last visited May 19, 2025). In fact, the Supreme Court has elsewhere held that "'to *regulate*' meant 'to *adjust* by rule or method.'" *NFIB v. Sebelius*, 567 U.S.

519, 550 n.4 (2012) (cleaned up) (emphases added). That closeness in meaning is especially strong because both IEEPA and the statute in *Algonquin* addressed actions taken by the President with respect to imports.

That provides an easy syllogism: the Supreme Court has held that "adjusting imports" allows for charges like tariffs and that "adjusting" means the same as "regulating," and IEEPA authorizes "regulating imports." Taken together, that means IEEPA authorizes tariffs, too.

If anything, the contextual statutory language in IEEPA is even more broadly worded than the statute in *Algonquin*, as IEEPA authorizes the President not only to "regulate" imports, but also to investigate, block, void, nullify, prevent, and prohibit them, along with a wide array of other covered actions, as well. 50 U.S.C. § 1702(a)(1)(B). It would make little sense to conclude that the language in *Algonquin* authorized monetary charges, yet the broader language in IEEPA does not.

Further, Congress enacted IEEPA under the backdrop of the TWEA and this Court's decision holding that TWEA authorized the President to impose an "import duty surcharge." *Yoshida*, 526 F.2d at 576; *see* H.R. Rep. No. 95-459, at 5 (1977) (citing *Yoshida* expressly). And, far from

5

changing the relevant statutory text in light of *Yoshida*, Congress copy-pasted it over to IEEPA. "[W]hen Congress 'adopt[s] the language used in [an] earlier act,'" courts "presume that Congress 'adopted also the construction given'" to that language. *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270 (2020).

For all these reasons, IEEPA authorizes tariffs.

## II.   Use of IEEPA for Tariffs Does Not Violate the Major-Questions Doctrine.

The major-questions doctrine primarily reflects courts' skepticism that Congress would provide administrative agencies with great power *without* clearly saying so. Indeed, the Supreme Court's leading case on the issue indicates a threshold requirement that "the statute at issue … confers authority upon *an administrative agency*." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (emphasis added).

There is good reason to doubt that the same skepticism applies to statutory grants of power directly to the President, given that he is a branch of government unto himself, rather than an unelected agency bureaucrat, as in the *West Virginia* case. "The President occupies a unique position in the constitutional scheme," and that "unique status under the Constitution distinguishes him from other executive officials."

6

*Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982). Unlike when dealing with agency bureaucrats, it should come as no surprise that Congress would grant broad powers to the President himself, and thus no inherent skepticism is warranted for statutes that appear to do so.

At the very least, there is serious cause to doubt that the major-questions doctrine applies to a statute that gives the President broad authorities related to his inherent Article II foreign-relations powers, in particular. "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) (quoting 10 Annals of Cong. 613 (1800) (statement of John Marshall)); *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 13, 20–21 (2015). When it comes to foreign affairs, "broad grants by Congress of discretion to the Executive are common." *Florsheim Shoe Co., Div. of Interco, Inc. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984). "[C]ongressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be

admissible were domestic affairs alone involved." *Curtiss-Wright*, 299 U.S. at 320.

Thus, there is little reason to "hesitate," *West Virginia*, 597 U.S. at 721 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)), before concluding that Congress would grant the President broad authority in a realm where he already possesses significant constitutional powers—and thus the premise of the major-questions doctrine makes little sense in the context of statutes dealing with the President and international relations.

Even if the major-questions doctrine did apply, however, IEEPA satisfies it. As noted above, the Supreme Court in *Algonquin* addressed quite similar statutory text and held that it authorized monetary charges on imports, and this Court agreed decades ago that TWEA authorized similar charges. That means (1) imposing tariffs pursuant to statutory language both similar and identical to that in IEEPA is not the exercise of an "unheralded power," *West Virginia*, 597 U.S. at 724, but rather a use that courts have long approved; and (2) the relevant statutory text provides sufficiently "clear congressional authorization" for such actions, *id.* at 732. Just as importantly, at every turn, the text of IEEPA embodies

broadness, not "modest[y]," *id.* at 723–24. Its natural reading authorizes the President to take an extraordinarily wide range of actions, with respect to an extraordinarily wide range of products and transactions. That interpretation was by design—it is not some *post hoc*, overly clever interpretation espoused by an agency trying to circumvent Congress.

## III.   IEEPA Does Not Violate the Nondelegation Doctrine.

The decision below suggested that the nondelegation doctrine influenced its interpretation of IEEPA. That was also incorrect under current precedent. Again, the *Algonquin* decision resolves this matter. There, the Supreme Court expressly rejected a nondelegation challenge to the statute in that case, which (as discussed above) broadly granted the President power to "take such action … to adjust the imports of" specified articles, if the article's importation "threaten[s] to impair the national security." *Algonquin*, 426 U.S. at 550.

The Court's nondelegation analysis admittedly is not lengthy, but it squarely held that the statute satisfies existing nondelegation requirements because it "establishes clear preconditions to Presidential action," including a finding that the article "'is being imported into the United States in such quantities or under such circumstances as to

threaten to impair the *national security*,'" and "[a]rticulates a series of specific factors to be considered by the President in exercising his authority." *Id.* at 559 (emphasis added).

IEEPA likewise requires a finding of an "unusual and *extraordinary threat*, which has its source in whole or substantial part outside the United States, to the *national security*, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a) (emphases added).

*Algonquin* also expressly "reject[ed] [the] suggestion that we must construe [the statutory text] narrowly in order to avoid 'a serious question of unconstitutional delegation of legislative power.'" *Algonquin*, 426 U.S. at 558–59. In other words, *Algonquin* also forecloses using constitutional avoidance to narrowly construe IEEPA.

Even as an originalist matter, there is a good argument that IEEPA would pass nondelegation muster. Powers that are strictly and exclusively legislative (e.g., domestic taxation), *Nat'l Cable & Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974), are subject to rigorous nondelegation scrutiny, with Congress often required to legislative in particular detail, leaving the executive with—at most—only

minor details to fill in.[2] By contrast, the Supreme Court has long held that nondelegation "limitations are … less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter." *United States v. Mazurie*, 419 U.S. 544, 556–57 (1975).

Foremost among this latter class are statutes "confid[ing] to the President … an authority which was cognate to the conduct by him of the foreign relations of the government," *Panama Refining Co. v. Ryan*, 293 U.S. 388, 422 (1935), as "many foreign affairs powers are constitutionally vested in the president under Article II," *Gundy v. United States*, 588 U.S. 128, 159 (2019) (Gorsuch, J., dissenting). Indeed, the Supreme Court's first foray into the nondelegation thicket was a challenge to the embargo authorized by the 1809 Non-Intercourse Act, which permitted the President to decide whether to lift an embargo on Great Britain. There, the Court blessed a broad delegation to the President in such matters and explained it saw "no sufficient reason[] why the legislature

---

[2] The one exception is 47 U.S.C. § 254, which authorized the Federal Communications Commission to raise domestic taxes without any objective limits, rates, or formulas. That statute is the subject of a pending Supreme Court nondelegation case argued in March 2025. *See FCC v. Consumers' Rsch.*, No. 24-354 (U.S.).

should not exercise its discretion in reviving the [Non-Intercourse Act], either expressly or conditionally, as their judgment should direct." *The Aurora*, 11 U.S. 382, 388 (1813).

Thus, "statutes relating to trade and commerce with other nations," *Marshall Field & Co. v. Clark*, 143 U.S. 649, 691 (1892), including "embargoes" and "suspending commercial intercourse with [certain countries]," *id.* at 684–85, arguably need not require the same specificity to pass nondelegation as would domestic revenue-raising statutes, given that foreign relations are already "cognate" to the President, *Curtiss-Wright*, 299 U.S. at 327. As Justice Thomas has explained, delegation of powers regarding embargoes and tariffs "arguably did not involve an exercise of core legislative power" and thus would not necessarily trigger the same nondelegation scrutiny as something like domestic taxation. *DOT v. Ass'n of Am. R.R.s*, 575 U.S. 43, 80 (2015) (Thomas, J., concurring in the judgment).

Professor Michael McConnell has explained that this approach "provide[s] a superior grounding for *Field v. Clark*, where Congress gave the President a bargaining chip to use in foreign negotiations, and *Curtiss-Wright*, which recognized a broader range of legitimate

delegation in the foreign affairs arena than in domestic law," and it "may also explain why stronger nondelegation norms survive in the context of power that is especially central to the legislative branch, such as domestic taxation." Michael W. McConnell, *The President Who Would Not Be King: Executive Power Under the Constitution* 334 (2020).

This would also track English practice, where (post-Glorious-Revolution) Parliaments imposed strict controls on domestic taxation, down to the penny or percentage, but the King's "role in protecting shipping engaged in overseas trade" meant that Parliament could grant customs powers on terms "much more liberal[]" than it could for domestic taxation. Paul Einzig, *The Control of the Purse: Progress and Decline of Parliament's Financial Control* 65–66 (1959). Accordingly, Kings often had broad powers to issue a new "book of rates" for duties, something that would have been unthinkable for domestic taxation. *Id.* at 69.

This all means that because tariffs and duties implicate foreign relations, a core Article II authority, Congress could legislate with less specificity and leave more policy decisions for the President to decide in the first instance.

Another area of overlapping congressional and presidential powers—and thus similarly subject to lessened nondelegation scrutiny—is the realm of national defense, which IEEPA also implicates. The Constitution empowers Congress "[t]o … provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, and the Framers understood that safeguarding the common defense required *executive* flexibility in responding to national emergencies. Alexander Hamilton explained that the powers essential to the common defense "ought to exist without limitation" because "it is impossible to foresee or define the extent and variety of national exigencies, or the correspondent extent and variety of the means which may be necessary to satisfy them." The Federalist No. 23 (1787) (Alexander Hamilton).

Early congressional practice confirmed this understanding: in 1794, just a few years after ratification, Congress authorized President George Washington to "lay, regulate and revoke Embargoes" whenever "in his opinion, the public safety shall so require." Ch. 41, 1 Stat. 372. This 1794 Act, like IEEPA, gave the President flexibility, under emergency circumstances, to broadly regulate imports. *Compare id.* ("[T]he President … is authorized … to lay an embargo … under such regulations

as the circumstances of the case may require"), *with* 50 U.S.C. § 1702(a)(1)(B) ("[T]e President may, under such regulations as he may prescribe … regulate … importation … of … property").

IEEPA thus lies at the heart of international relations *and* national defense, two areas where Congress has its widest latitude from a nondelegation perspective.

Some *Amici* supporting Plaintiffs argued below that the President lacks inherent constitutional authority to impose tariffs. But the question here is not whether the President has inherent Article II authority to impose tariffs *absent* any pre-authorization by Congress. Rather, the questions here are whether Congress authorized tariffs in IEEPA and (if so) whether that authorization is sufficiently specific to conform to nondelegation principles. As explained above, IEEPA does authorize tariffs, and *Algonquin* dictates that a nondelegation challenge to that language should fail.

The same *Amici* suggest *Algonquin* was different because the statute there imposed "limits," presumably referring to the complex procedural requirements before the President could impose monetary charges. But those procedural hurdles are irrelevant from a

15

nondelegation perspective. *See United States v. Rock Royal Co-Op.*, 307 U.S. 533, 576 (1939) ("[P]rocedural safeguards cannot validate an unconstitutional delegation."). For the nondelegation inquiry, the statute either imposes sufficient substantive limitations, or not. And under *Algonquin*, IEEPA passes muster.[3]

## IV. The Court Cannot Second-Guess the President's Determinations Under IEEPA.

Nor can courts review or second-guess the President's findings and determinations to trigger IEEPA. In the related context of TWEA, the Supreme Court has held that "[m]atters relating 'to the conduct of foreign relations … are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Regan*, 468 U.S. at 242 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)).

---

[3] Nor must the nondelegation test be the same for domestic taxes and tariffs simply because both are in Article I, Section 8. The Framers used different terms for these concepts, indicating that they have different meanings; moreover, Section 8 includes such disparate powers as regulating naturalization and creating lower federal courts, yet presumably Congress could not authorize the President to create lower federal courts under the same types of broad and open-ended statutory language routinely used and approved in the immigration context.

16

In *Regan*, the challengers "argue[d] that there is no 'emergency' at the present time," but the Court declined to challenge the President's contrary view. *Id.* "[C]ourts have not normally reviewed 'the essentially political questions surrounding the declaration or continuance of a national emergency,'" as the "statute contained no standards by which to determine whether a national emergency existed or continued; in fact, Congress had delegated to the President the authority to define all of the terms in that subsection of the TWEA including 'national emergency,' as long as the definitions were consistent with the purposes of the TWEA." *United States v. Spawr Optical Rsch., Inc.*, 685 F.2d 1076, 1080 (9th Cir. 1982).

This Court has likewise noted—specifically in the IEEPA context—that "to the extent that the plaintiffs' inquiry into the 'true facts' of the [declared] crisis would seek to examine the President's motives and justifications for declaring a national emergency, such an inquiry would likely present a nonjusticiable political question." *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988).

But even if some minimal judicial review were available, it would be extraordinarily deferential, lest the courts even risk substituting their

own judgment for the President's in matters of international relations and national defense. The Supreme Court recently reaffirmed "the deference traditionally accorded the President" on such matters. *Trump v. Hawaii*, 585 U.S. 667, 686 (2018). Here, the President declared the necessary emergency in part because the nation's "military readiness" and "national security posture" have been "compromised" due to decreased "domestic production capacity." *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,044–45 (Apr. 7, 2025). That relationship is not just logical but one already recognized by the Federal Circuit. *See Yoshida*, 526 F.2d at 580. It accordingly passes any minimal scrutiny.

* * *

For all the reasons above, as well as those in the government's motion, this Court should stay the Court of International Trade's decision.

## V.    Any Relief Should Be Limited to Plaintiffs.

If this Court does not grant a stay in full, it should at least narrowly tailor relief only to the alleged tariff payors identified in the Complaint.

18

The President's Executive Orders are not subject to review under the Administrative Procedure Act, *see Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992), and thus the APA's presumptive universal-vacatur rule cannot apply here, *see, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 826–43 (2024) (Kavanaugh, J., concurring). Nor can that outcome be circumvented by arguing that the challenge is actually to Agency Defendants' implementation of the Executive Orders. "The President, not the [Agencies], takes the final action that affects" Plaintiffs, and thus "the decisions made pursuant to [IEEPA] are not reviewable under the APA," even when carried out by Agency Defendants. *Dalton v. Specter*, 511 U.S. 462, 470–71 (1994). Accordingly, none of the challenged actions here is subject to the APA's presumptive rule of universal vacatur.

Nor can the State Plaintiffs obtain relief that extends to individuals or businesses within their borders under a thinly veiled *parens patriae* theory. "A State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982). The Supreme Court has thus repeatedly rejected States' attempts to litigate

the rights of their residents. In *Haaland v. Brackeen*, 599 U.S. 255 (2023), it rejected Texas's claim that a federal statute violated the Equal Protection Clause, as a State "has no equal protection rights of its own" and "cannot assert equal protection claims on behalf of its citizens," *id.* at 294–95. Just last year in *Murthy v. Missouri*, 603 U.S. 43 (2024), the Court rejected Missouri's claim that the federal government had violated Missouri's citizens' free speech rights, labeling it a "thinly veiled attempt to circumvent the limits on *parens patriae* standing," *id.* at 76. To the extent the State Plaintiffs here try the same trick, they should suffer the same fate.

## CONCLUSION

The Court should grant Defendants-Appellants' emergency motion for a stay.

June 4, 2025                    Respectfully submitted,

/s/ R. Trent McCotter
R. TRENT MCCOTTER
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com

DANIEL Z. EPSTEIN
AMERICA FIRST LEGAL
   FOUNDATION
611 Pennsylvania Ave. SE #231
Washington, DC 20003
202-964-3721
daniel.epstein@aflegal.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14- point font. There is no word limitation that specifically applies to an amicus brief at the emergency-motion stage. This brief contains 3734 words, excluding the exempt portions. Leave of Court has been sought to file this brief.

*/s/ R. Trent McCotter*
R. Trent McCotter

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

*/s/ R. Trent McCotter*
R. Trent McCotter