Nos. 25-1812, 25-1813

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT
_____

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC,
dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION
CYCLING LLC,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, PETE R.
FLORES, Acting Commissioner for United States Customs and Border
Protection, in his official capacity as Acting Commissioner of the United States
Customs and Border Protection, JAMIESON GREER, in his official capacity as
United States Trade Representative, OFFICE OF THE UNITED STATES
TRADE REPRESENTATIVE, HOWARD LUTNICK, in his official capacity
as Secretary of Commerce, UNITED STATES CUSTOMS AND BOARD
PROTECTION,

Defendants-Appellants.

_____

STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO,
STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF
ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF
NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF
VERMONT,

Plaintiffs-Appellees,

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security,
in her official capacity as Secretary of the Department of Homeland Security,
UNITED STATES CUSTOMS AND BORDER PROTECTION, PETE R.
FLORES, Acting Commissioner for United States Customs and Border
Protection, in his official capacity as Acting Commissioner for U.S. Customs
and Border Protection, UNITED STATES,

Defendants-Appellants.

—————————————

Appeals from the United States Court of International Trade in
Nos. 1:25-cv-00066-GSK-TMR-JAR and 1:25-cv-00077-GSK-TMR-JAR,
Judge Gary S. Katzmann, Judge Timothy M. Reif,
and Senior Judge Jane A. Restani

—————————————

## STATES PLAINTIFFS-APPELLEES' OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL AND AN IMMEDIATE ADMINISTRATIVE STAY

—————————————

DAN RAYFIELD  #064790
Attorney General of Oregon
BENJAMIN GUTMAN  #160599
Solicitor General
1162 Court St. NE
Salem, OR 97301-4096
Telephone:  (503) 378-4402
benjamin.gutman@doj.oregon.gov

Attorneys for State of Oregon

(Additional counsel listed on signature page)

—————————————————————————————————————————

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION .................................................................................... 1

BACKGROUND ...................................................................................... 3

    A.    IEEPA does not mention tariffs but allows the President to "regulate … importation" to "deal with an unusual and extraordinary threat." .................................................................... 3

    B.    President Trump invoked IEEPA to impose sweeping tariffs on imports, purportedly to address drug trafficking and trade deficits. ............................................................................................ 4

    C.    The CIT held that IEEPA did not authorize the tariffs. ................... 5

ARGUMENT ............................................................................................ 6

    A.    Defendants have not made a strong showing that they are likely to succeed on appeal. ............................................................ 7

        1.    The CIT correctly invalidated the worldwide tariffs because they exceed IEEPA's authorization to "regulate … importation." .................................................... 7

            a.    IEEPA does not grant authority to impose unlimited tariffs, if it authorizes tariffs at all. ............ 8

            b.    *Yoshida* supports rather than undermines that conclusion. .............................................................. 12

        2.    The CIT correctly invalidated the trafficking tariffs because they do not "deal with" the fentanyl crisis. ........... 13

        3.    The CIT did not abuse its discretion in issuing an injunction. ......................................................................... 15

    B.    The other factors weigh heavily against a stay. ............................. 17

        1.    The Administration's own public statements refute defendants' claims of dire harm from the CIT ruling ......... 17

2. The balance of injuries and public interest weigh
decidedly against a stay. ...................................................... 20

CONCLUSION ..................................................................................... 24

ADDENDUM

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

### Cases Cited

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
594 U.S. 758 (2021) ................................................................... 10

*Am. Signature, Inc. v. United States*,
598 F.3d 816 (Fed. Cir. 2010) ................................................... 22

*Apple Inc. v. Samsung Elecs. Co.*,
695 F.3d 1370 (Fed. Cir. 2012) ................................................. 17

*Atlas Powder Co. v. Ireco Chemicals*,
773 F.2d 1230 (Fed. Cir. 1985) ................................................. 19

*Bernhardt v. Los Angeles County*,
339 F.3d 920 (9th Cir. 2003) ..................................................... 23

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ................................................................... 23

*Cassell v. Snyders*,
990 F.3d 539 (7th Cir. 2021) ..................................................... 23

*El-Shifa Pharm. Indus. Co. v. United States*,
607 F.3d 836 (D.C. Cir. 2010) ................................................... 14

*Georgia v. President of the U.S.*,
46 F.4th 1283 (11th Cir. 2022) .................................................. 11

*Gibbons v. Ogden*,
22 U.S. (9 Wheat) 1 (1824) ......................................................... 8

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ................................................................... 10

*Kentucky v. Biden*,
23 F.4th 585 (6th Cir. 2022) ...................................................... 11

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)..........................................................................22

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022).....................................................................11

*Marland v. Trump*,
    498 F. Supp. 3d 624 (E.D. Pa. 2020)..........................................................15

*Mayes v. Biden*,
    67 F.4th 921 (9th Cir. 2023),
    *vac'd as moot,* 89 F.4th 1186 (9th Cir. 2023)..............................................11

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
    848 F.3d 1358 (Fed. Cir. 2017)...................................................................21

*Mistretta v. United States*,
    488 U.S. 361 (1989) ...................................................................................10

*Nebraska v. Su*,
    121 F.4th 1 (9th Cir. 2024)..........................................................................11

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................... 6, 7, 17

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ...................................................................................19

*Restaurant Law Ctr. v. U.S. Dep't of Labor*,
    66 F.4th 593 (5th Cir. 2023).......................................................................21

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013).....................................................................19

*Sampson v. Murray*,
    415 U.S. 61 (1974) .....................................................................................17

*U.S. Shoe Corp. v. United States*,
    296 F.3d 1378 (Fed. Cir. 2002)...................................................................15

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975)..................................... 8, 11, 12, 13, 14, 16

*Utility Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ...................................................................................10

*Winston-Salem/Forsyth Cnty. Bd. of Educ. v. Scott*,
    404 U.S. 1221 (1971) ...................................................................................7

iii

*Winter v. NRDC*,
  555 U.S. 7 (2008) .......................................................................................23

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) ..................................................................................14

## Constitutional and Statutory Provisions

19 U.S.C. § 1862..............................................................................................20

19 U.S.C. § 2132(a)(1).......................................................................................4

50 U.S.C. § 1701...........................................................................................6, 16

50 U.S.C. § 1701(b) ........................................................................... 3, 8, 13, 14

50 U.S.C. § 1702(a)(1)........................................................................................3

U.S. Const., Art. I, § 8 ............................................................................. 1, 8, 23

## Other Authorities

Exec. Order No. 14,193, 90 Fed. Reg. 9113 (Feb. 1, 2025)..................................4

Exec. Order No. 14,194, 90 Fed. Reg. 9117 (Feb. 1, 2025)..................................4

Exec. Order No. 14,195, 90 Fed. Reg. 9121 (Feb. 1, 2025)..................................4

Exec. Order No. 14,257, 90 Fed. Reg. 15,041 (Apr. 2, 2025).......................4, 16

H.R. Rep. No. 95-459 (1977) .................................................................... 3, 9, 13

*Webster's Third New Int'l Dictionary*
  (unabridged ed. 2002)...................................................................................9

iv

**STATES PLAINTIFFS-APPELLEES' OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL AND AN IMMEDIATE ADMINISTRATIVE STAY**
_____

## INTRODUCTION

Congress, not the President, has the "Power To lay and collect Taxes, Duties, Imposts and Excises."  U.S. Const., Art. I, § 8.  Defendants nonetheless claim that the International Emergency Economic Powers Act (IEEPA) delegates to the President the unilateral power to impose tariffs on any country, at any rate, for however long he likes, and regardless of express statutory limits in other tariff statutes and IEEPA itself.  This Court should not endorse that dangerous—and potentially unconstitutional—view, and certainly not in the rushed posture of a stay proceeding without the benefit of full briefing and argument.

This case is not about the President's Article II power over foreign policy or national security; it is about Congress's Article I power over taxes and tariffs.  Defendants' claimed need for a stay to strengthen the President's leverage in international negotiations is no basis for a stay when the leverage is based on asserting authority that he plainly does not have.  The Court of International Trade (CIT) correctly held that the sweeping tariffs at issue here exceed any authority Congress delegated to the President in IEEPA.  That

holding merely requires the President to stay within lines that every other President in the last 50 years has followed.

Beyond the merits, defendants' stay motion ("Motion") relies mainly on assertions about the effects of the CIT's ruling on national security and diplomatic relations, based on declarations submitted *before* that ruling.  But since that ruling—including before this Court entered a temporary administrative stay—top Administration officials have contradicted those assertions repeatedly and forcefully.  They have confirmed that the President retains sufficient authority over tariffs through statutes other than IEEPA and that negotiations with trading partners are not being adversely affected by the CIT's decision.  *See generally* B2–B10.[1]  This Court should not base a stay decision on defendants' earlier predictions to the contrary.

Plaintiffs do not oppose expedited briefing and argument on the merits. But defendants offer no sound basis to stay enforcement of the injunction in the meantime.  At the very least, this Court should leave the injunction in place to the extent it prohibits defendants from raising the unlawful tariffs further during this appeal—as they continue to say will happen as soon as July 9th.  B10.

---

[1]     An Addendum with relevant materials is attached to this opposition with pages marked "B__".  References to materials in defendants' Addendum are denoted "A_."

## BACKGROUND

**A.    IEEPA does not mention tariffs but allows the President to "regulate … importation" to "deal with an unusual and extraordinary threat."**

Congress enacted IEEPA in 1977 to reign in the "essentially … unlimited grant of authority" for the President to act in an emergency under IEEPA's predecessor, the Trading with the Enemy Act (TWEA).  H.R. Rep. No. 95-459, at 7 (1977); *see also id.* at 1 (Congress intended that IEEPA would provide "somewhat narrower powers").  IEEPA authorizes the President to take certain actions during a declared national emergency that arises from a foreign threat, but only "to deal with an unusual and extraordinary threat" and not "for any other purpose."  50 U.S.C. § 1701(b).  Among those authorities are the power to "regulate" the "importation or exportation" of "any property in which any foreign country or a national thereof has any interest."  *Id.* § 1702(a)(1).[2]

IEEPA does not specifically authorize the President to impose tariffs, and no other President before President Trump has used it to do so.  By contrast, Congress legislated extensively on the subject of tariffs in Title 19 of the U.S. Code, including provisions that allow the President to raise or lower tariffs in defined circumstances.  One such statute is Section 122 of the Trade Act of 1974, which allows the President to impose limited duties—up to 15% for up to

---

[2] The full text of §§ 1701 and 1702 are included in the Addendum at B16–B19.

3

150 days—"to deal with large and serious United States balance-of-payments deficits."  19 U.S.C. § 2132(a)(1).

**B.    President Trump invoked IEEPA to impose sweeping tariffs on imports, purportedly to address drug trafficking and trade deficits.**

Earlier this year, President Trump invoked IEEPA to impose tariffs on most imports worldwide.  The tariffs generally fell into two categories.  First, the President imposed tariffs on most imports from Canada, Mexico, and China based on his declarations of emergencies regarding fentanyl trafficking, other crime, and—for Mexico and China only—immigration.  Exec. Order No. 14,193, 90 Fed. Reg. 9113 (Feb. 1, 2025); Exec. Order No. 14,194, 90 Fed. Reg. 9117 (Feb. 1, 2025); Exec. Order No. 14,195, 90 Fed. Reg. 9121 (Feb. 1, 2025).  Second, he imposed tariffs worldwide, including additional tariffs on China, based on his conclusion that "U.S. trading partners' economic policies … suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits."  Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,041 (Apr. 2, 2025).

Over the past several months, the President suspended some tariffs, increased others, and modified the scope of the exceptions they allow.  *See* A19–A24 (detailing history).  As of the time of the CIT's ruling, the orders subjected most imports from China to a 30 percent additional tariff rate, most imports from Canada and Mexico to a 25 percent additional tariff rate, and most

4

imports from the rest of the world to a 10 percent additional tariff rate, with higher rates scheduled to take effect on July 9, 2025, and August 12, 2025. A22–A24 & n.2.

## C.    The CIT held that IEEPA did not authorize the tariffs.

Plaintiffs are 12 States who are adversely affected by the tariffs, including because they import products from overseas directly and because they purchase goods and supplies imported by others.  A31–A32.  Plaintiffs sued, arguing that the IEEPA tariffs were unlawful.

A three-judge CIT panel unanimously granted summary judgment to the States, as well as to a group of businesses that had sued separately.  A11.  The court held that IEEPA did not authorize any of the tariffs that the President had imposed.  A34.

First, the CIT held that the worldwide tariffs imposed based on trade deficits were invalid because IEEPA does "not confer unlimited tariff authority" of the kind the President claimed in imposing the Worldwide Tariffs. A38.  The court concluded that a finding that IEEPA authorizes "unlimited" tariffs would run afoul of both the nondelegation canon and the major questions doctrine.  A37.  The court also noted that in IEEPA Congress delegated narrower authority to deal with threats *not* addressed in non-emergency statutes. A43–A44.  Thus, the CIT held, "the President's Worldwide and Retaliatory

5

Tariffs, imposed in response to a balance-of-payments deficit, must conform with the limits of Section 122" of the Trade Act of 1974, which they did not. A44.

Second, the CIT held that the trafficking-related tariffs on Canada, Mexico, and China exceed another express limit in IEEPA: that the President's actions "deal with" the identified threat. A45 (quoting 50 U.S.C. § 1701). That statutory requirement does not present an unreviewable political question; "Section 1701 is not a symbolic festoon." A50. The term "deal with" requires "a direct link between an act and the problem it purports to address." A53. But collecting tariffs on lawful imports has no direct link to stopping illegal drug trafficking. A54. Nor is potential leverage in trade negotiations enough to satisfy the statutory requirement. A54–A55.

As relief, the CIT declared that the challenged executive orders are "invalid," enjoined their operation, and gave the United States 10 days to issue "necessary administrative orders" to effectuate that relief. A8–A9. The court explained that there was no basis for more narrowly tailored relief. A57.

## ARGUMENT

A stay pending appeal is "an exercise of judicial discretion," and "not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal quotation marks omitted). The

6

moving party bears a "heavy burden" of demonstrating entitlement to this "extraordinary" remedy. *Winston-Salem/Forsyth Cnty. Bd. of Educ. v. Scott*, 404 U.S. 1221, 1231 (1971). A court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (internal quotation marks omitted).

## A. Defendants have not made a strong showing that they are likely to succeed on appeal.

The CIT invalidated the worldwide tariffs because they do not fall within IEEPA's authorization to "regulate … importation," and the trafficking tariffs because they do not "deal with" the identified threat as IEEPA expressly requires. Both rulings are straightforward applications of IEEPA's statutory limits. Defendants' arguments do not make the "strong showing" on the merits needed for a stay pending appeal. *Id.* at 434.

### 1. The CIT correctly invalidated the worldwide tariffs because they exceed IEEPA's authorization to "regulate … importation."

IEEPA's authorization to "regulate … importation" does not allow the President to impose unlimited tariffs, particularly tariffs that exceed limits Congress imposed in other statutes such as Section 122. The CIT's holding

7

follows from basic principles of statutory construction and comports with the very precedent on which defendants rely, *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975).  Mot. 14.

### a.    IEEPA does not grant authority to impose unlimited tariffs, if it authorizes tariffs at all.

IEEPA says nothing about tariffs, much less anything suggesting that the President has blanket permission to override other statutory limits on tariffs. Authorization to "regulate" imports during an emergency does not imply authorization to *tax* imports.  The Constitution itself identifies the power to "lay and collect Taxes, Duties, Imposts and Excises" separately from the authority to "regulate Commerce with foreign Nations."  U.S. Const., Art. I, § 8.  Two hundred years of precedent recognizes that those powers are "distinct from each other."  *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 201 (1824).

Other provisions of IEEPA confirm that authorization to "regulate … importation" does not include the power to displace existing statutes that address tariffs, such as Section 122.  Congress specified that IEEPA's authority "may only be exercised to deal with an *unusual and extraordinary* threat." 50 U.S.C. § 1701(b) (emphasis added).  Although the CIT did not reach plaintiffs' separate argument that some of the tariffs violate the "unusual and extraordinary threat" requirement, A46 n.12, that statutory text reinforces the court's holding that IEEPA does not authorize tariffs that are covered by

8

another statutory rule.  The term "extraordinary," in the context of laws, means "of, relating to, or having the nature of a proceeding or action not normally required by law or not prescribed for the regular administration of the law" or "of, relating to, or having the nature of an occurrence (such as an accident or casualty) or risk of a kind other than what ordinary experience or prudence would foresee."  *Webster's Third New Int'l Dictionary* 807 (unabridged ed. 2002).  Thus, when IEEPA requires that the threat be "extraordinary," it means that it involves circumstances that were unforeseeable such that Congress has not provided for them in other legislation.  *See* H.R. Rep. No. 95-459, at 10 (IEEPA is intended to address "unforeseen contingencies"; "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems.").  In other words, if IEEPA authorizes the President to impose tariffs at all—which it does not—it does so only in circumstances not already covered by another, ordinary tariff statute.

Any doubt that "regulate … importation" does not authorize unlimited tariffs is put to rest by constitutional avoidance and canons of statutory interpretation.  *See* A28 ("Regardless of whether the court views the President's actions through the nondelegation doctrine, through the major questions doctrine, or simply with separation of powers in mind, any interpretation of IEEPA that delegates unlimited tariff authority is unconstitutional.").

First, the doctrine of constitutional avoidance requires courts to "shun" an interpretation that "raises serious constitutional doubts." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). Defendants' reading of IEEPA raises serious constitutional doubts under the nondelegation doctrine, which requires Congress to lay down an "intelligible principle" when it delegates its Article I powers to the executive branch. *Mistretta v. United States*, 488 U.S. 361, 372 (1989). Defendants contend that Congress delegated the President unlimited authority to impose tariffs—an exclusive congressional power under Article I— including authority to exceed separate statutory limits on tariffs and to rewrite the tariff schedules at his whim. A delegation that unbounded would raise grave separation-of-powers concerns.

Second, the major-questions doctrine reflects the commonsense presumption that, if Congress intends to give the Executive authority to make decisions of "vast economic and political significance," Congress will express that intent clearly. *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (internal quotation marks omitted); *see also Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021) (noting that the "sheer scope" of claimed authority is a reason for caution in interpreting a Congressional delegation of authority). IEEPA's authorization to "regulate" importation during a national emergency does not evince a clear intent to give

the President authority to tax trillions of dollars in imports from any country at any rate he wants and for however long he chooses.

Defendants contend that neither the major-questions doctrine nor the nondelegation doctrine applies to a statute dealing with the President's constitutional authority.  Mot. 15–19.  But this case is not about the President's Article II power over foreign affairs; it is about Congress's Article I power over tariffs.  Regardless, every court to consider the question has concluded that the major-questions doctrine applies to the President.  *See Kentucky v. Biden*, 23 F.4th 585, 606–08 (6th Cir. 2022); *Louisiana v. Biden*, 55 F.4th 1017, 1029–31 (5th Cir. 2022); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295–96 (11th Cir. 2022).[3]  And the reason that no court has found a nondelegation problem with IEEPA is that no court has upheld the limitless reading of IEEPA that defendants press here.  *Cf. Yoshida*, 526 F.2d at 583 ("We do not here sanction the exercise of an unlimited power, which, we agree with the Customs Court, would be to strike a blow to our Constitution.").

---

[3]    In *Mayes v. Biden*, 67 F.4th 921, 932–34 (9th Cir. 2023), the Ninth Circuit held that the major questions doctrine did not apply to the President. The court later vacated the opinion as moot.  *Mayes v. Biden*, 89 F.4th 1186 (9th Cir. 2023).  At least one judge on the Ninth Circuit has since come to the opposite conclusion.  *See Nebraska v. Su*, 121 F.4th 1, 17–22 (9th Cir. 2024) (Nelson, J., concurring).

### b. *Yoshida* supports rather than undermines that conclusion.

In arguing to the contrary, defendants rely mainly on *Yoshida*'s interpretation of similar text in TWEA, IEEPA's predecessor. Mot. 14. But to the extent *Yoshida* bears on IEEPA's meaning, it confirms that "regulate … importation" does *not* authorize unlimited tariffs, particularly tariffs that exceed the limits Congress set in Section 122.

*Yoshida* involved President Nixon's 1971 use of TWEA to impose a temporary surcharge on imports to address a balance-of-payments deficit. 526 F.2d at 567. The surcharge, which stayed within congressionally established tariff rates, was imposed before Congress enacted specific authority for that situation in Section 122 of the Trade Act of 1974. *Id.* at 577. In *Yoshida*, the court upheld the President's use of TWEA, but only because no more specific statute controlled the situation at the time. The court emphasized that, because Congress had since enacted Section 122, "a surcharge imposed after Jan. 3, 1975 must, of course, comply with the statute now governing such action." *Id.* at 582 n.33; *see also id.* at 578 ("Congress has said what may be done with respect to foreseeable events in the Tariff Act, the TEA, and in the Trade Act of 1974 …."). In other words, Section 122, not TWEA, would govern balance-of-payments problems going forward.

That is not an assertion that Section 122 "displaces" or is an "implied exception" to IEEPA.  Mot. 19.  It is an interpretation of the scope of IEEPA's emergency powers, which are meant only to deal with unusual and extraordinary threats that Congress did not anticipate through ordinary legislation.  Congress enacted IEEPA against the backdrop of *Yoshida*, and it intended to rein in the President's emergency powers—not to expand them.  H.R. Rep. No. 95–459, at 1, 7, 10.  If "regulate … importation" includes authority to set tariffs at all, that authority does not extend to tariffs that exceed other statutory limits.

## 2.  The CIT correctly invalidated the trafficking tariffs because they do not "deal with" the fentanyl crisis.

The across-the-board tariffs on Canada, Mexico, and China violate IEEPA's express requirement that emergency economic powers "may only be exercised to *deal with* an unusual and extraordinary threat" and "may not be exercised for any other purpose."  50 U.S.C. § 1701(b) (emphasis added).  As the CIT recognized, "'Deal with' connotes a direct link between an act and the problem it purports to address."  A53.  Yet the tariffs are not targeted at fentanyl or related products or any aspect of illicit drug trafficking, immigration, or crime more generally. Rather, they apply to almost all goods from the affected nations, regardless of whether any particular good has a reasonable connection to fentanyl trafficking or any of those other bases.

13

Defendants do not contest those facts. Instead, they argue that the tariffs give the President leverage in negotiations. But the CIT correctly held that mere leverage is not enough to satisfy the statutory requirement that IEEPA may be used only to deal with the threat directly, and not "for any other purpose." 50 U.S.C. § 1701(b). To conclude otherwise would essentially read the "deal with" requirement out of the statute. Defendants do not offer any alternative interpretation of "deal with" that gives that statutory phrase meaningful content. Mot. 21–22.

The political-question doctrine does not apply here, where the Court is interpreting a statute and deciding whether the executive branch exceeded the authority it grants. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (there is no political question when "the Judiciary must decide [which] interpretation of the statute is correct"); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 857 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the judgment) (explaining that "the political question doctrine does not apply in cases alleging statutory violations"). Although courts do not review a President's decision to declare a national emergency, they review the legality of actions taken under IEEPA and TWEA. *See Yoshida*, 526 F.2d at 579 ("Though courts will not normally review the essentially political questions surrounding the declaration or continuance of a national emergency, they will

14

not hesitate to review the actions taken in response thereto or in reliance thereon."); *see also Marland v. Trump*, 498 F. Supp. 3d 624, 635 (E.D. Pa. 2020) (courts have reviewed IEEPA actions under the APA).

### 3.    The CIT did not abuse its discretion in issuing an injunction.

Defendants have not made a strong showing that they are likely to succeed challenging the injunctive relief granted here. *See U.S. Shoe Corp. v. United States*, 296 F.3d 1378, 1381 (Fed. Cir. 2002) (equitable remedies are reviewed for abuse of discretion). As the CIT explained, a permanent injunction is necessary because of the "compelling public interest in ensuring that governmental bodies comply with the law" and "the lack of any cognizable hardship borne by the United States in the form of its non-enforcement of orders issued *ultra vires.*" B12. Defendants do not explain why the CIT, having concluded that the tariffs are unlawful, nonetheless should have withheld injunctive relief and effectively allowed defendants to continue to violate the law by collecting them.

* * *

This Court should deny a stay based on defendants' unlikelihood of success on appeal alone, even considering just the issues the CIT decided. Nonetheless, there are two additional statutory arguments that the CIT did not reach but that this Court can consider.

15

First, IEEPA does not authorize tariffs at all.  As explained, centuries of
jurisprudence confirm that "regulate" does not mean "tax."  The sole authority
for defendants' contrary argument is *Yoshida*, which interpreted a different
statute, involved surcharges that were capped at the congressionally approved
tariff rates, and said that it was *not* endorsing a reading of TWEA that would
"enabl[e] the President to rewrite the tariff schedules"—exactly the power that
President Trump is claiming here.  526 F.2d at 577–78, 583.  Regardless,
*Yoshida*'s precedential value is undercut by its failure to deploy any of the
important tools of statutory interpretation used by modern courts—among other
things, the ordinary meaning of "regulate" and its surrounding terms, the
context of related trade statutes that expressly delegate tariff-making authority,
and the major questions doctrine.  *See* ECF-14 (Memo. ISO Prelim. Inj. ("PI
Memo")) at 15–19; ECF-47 (Reply ISO Prelim. Inj. ("Reply")) at 8–10.

Second, the tariffs imposed as a response to the trade deficit do not
address an "unusual and extraordinary threat," as § 1701 requires.  The trade
deficit is not "unusual" because, as the President himself stated in imposing
tariffs, "annual U.S. goods trade deficits" are "persistent."  Exec. Order No.
14,257, 90 Fed. Reg. at 15,041.  A problem that is persistent is not unusual; it is
exactly the opposite.  And as noted above, the trade deficit is not
"extraordinary" because Congress anticipated the use of tariffs to address it in

16

Section 122.  *See* ECF-14 (PI Memo) at 22–23; ECF-47 (Reply) at 14–17. For

that reason too, the worldwide tariffs exceed IEEPA's express statutory limits.

**B.      The other factors weigh heavily against a stay.**

The equities do not favor a stay here either.  This Court considers

"whether the applicant will be irreparably injured absent a stay" as well as

"whether issuance of the stay will substantially injure the other parties

interested in the proceeding."  *Nken*, 556 U.S. at 434.  That standard is not

symmetrical: Only "irreparable" injuries count for the party seeking a stay, but

"substantial[]" injuries count for the other parties.  For defendants here, the

"key word … is irreparable. Mere injuries, however substantial, in terms of

money, time and energy necessarily expended in the absence of a stay, are not

enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted).  And

those irreparable injuries must also be "substantial and immediate," *Apple Inc.

v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012); a mere

"possibility of irreparable injury" does not suffice.  *Nken*, 556 U.S. at 434–35.

**1.      The Administration's own public statements refute defendants'
claims of dire harm from the CIT ruling.**

Defendants, relying on declarations submitted *before* the CIT's ruling

(A68–A91), represent to this Court that the ruling threatens ongoing trade

negotiations.  Mot. 23–25.  But *after* that ruling, and even before this Court

granted a temporary administrative stay, senior Administration officials publicly contradicted those claims:

- Kevin Hassett, the Director of the National Economic Council, said that the ruling is "certainly not going to affect the negotiations" over trade deals with other nations, explaining that "there are three or four other ways" for the President to impose tariffs even if he cannot do so under IEEPA.  B1–B3.

- Peter Navarro, the President's Senior Counselor for Trade and Manufacturing, confirmed that "nothing has really changed" and that the Administration is "still, as we speak, having countries call us and tell us they want a deal.  So these deals are going to happen."  B3; *see also* B4 ("There's 122, there's 301, there's 232, there's 338.  There's all sorts of things we can do well within the law.").

- Secretary of Commerce Howard Lutnick, who previously predicted that an adverse ruling would "collapse ongoing negotiations" (A78), now acknowledges that it "maybe cost us a week—but then everybody came right back to the table."  B9; *see also* B8 ("He has so many other authorities that even in the weird and unusual circumstance where this was taken away, we just bring on another or another or another.").

- U.S. Trade Representative Jamison Greer, who predicted that an adverse ruling "would create a foreign policy disaster scenario" (A91), now says that even "before we had the stay" he received "emails and texts from foreign officials saying … we're just going to keep negotiating with you as before." B7.

Thus, this Court should not credit defendants' assertions about the need for a stay to protect national security and the economy.

But even if the President's negotiating position were somehow harmed by the ruling below, that would not justify a stay. The President tried to exercise authority that he does not have. The government cannot "be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976); *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (The federal government "cannot suffer harm from an injunction that merely ends an unlawful practice[.]"); *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1231 (Fed. Cir. 1985) (rejecting a defendant's request to "continue the alleged infringements at the rate they occurred when the suit was filed, even though the assessment of likelihood of success had shown that such acts would probably be held unlawful").

Moreover, as Administration officials now acknowledge, the relief granted below does not affect the many other levers of power the President has

19

in trade negotiations.  It does not preclude him from invoking Section 122, which grants authority—albeit limited authority—to impose tariffs to deal with a large and serious balance-of-payment deficit.  *See* A43 (explaining that "an imbalance in trade" is "a type of balance-of-payments deficit").  It does not preclude him from invoking Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, which addresses tariffs based on national security risks.  And it does not preclude him from asking Congress for additional authority, as Presidents in the past have done.  Defendants may not want to comply with the substantive and procedural limitations that current law imposes, but that is not a basis to let them continue to act unlawfully.

### 2.    The balance of injuries and public interest weigh decidedly against a stay.

The only cognizable injury that defendants will suffer while this appeal proceeds is that they will be unable to collect the tariffs for a period.  But on the other side of the ledger, a stay will inflict on plaintiff States—and others—the very harms that justified relief in the first place, harms that cannot be remedied by the eventual refunds that defendants promise.  Mot. 25.

First, future refunds of tariffs paid will not redress the harm to the States that pay more for goods, equipment, and services in the meantime.  The States purchase goods from countless vendors who will raise prices due to the tariffs.  *E.g.*, ECF-14-4 ¶ 7 (Emerson Decl. (Or.)); ECF-14-13 ¶ 7 (Ward Decl. (Ariz.));

ECF-14-5 ¶¶ 8–14, Exs. A–F (Hayes Decl. (Minn.)); ECF-14-10 ¶¶ 9, 13–14, 17, Exs. B–D (Root Decl. (Minn.)).  Once they pass the tariff costs on to the States through higher prices, the States likely cannot recover those costs even if the vendors ultimately receive refunds.  That is not a trivial sum: The plaintiff States' annual losses are conservatively estimated at $1.6 billion per year.  ECF-14-2 ¶ 52 (Hines Decl.).

Second, refunds will not remedy the administrative costs, procurement problems, budgetary uncertainty, and related harms caused by the unlawful tariffs.  *See Restaurant Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 598 (5th Cir. 2023) ("[N]onrecoverable compliance costs are usually irreparable harm."); *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017) ("Where the injury cannot be quantified, no amount of money damages is calculable, and therefore the harm cannot be adequately compensated and is irreparable.").  A stay will force state agencies and universities to forgo purchases that are critical to public services because of the unexpected increased costs.  ECF-14-4 ¶ 6 (Emerson Decl. (Or.)); *see also* ECF-14-7 ¶¶ 8–9, 16 (Johnson Decl. (Ill.)); ECF-14-9 ¶¶ 12–13 (Ramsdell Decl. (Or.)).

At the very least, any stay should be limited to the tariff rates currently in effect and should not allow defendants to raise those rates further while this appeal is pending.  A stay that allowed the President to continue to raise tariffs

at his whim would inflict further harm.  The constantly changing tariff rates deprive the States of reasonable certainty as to how much goods and services will cost, which bids from contractors are the lowest, and what their agencies and universities can afford.  If the States have to budget for potential tariff rates ranging from 10 to 145 percent, depending on what the President decides to do on any given day, they cannot allocate resources appropriately.  *E.g.*, ECF-14-9 ¶ 11 (Ramsdell Decl. (Or.); ECF-14-11 ¶ 16 (Shabram Decl. (Or.)); ECF-14-13 ¶ 9–10 (Ward Decl. (Ariz.)).  And setting aside funding for tariff contingencies reduces the funds available for investments in core missions, including university research, infrastructure, and public services.  *E.g.*, ECF-14-11 ¶ 18 (Shabram Decl. (Or.)); ECF-14-9 ¶ 7 (Ramsdell Decl. (Or.)); ECF-14-6 ¶ 38 (Jaros Decl. (Colo.)).

Finally, the public interest weighs heavily against a stay.  There is a strong public interest in protecting the rule of law and not allowing the executive branch to unlawfully impose tariffs on the world at its whim, muddled by threats, additions, exceptions, and pauses.  *See Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010) ("The public interest is served by ensuring that governmental bodies comply with the law[.]"); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.").

Further, the public interest against a stay is heightened where, as here, the President's unlawful actions have devastating economic consequences nationwide. ECF-14-2, at 32 ¶¶ 54–55 (Hines Decl.); *see also Winter v. NRDC*, 555 U.S. 7, 24 (2008) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."); *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (public interest includes "the consequences of granting or denying the injunction to nonparties"); *Bernhardt v. Los Angeles County*, 339 F.3d 920, 932 (9th Cir. 2003) (same).

For the same reasons, this Court also should decline defendants' request for a limited stay as to nonparties. Mot. 26. Because the plaintiff States purchase goods imported by others, limiting injunctive relief to the parties would not "provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And defendants ignore the CIT's other justification for not so limiting the injunction: the constitutional requirement that "all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const., Art. I, § 8; A57–A58.

/ / /

/ / /

/ / /

23

# CONCLUSION

The Court should deny a stay pending appeal.

Respectfully submitted,

<table>
<tr>
<td>

**DAN RAYFIELD**
Attorney General
State of Oregon

By: */s/ Benjamin Gutman*
_____
BENJAMIN GUTMAN
Solicitor General
Dustin Buehler
Special Counsel
Brian Simmonds Marshall
Christopher A. Perdue
Leigh Salmon
Senior Assistant Attorneys General
Department of Justice
1162 Court Street NE
Salem, OR 97304
Telephone: (503) 378-4402
benjamin.gutman@doj.oregon.gov
dustin.buehler@doj.oregon.gov
brian.s.marshall@doj.oregon.gov
chris.perdue@doj.oregon.gov
leigh.a.salmon@doj.oregon.gov

Attorneys for the State of Oregon

</td>
<td>

**KRISTIN K. MAYES**
Attorney General
State of Arizona

By: */s/ Joshua D. Bendor*
_____
JOSHUA D. BENDOR
Solicitor General
Syreeta A. Tyrell
Senior Litigation Counsel
2005 North Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-8333
Joshua.Bendor@azag.gov
Syreeta.Tyrell@azag.gov
ACL@azag.gov

Attorneys for the State of Arizona

</td>
</tr>
<tr>
<td>

**PHILIP J. WEISER**
Attorney General
State of Colorado

By: */s/ Sarah H. Weiss*
_____
SARAH H. WEISS
Senior Assistant Attorney General
1300 Broadway, #10
Denver, CO 80203
Telephone: (720) 508-6000
Sarah.Weiss@coag.gov

Attorneys for the State of Colorado

</td>
<td>

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: */s/ Iam R. Liston*
_____
IAN R. LISTON
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
Telephone: (302) 683-8899
vanessa.kassab@delaware.gov

Attorneys for the State of Delaware

</td>
</tr>
</table>

**WILLIAM TONG**
Attorney General
State of Connecticut

By: */s/ Michael K. Skold*
———————————————
MICHAEL K. SKOLD
Solicitor General
165 Capitol Ave
Hartford, CT 06106
Telephone: (860) 808-5020
Michael.skold@ct.gov

Attorneys for the State of Connecticut


**RAÚL TORREZ**
Attorney General
State of New Mexico

By: */s/ Amy Senier*
———————————————
AMY SENIER
Senior Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
Telephone: (505) 490-4060
asenier@nmdoj.gov

Attorneys for the State of New
Mexico


**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Sarah A. Hunger*
———————————————
Jane Elinor Notz
Solicitor General
SARAH A. HUNGER
Deputy Solicitor General
Office of the Illinois Attorney
General
115 South LaSalle Street
Chicago, IL 60603
Telephone: (312) 814-3000
sarah.hunger@ilag.gov

Attorneys for the State of Illinois


**KEITH ELLISON**
Attorney General
State of Minnesota

By: */s/ Pete Farrell*
———————————————
PETE J. FARRELL
Deputy Solicitor General
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
Telephone: (651) 757-1424
Peter.Farrell@ag.state.mn.us

Attorneys for the State of Minnesota


**AARON D. FORD**
Attorney General
State of Nevada

By: */s/ Heidi Parry Stern*
———————————————
HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney
General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
Telephone: (775) 684-1100
HStern@ag.nv.gov

Attorneys for the State of Nevada


**AARON M. FREY**
Attorney General
State of Maine

By: */s/ Vivian A. Mikhail*
———————————————
VIVIAN A. MIKHAIL
Deputy Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
Telephone: (207) 626-8800
Vivian.mikhail@maine.gov

Attorneys for the State of Maine

25

**CHARITY R. CLARK**
Attorney General
State of Vermont

By: */s/ Ryan P. Kane*

RYAN P. KANE
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-2153
Ryan.kane@vermont.gov

**LETITIA JAMES**
Attorney General
State of New York

By: */s/ Ester Murdukhayeva*

ESTER MURDUKHAYEVA
Deputy Solicitor General
Rabia Muqaddam
Special Counsel for Federal
Initiatives
(929) 638-0447
Mark Ladov
Special Counsel
Office: (212) 416-8240
Cell: (347) 814-9434
28 Liberty St.
New York, NY 10005
Ester.Murdukhayeva@ag.ny.gov
rabia.muqaddam@ag.ny.gov
mark.ladov@ag.ny.gov

Attorneys for the State of Vermont

Attorneys for the State of New York

## STATEMENT OF CONSENT

Pursuant to Federal Circuit Rule 32(g)(3)(B), the undersigned represents that counsel for State of Arizona, State of Colorado, State of Delaware, State of Connecticut, State of Minnesota, State of New Mexico, State of Nevada, State of Illinois, State of Main, State of Vermont and State of New York have consented to their signatures on this opposition.

/s/  Benjamin Gutman
_____
BENJAMIN GUTMAN  #160599
Solicitor General
benjamin.gutman@doj.oregon.gov

**ADDENDUM**

# TABLE OF CONTENTS

Third Declaration of Brian Simmons Marshall (Dkt. 72-1) .............................B1

Order dated 6/3/25 (Dkt. 73)...........................................................................B11

Statutes .........................................................................................................B16

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES,<br><br>　　　　　　Defendants. | Case No.  1:25-cv-00077-GSK-TMR-JAR<br><br>THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL |

I, Brian Simmonds Marshall, declare under penalty of perjury as follows:

1.　　　　I am employed as an assistant attorney general with the Oregon Department of Justice. I represent the State of Oregon in this case. I previously executed two declarations in this case (ECF 14-3, ECF 32-2), which attached exhibits A–M to my declarations.

2.　　　　On May 29, 2025, before the U.S. Court of Appeals for the Federal Circuit issued its administrative stay of this Court's decision, National Economic Council Director Kevin Hassett was interviewed on Mornings With Maria on Fox Business, a recording of which is available by video at https://youtu.be/Z5-laLH84oU?si=w07U730F3U9uChQi. The States will

Page 1 -　THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice<br>100 SW Market Street<br>Portland, OR 97201<br>(971) 673-1880 / Fax: (971) 673-5000

**- B1 -**

ATTACHMENT 1, Page 1 of 10<br>to States' Response to Motion for a Stay<br>of Enforcement of Judgment Pending Appeal<br>US CIT No. 1:25-cv-00077-GSK-TMR-JAR

conventionally file a copy of this video on hard media and label the file Exhibit N to this declaration.

    3.    I personally reviewed Exhibit N and verify that this is an accurate transcription of 2:56–6:29:

**Q:** Well, I mean, that's the thing. I mean the International Emergency Economic Powers Act of 1977 is what the courts are deeming to say, look, this does not, this does not equate to an emergency under this Act of 1977. I know that the lawyers for the Administration immediately appealed. But what do you want to say about this, right now, strike down of these global tariffs? What happens in the interim now, Kevin?

**Kevin Hassett:** Well, what's going to happen is, first, we're going to see what happens on appeal, and we're very confident in our success there, because after all, hundreds and hundreds of thousands of Americans have died because of mostly Chinese fentanyl and Chinese fentanyl coming in from Mexico and Canada. And the idea that having more people die from fentanyl than died in the Vietnam War, and that's not an emergency—that we need to use every power that we have to try to address—is ludicrous to me. But the second thing is, the trade law is very complex, and this part of the trade law is the thing that was most accurately used, very precisely used, by USTR Trade Representative, Jamieson Greer, because this is the one that where we actually have the most authority for doing what we're exactly doing. But there are three or four other ways to do it, and we don't have to go into the numbers right now. I think everybody will go back to sleep, Maria. But the fact is that there are things that measures that we can take with different numbers that we can start right now. There are different approaches that would take a couple of months to put these in place and using procedures that have been approved in the past or approved in the last administration. But we're not planning to pursue those right now because we're very, very confident that this really isn't correct.

**Q:** Kevin, I guess the threat here is, what does this do to any negotiations that are currently pending, right? I mean, you and Scott Bessent have been saying that we're going to see more deals happening. You've already locked up a new deal with the U.K. You were talking about potentially India being close. And, of course, the President has, has put the China 90-day changes in place. Does this ruling from these judges put a crimp in anything that you're working on currently?

**Kevin Hassett:** No, it doesn't at all. And you know, we'll have to get Jamieson out here, who's the trade lawyer, to go through the play-by-play.

Page 2 -   THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**- B2 -**

ATTACHMENT 1, Page 2 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

But if we put our eyes on the horizon, that what's going to happen is that in a month or two, you're going to look ahead and see that countries have opened their markets to American products, they've lowered their non-tariff barriers, they've lowered their tariffs, and all of the countries that have done that are being treated very respectfully and well by the U.S. The countries that don't do that are going to see some form of reciprocal tariff that's higher than what the people who are acting well get. And that's what you're going to see on the horizon. And if there are little hiccups here or there because of decisions that activist judges make, then it shouldn't just concern you at all, and it's certainly not going to affect the negotiations. Because, in the end, people know President Trump is 100% serious, and they also have seen that President Trump always wins.

**Q:** So you, so you said that we're going to see probably more deals—and Scott Bessent, the Treasury secretary, said the same thing—in the coming weeks. Do you still believe that?

**Kevin Hassett:** Yes, I do. Yes, I do. And I saw last week at the end of the week three that were basically ready for the President's decision. I don't know if people have had that conversation with him yet. But yes, there are many, many deals coming and there were three that are basically look like they're done.

4.      On May 29, 2025, before the U.S. Court of Appeals for the Federal Circuit issued its administrative stay of this Court's decision, White House Senior Counsel for Trade and Manufacturing Peter Navarro was interviewed on Bloomberg Television, a recording of which is available by video at https://youtu.be/8DnUddNeVTY?si=4WJyhZCwyarIReoG. The States will conventionally file a copy of this video on hard media and label the file Exhibit O to this declaration.

5.      I personally reviewed Exhibit O to verify that this is an accurate transcription of 1:22–3:50:

**Peter Navarro:** So we think we have a strong case. Yes, we will immediately appeal and try to stay the ruling. But, at the same time, the court, interestingly enough, basically said we were right, just use different rules and laws. So nothing has really changed here in that sense. We're still, as we speak, having countries call us and tell us they want a deal. So these deals are going to happen. So that's kind of where we're at. And it's troublesome here because if you look broadly at the pattern, we've got

Page 3 -    THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**- B3 -**

ATTACHMENT 1, Page 3 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

courts in this country who are basically engaged in attacks on the American people. The President ran on stopping the fentanyl poisoning, stopping international trade unfair practices from stealing our factories and jobs. And courts keep getting in the way of that. The courts get in the way of our trying to deal with the border issues. Now they're getting in the way of our trying to deal with the fentanyl crisis. And that's where we stand here. And I think, I think part of what's going to be important about this ruling -- demonstrates yet again to the American people that the judiciary in this country has been weaponized in ways which are contrary to their interests.

**Q:** Well, Peter, you would have heard a lot of people come on this program and ultimately say you still have tons of options and you've alluded to one of them.

**Peter Navarro:** Yes.

**Q:** You will, of course, appeal. But could you describe what you might do in the interim, the way you might pursue your ultimate objective any way with the tools you have still available to you?

**Peter Navarro:** I'm going to let Jamieson Greer, the USTR, inform you on that and you'll be hearing from him soon on that. But I mean look, any trade lawyer knows it's just a number of different options we can take. If you look at the kind of things we've already done, it kind of give you a roadmap on that. There's all sorts of numbers out there. There's 122, there's 301, there's 232, there's 338. There's all sorts of things we can do well within the law. But look, we think that what we've done already is is perfectly appropriate. So that's why the appeal will take case. …

6.      I personally reviewed Exhibit O to verify that this is an accurate transcription of 7:10–9:08:

**Q:** But if the court said, if the ruling said, Peter, and we've been talking about this page 34, 35, they say basically you are in your right if you use Section 122. Why didn't you guys do that from the beginning?

**Peter Navarro:** Well, Section 122 only gives you 150 days. So there's your answer right there.

**Q:** (interrupting) So are Section 122, if you use this now for 150 days (crosstalk), could it be a bridge to 301 or a bridge to 232? What are you thinking more long term?

Page 4 -   THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**- B4 -**

ATTACHMENT 1, Page 4 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

**Peter Navarro:** You can be the strategist on that, but those are the kinds of thoughts. And look, look, if anybody thinks this caught the administration by surprise, think again. Okay. Because you could see in the oral arguments where those judges were going and that the lead judge in this. I mean, the problem with that court, it's so such an obscure court, but it's consistently been globalist, pro-importer, giving us bad rulings. The lead judge there ruled against the 232s originally and had to get overturned by the appeals court. So that gives you an idea of the, the bias against the President's tariff policy right on that court. But I think the big picture here is we've got a very strong case with IEEPA, but the court basically tells us if we lose that we just do some other thing. So nothing's really changed. I want to say this to the world. You're cheating us. We're coming after you. Deal. And let's make this right. Because ultimately what's at stake here is the global international environment -- getting it in a way where it's fair to America and thereby if it's fair to America and we structure this thing in a way we'll have just more stability in terms of financial flows and capital and everything like that.

**Q:** (interrupting) Dr. Navarro.

**Peter Navarro:** It's wildly out of balance now.

7.      On May 29, 2025, after the U.S. Court of Appeals for the Federal Circuit issued its administrative stay of this Court's decision, Mr. Navarro spoke to reporters outside at the White House, a recording of which is available by video at https://www.youtube.com/watch?v=JnFplVEpGkI. The States will conventionally file a copy of this video on hard media and label the file Exhibit P to this declaration.

8.      I personally reviewed Exhibit P to verify that this is an accurate transcription of 7:03–8:39:

**Q:** Thank you so much, Peter. And just given this appeals court temporarily reinstating the tariffs, what does that mean for you and your position? And does it buy the administration more time in your view?

**Peter Navarro:** "Me and my?" You're not talking about me personally, you're talking about the Administration?

**Q:** The Administration, of course.

Page 5 -   THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

- B5 -

ATTACHMENT 1, Page 5 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

**Peter Navarro:** So, look, the the tariff the tariffs remain in place. The court told us—they didn't all but tell us—they they told us go do it another way. So you can assume that even if we lose we will do it another way. And I can assure the American people that the Trump tariff agenda is alive, well, healthy and will be implemented to protect you, to save your jobs and your factories, and to stop shipping foreign wealth -- our wealth into foreign hands.

**Q:** You are working on a plan B right now?

**Peter Navarro:** Of course, there's no plan B. It's plan A. Okay. Plan A encompasses all strategic options. And when we move forward, we had a full view of what the battlefield looks like. We, we are not naive about rogue justices in the judiciary and Democrats filing lawsuits. This has got to stop, by the way. This, this, this weaponization of the judiciary to stop the Trump, President Trump from doing what he promised the American people. This has got to stop. It's, the people of America have the lowest level of of confidence in the American judiciary they've had in a hundred years. And, and it's getting close to what they think about Congress and that's a low bar to hit.

9.      I personally reviewed Exhibit P to verify that this is an accurate transcription of 8:59–9:49:

**Q:** Peter, I want to ask you what do the conversations look like right now with other countries as you're seeing the courts pushing back here in the United States?

**Peter Navarro:** Well, great question. In fact, that is the question in many ways. This morning, we were getting plenty of phone calls from countries saying, "We saw the ruling. So, what? We're going to continue to negotiate in good faith because we understand that there's a problem. And based on that court decision, we understand that that court decision is not going to stop you from doing what you need to do. So, we're going to work with you." So, I can assure you—and by the way there's going to be within the next I don't know say few days because that puts me too much on the spot—but you will see a cascade of new deals coming out in the near future and these will all be good for the American people.

10.     On May 30, 2025, the U.S. Trade Representative, Ambassador Jamieson Greer, appeared on CNBC, a recording of which is available by video at

Page 6 -   THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

- B6 -

ATTACHMENT 1, Page 6 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

https://www.youtube.com/watch?v=M_crUiRBDb8. The States will conventionally file a copy of this video on hard media and label the file Exhibit Q to this declaration.

11.    I personally reviewed Exhibit Q to verify that this is an accurate transcription of 0:17–2:25:

> **Q:** I guess we'll start with with some of your comments about that -- the rulings yesterday and the prospects for what is likely to happen. I know there's a lot of things that are being discussed right now. Do you think if you were to get emergency relief from the Supreme Court, do you think they'd come down on on the president's side? Do you think you have a strong case, or will it stand the way it is right now?
>
> **Ambassador Greer:** Well, I think we have a very strong case. Congress clearly delegated to the President the ability to take action when there's a national emergency. We've declared a national emergency. We've taken action. We have a stay from the circuit court right now. All the other countries I'm dealing with in negotiations are treating this as just kind of a bump in the road rather than any fundamental change. So, I feel pretty confident about the case. And if the case, you know, goes the other way, we have other tools as well.
>
> **Q:** Yeah, I was -- I've expressed that sentiment earlier that you don't know what you've got until it's gone. I, you know, as a pure conservative and a markets-type guy, tariffs, I think they can be effective. But there's times when you kind of wish that we would just maybe not be doing as many. But then we've we've come along so far, Mr. Ambassador, that to pull the rug out from the negotiating ability by making all these countries we're negotiating with think that the tariffs might not stick, that's frustrating. But you're telling me, again, that none of those countries expressed any -- they weren't saying, all right, we're going to pull out of these negotiations because we don't need to anymore?
>
> **Ambassador Greer:** It's actually the opposite. You know, when I woke up, you know, the morning after the initial ruling—before we had the stay—you know, I had emails and texts from foreign officials saying, you know, we're just going to keep negotiating with you as before. You know, we understand these are, you know, this is litigation. Things go up and down. We understand the U.S. policy going forward. And we're negotiating with you as before. So that's what's happening.

Page 7 -   THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ATTACHMENT 1, Page 7 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

**- B7 -**

12. On June 1, 2025, Secretary of Commerce Howard Lutnick was interviewed on Fox News Sunday, a recording of which is available by video at https://youtu.be/t0UtSmEWhbw?si=YvCa5tGe3iGkyoD2. The States will conventionally file a copy of this video on hard media and label the file Exhibit R to this declaration.

13. I personally reviewed Exhibit R to verify that this is an accurate transcription of the interview:

> **Q:** And now back to the uncertain future of President Trump's vast tariffs, and what's next after a flurry of court rulings. Joining me now, Commerce Secretary Howard Lutnick, welcome back to the show.
>
> **Secretary Lutnick:** Great to be back.
>
> **Q:** Okay, so we want to start here with the Court of International Trade. This is a decision that went against the President days ago. They said, "Because of the Constitution's express allocation of the tariff power to Congress … an unlimited delegation of tariff authority [to the President] would constitute an improper abdication of legislative power to another branch of government." Just to boil that down, they said he can't do it, but that decision is on hold for now. What is the backup plan?
>
> **Secretary Lutnick:** Well, think about how silly that is, right? So, Congress gives the President, under this IEEPA authority, the ability to take on other countries who are creating a national emergency, and the $1.2 trillion trade deficit and all the underlying implications of that is a national emergency. It's gutting our manufacturing base. The President takes that on, and Congress lets him do it—specifically, does not vote to take it away, calls a vote and says he can keep it. So, what's going to happen is we're going to take that up to higher courts. The President's going to win, like he always does. But rest assured, tariffs are not going away. He has so many other authorities that even in the weird and unusual circumstance where this was taken away, we just bring on another or another or another. Congress has given this authority to the President, and he's going to use it.
>
> **Q:** Okay. So you know that these two federal courts have so far said the use of that law as emergency power is not proper, it is on appeal. So we'll see what they—potentially Supreme Court—has to say about it. But in the meantime, it sparks this question about whether, if other countries think that our court system is potentially going to shut down these bigger, more

Page 8 - THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ATTACHMENT 1, Page 8 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

- B8 -

sweeping tariffs, you're losing some kind of advantage in negotiations. Reuters quotes an E.U. official saying this. Quote, the uncertainty as to the legality of the reciprocal tariffs certainly gives us meaning them extra leverage. Here is how Jonathan Turley put it.

> **Jonathan Turley:** Trump has been saying, you know, using these tariffs like a gun to the head of these other countries, and the court just removed the bullets.

**Q:** So, have you lost leverage? And where are we on the talks with the EU?

**Secretary Lutnick:** All right, so the President said he was going to put a 50% tariff on the EU, and as I said, not only does he have this authority under IEEPA, but he has many, many other authorities. The European Union sent in—after this—their first offer. So they are at the table. They are negotiating. You can't listen to silly people making silly comments. All of the countries that are negotiating with us understand the power of Donald Trump and his ability to protect the American worker. And so what they're doing is they're negotiating with us. I think it cost us a week—maybe cost us a week—but then everybody came right back to the table. Everybody is talking to us. You're going to see over the next couple of weeks, really first-class deals for the American worker, opening their markets and setting on tariffs to make sure that we are treated fairly around the world.

**Q:** Well, I know you and Secretary Bessent are talking to a lot of these countries trying to get those deals across the finish line. He has said talks with China are stalled. What's the latest?

**Secretary Lutnick:** Well, I think, what happened is Secretary Bessent and Ambassador Greer went to Geneva, they made a deal with the Chinese. And really the right way to say it is they're just slow rolling the deal. So, I think slow rolling is the right way to say it, and I think Donald Trump is on it. We are taking certain actions to show them what it feels like on the other side of that equation. But my view is Donald Trump and President Xi—you know, our President understands what to do. He's going to go work it out and, and I am confident that this is going to work out either way. The President understands the power of our economy. He said it over and over again: we are the consumer of the world. We are the consumer of Chinese goods. If we don't open our markets to them, their economy is in really, really tough shape. So I think -- I love having all of this power in the President's hands. He knows how to wield it correctly for the benefit of the American worker.

Page 9 -   THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**- B9 -**

ATTACHMENT 1, Page 9 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

**Q:** Okay, quickly, because we got to go, the 90-day pause on the major tariffs is due to expire at the beginning of July. You get a lot of deals to get done. Will the President extend that pause?

**Secretary Lutnick:** I think we're going to get a lot, a lot of deals done. I think they're all being set up. We could sign lots of deals now, but I think we're trying to make them better and better and better. And, as the President said, or he'll just set rates and he'll set the terms of the deal. So I don't see today that an extension is coming. In fact, I think that's the deadline and the President's just going to determine what rates people have. If they can't get a deal done, President Trump is going to determine what deal there's going to be.

**Q:** Okay, Secretary Lutnick, great to see you. Thanks for your time.

**Secretary Lutnick:** Great to be here.

**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED on June 2, 2025, in Portland, Oregon.

*s/ Brian Simmonds Marshall*
BRIAN SIMMONDS MARSHALL
Senior Assistant Attorney General

Page 10 -  THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

- B10 -

ATTACHMENT 1, Page 10 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE; MICROKITS, LLC; FISHUSA INC.; and TERRY PRECISION CYCLING LLC;<br><br>        **Plaintiffs,**<br><br>     v.<br><br>THE UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; and HOWARD LUTNICK, in his official capacity as Secretary of Commerce;<br><br>        **Defendants.** | Before: Gary S. Katzmann, Judge<br>       Timothy M. Reif, Judge<br>       Jane A. Restani, Judge<br><br>Court No. 25-00066 |
| THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE STATE OF ILLINOIS, THE STATE OF MAINE; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; and THE STATE OF VERMONT;<br><br>        **Plaintiffs,**<br><br>     v. | Before: Gary S. Katzmann, Judge<br>       Timothy M. Reif, Judge<br>       Jane A. Restani, Judge<br><br>Court No. 25-00077 |

> UNITED STATES DEPARTMENT OF
> HOMELAND SECURITY; KRISTI NOEM,
> in her official capacity as Secretary of the
> Department of Homeland Security; U.S.
> CUSTOMS AND BORDER PROTECTION;
> PETE R. FLORES in his official capacity as
> Acting Commissioner for United States
> Customs and Border Protection; and THE
> UNITED STATES OF AMERICA;
>
>            Defendants.

## ORDER

On May 28, the court entered summary judgment against the United States and issued both declaratory and permanent injunctive relief in V.O.S. Selections, Inc. v. United States, Slip Op. 25-66 (May 28, 2025) (per curiam).[1]  This relief included an injunction against the operation of the challenged Tariff Orders and all amendments and modifications thereto.  The injunction issued on account of Plaintiffs' success on the merits and the unavailability under the Uniformity Clause of a complete legal remedy in the form of piecemeal duty refunds to specific plaintiffs.  Intrinsic to this exercise of equitable discretion was the compelling public interest in "ensuring that governmental bodies comply with the law," Am. Signature, Inc. v. United States, 598 F.3d 816, 830 (Fed. Cir. 2010), and the lack of any cognizable hardship borne by the United States in the form of its non-enforcement of orders issued ultra vires.  The court's issuance of injunctive relief did not depend on the wisdom or policy consequences of such non-enforcement.  The principle at work was more straightforward: "[I]njunctive relief is generally available to preclude ultra vires conduct by subordinate executive officials." Kemet Elecs. Corp. v. Barshefsky, 21 CIT 912, 925,

---

[1] As the court explained in its combined opinion, the court also granted summary judgment against the United States in Oregon v. U.S. Dep't of Homeland Security, Case No. 25-00077.

976 F. Supp. 1012, 1024 (1997) (citing <u>Soucie v. David</u>, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971)); <u>see also</u> <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579 (1952).

The court has exclusive jurisdiction to hear this action because the challenged Tariff Orders are "law[s] of the United States providing for" tariffs. 28 U.S.C. § 1581(i)(1). "[L]aw" is a broader term than "statutes." To the extent the challenged Tariff Orders bind Customs to collect duties at the rates they prescribe, they are laws of the United States. <u>See</u> <u>Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin</u>, 418 U.S. 264, 273 (1974) (holding for Supremacy-Clause purposes that "the relevant federal law is Executive Order No. 11491 rather than the [National Labor Relations Act]."). The challenged Tariff Orders also effect changes to the Harmonized Tariff Schedule of the United States ("HTSUS"). <u>See, e.g.</u>, Executive Order 14257, 90 Fed. Reg. 15041, 15047 (Apr. 2, 2025) ("In order to establish the duty rates described in this order, the HTSUS is modified as set forth in the Annexes to this order."). This means the Orders are "law[s]" in the additional sense that they modify a statute: The HTSUS "shall be considered to be statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1).

This jurisdictional conclusion does not hinge on whether IEEPA authorizes tariffs as a categorical matter—a question this court did not reach in its opinion on May 28.[2] Nor is it material

---

[2] If jurisdiction followed the merits in this way, the Court of International Trade would have exclusive jurisdiction to hear only <u>un</u>successful claims of <u>ultra vires</u> presidential tariff orders, with successful claims left to the federal district courts (or to no court at all). That would accomplish the opposite of "remedy[ing] the confusion over the division of jurisdiction between . . . the Court of International Trade . . . and the district courts and . . . ensur[ing] uniformity in the judicial decisionmaking process." <u>K Mart Corp. v. Cartier, Inc.</u>, 485 U.S. 176, 188 (1988) (internal quotation marks, citation, and parenthesis omitted); <u>see also</u> <u>Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.</u>, 18 F.3d 1581, 1586 (Fed. Cir. 1994) ("Congress had in mind consolidating this area of administrative law in one place, and giving to the Court of International Trade, with an already developed expertise in international trade and tariff matters, the opportunity to bring to it a degree of uniformity and consistency. Obviously that would not be possible if jurisdiction were spread

that some non-tariff-related litigation involving IEEPA takes place in the federal district courts. "The district courts and the Court of International Trade can both have jurisdiction over actions arising out of the same act . . . ." Orleans Int'l, Inc. v. United States, 334 F.3d 1375, 1379 (Fed. Cir. 2003) (USCIT has exclusive jurisdiction over import assessment related to the Beef Promotion and Research Act of 1985).

The Government now moves to stay the court's enforcement of its judgment pending appeal of that judgment to the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"). See V.O.S. Mot. to Stay, May 28, 2025, ECF No. 59; Oregon Mot. to Stay, May 28, 2025, ECF No. 69 (collectively "USCIT Motions to Stay"). The Government has also moved for the same relief from the Federal Circuit, which on May 29 issued an administrative stay of this court's judgment pending consideration of the appellate motion to stay. See Order, No. 2025-1812 (Fed. Cir. May 29, 2025) (per curiam). Plaintiffs in both V.O.S. and Oregon oppose the Government's motions. See Pls.' V.O.S. Resp. to Mot. to Stay, June 2, 2025, ECF No. 62; Pls.' Oregon Resp. to Mot. to Stay, June 2, 2025, ECF No. 72.

Ultimately, the Federal Circuit's impending consideration of the motion to stay before it makes it unnecessary for this court to rule on the USCIT Motions to Stay. The two motions seek identical relief; the Federal Circuit's ruling will control. At the very least, the court cannot determine whether the Government "will be irreparably injured absent a stay" while (1) this court's denial of a stay (if ordered) would leave in place the temporary administrative stay issued by the Federal Circuit and (2) this court's denial of a stay could be immediately superseded by the Federal Circuit's imposition of one. Nken v. Holder, 556 U.S. 418, 426 (2009). It is accordingly

---

among the district courts throughout the land.").

Court Nos. 25-00066 & 25-00077                                                    Page 5

     **ORDERED** that the USCIT Motions to Stay are **HELD IN ABEYANCE** pending the

Federal Circuit's consideration of the Government's motion to stay this court's judgment pending

appeal.

<u>By the panel.</u>

Dated: <u>June 3, 2025</u>
     New York, New York

## STATUTES

50 U.S.C. § 1701:

> (a) Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

> (b) The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

50 U.S.C. § 1702:

> (a) In general

> (1) At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

> (A) investigate, regulate, or prohibit—

> (i) any transactions in foreign exchange,

> (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

> (iii) the importing or exporting of currency or securities,

> by any person, or with respect to any property, subject to the jurisdiction of the United States;

> (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a

national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and

(C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

(2) In exercising the authorities granted by paragraph (1), the President may require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in paragraph (1) either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of such paragraph. In any case in which a report by a person could be required under this paragraph, the President may require the production of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person.

(3) Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same. No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

(b) Exceptions to grant of authority

The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—

(1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;

(2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances; or

(3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 4604 [3] of this title, or under section 4605 [3] of this title to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of title 18; or

(4) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

(c) Classified information

In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in

camera. This subsection does not confer or imply any right to judicial review.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, I certify that the Motion to Stay is proportionately spaced, has a typeface of 14 points or more and contains 5,177 words.

DATED:  June 5, 2025

/s/  Benjamin Gutman
BENJAMIN GUTMAN  #160599
Solicitor General
benjamin.gutman@doj.oregon.gov

BG2:kw5/992019205