No. 25-1812

---

IN THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

---

**V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND
PRODUCTS, LLC,** *dba* **GENOVA PIPE, MICROKITS, LLC,
FISHUSA, INC., TERRY PRECISION CYCLING LLC,**

*Plaintiffs-Appellees*

v.

**DONALD J. TRUMP,** *in his official capacity as President of the
United States*; **EXECUTIVE OFFICE OF THE PRESIDENT;
UNITED STATES; PETE R. FLORES,** *Acting Commissioner for
United States Customs and Border Protection, in his official
capacity as Acting Commissioner of the United States Customs
and Border Protection*; **JAMIESON GREER,** *in his official
capacity as United States Trade Representative*; **OFFICE OF
THE UNITED STATES TRADE REPRESENTATIVE; HOWARD
LUTNICK,** *in his official capacity as Secretary Of Commerce*;
**UNITED STATES CUSTOMS AND BORDER PROTECTION,**

*Defendants-Appellants*

---

Appeal from the United States Court of International Trade in No. 1:25-
cv-00066-GSK-TMR-JAR, Judge Gary S. Katzmann, Judge Timothy M.
Reif, and Senior Judge Jane A Restani

---

No. 2025-1813

---

**STATE OF OREGON, STATE OF ARIZONA, STATE OF
COLORADO, STATE OF CONNECTICUT, STATE OF
DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE
OF MINNESOTA, STATE OF NEVADA, STATE OF NEW
MEXICO, STATE OF NEW YORK, STATE OF VERMONT,**

*Plaintiffs-Appellees*

v.

PRESIDENT DONALD J. TRUMP; UNITED STATES DEPARTMENT
OF HOMELAND SECURITY; KRISTI NOEM, *Secretary of
Homeland Security, in her official capacity as Secretary of the
Department of Homeland Security*; UNITED STATES CUSTOMS
AND BORDER PROTECTION, PETE R. FLORES, *Acting
Commissioner for United States Customs and Border
Protection, in his official capacity as Acting Commissioner for
U.S. Customs and Border Protection*, UNITED STATES,

*Defendants-Appellants*

---

Appeal from the United States Court of International Trade in
No. 1:25-cv-00077-GSK-TMR-JAR, Judge Gary S. Katzmann,
Judge Timothy M. Reif, and Senior Judge Jane A Restani

---

## VOS Plaintiffs' Response in Opposition to Emergency Motion for a Stay Pending Appeal

Jeffrey M. Schwab
Reilly Stephens
James McQuaid
Bridget F. Conlan
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org
bconlan@ljc.org

Ilya Somin
Antonin Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, Virginia 22201
773-993-8069
isomin@gmu.edu

*Counsel for Plaintiffs V.O.S.
Selections, Inc., Plastic Services
and Products, LLC, d/b/a Genova
Pipe, Microkits, LLC, FishUSA,
Inc., and Terry Precision Cycling
LLC*

# Table of Contents

Table of Authorities................................................................... ii

Introduction...............................................................................1

Legal Standard .........................................................................2

Argument...................................................................................2

I.    The VOS Plaintiffs will suffer irreparable harm if a stay is granted..............................................................................3

II.   Defendants will not suffer irreparable harm without a stay pending appeal ...............................................................7

    A.    Defendants' legitimate foreign policy and national security initiatives will not be harmed without a stay...........7

    B.    A stay as to nonparties is unwarranted ...............................12

III.  The public interest will be harmed if the stay is granted.........17

IV.  Defendants have failed to make a strong showing that they are likely to succeed on the merits of their appeal. ..........18

Conclusion...............................................................................25

Certificate of Compliance......................................................27

Certificate of Interest.............................................................28

# Table of Authorities

## Cases

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021) ................................................................8

*Am. Signature, Inc. v. United States*,
  598 F.3d 816 (Fed. Cir. 2010) ............................................18

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ................................................................9

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ..............................................................16

*Ceramica Regiomontana, S.A. v. United States*,
  7 Ct. Int'l Trade 390 (1984) ...............................................13

*Georgia v. President of the U.S.*,
  46 F.4th 1283 (11th Cir. 2022) ...........................................21

*Gill v. Whitford*,
  585 U.S. 48 (2018) ........................................................14, 15

*Head Money Cases*,
  112 U.S. 580 (1884) ..............................................................13

*In re Section 301 Cases*,
  524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021) ......................18

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022) ...............................................21

*Labrador v. Poe*,
  144 S. Ct. 921 (2024) ...........................................................16

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) .............................................21

*Mayes v. Biden*,
  67 F.4th 921 (9th Cir. 2023) ...............................................22

*Nebraska v. Su*,
  121 F. 4th 1 (9th Cir. 2024) ..........................................22, 23

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................2, 10

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
  591 U.S. 197 (2020) ...............................................................23

*Trump v. Wilcox*,
  145 S. Ct. 1415 (2025) ..........................................................23

*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936) ..........................................................23, 24

*United States v. U.S. Coin & Currency*,
  401 U.S. 715 (1971) .................................................................8

*United States v. Yoshida Int'l, Inc.*,
  526 F.2d 560 (C.C.P.A. 1975) ...............................................20

*Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ....................................................................24

## Regulations

90 Fed. Reg. 15041 ......................................................................... 8

## Constitutional Provisions

U.S. Const. art. II, § 1 ................................................................23

## Other Authorities

Doug Palmer and Giselle Ruhiyyih Ewing, *White House insists
  court ruling won't derail Trump's tariff agenda*, Politico, May
  29, 2025 ...................................................................................11

Jack Goldsmith & Curtis Bradley, *Foreign Affairs,
  Nondelegation, and the Major Questions Doctrine*, 172 U. Penn.
  L. Rev. 1743 (2024) ...............................................................25

Presidential Proclamation 4074, 85 Stat. 926 .......................20

Rapid Response 47 (@RapidResponse47), x.com
  (May 29, 2025 7:47 AM) .........................................................11

Ruth Simon, Small Sellers of Fireworks, *Ski Apparel and Other
  Imports Can't Escape Tariff War*, Wall St. J., Apr. 11, 2025 ..............17

# Introduction

The Court of International Trade (CIT) held that Congress did not delegate to the President the power to unilaterally impose tariffs on any country, at any rate, at any time, for any reason when it passed the International Emergency Economic Powers Act (IEEPA). Defendants seek a stay pending appeal of that court's order entering summary judgment for Plaintiffs and permanently enjoining the tariffs the President imposed under IEEPA because, they say, the President could do some really important things with unlimited tariff power.

But the President is not harmed by the denial of authority he does not legally possess, nor is he harmed by courts holding him to the statutory requirements Congress imposed. And a stay would cause irreparable harm not only to the Plaintiffs—particularly the VOS Plaintiffs[1]—but to thousands of businesses and millions of consumers across the country. Defendants' argument that the President has virtually unlimited unilateral tariff authority under IEEPA that is

---

[1] The term "VOS Plaintiffs" refers to the plaintiffs in *V.O.S. Selections, Inc. et al, v. Trump et al.*, Case No. 25-1812. The term "Plaintiffs" refers to all Plaintiffs in Case Nos. 25-1812 and 25-1813.

unreviewable by the judiciary is not likely to succeed on appeal. The motion for a stay should be denied.

## Legal Standard

A stay depends on four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quote and citation omitted). These factors substantially overlap with the factors governing preliminary injunctions "because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Id.* at 434.

## Argument

All four factors this Court considers when addressing a motion for a stay pending appeal favor denying the stay. Most importantly, the VOS Plaintiffs will suffer irreparable harm if a stay is granted. Denying a stay will cause no irreparable harm to Defendants, whereas granting a stay would harm the public interest. And Defendants are unlikely to

succeed on the merits of their appeal because IEEPA does not give the

President the unilateral tariff power he asserts.

## I.     The VOS Plaintiffs will suffer irreparable harm if a stay is granted.

The VOS Plaintiffs begin with the third factor because of its great

importance. They provided evidence before the CIT that the irreparable

harm they face because of the President's unlawful tariffs is

irreparable; it goes beyond the monetary loss of paying the tariffs. *See*

Pls.' Appl. for TRO and Mot. Prelim. Inj. and/or Summ. J., No. 25-66,

ECF No. 10 ("VOS MSJ"), 26–28, Exs. A–E; Pls.' Reply Br. in Support of

Prelim. Inj. and Mot. Summ. J. for Permanent Inj., No. 25-66, ECF No.

35, ("VOS Reply"), 26–31. Indeed, because of that harm, the VOS

Plaintiffs filed their Application for Temporary Restraining Order and

Motion for Preliminary Injunction and/or Summary Judgment for

Permanent Injunction ("Motion"), shortly after filing their complaint.

Although the CIT denied the application for a temporary restraining

order, it expedited the briefing of the VOS Plaintiffs' motion for

preliminary injunction and/or summary judgment, giving Defendants

seven days to file a response, the VOS Plaintiffs seven days to file a

reply, and holding a hearing seven days later. Case No. 25-66, ECF No.

13. And the CIT entered judgment granting summary judgment and a permanent injunction in favor of Plaintiffs a little over two weeks after holding oral argument. *See* Slip Op. Case No. 25-66, ECF No. 55; ECF No. 56.

Defendants assert that a stay would only subject Plaintiffs to monetary harm from paying tariffs. But CIT's expedited consideration of this case belies Defendants' contention that Plaintiffs' harm is merely monetary. And the record before the CIT and this Court shows that the VOS Plaintiffs will suffer irreparable harm if the Liberation Day tariffs are allowed to continue: their relationships with their suppliers and customers will suffer and eventually be lost. VOS MSJ 26–28. Their reputations will suffer. *Id.* They will lose business opportunities and may eventually have to go out of business entirely. *Id.*

Plaintiff V.O.S. Selections, Inc. will suffer irreparable harm if a stay is granted allowing the Liberation Day tariffs to continue because it "will be unable to plan its import orders, will suffer harm to its relationships with wholesale customers and its farmers who produce the wine, will suffer harm to its reputation and goodwill, and eventually

will become unable to operate the business." VOS MSJ 27, Ex. A,
¶¶ 35–39.

Plaintiff Genova Pipe will suffer irreparable harm if a stay is granted
allowing the Liberation Day tariffs to continue. "Because of the tariffs,
it will be unable to source the raw materials—including plastic resins—
and manufacturing equipment that are necessary to manufacture its
American-made plastic pipe, conduit, and fittings; its cost of raw
materials will increase; it may lose foreign customers, such as those in
Canada; and it will suffer harm to its reputation." VOS MSJ 27, Ex. B,
¶¶ 6–9, 13.

Plaintiff MicroKits will suffer irreparable harm if a stay is granted
allowing the Liberation Day tariffs to continue by forcing a longer pause
of manufacturing operations, which will cause it to run out of inventory,
preventing it from competing with copycats. VOS MSJ 27, Ex. C, ¶¶ 9,
15. Because the Liberation Day tariffs will cause MicroKits to raise
prices, *id.* ¶ 8, while the tariffs are in place, the copycats will maintain
a price advantage over MicroKits for markets outside of the U.S. *Id.*
¶ 15. MicroKits estimated that as of April 18, 2025, because it would
likely be unable to order more parts to make its products due to the

tariffs, it would have to shut down operations within seven weeks. *Id.* ¶¶ 9–11. It has now been more than six weeks.

Plaintiff FishUSA will suffer irreparable harm if a stay is granted allowing the Liberation Day tariffs to continue because it has already been forced to delay imports of some products, pause orders, postpone expansion projects, it has or will lose business opportunities, will suffer damage to its reputation, and will lose goodwill. VOS MSJ 27, Ex. D, ¶¶ 21–28.

Plaintiff Terry Cycling will suffer irreparable harm if a stay is granted allowing the Liberation Day tariffs to continue because "Terry Cycling has been forced to increase prices to attempt to mitigate the tariffs and cannot confirm costs with its wholesale customers, which will result in the loss of business opportunities, harm to reputation and goodwill," and the continued tariffs "constitute an existential threat to Terry Cycling's business." VOS MSJ 27–28, Ex. E, ¶¶ 5, 19, 28–35.

Despite this evidence set forth plainly in the record before the CIT, the motion for a stay fails to even acknowledge these harms to the VOS Plaintiffs and cites no evidence to contradict the multiple irreparable harms set forth in the VOS Plaintiffs' declarations, that go beyond the

monetary cost of paying tariffs. And the remedy Defendants propose—a "refund," Mot. Stay 25—is insulting. It would not cure these irreparable harms to the VOS Plaintiffs in the slightest. An eventual refund is of little comfort to the VOS Plaintiffs, who face imminent irreparable harm, including existential threats of bankruptcy and permanent damage to their business, whether by reputational damage, loss of goodwill, or harm to relationships with suppliers and customers. What good is a refund of the tariffs paid to a business that is bankrupt and no longer exists? How can a refund address the loss of customers, reputational damage, or loss of good will caused by having to cut back on certain products or having to raise prices? And what good is a refund for tariffs paid to a company that spent millions of dollars and hours redesigning its supply chain because the tariffs made it difficult or impossible to continue their relationships with existing suppliers?

## II.     Defendants will not suffer irreparable harm without a stay pending appeal.

### A.     Defendants' legitimate foreign policy and national security initiatives will not be harmed without a stay.

The government is not harmed by an injunction preventing it from imposing unlawful tariffs because "[the government has no legitimate interest in upholding an unconstitutional system" or requirement.

*United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971)

(Brennan J., concurring). The government isn't harmed just because it

may have supposedly compelling policy reasons to do something

unlawful or unconstitutional; "our system does not permit agencies to

act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors*

*v. HHS*, 594 U.S. 758, 766 (2021).

Defendants relied on their unlawful interpretation of IEEPA to

further their foreign policy and national security goals. Mot. Stay 23–

25. Defendants argue that the President declared national emergencies

in light of what he claimed to be unusual and extraordinary threats to

national security. *Id.* 10. But the President's determination was in

error. "Persistent annual U.S. goods trade deficits," 90 Fed. Reg. 15041,

are not an unusual or extraordinary threat. *See* VOS MSJ at 18–19;

Slip. Op. at 35–36.

Defendants assert that the CIT's order would interfere with "the

trade negotiations 'currently ongoing . . . with dozens of countries' [that]

are 'in a delicate state'" and "'would undermine the United States-

United Kingdom trade deal that was negotiated in reliance on the

President's emergency tariff authority,'  plus the recent 'China trade

agreement,'" and other arrangements currently being negotiated, interfering with these negotiations and threatening national security because "[t]hose negotiations 'are premised on the ability of the President to impose tariffs under IEEPA.'" Mot. Stay 23–24. But the CIT held that IEEPA does not grant the President the broad power to impose tariffs that he claims. Under the Constitution, the power to tariff is given to Congress, not the President. The President cannot do whatever he wants simply because it might affect foreign affairs and national security. *See e.g., Biden v. Nebraska*, 600 U.S. 477, 494 (2023) (holding that the Secretary of Education does not have authority to cancel $430 billion of student loan principal under the HEROES Act—a statute enacted to address national security crises—by deeming it necessary in connection with a national emergency). The fact that the President does not actually have this power is not a function of the stay but a function of the Constitution. The CIT is merely enforcing the separation of powers.

Defendants complain that the CIT's ruling "may have compromised delicate, time-sensitive foreign negotiations." Mot. Stay 25. But the

"foreign policy disaster scenario," *id.*, is speculative,[2] and one of the President's own making. The President has legitimate means of conducting foreign policy; imposing illegal tariffs is not one of them. The President cannot act illegally as a matter of policy convenience, be ordered to stop, and then plead prior reliance on his illegal acts. If Defendants' arguments were adopted, an injunction barring virtually any illegal action could be stayed by virtue of claiming that the illegality might create useful leverage: If the President illegally detained innocent people without due process, he could argue for a stay of an injunction against that action on the ground that detention could be useful leverage against the innocent detainees or their families, and thereby advance some claimed U.S. foreign policy or national security interests.

And the President's claim that the ability to unilaterally impose tariffs is necessary to conduct foreign affairs and manage national security is belied by the fact that no previous president has ever claimed or used it. Nothing prevents the President from utilizing the

---

[2] Simply showing some possibility of irreparable injury fails to satisfy this factor. *Nken v. Holder*, 556 U.S. 418, 434-435.

many other tools in his foreign policy toolkit during the pendency of the appeal. Even though IEEPA does not delegate Congress's constitutional tariff power to the President, the President can impose more limited tariffs under other statutes. Indeed, Kevin Hassett, the head of the President's National Economic Council, publicly stated that while the administration considered IEEPA the best option, "there are three or four other ways to do it." Doug Palmer and Giselle Ruhiyyih Ewing, *White House insists court ruling won't derail Trump's tariff agenda*, Politico, May 29, 2025.[3] And White House deputy press secretary Kush Desai stated that "President Trump pledged to put America First, and the Administration is committed to using every lever of executive power to address this crisis and restore American Greatness." Rapid Response 47 (@RapidResponse47), x.com (May 29, 2025 7:47 AM).[4] The President simply prefers a blank check.

Under Defendants' own logic, the negative consequences for the President's power to negotiate with foreign powers on the issues he

---

[3] Available at https://www.politico.com/news/2025/05/29/trump-tariffs-court-ruling-reaction-00374006

[4] Available at https://x.com/RapidResponse47/status/1928070713803497751

claims are important will be much *worse* if this Court *grants* the stay but ultimately upholds the CIT ruling several months from now—after an investment of vast resources in an endeavor that CIT unanimously found *ultra vires*—than they would be if the injunction were enforced. That is because the President would then have spent even more time engaging in negotiations based on an illegal premise, using his unlawful tariff power as a bargaining chip, moving further along, and presumably having negotiated with even more countries. U.S. credibility would then suffer still greater damage. Better to end the travesty as soon as possible.

Additionally, a stay of the judgment does not erase the judgment itself. Foreign leaders and their negotiators can read; they know that this Court has held that "the President's chosen means" to conduct foreign policy, Mot. Stay 12, are unlawful, and that such a decision is likely to be upheld on appeal. A stay, therefore, would not significantly enhance the President's negotiating position or his leverage.

**B.    A stay as to nonparties is unwarranted.**

But a stay will make a difference—a hugely detrimental one—to the millions of small businesses and other entities Defendants would prefer

continue to suffer simply because they do not have the resources to file a lawsuit. Mot. Stay 26. The public interest is best served when "our international trade statutes" are applied "uniformly and fairly." *Ceramica Regiomontana, S.A. v. United States,* 7 Ct. Int'l Trade 390, 397 (1984).

As the CIT observed in its ruling granting summary judgment:

> There is no question here of narrowly tailored relief; if the challenged Tariff Orders are unlawful as to Plaintiffs they are unlawful as to all. "[A]ll Duties, Imposts and Excises shall be uniform throughout the United States," U.S. Const. art. I, § 8, cl. 1, and "[t]he tax is uniform when it operates with the same force and effect in every place where the subject of it is found."

Slip Op. 48–49 (quoting *Head Money Cases*, 112 U.S. 580, 594 (1884)). A non-uniform tariff imposed as a result of a ruling staying the injunction for nonparties would be unconstitutional, since it would, by definition, *not* "operate with the same force and effect" everywhere. *Id.* In addition, it would necessarily create a highly non-uniform tariff schedule, thus rendering that schedule unconstitutional. Defendants' assertion that this Court should stay injunctive relief as to nonparties, Mot. Stay 26, should be rejected.

Defendants rely on *Gill v. Whitford*, 585 U.S. 48, 66 (2018), for the proposition that "a plaintiff's remedy must be limited to the inadequacy that produced his injury." Mot. Stay 26. *Gill* was a constitutional challenge to Wisconsin's redistricting plan that plaintiffs alleged to be partisan gerrymandering. The plaintiffs claimed, "a constitutional right not to be placed in legislative districts deliberately designed to 'waste' their votes." *Gill,* 585 U.S. at 66. The Court noted that the plaintiffs' alleged injury was "district specific. An individual voter in Wisconsin is placed in a single district. He votes for a single representative. . . . The disadvantage to the voter as an individual therefore results from the boundaries of the particular district in which he resides. And a plaintiff's remedy must be limited to the inadequacy that produced his injury in fact." *Id.* (quotes omitted). In that case, each individual district was separately designed, and the plaintiffs only had standing to challenge the drawing of their particular district: "A plaintiff who complains of gerrymandering, but does not live in a gerrymandered district, asserts only a generalized grievance against governmental conduct of which he or she does not approve." *Id.* (quote omitted). And the proper remedy to a challenge to the drawing of a particular district

14

would therefore be "the revision of the boundaries of the individual's own district." *Id.*

That is not the case here. Unlike the plaintiffs in *Gill*, which were limited to one legislative district—the district in which they reside— Plaintiffs are not limited to importing from one country. Nor are they limited to importing from only the countries that they have done so to date. And Plaintiffs are not harmed solely by the tariffs imposed on countries from which they import. *See* Reply 26–31, 35 ("the harm to Plaintiffs is not simply the cost of paying the Liberation Day tariffs. The application of those tariffs across the economy harms them."). Thus, unlike the plaintiffs in *Gill*, for whom the harm was limited only to the individual district in which they each resided, the harm to Plaintiffs in this case is not limited to the countries from which they import. The broad, across-the-board Liberation Day tariffs harm them because they make it more difficult for them to expand their imports from countries where they do not currently import, and the tariffs applied to Plaintiffs' suppliers and customers will affect their businesses, even if the Plaintiffs are not required to directly pay the tariffs themselves.

Thus, Defendants' assertion that an injunction be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," Mot. Stay at 26 (quoting *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979)), does not avail them. Defendants' reliance on *Califano* for this proposition also fails because the quote is part of the Court's summary of an argument that it rejects: "[T]he Secretary . . . argues that nationwide class relief is inconsistent with the rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." 442 U.S. at 702. The Court held that "a nationwide class" is not "inconsistent with principles of equity jurisprudence, since the scope of injunctive relief is dictated by the extent of the violation established." *Id.* The extent of the violation established here is vast because the Liberation Day tariffs are vast and have broad economic consequences that harm Plaintiffs' businesses.

Similarly, Defendants' reliance on *Labrador v. Poe,* 144 S. Ct. 921 (2024), for the proposition that the Supreme Court has stayed relief running solely to nonparties that was unnecessary to provide relief to the plaintiffs, Mot. Stay 26, is inapposite. As stated, the permanent

injunction on all the Liberation Day tariffs was necessary to provide relief to Plaintiffs.

## III.     The public interest will be harmed if the stay is granted.

Immediate implementation of the permanent injunction serves the public interest because many other businesses are suffering and will continue to suffer from the Liberation Day tariffs if a stay is granted. Small businesses are particularly vulnerable, as they are less equipped to absorb these extra costs. Close to two-thirds of small businesses have reported that tariffs and other trade issues would hurt their businesses. Ruth Simon, *Small Sellers of Fireworks, Ski Apparel and Other Imports Can't Escape Tariff War*, Wall St. J., Apr. 11, 2025.[5] American consumers, too, will face dire consequences if the tariffs are not enjoined. Prices will increase for nearly every product purchased by everyday Americans. And tariffs are likely to lead to higher inflation, which will decrease the purchasing power of everyday American

---

[5] Available at https://www.wsj.com/economy/trade/smallest-businesses-are-biggest-losers-in-global-tariff-war-f4df62d5

consumers, exacerbating the rising cost of consumer goods already facing American households.[6]

As to any interest the public may have in the policy underlying the Executive Order, "[t]he issuance of an injunction does not undermine that interest, it merely maintains the status quo." *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1372 (Ct. Int'l Trade 2021). "The public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). Because the tariffs are unlawful, the government's concerns about irrecoverable funds and guarding the public fisc are baseless; the government is not permitted to collect these funds in the first place.

## IV. Defendants have failed to make a strong showing that they are likely to succeed on the merits of their appeal.

Defendants' argument that they are likely to succeed on appeal simply rehashes arguments that the CIT has already rejected.

---

[6] Akrur Barua and Michael Wolf, *Tariffs will impact the economy and so will uncertainty*, Deloitte Global Economics Research Center, April 11, 2025, available at https://www2.deloitte.com/us/en/insights/economy/spotlight/united-states-tariffs-impact-economy.html

Defendants continue to assert virtually unlimited power to impose tariffs once the President has declared a national emergency, which judgment they claim is unreviewable. Mot. Stay 20–21. CIT rightly held that IEEPA "does not . . . confer such unbounded authority" and that "an unlimited delegation of tariff authority would constitute an improper abdication of legislative power to another branch of government," thus rendering IEEPA unconstitutional. Slip Op. 3–4, 28. This breathtaking power grab is illegal for multiple reasons: (1) IEEPA does not grant the authority to impose tariffs;[7] (2) the law can only be invoked in the event of an emergency, which does not exist here; (3) invocation of IEEPA is only permitted in response to an "unusual and extraordinary threat," which also does not exist in this case; (4) in the event IEEPA is ambiguous on tariffs, the major questions doctrine requires a ruling that Congress did not delegate the tariff power to the executive; (5) if IEEPA does grant such vast, unconstrained power to

---

[7] Contrary to Defendants' claims, Mot. Stay 15, the CIT did not reject this argument. Rather, as the CIT's recent order holding in abeyance the motion for a stay makes clear, this is a "a question this court did not reach in its opinion on May 28." *V.O.S. Selections, Inc. v. United States*, No. 25-66, ECF No. 63 (CIT, June 3, 2025) (order holding motion in abeyance), Slip Op. 3.

impose tariffs claimed by Defendants, it would violate nondelegation principles; and (6) constitutional avoidance requires a ruling against the government in the event the text is ambiguous. This Court need only agree with Plaintiffs on one of these points for them to prevail on appeal.

Defendants accuse CIT of "flouting [*United States v.] Yoshida [Int'l, Inc.*, 526 F.2d 560, 576 (C.C.P.A. 1975)]." Mot. Stay 4. But CIT did no such thing. CIT held that "[t]hough the appellate court in *Yoshida II* interpreted TWEA so as to include tariff authority, the court also repeatedly noted the constitutional concerns that would arise if the President exercised unlimited tariff authority based on the words "regulate . . . importation." Slip Op. 29.

*Yoshida II* did not read the words "regulate . . . importation" in TWEA to authorize whatever tariff the president wants whenever he wants at whatever rates he deems desirable. As CIT correctly found, the Liberation Day tariffs do not include the limitations that the court in *Yoshida II* relied upon in upholding President Nixon's actions under TWEA. While President Nixon's tariffs were expressly limited by the rates established in the HTSUS, *see* Proclamation No. 4074, at 927, the

tariffs here have no such limit. Indeed, this is exactly the scenario that the lower court warned of in *Yoshida I*—and that the appellate court said would be unconstitutional in *Yoshida II*. The precedent of this Court—and the *only* substantive precedent upon which Defendants rely in their stay request—is that the words "regulate . . . importation" cannot grant the President unlimited tariff authority. *See* Slip Op. 30–31. Thus, the CIT held that Defendants exercised unlimited tariff authority in contradiction to the limits set in *Yoshida II*. *Id.* at 26.

Defendants claim the major questions doctrine (MQD) does not apply to the President, and that the President's use of IEEPA in this case is not unprecedented. Mot. Stay 15. But this distinction is indefensible. It has already been rejected by at least three federal courts of appeals: the Fifth, Sixth, and Eleventh Circuits. *See Louisiana v. Biden*, 55 F.4th 1017, 1031 n.40 (5th Cir. 2022) ("delegations to the President and delegations to an agency should be treated the same under the major questions doctrine"); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295–96 (11th Cir. 2022) (holding that an assertion of power by the President under the Procurement Act is "no exception" to application of MQD); *Kentucky v. Biden*, 23 F.4th 585, 606–608 (6th Cir. 2022)

(applying MQD to a presidential directive). Although the Ninth Circuit previously held otherwise, in a decision that was later vacated as moot and thus has no precedential value, *see Mayes v. Biden*, 67 F.4th 921, 932–34 (9th Cir. 2023), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023), in a more recent ruling, the Ninth Circuit did apply MQD to a Presidential action, but held that the policy did not run afoul of the doctrine because it wasn't a "transformative expansion" of executive authority. *Nebraska v. Su*, 121 F. 4th 1, 14 (9th Cir. 2024). By contrast, the unprecedented use of IEEPA—a statute never before used to impose tariffs of any kind—to impose tariffs on imports from almost every nation in the world surely qualifies as a "transformative expansion," if anything does. *See id.* This point also undermines Defendants' claim that the Liberation Day tariffs represent a normal use of the statute.

For purposes of applying MQD, "[i]t makes no difference which Executive Branch officer has received an unlawful delegation." *Id.* at 15 (Nelson, J., concurring). If the doctrine "is fundamentally a separation of powers doctrine," then it "keeps Congress in its constitutional lane, preventing it from delegating 'fundamental policy decisions' to the Executive Branch." *Id.* (quoting *Indus. Union Dep't, AFL-CIO v. Am.*

*Petrol. Inst.*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring in the judgment)). That logic applies regardless of whether the power in question is claimed by the President or by an agency. *Id.* Indeed, under the "unitary executive" theory embraced by the Trump Administration, among others, "the "entire 'executive Power' belongs to the President alone." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020) (quoting U.S. Const. art. II, § 1). Agencies are, on this view, just adjuncts to presidential authority.

This reading of MQD has been reinforced by the Supreme Court's recent decision in *Trump v. Wilcox*, which embraced unitary executive theory to the extent that "he may remove without cause executive officers who exercise that power on his behalf, subject to narrow exceptions." 145 S. Ct. 1415, 1415 (2025). Such removal power gives the President near-total control over most executive agencies and effaces meaningful distinctions between authority granted to them and that granted to him.

Defendants also baselessly claim all foreign policy issues are somehow exempt from the nondelegation doctrine. Mot. Stay 17 (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936)). But

23

*Curtiss-Wright* did not endorse unlimited foreign-affairs delegation. It merely ruled greater discretion must often be granted to the President in the foreign affairs realm, but not unlimited discretion. *See Curtiss-Wright*, 299 U.S. at 320 (holding that legislation "within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved"). Moreover, the Supreme Court has specifically repudiated the notion that *Curtiss-Wright* grants the President unlimited authority over foreign affairs. *See Zivotofsky v. Kerry*, 576 U.S. 1, 20–21 (2015) (emphasizing that "*Curtiss-Wright* did not hold that the President is free from Congress' lawmaking power in the field of international relations" and that "[t]he Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue"). This is particularly true when, as the CIT noted, we are dealing with a power that the Constitution specifically assigns to Congress. Slip Op. 1–6. Unlike some other delegations, tariff authority does not implicate the President's independent authority and therefore has no exemption from the nondelegation doctrine. *Cf.* Jack Goldsmith & Curtis Bradley, *Foreign*

24

*Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Penn. L. Rev. 1743, 1788–89 (2024) (explaining that "the President has no independent constitutional authority over international commerce" and therefore "a simple categorical determination that an area involves foreign affairs or national security cannot by itself suffice to address delegation concerns" when it comes to IEEPA and other statutes related to foreign trade).

Defendants further accuse the CIT of improperly reviewing the President's "foreign-policy and national security judgments." Mot. Stay 20. The President's motives and reasoning may be immune from judicial scrutiny, but his actions are certainly not, and the CIT did not question the President's motive or reasons. Rather it held that the method the President adopted here was improper, in excess of the statutory authority delegated—or that even could be delegated—by Congress.

Defendants have failed to make a showing that they are likely to prevail on appeal.

## Conclusion

Defendants' motion for a stay should be denied. The VOS Plaintiffs and businesses and consumers across the country will be irreparably

harmed by a stay. Defendants will not be harmed without a stay. And Defendants have not made a strong showing that they are likely to succeed on appeal. The CIT's ruling should immediately be permitted to go into effect.

Dated: June 5, 2025

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey M. Schwab
Reilly Stephens
James McQuaid
Bridget F. Conlan
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org
bconlan@ljc.org

Ilya Somin
Antonin Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, Virginia, 22201
773-993-8069
isomin@gmu.edu

*Counsel for Plaintiffs V.O.S. Selections, Inc., Plastic Services and Products, LLC, d/b/a Genova Pipe, Microkits, LLC, FishUSA, Inc., and Terry Precision Cycling LLC*

## Certificate of Compliance

I, Jeffrey M. Schwab, hereby certify that this brief complies with the 5,200-word limitation set forth in Fed. R. App. P. 27(d)(2)(A) because this response brief contains 4,998 words. In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

Respectfully submitted

Dated: June 5, 2025                    /s/ Jeffrey M. Schwab

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 25-1812 |
| **Short Case Caption** | V.O.S. Selections, Inc. v. Trump |
| **Filing Party/Entity** | Plaintiffs-Appellees |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: June 5, 2025

Signature: /s/ Bridget Conlan

Name: Bridget Conlan

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| V.O.S. Selections, Inc. | Not Applicable | None |
| Plastic Services and | Not Applicable | None |
| Microkits LLC | Not Applicable | None |
| FishUSA Inc. | Not Applicable | None |
| Terry Precision Cycling | Not Applicable | None |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐  Additional pages attached

29

FORM 9. Certificate of Interest

Form 9 (p. 3)
March 2023

---

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable            ☐   Additional pages attached

| | | |
|---|---|---|
| James McQuaid | | |
| Ilya Somin | | |
| | | |

---

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable            ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |