No. 2025-1812 (and consolidated case)

In The

# United States Court of Appeals for the Federal Circuit

---

V.O.S. Selections, *et al.*,

*Plaintiffs-Appellees,*

– v. –

Donald J. Trump, *et al.,*

*Defendants-Appellants.*

---

On Appeal from the United States Court of International Trade

---

## BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK UNIVERSITY SCHOOL OF LAW AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

---

Donald L.R. Goodson
Kelly C. McGee
Richard L. Revesz
Max Sarinsky
Institute for Policy Integrity
139 MacDougal Street, 3d Floor
New York, NY 10012
(212) 998-8932
max.sarinsky@nyu.edu

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*

June 6, 2025

# DISCLOSURE STATEMENT

The Institute for Policy Integrity (Policy Integrity) is a nonpartisan, not-for-profit organization at New York University School of Law.[i] No publicly held entity owns an interest in Policy Integrity. Policy Integrity does not have any members who have issued shares or debt securities to the public.

DATED:    June 6, 2025                    Respectfully submitted,

/s/ Max Sarinsky
Max Sarinsky

*Counsel for Institute for Policy Integrity*

---

[i] This brief does not purport to represent the views, if any, of New York University School of Law.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................ iii

INTEREST OF *AMICUS CURIAE* ............................................. 1

SUMMARY OF ARGUMENT ..................................................... 2

ARGUMENT ............................................................................. 4

    I.    Only "Extraordinary Cases" Trigger The Major Questions Doctrine. .................................................... 4

        A.    Supreme Court precedent emphasizes history and the "unheralded" nature of the asserted authority. ...... 4

        B.    Supreme Court precedent also emphasizes the "transformative" nature of the asserted authority ........ 6

        C.    Economic and political significance are relevant but not dispositive ........................................... 7

    II.    All Factors Signaling An "Extraordinary Case" For The Major Questions Doctrine Are Present Here. ......................... 8

        A.    The challenged tariffs are "unheralded." ...................... 8

        B.    The President's interpretation of IEEPA is "transformative" as it converts the statute into a device to set national trade and fiscal policy. .............. 10

        C.    The challenged tariffs are economically and politically significant. .................................... 11

    III.    Because the Major Questions Doctrine Applies, The Government Must Identify "Clear Congressional Authorization" To Impose These Tariffs. ....................... 12

    IV.    The Major Questions Doctrine Applies To The President's Exercise Of Delegated Authority. ...................... 14

CONCLUSION ...................................................................... 15

CERTIFICATES

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.* 594 U.S. 758
 (2021)............................................................................................12

*Am. Forest Res. Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023).
 ........................................................................................................14

*Biden v. Missouri*, 595 U.S. 87 (2022) .......................................................5

*Biden v. Nebraska*, 600 U.S. 477 (2023) ..........................................*passim*

*FDA v. Brown & Williamson Tobacco Co.*, 529 U.S. 120 (2000) ..............2

*Georgia v. President of the United States,* 46 F.4th 1283 (11th Cir. 2022)
 ........................................................................................................15

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ...............................................12

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)..................13, 14

*Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022)..................................14

*Mayes v. Biden,* 67 F.4th 921 (9th Cir.), *vacated as moot*, 89 F.4th 1186
 (9th Cir. 2023)..............................................................................15

*United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975)..........9

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ...............................3, 6

*West Virginia v. EPA*, 597 U.S. 697 (2022) ....................................*passim*


**Statutes**

19 U.S.C. § 2414.......................................................................................10


**Other Authorities**

Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45618,
 *The International Emergency Economic Powers Act: Origins,*
 *Evolution, and Use* (2024). ..........................................................8, 10

Erika York & Alex Durante, *Trump Tariffs: The Economic Impact of the*
 *Trump Trade War*, Tax Foundation (June 2, 2025),
 https://perma.cc/J6WP-JEX2. ..........................................................11

Natasha Brunstein & Donald L. R. Goodson, *Unheralded and*
 *Transformative: The Test for Major Questions After* West Virginia, 74
 Wm. & Mary Env't L. & Pol'y Rev. 317 (2022)......................................1

Richard L. Revesz & Max Sarinsky, *Regulatory Antecedents and the Major Questions Doctrine*, 36 Geo. Env't L. Rev. 1 (2023)....................1

United States: Datasets, Int'l Monetary Fund (last updated Apr. 2025), https://www.imf.org/external/datamapper/profile/USA.......................11

## INTEREST OF *AMICUS CURIAE*

The Institute for Policy Integrity at New York University School of Law (Policy Integrity) is a nonpartisan, not-for-profit think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship in the fields of administrative law, economics, and public policy.[1]

Policy Integrity's faculty director, Professor Richard L. Revesz, and staff have published extensive scholarship on the major questions doctrine. *E.g.*, Natasha Brunstein & Donald L. R. Goodson, *Unheralded and Transformative: The Test for Major Questions After* West Virginia, 74 Wm. & Mary Env't L. & Pol'y Rev. 317 (2022); Richard L. Revesz & Max Sarinsky, *Regulatory Antecedents and the Major Questions Doctrine*, 36 Geo. Env't L. Rev. 1 (2023). Policy Integrity has also filed *amicus curiae* briefs in litigation involving the major questions doctrine.

Policy Integrity submits this brief to aid the Court by ensuring it has a complete understanding of the major questions doctrine. All parties consent to its filing.

---

[1] Per Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief wholly or partly, and no person contributed money intended to fund its preparation or submission.

## SUMMARY OF ARGUMENT

Plaintiffs correctly argue that the President's use of the International Emergency Economic Powers Act (IEEPA) to impose tariffs triggers the major questions doctrine. This brief lays out the doctrine and aligns the major questions argument with the relevant Supreme Court precedents.

**I.** The cases that the Supreme Court has found "extraordinary" enough to trigger the major questions doctrine have been ones "in which the 'history *and* the breadth of the authority that [the government] has asserted,' *and* the 'economic and political significance' of that assertion, provide a 'reason to hesitate.'" *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *FDA v. Brown & Williamson Tobacco Co.*, 529 U.S. 120, 159–60 (2000)) (emphasis added); *accord Biden v. Nebraska*, 600 U.S. 477, 501 (2023).

The Supreme Court's opinions in *West Virginia* and *Nebraska* (its only two decisions expressly applying the major questions doctrine) also followed the same order of analysis—addressing first the history, then the breadth, and only then economic and political significance. Both

2

opinions indicate that these three factors are conjunctive requirements—each necessary to trigger the doctrine.

**II.** The President's use of IEEPA to impose tariffs is unheralded, transformative, and economically and politically significant. The President's action is unheralded because no President has ever used IEEPA to impose tariffs in the statute's nearly half century of existence. It is transformative because it takes a statute meant to apply sanctions, asset freezes, and similar targeted measures to address acute emergencies and transforms it into a blank check to the President to rewrite congressional trade policy. It is also economically and politically significant.

**III.** Because these tariffs trigger the major questions doctrine, the government must identify "clear congressional authorization" supporting them. *West Virginia*, 597 U.S. at 723 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

**IV.** The major questions doctrine applies to the President's exercise of delegated authority.

# ARGUMENT

## I. Only "Extraordinary Cases" Trigger The Major Questions Doctrine.

*West Virginia* and *Nebraska* both indicate that history, breadth, and significance must be present to trigger the major questions doctrine. Although the Supreme Court often references economic and political significance in its major questions precedents, its application of the doctrine has focused primarily on history and breadth.

### A. Supreme Court precedent emphasizes history and the "unheralded" nature of the asserted authority.

Starting with history, the first five paragraphs of *West Virginia*'s analysis of the major questions doctrine address the history of EPA's exercises of authority under the Clean Air Act. 597 U.S. at 724–28.

Traditionally, the Supreme Court concluded, EPA "had always set emissions limits under Section 111 [of the Clean Air Act] based on the application of measures that would reduce pollution by causing the regulated source to operate more cleanly." *Id.* at 725. By contrast, in the Clean Power Plan, EPA departed from "prior Section 111 rules" by setting emissions limits based in part on purposeful generation shifting from coal-fired plants to gas and renewable sources. *Id.* at 726. For this

reason, the Supreme Court determined, the Clean Power Plan was "unheralded". *Id.* at 724.[2]

*Nebraska* contains a similar analysis. The case involved a roughly $430 billion student debt-relief program, and the Supreme Court first stressed that the "Secretary [of Education] has never previously claimed powers of this magnitude under" the operative statute. 600 U.S. at 501–02. Rather, past exercises of the Secretary's authority to "waive or modify" applicable statutory provisions "have been extremely modest and narrow in scope" and none had fully released "borrowers from their obligations to repay" hundreds of billions of dollars in student loans. *Id.*

In contrast, the Supreme Court rejected a major questions-based challenge to a vaccine mandate from Health and Human Services (HHS) for certain healthcare workers because HHS "routinely imposes conditions of participation that relate to the qualifications and duties of healthcare workers." *Biden v. Missouri*, 595 U.S. 87, 94 (2022). Past practice thus showed the HHS vaccine mandate was not extraordinary.

---

[2] Of course, the government need not identify an identical antecedent, because new actions will rarely, if ever, be identical to previous ones. Rather, *West Virginia*'s analysis suggests that the relevant antecedent must be an analogous exercise of authority.

**B.    Supreme Court precedent also emphasizes the "transformative" nature of the asserted authority.**

The Supreme Court's recent major questions cases also show that the breadth of the asserted authority must demonstrate a transformative expansion of power.

In *West Virginia*, the Supreme Court next discussed how the Clean Power Plan represented a "transformative expansion [of EPA's] regulatory authority." 597 U.S. at 724 (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324). In other words, the Supreme Court assessed whether the Clean Power Plan "also effected a 'fundamental revision of the statute, changing it from [one sort of] scheme of . . . regulation' into an entirely different kind." *Id.* at 728 (quoting *MCI*, 512 U.S. at 231). Similarly, in *Nebraska*, the Supreme Court concluded that the challenged debt-relief plan was of such breadth that it would permit the Secretary of Education to "unilaterally define every aspect of federal student financial aid.'" 600 U.S. at 502.

Several indicators may be relevant to determining whether the government's asserted authority is transformative. One potential indicator is comparative expertise. *See West Virginia*, 597 U.S. at 729. Another is when the government relies on statutory language that is

6

"vague," "ancillary," or "modest." *See West Virginia*, 597 U.S. at 724; *Nebraska*, 600 U.S. at 495.

## C.  Economic and political significance are relevant but not dispositive.

Although the Supreme Court often references economic and political significance in major questions cases, those factors have never sufficed to trigger the doctrine.

For instance, although the Supreme Court referenced the cost of the Clean Power Plan in *West Virginia*'s factual background, 597 U.S. at 714, it omitted express references to economic significance in its legal analysis, *id.* at 724–35. And while the size of the student-loan cancellation program played a role in *Nebraska*, *see* 600 U.S. at 502–03, the Supreme Court first addressed history and breadth before turning to economic effects. *Id.* at 501–02.

The Supreme Court's primary focus on history and breadth makes sense given that the major questions doctrine applies only in "extraordinary cases." Numerous government actions can be described as economically or politically significant; far fewer are unprecedented or represent a drastic change in authority.

II.  **All Factors Signaling An "Extraordinary Case" For The Major Questions Doctrine Are Present Here.**

This is an extraordinary case triggering the major questions doctrine, as the challenged tariffs are unheralded, transformative, and economically and politically significant.

A.  **The challenged tariffs are "unheralded."**

In the nearly half century since Congress enacted IEEPA, Presidents had declared 69 national emergencies invoking IEEPA, but "[n]o President ha[d] used IEEPA to place tariffs on imported products from a specific country or on products imported to the United States in general." Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* 15, 26 (2024), https://perma.cc/5UW7-EKD8. Rather, past Presidents had used IEEPA only to impose economic sanctions like import bans and asset freezes, not tariffs. *See id.* at 25–26; *see also id.* at App. A. This includes President Trump in his first term. *See id.* at 62 (listing uses from 2021–2023).

To be sure, President Nixon did use a predecessor statute, the Trading with the Enemy Act (TWEA), to impose a 10% tariff on all imports. Casey & Elsea, *supra*, at 26 & n.153, 52. But it is far from clear

that the Supreme Court would consider an action under a different statute sufficient to defeat the "unheralded" prong of the major questions doctrine. The Supreme Court has focused on the actual statutory provision at hand when assessing this factor: In *West Virginia*, it dismissed analogous programs under "other provisions of the Clean Air Act." 597 U.S. at 732–33; *see also Nebraska*, 600 U.S. at 502 (focusing on "regulation[s] premised on the HEROES Act" (cleaned up)).

Moreover, even if this Court finds that actions under TWEA are relevant to the "unheralded" inquiry, President Nixon's tariffs are distinguishable. In upholding those tariffs, the U.S. Court of Customs and Patent Appeals highlighted that they were "limited," "temporary," "not imposed to raise revenue," "calculated to help meet a particular national emergency," and did not "supplant the entire tariff scheme of Congress." *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 578 & n.26 (C.C.P.A. 1975) (quotation marks omitted). Stated somewhat differently, President Nixon's actions were far more "modest and narrow in scope" (and relied on a predecessor statute). *Nebraska*, 600 U.S. at 501.

**B.** **The President's interpretation of IEEPA is "transformative" as it converts the statute into a device to set national trade and fiscal policy.**

The President's tariffs would also transform a statute designed to give the President surgical tools to impose sanctions during national emergencies to give him power to override all trade statutes.

As noted above, Presidents have previously used IEEPA to impose targeted regulations meant to address specific threats posed by hostile actors or illicit trade. For instance, previous invocations have imposed targeted sanctions that: (1) concerned certain goods such as chemical and biological weapons and weapons of mass destruction; or (2) addressed international crises or hostile actors. *See* Casey & Elsea, *supra*, at App. A. As opposed to these targeted uses, the President is now attempting to use IEEPA to address widespread trade deficits and fiscal shortfalls, fundamentally transforming the statute.

This assertion is particularly transformative because Congress has enacted multiple trade statutes that authorize tariffs only in certain circumstances with specified procedures. *E.g.*, 19 U.S.C. § 2414 (authorizing tariffs on countries that have violated certain trade agreements, if the U.S. Trade Representative conducts an investigation

10

and makes detailed factual findings). While these statutes delegate broad authority to the executive to set tariffs, that authority is circumscribed by procedural and substantive limitations and is narrower than the President's claimed power under IEEPA. Interpreting IEEPA to give the President broad authority to reduce American trade deficits and raise revenue would render Congress's many other trade statutes superfluous.

### C. The challenged tariffs are economically and politically significant.

President Trump's full slate of recent tariffs is projected to "increase federal tax revenues by $156.4 billion" in a single year, representing "the largest tax hike since 1993." *See, e.g.*, Erika York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Foundation (June 2, 2025), https://perma.cc/J6WP-JEX2. And they are projected to reduce GDP by 0.8%, *id.*, which equates to over $200 billion per year.[3]

Although courts have not established a precise threshold for economic significance, this effect would easily qualify. When discussing

---

[3] U.S. GDP is currently over $30 trillion. United States: Datasets, Int'l Monetary Fund (last updated Apr. 2025), https://www.imf.org/external/datamapper/profile/USA.

economic significance in *Nebraska*, the Supreme Court cross-referenced *Alabama Realtors*, which stated that the challenged action was projected to have approximately $50 billion in economic impacts over the course of roughly a year, indicating that such effects may qualify as economically significant. *Nebraska*, 600 U.S. at 502 (citing 594 U.S. 758, 764 (2021)). The President's tariffs meet this threshold with room to spare.

The tariffs are politically significant, too. For instance, they have also been the subject of "earnest and profound debate across the country," *West Virginia*, 597 U.S. at 732 (quoting *Gonzales v. Oregon*, 546 U.S. 243, 267–68 (2006)), and will likely have substantial effects on foreign relations.

## III. Because the Major Questions Doctrine Applies, The Government Must Identify "Clear Congressional Authorization" To Impose These Tariffs.

When the major questions doctrine applies, the government "must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 597 U.S. at 723.

Although the Supreme Court has never explained precisely what qualifies as "clear congressional authorization," its major questions opinions "emphasize the importance of *context* when a court interprets a

[congressional] delegation." *Nebraska*, 600 U.S. at 508 (Barrett, J., concurring). "Seen in this light, the major questions doctrine is a tool for discerning—not departing from—the text's most natural interpretation," *id.*, enabling courts to use the doctrine as a "tool . . . to determine the best reading of the statute," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

Here, the President may offer a "colorable textual basis," that some of IEEPA's terms can authorize sweeping tariffs to rebalance international trade. But the "extraordinary" nature of this case should make courts reluctant to adopt that interpretation, and IEEPA's terms should be assessed with an eye toward their broader context. *West Virginia*, 597 U.S. at 732–35 (considering text and context to assess whether "clear congressional authorization" was present). Taking that context into account, the Court of International Trade held that "read in light of its legislative history and Congress's enactment of more narrow, non-emergency legislation," IEEPA "at the very least does not authorize the President to impose unbounded tariffs," including those issued in response to balance-of-payments deficits. A34, A44.

13

## IV. The Major Questions Doctrine Applies To The President's Exercise Of Delegated Authority.

Finally, while the Supreme Court has applied the major questions doctrine only to agencies or cabinet departments, nothing in its opinions provides that a different rule would apply to the President. Rather, Supreme Court caselaw strongly indicates that the doctrine applies when the President exercises delegated authority.

The major questions doctrine is a tool of statutory interpretation, *see Nebraska*, 600 U.S. at 508 (Barrett, J., concurring), and when the President interprets a statute, courts must independently analyze whether "the President acted in excess of his statutory authority." *See Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023). In fact, the Supreme Court stressed in *Loper Bright* that courts are not to "declar[e] a particular party's reading 'permissible'" in *any* case but instead to "use every tool at their disposal to determine the best reading of the statute" in every case. 603 U.S. at 400. Relevant interpretive canons, including the major questions doctrine, are such tools.[4]

---

[4] Several circuits have applied the major questions doctrine to presidential actions. *See Louisiana v. Biden*, 55 F.4th 1017, 1031 & n.40

## CONCLUSION

Because the challenged tariffs are unheralded, transformative, and of vast economic and political significance, they trigger the major questions doctrine.

June 6, 2025

Respectfully submitted,

/s/ Max Sarinsky
Max Sarinsky
Donald L.R. Goodson
Kelly C. McGee
Richard L. Revesz
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 992-8932
max.sarinsky@nyu.edu

*Counsel for Institute for Policy Integrity*

---

(5th Cir. 2022); *Georgia v. President of the United States*, 46 F.4th 1283, 1295 (11th Cir. 2022). One did not. *Mayes v. Biden*, 67 F.4th 921, 933–34 (9th Cir.), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023).

## CERTIFICATE OF COMPLIANCE

This *amicus curiae* brief complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) and 29(a)(5) because this brief contains 2,599 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted by counsel's word processing system.

This *amicus curiae* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

DATED:    June 6, 2025                    Respectfully submitted,

/s/ Max Sarinsky
Max Sarinsky

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*