**Case Nos. 2025-1812, 1813**

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, DBA GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,**
*Plaintiff-Appellees,*

**v.**

**DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, PETE R. FLORES, ACTING COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, IN HIS OFFICIAL CAPACITY AS ACTING COMMISSIONER OF THE UNITED STATES CUSTOMS AND BORDER PROTECTION, JAMIESON GREER, IN HIS OFFICIAL CAPACITY AS UNITED STATES TRADE REPRESENTATIVE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, IN HIS OFFICIAL CAPACITY AS SECRETARY OF COMMERCE, UNITED STATES CUSTOMS AND BORDER PROTECTION,**

**STATE ████████████████████████████████ OLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF VERMONT,**
*Plaintiff-Appellees,*

**v.**

**PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF**

HOMELAND SECURITY, UNITED STATES CUSTOMS AND BORDER PROTECTION, PETE R. FLORES, ACTING COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, IN HIS OFFICIAL CAPACITY AS ACTING COMMISSIONER FOR U.S. CUSTOMS AND BORDER PROTECTION, UNITED STATES,

*Defendants-Appellant.*

Appeal from the On Appeal from the United States Court of International Trade Nos. 25-66, -77, Judges Katzmann, Reif, and Restani

---

**BRIEF OF *AMICI CURIAE* FORMER GOVERNMENT OFFICIALS AND LEGAL SCHOLARS IN SUPPORT OF PLAINTIFFS-APPELLEES' OPPOSITION TO DEFENDANTS-APPELLANTS' MOTION FOR AN EMERGENCY STAY**

Mark A. Lemley
William H. Neukom Professor
  of Law
STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305
(650) 723-4605
mlemley@law.stanford.edu

Stephen A. Jonas
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
(202) 594-9958
Steve@statedemocracydefenders.org

Matthew A. Seligman
*Counsel of Record*
STRIS & MAHER LLP
17785 Center Court Dr. N., Suite 600
Cerritos, CA 90703
(213) 995-6873
mseligman@stris.com

*Counsel for Amici Curiae*

**FORM 9. Certificate of Interest**                                        **Form 9 (p. 1)**
                                                                           **March 2023**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2025-1812, 2025-1813

**Short Case Caption** V.O.S. Selections, Inc. v. Trump

**Filing Party/Entity** Amici Former Government Officials and Legal Scholars

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 6/6/2025

Signature:

Name:          Matthew Seligman

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
March 2023

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Former Government Officials and Legal Scholars | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☑ Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable               ☐   Additional pages attached

| | | |
|---|---|---|
| Matthew Seligman, Stris & Maher LLP | | |
| Mark Lemley, Stanford Law School | | |
| Steve Jonas, State Democracy Defenders Fund | | |

**5. Related Cases.**   Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☐   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable               ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................iii

INTEREST OF *AMICI CURIAE* ............................................................ 1

ARGUMENT............................................................................................. 1

    I.     IEEPA's Text Demonstrates that it Does Not Authorize Tariffs to Address Trade Deficits ............................................................... 1

    II.    The Structure of the Statutory Scheme Confirms that IEEPA Does Not Authorize Tariffs to Address Trade Deficits ............................................. 4

    III.   Historical Practice Comports With this Properly Circumscribed Statutory Interpretation of the President's Authority ............................................... 6

    IV.   The Trade Deficit Tariffs Imposed by Executive Order 14257 are Unlawful ................................................................................................. 9

    V.    Even if Section 1701 Were Ambiguous, The Court Must Interpret It Not to Authorize the Trade Deficit Tariffs ....................................... 10

CONCLUSION................................................................................... 12

APPENDIX A.................................................................................... A

CERTIFICATE OF SERVICE ..............................................................a

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS.... b

# TABLE OF AUTHORITIES

**Cases**

*West Virginia v. EPA*, 597 U.S. (2022).....................................................15

*Biden v. Nebraska*, 600 U.S. (2024).........................................................15

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. (2000)................................7

*Haig v. Agee*, 453 U.S. (1981) ...........................................................11

*Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. (2016)................5

*Mistretta v. United States*, 488 U.S. (1989) ...........................................15

*Regan v. Wald*, 468 U.S. (1984) ..........................................................5

*United States v. Garbish*, 222 U.S. (1911)................................................4

*United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. (2001)............16

**Statutes**

19 U.S.C. § 2132............................................................................6

50 U.S.C. § 1701.................................................................... passim

50 U.S.C. § 1702...........................................................................14

**Other Authorities**

Bureau of Econ. Research, *available at* https://www.bea.gov/ .............................13

Chris Isadore, *Trump aide says tariffs will raise $6 trillion, which would be largest tax hike in US history*, CNN (Mar. 31, 2025), *available* at https://www.cnn.com/2025/03/31/economy/tariffs-largest-tax-hike/index.html 13

Congressional Research Service, *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, App'x A (Jan. 30, 2024) ................................10

E.O. 12170, *Blocking Iranian Government Property* (November 14, 1979) .............8

E.O. 12543, *Prohibiting Trade and Certain Transactions Involving Libya* (Jan. 7, 1986) ................................................................................... 8

E.O. 12735, *Chemical and Biological Weapons Proliferation* (Nov. 16, 1991)..... 11

E.O. 12775, *Prohibiting Certain Transactions with Respect to Haiti* (Oct. 4, 1991) ........................................................................................... 8

E.O. 12938, *Proliferation of Weapons of Mass Destruction* (Nov. 14, 1994) ........ 10

E.O. 13818, *Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption* (Dec. 20, 2017) ................................................... 10

E.O. 13851, *Blocking Property of Certain Persons Contributing to the Situation in Nicaragua* (Nov. 27, 2018)................................................................. 9

E.O. 13882, *Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Mali* (July 25, 2019) ......................................... 9

E.O. 13894, *Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Syria* (Oct. 17, 2019) ........................................ 9

E.O. 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits* (Apr. 2, 2025)................................................... 11, 12, 14

H. Rep. No. 95-459 (1977) ............................................................. 3, 5, 6

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are former federal judges, members of Congress, senior Department of Justice and White House appointees, and other governmental officials, including appointees who served in every Republican administration from the Nixon administration to the first Trump administration, and legal scholars who spent their careers dedicated to the rule of law. They have an interest in the recognition of proper limitations on executive power.[1,2]

## ARGUMENT

### I. IEEPA's Text Demonstrates that it Does Not Authorize Tariffs to Address Trade Deficits.

The International Emergency Economic Powers Act ("IEEPA") does not authorize the president to impose the worldwide and "reciprocal" tariffs because trade imbalances are not an "unusual and extraordinary threat." A persistent trade deficit that has lasted for a half a century is a routine and ordinary circumstance, the exact opposite of the "unusual and extraordinary" threat that the statute requires. Accordingly, the challenged tariffs exceed the president's power under IEEPA.

---

[1] Neither the parties nor their counsel have authored this brief in whole or in part, and neither they nor any other person or entity other than *amici curiae* and their counsel contributed money that was intended to fund preparing or submitting this brief. The parties consent to the filing of this brief. *Amici* have sought leave to file this brief.

[2] A list of *amici curiae* and their institutional affiliations, for identification purposes only, is provided in Appendix A.

1

Congress carefully calibrated the statutory scheme to limit the exercise of the president's delegated powers to narrow circumstances. Section 1701 provides that the president may exercise powers under IEEPA only "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Congress spoke clearly that the "authorities granted to the President" in IEEPA "may *only* be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." *Id.* § 1701(b) (emphasis added). Unless the statutory prerequisite in Section 1701 is not satisfied, the president may not exercise any of IEEPA's powers in Section 1702.

The statutory requirement of an "unusual and extraordinary threat" demands uncommon and exceptional circumstances. The common meaning of "unusual" is "[n]ot usual" "rare," "exceptional," or "remarkable." *Unusual*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE 1698 (1975). Similarly, "extraordinary" means "[b]eyond an ordinary, common, usual, or customary order, method, or course; exceeding a common degree or measure; exceptional." *Extraordinary*, *id.* at 548; *see also Extraordinary*, THE CONCISE OXFORD DICTIONARY OF CURRENT

2

ENGLISH 368 ("[o]ut of the usual course" or "[e]xceptional, surprising; unusually great").

Consistent with that common meaning, IEEPA grants powers that the president may exercise only in strictly limited circumstances. Congress enacted IEEPA to constrain the powers it had previously granted in the Trading With the Enemy Act of 1917 ("TWEA"), which it reformed because it amounted to "essentially an unlimited grant of authority in both the domestic and international economic arena" whenever there was an "unterminated declaration of national emergency on the books." H. Rep. No. 95-459 at 7 (1977). IEEPA was therefore intended to "redefine the power of the President to regulate international economic transactions in future times of war or national emergency." *Id.* at 1. Congress recognized that the president's exercise of the powers granted by the statute should be limited to genuine and exceptional emergencies. As the committee report explained, "emergencies are by their nature rare and brief, and are not to be equated with normal ongoing problems." *Id.* at 10. It emphasized that "[a] national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose    A national emergency should not be a normal state of affairs." *Id.*

The Supreme Court's cases confirm that common meaning. Interpreting the statutory phrase "extraordinary emergency," the Court explained that "[i]t is a special occurrence, and the phrase used emphasizes this. It is not an emergency simply which is expressed by it, something merely sudden and unexpected, but an extraordinary one, one exceeding the common degree. We must assume that the phrase was used with a consciousness of its meaning and with the intention of conveying such meaning. The phrase 'continuing extraordinary emergency' is self-contradictory." *United States v. Garbish*, 222 U.S. 257, 261 (1911) (cleaned up). *See also Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 258 (2016) (holding "common . . . circumstances" including a litigant's financial condition are "far from extraordinary").

## II.     The Structure of the Statutory Scheme Confirms that IEEPA Does Not Authorize Tariffs to Address Trade Deficits.

The structure of the comprehensive statutory scheme of which IEEPA is a part confirms that it does not authorize the president to impose tariffs to respond to trade deficits. IEEPA was one of several statutes that Congress enacted in the mid-1970s to reform the TWEA. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). These reforms responded to President Nixon's imposition of a 10% tariff to address a balance-of-payments deficit. *See* H.R. Rep. No. 95-459, at 5 (1977).

In response to what Congress recognized to be an excessive grant of emergency powers in the TWEA, it enacted three pieces of legislation relevant to

the tariffs at issue here. First, it "amended [the TWEA] to limit the President's power to act pursuant to that statute solely to times of war." *Regan*, 468 U.S. 222 at 227 (citing Title I, § 101, of Pub. L. 95–223, 91 Stat. 1625). Second, it enacted the Section 122 of the Trade Act of 1974, which explicitly authorizes the president to impose emergency import surcharges in response to a balance-of-payments deficit, subject to a hard cap of 15% and a strict limit of 150 days on the tariff's duration. *See* Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1991 (codified at 19 U.S.C. § 2132).[3] Third, it enacted IEEPA, which did not include a strict limit on the duration of the actions the president takes under its authority but did limit the availability of that authority to "unusual and extraordinary threat[s]."

These three enactments together yield a coherent and comprehensive statutory scheme. Congress first limited the TWEA's extensive powers to wartime. It then bifurcated the president's peacetime emergency powers into two categories. The Trading Act of 1974, including its hard cap on the magnitude of tariffs and strict limit on their duration, is the exclusive statutory basis for a president's emergency power to impose tariffs to address a balance-of-payments deficit. IEEPA, in turn, grants emergency powers that lack the limits in the Trading Act to address "unusual and extraordinary threats" *apart from* balance-of-payments deficits.

---

[3] Trade deficits are, by definition, a species of balance-of-payments deficit. A34.

This comprehensive statutory scheme is eminently sensible. Because trade imbalances are a chronic phenomenon and tariffs are a blunt tool, Congress limited the president's authority to impose tariffs in response to them in magnitude and duration. Those limitations ensure that Congress, rather than the president, retains the ultimate authority to address this quintessential economic problem that falls squarely within Congress's legislative competency. By contrast, Congress determined that the president needed more latitude to address genuinely exceptional crises. The government's unwarranted interpretation of IEEPA would instead permit the president to evade the Trading Act's important limitations. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (cleaned up). This statutory structure demonstrates thus that trade deficits are not an "unusual and extraordinary threat" under IEEPA.

## III.    Historical Practice Comports With this Properly Circumscribed Statutory Interpretation of the President's Authority.

The history of presidential practice under IEEPA further confirms that the statute does not authorize the president to impose tariffs to address trade imbalances. No prior president has relied on IEEPA to do so, even though the United States has run persistent trade deficits every year since the statute's enactment in 1977. Consistent with the statutory text and structure, prior presidents have instead

consistently invoked IEEPA's emergency powers solely to address acute foreign policy and national security crises, not longstanding global economic patterns.

President Carter first invoked IEEPA to impose sanctions on Iran in response to the Iranian hostage crisis. *See* E.O. 12170, Blocking Iranian Government Property (November 14, 1979). Subsequent invocations of IEEPA were similarly targeted and tailored. In 1986, President Reagan imposed sanctions on Libya in response to its terrorist attacks in Europe the preceding month. *See* E.O. 12543, Prohibiting Trade and Certain Transactions Involving Libya (Jan. 7, 1986). In 1991, President George H.W. Bush imposed sanctions on Haiti in response to a coup against the democratically elected government. *See* E.O. 12775, Prohibiting Certain Transactions with Respect to Haiti (Oct. 4, 1991).

The unbroken practice of narrowly targeted exercises of the president's powers under IEEPA continued until the Trump administration issued the challenged orders, including during the current president's prior term in office. *See, e.g.*, E.O. 13894, Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Syria (Oct. 17, 2019); E.O. 13882, Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Mali (July 25, 2019); E.O. 13851, Blocking Property of Certain Persons Contributing to the Situation in Nicaragua (Nov. 27, 2018); E.O. 13818, Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption (Dec. 20, 2017).

7

Almost every executive order invoking IEEPA has targeted a specifically named country, entity, or individual. *See* Congressional Research Service, *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, App'x A (Jan. 30, 2024) (cataloging every IEEPA use). The few exceptions instead delegated to a senior official the task of identifying the specific targets to which the sanctions would apply. *See, e.g.*, E.O. 12938, Proliferation of Weapons of Mass Destruction (Nov. 14, 1994) (directing Secretaries of State and Commerce to identify specific "exports . . . that either Secretary determines would assist a country in acquiring the capability to develop, produce, stockpile, deliver, or use weapons of mass destruction or their means of delivery"); E.O. 12735, Chemical and Biological Weapons Proliferation (Nov. 16, 1991) (similar).

No prior president has used IEEPA indiscriminately against the entire world to address systemic economic conditions. Instead, they restrained their use of their emergency powers to narrow circumscribed instances of genuine "unusual and extraordinary threat[s]." That historical practice confirms that the trade deficit tariffs' unprecedented scope and subject exceed the president's statutory authority. *See Haig v. Agee*, 453 U.S. 280, 298 (1981) (relying on "an unbroken line of Executive Orders, regulations, instructions to consular officials, and notices to passport holders [by] the President and the Department of State" to inform interpretation of Passport Act of 1926) (citations omitted).

## IV.    The Trade Deficit Tariffs Imposed by Executive Order 14257 are Unlawful.

The unprecedented trade deficit tariffs at issue here apply indefinitely to all imports of all products from all countries. That assertion of vast emergency powers under IEEPA is contrary to the statute that Congress enacted.

Trade deficits are a routine and ordinary circumstance, not an unusual and extraordinary threat. They are the rule, not the exception. As the executive order imposing the trade deficit tariffs acknowledge, trade deficits have persisted in the United States for over five decades. *See* E.O. 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits* (Apr. 2, 2025) (recounting decades of trade imbalances creating "structural asymmetries [that] have driven the large and persistent annual U.S. goods trade deficit"). Nor have trade deficits grown in recent years; they have remained essentially unchanged for decades. From 2008 until 2024, the trade deficit in goods and services averaged 3.1% of GDP. The trade deficit in goods and services for 2024 was an identical 3.1%. Indeed, the trade deficit has *decreased* by almost half from its modern peak of 5.67% of GDP in 2005 and 5.69% of GDP in 2006. And contrary to the executive order's claims, the trade deficit in goods alone has remained similarly steady: 5.4% of GDP in 2006, 4.18% of GDP in 2014, 4.13% of GDP in 2017, 4.02% of GDP in 2019, 4.5% of GDP in 2022, and 4.15% of GDP in 2024. *See generally* Bureau of Econ. Research, *available at*

https://www.bea.gov/ (collecting historical data). This remarkably consistent and persistent phenomenon cannot qualify as an "unusual and extraordinary threat."

Moreover, the trade deficit tariffs are wholly unbounded in duration and in geographical scope. The government anticipates that the tariffs—and thus the trade deficits they aim to address—will persist for at least a decade, raising trillions of dollars in revenue. *See* Chris Isadore, *Trump aide says tariffs will raise $6 trillion, which would be largest tax hike in US history*, CNN (Mar. 31, 2025), *available* at https://www.cnn.com/2025/03/31/economy/tariffs-largest-tax-hike/index.html. And the problem the trade deficit tariffs purport to address are universal, as is the purported solution the executive order imposes. The order imposes a 10% tariff worldwide, and it imposes higher tariffs of up to 50% on dozens of individual countries. *See* E.O. 14257. A problem that persists everywhere forever simply cannot count as either unusual or extraordinary.

Accordingly, the longstanding phenomenon of trade deficits are not an "unusual and extraordinary threat" under Section 1701 and thus the president is not authorized to exercise any of the powers in Section 1702. The trade deficit tariffs imposed by Executive Order 14257 are therefore unlawful.

## V. Even if Section 1701 Were Ambiguous, The Court Must Interpret It Not to Authorize the Trade Deficit Tariffs

The text of Section 1701 is unambiguous. But even were there any ambiguity, that ambiguity must be resolved against the government for two reasons.

First, the government's unprecedented usurpation of Congress's power to levy and collect tariffs presents a "major question" that requires clear text delegating that power. *Biden v. Nebraska*, 600 U.S. 477, 503 (2024) (finding that executive order affecting student loans amounting to less than 10% the amount of the trade deficit tariffs to be of "staggering . . . economic and political significance" and "hit[] fundamental issues about the structure of the economy"). As the Court noted, "[a] decision of such magnitude and consequence on a matter of earnest and profound debate across the country must rest with Congress itself, or an agency acting pursuant to a clear delegation" from Congress. *Id.* at 504. *Accord West Virginia v. EPA*, 597 U.S. 697, 730 (2022).

Second, any such delegation of that authority would present a significant constitutional question. The Constitution gives Congress the exclusive power to levy tariffs. U.S. CONST., Art. I, sec. 8. The government's interpretation would delegate that power entirely to the executive without a hint of an "intelligible principle" to constrain its exercise. *See Mistretta v. United States*, 488 U.S. 361, 372 (1989). The canon of constitutional avoidance thus requires the Court to adopt a reasonable interpretation that does not pose that grave constitutional flaw. *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 494 (2001). Because the interpretation of Section 1701 that limits its scope to genuinely rare and exceptional threats is reasonable, the Court must adopt that construction.

11

## **CONCLUSION**

This Court should deny the government's application for a stay.


June 6, 2025                                 Respectfully submitted,

                                             By: /s/ Matthew A. Seligman


Mark A. Lemley                               Matthew A. Seligman
William H. Neukom Professor                  *Counsel of Record*
   of Law                                    STRIS & MAHER LLP
STANFORD LAW SCHOOL                          17785 Center Court Dr. N., Suite 600
559 Nathan Abbott Way                        Cerritos, CA 90703
Stanford, CA 94305                           (213) 995-6873
(650) 723-4605                               mseligman@stris.com
mlemley@law.stanford.edu

Stephen A. Jonas
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
(202) 594-9958
Steve@statedemocracydefenders.org

                                             *Counsel for Amici Curiae*

## APPENDIX A

*Amici curiae* are listed below. Affiliation is provided for identification purposes only. All signatories are participating in their individual capacity, not on behalf of their institutions.

**Donald B. Ayer**

Deputy Attorney General in the George H.W. Bush Administration from 1989 to 1990; Principal Deputy Solicitor General in the Reagan Administration from 1986 to 1988; United States Attorney for the Eastern District of California from 1981 to 1986 in the Reagan Administration.

**Tom Campbell**

Former Member of the U.S. House of Representatives (R-CA) from 1989 to 1993, and 1995 to 2001; Doy and Dee Henley Distinguished Professor of Jurisprudence at the Chapman University Fowler School of Law.

**Ty Cobb**

Special Counsel to the President in the Trump Administration from 2017 to 2018 and Assistant U.S. Attorney for the District of Maryland from 1980 to 1986.

***Tom Coleman***

Assistant Attorney General of Missouri from 1969 to 1972; Missouri State Representative from 1973 to 1976; Representative of the 6th Congressional District of Missouri from 1976 to 1993 (R).

***Barbara Comstock***

Representative of the 10th Congressional District of Virginia from 2015 to 2019 (R).

***George T. Conway III***

Board President, Society for the Rule of Law.

***Murray Dickman***

Primary Assistant to U.S. Attorney General from 1988 to 1992.

***Mickey Edwards***

Representative of the 5th Congressional District of Oklahoma from 1977 to 1993 (R).

*Richard Epstein*

Laurence A. Tisch Professor of Law, New York University.

*John J. Farmer Jr.*

New Jersey Attorney General from 1999 to 2002 (R); Assistant U.S.

Attorney for the District of New Jersey from 1990 to 1994.

*John Giraudo*

Attorney Advisor in the Department of Justice Office of Legal Counsel in

the Reagan Administration from 1986 to 1989.

*Bob Inglis*

Representative of the 4th Congressional District of South Carolina from

1993 to 1999 and from 2005 to 2011 (R).

*Peter Keisler*

Acting Attorney General in the George W. Bush Administration in 2007;

Assistant Attorney General for the Civil Division in the Bush Administration

from 2003 to 2007; Principal Deputy Associate Attorney General and Acting

Associate Attorney General in the Bush Administration from 2002 to 2003;

Assistant and Associate Counsel to the President in the Reagan

Administration from 1986 to 1988.


***William Kristol***

Chief of Staff to the Vice President in the George H.W. Bush Administration

from 1989 to 1993.


***Harold Hongju Koh***

Sterling Professor of International Law

Yale Law School


***Philip Lacovara***

Counsel to the Special Prosecutor, Watergate Special Prosecutor's Office in

the Nixon Administration from 1973 to 1974.


***Mike Lofgren***

Former Republican Congressional Staffer.


***J. Michael Luttig***

Circuit Judge, United States Court of Appeals appointed by George H.W.

Bush from 1991 to 2006; Assistant Attorney General, Office of Legal Counsel and Counselor to the Attorney General in the Bush Administration from 1990 to 1991; Assistant Counsel to the President in the Reagan Administration from 1981 to 1982.

### John McKay

U.S. Attorney for the Western District of Washington appointed by George W. Bush from 2001 to 2007.

### Mario Nicolais

General Counsel, The Lincoln Project.

### Richard Painter

S. Walter Richey Professor of Corporate Law at the University of Minnesota Law School; former Associate Counsel to the President where he served as the chief White House ethics lawyer.

### Carter Phillips

Assistant to the Solicitor General in the Reagan Administration from 1981 to 1984.

***Trevor Potter***

Chairman of the Federal Election Commission and Commissioner of the

Federal Election Commission from 1991 to 1995; General Counsel to John

McCain's Presidential Campaign from 2000 to 2008.

***Alan Charles Raul***

Associate Counsel to the President in the Reagan Administration from 1986

to 1988.

***Stephen Richer***

Maricopa County Recorder from 2021 to 2025 (R).

***Reid Ribble***

Representative of the 8th Congressional District of Wisconsin from 2015 to

2017 (R).

***Paul Rosenzweig***

Deputy Assistant Secretary for Policy, Department of Homeland Security in

the George W. Bush Administration from 2005 to 2009.

**Nicholas Rostow**

Special Assistant to the President for National Security Affairs and Legal
Adviser to the National Security Council under Reagan and George H.W.
Bush Administrations from 1987 to 1993; Special Assistant to the Legal
Adviser, U.S. Department of State from 1985 to 1987; Senior Research
Scholar at Yale Law School.

**Claudine Schneider**

Representative of the 2nd Congressional District of Rhode Island from 1981
to 1991 (R).

**Robert Shanks**

Deputy Assistant Attorney General, Office of Legal Counsel in the Reagan
Administration from 1981 to 1984.

**Stanley A. Twardy, Jr.**

United States Attorney for the District of Connecticut from 1985 to 1991
and Chief of Staff to Connecticut Governor Lowell P. Weicker, Jr from 1991
to 1993.

***Christopher Shays***

Representative for the 4th Congressional District of Connecticut from 1987

to 2009 (R).

***Fern M. Smith***

Judge of the U.S. District Court for the Northern District of California

appointed by President Reagan from 1988 to 2005.

***Alan O. Sykes***

Professor of Law and Warren Christopher Professor in the

Practice of International Law and Diplomacy, Stanford Law School

***William Joseph Walsh***

Representative of the 8th Congressional District of Illinois from 2011 to

2013 (R).

***William F. Weld***

Governor of Massachusetts from 1991 to 1997 (R) and United States

Assistant Attorney General for the Criminal Division from 1986 to 1988.

***Christine Todd Whitman***

Governor of New Jersey from 1994 to 2001 (R); Administrator of the

Environmental Protection Agency in the George W. Bush Administration,

2001-2003.

***Wendell Willkie, II***

Associate Counsel to the President from 1984 to 1985; Acting Deputy

Secretary, U.S. Department of Commerce from 1992 to 1993; General

Counsel, U.S. Department of Commerce from 1989 to 1993; General

Counsel, U.S. Department of Education, from 1985 to 1988.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 6, 2025, I caused the foregoing BRIEF OF

*AMICI CURIAE* FORMER GOVERNMENT OFFICIALS AND LEGAL

SCHOLARS IN SUPPORT OF PLAINTIFFS-APPELLEES to be served by

electronic means via the Court's CM/ECF system on all counsel registered to

receive electronic notices.

June 6, 2025                          /s/ Matthew A. Seligman

                                      Matthew A. Seligman
                                      STRIS & MAHER LLP
                                      17785 Center Court Dr. N., Suite 600
                                      Cerritos, CA 90703
                                      (213) 995-6873
                                      mseligman@stris.com

                                      *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATIONS

I hereby certify as follows:

1.     The foregoing BRIEF OF AMICI CURIAE FORMER GOVERNMENT OFFICIALS AND LEGAL SCHOLARS IN SUPPORT OF PLAINTIFFS-APPELLEES' OPPOSITION TO DEFENDANTS-APPELLANTS' MOTION FOR AN EMERGENCY STAY complies with the type-volume limitation of Fed. Cir. R. 29(b) as specified in paragraph 6 of this Court's June 30, 2023 order. The brief is printed in proportionally spaced 14-point type, and the brief has 2,600 words according to the word count of the word-processing system used to prepare the brief (excluding the parts of the motion exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)).

2.     The brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac in 14-point Times New Roman font.

June 6, 2025                                   /s/ Matthew A. Seligman

                                              Matthew A. Seligman
                                              STRIS & MAHER LLP
                                              17785 Center Court Dr. N., Suite 600
                                              Cerritos, CA 90703
                                              (213) 995-6873
                                              mseligman@stris.com

                                              *Counsel for Amici Curiae*