**Nos. 2025-1812, -1813**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

———————————

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MI-CROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OF-FICE OF THE PRESIDENT, UNITED STATES, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection, in his official capacity as Acting Commissioner of the United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTA-TIVE, HOWARD LUTNICK, UNITED STATES CUSTOMS AND BORDER PROTECTION,

Defendants-Appellants.

———————————

THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF VERMONT,

Plaintiffs-Appellees,

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECU-RITY, KRISTI NOEM, Secretary of Homeland Security, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTEC-TION, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protec-tion, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection, UNITED STATES,

Defendants-Appellants.

———————————

On Appeal from the United States Court of International Trade
Nos. 25-66, -77, Judges Katzmann, Reif, and Restani

———————————

## REPLY IN SUPPORT OF EMERGENCY MOTION
## FOR A STAY PENDING APPEAL

———————————

YAAKOV M. ROTH
*Acting Assistant Attorney General*

*Signature block continued*
*on inside cover*

MICHAEL S. RAAB
BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7245*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-8849*

# TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................ 2

I.    The Government Is Likely To Prevail ...................................................... 2

       A.    IEEPA Clearly Authorizes These Tariffs ....................................... 2

       B.    The Contraband-Drug-Related Tariffs "Deal With" The Identified Threat .................................................................................... 7

       C.    The CIT's Failure To Address The Equities Independently Justifies A Stay ................................................................................. 8

II.    The Equities Favor A Stay ..................................................................... 9

CONCLUSION .......................................................................................... 14

CERTIFICATE OF COMPLIANCE

The CIT's injunction is legally untenable and risks irreparable economic and national-security harms.  The CIT misapprehended IEEPA's text to unnaturally cabin the President's tariff authority.  The CIT then ignored equitable requirements for injunctive relief.  The result is an illegal injunction that improperly usurps political choices by the political branches and arrogates to the Judiciary a central role in managing foreign negotiations, the national economy, and national security.  The injunction unilaterally diminishes America's bargaining position during sensitive trade negotiations, encouraging other countries to hold our Nation hostage and catastrophically harm our economy.

Plaintiffs' responses are unpersuasive.  Their circumscribed theory of the President's tariff authorities would make a hash of interlocking statutory provisions that give the President flexible tariff authorities.  And they cannot justify the CIT's failure to consider the profound irreparable harms to foreign policy and national security that this injunction would inflict.  Instead, they ask this Court—a court of appellate review—to act as a court of first view, sift through evidence that the CIT ignored, and supplement the record with selective quotes from public officials' media appearances.  That is no

way for courts to review one of the most significant injunctions ever to cross the Judiciary's docket.

This Court should grant a stay pending appeal. If the Court denies a stay, it should extend its administrative stay for seven days to let the government seek relief from the Supreme Court.

## ARGUMENT

## I.    The Government Is Likely To Prevail

### A.    IEEPA Clearly Authorizes These Tariffs

1.    Plaintiffs' contention that the challenged tariffs should not be understood to "regulate" importation, 50 U.S.C. § 1702(a)(1)(B), defies the text. To "regulate" includes to "control" or "to adjust by rule." *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979). Imposing tariffs on imports is clearly a way of "controlling" them. This Court's predecessor held as much in construing identical language in IEEPA's predecessor statute, explaining that the power to "regulate … importation" includes the power to "impos[e] an import duty surcharge"—*i.e.*, a tariff. *United States v. Yoshida International*, 526 F.2d 560, 576 (C.C.P.A. 1975). Tariffs also are a means of "adjust[ing] [imports] by rule" (*Black's*); indeed, the Supreme Court has interpreted a trade statute authorizing the President "to adjust the imports" of a product

to permit "monetary methods" like tariffs. *FEA v. Algonquin SNG, Inc.*, 426

U.S. 548, 561 (1976); America First Legal Foundation (AFLF) Br. 3-5. As a

textual matter, these tariffs thus squarely fall within IEEPA's baseline grant

of tariff authority.

2.    Plaintiffs thus resort to extratextual arguments. But "extratex-

tual considerations" cannot "overcome" a statute's plain terms; they can

serve only "to help 'clear up,'" not to "'create,'" statutory ambiguity. *McGirt*

*v. Oklahoma*, 591 U.S. 894, 916 (2020). Regardless, plaintiffs' extratextual ar-

guments are meritless.

a.    Plaintiffs are incorrect to suggest that Section 122 of the Trade

Act of 1974, which "grants the President authority to impose restricted tariffs

in response to … 'balance-of-payments deficits[],'" impliedly "limit[s] any

such authority in the broader emergency powers under IEEPA," A40.

Courts cannot hold "that one statute 'displaces' a second" unless the two

statutes cannot "coexist harmoniously." *Department of Agric. Rural Dev. Ru-*

*ral Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024). If they are "merely complemen-

tary," courts must effectuate both. *Id.* Plaintiffs never explain why IEEPA

and Section 122 cannot "coexist harmoniously" when they serve clearly dis-

tinct, "complementary" functions. Section 122 is broader than IEEPA in one

- 3 -

key respect (it is not limited to declared emergencies) and narrower in another (it authorizes only tariffs responding to one type of concern).

Plaintiffs try to reframe the question as whether IEEPA "displace[s] … Section 122" and other "existing statutes that address tariffs." *Oregon* Opp. 8. But no one suggests that Section 122 or other authorities should be read narrowly to accommodate IEEPA; those authorities can be given full effect without narrowing either Section 122 or IEEPA. There is no basis for plaintiffs' view that only one provision can supply tariff authority to address certain concerns; Congress commonly enacts overlapping statutes. *See Kirtz*, 601 U.S. at 63.

Plaintiffs also read *Yoshida* to mean that Section 122 displaced TWEA as the authority for balance-of-payments tariffs. But Congress chose, after *Yoshida* and Section 122's enactment, to incorporate in IEEPA the same language that *Yoshida* had construed broadly in TWEA. Congress cannot plausibly be understood to have narrowed IEEPA's reach by deliberately adopting the *same* language from TWEA.

Finally, plaintiffs suggest (*Oregon* Opp. 8-9) that because Section 122 treats balance-of-payments concerns as non-emergencies, they cannot qualify as an "unusual and extraordinary threat" under IEEPA, 50 U.S.C.

§ 1701(b).  But even the CIT accepted the emergency declarations' validity, for good reason.  Mot. 20.  And there is nothing strange about the idea that lesser balance-of-payments concerns might be addressed in Section 122, yet more serious balance-of-payments concerns could qualify as emergencies under IEEPA.  Regardless, the concerns identified in the April 2 emergency declaration go well beyond balance-of-payments issues and include, for example, supply-chain vulnerabilities.

Finally, plaintiffs' arguments defy "the principle that statutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed."  *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996).  In any event, plaintiffs' Section 122 arguments are irrelevant to the contraband-drug-related emergency—but there is no textual basis for reading IEEPA to authorize one set of tariffs but not the other.

b.    Plaintiffs urge narrowly construing IEEPA to avoid nondelegation concerns.  But the avoidance canon is a tool for interpreting statutes, not rewriting them.  Because no "plausible construction" of IEEPA would support the CIT's interpretation, the canon is irrelevant.  *See Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018).  Regardless, no serious nondelegation concern exists.  The IEEPA authority is broad, not "unbounded" (*Oregon* Opp. 10),

and as the *V.O.S.* plaintiffs concede (Opp. 24), the Supreme Court has recognized that "greater discretion must often be granted to the President in the foreign affairs realm." The Court has long blessed broad delegations to the President to regulate international trade, including through tariffs. *See, e.g.,* *Algonquin*, 426 U.S. at 558-560; *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 409 (1928); AFLF Br. 9-16. And every court of appeals to have considered the question has upheld IEEPA against nondelegation challenges. Mot. 17. Plaintiffs ask this Court to disagree only by attacking the straw-man notion that the government is seeking an unbounded tariff power.

c.    Plaintiffs likewise fail to justify the CIT's invocation of the major-questions doctrine. Even if the doctrine covered delegations to the President—a subject of disagreement[1]—it has no application here. IEEPA on its face delegates flexible power within broad constraints, consistent with Congress's routine practice of granting the President broad authority regarding foreign affairs in general and tariffs in particular. *See, e.g.,* *Field v. Clark*, 143

---

[1] Plaintiffs mischaracterize the cases. No other panel member joined either the relevant portion of Judge Grant's opinion in *Georgia v. President of the United States*, 46 F.4th 1283 (11th Cir. 2022), or Judge Nelson's concurrence in *Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024), *pet. for reh'g pending*.

U.S. 649, 683-694 (1892) (history of broad delegations of tariff authority); *Algonquin*, 426 U.S. at 558-560; 19 U.S.C. § 1338 (Smoot-Hawley tariffs); AFLF Br. 6-9. And to the extent the major questions doctrine does apply, IEEPA supplies the requisite "'clear … authorization,'" *West Virginia v. EPA*, 597 U.S. 697, 723 (2022), for the reasons discussed above and in our motion.

## B. The Contraband-Drug-Related Tariffs "Deal With" The Identified Threat

Plaintiffs try to defend the CIT's conclusion that the contraband-drug-related tariffs are unauthorized because they do not "deal with" the emergency identified by the President, 50 U.S.C. § 1701. But this Court refuses to "second-guess the facts found and measures taken by the President" in the exercise of his international-trade authorities. *See, e.g.*, *PrimeSource Building Prods. v. United States*, 59 F.4th 1255, 1263 (Fed. Cir. 2023); AFLF Br. 16-18. And the Supreme Court has recognized—in an opinion plaintiffs ignore—that asset-blocking orders under IEEPA "serve as a 'bargaining chip' to be used by the President" "in negotiating the resolution of a declared national emergency." *Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981). Plaintiffs never explain why tariffs designed to create leverage in international negotiations over resolving an emergency are not a means of "dealing with" that

emergency—particularly given the President's subsequent determinations that Mexico and Canada had taken steps to address the emergencies. *See* Mot. 8.

### C.   The CIT's Failure To Address The Equities Independently Justifies A Stay

Finally, plaintiffs cannot defend the CIT's failure to consider the equitable prerequisites for injunctive relief. Plaintiffs claim "the CIT explained" that "a permanent injunction is necessary because of the 'compelling public interest in ensuring that governmental bodies comply with the law' and 'the lack of any cognizable hardship borne by the United States in the form of its non-enforcement of orders issued *ultra vires*.'" *Oregon* Opp. 15. But the CIT offered that explanation only in its order holding in abeyance the government's stay motions. B12. That post hoc reasoning cannot salvage the lack of such reasoning to support the injunction.

That belated reasoning is insufficient regardless. Even when a court has concluded that the government's conduct is illegal, the court must consider the injunction's countervailing harms to the public interest. *See, e.g.,* *Winter v. NRDC*, 555 U.S. 7, 32 (2008); *Defense Distributed v. Department of*

*State*, 838 F.3d 451, 459-460 (5th Cir. 2016).  The CIT's failure to conduct that analysis was a clear abuse of discretion.

## II.    The Equities Favor A Stay

1.    The CIT's injunction would undermine the President's ability to carry out foreign-policy and national-security objectives.  Mot. 1-2, 22-25.  Multiple Cabinet members explained that ongoing negotiations are "premised on the credible threat of enforcement of the IEEPA tariffs" and that the injunction could compromise that leverage so that "foreign counterparts will have reduced incentives to reach meaningful agreements."   A76 (Commerce); *see* A81 (State); A86 (Treasury); A90-91 (USTR).

In response, plaintiffs selectively quote statements by various Administration officials, after the CIT's decision, that negotiations have continued and that other statutory tariff authorities remain available.  *Oregon* Opp. 18-19; *V.O.S.* Opp. 11.  Plaintiffs mischaracterize the statements and ignore that this Court subsequently *stayed* the CIT's injunction.

The irreparable harm from this sweeping injunction does not disappear just because the President has other tariff authorities that might support pieces of the challenged tariffs.  As Secretary Lutnick explained (A75-76), IEEPA provides the most flexible, effective means for addressing the grave

emergencies the President has declared. *See* B2 (head of National Economic Council emphasizing that IEEPA supplies "the most authority for doing what we're exactly doing"); B4 (USTR explaining that another statute was not invoked because of its more limited authorities). Upending the existing tariffs at this critical juncture on the theory that the President can hypothetically impose other (less effective) tariffs later, under other authorities, also does nothing to solve the timing problem: The emergencies are looming now, negotiations are proceeding now, and the CIT's injunction threatens them.

Plaintiffs also pick out statements about continuing negotiations despite the CIT's ruling. But those negotiations may fail, or produce less favorable terms, where trading partners have "reduced incentives to reach meaningful agreements." A76. Plaintiffs' addendum includes a European Union official's statement that "uncertainty as to the legality of the reciprocal tariffs certainly gives [the EU] extra leverage" in negotiations. B9. And trading partners are presently factoring into their assumptions the likelihood that this Court will stay the CIT's injunction pending appeal. *See* B7 (USTR explaining that the government has a "strong case" on appeal, and "a stay from the circuit court right now," as context for statement that "other

countries … are treating [the CIT's injunction] as just kind of a bump in the road rather than any fundamental change"); B2-3, B8 (similar).  Allowing the injunction to take effect would significantly affect negotiations addressing threats to national security and the economy, particularly given the July 9 expiration of the current pause on certain tariffs.

Plaintiffs insist any harm to the government is irrelevant because the President "tried to exercise authority he does not have."  *Oregon* Opp. 19; *see V.O.S.* Opp. 7-10.  That argument recycles plaintiffs' faulty merits arguments and ignores that injunctive relief "does not follow from success on the merits as a matter of course," *Winter*, 555 U.S. at 32.  Even if plaintiffs were likely to prevail on appeal, the injunction still should not take effect pending appeal given the severe, irreparable harms the injunction would inflict on the government.  The only other court that has held the challenged tariffs invalid stayed its ruling "to protect the President's ability to identify and respond to threats to the U.S. economy and national security."  Order, *Learning Resources v. Trump*, No. 25-cv-1248, Dkt. 42 (D.D.C. June 3, 2025).

2.    By contrast, plaintiffs who import goods, and thus would pay tariffs while the injunction is stayed, agree that refunds are available for tariffs ultimately held unlawful.  They simply treat refunds as insufficient to

redress other consequences, such as reputational harms to their businesses. But *all* tariffs "necessarily have an adverse affect on … importers," and the CIT has correctly rejected a "per se irreparable harm rule" based on claims of potential "adverse economic impact" from tariffs. *Corus Grp. v. Bush*, 217 F. Supp. 2d 1347, 1355 (Ct. Int'l Trade 2002). Even assuming such collateral consequences could constitute irreparable harm, those predicted harms cannot justify allowing this injunction to take effect, given the severe and irreparable harm that it would pose to the President's ability to exercise his delegated powers in support of national security.

Finally, to the extent plaintiffs assert harms *other* than those of importers—like the potential harm of having to pay higher prices for products that an importer decided to mark up in response to the tariffs (*Oregon* Opp. 21)—those harms are not judicially cognizable. "[P]urchasers have no remedy to challenge [a] tariff classification." *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1352 (Fed. Cir. 2010). More generally, "a federal court cannot redress 'injury that results from the independent action of some third party not before the court,'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024), like an importer's decision to raise prices.

3.     Plaintiffs resist a stay even as to nonparties, arguing that tariffs must be uniform and only a universal injunction can protect plaintiffs' interests pending appeal.  *V.O.S.* Opp. 13, 15-17; *Oregon* Opp. 23.  Those defenses of universal relief fail.

Article I's uniformity requirement is a limitation on Congress; it is not a license for courts to exceed their Article III authority.  Allowing the tariffs to take effect against nonparties during this appeal thus would not produce any constitutionally problematic disuniformity, as illustrated by the party-specific injunction (which the court stayed pending appeal) in another case challenging these tariffs, *see Learning Resources v. Trump*, 2025 WL 1525376, at *15 (D.D.C. May 29, 2025).  In contrast, enjoining *all* the challenged tariffs as to *everyone* has no basis in Article III or equity.  *See* Mot. 26; AFLF Br. 18-20.

Nor can plaintiffs justify the CIT's overbroad relief with speculation that application of the tariffs to unrelated non-party importers—and even as to goods plaintiffs never purchase—may have some effect on plaintiffs.  Such attenuated claims of injury could not suffice even for standing, much less universal injunctive relief.  Otherwise, universal relief would be appropriate in every tariff case.

## CONCLUSION

This Court should stay the judgment pending appeal. If the Court denies a stay, it should continue its administrative stay for seven days to let the government seek relief from the Supreme Court.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

MICHAEL S. RAAB
BRAD HINSHELWOOD

 */s/ Daniel Winik*
DANIEL WINIK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*
  *Daniel.L.Winik@usdoj.gov*

- 14 -

## CERTIFICATE OF COMPLIANCE

This reply complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(C) because it contains 2,598 words.  This motion also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik