**Nos. 2025-1812, -1813**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

———————————

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, UNITED STATES CUSTOMS AND BORDER PROTECTION,

Defendants-Appellants.

———————————

THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF VERMONT,

Plaintiffs-Appellees,

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for U.S. Customs and Border Protection, UNITED STATES,

Defendants-Appellants.

———————————

On Appeal from the United States Court of International Trade
Nos. 25-66, -77, Judges Katzmann, Reif, and Restani

———————————

## OPENING BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
*Assistant Attorney General*

*Signature block continued
on inside cover*

MICHAEL S. RAAB
BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................iii

STATEMENT OF RELATED CASES ...........................................xiii

INTRODUCTION ........................................................................ 1

STATEMENT OF JURISDICTION .................................................. 6

STATEMENT OF ISSUES ............................................................ 6

STATEMENT OF THE CASE........................................................ 6

    A.    Statutory Background .......................................................6

    B.    Factual Background ........................................................14

        1.    Trafficking-related tariffs.......................................15

        2.    Reciprocal tariffs..................................................18

        3.    Initial effects of tariffs...........................................20

    C.    Prior Proceedings ..........................................................21

SUMMARY OF ARGUMENT ...................................................... 24

ARGUMENT............................................................................. 28

Standard of Review.................................................................. 28

I.    The CIT And This Court Have Exclusive Jurisdiction........................ 29

II.    IEEPA Authorizes The Challenged Tariffs ............................ 31

    A.    IEEPA Clearly Authorizes The Imposition Of Tariffs, Including The Reciprocal Tariffs....................................32

B.     IEEPA Clearly Authorizes The Trafficking-Related Tariffs.......54

III.   The CIT Abused Its Discretion In Entering An Injunction.................. 60

CONCLUSION .................................................................................................. 67

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Algoma Steel Corp. v. United States*,
   865 F.2d 240 (Fed. Cir. 1989) ............................................................66

*American Institute for International Steel, Inc. v. United States*,
   376 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) ...................................55
   806 F. App'x 982 (Fed. Cir. 2020) ...................................................42

*American Power & Light Co. v. SEC*,
   329 U.S. 90 (1946) .............................................................................41

*Andrus v. Glover Construction Co.*,
   446 U.S. 608 (1980) ...........................................................................36

*Arko Foods International, Inc. v. United States*,
   654 F.3d 1361 (Fed. Cir. 2011) ........................................................30

*B-West Imports, Inc. v. United States*,
   75 F.3d 633 (Fed. Cir. 1996) ............................................................45

*Babb v. Wilkie*,
   589 U.S. 399 (2020) ...........................................................................37

*Biden v. Nebraska*,
   600 U.S. 477 (2023) .....................................................................44, 46

*Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*,
   63 F.4th 25 (Fed. Cir. 2023) .............................................................33

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ...........................................................................65

*California v. Trump*,
   2025 WL 1569334 (N.D. Cal. June 2, 2025) ....................................31

*Cargo of the Brig Aurora v. United States*,
   11 U.S. (7 Cranch) 382 (1813) .....................................................40, 46

*Conoco, Inc. v. U.S. Foreign-Trade Zones Board*,
   18 F.3d 1581 (Fed. Cir. 1994) ..........................................................29

*Corus Group PLC v. Bush*,
  217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002) ....................................................64

*Dalton v. Specter*,
  511 U.S. 462 (1994) ..........................................................................................59

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ........................................................ 5, 12, 13, 27, 35, 46, 55

*Defense Distributed v. Department of State*,
  838 F.3d 451 (5th Cir. 2016) ............................................................................61

*Department of Agriculture Rural Development Rural Housing Service v. Kirtz*,
  601 U.S. 42 (2024) ............................................................................ 26-27, 27, 49

*Department of the Navy v. Egan*,
  484 U.S. 518 (1988) ......................................................................................39, 45

*DHS v. New York*,
  140 S. Ct. 599 (2020) ........................................................................................67

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ..........................................................................23, 28, 60, 61, 63

*Emily Ley Paper, Inc. v. Trump*,
  2025 WL 1482771 (N.D. Fla. May 20, 2025) ....................................................31

*Federal Energy Administration v. Algonquin SNG, Inc.*,
  426 U.S. 548 (1976) ..........................................................................3, 25, 33, 40

*Florida v. HHS*,
  19 F.4th 1271 (11th Cir. 2021) ..........................................................................46

*Florsheim Shoe Co., Division of Interco v. United States*,
  744 F.2d 787 (Fed. Cir. 1984) ..........................................................................59

*Fundicao Tupy S.A. v. United States*,
  652 F. Supp. 1538 (Ct. Int'l Trade 1987) ..........................................................66

*Gemveto Jewelry Co. v. Jeff Cooper Inc.*,
  800 F.2d 256 (Fed. Cir. 1986) ..........................................................................65

*Georgia v. Public.Resource.Org, Inc.*,
  590 U.S. 255 (2020) ................................................................... 35

*Gibbons v. Ogden*,
  22 U.S. (9 Wheat.) 1 (1824) ....................................................... 33

*Gill v. Whitford*,
  585 U.S. 48 (2018) ...................................................................... 64

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999) .................................................................... 65

*Gundy v. United States*,
  588 U.S. 128 (2019) .................................................................... 40

*Haig v. Agee*,
  453 U.S. 280 (1981) .................................................................... 58

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ....................................................................... 60

*Htet v. Trump*,
  2025 WL 522033 (D.D.C. Feb. 18, 2025) .................................... 59

*J.W. Hampton, Jr., & Co. v. United States*,
  276 U.S. 394 (1928) ........................................................ 7, 8, 40, 41

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) .............................................................. 38, 42

*Labrador v. Poe ex rel. Poe*,
  144 S. Ct. 921 (2024) .................................................................. 65

*Learning Resources, Inc. v. Trump*,
  2025 WL 1525376 (D.D.C. May 29, 2025) ............................... 29, 35

*Lewis v. Casey*,
  518 U.S. 343 (1996) .................................................................... 64

*Lorillard v. Pons*,
  434 U.S. 575 (1978) .................................................................... 35

*Maple Leaf Fish Co. v. United States*,
  762 F.2d 86 (Fed. Cir. 1985) ..............................................................29

*Marshall Field & Co. v. Clark*,
  143 U.S. 649 (1892) .....................................................................7, 40

*Mayes v. Biden*,
  67 F.4th 921 (9th Cir. 2023) ...........................................................44

*Michael Simon Design, Inc. v. United States*,
  609 F.3d 1335 (Fed. Cir. 2010) ......................................................30

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ........................................................................58

*Nucor Corp. v. United States*,
  594 F. Supp. 2d 1320 (Ct. Int'l Trade 2008) ..................................66

*Oman Fasteners, LLC v. United States*,
  125 F.4th 1068 (Fed. Cir. 2025) ........................................... 28-29, 29

*Paradissiotis v. United States*,
  304 F.3d 1271 (Fed. Cir. 2002) ......................................................13

*PrimeSource Building Products, Inc. v. United States*,
  59 F.4th 1255 (Fed. Cir. 2023) ..................................................42, 59

*Reebok International Ltd. v. J. Baker, Inc.*,
  32 F.3d 1552 (Fed. Cir. 1994) ........................................................64

*Regan v. Wald*,
  468 U.S. 222 (1984) ...................................................... 11-12, 42, 58

*Saha Thai Steel Pipe Public Co. Ltd. v. United States*,
  101 F.4th 1310 (Fed. Cir. 2024) .....................................................34

*Sale v. Haitian Centers Council, Inc.*,
  509 U.S. 155 (1993) ...................................................................39, 45

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ........................................................................43

*South Corp. v. United States*,
  690 F.2d 1368 (Fed. Cir. 1982) ..........................................................34

*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024) ..........................................................................61

*StarKist Co. v. United States*,
  29 F.4th 1359 (Fed. Cir. 2022) ..........................................................34

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ..........................................................................60

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001) ............................................................................36

*United States v. Amirnazmi*,
  645 F.3d 564 (3d Cir. 2011) ..............................................................42

*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936) ....................................................................39, 40

*United States v. Mendoza*,
  464 U.S. 154 (1984) ..........................................................................66

*United States v. Shih*,
  73 F.4th 1077 (9th Cir. 2023) ......................................................25, 42

*United States v. Yoshida International, Inc.*,
  526 F.2d 560 (C.C.P.A. 1975) ..................... 3, 10, 22, 25, 34, 38, 42, 50, 52, 55

*Utility Air Regulatory Group v. EPA*,
  573 U.S. 302 (2014) ..........................................................................44

*Wayman v. Southard*,
  23 U.S. (10 Wheat.) 1 (1825) ............................................................41

*Webber v. DHS*,
  2025 WL 1207587 (D. Mont. Apr. 25, 2025) ....................................31

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ..........................................................................63

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ................................................................26, 43, 44, 46

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ................................................................................61

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ..............................................................................47

*Zemel v. Rusk*,
   381 U.S. 1 (1965) ...............................................................................39

**U.S. Constitution:**

Art. I, § 8, cl. 1 ...................................................................................66

**Statutes:**

Act of Mar. 2, 1799, ch. 22, § 61, 1 Stat. 627 .........................................7

First War Powers Act, ch. 593, tit. III, § 301, 55 Stat. 838 (1941) ......................9

International Emergency Economic Powers Act (IEEPA),
   Pub. L. No. 95-223, tit. II, 91 Stat. 1626 (1977)
   (codified as amended at 50 U.S.C. § 1701 *et seq.*) ............................................1
      50 U.S.C. § 1701(a) ...........................................1, 4, 12, 27, 37-38, 41, 54, 57
      50 U.S.C. § 1701(b) ...........................................................22-23, 41
      50 U.S.C. § 1702(a)(1)(A) ...............................................................12
      50 U.S.C. § 1702(a)(1)(B) .....................1, 3, 12, 24, 32, 36, 38, 41, 45, 50, 54
      50 U.S.C. § 1702(a)(1)(C) ...............................................................12
      50 U.S.C. § 1702(b) ...........................................................36, 38, 41
      50 U.S.C. § 1702(b)(1)-(4) ...............................................................12
      50 U.S.C. § 1702(b)(3) ...................................................................12
      50 U.S.C. § 1703(a) ......................................................................13
      50 U.S.C. § 1703(b)-(c) ..................................................................13
      50 U.S.C. § 1703(d) ......................................................................13

National Emergencies Act (NEA),
   Pub. L. No. 94-412, 90 Stat. 1255 (1976) .........................................10

Reciprocal Trade Agreements Act of 1934, ch. 474,
48 Stat. 943 (codified as amended at 19 U.S.C. § 1351) .................................8

Smoot-Hawley Tariff Act of 1930, ch. 497, § 338,
46 Stat. 590 (codified as amended at 19 U.S.C. § 1338) .................................8

Trade Act of 1974,
Pub. L. No. 93-618, 88 Stat. 1978 (1975) ......................................................8, 47

Trade Expansion Act of 1962,
Pub. L. No. 87-794, 76 Stat. 872
(codified as amended at 19 U.S.C. § 1862) .....................................................8

Trading with the Enemy Act (TWEA), ch. 106,
40 Stat. 411 (1917) ...............................................................................................9

Pub. L. No. 95-223, § 101(a), 91 Stat. 1625 (1977) .............................................11

19 U.S.C. § 1202 .......................................................................................................30

19 U.S.C. § 1337(j)(2) ..............................................................................................40

19 U.S.C. § 1338 ...................................................................................................8, 51

19 U.S.C. § 1862(c)(1)(A)(ii) ...................................................................................8

19 U.S.C. § 2132 .......................................................................................................22

19 U.S.C. § 2132(a) ......................................................................................48, 49, 50

19 U.S.C. § 2251 .........................................................................................................8

19 U.S.C. § 2411 ...................................................................................................8, 48

19 U.S.C. § 3004(c)(1)(A) .......................................................................................31

19 U.S.C. § 3004(c)(1)(C) .......................................................................................31

19 U.S.C. § 3007 .......................................................................................................30

28 U.S.C. § 1295(a)(5) ...............................................................................................6

28 U.S.C. § 1581 .......................................................................................................30

28 U.S.C. § 1581(i)(1) ..............................................................................................30

28 U.S.C. § 1581(i)(1)(B) ....................................................................6, 30

28 U.S.C. § 1581(i)(1)(D) ...................................................................6, 30

50 U.S.C. § 1621(a) ...............................................................................10

50 U.S.C. § 1622(a)(1) ...........................................................................11

50 U.S.C. § 1622(b) ................................................................................11

50 U.S.C. § 1622(c)(3) ...........................................................................11

50 U.S.C. § 1622(d) ................................................................................11

50 U.S.C. § 4302 .....................................................................................11

## Executive Branch Materials:

Exec. Order No. 13,159,
    65 Fed. Reg. 39,279 (June 21, 2000) ................................................14

Exec. Order No. 13,222,
    66 Fed. Reg. 44,025 (Aug. 17, 2001) ...............................................14

Exec. Order No. 14,105,
    88 Fed. Reg. 54,867 (Aug. 9, 2023) .................................................14

Exec. Order No. 14,144,
    90 Fed. Reg. 6755 (Jan. 16, 2025) ...................................................14

Exec. Order No. 14,193,
    90 Fed. Reg. 9113 (Feb. 7, 2025) ..............................15, 16, 31, 58, 59

Exec. Order No. 14,194,
    90 Fed. Reg. 9117 (Feb. 7, 2025) ....................................15, 16, 58, 59

Exec. Order No. 14,195,
    90 Fed. Reg. 9121 (Feb. 7, 2025) ...........................................17, 58, 59

Exec. Order No. 14,197,
    90 Fed. Reg. 9183 (Feb. 10, 2025) ...........................................16, 56

Exec. Order No. 14,198,
    90 Fed. Reg. 9185 (Feb. 10, 2025) ............................................................16, 56

Exec. Order. No. 14,228,
    90 Fed. Reg. 11,463 (Mar. 7, 2025) ...................................................................18

Exec. Order No. 14,231,
    90 Fed. Reg. 11,785 (Mar. 11, 2025) .................................................................16

Exec. Order No. 14,232,
    90 Fed. Reg. 11,787 (Mar. 11, 2025) .................................................................16

Exec. Order No. 14,256,
    90 Fed. Reg. 14,899 (Apr. 7, 2025) ......................................................18, 19, 56

Exec. Order No. 14,257,
    90 Fed. Reg. 15,041 (Apr. 7, 2025) ........................................................2, 31, 53

Exec. Order No. 14,259,
    90 Fed. Reg. 15,509 (Apr. 14, 2025) .................................................................20

Exec. Order No. 14,266,
    90 Fed. Reg. 15,625 (Apr. 15, 2025) ................................................ 19-20, 20, 31

Exec. Order No. 14,298,
    90 Fed. Reg. 21,831 (May 21, 2025)..................................................................20

Exec. Order No. 14,309,
    90 Fed. Reg. 26,419 (June 16, 2026).................................................................21

89 Fed. Reg. 66,187 (Aug. 13, 2024).......................................................................14

89 Fed. Reg. 87,761 (Nov. 4, 2024)..................................................................13, 57

89 Fed. Reg. 88,869 (Nov. 7, 2024).......................................................................14

Proclamation No. 4074,
    36 Fed. Reg. 15,724 (Aug. 17, 1971).............................................................9, 10

Proclamation No. 10,886,
    90 Fed. Reg. 8327 (Jan. 29, 2025)....................................................................15

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ............................................................6

**Legislative Materials:**

H.R. Rep. No. 95-459, 95th Cong., 1st Sess. 5 (1977) ...................................9, 35

*National Emergencies Act: Hearings on H.R. 3884 Before the
    Subcomm. on Admin. Law & Gov't Relations of the S. Comm.
    on the Judiciary*, 94th Cong. 27 (1975) .............................................................10

**Other Authorities:**

Joint Statement on U.S.-China Economic and Trade
    Meeting in Geneva (May 12, 2025), https://www.whitehouse.gov/
    briefings-statements/2025/05/joint-statement-on-u-s-china-economic-
    and-trade-meeting-in-geneva/ ........................................................................21

*Regulate*, Black's Law Dictionary (5th ed. 1979) .................................................32

*Regulate*, Webster's Third New International Dictionary (1976)....................32

U.S. International Trade Commission, *Harmonized Tariff Schedule*,
    https://hts.usitc.gov/ (last visited June 17, 2025) .......................................30

## STATEMENT OF RELATED CASES

No other appeal in or from the present civil action has previously been before this or any other appellate court.  The government is not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

## INTRODUCTION

Congress has long delegated broad tariff authority to the President to supplement the President's Article II powers over foreign affairs.  Presidents have exercised that authority across many administrations to impose tariffs that in their judgment will protect national security, foster economic prosperity, and facilitate negotiations with foreign counterparts.  Consistent with that long tradition, the International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, tit. II, 91 Stat. 1626 (1977) (codified as amended at 50 U.S.C. § 1701 *et seq.*), authorizes the President to "regulate … importation" of foreign goods to "deal with any unusual and extraordinary threat" from abroad to the Nation's "national security, foreign policy, or economy," if the President finds that a national emergency exists.  50 U.S.C. §§ 1701(a), 1702(a)(1)(B).

President Trump has found that America's exploding trade deficit, the implications of that deficit for our economy and national security, and a fentanyl importation crisis that has claimed thousands of American lives constitute national emergencies.  No court has questioned that the President validly declared these emergencies under the National Emergencies Act.  To address the emergencies, President Trump invoked IEEPA to impose tariffs

meant to prompt Canada, Mexico, and the People's Republic of China (PRC) to stem the fentanyl crisis, and imposed further reciprocal tariffs on foreign imports to remedy "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits."  Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,041 (Apr. 7, 2025).

The President imposed these tariffs, consistent with his obligations under the Constitution, because in his judgment they are necessary and appropriate to address what he has determined are grave threats to the United States's national security and economy: to strengthen the United States's defense-industrial base to avoid compromising national security; to correct decades of trade imbalances and asymmetrical tariffs against American exports; to reverse the transfer of resources from domestic producers to foreign firms; to deliver billions of dollars in investments in U.S. companies and infrastructure; and to stem the deadly tide of fentanyl and other drugs into our country.  Indeed, the President's plan to impose such tariffs, in order to restore fairness and reciprocity to the Nation's trade relationships and to protect national security and the economy from foreign threats, was a key

component of his successful campaign for office. And the tariffs have already achieved successes. They have spurred ongoing negotiations on trade agreements with major trading partners and have already produced the general terms of a historic trade deal with the United Kingdom. *See* Appx451 (Secretary of Commerce).

Yet the Court of International Trade (CIT) held that the President lacks authority to take these measures under IEEPA. That decision—which this Court stayed pending appeal—is riddled with legal errors, and it would significantly harm the United States if it were to take effect.

IEEPA authorizes the President to "regulate … importation." 50 U.S.C. § 1702(a)(1)(B). This Court's predecessor held that identical language in IEEPA's predecessor statute "includes the power to 'impos[e] an import duty surcharge,'" *United States v. Yoshida International, Inc.*, 526 F.2d 560, 576 (C.C.P.A. 1975), and the Supreme Court has similarly recognized that the power to "'to adjust the imports'" of a product allows the use of "monetary methods," such as "license fees," for "effectuating such adjustments," *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976). The CIT did not dispute that IEEPA authorizes some tariffs, but it adopted an untenable construction under which some tariffs fall within that power and

- 3 -

others do not. The CIT identified no textual basis for that distinction; instead, it gestured toward various extrastatutory principles. But extrastatutory considerations cannot introduce ambiguity into a textually unambiguous statute, like this one.

In any event, none of the CIT's extrastatutory rationales was persuasive. The canon of constitutional avoidance is inapposite, both because the CIT's construction is textually implausible and because, as multiple appellate courts have held, IEEPA raises no serious nondelegation concern. The President's actions here do not implicate the major-questions doctrine. And there is no basis to conclude that a different statute, authorizing the President to impose certain tariffs to address non-emergency balance-of-payments concerns, should be read to bar the President from addressing emergencies, of which balance-of-payments issues are just one component, under IEEPA.

The CIT further erred in concluding that the tariffs the President imposed in an effort to curb cross-border drug trafficking were not a means of "deal[ing] with" that problem, 50 U.S.C. § 1701(a), because they merely created leverage in negotiations over the resolution of the problem. A central point of IEEPA actions is to create leverage "in negotiating the resolution of

a declared national emergency," *Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981), and that has long been true more generally of Congress's and the President's actions in the domain of international trade.  The CIT's analysis would have rendered unlawful such measures as President Carter's seizure of Iranian assets in an effort to secure the release of American hostages.

Compounding its errors on the merits, the CIT failed even to recognize, much less apply, the equitable requirements for injunctive relief.  Had it done so, it would have found that the equitable factors weighed heavily against injunctive relief.  The CIT's injunction would, if affirmed, disrupt the Executive Branch's ongoing, sensitive diplomatic negotiations with virtually every major trading partner.  And it would unilaterally deprive the United States of a powerful tool for combating systemic distortions in the global trading system, thus allowing other nations to continue to hold American exporters hostage to their unreasonable, discriminatory, and sometimes retaliatory trade policies.

This Court should reverse the CIT's judgment.  If the Court affirms the judgment, we respectfully ask that the Court extend its stay through the issuance of its mandate and stay its mandate under Rule 41(d) to allow the government to seek relief from the Supreme Court.

## STATEMENT OF JURISDICTION

As discussed below, the CIT had jurisdiction because this is a civil action against the federal government "that arises out of any law of the United States providing for … tariffs … on the importation of merchandise for reasons other than the raising of revenue," 28 U.S.C. § 1581(i)(1)(B), or "any law of the United States providing for … administration and enforcement with respect to" such tariffs, *id.* § 1581(i)(1)(D).  The CIT entered final judgment on May 28, 2025.  Appx60.  The government filed timely notices of appeal that day.  Appx162, Appx469-470; *see* Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. § 1295(a)(5).

## STATEMENT OF ISSUES

1.     Whether the CIT erred in concluding that the President lacked authority to issue the challenged tariffs.

2.     Whether the CIT otherwise abused its discretion in enjoining the enforcement of the tariffs.

## STATEMENT OF THE CASE

### A.     Statutory Background

1.     The Constitution grants the President broad powers over foreign affairs and national security.  Congress has long supplemented these powers

by delegating to the President the authority to manage tariffs or duties on foreign imports in response to dynamic international conditions. In 1799, for instance, Congress authorized the President to "cause to be established fit and proper regulations for estimating the duties on goods, wares and merchandise imported into the United States, in respect to which the original cost shall be exhibited in a depreciated currency." Act of Mar. 2, 1799, ch. 22, § 61, 1 Stat. 627, 673.

The Supreme Court has repeatedly upheld presidential exercises of such authority. In *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), for example, the Court upheld the Tariff Act of 1890, which authorized the President to suspend an exemption for certain products from import duties "for such time as he shall deem just" when he determined that the exporting country was "impos[ing] duties or other exactions" on American products that he "deem[ed] to be reciprocally unequal and unreasonable," *id.* at 680 (quotation marks omitted). And in *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928), the Court upheld the Tariff Act of 1922, which empowered the President to raise import duties if he found that existing tariffs did not equalize the differences between foreign and domestic production costs, and to

modify the tariffs "when he determine[d]" that "the differences in costs of

production ha[d] changed," *id.* at 401-402 (quotation marks omitted).

Congress has since enacted many other statutes authorizing the President to impose or modify tariffs or duties on imports. They include:

- Section 338 of the Smoot-Hawley Tariff Act of 1930, ch. 497, § 338, 46 Stat. 590, 704-706 (codified as amended at 19 U.S.C. § 1338), which authorizes tariffs of up to 50% to combat certain forms of trade discrimination against the United States;

- the Reciprocal Trade Agreements Act of 1934, ch. 474, 48 Stat. 943, 943-945 (codified as amended at 19 U.S.C. § 1351), which authorized the President to negotiate reductions to U.S. tariff rates through reciprocal trade agreements with other countries;

- Section 232 of the Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, 877 (codified as amended at 19 U.S.C. § 1862), which authorizes the President to "adjust the imports" of articles and their derivatives to address threats to national security, 19 U.S.C. § 1862(c)(1)(A)(ii);

- Title II of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978, 2011-2041 (1975) (codified as amended at 19 U.S.C. § 2251 *et seq.*), which authorizes the President to impose duties of up to 50%, for up to four years (with extensions to eight years), to safeguard domestic industries; and

- Title III of the Trade Act of 1974, 88 Stat. at 2041-2056 (codified as amended at 19 U.S.C. § 2411 *et seq.*), which authorizes the President to impose duties for up to four years (with indefinite extensions) in response to measures that violate trade agreements or that are unreasonable or discriminatory and burden or restrict U.S. commerce.

In particular, Congress has long delegated to the President authority to regulate importation during national emergencies. In 1917, it enacted the Trading with the Enemy Act (TWEA), ch. 106, 40 Stat. 411, which authorized the President to specify foreign goods that may not be imported during wartime "except at such time or times, and under such regulations or orders … as the President shall prescribe." *Id.* § 11, 40 Stat. at 422-423. And in 1941, Congress extended that authority to peacetime, amending TWEA to allow the President to "regulate … importation" of foreign goods not just in wartime but "during any other period of national emergency" he declares. First War Powers Act, ch. 593, tit. III, § 301, 55 Stat. 838, 839-840 (1941).

In 1971, President Nixon imposed peacetime tariffs similar to those at issue here. *See* Proclamation No. 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971). Finding that a "prolonged decline in the international monetary reserves" of the United States over a number of years had seriously threatened its "international competitive position" and potentially impaired its ability to assure national security, *id.* at 15,724, President Nixon "declared a national emergency with respect to the balance-of-payments crisis and under that emergency imposed a surcharge on imports," H.R. Rep. No. 95-459, 95th Cong., 1st Sess. 5 (1977) (IEEPA House Report), and called upon the public and

private sector to "make the efforts necessary to strengthen the international economic position of the United States," 36 Fed. Reg. at 15,724. In *United States v. Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A. 1975), this Court's predecessor held that TWEA authorized those tariffs. *Id.* at 575-576.

2.    In 1976 and 1977, Congress modified TWEA through two new laws: the National Emergencies Act (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976), and IEEPA.

The NEA "authorize[s]" "the President" "to declare [a] national emergency" "[w]ith respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a). The NEA does not specify what sorts of conditions the President may declare to be an emergency, given the difficulty of "circumscrib[ing] with words with what conditions a President might be confronted." *National Emergencies Act: Hearings on H.R. 3884 Before the Subcomm. on Admin. Law & Gov't Relations of the S. Comm. on the Judiciary*, 94th Cong. 27 (1975) (statement of Sen. Mathias); *see id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *id.* at 27 (statement of Sen. Church) (similar).

- 10 -

Congress retained for itself the power to "terminate[]" a declared emergency through "a joint resolution." 50 U.S.C. § 1622(a)(1). The NEA provides that Congress is directed to consider exercising that power by convening in each House "to consider a vote on a joint resolution" terminating an emergency "[n]ot later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues." *Id.* § 1622(b). It provides for joint resolutions reported by committees to be "voted upon within three calendar days." *Id.* § 1622(c)(3). And it provides that any emergency not terminated by joint resolution "shall terminate on the anniversary of the declaration of that emergency if, within the ninety-day period prior to each anniversary date, the President does not publish in the Federal Register and transmit to the Congress a notice stating that such emergency is to continue in effect after such anniversary." *Id.* § 1622(d).

Congress also separated the President's authority to act in wartime and peacetime. It amended TWEA to remove the President's peacetime emergency powers under that Act. Pub. L. No. 95-223, § 101(a), 91 Stat. 1625, 1625 (1977); *see* 50 U.S.C. § 4302. It then re-enacted in IEEPA "essentially the same" peacetime powers previously supplied by TWEA. *See Regan v. Wald*,

468 U.S. 222, 227-228 (1984).  Indeed, IEEPA's operative language was "directly drawn" from TWEA.  *Dames & Moore v. Regan*, 453 U.S. 654, 671 (1981).

IEEPA affords the President numerous powers with respect to foreign assets—including, for example, the power to "regulate[] or prohibit" certain foreign monetary transactions, 50 U.S.C. § 1702(a)(1)(A), and to "confiscate" certain property during "armed hostilities" or following an "attack[]," *id.* § 1702(a)(1)(C).  The provision of IEEPA most relevant here authorizes the President to "prevent or prohibit" or "regulate … any … importation … of … any property in which any foreign country or a national thereof has any interest."  *Id.* § 1702(a)(1)(B).

IEEPA provides that "[a]ny authority granted to the President" by § 1702 "may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."  50 U.S.C. § 1701(a).  There are narrow exceptions; for example, the President cannot "regulate or prohibit … the importation from any country … of any information or informational materials."  *Id.* § 1702(b)(3).  But none of those exceptions is implicated here.  *See id.* § 1702(b)(1)-(4).

Congress gave itself oversight authority over exercises of IEEPA powers beyond that afforded by the NEA. *See* 50 U.S.C. § 1703(d). For example, IEEPA directs the President to "consult regularly with the Congress so long as [IEEPA] authorities are exercised." *Id.* § 1703(a). The President also is directed to "immediately transmit to the Congress a report" on the national emergency, to be updated every six months. *Id.* § 1703(b)-(c). Even so, the Congress that enacted IEEPA recognized that its "new authorities should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies." IEEPA House Report 10. For instance, Congress rejected a proposal "that it place a definite time limit on the duration of any state of national emergency." *Id.*

Presidents have invoked IEEPA's authorities numerous times over the years. President Carter, for example, seized Iranian assets in response to the hostage crisis at the American Embassy in Tehran. *See Dames & Moore*, 453 U.S. at 662. That order has been renewed continuously since 1979. *See* 89 Fed. Reg. 87,761 (Nov. 4, 2024) (most recent renewal). President Reagan issued executive orders "banning commerce with Libya and freezing all U.S. assets of the Libyan government and its agents." *Paradissiotis v. United States*, 304 F.3d 1271, 1272 (Fed. Cir. 2002). President Clinton blocked Russian

assets related to the implementation of an agreement for the disposition of highly enriched uranium extracted from nuclear weapons. Exec. Order No. 13,159, 65 Fed. Reg. 39,279 (June 21, 2000). President George W. Bush invoked IEEPA to maintain the export control system previously established under a different statute; that order, too, has been maintained since its initial promulgation. *See* Exec. Order No. 13,222, 66 Fed. Reg. 44,025 (Aug. 17, 2001); 89 Fed. Reg. 66,187 (Aug. 13, 2024) (most recent renewal). And President Biden took numerous actions under IEEPA, on topics ranging from cybersecurity, Exec. Order No. 14,144, 90 Fed. Reg. 6755 (Jan. 16, 2025); to sensitive military- and intelligence-related technologies, Exec. Order No. 14,105, 88 Fed. Reg. 54,867 (Aug. 9, 2023); to securities investments financing PRC companies, 89 Fed. Reg. 88,869 (Nov. 7, 2024).

## B.    Factual Background

Since taking office, President Trump has declared various national emergencies and imposed tariffs to address those emergencies. The tariffs challenged here address two types of emergencies identified by the President: the influx of contraband drugs into the United States from Mexico, Canada, and the PRC and the exploding U.S. trade deficit caused by the lack of reciprocity in the United States's trading relationships. No one disputes

that President Trump has followed the procedural requirements of the NEA and IEEPA to declare these emergencies or to issue the challenged orders.

### 1.    Trafficking-related tariffs

a.    *Mexico and Canada.*  In January 2025, the President declared the flow of contraband drugs like fentanyl through illicit distribution networks, and the public-health consequences, to be a national emergency.  Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 29, 2025).  The President then "expand[ed] the scope of the national emergency declared in that [p]roclamation to cover" certain conduct by the governments of Canada and Mexico that, in the President's judgment, had contributed to the crisis.  Exec. Order No. 14,193, 90 Fed. Reg. 9113, 9114 (Feb. 7, 2025); Exec. Order No. 14,194, 90 Fed. Reg. 9117, 9118 (Feb. 7, 2025).  The President determined that Canada's and Mexico's conduct "constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security and foreign policy of the United States."  90 Fed. Reg. at 9114; *see* 90 Fed. Reg. at 9118.

On the basis of that determination, the President invoked IEEPA to impose tariffs on many imported Canadian and Mexican products, concluding "that action under other authority to impose tariffs [was] inadequate to

address this unusual and extraordinary threat." 90 Fed. Reg. at 9114; 90 Fed. Reg. at 9118. The President ordered an additional 25% duty on most Canadian and Mexican products (except for energy and energy resources from Canada, which were assessed an additional 10% duty). 90 Fed. Reg. at 9114; 90 Fed. Reg. at 9118.

On February 3, 2025, the President issued two executive orders determining that Canada and Mexico had taken immediate measures to alleviate their role in the emergency. The President determined, however, that additional time was needed to assess the sufficiency of those measures. The President thus paused the trafficking-related tariffs for Canadian and Mexican products until March 4, 2025. Exec. Order No. 14,197, 90 Fed. Reg. 9183 (Feb. 10, 2025); Exec. Order No. 14,198, 90 Fed. Reg. 9185 (Feb. 10, 2025).

Shortly after that pause lapsed, the President issued additional executive orders exempting from the duties all Canadian and Mexican goods that qualify for duty-free entry under the United States-Mexico-Canada Agreement. Exec. Order No. 14,231, 90 Fed. Reg. 11,785 (Mar. 11, 2025); Exec. Order No. 14,232, 90 Fed. Reg. 11,787 (Mar. 11, 2025).

b. *China*. After expanding it to include Canada and Mexico, the President further "expand[ed] the scope of the national emergency declared in"

the initial proclamation to include conduct by the PRC government.  Exec. Order No. 14,195, 90 Fed. Reg. 9121, 9122 (Feb. 7, 2025).  The President determined that the PRC government "has subsidized and otherwise incentivized PRC chemical companies to export fentanyl and related precursor chemicals that are used to produce synthetic opioids sold illicitly in the United States"; that "the PRC provides support to and safe haven for PRC-origin transnational criminal organizations (TCOs) that launder the revenues from the production, shipment, and sale of illicit synthetic opioids"; that "[m]any PRC-based chemical companies … go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce"; and that "[t]he flow of contraband drugs like fentanyl to the United States through illicit distribution networks has created a national emergency, including a public health crisis in the United States."  *Id.* at 9121.

As with Canada and Mexico, the President determined that the PRC's conduct "constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States."  90 Fed. Reg. at 9122.  He accordingly invoked his power under IEEPA to impose an additional 10% duty on most PRC products.  *Id.* at 9122-9123.  The President subsequently

increased the additional duty rate to 20% on the grounds that "the PRC has not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions[] and that the crisis described in Executive Order 14195 has not abated." Exec. Order. No. 14,228, 90 Fed. Reg. 11,463, 11,463 (Mar. 7, 2025). And the President suspended the de minimis duty exemption for covered low-value imports from the PRC, concluding that many PRC-based shippers "hide illicit substances and conceal the true contents of shipments sent to the United States through deceptive shipping practices" and may "avoid detection" if low-value shipments are exempt from tariffs. Exec. Order No. 14,256, 90 Fed. Reg. 14,899, 14,899 (Apr. 7, 2025).

### 2.    Reciprocal tariffs

The President declared an additional emergency in early April, determining that "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States" with "its source in whole or substantial part outside the United States." 90 Fed. Reg. at 15,041. In declaring the emergency, the President

explained his judgment that "[l]arge and persistent annual U.S. goods trade deficits have led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries." *Id.* These deficits, the President determined, "are caused in substantial part by a lack of reciprocity in our bilateral trade relationships." *Id.*

The President accordingly acted "to rebalance global trade flows" by imposing an additional 10% tariff "on all imports from all trading partners," with certain exceptions enumerated in the executive order. 90 Fed. Reg. at 15,045. This tariff took effect on April 5. *Id.* The President also imposed additional country-specific tariffs on numerous countries. *Id.* Those tariffs took effect on April 9. *Id.*

The President has also taken subsequent actions that he determined were necessary and appropriate to address this national emergency. On April 9, he suspended most country-specific tariffs for 90 days, on the ground that many countries had taken significant steps "toward remedying non-reciprocal trade arrangements and aligning sufficiently with the United States on economic and national security matters." Exec. Order No. 14,266,

90 Fed. Reg. 15,625, 15,626 (Apr. 15, 2025).  But he raised the reciprocal tariff rate for PRC products, concluding that doing so was necessary to respond to retaliation by the PRC.  *Id.*; *see* Exec. Order No. 14,259, 90 Fed. Reg. 15,509 (Apr. 14, 2025).  More recently, the President suspended the additional PRC reciprocal tariffs for 90 days "[i]n recognition of the intentions of the PRC to facilitate addressing the national emergency."  Exec. Order No. 14,298, 90 Fed. Reg. 21,831, 21,832 (May 21, 2025).

### 3.    Initial effects of tariffs

The tariffs have prompted discussions with trading partners to facilitate solutions to economic and national-security crises found by the President.  According to Executive Order 14,266, "more than 75 … foreign trading partners … have approached the United States to address the lack of trade reciprocity in our economic relationships and our resulting national and economic security concerns."  90 Fed. Reg. at 15,626.  The Secretary of Commerce has likewise explained that after the April 2 announcement, "foreign-trading partners that have run trade deficits in goods for years, and helped hollow out the American manufacturing base, immediately came to the negotiating table."  Appx450-451; *see also* Appx462 (Secretary of Treasury) ("The tariffs have proven to be well-tailored to bring trading partners to the

table."); Appx467 (U.S. Trade Representative) (similar).  These negotiations have produced the general terms of a historic trade deal with the United Kingdom.  Appx451 (Secretary of Commerce); Exec. Order No. 14,309, 90 Fed. Reg. 26,419 (June 16, 2026) (starting to implement these terms).  The subsequent 90-day pause likewise "has been a success," Appx451, and the PRC tariff increase "applied additional pressure to" bring China "to the ne-gotiating table," resulting in a "90-day agreement … to reduce China's tariffs on U.S. exports," Appx451-452, and a recent framework to implement that deal, *see* Joint Statement on U.S.-China Economic and Trade Meeting in Ge-neva (May 12, 2025), https://www.whitehouse.gov/briefings-statements/2025/05/joint-statement-on-u-s-china-economic-and-trade-meeting-in-ge-neva/.

### C.     Prior Proceedings

1.     These appeals arise from two cases in which plaintiffs contend that the tariffs discussed above exceed the President's authority under IEEPA.  In *V.O.S. Selections*, companies challenged the reciprocal tariffs.  In *Oregon*, a group of States challenged both the reciprocal tariffs and the traf-ficking-related tariffs.  The same CIT panel heard both cases.  The CIT granted summary judgment to plaintiffs in both cases, vacated the tariff

orders, and permanently enjoined the enforcement of the reciprocal and traf-ficking-related tariffs.  Appx48, Appx60.

The CIT concluded that IEEPA's authorization to "regulate … impor-tation" did not support the reciprocal tariffs (which the CIT dubbed the "Worldwide and Retaliatory Tariffs," Appx25-36).  The CIT noted *Yoshida*'s holding that the phrase "regulate … importation" as used in TWEA "in-cludes the power to 'impos[e] an import duty surcharge,'" Appx28-29 (quot-ing 526 F.2d at 576), but nonetheless concluded that that language did not authorize "the President to impose whatever tariff rates he deems desirable" because "such a reading would create an unconstitutional delegation of power."  Appx30.  The CIT further concluded that Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132, which authorizes the President to impose tariffs in response to certain balance-of-payments issues, implicitly "removes the President's power to impose remedies in response to balance-of-payments deficits, and specifically trade deficits, from the broader powers granted to a president during a national emergency under IEEPA."  Appx34.

As to the trafficking-related tariffs, the CIT focused on the provision that the President may exercise his authorities under IEEPA only to "deal with" a threat underlying a declared national emergency.   50 U.S.C.

§ 1701(b). The CIT determined that it could review whether the President's chosen means of addressing the declared emergencies "deal with" those emergencies, Appx37-43, and concluded that the trafficking-related tariffs "do not 'deal with' their stated objectives" because they do "not evidently relate to foreign governments' efforts 'to arrest, seize, detain, or otherwise intercept' bad actors within their respective jurisdictions," but instead "aim to create leverage to 'deal with' those objectives" through negotiation. Appx45.

The CIT did not engage in any remedial analysis, including to address the equitable factors for relief, *see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Instead, the CIT simply stated that "[t]he challenged Tariff Orders will be vacated and their operation permanently enjoined." Appx48. The CIT further ordered the government to issue "necessary administrative orders to effectuate the permanent injunction," and to restore the prior tariff rates, "within 10 calendar days." Appx61.

2. The government appealed in both cases and filed motions in the CIT and in this Court for a stay pending appeal.

In a brief order in which it held the government's stay motions in abeyance pending resolution of the similar motions in this Court, the CIT

appeared to respond to the government's observation that it had failed to consider the equitable requirements for injunctive relief. It wrote that "[t]he injunction issued on account of Plaintiffs' success on the merits and the unavailability under the Uniformity Clause of a complete legal remedy in the form of piecemeal duty refunds to specific plaintiffs," and that "[i]ntrinsic to this exercise of equitable discretion was the compelling public interest in 'ensuring that governmental bodies comply with the law' and the lack of any cognizable hardship borne by the United States in the form of its non-enforcement of orders issued *ultra vires*." Appx63 (citation omitted).

This Court consolidated the government's appeals and granted a stay pending their resolution.

## SUMMARY OF ARGUMENT

IEEPA's text and history, as well as governing precedent, all confirm that the statute clearly authorizes the President to impose tariffs to address declared emergencies. IEEPA allows a President to "regulate … importation," 50 U.S.C. § 1702(a)(1)(B), to address an emergency. The plain meaning of "regulate" includes the imposition of tariffs as a way to adjust or control imports, as this Court's predecessor recognized in holding that identical language in TWEA included the power to "impos[e] an import duty surcharge."

*United States v. Yoshida International, Inc.*, 526 F.2d 560, 576 (C.C.P.A. 1975); *see Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976) (holding that statute allowing President to "adjust" imports authorized imposition of tariffs).

The CIT properly did not question whether IEEPA authorizes tariffs as a general matter. It instead concluded that these particular tariffs were not authorized by the statute. The CIT could not locate a justification for that conclusion in IEEPA's text, because these tariffs "regulate … importation" just as other tariffs do. It instead resorted to various extratextual considerations, none of which overcomes IEEPA's plain text. The CIT suggested that giving effect to IEEPA's text would create constitutional concerns, invoking the nondelegation doctrine. That view misunderstands the constitutional-avoidance canon—which applies only where a statute is susceptible to more than one construction—and misapplies the nondelegation doctrine, which does not apply in its ordinary form to delegations in the foreign-affairs space. Moreover, even if those principles applied with full force, circuit courts have uniformly rejected nondelegation challenges to the President's IEEPA powers. *See, e.g.*, *United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 820 (2024).

The CIT also invoked the major-questions doctrine, but that doctrine likewise provides no support for the CIT's interpretation. It does not apply to delegations made directly to the President, and, in any event, this is not a circumstance in which an agency has located a sweeping new power in a previously narrow statute. IEEPA expressly authorizes actions to address national emergencies and gives the President broad and flexible powers, including powers—such as "prohibit[ing]" importation—that are far more significant than the ones at issue here. There is no basis to apply the major-questions doctrine to narrowly construe a statute in the foreign-affairs and national-security arena that Congress enacted to allow the President to deal with emergencies arising abroad. And in any event, like the constitutional-avoidance canon, the major-questions doctrine cannot supplant "clear congressional authorization for the power" exercised. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022).

The CIT's view that Section 122 of the Trade Act of 1974 precludes the imposition of tariffs under IEEPA—at least when those tariffs relate to "balance-of-payments" issues—is likewise unfounded. There is a strong presumption that two statutes addressing the same or similar issues "can coexist harmoniously," *Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,

601 U.S. 42, 63 (2024), and these provisions are no exception. IEEPA's emergency powers are "merely complementary," *id.*, to the powers in Section 122, which are both narrower (in that they are limited to tariffs that respond to only one type of concern) and broader (in that they are not limited to declared emergencies). And in any event, the challenged tariffs respond to far more than just balance-of-payments concerns, instead addressing a multifaceted emergency that includes non-tariff barriers, a lack of reciprocity in trade relationships, the decay of the U.S. defense industrial base, and more.

The CIT further erred in concluding that the trafficking-related tariffs do not "deal with," 50 U.S.C. § 1701(a), the emergencies the President identified, because they create leverage to urge other countries to act on trafficking-related issues. IEEPA makes clear that the President may use "[a]ny authority granted" by IEEPA to address a declared emergency, and thus does not limit which authorities a President may invoke to respond to a threat. And the entire purpose of those broad authorities is to provide the President with "a 'bargaining chip' to be used" in "negotiating the resolution of a declared national emergency." *Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981). That is how these powers have been used in the past. And the CIT's approach was especially flawed given the substantial deference courts owe

to the President's determinations about whether a particular trade measure "deal[s] with" an emergency.

Finally, the CIT erred in entering a sweeping universal injunction. At the outset, the CIT entirely failed to consider the four-factor test the Supreme Court has established for permanent injunctive relief, and that failure alone suffices to vacate the injunction. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Had it considered the relevant factors, the CIT would have been required to address the extensive evidence of harm to the government and the public interest from a broad injunction that threatens to jeopardize ongoing negotiations with trading partners, as well as fundamental equitable principles that require relief to be limited to remedying the injuries of parties properly before the court. The CIT's vastly overbroad relief cannot be sustained on a proper application of these principles.

## ARGUMENT

### Standard of Review

This Court reviews the CIT's "grant of an injunction for abuse of discretion," which "may be established by showing that the [CIT] 'made a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact findings.'" *Oman Fasteners,*

*LLC v. United States*, 125 F.4th 1068, 1084 (Fed. Cir. 2025) (quotation marks omitted). The CIT's determinations "'on questions of law'" are reviewed "without deference." *Id*. "In international trade controversies … involving the President and foreign affairs[,] this [C]ourt and its predecessors have often reiterated the very limited role of reviewing courts" and declined "to interpose" absent "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985).

## I.    The CIT And This Court Have Exclusive Jurisdiction

The CIT correctly concluded that it had exclusive jurisdiction over these tariff challenges, and this Court accordingly has exclusive appellate jurisdiction. No party to this litigation disputes as much, but because a lone district court reached a contrary conclusion in *Learning Resources, Inc. v. Trump*, 2025 WL 1525376 (D.D.C. May 29, 2025), *appeal pending*, No. 25-5202 (D.C. Cir.), *and pet. for cert. before judgment pending*, No. 24-1287, we briefly address the point here in an abundance of caution.

To promote uniformity and provide a single forum with "expertise in international trade and tariff matters," *Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1586 (Fed. Cir. 1994), Congress granted the CIT exclusive

jurisdiction over various types of suits addressing international-trade matters.  28 U.S.C. § 1581.  As relevant here, the CIT's sphere of exclusive jurisdiction includes "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for … tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue" or "any law of the United States providing for … administration and enforcement with respect to" such tariffs.  *Id.* § 1581(i)(1), (i)(1)(B), (i)(1)(D).

These civil actions plainly "arise[] out of" a "law of the United States providing for … tariffs" or for their "administration and enforcement" — specifically, the Harmonized Tariff Schedule of the United States (HTSUS) and the President's modifications to it through the challenged proclamations and executive orders.  The HTSUS establishes the tariff rates for all merchandise imported into the United States.  *See* 19 U.S.C. § 1202; *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1336 (Fed. Cir. 2010).[1]  The statute

---

[1] Although it is "codified at 19 U.S.C. § 1202," *Arko Foods Int'l, Inc. v. United States*, 654 F.3d 1361, 1363 (Fed. Cir. 2011), the HTSUS is not published in the U.S. Code; it is instead separately published by the International Trade Commission, *see* 19 U.S.C. § 3007; U.S. Int'l Trade Comm'n, *Harmonized Tariff Schedule*, https://hts.usitc.gov/ (last visited June 17, 2025).

establishing the HTSUS specifies that "[e]ach modification or change made to the Harmonized Tariff Schedule by the President under authority of law," as well as "[t]he provisions of the Harmonized Tariff Schedule … enacted by" Congress, "shall be considered to be statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1)(A), (C). And the executive orders at issue here modified the HTSUS—for example, by "inserting … new headings" providing for specific tariff rates applicable to goods from each country, 90 Fed. Reg. at 15,090, by "modifying the HTSUS to temporarily suspend" certain tariffs, 90 Fed. Reg. at 15,626, or by directing the Secretary of Homeland Security to alter the HTSUS to effectuate the orders, 90 Fed. Reg. at 9115, 9123. Three other district courts facing challenges to the same tariffs have recognized that suits of this type belong in the CIT. *See California v. Trump*, 2025 WL 1569334, at *4 (N.D. Cal. June 2, 2025), *appeal pending*, No. 25-3493 (9th Cir.); *Webber v. DHS*, 2025 WL 1207587 (D. Mont. Apr. 25, 2025), *appeal pending*, No. 25-2717 (9th Cir.); *Emily Ley Paper, Inc. v. Trump*, 2025 WL 1482771 (N.D. Fla. May 20, 2025).

## II.    IEEPA Authorizes The Challenged Tariffs

IEEPA's text, history, and precedent confirm that it empowers the President to impose tariffs to address declared emergencies. The CIT erred

in concluding that IEEPA did not authorize the reciprocal tariffs and that the trafficking-related tariffs were insufficiently related to the declared emergencies.

## A. IEEPA Clearly Authorizes The Imposition Of Tariffs, Including The Reciprocal Tariffs

1.    IEEPA authorizes the President to "regulate … any … importation … of … any property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 1702(a)(1)(B).  The authority to "regulate" imports includes the power to impose tariffs on imports.

That follows from the ordinary meaning of "regulate": to "fix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws."  *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979); *see, e.g.*, *Regulate*, Webster's Third New International Dictionary 1913 (1976) ("to govern or direct according to rule"; "to bring under the control of law or constituted authority").  Imposing tariffs on imports is clearly a way of "control[ling]" imports (*Black's*); "govern[ing] or direct[ing]" them "according to rule" (*Webster's*); "adjust[ing]" them "by rule, method, or established mode" (*Black's*); or, more generally, "subject[ing]" them "to governing principles or laws" (*Black's*).

- 32 -

Precedent bolsters that conclusion.  As far back as *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824), Chief Justice Marshall referred to "[t]he right to regulate commerce … by the imposition of duties."  *Id.* at 202; *see id.* (duties "often are[] imposed … with a view to the regulation of commerce").  More recently, the Supreme Court has held that a statute authorizing the President "'to adjust the imports'" of a product allowed not just "quantitative methods" for determining import quantities — that is, "quotas" — but also "monetary methods," such as "license fees," for "effecting such adjustments."  *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976).  Such fees, the Court explained, have an "initial and direct impact on imports" "as much as a quota" would.  *Id.* at 571.  Exactly the same is true of *ad valorem* tariffs like those at issue here (that is, tariffs proportional to the value of the imports in question).  Like the license fees in *Algonquin* — a fee for each barrel of oil imported — these tariffs are a "monetary method" for "adjusting" imports, and thus a means of "regulating" imports.  Indeed, this Court has recognized in the related context of Section 232 that "quotas" and "duties" are alternative means of "'adjust[ing] imports.'"  *Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*, 63 F.4th 25, 34 (Fed. Cir. 2023) (quoting *Algonquin*, 426 U.S. at 561).

A year before *Algonquin*, moreover, this Court's predecessor — in an opinion by this Court's first Chief Judge — reached the same conclusion, as to the very statutory language at issue here, in *United States v. Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A. 1975). *Yoshida* construed the President's power "to 'regulate importation'" under TWEA as encompassing the power to "impos[e] an import duty surcharge." *Id.* at 576; *see id.* at 575. This Court follows *Yoshida* and other holdings of its predecessor court, *see South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (en banc), so *Yoshida* — in combination with *Algonquin* — makes doubly clear that IEEPA authorizes the imposition of tariffs. Furthermore, this Court's tariff decisions have repeatedly described tariffs as a means of "regulating" imports. In *StarKist Co. v. United States*, 29 F.4th 1359 (Fed. Cir. 2022), for example, the Court explained that "[t]he cross-border movement of goods across international markets is regulated by tariff classification systems for ascribing the appropriate tariff to specific imported goods." *Id.* at 1361; *see also Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 101 F.4th 1310, 1324 (Fed. Cir. 2024), *cert. denied sub nom. Saha Thai Steel Pipe Pub. Co. Ltd. v. Wheatland Tube Co.*, 145 S. Ct. 1309 (2025).

Finally, if any doubt remained on this point, it would be eliminated by Congress's choice to "draw[]" IEEPA's language "directly" from TWEA,

*Dames & Moore v. Regan*, 453 U.S. 654, 671 (1981), after this Court's predecessor had interpreted it to authorize tariffs. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute[.]" *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). Here, there is not just a presumption but direct evidence that Congress knew of *Yoshida*: The House Report on IEEPA cited *Yoshida* and approvingly discussed its holding. IEEPA House Report 5. And "when Congress 'adopt[s] the language used in [an] earlier act,'" as it did here, courts "presume that Congress 'adopted also the construction given'" to that language. *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270 (2020).

In short, this is about as clear a statutory-interpretation question as the Court is likely to encounter. Indeed, even the CIT did not question the President's ability to impose *some* tariffs under IEEPA. Appx28-31, Appx35-36.[2]

2.    The CIT nevertheless concluded that IEEPA does not authorize the reciprocal tariffs imposed here. Appx29-31, Appx35-36. That conclusion

---

[2] The district court in *Learning Resources* concluded that IEEPA does not authorize any tariffs, *see* 2025 WL 1525376, at *7-13, but its reasoning was erroneous in numerous respects, and the government has appealed, No. 25-5202 (D.C. Cir.).

lacks any textual basis and is unsupported by any of the extratextual rationales the CIT offered for it.

a.    Start with the statutory text.  IEEPA authorizes the President to "regulate … importation."  50 U.S.C. § 1702(a)(1)(B).  The CIT recognized, as noted above, that *some* tariffs "regulate … importation"—a conclusion that follows from plain meaning.  And there is no textual reason why, if some tariffs "regulate … importation," other tariffs would not.  That should have been the end of its analysis:  These tariffs "regulate … importation" just as other tariffs do.

The CIT's error is compounded by the fact that IEEPA enumerates exceptions to the President's authority under § 1702.  It provides, for example, that the President may not "regulate or prohibit" the importation of "postal, telegraphic, telephonic, or other personal communication[s]."  50 U.S.C. § 1702(b).  It is black-letter law that, "'[w]here Congress explicitly enumerates certain exceptions … , additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.'"  *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-617 (1980)).

The absence of any textual basis for interpreting § 1702 to allow only some tariffs should have been dispositive. "[W]here, as here, the words of [a] statute are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 589 U.S. 399, 413 (2020) (quotation marks omitted).

b.    Even if extratextual considerations could be relevant here, given the clarity of the text, those the CIT offered are unpersuasive.

i.    The CIT's main rationale was that "any interpretation of IEEPA that delegates unlimited tariff authority is unconstitutional." Appx28. That rationale is mistaken for three reasons.

*First*, it attacks a straw man. No one suggests that IEEPA "delegates unlimited tariff authority." As discussed above, IEEPA cabins the President's power in numerous important respects. The President may invoke IEEPA only based on a public emergency declaration under the NEA. Such emergencies are by default time-limited, and the NEA provides for congressional oversight. *See supra* p. 11. Once the President has declared an emergency, he still cannot invoke IEEPA absent a further declaration that the emergency constitutes an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C.

§ 1701(a); *see id.* § 1701(b).  And IEEPA expressly sets forth various limits on the President's authority.  *Id.* § 1702(b).  The IEEPA power is broad—as it must be in order to give the President "the flexibility required to meet problems surrounding a national emergency with the success desired by Congress," *Yoshida*, 526 F.2d at 573—but it is not unbounded.

*Second*, the CIT's reasoning rested on the canon of constitutional avoidance, Appx26-28, but that interpretive principle "'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018).  Here, as discussed above, the CIT failed to identify any "plausible construction" of the statute, *id.*, under which some tariffs constitute "regulat[ions]" of "importation," 50 U.S.C. § 1702(a)(1)(B), and others do not.  "In the absence of" such a construction, the canon of constitutional avoidance "simply has no application." *Jennings*, 583 U.S. at 296 (quotation marks omitted).  "Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases." *Id.* at 298.

*Third*, the canon applies only "[w]hen 'a serious doubt' is raised about the constitutionality of an Act of Congress." *Jennings*, 583 U.S. at 296.  And here there is no genuine doubt at all—much less a "serious doubt"—about

the constitutionality of IEEPA as construed to include measures like those the President took here.

The CIT identified the nondelegation doctrine as a source of constitutional concern, but the Supreme Court has recognized that when Congress delegates "authority over matters of foreign affairs," it "must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). That is because "the President has unique responsibility" in the field of "foreign … affairs," *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993), and national security, *Department of the Navy v. Egan*, 484 U.S. 518, 529-530 (1988), such that when Congress enacts "legislation which is to be made effective through negotiation and inquiry within the international field," it must afford the President "a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved," *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).

The Supreme Court observed nearly a century ago that "[p]ractically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power

to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." *Curtiss-Wright*, 299 U.S. at 324. To cite just one example that implicates this Court's jurisdiction: Even where the International Trade Commission concludes that an importer is engaged in unfair trade practices (such as patent infringement) to the detriment of U.S. industry, the President has the unilateral authority to allow the imports "for policy reasons," without further elaboration. 19 U.S.C. § 1337(j)(2). The Supreme Court has long approved such broad delegations to the President—particularly delegations of authority to regulate international trade, including through tariffs. *E.g.*, *Algonquin*, 426 U.S. at 558-560; *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 409 (1928); *Marshall Field & Co. v. Clark*, 143 U.S. 649, 690-694 (1892); *Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 384-388 (1813); *see Gundy v. United States*, 588 U.S. 128, 158-159 (2019) (Gorsuch, J., dissenting).

In any event, even if the nondelegation doctrine in its ordinary form were applicable to this foreign-affairs context, IEEPA would pass muster. Congress of course cannot delegate legislative power to another branch or grant an agency unbounded discretion to regulate private parties. But

Congress "may commit something to the discretion" of the Executive, *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 46 (1825), as long as it sets forth "an intelligible principle to which the person or body authorized to [act] is directed to conform," *Hampton*, 276 U.S. at 409.  That is not a toothless requirement:  Congress must delineate both "the general policy" and "the boundaries of [the] delegated authority."  *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946).  But IEEPA easily satisfies it.

IEEPA's general policy is obvious: "to deal with any unusual and extraordinary [foreign] threat … to the national security, foreign policy, or economy of the United States" during a "national emergency" by authorizing the President to, among other things, "regulate … importation" of property.  50 U.S.C. §§ 1701(a), 1702(a)(1)(B).  And its boundaries are likewise plain:  The President cannot invoke IEEPA "for any … purpose" "other" than the one described above, *id.* § 1701(b), and cannot "regulate or prohibit, directly or indirectly," the items set forth in a list of exceptions to his power, *id.* § 1702(b).  Moreover, Congress oversees both the President's exercise of his IEEPA powers and his declaration of national emergencies as a predicate to invoking IEEPA.  *See supra* pp. 11, 13.

Every court of appeals to have considered the question has thus upheld IEEPA against nondelegation challenges.  *See United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (collecting four other cases), *cert. denied*, 144 S. Ct. 820 (2024).  In *Yoshida*, 526 F.2d at 580-581, this Court's predecessor likewise rejected a nondelegation challenge to TWEA—which, as discussed above, gave the President "essentially the same" peacetime powers, *Regan v. Wald*, 468 U.S. 222, 227-228 (1984), with fewer constraints, *see United States v. Amirnazmi*, 645 F.3d 564, 577 (3d Cir. 2011).  And this Court rejected a nondelegation challenge to a similar delegation of tariff authority:  Section 232 of the Trade Expansion Act of 1962, which "'empowers and directs the President to act to alleviate threats to national security from imports.'" *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1257-1258, 1263 (Fed. Cir. 2023).  In doing so, this Court reaffirmed its prior holding that the nondelegation analysis the Supreme Court adopted in *Algonquin* remains binding today.  *Id.* at 1263; *see American Inst. for Int'l Steel, Inc. v. United States*, 806 F. App'x 982, 990-991 (Fed. Cir. 2020) (rejecting arguments that subsequent Supreme Court decisions undermine *Algonquin* and *J.W. Hampton*).

In short, the nondelegation doctrine does not raise any "'serious doubt,'" *Jennings*, 583 U.S. at 296, as to the constitutionality of the plain-text

understanding of IEEPA that authorizes the tariffs challenged here.  And for the same reason, the CIT erred in reading as support for its conclusion, *see* Appx29-31, the portions of the *Yoshida* decision where this Court's predecessor opined that it could not "sanction the exercise of an unlimited power" to impose tariffs, 526 F.2d at 583.  Just as the Executive did "not … seek … approval" in *Yoshida* for a "grant of … 'unrestrained and unbridled' authority," and just as the *Yoshida* court agreed with the government that TWEA did not purport to grant such authority, *id.*, the government does not seek such authority—and IEEPA does not provide it—here.

ii.     The CIT also invoked the major-questions doctrine to justify its narrow construction of IEEPA.  Appx26-28.  That rationale is no more meritorious.

The major-questions doctrine addresses the "particular and recurring problem" of "*agencies* asserting highly consequential power beyond what Congress could reasonably be understood to have granted."  *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (emphasis added).  Those concerns dissipate when, as here, Congress delegates authority directly to the President—"the most democratic and politically accountable official in Government," *Seila*

*Law LLC v. CFPB*, 591 U.S. 197, 224 (2020).  *See, e.g.*, *Mayes v. Biden*, 67 F.4th 921, 933 (9th Cir.), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023).

In any event, the concerns animating the doctrine are inapplicable here.  The doctrine reflects a "presum[ption] that 'Congress intends to make major policy decisions itself" rather than "leav[ing] those decisions to agencies.'"  *West Virginia*, 597 U.S. at 723.  It therefore counsels judicial "skepticism" where "an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), particularly where there is an apparent "'mismatch[]'" between the breadth of the asserted power and the "narrow[ness]" of the statute in which the agency claims to have discovered it, *Biden v. Nebraska*, 600 U.S. 477, 517-518 (2023) (Barrett, J., concurring), and where the asserted power falls outside the agency's "wheelhouse," *id.* at 518-519.  Those are the sorts of cases in which it seems most unlikely that Congress actually meant for the agency to make the relevant type of decision.  None of those grounds for skepticism is present here.

First, the President's power over international trade under IEEPA is not some "unheralded" invocation of an apparently "narrow" statute.  Quite

the opposite: IEEPA expressly authorizes actions to address national emergencies, including actions (like "prohibit[ing]" imports from certain countries, 50 U.S.C. § 1702(a)(1)(B)) that are far more significant than the ones at issue here. In other words, IEEPA is on its face *all about* giving the President major powers to address major concerns. It would be perverse to apply the major-questions doctrine to curtail Congress's conscious efforts to address the most major of questions.

Second, it is particularly inappropriate to construe narrowly a delegation of power in the arena of foreign affairs and national security—areas that implicate the President's expertise and independent constitutional authority, *see, e.g.*, *Egan*, 484 U.S. at 529-530; *Haitian Ctrs. Council*, 509 U.S. at 188. This Court has thus recognized "that statutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed." *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996).

Finally, the President's imposition of tariffs in the exercise of broad authority delegated by Congress is nothing novel and certainly nothing outside the "wheelhouse" of the Nation's Chief Executive. Trade measures, of which tariffs are an essential component, have long been used in international diplomacy and even warfare, in episodes ranging from the Non-Intercourse

Act, designed in part to punish Britain and France, *see Brig Aurora*, 11 U.S. at 384, to the freezing of Iranian assets in response to the seizing of American hostages at the American Embassy in Tehran, *see Dames & Moore*, 453 U.S. at 662. As discussed above, Presidents have exercised such powers since the Founding, and courts have repeatedly and consistently upheld them.

In any event, even if the major-questions doctrine were applicable, it would be immaterial to the analysis because IEEPA provides "clear congressional authorization for the power" exercised here, *West Virginia*, 597 U.S. at 723. The major-questions doctrine does not require "an 'unequivocal declaration' from Congress authorizing the *precise* agency action under review." *Nebraska*, 600 U.S. at 511 (Barrett, J., concurring); *see Florida v. HHS*, 19 F.4th 1271, 1288 (11th Cir. 2021) ("a broad grant of authority" that "plainly encompasses" the action in question "does not require an indication that specific activities are permitted"). IEEPA's text and history and the relevant precedents make clear that it authorizes the President to impose the challenged tariffs to address a declared national emergency.

iii. Aside from the nondelegation and major-questions doctrines, the CIT more loosely pointed to "separation of powers" concerns to justify its narrow construction of IEEPA. That assertion is difficult to understand.

- 46 -

IEEPA expressly delegates to the President broad statutory authority on top of authority that the President already possesses in the fields of foreign affairs and national security. "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-636 (1952) (Jackson, J., concurring). Such a scenario presents no presidential incursion on congressional prerogatives.

Of course, the separation of powers also places limits on Congress's delegation of power to the President, but that principle is encapsulated in the nondelegation doctrine, while the major-questions doctrine operates to ensure that Congress has actually delegated the claimed power. Given the evident inapplicability of those doctrines, the CIT's broad gesturing toward the separation of powers adds nothing to its analysis.

iv.    The remaining ground on which the CIT based its narrow construction of IEEPA was Congress's enactment of Section 122 of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. at 1987-1989, several years after President Nixon's imposition of the tariffs at issue in *Yoshida*, and before those tariffs were upheld in *Yoshida*. Section 122 provides that whenever "fundamental

international payments problems require special import measures to restrict imports," including "to deal with large and serious United States balance-of-payments deficits," "the President shall proclaim, for a period not exceeding 150 days," "a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States." 19 U.S.C. § 2132(a). The CIT understood the enactment of Section 122—which it characterized as "an explicit non-emergency statute with greater limitations" than IEEPA—to have the effect of "remov[ing] the President's power to impose remedies in response to balance-of-payments deficits, and specifically trade deficits, from the broader powers granted to a president during a national emergency under IEEPA." Appx34.[3]

That is incorrect. Section 122 and IEEPA provide independent sources of authority for tariffs. The President's choice to exercise his authority under one does not compel him to comply with the terms of the other. Although both Section 122 and IEEPA address tariffs, courts "approach federal statutes

---

[3] In the introductory paragraph of this section of its opinion, the CIT made a similar assertion as to Section 301 of the Trade Act of 1974 (codified as amended at 19 U.S.C. § 2411), but it did not explain that assertion or otherwise refer to Section 301 in the subsequent analysis.

touching on the same topic with a 'strong presumption' they can coexist harmoniously.  Only by carrying a 'heavy burden' can a party convince [courts] that one statute 'displaces' a second."  *Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (citation omitted).  Plaintiffs cannot carry that burden here—and the CIT did not conclude that they had, or even acknowledge the existence of the burden.  IEEPA's emergency powers are "merely complementary," *id.*, to the powers in Section 122, which are both narrower (in that they are limited to tariffs that respond to only one type of concern) and broader (in that they are not limited to declared emergencies).  The CIT thus erred by "preferring one" statute—Section 122—"over another," rather than "giving effect to both."  *Id.*

It is unsurprising that Congress would provide the President with certain limited authorities (in Section 122) to address specific non-emergency harms, while also supplying broader authorities (in IEEPA) when those harms become severe enough to constitute an emergency.  Section 122 does not require a national emergency and is not subject to the congressional-oversight provisions of the NEA and IEEPA; it applies whenever (among other things) "large and serious United States balance-of-payments deficits" arise.  19 U.S.C. § 2132(a).  To address those specific circumstances, Section

122 limits the imposition of tariffs to an additional 15% and 150 days, absent congressional action. *Id.* But when circumstances rise to the level of a declared national emergency, IEEPA gives the President broader leeway to deal with that emergency, including through tariffs that "regulate … importation," 50 U.S.C. § 1702(a)(1)(B).

Indeed, *Yoshida* expressly adopted that understanding of the relationship between Section 122 and IEEPA's predecessor. There, the court explained that "Congress has said what may be done with respect to *foreseeable* events" in a range of statutes, including "the Trade Act of 1974," "and has said what may be done with respect to *unforeseeable* events in the TWEA." 526 F.2d at 578 (emphases added). The court expressly rejected the view that when "delegating broad powers to the President for periodic use during national emergencies," Congress nonetheless "intend[ed] that the President, when faced with such an emergency, must follow limiting procedures prescribed in other acts designed for continuing use during normal times." *Id.* The fact that the CIT cited this part of the *Yoshida* opinion, Appx29-30, without trying to rebut or distinguish it, suggests that the CIT misunderstood its import.

And more generally, it is common for Congress to enact overlapping tariff authorities. For example, another provision allows the President to impose "new or additional duties," not subject to the scope and duration limits of Section 122, against products from countries that discriminate against U.S. goods. 19 U.S.C. § 1338. Discriminatory trade practices of that nature could be the root cause of balance-of-payments concerns, but no one thinks that Section 122 displaces the provision for tariffs in response to discriminatory trade practices, or vice versa. The provisions coexist.

The CIT's reasoning is particularly erroneous because Section 122 was enacted *before* IEEPA. Congress thus deliberately chose after the enactment of Section 122 to incorporate in IEEPA the same language *Yoshida* had construed broadly in TWEA. It would have made no sense for Congress to do that if, after the enactment of Section 122, it meant for the IEEPA power to be more limited than the TWEA power as interpreted in *Yoshida*.

The CIT's reasoning was by no means bolstered by its references to IEEPA's legislative history. Consider, for example, the CIT's observation that the House Report stated that "'authority for routine, non[-]emergency regulation of international economic transactions … should be transferred to other legislation'" and "that IEEPA 'does not include authorities more

- 51 -

appropriately lodged in other legislation.'"  Appx35 (quoting IEEPA House Report 11).  As an initial matter, the CIT misread those statements as related.  When the House Report said the bill did "not include authorities more appropriately lodged in other legislation," it went on to give examples of such authorities—namely, the "authority to regulate purely domestic transactions or to respond to purely domestic circumstances, or … to control noneconomic aspects of international intercourse such as personal communications or humanitarian contributions."  IEEPA House Report 11.  It was not referring to non-emergency authorities in general.  And even if the CIT's reading of those sentences were correct, the proper inference would be that IEEPA excludes *non-emergency* balance-of-payments authorities—not that it requires the President to use, even in emergencies, powers enacted for non-emergencies.  As discussed above, *Yoshida* expressly rejects the idea that when "delegating broad powers to the President for periodic use during national emergencies," Congress nonetheless "intend[ed] that the President, when faced with such an emergency, must follow limiting procedures prescribed in other acts designed for continuing use during normal times."  526 F.2d at 578.

Finally, even if the CIT were correct that Section 122 implicitly pre-cludes the President from invoking IEEPA to address balance-of-payments concerns, that still would not render the reciprocal tariffs invalid. The President based those tariffs on his determination that the Nation faces problems far beyond the types of "balance-of-payments deficits" that trigger Section 122. He identified a multitude of severe "underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption." 90 Fed. Reg. at 15,041. For example, he determined that years of "structural asymmetries" had "re-duced U.S. manufacturing capacity," including in "certain advanced indus-trial sectors"; that "U.S. stockpiles of military goods are too low to be com-patible with U.S. national defense interests"; and that "U.S. supply chains [have become] vulnerable to geopolitical disruption and supply shocks." *Id.* at 15,043. The CIT seriously erred in concluding that the President lacked power under IEEPA to impose tariffs to address that multifaceted set of cri-ses, simply because Section 122 might have authorized him to impose tariffs in response to one facet of it.

\*    \*    \*

In short, the CIT erred at every turn in concluding that the President's power to "regulate … importation" under IEEPA, 50 U.S.C. § 1702(a)(1)(B), does not encompass the reciprocal tariffs.

## B.    IEEPA Clearly Authorizes The Trafficking-Related Tariffs

The CIT further erred in concluding that the trafficking-related tariffs are unauthorized because they do not "deal with," 50 U.S.C. § 1701(a), the emergencies the President identified.

1.    As noted above, the operative language of IEEPA allows the President to exercise "[a]ny authority granted" by § 1702—including the power to "regulate … importation," 50 U.S.C. § 1702(a)(1)(B)—"to deal with" a threat of the requisite type, *id.* § 1701(a).

IEEPA's text thus does not limit which of the President's emergency authorities may be exercised to address foreign threats, instead allowing him to use the full range of those authorities in seeking a resolution of the declared emergency.  And Congress and the President have always used their powers to control international trade as indirect means to a host of foreign-relations ends.  For example, as a member of the CIT panel here explained in another case, the Non-Intercourse Act of 1809—at issue in *Brig Aurora*—was

- 54 -

meant "to keep the United States from entanglement in the war between Britain and France by forbidding the importation of goods from either of those nations." *American Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d 1335, 1347 (Ct. Int'l Trade 2019) (Katzmann, J., dubitante), *aff'd*, 806 F. App'x 982 (Fed. Cir. 2020). And the freezing of Iranian assets in response to the hostage crisis at the American Embassy in Tehran, *see Dames & Moore*, 453 U.S. at 662, was meant to pressure Iran to secure the hostages' release. Indeed, the Supreme Court expressly stated in *Dames & Moore* that asset-blocking orders under IEEPA "serve as a 'bargaining chip' to be used by the President" "in negotiating the resolution of a declared national emergency." *Id.* at 673. Similarly, this Court's predecessor explained in *Yoshida* that "[p]ressure exerted" by President Nixon's import duties "contributed to achievement of a multilateral agreement of major nations, which included a realignment of currency exchange rates." 526 F.2d at 579 (footnote omitted).

The trafficking-related tariffs here "deal with" the related emergencies, 50 U.S.C. § 1701(a), in a materially similar way: They "serve as a 'bargaining chip' to be used by the President" "in negotiating the resolution of" the concerns he identified, *Dames & Moore*, 453 U.S. at 673. That is evident not just as a matter of common sense but from some of the steps the President has

taken with respect to the tariffs after initially imposing them. Shortly after imposing the initial trafficking-related tariffs on Canada and Mexico, for example, the President issued executive orders determining that Canada and Mexico had taken steps to alleviate their role in the emergency the President had identified, and paused the tariffs to assess the sufficiency of those measures. 90 Fed. Reg. 9183; 90 Fed. Reg. 9185.

The tariffs also "deal with" the trafficking-related emergencies in other ways. For example, the President suspended the de minimis duty exemption that might otherwise have been available for some low-value imports from the PRC on the ground that many PRC-based shippers "hide illicit substances and conceal the true contents of shipments sent to the United States through deceptive shipping practices" and may "avoid detection" if low-value shipments are exempt from tariffs. 90 Fed. Reg. at 14,899.

2.    The CIT concluded, however, that the phrase "'deal with'" requires "a direct link between an act and the problem it purports to address," and that the creation of leverage in negotiations over the resolution of a problem is not a sufficiently "direct" way of "'deal[ing] with'" that problem. Appx44-45. That was erroneous.

The CIT provided no basis—textual or otherwise—for its construction of the phrase.  It did not reconcile its view with the text's clear statement that the President may employ "[a]ny authority granted" in § 1702 "to deal with" the relevant threat.  50 U.S.C. § 1701(a).  Nor did it address, or even acknowledge, the inconsistency between its interpretation and the sorts of measures that Presidents have long taken under IEEPA and other international-trade authorities.  Under the CIT's interpretation, for example, the blocking of Iranian assets during the Embassy hostage crisis—an action taken under IEEPA itself, and one that has been maintained continuously since 1979, *see* 89 Fed. Reg. 87,761 (Nov. 4, 2024) (most recent renewal)— would have been illegal on the ground that it merely created leverage to secure the hostages' release, as opposed to "directly" extricating them from the Embassy.  That should be sufficient to conclude that the CIT's interpretation cannot be correct.

The CIT's own examples of how the phrase "deal with" is used—in non-international trade contexts—underscore the CIT's misunderstanding. It is of course true that one problem "[a] tax" might "deal with," "by raising revenue," is "a budget deficit," Appx44.  But taxes also "deal with" all sorts of other problems, by creating incentives for people and companies to alter

their behavior.  *See, e.g.*, *NFIB v. Sebelius*, 567 U.S. 519, 567 (2012) ("Some of our earliest federal taxes sought to deter the purchase of imported manufactured goods in order to foster the growth of domestic industry.").

The CIT's reasoning was doubly flawed because the question whether a given trade measure "deal[s] with" an identified emergency is one on which courts owe substantial deference to the President.  "Matters relating 'to the conduct of foreign relations … are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'"  *Wald*, 468 U.S. at 242; *see, e.g.*, *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").

That principle easily covers determinations about what constitutes an "extraordinary and unusual threat" and whether a particular action will effectively "deal with" that threat.  There is no basis for meaningful judicial review of President Trump's findings

- that the "grave threat … posed by the influx" of "illicit drugs into the United States" across the northern and southern borders constitutes a national emergency, 90 Fed. Reg. at 9114; 90 Fed. Reg. at 9118, as does the "flow of contraband drugs like fentanyl to the United States through illicit distribution networks" originating in the PRC, 90 Fed. Reg. at 9121;

- that Canada's, Mexico's, and the PRC's respective "failure[s] to act" against traffickers "constitute[] an unusual and extraordinary threat" to "the national security and foreign policy of the United States," 90 Fed. Reg. at 9114; 90 Fed. Reg. at 9118; *see* 90 Fed. Reg. at 9122; or

- that tariffs on those countries will encourage them to ameliorate those threats, 90 Fed. Reg. at 9114; 90 Fed. Reg. at 9118; 90 Fed. Reg. at 9122.

Such determinations are not susceptible to meaningful judicial review because of both their discretion-laden nature and the lack of judicially manageable standards. *See, e.g.*, *Dalton v. Specter*, 511 U.S. 462, 476 (1994) ("How the President chooses to exercise the discretion Congress has granted him is not a matter for our review.").

This Court has applied such principles in the tariff context by refusing to "second-guess the facts found and measures taken by the President" under Section 232, which "'empowers and directs the President to act to alleviate threats to national security from imports.'" *PrimeSource*, 59 F.4th at 1257-1258, 1263; *see id.* at 1263; *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787, 796 (Fed. Cir. 1984) (presidential tariff action under a different provision "is a 'multifaceted judgmental decision,' for which there is 'no law to apply'" in judicial review); *cf. Htet v. Trump*, 2025 WL 522033, at *5-7 (D.D.C. Feb. 18, 2025) (finding unreviewable whether a President's IEEPA's

action sufficiently dealt with an emergency).  And more generally, the Supreme Court has made clear that courts should not scrutinize "'[w]hether the President's chosen method' of addressing perceived risks is justified from a policy perspective."  *Trump v. Hawaii*, 585 U.S. 667, 686 (2018).  The CIT's scrutiny is thus "inconsistent with … the deference traditionally accorded the President in this sphere."  *Id.*; *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010).

## III.    The CIT Abused Its Discretion In Entering An Injunction

A.    The CIT failed to address—or even to mention—any of the required equitable considerations before issuing a sweeping and unprecedented universal permanent injunction against the challenged tariffs.  That failure alone warrants reversal.  Under "well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  That test requires a plaintiff to establish "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

disserved by a permanent injunction." *Id.* Absent such a showing, the Supreme Court has held that injunctive relief may not be awarded. *Id.* at 394; *see Starbucks Corp. v. McKinney*, 602 U.S. 339, 351 (2024); *Winter v. NRDC, Inc.*, 555 U.S. 7, 32 (2008).

It was not until the CIT's order holding in abeyance the government's stay motions that the court for the first time briefly referenced equitable considerations bearing on injunctive relief, stating that "a permanent injunction is necessary because of the 'compelling public interest in ensuring that governmental bodies comply with the law' and 'the lack of any cognizable hardship borne by the United States in the form of its non-enforcement of orders issued *ultra vires*.'" Appx63.

This post hoc explanation cannot absolve the court's failure to consider the traditional equitable factors in the first instance, and in any event, the court's delayed reasoning is insufficient because it conflates the court's merits analysis with the equitable factors. Even when a court has concluded that the government's conduct is illegal, the court must consider an injunction's countervailing harms to the public interest before granting such relief and in tailoring the scope of that relief. *See, e.g.*, *Winter*, 555 U.S. at 32; *Defense Distributed v. Department of State*, 838 F.3d 451, 459-460 (5th Cir. 2016).

This case exemplifies the need for careful consideration of the equitable factors before granting injunctive relief—particularly the sweeping universal relief the CIT ordered here.  The CIT did not address any of the extensive evidence of harm to the government and the public interest from its injunction.  Multiple members of the President's Cabinet attested that an injunction would harm the economic and national security of the United States, jeopardizing ongoing negotiations with foreign trading partners "premised on the credible threat of enforcement of the IEEPA tariffs," Appx453, leaving "foreign counterparts" with "reduced incentives to reach meaningful agreements[]," and leaving "the American people exposed to predatory economic practices by foreign actors[] and threaten[ing] national security."  Appx453; *see* Appx458-460, Appx463, Appx468.  Trading partners may also "feel emboldened to further distort the conditions of competition for U.S. exporters" if they believe "that the President *lacks* power to promptly respond to future emergencies."  Appx468.  Consequently, an injunction could lead trading partners to take retaliatory actions that the credible threat of further tariffs would otherwise have deterred.  Appx459, Appx463.  The Trade Representative described that prospect as "a foreign policy disaster scenario," Appx468, and the Secretary of State observed that it "would cause

significant and irreparable harm to U.S. foreign policy and national security," Appx457.

These harms would plainly be relevant to considering "the balance of hardships" and "the public interest," both in determining whether "a remedy in equity is warranted" and in determining the breadth of any such relief. *eBay*, 547 U.S. at 391; *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). A universal injunction barring enforcement of the President's tariffs affects foreign policy and undercuts the United States's position in delicate, time-sensitive foreign negotiations to an even greater degree than a narrower injunction or a declaratory judgment.

The CIT also failed to weigh those harms against plaintiffs' alleged harms. Aside from the cost of tariffs themselves—which other remedies, such as a party-specific declaratory judgment, would be entirely sufficient to redress—plaintiffs rely on speculative and general harms in the form of possible increased prices, altered relationships with consumers, supply chain changes, or reduction in cash flow. Appx130-131; Appx. 136-137; Appx140-141; Appx146-147; Appx150-153; Appx372-375; Appx379-381; Appx385-386; Appx391-392.

Even aside from the speculative nature of these assertions, these harms are not unique: "Every increase in duty rate will necessarily have an adverse affect on … producers and importers." *Corus Grp. PLC v. Bush*, 217 F. Supp. 2d 1347, 1355 (Ct. Int'l Trade 2002). The fact that tariff policies will naturally affect the economy does not mean that every consumer or seller affected is automatically entitled to an injunction—much less a universal injunction running to nonparties. *See id.*; *see also Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1558 (Fed. Cir. 1994) (rejecting the argument that "potential lost sales alone could demonstrate 'manifest irreparable harm' because acceptance of that position would require a finding of irreparable harm to every patentee, regardless of the circumstances").

B.     The CIT's disregard for the required equitable analysis further led it to ignore basic equitable principles governing the scope of injunctive relief. Those principles dictate that even if some injunctive relief were appropriate, it must be limited to the parties here, and the injunction at a minimum should be narrowed insofar as it grants relief to nonparties.

Under Article III, "a plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018); *see Lewis v. Casey*, 518 U.S. 343, 360 (1996) (narrowing an injunction that granted

- 64 -

"a remedy beyond what was necessary to provide relief" to the injured parties).  Moreover, a federal court's power to grant equitable relief is generally limited to the types of relief that were "traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999), and traditional equitable principles require that relief must, at most, be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

The Supreme Court has thus repeatedly stayed relief running to non-parties that was unnecessary to provide relief to the plaintiffs.  *E.g.*, *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024).  And this Court has likewise recognized that "injunctive relief should be narrowly tailored to fit the specific legal violations."  *Gemveto Jewelry Co. v. Jeff Cooper Inc.*, 800 F.2d 256, 259 (Fed. Cir. 1986).

The CIT did not conclude that universal relief was necessary to remedy plaintiffs' injuries.  It instead declared that there is "no question here of narrowly tailored relief" because the tariffs would be equally unlawful as to both plaintiffs and non-plaintiffs.  Appx48.  That rationale cannot support universal relief; the same could be said of a court's legal conclusion about every challenge to a broad policy or a broadly applicable statute.  Nor does

the CIT's passing reference to the constitutional provision stating that "[a]ll Duties, Imposts and Excises shall be uniform throughout the United States," Appx48 (quoting U.S. Const. art. I, § 8, cl. 1), justify such broad relief. That provision limits Congress's power under Article I; it does not expand the Judiciary's equitable powers or modify traditional principles of equity.

By conflating its merits analysis with its scope-of-relief analysis, the CIT ignored the separate analysis required to show that each affected party satisfies the requirements for a permanent injunction, which as discussed does not follow automatically from success on the merits. And it cannot be squared with the general rule that the government is free to relitigate an issue against a party even if it has previously lost on that issue against a different party. *See United States v. Mendoza*, 464 U.S. 154, 159-160 (1984).[4] The effect is an asymmetrical burden in which the government must prevail in every suit to keep its policy in force, but plaintiffs can block an executive

---

[4] Decisions of the CIT—including three-judge CIT panels like the one here—are not precedents binding other CIT judges. *See Nucor Corp. v. United States*, 594 F. Supp. 2d 1320, 1380 n.47 (Ct. Int'l Trade 2008); *Fundicao Tupy S.A. v. United States*, 652 F. Supp. 1538, 1542 (Ct. Int'l Trade 1987); *see also Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989).

action nationwide with just a single lower-court victory.  *See DHS v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring).

## CONCLUSION

The CIT's judgment should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

MICHAEL S. RAAB
BRAD HINSHELWOOD

 */s/ Daniel Winik*
DANIEL WINIK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*
  *Daniel.L.Winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Circuit Rule 32(b)(1) because it contains 13,776 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik

ADDENDUM

# TABLE OF CONTENTS

19 U.S.C. § 2132................................................................................... A1

28 U.S.C. § 1581................................................................................... A2

50 U.S.C. § 1621................................................................................... A2

50 U.S.C. § 1622................................................................................... A3

50 U.S.C. § 1701................................................................................... A5

50 U.S.C. § 1702................................................................................... A6

50 U.S.C. § 1703................................................................................... A8

**19 U.S.C. § 2132**

**§ 2132. Balance-of-payments authority**

(a) Presidential proclamations of temporary import surcharges and temporary limitations on imports through quotas in situations of fundamental international payments problems

Whenever fundamental international payments problems require special import measures to restrict imports —

(1) to deal with large and serious United States balance-of-payments deficits.

(2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or

(3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium,

the President shall proclaim, for a period not exceeding 150 days (unless such period is extended by Act of Congress) —

(A) a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States;

(B) temporary limitations through the use of quotas on the importation of articles into the United States; or

(C) both a temporary import surcharge described in subparagraph (A) and temporary limitations described in subparagraph (B).

The authority delegated under subparagraph (B) (and so much of subparagraph (C) as relates to subparagraph (B)) may be exercised (i) only if international trade or monetary agreements to which the United States is a party permit the imposition of quotas as a balance-of-payments measure, and (ii) only to the extent that the fundamental imbalance cannot be dealt with effectively by a surcharge proclaimed pursuant to subparagraph (A) or (C). Any temporary import surcharge proclaimed pursuant to subparagraph (A) or (C) shall be treated as a regular customs duty.

…

**28 U.S.C. § 1581**

**§ 1581. Civil actions against the United States and agencies and officers thereof**

…

(i)(1) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for--

(A) revenue from imports or tonnage;

(B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;

(C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

(D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section.

…

**50 U.S.C. § 1621**

**§ 1621. Declaration of national emergency by President; publication in Federal Register; effect on other laws; superseding legislation**

(a) With respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such national emergency. Such proclamation shall immediately be transmitted to the Congress and published in the Federal Register.

(b) Any provisions of law conferring powers and authorities to be exercised during a national emergency shall be effective and remain in effect (1) only when the President (in accordance with subsection (a) of this section),

specifically declares a national emergency, and (2) only in accordance with this chapter. No law enacted after September 14, 1976, shall supersede this subchapter unless it does so in specific terms, referring to this subchapter, and declaring that the new law supersedes the provisions of this subchapter.

## 50 U.S.C. § 1622

### § 1622. National emergencies

(a) Termination methods

Any national emergency declared by the President in accordance with this subchapter shall terminate if —

(1) there is enacted into law a joint resolution terminating the emergency; or

(2) the President issues a proclamation terminating the emergency.

Any national emergency declared by the President shall be terminated on the date specified in any joint resolution referred to in clause (1) or on the date specified in a proclamation by the President terminating the emergency as provided in clause (2) of this subsection, whichever date is earlier, and any powers or authorities exercised by reason of said emergency shall cease to be exercised after such specified date, except that such termination shall not affect —

(A) any action taken or proceeding pending not finally concluded or determined on such date;

(B) any action or proceeding based on any act committed prior to such date; or

(C) any rights or duties that matured or penalties that were incurred prior to such date.

(b) Termination review of national emergencies by Congress

Not later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues, each House of Congress shall meet to consider a vote on a joint resolution to determine whether that emergency shall be terminated.

(c) Joint resolution; referral to Congressional committees; conference committee in event of disagreement; filing of report; termination procedure deemed part of rules of House and Senate

(1) A joint resolution to terminate a national emergency declared by the President shall be referred to the appropriate committee of the House of Representatives or the Senate, as the case may be.  One such joint resolution shall be reported out by such committee together with its recommendations within fifteen calendar days after the day on which such resolution is referred to such committee, unless such House shall otherwise determine by the yeas and nays.

(2) Any joint resolution so reported shall become the pending business of the House in question (in the case of the Senate the time for debate shall be equally divided between the proponents and the opponents) and shall be voted on within three calendar days after the day on which such resolution is reported, unless such House shall otherwise determine by yeas and nays.

(3) Such a joint resolution passed by one House shall be referred to the appropriate committee of the other House and shall be reported out by such committee together with its recommendations within fifteen calendar days after the day on which such resolution is referred to such committee and shall thereupon become the pending business of such House and shall be voted upon within three calendar days after the day on which such resolution is reported, unless such House shall otherwise determine by yeas and nays.

(4) In the case of any disagreement between the two Houses of Congress with respect to a joint resolution passed by both Houses, conferees shall be promptly appointed and the committee of conference shall make and file a report with respect to such joint resolution within six calendar days after the day on which managers on the part of the Senate and the House have been appointed. Notwithstanding any rule in either House concerning the printing of conference reports or concerning any delay in the consideration of such reports, such report shall be acted on by both Houses not later than six calendar days after the conference report is filed in the House in which such report is filed first.  In the event the conferees are unable to agree

within forty-eight hours, they shall report back to their respective Houses in disagreement.

(5) Paragraphs (1)-(4) of this subsection, subsection (b) of this section, and section 1651(b) of this title are enacted by Congress--

(A) as an exercise of the rulemaking power of the Senate and the House of Representatives, respectively, and as such they are deemed a part of the rules of each House, respectively, but applicable only with respect to the procedure to be followed in the House in the case of resolutions described by this subsection; and they supersede other rules only to the extent that they are inconsistent therewith; and

(B) with full recognition of the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner, and to the same extent as in the case of any other rule of that House.

(d) Automatic termination of national emergency; continuation notice from President to Congress; publication in Federal Register

Any national emergency declared by the President in accordance with this subchapter, and not otherwise previously terminated, shall terminate on the anniversary of the declaration of that emergency if, within the ninety-day period prior to each anniversary date, the President does not publish in the Federal Register and transmit to the Congress a notice stating that such emergency is to continue in effect after such anniversary.


**50 U.S.C. § 1701**

**§ 1701. Unusual and extraordinary threat; declaration of national emergency; exercise of Presidential authorities**

(a) Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

(b) The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with

respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

## 50 U.S.C. § 1702

### § 1702. Presidential authorities

(a) In general

(1) At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise —

(A) investigate, regulate, or prohibit —

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and

(C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall

vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

(2) In exercising the authorities granted by paragraph (1), the President may require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in paragraph (1) either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of such paragraph. In any case in which a report by a person could be required under this paragraph, the President may require the production of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person.

(3) Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same. No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

(b) Exceptions to grant of authority

The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—

(1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;

(2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any

national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances; or

(3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 46043 of this title, or under section 46053 of this title to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of Title 18;

(4) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

(c) Classified information.—In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.

**50 U.S.C. § 1703**

**§ 1703. Consultation and reports**

(a) Consultation with Congress

The President, in every possible instance, shall consult with the Congress before exercising any of the authorities granted by this chapter and shall consult regularly with the Congress so long as such authorities are exercised.

(b) Report to Congress upon exercise of Presidential authorities

Whenever the President exercises any of the authorities granted by this chapter, he shall immediately transmit to the Congress a report specifying—

(1) the circumstances which necessitate such exercise of authority;

(2) why the President believes those circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States;

(3) the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those circumstances;

(4) why the President believes such actions are necessary to deal with those circumstances; and

(5) any foreign countries with respect to which such actions are to be taken and why such actions are to be taken with respect to those countries.

(c) Periodic follow-up reports

At least once during each succeeding six-month period after transmitting a report pursuant to subsection (b) with respect to an exercise of authorities under this chapter, the President shall report to the Congress with respect to the actions taken, since the last such report, in the exercise of such authorities, and with respect to any changes which have occurred concerning any information previously furnished pursuant to paragraphs (1) through (5) of subsection (b).

(d) Supplemental requirements

The requirements of this section are supplemental to those contained in title IV of the National Emergencies Act.

Slip Op. 25-66

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE; MICROKITS, LLC; FISHUSA INC.; and TERRY PRECISION CYCLING LLC;** | |
| **Plaintiffs,** | |
| **v.** | |
| **THE UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; and HOWARD LUTNICK, in his official capacity as Secretary of Commerce;** | **Before: Gary S. Katzmann, Judge<br>        Timothy M. Reif, Judge<br>        Jane A. Restani, Judge**<br><br>**Court No. 25-00066** |
| **Defendants.** | |

| | |
|---|---|
| **THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE STATE OF ILLINOIS, THE STATE OF MAINE; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; and THE STATE OF VERMONT;** | **Before: Gary S. Katzmann, Judge<br>       Timothy M. Reif, Judge<br>       Jane A. Restani, Judge**<br><br>**Court No. 25-00077** |
| **Plaintiffs,** | |
| **v.** | |

Court Nos. 25-00066 & 25-00077                                          Page 2

> **UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; and THE UNITED STATES OF AMERICA;**
>
>            **Defendants.**

## OPINION

[ The court grants Plaintiffs' Motions for Summary Judgment and denies Plaintiffs' Motions for Preliminary Injunction as moot. ]

Dated: <u>May 28, 2025</u>

<u>Jeffrey M. Schwab</u>, Liberty Justice Center, of Austin, Tex., argued for Plaintiffs V.O.S. Selections, Inc; Plastic Services and Products, LLC d/b/a Genova Pipe; MicroKits, LLC; FishUSA Inc.; and Terry Precision Cycling LLC. With him on the briefs were <u>Reilly Stephens</u>, <u>James McQuaid</u>, <u>Bridget F. Conlan</u>, and <u>Ilya Somin</u>, Antonin Scalia Law School, George Mason University, of Arlington, Vir.

<u>Brian Simmonds Marshall</u>, Senior Assistant Attorney General, Oregon Department of Justice, of Portland, Or., argued for Plaintiffs The State of Oregon, The State of Arizona, The State of Colorado, The State of Connecticut, The State of Delaware, The State of Illinois, The State of Maine, The State of Minnesota, The State of Nevada, The State of New Mexico, The State of New York, and The State of Vermont. With him on the briefs were <u>Dan Rayfield</u>, Attorney General of State of Oregon, <u>Benjamin Gutman</u>, Solicitor General, <u>Dustin Buehler</u>, Special Counsel, <u>Christopher A. Perdue</u>, <u>Leigh Salmon</u>, and <u>Nina R. Englander</u>, Senior Assistant Attorneys General, <u>YoungWoo Joh</u> and <u>Alexander C. Jones</u>, Assistant Attorneys General, of the State of Oregon; <u>Kristin K. Mayes</u>, Attorney General of the State of Arizona, <u>Joshua D. Bendor</u>, Solicitor General, <u>Syreeta A. Tyrell</u>, Senior Litigation Counsel, of the State of Arizona; <u>Keith Ellison</u>, Attorney General of the State of Minnesota and <u>Peter J. Farrell</u>, Deputy Solicitor General of the State of Minnesota; <u>Philip J. Weiser</u>, Attorney General of the State of Colorado and <u>Sarah H. Weiss</u>, Senior Assistant Attorney General of the State of Colorado; <u>William Tong</u>, Attorney General of the State of Connecticut, and <u>Michael K. Skold</u>, Solicitor General of the State of Connecticut; <u>Kathleen Jennings</u>, Attorney General of the State of Delaware, and <u>Ian R. Liston</u>, Director of Impact Litigation, <u>Vanessa L. Kassab</u>, Deputy Attorney General of the Delaware Department of Justice; <u>Aaron D. Ford</u>, Attorney General of the State of Nevada, and <u>Heidi Parry Stern</u>, Solicitor General

of the Office of the Nevada Attorney General; Raúl Torrez, Attorney General of the State of New Mexico, James W. Grayson, Chief Deputy Attorney General, and Amy Senier, of the New Mexico Department of Justice; Letitia James, Attorney General of the State of New York, Rabia Muqaddam, Special Counsel for Federal Initiatives, and Mark Ladov, Special Counsel, of the State of New York; Kwame Raoul, Attorney General of the State of Illinois, Cara Hendrickson, Assistant Chief Deputy Attorney General, and Gretchen Helfrich, Deputy Chief, Special Litigation Bureau of the Office of the Illinois Attorney General; Aaron M. Frey, Attorney General of the State of Maine, and Vivian A. Mikhail, Deputy Attorney General, of the State of Maine; and Charity R. Clark, Attorney General of the State of Vermont, and Ryan P. Kane, Deputy Solicitor General of the State of Vermont.

Eric J. Hamilton, Deputy Assistant Attorney General, U.S. Department of State, of Washington, D.C., argued for Defendants The United States Of America; U.S. Customs and Border Protection; Pete R. Flores in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; Jamieson Greer, in his official capacity as United States Trade Representative; Office of the United States Trade Representative; and Howard Lutnick, in his official capacity as Secretary of Commerce. With him on the briefs were Yaakov M. Roth, Acting Assistant Attorney General, Patricia M. McCarthy, Director, Claudia Burke, Deputy Director, Justin R. Miller, Attorney-in-Charge, International Trade Office, and Sosun Bae, Senior Trial Counsel. Of counsel, Alexander K. Haas, Director, and Stephen M. Elliott, Assistant Director, U.S. Department of Justice, Civil Division, Federal Programs Branch, of Washington D.C; and Luke Mathers and Blake W. Cowman, Trial Attorneys, U.S. Department of Justice Civil Division, Commercial Litigation Branch, of Washington, D.C.

Brett A. Shumate, Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendants U.S. Department of Homeland Security; Kristi Noem, in her official capacity as Secretary of the Department of Homeland Security; U.S. Customs and Border Protection; Pete R. Flores in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and the United States. With him on the briefs were Yaakov M. Roth, Acting Assistant Attorney General, Eric J. Hamilton, Deputy Assistant Attorney General, Patricia M. McCarthy, Director, Claudia Burke, Deputy Director, Justin R. Miller, Attorney-in-Charge, International Trade Office, Sosun Bae, Senior Trial Counsel, Luke Mathers, Catherine M. Yang, Blake W. Cowman, and Collin T. Mathias, trial attorneys. Of counsel, Alexander K. Haas, Director, and Stephen M. Elliott, Assistant Director, U.S. Department of Justice, Civil Division, Federal Programs Branch, of Washington D.C.

    Per Curiam: The Constitution assigns Congress the exclusive powers to "lay and collect

Taxes, Duties, Imposts and Excises," and to "regulate Commerce with foreign Nations." U.S.

Const. art. I, § 8, cls. 1, 3. The question in the two cases before the court is whether the

International Emergency Economic Powers Act of 1977 ("IEEPA") delegates these powers to the

President in the form of authority to impose unlimited tariffs on goods from nearly every country

Court Nos. 25-00066 & 25-00077                                                    Page 4

in the world.  The court does not read IEEPA to confer such unbounded authority and sets aside the challenged tariffs imposed thereunder.

**BACKGROUND**

*I.      Legal Background*

*A.      The Constitution*

While "Congress . . . may not transfer to another branch powers which are strictly and exclusively legislative . . . Congress . . . may confer substantial discretion . . . to implement and enforce the laws."  Gundy v. United States, 588 U.S. 128, 135 (2019) (internal quotation marks and citation omitted).  Thus, courts have consistently upheld statutory delegations as long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise that authority] is directed to conform."  Mistretta v. United States, 488 U.S. 361, 372 (1989) (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)).  This reflects the idea that in modern government, "[t]he legislative process would frequently bog down if Congress were constitutionally required to appraise before-hand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation."  American Power & Light Co. v. SEC, 329 U.S. 90, 105 (1946).

*B.      Tariffs*

Early in the nation's history, tariffs were a key means by which the federal government raised money to pay wages and to fund the national debt.  See John M. Dobson, Two Centuries of Tariffs: The Background and Emergence of the U.S. International Trade Commission 6 (U.S. Int'l Trade Comm'n 1976).  The revenue-raising purpose of tariffs has declined significantly since the ratification of the Sixteenth Amendment in 1913 permitted the imposition of income taxes.  See id. at 1, 70.  Since then, and with the increasing complexity and interconnectedness of the global

- Appx4 -

Court Nos. 25-00066 & 25-00077                                          Page 5

economic landscape, tariffs have served more diverse purposes including restricting the importation of certain goods, protecting American industry, and leveraging negotiations with foreign counterparts. See, e.g., id. at 80 (describing the use of tariffs to restrict Japanese textile imports).

As global economic relations grew in volume and complexity, Congress saw a need for specialized, nonpartisan assistance in administering tariffs. See id. at 87. Congress accordingly passed legislation creating the United States Tariff Commission, later renamed the United States International Trade Commission ("ITC"). See id.; Revenue Act of 1916, Pub. L. 64-271, §§ 700–09, 39 Stat. 756, 795–98. To provide this assistance, the Commission "shall have the power to investigate the tariff relations between the United States and foreign countries, commercial treaties, . . . the volume of importations compared with domestic production and consumption, and conditions, causes, and effects relating to competition of foreign industries with those of the United States." 19 U.S.C. § 1332. The ITC is responsible for maintaining the United States Harmonized Tariff Schedule ("HTSUS"), which sets tariff rates for all merchandise imported into the United States. See id. § 1202. The HTSUS itself "is indeed a statute but is not published physically in the United States Code." Libas, Ltd. v. United States, 193 F.3d 1361, 1364 (Fed. Cir. 1999). Congress's enactment of the HTSUS provided that its terms "shall be considered to be statutory provisions of law for all purposes." Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1204(c)(1), 102 Stat. 1107, 1149.

In addition to forming the ITC, Congress has responded to the growing complexity of global economic relations by delegating trade authority to the President. These delegations have included clear limitations that retain legislative power over the imposition of duties and over

Court Nos. 25-00066 & 25-00077                                                    Page 6

foreign commerce.  See, e.g., Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 305

(1933) ("What is done by the Tariff Commission and the President in changing the tariff rates to

conform to new conditions is in substance a delegation, though a permissible one, of the legislative

process.").

       For example, in 1962, Congress delegated to the President the power to take action to adjust

imports when the Secretary of Commerce finds that an "article is being imported into the United

States in such quantities or under such circumstances as to threaten to impair the national security."

Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232(b), 76 Stat. 872, 877 (codified as

amended at 19 U.S.C. § 1862(c)(1)(A)).  This delegation is conditioned upon an investigation and

findings by the Secretary of Commerce, and agreement by the President.  See id.  Section 301 of

the Trade Act of 1974, as amended, requires that the U.S. Trade Representative ("USTR") take

action, which may include imposing tariffs, where "the rights of the United States under any trade

agreement are being denied" or "an act, policy, or practice of a foreign country" is "unjustifiable

and burdens or restricts United States commerce."  19 U.S.C. § 2411(a)(1)(A)–(B).  The USTR

may impose duties also where the USTR determines that "an act, policy, or practice of a foreign

country is unreasonable or discriminatory and burdens or restricts United States commerce."  Id.

§ 2411(b)(1).  This power is conditioned on extensive procedural requirements including an

investigation that culminates in an affirmative finding that another country imposed unfair trade

barriers under § 2411(a)(1)(A) or (B) or § 2411(b), and a public notice and comment period.  See

id. § 2414(b).

Court Nos. 25-00066 & 25-00077                                                    Page 7

### C.    Presidential Authority to Regulate Importation During National Emergencies

In 1917, Congress passed the Trading with the Enemy Act ("TWEA") to grant the President powers to regulate international transactions with enemy powers following the entry of the United States into World War I.  See Trading with the Enemy Act, Pub. L. No. 65-91, § 2, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. §§ 4301 to 4341); see also Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45168, The International Emergency Economic Powers Act: Origins, Evolution, and Use 2–3 (2024).  The Great Depression then led Congress to expand the President's authority under TWEA to declare states of emergency and exercise authority over international trade even outside times of war.    See Emergency Banking Relief Act, Pub. L. No. 73-1, § 2, 48 Stat. 1, 1–2 (1933) (amending TWEA).  TWEA, as amended, grants the President the broad authority to "regulate . . . importation or exportation of . . . any property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 4305(b)(1)(B).

In 1974, the United States Customs Court, the predecessor to the United States Court of International Trade, heard a challenge to President Nixon's imposition of a supplemental duty on all dutiable merchandise imported into the United States.  See Yoshida Int'l, Inc. v. United States, 378 F. Supp. 1155 (1974) ("Yoshida I"); see also Proclamation No. 4074, Imposition of Supplemental Duty for Balance of Payments Purpose, 85 Stat. 926 (Aug. 15, 1971).  The Government argued that President Nixon's actions were lawfully authorized by TWEA.  Yoshida I, 378 F. Supp. at 1157.  The U.S. Customs Court construed TWEA "so as to preserve its constitutionality" and held that TWEA "precludes the President from laying the supplemental duties provided by [President Nixon]."  Id. at 1173.  The United States Court of Customs and Patent Appeals, the predecessor to the United States Court of Appeals for the Federal Circuit

("Federal Circuit"), reversed the lower court's decision, holding that President Nixon's duties were "within the power constitutionally delegated to him." United States v. Yoshida Int'l. Inc., 526 F.2d 560, 584 (C.C.P.A. 1975) ("Yoshida II"). The court reasoned that "Congress, in enacting [TWEA], authorized the President, during an emergency, to exercise the delegated substantive power, i.e., to 'regulate importation,' by imposing an import duty surcharge or by other means appropriately and reasonably related . . . to the particular nature of the emergency declared." Id. at 576.

Shortly after this decision and following a review by a Senate bipartisan special committee, Congress reformed the President's emergency powers. As part of this reform, Congress cabined the President's powers under TWEA to wartime. See Amendments to the Trading with the Enemy Act, Pub. L. No. 95-223, § 101–03, 91 Stat. 1625, 1625–26 (1977) ("[TWEA] is amended by striking out 'or during any other period of national emergency declared by the President' in the text preceding subparagraph (A)."). Congress also enacted a new statute, IEEPA, to confer "upon the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to more procedural limitations, including those of the National Emergencies Act." Comm. on Int'l Rels., Trading with the Enemy Act Reform Legislation, H.R. Rep. No. 95-459, at 2 (1977); see also International Emergency Economic Powers Act, Pub. L. No. 95-223, § 201–08, 91 Stat. 1625, 1626–29 (1977) (codified as amended at 50 U.S.C. §§ 1701–10). Congress drew much of the relevant language in IEEPA from TWEA, including language authorizing the President to "regulate . . . importation . . . of . . . any property in which any foreign country or a national thereof has any interest by any person . . . subject to the jurisdiction of the United States . . . ." 50 U.S.C. § 1702(a)(1)(B). In full, the relevant provision

Court Nos. 25-00066 & 25-00077                                         Page 9

of IEEPA provides that the President may:

> (A) investigate, regulate, or prohibit—

>> (i) any transactions in foreign exchange,

>> (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

>> (ii) the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States;

> (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

Id. § 1702.  IEEPA further provides that these authorities "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose."  Id. § 1701(b).

### D.    The National Emergencies Act

As part of Congress's reform of the President's emergency powers and in addition to amending TWEA and enacting IEEPA, Congress enacted the National Emergencies Act ("NEA") in 1976.  See National Emergencies Act, Pub. L. No. 94-412, § 201, 90 Stat. 1255, 1255–56 (1976) (codified as amended at 50 U.S.C. § 1622).  That act provided for the termination of all existing emergencies in 1978, except those making use of TWEA, and placed new restrictions on the declaration of emergencies.  Id.  First, the NEA requires the President to transmit to Congress a notification of the declaration of a national emergency.  Id.  Second, the act requires a biannual review whereby "each House of Congress shall meet to consider a vote on a . . . resolution to

Court Nos. 25-00066 & 25-00077                                                    Page 10

determine whether that emergency shall be terminated." Id.  At the time of its enactment in 1976,

the NEA afforded Congress the means to terminate a national emergency by adopting a concurrent

resolution in each chamber.  See id.  However, the Supreme Court later found Congress's use of

unicameral legislative vetoes, which terminated executive determinations without presentment, to

be unconstitutional.  See INS v. Chadha, 462 U.S. 919 (1983).  Congress subsequently amended

the NEA to require a joint resolution rather than a concurrent resolution to align the statutory

scheme with the implicit logic of Chadha.  See Foreign Relations Authorization Act, Fiscal Years

1986 and 1987, Pub. L. No. 99-93, § 801, 98 Stat. 405, 448 (1985) (codified as amended at 50

U.S.C. § 1622).  Following Chadha, congressional action terminating a national emergency is still

subject to presidential veto, making congressional review no more than the ordinary power to

legislate.

## II.    Factual Background

Since taking office on January 20, 2025, the President has declared several national

emergencies and imposed various tariffs in response.  The President has subsequently issued a

number of pauses and modifications to those tariffs, as outlined in detail below.

### A.    Trafficking Tariffs

On the date of his inauguration, the President issued Executive Order 14157, declaring a

national emergency under IEEPA to deal with the threats posed by international cartels that "have

engaged in a campaign of violence and terror throughout the Western Hemisphere that has not

only destabilized countries with significant importance for our national interests but also flooded

the United States with deadly drugs, violent criminals, and vicious gangs."  Executive Order

14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and

Specially Designated Global Terrorists, 90 Fed. Reg. 8439, 8439 (Jan. 20, 2025).  The President

Court Nos. 25-00066 & 25-00077                                                    Page 11

issued Proclamation 10886 on the same day, declaring a national emergency at the southern border caused by "cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans." Proclamation 10886, <u>Declaring a National Emergency at the Southern Border of the United States</u>, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025).

   Shortly thereafter, the President expanded the national emergency "to cover the threat to the safety and security of Americans, including the public health crisis of deaths due to the use of fentanyl and other illicit drugs, and the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." Executive Order 14193, <u>Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border</u>, 90 Fed. Reg. 9113, 9114 (Feb. 1, 2025) ("Canada Tariff Order"). Similarly, the President expanded the national emergency "to cover the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." Executive Order 14195, <u>Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China</u>, 90 Fed. Reg. 9121, 9122 (Feb. 1, 2025) ("China Tariff Order").

   In response to these emergencies, the President imposed 25 percent <u>ad valorem</u> duties on articles that are products of Canada and Mexico, <u>see</u> Executive Order 14193, 90 Fed. Reg. at 9114; Executive Order 14194, <u>Imposing Duties to Address the Situation at Our Southern Border</u>, 90 Fed. Reg. 9117, 9118 (Feb. 1, 2025) ("Mexico Tariff Order"), and a 10 percent <u>ad valorem</u> duty on articles that are the products of China, <u>see</u> Executive Order 14195, 90 Fed. Reg. at 9122. The President imposed a lower 10 percent <u>ad valorem</u> rate on energy and energy resources from

Court Nos. 25-00066 & 25-00077                                                    Page 12

Canada.  See Executive Order 14193, 90 Fed. Reg. at 9114.  These duties were to take effect on

February 4, 2025.  See id.  The President later raised the trafficking tariffs on Chinese products

from 10 percent to 20 percent.  See Executive Order 14228, Further Amendment to Duties

Addressing the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg.

11463, 11463 (Mar. 3, 2025).

On February 3, shortly after imposing the trafficking tariffs, the President issued two

additional executive orders, finding that the governments of Mexico and Canada "ha[ve] taken

immediate steps designed to alleviate the illegal migration and illicit drug crisis through

cooperative actions."  Executive Order 14198, Progress on the Situation at Our Southern Border,

90 Fed. Reg. 9185, 9185 (Feb. 3, 2025); Executive Order 14197, Progress on the Situation at Our

Northern Border, 90 Fed. Reg. 9183, 9183 (Feb. 3, 2025).  As a result, the President imposed a

pause on the 25 percent duties on Mexican and Canadian products and on the 10 percent duties on

Canadian energy and energy resources, moving the effective date of those duties to March 4, 2025.

See id.

Since the trafficking tariffs took effect on February 4 for China and March 4 for Canada

and Mexico, the President has modified the rates further.  The President lowered the duty rate for

potash[1] from Canada and Mexico to 10 percent.  See Executive Order 14231, Amendment to

Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 11785,

11785 (Mar. 6, 2025); Executive Order 14232, Amendment to Duties To Address the Flow of

---

[1] Potash is a soluble source of potassium and is primarily used as an agricultural fertilizer.  See
National Minerals Information Center, Potash Statistics and Information, U.S. Geological Service,
https://www.usgs.gov/centers/national-minerals-information-center/potash-statistics-and-
information (last visited May 28, 2025).

Court Nos. 25-00066 & 25-00077                                          Page 13

Illicit Drugs Across Our Southern Border, 90 Fed. Reg. 11787, 11787 (Mar. 6, 2025).

Additionally, the President implemented duty-free de minimis treatment for otherwise eligible

covered articles.  See Executive Order 14226, Amendment to Duties to Address the Flow of Illicit

Drugs Across Our Northern Border, 90 Fed. Reg. 11369, 11369 (Mar. 2, 2025); Executive Order

14227, Amendment to Duties to Address the Situation at Our Southern Border, 90 Fed. Reg.

11371, 11371 (Mar. 2, 2025); Executive Order 14200, Amendment to Duties Addressing the

Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9277, 9277 (Feb.

5, 2025).  The President later removed this duty-free de minimis treatment for Chinese products.

See Executive Order 14256, Further Amendment to Duties Addressing the Synthetic Opioid

Supply Chain in the People's Republic of China as Applied to Low-Value Imports, 90 Fed. Reg.

14899, 14899 (Apr. 2, 2025).

       Currently, the trafficking tariffs all remain in place, set at 25 percent for Mexican and

Canadian products and at 20 percent for Chinese products.  The tariffs on Canadian energy and

energy resources remain at the lower 10 percent rate.  All of these tariffs, including the

modifications listed here, are hereafter referred to as the "Trafficking Tariffs."

                    **B.    *Worldwide and Retaliatory Tariffs***

       On April 2, 2025, the President issued Executive Order 14257, invoking IEEPA to impose

a general 10 percent ad valorem duty on "all imports from all trading partners," which "shall

increase for" a list of 57 countries to higher rates ranging from 11 percent to as high as 50 percent

ad valorem. Executive Order 14257, Regulating Imports With a Reciprocal Tariff to Rectify Trade

Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90

Fed. Reg. 15041, 15045 (Apr. 2, 2025).  The President imposed these tariffs in response to a

national emergency with respect to "underlying conditions, including a lack of reciprocity in our

Court Nos. 25-00066 & 25-00077                                              Page 14

bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners'

economic policies that suppress domestic wages and consumption, as indicated by large and

persistent annual U.S. goods trade deficits." Id. at 15041.  The President stated that these "large

and persistent annual U.S. goods trade deficits" constitute an "unusual and extraordinary threat to

the national security and economy of the United States," having "its source in whole or substantial

part outside the United States in the domestic economic policies of key trading partners and

structural imbalances in the global trading system." Id.  On April 9, 2025, the President issued

another Executive Order that paused, for all countries but China, the implementation of the higher

country-specific tariffs for 90 days, moving their effective date to July 9, 2025.  See Executive

Order 14266, Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and

Alignment, 90 Fed. Reg. 15625, 15626 (Apr. 9, 2025).

       As China responded to the various country-specific tariff adjustments by adjusting its own

tariff rates on U.S. goods, the President has amended the duty rate on Chinese goods several times

in retaliation.  The President first increased the China-specific duty rate from 34 to 84 percent

effective April 8, see Executive Order 14259, Amendment to Reciprocal Tariffs and Updated

Duties as Applied to Low-Value Imports From the People's Republic of China, 90 Fed. Reg.

15509, 15509 (Apr. 8, 2025), and then from 84 to 125 percent effective April 10, 2025, see

Executive Order 14266, 90 Fed. Reg. at 15626.

       Currently, the worldwide tariffs remain in place at 10 percent for all countries, while the

country-specific higher rates are set to take effect on July 9, 2025.  The China-specific rate is now

Court Nos. 25-00066 & 25-00077                                         Page 15

also at 10 percent[2] after President Trump lowered the 125 percent retaliatory tariffs in response to China, taking "a significant step . . . toward remedying non-reciprocal trade arrangements and addressing the concerns of the United States relating to economic and national security matters." Executive Order 14298, <u>Modifying Reciprocal Tariff Rates To Reflect Discussions With the People's Republic of China</u>, 90 Fed. Reg. 21831, 21831 (May 12, 2025). This lower rate is effective until August 12, 2025. <u>See id.</u> All of these tariffs, including the modifications listed here, are hereafter referred to as the "Worldwide and Retaliatory Tariffs."

### III. *Procedural Background*

The <u>V.O.S.</u> Plaintiffs brought an action against Defendants the United States, the President, and certain agencies and officials (collectively, "the Government") on April 14, 2025, challenging the President's imposition of the Worldwide and Retaliatory Tariffs in Executive Orders 14257 and 14266. <u>See</u> Compl., <u>V.O.S. v. United States</u>, No. 25-00066, Apr. 14, 2025, ECF No. 2 ("<u>V.O.S.</u> Compl."), and subsequently filed an application for a temporary restraining order alongside motions for preliminary injunction and summary judgment. <u>See</u> Application for TRO & Mot. for Prelim. Inj., and or Summ. J., <u>V.O.S. v. United States</u>, No. 25-00066, Apr. 18, 2025, ECF No. 10 ("Pls.' <u>V.O.S.</u> Mots."). After the court denied the motion for a temporary restraining order, <u>see</u> Order Denying TRO, <u>V.O.S. v. United States</u>, No. 25-00066, Apr. 22, 2025, ECF No. 13, the Government filed its combined response, <u>see</u> Resp. in Opp'n to Mot. for Summ. J. and Prelim. Inj., <u>V.O.S. v. United States</u>, No. 25-00066, Apr. 29, 2025, ECF No. 32 ("Gov't Resp. to <u>V.O.S.</u> Mots."), and the V.O.S. Plaintiffs replied on May 6, 2025, <u>see</u> Reply in Supp. of Mots. for

---

[2] This 10 percent rate is in addition to the 20 percent Trafficking Tariff addressed above. The total rate on Chinese goods is thus currently set at 30 percent (subject to various exemptions not discussed here).

Court Nos. 25-00066 & 25-00077                                        Page 16

Prelim. Inj. and Summ. J., <u>V.O.S. v. United States</u>, No. 25-00066, May 6, 2025, ECF No. 35 ("Pls.'

<u>V.O.S.</u> Reply").[3]

  After the <u>V.O.S.</u> Plaintiffs filed their motions and during briefing in that case, the State

Plaintiffs brought a similar action against the Government on April 23, 2025, challenging the

President's Worldwide and Retaliatory Tariffs along with the President's imposition of Trafficking

Tariffs in Executive Orders 14193, 14194, and 14195. <u>See</u> Compl., <u>Oregon v. United States</u>, No.

25-00077, Apr. 23, 2025, ECF No. 2 ("<u>Oregon</u> Compl."). The plaintiffs in <u>Oregon</u> ("State

Plaintiffs") filed their own motion for preliminary injunction on May 7, 2025, <u>see</u> Or. Pls.' Mot.,

<u>Oregon v. United States</u>, No. 25-00077, May 7, 2025, ECF No. 14 ("Pls.' <u>Oregon</u> Mot."). The

court construed the State Plaintiffs' motion for preliminary injunction as a motion for summary

judgment, <u>see</u> Order Construing Mot. for Prelim. Inj. as Mot. for Summ. J., <u>Oregon v. United

States</u>, No. 25-00077, May 8, 2025, ECF No. 18, the State Plaintiffs filed a supplemental brief, <u>see</u>

Supp'l Resp. to Mot. for Summ. J., <u>Oregon v. United States</u>, No. 25-00077, May 13, 2025, ECF

No. 32 ("Pls.' <u>Oregon</u> Supp'l Br."), the Government responded, <u>see</u> Gov't Resp. in Opp'n to Mot.

for Summ. J., <u>Oregon v. United States</u>, No. 25-00077, May 16, 2025, ECF No. 41, and the State

Plaintiffs replied, <u>see</u> Reply in Supp. of Summ. J., <u>Oregon v. United States</u>, No. 25-00077, May

20, 2025, ECF No. 47 ("Pls.' <u>Oregon</u> Reply"). The Government filed an amended response shortly

thereafter. <u>See</u> Order for Amended Resp., May 17, 2025, <u>Oregon v. United States</u>, No. 25-00077,

ECF No. 42; Amended Resp., <u>Oregon v. United States</u>, No. 25-00077, May 19, 2025, ECF No. 46

---

[3] Several entities filed amicus briefs in support of the Plaintiffs in <u>V.O.S.</u> <u>See</u> Amici Curiae Br.,
<u>V.O.S. v. United States</u>, No. 25-00066, Apr. 28, 2025, ECF No. 31 ("Legal Scholars Amicus Br.");
Mot. for Leave to File an Amici Curiae Br., <u>V.O.S. v. United States</u>, No. 25-00066, May 12, 2025,
ECF No. 49 ("Princess Awesome Amicus Br."); Amicus Curiae Br., <u>V.O.S. v. United States</u>, No.
25-00066, May 9, 2025, ECF No. 44 ("Inst. for Pol. Integrity Amicus Br.").

Court Nos. 25-00066 & 25-00077                                    Page 17

("Gov't Resp. to <u>Oregon</u> Mots.").[4]  The court held oral argument in <u>V.O.S.</u> on Tuesday, May 13,

2025, and in <u>Oregon</u> on Wednesday, May 21, 2025.

**JURISDICTION**

 The Court of International Trade has exclusive jurisdiction to hear this action under 28

U.S.C. § 1581(i), which gives the court:

> exclusive jurisdiction of any civil action commenced against the United States, its
> agencies, or its officers, that arises out of any law of the United States providing
> for--
>
>  (A) revenue from imports or tonnage;
>
>  (B) tariffs, duties, fees, or other taxes on the importation of merchandise for
> reasons other than the raising of revenue;
>
>  (C) embargoes or other quantitative restrictions on the importation of
> merchandise for reasons other than the protection of the public health or
> safety; or
>
>  (D) administration and enforcement with respect to the matters referred to
> in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h)
> of this section.

<u>Id.</u> § 1581(i)(1); <u>see also</u> <u>id.</u> § 1337(c) ("The district courts shall not have jurisdiction under this

section of any matter within the exclusive jurisdiction of the Court of International Trade . . . .").

Here, the plaintiffs in both cases (collectively, "Plaintiffs") challenge tariffs imposed by the

President under IEEPA, which provides that the President, under certain conditions and with some

---

[4] Several entities filed amicus briefs in support of the Plaintiffs in <u>Oregon</u>.  <u>See</u> Amicus Curiae
Br., <u>Oregon v. United States</u>, No. 25-00077, May 16, 2025, ECF No. 40 ("Members of Congress
Amicus Br."); Amicus Curiae Br., <u>Oregon v. United States</u>, No. 25-00077, May 15, 2025, ECF
No. 38 ("Cal. Amicus Br."); Amicus Curiae Br., <u>Oregon v. United States</u>, No. 25-00077, May 20,
2025, ECF No. 53 ("Wash. Amicus Br.").  One party filed an amicus brief in support of the
Government in <u>Oregon</u>.  <u>See</u> Amicus Curiae Br., <u>Oregon v. United States</u>, No. 25-00077, May 20,
2025, ECF No. 51 ("America First Legal Found. Amicus Br.").

Court Nos. 25-00066 & 25-00077                                                    Page 18

elsewhere-enumerated exceptions, may:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B). The challenged Executive Orders, in turn, invoke this statute to impose tariffs (alternatively referred to as "duties") on merchandise from both specific countries and a list that includes "all trading partners" of the United States. See, e.g., Executive Order 14266, 90 Fed. Reg. at 15645. The Executive Orders made amendments to the HTSUS, which are set forth in subheading 9903.01. The HTSUS is the law of the United States setting tariffs.[5]

For the purpose of locating jurisdiction under 28 U.S.C. § 1581(i), an action involving a challenge to a presidential action that imposes tariffs, duties, or other import restrictions is one that arises from a "law providing for" those measures. See Luggage & Leather Goods Mfrs. of Am., Inc. v. United States, 7 CIT 258, 267, 588 F. Supp. 1413, 1419–21 (1984); U.S. Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 200–01, 544 F. Supp. 883, 886 (1982), aff'd, 683 F.2d 399 (C.C.P.A. 1982); see also 28 U.S.C. § 255 (contemplating "civil action[s]" falling under this court's jurisdiction that "raise[] . . . issue[s] of the constitutionality of . . . a proclamation of the

---

[5] This does not mean that Plaintiffs' ultra vires claims must instead route through 28 U.S.C. § 1581(a), which provides for "any civil action commenced to contest the denial of a protest" to "the . . . amount of duties chargeable" on an entry, 19 U.S.C. § 1514(a)(2). As the Supreme Court has explained, "protests are not pivotal" in circumstances where Customs operates under a binding external directive—as where "Customs performs no active role, it undertakes no analysis or adjudication, issues no directives, imposes no liabilities; instead, Customs merely passively collects . . . payments." United States v. U.S. Shoe Corp., 523 U.S. 360, 365 (1998) (internal quotation marks, alterations, and citation omitted).

Court Nos. 25-00066 & 25-00077                                    Page 19

President or an Executive order").  The Federal Circuit has confirmed that presidential action creates an appropriate basis for (i) jurisdiction, noting without disapproval that there are "numerous cases in which the Court of International Trade has . . . considered challenges to the actions of the President pursuant to the grant of jurisdiction in § 1581(i)." Humane Soc'y of United States v. Clinton, 236 F.3d 1320, 1327 (Fed. Cir. 2001) (citing, inter alia, Luggage & Leather Goods, 7 CIT 258, 588 F. Supp. 1413 and U.S. Cane Sugar Refiners' Ass'n, 3 CIT 196, 544 F. Supp. 883).

    This means that Plaintiffs' various challenges to the presidential actions here, successful or not, fall under this court's exclusive jurisdiction.  And while "section 1581(i) does not authorize proceedings directly against the President," meaning the President must be dismissed from the two cases before the court, Corus Grp. PLC. v. ITC, 352 F.3d 1351, 1359 (Fed. Cir. 2003), the court retains "jurisdiction to consider challenges to the President's actions in suits against subordinate officials who are charged with implementing the presidential directives," USP Holdings, Inc. v. United States, 36 F.4th 1359, 1366 (Fed. Cir. 2022).  That group covers the rest of the named Defendants in both cases.  All relief will run against the United States and its "officers," a category which for jurisdictional purposes does not include the President.  See 28 U.S.C. § 1581(i).

## STANDING

    Article III of the Constitution requires plaintiffs in federal court to have standing to sue.[6] "[T]he plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and

---

[6] The Government does not appear to contest statutory or "prudential" standing, which unlike Article III standing can be waived.  See Brooklyn Brewery Corp. v. Brooklyn Brew Shop, 17 F.4th 129, 140 (Fed. Cir. 2021).

Court Nos. 25-00066 & 25-00077                                                    Page 20

likely to be redressed by the lawsuit." Biden v. Nebraska, 600 U.S. 477, 489 (2023) (citing Lujan

v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)).  "A plaintiff may establish its injury-in-fact

'in the same way as any other matter on which the plaintiff bears the burden of proof.'" Canadian

Lumber Trade All. v. United States, 517 F.3d 1319, 1333 (Fed. Cir. 2008) (quoting Lujan, 504

U.S. at 561).

### I.    *Article III Standing of V.O.S. Plaintiffs*

A non-importer plaintiff may "fairly employ economic logic" to establish a concrete and

particularized injury-in-fact that is fairly traceable to a challenged tariff. Id. at 1333.  A plaintiff

that takes that route must show that the challenged tariff is "likely to cause [the plaintiff] an

economic injury," and that "this injury would be prevented by a declaratory judgment and

injunction" setting that tariff aside. Id. at 1334.  The V.O.S. Plaintiffs have done so here.

The businesses that bring the V.O.S. action—V.O.S. Selections, Genova Pipe, MicroKits,

FishUSA, and Terry Cycling—allege and aver[7] that they have suffered (and will continue to suffer)

economic injuries as a result of the Worldwide and Retaliatory Tariffs.  See V.O.S.

Compl. ¶¶ 52–56.  V.O.S. alleges that the Worldwide and Retaliatory Tariffs have occasioned

difficulties with sourcing and pricing, and also that "[t]he reduction in cash flow caused by

increased tariffs also necessarily reduces the company's inventory and the level of business that

V.O.S. can conduct, leading to an overall reduction in purchase orders placed with both foreign

---

[7] To establish standing at the summary judgment stage, a plaintiff "must set forth by affidavit or
other evidence specific facts, which for purposes of the summary judgment motion will be taken
to be true." Lujan, 504 U.S. at 561 (internal quotation marks and citation omitted).  Executives of
the various V.O.S. Plaintiffs have submitted declarations with their companies' motions.  See Pls.'
V.O.S. Mots. at Exs. A–E (Decls. of Victor Schwartz, Andrew Reese, David Levi, Dan Pastore,
& Nikolaus Holm).

Court Nos. 25-00066 & 25-00077                                                    Page 21

and domestic suppliers." Id. ¶ 52.  Its CEO avers in a declaration that "[t]ariffs must be paid by

V.O.S. upon arrival at the Port of New York, putting a large, immediate, strain on its cash flow."

Schwartz Decl. ¶ 25.  Genova Pipe alleges major sourcing problems stemming from the

Worldwide Tariffs, and also that "[t]he tariffs will directly increase the cost of raw materials,

manufacturing equipment, and resale goods imported from abroad by Genova Pipe."  V.O.S.

Compl. ¶ 53; see generally Reese Decl.  MicroKits alleges that "[a]t the current rates" of the

Worldwide and Retaliatory Tariffs it "cannot order parts from China and will have to pause

operations when it runs out of parts," and also that as a result it "will likely be unable to pay its

employees, will lose money, and as a result may go out of business."  V.O.S. Compl. ¶ 54; see also

Levi Decl. ¶ 13.  FishUSA alleges that "[t]he tariffs have caused [it] to delay shipment of finished

goods from China due to the unpredictability of the tariff rate that will be imposed when the

product arrives, and [that] it has also paused production of some products," and states that these

conditions inhibit its business growth.  V.O.S. Compl. ¶ 55; see generally Pastore Decl.  Terry

Cycling alleges that it "has already paid $25,000 in unplanned tariffs this year for goods for which

Terry was the importer of record," and "projects that the tariffs will cost the company

approximately $250,000 by the end of 2025."  V.O.S. Compl. ¶ 56; see generally Holm Decl.

        These allegations and declarations establish the Article III standing of all V.O.S. Plaintiffs.

While the Government objects that "no plaintiff has offered evidence that it has actually paid tariffs

pursuant to the Executive Orders," Gov't Resp. to V.O.S. TRO Application at 17, Apr. 21, 2025,

ECF No. 12, the Government does not meaningfully contest the "economic logic" tracing the

Worldwide and Retaliatory Tariffs to the V.O.S. Plaintiffs' showings of downstream harm. See

Canadian Lumber, 517 F.3d at 1333.

Court Nos. 25-00066 & 25-00077                                          Page 22

While the Government further objects that "[a]t the very least, the Court should hold that FishUSA and MicroKits lack standing, given that they do not even allege that they intend to import articles subject to the tariffs within any particular period of time," Gov't Resp. to <u>V.O.S.</u> TRO Application at 18, this point rests on an unsupported import-only rule of standing.[8]  To suffer an economic injury from a tariff it is not necessary to incur direct liability to Customs, or even to directly import an article of dutiable merchandise.  Fair traceability is more flexible than that.  <u>See Invenergy Renewables LLC v. United States</u>, 43 CIT __, __, 422 F. Supp. 3d 1255, 1273 (2019) ("The court determines that this 'economic logic' applies here: the duty on bifacial panels will increase—and, with it, likely Plaintiffs' costs—if the <u>Withdrawal</u> goes into effect.").  Here, injuries like (1) the prohibitively high price of operationally necessary components, <u>see</u> Levi Decl., and (2) the stoppage of orders and product production, <u>see</u> Pastore Decl., are "concrete and imminent harm[s] to a legally protected interest, like property or money—that [are] fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  <u>Biden v. Nebraska</u>, 600 U.S. at 489.

## II.    *Article III Standing of State Plaintiffs*

The standing inquiry is even simpler for the State Plaintiffs.  The State Plaintiffs allege "direct financial harm" from the challenged tariffs' impact on the cost of imported goods that are "essential" to the states' provision of public services, <u>see</u> <u>Oregon</u> Compl. ¶¶ 94–112, and also from

---

[8] Responding to the State Plaintiffs' Motions, the Government argues that "[w]hile importers have standing to challenge tariffs, purchasers of imported goods do not."  Gov't Resp. to <u>Oregon</u> Mots. at 11.  For that proposition the Government quotes <u>Totes-Isotoner Corp. v. United States</u>, where the Federal Circuit held that "purchasers have no remedy to challenge the tariff classification." 594 F.3d 1346, 1352 (Fed. Cir. 2010).  This reference to a lack of a remedy, however, had nothing to do with the purchasers' Article III standing.  It instead had to do with the fact that a purchaser could not have "sought a refund of duties" that it never paid to Customs, a fact that in turn supported an importer's claim of third-party standing on the purchaser's behalf.  <u>See id.</u> at 1350.

Court Nos. 25-00066 & 25-00077                                      Page 23

their impact on "Plaintiff States' ability to procure goods and services and to budget for and audit

price adjustments," id. ¶ 114.

The Government implicitly concedes that Oregon, Arizona, Colorado, and Connecticut are

"importers who have personally paid tariffs" who thus "have standing to challenge tariffs."  Gov't

Resp. to Oregon Mots. at 11.  The Government is right to make this concession: challenged conduct

that "directly injures" a state can also "confer[] standing on that State."  Biden v. Nebraska, 600

U.S. at 489.  And an importer's allegation that it pays unlawful U.S. duties "typically would satisfy

constitutional standing requirements."  Totes-Isotoner, 594 F.3d at 1351.

Since "[i]f at least one plaintiff has standing, the suit may proceed," Biden v. Nebraska,

600 U.S. at 489 (citation omitted), there is no need to go further.  The State Plaintiffs seek only

broad injunctive and declaratory relief.  That means that even if the non-importer states among

them were to hypothetically lack standing, the contours of available relief would not change.  See

Oregon Compl. at 35–36.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT

R. 56(a).

28 U.S.C. § 2640(e) provides that "[i]n any civil action not specified in this section," which

includes actions under 28 U.S.C. § 1581(i), "the Court of International Trade shall review the

matter as provided in section 706 of title 5."  This references the "[s]cope of review" section of

the Administrative Procedure Act ("APA"), codified at 5 U.S.C. § 706, which provides that "[t]he

reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions

Court Nos. 25-00066 & 25-00077                                              Page 24

found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

28 U.S.C. § 2640(e) does not address what happens when an action under 28 U.S.C. § 1581(i) challenges actions by the President, which unlike agency actions "are not subject to [the APA's] requirements." Franklin v. Massachusetts, 505 U.S. 788, 800–01 (1992). But the court "presume[s] that review is available when a statute is silent," Patel v. Garland, 596 U.S. 328, 346 (2022). Also, "claims that the President's actions violated the statutory authority delegated to him . . . are reviewable." USP Holdings, 36 F.4th at 1365. The Federal Circuit has observed that "[i]t is enough to say that some non-APA review remains available for constitutional issues, questions about the scope of statutory authority, and compliance with procedural requirements." Am. Inst. for Int'l Steel, Inc. v. United States, 806 F. App'x 982, 991 (Fed. Cir. 2020) (nonprecedential); see also Florsheim Shoe Co. v. United States, 744 F.2d 787, 795 (Fed. Cir. 1984) ("[T]he Executive's decisions in the sphere of international trade are reviewable only to determine whether the President's action falls within his delegated authority, whether the statutory language has been properly construed, and whether the President's action conforms with the relevant procedural requirements."); Maple Leaf Fish Co. v. United States, 762 F.2d 86, 89 (Fed. Cir. 1985) ("For a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority."); United States v. Sears, Roebuck & Co., 20 C.C.P.A. 295, 305 (1932) (reviewing the President's issuance of a proclamation "for the purpose of determining whether he has exceeded the powers delegated to him.").

Court Nos. 25-00066 & 25-00077                                               Page 25

As it undertakes this review function, "[t]he Court of International Trade shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States." 28 U.S.C. § 1585.

## DISCUSSION

Underlying the issues in this case is the notion that "the powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other departments." Federalist No. 48 (James Madison). Because of the Constitution's express allocation of the tariff power to Congress, see U.S. Const. art. I, § 8, cl. 1, we do not read IEEPA to delegate an unbounded tariff authority to the President. We instead read IEEPA's provisions to impose meaningful limits on any such authority it confers. Two are relevant here. First, § 1702's delegation of a power to "regulate . . . importation," read in light of its legislative history and Congress's enactment of more narrow, non-emergency legislation, at the very least does not authorize the President to impose unbounded tariffs. The Worldwide and Retaliatory Tariffs lack any identifiable limits and thus fall outside the scope of § 1702. Second, IEEPA's limited authorities may be exercised only to "deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . and may not be exercised for any other purpose." 50 U.S.C. § 1701(b) (emphasis added). As the Trafficking Tariffs do not meet that condition, they fall outside the scope of § 1701.

### I.   50 U.S.C. § 1702 Does Not Authorize the Worldwide and Retaliatory Tariffs

Plaintiffs in both cases argue that the words "regulate . . . importation" do not confer the power to impose tariffs. See Pls.' V.O.S. Reply at 3; Pls.' Oregon Mot. at 15. Any other interpretation, according to Plaintiffs, would run afoul of both the nondelegation doctrine and the major questions doctrine. See Pls.' V.O.S. Mot at 15; Pls.' Oregon Mot. at 18–19. The

Court Nos. 25-00066 & 25-00077                                         Page 26

Government counters that the words "regulate . . . importation" have the same meaning that they did in TWEA, an older statute that was found to delegate a power to impose tariffs.  See Gov't Resp. to V.O.S. Mots. at 17–19; Gov't Resp. to Oregon Mots. at 17–18.

Plaintiffs are correct in the narrow sense that the imprecise term "regulate . . . importation," under any construction that would comport with the separation-of-powers underpinnings of the nondelegation and major questions doctrines, does not authorize anything as unbounded as the Worldwide and Retaliatory Tariffs.  See Jennings v. Rodriguez, 583 U.S. 281, 286 (2018) ("[W]hen statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead . . . adopt an alternative that avoids those problems.").  The court in Yoshida II recognized that a case involving a claim to such unlimited authority might arise, observing that "[w]hether a delegation of such breadth as to have authorized [the tariffs here] would be constitutionally embraced, is determined . . . by the nature of the particular surcharge herein and its relationship to other statutes, as well as by its relationship to the particular emergency confronted."  526 F.2d at 576–77; see also Proclamation No. 4074, 85 Stat. 926.  That case has arisen here.

### A.    An Unlimited Delegation of Tariff Authority Would Be Unconstitutional

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const. art. 1, § 1.  Congress is empowered "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its general powers.  Id. § 8, cl. 18.  The Constitution thus establishes a separation of powers between the legislative and executive branches that the Framers viewed as essential to the preservation of individual liberty.  See, e.g., The Federalist No. 48 (James Madison).  To maintain this separation of powers, "[t]he Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative

Court Nos. 25-00066 & 25-00077                                                          Page 27

functions with which it is thus vested." Pan. Refining Co. v. Ryan, 293 U.S. 388, 421 (1935); see

also Marshall Field & Co. v. Clark, 143 U.S. 649, 692 (1892).

    The parties cite two doctrines—the nondelegation doctrine and the major questions

doctrine—that the judiciary has developed to ensure that the branches do not impermissibly

abdicate their respective constitutionally vested powers.  Under the nondelegation doctrine,

Congress must "lay down by legislative act an intelligible principle to which the person or body

authorized to fix such [tariff] rates is directed to conform." J.W. Hampton, Jr., 276 U.S. at 409

(1928); see also Pan. Refining, 293 U.S. at 429–30.  A statute lays down an intelligible principle

when it "meaningfully constrains" the President's authority. Touby v. United States, 500 U.S.

160, 166 (1991); see also Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 559–60

(1976).  Under the major questions doctrine, when Congress delegates powers of "'vast economic

and political significance,'" it must "speak clearly." Ala. Ass'n of Realtors v. HHS, 594 U.S. 758,

764 (2021) (quoting Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 324 (2014)); Indus. Union Dep't,

AFL-CIO v. Am. Petrol. Inst., 448 U.S. 607, 645 (1980).  The doctrine applies in "'extraordinary

cases' . . . in which the 'history and the breadth of the authority that [the executive branch] has

asserted,' and the 'economic and political significance' of that assertion, provide 'a reason to

hesitate before concluding that Congress meant to confer such authority.'" West Virginia v. EPA,

597 U.S. 697, 721 (2022) (quoting FDA v. Brown & Williamson Tobacco Co., 529 U.S. 120,

159–60 (2000)); see also Biden v. Nebraska, 600 U.S. at 501.

    Plaintiffs and some Amici argue that the Government's interpretation transforms IEEPA

into an impermissible delegation of power because "[t]he President's assertion of authority here

has no meaningful limiting standards, essentially enabling him to impose any tariff rate he wants

on any country at any time, for virtually any reason." Pls.' <u>V.O.S.</u> Mots. at 25; <u>see also</u> Pls.'
<u>Oregon</u> Mots. at 19; Pls.' <u>V.O.S.</u> Reply at 22.  Similarly, Plaintiffs suggest that Congress's use of
the words "regulate . . . importation" does not indicate the clear mandate necessary to delegate
"such unbounded authority to the President to make such decisions of 'vast economic and political
significance,'" as the wide-scale imposition of tariffs.  Pls.' <u>Oregon</u> Mot. at 18; <u>see also</u> Pls.'
<u>V.O.S.</u> Reply at 17; Inst. for Pol. Integrity's Amicus Br. at 16–18.  The Government counters that
IEEPA contains sufficient limitations: the President must declare a national emergency, the
emergency expires after one year unless renewed, the emergency must be declared with respect to
an "unusual and extraordinary threat," and the powers must extend only to property in which a
foreign country or foreign national has an interest.  Gov't Resp. to <u>V.O.S.</u> Mots. at 28–29.

The separation of powers is always relevant to delegations of power between the branches.
Both the nondelegation and the major questions doctrines, even if not directly applied to strike
down a statute as unconstitutional, provide useful tools for the court to interpret statutes so as to
avoid constitutional problems.  These tools indicate that an unlimited delegation of tariff authority
would constitute an improper abdication of legislative power to another branch of government.
Regardless of whether the court views the President's actions through the nondelegation doctrine,
through the major questions doctrine, or simply with separation of powers in mind, any
interpretation of IEEPA that delegates unlimited tariff authority is unconstitutional.

     1.      **The Words "Regulate . . . Importation" Do Not Authorize the President to Impose Unlimited Tariffs**

With these principles in place, the court turns to the interpretive question at hand.  Recall
that both TWEA and IEEPA authorize the President to "regulate . . . importation."  <u>See</u> 50 U.S.C.
§ 4305(b)(1)(B); <u>id.</u> § 1702(a)(1)(B).  The court in <u>Yoshida II</u> noted that "[t]he express delegation

in [TWEA] is broad" and includes the power to "impos[e] an import duty surcharge." Yoshida II, 526 F.2d at 573, 576. While the words "regulate . . . importation" may exist in identical form in IEEPA, those words do not confer unlimited tariff authority.

In interpreting TWEA, the appellate court in Yoshida II recognized the importance of the separation of powers, noting the lower court's warning that "a finding that the President has the power under [TWEA] to impose whatever tariff rates he deems desirable simply by declaring a national emergency would not only render our trade agreements program nugatory, it would subvert the manifest Congressional intent to maintain control over its Constitutional powers to levy tariffs." Yoshida II, 526 F.2d at 577 (quoting Yoshida I, 378 F. Supp. at 1182 (Maletz, J., concurring)). Though the appellate court in Yoshida II interpreted TWEA so as to include tariff authority, the court also repeatedly noted the constitutional concerns that would arise if the President exercised unlimited tariff authority based on the words "regulate . . . importation." For example, the court stated that "[t]he mere incantation of 'national emergency' cannot, of course, sound the death-knell of the Constitution." Id. at 583. Indeed, according to the court, "[t]he declaration of a national emergency is not a talisman enabling the President to rewrite the tariff schedules." Id.[9] While the court in Yoshida II ultimately reversed the lower court's decision and upheld President Nixon's tariffs, it upheld the tariffs on the basis that they were limited, "which is quite different from imposing whatever tariff rates he deems desirable." Id. at 578 (internal

_____

[9] This concern is even more significant today given the limited nature of Congress's review over national emergencies. Recall that the NEA originally provided Congress with the means to terminate a national emergency by adopting a concurrent resolution. See National Emergencies Act, Pub. L. No. 94-412, § 201, 90 Stat. 1255, 1255–56 (1976) (codified as amended at 50 U.S.C. § 1622). Today the NEA is much less restricted, requiring Congress to act with a veto-proof majority of both houses. See Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 801, 98 Stat. 405, 448 (1985) (codified as amended at 50 U.S.C. § 1622).

Court Nos. 25-00066 & 25-00077                                                    Page 30

quotation marks omitted).

  The limitations of President Nixon's tariffs were essential to the court's determination that "regulate . . . importation" permitted the President's actions in <u>Yoshida II</u>.  For example, the court noted that President Nixon did not "fix[] rates in disregard of congressional will."  <u>Id.</u> at 577.  The court emphasized that President Nixon "imposed a <u>limited</u> surcharge, as a temporary measure calculated to help meet a particular national emergency, which is <u>quite different from imposing whatever tariff rates he deems desirable</u>."  <u>Id.</u> at 578 (internal quotation marks and citation omitted) (emphasis added).  The court emphasized further that it was not deciding a case in which the President exerted unlimited tariff authority, and that "presidential actions must be judged in the light of what the President actually did, not in the light of what he could have done."  <u>Id.</u> at 577.  The court also explicitly stated that its decision did not "approve in advance any future surcharge of a different nature," <u>id.</u>, and its decision did "not here sanction the exercise of an unlimited power, which, we agree with the Customs Court, would be to strike a blow to our Constitution," <u>id.</u> at 583.

  Like the court in <u>Yoshida II</u>, this court does not read the words "regulate . . . importation" in IEEPA as authorizing the President to impose whatever tariff rates he deems desirable.  Indeed, such a reading would create an unconstitutional delegation of power.  <u>See id.</u>  Importantly, President Trump's tariffs do not include the limitations that the court in <u>Yoshida II</u> relied upon in upholding President Nixon's actions under TWEA.  Where President Nixon's tariffs were expressly limited by the rates established in the HTSUS, <u>see</u> Proclamation No. 4074, 85 Stat. at 927, the tariffs here contain no such limit.  Absent these limitations, this is exactly the scenario

Court Nos. 25-00066 & 25-00077                                              Page 31

that the lower court warned of in <u>Yoshida I</u>—and that the appellate court acknowledged in <u>Yoshida II</u>.

In sum, just as the court recognized in <u>Yoshida II</u>, the words "regulate . . . importation" cannot grant the President unlimited tariff authority. Thus, this court reads "regulate . . . importation" to provide more limited authority so as to avoid constitutional infirmities and maintain the "separate and distinct exercise of the different powers of government" that is "essential to the preservation of liberty." The Federalist No. 51 (Alexander Hamilton or James Madison).

### B.    *Congress Delegated Narrower Authority to the President Through IEEPA than It Delegated Through TWEA*

While TWEA and IEEPA both grant the President the power to "regulate . . . importation," <u>see</u> 50 U.S.C. § 4305(b)(1)(B); <u>id.</u> § 1702(a)(1)(B), Congress enacted IEEPA with the intent of limiting presidential power. The legislative history surrounding IEEPA confirms that the words "regulate . . . importation" have a narrower meaning than the power to impose any tariffs whatsoever. <u>Id.</u> § 1702(a)(1)(B). Congress's enactment of Section 122 of the Trade Act of 1974, <u>see</u> Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1987 (codified at 19 U.S.C. § 2132), and Section 301 of the Trade Act of 1974, <u>see</u> Pub. L. No. 93-618, § 301, 88 Stat. 1978, 2041 (codified at 19 U.S.C. § 2411), grants the President authority to impose restricted tariffs in response to "fundamental international payment problems," including "large and serious balance-of-payments deficits," and unfair trading practices, thereby limiting any such authority in the broader emergency powers under IEEPA. Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1987 (1974).

In enacting reform legislation including IEEPA, Representative John Bingham, Chair of the House International Relations Committee's Subcommittee on Economic Policy, described

Court Nos. 25-00066 & 25-00077                                         Page 32

TWEA as conferring "on the president what could have been dictatorial powers that he could have used without any restraint by the Congress." House Committee on International Relations, 95th Cong., <u>Revision of the Trading with the Enemy Act: Markup before the Committee on International Relations</u> 5 (Comm. Print 1977). Similarly, the House report on the reform legislation called TWEA "essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review." Comm. on Int'l Rels., <u>Trading with the Enemy Act Reform Legislation</u>, H.R. Rep. No. 95-459, at 7 (1977).

Congress reformed the President's emergency powers in part by enacting IEEPA to provide "the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to various procedural limitations, including those of the [NEA]." <u>Id.</u> at 2; <u>see also</u> International Emergency Economic Powers Act, Pub. L. No. 95-223, §§ 201–08, 91 Stat. 1625, 1626–29 (1977) (codified as amended at 50 U.S.C. §§ 1701–10). Thus, Congress enacted IEEPA to limit executive authority over international economic transactions, not merely to continue the executive authority granted by TWEA.

>    **1.    Congress Cabined the President's Authority to Impose Tariffs in Response to Balance-of-Payments Deficits to Non-Emergency Legislation**

When President Nixon imposed in 1971 the tariffs challenged in <u>Yoshida II</u>, he was responding to a monetary crisis—brought on by the peg of the U.S. dollar to a fixed price of 35 dollars per ounce of gold—as reflected in part in growing balance-of-payments deficits. <u>See</u> The Office of the Historian, <u>Nixon and the End of the Bretton Woods System, 1971-1973</u>, U.S. Dep't of State, https://history.state.gov/milestones/1969-1976/nixon-shock (last visited May 28, 2025). External values of foreign currencies were fixed in relation to the U.S. dollar, whose value was in

Court Nos. 25-00066 & 25-00077                                                    Page 33

turn expressed in gold at a congressionally set price.  See id.  A surplus of U.S. dollars threatened

the ability of the United States to meet its obligations and, thereby, the entire Bretton Woods

system, as the United States did not have enough gold to cover the volume of dollars in worldwide

circulation.  See id.  Accordingly, on August 15, 1971, President Nixon immediately cancelled the

direct international convertibility of the U.S. dollar to gold, took a series of other actions such as

the imposition of wage and price controls, and issued Proclamation 4074 in which he declared a

national emergency and introduced a ten percent import surcharge.[10]  See Christopher A. Casey &

Jennifer K. Elsea, Cong. Rsch. Serv., R45168, The International Emergency Economic Powers

Act: Origins, Evolution, and Use 2 (2024).

         In 1974, Congress enacted the Trade Act, including Section 122 dealing with remedies for

balance-of-payments deficits.  See Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978,

1987–89 (codified at 19 U.S.C. § 2132).  Section 122 is titled "[b]alance-of-payments authority"

and specifically addresses Presidential proclamations of "temporary import surcharge[s]" and

"temporary limitations through the use of quotas" in situations of "fundamental international

payments problems."  Id.  Section 122 sets specific limits on the President's authority to respond

to balance-of-payments problems, such as a 15 percent cap on tariffs and a maximum duration of

150 days.  See id.  Congress's enactment of Section 122 indicates that even "large and serious

United States balance-of-payments deficits" do not necessitate the use of emergency powers and

justify only the President's imposition of limited remedies subject to enumerated procedural

constraints.  See id.; see also Yoshida II, 526 F.2d at 578 ("Congress has said what may be done

with respect to foreseeable events in the Tariff Act, the [Trade Expansion Act], and in the Trade

---

[10] Notably, Proclamation 4074 did not mention TWEA.  See generally 85 Stat. 926.

Court Nos. 25-00066 & 25-00077                                                    Page 34

Act of 1974 (all of which are in force) and has said what may be done with respect to unforeseeable events in the TWEA.").  In these ways, Section 122 removes the President's power to impose remedies in response to balance-of-payments deficits, and specifically trade deficits, from the broader powers granted to a president during a national emergency under IEEPA by establishing an explicit non-emergency statute with greater limitations.[11]

    The President's imposition of the Worldwide and Retaliatory Tariffs responds to an imbalance in trade—a type of balance-of-payments deficit—and thus falls under the narrower, non-emergency authorities in Section 122.  The balance-of-payments is the "[r]ecord of transactions between U.S. residents and foreign residents during a given time period . . . includ[ing] transactions in goods, services, income, assets, and liabilities," and always balances to zero. Balance of Payments, Bureau of Econ. Analysis (last modified Apr. 11, 2018), https://www.bea.gov/help/glossary/balance-payments.  The term "balance-of-payments deficits" within Section 122 refers, necessarily, to deficits within the various accounts comprising the

---

[11] The court in Yoshida II recognized that before Section 122 was in effect, the Nixon surcharge "did not run counter to any explicit legislation" and there existed no statute "other than the TWEA, providing procedures for dealing with a national emergency involving a balance of payments problem such as that which existed in 1971." United States v. Yoshida Int'l, Inc., 526 F.2d 560, 578 (C.C.P.A. 1975) (internal quotation marks omitted).  The court in Yoshida II recognized further that after Section 122 was in effect, Section 122's limits would apply regardless of whether an emergency declared was extant. Id. at 582 n.33.  The court noted that the balance-of-payments emergency declared by President Nixon had not been terminated, in contradiction with the expectation that "emergencies are expected to be shortlived." Id. at 582.  However, the court found that "the failure to terminate the emergency has been rendered moot by Congressional enactment of [Section 122], specifically requiring the President, within certain parameters, to impose a surcharge or quotas in response to balance of payments problems." Id. at 582 n.33.  The court concluded that "[a] surcharge imposed after Jan. 3, 1975 must, of course, comply with the statute now governing such action." Id.  Thus, the court reasoned that any tariffs imposed in response to the balance-of-payments problem after the enactment of Section 122, including any imposed in response to the balance-of-payments emergency declared by President Nixon, must comply not with a broad emergency statute, but with Section 122.

Court Nos. 25-00066 & 25-00077                                                    Page 35

balance-of-payments (including the trade of goods) rather than to an overall summary deficit, because there cannot be a balance-of-payments deficit per se. Trade deficits are one of the key balance-of-payment deficits and can be directly impacted by mechanisms such as import quotas and tariffs, as authorized by Section 122. As a result, tariffs responding to a trade deficit fit under Section 122 because they "deal with [a] large and serious United States balance-of-payments deficit[]." 19 U.S.C. § 2132(a)(1). Thus, the President's Worldwide and Retaliatory Tariffs, imposed in response to a balance-of-payments deficit, must conform with the limits of Section 122.

The legislative history surrounding IEEPA confirms that Congress cabined any presidential authority to impose tariffs in response to balance-of-payments deficits to a narrower, non-emergency statute. To prevent IEEPA from becoming another "essentially . . . unlimited grant of authority," the House International Relations Committee suggested that "whenever possible, authority for routine, non[-]emergency regulation of international economic transactions which has heretofore been conducted under [TWEA] should be transferred to other legislation," and further stated that IEEPA "does not include authorities more appropriately lodged in other legislation . . . ." H.R. Rep. No. 95-459 at 7, 10–11. This reflects that in enacting Section 122, Congress narrowed the President's emergency authority to impose tariffs in response to balance-of-payments deficits. The words "regulate . . . importation" within IEEPA do not, therefore, permit the President to impose tariffs in response to balance-of-payments deficits.

Because the Worldwide and Retaliatory Tariffs deal with "large and persistent annual U.S. goods trade deficits," Executive Order 14257, 90 Fed. Reg. at 15041, these actions address a balance-of-payments deficit and therefore must comply with the limitations in Sections 122. The

Court Nos. 25-00066 & 25-00077                                              Page 36

Worldwide and Retaliatory Tariffs do not comply with the limitations Congress imposed upon the President's power to respond to balance-of-payments deficits. The President's assertion of tariff-making authority in the instant case, unbounded as it is by any limitation in duration or scope, exceeds any tariff authority delegated to the President under IEEPA. The Worldwide and Retaliatory tariffs are thus <u>ultra vires</u> and contrary to law.

### II.    *50 U.S.C. § 1701 Does Not Authorize the Trafficking Tariffs*

IEEPA does not authorize the Trafficking Tariffs for the separate reason that they do not satisfy the conditions that Congress imposed in 50 U.S.C. § 1701:

> (a) Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

> (b) The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

This provision limits the President's exercise of IEEPA powers to a limited set of situations. <u>Cf.</u> <u>Silfab Solar, Inc. v. United States</u>, 892 F.3d 1340, 1346 (Fed. Cir. 2018) (identifying a statutory "condition necessary for the President to take action"). Under it, IEEPA powers are available only where all of the following conditions pertain: First, there must be a "threat . . . which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Second, this threat must be "unusual and extraordinary." <u>Id.</u> § 1701(b). Third, a national emergency must be declared with respect to the threat. <u>Id.</u> And fourth, the President's exercise of IEEPA authority must "deal with" the threat.

Court Nos. 25-00066 & 25-00077                                                    Page 37

Id.

Both sets of Plaintiffs assert that the orders implementing the Worldwide and Retaliatory Tariffs ("Worldwide and Retaliatory Tariff Orders") do not meet the "unusual and extraordinary" condition[12] imposed by this section, see Pls.' V.O.S. Mots. at 18; Pls.' Oregon Mot. at 20, and the State Plaintiffs argue that the orders implementing the Trafficking Tariffs ("Trafficking Tariff Orders") do not meet the "deal with" condition, see Pls.' Oregon Mot. at 25.

By the Government's telling, the court cannot ever question the President's assertion that his IEEPA authority "deal[s] with an unusual and extraordinary threat." See Gov't Resp. to Oregon Mots. at 33. The Government invokes the "political question doctrine," under which "a controversy is nonjusticiable . . . where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" Nixon v. United States, 506 U.S. 224, 228 (1993) (alteration omitted) (quoting Baker v. Carr, 369 U.S. 186, 217 (1962)). The court concludes, however, that the question of the scope of § 1701 is (1) a justiciable question of statutory construction that (2) resolves in favor of Plaintiffs' contention that the Trafficking Tariff Orders do not "deal with an unusual and extraordinary threat." 50 U.S.C. § 1701(b). Those Orders thus lie outside the bounds of Congress's delegation of authority to the executive branch.

**A.    *The Political Question Doctrine Does Not Preclude Judicial Review of the Trafficking Orders' Compliance with 50 U.S.C. § 1701***

The political question doctrine bars judicial review in a number of different scenarios. The

---

[12] As the court holds that the Worldwide and Retaliatory Tariffs are unlawful for the reasons set forth in Section I of this opinion, the court does not reach the argument that their implementing Orders separately fail to invoke an "unusual and extraordinary threat." 50 U.S.C. § 1701.

Court Nos. 25-00066 & 25-00077                                    Page 38

Supreme Court has listed them as follows:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker, 369 U.S. at 217; see also Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 195, (2012) (explaining that "a court lacks the authority to decide the dispute before it" when one of the Baker factors pertains).  The Court clarified, however, that this is not a "doctrine . . . of 'political cases,'" Baker, 369 U.S. at 217, and that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," id. at 211.

The Government argues that two Baker factors preclude the court's review of whether the challenged Tariff Orders are permissible under § 1701's "deal with an unusual and extraordinary threat" standard.  The Government asserts "a profound 'lack of judicially discoverable and manageable standards for resolving' the validity of the President's threat assessment," and also the "impossibility of deciding [the question] without an initial policy determination of a kind clearly for nonjudicial discretion."  Gov't Resp. to Oregon Mots. at 30–31 (quoting Baker, 369 U.S. at 217).

This reliance on the political question doctrine is misplaced.  The court can "manage" the standards for applying 50 U.S.C. § 1701's "deal with an unusual and extraordinary threat" language just as it "manages" the standards for any other statutory enactment that constrains independent executive action.  See Feliciano v. Dep't of Transp., 605 U.S. __, __, 145 S. Ct. 1284, 1291 (2025) (listing instances of substantive conditions that federal statutes impose on the exercise

Court Nos. 25-00066 & 25-00077                                                    Page 39

of executive authority).  "[U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones."  Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986).

Even when it goes unmentioned, this principle is a common feature of statutory construction.  In the trade context, for example, the antidumping statute permits the imposition of duties only where "the Commission determines that . . . an industry in the United States . . . is threatened with material injury."  19 U.S.C. § 1673.  The court does not automatically uphold every material injury determination of the ITC on lack-of-manageable-standards grounds simply because "threatened with material injury" is an imprecise term that sounds in foreign affairs.  Instead, the court consults "the traditional tools of statutory construction" to ascertain the term's meaning and applies that meaning to specific cases.  Loper Bright Enters. v. Raimondo, 603 U.S. 369, 403 (2024); see, e.g., Rhone Poulenc, S.A. v. United States, 8 CIT 47, 50–54, 592 F. Supp. 1318, 1322–25 (1984) (citing legislative history for the proposition that while "[i]t is true that threat of material injury may not be based on supposition or conjecture . . . [t]he threat must be real and imminent").  As the Supreme Court explained in Zivotofsky, "[r]esolution of Zivotofsky's claim demands careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute and of the passport and recognition powers.  This is what courts do.  The political question doctrine poses no bar to judicial review of this case."  566 U.S. at 201.

Indeed, that "[t]rade policy is an increasingly important aspect of foreign policy, an area in which the executive branch is traditionally accorded considerable deference . . . is not to

Court Nos. 25-00066 & 25-00077                                              Page 40

say . . . that courts will unthinkingly defer to the Government's view of Congressional

enactments." Fed.-Mogul Corp. v. United States, 63 F.3d 1572, 1581 (Fed. Cir. 1995).  This is

especially so where the relevant congressional enactment is exactly what determines how much

deference the President is entitled to in the first place.  See U.S. Cane Sugar Refiners' Ass'n, 3

CIT at 212, 544 F. Supp. at 895 ("[I]f the President's action is authorized by the statutes relied

upon, the judiciary may not properly inquire or probe into the President's reasoning or into the

existence of the facts calling for the action taken." (emphasis added)).  Either § 1701 entails that

the President invokes IEEPA "pursuant to an express or implied authorization of Congress," which

would mean that "his authority is at its maximum," or § 1701 entails that he invokes it

"incompatibl[y] with the expressed or implied will of Congress," which would mean that "his

power is at its lowest ebb." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635–37

(1952) (Jackson, J., concurring).  If a court could never question the President's interpretation of

statutory language to place himself in Justice Jackson's first zone, there would only be one zone.

"[T]he issue here . . . involves the apportionment of power between the executive and legislative

branches," and "[t]he duty of courts to decide such questions has been repeatedly reaffirmed by

the Supreme Court." Crockett v. Reagan, 558 F. Supp. 893, 898 (D.D.C. 1982), aff'd, 720 F.2d

1355 (D.C. Cir. 1983) (per curiam).

        The Government's position on the unreviewability of § 1701 is also at odds with IEEPA's

text.  Section 1701 is not the particular type of "statute [that] gives a discretionary power to any

person, to be exercised by him upon his own opinion of certain facts," such that "it is a sound rule

of construction, that the statute constitutes him the sole and exclusive judge of the existence of

those facts." Martin v. Mott, 25 U.S. 19, 31–32 (1827).  That may be true of the NEA, whose

Court Nos. 25-00066 & 25-00077                                                    Page 41

operation requires only that the President "specifically declare[] a national emergency." 50 U.S.C. § 1621(b); see also Yoshida II, 526 F.2d at 581 n.32.[13] But IEEPA requires more than just the fact of a presidential finding or declaration: "The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b) (emphasis added). This language, importantly, does not commit the question of whether IEEPA authority "deal[s] with an unusual and extraordinary threat" to the President's judgment. It does not grant IEEPA authority to the President simply when he "finds" or "determines" that an unusual and extraordinary threat exists. Cf., e.g., Silfab Solar, 892 F.3d at 1349 (collecting cases involving "statute[s] authoriz[ing] a Presidential 'determination'"); United States v. George S. Bush & Co., 310 U.S. 371, 376–77 (1940).

Section 1701 is not a symbolic festoon; it is a "meaningful[] constrain[t] [on] the President's discretion," United States v. Dhafir, 461 F.3d 211, 216 (2d Cir. 2006) (internal quotation marks, alteration, and citation omitted). It sets out "the happening of the contingency on which [IEEPA powers] depend," and the court will give it its due effect. The Aurora, 11 U.S. (7 Cranch) 382, 386 (1813).

Congress enacted § 1701, after all, as a substantive addition to TWEA's basic framework. And "[w]hen Congress amends legislation," courts must "presume it intends the change to have real and substantial effect." Ross v. Blake, 578 U.S. 632, 641–42 (2016) (internal quotation marks,

_____

[13] The State Plaintiffs confirm that they "are not challenging the President's declaration of an emergency under the National Emergencies Act." Pls.' Oregon Mot. at 21.

Court Nos. 25-00066 & 25-00077                                            Page 42

alteration, and citation omitted).  Thus, although "[w]here a statute . . . commits decisionmaking

to the discretion of the President, judicial review of the President's decision is not available,"

Dalton v. Specter, 511 U.S. 462, 477 (1994), § 1701 is a statute that conditions this commitment

on factors that the court retains the power to review.

 In doing so, the court does not ask whether a threat is worth "deal[ing]" with, or venture to

"review the bona fides of a declaration of an emergency by the President."  Yoshida II, 526 F.2d

at 581 n.32; see also United States v. Am. Bitumuls & Asphalt Co., 246 F.2d 270, 276–77

(C.C.P.A. 1957) ("No doubt the courts cannot substitute their discretion for that of the President

in proclaiming trade agreements, but where, as here, the President bases his action on an incorrect

interpretation of the effect of a law or proclamation, the courts are not bound to accept that

interpretation as correct.").

 Indeed, "[t]he question here is not whether something should be done; it is who has the

authority to do it."  Biden v. Nebraska, 600 U.S. at 501.  The court simply asks whether the

President's action "deal[s] with an unusual and extraordinary threat."  Congress provided the

necessary standards for resolving this inquiry when it enacted IEEPA, and the court's task is to

apply them.  "This duty requires one body of public servants, the judges, to construe the meaning

of what another body, the legislators, has said."  United States v. Am. Trucking Ass'ns, 310 U.S.

534, 544 (1940).  The duty does not abate when foreign economic conduct forms part of the issue.

See Totes-Isotoner, 594 F.3d at 1352–53.

 According to the Government, there are two ways that the "deal with an unusual and

extraordinary threat" provision retains its meaning despite its unreviewability.  The first is that

"it . . . binds the President."  V.O.S. Oral Arg. Tr. at 47:11–12 (statement of E. Hamilton), May

Court Nos. 25-00066 & 25-00077                                    Page 43

27, 2025, ECF No. 54.  This means, the Government states, that "[t]he President still has to look at and faithfully apply that statute . . . ."  <u>V.O.S.</u> Oral Arg. Tr. at 47:11–13 (statement of E. Hamilton).  But what happens if the President does not do so?  Does the court still have no role?  Even if Congress could hypothetically undo the President's invocation of IEEPA powers by passing a law to that effect (over the President's likely veto, <u>see generally</u> <u>Chadha</u>, 462 U.S. 919), Congress's inherent power to legislate is no substitute for the "judicial function" of "determining the limits of statutory grants of authority."  <u>Stark v. Wickard</u>, 321 U.S. 288, 310 (1944).  "The supremacy of law," moreover, "demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied."  <u>St. Joseph Stock Yards Co. v. United States</u>, 298 U.S. 38, 84 (1936) (Brandeis, J., concurring).

     The Government also argues that § 1701 "informs legislative review of any national emergency declared under IEEPA."  <u>V.O.S.</u> Oral Arg. Tr. at 47:16–18 (statement of E. Hamilton).  But Congress has already legislated on the relevant question by enacting IEEPA "to limit the President's emergency power in peacetime."  <u>Dames & Moore v. Regan</u>, 453 U.S. 654, 672–73 (1981).  Congress should not have to enact new statutes to enforce the statutory constraints it has already enacted.

     **B.      *The Trafficking Orders Fall Outside 50 U.S.C. § 1701's Delegation of Authority***

     The court proceeds to adjudicate the justiciable question of whether the Trafficking Orders satisfy the statutory requirement that IEEPA powers be exercised only to "deal with an unusual and extraordinary threat."  50 U.S.C. § 1701.

Court Nos. 25-00066 & 25-00077                                              Page 44

The State Plaintiffs[14] do not argue that the Trafficking Orders fail to invoke "unusual and extraordinary threat[s]," as they do regarding the Worldwide and Retaliatory Tariffs (an argument that the court does not reach). Instead, the State Plaintiffs argue that the Trafficking Tariffs do not "deal with" the specific threats[15] they invoke. See Pls.' Oregon Mot. at 25–26; Pls.' Oregon Supp'l Br. at 4. The Government responds that "the President's actions are reasonably related to the desired change in behavior the President seeks from Mexico, Canada, and China because the President's actions pressure those countries to address the crisis." Gov't Resp. to Oregon Mots. at 39.[16]

By this description, and by their own language, the Trafficking Tariff Orders rest on a construction of "deal with" that is at odds with the ordinary meaning of the phrase.

"Deal with" connotes a direct link between an act and the problem it purports to address. A tax deals with a budget deficit by raising revenue. A dam deals with flooding by holding back a river. But there is no such association between the act of imposing a tariff and the "unusual and

---

[14] The V.O.S. Plaintiffs do not seek to enjoin the operation of the Trafficking Tariff Orders. See V.O.S. Compl. at 24.

[15] The Canada Tariff Order purports to "address" an "unusual and extraordinary threat" in the form of "the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." Executive Order 14193, 90 Fed. Reg. at 9113. The Mexico Tariff Order identifies a threat in the form of "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." Executive Order 14194, 90 Fed. Reg. at 9118. And the China Tariff Order refers to the "failure of the PRC government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other TCOs, criminals at large, and drugs." Executive Order 14195, 90 Fed. Reg. at 9122.

[16] Counsel for the Government stated at oral argument that "[t]he purpose of these tariffs is to create pressure, to tariff-pressure other countries to change bad behaviors that the President believes are hurting Americans and our national security." Oregon Oral Arg. Tr. at 31:19–22 (statement of B. Shumate), May 27, 2025, ECF No. 64.

Court Nos. 25-00066 & 25-00077                                                    Page 45

extraordinary threat[s]" that the Trafficking Orders purport to combat.  Customs's collection of

tariffs on lawful imports does not evidently relate to foreign governments' efforts "to arrest, seize,

detain, or otherwise intercept" bad actors within their respective jurisdictions.  The Government's

only suggested connection between these two activities—that "[t]he President's action . . . deters

importation of illicit drugs concealed within seemingly lawful imports," Gov't Resp. to Oregon

Mots. at 40—has no apparent basis in the Trafficking Orders themselves.  The Orders cite the

general problem of a failure to thwart trafficking and other crime as their target "unusual and

extraordinary threat[s]," not the specific problem of drugs smuggled within shipments of dutiable

merchandise.[17]  And if this specific problem were really what the Trafficking Tariff Orders aimed

to "deal with," the Orders would have to "deal with" that specific problem, not create "leverage"

ostensibly to do so.  50 U.S.C. § 1701(b).

        The Trafficking Orders do not "deal with" their stated objectives.  Rather, as the

Government acknowledges, the Orders aim to create leverage to "deal with" those objectives.  See

Oregon Oral Arg. Tr. at 31:19–25, 33:7–16 (statements of B. Shumate).  That approach differs

from what the Yoshida II court identified was Proclamation 4074's "direct effect on our nation's

balance of trade and, in turn, on its balance of payments deficit and its international monetary

reserves."  526 F.2d at 580.  The approach also differs from the relationship identified in Regan v.

Wald, where the Supreme Court sustained on constitutional grounds "the President's decision to

curtail the flow of hard currency to Cuba—currency that could then be used in support of Cuban

adventurism—by restricting travel."  468 U.S. at 243.

---

[17] The Trafficking Tariffs, of course, do not change the effective rate of duty (zero percent ad
valorem) for smuggled drugs themselves.

Court Nos. 25-00066 & 25-00077                                          Page 46

The Government's "pressure" argument effectively concedes that the direct effect of the country-specific tariffs is simply to burden the countries they target.  It is the prospect of mitigating this burden, the Government explains, that will induce the target countries to crack down on trafficking within their jurisdictions.  See Gov't Resp. to Oregon Mots. at 39.  But however sound this might be as a diplomatic strategy, it does not comfortably meet the statutory definition of "deal[ing] with" the cited emergency.  It is hard to conceive of any IEEPA power that could not be justified on the same ground of "pressure."

The Government's reading would cause the meaning of "deal with an unusual and extraordinary threat" to permit any infliction of a burden on a counterparty to exact concessions, regardless of the relationship between the burden inflicted and the concessions exacted.  If "deal with" can mean "impose a burden until someone else deals with," then everything is permitted.  It means a President may use IEEPA to take whatever actions he chooses simply by declaring them "pressure" or "leverage" tactics that will elicit a third party's response to an unconnected "threat."  Surely this is not what Congress meant when it clarified that IEEPA powers "may not be exercised for any other purpose" than to "deal with" a threat.

The court in Yoshida II explained that "[w]hether a delegation of such breadth as to have authorized Proclamation 4074 would be constitutionally embraced" was a function of the surcharge's "relationship to the particular emergency confronted."  526 F.2d at 576–77.  The court further explained that "[a] standard inherently applicable to the exercise of delegated emergency powers is the extent to which the action taken bears a reasonable relation . . . to the emergency giving rise to the action," and that "the nature of the emergency restricts the how of its doing, i.e., the means of execution."  Id. at 578–79.

Court Nos. 25-00066 & 25-00077                                              Page 47

The Government's concept of "leverage" would sap these words of their meaning.  The President's chosen "means of execution" here are tariffs on "[a]rticles that are products of Canada," Executive Order 14193, 90 Fed. Reg. at 9114, "[a]ll articles that are products of Mexico," Executive Order 14194, 90 Fed. Reg. at 9118, and "[a]ll articles that are products of the PRC," Executive Order 14195, 90 Fed. Reg. at 9122.  If leverage were all it took to establish a "reasonable relation" between these means and the "particular emergency" of trafficking, Yoshida II's means-end test would be trivially easy to pass.  See 526 F.2d at 578–79.

In so holding, the court does not pass upon the wisdom or likely effectiveness of the President's use of tariffs as leverage.[18]  That use is impermissible not because it is unwise or ineffective, but because § 1701 does not allow it.  Rather, the Trafficking Orders' "clear misconstruction" of § 1701's "deal with" condition renders them "action[s] outside delegated authority."  Maple Leaf Fish, 762 F.2d at 89.

Soon after joining the Supreme Court, Justice Story declared invalid a proclamation by President Madison that revived an embargo on trade with Britain and France in the Non-Intercourse Act of 1809.  The proclamation lacked statutory authority because it relied on an

---

[18] Another three-judge panel of this court made a similar point in Tembec, Inc. v. United States:

> Consideration of the USTR's authority to order implementation of affirmative section 129(a) determinations does not depend on the court's evaluation of the wisdom of a given implementation. The court is neither called upon to make trade policy, nor to direct the USTR as to whether any section 129 determination should be implemented.  Rather, the court is merely asked to determine the bounds of the USTR's authority to order implementation.

30 CIT 958, 982–83, 441 F. Supp. 2d 1302, 1326–27 (2006), judgment vacated as moot by 31 CIT 241, 251, 475 F. Supp. 2d 1393, 1401–02 (leaving prior decision in place for precedential purposes despite vacatur of judgment).

Court Nos. 25-00066 & 25-00077                                                    Page 48

expired embargo provision in the Act.  The young Justice's account of the judicial role in that case

applies undiminished today:

> I take it to be an incontestable principle, that the president has no common law
> prerogative to interdict commercial intercourse with any nation; or revive any act,
> whose operation has expired.  His authority for this purpose must be derived from
> some positive law . . . .  For the executive department of the government, this court
> entertain the most entire respect; and amidst the multiplicity of cares in that
> department, it may, without any violation of decorum, be presumed, that sometimes
> there may be an inaccurate construction of a law.  It is our duty to expound the laws
> as we find them in the records of state; and we cannot, when called upon by the
> citizens of the country, refuse our opinion, however it may differ from that of very
> great authorities.  I do not perceive any reasonable ground to imply an authority in
> the president to revive this act, and I must therefore, with whatever reluctance,
> pronounce it to have been, as to this purpose, invalid.

The Orono, 18 F. Cas. 830, 830–31 (C.C.D. Mass. 1812) (No. 10,585).

## CONCLUSION

The court holds for the foregoing reasons that IEEPA does not authorize any of the

Worldwide, Retaliatory, or Trafficking Tariff Orders.  The Worldwide and Retaliatory Tariff

Orders exceed any authority granted to the President by IEEPA to regulate importation by means

of tariffs.  The Trafficking Tariffs fail because they do not deal with the threats set forth in those

orders.  This conclusion entitles Plaintiffs to judgment as a matter of law; as the court further finds

no genuine dispute as to any material fact, summary judgment will enter against the United States.

See USCIT R. 56.  The challenged Tariff Orders will be vacated and their operation permanently

enjoined.

There is no question here of narrowly tailored relief; if the challenged Tariff Orders are

unlawful as to Plaintiffs they are unlawful as to all.  "[A]ll Duties, Imposts and Excises shall be

uniform throughout the United States," U.S. Const. art. I, § 8, cl. 1, and "[t]he tax is uniform when

it operates with the same force and effect in every place where the subject of it is found."  Head

Court Nos. 25-00066 & 25-00077                                                    Page 49

Money Cases, 112 U.S. 580, 594 (1884); see also Siemens Am., Inc. v. United States, 692 F.2d

1382, 1383 (Fed. Cir. 1982); Nat'l Corn Growers Ass'n v. Baker, 10 CIT 517, 521, 643

F. Supp. 626, 630–31 (1986) (noting "the statutory and constitutional mandate of uniformity in the

interpretation of the international trade laws").

     Plaintiffs' Motions for Summary Judgment are granted, and their Motions for Preliminary

Injunction are denied as moot.  Judgment will enter accordingly.

                                          By the panel.

Dated: May 28, 2025
      New York, New York

**Web Pages Cited in the Opinion**



# Potash Statistics and Information

By **National Minerals Information Center**

Statistics and information on the worldwide supply of, demand for, and flow of the mineral commodity *potash*

---

Potash is used primarily as an agricultural fertilizer (plant nutrient) because it is a source of soluble potassium, one of the three primary plant nutrients; the others are fixed nitrogen and soluble phosphorus. Potash and phosphorus are mined products, and fixed nitrogen is produced from the atmosphere by using industrial processes. Modern agricultural practice uses these primary nutrients in large amounts plus additional nutrients, such as boron, calcium, chlorine, copper, iron, magnesium, manganese, molybdenum, sulfur, and zinc, to assure plant health and proper maturation. The three major plant nutrients have no substitutes, but low  nutrient  content, alternative sources of plant nutrients, such as animal manure and guano, bone meal, compost, glauconite, and "tankage" from slaughterhouses, can be used. Potash denotes a variety of mined and manufactured salts, all containing the element potassium in water  soluble form.

*Subscribe to receive an email notification when a new publication is added to this page. On the Questions tab of the subscriber preferences page, please select "Potash" and any other options in which you may be interested. Please see the list services page for more information.*

# Annual Publications

Mineral Commodity Summaries

- Potash

  PDF Format:

  | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007

Was this page helpful?

- Appx51 -

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
2020 | 2021 | 2022 | 2023 | 2024 | **2025** |

- Appendixes

## Minerals Yearbook

- Potash
  PDF Format:
  | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |

  XLS Format:
  | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 tables  only release | 2021 tables  only release | 2022 tables-only release | **2023 tables-only release** |

- Archive
  | 1932-1993 |

## Mineral Industry Surveys

- Potash, Crop Year
  PDF Format:
  | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | **2023** | **2024** |
  XLS Format:
  | 2003 | 2004 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | **2023** | **2024** |

# Special Publications

- Earth Mapping Resources Initiative (Earth MRI)    Focus areas for data acquisition for potential domestic resources of 13 critical minerals in the conterminous United States and Puerto Rico — Antimony, barite, beryllium, chromium, fluorspar, hafnium, helium, magnesium, manganese, potash, uranium, vanadium, and zirconium

- Fertilizers    Sustaining Global Food Supplies

- Historical Statistics for Mineral and Material Commodities in the United States Data Series 140

Was this page helpful?

- Appx52 -

○ Potash

- Potash--A Global Overview of Evaporite-Related Potash Resources, Including Spatial Databases of Deposits, Occurrences, and Permissive Tracts

- Potash  A Vital Agricultural Nutrient Sourced from Geologic Deposits Open-File Report 2016-1167

- Technical Announcement: Plenty of Potash, but Some Regions Lack Low Cost Sources for Crop Production

# Contacts

## Stephen Jasinski

**Mineral Commodity Specialist**

National Minerals Information Center
Email: sjasinsk@usgs.gov
Phone: 703-648-7711

SCIENCE

Science Explorer
Mission Areas
Programs
Regions
Science Centers
Observatories
Laboratories
Frequently Asked Questions
Educational Resources
Special Topics

PRODUCTS

Data
Maps
Publications
Multimedia Gallery
Web Tools
Software
U.S. Board on Geographic Names
The National Map
USGS Library
USGS Store
Park Passes

NEWS

Featured Stories
News Releases
Science Snippets
Technical Announcements
Employees in the News
Get Our News
Media Contacts
I'm a Reporter
Newsletters

Was this page helpful?

- Appx53 -

Case: 25-1812    Document: 61-1    Page: 148    Filed: 06/24/2025

5/28/25, 10:50 AM    Case 1:25-cv-00066-GSK-TMR-JAR    Document 55-1    Filed 05/28/25    Page 5 of 9
Potash Statistics and Information | U.S. Geological Survey

| CONNECT | ABOUT | LEGAL |
|---|---|---|
| Headquarters | About Us | Accessibility |
| Locations | Survey Manual | FOIA |
| Staff Profiles | Organization | Site Policies |
| Social Media | Key Officials | Privacy Policy |
| Careers | Congressional | Site Map |
| Contact Us | Budget | DOI and USGS link policies apply |
| | Careers and Employees | No FEAR Act |
| | Doing Business | USA.gov |
| | Emergency Management | Vulnerability Disclosure Policy |



**U.S. Geological Survey**
U.S. Department of the Interior

**Contact USGS**

1-888-392-8545

answers.usgs.gov

Was this page helpful?



**MILESTONES: 1969–1976**

> **NOTE TO READERS**
> "Milestones in the History of U.S. Foreign Relations" has been retired and is no longer maintained. For more information, please see the full notice.

# Nixon and the End of the Bretton Woods System, 1971–1973

On August 15, 1971, President Richard M. Nixon announced his New Economic Policy, a program "to create a new prosperity without war." Known colloquially as the "Nixon shock," the initiative marked the beginning of the end for the Bretton Woods system of fixed exchange rates established at the end of World War II.



*Secretary of the Treasury John Connally on the day that President Richard Nixon announced his New Economic Policy, August 15, 1971. (Nixon Presidential Library)*

Under the Bretton Woods system, the external values of foreign currencies were fixed in relation to the U.S. dollar, whose value was in turn expressed in gold at the congressionally-set price of $35 per ounce. By the 1960s, a surplus of U.S. dollars caused by foreign aid, military spending, and foreign investment threatened this system, as the United States did not have enough gold to cover the volume of dollars in worldwide circulation at the rate of $35 per ounce; as a result, the dollar was overvalued. Presidents John F. Kennedy and Lyndon B. Johnson adopted a series of measures to support the dollar and sustain Bretton Woods: foreign investment disincentives; restrictions on foreign lending; efforts to stem the

- Appx55 -

official outflow of dollars; international monetary reform; and cooperation with other countries. Nothing worked. Meanwhile, traders in foreign exchange markets, believing that the dollar's overvaluation would one day compel the U.S. government to devalue it, proved increasingly inclined to sell dollars. This resulted in periodic runs on the dollar.

It was just such a run on the dollar, along with mounting evidence that the overvalued dollar was undermining the nation's foreign trading position, which prompted President Richard M. Nixon to act. On August 13, 1971, Nixon convened a meeting of his top economic advisers, including Secretary of the Treasury John Connally and Office of Management and Budget Director George Shultz, at the Camp David presidential retreat to consider a program of action. Notably absent from the meeting were Secretary of State William Rogers and President's Assistant for National Security Affairs Henry Kissinger. After two days of talks, on the evening of August 15, Nixon announced his New Economic Policy in an address to the nation on "The Challenge of Peace." Asserting that progress in bringing an end to U.S. involvement in the war in Vietnam meant that it was time for Americans to turn their minds to the challenges of a post-Vietnam world, Nixon identified a three-fold task: "We must create more and better jobs; we must stop the rise in the cost of living; we must protect the dollar from the attacks of international money speculators." To achieve the first two goals, he proposed tax cuts and a 90-day freeze on prices and wages; to achieve the third, Nixon directed the suspension of the dollar's convertibility into gold. He also ordered that an extra 10 percent tariff be levied on all dutiable imports; like the suspension of the dollar's gold convertibility, this measure was intended to induce the United States' major trading partners to adjust the value of their currencies upward and the level of their trade barriers downward so as to allow for more imports from the United States.

A success at home, Nixon's speech shocked many abroad, who saw it as an act of worrisome unilateralism; the assertive manner in which Connally conducted the ensuing exchange rate negotiations with his foreign counterparts did little to allay such concerns. Nevertheless, after months of negotiations, the Group of Ten (G–10) industrialized democracies agreed to a new set of fixed exchange rates centered on a devalued dollar in the December 1971 Smithsonian Agreement. Although characterized by Nixon as "the most significant monetary agreement in the history of the world," the exchange rates established in the Smithsonian Agreement did not last long. Fifteen months later, in February 1973, speculative market pressure led to a further devaluation of the dollar and another set of exchange parities. Several weeks later, the dollar was yet again subjected to heavy pressure in financial markets; however, this time there would be no attempt to shore up Bretton Woods. In March 1973, the G–10 approved an arrangement wherein six members of the European Community tied their currencies together and jointly floated against the U.S. dollar, a decision that effectively signaled the abandonment of the Bretton Woods fixed exchange rate system in favor of the current system of floating exchange rates.

- Appx56 -

Home (/)  |  Help (/help)  |  Glossary (/help/glossary)  |  Balance of payments

# Balance of payments

## Glossary



**A-Z:**

- Any -

**Search Glossary term:**

Apply

Record of transactions between U.S. residents (/help/glossary/us-residents) and foreign residents (/help/glossary/foreign-residents) during a given time period. Includes transactions in goods, services (/help/glossary/services), income, assets, and liabilities. It is broken down into the current accounts (international), capital accounts (international) (/help/glossary/capital-account-international), and financial accounts (international) (/help/glossary/financial-account-international).

Download Acrobat Reader (http://get.adobe.com/reader/)

Page last modified on 4/11/18

## Bureau of Economic Analysis    4600 Silver Hill Road • Suitland, MD 20746

Contact Us (//www.bea.gov/contact-us)

Working at BEA (//www.bea.gov/about/working-at-bea)

Frequently Asked Questions (//www.bea.gov/help/faq)

Our Policies (//www.bea.gov/about/policies-and-information)

Privacy (/privacy)

Commitment to Scientific Integrity (//www.bea.gov/statement-commitment-scientific-integrity-principal-statistical-agencies)

Data Dissemination Practices (//www.bea.gov/about/policies-and-information/data-dissemination)

Open Data (//www.bea.gov/open-data)

USA.gov (https://www.usa.gov/)

Business USA (https://business.usa.gov/)

No FEAR Act (http://www.osec.doc.gov/ocr/nofear/nofear.htm)

FOIA (https://www.commerce.gov/opog)

U.S. Department of Commerce (https://www.commerce.gov/)

Emergency Status (https://apps.bea.gov/status/)

The BEA Wire | BEA's Official Blog (//www.bea.gov/news/blog)

News Release Feed (RSS) (https://apps.bea.gov/rss/rss.xml)

Sign up for Email Notifications (/_subscribe/)

(https://www.linkedin.com/company/bureau-of-economic-

(https...k/bea)...(https://...https://www.instagr...ho...me/user?lists...\_z\_\_duUivA6Yb5w)

- Appx58 -

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE; MICROKITS, LLC; FISHUSA INC.; and TERRY PRECISION CYCLING LLC; | |
| **Plaintiffs,** | |
| v. | |
| THE UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; and HOWARD LUTNICK, in his official capacity as Secretary of Commerce; | Before: Gary S. Katzmann, Judge<br>        Timothy M. Reif, Judge<br>        Jane A. Restani, Judge<br><br>Court No. 25-00066 |
| **Defendants.** | |

| | |
|---|---|
| THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE STATE OF ILLINOIS, THE STATE OF MAINE; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; and THE STATE OF VERMONT; | Before: Gary S. Katzmann, Judge<br>        Timothy M. Reif, Judge<br>        Jane A. Restani, Judge<br><br>Court No. 25-00077 |
| **Plaintiffs,** | |
| v. | |

Court Nos. 25-00066 & 25-00077                                    Page 2

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; and THE UNITED STATES OF AMERICA;**

**Defendants.**

## JUDGMENT

Dated: <u>May 28, 2025</u>

In accordance with the court's opinion of this date, it is hereby

**ORDERED** that Executive Order 14193, <u>Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border</u>, 90 Fed. Reg. 9113 (Feb. 1, 2025); Executive Order 14194, <u>Imposing Duties To Address the Situation at Our Southern Border</u>, 90 Fed. Reg. 9117 (Feb. 1, 2025); Executive Order 14195, <u>Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China</u>, 90 Fed. Reg. 9121 (Feb. 1, 2025); Executive Order 14257, <u>Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits</u>, 90 Fed. Reg. 15041 (Apr. 2, 2025) (collectively, the "Challenged Tariff Orders"); and all modifications and amendments thereto; be, and hereby are, declared to be invalid as contrary to law; it is further

**ORDERED** that the operation of the Challenged Tariff Orders and all modifications and amendments thereto be, and hereby is, permanently enjoined; it is further

Court Nos. 25-00066 & 25-00077                                                      Page 3

      **ORDERED** that within 10 calendar days necessary administrative orders to effectuate the

permanent injunction shall issue; and it is further

      **ORDERED** that each party shall bear its own costs.

<u>By the panel.</u>

Dated: <u>May 28, 2025</u>
      New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE; MICROKITS, LLC; FISHUSA INC.; and TERRY PRECISION CYCLING LLC; | |
| **Plaintiffs,** | |
| **v.** | |
| THE UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; and HOWARD LUTNICK, in his official capacity as Secretary of Commerce; | **Before: Gary S. Katzmann, Judge**<br>**Timothy M. Reif, Judge**<br>**Jane A. Restani, Judge**<br><br>**Court No. 25-00066** |
| **Defendants.** | |
| THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE STATE OF ILLINOIS, THE STATE OF MAINE; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; and THE STATE OF VERMONT; | **Before: Gary S. Katzmann, Judge**<br>**Timothy M. Reif, Judge**<br>**Jane A. Restani, Judge**<br><br>**Court No. 25-00077** |
| **Plaintiffs,** | |
| **v.** | |

Court Nos. 25-00066 & 25-00077                                              Page 2

> **UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; and THE UNITED STATES OF AMERICA;**
>
> **Defendants.**

## ORDER

On May 28, the court entered summary judgment against the United States and issued both declaratory and permanent injunctive relief in <u>V.O.S. Selections, Inc. v. United States</u>, Slip Op. 25-66 (May 28, 2025) (per curiam).[1]  This relief included an injunction against the operation of the challenged Tariff Orders and all amendments and modifications thereto.  The injunction issued on account of Plaintiffs' success on the merits and the unavailability under the Uniformity Clause of a complete legal remedy in the form of piecemeal duty refunds to specific plaintiffs.  Intrinsic to this exercise of equitable discretion was the compelling public interest in "ensuring that governmental bodies comply with the law," <u>Am. Signature, Inc. v. United States</u>, 598 F.3d 816, 830 (Fed. Cir. 2010), and the lack of any cognizable hardship borne by the United States in the form of its non-enforcement of orders issued <u>ultra vires</u>.  The court's issuance of injunctive relief did not depend on the wisdom or policy consequences of such non-enforcement.  The principle at work was more straightforward: "[I]njunctive relief is generally available to preclude <u>ultra vires</u> conduct by subordinate executive officials." <u>Kemet Elecs. Corp. v. Barshefsky</u>, 21 CIT 912, 925,

---

[1] As the court explained in its combined opinion, the court also granted summary judgment against the United States in <u>Oregon v. U.S. Dep't of Homeland Security</u>, Case No. 25-00077.

Court Nos. 25-00066 & 25-00077                                                          Page 3

976 F. Supp. 1012, 1024 (1997) (citing <u>Soucie v. David</u>, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971)); <u>see also</u> <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579 (1952).

The court has exclusive jurisdiction to hear this action because the challenged Tariff Orders are "law[s] of the United States providing for" tariffs. 28 U.S.C. § 1581(i)(1). "[L]aw" is a broader term than "statutes." To the extent the challenged Tariff Orders bind Customs to collect duties at the rates they prescribe, they are laws of the United States. <u>See</u> <u>Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin</u>, 418 U.S. 264, 273 (1974) (holding for Supremacy-Clause purposes that "the relevant federal law is Executive Order No. 11491 rather than the [National Labor Relations Act]."). The challenged Tariff Orders also effect changes to the Harmonized Tariff Schedule of the United States ("HTSUS"). <u>See, e.g.</u>, Executive Order 14257, 90 Fed. Reg. 15041, 15047 (Apr. 2, 2025) ("In order to establish the duty rates described in this order, the HTSUS is modified as set forth in the Annexes to this order."). This means the Orders are "law[s]" in the additional sense that they modify a statute: The HTSUS "shall be considered to be statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1).

This jurisdictional conclusion does not hinge on whether IEEPA authorizes tariffs as a categorical matter—a question this court did not reach in its opinion on May 28.[2] Nor is it material

---

[2] If jurisdiction followed the merits in this way, the Court of International Trade would have exclusive jurisdiction to hear only <u>un</u>successful claims of <u>ultra vires</u> presidential tariff orders, with successful claims left to the federal district courts (or to no court at all). That would accomplish the opposite of "remedy[ing] the confusion over the division of jurisdiction between . . . the Court of International Trade . . . and the district courts and . . . ensur[ing] uniformity in the judicial decisionmaking process." <u>K Mart Corp. v. Cartier, Inc.</u>, 485 U.S. 176, 188 (1988) (internal quotation marks, citation, and parenthesis omitted); <u>see also</u> <u>Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.</u>, 18 F.3d 1581, 1586 (Fed. Cir. 1994) ("Congress had in mind consolidating this area of administrative law in one place, and giving to the Court of International Trade, with an already developed expertise in international trade and tariff matters, the opportunity to bring to it a degree of uniformity and consistency. Obviously that would not be possible if jurisdiction were spread

Court Nos. 25-00066 & 25-00077                                              Page 4

that some non-tariff-related litigation involving IEEPA takes place in the federal district courts. "The district courts and the Court of International Trade can both have jurisdiction over actions arising out of the same act . . . ."  Orleans Int'l, Inc. v. United States, 334 F.3d 1375, 1379 (Fed. Cir. 2003) (USCIT has exclusive jurisdiction over import assessment related to the Beef Promotion and Research Act of 1985).

The Government now moves to stay the court's enforcement of its judgment pending appeal of that judgment to the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"). See V.O.S. Mot. to Stay, May 28, 2025, ECF No. 59; Oregon Mot. to Stay, May 28, 2025, ECF No. 69 (collectively "USCIT Motions to Stay").  The Government has also moved for the same relief from the Federal Circuit, which on May 29 issued an administrative stay of this court's judgment pending consideration of the appellate motion to stay.  See Order, No. 2025-1812 (Fed. Cir. May 29, 2025) (per curiam).  Plaintiffs in both V.O.S. and Oregon oppose the Government's motions.  See Pls.' V.O.S. Resp. to Mot. to Stay, June 2, 2025, ECF No. 62; Pls.' Oregon Resp. to Mot. to Stay, June 2, 2025, ECF No. 72.

Ultimately, the Federal Circuit's impending consideration of the motion to stay before it makes it unnecessary for this court to rule on the USCIT Motions to Stay.  The two motions seek identical relief; the Federal Circuit's ruling will control.  At the very least, the court cannot determine whether the Government "will be irreparably injured absent a stay" while (1) this court's denial of a stay (if ordered) would leave in place the temporary administrative stay issued by the Federal Circuit and (2) this court's denial of a stay could be immediately superseded by the Federal Circuit's imposition of one.  Nken v. Holder, 556 U.S. 418, 426 (2009).  It is accordingly

_____

among the district courts throughout the land.").

Court Nos. 25-00066 & 25-00077                                                      Page 5

**ORDERED** that the USCIT Motions to Stay are **HELD IN ABEYANCE** pending the Federal Circuit's consideration of the Government's motion to stay this court's judgment pending appeal.

<u>By the panel.</u>

Dated: <u>June 3, 2025</u>
         New York, New York