# United States Court of Appeals for the Federal Circuit

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

*Plaintiffs –Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, RODNEY S. SCOTT, in his official capacity as Commissioner for U.S. Customs and Border Protection, JAMIESON GREER, in his official capacity as U.S. Trade Representative, OFFICE OF THE U.S. TRADE REPRESENTATIVE, HOWARD LUTNICK, in his official capacity as Secretary of Commerce, U.S. CUSTOMS AND BORDER PROTECTION,

*Defendants – Appellants.*

*(caption continued)*

*On Appeal from the United States Court of International Trade*
*Nos. 25-66, -77 (Hon. Katzmann, Hon. Reif, and Hon. Restani)*

## BRIEF OF CATO INSTITUTE AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Thomas A. Berry
   *Counsel of Record*
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(443) 254-6330
tberry@cato.org

Dated: July 8, 2025

THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF
COLORADO, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE
STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA,
THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF
VERMONT,

*Plaintiffs –Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, in her
official capacity as Secretary of Homeland Security, U.S. CUSTOMS AND
BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as
Commissioner of U.S. Customs and Border Protection, UNITED STATES

*Defendants – Appellants.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** Nos. 25-1812, 25-1813

**Short Case Caption** VOS Selections v. Trump

**Filing Party/Entity** Cato Institute

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/07/2025

Signature:  /s/Thomas A. Berry

Name:  Thomas A. Berry

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Cato Institute | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................... i

TABLE OF AUTHORITIES ................................................... ii

INTEREST OF *AMICUS CURIAE*...........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

ARGUMENT ...................................................................5

  I.  HISTORICAL PRACTICE CONFIRMS THAT TARIFF-SETTING IS A NONDELEGABLE LEGISLATIVE POWER. ...............................................5

  II.  IEEPA DOES NOT AUTHORIZE THE PRESIDENT TO MODIFY TARIFF RATES. ...........................................................8

    A.  IEEPA Provides No Textual Support for Tariff Authority.........................9

    B.  IEEPA's Origins Confirm That Tariff Authority Remains with Congress. ...........................................................11

CONCLUSION...................................................................15

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS ...........17

CERTIFICATE OF SERVICE ...................................................18

# TABLE OF AUTHORITIES

**Cases**

*Alcan Sales v. United States*, 534 F.2d 920 (Cust. & Pat. App. 1976)....................14

*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1922) ............................8

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................... 3, 9, 10

*Marsh v. Chambers*, 463 U.S. 783 (1983) ...........................................................5, 8

*Stoehr v. Wallace*, 255 U.S. 239 (1921) ..............................................................12

*United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (Ct. Cust. & Pat. App. 1975) ............................................................................................................................14

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) .................................................11

*West Virginia v. EPA*, 597 U.S. 697 (2022) ..................................................... 5, 10

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...............................7

**Statutes**

19 U.S.C. § 1338(a) .................................................................................................4

19 U.S.C. § 1338(d) .................................................................................................4

19 U.S.C. § 1821(a) .................................................................................................9

19 U.S.C. § 2132 ....................................................................................................14

19 U.S.C. § 2411(c)(1)(B) .......................................................................................9

50 U.S.C. § 1701(a) .................................................................................................2

50 U.S.C. § 1701(b) .................................................................................................2

50 U.S.C. § 1702 .....................................................................................................9

50 U.S.C. § 1702(a)(1)(B) ........................................................................................2

Act of Dec. 18, 1941, 55 Stat. 839 ........................................................................12

Act of July 13, 1861, 12 Stat. 255 ...........................................................................6

Act of July 4, 1789, 1 Stat. 24 .................................................................................6

Act of March 9, 1933, 48 Stat. 1 ............................................................................12

Oct. 6, 1917, ch. 106, § 5, 40 Stat. 415 ................................................................12

Revenue Act of 1913, 30 Stat. 151 ..............................................6

Tariff Act of 1816, 3 Stat. 310 .................................................6

Tariff Act of 1832, 4 Stat. 583 .................................................6

Tariff Act of 1861, 12 Stat. 178 ................................................6

Tariff Act of 1883, 22 Stat. 488 ................................................7

Tariff Act of 1890, 26 Stat. 567 ................................................7

The International Emergency Economic Powers Act of 1977, 50 U.S.C.
§ 1701.................................................................... 2, 12

**Other Authorities**

Blocking Property of Certain Persons Contributing to the Conflict in Cote
d'Ivoire, Exec. Order 13396 (Feb. 7, 2006) ........................10

FEDERALIST NO. 23 (Alexander Hamilton) (Royal Classics ed. 2020) ...........7

Forbidding the Hoarding of Gold Coin, Gold Bullion and Gold Certificates,
Exec. Order No. 6102 (1933)........................................13

Governing Certain Capital Transfers Abroad, Exec. Order 11387 (1968)..........14

Imposition of Supplemental Duty for Balance of Payments Purposes,
Proclamation 4074 (Aug. 15, 1971) ................................14

Mary M.C. Bowman, *Presidential Emergency Powers related to International
Economic Transactions*, 11 VAND L. REV. 515 (1978) ............ 14, 15

Michael H. Salsbury, *Presidential Authority in Foreign Trade: Voluntary
Steel Import Quotas from a Constitutional Perspective*, 15 VA. J. INT'L L.
179 (1974)........................................................11

Note, *The International Emergency Economic Powers Act: A Congressional
Attempt to Control Presidential Emergency Power*, 96 HARV. L. REV.
1102 (1983).......................................................12

Regulation of Consumer Credit, Exec. Order No. 8843 (1941) ...............13

Reopening Banks, Exec. Order No. 8773 (1933) ...................................13

Termination of Additional Duty for Balance of Payments Purposes,
Proclamation 4098 (Dec. 20, 1971)................................14

**Regulations**

Office of Censorship, U.S. Censorship Regulations, 8 Fed. Reg. 1644
(Feb. 5, 1943)..................................................................................13

**Constitutional Provisions**

U.S. CONST. art. I, § 1 .........................................................................5

U.S. CONST. art. I, § 8 .........................................................................3

U.S. CONST. art. III, § 1 .......................................................................8

## INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public-policy research foundation established in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, produces the annual *Cato Supreme Court Review*, and files *amicus* briefs.

Cato Institute scholars have published extensive research on regulation and constitutional law. This case interests the Cato Institute because it concerns the legality of a contested exercise of executive power that threatens the separation of powers and economic liberty.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Soon after taking office, President Trump issued a series of executive orders and proclamations imposing tariffs on imports from dozens of countries. These actions, interspersed with negotiations with and responses from some of those

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amicus* contributed money to fund this brief's preparation or submission.

countries, resulted in rapid increases and (partial) decreases in tariff rates. The President imposed a 10% tariff on most trading partners, and imports from China were singled out with a combined tariff rate of 145% (since reduced). Notably, the President's orders cite the International Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 *et seq*. ("IEEPA"), as a statutory basis for the President's unilateral imposition of additional—and fluctuating—tariffs.

IEEPA grants the President broad authority to block transactions involving Americans and foreign nationals, *see id*. § 1702(a)(1)(B), and the law is frequently used by Presidents to impose economic sanctions on nations and foreign citizens. But the statute explicitly limits this authority to situations involving "an unusual and extraordinary threat" for which "a national emergency has been declared for purposes of this chapter," and the law provides that these powers "may not be exercised for any other purpose." *Id*. § 1701(b). "[T]o deal with any [such] threat," IEEPA continues, the President may "regulate . . . importation." *Id.* § 1701(a); § 1702(a)(1)(B).

The President's novel tariffs, purportedly imposed to combat illegal drug operations and trade imbalances, have inflicted significant costs on thousands of American business owners who rely on imports. A group of states and businesses sued to enjoin the imposition of these tariffs, alleging violations of IEEPA and of the Constitution. The Court of International Trade (CIT) agreed with Plaintiffs-

2

Appellees that IEEPA does not authorize the President's tariffs. In rejecting the trade imbalance tariffs, the lower court cited separations of powers issues with the President's broad interpretation of IEEPA. The court also "determine[d] the best reading" of the statute precluded the imposition of tariffs to "deal with" the problem of illegal drug importation. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). This Court should affirm.

The Constitution vests the power to impose tariffs solely in Congress. *See* U.S. CONST. art. I, § 8. The Cato Institute writes separately to provide historical context regarding IEEPA's purposes and the original understanding of Congress's constitutional authority to impose tariffs. For over a century, Congress exercised that power directly and in exhaustive detail, even during times of war and economic crisis. When Congress has chosen to delegate limited authority to the Executive to vary tariffs, it has done so explicitly and with clear statutory limits.

The government's reliance on IEEPA as a source of unilateral tariff authority breaks with this tradition and misreads the statute. IEEPA contains no reference to "tariffs" or "duties," and no President had cited it to impose tariffs in the nearly 50 years since its enactment—until now. Congress knows how to grant tariff authority when it chooses to, as it did in the Tariff Act of 1922, the Tariff Act of 1930,[2] the

---

[2] *Amicus* American First Policy Institute (AFPI) cites this law as authorizing the President's tariffs. AFPI Br. 2. Specifically, AFPI points to section 338, which

Trade Expansion Act of 1962, and the Trade Act of 1974. IEEPA, by contrast, was enacted to *limit* executive power, not expand it. Courts should not credit interpretations of vague statutory texts that, for the first time in decades, are "discovered" to confer vast economic powers on the President.

The government's reading of IEEPA not only stretches the text beyond recognition; it also undermines the Framers' designs for the separation of powers. Accepting the government's theory would mean that Congress, through ambiguous text and legislative silence, can transfer sweeping legislative power to the President—a result the Supreme Court has cautioned against. "Courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716

---

permits the President to impose tariffs up to 50 percent on imports from countries that unduly burden or disadvantage U.S. commerce. *See* 19 U.S.C. § 1338(a), (d). Two problems arise. First, the President did not rely on this law when he imposed the tariffs. AFPI suggests that courts scour the federal code to locate authority where the Executive itself has failed or refuses to do so. *See* AFPI Br. 4 ("[C]ourts ruling on the statutory authority supporting an Executive Order may examine statutes not cited in the Order itself."). But that raises a profound separation of powers issue. Second, the 1930 Act cannot salvage the Executive Order because, as AFPI acknowledges, the Order exceeds the Act's limits. AFPI Br. 15 (noting that "the President briefly imposed on China tariffs higher than 50%"). In any event, the government argues that IEEPA confers unilateral, discretionary tariff authority on the President that exceeds the constraints of section 338 and its 50 percent cap. Opening Br. 31–35.

(2022) (cleaned up).

The Constitution, IEEPA's text, and over two centuries of history point in the same direction: the tariff-setting power remains in the hands of Congress. The Court should reject the President's novel reading of IEEPA and affirm the decision below.

**ARGUMENT**

## I. HISTORICAL PRACTICE CONFIRMS THAT TARIFF-SETTING IS A NONDELEGABLE LEGISLATIVE POWER.

The Constitution vests "[a]ll legislative powers" in the Congress. U.S. CONST. art. I, § 1. These legislative powers include the exclusive authority to set tariff rates. *Id.* § 8 (granting Congress the power "to lay and collect, taxes, duties, imposts and excises"). While early congressional practice is not dispositive, the practice of the First Congress is probative of the original meaning of a constitutional provision. *See, e.g.*, *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) ("An act passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, . . . is contemporaneous and weighty evidence of its true meaning.") (internal quotation marks omitted).

It is therefore notable that the second law ever enacted by Congress—and signed by President George Washington—was a statute establishing detailed rates of tariffs. *See* Act of July 4, 1789, 1 Stat. 24. That law set detailed and exhaustive duties, such as one cent per pound of brown sugars, fifty cents per pair of boots, and

5

a 12.5% *ad valorem* tax on all goods (except teas) imported from China or India. *Id*.

For generations, Congress zealously guarded its authority to set tariffs. For more than a century after the Framing, tariff legislation followed a familiar pattern: Congress would repeal its previous duties and replace them with new, specific rates and schedules. *See*, *e.g.*, Tariff Act of 1816, 3 Stat. 310; Tariff Act of 1832, 4 Stat. 583; Revenue Act of 1913, 30 Stat. 151. These statutes gave the President no discretion to modify duties. Where Congress authorized the President to administer and enforce customs laws, it carefully withheld any power to revise or adjust Congress's detailed tariff schedules.

Even during the crisis of the Civil War, Congress retained exclusive control over tariff rates. *See* Tariff Act of 1861, 12 Stat. 178 (detailed schedule of duties); Act of July 13, 1861, 12 Stat. 255–57 (delegating substantial wartime powers). While Congress granted the President considerable discretion to exercise his executive powers—like shutting down whole ports held by rebel forces—it did not authorize him to alter tariff rates. Even in wartime, when rebel forces controlled American territory, Congress did not concede its legislative tariff powers.

In the late 19th and early 20th centuries, Congress began empowering the Executive to negotiate trade agreements and selectively apply duties based on foreign governments' conduct. But even then, Congress retained the core legislative function: it prescribed detailed duty schedules and permitted the President to activate

or suspend them only under certain conditions. For example, the Tariff Act of 1883, 22 Stat. 488, banned cattle imports unless the Secretary of the Treasury found them free from disease. The Tariff Act of 1890, 26 Stat. 567, allowed the President to suspend free trade agreements and impose statutory duties if another nation's duties on American goods were "unequal and unreasonable." In those cases, the President could not set new rates at will; he could only trigger duties Congress had already prescribed. *See id.*

In short, for at least the first century of the Republic, Congress consistently set duty schedules and never relinquished its duty-setting power to the President. Nor, as far as we can tell, did Presidents assert any inherent or emergency power to set tariff rates,[3] even during wars, financial panics, and depressions. This unbroken practice is important in determining the original meaning of a constitutional provision and the best interpretation of IEEPA. *See Marsh*, 463 U.S. at 790; *The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice

---

[3] Strictly speaking, the government has no special "emergency powers"; it has only those powers enumerated in the Constitution. The Framers "knew what emergencies were, knew the pressures they engender for authoritative action, [and] knew, too, how they afford a ready pretext for usurpation." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring). While it was "impossible to foresee or define the extent and variety of national exigencies" that might beset the country, THE FEDERALIST NO. 23, at 132–33 (Alexander Hamilton) (Royal Classics ed. 2020) (capitalization normalized), the Framers equipped the three branches with enumerated powers to handle those emergencies.

is a consideration of great weight in a proper interpretation of constitutional" issues of separation of powers.).

The reason for this longstanding practice is clear: Congress cannot vest duty-setting power—a legislative power—with the President, just as Congress cannot vest judicial power with the President or the Speaker of the House. *See* U.S. CONST. art. III, § 1 (vesting the judicial power "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish"); *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1922) ("[I]t is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President, or to the Judicial branch, or if by law it attempts to invest itself or its members with either executive power or judicial power.").[4]

## II. IEEPA DOES NOT AUTHORIZE THE PRESIDENT TO MODIFY TARIFF RATES.

The Supreme Court recently reaffirmed a "judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." *Loper*

---

[4] While modern practices are less probative in determining the original meaning of Congress's duty-setting power, recent practice does not aid the President much. Even in the early- and mid-20th century, when Congress authorized the President to function as the principal actor in the formulation of trade policy, Congress constrained his discretion by referencing objective—if sometimes vague or contested—standards. *See J.W. Hampton*, 276 U.S. at 409–11 (affirming the constitutionality of the Tariff Act of 1922, which authorized the Executive to vary tariffs to "equalize the . . . differences in costs of production" between the United States and another nation, but limited rate increases to 50% of existing rates).

*Bright,* 603 U.S. at 391–91. The President's interpretation of IEEPA is not entitled to deference—rather, it is the duty of the courts to "determine the best reading" of a contested statute. *Id.* at 400. The best reading of IEEPA is that it provides the President no authority to unilaterally modify tariff schedules.

### A. IEEPA Provides No Textual Support for Tariff Authority.

As this brief's historical survey, *supra*, demonstrates, Congress knows how to give the President discretion—within limits—to modify tariff rates. And Congress did so, for instance, in the Tariff Act of 1922, the Trade Act of 1974, and the Trade Expansion Act of 1962, the latter of which President Trump used in his first term when modifying tariffs. It is notable that in those statutes, Congress expressly identified "duty" or "duties" modification as a permissible policy tool for the President. *See* 19 U.S.C. § 2411(c)(1)(B) (permitting the U.S. Trade Representative to "give preference to the imposition of duties over the imposition of other import restrictions"); 19 U.S.C. § 1821(a) (permitting the President to "enter into trade agreements" and "modif[y] . . . any existing duty"). In contrast, the relevant provisions in IEEPA make no mention of "duty," "duties," or "tariffs." *See* 50 U.S.C. § 1702.

This omission is fatal to the government's strained interpretation. "Courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. at 716 (cleaned

up). Careful textual analysis is especially important in emergency power cases, as presidents often adopt an expansive view of what qualifies as an "unusual and extraordinary threat"—including domestic issues in countries halfway around the world.[5] Notably, this administration has declined to offer any limiting principle for its emergency declarations.[6]

The Supreme Court has also emphasized that Executive Branch interpretations "issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Loper Bright*, 600 U.S. at 394. A telling signal that the government's interpretation is unsound is that, nearly 50 years after IEEPA's enactment, no President invoked it to impose tariffs—until now. It appears the government would have this Court believe that the President and his trade advisers, like Indiana Jones in the *Raiders of the Lost Ark*, found a valuable artifact—an unconditional delegation of legislative power—gathering dust in the depths of the U.S. Code. The Supreme

---

[5] *See, e.g.*, Blocking Property of Certain Persons Contributing to the Conflict in Cote d'Ivoire, Exec. Order 13396 (Feb. 7, 2006) (declaring that violence in Cote d'Ivoire "constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States").

[6] Judge Restani offered the hypothetical as to whether a national peanut butter shortage might constitute an "unusual and extraordinary threat." The administration attorney replied, "it probably depends." Oral Argument at 1:09:25, *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-00066 (Ct. Intl. Trade May 13, 2025).

Court has warned courts against rubber-stamping such Executive branch "discoveries" of new authority in decades-old statutes. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, . . . we typically greet its announcement with a measure of skepticism.") (internal quotation marks omitted).

This Court should reject the government's argument that, after 150 years, Congress silently transferred to the President most of its immense duty-making powers through IEEPA's ambiguous language.

## B. IEEPA's Origins Confirm That Tariff Authority Remains with Congress.

Finally, the government's position runs contrary to the purposes of IEEPA. In the 1970s, Congress undertook a long-overdue effort to rein in Presidents' unilateral actions in foreign trade and transactions. *See* Michael H. Salsbury, *Presidential Authority in Foreign Trade: Voluntary Steel Import Quotas from a Constitutional Perspective*, 15 Va. J. Int'l L. 179, 186 (1974) ("Since 1934, the President's authority to impose restrictions on foreign trade has been significantly curtailed by statute."). Congress codified IEEPA in 1977 to clarify and *limit* the executive branch powers that had metastasized under IEEPA's predecessor, the Trading with the Enemy Act of 1917. *See* Note, *The International Emergency Economic Powers Act:*

*A Congressional Attempt to Control Presidential Emergency Power*, 96 HARV. L. REV. 1102, 1102 (1983).

Originally, Section 5(b) of the Trading with the Enemy Act of 1917 granted the President authority over Americans' transactions with foreign nationals only during wartime.[7] But within days of taking office, President Franklin Roosevelt unilaterally invoked Section 5(b) in peacetime to respond to bank failures and the Depression.[8] A few days later, Congress ratified those actions and greatly expanded the scope of the President's powers under Section 5(b) to peacetime "emergencies" and transactions with any foreign citizen, ally or enemy. *See* Act of March 9, 1933, 48 Stat. 1, 1–2. Congress amended the Act again in the early days of war in December 1941, going so far as to confer authority to the President to *prescribe the operative definitions* within the Act. Act of Dec. 18, 1941, 55 Stat. 839, 839–40; codified at 50 U.S.C. § 4305(b)(3).

The Trading with the Enemy Act became (and, though amended, still is) an immensely powerful law, enabling Presidents to exercise sweeping, and at times

---

[7] *See Stoehr v. Wallace*, 255 U.S. 239, 242 (1921) ("The Trading with the Enemy Act . . . is strictly a war measure, and finds its sanction in the constitutional provision, Art. I, § 8, cl. 11, empowering Congress 'to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water.'").

[8] Oct. 6, 1917, ch. 106, § 5, 40 Stat. 415, codified, as amended, at 50 U.S.C. § 4305. *See also The International Emergency Economic Powers Act*, *supra*, at 1102.

authoritarian, powers. In the 1930s, the law was used to place banks under the supervision of the federal government and prohibit them from paying out gold to bank customers (the so-called "bank holiday"),[9] to compel all Americans to surrender all of their gold and gold certificates to their nearest bank,[10] and to impose national regulation of consumer credit in order to curb inflation.[11] The Roosevelt administration even invoked the Trading with the Enemy Act in wartime to censor all news, mail, and communications from abroad—including "[r]umors which might render aid and comfort to the enemy" and "[a]ny other matter whose dissemination might directly or indirectly . . . disparage the foreign relations of the United States or the United Nations." Office of Censorship, U.S. Censorship Regulations, 8 Fed. Reg. 1644–46 (Feb. 5, 1943).

Later Presidents used the Trading with the Enemy Act in trade policy. In his final days in office in 1968, President Lyndon Johnson issued an executive order to halt and supervise capital transfers abroad in order to improve the nation's "balance of payments position." Governing Certain Capital Transfers Abroad, Exec. Order 11387 (1968). His successor, President Nixon, relied on the Act in August 1971 to

---

[9] Reopening Banks, Exec. Order No. 8773 (1933).

[10] Forbidding the Hoarding of Gold Coin, Gold Bullion and Gold Certificates, Exec. Order No. 6102 (1933).

[11] Regulation of Consumer Credit, Exec. Order No. 8843 (1941).

impose a 10% tariff on imports to improve America's balance of payments as the U.S. withdrew from the gold standard. Imposition of Supplemental Duty for Balance of Payments Purposes, Proclamation 4074 (Aug. 15, 1971).[12]

In response to these unilateral actions in trade policy, Congress moved to clarify and restrict presidential authority. In the Trade Act of 1974, Congress provided express and narrow authority to address balance-of-payments issues in trade. *See* 19 U.S.C. § 2132. Three years later, Congress passed IEEPA to constrain the President even further. As one contemporaneous account explained, IEEPA's "primary purpose . . . [was] to revise the Trading With the Enemy Act of 1917 (TWEA), and thus to restrict presidential authority to respond to emergencies related to international economic transactions." Mary M.C. Bowman, *Presidential*

---

[12] Those tariffs were terminated by proclamation three months later. *See* Termination of Additional Duty for Balance of Payments Purposes, Proclamation 4098 (Dec. 20, 1971). The United States Court of Customs and Patent Appeals held that the imposition of duties was a valid exercise of the authority delegated to the President by section 5(b) of the Trading with the Enemy Act (TWEA). *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (Ct. Cust. & Pat. App. 1975); *Alcan Sales v. United States*, 534 F.2d 920 (Cust. & Pat. App. 1976), *cert. denied*, 429 U.S. 986 (1976). The government cites these 1971 tariffs to show there is "nothing novel" about the President's tariffs. Opening Br. 45. But IEEPA's statutory context commands a more limited construction than the TWEA, *see* Bowman, *infra*, and President Trump's tariffs are much larger than the surcharge sustained in *Yoshida*, which had an "effective rate" of 4.5%. The government skates over these differences. Opening Br. 9 (calling *Yoshida*'s tariffs "similar").

*Emergency Powers related to International Economic Transactions*, 11 VAND L. REV. 515, 515 (1978).

It is thus ironic—and legally untenable—for a President to invoke IEEPA for tariff-setting authority that no President has ever exercised. Even President Franklin Roosevelt—who had an expansive theory of presidential power and was President during economic depression and a global war—never used IEEPA's more powerful predecessor, the Trading with the Enemy Act, to modify tariffs. Courts should not require Congress to play legislative whack-a-mole and respond specifically to every claimed emergency a President might cite to usurp Congress's powers. The text of the Constitution is clear that duty-setting is a legislative power, and the history of tariffs and "emergency power" legislation like IEEPA shows that Congress provided no authority to the President to unilaterally impose tariffs.

## CONCLUSION

For the foregoing reasons, and those stated by appellees, the Court should affirm the decision of the Court of International Trade.

Respectfully submitted,

Thomas A. Berry
  *Counsel of Record*
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(443) 254-6330
tberry@cato.org

Dated: July 8, 2025

*Counsel for amicus curiae*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and Federal Circuit Rule 32(a) in that the brief contains 3,667 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) in that the brief has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Times New Roman font.

July 8, 2025

*/s/ Thomas A. Berry*
Thomas A. Berry
*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

The undersigned counsel certifies that on July 8, 2025, he electronically filed the foregoing *amicus curiae* brief with the Clerk of the Court for the Federal Circuit using the CM/ECF system. The undersigned also certifies that all participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Thomas A. Berry*
Thomas A. Berry
*Counsel for Amicus Curiae*
