Nos. 2025-1812, -1813

IN THE

# United States Court of Appeals for the Federal Circuit

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, DBA GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

*Plaintiffs-Appellees,*

– v. –

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, PETE R. FLORES, ACTING COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, IN HIS OFFICIAL CAPACITY AS ACTING COMMISSIONER OF THE UNITED STATES CUSTOMS AND BORDER PROTECTION, JAMIESON GREER, IN HIS OFFICIAL CAPACITY AS UNITED STATES TRADE REPRESENTATIVE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, IN HIS OFFICIAL CAPACITY AS SECRETARY OF COMMERCE, UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Defendants-Appellants.*

Appeal from the United States Court of International Trade in No. 1:25-cv-00066-GSK-TMR-JAR, Judge Gary S. Katzmann, Judge Timothy M. Reif, and Senior Judge Jane A. Restani

STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF VERMONT,

*Plaintiffs-Appellees,*

– v. –

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, UNITED STATES CUSTOMS AND BORDER PROTECTION, PETE R. FLORES, ACTING COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, IN HIS OFFICIAL CAPACITY AS ACTING COMMISSIONER FOR U.S. CUSTOMS AND BORDER PROTECTION, UNITED STATES,

*Defendants-Appellants.*

Appeal from the United States Court of International Trade in No. 1:25-cv-00077-GSK-TMR-JAR, Judge Gary S. Katzmann, Judge Timothy M. Reif, and Senior Judge Jane A. Restani.

## BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK UNIVERSITY SCHOOL OF LAW AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

Donald L.R. Goodson
Kelly C. McGee
Richard L. Revesz
Max Sarinsky
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 992-8932
max.sarinsky@ nyu.edu

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*

July 8, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1812 and 2025-1813

**Short Case Caption** V.O.S. Selections v. Trump

**Filing Party/Entity** Institute for Policy Integrity

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/05/2025

Signature: /s/ Max Sarinsky

Name: Max Sarinsky

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Institute for Policy Integrity at NYU School of Law | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☐   No    ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................ii

INTEREST OF *AMICUS CURIAE* ........................................... 1

SUMMARY OF ARGUMENT ........................................................ 2

ARGUMENT ................................................................................... 6

    I.    Only "Extraordinary Cases" Trigger The Major Questions Doctrine. ................................................. 6

        A.    History and breadth must indicate a case is extraordinary. .............................................. 8

            1.    Supreme Court precedent emphasizes history and the "unheralded" nature of the asserted authority ............................. 10

            2.    Supreme Court precedent also emphasizes the "transformative" nature of the asserted authority ............................. 13

        B.    Economic and political significance are relevant but not dispositive. ........................... 16

    II.    All Factors Signaling An "Extraordinary Case" For The Major Questions Doctrine Are Present Here. ...................... 21

        A.    The challenged tariffs are "unheralded." .................... 21

        B.    The President's interpretation of IEEPA is "transformative" as it converts the statute into a device to set national trade and fiscal policy............... 24

        C.    The challenged tariffs are economically and politically significant. .................................. 28

    III.    Because the Major Questions Doctrine Applies, The Government Must Identify "Clear Congressional Authorization" To Impose These Tariffs. .............................. 29

    IV.    The Major Questions Doctrine Applies To The President's Exercise Of Delegated Authority. ...................... 32

CONCLUSION ........................................................................... 33

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
594 U.S. 758 (2021) ........................................ 7, 12, 17, 28, 29

*Am. Forest Res. Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023).
.................................................................................... 32

*Am. Hosp. Ass'n v. Becerra*,
596 U.S. 724 (2022) ................................................... 20

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) ................................................... 20

*Becerra v. Empire Health Found.*,
597 U.S. 424 (2022) ................................................... 20

*Biden v. Missouri*,
595 U.S. 87 (2022) ................................................. 8, 13

*Biden v. Nebraska*,
600 U.S. 477 (2023) ............................................. passim

*FDA v. Brown & Williamson Tobacco Co.*,
529 U.S. 120 (2000) ......................................... 3, 6, 7, 9, 30

*FTC v. Bunte Bros., Inc.*,
312 U.S. 349 (1941) ................................................... 10

*Georgia v. President of the United States*,
46 F.4th 1283 (11th Cir. 2022) ...................................... 33

*Gonzales v. Oregon*,
546 U.S. 243 (2006) ................................................ 5, 29

*Indus. Union Dep't AFL-CIO v. Am. Petroleum Inst.*,
448 U.S. 607 (1980) ................................................... 16

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ................................................... 14

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................ 30, 32

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) ........................................ 33

*Mayes v. Biden*,
   67 F.4th 921 (9th Cir.), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023)
   .................................................................................................33

*MCI Telecommunications Corp. v. AT&T*,
   512 U.S. 218 (1994) ...........................................................7, 14

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
   595 U.S. 109 (2022) .............................................7, 12, 14, 17

*State v. Su*, 121 F.4th 1 (9th Cir. 2024)....................................33

*United States v. Rahimi*,
   602 U.S. 680 (2024) ...................................................................11

*United States v. Yoshida Int'l, Inc.*,
   526 F.2d 560 (C.C.P.A. 1975) ................................................24

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) .............................................5, 9, 13, 31

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ...................................................... passim


**Statutes**

5 U.S.C. § 804(2) ............................................................................19

19 U.S.C. § 1862...............................................................................22

19 U.S.C. § 1862(c).........................................................................26

19 U.S.C. § 2251...............................................................................22

19 U.S.C. § 2411...............................................................................22

19 U.S.C. § 2414...............................................................................26

20 U.S.C. § 1098ee(2)(D) ...........................................................14

42 U.S.C § 7411(a)(1).......................................................................9

42 U.S.C § 7411(b)(1).......................................................................9

42 U.S.C. § 7411(d) ......................................................................8, 9

## Other Authorities

Brock R. Williams, Cong. Rsch. Serv., R45529, *Trump Administration Tariff Actions: Frequently Asked Questions* (2020). ..............................22

Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* (2024). ................................................21, 23, 25, 26

Compl., *Oregon et al. v. U.S. Dep't Homeland Sec. et al.*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) (No. 25-00077)...........................................25

Cong. Rsch. Serv., R43056, *Counting Regulations: An Overview of Rulemaking, Types of Federal Regulations, and Pages in the Federal Register* (2019) ......................................................................19

Curtis Bradley & Jack Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Penn. L. Rev. 1743 (2024) .......27

Erika York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Foundation (July 3, 2025), https://perma.cc/KB97-USZL. .............................................................28

Mila Sohoni, *The Major Questions Quartet*, 136 Harv. L. Rev. 262, 262 (2022)...............................................................................................7

Natasha Brunstein, *Major Questions in Lower Courts*, 75 Admin. L. Rev. 661 (2023) ........................................................................3

Natasha Brunstein & Donald L. R. Goodson, *Unheralded and Transformative: The Test for Major Questions After* West Virginia, 74 Wm. & Mary Env't L. & Pol'y Rev. 317 (2022)............................1, 7, 19

Natasha Brunstein & Richard L. Revesz, *Mangling the Major Questions Doctrine*, 74 Admin. L. Rev. 317 (2022)....................................................1

Pls. Mem., *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) (No. 25-00066)....................................................20

Richard L. Revesz & Max Sarinsky, *Regulatory Antecedents and the Major Questions Doctrine*, 36 Geo. Env't L. Rev. 1 (2023).....................1

U.S. Const. art. I, § 8, cls. 1, 3.................................................................27

United States: Datasets, Int'l Monetary Fund (last updated Apr. 2025), https://www.imf.org/external/datamapper/profile/USA.......................28

### INTEREST OF *AMICUS CURIAE*

The Institute for Policy Integrity at New York University School of Law (Policy Integrity)[1] is a nonpartisan, not-for-profit think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship in the fields of administrative law, economics, and public policy.[2]

Policy Integrity has produced extensive scholarship on administrative law. Our faculty director, Professor Richard L. Revesz, is one of the nation's most cited environmental and administrative law scholars, having published more than 100 articles and books in the field. Revesz and Policy Integrity staff have published scholarship on the major questions doctrine. *See, e.g.*, Natasha Brunstein & Richard L. Revesz, *Mangling the Major Questions Doctrine*, 74 Admin. L. Rev. 317 (2022); Natasha Brunstein & Donald L. R. Goodson, *Unheralded and Transformative: The Test for Major Questions After* West Virginia, 74 Wm. & Mary Env't L. & Pol'y Rev. 317 (2022); Richard L. Revesz & Max

---

[1] This brief does not purport to represent the views, if any, of New York University School of Law.

[2] Per Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief wholly or partly, and no person contributed money intended to fund its preparation or submission.

Sarinsky, *Regulatory Antecedents and the Major Questions Doctrine*, 36 Geo. Env't L. Rev. 1 (2023). Revesz and Policy Integrity have also filed *amicus curiae* briefs in litigation involving the major questions doctrine. *See* Br. of the Inst. for Pol'y Integrity as *Amicus Curiae* in Supp. of Defs.-Appellees, *Utah v. Su*, 109 F.4th 313 (5th Cir. 2024) (No. 23-11097); Br. of the Inst. for Pol'y Integrity as *Amicus Curiae* in Supp. of Neither Party, *Sweet v. Cardona*, 121 F.4th 32 (9th Cir. 2024) (No. 23-15049); Br. of Richard L. Revesz as *Amicus Curiae* in Supp. of Resp'ts, *West Virginia v. EPA*, 597 U.S. 697 (2022) (No. 20-1530).

Policy Integrity has an interest in the development and proper application of administrative law. Any statement on the major questions doctrine from this Court could have far-reaching implications for administrative law. Policy Integrity therefore submits this brief to aid the Court by ensuring it has a complete and accurate understanding of the major questions doctrine.

## SUMMARY OF ARGUMENT

Plaintiff-Appellees correctly argue that the President's use of the International Emergency Economic Powers Act (IEEPA) to impose tariffs triggers the major questions doctrine. Given ongoing confusion among

litigants, courts, and even academics over when the major questions doctrine applies, *see* Natasha Brunstein, *Major Questions in Lower Courts*, 75 Admin. L. Rev. 661 (2023), this brief lays out the doctrine's requirements under relevant Supreme Court precedents to aid this Court in its analysis. This brief also discusses the requirement for "clear congressional authorization," which the government must identify when the major questions doctrine applies.

**I.** Although litigants often argue that the major questions doctrine applies to interpretive questions of "economic and political significance," the Supreme Court has never found these factors alone sufficient to trigger the doctrine. Rather, the cases that the Supreme Court has found "extraordinary" enough to trigger the doctrine have been ones "in which the 'history *and* the breadth of the authority that [the government] has asserted,' *and* the 'economic and political significance' of that assertion, provide a 'reason to hesitate.'" *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *FDA v. Brown & Williamson Tobacco Co.*, 529 U.S. 120, 159–60 (2000) (emphasis added); *accord Biden v. Nebraska*, 600 U.S. 477, 501 (2023).

The Supreme Court's recent opinions in *West Virginia* and *Nebraska* (its only two decisions expressly applying the major questions doctrine) also followed the same order of analysis—addressing first the history, then the breadth, and only then the economic and political significance of the action at issue. Both opinions indicate that these factors are conjunctive requirements—each necessary but none alone sufficient to trigger the doctrine.

This conjunctive requirement makes sense given that many federal actions are arguably economically and politically significant, but the doctrine applies only in "extraordinary" cases. Placing dispositive weight on economic and political significance would apply the doctrine in many ordinary cases rather than only extraordinary ones.

**II.** This brief fully sets forth the requirements of the major questions doctrine and applies them to the facts of this case, explaining why the President's use of IEEPA to impose tariffs is unheralded, transformative, and economically and politically significant. The President's action is unheralded because no President (including the current one in his first term) has ever used IEEPA to impose tariffs in the statute's nearly half century of existence. It is transformative because

4

it takes a statute meant to apply sanctions, asset freezes, and similar targeted measures to address acute emergencies and transforms it into a blank check to the President to rewrite all congressional trade policy. And it is economically and politically significant because it would have massive impacts on U.S. revenues and gross domestic product and has been the subject of "earnest and profound debate across the country." *West Virginia*, 597 U.S. at 732 (quoting *Gonzales v. Oregon*, 546 U.S. 243, 267–68 (2006)).

**III.** Because the challenged action triggers the major questions doctrine, the government must identify "clear congressional authorization" supporting it. *West Virginia*, 597 U.S. at 723 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). This "clear congressional authorization" can come in various forms, such as "text directly authorizing the agency action or context demonstrating that the agency's interpretation is convincing." *Nebraska*, 600 U.S. at 511, 516 (Barrett, J., concurring).

**IV.** The Government's argument that the major questions doctrine does not apply to the President lacks support in the Supreme Court's opinions.

## ARGUMENT

### I. Only "Extraordinary Cases" Trigger The Major Questions Doctrine.

The major questions doctrine applies only in "extraordinary cases." *West Virginia*, 597 U.S. at 721 (quoting *Brown & Williamson*, 529 U.S. at 159–60). Such extraordinary cases are ones "in which the 'history *and* the breadth of the authority that [the government] has asserted,' *and* the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *Id.* (emphasis added) (quoting *Brown & Williamson*, 529 U.S. at 159–60). The Supreme Court reiterated this basic formulation— emphasizing the same factors—in *Nebraska*. 600 U.S. at 501 (citing *West Virginia*, 597 U.S. at 721). Both opinions indicate that all relevant factors—history, *and* breadth, *and* economic and political significance— must be present for a case to trigger the major questions doctrine. As explained in the next section, all of those factors are present here. But before applying the doctrine to the facts of this case, it is important to explain why the Court should avoid an overly simplified application of the doctrine.

All too often, instead of following the Supreme Court's analysis in *West Virginia* and *Nebraska*, many litigants have misapplied the doctrine by placing undue emphasis on the economic or political significance of the action at issue. As the following sections explain, such arguments overlook *West Virginia*'s and *Nebraska*'s directives to consider (1) history, (2) breadth, and (3) economic and political significance to ensure the doctrine applies only in extraordinary cases.

Such arguments also find little support in recent cases predating *West Virginia*. Although the major questions doctrine traces its roots to two earlier cases—*MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218, 229 (1994), and *Brown & Williamson*—the Supreme Court did not invoke the doctrine by name or articulate a test for it until *West Virginia*. *See* Brunstein & Goodson, *supra*, at 51–52. That said, many scholars often group together three other opinions decided just before *West Virginia* (and all in response to the COVID-19 pandemic) in their discussions of the doctrine. *See, e.g.*, Mila Sohoni, *The Major Questions Quartet*, 136 Harv. L. Rev. 262, 262 (2022) (discussing *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.* (*Alabama Realtors*), 594 U.S. 758 (2021) (per curiam); *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.* (*NFIB*),

595 U.S. 109 (2022); and *Biden v. Missouri*, 595 U.S. 87 (2022) (per curiam)). Accordingly, this brief also references those three opinions in addition to *West Virginia* and *Nebraska*—the two most recent decisions and the only ones that expressly apply the major questions doctrine.

### A.    History and breadth must indicate a case is extraordinary.

Although the Supreme Court often references economic and political significance in its major questions precedents, its application of the doctrine has focused primarily on the history and the breadth of the authority that the government has asserted.

Consider *West Virginia*, the Supreme Court's most thorough discussion of the major questions doctrine to date (and, as noted, the first to expressly invoke the doctrine). That case involved Section 111(d) of the Clean Air Act, which requires States to set performance standards for power plants' and other sources' emissions of certain air pollutants, including greenhouse gases. 42 U.S.C. § 7411(d). But the Environmental Protection Agency (EPA) "retains the primary regulatory role in Section 111(d)," *West Virginia*, 597 U.S. at 710, because the standard the States set "must reflect the 'best system of emission reduction' that [EPA] has determined to be 'adequately demonstrated' for the" source, *id.* at 706

8

(quoting 42 U.S.C. §§ 7411(a)(1), (b)(1), (d)). The question in *West Virginia* was whether Section 111(d) authorized EPA to issue the Clean Power Plan, which, among other things, identified purposeful "generation shifting" as a component of the best system of emission reduction for power plants. *Id.* at 712–14.[3]

The Supreme Court explained that *West Virginia* presented "a major questions case" because EPA had "'claim[ed] to discover in a long-extant statute an [1] unheralded power' [2] representing a 'transformative expansion in [its] regulatory authority.'" *Id.* at 724 (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324). After introducing these two factors, which echo references to "history and . . . breadth" earlier in the opinion, *id.* at 721 (quoting *Brown & Williamson*, 529 U.S. at 159–60), the Supreme Court divided the bulk of its legal analysis of the doctrine's triggers into two segments. The Supreme Court first addressed why the Clean Power Plan was "unheralded," *id.* at 724–28; it next addressed why the Clean Power Plan also represented a transformative change in EPA's authority, *id.* at 728–32. Similarly, in *Nebraska*, after

---

[3] "Generation shifting" describes "a shift in electricity production from higher-emitting to lower-emitting producers." *West Virginia*, 597 U.S. at 697.

quoting *West Virginia*, the Supreme Court also first addressed history before turning to breadth in its analysis of the major questions doctrine. 600 U.S. at 501–02. This brief thus discusses the two factors in turn.

> **1.    Supreme Court precedent emphasizes history and the "unheralded" nature of the asserted authority.**

Starting with history, the first five paragraphs of *West Virginia*'s legal analysis of the triggers for the major questions doctrine address the history of EPA's comparable exercises of authority. 597 U.S. at 724–28. The Supreme Court explained that regulatory history is especially relevant to determining whether the challenged government action is extraordinary because, "just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *Id.* at 725 (quoting *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941)).

Before the Clean Power Plan, the Supreme Court concluded, EPA "had always set emissions limits under Section 111 based on the application of measures that would reduce pollution by causing the

regulated source to operate more cleanly." *Id.* By contrast, in the Clean Power Plan, EPA departed from "prior Section 111 rules" by setting emissions limits based in part on purposeful generation shifting from coal-fired plants to natural gas and renewable sources. *Id.* at 726. For this reason, the Supreme Court determined that the Clean Power Plan was "unheralded" (i.e., "unprecedented"). *Id.* at 724, 728.[4]

*Nebraska* and the cases decided just before *West Virginia* similarly focus on the unprecedented nature of the government action. For example, in *Nebraska*, which involved a roughly $430 billion student debt-relief program, the Supreme Court first stressed in its discussion of the major questions doctrine that the "Secretary [of Education] has never previously claimed powers of this magnitude under" the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act). 600 U.S. at 501–02. Rather, past exercises of the Secretary's authority

---

[4] As used in *West Virginia*, "unheralded" means unlike anything the government actor has done before. Of course, the government need not identify an identical antecedent, because new actions will rarely, if ever, be identical to previous ones. *Cf. United States v. Rahimi*, 602 U.S. 680, 699–700 (2024) (discussing what qualifies as a relevant "historical analogue" for the Second Amendment). Rather, *West Virginia*'s analysis suggests that the relevant antecedent must be an analogous exercise of authority.

under the HEROES Act to "waive or modify" applicable statutory provisions "have been extremely modest and narrow in scope" and none had fully released "borrowers from their obligations to repay" hundreds of billions of dollars in student loans. *Id.*

In *Alabama Realtors*, the Supreme Court also highlighted that the "expansive authority" that the Centers for Disease Control and Prevention (CDC) asserted in that case was "unprecedented." 594 U.S. at 765. And in *NFIB*, the Supreme Court similarly explained that the "lack of historical precedent, coupled with the breadth of authority that the [Occupational Safety and Health Administration (OSHA)] now claims, is a telling indication that [OSHA's action] extends beyond the agency's legitimate reach." 595 U.S. at 119 (quotation marks omitted). The Supreme Court further noted that "OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind—addressing a threat that is untethered, in any causal sense, from the workplace." *Id.*

In contrast, the Supreme Court rejected a similar major questions-based challenge to a vaccine mandate from Health and Human Services (HHS) for certain healthcare workers because HHS "routinely imposes

conditions of participation that relate to the qualifications and duties of healthcare workers." *Missouri*, 595 U.S. at 94. Past practice thus showed the HHS vaccine mandate was not an extraordinary action.

### 2. Supreme Court precedent also emphasizes the "transformative" nature of the asserted authority.

The Supreme Court's recent major questions cases show that, even if the government's action is unlike anything the relevant actor has done before, such "unheralded" novelty is not sufficient to trigger the doctrine—the breadth of the asserted authority must also demonstrate a transformative expansion of power.

For example, in *West Virginia*, after the Supreme Court examined EPA's prior regulations under Section 111(d) and concluded that the Clean Power Plan was "unheralded," it next discussed how the Clean Power Plan also represented a "transformative expansion [of EPA's] regulatory authority." 597 U.S. at 724 (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324). In other words, after concluding that EPA's asserted authority in the Clean Power Plan "was . . . unprecedented," the Supreme Court went on to determine whether "it also effected a 'fundamental revision of the statute, changing it from [one sort of] scheme of . . .

regulation' into an entirely different kind." *Id.* at 728 (quoting *MCI*, 512 U.S. at 231). Highlighting the "breadth" of the authority that EPA was newly asserting, the Court found "little reason to think Congress assigned" the asserted power. *Id.* at 729. Similarly, in *Nebraska*, the Supreme Court concluded that the challenged debt-relief plan was of such breadth that it would permit the Secretary of Education to "unilaterally define every aspect of federal student financial aid, provided he determines that recipients have 'suffered direct economic hardship as a direct result of a . . . national emergency.'" 600 U.S. at 502 (quoting 20 U.S.C. § 1098ee(2)(D)).

Several potential indicators may be relevant to determining whether a government actor's assertion of authority is sufficiently transformative to warrant skepticism. For example, one key indicator is comparative expertise: As the Supreme Court noted in *West Virginia*, "'[w]hen [an] agency has no comparative expertise' in making certain policy judgments," one "presume[s]" that Congress did not "task it with doing so." *West Virginia*, 597 U.S. at 729 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 578 (2019)); *see also, e.g.*, *NFIB*, 595 U.S. at 118 (finding that public health standards fell "outside of OSHA's sphere of expertise").

14

That said, comparative expertise, though relevant, is not dispositive: For instance, in *Nebraska*, the Supreme Court did not analyze the Department of Education's (likely considerable) expertise relevant to student-loan forgiveness. 600 U.S. at 501–06.

Another potential indicator that an action represents a transformative change in authority is when the government actor relies on statutory language that is "vague," "ancillary," or "modest" to do something unlike anything it has done before. *See West Virginia*, 597 U.S. at 724 ("vague" and "ancillary" provision); *Nebraska*, 600 U.S. at 495 ("modest" authority).

The indicators referenced above (and others like them) were not dispositive in *West Virginia* (or other recent cases). Rather, they provided evidence of a transformative change in the agency's authority. But that evidence of breadth was just one factor in the Supreme Court's analysis of the major questions doctrine; as noted, the Supreme Court also emphasized history. *See supra* Sec. I.A.1.

### B.    Economic and political significance are relevant but not dispositive.

Although the Supreme Court often references economic and political significance in its major questions precedents, indicators of significance have never sufficed to trigger the doctrine.

In fact, although the Supreme Court referenced the cost of the Clean Power Plan in *West Virginia*'s factual background, 597 U.S. at 714, it omitted express references to indicators of economic significance from the opinion's legal analysis, *id.* at 724–35. The most the Supreme Court said about economic significance in *West Virginia*'s legal analysis is a passing reference to the Clean Power Plan as representing "unprecedented power over American industry." *Id.* at 728 (quoting *Indus. Union Dep't AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980)).

And while the size of the student-loan cancellation program played a role in *Nebraska*, *see* 600 U.S. at 502–03, the Supreme Court's analysis of the major questions doctrine did not rest on that fact alone. Rather, the Supreme Court first addressed history and breadth before turning to the program's economic effects. *Id.* at 501–02. None of that additional

16

analysis would have been necessary if economic significance alone triggered the major questions doctrine.

Likewise, although litigants emphasizing economic significance often point to *Alabama Realtors*, indicators of economic significance were just one part of that opinion's analysis. The opinion also notes that the CDC's "claim of expansive authority . . . [was] unprecedented." 594 U.S. at 765. "Since that provision's enactment in 1944," the opinion explains, "no regulation premised on it has even begun to approach the size or scope of the eviction moratorium" that the CDC adopted. *Id.* To the contrary, "[r]egulations under this authority have generally been limited to quarantining infected individuals and prohibiting the import or sale of animals known to transmit disease." *Id.* at 761. *Alabama Realtors* thus does not rest solely or even primarily on indicators of economic significance either.

The same was true in *NFIB*, which states that the action at issue (a testing or vaccination mandate) would apply to "84 million" workers. 595 U.S. at 118. As explained above, however, *NFIB*'s legal analysis does not rest on indicators of economic significance alone; it also emphasizes

regulatory history and the transformative nature of the asserted authority. *See supra* Sec. I.A.1–2.

All the above points apply with equal force to political significance. The Supreme Court often references political significance in its cases on the major questions doctrine. *See, e.g.*, *West Virginia*, 597 U.S. at 731–32 (discussing proposals Congress "declined to enact" and nationwide debate); *Nebraska*, 600 U.S. at 503–04 (same). But history and breadth have played a greater analytical role. *See supra* Sec. I.A.1–2. In fact, the Supreme Court appended political significance as an afterthought at the very end of its major questions analysis in *West Virginia*—after pages discussing history and breadth. 597 U.S. at 731–32. And in *Nebraska*, the Supreme Court similarly reached political significance only after discussing history and breadth. 600 U.S. at 503–04.

The Supreme Court's focus on history and breadth in addition to economic and political significance makes sense given its explanation that the major questions doctrine applies only in "extraordinary cases." Numerous government actions can be described as economically or politically significant; far fewer are unlike anything the relevant actor has done before or represent a drastic change in authority. The Supreme

Court's emphasis on history and breadth thus helps ensure the doctrine remains confined to extraordinary cases.

To give a rough sense of the numbers, agencies promulgate upwards of 3,000 rules a year, with roughly 40 to 120 designated annually as "major rules" under the Congressional Review Act—namely, rules with an annual effect on the economy of $100 million or more, 5 U.S.C. § 804(2). *See* Cong. Rsch. Serv., R43056, *Counting Regulations: An Overview of Rulemaking, Types of Federal Regulations, and Pages in the Federal Register* 6–9 (2019), https://perma.cc/67GG-FFVH. In contrast to these hundreds of arguably economically significant government actions, the Supreme Court has identified only a handful of "extraordinary cases" potentially implicating the major questions doctrine over 30 years. *See* Brunstein & Goodson, *supra*, at 51–70.

In addition, the large scope of many government programs means that actions under those programs inevitably involve billions of dollars in government spending or costs to regulated entities and affect tens or hundreds of millions of Americans. But the Supreme Court has never suggested that all cases under sizable government programs trigger the major questions doctrine. That includes cases involving gargantuan

programs like Medicare; even in recent years, opinions addressing such programs have not invoked the major questions doctrine (regardless of whether the Supreme Court upheld or invalidated the agency action at issue). *See generally Becerra v. Empire Health Found.*, 597 U.S. 424 (2022); *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022); *Azar v. Allina Health Servs.*, 587 U.S. 566 (2019).

Here, for example, Private Plaintiffs alleged in their brief below that the President's tariffs "would impose an estimated average of almost $1,300 in new taxes per year on American households, for a total tax burden of some $1.4 to 2.2 trillion over the next ten years, reducing U.S. gross domestic product by some 0.8%." Pls. Mem. 13, *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) (No. 25-00066) (footnote omitted). But large economic impacts alone should not suffice to trigger the doctrine: Many government actions implicate billions of dollars in economic effects each year; applying the major questions doctrine to every such action would expand the doctrine far beyond the "extraordinary" case.

\*     \*     \*

In short, under binding Supreme Court precedent, history, *and* breadth, *and* significance must favor application of the major questions doctrine. If one is absent, the doctrine does not apply.

## II. All Factors Signaling An "Extraordinary Case" For The Major Questions Doctrine Are Present Here.

This is an extraordinary case that triggers the major questions doctrine, as the challenged tariffs are unheralded, transformative, and economically and politically significant.

### A.     The challenged tariffs are "unheralded."

In the nearly half century since Congress enacted IEEPA, no President has ever used it to impose a tariff. Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* 26 (2024), https://perma.cc/5UW7-EKD8. Rather, according to a detailed report from the Congressional Research Service, past Presidents have used IEEPA only to impose economic sanctions like import bans and asset freezes, not tariffs. *See id.* at 25–26; *see also id.* at App. A (listing every past use of IEEPA). As that report explains, as of January 2024, Presidents had declared 69 national emergencies invoking IEEPA, *id.* at

15, but "[n]o President ha[d] used IEEPA to place tariffs on imported products from a specific country or on products imported to the United States in general," *id.* at 26.

In fact, in his first Term, President Trump used IEEPA as his predecessors had—to impose economic sanctions like asset freezes. *See id.* at 62 (listing uses from 2021–2023). He did not use IEEPA to impose tariffs. Rather, when he sought to impose tariffs on imports from China, he relied on Section 301 of the Trade Act of 1974, 19 U.S.C. § 2411. Brock R. Williams, Cong. Rsch. Serv., R45529, *Trump Administration Tariff Actions: Frequently Asked Questions* 10 (2020), https://perma.cc/442E-WFKF. When he sought to impose tariffs on steel and aluminum imports, he relied on Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862. *Id.* at 9. When he sought to impose tariffs on solar cells and washing machines, he relied on Section 201 of the Trade Act of 1974, 19 U.S.C. § 2251. *Id.* at 8. These statutes all require the President to follow specific procedures before imposing a tariff—procedures President Trump followed in his first term but did not follow here.[5]

---

[5] True, President Trump *threatened* to impose tariffs under IEEPA during his first term, but he never fully carried out the threat. *See* Casey

True, President Nixon relied on a predecessor statute, the Trading with the Enemy Act (TWEA), to impose a 10% ad valorem tariff on all imports to the United States. *See* Casey & Elsea, *supra*, at 26 & n.153, 52. But it is far from clear that the Supreme Court would consider an exercise of authority under a different statute sufficient to defeat the "unheralded" prong of the major questions doctrine. Among other things, the Supreme Court has focused on the actual statutory provision at hand (and regulations promulgated thereunder) when assessing this factor. In *West Virginia*, it dismissed the relevance of sector-wide pollution-regulation programs under "other provisions of the Clean Air Act" when determining whether there was "clear authorization" for a similar scheme under Section 111. 597 U.S. at 732–33; *see also Nebraska*, 600 U.S. at 502 (focusing on "regulation[s] premised on the HEROES Act" (cleaned up)).

Moreover, even if this Court finds that actions analyzed under the TWEA are relevant to the "unheralded" inquiry, President Nixon's tariffs

---

& Elsea, *supra*, at 27. The fact thus remains that, until now (and certainly not before President Trump), no previous President had ever invoked IEEPA to impose tariffs, much less the sweeping tariffs at issue here. *Id.* at 26.

are meaningfully different from President Trump's. In upholding President Nixon's actions, the U.S. Court of Customs and Patent Appeals highlighted that they were "limited," "temporary," "not imposed to raise revenue," "calculated to help meet a particular national emergency," and did not "supplant the entire tariff scheme of Congress." *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 578 & n.26 (C.C.P.A. 1975) (quotation marks omitted). The court expressed doubt that the TWEA authorized broader tariffs that did not meet these conditions. *See id.* Stated somewhat differently, President Nixon's actions were far more "modest and narrow in scope" (and upheld under a predecessor statute) than President Trump's. *Nebraska*, 600 U.S. at 501.

Given that IEEPA has never been used to impose tariffs in its nearly 50-year history, President Trump's use of IEEPA to impose these tariffs is unheralded.

## B.    The President's interpretation of IEEPA is "transformative" as it converts the statute into a device to set national trade and fiscal policy.

The President's use of IEEPA would transform a narrow statute designed to give the President surgical tools to impose narrow sanctions during national emergencies the power to override *all* of Congress's

carefully drawn trade statutes, effectively appropriating Congress's authorities over foreign commerce and taxation as his own.

As noted above, Presidents have previously used IEEPA to impose targeted trade regulations meant to address specific threats posed by hostile actors or illicit trade. For instance, previous invocations of IEEPA have been targeted sanctions (not tariffs) that: (1) concerned certain goods such as chemical and biological weapons proliferation, rough diamonds, and weapons of mass destruction; or (2) addressed international crises or hostile actors by blocking property to groups such as transnational criminal organizations, those engaging in malicious cyber-enabled activities, or persons contributing to foreign conflicts in Ukraine, South Sudan, Syria, and elsewhere. *See* Casey & Elsea, *supra*, at App. A.

As opposed to these surgical and targeted uses, the President is now attempting to use IEEPA to address widespread trade deficits and fiscal shortfalls, fundamentally transforming the statute into a blank check to rebalance international trade and raise revenue. *See* Compl. ⁋ 68, *Oregon et al. v. U.S. Dep't of Homeland Sec. et al.*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) (No. 25-00077) (stating that challenged tariffs "are intended

. . . to raise revenue"). This, much like EPA's use of generation shifting in *West Virginia*, would effect a "fundamental revision of the statute," asserting it for "an entirely different kind" of authority. *West Virginia*, 597 U.S. at 728 (cleaned up).

The President's assertion of this authority under IEEPA is particularly transformative because Congress has already enacted multiple carefully drafted trade statutes that authorize tariffs only in certain circumstances (e.g., specifying industries, countries, or criteria) and after following specified procedures. For example, Section 232 of the Trade Expansion Act of 1962 "provides that if the Secretary of Commerce 'finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair [the] national security,' then the President may take action to adjust the imports such that they will no longer impair national security." Casey & Elsea, *supra*, at 26–27 (emphasis added) (quoting 19 U.S.C. § 1862(c)). And as noted above, Section 301 of the Trade Act of 1974 authorizes tariffs on countries that have violated certain trade agreements, but only after the U.S. Trade Representative satisfies various processes including conducting an investigation and making detailed factual findings. 19

U.S.C. § 2414. While these statutes delegate broad authority to the executive to set tariffs, that authority is circumscribed by procedural and substantive limitations and is narrower than the President's claimed power under IEEPA. Interpreting IEEPA to give the President a blank check to reduce American trade deficits and raise revenue would render Congress's many other carefully drawn trade statutes superfluous.

Further supporting its claim that the challenged tariffs fall within IEEPA's ambit, the Government notes that the President has "expertise and independent constitutional authority" over "foreign affairs and national security." Gov't Br. 45. True enough. But the President's "independent constitutional authority" covers only a subset of foreign affairs domains, such as "national defense, command over the military, diplomacy, recognition of foreign governments, and the settlement of claims," Curtis Bradley & Jack Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Penn. L. Rev. 1743, 1764 (2024), not all of them. The Constitution grants *Congress* the power to "regulate commerce with foreign nations" and to "lay and collect taxes, duties, imposts and excises." U.S. Const. art. I, § 8, cls. 1, 3.

### C. The challenged tariffs are economically and politically significant.

There are multiple different ways to discuss the economic effects of the President's tariffs. *See, e.g.*, Erika York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Foundation (July 3, 2025), https://perma.cc/KB97-USZL. For example, his full slate of recent tariffs is projected to "increase federal tax revenues by $156.2 billion" in a single year, representing "the largest tax hike since 1993." *Id.* And they are projected to reduce GDP by 0.8% (before foreign retaliation), *id.*, which equates to over $200 billion per year or more than $2 trillion over ten years.[6]

Although courts have not established a precise threshold for economic significance, this alleged economic effect would more than qualify. When discussing economic significance in *Nebraska*, the Supreme Court cross-referenced *Alabama Realtors*, which stated that the challenged action was projected to have approximately $50 billion in economic impacts over the course of roughly a year. *Nebraska*, 600 U.S.

---

[6] U.S. GDP is currently over $30 trillion. United States: Datasets, Int'l Monetary Fund (last updated Apr. 2025), https://www.imf.org/external/datamapper/profile/USA.

at 502 (citing *Ala. Realtors*, 594 U.S. at 764). That $50 billion estimate was just a "reasonable proxy of the [action's] impact," *id.*, but it still provides a reference point indicating that around $50 billion in annual economic effects may qualify as economically significant. The President's tariffs meet this threshold with room to spare.

The tariffs are politically significant, too. There are few decisions that are more politically fraught than taxation, and as noted above, these tariffs by one estimate represent the largest tax hike in a generation. These tariffs have also been the subject of "earnest and profound debate across the country." *West Virginia*, 597 U.S. at 732 (quoting *Gonzales*, 546 U.S. at 267–68). Though Supreme Court precedents have not spelled out a clear test for political significance, these IEEPA tariffs would qualify under any reasonable standard.

## III.  Because the Major Questions Doctrine Applies, The Government Must Identify "Clear Congressional Authorization" To Impose These Tariffs.

When the major questions doctrine applies, the government "must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 597 U.S. at 723.

Although the Supreme Court has not explained precisely what qualifies as "clear congressional authorization," its major questions opinions "emphasize the importance of *context* when a court interprets a [congressional] delegation." *Nebraska*, 600 U.S. at 508 (Barrett, J., concurring). "Seen in this light, the major questions doctrine is a tool for discerning—not departing from—the text's most natural interpretation," *id.*, enabling courts to use the doctrine as a "tool . . . to determine the best reading of the statute," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

As Justice Barrett explains in her *Nebraska* concurrence, the major questions doctrine "serves as an interpretive tool reflecting 'common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude." *Nebraska*, 600 U.S. at 511 (quoting *Brown & Williamson*, 529 U.S. at 133). While a claim to unheralded and transformative power should be greeted "with at least some measure of skepticism" given "baseline assumptions" about how delegations normally operate, "this skepticism does not mean that courts have an obligation (or even permission) to choose an inferior-but-tenable alternative that curbs the agency's authority." *Id.* at 516. Rather, "[i]n

some cases, the court's initial skepticism might be overcome by text directly authorizing the agency action or context demonstrating that the agency's interpretation is convincing." *Id.*

Here, the President may offer a "colorable textual basis," that some of IEEPA's terms (e.g., "regulate") can be stretched to authorize sweeping tariffs to rebalance international trade, just like in *West Virginia* the Court recognized that EPA could offer a colorable argument that the phrase "system of emission reduction" authorized generation shifting. But the "extraordinary" nature of this case should "make [courts] 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there," like the Court was in *West Virginia.* 597 U.S. at 722–23 (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324). While IEEPA's text may encompass sweeping tariffs when "shorn of all context," *id.*, it should be assessed with an eye toward broader context including statutory history and its place among other provisions. *See id.* at 732–35 (considering text and context to assess whether "clear congressional authorization" was present). Taking into account IEEPA's "legislative history and Congress's enactment of more narrow, non-emergency legislation," the Court of International Trade held that the statute "at

the very least does not authorize the President to impose unbounded tariffs," including those issued "in response to balance-of-payments deficits." Appx25, Appx35.

## IV. The Major Questions Doctrine Applies To The President's Exercise Of Delegated Authority.

Finally, while the Supreme Court has applied the major questions doctrine only to agencies or cabinet departments, nothing in the Supreme Court's opinions provides or suggests that a different rule would apply to the President. To the contrary, Supreme Court caselaw strongly indicates that the major questions doctrine is a tool of statutory interpretation that applies regardless of who is exercising the disputed statutory authority. *See Nebraska*, 600 U.S. at 508 (Barrett, J., concurring) (["T]he major questions doctrine is a tool for discerning—not departing from—the text's most natural interpretation.").

When the President interprets a lawful delegation from Congress, as with any other executive branch official, courts must independently analyze the scope of the delegation to assess "a claim alleging that the President acted in excess of his statutory authority." *See Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023). In fact, the Supreme Court stressed in *Loper Bright* that courts are not to "declar[e]

a particular party's reading 'permissible'" in *any* case but are instead required to "use every tool at their disposal to determine the best reading of the statute" in every case. 603 U.S. at 400. Relevant interpretive canons, including the major questions doctrine, are such tools.[7]

## CONCLUSION

Because the challenged tariffs are unheralded, transformative, and of vast economic and political significance, the Court should find that they trigger the major questions doctrine.

---

[7] Notably, several circuit courts have applied the major questions doctrine to presidential actions. *See Louisiana v. Biden*, 55 F.4th 1017, 1031 & n.40 (5th Cir. 2022); *Georgia v. President of the United States*, 46 F.4th 1283, 1295 (11th Cir. 2022). One circuit took the opposite view, *Mayes v. Biden*, 67 F.4th 921, 933–34 (9th Cir.), but that decision was later vacated as moot, 89 F.4th 1186 (9th Cir. 2023); *see also State v. Su*, 121 F.4th 1, 17–19 (9th Cir. 2024) (R. Nelson, J., concurring) (concluding in a case decided after *Mayes* that the major questions analysis applies to actions by the President, regardless of whether the doctrine is a "substantive canon rooted in non-delegation principles" or a statutory interpretation tool).

July 8, 2025                              Respectfully submitted,

                                         /s/ Max Sarinsky
                                         Donald L.R. Goodson
                                         Kelly C. McGee
                                         Richard L. Revesz
                                         Max Sarinsky
                                         INSTITUTE FOR POLICY INTEGRITY
                                         139 MacDougal Street, 3rd Floor
                                         New York, NY 10012
                                         (212) 992-8932
                                         max.sarinsky@nyu.edu

                                         *Counsel for* Amicus Curiae
                                         *Institute for Policy Integrity*

## CERTIFICATE OF COMPLIANCE

Counsel hereby certifies that this brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font. Counsel further certifies that this brief contains 6,324 words, in compliance with this Court's word limitations.


DATED:    July 8, 2025                 Respectfully submitted,

                                       /s/ Max Sarinsky
                                       Max Sarinsky

                                       *Counsel for* Amicus Curiae
                                       *Institute for Policy Integrity*