Nos. 25-1812, 25-1813

**UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

V.O.S. SELECTIONS, INC. et al,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as

President of the United States et al,

Defendants-Appellants.

_____

Appeal from the United States Court of International Trade in No. 1:25-cv-00066-GSK-TMR-JAR, Judge Gary S. Katzmann, Judge Timothy M. Reif, and Senior Judge Jane A. Restani

_____

**BRIEF OF AMICUS CURIAE PETER W. SAGE IN SUPPORT OF
PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Thad M. Guyer
T.M. Guyer & Friends, PC
116 Mistletoe Street
Medford, OR 97501
Tel. (206) 941-2869
EM thad@guyerayers.com

Counsel for Amicus

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST 6

STATEMENT OF INTEREST OF AMICUS CURIAE 7

PRELIMINARY STATEMENT 8

I. INTRODUCTION: A BOUNDLESS PRESIDENCY 10

II. SUMMARY OF ARGUMENT 12

III. TRADE AND TARIFF DOMAIN: CONGRESSIONAL AUTHORITY 18

   A. The Constitution Grants Congress Exclusive Authority Over Trade and Tariffs 18

   B. Early American Tariff Policy and Unwavering Congressional Control 20

   C. The Separation of Powers Requires Congressional Control Over Trade Policy 22

IV. THE FEDERAL JUDICIARY: PROTECTING ARTICLE III INDEPENDENCE 22

   A. The Maryland Judges vs. the President 22

   B. Erez Reuveni's Whistleblower Retaliation: Executive Overreach in Action 24

   C. Congressional Authority Over the Judiciary: Constitutional Design and Historical Practice 26

   D. The Executive Lacks Authority to Nullify Judicial Offices or Systems Created by Congress 29

   E. Policy Implications and Contemporary Challenges for the Judiciary 29

V. THE CIVIL SERVICE DOMAIN OF CONGRESSIONAL AUTHORITY 30

   A. The Early Republic: A De Facto Merit System and the Emergence of Patronage 30

B. The Pendleton Act of 1883: Establishing a Merit-Based System and Congressional Control 31

C. Modern Developments and the Civil Service Reform Act of 1978 32

D. Whistleblower Protections as a Structural Safeguard of Congressional Intent 33

VI. CONCLUSION 33

CERTIFICATE OF SERVICE 36

CERTIFICATE OF COMPLIANCE 37

# TABLE OF AUTHORITIES

## CASES

*Abrego Garcia v. Noem*, No. 25-cv-951 (D. Md.), ..................................................24

Biden v. Nebraska, 600 U.S. 477, 506–08 (2023) ...................................................22

Bowsher v. Synar, 478 U.S. 714 (1986)...................................................................18

*Bowsher v. Synar*, 478 U.S. 714, 730 (1986), .........................................................29

*Dept of Homeland Sec. v. MacLean*, 574 U.S. 383, 394 (2015) ............................33

Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548 (1976), ....................15

INS v. Chadha, 462 U.S. 919, 951 (1983) ...............................................................22

JCM, Ltd. v. United States, 210 F.3d 1357 (Fed. Cir. 2000), ................................15

Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803),..............................................17

Marshall Field & Co. v. Clark, 143 U.S. 649 (1892) .............................................15

*Massachusetts v. Mellon*, 262 U.S. 447, 478, 43 S. Ct. 597, 598 (1923)...............21

*Michelin Tire Corp. v. Wages*, 423 U.S. 276, 291 n.12 (1976).............................19

*Noem v. Abrego Garcia*, 145 S.Ct. 1017 (2025) .....................................................25

*Plaut v. Spendthrift Farm*, 514 U.S. 211, 241 (1995) ...........................................20

*United States ex rel. Hoover v. Franzen*, 669 F.2d 433, 443 n.21 (7th Cir. 1982) .21

*United States of America v. Chief Judge George L. Russell III*, et al., No. 1:25-cv-02029 (D. Md.),..............................................................................................22

United States v. Klein, 80 U.S. (13 Wall.) 128 (1872) ..........................................17

*United States v. Lopez*, 514 U.S. 549, 590 (1995) .................................................21

## STATUTES

5 U.S.C. § 2302(b)(8)......................................................................13, 26,33

5 U.S.C. § 7211 .......................................................................................33

50 U.S.C. §§ 1701–1710, ........................................................................13

**CONSTITUTIONAL PROVISIONS**

Article I, Section 8, Clause 18.................................................................14

Article I, Section 8, Clause 3...................................................................18

Article I, Section 8, Clause 9...................................................................26

Article I, Section 9, Clause 7...................................................................14

**OTHER AUTHORITIES**

*Landmark Legislation: Judiciary Act of 1789*, Federal Judicial Center (1992)......28

The Federalist No. 47 and No. 48 ...........................................................27

U.S. Senate Committee on the Judiciary, *Protected Whistleblower Disclosure of Erez Reuveni Regarding Violation of Laws, Rules & Regulations, Abuse of Authority, and Substantial and Specific Danger to Health and Safety at the Department of Justice* (June 24, 2025)...............................................26

**TREATISES**

Hamilton's Report on Manufactures (1791) ...........................................20

Frederick C. Mosher, "Democracy and the Public Service" (1982) .......................31

History of the Federal Civil Service, 1789 to the Present" by the United States Civil Service Commission (1941).......................................................31

Joseph Postell, "From Merit to Expertise and Back: The Evolution of the U.S. Civil Service System" (2020).......................................................32

# CERTIFICATE OF INTEREST

**Case Numbers:**      25-1812, 25-1813
**Short Case Caption:**    V.O.S. Selections, Inc. v. Trump
**Filing Party/Entity:**      Peter W. Sage

Pursuant to Federal Circuit Rule 47.4, counsel for amicus curiae Peter W. Sage certifies the following:

The full name of every party or amicus represented by me is: Peter W. Sage

The name of the real party in interest represented by me is: None.

All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None.

The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are: None.

The title and number of any case known to counsel to be pending that will directly affect or be directly affected by this court's decision: None.

I certify the above information is accurate and complete to the best of my knowledge.

Date: July 7, 2025        */s/ Thad M. Guyer*
                             Thad M. Guyer

                             Counsel for Amicus Curiae

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

Peter W. Sage, age 75, is a retired professional who operates a small farm and vineyard in Southern Oregon. He lives primarily on Social Security and modest personal investments, along with the hope of future income from his vineyard. He is financially vulnerable to costs imposed by tariffs affecting the equipment and supplies necessary to develop and operate his vineyard, as well as the risk of losing access to foreign markets for his wine in the event of retaliatory tariffs. Mr. Sage depends on a competent, merit-based federal civil service to safeguard his well-being and that of his community. He relies on the National Weather Service for accurate forecasts to protect his crops from frost damage and to provide critical data for managing and responding to regional forest fires, which at times leave his region immersed in hazardous smoke for weeks. He depends on career professionals at the Department of Health and Human Services to administer his Social Security and Medicare benefits fairly and accurately. He also relies on the integrity of financial regulators, including the SEC and the

_____

[1] No party or party's counsel authored this brief in whole or in part, and no person other than the amicus curiae, its members, or its counsel or contributed money intended to fund the preparing or submission of this brief.

Treasury Department, to protect his investments from fraud, bank failures, and market instability. Political interference in these agencies and the courts threatens Mr. Sage's livelihood and erodes public trust in essential governmental functions.

## PRELIMINARY STATEMENT

Mr. Sage relies on the constitutional structure of the United States, specifically on the separation of powers and Congress's exclusive authority to impose tariffs, to protect his financial interests. He depends on the stability of congressional action, rather than the unilateral deal-making of an executive, to ensure a reliable supply chain and stable markets for his vineyard's products. Congressional authority over tariffs provides him with practical access to decision-makers in the House and Senate who understand and represent the needs of small agricultural producers in Southern Oregon like himself.

In addition to these concrete economic concerns, Mr. Sage has, for almost a decade, written about executive overreach in his political blog, *Up Close with Peter Sage*,[2] where he reports on in-person interactions with presidential candidates in New Hampshire and Iowa. Until recently, Mr. Sage's warnings about

---

[2] https://peterwsage.blogspot.com/

unchecked executive power were largely theoretical. However, he now fears targeted retaliation by the President of the United States, including politically motivated IRS audits, placement on a no-fly list, interference with the naturalization status of family members, and harassment of lawfully present Hispanic workers at his vineyard. These are no longer abstract possibilities; they have become tangible concerns in light of recent examples of executive retaliation against critics.

Mr. Sage notes with alarm that the Executive Department recently filed lawsuits against every District Court judge in the state of Maryland — an act that is unprecedented and demonstrates a shocking lack of respect for judicial review of executive actions. He is concerned about the erosion of boundaries and the dismantling of checks and balances. These threats are manifesting now, in real time. Each breach of constitutional boundaries, including, in this case, the circumvention of Congress's authority over tariffs, normalizes further encroachments and weakens the framework of limited government.

Mr. Sage's experience underscores the broader constitutional principle at stake: no individual, including the President, is above the law. When executive power is exercised without accountability, it jeopardizes not only national governance but also the personal freedoms, safety, and economic stability of

9

ordinary Americans. For these reasons, Mr. Sage respectfully urges the Court to reaffirm the separation of powers and the foundational principle that the President is subject to the law.

## I.  INTRODUCTION: A BOUNDLESS PRESIDENCY

On June 24, 2025, the Executive Branch took an unprecedented step in the assertion of presidential power. In *United States of America v. Chief Judge George L. Russell III,* et al., No. 1:25-cv-02029 (D. Md.), the Department of Justice filed an extraordinary lawsuit against every federal judge in the U.S. District Court for the District of Maryland, seeking to enjoin their exercise of basic judicial functions.[3] This is an escalation in the Executive's determination to exert its will over coordinate branches of government. The Maryland litigation illustrates why this Court must reject executive overreach in the tariff context before it metastasizes throughout our constitutional system. An Executive Branch emboldened by success in subjugating one constitutional domain will inevitably extend its claims of unlimited authority to other domains.

---

[3] See, *Case Summary*, Civil Rights Litigation Clearinghouse, Univ. of Michigan, https://clearinghouse.net/case/46732/#:~:text=The%20Trump%20Administration%20filed%20this%20novel%20lawsuit%20on,defendants%2C%20as%20well%20as%20the%20district%27s%20court%20clerk.

The underlying dispute centers on Chief Judge George Russell's standing orders that automatically stay immigration removal proceedings for two business days when detainees file habeas corpus petitions. These orders were designed to address an influx of habeas petitions concerning alien detainees filed after normal court hours and on weekends and holidays that had created scheduling difficulties and resulted in hurried and frustrating hearings. The orders ensure basic due process by giving courts time to review detention cases before irreversible deportations occur. Rather than following normal appellate procedures to challenge these judicial rulings, the Executive chose the radical step of suing the judges themselves. The administration characterizes routine judicial oversight as lawless and judicial overreach, seeking preliminary and permanent injunctions to prevent the Maryland court from exercising its Article III powers. This represents a fundamental departure from legal norms where parties dissatisfied with injunctions appeal the orders rather than sue the courts or judges themselves.

The Executive asserts that any institutional constraint on its immigration agenda constitutes improper interference with core Executive Branch powers and undermines the democratic process. This same logic would permit the Executive to override Congress's exclusive constitutional authority over trade and taxation simply by invoking electoral mandates and claiming inherent emergency powers.

We now have a real-time demonstration of how constitutional violations may compound across domains. This progression from trade overreach to judicial intimidation confirms that the separation of powers functions as an integrated constitutional system. Allowing executive usurpation in any domain weakens the entire structure of limited government.  Today tariffs, then the federal civil service and now the courts themselves. This court must protect all three Congressional domains.

## II.  SUMMARY OF ARGUMENT

Amicus Peter W. Sage urges this Court to affirm the Court of International Trade's decision in *V.O.S. Selections, Inc. v. United States*, Slip Op. 25-66 (Ct. Int'l Trade May 28, 2025).  This brief frames Mr. Sage's argument around three statutory domains where Congress has exercised exclusive authority: tariffs, the judiciary, and the civil service. These domains, grounded in Article I and shaped by generations of legislative action, are the constitutional guardrails preventing executive power from subsuming the entire machinery of government.  Each domain illustrates how Congress constructs, funds, and governs essential systems—setting tariffs, establishing courts, and protecting a merit-based federal workforce. When the Executive breaches these statutory barriers, as in the

12

imposition of global tariffs without authorization or in suing Maryland's entire district bench, the separation of powers itself is imperiled.

The lower court correctly determined that the President's imposition of broad Worldwide, Retaliatory, and Trafficking Tariffs under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1710, was an unconstitutional exercise of executive power, exceeding congressional authorization and violating the separation of powers. Mr. Sage contends that unchecked executive authority threatens Congress's exclusive Article I powers over trade and taxation and undermines the meticulously constructed statutory protections for the federal civil service under the Civil Service Reform Act (CSRA), 5 U.S.C. §§ 1101 et seq., and the Whistleblower Protection Act (WPA), 5 U.S.C. § 2302(b)(8), as well as the indispensable independence of the federal judiciary under Article III. This brief will demonstrate that executive overreach in any of these domains constitutes a profound violation of the separation of powers, undermines democratic accountability, and erodes the rule of law.

The federal civil service is a constitutional construct, firmly rooted in Congress's Article I authority to structure the federal government. Congress has exercised its constitutional authority to create and fund executive departments through several interconnected provisions of Article I. The Necessary and Proper

13

Clause (Article I, Section 8, Clause 18) grants Congress power to enact all laws "necessary and proper for carrying into Execution" the enumerated powers and "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." This clause provides the primary constitutional foundation for establishing executive departments as administrative structures essential to implementing congressional powers such as collecting taxes, regulating interstate commerce, and maintaining armed forces. The Appropriations Clause (Article I, Section 9, Clause 7) mandates that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," giving Congress exclusive control over federal spending and thus complete authority over departmental funding. Beginning with the First Congress in 1789, this authority was operationalized through the creation of the Department of Foreign Affairs, 1 Stat. 28 (July 27, 1789), later renamed the Department of State, 1 Stat. 68 (September 15, 1789); the Department of War, 1 Stat. 49 (August 7, 1789); and the Department of the Treasury, 1 Stat. 65 (September 2, 1789). Congress has continued to exercise this authority throughout American history, creating new departments like Homeland Security in 2002 and regularly restructuring existing agencies through comprehensive legislation. Upon this congressional control over executive department creation and funding the federal civil service has been

14

created and funded. This is a fundamental check on executive power, ensuring that the administrative apparatus of government reflects legislative priorities rather than unilateral executive design.

Statutes like the Pendleton Act of 1883, the CSRA, and the WPA have painstakingly built a merit-based system designed to ensure impartial administration and protect whistleblowers who expose governmental misconduct. Allowing executive overreach in trade policy, as rightly rejected in *V.O.S.*, risks establishing a dangerous precedent that could justify bypassing these vital civil service protections, ultimately undermining government transparency, accountability, and the very integrity of public service.

Congress's exclusive authority over trade and tariffs, vested in Article I, Section 8, Clauses 1 and 3, is essential for ensuring democratic accountability. The *V.O.S.* court correctly held that IEEPA does not authorize sweeping tariffs without clear congressional approval, thereby upholding the nondelegation and major questions doctrines. The extensive body of judicial precedent, including the numerous tariff cases cited in the lower court's opinion, such as *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), *JCM, Ltd. v. United States*, 210 F.3d 1357 (Fed. Cir. 2000), and *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976), consistently emphasize the indispensable need for explicit statutory delegation and

15

robust judicial review to prevent executive overreach. Unchecked executive tariff authority could set a perilous precedent, enabling similar unilateral executive encroachments into other congressional domains, including the civil service and the judiciary, thereby disrupting the delicate constitutional balance.

Executive attempts to dismantle or interfere with the congressionally established federal district court system—including its judges, courthouses, and essential operational systems like PACER— would represent a profound violation of the separation of powers; even the threat of underfunded or withdrawn courthouse security is a cause for concern. See, Judiciary Officials Cite Threats Against Judges as They Make Case to Congress for More Security Funding, Courthouse News Service (May 12, 2025).[4]  The President appoints the General

---

[4] https://www.courthousenews.com/judiciary-officials-cite-threats-against-judges-as-they-make-case-to-congress-for-more-security-funding/. The Department of Justice controls the U.S. Marshal Service and courthouse security. The Judiciary Act of 1789 established the Office of the United States Marshal and the original 13 Federal judicial districts and called for appointment of a Marshal for each district.  The Senate confirmed President Washington's nomination of the first Marshals on September 26, 1789. The Attorney General began supervising the Marshals in 1861.  The Department of Justice was created in 1870, and the Marshals have been under its purview since that time.  On May 12, 1969, DOJ Order 415-69 established the United States Marshals Service (USMS), with its director appointed by the Attorney General.  On November 18, 1988, the USMS was permanently established as a bureau within the Department under the authority

Services Administration (GSA) administrator,[5] which administers real property and

buildings of the United States.

Cases such as *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), and

*United States v. Klein*, 80 U.S. (13 Wall.) 128 (1872), unequivocally establish that

the Executive cannot nullify judicial offices, prescribe rules of decision for courts,

or manipulate judicial authority to control case outcomes. *Bowsher v. Synar*, 478

---------------------

and direction of the Attorney General with its Director appointed by the
President. See,  https://www.justice.gov/doj/organization-mission-and-functions-
manual-united-states-marshals-service.

[5] https://www.gsa.gov/about-us/newsroom/news-releases/stephen-ehikian-
appointed-acting-administrator-and-deputy-administrator-of-gsa-01222025.
"Under the Trump-Vance Administration, I will return the GSA to its core purpose
of making government work smarter and faster," said Stephen Ehikian, Acting
Administrator and Deputy Administrator of the General Services Administration.
See also, *Federal Courthouse Construction: Process, Recent Projects, and
Funding Options*, Congressional Research Service, (October 1, 2021): Federal
courts are located in more than 750 government-owned and leased properties
across the nation. Federal courthouses provide space for U.S. district, appellate,
and bankruptcy judges, as well as judicial administrative offices and non-court-
related tenants. Within the judiciary, the Administrative Office of the
U.S. Courts (AOUSC) provides a range of program support services to the federal
courts, including capital-planning. The AOUSC does not have the authority to
acquire real property and is required by law to work through the General Services
Administration (GSA) to lease, build, or purchase courthouse space.4 The AOUSC
and GSA, therefore, administer the federal courthouse construction program
jointly.

U.S. 714 (1986), further reinforces the judiciary's independence as a coequal branch of government. Affirming the *V.O.S.* decision is critical to protecting the judiciary's constitutionally mandated role as an independent check on executive power and upholding the rule of law.

## III.   TRADE AND TARIFF DOMAIN: CONGRESSIONAL AUTHORITY

### A.   <u>The Constitution Grants Congress Exclusive Authority Over Trade and Tariffs</u>

The authority to impose tariffs is a cornerstone of congressional power within the U.S. Constitution, which vests Congress with exclusive authority over trade and tariffs, ensuring democratic accountability in economic policy. Article I, Section 8, Clause 3 grants Congress the power to "regulate Commerce with foreign Nations," while Clause 1 authorizes Congress to "lay and collect Taxes, Duties, Imposts and Excises." The Necessary and Proper Clause enables Congress to enact all laws "necessary and proper" for these powers, ensuring comprehensive legislative oversight. The Tenth Amendment clarifies that powers not delegated to the federal government are "reserved to the States respectively, or to the people," precluding executive authority over trade and taxation. This design reflects the Framers' intent to ensure accountability in economic policy through a balanced legislative process.

The assignment of tariff authority to Congress was a response to the economic chaos under the Articles of Confederation, where states imposed conflicting tariffs, leading to commercial disputes and a weakened national economy. The Framers recognized that a unified economic policy was essential for national prosperity and stability.

Alexander Hamilton, a key architect of the constitutional order, articulated the need for centralized tariff authority in The Federalist Papers. In Federalist No. 12, he emphasized that Congress's power to "lay and collect... Duties, Imposts and Excises" was crucial for efficient revenue collection and preventing smuggling. He noted that state-level tariffs led to economic fragmentation, undermining national revenue and coherence. *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 291 n.12 (1976).

Hamilton argued in Federalist No. 35 that tariffs necessitated legislative deliberation to balance competing regional interests, ensuring national policy reflected broad consensus. James Madison, in Federalist No. 42, clarified that the commerce clause aimed for uniform tariff policies to prevent destructive interstate conflicts and promote national interests. Madison's warnings in Federalist Nos. 47 and 48 against consolidating legislative and executive powers, cautioning that executive overreach could undermine essential checks and balances and result in

despotic government. *Plaut v. Spendthrift Farm*, 514 U.S. 211, 241 (1995). The Framers' design reflects a deliberate choice to vest tariff authority in Congress, ensuring trade policies reflect diverse interests through representative debate and legislative compromise. This structure stands in stark contrast to monarchical systems, where unilateral executive control over trade often served narrow, arbitrary interests, a danger Hamilton explicitly highlighted in Federalist No. 22.

## B. Early American Tariff Policy and Unwavering Congressional Control

The allocation of tariff authority to Congress was decisively operationalized in the early years of the republic, establishing a precedent that has endured. The Tariff of 1789, one of the first acts of the First Congress, imposed duties on imports to generate revenue and protect American industries. This act established congressional control, as lawmakers debated specific rates and exemptions, balancing regional interests. Hamilton's Report on Manufactures (1791) solidified this legislative role, advocating for protective tariffs to foster industrial development and economic self-sufficiency.[6] His report underscored the necessity

---

[6] https://constitution.org/2-Authors/ah/rpt_manufactures.pdf . From the earliest days of our country's existence statesmen have recognized in their public utterances this broad scope of the power to appropriate for the public welfare;

of legislative deliberation to weigh long-term benefits against short-term consumer costs, reinforcing Congress's role as the primary arbiter of national tariff policy.

The enduring nature of congressional control over tariffs was tested during the "Tariff of Abominations" in 1828, *United States ex rel. Hoover v. Franzen*, 669 F.2d 433, 443 n.21 (7th Cir. 1982) igniting the Nullification Crisis. South Carolina opposed high duties favoring Northern industries, perceived as detrimental to Southern agriculture. President Andrew Jackson defended federal authority, but the crisis was resolved through legislative compromise: the Tariff of 1833, which gradually reduced rates. This demonstrated Congress's capacity to adjust tariffs in response to economic realities and political pressures, reaffirming its central role in national trade policy, balancing revenue needs and regional harmony, as envisioned by Hamilton in Federalist No. 35.*United States v. Lopez*, 514 U.S. 549, 590 (1995)

---

Congress has recognized it in innumerable appropriations of money and property aggregating in value billions of dollars; and those appropriations have never been successfully challenged in this Court. *Hamilton: Opinion to Washington, Hamilton's Works, Lodge's ed*., III, pp. 179, 217; *Report on Manufactures*, ibid., pp. 294, 371, 372. *Massachusetts v. Mellon*, 262 U.S. 447, 478, 43 S. Ct. 597, 598 (1923)

C.  **The Separation of Powers Requires Congressional Control Over Trade Policy**

The separation of powers is a cornerstone of American governance, ensuring that no branch usurps the functions of another. INS v. Chadha, 462 U.S. 919, 951 (1983), rejected claims of convenience to bypass this structure, holding that the Constitution's division of powers is non-negotiable. *Biden v. Nebraska*, 600 U.S. 477, 506–08 (2023), reinforced the major questions doctrine, requiring clear congressional authorization for executive actions with significant economic and political impact. The *V.O.S.* court applied this doctrine, holding that IEEPA's authorities are limited to unusual and extraordinary threats and that the tariffs, justified by persistent trade deficits, did not meet this threshold. Slip Op. 25-66, at 9 (quoting 50 U.S.C. § 1701(b)).

## IV.  THE FEDERAL JUDICIARY: PROTECTING ARTICLE III INDEPENDENCE

A.  **The Maryland Judges vs. the President**

The Maryland litigation exemplifies the constitutional crisis that inevitably follows from unchecked executive power. In *United States of America v. Chief Judge George L. Russell III*, et al., No. 1:25-cv-02029 (D. Md.), filed June 24, 2025, the Executive Branch launched an unprecedented attack on judicial independence by suing every federal judge in Maryland's district court. This extraordinary action demonstrates precisely how executive overreach in one

constitutional domain—such as the tariff authority at issue in V.O.S.—spreads inexorably to threaten all institutional checks on presidential power.

The administration's lawsuit targets Chief Judge Russell's standing orders that provide automatic two-day stays of removal proceedings when immigration detainees file habeas corpus petitions. These modest due process protections, designed to address the influx of after-hours habeas petitions that created scheduling difficulties and resulted in hurried and frustrating hearings, triggered a ferocious executive response. Rather than pursuing normal appellate remedies, the administration characterized routine judicial oversight as lawless judicial overreach and demanded that all Maryland judges recuse themselves from the case.

The Executive's characterization of this dispute reveals its broader constitutional strategy. Attorney General Bondi declared that judicial orders blocking executive actions undermine the democratic process and cannot be allowed to stand. The Justice Department's complaint asserts that every unlawful order entered by district courts robs the executive branch of its most scarce resource—time to put policies into effect—and diminishes the votes of citizens who elected the head of the executive branch. This theory treats electoral victories as licenses to override constitutional limitations, effectively arguing that democratic mandates supersede separation of powers constraints.

The constitutional theory underlying this judicial intimidation campaign mirrors exactly the dangerous precedent that would flow from accepting unlimited executive tariff authority. Just as the administration claims inherent power to impose tariffs without congressional authorization, it now claims authority to intimidate judges who exercise their Article III functions. Both assertions rest on the same constitutional fallacy: that executive power, when democratically legitimated, recognizes no institutional boundaries.

### B. **Erez Reuveni's Whistleblower Retaliation: Executive Overreach in Action**

The executive branch's retaliation against Erez Reuveni, former Acting Deputy Director of the Department of Justice's (DOJ) Office of Immigration Litigation (OIL), further exemplifies the dangerous overreach threatening Article III independence.  In *Abrego Garcia v. Noem*, No. 25-cv-951 (D. Md.), Mr. Reuveni defended the government's unlawful removal of Abrego Garcia to El Salvador's Center for Terrorism Confinement (CECOT) on March 15, 2025, despite a 2019 Immigration Judge order prohibiting deportation to El Salvador due to a clear probability of future persecution. (Doc. 21, No. 25-cv-951). The government conceded this was an "administrative error", yet failed to rectify it, prompting Judge Paula Xinis to order Mr. Abrego Garcia's return by April 7, 2025. See, DOJ Atty Firing Highlights Tension Between 2 Ethical Duties", Law360

(June 25, 2025). The Supreme Court partially upheld this order, vacating the

deadline but mandating due process compliance. *Noem v. Abrego Garcia*, 145

S.Ct. 1017 (2025).

On April 4, 2025, Mr. Reuveni candidly informed Judge Xinis that the

removal was erroneous, mirroring the government's own declaration by ICE

official Robert Cerna. That evening, DOJ leadership, including Senior Counselor

James Percival, directed him to file an appeal brief misrepresenting facts about the

removal and alleging unsubstantiated MS-13 ties, which lacked evidentiary

support. Citing his ethical obligations under Rule 3.3(a)(1) of the Model Rules of

Professional Conduct, which prohibits false statements to a tribunal, Mr. Reuveni

refused. On April 5, he was placed on administrative leave for his alleged failure to

zealously advocate and engaging in conduct prejudicial to his client, and was

terminated on April 11, 2025. See, *Trump Admin. Suspends Lawyer in Case of*

*Maryland Man Mistakenly Deported for Failing to 'Zealously Advocate'*, Fox

News (*Apr. 5, 2025*).[7] His whistleblower complaint, filed with the Office of

---

[7] https://www.foxnews.com/politics/trump-admin-suspends-lawyer-case-maryland-man-mistakenly-deported-failing-zealously-advocate?msockid=09b67f5c2f3e6d8d20a26a302efe6c0c

Special Counsel and DOJ's Office of Inspector General, alleges retaliation for his

protected disclosures under the Whistleblower Protection Act (WPA), 5 U.S.C. §

2302, including his refusal to obey illegal orders and reports of DOJ's non-

compliance with court orders. See U.S. Senate Committee on the Judiciary,

*Protected Whistleblower Disclosure of Erez Reuveni Regarding Violation of Laws,*

*Rules & Regulations, Abuse of Authority, and Substantial and Specific Danger to*

*Health and Safety at the Department of Justice* (June 24, 2025).[8] This stance

mirrors the DOJ's attack on the District of Maryland's judicial independence,

treating Article III as an obstacle to executive will.

### C. <u>Congressional Authority Over the Judiciary: Constitutional Design and Historical Practice</u>

The authority to establish the federal judiciary, particularly district courts, is

a cornerstone of congressional power within the U.S. Constitution. This power is

vested in Congress through Article III, Section 1, which grants discretion to

"ordain and establish" inferior courts, and Article I, Section 8, Clause 9, which

empowers Congress to "constitute Tribunals inferior to the supreme Court." This

---

[8] https://www.judiciary.senate.gov/imo/media/doc/06-24-2025_-
_Protected_Whistleblower_Disclosure_of_Erez_Reuveni_Redacted.pdf

design reflects the Framers' intent to ensure an independent judiciary, safeguarding the separation of powers.

The Constitution's assignment of authority over the federal judiciary to Congress addresses the weaknesses of the judicial system under the Articles of Confederation. The Framers recognized that a unified and independent judiciary was essential for national cohesion and protection of individual rights. Article III, Section 1.

James Madison articulated the rationale for the separation of powers in *The Federalist No. 47* and *No. 48*, warning against consolidating powers, which he deemed the definition of tyranny. Allowing the executive to dictate the structure of the courts would undermine essential checks and balances. The Framers deliberately vested authority over the judiciary in Congress to ensure that federal courts remain an independent, co-equal branch, accountable through legislative oversight, not executive whim.

The theoretical allocation of judicial authority to Congress was quickly operationalized in the early years of the American republic. The Judiciary Act of 1789, one of the first acts of the First Congress, exemplified this assertion of congressional power. This legislation organized a federal judiciary that the Constitution had only outlined, creating a three-part system: a Supreme Court, U.S.

district courts, and U.S. circuit courts. The Supreme Court included a Chief Justice

and five associate justices. Federal judges presided over district courts in each

state, which heard admiralty, maritime, and some minor civil and criminal cases.

The circuit courts functioned as principal trial courts with limited appellate

jurisdiction, presided over by two Supreme Court justices and the local district

judge. presiding in these courts. See, *Landmark Legislation: Judiciary Act of 1789*,

Federal Judicial Center (1992).[9] This act established a precedent for congressional

control, defining the jurisdiction and operational aspects of federal courts.

Congress has continuously adapted the federal judiciary to meet evolving

national needs, demonstrating exclusive authority over judicial structure and

administration. The codification of federal statutes in Title 28 of the United States

Code aimed to improve organization and accessibility of these laws. The Judicial

Code of 1948 created the basic structure of Title 28 that exists today, regularizing

court names and making substantive changes related to jurisdiction and venue.

---

[9] From *Origins of the Federal Judiciary: Essays on the Judiciary Act of 1789* ,
Maeva Marcus, ed. New York: Oxford University Press, 1992.
https://www.fjc.gov/history/legislation/landmark-legislation-judiciary-act-1789-
0#:~:text=In%20the%20Judiciary%20Act%20of%201789%2C%20the%20First,inf
erior%20courts%2C%20the%20Congress%20instituted%20a%20three-
part%20judiciary.

**D. The Executive Lacks Authority to Nullify Judicial Offices or Systems Created by Congress**

Attempts to defund essential judicial systems or disrupt operations would violate the separation of powers just as with tariff control by Congress. *Bowsher v. Synar*, 478 U.S. 714, 730 (1986), warned against actions rendering one branch subservient to another. This principle applies to executive interference with judicial functions. The judiciary's independence is critical to the rule of law, ensuring impartial adjudication. Executive attempts to disrupt judicial systems would render the judiciary subservient, mirroring the unconstitutional overreach rejected in *Bowsher*.

**E. Policy Implications and Contemporary Challenges for the Judiciary**

Any erosion of congressional authority over the judiciary at the hands of the executive carries profound implications for governance and individual liberties. The independence of the judiciary is fundamental to the impartial application of laws and maintaining a stable constitutional order. Legislative oversight is essential to ensure that the administration of justice serves the public good, free from political interference. Unilateral executive overreach risks prioritizing short-term political goals over the integrity of the justice system. Attempts to control judicial resources or access to court information could undermine due process and create

uncertainty for litigants. Congress's deliberative process ensures judicial policies reflect diverse input and constitutional principles, leading to stable outcomes.

## V.  THE CIVIL SERVICE DOMAIN OF CONGRESSIONAL AUTHORITY

Over more than 140 years, Congress has built a merit-based system through landmark statutes, beginning with the Pendleton Act of 1883 and continuing through the Civil Service Reform Act and the Whistleblower Protection Act. These enactments ensure impartial administration, protect whistleblowers, and safeguard due process rights for federal employees. Recent executive efforts threaten this established structure.

### A.  <u>The Early Republic: A De Facto Merit System and the Emergence of Patronage</u>

In the early years of the United States, the federal government operated under a de facto merit-based system for administrative appointments. The first six Presidents prioritized competence and integrity over political patronage. Frederick Mosher characterizes this period as "Government by Gentlemen," noting President Washington insisted that "fitness of character" should guide nominations. This "fitness of character" was not merely an abstract ideal; it was often "tempered by a sagacious regard for geographic representation," a practical consideration vital for ensuring the new government's legitimacy and fostering national unity by reflecting the diverse composition of the nascent nation. Frederick C. Mosher,

30

"Democracy and the Public Service" (1982), at 60.[10] See also, Leonard White,

"The Federalists: A Study in Administrative History" (1947).[11]

However, the seeds of the patronage-driven spoils system were sown early,

even amidst meritocratic ideals. As documented in "History of the Federal Civil

Service, 1789 to the Present" by the United States Civil Service Commission

(1941),[12] at page 2, the informal practice of "Senatorial courtesy" emerged. This

custom led Members of Congress to expect their advice on local appointments to

be accepted. The election of Andrew Jackson in 1828 marked the full embrace of

the spoils system, characterized by the slogan "To the Victor Belong the Spoils!"

coined by Senator William L. Marcy in 1832. Id. at 19-20.

### B. <u>The Pendleton Act of 1883: Establishing a Merit-Based System and Congressional Control</u>

The catalyst for decisive action came with the tragic assassination of

President James A. Garfield in 1881 by Charles Guiteau, a disgruntled office

seeker who believed he was owed a government position. As recounted in *Arnett v.*

---

[10] https://archive.org/details/democracypublic00mosh

[11] https://archive.org/details/federalistsstudy0000leon/page/n5/mode/2up

[12] https://books.google.com.vn/books?id=dwbvhZnJT9sC&printsec=frontcover&hl=vi&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false

*Kennedy*, 416 U.S. 134, 148 (1974), the public outrage over this profound tragedy brought to a head the widespread sentiment for civil service reform, transforming a long-standing grievance into an urgent national imperative. This singular event provided the necessary political momentum for Congress to overcome entrenched opposition and enact the landmark Pendleton Civil Service Act of 1883. This Act fundamentally reshaped federal employment, establishing a non-partisan civil service and shifting appointments from a system of political patronage to one based on merit. Willis Ryder Arnold and Meghna Chakrabarti, "How the civil service system changed American government" (2025), at 1.

### C.  Modern Developments and the Civil Service Reform Act of 1978

The federal civil service evolved throughout the 20th century, adapting to new challenges. The New Deal era saw a temporary decline in classified employees due to the creation of "emergency" agencies but ultimately led to further expansion and debate over executive accountability. Joseph Postell, "From Merit to Expertise and Back: The Evolution of the U.S. Civil Service System" (2020), at 18-19.[13]

_____

[13] https://administrativestate.gmu.edu/wp-content/uploads/2020/02/Postell-From-Merit-to-Expertise-and-Back.pdf

### D.  **Whistleblower Protections as a Structural Safeguard of Congressional Intent**

Congress's whistleblower protections under the Whistleblower Protection Act (WPA), 5 U.S.C. § 2302(b)(8), and the right of federal employees to communicate with Congress, 5 U.S.C. § 7211, are essential checks designed to ensure transparency and prevent abuses of power. These protections are integral to the civil service framework, designed by Congress to safeguard public integrity. In *Dept of Homeland Sec. v. MacLean*, 574 U.S. 383, 394 (2015), the Supreme Court held that executive agencies cannot override these protections through internal regulations, reinforcing congressional intent in defining employee rights.

## VI.  CONCLUSION

The Executive's imposition of the Worldwide, Retaliatory, and Trafficking Tariffs exceeds the authority delegated by IEEPA and violates the separation of powers. The body of tariff cases, including *Marshall Field*, *JCM*, *Algonquin*, and *Yoshida*, confirms that presidential trade actions require clear statutory delegation and are subject to judicial review to prevent executive overreach. The constitutional framework, supported by historical practice and judicial precedents, affirms that tariff-setting is a congressional prerogative under Article I, Section 8. Executive overreach in tariff policy threatens the principle of separation of powers, affecting congressional authority over trade and other critical domains.

The Maryland litigation in *United States of America v. Chief Judge George L. Russell III* is beacon warning of constitutional dangers ahead. The administration's characterization of standard judicial oversight as unlawful interference with executive authority reveals a fundamental rejection of the constitutional principle that power must be divided to preserve liberty. This represents a systematic and strategic attempt to reprint the Madisonian framework where "ambition must be made to counteract ambition" through institutional checks and balances.

The federal civil service is a vital institution, constructed by Congress to serve the public interest through merit-based appointments and nonpartisan administration. Its evolution, from the early republic's merit system to the Civil Service Reform Act of 1978, demonstrates a commitment to efficiency and accountability. Judicial precedents affirm Congress's authority to structure the civil service and limit executive removal powers, recognizing the importance of an independent bureaucracy. Unilateral actions represent dangerous attemp to dismantle this system, threatening to erode institutional expertise and undermine essential whistleblower protections.

Peter W. Sage urges this Court to affirm the *V.O.S.* decision to maintain Congress's authority over trade, protect the federal civil service, and ensure the

independence of the federal judiciary, promoting accountability and the rule of law. By upholding Congress's role, this Court can protect the constitutional balance and democratic principles central to the Framers' design.

Respectfully submitted,

/s/ Thad M. Guyer

_____

Thad M. Guyer
Counsel for Amicus Curiae

Dated: July 8, 2025

## CERTIFICATE OF SERVICE

On July 8, 2025, I served the foregoing document on all counsel of record

through the Court's CM/ECF system.

Dated: July 8, 2025                    */s/ Thad M. Guyer*
                                       Thad M. Guyer

# CERTIFICATE OF COMPLIANCE

Under Fed. R. App. P. 29(b), counsel for the undersigned Amicus Curiae certify that this brief complies with the type–volume limitation for motions under Fed. R. App. P. 27(d)(2). Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2), the brief contains 5,498 words. The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), I have relied on the word count feature of this word processing system in preparing this certificate.

I certify that the foregoing information is accurate and complete to the best of my knowledge.

Dated: July 8, 2025

/s/ Thad M. Guyer