# In the United States Court of Appeals for the Federal Circuit

————————

V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC, DBA GENOVA PIPE; MICROKITS, LLC; FISHUSA, INC.; TERRY PRECISION CYCLING, LLC,
PLAINTIFFS-APPELLEES

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES; RODNEY S. SCOTT, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF UNITED STATES CUSTOMS AND BORDER PROTECTION; JAMIESON GREER, IN HIS OFFICIAL CAPACITY AS UNITED STATES TRADE REPRESENTATIVE; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; HOWARD LUTNICK, IN HIS OFFICIAL CAPACITY AS SECRETARY OF COMMERCE; UNITED STATES CUSTOMS AND BORDER PROTECTION,
DEFENDANTS-APPELLANTS

————————

STATES OF OREGON, ARIZONA, COLORADO, CONNECTICUT, DELAWARE, ILLINOIS, MAINE, MINNESOTA, NEVADA, NEW MEXICO, NEW YORK, VERMONT,
PLAINTIFFS-APPELLEES

*v.*

PRESIDENT DONALD J. TRUMP; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION; UNITED STATES,
DEFENDANTS-APPELLANTS

————————

*ON APPEAL FROM THE UNITED STATES COURT OF INTERNATIONAL TRADE JUDGES KATZMANN, REIF, AND RESTANI, PRESIDING, NOS. 25-66, -77*

————————

**BRIEF FOR PLAINTIFFS-APPELLEES V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC, DBA GENOVA PIPE; MICROKITS, LLC; FISHUSA, INC.; TERRY PRECISION CYCLING, LLC**

————————

NEAL KUMAR KATYAL
COLLEEN E. ROH SINZDAK
EZRA P. LOUVIS
SAMANTHA K. ILAGAN
  *Milbank LLP*
  *1850 K Street N.W.*
  *Washington, DC 20006*
  *(202) 835-7505*
  *nkatyal@milbank.com*

JEFFREY M. SCHWAB
REILLY STEPHENS
JAMES MCQUAID
  *Liberty Justice Center*
  *7500 Rialto Blvd.*
  *Austin, Texas 78735*
  *(512) 481-4400*
  *jschwab@ljc.org*
  *rstephens@ljc.org*
  *jmcquaid@ljc.org*

MICHAEL W. MCCONNELL
STEFFEN N. JOHNSON
PAUL N. HAROLD
  *Wilson Sonsini*
  *Goodrich & Rosati, PC*
  *1700 K Street N.W.*
  *Washington, DC 20006*
  *(202) 973-8000*
  *mmcconnell@wsgr.com*
  *sjohnson@wsgr.com*
  *pharold@wsgr.com*

ILYA SOMIN
  *Antonin Scalia Law School*
  *George Mason University*
  *3301 Fairfax Dr.*
  *Arlington, Virginia 22201*
  *(703) 993-8069*
  *isomin@gmu.edu*

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellees hereby certifies the following:

1. **Represented Entities.** The full names of every party represented by us are:

> **V.O.S. Selections, Inc.;**
>
> **Plastic Services and Products, LLC, dba Genova Pipe;**
>
> **MicroKits, LLC;**
>
> **FishUSA, Inc.; and**
>
> **Terry Precision Cycling, LLC.**

2. **Real Parties in Interest.**

> **Not applicable.**

3. **Parent Corporations and Stockholders.** All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

> **None.**

4. **Legal Representatives.** The names of all law firms and the partners or associates that appeared for the party or amicus now represented by us in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

**None.**

5.    **Related Cases.**  The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeals:

**Not applicable.**

6.    Any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees) is as follows:

**Not applicable.**

DATED: JULY 8, 2025            */s/ Michael W. McConnell*
                              MICHAEL W. MCCONNELL
                              *Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................................................................i

TABLE OF AUTHORITIES .......................................................vi

INTRODUCTION...................................................................1

STATEMENT OF ISSUES.........................................................6

STATEMENT OF THE CASE ...................................................7

    A.    Constitutional and statutory background ..............................7

    B.    The 2025 Global Tariffs ........................................................12

    C.    The Plaintiffs............................................................................14

    D.    Proceedings below ..................................................................16

STANDARD OF REVIEW.........................................................18

SUMMARY OF ARGUMENT ...................................................19

ARGUMENT ............................................................................19

I.    IEEPA does not delegate an unbounded tariff authority.............19

II.    The President's Global Tariffs violate Section 122 of the
Trade Act of 1974. ...........................................................................26

    A.    Section 122 governs the President's imposition of
tariffs in response to "large and serious" trade deficits. ......28

    B.    IEEPA does not authorize the President to circumvent
Section 122 by imposing whatever tariffs he chooses in
response to a trade deficit. .....................................................33

    C.    The government's remaining arguments against the
application of Section 122 lack merit....................................37

III.  Neither an "emergency" nor an "unusual and extraordinary threat" exists to justify the Global Tariffs....................................39

    A.  A trade deficit does not pose an "unusual and extraordinary" threat or an "emergency." ............................40

    B.  The government errs in asserting that its invocation of IEEPA is unreviewable........................................................43

IV.  The major questions doctrine requires a ruling that IEEPA does not authorize the Global Tariffs. ...........................................46

    A.  The Supreme Court has repeatedly held that Congress must speak clearly when delegating vast economic and political power. .....................................................................46

    B.  The imposition of the Global Tariffs qualifies as a major question......................................................................48

    C.  Assertions of authority by the President are not exempt from the major questions doctrine...........................51

    D.  Tariffs are not exempt from the major questions doctrine...................................................................................53

V.  The government's interpretation of IEEPA would render the statute an unconstitutional delegation of legislative power to the executive....................................................................................54

    A.  The government's unbounded reading of IEEPA violates the nondelegation doctrine......................................55

    B.  The Court should avoid constitutional problems by giving IEEPA and Section 122 their natural reading..........62

VI.  The CIT properly awarded Plaintiffs complete relief....................64

    A.  The CIT properly addressed the equitable factors in a separate order. .....................................................................65

|  | B. | The CIT properly exercised its broad remedial discretion in concluding that Plaintiffs are entitled to injunctive relief. ................................................................. 66 |
|  | C. | The CIT correctly weighed the public-interest factors......... 67 |
|  | D. | Plaintiffs will not receive complete relief if the executive order remains enforceable against other entities. ................................................................................. 71 |

CONCLUSION ......................................................................................... 73

CERTIFICATE OF COMPLIANCE ....................................................... 75

CERTIFICATE OF SERVICE ................................................................. 76

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021) ................................................................ 47, 49, 51

*Am. Signature, Inc. v. United States*,
  598 F.3d 816 (Fed. Cir. 2010) ............................................................ 67

*Aspects Furniture Int'l, Inc. v. United States*,
  42 F.4th 1366 (Fed. Cir. 2022) .......................................................... 18

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ...................................................................... 47–49

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ............................................................................ 69

*Canadian Lumber Trade All. v. United States*,
  517 F.3d 1319 (Fed. Cir. 2008) ......................................................... 67

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012) ........................................................... 66

*Clark v. Martinez*,
  543 U.S. 371 (2005) ............................................................................ 22

*Colautti v. Franklin*,
  439 U.S. 379 (1979) ............................................................................ 41

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ............................................................................ 20

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
  601 U.S. 42 (2024) .............................................................................. 33

*FCC v. Consumers' Research*,
  2025 WL 1773630 (U.S. June 27, 2025) .......... 23, 47, 52–53, 55, 58–60

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ..................................................................... 34, 46

*Georgia v. President of the U.S.*,
46 F.4th 1283 (11th Cir. 2022) .......................................................... 51

*Gibbons v. Ogden*,
22 U.S. (9 Wheat.) 1 (1824)................................................................ 21

*Guidry v. Sheet Metal Workers Nat'l Pension Fund*,
493 U.S. 365 (1990)............................................................................ 34

*Hamdan v. Rumsfeld*,
548 U.S. 557 (2006)............................................................................ 32

*ICC v. Cincinnati, N. O. & T. P. R. Co.*,
167 U. S. 479 (1897)........................................................................... 46

*Indus. Union Dep't, AFL–CIO v. Am. Petroleum Inst.*,
448 U.S. 607 (1980)............................................................................ 50

*INS v. Chadha*,
462 U.S. 919 (1983)..................................................................... 11, 57

*J.W. Hampton Jr. & Co. v. United States*,
276 U.S. 394 (1928)............................................................................ 60

*Jama v. Immigr. & Customs Enf't*,
543 U.S. 335 (2005)............................................................................ 24

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)............................................................................ 62

*Johnson v. Eisentrager*,
339 U.S. 763 (1950)............................................................................ 43

*Kentucky v. Biden*,
23 F.4th 585 (6th Cir. 2022) .............................................................. 51

*Learning Resources, Inc. v. Trump*,
2025 WL 1525376 (D.D.C. May 29, 2025) .............................. 22, 54, 64

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) ............................................................. 51

*Ludecke v. Watkins*,
335 U.S. 160 (1948)............................................................................. 43

*Maine Cmty. Health Options v. United States*,
590 U.S. 296 (2020)............................................................................. 34

*Mansfield v. Pfaff*,
719 F. App'x 583 (9th Cir. 2017)......................................................... 65

*Marshall Field & Co. v. Clark*,
143 U.S. 649 (1892)............................................................................. 60

*Mayes v. Biden*,
67 F.4th 921 (9th Cir. 2023) ............................................................... 51

*Medellín v. Texas*,
552 U.S. 491 (2008)............................................................................. 69

*Nebraska v. Su*,
121 F. 4th 1 (9th Cir. 2024) ............................................................... 52

*NFIB v. OSHA*,
595 U.S. 109 (2022)............................................................................. 49

*NFIB v. Sebelius*,
567 U.S. 519 (2012)....................................................................... 21, 63

*North Carolina v. Covington*,
581 U.S. 486 (2017)............................................................................. 73

*Off. of the United States Tr. v. John Q. Hammons Fall 2006, LLC*,
602 U.S. 487 (2024)............................................................................. 72

*Oman Fasteners, LLC v. United States*,
125 F.4th 1068 (Fed. Cir. 2025)................................................... 18, 66

*OPP Cotton Mills, Inc. v. Adm'r of Wage and Hour Div.,
Dep't of Labor*,
312 U.S. 126 (1941)....................................................................... 55, 58

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976)................................................................69

*Radzanower v. Touche Ross & Co.*,
426 U.S. 148 (1976)................................................................34

*Regan v. Wald*,
468 U.S. 222 (1984)................................................................44

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013)...............................................67

*S.E.C. v. Sloan*,
436 U.S. 103 (1978)................................................................25

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
145 S. Ct. 1497 (2025)...........................................................27

*Shelton v. Bd. of Sup'rs of S. Univ. & Agr. & Mech. Coll.*,
532 F. App'x 558 (5th Cir. 2013)...........................................65

*Trump v. CASA, Inc.*,
2025 WL 1773631 (June 27, 2025) ................................. 71, 73

*Trump v. Hawaii*,
585 U.S. 667 (2018)................................................................45

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025)...........................................................52

*United States v. Amirnazmi*,
645 F.3d 564 (3d Cir. 2011) ..................................................62

*United States v. Arch Trading Co.*,
987 F.2d 1087 (4th Cir. 1993)...............................................62

*United States v. Curtiss-Wright Export Corp.*,
299 U.S. 304 (1936)..........................................................60–61

*United States v. Dhafir*,
461 F.3d 211 (2d Cir. 2006) ..................................................62

*United States v. Mirza,*
454 F. App'x 249 (5th Cir. 2011).........................................................62

*United States v. Shih,*
73 F.4th 1077 (9th Cir. 2023) ............................................................62

*United States v. Yoshida Int'l. Inc.,*
526 F.2d 560 (C.C.P.A. 1975)
...................................... 3–4, 9–10, 22, 24–26, 29, 31–33, 35–36, 54, 61

*Util. Air Reg. Group v. EPA,*
573 U.S. 302 (2014)...........................................................................47

*W. Lynn Creamery, Inc. v. Healy,*
512 U.S. 186 (1994)...........................................................................21

*Washington Fed. v. United States,*
26 F.4th 1253 (Fed. Cir. 2022)..........................................................65

*West Virginia v. EPA,*
597 U.S. 697 (2022)............................................................... 47, 49–50

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008)...............................................................................68

*Yoshida Int'l, Inc. v. United States,*
378 F. Supp. 1155 (Cust. Ct. 1974)................................................9, 29

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952).......................................1–3, 27–28, 32, 54, 68, 70

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
576 U.S. 1 (2015)................................................................... 44, 65, 69

## Statutory and Constitutional Provisions

12 U.S.C. § 4008(c)(1)...............................................................................22

15 U.S.C.:
§ 78i(h) ...............................................................................................22
§ 78k(a)(2) ...........................................................................................22

19 U.S.C.:

§ 1304 ............................................................................................ 20

§ 1338 ..................................................................................... 20, 38

§ 1821(b) ...................................................................................... 60

§ 1862 ............................................................................................ 20

§ 2132 ............. 3–6, 10–11, 17, 19, 25–35, 37–39, 41, 46, 60, 62–64, 69

§ 2251 ............................................................................................ 20

§ 2411 ..................................................................................... 20, 38

§ 3004(b)(1) .................................................................................. 36

28 U.S.C. § 1581(i)(1)(B) ........................................................................ 72

47 U.S.C.:

§ 201(b) ......................................................................................... 23

§ 254 .............................................................................................. 23

50 U.S.C.:

§ 1701 ..................................................................................... 24, 39

§ 1701(b) ................................................................................... 4, 12

§ 1702 ............................................................................................ 12

§ 1702(a)(1)(B) ............................................................................. 21

§ 1702(b) ...................................................................................... 58

§ 1702(c) ....................................................................................... 45

Emergency Banking Relief Act,
Pub. L. No. 73-1, 48 Stat. 1 (1933) ....................................................... 8

International Emergency Economic Powers Act ("IEEPA"),
Pub. L. No. 95-233, tit. II, 91 Stat. 1626 (1977)
(codified as amended at 50 U.S.C. § 1701 *et seq.*) ...................... *passim*

National Emergencies Act,
Pub. L. No. 94-412, 90 Stat. 1255 (1976)
(codified as amended at 50 U.S.C. § 1622 *et seq.*) .............. 6, 11, 56–57

Reciprocal Trade Agreements Act of 1934 ("RTAA"),
Pub. L. No. 73-316, 48 Stat. 943 (1934) ............................................... 8

Smoot-Hawley Tariff Act of 1930,
ch. 497, 46 Stat. 590
(codified as amended at 19 U.S.C. § 1338) ........................................... 8

Trade Act of 1974,
Pub. L. No. 93-618, 88 Stat. 1978
(codified as amended at 19 U.S.C. § 2101 *et seq.*) ...................... 3, 9, 53

Trading with the Enemy Act ("TWEA"),
ch. 106, 40 Stat. 411 (1917) ...............................8–11, 24–26, 29, 35–37

Amendments to the Trading with the Enemy Act,
Pub. L. No. 95-223, 91 Stat. 1625 (1977)............................................. 11

U.S. Const.,
art. I .................................................................................................. 1, 7
art. I, § 7.................................................................................... 1, 7, 23
art. I, § 8....................................................................... 1, 7, 23, 53, 68
art. I, § 8, cl. 1 ............................................................................. 19, 72
art. I, § 9, cl. 1 ................................................................................... 61
art. I, § 9, cl. 4 ................................................................................... 23
art. I, § 9, cl. 5 ................................................................................... 22
art. II, § 1 .......................................................................................... 52

## Executive Branch Materials

Exec. Order No. 14,257,
90 Fed. Reg. 15,041 (April 7, 2025) ............................ 12–14, 41, 43, 48

Exec. Order No. 14,266
90 Fed. Reg. 15,621 (April 15, 2025) ............................................ 13, 48

Memorandum, *Clarification of Exceptions Under Executive
Order 14257 of April 2, 2025*, DCPD-202500470, 2025 WL
1560798 (Apr. 11, 2025)....................................................................... 13

Proclamation No. 4074,
36 Fed. Reg. 15,724 (Aug. 17, 1971) ...................................................... 9

Proclamation No. 4098,
36 Fed. Reg. 24,201 (Dec. 20, 1971)....................................................... 9

## Legislative Materials

H.R. Rep. No. 95-459 (1977)................................... 11, 25, 37, 42

S. Rep. No. 93-1298 (1974) ................................................. 29, 31

S. Rep. No. 95-466 (1977) ........................................................ 37

## Other Authorities

Brennan Ctr. for Just., *Declared National Emergencies Under the National Emergencies Act* (last updated July 3, 2025), https://www.brennancenter.org/our-work/research-reports/declared-national-emergencies-under-national-emergencies-act.................................................................. 56

Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 La. L. Rev. 595 (2023)......................................................... 21

Cong. Research Serv., *International Emergency Economic Powers Act* (2024).................................................................. 50

Cong. Research Serv., *National Emergencies Act: Expedited Procedures in the House and Senate* (2025) ....................................... 57

William Deese et al., U.S. Int'l Trade Comm'n, Pub. 4094, *The Economic Effects of Significant U.S. Import Restraints: Sixth Update 2009* (2009)....................................... 7

*Emergency,* BLACK'S LAW DICTIONARY (4th rev. ed. 1968) ................ 40, 42

*Emergency*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (unabridged ed. 1971)....................................... 40

*Extraordinary*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (unabridged ed. 1971) ........................................ 40

*Federalist* No. 58 ..................................................................... 1

*Federalist* No. 70 ..................................................................... 42

John McGinnis & Mark Movsesian, *The World Trade Constitution*, 114 Harv. L. Rev. 511 (2000)......................................... 8

*Regulate*, BLACK'S LAW DICTIONARY (5th ed. 1979)................................ 21

*Unusual*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (unabridged ed. 1971) ...................................................... 40

U.S. Trade Representative, *Reciprocal Tariff Calculations* (2025), https://ustr.gov/sites/default/files/files/Issue_Areas/Presidential%20Tariff%20Action/Reciprocal%20Tariff%20Calculations.pdf........................................................................ 48

Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Foundation (June 2, 2025), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/ ........................................................................ 48, 54

## INTRODUCTION

The government claims the President may impose tariffs on the American people whenever he wants, at whatever level he wants, against whatever countries and products he wants, and for as long as he wants—merely by declaring longstanding U.S. trade deficits a national "emergency" and an "unusual and extraordinary threat," declarations the government insists are unreviewable. But under the familiar framework of *Youngstown Sheet & Tube Co. v. Sawyer*, the President may exercise executive power over U.S. persons and property only if given authority by "an act of Congress" or "the Constitution itself." 343 U.S. 579, 585 (1952). Neither grants him that authority here.

It is common ground that the President has no independent constitutional authority to impose the challenged tariffs. Article I expressly vests in Congress the power to "lay and collect * * * Duties, Imposts and Excises," U.S. Const., art. I, § 8, and it requires that "Bills for raising Revenue shall originate in the House of Representatives," *id.* § 7. As James Madison wrote in *Federalist* No. 58, granting Congress the "power over the purse"—"the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people"—

was a deliberate check on executive power, born of colonial resistance to Crown-imposed duties levied without consent. That structural safeguard ensures that only a geographically diverse representative body may tax the people. The executive may not override this safeguard by claiming tariff authority that Congress has not provided.

Any tariff authority that the President enjoys must be "rooted in" some statute. *Youngstown*, 343 U.S. at 586. The government invokes just one—the International Emergency Economic Powers Act of 1977 ("IEEPA"). But IEEPA nowhere mentions tariffs, duties, imposts, or taxes, and no other President in the statute's nearly 50-year history has claimed that it authorizes tariffs. The government nevertheless argues that the "ordinary meaning" of "regulate" in IEEPA includes the power to tax goods through tariffs. But that extraordinary view finds no support in dictionaries or precedent, and it would have intolerable implications. The U.S. Code contains hundreds of statutes authorizing agencies to "regulate." If such generic language authorized taxation, the President would have vast taxing powers that no President in U.S. history has ever been understood to have. IEEPA is thus properly understood as a

2

sanctions and embargo law, not a blank check for the President to rewrite tariff schedules.

But that is not all. As in *Youngstown*, Congress has not been silent about tariffs and trade deficits. It has passed several statutes authorizing tariffs, subject to specific substantive, temporal, and procedural limitations—none of which is satisfied here. When Congress passes specific legislation addressing a topic, the executive may not latch onto general terms in other statutes as a means of avoiding specific "conditions" imposed by Congress. 343 U.S. at 586.

That is precisely what the President has done here. As this Court's predecessor explained half a century ago, the Trade Act of 1974 now "govern[s]" any imposition of tariffs addressing trade deficits. *United States v. Yoshida Int'l, Inc.* ("*Yoshida II*"), 526 F.2d 560, 582 n.33 (C.C.P.A. 1975). Section 122 of that Act specifies what the President "shall" do "[w]henever" a "large and serious" "balance-of-payments deficit[]" calls for "special" tariffs. 19 U.S.C. § 2132(a)(1). In those circumstances, the President can take immediate tariff action, but Congress significantly limited that authority—tariffs cannot exceed 15% or last longer than five months, absent congressional authorization. And the President "must,

3

of course, comply" with those limits. *Yoshida II*, 526 F.2d at 582 n.33. Yet the tariffs here ignore them entirely.

Those are not the only statutory limits the President's tariffs defy. Congress explicitly provided that IEEPA authority "may only be exercised" in an emergency and only to "deal with an unusual and extraordinary threat" to the "national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(b). Trade deficits are anything but. As the President's own words make clear, trade deficits have been "persistent" for half a century. Thus, even if IEEPA could somehow be read to grant tariff authority, that power could not be invoked here.

The government's claim of unbounded power to set, reset, rescind, and reapply tariffs of any amount against any product, based on a unilateral and unreviewable emergency declaration, runs contrary to the plain text of both IEEPA—which confers only the power to "regulate" (not to tax) and may be invoked only to address an "unusual and extraordinary threat" that is also a declared "emergency"—*and* Section 122.

But those are not the only bases for invalidating these tariffs. The major questions, nondelegation, and constitutional-avoidance doctrines all apply and independently support affirmance.

4

The major questions doctrine provides that courts may not read statutes to grant the executive broad economic powers unless Congress has spoken clearly on the issue. IEEPA contains no clear grant of tariff power, much less the vast power to use tariffs to reshape the American economy. Further, under the nondelegation doctrine, any such grant of power must be bounded by an "intelligible" and judicially enforceable principle, but the government disclaims any such limit on the President's power. Thus, to avoid the constitutional problems rife in the government's understanding of IEEPA, this Court should read that statute and Section 122 according to their plain meaning to prohibit the President's tariffs.

Finally, the Court of International Trade's injunction complied with traditional equitable principles. As the court recognized, an injunction is necessary to afford Plaintiffs complete relief, the government cannot assert cognizable harms based on a desire to violate statutory constraints, and the public interest is served when the executive adheres to statutory limits on his power. The injunction should be affirmed.

## STATEMENT OF ISSUES

1. Whether IEEPA grants the President power to impose tariffs of any amount, for any duration, on any product of any country, whenever he determines that trade deficits pose an "unusual and extraordinary threat" to U.S. interests and declares an "emergency" to that effect.

2. Whether, in imposing tariffs to deal with "large and serious" trade deficits, the President must comply with Section 122 of the Trade Act of 1974.

3. Whether courts may review whether persistent trade deficits over a period of half a century constitute an "unusual and extraordinary" threat to U.S. interests, or an "emergency," within the meaning of those terms in IEEPA; and if so whether those requirements have been met.

4. Whether the major questions doctrine demands explicit congressional authorization for imposing broad-based tariffs, and if so whether IEEPA provides such explicit authorization.

5. Whether an interpretation of IEEPA that permits the President to impose tariffs of any amount, for any duration, on any product of any country violates the nondelegation doctrine, and if so whether the court should avoid such an unconstitutional interpretation of IEEPA.

6.    Whether the court below abused its discretion in entering a permanent injunction that awarded Plaintiffs complete relief.

## STATEMENT OF THE CASE

### A.    Constitutional and statutory background

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in * * * Congress."  U.S. Const., art. I, § 1.  Those legislative powers include both the "Power To lay and collect Taxes, Duties, Imposts and Excises," which must be "uniform throughout the United States," and the power "[t]o regulate Commerce with foreign Nations."  *Id.*, art. I, § 8.  Further, to ensure that laws taxing the American people are subject to maximum political accountability, "[a]ll Bills for raising Revenue shall originate in the House of Representatives."  *Id.* § 7.

Historically, "tariff changes were viewed as entirely the domain of Congress."  William Deese et al., U.S. Int'l Trade Comm'n, Pub. 4094, *The Economic Effects of Significant U.S. Import Restraints: Sixth Update 2009*, at 65 (2009).  Those changes often provoked highly charged disputes, from the debates over Henry Clay's American System in the 1830s, to the McKinley tariffs of the 1890s, to the Smoot-Hawley Tariff Act of 1930—all resolved in Congress, never by unilateral executive action.

Beginning in the 1930s, however, Congress began passing statutes granting the President authority to negotiate with our trading partners to *reduce* tariffs, subject to congressional approval. *E.g.*, Reciprocal Trade Agreements Act of 1934 ("RTAA"), Pub. L. No. 73-316, 48 Stat. 943, 943-44 (1934). Ultimately, that led to today's World Trade Organization system. *See* John McGinnis & Mark Movsesian, *The World Trade Constitution*, 114 Harv. L. Rev. 511 (2000).

During World War I, Congress also granted the President specific authorities to regulate economic relations with enemy powers through the Trading with the Enemy Act ("TWEA"), Pub. L. No. 65-91, 40 Stat. 411 (1917). Tariffs were not among the powers explicitly listed in that statute, which began as a wartime measure but was later expanded to other emergencies. Emergency Banking Relief Act, Pub. L. No. 73-1, 48 Stat. 1, 1-2 (1933).

TWEA was never used to impose tariffs until 1971, when President Nixon invoked the Act in response to an economic crisis involving the collapse of the gold standard, the overvaluing of the dollar, and—as most relevant here—the occurrence of a large trade deficit for the first time in then-recent American history. Proclamation No. 4074, 36 Fed. Reg.

15,724 (Aug. 17, 1971).  In August 1971, President Nixon took the country off the gold standard and imposed a temporary 10% tariff on imports, *id.*, which he rescinded less than five months later, Proclamation No. 4098, 36 Fed. Reg. 24,201 (Dec. 20, 1971).

President Nixon's invocation of TWEA was immediately challenged in court.  And in 1974, after the tariffs had been terminated, the Customs Court (predecessor to the Court of International Trade ("CIT")) held that TWEA did not authorize the tariffs.  *Yoshida Int'l, Inc. v. United States* ("*Yoshida I*"), 378 F. Supp. 1155, 1175-76 (Cust. Ct. 1974).  Congress promptly enacted the Trade Act of 1974, 19 U.S.C. § 2101 *et seq.*, for the first time explicitly authorizing the President to impose surcharges "to deal with large and serious United States balance-of-payments deficits," but limiting those surcharges in amount (15%) and duration (5 months). 19 U.S.C. § 2132(a).

The Court of Customs and Patent Appeals later reversed the Customs Court, holding that TWEA had "authorized the President" to impose his tariffs.  *Yoshida II*, 526 F.2d at 576.  But the appellate court stressed that the President had "imposed a limited surcharge, as a temporary measure calculated to help meet a particular national emergency," *id*. at

578 (internal quotations and citation omitted), and did not "fix[] rates in disregard of congressional will," *id*. at 577.

The Court also cautioned that it was not "approv[ing] in advance any future surcharge of a different nature," *id*., or "sanction[ing] the exercise of an unlimited power," which would "strike a blow to our Constitution," *id*. at 583. "A finding that the President has the power under [TWEA] to impose whatever tariff rates he deems desirable simply by declaring a national emergency," the Court explained, "would not only render our trade agreements program nugatory" but "would subvert the manifest Congressional intent to maintain control over its Constitutional powers to levy tariffs." *Id*. at 577. The Court further observed that "[t]he declaration of a national emergency is not a talisman enabling the President to rewrite the tariff schedules" and "cannot, of course, sound the death-knell of the Constitution." *Id*. at 583.

The Court also explained that, going forward, similar cases would be controlled by Section 122 of the Trade Act of 1974, which "specifically require[s] the President, within certain parameters, to impose a surcharge or quotas in response to balance of payments problems." *Id*. at

582 n.33. "A surcharge imposed after" Section 122's effective date "must, of course, comply with the statute now governing such action." *Id*.

Congress thereafter adopted several statutes addressing the President's emergency powers. In 1976, it passed the National Emergencies Act ("NEA"), 50 U.S.C. § 1622 *et seq*. Effective in 1978, the NEA terminated all existing emergencies except those declared under TWEA, and it subjected new presidential emergency declarations to a legislative veto. A decade later, after the Supreme Court invalidated legislative vetoes in *INS v. Chadha*, 462 U.S. 919 (1983), Congress amended the NEA to allow congressional termination of emergency declarations only through a joint resolution subject to presidential veto.

Congress again addressed emergency powers in 1977, repealing the President's TWEA authority outside wartime. Amendments to the Trading with the Enemy Act, 91 Stat. 1625, 1625-26 (1977). That same year, Congress passed IEEPA, providing new "authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to various procedural limitations, including those of the National Emergencies Act." H.R. Rep. No. 95-459, at 2 (1977).

IEEPA grants the President a specific list of powers, including the power to regulate transactions in foreign exchanges, the import or export of currency or securities, and the acquisition, use, transfer, transportation, or importation of foreign property. 50 U.S.C. § 1702. That list does not include the term "tariff" or any of its synonyms, and IEEPA specifies that the authorities it grants "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." *Id.* § 1701(b).

### B. The 2025 Global Tariffs[1]

Although no other President has invoked IEEPA to impose tariffs, on April 2, 2025, President Trump issued Executive Order 14,257, entitled "Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits" (the "Global Tariffs Order"). 90 Fed. Reg. 15,041 (April 7, 2025). That Order imposed sweeping new tariffs: a global 10% *ad valorem* duty on "all imports from all trading partners," regardless of

---

[1] Plaintiffs challenge only the Global Tariffs. Twelve States have challenged the President's other tariffs under IEEPA, and this Court consolidated that case (No. 25-1813) with this one.

whether those countries impose tariffs on U.S. products, the rates at which they do so, or the existence of any governing trade agreements. *Id.* at 15,045. It also imposed much higher tariff rates—ranging from 11 to 50 percent—on 57 countries. *Id.* at 15,049-50.

The President imposed these Global Tariffs to address what he called "a national emergency" involving "underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits." *Id.* at 15,041.

On April 9, 2025, the President delayed the elevated tariff rates on all countries except China for 90 days, while leaving in place the global 10% tariff. Exec. Order No. 14,266, 90 Fed. Reg. 15,625 (April 15, 2025). The President also exempted certain products from the Reciprocal Tariffs Order. *E.g.*, Memorandum, "Clarification of Exceptions Under Executive Order 14257 of April 2, 2025," DCPD-202500470, 2025 WL 1560798 (Apr. 11, 2025) (exempting "semiconductors").

On July 7, 2025, the President again delayed the elevated tariff rates until August 1, 2025.

### C. The Plaintiffs

Plaintiffs are five small businesses that have paid substantial tariffs and suffered related harms to their businesses. Appx127-161.

Plaintiff V.O.S. Selections, Inc. ("V.O.S.") is a wine and spirits importer. Appx131, Appx155. As a result of the Global Tariffs Order and related price changes, V.O.S. cannot plan import orders. Appx132. V.O.S.'s relationships with wholesale customers are further harmed by its inability to provide products that meet their price points. Appx132. And V.O.S.'s relationships with vineyards—which often go back generations—will be harmed if it cannot sell those wines. Appx129, Appx132. V.O.S. is thus suffering damage to its reputation and goodwill, as well as substantial lost business opportunities. Appx133.

Plaintiff Plastic Services and Products, LLC, dba Genova Pipe ("Genova Pipe")—which manufactures plastic pipe, conduit, and fittings—imports raw materials, manufacturing equipment, and finished goods from ten countries. Appx135. Genova Pipe depends on imports because it cannot domestically source the raw materials, including plastic resins and the equipment needed to manufacture its American-made products.

Appx136.  The tariffs directly increase the cost of these items and needed resale goods.  Appx136.

Plaintiff MicroKits, LLC ("MicroKits")—which creates learning electronics that combine engineering with music—imports electronics from China, Mexico, Thailand, and Taiwan.  Appx139.  The tariffs have forced MicroKits to delay hiring and pause manufacturing; its inventory is being depleted, its revenue is imperiled, and it may soon need to close.  Appx140-41.  Because of the tariffs, MicroKits must raise prices, harming its reputation, goodwill, and ability to compete with copycat products from China.  Appx140-141.

Plaintiff FishUSA, Inc. ("FishUSA")—which makes freshwater fishing tackle—directly imports goods from five countries.  Appx143.  FishUSA has paused import orders and delayed shipments due to fluctuating tariff rates.  Appx145-146.  Moreover, the tariffs have caused FishUSA to postpone expansion and lose business opportunities.  Appx146.

Plaintiff Terry Precision Cycling, LLC ("Terry Cycling")—which makes bike saddles and biking apparel for women—imports goods from five countries.  Appx149.  The tariffs are an existential threat to Terry

15

Cycling, Appx149, which paid $26,094.35 in duties between April 18 and May 2, 2025. Appx158-159. In 2026, the company will face an estimated $1.2 million in tariff costs—which it cannot pay. Appx152. Terry Cycling has had to increase prices by over 30% to try to mitigate the situation, damaging its reputation and goodwill. Appx152-153.

## D. Proceedings below

On April 14, 2025, Plaintiffs filed this lawsuit in the CIT to challenge the President's authority to issue the Global Tariffs. On May 28, a three-judge panel of the court granted Plaintiffs' motion for summary judgment. Appx1-49. In the same opinion, the court granted summary judgment to twelve States in a case challenging all tariffs imposed under IEEPA. Appx16.

The CIT first held that the individual Plaintiffs have standing, as they have suffered "a concrete and particularized injury-in-fact that is fairly traceable" to the Global Tariffs and "will continue to suffer[] economic injuries" from the tariffs. Appx20. The government does not challenge Plaintiffs' standing, and this brief will not further address it.

On the merits, citing "the Constitution's express allocation of the tariff power to Congress," the court held that IEEPA does not delegate

16

"unbounded tariff authority to the President." Appx25. Rather, IEEPA's delegation of the power to "regulate * * * importation" imposes meaningful limits and should be "read in light of its legislative history and Congress's enactment of more narrow, non-emergency legislation" governing tariffs. *Id.* Specifically, Section 122 of the Trade Act of 1974 "removes the President's power to impose remedies in response to balance-of-payments deficits, and specifically trade deficits, from the broader powers granted to a president during a national emergency under IEEPA by establishing an explicit non-emergency statute with greater limitations." Appx34. Because these tariffs address an "imbalance in trade—a type of balance-of-payments deficit"—they "fall[] under the narrower, non-emergency authorities in Section 122," yet ignore its limits. Appx34-36.

The court also found support in the nondelegation, major questions, and constitutional-avoidance doctrines, as well as general separation-of-powers principles, explaining that "an unlimited delegation of tariff authority would constitute an improper abdication of legislative power to another branch of government." Appx28.

17

The CIT entered judgment for Plaintiffs as a matter of law, permanently enjoining the tariffs and explaining that relief could not be confined to Plaintiffs.  Appx48.

The government appealed both cases and moved for a stay pending appeal.  This Court consolidated this case and the twelve States' case, granted the government's motions to stay pending the cases' resolution, and expedited briefing and argument.

## STANDARD OF REVIEW

This Court "review[s] a grant of summary judgment by the Court of International Trade de novo," giving the "informed opinion" of the CIT "great weight."  *Aspects Furniture Int'l, Inc. v. United States*, 42 F.4th 1366, 1369 (Fed. Cir. 2022).  It reviews the "grant of an injunction for abuse of discretion," which may be established by showing "a clear error of judgment" or by demonstrating that the CIT "exercised its discretion based on an error of law or clearly erroneous fact findings."  *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1084 (Fed. Cir. 2025) (citation omitted).

## SUMMARY OF ARGUMENT

IEEPA does not grant the President unbounded tariff authority. The power to impose tariffs is not among the authorities the statute confers, and even if IEEPA could be read to delegate some tariff authority, it plainly would not include the power to impose the tariffs here. Those sweeping tariffs contravene both Section 122's express limits on imposing tariffs to address significant trade deficits and IEEPA's express instruction that the statute may be invoked only in the face of an "unusual and extraordinary threat" and an "emergency." What's more, the major questions and nondelegation doctrines—as well as basic principles of constitutional avoidance—require enforcing the strict limits that Congress has placed on its delegation of tariff authority.

This Court should affirm.

## ARGUMENT

## I.    IEEPA does not delegate an unbounded tariff authority.

The government asserts that the President has broad and unreviewable power to impose tariffs whenever and however he chooses, merely by declaring an emergency. But the Constitution expressly vests the power to impose tariffs in Congress, U.S. Const., art. I, § 8, cl. 1, and no statute contains the sweeping delegation of authority the government

claims. Nor could a statute grant such unbounded tariff authority without violating the separation-of-powers principles on which our Constitution is based.

A. The government purports to find unbounded authority to impose tariffs in IEEPA. But one searches IEEPA's text in vain for any mention of tariffs, and in the almost 50 years since IEEPA was enacted, no other president has read IEEPA to authorize them. IEEPA expressly empowers the President to impose on foreign entities various economic sanctions, such as the asset freeze in *Dames & Moore v. Regan*, 453 U.S. 654 (1981), not to tax imports.

Citing statutes in which Congress *has* explicitly conferred tariff authority, the government portrays IEEPA as a variation on that theme. Br. 8. Yet *every* example it cites uses the word "tariff" or an equivalent, like "duty." *See* 19 U.S.C. § 1338 ("new or additional duties"); *id.* § 1304 ("Additional duties for failure to mark"); *id.* § 1862 ("duty or other import restrictions"); *id.* § 2251 ("Customs Duties"); *id.* § 2411 ("duties or other import restrictions"). And in *every* such statute, Congress imposed substantive, procedural, or durational limits on the authority it delegated. The omission of any such limitations in IEEPA speaks volumes.

B.     The government nonetheless claims that IEEPA implicitly grants the President boundless tariff authority through its grant of power to "regulate * * * any * * * importation * * * of * * * any property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 1702(a)(1)(B).  But the term "regulate" cannot bear that weight.

Citing the 1979 edition of *Black's Law Dictionary*, the government asserts (Br. 32) that "regulate" means "fix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws."  BLACK'S LAW DICTIONARY 1156 (5th ed. 1979).  None of those terms naturally includes the power to impose a tariff, which "taxes goods" and "raises revenue," *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994), rather than "direct[ing]" or "control[ling]" imports, Br. 32; *see* Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 La. L. Rev. 595 (2023).  Of course, legislatures may use the taxing power—when they have it—for regulatory purposes, *NFIB v. Sebelius*, 567 U.S. 519, 567 (2012); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 1 (1824), but that does not mean the power to regulate is the power to tax.

Moreover, Congress cannot have intended that interpretation of "regulate" in IEEPA because the statute also gives the President the power to "regulate * * * exportation," 50 U.S.C. § 1702(a)(1)(B), and the Constitution clearly prohibits any imposition of export taxes. U.S. Const. art. I, § 9, cl. 5; *see Learning Resources, Inc. v. Trump*, 2025 WL 1525376 at \*11 (D.D.C. May 29, 2025). Where a term's interpretation renders a statute unconstitutional in some applications, courts should avoid that interpretation in all contexts, lest the term become a "chameleon," taking on different meanings in different situations. *Clark v. Martinez*, 543 U.S. 371, 381 (2005).

Settled interbranch understanding confirms the critical distinction between regulating authority and taxing authority. Hundreds of federal laws empower agencies to "regulate." *E.g.*, 12 U.S.C. § 4008(c)(1)(A)-(B) (charging the Federal Reserve to "to regulate * * * the payment system"); 15 U.S.C. § 78k(a)(2)(A) (the SEC may "regulate * * * transactions on a national securities exchange"); *id*. § 78i(h)(1) (granting the SEC "authority to regulate * * * trading" related to foreign currencies). But other than *Yoshida II*, no court of appeals decision has interpreted this regulatory authority to include the power to tax. Where Congress intends to grant

22

agencies power to raise revenue, even administrative fees, it does so separately and explicitly.

*FCC v. Consumers' Research*, 2025 WL 1773630 (U.S. June 27, 2025), is instructive. The Communications Act, at issue there, authorizes "regulation" of communication carriers. 47 U.S.C. § 201(b). A separate provision of the Act then authorizes the FCC to impose taxes to support a universal service fund. If the general term "regulation" meant what the government says it means in IEEPA, Section 254 would be superfluous—and the Act's reference to "regulation" would enable the FCC to evade the restrictions that the Court recited as saving the Act from being invalidated under the nondelegation doctrine. *Consumers' Research*, 2025 WL 1773630, at *16.

Indeed, Article 1, Section 8 of the Constitution itself distinguishes between taxation and regulation, placing the former in Clause 1 and the latter in Clause 3, and the Framers treated those powers differently. U.S. Const., art. I, § 8. Tax bills must originate in the most representative branch (the House); imposts and excises must be "uniform throughout the United States"; direct taxes must be apportioned; and exports may not be taxed. U.S. Const., art. I, § 7, cl. 1; *id.*, § 9, cls. 4 & 5. No such

restrictions apply to regulation. If the "ordinary meaning" of "regulate" included the power to tax, Congress could evade all these restrictions simply by invoking its commerce power rather than its taxing power.

C.     Perhaps because the ordinary meaning of "regulate" does not include the power to impose tariffs, the government resorts to arguing that Congress meant the term to have a special meaning in IEEPA. Noting that, before IEEPA passed, *Yoshida II* interpreted similar language in TWEA to include some tariff authority, the government surmises that Congress must have imported that power into IEEPA. Br. 34-35. But that view is unconvincing for multiple reasons.

1.     For starters, the government's argument relies solely on *Yoshida II*, but that decision provides no sound reason to interpret "regulate" contrary to its plain meaning—especially where, as here, "[n]either of the two requirements for congressional ratification is met," *see Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 349 (2005). *Yoshida II* did not represent a "broad and unquestioned" judicial "consensus" regarding the interpretation of "regulate," nor did Congress "simply reenact [TWEA] without change," *id*.—rather, it expressly narrowed the statute's reach, *see*, *e.g.*, 50 U.S.C. § 1701.     Moreover, while the House Report

accompanying IEEPA referred to *Yoshida II* in describing the history of presidential use and abuse of TWEA, H.R. Rep. No. 95-459, at 5, Congress nowhere suggested that it approved of a president's unilateral tariff power. Indeed, the House Report explains that Congress found it necessary to enact IEEPA precisely because TWEA power had been understood too expansively. *See id.* at 7. Even in the case of reenactment, this Court should be "extremely hesitant" to use language "in a Committee Report" to adopt the government's preferred statutory interpretation where it is not only "at odds with the language" of the statute, but also "extremely far reaching in terms of the virtually untrammeled and unreviewable power it would vest." *S.E.C. v. Sloan*, 436 U.S. 103, 121 (1978).

2. *Yoshida II* is certainly relevant, but it undermines the government's interpretation of IEEPA. *Yoshida II* held that TWEA granted the President some limited tariff power to address a significant trade deficit in 1971, when no more specific statute addressed the issue. *See infra* at 29-30. But the Court also recognized that, going forward, TWEA would *not* give the President that tariff power because Congress had since enacted a more specific statute, Section 122, which would "govern[]." *See infra* at 34-37.

Nor did *Yoshida II* suggest that TWEA necessarily granted a broader tariff power. To the contrary, *Yoshida II* stressed that "a finding that the President has the power under [an emergency statute] to impose whatever tariff rates he deems desirable simply by declaring a national emergency would not only render our trade agreements program nugatory," but "would subvert the manifest Congressional intent to maintain control over its Constitutional powers to levy tariffs." *Yoshida II*, 526 F.2d at 577. *Yoshida II* therefore provides no support for the government's erroneous reading of IEEPA.

## II. The President's Global Tariffs violate Section 122 of the Trade Act of 1974.

Even if IEEPA could be read to delegate some tariff authority, Section 122 of the Trade Act establishes that, at a minimum, that authority does not include the power to impose the Global Tariffs. Section 122 spells out precisely what the President "shall" do upon concluding that a "large and serious balance-of-payments deficit[]" requires imposing "special import measures." 19 U.S.C. § 2132(a). Section 122 also strictly limits that tariff authority: The President cannot increase tariffs more than 15%, and the tariffs cannot last longer than five months without express congressional approval. *Id.*

It is therefore Section 122, not IEEPA, that governs where—as here —the President seeks to impose special tariffs in response to trade deficits. That statute gives the President the flexibility he needs to remedy problems associated with those deficits, while setting guardrails that both keep U.S. tariff policy from deviating dramatically from the framework Congress set and promote the "clarity and predictability" that is vital to "the American economy." *Seven Cnty. Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1518 (2025). The tariffs here ignore Congress's guardrails. Fifty of the 57 tariffs exceed Section 122's 15% cap, and all apply in perpetuity. Nothing in IEEPA authorizes this outright disregard of Congress's express limits.

These are no mere statutory quibbles; they are fundamental to the Constitution's separation of powers. In *Youngstown*, both the majority and four separate opinions recognized that presidential orders must be invalidated where Congress has addressed specific emergencies and the President's order is "not rooted in * * * th[ose] statutes." 343 U.S. at 586 (majority); *see id.* at 639 (Jackson, J., concurring) ("Congress has not left seizure of private property an open field but has covered it by three statutory policies inconsistent with this seizure."); *id.* at 597-98 (Frankfurter,

J., concurring); *id.* at 659-60 (Burton, J., concurring in the opinion and judgment); *id.* at 662-63 (Clark, J., concurring in the judgment). As Justice Frankfurter put it, where Congress "qualifie[s] [a] grant of power with limitations and safeguards," "it is quite impossible * * *, to find secreted in the interstices of" other statutes "the very grant of power which Congress consciously withheld." *Id.* at 598, 609.

Because the government purports to find within IEEPA an unlimited tariff power that Congress expressly conditioned in Section 122, and because the President's tariffs exceed Section 122's boundaries, they must be invalidated.

## A. Section 122 governs the President's imposition of tariffs in response to "large and serious" trade deficits.

1. Section 122's plain terms specify precisely what the President must do when significant trade deficits warrant special import measures, including tariffs. It provides: "*Whenever* fundamental international payments problems require special import measures * * * to deal with large and serious balance-of-payments deficits * * * the President *shall*" (1) impose a tariff "not to exceed 15 percent ad valorem" for up to 150 days, which Congress may extend by statute; (2) impose temporary import quotas; or (3) both. 19 U.S.C. § 2132(a) (emphasis added).

Congress enacted Section 122 in response to President Nixon's imposition of tariffs to "deal with" a trade deficit in 1971. *Yoshida I*, 378 F. Supp. at 1175-76. Those tariffs lasted less than five months. *Id*. In 1974, the Customs Court declared them unlawful. *Id*. Within months, the Senate Finance Committee reported the bill containing Section 122 to the floor, accompanied by a report explaining that, "in the light of th[e] recent decision," it was appropriate to provide "explicit statutory authority" for the President "to impose surcharges and other import restrictions for balance of payments reasons." S. Rep. No. 93-1298, at 87-88 (1974).

The next year, the appellate court reversed *Yoshida I*, finding that —at the time—TWEA authorized President Nixon's tightly limited 1971 tariffs. *Yoshida II*, 526 F.2d at 583. But as the Court further explained, future balance-of-payment problems were subject to the newly enacted Section 122, which "specifically require[s] the President, within certain parameters, to impose a surcharge or quotas in response to balance of payments problems." *Id.* at 582 n.33. "A surcharge imposed after" Section 122's effective date "must, of course, comply with the statute now governing such action." *Id.*

This history and precedent make plain that when a significant trade deficit warrants imposing a "special" tariff, the President "must, of course, comply" with Section 122.  That statute allows presidents to react quickly to an economic crisis involving a trade deficit—as in 1971—but limits tariffs to 15% (slightly more than President Nixon deemed necessary) and five months in duration (slightly longer than his tariffs), absent congressional authorization.  In short, the President can deal with trade deficits, but not by using an asserted "emergency" to usurp Congress's constitutional authority over tariffs.

2.    The government does not dispute that Section 122 governs tariffs addressing trade deficits, and it does not contest either the CIT's determination that a trade deficit is a "balance-of-payments deficit" or the basic proposition that problems arising from trade deficits are "international payments problems" under Section 122.  Instead, the government says (Br. 49) Section 122 addresses "specific non-emergency harms," while IEEPA "suppl[ies] broader authorities" for use "when those harms become severe enough to constitute an emergency."  The government thus agrees that Section 122 governs tariffs addressing trade deficits, but says Section 122 does not apply when trade deficits constitute

an emergency. That contention runs headlong into Section 122's text, history, and precedent.

Take the text. Section 122 expressly applies "[w]henever" the President imposes a "special" tariff to respond to a "fundamental international payments problem" involving "large and serious" trade deficits. 19 U.S.C. § 2132(a). The term "[w]henever" does not mean "sometimes"—it confirms that Section 122 reaches emergencies, and Congress's use of the adjectives "special," "fundamental," "large[,] and serious" all further confirm that it addresses the kinds of severe problems that might otherwise trigger emergency proclamations.

The historical background and precedent confirm the point. As noted, Congress passed Section 122 to provide "explicit statutory authority" to deal with the type of emergency President Nixon declared in 1971. S. Rep. No. 93-1298, at 88. That forecloses any suggestion that Section 122 addresses only non-emergency balance-of-payments problems. The whole point of Section 122 was to remedy the lack of emergency tariff authority that President Nixon faced. Indeed, *Yoshida II* held as much, expressly recognizing that, after Section 122 passed, any tariffs imposed

31

in response to a "balance of payments problem[]" that is a "declared emergency" "must" comply with Section 122.  526 F.2d at 582 n.33.

Moreover, the government's argument that Section 122 applies only to non-emergencies contravenes basic separation of powers principles, which dictate that—even in a crisis—the President must adhere to the solution Congress legislated, not the one he prefers. *See Youngstown*, 343 U.S. at 585-86; *Hamdan v. Rumsfeld*, 548 U.S. 557, 635 (2006) (even where a law "tolerates a great degree of flexibility" in matters of national security and foreign affairs, the President must abide by the law's requirements).  Here, the President did not even attempt to address the trade deficit using the procedures Congress set out in Section 122; he simply declared the deficit an emergency and claimed a boundless tariff power under IEEPA.  It would deeply upset the separation of powers to permit the President to ignore the very statute designed to deal with a particular problem and instead to declare that problem an emergency and assert additional, sweeping powers.

**B.    IEEPA does not authorize the President to circumvent Section 122 by imposing whatever tariffs he chooses in response to a trade deficit.**

The government insists that IEEPA permits whatever tariffs the President deems appropriate, based on the "strong presumption that two statutes addressing the same or similar issues 'can coexist harmoniously.'"  Br. 26 (quoting *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024)).  But that presumption supports affirmance. The government's reading does not harmonize IEEPA with Section 122; it allows IEEPA to swallow Section 122 whole, by granting the President power to impose tariffs that flout Section 122's limits.  That reading puts the two statutes on a collision course, and in the face of such a conflict, the more specific statute—Section 122—necessarily governs.  Nor does *Yoshida II* (or any other source) support interpreting IEEPA to give the President the sweeping authority he claims.

1.    By the government's telling, IEEPA empowers the President to impose whatever tariffs he chooses any time he finds (in his assertedly unreviewable discretion) that a trade deficit is creating significant national problems.  But Section 122 provides that "[w]henever" tariffs are necessary to "deal with" a trade deficit, they "*shall*" be no greater than

15%, and last no longer than five months, unless Congress steps in. 19 U.S.C. § 2132(a) (emphasis added). The word "shall" is "mandatory." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020). And since Section 122 restricts the amount and length of tariffs addressing trade deficits, IEEPA cannot be read to authorize greater and longer tariffs without putting the statutes squarely in conflict.

Interpreting IEEPA to override Section 122 would violate the basic principle that "general" statutory language cannot overcome an "express, specific congressional directive," *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 376 (1990), even if the general statute is "later enacted," *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976). *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[T]he meaning of one statute may be affected by other Acts" that speak "more specifically to the topic").

Here, Section 122 is the more "specific congressional directive" because it specifically addresses imposing tariffs to counter balance-of-payment problems. IEEPA, by contrast, makes *no* mention of tariffs or balance-of-payments issues; it creates a general scheme for imposing economic measures in response to qualifying emergencies. In the face of a

34

conflict, therefore, Section 122 controls. Indeed, *Yoshida II* recognized that the President may not rely on general emergency powers where Section 122 "govern[s]." 526 F.2d at 582 n.33.

2. The government says *Yoshida II* instead supports its position that IEEPA (rather than Section 122) applies, as the court there ultimately upheld President Nixon's authority to impose tariffs under TWEA, IEEPA's statutory precursor. But as explained, *supra* at 29-30, Section 122 had not yet been enacted in 1971. In finding that TWEA authorized the tariffs, the court relied on the fact that, at the time of their imposition, those tariffs "did not run counter to any explicit legislation." *Yoshida II*, 526 F.2d at 578. Moreover, the Court recognized that, after Section 122's enactment, that statute (*not* TWEA) "govern[s]," explaining that later tariffs addressing trade deficits "must, of course, comply with" Section 122. *Id.* at 582 n.33. Thus, even if IEEPA is interpreted in accordance with *Yoshida II*, IEEPA still would not govern cases involving trade deficits.

Moreover, the tariffs upheld in *Yoshida II* were far narrower than the tariffs here, and those limits were crucial to the Court's determination that the tariffs were valid under TWEA. Indeed, an entire section of

that opinion is entitled: "[The] Limited Nature of Proclamation 4074." *Id.* at 577-78. In that section, the Court explained that President Nixon's tariffs were set at 10% *ad valorem*, with an express exception to ensure that no tariff would exceed the "rate prescribed in column 2 of the Tariff Schedule." *Id.* at 577; *see* 19 U.S.C. § 3004(b)(1). Thus, the tariffs were far more modest than those imposed here and respected Congress's tariff schedule. Further, President Nixon terminated his tariffs within "less than five months." *Yoshida II*, 526 F.2d at 568. The tariffs here, by contrast, acknowledge no statutory cap or end point.

*Yoshida II* explicitly refused to "sanction" such an "exercise of * * * unlimited power," noting that doing so would "strike a blow to our Constitution." *Id.* at 583. The Court further stressed that "[t]he declaration of a national emergency is not a talisman enabling the President to rewrite the tariff schedules," and that it did not "approv[e] of a wholesale delegation of" Congress's tariff power, *id.*—which is what the government purports to find in IEEPA here.

In any event, even if *Yoshida II* could be read to support a broad tariff power in TWEA, Congress intentionally narrowed that power, first by passing Section 122, then by repealing TWEA except in wartime, and

finally by enacting IEEPA. As the House Committee Report confirms, IEEPA provided "a new set of authorities for use in time of national emergency which are *both more limited in scope than those of* [*TWEA*] *and subject to various procedural limitations*." H.R. Rep. No. 95-459, at 2 (emphasis added). Likewise, the Senate Committee Report emphasized that IEEPA was not a blank check for presidential control over the economy. *See* S. Rep. No. 95-466, at 5-6 (1977). The government's position that IEEPA authorizes tariffs of any size, against any country, for any length of time amounts to precisely such a blank check.

## C. The government's remaining arguments against the application of Section 122 lack merit.

None of the government's other arguments against applying Section 122 here is persuasive.

1. The government says (Br. 51) that "it is common for Congress to enact overlapping tariff authorities," such that the express authority in Section 122 should not be read to displace any tariff power granted by IEEPA. But again, the tariff authority claimed under IEEPA here would not simply "overlap[]" with the authority conferred under Section 122; it would impermissibly displace Section 122's express limits on tariff authority.

37

Notably, Section 338 of the Trade Act of 1930, 19 U.S.C. § 1338—the government's leading example of another "overlapping" statute (Br. 51)—in no way displaced the scheme applicable to balance-of-payment crises. Instead, it provided limited retaliatory tariff authority where a country imposes a non-uniform tariff that "[d]iscriminates" against U.S. exports. *Id.* § 1338(a)(2). In any event, it has been superseded by Congress's reticulated scheme for tariffs in response to "unjustifiable" burdens on "United States commerce." *Id.* § 2411(a)(1)(B)(ii).[2]

2. The government also argues (Br. 53) that Section 122 is inapplicable because the President's tariffs do not solely address a trade deficit. It contends that the tariffs address several "underlying conditions," including a lack of trade-agreement reciprocity and supply chain

---

[2] The America First Policy Institute Brief argues that Section 338 fully authorizes the Global Tariffs. The government does not embrace that argument, and for good reason: President Trump did not invoke Section 338 in imposing these tariffs, and they do not adhere to Section 338's requirements, even if it were operative. Section 338 permits tariffs only when the President "find[s] as a fact" that a country satisfies two statutory conditions, including that the country "[d]iscriminates" against U.S. exports. 19 U.S.C. § 1338(a). The President never purported to make such findings. Nor could he, as the Global Tariffs apply both to countries with which the United States has a trade *surplus*, such as the Netherlands, and to those that impose no tariffs whatsoever on the United States, such as Switzerland.

vulnerability. *Id.* But the statute, by its terms, applies whenever "large and serious United States balance-of-payments deficits" are at issue, regardless of whether there might also be related underlying conditions (which there always will be). The notion that the statute is inapplicable when trade deficits are accompanied by lack of trade-agreement reciprocity or supply chain vulnerability defies logic.

## III. Neither an "emergency" nor an "unusual and extraordinary threat" exists to justify the Global Tariffs.

IEEPA does not authorize the challenged tariffs for the independent reason that Congress explicitly limited the President's authority by providing that IEEPA may be invoked only to deal with "an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter" and not "for any other purpose." 50 U.S.C. § 1701(b). The trade deficit here does not qualify. For one thing, Congress enacted Section 122 expressly to deal with trade deficits, demonstrating that those deficits are not the sort of unexpected circumstances for which IEEPA was enacted. For another, the President's own proclamation demonstrates that trade deficits are anything but unusual.

**A.    A trade deficit does not pose an "unusual and extraordinary" threat or an "emergency."**

Congress limited IEEPA authority to situations that not only qualify as an "emergency," but rise to the level of an "unusual and extraordinary threat."    An "emergency" is a "sudden" and "unforeseen" event. *Emergency,* BLACK'S LAW DICTIONARY (4th rev. ed. 1968); *see* THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 467 (unabridged ed. 1971) ("a *sudden,* urgent, usually unforeseen circumstance or occasion requiring immediate action" (emphasis added)).    And to qualify as an "unusual and extraordinary threat," the unforeseen event must in some way be "exceptional."    *E.g.*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1568 (unabridged ed. 1971) (unusual: "not usual, common, or ordinary; uncommon in amount or degree; exceptional"); *id*. at 505 (extraordinary: "(1) beyond what is usual, ordinary, regular, or established" and "(2) exceptional in character, amount, extent, degree, etc.; noteworthy; remarkable").

Moreover, an emergency does not automatically qualify as an "unusual and extraordinary threat," and vice versa.    Otherwise, one of these requirements would become superfluous, in violation of the "elementary canon of construction that a statute should be interpreted so as not to

40

render one part inoperative." *Colautti v. Franklin*, 439 U.S. 379, 392 (1979).

1. A longstanding trade deficit is neither an "emergency" nor "an unusual and extraordinary threat." Whatever else those terms might cover, they cannot apply to situations that Congress has already addressed, as Congress did in Section 122.

As the Executive Order itself recognizes, far from being unforeseeable or out of the ordinary, trade deficits are commonplace. At least nine times, Executive Order 14,257 describes the trade deficit as "large and persistent." The Order compares three periods—2023 to 2001 (a 22-year period), 2024 to 1997 (a 27-year period), and 2017 to 2003 (a 14-year period)—marked by such trade deficits. And indeed, "imports exceeding exports has been a consistent feature of the U.S. economy since the mid-1970s"—half a century. Appx215 (decl. of Professor James R. Hines).

A threat that is "large and persistent" might be "grave"—the government's term (Br. 2)—but it cannot be "unusual" or "extraordinary." Nor can a "persistent" problem that has been a consistent feature of the U.S. economy for 50 years be deemed an "emergency," as such a threat is neither "sudden" nor "unforeseen," *Emergency,* BLACK'S LAW DICTIONARY.

2.    Congress regarded these preconditions as essential to IEEPA. As the House Report stressed, "emergencies are by their nature rare and brief, and are not to be equated with normal ongoing problems."  H.R. Rep. No. 95-459, at 10.  IEEPA should be "employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose," and emergency measures "should be terminated in a timely manner when the factual state of emergency is over."  *Id*.

These limitations also make sound structural sense.  The Constitution vests the tariff authority in Congress, the most deliberative branch. But some problems arise suddenly and are better dealt with by the branch having the virtues of "activity, secrecy, and despatch."  *Federalist* No. 70.  IEEPA eschews providing specific guidance as to how the President shall use the powers it grants, but it limits their use to situations that are both a genuine "emergency" and an "unusual and extraordinary threat," thereby ensuring that the President can use his statutory authority only in situations where Congress lacks the time to develop a solution through the deliberative process.

**B.** **The government errs in asserting that its invocation of IEEPA is unreviewable.**

1. The government claims that courts cannot meaningfully review a President's invocation of IEEPA—full stop. Br. 59-60. But while courts should generally give the President's evaluation of the facts on the ground or the likely consequences of proposed policy some leeway, they must make an independent judgment regarding the legal implications of those facts. Even in the context of war and national security, "resort to the courts may be had * * * to challenge the construction and validity of the statute," *Ludecke v. Watkins*, 335 U.S. 160, 171 (1948), and to review whether statutory predicates have been met, including "to ascertain the existence of a state of war," *Johnson v. Eisentrager*, 339 U.S. 763, 775 (1950). Were it otherwise, Congress might be reluctant to delegate emergency powers when they are needed, for fear that a president might treat such delegations as a free pass for use whenever he chooses.

In any event, rejecting the government's claim that "large and persistent" trade deficits constitute an emergency and an "unusual and extraordinary threat" does not require impermissible judicial second-guessing; it merely requires taking the President at his word. Executive Order 14257 contains *not one* assertion that the problem here was sudden,

unforeseen, unusual, or extraordinary.  Rather, the Order insists—repeatedly—that trade deficits have been an "annual," "persistent" problem developing over many decades.  "Persistent" problems are beyond IEEPA's scope.

2.    The government's only hope of prevailing on this point is its assertion that presidential "determinations about what constitutes an 'extraordinary and unusual threat'" raise "[m]atters relating to the conduct of foreign relations [which] are so exclusively entrusted to the political branches of government as to be" unreviewable under the political question doctrine.  Br. 58 (quoting *Regan v. Wald*, 468 U.S. 222, 242 (1984)) (quotation marks omitted).  But that doctrine cannot be extended to areas like tariffs and foreign commerce that fall squarely within Congress's constitutional domain and are thus controlled by statute.  *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) (recognizing courts' authority to decide whether the President has adhered to a valid statutory limit).

Moreover, IEEPA's text confirms that the determinations of what constitutes an "emergency" and an "unusual and extraordinary threat" are reviewable.  IEEPA expressly provides for review of classified

documents "[i]n any judicial review of a determination made under this section." 50 U.S.C. § 1702(c). The only reason courts might review such information is to consider whether there is an "emergency" or an "unusual and extraordinary threat." While that subsection by itself "does not confer or imply any *right* to judicial review," *id.* (emphasis added), it makes clear that Congress intended such review.

Further, the statutory requirement of an "unusual and extraordinary threat" is not framed the same way as other statutes that have been found to limit judicial review of presidential decision-making. In *Trump v. Hawaii*, for example, the Supreme Court inferred that a statute permitting the President to suspend immigration where he "find[s]" that the entry of non-citizens "would be detrimental to the interests of the United States" calls for a high degree of deference to the President's "finding." 585 U.S. 667, 685-86 (2018). But IEEPA is not triggered by a presidential finding alone. It imposes a free-standing legal prerequisite of an "unusual and extraordinary threat," which the courts should enforce just as they would any other statutory condition.

## IV. The major questions doctrine requires a ruling that IEEPA does not authorize the Global Tariffs.

As discussed above, neither the ordinary meaning of IEEPA nor Section 122 supports the government's claim of essentially unbounded tariff authority. But if any statutory ambiguity remains, the major questions doctrine compels affirmance. Because the President asserts powers having vast economic and political significance, the government's claim of unbounded tariff authority requires explicit authority from Congress. Yet IEEPA nowhere mentions tariffs, there is no evidence that Congress understood it to delegate broad tariff powers (the evidence is to the contrary), and no other President has ever asserted tariff authority based on IEEPA. Thus, this is a textbook case for the major questions doctrine, and that doctrine dooms the government's effort to conjure up powers that Congress has not granted.

### A. The Supreme Court has repeatedly held that Congress must speak clearly when delegating vast economic and political power.

The Supreme Court has long held that Congress must not be assumed to have implicitly delegated the power to regulate "a significant portion of the American economy" without explicitly saying so. *Brown & Williamson*, 529 U.S. at 159; *see ICC v. Cincinnati, N. O. & T. P. R. Co.*,

167 U. S. 479, 494-95, 509 (1897).  Now known as the "major questions doctrine," this principle requires Congress to "speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Reg. Group v. EPA*, 573 U.S. 302, 324 (2014).  Otherwise, courts will "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotations omitted); *accord Ala. Ass'n of Realtors v. HHS,* 594 U.S. 758, 764 (2021).

Whether the major questions doctrine is viewed as "a commonsense interpretive maxim" or as a substantive canon serving the separation of powers, *see Consumers' Research*, 2025 WL 1773630, at \*22 (Kavanaugh, J., concurring); *Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring), the result is the same:  The government's claim of essentially unlimited tariff authority requires clear legislative authorization.  Not only is such broad authority improbable in that Congress has imposed strict limits on every explicit grant of tariff authority that it has enacted, but, as the court below held, it would cause the statute to run afoul of the nondelegation doctrine.  Appx27-28; *infra* at 54-64.

### B. The imposition of the Global Tariffs qualifies as a major question.

"The 'economic and political significance'" of the Global Tariffs is "staggering by any measure." *Biden*, 600 U.S. at 502 (quotation marks omitted). The President imposed 10% tariffs on most countries, without taking into account differences in those countries' trade policies, and additional reciprocal tariffs on specific countries based on a simple ratio of the trade deficit in goods (excluding services) as a percentage of total U.S. imports from the given country. Exec. Order 14,257, 90 Fed. Reg. at 15,045.[3] Seven days later, the President unilaterally paused the latter "reciprocal" tariffs for 90 days, while simultaneously raising the tariff rate on China to 145%, subject to various exemptions that lacked any standards or procedures. Exec. Order 14,266, 90 Fed. Reg. at 15,626.

In 2024, United States imports were roughly $3 trillion, which (subject to reduced demand) means a 10% tariff imposes roughly $300 billion in new taxes in the President's unilateral discretion. Current estimates project that the challenged Order would impose, on average, almost

---

[3] *See* U.S. Trade Representative, *Reciprocal Tariff Calculations* (2025), https://ustr.gov/sites/default/files/files/Issue_Areas/Presidential%20Tariff%20Action/Reciprocal%20Tariff%20Calculations.pdf.

$1,300 annually in new taxes on American households, or a total tax burden of some $1.4 to $2.2 *trillion* over the next ten years. Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Foundation (June 2, 2025).[4] And the significance goes beyond economics: The government's claimed power allows the President to set at nought treaties and agreements to which Congress has committed the nation. Such power requires a clear statutory basis.

These impacts are much larger than those of earlier executive actions that raised "major questions." *Biden*, 600 U.S. at 483 ("roughly $430 billion" in student loan forgiveness); *West Virginia*, 597 U.S. at 706 (EPA authority to regulate carbon emissions); *NFIB v. OSHA*, 595 U.S. 109 (2022) (pandemic-era vaccination mandate for private employees); *Ala. Ass'n of Realtors*, 594 U.S. at 758 (temporary pandemic-era nationwide eviction moratorium). Indeed, the government's protestations about the tariffs' importance (Br. 45-46) essentially concede the point.

Moreover, the power asserted by the President is a core, enumerated legislative power; under the Constitution, Congress holds the

---

[4] Available at https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/.

49

powers to lay duties and regulate foreign commerce. *Supra* at 7. The President can therefore exercise such authority *only* if Congress delegated it. And "[i]n the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give [him] the unprecedented power over American industry that would result from the Government's view." *Indus. Union Dep't, AFL–CIO v. Am. Petroleum Inst.* ("*API*")*,* 448 U.S. 607, 645 (1980).

Further, major questions doctrine scrutiny is especially stringent when the executive asserts "unprecedented power[s]" never previously asserted by presidents or recognized by courts. *West Virginia*, 597 U.S. at 728 (quoting *API*, 448 U.S. at 645). The authority asserted here is even more unprecedented than prior cases. Over IEEPA's nearly 50-year history, no other president has used it to impose tariffs, much less on such a vast scale. Cong. Research Serv., *The International Emergency Economic Powers Act: Origins, Evolution, and Use* 26 (2024). That presidents have imposed tariffs under *other* statutes (Br. 45-46) is irrelevant. Those statutes were explicit, and the powers granted were subject to limits. The question here is whether *IEEPA* delegates the claimed authority.

Under the major questions doctrine, therefore, the President's Global Tariffs may be sustained only if Congress "sp[oke] clearly" in authorizing him to impose whatever tariffs he wants on whatever goods from whatever countries at whatever rates, with no limitations on scope, methodology, timing, or anything else. *Ala. Ass'n of Realtors*, 594 U.S. at 764. Plainly, it did not. IEEPA never mentions tariffs; the legislative history recites a list of its powers, not including tariffs; and 50 years passed without any president asserting that IEEPA authorized tariffs.

## C. Assertions of authority by the President are not exempt from the major questions doctrine.

The government claims that presidential—as opposed to agency—actions are exempt from the major questions doctrine. But at least three federal circuits have rejected that loophole. *See Louisiana v. Biden*, 55 F.4th 1017, 1031 n.40 (5th Cir. 2022) ("delegations to the President and delegations to an agency should be treated the same under the major questions doctrine"); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295-96 (11th Cir. 2022) (a presidential assertion of power is "no exception"); *Kentucky v. Biden*, 23 F.4th 585, 606-608 (6th Cir. 2022) (applying the doctrine to a presidential directive). The only contrary appellate decision was vacated. *Mayes v. Biden*, 67 F.4th 921, 932-34 (9th Cir. 2023),

*vacated as moot*, 89 F.4th 1186 (9th Cir. 2023). And as these decisions confirm, the distinction is indefensible as a matter of principle.

The rationales that undergird the major questions doctrine confirm that "[i]t makes no difference which Executive Branch officer has received an unlawful delegation." *Nebraska v. Su*, 121 F. 4th 1, 18 (9th Cir. 2024) (Nelson, J., concurring). Insofar as the doctrine is a commonsense maxim designed to respect congressional intent, it should apply here. "An implausible reading of a statute is no less implausible when that statute confers authority on the President versus an agency." *Id*. at 19-20 (Nelson, J., concurring). And insofar as the Constitution vests the entire "executive Power" in the "President," U.S. Const., art. II, § 1, the government's distinction is inconsistent with the unitary nature of executive power, *see Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) (the President "may remove without cause executive officers who exercise that power on his behalf, subject to narrow exceptions"). Whether discretion is nominally vested in the President personally or in his subordinate officers, the buck stops in the same place—which belies the government's suggestion that the President is different because he is "politically accountable." Br. 43; *see Consumers' Research*, 2025 WL 1773630, at *23

(Kavanaugh, J., concurring). And, of course, agencies face accountability from Congress—which can abolish them entirely.

## D. Tariffs are not exempt from the major questions doctrine.

In a recent concurring opinion, Justice Kavanaugh suggested that "the major questions canon has not been applied by this Court in the national security or foreign policy contexts, because the canon does not reflect ordinary congressional intent in those areas," where "the President possesses at least some independent constitutional power to act." *Consumers' Research*, 2025 WL 1773630, at *23 (Kavanaugh, J., concurring). Here, however, the President has no "independent" authority. Two separate clauses of Article I, Section 8, confirm that as to "Duties, Imposts and Excises" (i.e., tariffs) and regulating foreign commerce, Congress—not the President—is the repository of national power.

Moreover, there is no need to guess about "ordinary congressional intent" as to tariff authority. In every statute granting such authority, Congress does so explicitly and with conditions and restrictions. Just three years before IEEPA, Congress did exactly that in the Trade Act. Thus, insofar as the major questions doctrine discerns "ordinary congressional intent," that cuts *against* the government's position.

Finally, tariffs are not a pure matter of foreign relations of the sort that Justice Kavanaugh was discussing. They are taxes paid by Americans, with domestic consequences much like those imposed by the seizure of the steel mills in *Youngstown*—despite obvious foreign policy implications during wartime. *Learning Resources*, 2025 WL 1525376, at \*7. The tariffs here would impose massive tax increases on Americans. Where so much of the brunt of presidential action falls on the American people, it makes little sense to carve out a "foreign affairs" exception to the major questions doctrine.

## V. The government's interpretation of IEEPA would render the statute an unconstitutional delegation of legislative power to the executive.

Reading IEEPA to grant the President the sweeping tariff authority asserted here would also cause the statute to violate the nondelegation doctrine. As the court below recognized, "an unlimited delegation of tariff authority would constitute an improper abdication of legislative power to another branch of government," and would be "unconstitutional." Appx28. Likewise, *Yoshida II* refused to "sanction the exercise of an unlimited power, which \*\*\* would be to strike a blow to our Constitution." 526 F.2d at 583. Avoiding that constitutional problem requires only that

the Court interpret IEEPA in a manner consistent with its ordinary meaning.

## A. The government's unbounded reading of IEEPA violates the nondelegation doctrine.

Just days ago, the Supreme Court reaffirmed that Congress may not delegate "boundless authority" to the executive. *Consumers' Research*, 2025 WL 1773630, at \*15. Specifically, the Court held that the nondelegation doctrine requires that Congress "provide[] sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *Id.* at \*8 (quoting *OPP Cotton Mills, Inc. v. Adm'r of Wage and Hour Div., Dep't of Labor*, 312 U.S. 126, 144 (1941)). The Court also recognized that "[t]he 'guidance' needed is greater \* \* \* when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue." *Consumers' Research*, 2025 WL 1773630 at \*8. If this Court accepts the government's interpretation of IEEPA, the statute would contravene nondelegation principles by allowing the President the unbounded authority to impose tariffs that have massive effects on "the entire economy."

1. While acknowledging that the nondelegation doctrine retains its force, the government insists that the authority it claims is "not

unbounded" because "IEEPA cabins the President's power in numerous important respects."  Br. 37.  It offers four such limitations, each of which dissolves upon examination.

a.    First, the government points to the requirement that the President promulgate a "public emergency declaration under the NEA." Br. 37.  But according to the government, whether to declare such emergencies rests entirely in the President's discretion, which is "not susceptible to meaningful judicial review."  Br. 59.  To say that the President may declare an emergency in his sole discretion is not a *limitation*; it is a sweeping grant of power.  Indeed, the declaration of an emergency here, based on "persistent" trade deficits present for half a century, shows just how "toothless" the "limitation" is.  *See supra* at 51.

b.    Second, the government asserts that emergencies are "by default time limited" and subject to "congressional oversight."  Br. 37.  In fact, on the books today, one finds 51 extant "emergency" decrees dating back *40-plus* years.    *See* Brennan Ctr. for Just., *Declared National*

*Emergencies Under the National Emergencies Act* (last updated July 3, 2025).[5] So much for time limits.

As for "congressional oversight," the government presumably refers to the fact that, when Congress originally enacted the Emergency Powers Act and IEEPA, it had the power to terminate emergency declarations by legislative veto. But the Supreme Court later invalidated legislative vetoes in *INS v. Chadha*, 462 U.S. 919 (1983). Now, if Congress wishes to terminate a president's emergency declaration, it must pass a joint resolution—ordinary legislation subject to presidential veto. While Congress has passed multiple such resolutions, it has *never* overcome a presidential veto. Cong. Research Serv., *National Emergencies Act: Expedited Procedures in the House and Senate* 14-18 (2025).

c. Third, the government points (Br. 52) to the requirement that an emergency constitute an "unusual and extraordinary threat." Here again, however, the government tells us this further determination is, like the emergency itself, a matter of the President's unreviewable

---

[5] Available at https://www.brennancenter.org/our-work/research-reports/declared-national-emergencies-under-national-emergencies-act.

discretion. Br. 59. A requirement that the President perform a discretionary act that is wholly unreviewable is not a restriction.

Indeed, the government's insistence that *unreviewable* statutory boundaries could immunize IEEPA from a nondelegation challenge runs headlong into the Supreme Court's repeated recognition that a valid delegation must enable "'*the courts* * * * to ascertain whether the [Executive Branch]' has followed the law." *Consumers' Research*, 2025 WL 1773630, at \*12 (emphasis added) (quoting *OPP Cotton Mills*, 312 U.S. at 144).

d.     Fourth, the government declares (Br. 38) that § 1702(b) "expressly sets forth various limits on the President's authority."     But § 1702(b) simply lists items the President cannot *regulate*—namely, communications and informational materials, donations, and travelers' personal baggage. These items are irrelevant to tariffs, on which § 1702(b) imposes no limits whatsoever. And the government cannot identify any other limitations on the tariff power it asserts.

The government is therefore caught on the horns of a dilemma. It cannot rely on time limits, congressional oversight, or a handful of enumerated exceptions because none of those provisions imposes any meaningful constraint. And while IEEPA's requirements of an "emergency"

and "an unusual and extraordinary threat" could provide some limit on IEEPA's delegation if those determinations are subject to meaningful judicial review, the government cannot admit that they are because it could not show in court that the Proclamation satisfies those statutory conditions. Trade deficits that, in the President's own words, are "persistent" and "annual," *supra* at 51, are—by definition—neither "unusual" nor "extraordinary," nor an "emergency." *Supra* at 40-42.

2. The result is that IEEPA, at least as the government reads it, lacks precisely the "intelligible principle" that saved the statute in *Consumers' Research*. That case, like this one, involved delegation of the power to tax—a power jealously guarded by Congress. *See Consumers' Research*, 2025 WL 1773630, at *25 (Gorsuch, J. concurring). The Supreme Court upheld the FCC's power to impose "contributions" (i.e., taxes) only after concluding that the statute, properly interpreted, set both a "ceiling" and a "floor" for such contributions. *Id.* at *3. The FCC could not compel contributions at whatever level it wished—only those sufficient to fund a determinate level of universal service. *Id.*

Here, the President asserts the authority to set tariffs at whatever levels he wishes—10% on some, 145% on others. There is neither floor

nor ceiling—the sky's the limit.  So interpreted, IEEPA lacks the limiting principle deemed essential to the validity of the statute in *Consumers' Research*—a limiting principle that Congress itself has deemed necessary in every statute expressly authorizing tariffs.  *See, e.g.*, *supra* at 28-32 (explaining Section 122's limits); 19 U.S.C. § 1821(b) (expressly limiting the rate by which duties may be increased or decreased in response to burdensome foreign restrictions on trade).

3.    Hoping to evade these obvious nondelegation problems, the government says the nondelegation doctrine does not apply with full force to foreign affairs matters.  Br. 39-40 (citing, inter alia, *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 324 (1936)).  But as the government's own cases confirm, that view is untenable.

Indeed, the very first Supreme Court case to establish the "intelligible principle" test involved tariffs, *J.W. Hampton Jr. & Co. v. United States*, 276 U.S. 394 (1928), and *J.W. Hampton* nowhere suggests that delegations of tariff authority are subject to a lower standard.  The most relevant earlier case, *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), was similarly strict in applying the nondelegation doctrine.  *Id*. at 692-93.  These precedents do not remotely suggest that the government may

evade constitutional scrutiny merely because tariffs relate to foreign affairs, as well as domestic taxation.

Even *Curtiss-Wright* examined the degree of delegation with care, and its conclusion was consistent with the usual "intelligible principles" doctrine. 299 U.S. at 322-29. Moreover, *Curtiss-Wright* approved of the delegation at issue primarily because of an "unbroken legislative practice" authorizing virtually identical action—wartime munition embargos —that had "prevailed almost from the inception of the national government." *Id.* at 322. The Court found this record of congressional action "almost conclusive" as to the validity of the delegation. *Id.* at 328-29. There is nothing remotely similar here. Indeed, *no* prior president has claimed the power to impose tariffs under IEEPA, and the events of *Yoshida II* represent the only instance in which any other President has asserted an emergency tariff authority.

Finally, courts afford greater deference to the President in foreign affairs because the President is constitutionally vested with broad independent powers over many aspects of that arena. But the power over "Taxes, Duties, Imposts, and Excises" is explicitly vested in Congress, not the President. U.S. Const., art. I, § 9, cl. 1. Nothing suggests that the

61

nondelegation doctrine applies with lesser force to the delegation of powers expressly vested in Congress, where the President lacks independent authority to act.

4.     The government's reliance on cases rejecting nondelegation challenges to IEEPA in *other* contexts is misplaced.  Br. 42.  Those cases involved powers explicitly granted by IEEPA—powers with specific limits and conditions.  *United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023); *United States v. Amirnazmi*, 645 F.3d 564, 577 (3d Cir. 2011); *United States v. Dhafir*, 461 F.3d 211, 215-17 (2d Cir. 2006); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1092-94 (4th Cir. 1993); *United States v. Mirza*, 454 F. App'x 249, 255-56 (5th Cir. 2011).  Here, the government asserts broad powers nowhere mentioned in IEEPA— powers subject to no statutory limit beyond having to declare an "emergency" and an "unusual and extraordinary threat."

## B.     The Court should avoid constitutional problems by giving IEEPA and Section 122 their natural reading.

"Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems."  *Jennings v. Rodriguez*,

583 U.S. 281, 286 (2018). "The question is not whether" an interpretation that avoids constitutional problems "is the most natural statutory interpretation"—"only whether it is a 'fairly possible'" one. *NFIB*, 567 U.S. at 563 (citation omitted). And the nondelegation concerns raised by the government's sweeping interpretation of IEEPA are at least sufficient to trigger this constitutional-avoidance canon. *See also supra* at 22 (recognizing that the government's interpretation of "regulate" implicates the Constitution's bar on export taxes).

The Court can easily avoid those issues by reading the statutes here as written. IEEPA never mentions tariffs and has never been used to impose them; there is no reason to read that power into the statute. Section 122 provides authority tailored to the specific problems of large and persistent trade deficits, and it does so with standards that easily satisfy the Constitution. In addition, IEEPA itself can be invoked only in the event of a genuine emergency that amounts to an "unusual and extraordinary threat," which does not exist here. Moreover, the case for applying constitutional avoidance is especially strong here, because the nondelegation issues are problems of the government's own making. Had the President exercised the tariff powers explicitly granted by Section 122,

the relevant intelligible principle would be evident on the face of the statute. There is no intelligible principle here because Congress did not understand IEEPA as a freestanding authorization for tariffs—so there was no need to impose any limits.

The government is thus wrong to assert (Br. 38) that no "plausible construction" of IEEPA can solve the nondelegation problem. Nothing in IEEPA's text grants the President the boundless tariff power the government claims, and both Section 122 and IEEPA itself expressly limit his tariff authority.

Plaintiffs' interpretation would also avoid authorizing the President to take impose plainly unconstitutional export taxes. *Supra* at 22. This is yet another reason for the court to apply the avoidance canon here. *See Learning Resources*, 2025 WL 1525376, at \*11.

## VI.   The CIT properly awarded Plaintiffs complete relief.

Without citing any authority, the government advances a remarkable position:  Even if the President has exceeded his powers, the CIT should not have issued the injunction necessary to provide complete relief because requiring him to adhere to the law might weaken his negotiating position in trade talks.

No doubt there are often policy objections to requiring the executive to follow the law. But policy objections do not warrant allowing the President to evade the courts' remedial powers or the "checks of Congress," even when "foreign affairs are at issue." *Zivotofsky*, 576 U.S. at 21. The CIT's injunction vindicates that settled proposition and fully comports with settled equitable principles.

## A. The CIT properly addressed the equitable factors in a separate order.

The government first says the CIT's initial summary judgment opinion failed to address the permanent injunction factors. Br. 60-61. But it is undisputed that the court addressed each factor just a few days later. *See* Appx63; Br. 61 (acknowledging that Order). And it is neither unusual nor improper for courts to explain their reasoning in two separate orders, especially when operating under time pressures. *E.g.*, *Mansfield v. Pfaff*, 719 F. App'x 583, 585 (9th Cir. 2017); *Shelton v. Bd. of Sup'rs of S. Univ. & Agr. & Mech. Coll.*, 532 F. App'x 558, 561 (5th Cir. 2013). Regardless, this Court may affirm "on any grounds supported by the record." *Washington Fed. v. United States*, 26 F.4th 1253, 1263 n.6 (Fed. Cir. 2022).

The government is also wrong (Br. 62) that the CIT "did not address" record evidence of harm. Rather, the court explained that those "consequences" were not enough to overcome Plaintiffs' entitlement to complete relief and the public interest in preventing the government from violating the law. Appx63. The government may have preferred a fuller explanation, but this Court has declined to find "reversible error" based on even less "balance of hardships" analysis. *Oman Fasteners*, 125 F.4th at 1090. Moreover, an extensive examination of the government's evidence is not required where, as here, the "merits determination" "weakens or nullifies" any assertion of "cognizable harm." *Id*.

## B. The CIT properly exercised its broad remedial discretion in concluding that Plaintiffs are entitled to injunctive relief.

The CIT correctly found that Plaintiffs lacked "a complete legal remedy" to redress their injuries, Appx63, which include substantial harms to their business operations, goodwill, reputation, and business opportunities. Appx127-161; *supra* at 14-16. "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).

The government complains that Plaintiffs' harms are "speculative," "general," and "not unique." Br. 63-64. But Plaintiffs may "fairly employ economic logic" to demonstrate a concrete and particularized injury by showing that the government's illegal action is "likely to cause [them] an economic injury." *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1333-34 (Fed. Cir. 2008). Thus, "[t]o suffer an economic injury from a tariff it is not necessary to incur direct liability to Customs, or even to directly import an article of dutiable merchandise." Appx22 (citation omitted).

## C.    The CIT correctly weighed the public-interest factors.

Nor was there any abuse of discretion in the CIT's holding that the public interest and balance of harms support permanent injunctive relief. The public has an overriding interest in "ensuring that governmental bodies comply with the law," Appx63 (quoting *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010)), and in ensuring that the President applies "trade statutes uniformly and fairly," *Am. Signature*, 598 F.3d at 830. Moreover, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *E.g.*, *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). The CIT reasonably

concluded that the "policy consequences" of an injunction could not overcome those settled principles. Appx63.

The public interest factor sometimes favors the losing defendant when the scope of the remedy is at issue. *E.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 28-29 (2008), cited twice at Br. 62 (disputing whether a 2,200-yard shutdown zone for submarine testing was necessary to prevent environmental damage). But the government cites no case—presumably because there is none—where the public interest factor allowed the government to keep violating the law. Indeed, the court's citation of *Youngstown* (Appx64) is a pointed rebuttal to that astonishing position.

The government nonetheless urges (Br. 5, 62-63) that the equities weigh "heavily" in its favor because restricting emergency tariff authority will jeopardize "ongoing negotiations with foreign trading partners." But Congress has already balanced those equities, and no *equitable* principle allows the President to engage in *ultra vires* conduct. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); U.S. Const., art. I, § 8. To be sure, Presidents have tried to find one. They have invoked national security catastrophes and relations with foreign governments, just as the

government does now.  *Boumediene v. Bush*, 553 U.S. 723, 797 (2008); *Medellín v. Texas*, 552 U.S. 491, 524 (2008).  Yet no matter how "compelling" the asserted interest, none of them "allow[s] [courts] to set aside first principles."  *Medellín*, 552 U.S. at 524.  Otherwise, the need for negotiating "leverage" would always justify dispensing with statutes, based on the President's say-so.  The CIT's injunction ensures that Congress's judgment will "be understood and respected."  *Zivotofsky*, 576 U.S. at 21.

Further, an injunction will not leave the President powerless to act.  Section 122, and the myriad other tariff laws listed by the government (Br. 8), provide ample authority to promptly respond to balance-of-trade emergencies.  *Supra* at 11-12.  The existence of those authorities also underscores a distinct but important point:  The government is only in this position because it refused to follow Congress's express directives in the first place.  Any resulting harms are ones "inflicted by its own hand," and thus are not a cognizable basis for denying an injunction.  *Cf. Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).

Although this Court need not reach the issue, the record does not support the government's assertions of harm *from an injunction*.  The government cites (Br. 62) a series of declarations about the potential

consequences of an injunction. But crucially, they were all executed *before* an injunction issued. Appx455, Appx460, Appx464, Appx468. The same declarants who warned of a "disaster scenario" then, Appx468 (statement of U.S. Trade Representative Jamieson Greer), said *after* the injunction issued—and before this Court entered a stay—that "[i]t's actually the opposite" and that countries will "keep negotiating," Appx478 (same); *compare* Appx455 (Commerce Secretary Howard Lutnick stating an injunction would "jeopardize vital trade agreements"), *with* Appx480 (Secretary Lutnick stating that the order "maybe cost us a week—but then everybody came right back to the table"). Because even a genuine emergency will not dispense with the President's duty to follow the law, *Youngstown*, 343 U.S. at 582, *unsupported* assertions of harm certainly cannot justify the denial of an injunction.

In any event, the consequences described in the declarations do not follow from the nature of the relief but from the legal conclusion that the President lacks the power to impose the tariffs. Once it is finally determined that the reciprocal tariffs are unlawful, whether or not the remedy includes an injunction, the President will be confined to the authorities he has under Congress's other tariff laws. The government's equitable

arguments are but a repackaging of its case—or perhaps another way of saying that it is dissatisfied with the tools Congress has provided. That is no reason to deny complete relief to Plaintiffs.

## D. Plaintiffs will not receive complete relief if the executive order remains enforceable against other entities.

The decision below, and the government's brief, were written before *Trump v. CASA, Inc.*, 2025 WL 1773631 (June 27, 2025). It is now established that lower courts must confine injunctive relief to whatever is necessary to provide complete relief to the parties; non-parties may benefit "only incidentally." *Id.* at *11. For reasons stated by the CIT, however, complete relief is possible only if the injunction applies across the board.[6]

First, Plaintiffs' economic harms are inextricably linked with the Global Tariffs that non-parties face. The tariffs applied to Plaintiffs' suppliers or customers will impact their businesses, even if Plaintiffs are not required to directly pay the tariffs themselves. Thus, only an injunction that blocks enforcement of the executive order nationwide can provide complete relief.

---

[6] This brief confines its discussion to the individual Plaintiffs. The State Plaintiffs have other arguments.

Second, the Constitution requires that "all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const., art. I, § 8, cl. 1. It thus would be unconstitutional for a court to order that five companies pay lower tariffs than all other importers. Appx48-49. The government's only answer is to assert that this constitutional provision limits only Congress's power and does not affect the court's equitable authority. Br. 66. But the judiciary cannot remedy one "constitutional problem by creating a new one." *Off. of the United States Tr. v. John Q. Hammons Fall 2006, LLC*, 602 U.S. 487, 504 (2024). The uniformity provision is not about the words found in the statute, but the duties themselves.

Third, as the CIT explained (Appx64), the challenged Order effects changes in the Harmonized Tariff Schedule of the United States, which has the status of law, and which Plaintiffs must obey. If the Tariff Schedule is corrected for the benefit of these parties, it necessarily will be corrected for all persons subject to its requirements.

Fourth, because the CIT has exclusive jurisdiction over civil actions against the United States, its agencies, or its officers arising from any law providing for tariffs, 28 U.S.C. § 1581(i)(1)(B); *see also* Appx17, the

usual concerns about such broad relief—such as forum shopping, a single district court controlling national policy, hindering the development of federal law, or conflicting injunctions, *CASA*, 2025 WL 1773631, at \*20 (Kavanaugh, J., concurring)—do not apply here. Enjoining enforcement of the executive order in its entirety is "what is necessary, what is fair, and what is workable" to provide complete relief here. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (quotation omitted).

## CONCLUSION

For the foregoing reasons, the judgment below should be affirmed. Plaintiffs respectfully request that the Court lift the stay on enforcement of the CIT's injunction as soon as practicable after oral argument.[7] The parties and the broader economy will only benefit from an order clearly defining the President's tariff authority.

---

[7] Plaintiffs do not oppose the government's request for a brief administrative stay permitting it to seek emergency Supreme Court review.

Respectfully submitted.

/s/ Michael W. McConnell

NEAL KUMAR KATYAL
COLLEEN E. ROH SINZDAK
EZRA P. LOUVIS
SAMANTHA K. ILAGAN
  *Milbank LLP*
  *1850 K Street N.W.*
  *Washington, DC 20006*
  *(202) 835-7505*
  *nkatyal@milbank.com*

JEFFREY M. SCHWAB
REILLY STEPHENS
JAMES MCQUAID
  *Liberty Justice Center*
  *7500 Rialto Blvd.*
  *Austin, Texas 78735*
  *(512) 481-4400*
  *jschwab@ljc.org*
  *rstephens@ljc.org*
  *jmcquaid@ljc.org*

MICHAEL W. MCCONNELL
STEFFEN N. JOHNSON
PAUL N. HAROLD
  *Wilson Sonsini*
  *Goodrich & Rosati, PC*
  *1700 K Street N.W.*
  *Washington, DC 20006*
  *(202) 973-8000*
  *mmcconnell@wsgr.com*
  *sjohnson@wsgr.com*
  *pharold@wsgr.com*

ILYA SOMIN
  *Antonin Scalia Law School*
  *George Mason University*
  *3301 Fairfax Dr.*
  *Arlington, Virginia 22201*
  *(703) 993-8069*
  *isomin@gmu.edu*

*Counsel for Plaintiffs-Appellees*

DATED: JULY 8, 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32 because it contains 13,999 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Century Schoolbook font.

DATED: JULY 8, 2025

*/s/ Michael W. McConnell*
MICHAEL W. MCCONNELL
*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I certify that today I caused this document to be filed electronically with the Clerk of Court using the CM/ECF system and thereby served via CM/ECF on all parties and counsel of record.

DATED: JULY 8, 2025

/s/ Michael W. McConnell
MICHAEL W. MCCONNELL
*Counsel for Plaintiffs-Appellees*