Nos. 2025-1812, -1813

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 for the 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

**V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, D/B/A GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,**

*Plaintiffs-Appellees,*

v.

**DONALD J. TRUMP,** in his official capacity as President of the United States**; EXECUTIVE OFFICE OF THE PRESIDENT; UNITED STATES; PETE R. FLORES,** in his official capacity as Acting Commissioner of United States Customs and Border Protection**; JAMIESON GREER,** in his official capacity as United States Trade Representative**; OFFICE OF THE UNITED SATES TRADE REPRESENTATIVE; HOWARD LUTNICK,** in his official capacity as Secretary of Commerce**; UNITED STATES CUSTOMS AND BORDER PROTECTION,**

*Defendants-Appellants*

_____

*On Appeal from the United States Court of International Trade in No. 1:25-cv-00066-GSK-TMR-JAR, Judge Gary S. Katzmann, Judge Timothy M. Reif, and Senior Judge Jane A. Restani*

_____

**STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF VERMONT,**

*Plaintiffs-Appellees,*

v.

**PRESIDENT DONALD J. TRUMP; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM,** in her official capacity as Secretary of Homeland Security; **UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES,** in his official capacity as Acting Commissioner of United States Customs and Border Protection; **UNITED STATES,**

*Defendants-Appellants*

———————————————

*On Appeals from the United States Court of International Trade in No. 1:25-cv-00077-GSK-TMR-JAR, Judge Gary S. Katzmann, Judge Timothy M. Reif, and Senior Judge Jane A. Restani*

———————————————

# BRIEF OF AMICI CURIAE PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UP-WARD GLANCE, LLC D/B/A QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC D/B/A MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; AND RECLAMATION STUDIO, LLC D/B/A WITSEND MOSAIC SUPPORTING AFFIRMANCE

MOLLY E. NIXON
JOSHUA M. ROBBINS
ASHLEY TORKELSON LEVINE
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
(202) 888-6881
MNixon@pacificlegal.org
JRobbins@pacificlegal.org
ALevine@pacificlegal.org

OLIVER J. DUNFORD
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
(916) 503-9060
ODunford@pacificlegal.org

*Attorneys for Amici Curiae Princess Awesome, LLC, et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 25-1812, 25-1813 |
| **Short Case Caption** | V.O.S. Selections, Inc. v. Trump |
| **Filing Party/Entity** | Princess Awesome, LLC, et al. (Amici Curiae) |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/08/2025

Signature: /s/Oliver J. Dunford

Name: Oliver J. Dunford

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Princess Awesome, LLC | | |
| Stonemaier, LLC | | |
| 300 Below, Inc. | | |
| Upward Glance, LLC d/b/a Quent Cordair Fine Art | | |
| KingSeal Corporation d/b/a Wesco Enterprises, Inc. | | |
| Mischief, LLC d/b/a Mischief Toy Store | | |
| Spielcraft Games, LLC | | |
| Rookie Mage Games, LLC | | |
| XYZ Game Labs, Inc | | |
| Tinkerhouse, Inc. | | |
| Reclamation Studio, LLC d/b/a WitsEnd Mosaic | | |

☐     Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
March 2023

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable          ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)    ☐ No    ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

Table of Authorities................................................................... iii

Identification and Interest of Amici Curiae ............................................1

Summary of Argument...................................................................3

Law & Argument.........................................................................5

   I.  IEEPA Does Not Authorize Tariffs.....................................................5

      A.  IEEPA's Text and Context Confirm That the Statute
Does Not Authorize the President to Impose Tariffs................5

          1.  IEEPA Does Not Mention Tariffs .....................................5

          2.  An Authorization to "Regulate" Specific Transactions
and Property Does Not Include the Power to Impose
Tariffs....................................................................6

      B.  History Confirms That IEEPA Does Not Authorize Tariffs......8

      C.  The Major Questions Doctrine Forecloses the President's
Reliance on IEEPA ...............................................................11

          1.  The Major Questions Doctrine Applies to the
President.............................................................12

          2.  The Major Questions Doctrine Applies to the IEEPA
Tariffs...............................................................13

  II.  The Emergency Declarations Do Not Address any "Unusual and
Extraordinary Threat" ...............................................................17

 III. IEEPA Unconstitutionally Transfers Legislative Power ..............19

      A.  IEEPA Fails Every Version of a Nondelegation Test.............20

      B.  The Tariff-Authorizing Cases Relied on by Appellants Depart
from IEEPA in Degree and in Kind .......................................27

      C.  The Nondelegation Analysis Is Not Altered by Any Inherent
Executive Power Because No Such Power to Impose Tariffs
Exists .....................................................................31

Conclusion ..........................................................................33

Certificate of Service ................................................................ 35

Certificate of Compliance ........................................................ 36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ala. Ass'n of Realtors v. Dep't of Health and Hum. Servs.*,
594 U.S. 758 (2021)................................................................ 16

*B-West Imports v. United States*,
75 F.3d 633 (Fed. Cir. 1996) ............................................... 15

*Biden v. Nebraska*,
600 U.S. 477 (2023) ............................................................. 15

*Biden v. Texas*,
597 U.S. 785 (2022)........................................................... 6, 8

*Bradford v. U.S. Dep't of Lab.*,
101 F.4th 707 (10th Cir. 2024) ........................................... 12

*Cargo of the Brig Aurora v. United States*,
11 U.S. (7 Cranch) 382 (1813) ............................................ 26

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024)............................................................. 14

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992)............................................................. 15

*Ctr. for Bio. Diversity v. Trump*,
453 F. Supp. 3d 11 (D.D.C. 2020) ...................................... 24

*El-Shifa Pharm. Indus. Co. v. United States*,
607 F.3d 836 (D.C. Cir. 2010) ............................................ 26

*FCC v. Consumers' Rsch.*,
No. 24-354, 2025 WL 1773630 (U.S. June 27, 2025)................... 23, 33

*FTC v. Bunte Bros.*,
312 U.S. 349 (1941)............................................................... 9

*Georgia v. President*,
46 F.4th 1283 (11th Cir. 2022) ........................................... 12

*Gibbons v. Ogden*,
22 U.S. 1 (1824).................................................................. 3, 8

*Gross v. FBL Fin. Servs., Inc.*,
  557 U.S. 167 (2009) ........................................................... 5

*Gundy v. United States*,
  588 U.S. 128 (2019) ..................................................... 28, 32

*J.W. Hampton, Jr. v. United States*,
  276 U.S. 394 (1928) ..................................................... 27–28

*Jama v. ICE*,
  543 U.S. 335 (2005) ....................................................... 9–10

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022) ........................................... 12

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ......................................... 12

*Marshall Field & Co. v. Clark*,
  143 U.S. 649 (1892) ................................................ 26, 28–30

*Moers v. City of Reading*,
  21 Pa. 188 (1853) ............................................................ 30

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) ............................................. 12

*Panama Refining Co. v. Ryan*,
  293 U.S. 388 (1935) ..................................................... 32–33

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ......................................................... 12

*United States v. Am. Home Assurance Co.*,
  789 F.3d 1313 (Fed. Cir. 2015) ........................................ 6–7

*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936) ......................................................... 31

*United States v. Yoshida Int'l, Inc.*,
  526 F.2d 560 (C.C.P.A. 1975) .................................... *passim*

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ..................................................... 11, 16

*Wayman v. Southard*,
  23 U.S. 1 (1825) .......................................................... 20–21

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ................................................................ *passim*

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) .................................................................. 5, 20

*Yakus v. United States*,
   321 U.S. 414 (1944) ................................................................ 24–25

*Zemel v. Rusk*,
   381 U.S. 1 (1965) ........................................................................... 31

*Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ..................................................................... 14, 32

## U.S. Constitution

U.S. Const. art. I, § 7, cl. 1 ..................................................... 14

U.S. Const. art. I, § 8, cl. 1 ............................................. *passim*

U.S. Const. art. I, § 8, cl. 3 .................................................. 3, 7

## Statutes

19 U.S.C. § 1338(a) .................................................................. 5–6

19 U.S.C. § 2132 ........................................................................ 10

19 U.S.C. § 2411(c)(1)(B) ........................................................ 5–6

50 U.S.C. § 1701 .......................................................................... 3

50 U.S.C. §§ 1701–10 ................................................................. 1

50 U.S.C. § 1701(a) ................................................................... 17

50 U.S.C. § 1701(b) ................................................... 4, 17, 30

50 U.S.C. § 1702 ..................................................................... 3, 5

50 U.S.C. § 1702(a) ..................................................................... 8

50 U.S.C. § 1702(a)(1)(A) ........................................................ 21

50 U.S.C. § 1702(a)(1)(B) ..................................... 3, 5, 13, 21

First War Powers Act, Pub. L. No. 354 § 301, 55 Stat. 838
   (Dec. 18, 1941) ........................................................................ 8

Foreign Relations Authorization Act, Pub. L. No. 99-93, 99 Stat. 405 (1985) .......................................................... 25

Pub. L. No. 13-1, tit. 1, § 2 (Mar. 9, 1933) ................................ 8

Tariff Act of 1922, ch. 356, § 315, 42 Stat. 858 .................... 5–6

Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978 (1975) ........................................................................... 10

Trading with the Enemies Act, Pub. L. No. 65-91 § 5(b), 40 Stat. 411 (Oct. 6, 1917) .............................................. 8

## Regulations

Exec. Order No. 14195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 7, 2025) ........................ 1, 18

Exec. Order No. 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025) .......................................................................... 1, 13

Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025) ...................................................... 1, 13, 18–19

Exec. Order No. 14259*, Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025) .......................................................................... 1

Exec. Order No.14266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625 (Apr. 15, 2025) ....................................... 2

## Other Authorities

Casey, Christopher A. & Elsea, Jennifer K., Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* (2024) .............................. 8–9

Defs.' Resp. in Opp'n to Mot. for Summ. J., ECF No. 16
*Princess Awesome v. U.S. Customs & Border Protection*,
No. 25-00078 (Ct. Int'l Trade)..............................................23

*Extraordinary*, Black's Law Dictionary (5th ed. 1979)........................19

*Extraordinary*, Black's Law Dictionary (4th rev. ed. 1968) ..................19

H.R. Rep. No. 95-459 (1977)...................................................17

*Magna Carta* (1215), *reprinted in* McKechnie, William
Sharp, *Magna Carta: A Commentary on the Great Charter
of King John* (1905) ........................................................14

Mem. in Supp. of Defs.' Mot. to Dismiss, ECF No. 15-1,
*Vassiliades v. Blinken*, No. 1:24-cv-01952 (Sept. 17, 2024) .........20–23

Paperless Order, *Princess Awesome v. U.S. Customs &
Border Protection*, ECF No. 21, No. 25-00078
(June 16, 2025)..............................................................2

Pls.' Mot. for Summ. J., *Princess Awesome v. U.S. Customs &
Border Protection*, ECF No. 14, No. 25-00078 (Ct. Int'l
Trade).......................................................................23

*Regulate*, Black's Law Dictionary (12th ed. 2024)............................7

*Regulate*, Black's Law Dictionary (4th ed. 1968)............................7

*Regulate*, Oxford English Dictionary (2009).................................7

Torry, Harriet, *U.S. Economy Shrank in First Quarter as
Imports Surged Ahead of Tariffs*, Wall St. J. (Apr. 30,
2025)....................................................................15–16

*Unusual*, Black's Law Dictionary (5th ed. 1979)............................19

*Unusual*, Black's Law Dictionary (4th rev. ed. 1968).......................19

Webster's Third New Int'l Dictionary of the English
Language Unabridged 1914 (1961) .............................................7

*Where We Stand: The Fiscal, Economic, and Distributional
Effects of All U.S. Tariffs Enacted in 2025 Through April
2*, The Budget Lab at Yale (Apr. 2, 2025)...................................15

# IDENTIFICATION AND INTEREST OF AMICI CURIAE

Princess Awesome, LLC; Stonemaier, LLC; 300 Below, Inc.; Upward Glance, LLC d/b/a Quent Cordair Fine Art; KingSeal Corporation d/b/a Wesco Enterprises, Inc.; Mischief, LLC d/b/a Mischief Toy Store; Spielcraft Games, LLC; Rookie Mage Games, LLC; XYZ Game Labs, Inc.; Tinkerhouse, Inc.; and Reclamation Studio, LLC d/b/a WitsEnd Mosaic (*Princess Awesome* Amici) are small American businesses in various fields—clothing, board games, arts and crafts, toys, foodservice products, and mechanical services.

All but one *Princess Awesome* Amici directly import goods from abroad, and all are suffering significant and irreparable harm because of the tariffs imposed by President Trump, purportedly pursuant to the International Emergency Economic Protection Act, 50 U.S.C. §§ 1701–10 (IEEPA).[1] Several Amici have paid these unlawful tariffs or soon must

---

[1] Exec. Order No. 14195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 7, 2025); Exec. Order No. 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025); Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025); Exec. Order No. 14259*, Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509,

pay to import their products. These tariffs and the economic uncertainty resulting from their ongoing modifications cause Amici significant financial harm and threaten their ability to remain in operation.

Accordingly, *Princess Awesome* Amici filed their own challenge to the IEEPA Tariffs in the U.S. Court of International Trade (CIT). *Princess Awesome, LLC v. U.S. Customs and Border Protection*, No. 25-00078 (Ct. Int'l Trade). The CIT, after entering the order that is the subject of this appeal, granted the government's motion for a stay of the *Princess Awesome* case pending a final, unappealable judgment here. Paperless Order, ECF No. 21, *Princess Awesome*, No. 25-00078 (June 16, 2025). *Princess Awesome* Amici file this brief pursuant to the Court's June 13, 2025, order to emphasize the dangers posed by unilateral and unaccountable executive policy-making.[2]

---

15,509 (Apr. 14, 2025); Exec. Order No. 14266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625 (Apr. 15, 2025) (collectively, the "IEEPA Tariffs").

[2] This amicus brief was not authored in whole or in part by counsel for any party. No party or counsel for a party, and no person other than Amici or their counsel, contributed money to fund this brief's preparation or submission.

## SUMMARY OF ARGUMENT

The Constitution vests in Congress, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises," including tariffs. U.S. Const. art. I, § 8, cl. 1. Nonetheless, through a series of proclamations and executive orders, President Trump arrogated Congress's tariff power to himself and imposed steep new tariffs on goods imported from nearly every country in the world.

But IEEPA says nothing about duties, imposts, or tariffs—much less does it allow the President to rewrite the Nation's elaborate tariff regime. Instead, IEEPA authorizes the President to exercise specified powers over foreign property when he declares a national emergency with respect to an "unusual and extraordinary threat." 50 U.S.C. §§ 1701–02. The government latches on to the word "regulate" (§ 1702(a)(1)(B)) to justify the President's actions. In context, *regulate* cannot be stretched to include the tariff power. Indeed, Article I of the Constitution separates the power to impose tariffs (U.S. Const. art. I, § 8, cl. 1) from the power to regulate foreign commerce (*id.* cl. 3), and the Supreme Court has long understood them as distinct. *Gibbons v. Ogden*, 22 U.S. 1, 201 (1824). Additionally, over the course of its 50-plus-year history, IEEPA has never

been used to impose tariffs—until now. Thus, text, context, and history all point in the same direction: IEEPA does not grant the President any tariff power.

This conclusion is confirmed by the major questions doctrine, which requires the government to point to "clear congressional authorization" when, as here, the executive claims sweeping new authority. *West Virginia v. EPA*, 597 U.S. 697, 732 (2022) (citation omitted). IEEPA has no such clear authorization, and the government's reliance on the term *regulate* again fails.

Additionally, while IEEPA may be invoked "only ... to deal with an unusual and extraordinary threat ... and may not be exercised for any other purpose," 50 U.S.C. § 1701(b), the President's declarations identify only "sustained" and "persistent" policy concerns. The IEEPA tariffs are unlawful for this reason alone.

Finally, if IEEPA does authorize the President's rewriting of the Nation's tariff regime, it runs afoul of the nondelegation doctrine, which precludes the transfer of legislative power to the executive.

## LAW & ARGUMENT

### I.    IEEPA Does Not Authorize Tariffs

#### A.    IEEPA's Text and Context Confirm That the Statute Does Not Authorize the President to Impose Tariffs

"'Statutory construction must begin with the language employed by Congress.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted). Here, IEEPA says nothing about tariffs, much less allows the President to rewrite the Nation's tariff policy.

### 1. IEEPA Does Not Mention Tariffs

The words "tariff," "duty," and any like term do not appear in IEEPA. 50 U.S.C. § 1702. This omission is notable considering both what IEEPA and (true) tariff statutes do say. According to IEEPA, the President may (1) "investigate," (2) "block during the pendency of an investigation," (3) "regulate," (4) "direct and compel," (5) "nullify", (6) "void," or (7) "prevent or prohibit" "importation ... of ... any" foreign property. *Id.* § 1702(a)(1)(B). IEEPA's silence as to tariffs shows that Congress granted no tariff authority to the President. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

In contrast to IEEPA's silence, tariff statutes expressly authorize the President to adjust tariffs. For example, Section 301 of the Trade Act of 1974 authorizes the U.S. Trade Representative to "impose duties" on

foreign countries that violate trade agreements or employ unfair trade practices. 19 U.S.C. § 2411(c)(1)(B); *see also* Tariff Act of 1922, ch. 356, § 315, 42 Stat. 858, 941 ("duties fixed"); 19 U.S.C. § 1338(a) ("declare new or additional duties"). The government itself makes this point. In defending "presidential exercises" of the tariff authority, it cites trade statutes exclusively. Gov't Br. (ECF No. 61-1) at 6–8.

This extensive and detailed set of statutes governing trade—Title 19, U.S. Code–Customs Duties—makes the absence of any mention of tariffs in IEEPA even more conspicuous and confirms that tariff authority was withheld. *See Biden v. Texas*, 597 U.S. 785, 803 (2022) (Courts "'do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply.'" (citation omitted)).

### 2. An Authorization to "Regulate" Specific Transactions and Property Does Not Include the Power to Impose Tariffs

The government argues that the authorization to "regulate ... importation" is sufficient to authorize tariffs. Gov't Br. at 32–37. But the word "regulate" cannot sustain this meaning.

First, the "ordinary, contemporary, common meaning" of *regulate*, which controls "absent an indication Congress intended" otherwise, has

nothing to do with tariffs. *United States v. Am. Home Assurance Co.*, 789 F.3d 1313, 1325 (Fed. Cir. 2015) (cleaned up). When IEEPA was enacted in 1977, *regulate* was defined as "1: to govern or direct according to rule; to bring under the control of law or constituted authority; to make regulations for or concerning." Webster's Third New Int'l Dictionary of the English Language Unabridged 1914 (1961). Similarly, the contemporaneous Black's Law Dictionary defined *regulate* to mean "[t]o fix, establish, or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws." *Regulate*, Black's Law Dictionary 1451 (4th ed. 1968).[3] Therefore, to conclude that these definitions incorporate the distinct authority to impose a tariff would be to enlarge the scope of the word "regulate" beyond its "common meaning." *Am. Home Assurance Co.*, 789 F.3d at 1325 (citation omitted).

Second, and similarly, the Constitution treats the power to regulate foreign commerce (U.S. Const. art. I, § 8, cl. 3) as separate and distinct

---

[3] This meaning has not changed. *See Regulate*, Oxford English Dictionary (2009), *available at* https://tinyurl.com/bddwpbr5 ("To control, govern, or direct, esp. by means of regulations or restrictions; ... To control, modify, or adjust with reference to some principle, standard, or norm; to alter in response to a situation, set of circumstances, etc."); *Regulate*, Black's Law Dictionary (12th ed. 2024) ("1. To control (an activity or process) esp. through the implementation of rules.").

from the power to impose tariffs and other taxes (*id.* cl. 1). The Supreme Court has thus long recognized that the power to impose taxes/tariffs and the power to regulate commerce are "substantive, and distinct from each other." *Gibbons*, 22 U.S. at 201. Accordingly, when Congress authorized the Executive Branch to "regulate" imports, it cannot be assumed that Congress intended this power to include tariffs.

## B.  History Confirms That IEEPA Does Not Authorize Tariffs

"The historical context in which the provision was adopted confirms the plain import of its text." *Biden*, 597 U.S. at 804. Congress first granted presidential authority over certain foreign property and transactions, but only during times of war, in the 1917 Trading with the Enemy Act (TWEA). *Compare* 50 U.S.C. § 1702(a), *with* Pub. L. No. 65-91 § 5(b), 40 Stat. 411, 415 (Oct. 6, 1917). Congress later authorized the President to invoke TWEA during national emergencies (1933) and to "regulate ... importation" (1941). Pub. L. No. 13-1, tit. 1, § 2 (Mar. 9, 1933); Pub. L. No. 354 § 301, 55 Stat. 838, 839 (Dec. 18, 1941). And, with one exception discussed next, TWEA was never claimed as authority to impose tariffs. Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution,*

*and Use* (2024) at 2–8. The same goes for IEEPA (until now). This "want of assertion of power by those who presumably would be alert to exercise it" for over 100 years is "significant in determining whether such power was actually conferred." *FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941). And, indeed, the tariff power was not actually conferred.

The lone exception was President Nixon's imposition of a temporary 10% ad valorem tariff, purportedly to address a balance-of-payments problem. The predecessor court to the Federal Circuit upheld the President's action as an exercise of TWEA, assuming, without carefully analyzing, that because Congress *could* use tariffs as a regulatory tool, Congress *must have* delegated that policy decision to the President. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 572–75, 575 n.20, 584 (C.C.P.A. 1975).

Nor, when it enacted IEEPA, did Congress ratify, adopt, or otherwise accept *Yoshida's* interpretation of "regulate ... importation." Gov't Br. at 34–35. The government cannot meet the two Congressional "ratification" factors: (1) "reenact[ment] [of the statute] without change" and (2) a "judicial consensus" about the meaning "so broad and unquestioned that [the court] must presume Congress knew of and endorsed it." *Jama*

*v. ICE*, 543 U.S. 335, 349 (2005). Assuming the first prong is satisfied, there was no broad and unquestioned judicial consensus that "regulate ... importation" includes the imposition of tariffs. Indeed, judicial consensus cannot be established through the lone case of *Yoshida*. *See Jama*, 543 U.S. at 351 (holding that two circuit cases, one without analysis, did not establish judicial consensus).

Congress's actions since *Yoshida* further confirm that President Nixon's action was an aberration that should not be given precedential weight in interpreting IEEPA. President Nixon himself recognized the problem. At his request, Congress passed the Trade Act of 1974, which authorizes the President to address balance-of-payments issues by imposing "a temporary import surcharge ... in the form of duties," no higher than 15% and limited to 150 days. Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1987–89 (1975), *codified at* 19 U.S.C. § 2132. This law effectively ratified President Nixon's contra-TWEA actions. *See Yoshida*, 526 F.2d at 582 n.33.

This Court is not bound by *Yoshida*'s cursory review of TWEA, and it should conduct a fresh analysis to decide whether a statute that never

even mentions tariffs authorizes the President to make sweeping altera-

tions to the Nation's lengthy and intricate tariff laws.[4]

### C.    The Major Questions Doctrine Forecloses the President's Reliance on IEEPA

This is a major questions case. *West Virginia v. EPA*, 597 U.S. 697,

724 (2022). The doctrine applies in "cases in which the 'history and the

breadth of the authority ... asserted,' and the 'economic and political sig-

nificance' of that assertion, provide a 'reason to hesitate before concluding

that Congress' meant to confer such authority." *Id.* at 721. The breadth,

novelty, and significance of the tariffs imposed pursuant to IEEPA reflect

the kind of "extravagant statutory power over the national economy" that

courts "typically greet" with "skepticism." *Id.* at 724. Therefore, the gov-

ernment must point to "'clear congressional authorization'" for the as-

serted power. *Id.* at 732 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S.

302, 324 (2014) (*UARG*)). It cannot do so.

---

[4] Indeed, to the extent *Yoshida* applies at all, it underscored that the "declaration of a national emergency is not a talisman enabling the President *to rewrite the tariff schedules*, as it was *not in this case*." *Id.* at 583 (emphasis added).

### 1. The Major Questions Doctrine Applies to the President

The government is wrong to argue that the doctrine is inapplicable to presidential action for three reasons. Gov't Br. at 43–44. First, as a separation of powers matter, administrative agencies cannot be disaggregated from the President. "Under our constitution, the 'executive Power'—all of it—is 'vested in a President.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020). Second, as a matter of statutory interpretation, the relevant question is what authority Congress delegated based on the text of the statute, not to whom that authority was delegated. *West Virginia*, 597 U.S. at 723. Finally, the Supreme Court has never excluded the President from the major questions doctrine, and five circuits have applied the major questions doctrine to presidential actions. *See Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024); *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 728 (10th Cir. 2024); *Louisiana v. Biden*, 55 F.4th 1017, 1031 n.40 (5th Cir. 2022); *Georgia v. President*, 46 F.4th 1283, 1295–97 (11th Cir. 2022); *Kentucky v. Biden*, 23 F.4th 585, 606–08 (6th Cir. 2022). This Court should follow the circuit-court consensus.

### 2. The Major Questions Doctrine Applies to the IEEPA Tariffs

The President's claimed power "represent[s] a transformative expansion of [the government's] regulatory authority" and "a fundamental revision of the statute." *West Virginia*, 597 U.S. at 724, 728. (citations omitted). By simply declaring an emergency, he claims plenary authority—based solely on the phrase "regulate … importation," 50 U.S.C. § 1702(a)(1)(B)—to apply tariffs on any goods from any country. *See* 90 Fed. Reg. 11,463; 90 Fed. Reg. 15,041. In his April 2, 2025, Executive Order, the President asserted that his global tariffs were intended to preserve the "future of American competitiveness" by reversing declines in manufacturing capacity and jobs. 90 Fed. Reg. at 15,044. On April 5, the President declared that his new tariffs would bring about an "economic revolution."[5] At least if IEEPA is limited to certain, identified foreign property—as it has been for over fifty years—that purpose-driven limitation would cabin the scope of the President's emergency authority. But if that authority includes tariffs and "regulation" of all foreign commerce, it includes the ability for the President to remake the entire economy.

---

[5] @realDonaldTrump, Truth Social (Apr. 5, 2025, 8:34 AM), https://tinyurl.com/3kbmsazv.

Second, tariff policy is an important topic within the Legislature's sole domain. *See* U.S. Const. art. I, § 8, cl. 1. Indeed, the question of taxes has been considered a legislative prerogative since at least the time of Magna Carta. *See Magna Carta* ch. 12 (1215), *reprinted in* William Sharp McKechnie, *Magna Carta: A Commentary on the Great Charter of King John* 232, 248 (1905) ("No scutage [a type of tax] nor aid shall be imposed in our kingdom, unless by common counsel of our kingdom."). The Constitution requires not only that Congress must make such decisions, but also that revenue-raising bills must originate in the House of Representatives. U.S. Const. art. I, § 7, cl. 1; *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 428–31 (2024). And Congress has given the President certain tariff authorities through the *trade* laws (Title 19, U.S. Code)—not through IEEPA (enacted in Title 50, U.S. Code).

Third, and relatedly, because the tariff and foreign-commerce powers were delegated exclusively to Congress (U.S. Const. art. I, § 8, cls. 1, 3), the traditional deference afforded the President in the execution of foreign affairs does not limit the applicability of the major questions doctrine. Indeed, "it is still the Legislative Branch, not the Executive Branch, that makes the law" regarding tariffs. *Zivotofsky v. Kerry*, 576 U.S. 1, 21

(2015). Therefore, precedents counseling for a broad construction for for-eign-affairs statutes granting power to the President do not negate the applicability of the major questions doctrine. *See, e.g.*, *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("[C]anons of construction are no more than rules of thumb …."); *B-West Imports v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996). It may be that the broad construction given to foreign-affairs statutes expands the breadth of authority that a statute may be read to confer, but the major questions doctrine remains a critical interpretive tool to work out "who has the authority to" (in this case) im-pose tariffs. *Biden v. Nebraska*, 600 U.S. 477, 501 (2023).

Finally, the President's tariffs, intending to bring about, among other things, an "economic revolution," is an action of tremendous "eco-nomic and political significance." *West Virginia*, 597 U.S. at 721 (citation omitted). They could raise trillions in revenue and push up consumer prices. *Where We Stand: The Fiscal, Economic, and Distributional Effects of All U.S. Tariffs Enacted in 2025 Through April 2*, The Budget Lab at Yale (Apr. 2, 2025).[6] And they have already contributed to a first quarter economic contraction. Harriet Torry, *U.S. Economy Shrank in First*

---

[6] https://tinyurl.com/4bswe556.

*Quarter as Imports Surged Ahead of Tariffs*, Wall St. J. (Apr. 30, 2025).[7] This is as significant, if not more significant, than any of the executive actions to which the Supreme Court has applied the major questions doctrine so far. *See, e.g.*, *Nebraska*, 600 U.S. at 502; *West Virginia*, 597 U.S. at 730; *Ala. Ass'n of Realtors v. Dep't of Health and Hum. Servs.*, 594 U.S. 758, 764 (2021).

Accordingly, because this is a major questions case, the President's use of IEEPA to impose worldwide tariffs must be invalidated unless the government can point to "'clear congressional authorization.'" *West Virginia*, 597 U.S. at 732 (quoting *UARG*, 573 U.S. at 324). It cannot do so. The word "regulate" cannot bear the extraordinary weight that the government places on it to authorize the tariffs. Even if "regulate" provides a "colorable textual basis" for the imposition of tariffs, "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' [or] 'vague terms.'" *Id.* at 722–23 (citation omitted). The history and usage of IEEPA, its predecessor statute TWEA, Congress's post-enactment use of IEEPA, and the separate congressional authorization of tariffs to address balance-of-payments problems, *see supra* Part I.B, all

---

[7] https://tinyurl.com/yzkkde74.

confirm that "it is not plausible that Congress gave" the President *Congress's* constitutionally vested power to set the Nation's entire tariff policy, *West Virginia*, 597 U.S. at 735.

## II.    The Emergency Declarations Do Not Address Any "Unusual and Extraordinary Threat"

The President may invoke IEEPA only to deal with "unusual and extraordinary threat[s]" from (at least in substantial part) outside the United States, "to the national security, foreign policy, or economy of the United States ...." 50 U.S.C. § 1701(a). IEEPA emphasizes that the powers authorized therein may be used "*only ... to deal with an unusual and extraordinary* threat ... and may *not* be exercised *for any other purpose.*" *Id.* § 1701(b) (emphasis added); *compare Yoshida*, 526 F.2d at 581 n.32 (noting that Congress had not, at that time, either defined or conditioned an "emergency"), *with* IEEPA, 50 U.S.C. § 1701(b) (authorizing action *only* for emergencies that "deal with an unusual and extraordinary threat"). As the House Report on IEEPA confirms, a "national emergency should not be a normal state of affairs." H.R. Rep. No. 95-459, at 65 (1977); *cf. id.* ("[E]mergencies are by their nature rare and brief, and are not to be equated with normal ongoing problems."); *see also Yoshida*, 526

F.2d at 582 (Emergencies "are expected to be shortlived.") (footnote omitted).

None of the President's declared "emergencies" here have anything to do with "unusual and extraordinary threat[s]." The "emergency" declared in February was based on the "sustained influx of synthetic opioids" from China and the failure of "multiple attempts" at "bilateral dialogue" with the Chinese government to "resolve this crisis at its root source." Exec. Order No. 14195, 90 Fed. Reg. at 9121–22. The "emergency" declared in April was based on "underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption," "indicated by large and persistent annual U.S. goods trade deficits[.]" Exec. Order No. 14257, 90 Fed. Reg. at 15,041. The President observed that "U.S. Trade policy has been organized around the principle of reciprocity" "[f]or decades." *Id.* Thus, the declarations themselves identify "sustained" and "persistent" "policy" questions—not "unusual and extraordinary threats."

Indeed, even if an influx of opioids or the lack of reciprocity in trade relationships or trade deficits are in fact "threats," their "sustained" and

"persistent" nature necessarily means that they are neither *unusual*— i.e., "uncommon, not usual, rare"[8]—nor *extraordinary*—i.e., "[o]ut of the ordinary; ... remarkable; uncommon; rare."[9] The President himself noted that the goods trade deficits have long been a "feature of the global trading system." 90 Fed. Reg. at 15,042. And there is no indication that the President's new tariff policies are to be short-lived. They are, based on the President's own admissions, of indefinite and unpredictable duration.

### III.    IEEPA Unconstitutionally Transfers Legislative Power

As emphasized above, the Constitution vests in Congress "all legislative Powers herein granted[,]" including the power to lay taxes, duties, imposts, and excises. U.S. Const. art. I, § 8, cl. 1. The Supreme Court has

---

[8] *See Unusual*, Black's Law Dictionary 1708 (4th rev. ed. 1968) ("Uncommon; not usual, rare"); *Unusual*, Black's Law Dictionary 1380 (5th ed. 1979) (same).

[9] *See Extraordinary*, Black's Law Dictionary 699 (4th Rev. ed. 1968) ("Out of the ordinary; exceeding the usual, average, or normal measure or degree; beyond or out of the common order or rule; not usual, regular, or of a customary kind; remarkable; uncommon; rare. ... Beyond or out of the common order or method; exceeding the ordinary degree; not ordinary; unusual; employed for an exceptional purpose or on a special occasion"); *Extraordinary*, *Black's Law Dictionary* 527 (5th ed. 1979) (same).

made clear that the Constitution "permits no delegation of those [legislative] powers." *Whitman*, 531 U.S. at 472.

## A.   IEEPA Fails Every Version of a Nondelegation Test

1. Early in the Nation's history, Chief Justice John Marshall explained that to "determine the character of the power" Congress granted to another branch—i.e., whether it is legislative, and therefore nondelegable—"we must inquire into its extent[,]" concluding that the "important subjects" "must be entirely regulated by the legislature itself." *Wayman v. Southard*, 23 U.S. 1, 43 (1825).

There can be no doubt that IEEPA delegates extensive (and, thus, legislative) power to the President. The government itself has insisted that the scope of power conferred by IEEPA is vast. *See, e.g.* Mem. in Supp. of Defs.' Mot. to Dismiss at 30, ECF No. 15-1, *Vassiliades v. Blinken*, No. 1:24-cv-01952 (Sept. 17, 2024) (describing IEEPA's authorization as "broad and sweeping" and noting that "Congress did not ... impose any conditions or restrictions in IEEPA that would limit the President's authority to decide the circumstances in which individuals' property and interests in property should be blocked pursuant to a national

emergency. Instead, Congress intentionally left these determinations to the President's discretion.").

IEEPA authorizes the President to, among other things, "investigate, regulate, or prohibit" "*any* transactions in foreign exchange," bank transfers "involv[ing] *any* interest of *any* foreign country or a national[,]" "by *any* person, or with respect to *any* property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(A) (emphasis added). It also allows the President to investigate, block, regulate, direct, compel, nullify, void, prevent, or prohibit:

> *any* acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising *any* right, power, or privilege with respect to, or transactions involving, *any* property in which *any* foreign country or a national thereof has *any* interest by *any* person, or with respect to *any* property, subject to the jurisdiction of the United States.

*Id.* § 1702(a)(1)(B) (emphasis added). And, under the government's reading, it *also* authorizes the President to impose broad-based tariffs on imports from nearly every country in the world.

Similarly, the government cannot credibly claim that IEEPA reserves to Congress the responsibility to regulate the "important subjects." *Wayman*, 23 U.S. at 43. Indeed, the government here concedes that the

IEEPA tariffs were imposed by the President because "*in his judgment* they are necessary and appropriate to address *what he has determined* are grave threats to the United States's national security and economy." Gov't Br. at 2 (emphasis added). Again, "*the President's plan* to impose such tariffs … was *a key component of his successful campaign* for office." *Id.* at 2–3. These decisions cannot credibly be characterized as the mere execution of Congress's policy decisions as to the "important subjects"; they are themselves policy decisions, which Congress may not abdicate to the President.

2. Appellants also effectively concede that any principles in IEEPA are not intelligible. According to the government, there "is no basis for meaningful judicial review of President Trump's findings" that there is an "extraordinary and unusual threat" or that the tariffs "deal with" that threat because those IEEPA "determinations are not susceptible to meaningful judicial review because of both their discretion-laden nature and the lack of judicially manageable standards." Gov't Br. at 58–59.

Less than a year ago, the government acknowledged that IEEPA "sets forth *no standards* from which the Court could judge the President's selection of designation criteria [for sanctioned individuals] or determine

whether specific criteria effectively address an unusual and extraordinary threat to the United States' interests." Mem. in Supp. of Defs.' Mot. to Dismiss at 13, ECF No. 15-1, *Vassiliades v. Blinken*, No. 1:24-cv-01952 (Sept. 17, 2024) (emphasis added). The government went on: "Congress did not define the terms 'national emergency' or 'deal with,' nor impose any conditions or restrictions in IEEPA that would limit the President's authority to decide the circumstances in which individuals' property and interests in property should be blocked pursuant to a national emergency." *Id.* at 19.

Exactly right.[10] And if there are no standards courts can apply to assess whether the President's actions are within statutory

---

[10] Recently, the Supreme Court expressed frustration that "at every turn" the party challenging a statutory delegation reads the statutory provision "extravagantly, the better to create a constitutional problem." *FCC v. Consumers' Rsch.*, No. 24-354, 2025 WL 1773630, at *16 (U.S. June 27, 2025). Here, in contrast, amici are simply agreeing with the government's assertions as to the scope of IEEPA's "sweeping" authorization. If there were any doubt as to the government's reading of the law, it was put to rest by the government's unwillingness even to contest amici's contention in that the President could invoke all IEEPA's powers in response to a declared national emergency over a hangnail. Pls.' Mot. for Summ. J., *Princess Awesome v. U.S. Customs & Border Protection*, No. 25-00078, ECF No. 14 at 42 (Ct. Int'l Trade). Instead, the government contested only whether such a delegation violated the Constitution. Defs.' Resp. in Opp'n to Mot. for Summ. J., *Princess Awesome v. U.S. Customs & Border Protection*, No. 25-00078, ECF No. 16 at 40–45 (Ct. Int'l Trade).

authorization, there are then no standards guiding the President's actions, much less "sufficiently definite and precise" standards "to enable Congress, the courts and the public to ascertain whether the" President has conformed to the law. *Yakus v. United States*, 321 U.S. 414, 426 (1944) (upholding against a nondelegation challenge a "temporary wartime measure" establishing "a comprehensive scheme for the promulgation ... of regulations or orders fixing ... maximum prices of commodities and rents").

*Yoshida* rejected a nondelegation challenge to IEEPA's predecessor because it found an intelligible principle "in the express limitations that" TWEA would be operative only during a war or declared national emergency. 526 F.2d at 581. The court apparently read TWEA in such a way that Congress "remain[ed] the ultimate decision maker and the fundamental reservoir of power to regulate commerce" and could "of course, recall or limit the delegated emergency power at any time." *Id.* at 582.

But "national emergency" is a statutory term without substance. *See, e.g.*, *Ctr. for Bio. Diversity v. Trump*, 453 F. Supp. 3d 11, 32 (D.D.C. 2020) (stating that the 1976 National Emergencies Act (NEA) "simply allows the President to declare an emergency to activate special

emergency powers created by Congress. Nothing else guides how the President should make this decision"); *see also* Gov't Br. at 58–59.

And while the government echoes *Yoshida*'s reasoning that Congress "retained for itself the power to terminate a declared emergency," Gov't Br. 11 (cleaned up), Congress has since amended the law. Now, under the NEA, a declared emergency may be terminated only through a joint resolution—which must be signed by the President or passed by a two-thirds vote of each chamber. Pub. L. No. 99-93, 99 Stat. 405, 407, 448 (1985). Accordingly, any "congressional oversight" of NEA declarations reflects no more "retained" power to police the President's exercise of IEEPA authorities than any other authorizing statute.

In any event, the government has it backward. The legislative branch has the least need to parse whether the executive branch is complying with an intelligible principle in IEEPA or any other law; if enough members of Congress disagree with the President's exercise of discretion—whether its within his statutory authority or not—they can change the law or use Congress's power of the purse to compel a change of course. But in exercising the judicial power, courts must be able to test executive actions against the will of Congress. *See Yakus*, 321 U.S. at 427.

Concluding otherwise would render all the Court's nondelegation prece-
dents a waste of ink: if Congress could delegate legislative authority to
the executive branch through unreviewable terminology like "emer-
gency" without running afoul of delegation limits, the Court's centuries-
long grappling with the constitutional limits on delegation was wholly
misspent time. *See, e.g., Cargo of the Brig Aurora v. United States*, 11
U.S. (7 Cranch) 382, 387 (1813) (upholding statutory embargo authoriza-
tion based on presidential fact-finding); *Marshall Field & Co. v. Clark*,
143 U.S. 649, 693 (1892); *see also El-Shifa Pharm. Indus. Co. v. United
States*, 607 F.3d 836, 855 (D.C. Cir. 2010) (Kavanaugh, J., concurring)
("[P]laintiffs allege that the Executive Branch violated congressionally
enacted statutes that purportedly constrain the Executive. The Supreme
Court has never applied the political question doctrine in cases involving
statutory claims of this kind.").

Accordingly, the government's argument that IEEPA's standards
are so indeterminate that they are not susceptible to judicial review is
indisputably relevant to whether Congress has impermissibly delegated
its legislative power to the President. Were that not the case, Congress
could transfer all policy questions to the executive branch by using

"discretion-laden" language, Gov't Br. at 59, such that any exercise of that authority would be unreviewable, thereby leapfrogging the nondelegation doctrine's constraints. That cannot be—and is not—the law.

### B. The Tariff-Authorizing Cases Relied on by Appellants Depart from IEEPA in Degree and in Kind

Appellants assert that "Congress has long supplemented" the President's foreign affairs and national security powers "by delegating to the President the authority to manage tariffs or duties on foreign imports in response to dynamic international conditions." Gov't Br. at 6–7. But the Supreme Court has never approved of a delegation of Congress's foreign commerce or tariff power as broad as the President claims IEEPA effected here.

In *J.W. Hampton, Jr. v. United States*, for example, the statute under review required the President to modify import classifications and rates of duty (capped at 50%) if, after investigation, the President determined that the statutory duties did not equalize the differences in costs

of production in the United States and the principal competing country.

276 U.S. 394, 401–02 (1928).[11] The Court held that Congress:

> describe[ed] with clearness what its policy and plan was and then authoriz[ed] a member of the executive branch to carry out its policy and plan and to find the changing difference from time to time and to make the adjustments necessary to conform the duties to the standard underlying that policy and plan.

*Id.* at 405. And, as Justice Gorsuch later observed, the

> President's fact-finding responsibility may have required intricate calculations, but it could be argued that Congress had made all the relevant policy decisions, and the Court's reference to an "intelligible principle" was just another way to describe the traditional rule that Congress may leave the executive the responsibility to find facts and fill up details.

*Gundy v. United States*, 588 U.S. 128, 163 (2019) (Gorsuch, J., dissenting).

And in *Marshall Field*, the Court considered a statute that required the president to suspend the law's duty-free treatment of certain specified products, and impose a statutorily specified duty on those imports, if he found that a foreign country "imposes duties or other exactions upon ... products of the United States, which ... he may deem to be reciprocally

---

[11] The statute directed the President to take multiple factors into consideration, including differences in specified production conditions and advantages granted to foreign producers. *See id.*

unequal and unreasonable[.]" 143 U.S. at 680. The Court reviewed the country's 100-year history of statutes authorizing the president to impose an embargo (or suspend an embargo or statutory duty) upon making certain statutorily required findings, characterizing such contingent statutes as "invest[ing] the president with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations." *Id.* at 691.

The Court nevertheless affirmed the principle "[t]hat congress cannot delegate legislative power to the president" to be "universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution." *Id.* at 692. The statute withstood challenge because "the suspension was absolutely required when the president ascertained the existence of a particular fact," and, accordingly, "it cannot be said that in ascertaining that fact, and in issuing his proclamation, in obedience to the legislative will, he exercised the function of making laws." *Id.* at 693. The Court explained that "[i]t was a part of the law itself, as it left the hands of congress, that the [duty] provisions, full and complete in themselves ... should be suspended in a given contingency, and that in case of such suspension certain [statutorily specified]

duties should be imposed." *Id.* Indeed, *Marshall Field* favorably quoted an earlier case observing, "'[h]alf the statutes on our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them.'" *Id.* at 694 (quoting *Moers v. City of Reading*, 21 Pa. 188, 202 (1853)).

But under no reading does IEEPA present such an if/then framework, providing for alternative actions contingent on specific events or fact-findings. It is, rather, a striking transfer of core legislative powers. And the exercise of those powers is neither cabined by process nor triggered by specific fact-findings. The only superficially substantive restriction on the President's IEEPA powers is that they "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared[.]" 50 U.S.C. § 1701(b). But, as the government has argued—and multiple courts have agreed— those "constraints" are nonjusticiable, at least in part because those determinations are standardless grants of discretion; in other words, they are not constraints at all. *See infra,* Part III.A; Gov't Br. at 58–59. Under

IEEPA, the President's exercise of legislative power is dependent only on his own unreviewable opinions.

### C. The Nondelegation Analysis Is Not Altered by Any Inherent Executive Power Because No Such Power to Impose Tariffs Exists

Appellants observe, without precision as to the crux of their argument, that "when Congress delegates 'authority over matters of foreign affairs' it 'must of necessity paint with a brush broader than that it customarily wields in domestic areas.'" Gov't Br. at 39 (quoting *Zemel v. Rusk*, 381 U.S. 1, 17 (1965)). And that legislation "'to be made effective through negotiation and inquiry within the international field,'" may afford the President "'a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved.'" *Id.* (quoting *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936)).

But the government articulates no clear position as to what such vague statements demand in assessing delegations. Appellants say simply that the "Supreme Court has long approved such broad delegations to the President—particularly delegations of authority to regulate international trade, including through tariffs." *Id.* at 55; *but see infra*

Part III.B. But the Supreme Court has stated even outside of the foreign affairs context that its delegation standard is "not demanding" and that it has "over and over upheld even very broad delegations." *Gundy*, 588 U.S. at 146. As such, in acknowledging that Congress "of course cannot delegate legislative power to another branch or grant an agency unbounded discretion[,]" Gov't Br. at 40, it is unclear just how much more delegation the government believes Congress can get away with.

Regardless, the conclusion that *Congress* improperly transferred its legislative power in IEEPA does not intrude on the *President's* constitutional authorities. "[W]hether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law." *Zivotovsky*, 576 U.S. at 21. Indeed, whatever the scope of the President's inherent power to act in foreign affairs, it cannot include powers that have been explicitly vested in another branch. *See id.* at 33 (Thomas, J., concurring in part and dissenting in part) (stating that the Constitution vests only "residual foreign affairs powers" in the President, i.e., those foreign affairs powers not explicitly given to Congress).

\*  \*  \*

If IEEPA is upheld, "it would be idle to pretend that anything would be left of limitations upon the power of the Congress to delegate its

lawmaking function." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935). "Instead of performing its lawmaking function, the Congress could at will and as to such subjects as it chooses transfer that function to the President or other officer or to an administrative body." *Id.* And, as in 1935, the "question is not of the intrinsic importance of the particular statute before us, but of the constitutional processes of legislation which are an essential part of our system of government." *Id.* If any nondelegation limit exists—and the Supreme Court just last month said it does[12]—IEEPA crosses it by unconstitutionally transferring to the President legislative power, the decisions about "important subjects," vested in Congress by the people.

## CONCLUSION

For the foregoing reasons, this Court should AFFIRM the judgment of the U.S. Court of International Trade invalidating the IEEPA Tariffs and permanently enjoining their enforcement.

---

[12] *See Consumers' Rsch.*, 2025 WL 1773630, at *8 ("Article I of the Constitution provides that '[a]ll legislative Powers herein granted shall be vested in a Congress of the United States.' § 1. Accompanying that assignment of power to Congress is a bar on its further delegation: Legislative power, we have held, belongs to the legislative branch, and to no other.").

DATED: July 8, 2025.                    Respectfully submitted,

                                        _/s/ Oliver J. Dunford_____
                                        OLIVER J. DUNFORD
                                        Pacific Legal Foundation
                                        4440 PGA Blvd., Suite 307
                                        Palm Beach Gardens, FL 33410
                                        (916) 503-9060
                                        ODunford@pacificlegal.org

                                        MOLLY E. NIXON
                                        JOSHUA M. ROBBINS
                                        ASHLEY TORKELSON LEVINE
                                        Pacific Legal Foundation
                                        3100 Clarendon Blvd., Suite 1000
                                        Arlington, VA 22201
                                        (202) 888-6881
                                        MNixon@pacificlegal.org
                                        JRobbins@pacificlegal.org
                                        ALevine@pacificlegal.org

                                        *Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

On July 8, 2025, the foregoing brief was electronically filed using the Court's CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users.

DATED: July 8, 2025.        */s/ Oliver J. Dunford*
                                        OLIVER J. DUNFORD
                                        *Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Federal Circuit Rules 29(b) and 32(b)(1) in that the brief contains 6,729 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) in that the brief has been prepared in a proportionally spaced typeface using MS Word Version 16.58 in a 14-point Century Schoolbook font.

DATED: July 8, 2025.　　　　/s/ Oliver J. Dunford
　　　　　　　　　　　　　　OLIVER J. DUNFORD
　　　　　　　　　　　　　　*Counsel for Amici Curiae*