# United States Court of Appeals for the Federal Circuit

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

*Plaintiffs-Appellees,*

— v. —

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OFTHE PRESIDENT, UNITED STATES, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection, in his official capacity as Acting Commissioner of the United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, in his official capacity as Secretary of Commerce, UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Defendants-Appellants.*

*(For Continuation of Caption See Inside Cover)*

*On Appeal from the United States Court of International Trade in No. 1:25-cv-00066-GSK-TMR-JAR*

**BRIEF OF ADVANCING AMERICAN FREEDOM, INC.; FRONTLINE POLICY COUNCIL; INDEPENDENT INSTITUTE; MOUNTAIN STATES POLICY CENTER; RIO GRANDE FOUNDATION; AND PAUL STAM, FORMER SPEAKER PRO TEMPORE, NORTH CAROLINA HOUSE OF REPRESENTATIVES AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES**

J. MARC WHEAT
Timothy Harper
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue, N.W., Suite 930
Washington, D.C. 20004
(202) 780-4848
MWheat@advancingamericanfreedom.com
*Counsel for Amicus Curiae*

JULY 8, 2025

 COUNSEL PRESS    (800) 4-APPEAL • (131317)

STATE OF OREGON, STATE OF ARIZONA, STATE OF
COLORADO, STATE OF CONNECTICUT, STATE OF
DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE
OF MINNESOTA, STATE OF NEVADA, STATE OF NEW
MEXICO, STATE OF NEW YORK, STATE OF VERMONT,

*Plaintiffs-Appellees,*

– v. –

PRESIDENT DONALD J. TRUMP, UNITED STATES
DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM,
Secretary of Homeland Security, in her official capacity as Secretary
of the Department of Homeland Security, UNITED STATES
CUSTOMS AND BORDER PROTECTION, PETE R. FLORES,
Acting Commissioner for United States Customs and Border
Protection, in his official capacity as Acting Commissioner for U.S.
Customs and Border Protection, UNITED STATES

*Defendants-Appellants.*

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1812

**Short Case Caption** V.O.S. Selections, Inc., et al. v. Trump

**Filing Party/Entity** Advancing American Freedom, et al.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/08/2025

Signature: /s/John Marc Wheat

Name: J. Marc Wheat

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Advancing American Freedom, Inc. | | |
| Frontline Policy Council | | |
| Independent Institute | | |
| Josiah Bartlett Center for Public Policy | | |
| Mountain States Policy Center, Inc. | | |
| Michael C. Munger | | |
| Rio Grande Foundation | | |
| Society for the Rule of Law Institute | | |
| Paul Stam | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable            ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)    ☐  No    ☑  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable            ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ...............................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................1

ARGUMENT .................................................................................4

    I.    The Government's Interpretation of IEEPA Would Violate the Supreme Court's Nondelegation Doctrine ......................................4

    II.    The Powers of Taxation and Commerce Regulation are Core Legislative Powers Not Within the Scope of the President's Constitutional Power .............................................................13

    III.    The Original Meaning of the Constitution Prohibits Congressional Delegation of Legislative Power ................................19

        A.    Evidence from before, during, and immediately after the founding demonstrates that the nondelegation principle was widely accepted and understood as prohibiting congressional delegation of legislative power ...........................................................19

CONCLUSION .............................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.L.A. Schechter Poultry Corporation v. United States*,
  295 U.S. 495 ...................................................................................11, 13

*American Power & Light Co. v. SEC*,
  329 U.S. 90 (1946).............................................................................6, 8

*Consumers' Research*,
  No. 24-354, slip op. at 11 (June 27, 2025)......................................... 5-6

*Cooper v. Telfair*,
  4 U.S. 14 (4 Dall.) (1800) ....................................................................21

*FCC v. Consumers' Research*,
  No. 24-354, slip op. at 10 (June 27, 2025) ...........................................4

*Gibbons v. Ogden*,
  22 U.S. 1 (1824)....................................................................................13

*Gilchrist v. Collector of Charleston*,
  10 F. Cas. 355 (1808)............................................................................22

*Gundy v. United States*,
  588 U.S. 1554 (2019)...................................................................... *passim*

*Hayburn's Case*,
  2 U.S. (2 Dall.) 409 (1792) ..................................................................21

*J.W. Hampton, Jr., & Co. v. United States*,
  276 U.S. 394 (1928)................................................................................5

*Marshall Field & Co. v. Clark*,
  143 U.S. 649 (1892)..............................................................................11

*McCulloch v. Maryland*,
  17 U.S. 316 (1819)........................................................................ 13, 15

*Mistretta v. United States*,
  488 U.S. 361 (1989)................................................................................5

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012)..............................................................................13

*OPP Cotton Mills, Inc. v. Administrator of Wage*
*and Hour Div., Dep't of Labor,*
312 U.S. 126 (1941)........................................................................6

*The Cargo of the Brig Aurora v. United States,*
11 U.S. (7 Cranch) 382 (1813).....................................................24

*United States v. Sears,*
27 F. Cas. 1006 (1812)................................................................23

*Vanhorne's Lessee v. Dorance,*
2 U.S. 304 (2 Dall.).....................................................................21

*V.O.S. Selections Inc. v. Trump,*
No. 25-00066 (CIT, April 21, 2025)..............................................7

*V.O.S. Selections Inc. v. United States,*
No. 25-00066 (CIT, May 28, 2025)..............................................12

*Whitman v. American Trucking,*
531 U.S. 457 (2001).................................................................5, 6

**Statutes & Other Authorities:**

U.S. Const. art. I...............................................................................12

U.S. Const. art. I, § 1.....................................................................4, 14

U.S. Const. art. I, § 7, cl. 1..............................................................14

U.S. Const. art. I, § 8.......................................................................14

U.S. Const. art. I, § 8, cl. 1..............................................................14

U.S. Const. art. I, § 8, cl. 3..............................................................14

U.S. Const. art. X..............................................................................2

50 U.S.C. § 1701(b).........................................................................2

50 U.S.C. § 1702(a)(1)(A)................................................................2

18 Annals of Cong. 2084 (1808) (Statement of Rep. Campbell)............23

18 Annals of Cong. 2125 (1808) (Statement of Representative Key).....23

Act to Regulate Invalid Pensions......................................................20

Articles of Confederation ........................................................................14

Embargo Act of 1807 ................................................................ 22, 23, 24

International Emergency Economic Powers Act ............................. *passim*

An Old Whig No.6, *The Founders' Constitution*, Art. I, § 8, cl. 1 .........................18

Federal Farmer No. 3, *The Founders' Constitution*, Art. I, § 8, cl. 1 .....................18

Federalist No. 33 at 160 (Alexander Hamilton)
    (George Carey & James McClellan eds., 2001) ...................................15

Federalist No. 45 at 241 (James Madison)
    (George Carey & James McClellan eds., The Liberty Fund 2001).....................13

Federalist No. 47, 250-51 (James Madison).............................................16

Federalist No. 62, 321-22 (James Madison)
    (George Carey & James McClellan eds., The Liberty Fund 2001).......................3

Federalist No. 73, 381-82 (Alexander Hamilton) (George Carey & James
    McClellan eds., The Liberty Fund 2001)................................................4

Federalist No. 78, 383 (Alexander Hamilton)
    (George Carey & James McClellan eds., The Liberty Fund 2001).....................15

Federalist No. 78, 465 (Alexander Hamilton)
    (C. Rossiter ed. 1961)) ...................................................................15

Feulner, Edwin J., Jr., *Conservatives Stalk the House: The Story of the
    Republican Study Committee*, 212 (Green Hill Publishers, Inc. 1983) .................1

"From Thomas Jefferson to Charles Pinckney, 18 July 1808,"
    *Founders Online*, National Archives ............................................. 21, 22

Hamburger, Philip, *Is Administrative Law Unlawful*, 84 (2015)..................... 16, 17

Independence Index: Measuring Life, Liberty and the Pursuit
    of Happiness, Advancing American Freedom .........................................1

Jefferson, Thomas, *Notes on the State of Virginia*, Query XIII, 136 (1853) ...........19

Locke, John, *Second Treatise on Government*, § 141, 323
    (Thomas Hollis ed., 1764) (1689).........................................................19

Madison, James, *Notes of Debates in the Federal Convention of 1787 (June 1)*,
    in 1 *The Records of the Federal Convention of 1787*, 65
    (Max Farrand ed., Yale University Press 1911)...................................19

Madison, James, *Notes of Debates in the Federal Convention of 1787 (September 15)*, in 2 *The Records of the Federal Convention of 1787*, 627 (Max Farrand ed., Yale University Press 1911)....................................................20

Madison, James, Preface to Debates in the Convention, *The Founders' Constitution*, Art. I, § 8, cl. 1........................................................14

Montesquieu, *The Spirit of the Laws* 156 (Cohler, Miller, & Stone eds., Cambridge University Press 1989)(1748) ...........16

The Declaration of Independence para. 19 (U.S. 1776) .........................................15

"To George Washington from James Iredell and John Sitgreaves, 8 June 1792," *Founders Online*, National Archives...........................................21

Tucker, St. George, *View of the Constitution of the United States with Selected Writings* at 46-47 (Clyde Wilson, ed., Liberty Fund 1999) (1803) ......................17

## STATEMENT OF INTEREST OF *AMICI CURIAE*

Advancing American Freedom (AAF) is a nonprofit organization that promotes and defends policies that elevate traditional American values, including freedom from arbitrary power.[1] AAF "will continue to serve as a beacon for conservative ideas, a reminder to all branches of government of their responsibilities to the nation,"[2] and believes American prosperity depends on ordered liberty and self-government.[3] AAF files this brief on behalf of its 137,108 members nationwide.

Amici Frontline Policy council; Independent Institute; Josiah Bartlett Center for Public Policy; Mountain States Policy Center; Michael C. Munger, Director, Philosophy, Politics, and Economics Program, Duke University; Rio Grande Foundation; Society for the Rule of Law Institute; and Paul Stam, Former Speaker Pro Tempore, North Carolina House of Representatives believe that the government's compliance with the Constitution's limits on government power is essential to the preservation of American freedom.

---

[1] No counsel for a party authored this brief in whole or in part. No person other than *Amicus Curiae* and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

[2] Edwin J. Feulner, Jr., *Conservatives Stalk the House: The Story of the Republican Study Committee*, 212 (Green Hill Publishers, Inc. 1983).

[3] Independence Index: Measuring Life, Liberty and the Pursuit of Happiness, Advancing American Freedom available at https://advancingamericanfreedom.com/aaff-independence-index/.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Government officials may not alter the structures created by the Constitution except by following the procedures the Constitution itself establishes for its own alteration. When those in government attempt to do so, they act beyond their legitimate power and usurp the powers "reserved to the States respectively, or to the people." U.S. Const. art. X. The courts serve as a backstop to overreach by the political branches, a last line of defense for the people's liberty. This Court must play that role here.

The International Emergency Economic Powers Act (IEEPA) provides that the President may "investigate, regulate, or prohibit" large swaths of international trade including "any transactions in foreign exchange." 50 U.S.C. § 1702(a)(1)(A). These powers, however, "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b). Claiming to exercise these powers, President Trump has issued changes to tariff rates worldwide and has repeatedly modified the rates and conditions of those tariffs unilaterally.

The powers asserted by the President in this case are not within the constitutional authority of the presidency. Rather, they belong to Congress, which cannot delegate them to the President. The President's exercise of power here is thus

either outside the scope of the power granted by Congress through IEEPA or IEEPA is an unconstitutional delegation of power reserved exclusively to the legislative branch. Either way, the Court of International Trade's decision striking down the President's tariffs should be affirmed.

The Constitution grants the national government's legislative powers to Congress alone because the framers "believed the new federal government's most dangerous power was the power to enact laws restricting the people's liberty." *Gundy v. United States*, 588 U.S. 154 (2019) (Gorsuch, J., dissenting). As Madison explained, it was the "facility and excess of lawmaking" that "seem[ed] to be the diseases to which our governments are most liable."[4] As a cure to those "diseases," "the framers went to great lengths to make lawmaking difficult." *Id*. As Justice Gorsuch explains, "[s]ome occasionally complain about the arduous processes for new legislation, but to the framers these were bulwarks of liberty." *Id*.

These "arduous processes" "were also designed to promote deliberation," *id*., because, "[t]he oftener a measure is brought under examination, the greater the diversity in the situations of those who are to examine it, the less must be the danger of those errors which flow from want of due deliberation, or of those missteps which

---

[4] Federalist No. 62, 321-22 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001).

3

proceed from the contagion of some common passion or interest."[5] Here, though, the deliberation, care, and accountability due before making decisions of such significance has been absent.

The major questions doctrine is one tool courts use to ensure that Congress and the President stay within their constitutional bounds and is relevant in this case. However, the nondelegation doctrine more directly addresses the constitutional malady here. "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government," *Gundy*, 588 U.S. at 132 (plurality opinion), precisely because the founders understood that important policy decisions should be the result of a deliberative process and should pass only with the support of a legislative coalition representing a broad swath of the nation's population. Because the tariffs at issue in this case represent, instead, the whims of one man who is not constitutionally empowered to enact them, this Court should uphold the Court of International Trade's decision striking them down.

## ARGUMENT

### I. The Government's Interpretation of IEEPA Would Violate the Supreme Court's Nondelegation Doctrine.

The Constitution vests "[a]ll legislative Powers" of the national government "in a Congress of the United States." U.S. Const. art. I, § 1. Further, "that assignment

---

[5] Federalist No. 73, 381-82 (Alexander Hamilton) (George Carey & James McClellan eds., The Liberty Fund 2001).

of power to Congress is a bar on its further delegation." *FCC v. Consumers'
Research*, No. 24-354, slip op. at 10 (June 27, 2025) (citing *Whitman v. American
Trucking*, 531 U.S. 457, 472 (2001). The nondelegation doctrine, the Supreme
Court's rule for enforcing this constitutional principle, "bars Congress from
transferring its legislative power to another branch of Government." *Gundy*, 588
U.S. at 132 (plurality opinion).

To avoid improperly delegating legislative power to the executive, Congress
must "lay down . . . an intelligible principle to which the person or body authorized"
to exercise the power in question must "conform." *J.W. Hampton, Jr., & Co. v.
United States*, 276 U.S. 394 (1928). While the intelligible principle test has, at times,
been used to allow Congress to empower the President with "extraordinarily
capacious standards," *Gundy*, 588 U.S. at 149 (Alito, J., concurring), the
fundamental prohibition remains clear: "No one, not even Congress, ha[s] the right
to alter [the constitutional] arrangement" of powers. *Id.* 588 U.S. at 153 (Gorsuch,
J., dissenting). As Justice Scalia explained, "Our Members of Congress could not,
even if they wished, vote all power to the President and adjourn *sine die.*" *Mistretta
v. United States*, 488 U.S. 361, 415 (1989) (Scalia, J., dissenting).

As the Court recently explained, "[t]he 'guidance' needed [from Congress] is
greater . . . when an agency action will 'affect the entire national economy' than
when it addresses a narrow, technical issue." *Consumers' Research*, No. 24-354, slip

op. at 11 (June 27, 2025), (quoting *Whitman*, 531 U.S. at 475). Congress must make clear "both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *Id*. (alteration in original) (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). The Court also considers whether "Congress has provided sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *Id*. (alteration in original) (quoting *OPP Cotton Mills, Inc. v. Administrator of Wage and Hour Div., Dep't of Labor*, 312 U.S. 126, 144 (1941)). Under the government's interpretation of IEEPA, the President's tariff power affects the "entire national economy," *id*., the supposedly delegated authority is unbounded, and neither the courts nor the public can effectively determine whether the tariffs are within the scope of IEEPA's delegation.

More fundamentally, the President invokes core legislative powers which are neither granted to him by the Constitution nor delegable by Congress. As Chief Justice Marshall wrote in 1825, because "it will not be contended that Congress can delegate to the Courts, or to any other tribunals, powers which are strictly and exclusively legislative," the only question the intelligible principle test addresses is whether the power claimed by another branch under a statute is legislative or executive in nature. *But see, Gundy*, 588 U.S. at 135 (plurality opinion) ("The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion."). On the margins, distinguishing between

legislative and executive power may be difficult, but, as explained in Section II below, the powers at issue in this case are clearly legislative because they are both legislative in nature and are listed among Congress's legislative powers.

The government effectively acknowledged that the President is claiming legislative power in its briefing at the district court. There, the government quoted the *Gundy* plurality opinion as follows: "'The nondelegation doctrine bars Congress from *transferring its legislative power* to another branch of Government' *without supplying* 'an intelligible principle to guide the delegee's use of discretion.'" Defendants' Response to Motion for Summary Judgment and Preliminary Injunction at 46, *V.O.S. Selections Inc. v. Trump*, No. 25-00066 (CIT, April 21, 2025) (emphasis added) (quoting *Gundy*, 588 U.S. at 132, 135 (plurality opinion)). However, this quotation combines two different lines several pages apart. Those two sentences, quoted in full, harm rather than support the government's argument. In full, the first sentence quoted reads, "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government." *Gundy*, 588 U.S. at 132 (plurality opinion). The second sentence reads, "The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Gundy*, 588 U.S. at 135 (plurality).

By combining these two lines as it did, the government effectively admitted that it was defending a supposed delegation of *legislative* power, a state of affairs

7

explicitly rejected by the language they quoted when quoted in full. In other words, below, the government attempted to use the plurality opinion in *Gundy* to show that all that is needed for a delegation of *legislative* power is an intelligible principle. The government's brief before this Court no longer contains this implicit admission, but the facts have not changed. That admission alone is sufficient to find that the President's asserted tariff authority is unconstitutional.

Further, even if the government had not conceded the critical point, its argument should still fail under the nondelegation doctrine. While it is true that the Supreme Court has applied the doctrine loosely, *Gundy*, 588 U.S. at 146 (plurality opinion) ("Those standards, the Court has made clear, are not demanding."), the government's own argument and the President's repeated actions show that the unilateral tariffs fail the standards of the nondelegation doctrine. Read broadly, as it often has been, a statute empowering the executive "is permissible" under the intelligible principle test "if Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of his authority.'" *Id*. 588 U.S. at 146 (quoting *American Power & Light Co. v. Securities and Exchange Committee*, 329 U.S. 90, 105 (1946)).

The government's arguments fail this test. First, the government claims that "Congress gave itself oversight authority over exercises of IEEPA powers." Pet'r's Br. at 13. But the nondelegation doctrine is not satisfied merely because Congress

established for itself a means of review. The nondelegation doctrine exists to ensure that Congress, not the Executive, makes law. It does not allow the President to make law even if there is, at least in theory, a means of congressional review.[6]

Second, the government effectively concedes that IEEPA does not provide an intelligible principle guiding the implementation of tariffs. The government argues that "what constitutes an 'extraordinary and unusual threat' and whether a particular action will effectively 'deal with' that threat" contains "no basis for meaningful judicial review of President Trump's findings." Pet'r's Br. at 58. The government seems to want to have it both ways. IEEPA's "unusual and extraordinary circumstances" requirement does provide an intelligible principle guiding the President's actions, the government argues, but one that is only intelligible to the President, not to the Courts.

Such a standard demonstrates that the questions the President claims authority to decide here are legislative policy decisions, not executive fact-finding determinations. Courts are not constitutionally competent to assess the wisdom of

---

[6] Further, congressional action is difficult by design. *Gundy*, 588 U.S. at 154 (Gorsuch, J., dissenting). That difficulty is likely to be exacerbated when the political party of the President controls both chambers of Congress. Congressional inaction is also incentivized when the President adopts a controversial policy. More fundamentally, whether IEEPA's language contains an intelligible principle directing the implementation of these tariffs is unaffected by Congress's on-paper authority to respond.

the policy of the political branches. On the other hand, it is their core function to determine whether the application of a law is consistent with the letter of the law. If the statutory language is too vague for a court to exercise meaningful review of its application, then it must also insufficiently guide the President's execution.

If, on the other hand, the President is exercising executive power, finding facts and applying the law, then courts are competent and have a constitutional responsibility to determine whether the President's fact-finding and application are consistent with both the letter of the law in question and the letter and the spirit of the Constitution. The government's argument, then, effectively concedes that IEEPA, under its interpretation, does not provide an intelligible principle to direct the President's exercise of power.

Further, the undemanding reading of the intelligible principle test is a misreading. As Justice Gorsuch explained, when the Court first used the phrase in 1928, "No one . . . thought the phrase meant to effect some revolution in this Court's understanding of the Constitution." *Gundy*, 588 U.S. at 162 (Gorsuch, J., dissenting). The difficulty in some cases of determining "the exact line between policy and details, law-making and fact-finding, and legislative and non-legislative functions" does not undermine the fact that "everyone agreed these were the relevant inquiries." *Id*. As the Court had said a few decades earlier, "[t]hat Congress cannot delegate its legislative power to the President is a principle universally recognized as vital to the

10

integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892). The Court echoed this sentiment again in 1935, writing, "The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corporation v. United States*, 295 U.S. 495, 529-30.

Justice Gorsuch, in his dissent in *Gundy*, lays out a test more faithful to the Constitution's separation of powers:

> To determine whether a statute provides an intelligible principle, [courts] must ask: Does the statute assign to the executive only the responsibility to make factual findings? Does it set forth the facts that the executive must consider and the criteria against which to measure them? And most importantly, did Congress, and not the Executive Branch, make the policy judgments? Only then can we fairly say that a statute contains the kind of intelligible principle the Constitution demands.

*Gundy*, 588 U.S. at 166 (Gorsuch, J., dissenting). The government's interpretation of IEEPA fails this test.

First, the government's interpretation of IEEPA allows the President to do far more than determine facts. The President must begin by determining whether the

situation in question amounts to "unusual and extraordinary circumstances" justifying the declaration of a national emergency. As argued above, this is a policy rather than a factual determination because it is too vague to allow for meaningful judicial review.

Second, and "most importantly," IEEPA, under the government's interpretation, allows the Executive to make policy judgments of massive import with only *de jure,* not *de facto,* meaningful congressional oversight. The President's determination that there is a national emergency unlocks, according to the government, vast powers that the Court of International Trade rightly called "unbounded." *V.O.S. Selections, Inc. v. United States*, No. 25-00066 (CIT, May 28, 2025). There appears to be no principle in the government's interpretation that would prevent the President from banning all international trade, indefinitely. Such decisions are legislative policy decisions reserved to Congress in Article I.

The government's interpretation of IEEPA violates the nondelegation doctrine's intelligible principle test, whether read more or less permissively. The President asserts for himself apparently unlimited authority to make policy decisions about international commerce on the grounds of a statute so supposedly vague that courts would not have sufficient guidance to question the President's decision making. "This is delegation running riot." *Gundy*, 588 U.S. at 161 (Gorsuch, J.,

dissenting) (internal quotation marks omitted) (quoting *Schechter Poultry*, 295 U.S. at 553 (Cardozo, J., concurring).

## II. The Powers of Taxation and Commerce Regulation are Core Legislative Powers Not Within the Scope of the President's Constitutional Power.

At issue in this case is whether the President, under IEEPA, may unilaterally impose tariffs, whether to raise revenue or as a form of commerce regulation. Because the national government is one of enumerated powers,[7] and because enumeration implies limitation, *Gibbons v. Ogden*, 22 U.S. 1, 195 (1824), the question of this case is whether these powers are within the legitimate power of the Executive Branch. The answer is no. The powers the President seeks to exercise in this case are defined as legislative powers by the Constitution and are legislative in nature.

---

[7] The Federalist No. 45 at 241 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001) ("The powers delegated by the proposed constitution to the federal government, are few and defined."). *McCulloch v. Maryland*, 17 U.S. 316, 405 (1819) (explaining that the federal "Government is acknowledged by all to be one of enumerated powers. The principle that it can exercise only the powers granted to it would seem too apparent to have required to be enforced by all those arguments which its enlightened friends, while it was depending before the people, found it necessary to urge."). The Constitution, "rather than granting general authority to perform all the conceivable functions of government," "lists, or enumerates, the Federal Government's powers." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 534 (2012). An "enumeration of powers is also a limitation of powers, because '[t]he enumeration presupposes something not enumerated.'" *Id.* at 534 (quoting *Gibbons v. Ogden*, 22 U.S. 1, 9 (1824)) (alteration in original).

The Constitution vests "all legislative powers" of the federal government in "a Congress of the United States." U.S. Const. art. I, § 1. Congress's core legislative powers are enumerated in Article I, Section 8, of the Constitution. The first of those powers is "To lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Further, this power is limited by the requirement that "All bills for raising revenue shall originate in the House of Representatives." U.S. Const. art. I, § 7, cl. 1. The third power listed in Section 8 is "To regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3.

That the power to tax is listed first among Congress's powers is no accident. The inability of the national government under Articles of Confederation to raise revenue was the impetus for the constitutional convention.[8] But the Framers also knew, as the Supreme Court would later say, "[t]hat the power to tax involves the

---

[8] *See, e.g.*, James Madison, Preface to Debates in the Convention, *The Founders' Constitution*, Art. I, § 8, cl. 1, https://press-pubs.uchicago.edu/founders/documents/a1_8_1s2.html (Last visited July 7, 2025) ("At the date of the Convention, the aspect & retrospect of the pol: condition of the U.S. could not but fill the pub. mind with a gloom which was relieved only by a hope that so select a Body would devise an adequate remedy for the existing and prospective evils so impressively demanding it. It was seen that the public debt rendered so sacred by the cause in which it had been incurred remained without provision for its payment. The reiterated and elaborate efforts of Cong. to procure from the States a more adequate power to raise the means of payment had failed.").

power to destroy." *McCulloch v. Maryland*, 17 U.S. 316, 431 (1819). Among the founding generation's complaints against British rule was that King George III had "impos[ed] taxes on us without our consent." The Declaration of Independence para. 19 (U.S. 1776). When the framers designed America's system of government, they consciously kept the taxing power close to the people and far from unilateral control.

Further, the powers of taxation and regulation of commerce are legislative not just because they are listed among the legislature's powers but because they are legislative in nature. Alexander Hamilton explained that legislative power is the power that "not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated,"[9] one of which "is the power of laying and collecting taxes."[10]

Legislative power is "the power to adopt generally applicable rules of conduct governing future actions by private persons—the power to 'prescribe the rules by which the duties and rights of every citizen are to be regulated,' or the power to 'prescribe general rules for the government of society.'" *Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting) (citing The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton)).

---

[9] Federalist No. 78 at 383 (Alexander Hamilton) (George Carey & James McClellan eds., The Liberty Fund 2001).

[10] *See*, Federalist No. 33 at 160 (Alexander Hamilton) (George Carey & James McClellan eds., 2001) (What is the power of laying and collecting taxes, but a *legislative power,* or a power of *making laws,* to lay and collect taxes?").

For the Founders, the most influential proponent of the separation of powers was Montesquieu.[11] According to Montesquieu, legislators are those who "make laws for a time, or for always, and *corrects* or *abrogates* those that have been made."[12] He distinguished this from executive powers which were held by he who "makes war or peace, sends or receives embassies, establishes security, or prevents invasions" and was engaged in "the execution of the general will of the state."[13] According to John Locke, "the 'legislative authority' is that by which laws 'are in force over the subjects of the commonwealth.'"[14] Similarly, Blackstone wrote, "Legislators and their laws are said to compel and oblige."[15] As Professor Philip Hamburger explains, "the natural dividing line between legislative and nonlegislative power was between rules that bound subjects and those that did not . . . It therefore was assumed that the enactment of legally binding rules could come only from a representative legislature and that the resulting rules could bind only subjects, not other peoples . . . [T]he executive could not make rules or duties that

---

[11] *See*, Federalist No. 47, 250-51 (James Madison) ("The oracle who is always consulted and cited on this subject is the celebrated Montesquieu. If he be not the author of this invaluable precept in the science of politics, he has the merit at least of displaying and recommending it most effectually to the attention of mankind.").
[12] Montesquieu, *The Spirit of the Laws* 156 (Cohler, Miller, & Stone eds., Cambridge University Press 1989) (1748).
[13] *Id*. at 194.
[14] Philip Hamburger, *Is Administrative Law Unlawful*, 84 (2015).
[15] *Id*. (internal quotation marks omitted).

bound subjects, for these were legislative."[16] This distinction between legislative and

executive powers was widely recognized by the Founding generation.[17]

The President's tariffs are legislative because they are binding on Americans

seeking to purchase goods from overseas, restricting their liberty to do so. For some,

the tariffs can and will operate as a prohibition of international trade because the

costs will drive them out of the market. Such restrictions warrant careful deliberation

of the people's representatives if they are to be adopted at all.

The government makes much of the fact that tariffs are in the domain of

foreign affairs, suggesting that the President deserves special deference to exercise

---

[16] *Id.*

[17] St. George Tucker, *View of the Constitution of the United States with Selected Writings* at 46-47 (Clyde Wilson, ed., Liberty Fund 1999) (1803) ("First, the power of directing the actions of the citizens by laws requiring whatever is requisite for this end, and prohibiting the contrary by penalties: determining and limiting more precisely the several rights of men, appointing the proper methods for securing, transferring, or conveying them, as the general interest may require, and even limiting their use of them, in certain cases, for the same general purpose. Secondly, another power of the same class is that of appointing in what manner, and what proportion each one shall contribute towards the public expenses out of his private fortune, or private gains, by paying taxes, as the state of the people will admit. These two branches of power are commonly called legislative [...] The power of appointing inferior magistrates (that of appointing the judges of the superior courts being by the constitution of this state vested in the legislature) and ministerial officers to take care of the execution both of the ordinary laws, and of the special orders of the state, given by the proper departments, and of collecting the public revenue; paying the public creditors, defraying the public charges; and commanding, and directing the public force, pursuant to the law and constitution of the state, is ordinarily called the executive department.").

power in this area. Pet'r's Br. at 73. Yet the founding generation saw taxes on imports and exports as an exercise of the same type of power as taxes internal to the nation. During debates over the ratification of the Constitution, many advocated for taxation on foreign trade, or "external taxation," as preferable to "internal taxation," as a source of revenue for the national government. Regarding the Constitution itself, the debate was over whether Congress should have been granted authority to issue internal as well as external taxes, or whether it should have been limited to external taxation.[18] In other words, the debate was over the desirable extent of the congressional taxing power, demonstrating that taxations levied on imports were not a special category of power that Congress shared with, or could share with, the President.

The powers of taxation and regulation of commerce are legislative powers the Constitution grants solely to Congress. The Constitution's arrangement of the national government's powers is binding on those who govern. "No one, not even Congress, ha[s] the right to alter that arrangement." *Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting). For these reasons, the Court should affirm the Court of International Trade's decision and strike down the President's tariffs.

---

[18] See Federal Farmer No. 3, *The Founders' Constitution*, Art. I, § 8, cl. 1, https://press-pubs.uchicago.edu/founders/documents/a1_8_1s4.html (Last visited July 7, 2025); An Old Whig No.6, *The Founders' Constitution*, Art. I, § 8, cl. 1, https://presspubs.uchicago.e du/founders/documents/a1_8_1s5.html (Last visited July 7, 2025).

## III. The Original Meaning of the Constitution Prohibits Congressional Delegation of Legislative Power.

The founders, the thinkers and writers who influenced them, and lawyers in the early republic all understood that an essential part of the separation of powers, an essential protection of liberty, was that the legislative authority could not delegate legislative power to any other entity. Writing about the delegation of legislative powers, Locke explained, "*[t]he legislative cannot transfer the power of making laws to any other hands: for it being but a delegated power from the people, they who have it cannot pass it over to others.*"[19] Locke, similarly, argued that, "[t]he legislative power *neither must nor can transfer the power of making laws to anyone else.*"[20]

At the constitutional convention, Madison explained that certain powers were "in their nature Executive, and must be given" to that branch.[21] He then presented a motion to prohibit Congress from delegating additional power to either the executive or judiciary in order to prevent "misconstructions."[22] Charles Pinckney successfully

---

[19] John Locke, *Second Treatise on Government*, § 141, 323 (Thomas Hollis ed., 1764) (1689) (emphasis in original). *See also*, Thomas Jefferson, *Notes on the State of Virginia*, Query XIII, 136 (1853) ("Our ancient laws expressly declare that those who are but delegates themselves shall not delegate to others powers which require judgment and integrity in their exercise.").

[20] *Id*. at 324-325.

[21] James Madison, *Notes of Debates in the Federal Convention of 1787 (June 1)*, in 1 *The Records of the Federal Convention of 1787*, 65 (Max Farrand ed., Yale University Press 1911).

[22] *Id.*

moved to strike out Madison's motion because it was "unnecessary" since the executive inherently lacks the power to make laws.[23] Throughout the Convention, delegates demonstrated a distinct understanding of powers as legislative or executive in nature.[24]

In 1792, Congress passed, and President Washington signed into law, an Act to Regulate Invalid Pensions.[25] That law required circuit court justices to judge the pension applications of disabled soldiers, subject to revision by the Attorney General or an act of the legislature. The early Supreme Court justices riding circuit refused to exercise the powers the law supposedly granted to them because they determined that the mix of legislative and executive duties delegated to the courts by the act were unconstitutional. Chief Justice Jay, in his written opinion to Washington on behalf of himself, Justice Cushing, and Judge Duane, wrote "neither the legislative

---

[23] *Id.*

[24] James Madison, *Notes of Debates in the Federal Convention of 1787 (September 15)*, in 2 *The Records of the Federal Convention of 1787*, 627 (Max Farrand ed., Yale University Press 1911) ("Mr. King thought it would be inconsistent with the Constitutional separation of the Executive & Legislative powers to let the prerogative be exercised by the latter — A Legislative body is utterly unfit for the purpose. They are governed too much by the passions of the moment. In Massachusetts, one assembly would have hung all the insurgents in that State: the next was equally disposed to pardon them all. He suggested the expedient of requiring the concurrence of the Senate in Acts of Pardon.").

[25] An Act to provide for the settlement of the Claims of Widows and Orphans barred by the limitations heretofore established, and to regulate the Claims to Invalid Pensions, ch. 11, 1 Stat. 244 (1792).

nor the executive branches, can constitutionally assign to the judicial any duties, but such as are properly judicial, and to be performed in a judicial manner." *Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410 (1792). Justice Iredell, also riding circuit, came to the same conclusion, writing that the courts could "not be warranted" in exercising the power delegated by the act because for the judiciary to exercise "any power not in its nature judicial, or, if judicial, not provided for upon the terms the constitution requires" was unconstitutional.[26]

Similarly, in *Vanhorne's Lessee v. Dorance*, 2 U.S. 304 (2 Dall.), 308, 311 (1795), Justice Paterson explained that law can only be "the work or will of the legislature in their derivative or subordinate capacity." American constitutions acted as the "sun of the political system" and laid out the exact "orbit in which [law] must move." *Id*. Certain powers can only be exercised by the legislative body, such as "the despotic power [...] of taking property," and legislatures cannot delegate that power. *Id*. The idea of core nondelegable powers was also recognized in the case of *Cooper v. Telfair*.[27]

---

[26] "To George Washington from James Iredell and John Sitgreaves, 8 June 1792," *Founders Online,* National Archives, https://founders.archives.gov/documents/Washington/05-10-02-0290.

[27] *Cooper v. Telfair*, 4 U.S. 14 (4 Dall.), 19 (1800) (Paterson, J.) ( "But the power of confiscation and banishment does not belong to the judicial authority, whose process could not reach the offenders: and yet, it is a power, that grows out of the very nature of the social compact, which must reside somewhere, and which is so

The nondelegation principle was reiterated during the Jefferson Administration. The Embargo Act of 1807 empowered the President "to give such instructions" to executive officers "as shall appear best adapted for carrying the same into effect."[28] The Supplementary Act passed soon after appeared to further augment this power by giving the President authority to individually decide the detainment of ships he considered suspicious.[29] Jefferson interpreted this as a broad grant of authority, writing the "legislature having found, after repeated trials, that no general rules could be formed," decided to delegate to the President "discretionary power paramount to all their general rules."[30] Justice Johnson, riding circuit, disagreed that Congress could have ever delegated such broad power to the President. In *Gilchrist v. Collector of Charleston*, 10 F. Cas. 355, 358 (1808), he found that if the law did what the President claimed, it would "necessarily have the effect of transferring the powers vested in one department to another department."

---

inherent in the legislature, that it *cannot be divested, or transferred*, without an express provision of the constitution.") (Emphasis added).

[28] An Act laying an Embargo on all ships and vessels in the ports and harbors of the United States, ch. 5, 2 Stat. 451 (1807).

[29] An Act in addition to the act intituled (sic) "An act laying an embargo on all ships and vessels in the ports and harbors of the United States," and the several acts supplementary thereto, and for other purposes, ch. 66, 2 Stat. 499 (1808).

[30] "From Thomas Jefferson to Charles Pinckney, 18 July 1808," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/99-01-02-8354.

In *United States v. Sears*, Justice Story, writing for the circuit court, found that the apparent delegation of power to issue instructions for officers was narrow because it "presupposes that the law had already devolved these duties upon them." 27 F. Cas. 1006, 1011 (1812). Congress could not have intended to delegate "an unlimited authority over the commercial property of the citizens." *Id*.

The provision which loomed largest over the Embargo Act controversy was the empowerment of the President to lift the embargo if he received intelligence justifying such an act. The House of Representatives vigorously debated whether this was a delegation of legislative power. The key takeaway is that *both* proponents and opponents of the measure recognized there existed a principle of nondelegation. Representative Campbell, the motion's sponsor, declared that the bill did not vest commercial regulation, a law-making power, in the President, but only typical executive fact finding.[31] Representative Key opposed the measure as he saw in it the power to "repeal a Legislative act, and we cannot transfer the power of legislating from us to the President."[32]

---

[31] 18 Annals of Cong. 2084 (1808) (Statement of Rep. Campbell) ("For myself I cannot see what objections can be made to this measure. It is not vesting a power in the President to oppress or embarrass the commercial interest; it only invests in him a power, under certain restrictions, a pressure which our fellow-citizens feel from the measure we have been forced to adopt.")
[32] 18 Annals of Cong. 2125 (1808) (Statement of Representative Key).

When the Embargo Act challenge reached the Supreme Court, Joseph Ingersoll, son of signer of the Constitution Jared Ingersoll, representing the appellant owner of the ship Aurora, argued, "Congress could not transfer the legislative power to the President. To make the revival of a law depend upon the President's proclamation, is to give to that proclamation the force of a law. Congress meant to reserve to themselves the power of ascertaining when the condition should have been performed." *The Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 386 (1813). The Court acknowledged the Congress could not transfer any legislative power to the President, but found that, in this case, Congress had not delegated legislative power. Instead, it held that Congress had "only prescribed the evidence which should be admitted of a fact, upon which the law should go into effect." *Id*. at 387.

The nondelegation principle is well established in early American legal thought and jurisprudence, growing out of hard-won wisdom about the dangers of the executive exercise of legislative power. The founders incorporated that wisdom into the Constitution to ensure that the legislative power of the United States, all of it, would be exercised by Congress, and by Congress alone. Although the Supreme Court's more recent jurisprudence has not, heretofore, been particularly strict in its enforcement of the boundary between legislative and executive power, it nonetheless provides ample reason to strike down the President's tariffs in this case.

The President's actions here involve the exercise of core legislative powers on the basis of a vaguely worded statute. That exercise of power either derives from a statute that provides sufficient clarity to allow judicial review, or it does not. If it does not, then the statute illegitimately delegates legislative power to the President. If it does, then the Courts are just as competent as the President is at determining whether the facts asserted by the President satisfy the statute's requirements. Regardless, the President's emergency declaration does not constitute a nonjusticiable political question.

The Constitution divides the government's powers against one another to ensure that the liberty of the people is secure. Government officials cannot change that system apart from the established amendment process. Because the President's tariffs rip powers away from Congress that the Constitution reserves exclusively to that branch, this Court should find that IEEPA either does not grant the powers asserted or, in the alternative, is an unconstitutional delegation of legislative power to the President.

## CONCLUSION

For the foregoing reasons, the Court should rule for Plaintiffs-Appellees.

Respectfully submitted,

<u>/s/ J. Marc Wheat</u>
J. Marc Wheat
Advancing American Freedom, Inc.
801 Pennsylvania Avenue, N.W.
Suite 930
Washington, D.C. 20004
(202) 780-4848
mwheat@advancingamericanfreedom.com

*Counsel for Amicus Curiae*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 25-1812

**Short Case Caption:** V.O.S. Selections, Inc. v. Trump

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6,228 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 07/08/2025

Signature: /s/ J. Marc Wheat

Name: J. Marc Wheat