**Nos. 2025-1812, -1813**

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

_____

V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC, d/b/a Genova Pipe; MICROKITS, LLC; FISHUSA INC.; TERRY PRECISION CYCLING LLC,

Plaintiffs–Appellees

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection, in his official capacity as Acting Commissioner of the United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, in his official capacity as Secretary of Commerce, UNITED STATES CUSTOMS AND BORDER PROTECTION,

Defendants–Appellants.

_____

STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF VERMONT,

Plaintiffs–Appellees

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, PETE R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection, UNITED STATES,

Defendants–Appellants.

On Appeal from the United States Court of International Trade,
Nos. 25- 66, -77, Judges Katzmann, Reif, and Restani

**BRIEF OF THE NEW CIVIL LIBERTIES ALLIANCE AS *AMICUS
CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES**

Andrew J. Morris
  *Counsel of Record*
JOHN J. VECCHIONE
New Civil Liberties Alliance
4250 N. Fairfax Drive,
Suite 300
Arlington, VA 22203
(202) 869-5210
andrew.morris@ncla.legal

*Counsel for Amicus Curiae*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 25-1812, 25-1813 |
| **Short Case Caption** | V.O.S. Selection, Inc. v. Trump |
| **Filing Party/Entity** | New Civil Liberties Alliance |

> **Instructions:**
>
> 1. Complete each section of the form and select none or N/A if appropriate.
>
> 2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
>
> 3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
>
> 4. Please do not duplicate entries within Section 5.
>
> 5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/08/2025

Signature: /s/ Andrew J. Morris

Name: Andrew J. Morris

FORM 9. Certificate of Interest

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| New Civil Liberties Alliance | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☐   No   ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................i

TABLE OF AUTHORITIES ...................................................................ii

AUTHORITY TO FILE.........................................................................1

IDENTITY AND INTEREST OF *AMICUS CURIAE* ...........................1

INTRODUCTION.................................................................................2

ARGUMENT .......................................................................................6

I.  THE TERM "REGULATE … IMPORTATION" USED IN IEEPA HAS A DIFFERENT MEANING THAN SIMILAR LANGUAGE IN THE TRADING WITH THE ENEMY ACT (TWEA) ............................................6

II.  THE HISTORY OF TARIFF POLICY MAKES CLEAR THAT, WHEN THE PRESIDENT PURPORTS TO USE IEEPA TO IMPOSE TARIFFS ABOVE THE BACKGROUND LEVEL APPROVED BY CONGRESS, HE ACTS AT THE NADIR OF HIS CONSTITUTIONAL AUTHORITY .................................10

    A.  The History of Tariff Policy Indicates That the Authority Delegated to the President Is to Lower Tariff Rates, Not to Raise Them Beyond the Rates Set by Congress.....................13

    B.  The Executive Orders Challenged Here Do Not Include the Limits Essential to the Opinion in *Yoshida II* ........................19

III.  HOLDING THAT IEEPA DOES NOT PERMIT TARIFFS IS CONSISTENT WITH THE COURT OF INTERNATIONAL TRADE'S DECISION BELOW .....21

CONCLUSION ...................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Clark v. Martinez,*
  543 U.S. 371 (2005)..............................................................3, 8

*Learning Resources, Inc. v. Trump,*
  No. 25-1248 (RC), 2025 WL 1525376 (May 29, 2025)............................9

*Loper Bright v. Raimondo,*
  603 U.S. 369 (2024)................................................................12

*McLaughlin Chiropractic Assocs. v. McKesson Corp.,*
  145 S.Ct. 2006 (2025)..............................................................12

*Resonate Inc. v. Alteon Websystems, Inc.,*
  338 F.3d 1360 (Fed. Cir. 2003) ................................................21

*Troy v. Samson Mfg. Corp.,*
  758 F.3d 1322 (Fed. Cir. 2014) ................................................11

*United States v. Yoshida Int'l, Inc.,*
  526 F.2d 560 (C.C.P.A. 1975) .................... 4, 10, 11, 12, 19, 20

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014)..................................................................7

*V.O.S. Selections, Inc. v. Trump,*
  772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025)........... 3, 7, 9, 10, 20, 21, 23

*Yoshida Int'l, Inc. v. United States,*
  378 F. Supp. 115 (Cust. Ct. 1974) .......................................11

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952)..............................................................4, 12

**Constitutional Provisions**

U.S. Const. Art. I, Sec. 9 .....................................................14
U.S. Const. Art. I., Sec. 8 ....................................................14

**Statutes**

50 U.S.C. § 1702 ...................................................................20
Fordney-McCumber Tariff Act,
  Pub. L. No. 67-318, 42 Stat. 858 (1922) ..............................16
Reciprocal Trade Agreements Act of 1934,
  Pub. L. No. 73-316, 48 Stat. 943 (1934) ..............................17
Smoot-Hawley Tariff Act,
  Pub. L. No. 71-361, 46 Stat. 590 (1930) ..............................16
Underwood Tariff Act,
  Pub. L. No. 63-16, 38 Stat. 114 (1913) ................................15

**Other Authorities**

Abraham Berglund,
  *The Tariff Act of 1922*,
  13 Am. Econ. Rev. 14 (1923) .................................................................. 16
Adam Augustyn,
  Smoot Hawley Tariff Act, *Encyclopedia Brittanica* ............................ 16
Gary Hawke,
  *The United States Tariff and Industrial Protection in the Late*
  *Nineteenth Century*,
  28 Econ. Hist. Rev. 84 (1975) ............................................................. 15
Oscar Underwood,
  *The Tariff As a Factor in American Foreign Trade*,
  1 Foreign Affairs 29 (1923) ................................................................. 15

## AUTHORITY TO FILE[1]

The Court has previously authorized all timely *amicus curiae* briefs.

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil rights organization and public-interest law firm devoted to defending constitutional freedoms from the administrative state's depredations. Professor Philip Hamburger founded NCLA to challenge multiple constitutional defects in the modern administrative state through original litigation, *amicus curiae* briefs, and other advocacy.

The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as jury trial, due process of law, and the right to have laws made by the nation's elected lawmakers through constitutionally prescribed channels (*i.e.*, the right to self-government). These selfsame civil rights are also very contemporary—and in dire need of renewed vindication—precisely because Congress, the President, federal agencies, and even sometimes the Judiciary, have neglected them for so long.

---

[1] No person other than *amicus curiae* and its counsel assisted with or made a monetary contribution for preparing or submitting this brief.

1

NCLA aims to defend civil liberties—primarily by asserting constitutional constraints on the administrative state. Although the American People still enjoy the shell of their Republic, there has developed within it a very different sort of government—a type, in fact, that the Constitution was designed to prevent. This unconstitutional state within the Constitution's United States is the focus of NCLA's concern.

Additionally, NCLA serves as counsel of record for *Emily Ley Paper, Inc. v. Trump*, a case recently transferred to the U.S. Court of International Trade that also challenges these tariffs. We have great interest in this case because the decision in *V.O.S. Selections v. Trump* potentially affects our clients' interests.

## INTRODUCTION

This Court should not merely affirm the decision by the Court of International Trade; rather, it should issue an even stronger opinion unreservedly holding that any tariffs imposed through the International Emergency Economic Powers Act (IEEPA) are unlawful, as it is not a statute that provides for tariffs. The Court could reach this conclusion by

determining, in the ***first*** instance, that the plain meaning of the statute does not provide for tariffs and that such a reading ends the matter.

This Court should still find that the term "regulate … importation" as used in IEEPA has a different meaning than how similar language in the Trading with the Enemy Act (TWEA) was construed by the Court of Customs and Patent Appeals, the predecessor to this Court, in *United States v. Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A. 1975) (*Yoshida II*). This is because, as the Court of International Trade noted, "Congress delegated narrower authority to the president through IEEPA than it delegated through TWEA." *V.O.S. Selections, Inc. v. Trump*, 772 F. Supp. 3d 1350, 1373 (Ct. Int'l Trade 2025). Such narrower authority cannot be construed to grant unlimited tariff authority, and because IEEPA does not purport to limit any authority it grants, any authority it delegates cannot be properly construed to include the authority to impose tariffs. *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) (under the interpretive principle of constitutional avoidance, courts presume Congress enacted a statute that was constitutional).

Even if this Court determines that delegating the authority to raise tariffs would not violate the nondelegation doctrine *and* that the

3

language used in IEEPA should be construed in the same way that similar language was construed in *Yoshida II*, in a different factual and precedential milieu, the Court should still rule in favor of the plaintiffs-appellees. It was essential to the reasoning in *Yoshida II* that, applying the schema introduced in Justice Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952), the challenged action by President Nixon was in the middle zone, 526 F.2d at 578, which *Youngstown* identified as the "zone of twilight," 343 U.S. at 637. By contrast the present action comes in the darkness of a starless night. The challenged action in this case is taken against IEEPA's design, because Congress has delegated authority to the President solely for the purpose of negotiating *lower* tariff rates. Accordingly, the executive action at issue comes at the nadir of the President's constitutional authority. The analysis in *Yoshida II* would not suffice–and this provides a ***second*** basis for affirming the Court of International Trade's decision.

Should this Court determine that delegating the authority to raise tariffs would not violate the nondelegation doctrine *and* that the language used in IEEPA should be construed in the same way that similar language was construed in *Yoshida II, and additionally* that

these actions are taken in the zone of twilight, then the Court should still rule in plaintiffs-appellees' favor because the tariffs imposed in this case are substantially different from the ones at issue in *Yoshida II* and the limitations present in the *Yoshida II* tariffs are absent in the ones at issue here. These factual differences in the underlying executive actions provide a ***third*** basis for affirming the decision by the Court of International Trade—albeit one that, as the Court of International Trade noted, only suffices to strike down these specific tariffs, not necessarily any other tariffs imposed under IEEPA.

In sum, for at least these three independent reasons, this Court should affirm the decision below. Because the first basis is the best construction of IEEPA's text, this Court should clarify that the imposition of any tariffs under IEEPA would be unlawful. Alternatively, based on the history of the delegation in the tariff context, this Court should hold that any tariffs purportedly imposed through IEEPA that exceed the background tariff rate created by other congressional legislation are unlawful. Finally, any ruling holding that the tariffs are unlawful and should be set aside should not be stayed pending rehearing nor pending a petition for a writ of certiorari.

5

# ARGUMENT

The Court of International Trade Panel correctly determined that the facts in this case are so divorced in nature from those in *Yoshida II* that they would exceed the President's constitutional authority even based on the reasoning used by the court in that case. This suffices to determine that the tariffs at issue in this case exceed the President's constitutional authority. But this Court may affirm based on any evidence present in the record; therefore, it can and should hold that the imposition of any tariffs through IEEPA would exceed the constitutional authority of the executive.

## I.    THE TERM "REGULATE ... IMPORTATION" USED IN IEEPA HAS A DIFFERENT MEANING THAN SIMILAR LANGUAGE IN THE TRADING WITH THE ENEMY ACT (TWEA)

This Court should affirm because the most logical way to construe the phrase "regulate ... importation" in IEEPA is different and narrower than the use of that phrase in the TWEA. This narrower construal does not permit the president to impose tariffs.

As the Panel explained at the Court of International Trade, whatever the language in IEEPA is designed to do, even on the most generous reading, it *cannot* mean that the words "regulate ... importation" grant the power generally to impose tariffs. 772

6

F. Supp. 3d at 1370–71. Instead, because there are no scope limitations in the same provision, § 1702(a)(1)(B) cannot grant the President tariff authority that is unlimited. *Id*. at 1370 ("at the very least [§ 1702(a)(1)(B)] does not authorize the President to impose unbounded tariffs") (emphasis added). Accordingly, *V.O.S. Selections* teaches that, even if "regulate … importation" *did* refer to tariffs as the underlying TWEA language did in *Yoshida*, that grant of tariff authority would be unconstitutional because it is unlimited in scope. As *V.O.S. Selections* explains, an unlimited grant of tariff power would not "comport with" the major questions doctrine nor the nondelegation doctrine. *See id*.

Hence, § 1702(a)(1)(B) does not authorize any tariffs at all, because courts are not constitutionally authorized to infer or to add the limits that would be necessary to render a grant of tariff authority constitutional. The major questions doctrine prevents courts from inferring limitations not clearly stated in the text. *See, e.g., Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (requiring "clear congressional authorization" for a claim of statutory authority). And the nondelegation doctrine uncontroversially prevents courts from relying on limitations not contained in the text. *V.O.S. Selections*, 772 F. Supp. 3d at 1358 (quoting

7

*Mistretta v. United States*, 488 U.S. 361, 372 (1989)) (courts can "uphold statutory delegations" only "as long as Congress 'lays down by legislative act an intelligible principle to which the person or body authorized to exercise that authority is directed to conform.'" (cleaned up)).

The logic of *V.O.S. Selections* goes further than the court below noticed. It establishes that, because IEEPA cannot be construed to grant unlimited tariff authority, and because IEEPA does not limit any authority that it grants, IEEPA cannot be construed to grant any tariff authority whatsoever. *See Clark*, 543 U.S. at 381 (under the interpretive principle of constitutional avoidance, Courts presume Congress enacted a statute that was constitutional).

This conclusion dovetails with the contextual arguments advanced at CIT—that the absence of limitations on tariff authority provides strong evidence that Congress did not understand "regulate … importation" to authorize any tariffs in the first place. IEEPA, as plaintiffs-appellees note, does not mention "tariffs" at all. So, the idea that IEEPA cannot be construed to allow tariffs, and must instead be construed according to its plain meaning, makes perfect sense—and is the most logical way to construe the statutory language.

Fundamentally, IEEPA provides for sanctions, asset freezes, and other forms of regulation—it does not provide for tariffs. The text of IEEPA does not use the word "tariffs," the Constitution treats tariffs differently, and tariff-related portions are found in other sections of the United States Code. Given all this, it is unsurprising that one federal district court has already decided that IEEPA does not authorize tariffs at all— so that a challenge to executive orders invoking IEEPA can be resolved by a federal district court. *See Learning Resources, Inc. v. Trump*, No. 25-1248 (RC), 2025 WL 1525376, *10 (May 29, 2025), *appeal filed*, No. 25-5202 (D.C. Cir. May 30, 2025), *pet. for cert. before judgment docketed*, No. 24-1287 (U.S. June 17, 2025).

Although this was not the exact analysis employed by the Court of International Trade, this resolution would be consistent with the Court of Customs and Patent Appeals decision in *Yoshida II*, and with the CIT Panel's *Yoshida II* analysis. *See V.O.S. Selections*, 772 F. Supp. 3d. at 1372–73. As CIT noted, Proclamation 4074 in *Yoshida II* expressly incorporated detailed statutory limits on the President's surcharge (tariff) authority. *Id.* at 1373. For example, the Proclamation imposed the surcharge only on "dutiable" articles under the TSUS, the predecessor to

the HTSUS, and limited total surcharge to 10%, capping the total duty on any article to the amount otherwise permitted by the TSUS. *Yoshida II*, 526 F.2d at 567–68. The court in *Yoshida II* found that this incorporation of statutory limits provided the necessary limitations on the surcharge authority the President claimed. *Id.* at 574, 578. *See also V.O.S. Selections*, 772 F. Supp. 3d at 1372–73 (discussing *Yoshida II*). Because no such necessary limitations exist here, and because, were the courts to accept the defendants-appellants' argument, no such limitations can be read into the IEEPA statute, there is no way to construe IEEPA's text that is simultaneously constitutionally permissible and that permits the executive to impose tariffs.

## II. THE HISTORY OF TARIFF POLICY MAKES CLEAR THAT, WHEN THE PRESIDENT PURPORTS TO USE IEEPA TO IMPOSE TARIFFS ABOVE THE BACKGROUND LEVEL APPROVED BY CONGRESS, HE ACTS AT THE NADIR OF HIS CONSTITUTIONAL AUTHORITY

*Yoshida II* teaches that we should apply the *Youngstown* framework to determine whether the imposition of tariffs by executive order is lawful. As defendants-appellants emphasize at great length, in *Yoshida II*, the predecessor to this Court considered Proclamation 4074, an act by President Nixon that suspended executive actions that had lowered some tariff rates beyond the background tariff rate approved by

Congress through the Tariff Schedules of the United States (TSUS) and other statutory authorities. Although the Customs Court, the predecessor court to the Court of International Trade, held that Proclamation 4074 was not authorized by statute and therefore not constitutionally permissible, *Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155, 1175–76 (Cust. Ct. 1974), the Court of Customs and Patent Appeals held otherwise, finding that the emergency invoked sufficed to permit a limited, five-month suspension of the previously negotiated rate cuts, considering that those cuts were reasonably related to resolving the temporary emergency that the President had identified. *See Yoshida II*, 526 F.2d at 584.

Decisions issued by the Supreme Court since 1974 establish that *Yoshida II*'s method of interpreting statutes is no longer valid. *See Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) (citations omitted) (if the U.S. Supreme Court's subsequent "mode of analysis" is "irreconcilable" with a lower court opinion, that lower court opinion is "no longer viable" as binding precedent).[2] But even if this Court assumes that

---

[2] To reach its conclusion that the TWEA permitted President Nixon's surcharge, the court construed statutory silence as a grant of executive power. It first stated that "nothing in the TWEA or in its

the methodology and conclusion in *Yoshida II* remain valid, this Court should still affirm the decision of the CIT panel in this case.

There is an essential difference between the facts in this case and the facts in *Yoshida II*. In that case, it was essential to the opinion that Proclamation 4074 was very limited—specifically, that it suspended only other executive actions that had lowered tariff rates from their background HTSUS levels. 526 F.2d at 567–68. Because Congress had not authorized the suspension at issue in 4074, nor expressly disavowed it, and because the action was taken in an area where Congress had traditionally acquiesced to presidential efforts to lower tariff rates, the court in *Yoshida II* determined that, applying the *Youngstown* framework, the Executive acted in the zone of twilight. *Id.*; *see also Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Had Congress

---

history … specifically either authorizes or prohibits the imposition of a surcharge." 526 F.2d at 572–73. It construed this indeterminate language in the President's favor, stating that "regulate" "can" include imposing duties. *Id*. at 575. The court then noted that the TWEA legislative history did not "indicate[] an intent to prohibit" the President from imposing tariffs. *Id*. at 576. This flawed method of statutory construction is no longer used. *Loper Bright v. Raimondo* does not permit a court to construe silence or ambiguity as a grant of authority from Congress. 603 U.S. 369, 400 (2024); *see also McLaughlin Chiropractic Assocs. v. McKesson Corp.*, 145 S.Ct. 2006, 2015 (2025) (no deference is "default rule").

12

expressly authorized a suspension, the Executive would have been acting at the apex of his power. However, had Congress disavowed any suspension, President Nixon would have been acting at the nadir of his constitutional powers. Because *Yoshida II* was already a close call and narrowly decided, had President Nixon been acting at the nadir of his powers rather than in the zone of twilight, the Court of Appeals would doubtless have affirmed the Court of Customs' initial opinion in *Yoshida II*.[3]

Defendants-appellants insist that this case is similar, and that here the President is similarly acting in the zone of twilight. Not so. A close review of the historical record makes it clear that when President Trump used IEEPA to impose tariff rates higher than the background levels set by Congress, he was acting at the nadir of his constitutional authority.

## A. The History of Tariff Policy Indicates That the Authority Delegated to the President Is to Lower Tariff Rates, Not to Raise Them Beyond the Rates Set by Congress

For most of the early history of the United States, tariffs were a primary source of revenue for the government. This meant that tariff

---

[3] It should be noted that not only are these purported tariffs greater, more wide-ranging and more subject to revision than the Nixon tariffs, they have also already lasted longer than those tariffs.

rates were high, by the standards of the late 20th century. But it also provided a natural limit on tariff rates. Tariffs were set high enough to pay for government functions. If the tariff rates were set too high, imports would stop—and then there would be no revenue. So, politicians were heavily incentivized to maximize revenue from tariffs, which meant keeping rates below a maximum threshold.

During this period, it was uncontroversially agreed that the authority to set tariff rates and to negotiate tariff policy belonged to Congress. Article I, § 8 grants Congress the power to "lay and collect Taxes, Duties, Imposts and Excises" and to "regulate Commerce with foreign Nations." U.S. Const. art. I., § 8. Setting tariff policy was considered a core Congressional domain—it was, after all, how the government funded itself, because most forms of direct tax were too cumbersome to use. *Cf.* U.S. Const. art. I, § 9 (limiting direct taxation by tying it to a census for proper apportioning).

Then, in 1913, the 16th Amendment was ratified. Suddenly, the government had a new non-trade way to gather substantial revenue. The new income tax rapidly became the primary way the government funded itself, so tariffs were no longer needed to keep the government running.

14

But that also meant there was no longer a natural limit on the maximum tariff rate. If the government imposed a rate so punitive that it brought imports to a halt, that would, indeed, reduce revenue—but now the government had other means of paying its bills.

At first, tariff rates fell after the 16th Amendment was ratified because tariffs were no longer needed to fund the government. *See* Oscar Underwood, *The Tarriff As a Factor in American Foreign Trade*, 1 Foreign Affairs 29, 33 (1923) ("…under the comparatively low tariff rates of the customs act of 1913, recently repealed …"). In the 19th century, tariff rates had varied considerably but averaged between 40–50%. *Cf.* Gary Hawke, *The United States Tariff and Industrial Protection in the Late Nineteenth Century*, 28 Econ. Hist. Rev. 84 (1975) (recounting and explaining 19th century tariff policy). After the new income tax was ratified, the new Underwood Tariff, Pub. L. No. 63-16, 38 Stat. 114 (1913), lowered the tariff rate to around 20%—still high by modern standards, but low compared to what it had been. *Cf.* Underwood at 33. But because tariffs were no longer necessary for revenue, the upper bound on tariff rates no longer applied. In 1922, Congress restored tariff rates to their pre-Underwood levels through the Fordney-McCumber

tariffs. Pub. L. No. 67-318, 42 Stat. 858 (1922). *See* Abraham Berglund, *The Tariff Act of 1922*, 13 Am. Econ. Rev. 14, 17 (1923) ("the Congress which framed the act of 1922 aimed to restore the" 1909 rates.). Then, in 1930, the Smoot-Hawley tariffs further increased the tariff rate to almost 60%. Pub. L. No. 71-361, 46 Stat. 590 (1930). Adam Augustyn, Smoot Hawley Tariff Act, *Encyclopedia Brittanica*, https://www.brittanica.com/topic/Smoot-Hawley-Tariff-Act (last visited Jul. 8, 2025) ("Smoot-Hawley contributed to the early loss of confidence … [b]y raising the average tariff by some 20 percent [from the 1922 level of around 40%]").

The Smoot-Hawley tariffs meant to protect American industry. But the tariffs generated a backlash of protectionist measures around the world, and global trade plunged over the next five years by almost two-thirds. By 1935, there was widespread agreement that the Smoot-Hawley tariffs had caused more harm than good, and that industries reliant on exports had been badly damaged. The United States needed a way out.

Unfortunately, from a political-economy perspective, tariff rates proved easier to raise than to lower. Most business leaders and most politicians agreed that the rates should be lowered overall, but nobody

wanted to move first to lower rates for their specific industry. Paralyzed by first-mover problems, punitive tariff rates continued, causing economic problems for the United States. It seemed that there was no way to muster the political will to do what nearly everyone agreed made the most sense.

Secretary of State Cordell Hull devised a new strategy. In 1934, Hull helped shepherd through Congress the Reciprocal Trade Agreements Act of 1934 (RTAA), Pub. L. No. 73-316, 48 Stat. 943 (1934). Under the RTAA, while Congress retained the constitutional power to set the tariff schedule by law, the law delegated the president authority to negotiate bilateral trade agreements with other countries that would lower tariff rates below the congressional baseline. These new, lowered tariffs could be ratified through a simple majority, as opposed to the supermajority required for a treaty.

Secretary Hull reasoned that, because the president represented a national constituency, he would be less partial to specific local regional constituencies and to regional industries. So, the president could negotiate drops in tariff rates that would be politically infeasible for Congress to pursue. Congress could not get through a bill lowering tariff

17

rates directly—even if it thought it should in the abstract—because of strident opposition from politicians representing affected industries. But Congress *could* get through a bill *delegating* that authority to the president.

The RTAA's approach led to a wave of trade liberalization. By the end of World War II, the average U.S. tariff rate fell from almost 60% under Smoot-Hawley to less than 30%, even though Congress had not formally changed the tariff schedule. In 1947, the underlying structure of the RTAA led to the General Agreement on Tariffs and Trade (GATT), the precursor to the World Trade Organization (WTO). The next several decades saw dozens of treaties and congressional-executive agreements lowering rates still further. These actions, approved by Congress, continue to reflect the congressional will to keep tariff rates low.

The Executive has been negotiating *lower* rates through its delegated authority now for over 90 years. But from the beginning this delegation helped Congress to *lower* tariff rates, not to raise them. So, if the president uses his delegated authority to *lower* rates, he acts in a way authorized by Congress and thus at the apex of his constitutional authority. However, if the president *raises* rates above the rates set by

18

Congress in the HTSUS and other relevant laws, he defies the will of Congress and operates at the nadir of his constitutional authority.

When the president acts in any other way—as, for example, *Yoshida II* teaches that President Nixon did when he temporarily suspended lower rates that the Executive had previously negotiated—the president acts in the twilight zone of intermediate constitutional authority. It is only when the president takes actions in this twilight zone that the reasoning in *Yoshida II* might apply. It does not apply when Congress is not silent—such as when the president acts to raise tariff rates above maximum levels previously set by Congress.

## B. The Executive Orders Challenged Here Do Not Include the Limits Essential to the Opinion in *Yoshida II*

In this case, the facts differ dramatically from the facts at issue in *Yoshida II*. Here, the president has taken actions that raise tariffs above their HTSUS rates and has not included any of the limiting language so essential to the opinion in *Yoshida II*.[4] In so doing, President Trump is

---

[4] In *Yoshida*, the court held that Congress had been silent on whether President Nixon could take this act. 526 F.2d at 578, 582. So, the court applied *Youngstown* and considered the specific facts of Proclamation 4074. Although it urged that its resulting opinion be read narrowly it affirmed that the language in the TWEA would permit a temporary, short-term emergency tariff—circumscribed as President Nixon did in 4074 and limited to the short duration of the emergency. *Id.* at 584.

*not* acting—as the Court of Customs and Patent Appeals said that President Nixon did—in the intermediate twilight zone of Executive authority. *Yoshida II*, 526 F.2d at 578. Instead, President Trump is acting against the will of Congress as expressed in statute, so he is acting at the nadir of his constitutional powers.

In other words, the issue here is whether "regulate … importation" as used in IEEPA, 50 U.S.C. § 1702(a)(1), (even assuming that this means the same thing it meant in the TWEA) should be understood to permit *raising tariff rates above the background level imposed by Congress*. This is why *Yoshida II* differs from this case—because unlike in *Yoshida II*, here the challenged executive orders do not acknowledge any limitations on the president's tariff authority and are exercised at the nadir of his powers. *See* 772 F. Supp. 3d at 1373 ("Importantly, President Trump's tariffs do not include the limitations that the court in *Yoshida II* relied upon in upholding President Nixon's actions under TWEA.").

Ruling in favor of the defendants-appellants in this case would *not* be an application of *Yoshida II*. It would instead represent a dramatic, unprecedented extension of existing law, stretching the reasoning of a case designed "[to rest on a narrow decision]" beyond the breaking point

and ignoring the constitutional limits that *Yoshida II* placed on unilateral executive action in the tariff context. As the historical context makes abundantly clear, any presidential action that uses IEEPA to raise tariffs beyond the background rate already established by Congress is unlawful.

**III.    HOLDING THAT IEEPA DOES NOT PERMIT TARIFFS IS CONSISTENT WITH THE COURT OF INTERNATIONAL TRADE'S DECISION BELOW**

This Court may affirm based on any evidence present in the record. *See Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1368 (Fed. Cir. 2003). While the Court of International Trade applied the reasoning in *Yoshida II* and ruled that, even on the *Yoshida II* test, the challenged executive orders are unlawful, this Court can clarify that *any* tariffs imposed through IEEPA (or, at least, any tariffs above the background rate set by Congress) are unlawful.

This conclusion would still be consistent with the CIT opinion. The CIT panel struck down the reciprocal tariffs because the tariff threats here have lasted longer than Proclamation 4074, the threatened and imposed tariffs are much broader than 4074, and the IEEPA grants less presidential authority than the TWEA. 772 F. Supp. 3d at 1373–76.

21

Holding that IEEPA generally cannot be reasonably construed to delegate the power to impose tariffs (or, at least, that no construal permits the president to impose tariff rates above the last rates approved by Congress) aligns with this opinion. After all, *if* the test in *Yoshida II* did apply here as it did to Proclamation 4074, then the Court of International Trade would still be correct, for the reasons articulated in the court's opinion. Holding that the tariffs are unlawful for other reasons affirms that outcome on an alternate basis—but it does not countermand or conflict with that opinion, because the CIT panel's application of the test would still be accurate if that test applied.

Defendants-appellants argue that the CIT panel adopted an extreme position that would constrain executive power necessary for the discharge of American foreign policy. As the above analysis makes clear, this is just not accurate. Indeed, the CIT panel chose not to adopt at least three different, more comprehensive positions.

***First***, the CIT panel could have held that IEEPA simply does not generally confer the power to impose tariffs, as multiple plaintiffs urged and as the nearly 50-year long silent history of IEEPA and tariffs

indicates.[5] If CIT had so held, it would not have even needed to consider the test in *Yoshida II*, because it would have held that IEEPA does not confer the same powers that TWEA conferred. The CIT panel sidestepped this question and applied the test from *Yoshida II* as if the powers conferred by IEEPA were substantially similar. But this Court can hold that the two statutes confer different powers—or even that IEEPA confers no tariff authority at all—and still reach a conclusion consistent with the opinion below.

Even if this Court does not agree with the logic of this construal, this Court can still affirm for a ***second*** reason: the president's challenged orders in this case are so much more expansive than the acts at issue in Proclamation 4074. The challenged executive orders here are not limited in the way that President Nixon's were and these executive orders violate the purpose of the initial delegation by Congress of executive authority to *lower* tariffs. So, this Court could conclude that—unlike in *Yoshida II*—this is not a case where the Executive is operating within the zone of twilight, but is rather a case where Executive action is at its

---

[5] Indeed, the court below acknowledges as much, noting that "Congress Delegated Narrower Authority to the President Through IEEPA than It Delegated Through TWEA." 772 F. Supp. 3d at 1373.

constitutional nadir. These executive orders—and any executive orders that used IEEPA to raise tariff rates above the levels set by Congress—are thus unlawful.

A *third* possible resolution for this case was also advanced substantively by the CIT panel. Namely, even applying the test in *Yoshida II*, these executive orders are unconstitutional because they lack the limiting factual details that were essential to the court's opinion in *Yoshida II*.

Finally, the Government has chosen this forum repeatedly, including by moving to transfer *Emily Ley Paper Inc. v. Trump* from the U.S. District Court for the Northern District of Florida to the U.S. Court of International Trade. *See* 1:25-cv-00096 (Ct. Int'l Trade). NCLA represents the plaintiffs in that case. It likely did so because of *Yoshida II*. If the government loses this appeal—as it should under plain text, history and every other principle of judicial review of statutes—no stay should be granted by this Court pending rehearing nor pending a petition for a writ of *certiorari*. Millions of American citizens and businesses are being unlawfully taxed by the Executive's unilateral action with no law being passed to authorize doing so. After the Court chosen by the

24

government strikes down these modern "tariffs of abomination," the government should not be rescued by the "nationwide stays" it has so vociferously railed against.

## CONCLUSION

For the reasons given above, defendants-appellants have failed to show that the CIT panel erred in ruling that the challenged actions exceeded the president's constitutional authority. Several independent arguments lead to the inexorable conclusion that the challenged executive orders are unlawful. This Court should affirm the decision of the Court of International Trade and should take the further step of holding that any tariffs imposed through IEEPA exceed the president's constitutional authority and are unlawful.

DATED: July 8, 2025                 Respectfully submitted,

/s/ *Andrew J. Morris*
Andrew J. Morris
John J. Vecchione
New Civil Liberties Alliance
4250 N. Fairfax Drive
Suite 300
Arlington, VA 22203
(202) 869-5210
andrew.morris@ncla.legal

*Counsel for Amicus Curiae*

25

FORM 19. Certificate of Compliance with Type-Volume Limitations                    Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 25-1812, 25-1813

**Short Case Caption:** V.O.S. Selections, Inc. v. Trump

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __5,108__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 07/08/2025        Signature: /s/ Andrew J. Morris

Name: Andrew J. Morris

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

*/s/ Andrew J. Morris*
Andrew J. Morris