Nos. 25-1812, 25-1813
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT
_____

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC,
dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION
CYCLING LLC,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, PETE R.
FLORES, Acting Commissioner for United States Customs and Border
Protection, in his official capacity as Acting Commissioner of the United States
Customs and Border Protection, JAMIESON GREER, in his official capacity as
United States Trade Representative, OFFICE OF THE UNITED STATES
TRADE REPRESENTATIVE, HOWARD LUTNICK, in his official capacity
as Secretary of Commerce, UNITED STATES CUSTOMS AND BOARD
PROTECTION,

Defendants-Appellants.
_____

STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO,
STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF
ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF
NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF
VERMONT,

Plaintiffs-Appellees,

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security,
in her official capacity as Secretary of the Department of Homeland Security,
UNITED STATES CUSTOMS AND BORDER PROTECTION, PETE R.
FLORES, Acting Commissioner for United States Customs and Border
Protection, in his official capacity as Acting Commissioner for U.S. Customs
and Border Protection, UNITED STATES,

Defendants-Appellants.

—————————————

Appeals from the United States Court of International Trade in
Nos. 1:25-cv-00066-GSK-TMR-JAR and 1:25-cv-00077-GSK-TMR-JAR,
Judge Gary S. Katzmann, Judge Timothy M. Reif,
and Senior Judge Jane A. Restani

—————————————

## STATES PLAINTIFFS-APPELLEES' BRIEF

—————————————

DAN RAYFIELD  #064790
Attorney General of Oregon
BENJAMIN GUTMAN  #160599
Solicitor General
1162 Court St. NE
Salem, OR 97301-4096
Telephone:  (503) 378-4402
benjamin.gutman@doj.oregon.gov

Attorneys for State of Oregon

(Additional counsel listed on signature page)

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2025-1812, 2025-1813 |
| **Short Case Caption** | V.O.S. Selections, Inc. v. Trump |
| **Filing Party/Entity** | The Plaintiff States in Case No. 2025-1813 |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/08/2025

Signature: /s/ Benjamin Gutman

Name: Benjamin Gutman

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| State of Oregon | | |
| State of Arizona | | |
| State of Colorado | | |
| State of Connecticut | | |
| State of Delaware | | |
| State of Illinois | | |
| State of Maine | | |
| State of Minnesota | | |
| State of Nevada | | |
| State of New Mexico | | |
| State of New York | | |

☑ Additional pages attached

**Form 9 – Certificate of Interest**

1. <u>Additional Represented Entities</u>:

     State of Vermont

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST

STATEMENT OF RELATED CASES

INTRODUCTION .............................................................................................1

STATEMENT OF THE CASE ..........................................................................2

A.    IEEPA authorizes the President to "regulate … importation or exportation" to "deal with an unusual and extraordinary threat." ..........................................................................................2

B.    The President invoked IEEPA to impose sweeping tariffs on imports, citing drug trafficking and trade deficits. .........................4

C.    The CIT held that IEEPA did not authorize the tariffs. ..................5

SUMMARY OF ARGUMENT ..........................................................................7

ARGUMENT ...................................................................................................10

A.    The reciprocal tariffs are invalid because they exceed Section 122's limits. ......................................................................10

1.    The CIT correctly held that IEEPA does not authorize unlimited tariffs that exceed what Section 122 allows. ...... 11

a.    The major questions doctrine counsels against reading IEEPA to delegate the sweeping tariff authority that the President claims. ......................... 12

b.    Reading IEEPA to authorize unlimited tariffs would raise a significant nondelegation question ................................................................. 18

c.    *Yoshida* confirms that IEEPA does not delegate power to exceed Section 122's limits ...................... 20

d.    The reciprocal tariffs exceed Section 122's limits. ..................................................................... 23

2.    The trade deficit is not an "unusual and extraordinary"

threat. ................................................................................... 25

    B.    The trafficking tariffs are invalid because they do not "deal with" the fentanyl crisis. .................................................. 29

    C.    In the alternative, IEEPA does not authorize the President to impose tariffs at all. ........................................................ 32

        1.    Textually, authority to "regulate … importation or exportation" is not authority to impose tariffs. .................... 32

            a.    The term "regulate" by itself does not imply the power to tax. ............................................................ 33

            b.    Context confirms that "regulate" in IEEPA does not encompass authority to impose tariffs. .............. 38

            c.    Other tariff statutes further undermine defendants' reading of "regulate" in IEEPA to permit tariffs. ............................................................ 40

        2.    Legislative history does not suggest that Congress intended to delegate tariff authority in IEEPA. .................. 43

            a.    Congress enacted IEEPA to rein in the use of emergency powers in peacetime. .............................. 43

            b.    Defendants misplace their reliance on *Yoshida* ........ 47

    D.    The CIT did not abuse its discretion by issuing a permanent injunction against the unlawful tariffs. ......................................... 51

        1.    The court adequately considered the equitable considerations relevant to an injunction. ........................... 52

        2.    The scope of the injunction entered by the CIT is appropriate. ....................................................................... 56

CONCLUSION ................................................................................. 60

STATEMENT OF CONSENT

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
594 U.S. 758 (2021) ................................................................... 12, 13, 16

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946) ................................................................................19

*Am. Signature, Inc. v. United States*,
598 F.3d 816 (Fed. Cir. 2010) ......................................................... 52, 53

*Biden v. Nebraska*,
600 U.S. 477 (2023) ...................................................... 13, 15, 16, 17, 50

*Butterbaugh v. Dep't of Justice*,
336 F.3d 1332 (Fed. Cir. 2003) ..............................................................50

*Canadian Lumber Trade All. v. United States*,
517 F.3d 1319 (Fed. Cir. 2008) ..............................................................58

*City of Grants Pass v. Johnson*,
603 U.S. 520 (2024) ...............................................................................27

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ......................................................................... 31, 32

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. __ (June 20, 2025) ....................................................................58

*Diginet, Inc. v. W. Union ATS, Inc.*,
958 F.2d 1388 (7th Cir. 1992) .................................................................34

*El-Shifa Pharm. Indus. Co. v. United States*,
607 F.3d 836 (D.C. Cir. 2010) ................................................................28

*FCC v. Consumers' Research*,
606 U.S. __ (June 27, 2025) ................................................................1, 20

*FEC v. Akins*,
524 U.S. 11 (1998) .................................................................................59

*Federal Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976) ......................................................................... 35, 36

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517 (1994) ...............................................................................48

iii

*Gen. Dynamics Land Sys., Inc. v. Cline*,
  540 U.S. 581 (2004) .................................................................48

*Georgia v. President of the U.S.*,
  46 F.4th 1283 (11th Cir. 2022).................................................16

*Gibbons v. Ogden*,
  22 U.S. (9 Wheat) 1 (1824) ............................................. 32, 34

*Janus v. AFSCME Council 31*,
  585 U.S. 878 (2018) .................................................................49

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ........................................................ 18, 38

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022)....................................................15

*Lackey v. Stinnie*,
  145 S. Ct. 659 (2025) ...................................................... 37, 39

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016).....................................................52

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024) .................................................................28

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022)...................................................15

*Maple Leaf Fish Co. v. United States*,
  762 F.2d 86 (Fed. Cir. 1985)....................................................28

*Mayes v. Biden*,
  67 F.4th 921 (9th Cir. 2023),
  89 F.4th 1186 (9th Cir 2023)....................................................16

*McLaughlin Chiropractic Assoc., Inc. v. McKesson Corp.*,
  606 US __ (slip op. 13) (June 20, 2025) ..................................27

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
  595 U.S. 109 (2022) ................................................. 12, 13, 14

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) .................................................................18

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024).......................................................16

iv

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ...................................................................................53

*Pittsburgh & Lake Erie R. Co. v. Ry. Labor Executives' Ass'n*,
    491 U.S. 490 (1989) ...................................................................................22

*Rexnord Indus., LLC v. Kappos*,
    705 F.3d 1347 (Fed. Cir. 2013)..............................................................25

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997) ...................................................................................48

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013)..................................................................53

*Schneidewind v. ANR Pipeline Co.*,
    485 U.S. 293 (1988) ...................................................................................51

*Selia Law LLC v. CFPB*,
    591 U.S. 197 (2020) ...................................................................................15

*Trump v. CASA, Inc.*,
    606 U.S. __ (June 27, 2025).............................................................. 56, 57

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ...................................................................................49

*United States v. Cleveland Indians Baseball Co.*,
    532 U.S. 200 (2001) ...................................................................................48

*United States v. Menasche*,
    348 U.S. 528 (1955) ...................................................................................30

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975)................. 8, 20, 21, 22, 28, 47, 49, 50, 51

*Utility Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ......................................................................... 12, 14

*Van Loon v. Dep't of the Treasury*,
    122 F.4th 549 (5th Cir. 2024)...................................................................31

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ......................................................................... 13, 15

*Yates v. United States*,
    574 U.S. 528 (2015) ...................................................................................49

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ...................................................................................17

*Zenith Elecs. Corp. v. Exzec, Inc.*,
   182 F.3d 1340 (Fed Cir. 1999) .................................................................23

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
   566 U.S. 189 (2012) ..............................................................................28

## Statutes & Constitutional Provisions

12 U.S.C. § 5491(a) ...........................................................................37

15 U.S.C. § 78k(a)(2)..........................................................................37

16 U.S.C. § 1540(f)............................................................................34

16 U.S.C. § 460bbb-9(a).....................................................................34

19 U.S.C. § 1338(a) ...........................................................................25

19 U.S.C. § 1338(d) ...........................................................................25

19 U.S.C. § 1338(g) ...........................................................................25

19 U.S.C. § 1508...............................................................................39

19 U.S.C. § 1671(a) .............................................................. 35, 41, 42

19 U.S.C. § 1671d(a)(1).......................................................................42

19 U.S.C. § 1673................................................................. 35, 41, 42

19 U.S.C. § 1675(a) ...........................................................................42

19 U.S.C. § 1862...............................................................................55

19 U.S.C. § 1862(a) ...........................................................................35

19 U.S.C. § 2132...............................................................................49

19 U.S.C. § 2132(1) ...........................................................................24

19 U.S.C. § 2132(a) .........................................................................3, 10

19 U.S.C. § 2132(a)(1).........................................................................23

19 U.S.C. § 2252(e) ...........................................................................42

19 U.S.C. § 2253(a)(3)(A) ........................................................... 35, 48

19 U.S.C. § 2411(c)(1)(B) ........................................................... 35, 48

19 U.S.C. § 2417...............................................................................42

19 U.S.C. §§ 1351–54 (2018)..............................................................40

19 U.S.C. §§ 2111–2112, 2191 ........................................................... 41

19 U.S.C. §§ 2251–55 ......................................................................... 41

19 U.S.C. §§ 2411–20 ......................................................................... 41

19 U.S.C. ch. 22 ................................................................................. 41

19 U.S.C. ch. 26 ................................................................................. 41

19 U.S.C. ch. 29 ................................................................................. 41

20 U.S.C. § 1098bb(a)(1) .................................................................... 16

21 U.S.C. § 360bbb-2(a) ..................................................................... 37

42 U.S.C. § 264(a) .............................................................................. 16

49 U.S.C. § 40117(j) ........................................................................... 34

50 U.S.C. § 1701 .......................................................................... 2, 6, 25

50 U.S.C. § 1701(a) .............................................................................. 2

50 U.S.C. § 1701(b) .................................................................. 2, 29, 30

50 U.S.C. § 1702(a) .............................................................................. 3

50 U.S.C. § 1702(a)(1)(B) .............................................................. 33, 38

50 U.S.C. § 1702(a)(2) ....................................................................... 39

50 U.S.C. § 1702(b) ........................................................................... 19

50 U.S.C. § 1702(c) ........................................................................... 27

50 U.S.C. § 4305 ................................................................................ 43

50 U.S.C. § 5(b) ................................................................................. 43

50 U.S.C. §§ 1-4 ................................................................................ 43

50 U.S.C. §§ 1601 *et seq* ................................................................. 45

U.S. Const., Art. I, § 8 ................................................................... 16, 34

U.S. Const., Art. I, § 8, cl. 1 .................................................... 1, 19, 59

U.S. Const., Art. I, § 9 ........................................................................ 38

Benjamin A. Coates,
  *The Secret Life of Statutes: A Century of the Trading with the Enemy Act*,
  1 Modern American History 151 (2018)....................................................45

*Black's Law Dictionary* (12th ed. 2024) ..........................................................33

*Black's Law Dictionary* (4th ed. 1968)...............................................................33

Daniel K. Tarullo,
  *Law and Politics in Twentieth Century Tariff History*, 34 UCLA L. Rev.
  285 (1986)..............................................................................................40

Emergency Banking Relief Act,
  Pub. L. No. 73-1, § 2, 48 Stat. 1 (1933) ...................................................43

Exec. Order No. 14,059, 86 Fed. Reg. 71,549 (Dec. 17, 2021) .........................30

Exec. Order No. 14,193, 90 Fed. Reg. 9113 (Feb. 1, 2025)................................4

Exec. Order No. 14,194, 90 Fed. Reg. 9117 (Feb. 1, 2025)................................4

Exec. Order No. 14,195, 90 Fed. Reg. 9121 (Feb. 1, 2025)................................4

Exec. Order No. 14,257, 90 Fed. Reg. 15,041 (Apr. 2, 2025)..... 4, 10, 23, 24, 27

Exec. Order No. 14,266, 90 Fed. Reg. 15,625, 15,626 (Apr. 9, 2025) ..............24

Exec. Order No. 11,387, 33 Fed. Reg. 47 (1968)..............................................45

Exec. Order, *Extending the Modification of the Reciprocal Tariff Rates* (July 7,
  2025).......................................................................................................24

First War Powers Act of 1941, Pub. L. No. 77-593, § 301, 55 Stat. 839...........44

H.R. 116-764 (2019)...........................................................................................56

H.R. 119-735 (2025)...........................................................................................56

H.R. Rep. No. 77-1507 (1941) ...........................................................................44

H.R. Rep. No. 95-459 (1977) ..................................................... 23, 26, 46, 47, 48

Legislative History of the Wartime or National Emergencies Presidential
  Powers P.L. 95-223 (1977).......................................................................46

Office of Foreign Assets Control,
  *Venezuela-Related Sanctions*, at https://ofac.treasury.gov/sanctions-
  programs-and-country-information/venezuela-related-sanctions ............33

Proclamation 2914, 15 Fed. Reg. 9029 (1950)...................................................45

Pub. L. No. 95-223, § 101, 91 Stat. 1625 (1977) ...............................................45

Reenactment of Overman and Trading with the Enemy Acts: Senate Debate,
    87 Cong. Rec. 9837–38, 9842, 9845 (1941) ...........................................44

Trade Act of 1974,
    Pub. L. No. 93-618, § 122, 88 Stat. 1987 (codified at 19 U.S.C. § 2132)
    .................................................................................................................21

*Webster's Third New International Dictionary* 1913 (1961) .............................33

*Webster's Third New International Dictionary* 23 (unabridged ed. 2002) . 17, 26

White House Office of Trade and Manufacturing Policy,
    *The United States Reciprocal Trade Act: Estimated Job & Trade Deficit
    Effects*, p. 16 (May 2019) ........................................................................56

## Rules

19 C.F.R. § 102.11 ..............................................................................................39

## STATEMENT OF RELATED CASES

No other appeal in or from the present civil action has previously been before this or any other appellate court. The States are not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

## STATES PLAINTIFFS-APPELLEES' BRIEF
_____

## INTRODUCTION

The Constitution assigns to Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises."  U.S. Const., Art. I, § 8, cl. 1.  Congress has delegated to the executive branch some authority to adjust the rate of tariffs in response to world events—including, in Section 122 of the Trade Act of 1974, authority to impose limited tariffs to deal with a large and serious trade deficit.  Those delegations are specific and bounded, reflecting that authority to impose tariffs "affect[s] the entire national economy" and so demands greater "guidance" from Congress than other delegations of authority.  *FCC v. Consumers' Research*, 606 U.S. __ (slip op. at 11) (June 27, 2025).

Defendants do not rely on those specific delegations here.  Instead, they claim that the International Emergency Economic Powers Act (IEEPA)—a statute that does not mention tariffs and that no other President has used to impose tariffs—delegates to the President the power to impose tariffs on any country, at any rate, for however long he likes, and regardless of express statutory limits in other tariff statutes like Section 122.  The President's chaotic assertion of that purported authority, which changed by the day and wreaked havoc on capital markets and the economy, illustrates both the breadth of

powers that the President claims and the danger of unlimited authority in this domain.

The Court of International Trade (CIT) correctly rejected defendants' interpretation of IEEPA, which would leave Congress a bit player in an area in which it has exclusive constitutional authority. IEEPA does not give the President unlimited tariff authority. Indeed, it does not authorize tariffs at all. But at a minimum it does not authorize tariffs that—like the ones at issue here—exceed the express limits that Congress set in more specific delegations of tariff authority like Section 122, or do not "deal with an unusual and extraordinary threat," as IEEPA requires. 50 U.S.C. § 1701. This Court should affirm the judgment of the CIT.

## STATEMENT OF THE CASE

### A. IEEPA authorizes the President to "regulate … importation or exportation" to "deal with an unusual and extraordinary threat."

IEEPA authorizes the President to take certain actions during a declared national emergency that arises from an "unusual and extraordinary" threat. 50 U.S.C. § 1701(a). The statute requires that those authorities be exercised "only" to "deal with" such a threat and not "for any other purpose." *Id*. § 1701(b). Among those authorities are the power to "regulate" the "importation or exportation" of "any property in which any foreign country or a national thereof has any interest":

2

(1) At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

* * *

(B) investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation or exportation of*, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, *any property in which any foreign country or a national thereof has any interest* by any person, or with respect to any property, subject to the jurisdiction of the United States;

*Id.* § 1702(a) (emphases added).

IEEPA does not mention "tariffs" or "duties." Other statutes, by contrast, expressly authorize the President to raise tariffs in defined circumstances. For example, Section 122 of the Trade Act of 1974, which Congress enacted shortly before IEEPA, authorizes the President to proclaim a "temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties" for up to 150 days to "deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a).

Until this year, no President ever used the authority provided by IEEPA to impose tariffs.

**B.**     **The President invoked IEEPA to impose sweeping tariffs on imports, citing drug trafficking and trade deficits.**

Earlier this year, the President invoked IEEPA to impose tariffs on most imports worldwide.  The tariffs generally fell into two categories.  First, the President imposed tariffs on most imports from Canada, Mexico, and China based on his declarations of emergencies regarding fentanyl trafficking, other crime, and—for Mexico and China only—immigration (the "trafficking tariffs").  Exec. Order No. 14,193, 90 Fed. Reg. 9113 (Feb. 1, 2025); Exec. Order No. 14,194, 90 Fed. Reg. 9117 (Feb. 1, 2025); Exec. Order No. 14,195, 90 Fed. Reg. 9121 (Feb. 1, 2025).  Second, he imposed tariffs worldwide, including additional tariffs on China, based on his conclusion that "U.S. trading partners' economic policies … suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits" (the "reciprocal tariffs").[1]  Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,041 (Apr. 2, 2025).

Over the past several months, the President suspended some tariffs, increased others, and modified the scope of the exceptions they allow.  *See*

---

[1] For clarity's sake, this brief uses the shorthand "reciprocal tariffs" to match defendants' brief.  Undisputed evidence in the record shows that the tariffs are not, in fact, reciprocal in the ordinary sense.  *See* Appx219–22 (Hines Decl.) (explaining the purported basis for the tariffs).

Appx10–15 (detailing history).  For example, the President imposed 25 percent tariffs on Canada and Mexico on February 1, 2025, but then two days later suspended those tariffs for four weeks.  Appx11–12.  The President threatened country-by-country reciprocal tariffs of up to 50 percent on April 2, 2025, but suspended them a week later, leaving only the worldwide 10 percent tariffs.  Appx13–14.  And for China, the combined tariffs snowballed from 10 percent (on February 1st) all the way up to 145 percent (on April 10th) and then decreased to 30 percent (on May 12th).  Appx14–15.  As of the time of the CIT's ruling, the orders subjected most imports from China to a 30 percent additional tariff rate, most imports from Canada and Mexico to a 25 percent additional tariff rate, and most imports from the rest of the world to a 10 percent additional tariff rate, with higher rates scheduled to take effect on July 9, 2025, and August 12, 2025.  Appx13–15 & n.2.  Shortly before this brief was filed, the President further delayed the higher rates until August 1, 2025.  Exec. Order, *Extending the Modification of the Reciprocal Tariff Rates* (July 7, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/07/extending-the-modification-of-the-reciprocal-tariff-rates/.

## C. The CIT held that IEEPA did not authorize the tariffs.

Plaintiffs are 12 States that both import products from overseas directly and purchase goods and supplies imported by others.  Appx22–23.  The States

sued, arguing that the tariffs were unlawful. A three-judge panel of the CIT unanimously granted summary judgment to the States, as well as to a group of businesses that had sued separately. Appx2. The court held that IEEPA did not authorize any of the tariffs that the President had imposed. Appx25.

First, the court held that the reciprocal tariffs were invalid because IEEPA does "not confer unlimited tariff authority," and in particular does not authorize tariffs that exceed the limits in Section 122. Appx29, 35. The court concluded that a finding that IEEPA authorizes "unlimited" tariffs would run afoul of both the nondelegation canon and the major questions doctrine. Appx28. The court also noted that in IEEPA Congress delegated narrower authority to deal with threats *not* addressed in non-emergency statutes. Appx34–35. Thus, the court held, the reciprocal tariffs, which were "imposed in response to a balance-of-payments deficit, must conform with the limits of Section 122" of the Trade Act of 1974, which they did not. Appx35.

Second, the court held that the trafficking tariffs were invalid because they do not "deal with" the identified threat of drug trafficking and other crime. Appx36 (quoting 50 U.S.C. § 1701(b)). The term "deal with" requires "a direct link between an act and the problem it purports to address." Appx44. But collecting tariffs on lawful imports has no direct link to stopping illegal drug

6

trafficking.  Appx45.  Nor is potential leverage in trade negotiations enough to satisfy the statutory requirement.  Appx45–46.

As relief, the court declared that the challenged executive orders are invalid, enjoined their operation, and gave the United States 10 days to issue "necessary administrative orders" to effectuate that relief.  Appx60–61.  The court explained that there was no basis for more narrowly tailored relief. Appx48.

## SUMMARY OF ARGUMENT

1. The CIT correctly held that IEEPA does not authorize the President to impose the reciprocal tariffs.  The power to "regulate … importation" does not include the power to exceed the limits Congress set in Section 122 for tariffs that address large and serious trade deficits.  The major questions doctrine counsels against interpreting a general provision like "regulate … importation" to include a newly discovered power to impose unlimited tariffs.  Defendants' reading of IEEPA as an unbounded delegation of Congress's tariffs authority to the President also raises serious separation-of-powers questions that should be avoided.

Legislative history reinforces that IEEPA does not authorize tariffs that exceed Section 122's limits.  Congress enacted IEEPA to rein in the broader emergency powers that Presidents had exercised under its predecessor, the

7

Trading With the Enemy Act (TWEA). The main TWEA decision on which defendants rely—*United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975)—declared that the President could not use TWEA to exceed the limits Congress enacted Section 122. Defendants ignore that part of *Yoshida* and offer no persuasive reason to construe IEEPA as granting broader powers than the *Yoshida* court interpreted TWEA to grant.

Although the CIT did not need to reach the issue, the reciprocal tariffs also violate IEEPA's statutory requirement that its powers be used only to deal with "unusual and extraordinary" threats. Trade deficits are neither. They are not "unusual," because—as the President said in imposing the tariffs—they have long been a persistent feature of the American economy. And they are not "extraordinary," because Congress specifically contemplated how to address them in Section 122. That provides an independent basis for this Court to affirm with respect to the reciprocal tariffs.

2. The CIT correctly held that the trafficking tariffs exceed IEEPA's authorization because they do not "deal with" the threat of cross-border drug trafficking and other crime. Congress limited use of IEEPA's powers to actions that "deal with" the identified foreign threat and expressly said that they could not be used "for any other purpose." The trafficking tariffs do not address the threats that the President identified. Defendants' contention that they generally

8

give the President leverage in negotiations with trading partners is not enough. The statute requires a more direct connection to the threat, not just the potential to be used as a collateral bargaining chip.

3.     In the alternative, this Court may affirm on the ground that IEEPA does not authorize tariffs at all.  Textually, the power to "regulate" is different from the power to tax.  Statutory context, Congress's consistent practices in other statutes that delegate limited tariff authority to the executive branch, and legislative history all reinforce the conclusion that IEEPA's use of the phrase "regulate … importation or exportation" does not include the power to impose tariffs.

4.     The CIT did not abuse its discretion in granting a permanent injunction.  The equities straightforwardly weigh in favor of stopping the government from exercising authority it does not have to continue inflicting irreparable harm on the plaintiffs.  And the complete-relief principle supports the relief granted here.  The States are harmed not only when they pay tariffs directly on imported goods but also when they pay higher prices to third parties who are subject to those tariffs.  The CIT properly exercised its discretion to remedy the latter form of harm by enjoining defendants from collecting the unlawful tariffs from anyone—especially in light of the Constitutional requirement that tariffs be "uniform" throughout the United States.

**ARGUMENT**

The President exceeded his authority in imposing tariffs under IEEPA. As explained below, (1) the reciprocal tariffs exceed the limits Congress set in Section 122 for tariffs that deal with trade deficits; (2) the trafficking tariffs do not "deal with" the threat of drug trafficking and other crime merely by creating leverage for negotiations with trade partners; and (3) in any event, IEEPA's authorization to "regulate … importation or exportation" does not empower the President to impose tariffs at all.

## A. The reciprocal tariffs are invalid because they exceed Section 122's limits.

The threat the President identified to justify the reciprocal tariffs is "large and persistent annual U.S. goods trade deficits." 90 Fed. Reg. at 15,041. But Congress gave the President specific—and limited—authority in Section 122 of the Trade Act of 1974 to impose tariffs to address that very threat.

Section 122 provides that "[w]henever fundamental international payment problems require special import measures to restrict imports … to deal with large and serious United States balance-of-payments deficits," the President "shall proclaim, for a period not exceeding 150 days (unless such period is extended by Act of Congress) … a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties." 19 U.S.C. § 2132(a). Thus, the statute directly addresses the President's authority to impose tariffs to

10

deal with "large and serious" trade deficits. *See* Appx34–35 (explaining why "balance-of-payments deficits" includes trade deficits). And it limits the tariffs to 15 percent and 150 days—limits that the President claimed the authority to ignore in imposing the reciprocal tariffs.

But nothing in IEEPA purports to override those limits. As the CIT held, even assuming that IEEPA authorizes tariffs at all, it does not "delegate an unbounded tariff authority to the President" and in particular does not authorize tariffs that exceed the express limits Congress set in Section 122. Appx25. That conclusion follows for either of two independent reasons. First, IEEPA's authorization to "regulate … importation" does not delegate to the President the power to impose the sort of unlimited tariffs at issue here. Second, trade deficits do not constitute an "unusual and extraordinary" threat when Congress enacted Section 122 to address that very situation.

### 1. The CIT correctly held that IEEPA does not authorize unlimited tariffs that exceed what Section 122 allows.

This Court may assume without deciding that IEEPA allows the President to impose *some* tariffs by authorizing him to "regulate … importation." Appx64 (noting that the CIT "did not reach" the question "whether IEEPA authorizes tariffs as a categorical matter"). But two well-settled principles of statutory construction—the major questions doctrine and constitutional avoidance—weigh heavily against reading that phrase to

11

authorize unlimited tariffs, including tariffs that exceed the express limits in Section 122. Precedent and legislative history confirm that conclusion.

### a. The major questions doctrine counsels against reading IEEPA to delegate the sweeping tariff authority that the President claims.

The major questions doctrine reflects the commonsense presumption that, if Congress intends to give the Executive authority to make decisions of "vast economic and political significance," it will express that intent clearly. *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quotation marks omitted); *see also Alabama Ass'n of Realtors v. Dep't of Health & Human Servs*., 594 U.S. 758, 764 (2021) (noting that the "sheer scope" of claimed authority is a reason for caution in interpreting a Congressional delegation of authority).

The President's invocation of IEEPA to impose the tariffs at issue here is much like other "almost unlimited" exercises of authority that the Supreme Court has disapproved based on the major questions doctrine. *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 126 (2022) (Gorsuch J., concurring). In those cases, as here, the Executive "claim[ed] to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy." *Utility Air Regul. Grp.*, 573 U.S. at 324 (cleaned up). Yet the history, breadth, and economic and political significance of the Executive's actions provided "reason to hesitate before concluding that Congress meant to

12

confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up). Thus, for example, in *Biden v. Nebraska*, 600 U.S. 477, 495 (2023), the Court held that Congress's delegation of authority to "modify" the laws governing student loan programs allowed only "modest" adjustments, not changes that would "transform" the laws. In *West Virginia*, the Court held that the EPA's authority to set emissions limits based on the "best system of emission reduction" did not include restructuring the Nation's overall mix of electricity generation. 597 U.S. at 734–35. In *National Federation of Independent Businesses*, the Court held that OSHA's authority to set workplace safety standards did not include authority to require COVID-19 vaccines or weekly tests. 595 U.S. at 120. And in *Alabama Association of Realtors*, the Court held that the Surgeon General's authority to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases" did not include the authority to impose an eviction moratorium in high-transmission areas. 594 U.S. at 763–65.

Here too, IEEPA's use of the word "regulate" is "a wafer-thin reed on which to rest" the sweeping authority that the President claims. *Alabama Ass'n of Realtors*, 594 U.S at 765. The U.S. imports more than $4 trillion of goods annually, representing 14 percent of the U.S. economy. Appx215 (Hines

13

Decl.). Under defendants' reading of IEEPA, Congress delegated to the President the unreviewable authority to impose tariffs of any amount for any length of time on all of that trade—and even to override the express limits Congress set in other delegations of tariff authority like Section 122. Whatever else might qualify as a decision of "vast economic and political significance," across-the-board taxes on large swathes of the economy fit the bill. Common sense suggests that Congress would not bury that vast power in the otherwise innocuous phrase "regulate … importation."

Reinforcing that conclusion is the fact that President Trump's use of IEEPA to impose or modify tariffs is unprecedented. *See Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 119 (finding it "telling that OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind"). Courts typically greet the announcement of a newly discovered power in an old statute with "a measure of skepticism." *Util. Air Regul. Grp.*, 573 U.S. at 324. This Court should be skeptical here: No other President has invoked IEEPA to impose any tariffs, let alone tariffs on almost all goods from every country in the world as an end run around statutory limits in more specific delegations of tariff authority. Because the "basic and consequential tradeoffs" inherent in the President's decision to use tariffs to reshape the American economy "are ones that Congress would likely have intended for

14

itself," the Executive must "point to clear congressional authorization" for its actions. *Biden v. Nebraska*, 600 U.S. at 506 (quoting *West Virginia*, 597 U.S. at 730). Defendants cannot do so.

Defendants do not dispute that the tariffs at issue here are at least as significant as the actions in *Biden v. Nebraska* or any of the other cases invalidating executive actions with breathtaking "economic and political significance." *West Virginia*, 597 U.S. at 721 (cleaned up). They instead argue that the concerns underlying the major questions doctrine "dissipate" for statutes that delegate authority to the President instead of an agency. App. Br. 43. But the doctrine—whether treated as a canon of statutory construction or just a commonsense inference about what Congress intended—applies equally regardless of whether the President acts directly or through an agency. After all, the Constitution vests the executive power—"all of it"—in the President. *Selia Law LLC v. CFPB*, 591 U.S. 197, 203 (2020). Delegations to the President's subordinates are just as much delegations to the President himself. The major questions doctrine therefore applies the same to delegations to the President as it does to delegations to executive agencies. *See Kentucky v. Biden*, 23 F.4th 585, 606–08 (6th Cir. 2022) (applying the major questions doctrine to the President); *Louisiana v. Biden*, 55 F.4th 1017, 1029 (5th Cir. 2022) (same); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295–96 (11th

15

Cir. 2022) (same); *see also Nebraska v. Su*, 121 F.4th 1, 19–20 (9th Cir. 2024) (Nelson, J., concurring) ("An implausible reading of a statute is no less implausible when that statute confers authority on the President versus an agency."). The only decision defendants cite that suggested a different conclusion, *Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023), was vacated, 89 F.4th 1186 (9th Cir 2023), as defendants correctly acknowledge.

Nor does the major questions doctrine lose force when the statute relates to the President's authority to conduct foreign policy—even in an emergency— or when the statute is not "narrow." App. Br. 44–45. *Biden v. Nebraska* applied the major questions doctrine to a statute that applied only in the event of "a war or other military operation or national emergency." 20 U.S.C. § 1098bb(a)(1). *Alabama Association of Realtors* applied the doctrine to an incredibly broad statute. 42 U.S.C. § 264(a) (authorizing the officer to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases").

Moreover, the Constitution grants authority to impose tariffs to Congress, not the President. U.S. Const., Art. I, § 8. Even if the President has authority over certain questions of foreign affairs, a President cannot shirk clear statutory limits arising from Congress' exclusive authority over a matter simply by declaring that the matter has foreign policy implications. *See Youngstown Sheet*

*& Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) (reasoning that however expansive the concept of "theater of war" the President as Commander in Chief did not have constitutional authority to take possession of private property). So even if the President seeks to impose tariffs to advance foreign-policy goals, he still must identify a delegation of authority to exercise powers constitutionally committed to Congress. *See id.* at 585 ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself.").

Defendants are wrong to claim that the CIT's holding "lacks any textual basis." App. Br. 36. Just like the statutory term "modify" in *Biden v. Nebraska* meant "modest" rather than transformational adjustments, 600 U.S. at 495, the term "regulate" connotes at most minor changes to the tariffs schedule but not unlimited authority to rewrite it. Indeed, defendants' cherry-picked dictionary definition for "regulate"—"adjust," *see* App. Br. 32–33—has precisely that connotation. *Webster's* explains that to adjust to something usually suggests "no significant alteration or modification but rather a bringing into a correspondence or harmony, prearranged or clearly possible but not quite achieved previously." *Webster's Third New International Dictionary* 23 (unabridged ed. 2002) (note on synonyms for "adapt"). If defendants were right that the power to "regulate … importation" includes the power to "adjust

imports," it would be textually plausible to construe that power to cover minor changes that are consistent with other delegated tariff authority like Section 122 but not to grant the expansive authority that defendants claim here.

### b. Reading IEEPA to authorize unlimited tariffs would raise a significant nondelegation question.

The doctrine of constitutional avoidance points the same way, because defendants' reading of IEEPA would raise significant constitutional problems that can be avoided by reading the statute more narrowly. "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). The alternative need not be "the most natural interpretation" of the statutory text as long as it is a "fairly possible" one. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012).

Defendants' reading of IEEPA raises "serious constitutional doubts" under the nondelegation doctrine. Article I of the Constitution assigns "[a]ll legislative Powers" to Congress, and that assignment of power "is a bar on its further delegation." *Consumers' Research*, slip op. at 10. Congress may "seek assistance" from the executive branch to "implement and apply the laws it has enacted—for example, by deciding on the details of their execution." *Id.* at 11

18

(cleaned up).  But Congress must "set out an 'intelligible principle' to guide what it has given the agency to do."  *Id.*  And "[t]he guidance needed is greater … when an agency action will affect the entire national economy than when it addresses a narrow, technical issue."  *Id.* (cleaned up).

Congress alone has constitutional authority to impose tariffs.  U.S. Const., Art. I. § 8, cl. 1.  But under President Trump's reading of IEEPA, Congress gave him the authority to rewrite the tariff schedules at his whim. Defendants assert that IEEPA sets forth adequate "boundaries of [the] delegated authority" because the President cannot invoke IEEPA for any purpose other than dealing with the stated national emergency and cannot regulate certain types of goods.  App. Br. 41 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).  But those are no boundaries.  According to defendants, the President can declare essentially any national emergency, a court cannot review whether the emergency qualifies as an "unusual and extraordinary threat" or whether the action "deal[s] with" that threat, App. Br. 58, and any action "deal[s] with" a threat if it gives the President any amount of negotiating leverage—which will almost always be the case, since any change in the status quo is likely to affect negotiations.  And the fact that IEEPA categorically exempts certain goods like donated medicine, *see* 50 U.S.C. § 1702(b), does not

constrain the President's discretion with respect to the vast array of goods to which IEEPA regulation may apply.

Defendants claim a power of nearly unlimited tariffs that would "affect the entire national economy." *Consumers' Research*, slip op. at 11. Constitutional avoidance provides a reason not to construe the statute that broadly. At a minimum, the need for intelligible principles counsels against reading IEEPA to allow the President to override the express limits Congress set in other statutes delegating tariff authority.

### c. *Yoshida* confirms that IEEPA does not delegate power to exceed Section 122's limits.

Nothing in IEEPA's legislative history suggests that Congress intended "regulate … importation" to provide a wholesale delegation of Congress's power to impose tariffs. On the contrary, the purpose of IEEPA was to rein in the expansive power that Presidents exercised under its predecessor, TWEA. And even TWEA would not have allowed the President to impose tariffs that exceed Section 122's limits, as the main decision on which defendants rely— *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975)—expressly stated.

In 1971, concerned about the weakening of the U.S. dollar, President Nixon proclaimed a national emergency with respect to the balance of payments with U.S. trading partners and imposed surcharges on almost all dutiable goods.

20

Proclamation 4074, "Imposition of Supplemental Duty for Balance of Payments Purposes," 36 Fed. Reg. 15,724 (1971). In doing so, President Nixon suspended prior proclamations containing concessions on the tariff rates for dutiable goods. *See id.* The surcharges lasted less than six months. *Yoshida*, 526 F.2d at 568–69. In his proclamation, President Nixon relied only on the Tariff Act of 1930 and the Trade Expansion Act of 1962; he did not refer to TWEA. *See* Proclamation 4074, 36 Fed. Reg. at 15,724. But when importers challenged the duties that they were required to pay, the federal government invoked TWEA to defend the surcharges, and the Court of Customs and Patent Appeals in *Yoshida* ultimately upheld the surcharges based on TWEA—which, like IEEPA, authorized the President to "regulate … importation" during an emergency—to impose a temporary surcharge on imports to address a balance-of-payments deficit. 526 F.2d at 584.

While that litigation was pending, at President Nixon's request Congress enacted Section 122, which expressly empowered the President to impose limited duties in response to balance-of-payments issues. *See* Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1987 (codified at 19 U.S.C. § 2132). *Yoshida* noted the enactment and observed that "a surcharge imposed after Jan. 3, 1975 must, of course, comply with the statute now governing such action." 526 F.2d at 582 n.33; *see also id.* at 578 ("Congress has said what may be done

21

with respect to foreseeable events in the Tariff Act, the TEA, and in the Trade Act of 1974 …."). In other words, Section 122, not TWEA, would govern balance-of-payments problems going forward.

*Yoshida* thus directly rejected defendants' core argument: that even after the enactment of more specific tariff statutes like Section 122, general authority to "regulate … importation or exportation" includes unlimited authority to impose tariffs of any amount for any length of time. That part of *Yoshida*, which defendants ignore, refutes their contention that Section 122 and IEEPA provide wholly independent sources of authority for tariffs and allow the President the "choice" to comply with whichever one he chooses. App. Br. 48. If (as defendants contend, App. Br. 35) Congress intended to codify *Yoshida* in IEEPA, it codified all of *Yoshida*—including the part making it clear that the President could *not* invoke the general authority to "regulate … importation" to supplant the rate and time limits set by Congress.

That conclusion does not depend on the proposition that Section 122 "displaces" IEEPA. App. Br. 49. Rather, it relies on the commonsense observation that, although Congress can enact overlapping sources of authority, normally it intends complementary statutes to work in harmony rather than at odds with one another. *See, e.g.*, *Pittsburgh & Lake Erie R. Co. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490, 510 (1989) (observing that "when two statutes

are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective"); *Zenith Elecs. Corp. v. Exzec, Inc*., 182 F.3d 1340, 1347 (Fed Cir. 1999) (observing that courts should generally "interpret and apply [statutes] in a way that preserves the purposes of both and fosters harmony between them.") (cleaned up). That observation is especially apt here, where Congress intended IEEPA to cover "unforeseen contingencies"—not problems that Congress had addressed in other statutes. H.R. Rep. No. 95-459, at 10 (1977). Defendants' argument that Section 122 is for "non-emergency harms" and IEEPA is for the same harms in an emergency, App. Br. 49, makes little practical sense. Section 122 applies only to "large and serious" balance-of-payments deficits. 19 U.S.C. § 2132(a)(1). If large trade deficits are an emergency, they are ones fully addressed by Section 122. It is unlikely that Congress meant to authorize the President to ignore the very limits it set in Section 122 merely by invoking IEEPA.

### d.    The reciprocal tariffs exceed Section 122's limits.

The President imposed the reciprocal tariffs because of what he called "large and persistent annual U.S. goods trade deficits." 90 Fed. Reg. at 15,041. But Section 122 limits tariffs that deal with "large and serious" balance-of-payment deficits, including trade deficits, to a maximum of 15 percent for 150

23

days.  19 U.S.C. § 2132(a); *see also* Appx35 (explaining that "[t]rade deficits

are one of the key balance-of-payment deficits").  Defendants do not dispute

that the reciprocal tariffs exceed those limits; the country-by-country rates

ranged as high as 50 percent, and the President stated that they would remain in

effect indefinitely.  90 Fed. Reg. at 15,049 (annex of rates); *id.* at 15,045

("These additional ad valorem duties shall apply until such time as I determine

that the underlying conditions described above are satisfied, resolved, or

mitigated.").  Although the President later temporarily suspended all but 10

percent of those tariffs, as of the filing of this brief the higher rates are

scheduled to come back into effect on August 1.  Exec. Order No. 14,266, 90

Fed. Reg. 15,625, 15,626 (Apr. 9, 2025); Exec. Order, *Extending the*

*Modification of the Reciprocal Tariff Rates* (July 7, 2025), available at

https://www.whitehouse.gov/presidential-actions/2025/07/extending-the-
modification-of-the-reciprocal-tariff-rates/.

     Defendants cannot salvage the reciprocal tariffs by claiming that they

were based on considerations other than persistent trade deficits.  App. Br. 53.

Defendants waived that argument by not making it before the CIT.  Regardless,

the President's Executive Order makes it clear that it is based on "Large and

Persistent Annual United States Goods Trade Deficits," as the title states.  90

Fed. Reg. at 15,041.  It notes in passing various circumstances that contribute to

those trade deficits.  *Id.*  But it relies on the trade deficits themselves as the

basis for tariffs—precisely what Section 122 addresses.[2]

> ### 2.     The trade deficit is not an "unusual and extraordinary" threat.

The reciprocal tariffs also violate IEEPA's separate requirement that its

powers be used only "to deal with an unusual and extraordinary threat" and not

"for any other purpose."  50 U.S.C. § 1701.  The reciprocal tariffs do not deal

with an "unusual and extraordinary threat," because trade deficits are neither

"unusual" nor "extraordinary."  Although the CIT did not reach that question

(Appx37 n.12), it is properly before this Court and provides an independent

basis for the conclusion that the reciprocal tariffs are invalid.  *See Rexnord*

*Indus., LLC v. Kappos*, 705 F.3d 1347, 1356 (Fed. Cir. 2013) ("[T]he

---

[2] This Court should not address the argument—not raised below, and made on appeal only by amicus America First Policy Institute—that Section 338 of the Tariff Act of 1930 authorizes the tariffs at issue here.  That argument is waived, and in any event is meritless.  First, Section 338 applies only to violations of most-favored-nation treatment, which is not at issue here.  *See* 19 U.S.C. § 1338(a) (requiring findings that a foreign country is imposing a restraint that is "not equally enforced upon the like articles of every foreign country" or that "place[s] the commerce of the United States at a disadvantage compared with the commerce of any foreign country").  Second, tariffs under Section 338 are limited to 50 percent and cannot be levied until "thirty days after the date of such proclamation," 19 U.S.C. § 1338(d), requirements that the President did not comply with for all the tariffs imposed here.  Finally, Section 338 tariffs require an investigation and recommendation from the International Trade Commission, which was not done here.  19 U.S.C. § 1338(g).

correctness of the decision appealed from can be defended by the appellee on any ground that is supported by the record" (emphasis removed)).

"Unusual" and "extraordinary" are familiar terms. "Unusual" means "out of the ordinary" or "exceptional." *Webster's Third New Int'l Dictionary*, *supra*, at 2514 (defining "unusual"). "Extraordinary," in the context of laws, means "of, relating to, or having the nature of a proceeding or action not normally required by law or not prescribed for the regular administration of the law" or "of, relating to, or having the nature of an occurrence (such as an accident or casualty) or risk of a kind other than what ordinary experience or prudence would foresee." *Id.* at 807.

Thus, when IEEPA requires that the threat be "unusual," it means that it involves circumstances that are rare, and when it requires that the threat be "extraordinary," it means that it involves circumstances that are not addressed in existing legislation because Congress could not reasonably have foreseen them. *See* H.R. Rep. No. 95-459, at 10 (IEEPA is intended to address "unforeseen contingencies"; "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems."). In other words, to the extent IEEPA authorizes the President to impose tariffs at all, it does so only in circumstances that are rare and not already covered by another, ordinary tariff statute.

The tariffs based on trade deficits do not satisfy either requirement. Trade deficits are not "unusual" because, as the President stated in imposing tariffs, "annual U.S. goods trade deficits" are "persistent." Exec. Order No. 14,257, 90 Fed. Reg. at 15,041; *see also* Appx215 (Hines Decl.) (noting that "[t]he United States has run persistent current account deficits since the mid-1970s"). "Persistent" is the opposite of "unusual." *See City of Grants Pass v. Johnson*, 603 U.S. 520, 543 (2024) (concluding that a city's fines for unauthorized camping were not "unusual" because "similar punishments have been and remain among 'the usual mode[s]' for punishing offenses throughout the country"). Nor are trade deficits "extraordinary" when the President may respond by deploying the ordinary tools of trade law in Title 19, such as Section 122.

Courts can enforce IEEPA's requirements, including the requirement of an "unusual and extraordinary" threat. "[U]nless there is persuasive reason to believe" that Congress intended to preclude judicial review, the courts will review the executive's compliance with statutory limits. *McLaughlin Chiropractic Associates*, 606 U.S. __ (slip op. at 8) (June 20, 2025); *see also* 50 U.S.C. § 1702(c) (contemplating judicial review of determinations under IEEPA). The political-question doctrine does not apply because the Court is interpreting a statute and deciding whether the executive branch exceeded the

authority it grants. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (there is no political question when "the Judiciary must decide [which] interpretation of the statute is correct"); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 857 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the judgment) (explaining that "the political question doctrine does not apply in cases alleging statutory violations"). *Yoshida*, again, is directly on point: Even if courts cannot review emergency declarations, courts "will not hesitate to review the actions taken in response or in reliance" on them. 526 F.2d at 579.[3]

Defendants have not offered a plausible construction of the phrase "unusual and extraordinary" that embraces economic conditions that have remained persistent for half a century and are specifically addressed by another delegation of tariff authority. IEEPA thus does not authorize the President to impose tariffs to deal with trade deficits—much less tariffs that exceed the limits Congress set in Section 122.

---

[3] Defendants are wrong to suggest that their interpretations of statutory terms warrant deference under *Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985). App. Br. 29. *Maple Leaf* cannot be squared with *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024), which observed that courts have an "obligation to independently interpret" statutes. Regardless, *Maple Leaf* allows the court to determine if the President has acted "beyond delegated authority," which he has here. 762 F.2d at 89.

In sum, the reciprocal tariffs violate two different provisions of IEEPA. First, as the CIT held, § 1702's conferral of authority to "regulate … importation" does not include unlimited authority to impose tariffs, in particular tariffs that exceed Section 122's limits. Second, § 1701's requirement that IEEPA be used only to deal with "unusual and extraordinary" threats does not include trade deficits that are persistent and fully addressed in Section 122. For either reason, the reciprocal tariffs are invalid.

## B. The trafficking tariffs are invalid because they do not "deal with" the fentanyl crisis.

The trafficking tariffs on Canada, Mexico, and China violate IEEPA's express requirement that emergency economic powers "may only be exercised to deal with" certain threats and not "for any other purpose." 50 U.S.C. § 1701(b). In other words, even when the President has declared a national emergency based on an unusual and extraordinary foreign threat, the President's response must be targeted only to deal with that threat.

Here, the CIT correctly found that there is a mismatch between the President's implementation of across-the-board tariffs on Canada, Mexico, and China and the problems—drug trafficking and other crime—that the tariffs purport to address. Appx43–48. The tariffs are not targeted at fentanyl or related products or any aspect of illicit drug trafficking, immigration, or crime more generally. *Cf.* Exec. Order No. 14,059, 86 Fed. Reg. 71,549 (Dec. 17,

2021) (imposing sanctions on foreign persons involved in the global illicit drug trade). Rather, the trafficking tariffs apply to almost all goods imported from the affected nations, regardless of whether any particular good has a reasonable connection to fentanyl trafficking or any of those other bases. And the costs that tariffs impose are not directly targeted at traffickers or the foreign governments that the President thinks need to do more to stop them. The costs fall on importers, who in turn may purchase less from foreign sellers, who in turn may put pressure on their governments to take action against traffickers. If that is "deal[ing] with" the threat of traffickers, then anything is.

Defendants do not contest that the trafficking tariffs do not directly target trafficking or other crime. Instead, they argued that the tariffs "deal with" the identified threats because they give the President a "bargaining chip" in negotiations with other countries. App. Br. 55. But the CIT correctly held that mere leverage is not enough to satisfy IEEPA's requirement that it be used only to deal with the stated threat directly, and not "for any other purpose." 50 U.S.C. § 1701(b). To conclude otherwise would essentially read the "deal with" and "not … for any other purpose" requirements out of IEEPA. *See United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (noting that it is a court's "duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section, as the Government's interpretation

requires") (cleaned up). The mismatch between means and ends under defendants' interpretation supports the CIT's conclusion that the President exceeded his authority under IEEPA.

Here too, defendants' interpretation of the statute triggers the major questions doctrine and constitutional avoidance. The emergency powers that IEEPA delegates may be broad in some respects, but they have limits. *See Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 571 (5th Cir. 2024) ("IEEPA grants the President broad powers to regulate a variety of economic transactions, but its language is not limitless."). The CIT was not "second-guess[ing]" the President's factual findings or declining to provide "substantial deference" to the President's conduct of foreign relations. App. Br. 58–59. It was interpreting a statutory term. The dispute here is not about the facts; it is whether those facts qualify as "deal[ing] with" the identified threat. This Court should not accept defendants' invitation to nullify the limits that Congress expressly imposed.

*Dames & Moore v. Regan*, 453 U.S. 654 (1981), does not suggest otherwise. That case was decided on an exceptionally expedited schedule and "attempt[ed] to lay down no general 'guidelines' covering other situations not involved here." *Id.* at 661. The Court upheld the President's use of IEEPA to nullify attachments and order the transfer of claims against Iranian property as

part of the resolution of the hostage crisis. *Id.* at 666, 674. *Dames & Moore* did not discuss the "deal with" requirement of IEEPA, which apparently was not contested—and for good reason: The property at issue in that case was property of the Government of Iran and its instrumentalities. *Id.* at 662–63. *Dames & Moore* thus did not involve, as this case does, the use of IEEPA to attempt to create leverage with a foreign government by imposing economic consequences on American companies and consumers with collateral impacts across the world.

**C.    In the alternative, IEEPA does not authorize the President to impose tariffs at all.**

The discussion above all assumes for argument's sake, as the CIT did, that IEEPA allows the President to impose some tariffs. This Court also can affirm on the alternative ground that IEEPA does not authorize tariffs at all. Statutory text, context, and legislative history confirm that the power to "regulate … importation or exportation" does not confer that power.

**1.    Textually, authority to "regulate … importation or exportation" is not authority to impose tariffs.**

Tariffs are taxes on imports. Appx227 (Hines Decl.); *see also Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 201 (1824) ("the act of laying 'duties or imposts on imports' … is considered as a branch of the taxing power"). Nothing in IEEPA expressly authorizes the President to impose tariffs or any other form of

taxes.  And although IEEPA allows the President to "regulate … importation or exportation," 50 U.S.C. § 1702(a)(1)(B), "regulate" in that context does not mean "tax."

### a. The term "regulate" by itself does not imply the power to tax.

Defendants are wrong to suggest that dictionary definitions of the term "regulate" alone imply a power to impose tariffs.  App. Br. 32.  "Regulate" means "to control (an activity or process) esp. through the implementation of rules."  *Black's Law Dictionary* (12th ed. 2024) (defining "regulate"); *see also Black's Law Dictionary* 1451 (4th ed. 1968) ("To fix, establish, or control; to adjust by rule, method, or established mode."); *Webster's Third New International Dictionary* 1913 (1961) ("to govern or direct according to rule"). The government can "regulate" importation by implementing rules that control the flow of goods coming into the country, such as by restricting the quantity or quality of the goods or requiring inspections or quarantines.  It can also "regulate" importation by permitting specific transactions that would otherwise be prohibited by other IEEPA sanctions.  *See* Office of Foreign Assets Control, *Venezuela-Related Sanctions*, at https://ofac.treasury.gov/sanctions-programs-and-country-information/venezuela-related-sanctions (listing licenses permitting certain transactions otherwise barred by sanctions).  But none of the words that define "regulate" are synonyms of "tax" or "tariff."

Two centuries of consistent usage confirms that "regulate" and "tax" are different powers and that the power to regulate does not necessarily imply the power to tax. The Constitution itself identifies the power to "lay and collect Taxes, Duties, Imposts and Excises" separately from the authority to "regulate Commerce with foreign Nations." U.S. Const., Art. I, § 8, cl. 3. As long ago as 1824 in *Gibbons v. Ogden*, the Supreme Court recognized that those powers are "distinct from each other." 22 U.S. (9 Wheat) at 201; *see also Diginet, Inc. v. W. Union ATS, Inc*., 958 F.2d 1388, 1399 (7th Cir. 1992) ("The legal power to regulate is not necessarily the legal power to tax.").

Reflecting that distinction, federal statutes consistently grant separate, explicit authority to tax when Congress intends to confer both the power to regulate and the power to raise revenue. *See, e.g.*, 16 U.S.C. § 1540(f) (separately conferring authority "to promulgate such regulations as may be appropriate to enforce" the Endangered Species Act and authority to "charge reasonable fees for expenses to the Government connected with [authorized] permits or certificates"); 16 U.S.C. § 460bbb-9(a) (describing power to "tax" people, franchises, or property on lands separately from power to "regulate" the lands); 49 U.S.C. § 40117(j) (providing that state may not "tax, regulate, or prohibit" certain passenger facility charges in aviation context).

That consistent practice is reflected in statutes governing tariffs as well. When Congress delegates authority to the executive branch to adjust tariffs to respond to particular trade issues, it does so explicitly. *See, e.g.*, 19 U.S.C. § 1671(a) (providing for "countervailing duty" to protect domestic industry against "countervailing subsidy"); 19 U.S.C. § 1673 (providing for an "antidumping duty"); 19 U.S.C. § 2253(a)(3)(A) (authorizing President to "proclaim an increase in, or the imposition of, any duty on the imported article" to respond to harms or threats to domestic industry); 19 U.S.C. § 2411(c)(1)(B) (authorizing the Executive branch to "impose duties" to respond to certain trade practices or violations of trade agreements).

In arguing to the contrary, defendants note that the Supreme Court interpreted the phrase "adjust the imports" in Section 232 of the Trade Expansion Act of 1962 to permit licensing fees. *See Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 571 (1976). But *Algonquin* addressed licensing fees, not tariffs, and the Court emphasized that its holding was "a limited one." *Id*. At any rate, Section 232 differs from IEEPA in critical respects. First, Section 232 refers explicitly to "the duty … on any article." 19 U.S.C. § 1862(a). IEEPA, by contrast, says nothing about taxes, tariffs, or duties. Second, the phrase "adjust the imports" in Section 232 arises in a statutory context starkly different from IEEPA, which includes a list of verbs

surrounding "regulate"—"block," "direct and compel," and "prevent or prohibit"—that convey blunt powers to stop or control property inconsistent with the gradual way that taxes or tariffs change behavior. *Cf. McLaughlin Chiropractic Assoc.*, slip op. at 13 (noting that the *noscitur a sociis* canon counsels against reading one term to be "different in kind and broader than" the other terms that the other terms that appear in the same list). Third, *Algonquin* relied in large part on unusually clear legislative history of the 1962 law and its predecessors. The legislative history showed that key Members of Congress believed that the provision would authorize the President "to take whatever action he deems necessary to adjust imports … (including the use of) tariffs, quotas, import taxes or other methods of import restriction." 426 U.S. at 563–64 (quoting Senator Millikin and observing that Senator Martin also noted that the President had authority to "increase" duties). There is no comparable legislative history for IEEPA, making *Algonquin*—which, in any event, interpreted the statutory term "adjust" rather than, as here, "regulate"—of limited relevance.

Defendants cannot identify any other federal statute that uses the term "regulate" to authorize taxes or tariffs. They instead resort to cases that happen to have the words "regulate" and "tariff" in the same sentence. App. Br. 34 (citing cases). But none of those cases analyze whether the power to regulate

necessarily includes the power to tax. And their contention that the plain meaning of "regulate" includes such measures would have drastic consequences for other areas of the law. For example, the Consumer Financial Protection Bureau has the power to "regulate the offering and provision of consumer financial products," 12 U.S.C. § 5491(a); the SEC has the power to "regulate … transactions on a national securities exchange," 15 U.S.C. § 78k(a)(2); and the FDA has the power to "regulate" drugs, biological products, and devices, 21 U.S.C. § 360bbb-2(a). If defendants were right that "the ordinary meaning of 'regulate'" included the power to tax (App. Br. 32), those agencies would have blanket authority to impose *ad valorem* taxes on the products that they regulate. Yet no one thinks they do.

The many provisions of Title 19 expressly conferring authority to raise or lower tariffs show that Congress knows how to grant that power when it so intends. Its failure to include any similar express provision in IEEPA shows that it did not so intend. *See Lackey v. Stinnie*, 145 S. Ct. 659, 669–70 (2025) (reasoning that if Congress "shows that it knows how to adopt" omitted language courts should not add to the text to create such authority). As a matter of plain meaning and consistent usage, the term "regulate … importation" does not include authority to impose tariffs, much less unlimited tariffs.

### b. Context confirms that "regulate" in IEEPA does not encompass authority to impose tariffs.

Other features of IEEPA reinforce that Congress, in authorizing the President to "regulate … importation," did not delegate authority to impose tariffs.  First, "regulate" modifies the phrase the "importation or exportation," which is offset by commas within a larger list.  50 U.S.C. § 1702(a)(1)(B) ("regulate … [any] withdrawal, transportation, importation or exportation of, or dealing in" certain foreign property).  That wording suggests that the statute authorizes the same types of regulation of imports as it does exports.  But Article I, section 9, of the Constitution forbids any "Tax or Duty" on exports.  This Court should presume that Congress, by granting the power to "regulate … importation or exportation," did not intend to create a power to tax in IEEPA when doing so would purport to authorize the President to impose unconstitutional duties on exports.  *See Jennings*, 583 U.S. at 286 (courts should "shun an interpretation that raises serious constitutional doubts" and instead "adopt an alternative that avoids those problems").

Second, if the term "regulate" encompassed authority to impose tariffs, it would be difficult to square with IEEPA's limitation to "property in which any foreign country or a national thereof *has* any interest."  50 U.S.C. § 1702(a)(1)(B) (emphasis added).  The act of importing a product produced in a particular country—not the nationality of the product's owner—determines

38

whether a tariff applies. *See, e.g.*, Harmonized Tariff Schedule of the United States; 19 U.S.C. § 1508 (prescribing recordkeeping rules regarding the origin of goods receiving preferential tariff treatment); 19 C.F.R. § 102.11 (prescribing rules for determining the origin of a product in terms of factors such as where it is produced and where its component materials are from, with no mention of ownership). Had Congress wanted to empower the President to impose tariffs on imports, it likely would have described the property that a President may "regulate" as property in which a foreign country or national *has had* any interest. Indeed, Congress used that exact wording in the next subsection of IEEPA describing recordkeeping requirements for property in which a foreign country or national "has or *has had* any interest." 50 U.S.C. § 1702(a)(2) (emphasis added); *see also Lackey*, 145 S. Ct. at 669–70 ("A textual judicial supplementation is particularly inappropriate when … Congress has shown that it knows how to adopt the omitted language or provision."). Defendants' reading would set up an odd regime in which identical imported goods are subject to different tariffs based on whether any foreigner retains a legal or equitable interest in the goods. There is no reason to think Congress intended to create such a regime.

### c. Other tariff statutes further undermine defendants' reading of "regulate" in IEEPA to permit tariffs.

Congress has legislated extensively on tariffs. When it delegates authority to adjust tariffs, it does so explicitly and with carefully defined limits and procedures. That consistent practice casts further doubt on defendants' contention that the term "regulate … importation" gives the President unlimited authority to impose tariffs in any amount on any country for any length of time.

For the nation's first 140 years, Congress generally set tariffs directly. Daniel K. Tarullo, *Law and Politics in Twentieth Century Tariff History*, 34 UCLA L. Rev. 285, 285–86 (1986) (describing Congress's detailed revisions of tariff schedules between 1790 and 1930). The modern system for imposing tariffs derives from legislation Congress enacted in response to the Great Depression. After the disastrous Smoot-Hawley Tariff Act of 1930, Congress enacted the Reciprocal Trade Agreements Act of 1934, Pub. L. No. 73-316, ch. 474, § 1, 48 Stat. 943, 943–44 (codified as amended at 19 U.S.C. §§ 1351–54 (2018)). That Act empowered the President to enter trade agreements that reduced U.S. and foreign countries' tariffs and delegated to the President the power to proclaim the resulting tariffs, subject to legislatively imposed limits on tariff reductions.

That system evolved into a two-step approach to trade policy, under which Congress agrees to consider trade agreements that the President

negotiates expeditiously *if* the President negotiates such an agreement during a particular period and following certain substantive and procedural rules. *See, e.g.*, Trade Act of 1974, Pub. L. No. 93-618, §§ 101–02, 151, 19 U.S.C. §§ 2111–2112, 2191 (granting authority to negotiate certain agreements for a 13-year period). Today, the United States is party to 15 trade agreements, negotiated by the President and approved and implemented by Congress. But the legal basis for generally applicable U.S. tariffs derives from legislation consenting to and implementing these agreements as a matter of federal law. *See, e.g.*, 19 U.S.C. ch. 22 (implementing the Uruguay Round Agreements); 19 U.S.C. ch. 26 (implementing the Dominican Republic-Central America Free Trade Agreement); 19 U.S.C. ch. 29 (implementing the United States-Mexico-Canada Agreement).

As noted earlier, Congress has created limited tariff-adjustment authority for the Executive to respond to particular trade issues, such as countervailing subsidies or unfair pricing. *See* 19 U.S.C. § 1671(a) (countervailing duties authority); 19 U.S.C. § 1673 (anti-dumping authorities); 19 U.S.C. §§ 2251–55 (authority for duties to respond to harms or threats to domestic industry); 19 U.S.C. §§ 2411–20 (authority for duties to respond to unjustifiable or burdensome trade practices or violations of trade agreements).

To impose such tariffs, however, the President must follow particular procedures, make certain findings or determinations, and limit the duration and magnitude of the tariffs. *See* 19 U.S.C. § 1671(a) (limiting countervailing duties to amount equal to net countervailing subsidy); 19 U.S.C. § 1671d(a)(1) (providing procedures for countervailing duties); 19 U.S.C. §§ 1673 *et seq.* (providing limits and procedures for antidumping tariffs); 19 U.S.C. § 1675(a) (requiring annual review of antidumping and countervailing duty orders); 19 U.S.C. §§ 2252(e)–(f), (h) (providing limitations on duties to protect domestic industry); 19 U.S.C. § 2417 (providing procedures for duties imposed in response to burdensome trade practices).

Those consistent practices show two things. First, when Congress authorizes the President to negotiate trade agreements that increase tariffs, it reserves its own authority to approve or disapprove the agreements—and so the tariffs—before they take effect. Second, when Congress authorizes the President to adjust tariffs that it already approved, it imposes specific restrictions on that authority, such as requiring particular findings, limiting how high the tariffs can be, and limiting how long they can remain in place. It is exceedingly unlikely that Congress intended to depart from those practices in IEEPA, which does not mention tariffs at all.

## 2. Legislative history does not suggest that Congress intended to delegate tariff authority in IEEPA.

### a. Congress enacted IEEPA to rein in the use of emergency powers in peacetime.

IEEPA is part of a line of statutes addressing wartime and national emergencies. The history shows that Congress gradually expanded the President's emergency powers until the 1970s but then intentionally cut back on those powers because of concerns about how they had been used, including (on one occasion) to impose surcharges on imports.

In 1917, Congress enacted TWEA to address a string of global crises affecting the U.S. economy during wartime. Pub. L. No. 65-91, §§ 1–19, 40 Stat. 411, 411–26 (1917) (codified as amended at 50 U.S.C. §§ 4305 et seq.). Among other powers, TWEA authorized the President to limit trading with, communicating with, or transporting citizens of foreign nations defined as "enemies." *Id.* §§ 1–4. Section 5(b) of TWEA empowered the President to "investigate, regulate, or prohibit" "any transactions in foreign exchange" during wartime. *Id.* § 5(b).

Congress expanded TWEA in 1933 by authorizing the President to deploy the power to "investigate, regulate, or prohibit" foreign transactions during national emergencies other than war. Emergency Banking Relief Act, Pub. L. No. 73-1, § 2, 48 Stat. 1 (1933).

In 1941, just a week after the Pearl Harbor attack, Congress expanded

TWEA's Presidential authorities, among other ways, by adding the phrase

"importation or exportation" to the list of objects that the President may

"investigate, regulate, or prohibit." *See* First War Powers Act of 1941, Pub. L.

No. 77-593, § 301, 55 Stat. 839. Although the legislative history does not

indicate why Congress added "importation or exportation" Congress's primary

concern was to create authority for the President to take or direct the use of

foreign property. *See* H.R. Rep. No. 77-1507 (1941). Congress understood

that, as written, TWEA did not provide "broad powers to take, administer,

control, use, liquidate, etc., such foreign-owned property" that may threaten

U.S. interests during war or national emergency. *Id.* at 3. The 1941

Amendments filled those gaps by permitting the President to "vest" seized

foreign property and otherwise control and compel the use of foreign property

during war. First War Powers Act of 1941, Pub. L. No. 77-593, § 301. Such

authority would include the power "to liquidate[] and dispose[] of [seized

property] under the rules and regulations of the Department." Reenactment of

Overman and Trading with the Enemy Acts: Senate Debate, 87 Cong. Rec.

9837–38, 9842, 9845 (1941) (statement of Sen. Van Nuys).

After World War II, "there was little that U.S. Presidents *could not* do,

legally speaking, in the realm of economic warfare." Benjamin A. Coates, *The*

*Secret Life of Statutes: A Century of the Trading with the Enemy Act*, 1 Modern American History 151, 163 (2018) (emphasis in original). Presidents used TWEA to impose economic sanctions on foreign adversaries, regulate foreign exchange, and control exports under the auspices of multiple national emergencies. *See, e.g.*, Proclamation 2914, 15 Fed. Reg. 9029 (1950) (President Truman enforcing economic sanctions against North Korea and China); Exec. Order No. 11,387, 33 Fed. Reg. 47 (1968) (President Johnson placing controls on capital exports).

By the 1970s, Congress became concerned about expansive use of TWEA and took steps to rein it in. First came the National Emergencies Act in 1976. Pub. L. No. 94-412 (Sept. 14, 1976), 90 Stat. 1255, *codified as amended at* 50 U.S.C. §§ 1601 *et seq*. The Act ended all existing emergencies except those proclaimed under Section 5(b) of TWEA and placed new restrictions on the declaration of new emergencies. A year later, in 1977, Congress amended TWEA to make it applicable only during times of war. Pub. L. No. 95-223, § 101, 91 Stat. 1625 (1977).

At the same time, Congress crafted IEEPA to provide the President a more limited set of emergency powers during peacetime. *Id.* tit. II, 91 Stat. 1626. During the House markup of the bill that would revise TWEA, Chairperson Bingham suggested that TWEA created "a dangerous situation in

45

that it virtually conferred on the President what could have been dictatorial powers that he could have used without any restraint by the Congress." Legislative History of the Wartime or National Emergencies Presidential Powers P.L. 95-223, at 5 (1977).

IEEPA's primary limitation was its requirement of an "unusual" and "extraordinary" threat to U.S. interests, not simply a national emergency.  H.R. Rep. No. 95-459, at 10.  IEEPA thus did not "include authorities more appropriately lodged in other legislation, such as authority to regulate purely domestic transactions or to respond to purely domestic circumstances, or authority to control noneconomic aspects of international intercourse such as personal communications or humanitarian contributions."  *Id.* at 11.  And although Congress adopted the same list of authorities as in TWEA—including the power to "regulate" "importation or exportation of" or "any transactions involving" "any property" held by a foreign country a foreign national— Congress intended that IEEPA would provide "somewhat narrower powers." *Id.* at 1.

Congress also made it clear that, although it was carrying over statutory text from TWEA, it was not ratifying all the ways in which Presidents previously had used that statute.  Even when Congress "grandfather[ed]" in certain uses that remained in effect at the time of IEEPA, the House Report

46

explained that it was doing so "without either endorsing or disclaiming them." *Id.* at 10.

None of that history suggests that Congress intended "regulate … importation" to authorize tariffs or to carry any expansive meaning.  On the contrary, it suggests that Congress intended the term to be confined to its ordinary meaning, and no more.

### b.    Defendants misplace their reliance on *Yoshida*.

As noted above, *Yoshida* involved President Nixon's 1971 use of TWEA—which, like IEEPA, authorized the President to "regulate … importation" during an emergency—to impose a temporary surcharge on imports to address a balance-of-payments deficit.  526 F.2d at 566.  President Nixon imposed the surcharge, which stayed within congressionally established tariff rates, before Congress enacted specific authority for that situation in Section 122 of the Trade Act of 1974.  *Id.* at 577.  In *Yoshida*, this Court's predecessor upheld the President's use of TWEA, but emphasized that, because Congress had since enacted Section 122, "a surcharge imposed after Jan. 3, 1975 must, of course, comply with the statute now governing such action."  *Id.* at 582 n.33.

Defendants are wrong to treat *Yoshida* as though it resolves whether IEEPA authorizes tariffs.  *Yoshida* interpreted a different statute against a

different statutory background and legislative history. Courts do not hesitate to interpret the same terms differently for statutes with different history, structure, or purpose—and sometimes even within different parts of one statute. *See, e.g.*, *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595–97 (2004) (holding that "age" has different meaning in different parts of the ADEA); *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001) (same for "wages paid" in different provisions of Title 26); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 343–44 (1997) (same for "employee" in different parts of Title VII); *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 522–25 (1994) (same for Copyright Act's attorney's fees provision despite "virtually identical language" in an analogous provision in Title VII).

Here, Congress made it clear that it was neither endorsing nor disclaiming past uses of TWEA when it enacted IEEPA. H.R. Rep. No. 95-459, at 10. Rather, Congress was taking "a new approach to international emergency economic powers." *Id.* Equally important, the context shows Congress had taken a new approach to tariff authority by enacting several statutes empowering the President to impose or adjust duties to address recurring trade problems, including Section 122. *See* 19 U.S.C. § 2411(c)(1)(B) (authorizing the Trade Representative to "impose duties" in response to trade agreement violations or burdensome trade practices); 19 U.S.C. § 2253(a)(3)(A)

(authorizing "an increase in, or the imposition of, any duty on the imported article" to protect domestic industry); 19 U.S.C. § 2132 (Section 122 authorizing the President to proclaim a temporary import surcharge not to exceed 15 percent *ad valorem* for a period no longer than 150 days to "deal with large and serious United States balance-of-payment deficits").  In enacting IEEPA, Congress was legislating against a different legal background in which it was affording far less deference to the President in the area of tariffs.  *See Trump v. Hawaii*, 585 U.S. 667, 692 (2018) (reasoning that drafting history may suggest a different meaning from that of borrowed statute if Congress makes a "critical alteration" to statutory scheme).

If this Court nonetheless concludes that *Yoshida* has precedential value suggesting that "regulate … importation" in IEEPA includes the authority to impose tariffs, it should overrule that part of *Yoshida*.  *See, e.g.*, *Janus v. AFSCME Council 31*, 585 U.S. 878, 917 (2018) (considering, among other factors, the quality of the prior case's reasoning, developments since the decision was handed down, and reliance interests).  That part of *Yoshida*'s analysis deployed almost none of the tools of statutory interpretation used by modern courts.  *See Yates v. United States*, 574 U.S. 528, 537–46 (2015) (plurality opinion) (considering dictionary definitions, context, statutory caption, contemporaneous statutes, textual canons, and legislative history).  It

did not identify the ordinary meaning of "regulate" or consider the meaning of the words surrounding the term "regulate." It failed to give proper weight to the context of related trade statutes, which show that Congress knew how to delegate tariff-making authority but declined to use the same wording to delegate that authority in IEEPA. And it did not have the benefit of the modern articulation of the major questions doctrine's canon of statutory construction. *See Biden v. Nebraska*, 600 U.S. at 516 (Barrett, J., concurring) (tracing the doctrine's "skepticism" of broad readings of executive authority "in a line of decisions spanning at least 40 years" starting in 1980).

*Yoshida* also gave weight to Congress's acquiescence to various Presidential uses of TWEA: "[A]pparently perceiving no threat of abuse of executive power, Congress has been content to let the Act stand untouched for thirty-four years, while various emergencies have been declared and courts have sustained both the breadth of the TWEA and the constitutionality of diverse actions taken under its authority." *Yoshida*, 526 F.2d at 578–79. Yet "congressional inaction is perhaps the weakest of all tools for ascertaining legislative intent, and courts are loath to presume congressional endorsement unless the issue plainly has been the subject of congressional attention." *Butterbaugh v. Dep't of Justice*, 336 F.3d 1332, 1342 (Fed. Cir. 2003);

*Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306 (1988) ("This Court generally is reluctant to draw inferences from Congress' failure to act.").

This Court need not overrule *Yoshida* to reject defendants' reading of IEEPA. But it should not reaffirm that part of *Yoshida* without examining the strength of its reasoning, which does not stand up to scrutiny. Other than *Yoshida*, defendants have no precedent supporting their interpretation of IEEPA and are left to rely on dictionary definitions that cannot sustain it. Whether or not it formally overrules *Yoshida*, this Court should hold that IEEPA's authority to "regulate … importation" does not include authority to impose tariffs.

## D. The CIT did not abuse its discretion by issuing a permanent injunction against the unlawful tariffs.

After granting summary judgment to the plaintiffs, the CIT issued two forms of relief: first, a declaratory judgment that declared the tariffs invalid, and second, a permanent injunction against their operation. Appx60. The court explained that the injunction was appropriate in scope because the Constitution requires tariffs to be uniform throughout the United States. Appx48. The court also noted, in addressing defendants' request for a stay pending appeal, the "compelling public interest in ensuring that governmental bodies comply with the law" and the "lack of any cognizable hardship borne by the United States in the form of its non-enforcement of orders issued *ultra vires*." Appx63 (cleaned up).

On appeal, defendants do not dispute the remedy of declaratory relief, but they argue that the court abused its discretion in issuing an injunction. App. Br. 60. Neither of the arguments that defendants advance against the injunction has merit.

### 1. The court adequately considered the equitable considerations relevant to an injunction.

The CIT was correct to issue an injunction. Defendants do not contest that the States will suffer irreparable injury absent an injunction. Instead, their arguments are limited to the public interest and balance-of-equities factors, which weigh strongly in favor of an injunction here.

Although the CIT's discussion of the equitable considerations was brief, it shows that the court considered the relevant factors. Defendants argue that the CIT's reasoning "conflates the court's merits analysis with the equitable factors." App. Br. 61. But the basis for injunctive relief in this case rests largely on resolution of the substantive issue—whether the President exceeded his statutory authority in imposing the challenged tariffs. That is because the public has *no* "interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010) ("The public interest is served by ensuring that governmental bodies comply with the law[.]").

Defendants' argument that the CIT did not address "the extensive evidence of harm to the government and the public interest," App. Br. 62, ignores that basic proposition.  The President tried to exercise authority that he does not have.  The CIT was not required to allow defendants to continue collecting the unlawful tariffs so that they could maintain a "credible threat of further tariffs" against other countries.  App. Br. 62.  Even if the court's merits ruling diminished the federal government's negotiating leverage—a proposition that, as explained below, is belied by the public statements of senior Administration officials—the government cannot "be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976); *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (The federal government "cannot suffer harm from an injunction that merely ends an unlawful practice[.]").  And "the public interest is served by ensuring that governmental bodies comply with the law[.]" *Am. Signature, Inc.*, 598 F.3d at 830.

In any event, the CIT did not abuse its discretion in rejecting defendants' factual assertions of harm from an injunction.  Defendants rely on apocalyptic predictions made by officials about the future effect of the ruling.  App. Br. 62– 63.  Those predictions were not credible when made, and as the record shows they have not been borne out.  On the contrary, senior Administration officials

(including some of the original declarants) publicly contradicted them right after the CIT ruled, and even before this Court stayed the injunctive relief:

- Kevin Hassett, the Director of the National Economic Council, said that the ruling is "certainly not going to affect the negotiations" over trade deals with other nations, explaining that "there are three or four other ways" for the President to impose tariffs even if he cannot do so under IEEPA. Appx473–74.

- Peter Navarro, the President's Senior Counselor for Trade and Manufacturing, confirmed that "nothing has really changed" and that the Administration is "still, as we speak, having countries call us and tell us they want a deal. So these deals are going to happen." Appx474; *see also* Appx475 ("There's 122, there's 301, there's 232, there's 338. There's all sorts of things we can do well within the law.").

- Secretary of Commerce Howard Lutnick, who previously predicted that an adverse ruling would "collapse ongoing negotiations" (Appx455), later acknowledged that it "maybe cost us a week—but then everybody came right back to the table." Appx480; *see also* Appx479 ("He has so many other authorities that even in the weird

and unusual circumstance where this was taken away, we just bring on another or another or another.").

- U.S. Trade Representative Jamison Greer, who predicted that an adverse ruling "would create a foreign policy disaster scenario" (Appx468), later said that even "before we had the stay" he received "emails and texts from foreign officials saying … we're just going to keep negotiating with you as before." Appx478.

Moreover, as Administration officials now acknowledge, the relief granted below does not affect the many other levers of power the President has in trade negotiations. It does not preclude him from invoking Section 122, which grants authority—albeit limited authority—to impose tariffs to deal with a large and serious balance-of-payment deficit. *See* Appx34 (explaining that "an imbalance in trade" is "a type of balance-of-payments deficit"). It does not preclude him from invoking Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, which addresses tariffs based on national security risks. And it does not preclude him from asking Congress for additional authority, as Presidents in the past have done.[4] Defendants may not want to comply with the

_____

[4] President Trump has asked Congress to grant him the authority to impose reciprocal tariffs, but Congress has not acted. In 2019, the President unsuccessfully urged Congress to enact the United States Reciprocal Trade Act, which would have authorized him to increase tariff rates to match other

*Footnote continued…*

55

substantive and procedural limitations that current law imposes, but the CIT adequately considered the equities in deciding not to allow them to continue to act unlawfully.

### 2. The scope of the injunction entered by the CIT is appropriate.

Defendants' other criticism of the injunction is that it is not by its terms limited to the parties. App. Br. 64. But the scope of relief matches what is needed to redress the harms to the plaintiff States. It fully complies with the principles the Supreme Court recently articulated in *Trump v. CASA, Inc.*, 606 U.S. __ (June 27, 2025), and comports with the constitutional requirement of uniformity in tariffs.

*CASA* held that federal courts likely lack statutory authority to issue injunctions that cover nonparties except when necessary to do so to afford complete relief to the parties. Slip op. 1–2 ("These injunctions—known as 'universal injunctions'—likely exceed the equitable authority that Congress has granted to federal courts."); *id.* at 17 (explaining that under the "complete-relief principle," "the question is not whether an injunction offers complete relief to

---

countries' rates or nontariff barriers. H.R. 116-764 (2019); *see also* White House Office of Trade and Manufacturing Policy, *The United States Reciprocal Trade Act: Estimated Job & Trade Deficit Effects*, p. 16 (May 2019) (quoting bill sponsor Rep. Duffy as stating that the President lacked the "'appropriate tools'" to deal with reciprocal trade issues). Similar legislation was reintroduced this year. H.R. 119-735 (2025).

*everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." (emphasis in original)). But the Court cast no doubt on the propriety of relief that may incidentally benefit nonparties when it *is* necessary to afford complete relief to a party. And it noted that the inquiry can be "more complicated" when States, rather than private parties, are the plaintiffs, because a universal injunction may well be "necessary to provide the States *themselves* with complete relief." *Id.* at 18 (noting the States' arguments for why universal relief was necessary in that case). The Court "decline[d] to take up" arguments about whether the facts of that case—about the President's effort to end birthright citizenship—warranted universal relief for the plaintiff States, leaving that for remand. *Id.* at 19.

The complete-relief principle supports the universal relief ordered here. That relief is necessary to provide complete relief to the States themselves, because the States both import goods directly and purchase imported goods from third parties. The States submitted undisputed evidence below that they purchase goods from countless vendors who will raise prices due to the tariffs. *E.g.*, Appx258 (Emerson Decl. (Or.)); Appx261–95 (Hayes Decl. (Minn.)); Appx389–92, 396–416 (Root Decl. (Minn.)); Appx429 (Ward Decl. (Ariz.)). Once those vendors pass the tariff costs on to the States through higher prices,

the States likely cannot recover those costs even if the vendors ultimately receive refunds. That is not a trivial sum: The plaintiff States' annual losses are conservatively estimated at $1.6 billion per year. Appx235 (Hines Decl.). To prevent that harm, the CIT properly enjoined defendants from collecting tariffs not just from the States or their instrumentalities directly but from anyone who imports products that they might purchase. Complete relief to the States alone—not relief to nonparties—justifies the injunction the CIT issued.

Defendants do not dispute on appeal that the States have standing to sue both as direct importers and as indirect purchasers of imported goods. Tariffs can inflict an "economic injury" on non-importers that is traceable to the challenged tariff and redressable by an injunction. *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1334 (Fed. Cir. 2008). Indeed, a plaintiff's standing can rely on "commonsense economic realities" because "[w]hen third party behavior is predictable, commonsense inferences may be drawn." *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. __ (slip op. at 14) (June 20, 2025) (reasoning that state regulations mandating more electric vehicles likely will "cause downstream or upstream economic injuries to others in the chain, such as producers of gasoline and other liquid fuels"). The undisputed evidence shows that importers who have to pay tariffs will predictably raise the price of the goods they sell. *E.g.*, Appx228 (Hines Decl.); Appx257–58 (Emerson Decl.

(Or.)); Appx261–95 (Hayes Decl. (Minn.)); Appx298–99 (Jaros Decl. (Colo.);

Appx389–92, 396–416 (Root Decl. (Minn.)); Appx429 (Ward Decl. (Ariz.)).

States will be harmed when they pay the higher prices. Those pocketbook

injuries are "concrete" and, even though "widely shared," sufficient to support

standing. *FEC v. Akins*, 524 U.S. 11, 24 (1998) ("[W]here a harm is concrete,

though widely shared, the Court has found 'injury in fact.'").

The scope of the injunction also comports with the Constitution's

requirement that "all Duties, Imposts, and Excises shall be uniform throughout

the United States." U.S. Const. Art. I, § 8, cl. 1. If defendants are suggesting

that a narrower injunction would allow them to continue to collect unlawful

tariffs from nonparties even though they cannot continue to collect them from

the parties, or to continue to collect them in some parts of the country but not in

the plaintiff States, they have not explained how that regime would comport

with the uniformity requirement.

For those reasons, the CIT did not abuse its discretion in issuing an

injunction necessary to provide complete relief to the States.

/ / /

/ / /

/ / /

# CONCLUSION

This Court should affirm the judgment of the Court of International

Trade.

Respectfully submitted,

**DAN RAYFIELD**
Attorney General
State of Oregon

By: */s/ Benjamin Gutman*
_____
BENJAMIN GUTMAN
Solicitor General
Dustin Buehler
Special Counsel
Brian Simmonds Marshall
Christopher A. Perdue
Leigh Salmon
Senior Assistant Attorneys General
Department of Justice
1162 Court Street NE
Salem, OR 97304
Telephone: (503) 378-4402
benjamin.gutman@doj.oregon.gov
dustin.buehler@doj.oregon.gov
brian.s.marshall@doj.oregon.gov
chris.perdue@doj.oregon.gov
leigh.a.salmon@doj.oregon.gov

Attorneys for the State of Oregon

**KRISTIN K. MAYES**
Attorney General
State of Arizona

By: */s/ Joshua D. Bendor*
_____
JOSHUA D. BENDOR
Solicitor General
Syreeta A. Tyrell
Senior Litigation Counsel
2005 North Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-8333
Joshua.Bendor@azag.gov
Syreeta.Tyrell@azag.gov
ACL@azag.gov

Attorneys for the State of Arizona

**PHILIP J. WEISER**
Attorney General
State of Colorado

By: */s/ Sarah H. Weiss*
_____
SARAH H. WEISS
Senior Assistant Attorney General
1300 Broadway, #10
Denver, CO 80203
Telephone: (720) 508-6000
Sarah.Weiss@coag.gov

Attorneys for the State of Colorado

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: */s/ Iam R. Liston*
_____
IAN R. LISTON
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
Telephone: (302) 683-8899
vanessa.kassab@delaware.gov

Attorneys for the State of Delaware

60

**WILLIAM TONG**
Attorney General
State of Connecticut

By: */s/ Michael K. Skold*
_____
MICHAEL K. SKOLD
Solicitor General
165 Capitol Ave
Hartford, CT 06106
Telephone: (860) 808-5020
Michael.skold@ct.gov

Attorneys for the State of Connecticut

**KEITH ELLISON**
Attorney General
State of Minnesota

By: */s/ Pete Farrell*
_____
PETE J. FARRELL
Deputy Solicitor General
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
Telephone: (651) 757-1424
Peter.Farrell@ag.state.mn.us

Attorneys for the State of Minnesota

**RAÚL TORREZ**
Attorney General
State of New Mexico

By: */s/ Amy Senier*
_____
AMY SENIER
Senior Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
Telephone: (505) 490-4060
asenier@nmdoj.gov

Attorneys for the State of New
Mexico

**AARON D. FORD**
Attorney General
State of Nevada

By: */s/ Heidi Parry Stern*
_____
HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney
General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
Telephone: (775) 684-1100
HStern@ag.nv.gov

Attorneys for the State of Nevada

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Sarah A. Hunger*
_____
Jane Elinor Notz
Solicitor General
SARAH A. HUNGER
Deputy Solicitor General
Office of the Illinois Attorney
General
115 South LaSalle Street
Chicago, IL 60603
Telephone: (312) 814-3000
sarah.hunger@ilag.gov

Attorneys for the State of Illinois

**AARON M. FREY**
Attorney General
State of Maine

By: */s/ Vivian A. Mikhail*
_____
VIVIAN A. MIKHAIL
Deputy Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
Telephone: (207) 626-8800
Vivian.mikhail@maine.gov

Attorneys for the State of Maine

**CHARITY R. CLARK**
Attorney General
State of Vermont

By: */s/ Ryan P. Kane*
_____
RYAN P. KANE
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-2153
Ryan.kane@vermont.gov

**LETITIA JAMES**
Attorney General
State of New York

By: */s/ Ester Murdukhayeva*
_____
ESTER MURDUKHAYEVA
Deputy Solicitor General
Rabia Muqaddam
Special Counsel for Federal
Initiatives
(929) 638-0447
Mark Ladov
Special Counsel
Office: (212) 416-8240
Cell: (347) 814-9434
28 Liberty St.
New York, NY 10005
Ester.Murdukhayeva@ag.ny.gov
rabia.muqaddam@ag.ny.gov
mark.ladov@ag.ny.gov

Attorneys for the State of Vermont

Attorneys for the State of New York

## STATEMENT OF CONSENT

Pursuant to Federal Circuit Rule 32(g)(3)(B), the undersigned represents that counsel for State of Arizona, State of Colorado, State of Delaware, State of Connecticut, State of Minnesota, State of New Mexico, State of Nevada, State of Illinois, State of Main, State of Vermont and State of New York have consented to their signatures on this brief.

/s/  Benjamin Gutman
BENJAMIN GUTMAN   #160599
Solicitor General
benjamin.gutman@doj.oregon.gov

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Circuit Rule 32(b)(1) because it contains 13,307 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Times New Roman, a proportionally spaced typeface.

DATED:  July 8, 2025

/s/  Benjamin Gutman
_____
BENJAMIN GUTMAN  #160599
Solicitor General
benjamin.gutman@doj.oregon.gov