**Case Nos. 25-1812, 25-1813**

---

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL DISTRICT

---

V.O.S. SELECTIONS, INC., et al.

*Plaintiffs-Appellees,*

vs.

DONALD J. TRUMP, et al.,

*Defendants-Appellants.*

and

STATE OF OREGON, et al.

*Plaintiffs-Appellees,*

vs.

PRESIDENT DONALD J. TRUMP, et al.

*Defendants-Appellants.*

---

Appeals from the United States Court of International Trade
Nos. 1:25-cv-00066-GSK-TMR-JAR and 1:25-cv-00077-GSK-TMR-JAR,
Judge Gary S. Katzmann, Judge Timothy M. Reif,
and Senior Judge Jane A. Restani

---

**BRIEF AMICUS CURIAE OF GOLDWATER INSTITUTE AND
DALLAS MARKET CENTER IN SUPPORT OF
PLAINTIFFS-APPELLANTS AND IN SUPPORT OF AFFIRMANCE**

---

**Scharf-Norton Center for Constitutional Litigation at the GOLDWATER INSTITUTE**
Timothy Sandefur
500 E. Coronado Rd.
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

*Counsel for Amicus Curiae Goldwater Institute*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Amici Curiae Goldwater Institute and Dallas Market Center hereby state that they have no parent companies, subsidiaries, or affiliates that have issued shares to the public.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................. i

Table of Contents ..................................................................................... ii

Table of Authorities ................................................................................ iii

Rule 29(a) Statement................................................................................ 1

Identity and Interest of Amici Curiae .................................................... 1

Introduction and Summary of Argument ................................................ 3

Argument ................................................................................................. 3

I.   The Constitution's authors were familiar with the idea of unilateral executive-branch taxation and prohibited it. .................................................... 3

II. The "intelligible principles" test shows why IEEPA does not delegate the taxing power. ........................................................................................ 16

    A. Special factors govern the application of the "intelligible principles" test in this context. ......................................................................... 16

    B. IEEPA fails that the "intelligible principles" test. ..................... 21

III. If this is allowed, what else is allowed? ......................................... 24

Conclusion ............................................................................................ 26

Certificate of Compliance .................................................................... 27

Certificate of Service ........................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ...............16

*Clinton v. City of New York*, 524 U.S. 417 (1998) ....................................................14

*Consumers' Rsch. v. FCC*, 109 F.4th 743 (5th Cir. 2024), *rev'd on other grounds, FCC v. Consumers' Rsch.,* Nos. 24-354 & 24-422, 2025 WL 1773630 (U.S. June 27, 2024) ................................................................................................ 13, 18, 25

*Fed. Commc'ns Comm'n v. Consumers' Rsch.,* Nos. 24-354 & 24-422, 2025 WL 1773630 (June 27, 2025) ........................................................................ 16, 23, 24

*Field v. Clark*, 143 U.S. 649 (1892)...................................................... 19, 20, 21, 22

*Flytenow, Inc. v. FAA*, 808 F.3d 882 (D.C. Cir. 2015)..............................................2

*INS v. Chadha*, 462 U.S. 919 (1983).........................................................................15

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) .................... 20, 21

*Kennedy v. Braidwood Mgmt., Inc.*, No. 24-316, 2025 WL 1773628 (U.S. June 27, 2025)...............................................................................................1, 2

*Mills v. Arizona Bd. of Tech. Registration*, 514 P.3d 915 (Ariz. 2022) ...................2

*Missouri v. Jenkins*, 495 U.S. 33 (1990).................................................................17

*Nat'l Cable Television Ass'n, v. United States*, 415 U.S. 336 (1974).....................13

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012)...................................16

*New Orleans Waterworks Co. v. Louisiana Sugar-Refin. Co.*, 125 U.S. 18 (1888) ................................................................................................................. 13, 19

*New York Central Securities Corp. v. United States*, 287 U.S. 12 (1932)...............18

*Rex v. Hampden (The Ship-Money Case)*, 3 St. Tr. 825 (Exch. 1637)......................7

*Tagg Bros. & Moorhead v. United States*, 280 U.S. 420 (1930)...................... 17, 18

*The Case of Impositions,* 2 St. Tr. 371 (Exch. 1608) ...................................................4

*United States v. Arch Trading Co.*, 987 F.2d 1087 (4th Cir. 1993).........................23

*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1 (1825) ................................. 13, 14, 19

*Yakus v. United States*, 321 U.S. 414 (1944)...........................................................18

## Constitutional Provisions

U.S. Const. art. I § 7...............................................................................................14

U.S. Const. art. I § 8...............................................................................................14

U.S. Const. art. I § 9...............................................................................................14

U.S. Const. art. I § 10.............................................................................................14

## Statutes

26 Stat. 567 (1890).................................................................................................21

42 Stat. 858 (1922).................................................................................................21

50 U.S.C. § 1701, et seq. ..........................................................................................3

50 U.S.C. § 1702(a)(1)(A) ........................................................................ 22, 24, 25

50 U.S.C. § 1702(a)(1)(B) ............................................................................ 22, 24

50 U.S.C. § 1702(a)(3).............................................................................................24

50 U.S.C. § 1702(b)(3).............................................................................................24

Boston Port Act, 14 Geo. 3 c. 19.............................................................................12

Revenue Act, 7 Geo. 3 c. 46.....................................................................................10

Sugar Act, 4 Geo. 3 c. 15 ..........................................................................10

**Other Authorities**

1 Henry Hallam, *The Constitutional History of England* (1884) ..........................5, 6

1 W. Blackstone, *Commentaries* ..................................................................9

3 *Debates in the Several State Conventions* (Jonathan Elliot, ed., 1836)...............12

3 *William Cobbett's Parliamentary History* (1808)..................................................8

*A Summary View of the Rights of British America* (1774), *reprinted in Jefferson: Writings* (Merrill Peterson, ed., 1984)..................................................12

Brakkton Booker, *Trump Administration Diverts $3.8 Billion in Pentagon Funding to Border Wall*, NPR (Feb. 13, 2020) ...................................................25

*Federalist* No. 12 (J. Cooke, ed., 1961)..................................................12

Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327 (2002) .......19

*Instructions to Braintree's Representative Concerning the Stamp Act, reprinted in John Adams: Revolutionary Writings 1755-1775* (Gordon Wood, ed., 2011) .....11

J.H. Crooker, *John Wise, the Forgotten American*, 8 Mag. of W. Hist. 392 (1888)..9

J.R. Tanner, *Constitutional Documents of the Reign of James I* (1960)...................5

Jack M. Sosin, *English America and the Revolution of 1688* (1982) ......................9

James I, Commission to Levy Impositions (1608), *in Select Statutes and Documents of Elizabeth and James I* (G.W. Prothero, ed., 1894).........................5

John Dickinson, *Letters from a Farmer in Pennsylvania* (1768), *reprinted in The American Revolution: Writings from the Pamphlet Debate* (Gordon Wood, ed., 2015) ..................................................................................11

John Locke, *Second Treatise of Civil Government*, *in John Locke: Two Treatises of Civil Government* (Peter Laslett, rev. ed, 1963) .................................................17

John Phillip Reid, *Constitutional History of the American Revolution Volume 2: The Power to Tax* (1987) ..............................................................10, 11

Josh Chafetz, *Executive Branch Contempt of Congress*, 76 U. Chi. L. Rev. 1083 (2009)..........................................................................................7

Ken Shumate, *The Sugar Act and the American Revolution* (2022) ......................10

Kevin Sharpe, *The Personal Rule of Charles I* (1992).............................................6

Lisa Schultz Bressman, *Schechter Poultry at the Millennium: A Delegation Doctrine for the Administrative State,* 109 Yale L.J. 1399 (2000)......................18

Mark A. Graber, *Ship-Money: The Case That Time and Whittington Forgot*, 35 Const. Comm. 47 (2020) ........................................................................7

Nathaniel Byfield, *An Account of the Late Revolution in New England* (1689) ......9

Peter Ackroyd, *Rebellion: The History of England from James I to the Glorious Revolution* (2014) ...............................................................................6

Philip Hamburger, *Is Administrative Law Unlawful?* (2014)..................................7

Shepard Ashman Morgan, *The History of Parliamentary Taxation in England* (1911)..........................................................................................9

Tara Parker-Pope, *Cigarettes: Anatomy of an Industry* (2001) ................................4

*The Library of Original Sources* (Oliver Thatcher, ed., 1907).................................8

*The Stuart Constitution: Documents and Commentary* (J.P. Kenyon, ed., 1986) .....7

Tony Romm, et al., *How Are Trump's Tariff Rates Calculated?* N.Y. Times (Apr. 2, 2025)..........................................................................................22

## RULE 29(a) STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29 (c) (5), Amici Curiae state:

(A) the amicus curiae brief was authored by attorneys of the Goldwater Institute, and no portion was authored by counsel for any party;

(B) funding for preparation of the amicus curiae brief was provided by Goldwater Institute, and no party or party's counsel, contributed money that was intended to fund preparing or submitting the amicus curiae brief;

(C) no person, other than the Amicus Curiae Goldwater Institute, contributed money that was intended to fund preparing or submitting the amicus curiae brief.

## IDENTITY AND INTEREST OF AMICI CURIAE

Goldwater Institute (GI) was established in 1988 as a nonpartisan public policy and research foundation devoted to advancing the principles of limited government, individual freedom, and constitutional protections. Through its Scharf-Norton Center for Constitutional Litigation, GI litigates cases and files amicus briefs when its or its clients' objectives are directly implicated. Among GI's priorities is the enforcement of constitutional checks and balances that protect individual rights against arbitrary and unauthorized executive branch agencies, and it has appeared in numerous courts to vindicate that principle, both representing parties and as an amicus. *See, e.g., Kennedy v. Braidwood Mgmt., Inc*., No. 24-316, 2025 WL

1

1773628 (U.S. June 27, 2025); *Flytenow, Inc. v. FAA*, 808 F.3d 882 (D.C. Cir. 2015); *Mills v. Arizona Bd. of Tech. Registration*, 514 P.3d 915 (Ariz. 2022).  Because this case involves the Executive Branch's unilateral imposition of taxes, it implicates matters central to GI's mission.

Dallas Market Center (DMC) is a global business-to-business trade center and the leading wholesale marketplace in North America.  DMC owns and operates a 5.5 million square foot market center in Dallas, showcasing 27,000 brands of gift, home, lighting, floral/holiday, and other products.  DMC hosts markets throughout the year timed around new product line breaks, and sells wholesale to the trade only; but beyond markets, DMC is open daily to serve retail customers including interior designers.  The tariffs at issue here affect every industry DMC serves, some more than others.  While many companies have moved production out of China, most are still affected in some way, by increasing the cost of tooling, molds, or raw materials they use.  Many companies have cancelled or reduced fall and Halloween orders, have laid off staff and/or frozen pay in consequence.  Given their history and experience with regard to these issues, GI and DMC believe their perspective will aid this Court in considering this case.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

One of the foundation-stones of our Constitution is that the taxing power—including the power to tax international trade—belongs firmly and exclusively in the hands of the people's elected representatives. Even if the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.* ("IEEPA") or other statutes cited in the challenged Executive Order[1] authorize the "Liberation Day" tariffs, that act is an unconstitutional delegation of taxing power that contradicts our constitutional order's most basic principles.

**ARGUMENT**

**I.    The Constitution's authors were familiar with the idea of unilateral executive-branch taxation and prohibited it.**

The Constitution's authors were well aware of the possibility of an executive official imposing taxes unilaterally. The history of the Stuart kings, who ruled England from 1603 until 1689 before being dethroned by the Glorious Revolution, was (and remains) infamous for just that reason, and that history was well known to the Constitution's framers. Among the most offensive abuses by these kings—James I, Charles I, Charles II, and James II—were their efforts to tax England and

---

[1] What is said herein of IEEPA is equally true of the Tariff Act of 1930 (19 U.S.C. § 1338), which makes the argument offered by Amicus America First Policy Institute moot. Even assuming the tariffs at issue here were authorized by the latter act instead of the former, the Constitution only gives *Congress* the power to lay and collect taxes.

its colonies without legislative approval.  Much of our Constitution was written specifically with that history in mind.

In 1604, only three years after taking the throne, James I imposed a 4,000% tax on the importation of tobacco from America.  He disapproved of smoking (even publishing a book about its evils) and sought to prevent competition from Spanish imports.  But the tax caused a black market to spring up, so he reduced it in order to obtain revenue. Tara Parker-Pope, *Cigarettes: Anatomy of an Industry* 142, 145 (2001).  That proved only the first of a series of so-called royal "impositions," customs duties intended to raise revenue without Parliamentary approval. James and his heirs had little respect for elected representative bodies, seeing them as trouble-making obstructions.  They therefore frequently dissolved or dismissed Parliaments out of frustration over refusal to approve taxes, and sought instead to impose taxes through the "prerogative" power.

When an importer named John Bates refused to pay the imposition on the grounds that it was unlawful, the Court of Exchequer upheld the king's authority in *Bates' Case*, also known as *The Case of Impositions*, 2 St. Tr. 371 (Exch. 1608).  It held that impositions fell within the king's "absolute power," which "varieth … according to the wisdom of the king."  *Id*. at 389.[2]   James took this power and ran

---

[2] At a time when judicial independence was still in its infancy, the Court of Exchequer was roughly analogous to today's administrative agencies.

with it, imposing massive tariffs on most imports through the so-called Book of Rates. *See* 1 Henry Hallam, *The Constitutional History of England* 319 (1884). He insisted that the power to levy impositions had long been "yielded and acknowledged to be proper and inherent in the persons of princes, that they may according to their several occasions raise to themselves … fit and competent means by levying of customs and impositions." James I, *Commission to Levy Impositions* (1608), *in* S*elect Statutes and Documents of Elizabeth and James I* at 354 (G.W. Prothero, ed., 1894).

Parliament strongly disagreed. It was already a longstanding common law principle that the power to levy taxes belonged to Parliament, not the king, and when Members of Parliament spoke out against the taxes in 1610, James ordered the Commons "not to dispute of the King's power and prerogative in imposing upon merchandises exported or imported." *Id*. at 296 n.2. The House responded with a petition correcting him. Parliament not only had "an ancient, general, and undoubted right" to debate whatever they pleased, *id*. at 297, but it also held that the king had no unilateral power to levy imposts. *See* J.R. Tanner, *Constitutional Documents of the Reign of James I* at 247-63 (1960).

That did not resolve matters, and in 1614, Parliament again protested James's unilateral imposition of tariffs. "If the King may impose [taxes] by his absolute power, then no man [is] certain [of] what he hath, for it shall be subject to

the King's pleasure," complained one member. The Commons should be sure "[n]ot to leave our posterity in worse case than our ancestors have left us." *Id*. at 267. James punished this temerity by dissolving the House and having five members arrested. 1 Hallam, *supra*, at 341. He then ruled the country without a Parliament for the next seven years. Peter Ackroyd, *Rebellion: The History of England from James I to the Glorious Revolution* 43 (2014).

This set a pattern that was to plague England for most of the century, as the Stuarts time and again imposed taxes—so called "tonnage and poundage," for example, or the even more offensive "ship money"—without Parliamentary approval. Ship money was a Medieval form of taxation on seaside towns to raise funds for fighting pirates. It had fallen into desuetude by the seventeenth century, but Charles I revived it as a means of raising revenue without Parliamentary involvement, and demanded ship money not just from port towns but from the entire realm. This tax was collected by the direct seizure of assets, overseen by an army of bureaucrats and sheriffs, and therefore represented an unprecedented degree of intrusion into private life. Kevin Sharpe, *The Personal Rule of Charles I* at 581 (1992).

In 1637, an MP named John Hampden refused to pay and was arrested. He became a political hero to "Whigs"[3] (opponents of the crown), and the dissenting opinions of the judges who favored Hampden's position were widely circulated. One declared that ship money was "against the common law of the land, which gives a man a freedom and property in his goods and estates, that it cannot be taken from him, but by his consent in specie, as in Parliament, or by his particular assent." *Rex v. Hampden (The Ship-Money Case)*, 3 St. Tr. 825, 1129 (Exch. 1637). *See also* Mark A. Graber, *Ship-Money: The Case That Time and Whittington Forgot,* 35 Const. Comm. 47, 54 (2020).

The back-and-forth between the Stuarts and Parliament over the authority to levy taxes is a tedious story. *See generally* Philip Hamburger, *Is Administrative Law Unlawful?* 57-63 (2014); Josh Chafetz, *Executive Branch Contempt of Congress*, 76 U. Chi. L. Rev. 1083, 1100-16 (2009). Suffice to say that it was largely responsible for the Petition of Right in 1628, in which Parliament formally protested to Charles I that "your subjects … should not be compelled to contribute to any tax, tallage, aid, or other like charge not set by common consent, in parliament." *The Stuart Constitution: Documents and Commentary* 68 (J.P. Kenyon, ed., 1986). It was also responsible—when Charles did not desist—for the English Civil

---

[3] Hampden-Sidney College in Virginia is named after him (and Algernon Sidney, another opponent of the Stuarts).

War, which led to his overthrow and execution.  In 1653, Parliament sought to rule England without a king, under a written "instrument of government" which pledged that "[no] tax, charge, or imposition [shall be] laid upon the people, but by common consent in parliament."  3 *William Cobbett's Parliamentary History* 1417 (1808).

After the monarchy was restored, however, Charles II and James II persisted in taxing without Parliamentary input.  When the English again rose against their monarch, deposing James II in 1689 and replacing him with William and Mary, they adopted a new Bill of Rights that again reiterated that the power to levy taxes belonged to Parliament, not the king.  James, it declared, had given up his right to rule "[b]y levying money for and to the use of the Crown by pretense of prerogative for other time and in other manner than the same was granted by Parliament." *The Library of Original Sources* 10 (Oliver Thatcher, ed., 1907).

The Stuarts' efforts at prerogative taxation were not confined to Europe. They also sought to extract funds from American colonists, most notably by the imposition of quit-rents on land in the colonies.  Charles II, frustrated that colonists evaded tariffs and other trade restrictions, went so far as to abolish the colonial governments of New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, and New Jersey, and to replace them with a single government, the Dominion of New England, ruled by a dictator named Edmond Andros.

8

Andros's efforts to impose quit-rents and other taxes without legislative approval outraged the colonists. When one Massachusetts clergyman gave an impassioned sermon that encouraged Americans to declare that "no taxes should be levied upon the subjects without the consent of the assembly chosen by the freeholders," Andros had him arrested, and when Wise complained that the Magna Carta protected his rights, the reply came: "Mr. Wise, you have no more privileges left you than not to be sold for slaves."  J.H. Crooker, *John Wise, the Forgotten American*, 8 Mag. of W. Hist. 392, 399 (1888); Jack M. Sosin, *English America and the Revolution of 1688* at 73 (1982) (cleaned up).  At last, fed up with Andros's taxes, colonists overthrew him, arrested him, and issued a statement denouncing him for "rais[ing] taxes as he pleased" without "any liberty for an assembly."  Nathaniel Byfield, *An Account of the Late Revolution in New England* 7-19 (1689).

The Glorious Revolution of 1689 was seen as vindicating the principle that Parliament, not the king, possessed the fundamental sovereignty, and therefore that whatever power the king had to tax must come exclusively by and through Parliament.  *See* Shepard Ashman Morgan, *The History of Parliamentary Taxation in England* 307-08 (1911); *see further* 1 W. Blackstone, *Commentaries* *169.

A variation on this principle was itself central to the Revolution.  American "Whigs" or "Patriots" regarded taxes such as the Stamp Act or the Townshend Duties as illegitimate because they were adopted by a Parliament in which they were

not represented.  In fact, the taxes that started the American Revolution were tariffs on imports.  The revolutionary controversy began in 1764 with the Sugar Act (4 Geo. 3 c. 15), which imposed levies on imported sugar, wine, coffee, and cloth, and forbade Americans from shipping lumber and other items to Europe without first stopping in England to be unpacked, repacked, and re-shipped. *See generally* Ken Shumate, *The Sugar Act and the American Revolution* (2022).  Three years later, with the Townshend Duties (Revenue Act, 7 Geo. 3 c. 46), Parliament imposed levies on imported tea, glass, lead, paper, and paint.  Protests over these duties led to the repeal of all but the tea tax.  When Parliament reinforced that tax with the Tea Act of 1773, the result was an outbreak of protests in which Americans forced tea shipments to return to England or, in the most famous case, destroyed 92,000 pounds of tea by throwing it into Boston Harbor.

The reason for these protests was, again, that the taxing power should be held exclusively by the people's elected representatives.  While the 1760s taxes were levied by Parliament instead of the king, as the Stuart impositions had been, Americans were not, and could not be, represented in Parliament.  That meant its taxes were as illegitimate as the Stuarts' prerogative taxation.[4]  American colonial

---

[4] As John Phillip Reid puts it, Americans saw these taxes as proof of "the Stuartness of Parliament."  *Constitutional History of the American Revolution Volume 2: The Power to Tax* 55 (1987).

legislatures, not Parliament, had the exclusive power to impose taxes.  *See generally* Reid, 105-21.  Reid, the foremost historian of the constitutional issues of the American Revolution, called this the Revolution's "constitutional dogma."  *Id*. at 106.

As John Adams put it in 1765, "[w]e have always understood it to be a grand and fundamental principle of the [British] Constitution, that no freeman should be subjected to any tax, to which he has not given his own consent, in person or by proxy."  *Instructions to Braintree's Representative Concerning the Stamp Act, reprinted in John Adams: Revolutionary Writings* 1755-1775 at 126 (Gordon Wood, ed., 2011).  His nemesis, John Dickinson, agreed, explaining:

> No free people ever existed, or can ever exist, without keeping, to use a common, but strong expression, 'the purse strings' in their own hands.  Where this is the case, *they* have a *constitutional check* upon the administration, which may thereby be brought into order *without violence*.  But where such a power is not lodged in the people, oppression proceeds uncontrolled in its career.

John Dickinson, *Letters from a Farmer in Pennsylvania* (1768), *reprinted in The American Revolution: Writings from the Pamphlet Debate* 456 (Gordon Wood, ed., 2015) (emphasis added).

Parliament does not appear ever to have contemplated *delegating* to the king the power to unilaterally impose taxes without substantial Parliamentary input.  But in early 1774, when Parliament punished Boston for the Tea Party by closing Boston Harbor to all imports, it did purport to delegate to the king the authority to

11

determine whether and when to reopen two parts of the harbor. *See* Boston Port Act, 14 Geo. 3 c. 19 § 7. This struck colonists as an outrageous violation of the separation of powers. "This little exception seems to have been thrown in for no other purpose than that of setting a precedent for investing his majesty with legislative powers," declared Thomas Jefferson. "If the pulse of his people shall beat calmly under this experiment, another and another will be tried, till the measure of despotism be filled up." *A Summary View of the Rights of British America* (1774), *reprinted in Jefferson: Writings* 113 (Merrill Peterson, ed., 1984).

For these reasons, the Constitution's authors ensured that the taxing power would be held not only by Congress exclusively, but primarily by the House of Representatives, the part of the government considered closest to the people. The idea of this power being held by one particular individual was anathema to the founders. When Patrick Henry expressed fear that the President "may easily become king," 3 *Debates in the Several State Conventions* 58 (Jonathan Elliot, ed., 1836), Madison replied that this was not so because "[t]he purse is in the hands of the representatives of the people." *Id.* at 393.[5]

---

[5] At that time, the overwhelming majority of national taxes consisted of taxes on imports—meaning that when the founders gave Congress the power to tax, they specifically had in mind the power to impose tariffs and other exactions on international trade. *See, e.g., Federalist* No. 12 at 75 (J. Cooke, ed., 1961) (Alexander Hamilton) ("[W]e must a long time depend for the means of revenue, chiefly on such duties.").

The Fifth Circuit recently reiterated these principles in holding that there is "no historical precedent for broad delegations of Congress's power to tax." *Consumers' Rsch. v. FCC*, 109 F.4th 743, 782 (5th Cir. 2024), *rev'd on other grounds, FCC v. Consumers' Rsch.*, Nos. 24-354 & 24-422, 2025 WL 1773630 (U.S. June 27, 2024). Although legislatures routinely delegate to the executive branch the power to assess, or value property for tax purposes, it's highly irregular—indeed, contrary to constitutional principles—to authorize the executive branch to determine when to impose a tax and for how much and on what. As the Court said in *Nat'l Cable Television Ass'n, v. United States*, 415 U.S. 336, 340-41 (1974), "[t]axation is a legislative function, and Congress … is the sole organ for levying taxes …. It would be … a sharp break with our traditions to conclude that Congress had bestowed on [the executive branch] the taxing power."

In short, the founders understood the taxing power to be solely within the legislative purview. The Supreme Court has acknowledged that it "belongs exclusively to the legislative branch" and "is strictly a legislative power." *New Orleans Waterworks Co. v. Louisiana Sugar-Refin. Co.*, 125 U.S. 18, 31 (1888). It has also long held that Congress cannot delegate to the executive powers that are "strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42 (1825). It logically follows that Congress cannot delegate the taxing power.

13

The Constitution is unusually clear in vesting Congress, and Congress alone, with that power.  Not only does it state that "[t]he Congress shall have power to lay and collect taxes, duties, imposts and excises," U.S. Const. art. I § 8, but it also specifies that all bills for raising revenue must originate in the House.  *Id*. § 7.  Also, Congress may not give preferences in revenue legislation to the ports of one state over those of another, *id*. § 9, or adopt a direct or capitation tax without apportionment, or a tax on the export of articles from any state (or, prior to 1808, a tax on slave imports).  *Id*. § 10.  No such specificity is found with respect to Congress's general lawmaking authority, which is specified in terms of categories of legislative power—establishing post roads, making rules for the military forces, coining money, etc.—and a broadly phrased authority to "make all laws which shall be necessary and proper for carrying into execution the foregoing powers."  *Id*. § 8.  And, of course, *no such limits apply to the Executive Branch, because the Constitution's authors never contemplated that branch levying taxes.*

To paraphrase *Clinton v. City of New York*, 524 U.S. 417 (1998), it's impossible to believe that the framers would establish "'a single, finely wrought and exhaustively considered, procedure'" for laying and collecting taxes, while at the same time authorizing Congress to give the executive branch power to impose taxes on what it chooses, when it chooses, as much as it chooses.  *Id*. at 439-40 (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)).

14

It's no answer to say that delegation of such power might be warranted by the possibility of emergencies that could render it necessary for the President to raise funds. The prerogative taxes imposed by the Stuarts were also imposed during times of real or alleged emergencies, intended to raise funds for the vital purpose of waging war at a time when England was beset by foreign foes. Nevertheless, Parliament insisted upon its "power of the purse" as the most important means of protecting the people against an overbearing monarch. The whole theory of the "power of the purse" is that it keeps the executive in line by requiring him to request funds from the people's representatives. To excuse that requirement in times of "emergency" would neutralize its effectiveness at just that time when it is most effective—and would, of course, create an incentive for the executive branch to declare emergencies at any time.

## II.    The "intelligible principles" test shows why IEEPA does not delegate the taxing power.

### A.    Special factors govern the application of the "intelligible principles" test in this context.

Federal courts have long accepted legislative delegations of rulemaking power to executive agencies, but the taxing power differs significantly from ordinary rulemaking in ways that make delegation of the taxing power uniquely dangerous—and thus warrant a careful attention to constitutional principles.[6]

First, rule-making differs from taxing. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 546-74 (2012). Rules establish standards for behavior that is or isn't allowed. Taxes, by contrast, impose a revenue-raising charge on allowed behavior. Laws are "legal command[s]," whereas taxes simply establish conditions requiring a specified payment. *Id*. at 563. Taxes are also quintessentially matters for deliberation and compromise—that is, for legislative determination—because they involve complicated cost-benefit analyses and tradeoffs—which is not true of

---

[6] The Supreme Court held in *Fed. Commc'ns Comm'n v. Consumers' Rsch.,* that Congress need not set a "numeric cap or tax rate" when empowering administrative agencies to raise revenue. Nos. 24-354 & 24-422, 2025 WL 1773630, at *9 (June 27, 2025). But it expressly declined to address any other question regarding the delegation of taxing power. *See id.* at *14 n.9. *See also id.* at *35 (Gorsuch, J., dissenting) (remarking on the limitation of the holding). Indeed, it acknowledged that a law that, e.g., "authorize[s] the President to approve 'codes of fair competition … throughout the country,' yet impose[s] 'few restrictions' and 'set[s] up no standards' aside from a 'statement of the general aims,'" would be unconstitutional. *Id*. at *13 (quoting *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 521–22 (1935)).

the administrative regulations of executive agencies.  In *Missouri v. Jenkins*, 495 U.S. 33 (1990), the Court observed that it's inappropriate for courts to impose taxes because "[t]he very complexity of the problems of financing … suggests that there will be more than one constitutionally permissible method of solving them, and that ... the legislature's efforts to tackle the problems" should be entitled to respect."  *Id*. at 52 (cleaned up).  For the same reasons, taxation is a quintessentially legislative matter, depending on input from multiple stakeholders—and thus unsuited to unilateral executive action.

Second, although legislative delegation of rulemaking authority to the executive has long been accepted, that's because it's subject to various limitations—limitations that don't port over easily into the tax context.  The "intelligible principle" rule—which is rooted in the Lockean principle that the people only give the legislature the power to make laws, not lawmakers[7]—holds that Congressional authorization of rulemaking authority is not the giving away of legislative power, as long as Congress limits it by prescribing "intelligible principles" that guide the executive branch in carrying out the power.  "Intelligible principles" can be broad— they have included such terms as "just and reasonable," *Tagg Bros. & Moorhead v.*

---

[7] *Cf.* John Locke, *Second Treatise of Civil Government* § 141, *in John Locke: Two Treatises of Civil Government* 409 (Peter Laslett, rev. ed, 1963).

*United States*, 280 U.S. 420, 431 (1930), or "in the public interest," *New York Central Securities Corp. v. United States*, 287 U.S. 12, 21 (1932)—but other legal doctrines such as the "major questions" doctrine also help ensure that agency actions are within the scope of statutorily delegated authority.  Lisa Schultz Bressman, *Schechter Poultry at the Millennium:* A *Delegation Doctrine for the Administrative State*, 109 Yale L.J. 1399, 1408-09 (2000).  These limits prevent the wholesale giving away of legislative authority to the executive branch.

Yet it's unimaginable that Congress could, say, repeal all taxes tomorrow and replace them with a single-sentence statute allowing the President to collect whatever taxes he believes are "just and reasonable," *Tagg Bros.*, 280 U.S. at 431, or "in the public interest."  *N.Y. Cent. Securities Corp.*, 287 U.S. at 21.  In other words, what constitutes an "intelligible" principle differs based on context.

One purpose of the intelligible principles test is to make it possible "in a proper proceeding to ascertain whether the will of Congress has been obeyed."  *Yakus v. United States,* 321 U.S. 414, 426 (1944).  But if Congress were to give the President power to tax "for the good the public," it would be impossible to make such a determination.  *Cf. Consumers' Rsch.*, 109 F.4th at 761 ("it remains a mystery how we are supposed to 'ascertain whether the will of Congress has been obeyed' …. [Y]our guess is as good as ours … is as good as any random American taxpayer's.").

18

It would be equally impossible to determine whether a delegation of the taxing power to the President would be a "major question," as opposed to a minor one.  Would a three-penny tax on tea, imposed by the President alone, without Congressional involvement, be one of "those important subjects, which must be entirely regulated by the legislature itself," or merely a "fill[ing] up [of] the details"?  *Wayman*, 23 U.S. (10 Wheat.) at 43.  Presumably, all taxes are "major questions."

True, Congress has sometimes written statutes that give the executive power to apply or not apply tax laws in *specific instances, see, e.g., New Orleans Waterworks Co.,* 125 U.S. at 31, or to exempt specific items from taxation, *Field v. Clark*, 143 U.S. 649 (1892), but in doing so it has not purported to give the executive branch discretion to decide *what* taxes to impose or *how much*.  Rather, these instances involve Congress giving the President an "on/off switch," or "trigger for effectiveness,"[8] which is not what's happening here.

In *Field*, Congress adopted a tariff on a wide variety of goods, then exempted a list of specified goods, but then allowed the President to suspend that exemption when, in his judgment, another country had set its import restrictions in a way that was "unreasonable."  *Id*. at 680.  The Supreme Court held that this was

---

[8] Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 364 (2002).

constitutional because Congress had not delegated any power regarding "the expediency or the just operation" of the taxes. *Id.* at 693. Instead, Congress established a formula for the President to follow when turning the on/off switch of the taxes; he "had no discretion in the premises except in respect to the duration of the suspension," the Court said. "[T]he suspension was absolutely required when the president ascertained the existence of a particular fact." *Id.* That was an "on/off switch."

Likewise, in *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928), the Court upheld the constitutionality of a tariff statute that allowed the President to decide when to impose certain duties. That, too, was not giving away the taxing power; instead, Congress had specified the terms of the tax, but had "[felt] itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions," and had therefore left it to the White House to determine when the triggering event had occurred. *Id.* at 407. That, too, was an "on/off switch."

Here, by contrast, the Executive Branch has chosen to create tariffs that did not previously exist, on items that may or may not have been subject to tariffs, in amounts that the White House alone has decided upon. This is not an "on/off switch"—this is tax-creation.

20

**B.     IEEPA fails that the "intelligible principles" test.**

Compare IEEPA with the statute at issue in *J.W. Hampton*, which is found at 42 Stat. 858 (1922).  That statute set forth a "dutiable list," declaring that "there shall be levied, collected, and paid" certain duties on a wide variety of imports.  *Id.* at 858.  The list was quite precise, including everything from oxide of antinomy, taxed at 2 cents per pound, *id*. at 859, to "earthenware and crockery ware composed of a nonvitrified absorbent body," taxed at 45 percent *ad valorum, id*. at 870, and saddles, taxed at 35 percent unless the metalwork was made of brass, in which case it was taxed at 50 percent.  *Id*. at 881.

Or compare it with the statute at issue in *Field*—26 Stat. 567 (1890)—which if anything was more detailed.  It specified that penknives and pocket-knives were taxed at 50 cents per dozen, *id*. at 579, leaf tobacco suitable for cigar-wrappers were taxed at $2 per pound, unless stemmed, in which case they were taxed at $2.75 per pound, and that wools of the third class was taxed at thirteen cents per pound.  *Id*. at 585, 595.

IEEPA and the other statutes cited in the executive orders are totally unlike those statutes.  They contain no list of dutiable items, valuations, or other directives regarding amounts to be charged.  And where the statutes in *J.W. Hampton* and

21

*Field* set out specific rates on specific items, and left it to the President only to decide when to pull the trigger, neither IEEPA nor any of the other statutes specifies any criterion for determining when to pull the trigger.

That explains why the tariffs as actually announced appear to have been based on a purely subjective, and economically irrational valuation. The amounts were calculated "based on the U.S. trade deficit with a foreign country, divided by the country's exports." Tony Romm, *et al., How Are Trump's Tariff Rates Calculated?* N.Y. Times (Apr. 2, 2025).[9] No such formula is specified in IEEPA or in any other statute.

IEEPA allows the President to "regulate … transactions in foreign exchange," and to "regulate … any … importation or exportation of, or dealing in … any … transactions involving … any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(A), (B). But it sets forth no formulae, rate, or amount of taxation; specifies no item or items to be taxed; is silent respecting countries of origin; and provides no standard by which the President is to "ascertain[] the existence of [any] particular fact," which is what the *Field* Court found decisive. 143 U.S. at 693. Instead, IEEPA is a broad grant of

---

[9] https://www.nytimes.com/2025/04/02/business/economy/trump-tariff-rates-calculation.html.

emergency power to regulate for purposes of temporary national emergencies, and contains no indicia that it was designed as a tax or tariff statute.

Whatever intelligible principles IEEPA contains were intended to serve that statute's *actual* purpose of authorizing emergency powers in case of war or other emergency, *not* the unanticipated purpose of international trade regulation for which it is now being utilized.  That's why cases such as *United States v. Arch Trading Co.*, 987 F.2d 1087, 1093 (4th Cir. 1993), are unhelpful.  *Arch Trading* said IEEPA satisfied the intelligible principles test because it "defines the specific circumstances in which the President may act and to what extent," and in particular because "[t]he powers granted to the President are explicitly defined and circumscribed."  *Id*.  But that case involved a presidential order forbidding travel to Iraq and the sales of goods there during the First Gulf War, which was plainly the purpose for which IEEPA was designed.  It bears little resemblance to this case, where the statute is being twisted into a grant of (apparently limitless) taxing authority.

So while *Arch Trading* found the "explicit[]" limits on Presidential power in IEEPA (or, in the synonymous phrase that *Consumers' Rsch.,* used, the "qualitative limits," 2025 WL 1773630, at *12) adequate, those limits have no bearing on *taxation*.  Tax laws usually provide some kind of formulae for calculating a levy.  None of that is present in IEEPA—which contains neither quantitative nor "qualitative" limits on taxes.  *Id.*  And what limits it *does* contain can't be applied to taxes.

23

For example, Section 1702(a)(1)(A) lets the President "investigate, regulate, or prohibit." But these verbs don't fit with "tax." Tax and tariff statutes virtually always use verbs such as "levy," "collect," or "assess," instead—and these don't appear in IEEPA. Likewise, Section 1702(a)(3) says all persons are immune from liability "with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter"—which is hard to square with taxation, where liability doesn't turn on questions of good faith. And Section 1702(b)(3) bars the President from "regulat[ing] or prohibit[ing] … the importation from any country … of any information," when *information* is not subject to taxes in the first place.

The bottom line is that applying the intelligible principles test helps show why IEEPA doesn't delegate taxing power to begin with—and, if it does, it fails the intelligible principles test.

## III.   If this is allowed, what else is allowed?

Finally, IEEPA lacks any provision specifying *what the Executive Branch does with the money*. That raises an even graver constitutional concern.[10] If the

---

[10] By contrast, the Court said in *Consumers' Rsch*., *supra*, that the statute at issue was constitutional because it *did* limit what the agency could do with the money it raised—requiring that it be spent on a specific program, *see* 25 WL 1773630, at **13-16, and thus the statute did not "[give] the President 'virtually unfettered' authority to govern the Nation's trades and industries." *Id.* at *13.

President can impose and collect tariffs under IEEPA, on the theory that they qualify as "regulat[ions]" of "dealing," or of "exercising any right, power, or privilege with respect to, or transactions," 50 U.S.C. § 1702(a)(1)(A), (B), then he can with equal plausibility assert power to *keep and spend* the collected funds. Expenditures are neither more nor less "regulations" than are tariffs. So, a fortiori the President could collect *and spend* revenue without any Congressional involvement. In fact, the President has already asserted authority to spend money from "discretionary funds" on projects Congress has expressly refused to fund. *See, e.g.,* Brakkton Booker, *Trump Administration Diverts $3.8 Billion in Pentagon Funding to Border Wall*, NPR (Feb. 13, 2020).[11]

Thus, in an echo of the Stuart doctrine of prerogative taxation, the President could declare a national emergency, and, using IEEPA, impose taxes directly on Americans, to fund an endowment to spend on whatever he saw fit, without input from Congress. *Cf. Consumers' Rsch.*, 109 F.4th at 760 (where "[n]othing in the statute precludes [the agency] from, for example, imposing [the] Tax to create an endowment that it could use to fund whatever projects it might like," the statute was an unconstitutional delegation of taxing power). Indeed, he could collect reve-

---

[11] https://www.npr.org/2020/02/13/805796618/trump-administration-diverts-3-8-billion-in-pentagon-funding-to-border-wall.

nues sufficient to collect more revenues, thereby evading the appropriations process that normally serves as the circuit-breaker protection for constitutional democracy. Considering the historical experience underlying the Constitution, that cannot be what the framers had in mind.

**CONCLUSION**

Interpreting IEEPA as a delegation of taxing authority to the President raises the gravest constitutional concerns. If that is, indeed, what the statute authorizes, it is unconstitutional.

Respectfully submitted this 8th day of July 2025 by:

*/s/ Timothy Sandefur*
Timothy Sandefur
**Scharf-Norton Center for**
**Constitutional Litigation**
**at the GOLDWATER INSTITUTE**
500 East Coronado Road
Phoenix, Arizona 85004
litigation@goldwaterinstitute.org

*Counsel for Amici Curiae Goldwater Institute*
*and Dallas Market Center*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,984 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman in 14 point font.

/s/ *Timothy Sandefur*
Timothy Sandefur
*Attorney for Amicus Curiae*
*Goldwater Institute*
Dated:

## CERTIFICATE OF SERVICE

Document Electronically Filed and Served by ECF this 8th day of July 2025

on all counsel of record.


/s/ *Kris Schlott*
     Kris Schlott, Paralegal