**Nos. 25-1812 and 25-1813**

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

*Plaintiffs - Appellees*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection, in his official capacity as Acting Commissioner of the United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, in his official capacity as Secretary of Commerce, UNITED STATES CUSTOMS AND BORDER PROTECTION, (remainder of caption continued on following page)

*Defendants - Appellants*

On Appeal from the United States Court of International Trade in Nos. 1:25-cv-00066-GSK-TMR-JAR and 1:25-cv-00077-GSK-TMR-JAR (Judge Gary S. Katzmann, Judge Timothy M. Reif, and Senior Judge Jane A. Restani)

## BRIEF FOR *AMICI CURIAE* VIKRAM DAVID AMAR AND MICKEY EDWARDS IN SUPPORT OF PLAINTIFFS-APPELLEES

Tadhg Dooley
Emmett Gilles
WIGGIN AND DANA LLP
265 Church Street
New Haven, CT 06508
(203) 498-4400
tdooley@wiggin.com
egilles@wiggin.com

*Counsel for Amici Curiae*

———————————————

STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF VERMONT,

*Plaintiffs - Appellees*

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection, UNITED STATES,

*Defendants - Appellants*

———————————————

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**   25-1812 and 25-1813

**Short Case Caption**   V.O.S. Selections, Inc. v. Trump

**Filing Party/Entity**   Amici Curiae Vikram David Amar and Mickey Edwards

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/08/2025

Signature: /s/

Name:

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Vikram David Amar | | |
| Mickey Edwards | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

ii

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable                ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☐    No    ☑    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable                ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................i

TABLE OF AUTHORITIES...............................................................v

INTEREST OF AMICI CURIAE..............................................................1

BACKGROUND ........................................................................3

SUMMARY OF THE ARGUMENT ........................................................6

ARGUMENT .........................................................................10

   I.  Broad, and difficult-to-reclaim, delegations of legislative
      authority to the Executive pose profound separation-of-powers
      concerns. .......................................................................10

   II.  Constitutional retrieval concerns counsel in favor of narrowly
      construing statutes that delegate power to the President. ...........20

   III. The Court of International Trade correctly construed the
      IEEPA's delegation of power.........................................................25

CONCLUSION ......................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amer. Power & Light Co. v. SEC,*
   329 U.S. 90 (1946)................................................................ 13

*Biden v. Nebraska,*
   600 U.S. 477 (2023)............................................................. 22

*Currin v. Wallace,*
   306 U.S. 1 (1939)................................................................. 16

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
   545 U.S. 546 (2005)............................................................. 23

*Fed. Commc'ns Comm'n v. Consumers' Rsch.,*
   606 U.S. ----, 2025 WL 1773630 (U.S. June 27, 2025)................. 13, 20

*Field v. Clark,*
   143 U.S. 649 (1892) (Harlan, *J.*)......................................... 12

*Finley v. United States,*
   490 U.S. 545 (1989)............................................................. 23

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991)............................................................. 22

*INS v. Chadha,*
   462 U.S. 919 (1983)............................................................. 26

*J.W. Hampton, Jr., & Co. v. United States,*
   276 U.S. 394 (1928)........................................................ 12, 15, 21

*Learning Res., Inc. v. Trump,*
   2025 WL 1525376 (D.D.C. May 29, 2025) ............................. 7

*Mistretta v. United States,*
   488 U.S. 361 (1989)............................................................. 10

*Myers v. United States,*
272 U.S. 52 (1926) ........................................................................ 13

*Nat'l Cable Television Ass'n, Inc. v. United States,*
415 U.S. 336 (1974) ..................................................................... 21

*Panama Ref. Co. v. Ryan,*
293 U.S. 388 (1935) ..................................................................... 11

*Perez v. Mortgage Bankers Ass'n, Perez v. Mortgage Bankers Ass'n,*
135 S. Ct. 1199 (2015) (Thomas, J., concurring) .............................. 10

*Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ................................................................ 11, 21

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
591 U.S. 197 (2020) ..................................................................... 11

*United States v. Yoshida Int'l. Inc.,*
526 F.2d 560 (C.C.P.A. 1975) ......................................................... 5

*United Steelworkers of America v. Weber,*
443 U.S. 193 (1970) (Blackmun, J., concurring) ..................... 9, 23, 26

*V.O.S. Selections, Inc. v. United States,*
772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ..................... 5, 7, 21, 25

*Virginia v. EPA,*
597 U.S. 697 (2022) ..................................................................... 22

*Wayman v. Southard,*
10 Wheat. 1 (1925) ...................................................................... 21

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952) (Jackson, J., concurring) .................................. 10

## Statutes

International Emergency Economic Powers Act ............................ *passim*

Trade Act of 1974 ......................................................................... 6

## Other Authorities

31 Op. O.L.C. 73 (2007) .................................................................. 13, 15

Abner S. Greene, *Checks and Balances in an Era of Presidential Lawmaking*, 61 U. CHI. L. REV. 123, 126 (1994) .......................................................................................... 19

Charles M. Cameron, *Bargaining and Presidential Power*, *in Presidential Power: Forging the Presidency for the Twenty-First Century* 47 (Robert Shapiro et al., eds., 2000) ....................................................................................... 19

CRS Report RL30909, *The Pocket Veto: Its Current Status* (Mar. 30, 2001) ............................................................................ 18

CRS Report RS21750, *The Presidential Veto and Congressional Procedure* (Feb. 27, 2004) ......................................... 17

Executive Order 14193, 90 Fed. Reg. 9113, 9114 (Feb. 1, 2025) ........................................................................................... 3

Executive Order 14194, 90 Fed. Reg. 9117, 9118 (Feb. 1, 2025) ........................................................................................... 3

Executive Order 14195, 90 Fed. Reg. 9121, 9122 (Feb. 1, 2025) ........................................................................................... 3

Executive Order 14228, 90 Fed. Reg. 11463, 11463 (Mar. 3, 2025) ........................................................................................... 3

Executive Order 14257, 90 Fed. Reg. 15041, 15045 (Apr. 2, 2025) ........................................................................................... 3

Executive Order 14259, 90 Fed. Reg. 15509, 15509 (Apr. 8, 2025) ........................................................................................... 3

Executive Order 14266, 90 Fed. Reg. 15625, 15626 (Apr. 9, 2025) ........................................................................................... 3

Executive Order 14298, 90 Fed. Reg. 21831, 21831 (May 12, 2025) ........................................................................................... 3

*The Federalist No. 51*, at 321 (Madison) ................................................. 10

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 COLUM. L. REV. 277, 307 (2021) ........................... 16

Keith E. Whittington & Jason Iuliano, *The Myth of the Nondelegation Doctrine,* 165 U. PENN. L. REV. 379 (2017)................. 20

Patrick W. Duff & Horace E. Whiteside, *Delegata Potestas Non Potest Delegari: A Maxim of American Constitutional Law*, 14 CORNELL L. REV. 168 (1929).................................................. 14

Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 YALE L.J. 541 (1994)........................................................................................... 14

U.S. Const. art. I, § 7 ............................................................................. 12

U.S. Const. art. I, § 7, cl. 2 ............................................................ 17, 18

U.S. Const. art. I, § 8 ......................................................................... 3, 6

United States Senate, *Summary of Bills Vetoed, 1789– Present*, at https://www.senate.gov/legislative/vetoes/ vetoCounts.htm............................................................................. 18, 19

Vikram Amar, *Indirect Effect of Direct Election*: *A Structural Examination of the Seventeenth Amendment*, 49 VAND. L. REV. 1347, 1378 (1996) ..................................................................... 15

Volume 17 of Wright and Miller's *Federal Practice & Procedure* ............................................................................................ 1

## INTEREST OF AMICI CURIAE[1]

Vikram David Amar is a legal scholar and historian who studies and writes about constitutional law, federal courts, and civil procedure. One branch of his scholarship has focused on the ways in which courts undermine constitutional values when they approve, without clear congressional authorization, broad delegations of policy-making power to the President, given that such delegations cannot easily be retrieved. Professor Amar has a general interest in assisting the courts in practicing principled constitutional decision-making and faithful originalism, and in minimizing the error costs of judicial decisions. He has a special interest in assisting this Court, as the author of Volume 17 of Wright and Miller's *Federal Practice & Procedure*, which addresses the powers and functions of the Federal Circuit and the Court of International Trade.

Mickey Edwards is a former member of Congress who served Oklahoma's 5th Congressional District from 1977 to 1993. As a member of Congress, Representative Edwards was committed to preserving the

---

[1] When establishing the briefing schedule in this case, the Court authorized all timely amicus briefs without the need to obtain consent or leave of the Court. ECF No. 53 at 3–4. No counsel for any party authored this brief in whole or in part or made a monetary contribution toward its preparation and submission.

1

constitutional separation of powers and guarding against excessive concentration of power in the Oval Office, regardless of its occupant. After leaving Congress, Representative Edwards taught government and public policy for over 20 years at Harvard's Kennedy School of Government and Princeton's Woodrow Wilson School of Public and International Affairs. He has also been affiliated with the Aspen Institute, where he created and directed a bipartisan leadership program for elected officials and directed an initiative to restore Congress's constitutional powers.

Based on their academic and practical experience, *Amici* have a shared interest in encouraging courts to exercise caution when construing statutory delegations of power to the President. Caution is warranted because it is difficult for Congress to "retrieve" power that a court has erroneously concluded was conferred, and such difficulty directly implicates the Constitution's concern about delegations of legislative power. For this reason, the costs of an erroneous decision by the courts in this arena are not symmetrical. *Amici* therefore urge this Court to reject the President's broad reading of the International Emergency Economic Powers Act and affirm the judgment below.

## BACKGROUND

Between February and May 2025, President Trump singlehandedly imposed tariffs on nearly every good imported into the United States. These duties include a 10% baseline tariff on all imports, higher "reciprocal" tariffs derived from various country-specific trade deficits, and additional "trafficking" tariffs on goods from Mexico, Canada, and China. The President imposed these tariffs—unilaterally overhauling decades of United States trade policy—through a series of executive orders (the "Tariff Orders"), without any involvement from Congress, the branch of government imbued with the power to "regulate Commerce with foreign Nations" and to "lay and collect Taxes, Duties, Imposts and Excises." U.S. Const. art. I, § 8.[2]

The President claims authority for his Tariff Orders under the International Emergency Economic Powers Act ("IEEPA"), which confers

---

[2]     *See* Executive Order 14193, 90 Fed. Reg. 9113, 9114 (Feb. 1, 2025); Executive Order 14194, 90 Fed. Reg. 9117, 9118 (Feb. 1, 2025); Executive Order 14195, 90 Fed. Reg. 9121, 9122 (Feb. 1, 2025); Executive Order 14228, 90 Fed. Reg. 11463, 11463 (Mar. 3, 2025); Executive Order 14257, 90 Fed. Reg. 15041, 15045 (Apr. 2, 2025); Executive Order 14259, 90 Fed. Reg. 15509, 15509 (Apr. 8, 2025); Executive Order 14266, 90 Fed. Reg. 15625, 15626 (Apr. 9, 2025); Executive Order 14298, 90 Fed. Reg. 21831, 21831 (May 12, 2025).

on the President the power to "regulate … importation … of … any property in which any foreign country or a national thereof has any interest by any person … subject to the jurisdiction of the United States …." 50 U.S.C. § 1702(a)(1)(B). But the IEEPA expressly provides that this power "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared … and may not be exercised for any other purpose." *Id*. § 1701(b). The President claims to have satisfied this statutory limitation by declaring a national emergency based on purported threats to the nation's security and economy posed by cross-border drug dealing, gang violence, human trafficking, and money laundering.[3]

Plaintiffs–Appellees are a collection of States and businesses that have been adversely impacted by the President's unilateral and abrupt overhaul of national trade policy. They challenged the Tariff Orders in the Court of International Trade, which granted their motion for summary judgment. In a unanimous decision, the court held that the IEEPA does not delegate to the President the "unbounded tariff authority" he claimed to impose worldwide baseline and retaliatory

---

[3] *See supra*, n.2.

tariffs. *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1370 (Ct. Int'l Trade 2025). Such a broad delegation "would constitute an improper abdication of legislative power to another branch of government." *Id.* at 1372. Therefore, in deference to the constitutional separation of powers, the court read the IEEPA's delegation of power narrowly, to authorize only "a limited surcharge, as a temporary measure calculated to help meet a particular national emergency," not to "confer unlimited tariff authority" on the President. *Id.* at 1372–73 (quoting *United States v. Yoshida Int'l. Inc.*, 526 F.2d 560, 584 (C.C.P.A. 1975)).

With respect to the "trafficking" tariffs on Canada, Mexico, and China, the court rejected the President's argument that these tariffs satisfied the statutory requirement that powers delegated under the IEEPA be exercised only to "deal with an unusual and extraordinary threat." *Id.* at 1380–82 (quoting 50 U.S.C. § 1701(b)). In particular, the court found that the "collection of tariffs on lawful imports does not evidently relate to" cross-border law-enforcement efforts, and that even if the threat of such tariffs could "pressure" foreign governments to do more, that form of "leverage" was too far removed from directly "dealing with the cited emergency." *Id.* at 1381–82 ("If 'deal with' can mean

'impose a burden until someone else deals with,' then everything is permitted.").

On appeal, the President presses his expansive reading of the IEEPA's text, starting from the premise that Congress "delegated broad tariff authority to the President[.]" Opening Br. at 1. With respect to his baseline and retaliatory tariffs, the President contends that Section 122 of the Trade Act of 1974 does not limit his delegated powers under the IEEPA. *Id.* at 46–54. As for the trafficking tariffs, the President asserts that there is no statutory obstacle to using these tariffs as a "bargaining chip" to be leveraged "in negotiating the resolution of a declared national emergency." *Id.* at 54–60.

## SUMMARY OF THE ARGUMENT

Because the Constitution expressly assigns to Congress the powers "[t]o lay and collect Taxes, Duties, Imposts and Excises," and "[t]o regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, the President's unilateral Tariff Orders can withstand constitutional scrutiny only if they were issued pursuant to authority properly

conferred by Congress.[4] The President claims that Congress gave him the requisite authority in the IEEPA. But as the court below concluded, that statute does not authorize the President to impose "unbounded tariffs" or to use tariffs as "leverage" to obtain unrelated policy goals. 772 F. Supp. 3d at 1370. On the contrary, the IEEPA's text and history show that it was enacted to *rein in* presidential overreach and *limit* the President's power to adjust tariffs. *See generally* Case No. 1:25-cv-00066, ECF 29-1, Joint Brief of *Amici Curiae* (April 23, 2025) at 9–21; *Learning Res., Inc. v. Trump*, 2025 WL 1525376, at *8–12 (D.D.C. May 29, 2025).

There are many reasons, grounded in ordinary principles of statutory construction, to support the holding below. *See generally* Case No. 1:25-cv-00066, ECF 10, V.O.S. Selections' Motion for Summary Judgment, at 20-35; Case No. 1:25-cv-00077, ECF 15, States' Motion for Summary Judgment, at 2-3; 772 F. Supp. 3d at 1370–82. But even if this were a closer question—that is, even if there were genuine doubt about whether Congress intended to delegate such broad tariff power to the

---

[4]    The President does not, nor could he plausibly, claim any inherent authority to set tariffs. Instead, he argues that Congress has "delegated broad tariff authority to the President to supplement the President's Article II powers over foreign affairs." Opening Br. at 1.

President—this Court should still err on the side of caution and read the IEEPA's delegation of power narrowly. The need for caution is grounded in both constitutional and related practical concerns.

First, as a matter of constitutional law and theory, courts should construe statutory delegations of power narrowly, both to prevent an unconstitutional concentration of power in the Executive Branch and to ensure that delegated power is exercised consistent with the intent of the original delegators. Courts must be especially vigilant when legislative power is purportedly delegated to the President because power delegated to the President cannot be easily retrieved on account of the President's ability to veto subsequent retrieval attempts by Congress.

Second, practical experience and history have confirmed that, because of the President's veto power and other impediments to retrieval, delegation in fact tends to be a one-way ratchet. Because the President (any President) has an institutional interest in preserving executive power, a two-thirds vote of both Houses of Congress is generally required to override a veto of legislation seeking to retrieve that power. This is a historically rare feat. By contrast, if Congress wants to delegate *more* power to the President than courts have recognized, it may generally

8

undo such judicial rulings by a simple majority, passing legislation that the President (any President) will almost certainly sign into law. *See infra* at 10–21.

Given these constitutional and related practical concerns, courts should generally construe statutory delegations of power narrowly, so as to limit the costs of an incorrect decision.[5] Here, a narrow reading of the IEEPA plainly shows that Congress did not delegate to the President the power he claims to unilaterally adjust foreign tariffs. The lower court was therefore correct to hold that the Tariff Orders are *ultra vires* and invalid. This Court should affirm. If it turns out that the Court has "erred," *see supra* n.5, then it will be far easier for Congress to "correct" the error by passing legislation clearly delegating broad tariff power to the President than it would be for Congress to claw back presidential power erroneously recognized by this court via a broad statutory reading. *See infra* at 21–28.

---

[5]     As used here, an "incorrect" or "erroneous" decision on the meaning of a statute is one that "misperceive[s] the political will," *Weber*, 443 U.S. at 216 (Blackmun, J., concurring). That is not to say it is poorly reasoned. In our system of representative democracies, legislative overrides of judicial decisions that do not reflect legislative will, even if they were carefully and prudently reached, should be welcomed, not scorned.

## ARGUMENT

### I. Broad, and difficult-to-reclaim, delegations of legislative authority to the Executive pose profound separation-of-powers concerns.

To prevent the concentration of power and preserve individual liberty, the Framers devised a constitutional system that divides power among three distinct and coequal branches of government. *See generally Perez v. Mortgage Bankers Ass'n, Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1216–17 (2015) (Thomas, J., concurring) ("To the framers, the separation of powers and checks and balances were more than just theories. They were the practical and real protections for individual liberty in the new Constitution.")

While the design of the Constitution permits a practical degree of interdependence and power-sharing among the political branches, *see generally Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring), the Supreme Court has nevertheless cautioned against the "gradual concentration of the several powers in the same department." *Mistretta v. United States*, 488 U.S. 361, 381 (1989) (quoting *The Federalist No. 51*, at 321 (Madison)). Broad statutory conferrals of power to the Executive Branch can be dangerous for two

10

distinct but related reasons.

First, the concentration of too much authority in the hands of a single person—and the Court has increasingly recognized that the Executive Branch is controlled by a single person, the President, *see, e.g., Seila L. LLC v. Consumer Fin. Prot. Bureau,* 591 U.S. 197 (2020)—risks converting constitutional democracy into soft dictatorship. The Supreme Court's decisions striking down New Deal programs under the so-called nondelegation doctrine were rooted in this concern, which was not at all abstract in the years leading up to World War II. *See, e.g., Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935).

Second, and more insidiously, it is all too easy for a statutory conferral of policy-making power to the Executive Branch to be exercised by subsequent presidential administrations in a manner inconsistent with the intent of the original actors—House, Senate, and signing President—who combined to enact the delegation in the first place. Our Constitution contemplates that federal law and policy can be changed only by a process involving both chambers of the legislature and the President (or, in the absence of presidential assent, a supermajority of

the legislature). *See* U.S. Const. art. I, § 7. In this way, the separation of powers is not merely a negative check on the concentration of power in one department but also a positive requirement that lawmaking involve both political branches. Once policy-making power is delegated to the President, however, there is little Congress can do to prevent that power from being exercised in ways not contemplated by the original delegators. Future presidential Administrations may test whatever boundaries the delegating legislators attempted to set, resulting in the Executive Branch unilaterally shaping federal law and policy without the involvement of the Legislative Branch.

The nondelegation doctrine has long been invoked to address these concerns. *See, e.g., J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928) ("[I]n carrying out that constitutional division into three branches it is a breach of the national fundamental law if Congress gives up its legislative power and transfers it to the President...."); *Field v. Clark*, 143 U.S. 649, 692 (1892) (Harlan, *J.*) ("That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution."). Under this doctrine,

Congress may delegate legislative authority to the President, or an executive agency, but only if the delegation is accompanied by a sufficiently "intelligible principle" to guide and constrain the exercise of that authority. *See, e.g.*, *Fed. Commc'ns Comm'n v. Consumers' Rsch.,* 606 U.S. ----, 2025 WL 1773630, at *8 (U.S. June 27, 2025); *Amer. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946) (delegation permissible where Congress "clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority").

The nondelegation doctrine obviously cannot be understood as forbidding *all* delegations of vested power. After all, Article II provides that "[t]he executive Power shall be vested in a President of the United States of America," yet no one finds it constitutionally problematic for the President to transfer substantial executive authority to his subordinates in the Executive Branch. *See Myers v. United States*, 272 U.S. 52, 117 (1926) ("[T]he President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates."); Officers of the U.S. Within the Meaning of the Appointments Clause, 31 Op. O.L.C. 73, 81 (2007) ("The earliest commentators shared and perpetuated the

Federalist's understanding of a federal office as involving the wielding of delegated sovereign authority.").[6]

But the primary reason the Constitution so readily permits broad delegations of power *within* the Executive Branch is that the President is generally (under unitary-executive notions) free to oversee, override, and reclaim any authority he has delegated. *See generally* Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 YALE L.J. 541 (1994). This key feature of intra-branch delegation helps illuminate what is problematic about broad inter-branch delegations of power from Congress to the President: once delegated, that legislative power cannot readily be reclaimed by Congress. In other words, under the Constitution, delegations of power are problematic not *per se*, but instead when delegated power is *hard to reclaim* after it has been delegated.

This understanding of the nondelegation principle finds support in the originalist scholarship done at the beginning of the last century by Professors Patrick W. Duff and Horace E. Whiteside. *See* Patrick W. Duff

---

[6]    For example, a President doesn't criminally prosecute defendants himself; he relies on officers in the Department of Justice to discharge this core executive power.

& Horace E. Whiteside, *Delegata Potestas Non Potest Delegari: A Maxim of American Constitutional Law*, 14 CORNELL L. REV. 168 (1929). Duff and Whiteside set out to uncover the origins of the Latin nondelegation maxim, "delegata potestas non potest delegari," generally translated as "delegated power may not be redelegated." Their groundbreaking historical research established that the earliest forms of this common-law maxim—which has informed constitutional nondelegation concerns[7]—were framed in anti-alienation terms. Namely, power cannot "be so delegated, *that the primary (or regulating) power does not remain with the King himself*." *Id.* at 173 (emphasis added). As Professors Duff and Whiteside conclude, the original concern was that the "King's power not [be] *diminished* by its delegation to others." *Id.* (emphasis added). This historically accurate reformulation focuses attention on a key aspect of the delegation problem: "that delegation is more problematic *when it is harder to reclaim*." Vikram Amar, *Indirect Effect of Direct Election: A*

---

[7]   As Chief Justice Taft observed, this maxim of agency law "has had wider application in the construction of our federal and state Constitutions than it has in private law." *Hampton*, 276 U.S. at 405–06.

*Structural Examination of the Seventeenth Amendment*, 49 VAND. L. REV. 1347, 1378 (1996) (emphasis added).[8]

The upshot of all this is that broad delegation of legislative power to the President poses particularly vexing problems. When a President (as opposed to a State, for example) exercises delegated power in a way that diverges from the understandings and expectations of the empowering Congress, and thus essentially embarks on new unilateral lawmaking, Congress cannot easily retrieve the delegated power. *See id.* at 1384. That is because when Congress tries to reclaim broad delegations to the President (or agencies over which he exercises

---

[8] Even scholars who have suggested the Framers were generally untroubled by the delegation of legislative power have acknowledged the concerns created by "legislatures' *permanent alienation of legislative power without right of reversion or control.*" Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 COLUM. L. REV. 277, 307 (2021) (emphasis added). Alienation—permanent dispossession—is another way of describing something that has been given in such a way that it can't be controlled or retrieved. Then-Solicitor General Robert Jackson invoked that very distinction in a brief the United States filed in *Currin v. Wallace*, 306 U.S. 1 (1939), writing: "It would appear elementary that no department can divest itself of the power thus vested in it. In other words, there can be no alienation of power. [But] [d]elegation . . . that is *at all times subject to recall and supervision by Congress* . . . is in no sense a divesting or alienation of its power." Brief for the United States, 1938 WL 63974, at 44–65 (1938) (emphasis added).

complete dominion), the President enjoying that delegated power can veto the proposed repeal law, requiring a supermajority of both houses to overcome.

The Presentment Clause of the Constitution gives the President authority to veto legislation, subject to override by two-thirds vote of both houses of Congress:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States: If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise by reconsidered, and if approved by two thirds of that House, it shall become a Law.

U.S. Const. art. I, § 7, cl. 2. Today, that means at least 67 Senators and 290 Representatives must agree to override a veto.

It should go without saying that getting 357 members of Congress to agree on something is no small feat. What's more, by convention if one house fails to override a veto, the other will not take a vote, even if more than two-thirds of its members wish to override. *See* CRS Report RS21750, *The Presidential Veto and Congressional Procedure* at 2 (Feb.

27, 2004), *available at* https://www.archives.gov/files/legislative/resources/education/veto/veto-procedure.pdf. Therefore, if the legislation originated in the Senate, it is theoretically possible that just 34 Senators could prevent a veto override favored by the other 501 members of Congress, frustrating the will of the people as expressed by 93% of their representatives.

It is no surprise, then, that veto overrides have been historically rare. Since 1789, there have only been 112 veto overrides, compared to 1531 "regular" vetoes (about 7%). *See* United States Senate, *Summary of Bills Vetoed, 1789–Present*, at https://www.senate.gov/legislative/vetoes/vetoCounts.htm. The problem is compounded by the President's (contested) ability to issue a "pocket veto" by returning a bill to Congress while it is adjourned. *See* U.S. Const. art. I, § 7, cl. 2 ("If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a law, in like Manner as if he had signed it, *unless the Congress by their Adjournment prevent its Return, in which case it shall not be a Law.*") (emphasis added); *see generally* CRS Report RL30909, *The Pocket Veto: Its Current Status* (Mar. 30, 2001). When pocket vetoes are included, Congress has

18

overridden less than 5% of presidential vetoes since 1789. *See* United States Senate, *Summary of Bills Vetoed,* 1789–Present, *supra.*[9]

The Presentment Clause, while an important safeguard against congressional encroachment on executive power, has tended to exacerbate the "one-way ratchet" effect of the expansion of presidential power over time. *See generally* Abner S. Greene, *Checks and Balances in an Era of Presidential Lawmaking,* 61 U. CHI. L. REV. 123, 126 (1994) ("[I]n the post-nondelegation doctrine world, the presidential veto has served not only to prevent legislation the President deems unconstitutional or unwise, but also to entrench the President's own acts of lawmaking."). Simply put, a majority of Congress can (within broad constitutional limitations) always give the President *more* power, but it requires an historically rare supermajority to retract any of that power, once given.

---

[9]    Even this figure does not fully account for the scope of the veto power, for the mere threat of a veto can often have the same effect as a veto itself. *See, e.g.*, Charles M. Cameron, *Bargaining and Presidential Power*, *in Presidential Power: Forging the Presidency for the Twenty-First Century* 47, 61 (Robert Shapiro et al., eds., 2000) ("Broadly speaking, veto threats often enhance presidential power … because they help the president and Congress strike bargains that they might not otherwise forge, for want of congressional concessions.").

For these reasons, delegated power that required a bare majority of both houses of Congress to create may require a supermajority to reclaim. The fact that the President wears two hats—as recipient of delegated power and as decisionmaker (via the veto) in attempts to rein in that power—means that legislative delegations of power to the President are particularly troublesome.

## II. Constitutional retrieval concerns counsel in favor of narrowly construing statutes that delegate power to the President.

To be sure, the Supreme Court has not invoked nondelegation principles to invalidate conferrals of power to the Executive Branch very often, or very recently—in part due to practical line-drawing problems. *See generally* Keith E. Whittington & Jason Iuliano, *The Myth of the Nondelegation Doctrine*, 165 U. PENN. L. REV. 379 (2017). As the Court explained in its most recent discussion on the subject, "we have recognized that Congress may 'seek assistance' from its coordinate branches to secure the 'effect intended by its acts of legislation,'" and that it "may 'vest[] discretion' in executive agencies to implement and apply the laws it has enacted—for example, by deciding on 'the details of their execution.'" *Consumers' Research*, 2025 WL 1773630, at *8 (quoting

*Hampton,* 276 U.S. at 406 and *Wayman v. Southard*, 10 Wheat. 1, 46 (1925)).

But no one contends in this appeal that the court should *invalidate* the IEEPA. Instead, the issue in this case is the best way to *understand* the IEEPA in light of the Constitution's nondelegation concern. Thus, while the separation-of-powers principles animating the nondelegation doctrine remain front and center, those principles do not require the *direct* application of the nondelegation doctrine, as generally understood, so much as they call for a narrow reading of the IEEPA. As the court below put it:

> Both the nondelegation and the major questions doctrines, even if not directly applied to strike down a statute as unconstitutional, provide useful tools for the court to interpret statutes so as to avoid constitutional problems.

*V.O.S. Selections*, 772 F. Supp. 3d at 1371–72.

The Supreme Court has, itself, invoked the nondelegation doctrine in just this manner, as a reason to read a statute narrowly so as to avoid constitutional concerns. *See Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 342 (1974) ("Whether the present Act meets the requirement of *Schechter* and *Hampton* is a question we do not reach.

But the hurdles revealed in those decisions lead us to read the Act narrowly to avoid constitutional problems.").[10] Likewise, the "major questions" doctrine that the Court has discussed in recent terms can be seen as a variation on this practice—*i.e.*, requiring a clear statement before assuming that Congress intended to delegate matters of enormous economic and political significance to executive agencies. *See Virginia v. EPA*, 597 U.S. 697, 721 (2022) (stating that the "the breadth of the authority that the executive branch has asserted" and the "economic and political significance" of that assertion provide "reason to hesitate before concluding that Congress meant to confer such authority"); *see also Biden v. Nebraska,* 600 U.S. 477, 504 (2023) ("A decision of such magnitude and consequence on a matter of earnest and profound debate across the country must rest with Congress itself. Or an agency acting pursuant to a clear delegation from that representative body.").

In light of these separation-of-powers nondelegation concerns, reading statutory conferrals of power to the President narrowly has the

---

[10]    The Court has similarly invoked federalism concerns as a reason to read statutes narrowly. *E.g. Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("[I]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.").

constitutionally salutary effect of minimizing the costs of error. Any time a court interprets a statute, there is some risk of error. *See supra* n.5. Therefore, courts have long recognized—and occasionally taken comfort in—the ability of Congress to override their statutory-interpretation decisions. As Justice Blackmun put it in *United Steelworkers of America v. Weber*, "if the Court has misperceived the political will, it has the assurance that because the question is statutory Congress may set a different course if it so chooses." 443 U.S. 193, 216 (1970) (Blackmun, J., concurring).[11]

But a majority of each house of Congress (that enacted the original statute) can set a different course only with the cooperation of the President; and, as discussed *supra*, in cases involving statutory delegations of power, the President is unlikely to cooperate in overriding a judicial decision that erroneously granted him *more* power than Congress desires. The costs of an erroneous decision approving the

---

[11]    *See also, e.g.*, *Finley v. United States*, 490 U.S. 545, 556 (1989) ("Whatever we say regarding the scope of jurisdiction conferred by a particular statute can of course be changed by statute."); *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 557 (2005) (noting that "Congress accepted the invitation" extended in *Finley* when it passed the Judicial Improvements Act).

President's assumption and exercise of legislative power are thus greater than the costs of an erroneous decision finding that the President has exceeded his delegated authority. If the Court "misperceive[s] the political will" by construing a statute to confer *less* power on the President than Congress intended, there is a relatively easy fix: Congress can pass a new bill by simple majority and the President will almost certainly sign it into law. But if the Court errs by construing a statutory delegation to give *more* power to the President than Congress intended, it will require likely a supermajority in both houses to correct the error, because the President has the ability and incentive to veto any legislation constraining his power.

Given the asymmetrical costs of error, courts should generally resolve any doubts about the scope of a delegation of power against the President. That way, the risk of the creation of unintentional and irretrievable presidential power in violation of nondelegation principles is reduced, and the opportunity for Congress to correct any interpretive mistakes is enhanced. To be clear, this is not an argument forbidding all broad conferrals of power to the President. It is an argument in favor of ensuring that broad delegations of power are in fact intended and guided

24

by Congress before they are assumed and exercised by the President. Because of the retrieval problems and asymmetrical error costs that arise in cases of statutory delegations to the President, courts should generally require explicit language demonstrating both Congress's intent to delegate and the intelligible principles that will guide and constrain the President's exercise of delegated power. As the court below correctly observed, that sort of language is lacking in the IEEPA.

## III.   The Court of International Trade correctly construed the IEEPA's delegation of power.

Truth be told, the question of statutory interpretation in this case cuts against the President in any event. As explained by the court below, the IEEPA does not by any fair reading of its terms provide the President with the expansive breadth of authority he claimed in issuing the Tariff Orders. *See* 772 F. Supp. 3d at 1370 ("Because of the Constitution's express allocation of the tariff power to Congress, we do not read IEEPA to delegate an unbounded tariff authority to the President."). But even if it were a close call, the lower court took the constitutionally proper and responsible course in interpreting the IEEPA narrowly, in light of the asymmetrical costs of error described above.

The Court is presented with two competing interpretations of the

IEEPA—one that would substantially expand the President's power over tariffs, as understood for decades, and one that would not. To the extent the statute's text and history does not decisively resolve which interpretation is superior, *but see infra* at 7–8, the Court should adopt the narrower interpretation, as that is the one less likely to run afoul of constitutional principles and the one that Congress could more easily correct in the event that "the Court has misperceived the political will." *Weber*, 443 U.S. at 216.

## CONCLUSION

The Court should adopt the lower court's narrow reading of the IEEPA not only because it is the most natural reading, but because, in the absence of explicit direction from Congress, it is the reading that best respects the Framers' concerns about irretrievable delegations of power. If Congress disagrees, it can easily pass a new law—which the President would undoubtedly sign—expressly delegating to the President the expansive power over federal trade policy that he seeks to exercise. But, if Congress instead believes that the Framers were wise to reserve basic decisions about international trade to the legislative branch, rather than to the "final arbitrary action of one person," *INS v. Chadha*, 462 U.S. 919,

951 (1983) it won't be hamstrung in its ability to claim that power for itself.

Dated: July 8, 2025                          Respectfully submitted,

                                             /s/ *Tadhg Dooley*
                                             Tadhg Dooley
                                             Emmett Gilles
                                             WIGGIN AND DANA LLP
                                             265 Church Street
                                             One Century Tower
                                             PO Box 1832
                                             New Haven, CT 06508-1832
                                             (203) 498-4400
                                             (203) 782-2889 (fax)
                                             tdooley@wiggin.com
                                             egilles@wiggin.com

                                             *Counsel for Amici Curiae*
                                             *Vikram David Amar and*
                                             *Mickey Edwards*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this brief complies with the type-volume limitation of Fed. Cir. R. 29(a)(5) and Fed. Cir. R. 32(a)(7)(B) because this brief contains 5,425 words, excluding the parts of the brief exempted by FRAP 32(f).

This brief complies with the typeface requirements of Fed. Cir. R. 32(a)(5) and the type style requirements of Fed. Cir. R. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook font, Size 14.

Dated: July 8, 2025        By:    /s/ *Tadhg Dooley*      
                                           Tadhg Dooley