_____

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

_____

**V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, DBA GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,**
*Plaintiff-Appellees,*

**v.**

**DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, PETE R. FLORES, ACTING COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, IN HIS OFFICIAL CAPACITY AS ACTING COMMISSIONER OF THE UNITED STATES CUSTOMS AND BORDER PROTECTION, JAMIESON GREER, IN HIS OFFICIAL CAPACITY AS UNITED STATES TRADE REPRESENTATIVE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, IN HIS OFFICIAL CAPACITY AS SECRETARY OF COMMERCE, UNITED STATES CUSTOMS AND BORDER PROTECTION,**
*Defendants-Appellant.*

_____

**STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF VERMONT,**
*Plaintiff-Appellees,*

**v.**

**PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF**

**HOMELAND SECURITY, UNITED STATES CUSTOMS AND BORDER PROTECTION, PETE R. FLORES, ACTING COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, IN HIS OFFICIAL CAPACITY AS ACTING COMMISSIONER FOR U.S. CUSTOMS AND BORDER PROTECTION, UNITED STATES,**
*Defendants-Appellant.*

---

On Appeal from the United States Court of International Trade Nos. 25-66, -77, Judges Katzmann, Reif, and Restani

---

**BRIEF OF *AMICI CURIAE* FORMER GOVERNMENT OFFICIALS AND LEGAL SCHOLARS IN SUPPORT OF PLAINTIFFS-APPELLEES**

Mark A. Lemley
William H. Neukom Professor
  of Law
STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305
(650) 723-4605
mlemley@law.stanford.edu

Stephen A. Jonas
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
(202) 594-9958
Steve@democracydefenders.org

Matthew A. Seligman
*Counsel of Record*
STRIS & MAHER LLP
17785 Center Court Dr. N., Suite 600
Cerritos, CA 90703
(213) 995-6873
mseligman@stris.com

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1812, 2025-1813

**Short Case Caption** V.O.S. Selections, Inc. v. Trump

**Filing Party/Entity** Amici Former Government Officials and Legal Scholars

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 7/8/2025          Signature:

                        Name:     Matthew Seligman

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Former Government Officials and Legal Scholars | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☑ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Matthew Seligman, Stris & Maher LLP | | |
| Mark Lemley, Stanford Law School | | |
| Stephen A. Jonas, Democracy Defenders Fund | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)   ☐ No   ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

July 8, 2025                              /s/ Matthew A. Seligman

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................v

INTEREST OF *AMICI CURIAE*............................................1

ARGUMENT ........................................................................1

I.    IEEPA Does Not Authorize Tariffs to Address Trade Deficits. ...............1

    a... ............IEEPA's Text Demonstrates that it Does Not Authorize Tariffs to Address Trade Deficits. ........................................................1

    b…...........The Structure of the Statutory Scheme Confirms that IEEPA Does Not Authorize Tariffs to Address Trade Deficits. ...........................4

    c.............Historical Practice Comports With this Properly Circumscribed Statutory Interpretation of the President's Authority Under IEEPA. ........7

    d...........The Trade Deficit Tariffs Imposed by Executive Order 14257 are Unlawful. ..........................................................................10

II.    Even If Section 1701 Were Ambiguous, the Court Must Interpret It Not to Authorize the Trade Deficit Tariffs ....................................................12

    a..............The Major Questions Doctrine Requires a Clear Congressional Authorization that Section 1701 Lacks....................................................12

    b.............. ..The Canon of Constitutional Avoidance Requires the Court to Interpret Section 1701 to Avoid Grave Non-Delegation Concerns .........15

III.    The Court Cannot Uphold the Trade Deficit Tariffs Based on a Statute Neither Cited in the Executive Order Nor Argued in the Government's Briefing ...............................................................................21

CONCLUSION ...................................................................22

APPENDIX A .....................................................................A

CERTIFICATE OF SERVICE.................................................a

CERTIFICATE OF COMPLIANCE WITH  TYPE-VOLUME LIMITATIONS....b

# TABLE OF AUTHORITIES

**Cases**

*West Virginia v. EPA*, 597 U.S. (2022) ................................................................. 15

*Biden v. Nebraska*, 600 U.S. (2024) ..................................................................... 15

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. (2000) .............................. 7

*Haig v. Agee*, 453 U.S. (1981) ............................................................................ 11

*Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. (2016) ............... 5

*Mistretta v. United States*, 488 U.S. (1989) .......................................................... 15

*Regan v. Wald*, 468 U.S. (1984) ............................................................................. 5

*United States v. Garbish*, 222 U.S. (1911) ............................................................. 4

*United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. (2001) ........... 16

**Statutes**

19 U.S.C. § 2132 ..................................................................................................... 6

50 U.S.C. § 1701 ............................................................................................... passim

50 U.S.C. § 1702 ................................................................................................... 14

**Other Authorities**

Bureau of Econ. Research, *available at* https://www.bea.gov/ .............................. 13

Chris Isadore, *Trump aide says tariffs will raise $6 trillion, which would be largest tax hike in US history*, CNN (Mar. 31, 2025), *available* at https://www.cnn.com/2025/03/31/economy/tariffs-largest-tax-hike/index.html 13

Congressional Research Service, *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, App'x A (Jan. 30, 2024) .............................. 10

E.O. 12170, *Blocking Iranian Government Property* (November 14, 1979) ............ 8

E.O. 12543, *Prohibiting Trade and Certain Transactions Involving Libya* (Jan. 7, 1986)................................................................................................8

E.O. 12735, *Chemical and Biological Weapons Proliferation* (Nov. 16, 1991).....11

E.O. 12775, *Prohibiting Certain Transactions with Respect to Haiti* (Oct. 4, 1991) ................................................................................................8

E.O. 12938, *Proliferation of Weapons of Mass Destruction* (Nov. 14, 1994)........10

E.O. 13818, *Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption* (Dec. 20, 2017)................................................10

E.O. 13851, *Blocking Property of Certain Persons Contributing to the Situation in Nicaragua* (Nov. 27, 2018) ...................................................9

E.O. 13882, *Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Mali* (July 25, 2019)..........................................9

E.O. 13894, *Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Syria* (Oct. 17, 2019)........................................9

E.O. 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits* (Apr. 2, 2025) ................................................11, 12, 14

H. Rep. No. 95-459 (1977)................................................................3, 5, 6

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are former federal judges, members of Congress, senior Department of Justice and White House appointees, and other governmental officials, including appointees who served in every Republican administration from the Nixon administration to the first Trump administration, and legal scholars who spent their careers dedicated to the rule of law. They have an interest in the recognition of proper limitations on executive power.[1,2]

## ARGUMENT

## I. IEEPA Does Not Authorize Tariffs to Address Trade Deficits.

### a. IEEPA's Text Demonstrates that it Does Not Authorize Tariffs to Address Trade Deficits.

The International Emergency Economic Powers Act ("IEEPA") does not authorize the president to impose the worldwide and "reciprocal" tariffs because trade imbalances are not an "unusual and extraordinary threat." A persistent trade deficit that has lasted for a half a century is a routine and ordinary circumstance, the exact opposite of the "unusual and extraordinary threat" that the statute requires. Accordingly, the challenged tariffs exceed the president's power under IEEPA.

---

[1] Neither the parties nor their counsel have authored this brief in whole or in part, and neither they nor any other person or entity other than *amici curiae* and their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] A list of *amici curiae* and their institutional affiliations, for identification purposes only, is provided in Appendix A.

Congress carefully calibrated the statutory scheme to limit the exercise of the president's delegated powers to narrow circumstances. Section 1701 provides that the president may exercise powers under IEEPA only "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Congress spoke clearly that the "authorities granted to the President" in IEEPA "may *only* be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." *Id.* § 1701(b) (emphasis added). Accordingly, if the statutory prerequisite in Section 1701 is not satisfied, then the president may not exercise any of IEEPA's powers in Section 1702.

The statutory requirement of an "unusual and extraordinary threat" demands rare and exceptional circumstances. The common meaning of "unusual" is "[n]ot usual" "rare," "exceptional," or "remarkable." *Unusual*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE 1698 (1975); *see also Unusual*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 1277 (6th ed. 1976). Similarly, "extraordinary" means "[b]eyond an ordinary, common, usual, or customary order, method, or course; exceeding a common degree or measure; exceptional."

*Extraordinary*, *id.* at 548; *see also Extraordinary*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 368 ("[o]ut of the usual course" or "[e]xceptional, surprising; unusually great").

Consistent with that common meaning, IEEPA grants powers that the president may exercise only in strictly limited circumstances. Congress enacted IEEPA to constrain the powers it had previously granted in the Trading with the Enemy Act of 1917 ("TWEA"), which it reformed because the TWEA was "essentially an unlimited grant of authority . . . in both the domestic and international economic arena" whenever there was an "unterminated declaration of national emergency on the books." H. Rep. No. 95-459 at 7 (1977). IEEPA was therefore intended to "redefine the power of the President to regulate international economic transactions in future times of war or national emergency." *Id.* at 1. Congress recognized that the exercise of the powers granted by the statute should be limited to genuine and exceptional emergencies. As the committee report explained, "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems." *Id.* at 10. It further emphasized that "[a] national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose . . . . A state of national emergency should not be a normal state of affairs." *Id.*

The Supreme Court's cases confirm that common meaning. Interpreting the statutory phrase "extraordinary emergency," the Court explained that "[i]t is a special occurrence, and the phrase used emphasizes this. It is not an emergency simply which is expressed by it, something merely sudden and unexpected, but an extraordinary one, -one exceeding the common degree. We must assume that the phrase was used with a consciousness of its meaning and with the intention of conveying such meaning... The phrase 'continuing extraordinary emergency' is self-contradictory." *United States v. Garbish*, 222 U.S. 257, 261 (1911) (cleaned up). *See also Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 258 (2016) (holding "common . . . circumstances" including a litigant's financial condition are "far from extraordinary").

### b. The Structure of the Statutory Scheme Confirms that IEEPA Does Not Authorize Tariffs to Address Trade Deficits.

The structure of the comprehensive statutory scheme of which IEEPA is a part confirms that it does not authorize the president to impose tariffs to respond to trade deficits. IEEPA was one of several statutes that Congress enacted in the mid-1970s to reform the TWEA. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). These reforms responded to President Nixon's imposition of a 10% tariff to address a balance-of-payments deficit. *See* H.R. Rep. No. 95-459, at 5 (1977); *see also United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975).

In response to what Congress recognized to be an excessive grant of emergency powers in the TWEA, it enacted three pieces of legislation relevant to the trade deficit tariffs at issue here. First, it "amended [the TWEA] to limit the President's power to act pursuant to that statute solely to times of war." *Regan*, 468 U.S. 222 at 227 (citing Title I, § 101, of Pub. L. 95–223, 91 Stat. 1625). Second, it enacted the Section 122 of the Trade Act of 1974, which explicitly authorizes the president to impose emergency import surcharges in response to a balance-of-payments deficit, subject to a hard cap of 15% and a strict limit of 150 days on the tariff's duration. *See* Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1991 (codified at 19 U.S.C. § 2132).[3] Third, it enacted IEEPA, which did not include a strict limit on the duration of the actions the president takes under its authority but did limit the availability of that authority to "unusual and extraordinary threat[s]."

These three enactments together yield a coherent and comprehensive statutory scheme. Congress first limited the TWEA's extensive powers to wartime. It then bifurcated the president's peacetime emergency powers into two categories. The Trading Act of 1974, including its hard cap on the magnitude of tariffs and strict

---

[3] Trade deficits are, by definition, a species of balance-of-payments deficit. A34 ("Trade deficits are one of the key balance-of-payment deficits and can be directly impacted by mechanisms such as import quotas and tariffs, as authorized by Section 122.").

limit on their duration, is the exclusive statutory basis for a president's emergency power to impose tariffs to address a balance-of-payments deficit. IEEPA, in turn, grants emergency powers that lack the limits in the Trading Act and authorizes the exercise of those powers to address "unusual and extraordinary threats" *apart from* balance-of-payments deficits.

This comprehensive statutory scheme is eminently sensible. Because trade imbalances are a chronic phenomenon and tariffs are a blunt tool, Congress curtailed the president's authority to respond to trade deficits with tariffs by limiting the magnitude and duration of those tariffs. Those limitations ensure that Congress, rather than the president, retains the ultimate authority to prescribe legislative solutions to this quintessential economic problem that falls squarely within Congress's competency. By contrast, Congress determined that the president needed more latitude to address genuinely exceptional crises aside from trade deficits. The government's unwarranted interpretation of IEEPA would instead permit the president to evade the Trading Act's important limitations. *See Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'") (cleaned up). This statutory structure thus demonstrates that trade deficits are not an "unusual and extraordinary threat" under IEEPA.

### c. Historical Practice Comports With this Properly Circumscribed Statutory Interpretation of the President's Authority Under IEEPA.

The history of presidential practice under IEEPA further confirms that the statute does not authorize the president to impose tariffs to address trade imbalances. No prior president has relied on IEEPA to do so, even though the United States has run persistent trade deficits every year since the statute's enactment in 1977. *See* Council on Foreign Relations, *The U.S. Trade Deficit: How Much Does It Matter?* (Last updated April 23, 2025 11:44 am (EST)), *available at* https://www.cfr.org/backgrounder/us-trade-deficit-how-much-does-it-matter. Consistent with the statutory text and structure, prior presidents have instead consistently invoked IEEPA's emergency powers solely to address acute foreign policy and national security crises, not longstanding global economic patterns.

President Carter first invoked IEEPA to impose sanctions on Iran in response to the Iranian hostage crisis. *See* E.O. 12170, Blocking Iranian Government Property (November 14, 1979). Subsequent invocations of IEEPA were similarly targeted and tailored. For example, in 1985, President Reagan prohibited imports and exports with Nicaragua in response to the Sandinista government's support of terrorism and human rights violations. *See* E.O. 12513, Prohibiting Trade and Certain Other Transactions Involving Nicaragua (May 1, 1985). In 1986, President Reagan imposed sanctions on Libya in response to its terrorist attacks in Europe the

preceding month. *See* E.O. 12543, Prohibiting Trade and Certain Transactions Involving Libya (Jan. 7, 1986). In 1991, President George H.W. Bush imposed sanctions on Haiti in response to a coup against the democratically elected government. *See* E.O. 12775, Prohibiting Certain Transactions with Respect to Haiti (Oct. 4, 1991).

The unbroken practice of narrowly targeted exercises of the president's powers under IEEPA continued until the Trump administration issued the challenged order, including during the current president's prior term in office. *See, e.g.*, E.O. 13959, Addressing the Threat from Securities Investments that Finance Chinese Military Companies (Nov. 12, 2020) (targeting 31 listed Chinese companies); E.O. 13894, Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Syria (Oct. 17, 2019); E.O. 13882, Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Mali (July 26, 2019); E.O. 13851, Blocking Property of Certain Persons Contributing to the Situation in Nicaragua (Nov. 27, 2018); E.O. 13818, Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption (Dec. 20, 2017).

Almost every executive order invoking IEEPA has targeted a specifically named country, entity, or individual. *See* Congressional Research Service, *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, App'x A (Jan. 30, 2024) (cataloging every IEEPA use from its enactment through

January of 2024). The few executive orders that did not explicitly name its target instead delegated to a senior administration official the task of identifying the specific targets to which the sanctions would apply. *See, e.g.*, E.O. 12938, Proliferation of Weapons of Mass Destruction (Nov. 14, 1994) (directing Secretaries of State and Commerce to identify specific "exports . . . that either Secretary determines would assist a country in acquiring the capability to develop, produce, stockpile, deliver, or use weapons of mass destruction or their means of delivery"); E.O. 12735, Chemical and Biological Weapons Proliferation (Nov. 16, 1990) (directing Secretaries of State and Commerce to identify specific "exports that either Secretary determines would assist a country in acquiring the capability to develop, produce, stockpile, deliver, or use chemical or biological weapons").

No prior president has used IEEPA indiscriminately against the entire world to address systemic economic conditions. Instead, they restrained their use of emergency powers to narrow circumscribed instances of genuine "unusual and extraordinary threat[s]." That historical practice confirms that the trade deficit tariffs' unprecedented scope and subject exceed the president's statutory authority. *See Haig v. Agee*, 453 U.S. 280, 298 (1981) (relying on "an unbroken line of Executive Orders, regulations, instructions to consular officials, and notices to passport holders [by] the President and the Department of State" to inform interpretation of Passport Act of 1926) (citations omitted). *Cf. Dames & Moore*, 453

U.S. 654, 686 (1981) (citing *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring)) (upholding IEEPA on ground that "'a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned . . . may be treated as a gloss on 'Executive Power' vested in the President by §1 of Art. II.'").

### d. The Trade Deficit Tariffs Imposed by Executive Order 14257 are Unlawful.

The unprecedented trade deficit tariffs at issue here apply indefinitely to all imports of all products from all countries. That assertion of vast emergency powers under IEEPA is contrary to the statute that Congress enacted.

Trade deficits are a routine and ordinary circumstance, not an unusual and extraordinary threat. They are the rule, not the exception. As the executive order imposing the trade deficit tariffs acknowledge, trade deficits have persisted in the United States for over five decades. *See* E.O. 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits* (Apr. 2, 2025) (recounting decades of trade imbalances creating "structural asymmetries [that] have driven the large and persistent annual U.S. goods trade deficit"). Nor have trade deficits grown in recent years; they have remained essentially unchanged for decades. From 2008 until 2024, the trade deficit in goods and services averaged 3.1% of GDP. The trade deficit in goods and services for 2024 was an identical 3.1%. Indeed, the trade deficit has

*decreased* by almost half from its modern peak of 5.67% of GDP in 2005 and 5.69% of GDP in 2006. And contrary to the executive order's claims, the trade deficit in goods alone has remained similarly steady: 5.4% of GDP in 2006, 4.18% of GDP in 2014, 4.13% of GDP in 2017, 4.02% of GDP in 2019, 4.5% of GDP in 2022, and 4.15% of GDP in 2024. *See generally* Bureau of Econ. Research, *available at* https://www.bea.gov/ (collecting historical data) (last visited July 8, 2025). This remarkably consistent and persistent phenomenon cannot qualify as an "unusual and extraordinary threat."

Moreover, the trade deficit tariffs are wholly unbounded in duration and in geographical scope. The government anticipates that the tariffs—and thus the trade deficits they aim to address—will persist for at least a decade, raising trillions of dollars in revenue. *See* Chris Isadore, *Trump aide says tariffs will raise $6 trillion, which would be largest tax hike in US history*, CNN (Mar. 31, 2025), *available* at https://www.cnn.com/2025/03/31/economy/tariffs-largest-tax-hike/index.html. And the problem the trade deficit tariffs purport to address are universal, as is the purported solution the executive order imposes. The order imposes a 10% tariff worldwide, and it imposes higher tariffs of up to 50% on dozens of individual countries. *See* E.O. 14257. A problem that persists everywhere forever simply cannot count as either unusual or extraordinary.

Accordingly, the longstanding phenomenon of trade deficits are not an "unusual and extraordinary threat" under Section 1701 and thus the president is not authorized to exercise any of the powers in Section 1702. The trade deficit tariffs imposed by Executive Order 14257 are therefore unlawful.

## II. Even If Section 1701 Were Ambiguous, the Court Must Interpret It Not to Authorize the Trade Deficit Tariffs

The text of Section 1701 is unambiguous: the "unusual and extraordinary threat[s]" which IEEPA authorizes the president to address do not include trade deficits. "[W]here, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, . . . 'judicial inquiry is complete.'") (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)). But even if Section 1701 were ambiguous as to whether trade deficits—a global phenomenon that has persisted for decades—constitutes an "unusual and extraordinary threat," the Court must resolve that ambiguity against the government for two reasons.

### a. The Major Questions Doctrine Requires a Clear Congressional Authorization that Section 1701 Lacks

First, the government's unprecedented usurpation of Congress's power to levy and collect tariffs presents a "major question" that requires clear text delegating that

power to the executive that is lacking here. The Supreme Court has made clear that when the executive asserts the authority to resolve a question of "staggering . . . economic and political significance," the Court "require[s] the [executive] to point to clear congressional authorization to justify the challenged program." *Biden v. Nebraska*, 600 U.S. 477, 494, 506 (2023). The Court in *Biden* rejected the executive's attempt to cancel student loans pursuant to a statute authorizing it to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs . . . as the Secretary deems necessary in connection with a war or other military operation or national emergency." *Id.* at 485 (quoting 20 U.S.C. § 1098bb(a)(1)). The trade deficit tariffs exceed the significance and impact of the loan cancelation program at issue in *Biden*, and thus the requirement of a clear congressional authorization applies with at least as much force.

There, as here, the executive "has never previously claimed powers of this magnitude under the [statute]," as "past waivers and modifications issued under the Act have been extremely modest and narrow in scope." *Id.* at 501. There, as here, the executive asserted authority to make a decision affecting hundreds of billions of dollars. *Id.* at 501 ("[T]he Secretary of Education claims the authority, on his own, to release 43 million borrowers from their obligations to repay $430 billion in student loans."). Indeed, in *Biden* a "budget model issued by the Wharton School of the University of Pennsylvania estimates that the program will cost taxpayers

'between $469 billion and $519 billion.'" *Id.* at 502. Here, Wharton's budget model estimates that the impact will be trillions. *See* Lysle Boller, Kody Cramody, et. al, *The Economic Effects of President Trump's Tariffs,* The Wharton School of Business (Apr. 10, 2025), *available at* https://budgetmodel.wharton.upenn.edu/issues/2025/4/10/economic-effects-of-president-trumps-tariffs ("[W]e project that tariffs will raise $5.2 trillion in new revenue over the next 10 years. . . . Over the next 30 years, tariffs are expected to raise revenues of $16.4 trillion."). There, the program impacted "practically every student borrower," *Biden*, 600 U.S. at 502. Here, the trade deficit tariffs will impact essentially every American.

There can be no question that, to an even greater extent than with the student loan cancellation program that the Supreme Court rejected in *Biden*, in issuing the trade deficit tariffs the president "claims the authority to exercise control over 'a significant portion of the American economy.'" *Biden*, 600 U.S. at 503 (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)). The Court explained that a "'decision of such magnitude and consequence' on a matter of 'earnest and profound debate across the country' must 'rest with Congress itself, or an agency acting pursuant to a *clear* delegation'" from Congress. *Id.* at 504 (emphasis added). *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 730 (2022) ("Even if Congress has delegated an agency general rulemaking or adjudicatory

power, judges presume that Congress does not delegate its authority to settle or amend major social and economic policy decisions.") (citation omitted). Like the student loan cancellation program at issue in *Biden*, the trade deficit tariffs depend on an "assertion of administrative authority [that] has 'conveniently enabled [the executive] to enact a program' that Congress has chosen not to enact itself." *Biden*, 600 U.S. at 503 (quoting *West Virginia*, 597 U.S. at 701-702). And like the statute at issue in *Biden*, IEEPA "provides no authorization for the [executive's] plan even when examined using the ordinary tools of statutory interpretation—let alone 'clear congressional authorization' for such a program" that the Supreme Court's cases require. *Id.* at 506.

### b. The Canon of Constitutional Avoidance Requires the Court to Interpret Section 1701 to Avoid Grave Non-Delegation Concerns

Even if IEEPA could be read to authorize the president to impose the trade deficit tariffs, such a delegation of that power would present a significant constitutional question. The Constitution gives Congress the exclusive power to levy tariffs. U.S. CONST., Art. I, sec. 8. The government's interpretation would delegate that power entirely to the executive without a hint of an "intelligible principle" to constrain its exercise. *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. at *8 (U.S. 2025) (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). *See also Mistretta v. United States*, 488 U.S. 361, 372 (1989). To identify the "requisite intelligible principle," the Court "assesse[s] whether Congress has

made clear both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority'" to ensure that "Congress has provided sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *Id.* (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946) and *OPP Cotton Mills, Inc. v. Administrator of Wage and Hour Div., Dept. of Labor*, 312 U.S. 126 (1941)).

Under the government's interpretation of IEEPA, the statute offers neither a general policy for the president to pursue in imposing tariffs, nor any boundaries on the circumstances in which he may do so. If trade deficits with every country in the world that have persisted for decades count as an "unusual and extraordinary threat," then it is difficult to imagine an economic circumstance that falls outside the scope of the statute's delegated authority. That limitless discretion to levy tariffs in whatever circumstances the president sees fit would constitute a wholesale delegation a core constitutional power belonging to Congress that is impermissible under the Supreme Court's cases. *See Consumers' Consumers' Rsch.*, 606 U.S. at *20 (Kavanaugh, J., concurring) ("Congress likewise cannot merely assign the President to take over the legislative role as to a particular subject matter. Rather, the Court has said, any congressional grant of authority must supply some guidance to the President—otherwise the President would no longer be exercising 'executive Power' when implementing legislation.") (citing *A.L.A. Schechter Poultry Corp. v.*

*United States*, 295 U.S. 495, 537–542 (1935) and *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935)).

Moreover, the Supreme Court has explained that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 475 (2001). "The 'guidance' needed is greater . . . when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue (e.g., the definition of 'country [grain] elevators')." *Consumers' Rsch.*, 606 U.S., at *8. As explained above, the trade deficit tariffs will "affect the entire national economy" to an unprecedented degree. Accordingly, to comport with the Constitution's allocation of the power to levy tariffs to Congress rather than the president, a statute authorizing the trade deficit tariffs must provide an unprecedented degree of guidance that is plainly lacking in the government's interpretation of IEEPA.

The Supreme Court's cases confirm this conclusion. Less than two weeks ago, the Supreme Court rejected a challenge that the Federal Communication Commission's implementation of the "universal-service contribution scheme violates the Constitution's nondelegation rule." *Consumers' Rsch.*, 606 U.S., at *12. The detailed statutory guidance the Court determined to be an intelligible principle in *Consumers' Research* demonstrates the absence of any such principle in the government's interpretation of IEPPA. Section 254 of the Telecommunications Act

of 1996 "directs the FCC to collect the amount that is 'sufficient' to support the universal-service programs Congress has told it to implement." *Id*. at \*12 (citing 47 U.S.C. §§ 254(b)(5), (d), (e)). That "sufficiency" requirement directs the FCC to raise an "amount of support that is adequate, but no greater than necessary, to achieve the goals of the universal service program." *Id.* (quoting *In re High-Cost Universal Serv. Support*, 25 FCC Rcd. 4072, 4074 (2010)).

Section 254 further defines the contours of the universal service program the FCC's raised funds must be "sufficient" to support. It "makes clear whom the program is intended to serve: those in rural and other high-cost areas (with a special nod to rural hospitals), low-income consumers, and schools and libraries." *Id.* at \*13 (citing 47 U.S.C. §§ 254(b)(3), (6), (h)(1)). In deciding whether a service should be subsidized, the FCC must consider whether it has "been subscribed to by a substantial majority of residential customers." 47 U.S.C. § 254(c)(1)(B). Moreover, the service must be "essential to education, public health, or public safety." *Id.* § 254(c)(1)(A). The Court concluded that "Congress has [thus] given appropriate guidance about the nature and content of universal service, [and] then that plus the 'sufficiency' ceiling will defeat this challenge to the contribution system. For Congress will have provided intelligible principles to guide the FCC as it raises funds." *Consumers' Rsch.*, 606 U.S. at \*13. The carefully crafted statutory scheme governing the universal service contribution system thereby provides a specific

policy to pursue and parameters for the executive's pursuit of that policy that the government's interpretation of IEEPA falls far short of providing.

In contrast to the provisions of the Telecommunications Act of 1996 at issue in *Consumers' Research*, the statutes the Supreme Court has struck down on non-delegation grounds bear a striking similarity to the government's interpretation of IEEPA. In *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), the Court struck down Section 9(c) of the National Industrial Recovery Act, which authorized (but did not require) the president to prohibit the interstate transport of petroleum and petroleum products produced or withdrawn in excess of a state law limitation. *Id.* at 415. As the Court explained:

> Section 9(c) does not state whether or in what circumstances or under what conditions the President is to prohibit the transportation of the amount of petroleum or petroleum products produced in excess of the state's permission. It establishes no creterion to govern the President's course. . . . The Congress in section 9(c) thus declares no policy as to the transportation of the excess production.

*Id*.

So too here. If the statutory constraint that the president may exercise IEEPA's powers only to address an "unusual and extraordinary threat" extend so far as to include the pervasive and longstanding phenomenon of trade deficits, then it is no constraint at all. The statute so interpreted would "give[] to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit." *Id.* Because, under the government's interpretation

Section 1701, "Congress has declared no policy, has established no standard, has laid down no rule" and has set "no requirement, no definition of circumstances and conditions in which the [importation] is to be allowed or prohibited," such a statute would constitute an impermissible delegation of Congress's legislative power to levy tariffs. *Id.* at 430. *See also Schechter Poultry*, 295 U.S. at 521–522, 541–542 (striking down statute granting "virtually unfettered" authority to president to approve "codes of fair competition" for "trade and industry throughout the country" with "few restrictions" and "no standards" aside from "rehabilitat[ing], correct[ing,] and expand[ing]" economy).

The canon of constitutional avoidance requires the Court to adopt a reasonable interpretation of a statute rather than one that raises serious constitutional concerns. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018) ("Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems."). The government's interpretation of Section 1701 at the very least poses a grave concern that IEEPA unconstitutionally delegates Congress's legislative power to levy tariffs. Accordingly, because interpretating Section 1701 to limit its scope to genuinely rare and exceptional threats is reasonable, the Court must adopt that construction.

## III. The Court Cannot Uphold the Trade Deficit Tariffs Based on a Statute Neither Cited in the Executive Order Nor Argued in the Government's Briefing

*Amicus* America First Policy Institute (AFPI) argues that the president's authority to impose the trade deficit tariffs may be grounded in 19 U.S.C. § 1338. The government forfeited that argument. The government did not argue that Section 1338 authorizes the trade deficit tariffs either in the Court of International Trade or in its briefing in this Court. Although AFPI argues that a court may uphold an executive order on a legal basis not cited in the order itself, that is not the issue here. AFPI points to cases in which the government sought to defend an executive order, beginning in the trial court and through appeal, based on a statute not explicitly cited in the text of the challenged order. Here, by contrast, the government has chosen not to defend the order on that ground. A party forfeits an argument on appeal by failing to make it in the lower court or in its opening brief to this Court. *See, e.g., Eolas Techs. Inc. v. Amazon.com, Inc.*, No. 2022-1932, 2024 WL 371959, at *6 (Fed. Cir. Feb. 1, 2024) (argument forfeited where party did not present it to the district court); *C.R. Bard, Inc. v. Bos. Sci. Corp.*, 250 F.3d 761 (Fed. Cir. 2000) ("[A]n appellate court does not consider arguments first made on appeal.") (citing *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997)). *See also Stanley v. City of Sanford, Fla.*, 83 F.4th 1333, 1344 (11th Cir. 2023) (Courts "will not consider arguments raised only by *amici*.") (cleaned up).

## **CONCLUSION**

This Court should affirm the judgment of the Court of International Trade.

July 8, 2025                                     Respectfully submitted,

                                                 By: /s/ Matthew A. Seligman

Mark A. Lemley                          Matthew A. Seligman
William H. Neukom                       *Counsel of Record*
Professor of Law                        STRIS & MAHER LLP
STANFORD LAW SCHOOL                     17785 Center Court Dr. N., Suite 600
559 Nathan Abbott Way                   Cerritos, CA 90703
Stanford, CA 94305                      (213) 995-6873
(650) 723-4605                          mseligman@stris.com
mlemley@law.stanford.edu

Stephen A. Jonas
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
(202) 594-9958
Steve@statedemocracydefenders.org       *Counsel for Amici Curiae*

## APPENDIX A

*Amici curiae* are listed below. Affiliation is provided for identification purposes only. All signatories are participating in their individual capacity, not on behalf of their institutions.

**Arne Carlson**

Governor of Minnesota from 1991 to 1999 (R).

**Donald B. Ayer**

Deputy Attorney General in the George H.W. Bush Administration from 1989 to 1990; Principal Deputy Solicitor General in the Reagan Administration from 1986 to 1988; United States Attorney for the Eastern District of California from 1981 to 1986 in the Reagan Administration.

**Ty Cobb**

Special Counsel to the President in the Trump Administration from 2017 to 2018 and Assistant U.S. Attorney for the District of Maryland from 1980 to 1986.

**Tom Coleman**

Assistant Attorney General of Missouri from 1969 to 1972; Missouri State

Representative from 1973 to 76; Representative of the 6th Congressional

District of Missouri from 1976 to 1993 (R).

**Mickey Edwards**

Representative of the 5th Congressional District of Oklahoma

from 1977 to 1993 (R).

**John Giraudo**

Attorney Advisor in the Department of Justice Office of Legal Counsel in

the Reagan Administration from 1986 to 1989.

**Peter Keisler**

Acting Attorney General in the George W. Bush Administration in 2007;

Assistant Attorney General for the Civil Division in the Bush Administration

from 2003 to 2007; Principal Deputy Associate Attorney General and Acting

Associate Attorney General in the Bush Administration from 2002 to 2003;

Assistant and Associate Counsel to the President in the Reagan

Administration from 1986 to 1988.

**James Kelly**

Deputy Assistant Secretary, International Trade Administration, 1984 to

1988.

**Philip Lacovara**

Counsel to the Special Prosecutor, Watergate Special Prosecutor's Office in

the Nixon Administration from 1973 to 1974.

**Trevor Potter**

Chairman of the Federal Election Commission and Commissioner of the

Federal Election Commission from 1991 to 1995; General Counsel to John

McCain's Presidential Campaign from 2000 to 2008.

**Alan Charles Raul**

Associate Counsel to the President in the Reagan Administration from 1986

to 1988.

**Paul Rosenzweig**

Deputy Assistant Secretary for Policy, Department of Homeland Security in the George W. Bush Administration from 2005 to 2009.

**Claudine Schneider**

Representative of the 2nd Congressional District of Rhode Island from 1981-1991 (R).

**Rina Shah**

Geopolitical Adviser & Former RNC Delegate.

**Robert Shanks**

Deputy Assistant Attorney General, Office of Legal Counsel in the Reagan Administration from 1981 to 1984.

**Christopher Shays**

Representative for the 4th Congressional District of Connecticut from 1987 to 2009 (R).

**Jeff Timmer**

The Lincoln Project.

**Stanley A. Twardy, Jr.**

United States Attorney for the District of Connecticut from 1985 to 1991 and Chief of Staff to Connecticut Governor Lowell P. Weicker, Jr from 1991 to 1993.

**William F. Weld**

Governor of Massachusetts from 1991 to 1997 (R) and United States Assistant Attorney General for the Criminal Division from 1986 to 1988.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2025, I caused the foregoing BRIEF OF

*AMICI CURIAE* FORMER GOVERNMENT OFFICIALS AND LEGAL

SCHOLARS IN SUPPORT OF PLAINTIFFS-APPELLEES to be served by

electronic means via the Court's CM/ECF system on all counsel registered to

receive electronic notices.

July 8, 2025                                  /s/ Matthew A. Seligman

                                              Matthew A. Seligman
                                              STRIS & MAHER LLP
                                              17785 Center Court Dr. N., Suite 600
                                              Cerritos, CA 90703
                                              (213) 995-6873
                                              mseligman@stris.com

                                              *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATIONS

I hereby certify as follows:

1.     The foregoing BRIEF OF AMICI CURIAE FORMER GOVERNMENT OFFICIALS AND LEGAL SCHOLARS IN SUPPORT OF PLAINTIFFS-APPELLEES complies with the type-volume limitation of Fed. Cir. R. 29(b) as specified in paragraph 6 of this Court's June 30, 2023, order. The brief is printed in proportionally spaced 14-point type, and the brief has 5,205 words according to the word count of the word-processing system used to prepare the brief (excluding the parts of the motion exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)).

2.     The brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac in 14-point Times New Roman font.

July 8, 2025

/s/ Matthew A. Seligman

Matthew A. Seligman
STRIS & MAHER LLP
17785 Center Court Dr. N., Suite 600
Cerritos, CA 90703
(213) 995-6873
mseligman@stris.com

*Counsel for Amici Curiae*