Nos. 25-1812, 25-1813

# United States Court of Appeals
# for the Federal Circuit

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, DBA GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection, in his official capacity as Acting Commissioner of the United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, in his official capacity as Secretary of Commerce, UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Defendants-Appellants.*

STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF VERMONT,

*Plaintiffs-Appellees*,

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection, UNITED STATES,

*Defendants-Appellants.*

Appeal from the United States Court of International Trade
in Nos. 1:25-cv-00066-GSK-TMR-JAR, 1:25-cv-00066-GSK-TMR-JAR
(Judges Gary S. Katzmann, Timothy M. Reif, and Jane A. Restani)

---

***AMICI CURIAE* BRIEF OF THE CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA AND THE CONSUMER
TECHNOLOGY ASSOCIATION IN SUPPORT OF APPELLEES**

---

Daryl Joseffer
Kevin R. Palmer
U.S. CHAMBER
  LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

Gregory G. Garre
Roman Martinez
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

July 8, 2025

*Counsel for* Amici Curiae

# CERTIFICATE OF INTEREST

**Case Numbers**  _____25-1812, 25-1813_____

**Short Case Caption**  *V.O.S. Selections, Inc. v. Trump*_____

**Filing Party/Entity**  The Chamber of Commerce of the United States of America, *Amicus Curiae*; The Consumer Technology Association, *Amicus Curiae*_____

I certify the following information is accurate and complete to the best of my knowledge.

Date: July 8, 2025          Signature:     */s/ Gregory G. Garre*___
                            Name:         __Gregory G. Garre____

1.  **Represented Entities**.  Provide the full names of all entities represented by undersigned counsel in this case.

    The Chamber of Commerce of the United States of America.

    The Consumer Technology Association.

2.  **Real Party in Interest.**  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

    None.

3.  **Parent Corporations and Stockholders.**  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

    None.

4.  **Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

    None.

5.    **Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

None.

6.    **Organizational Victims and Bankruptcy Cases.**  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

Not applicable.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..............................................................i

TABLE OF AUTHORITIES .................................................................iv

INTEREST OF *AMICI CURIAE* ...........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

ARGUMENT ...................................................................................5

I.    THE PRESIDENT'S TARIFF POWERS ARE LIMITED TO THOSE
      EXPRESSLY GRANTED BY CONGRESS. ...............................................5

      A.    IEEPA's Silence On Tariffs Is Deafening When Compared To
            Congress's Numerous Express Delegations Of Tariff Authority. ........6

      B.    Because The Tariffs Present A Question Of Major Economic
            Significance, The Court Should Require A Clear Delegation Of
            Congressional Authority Under IEEPA. ...................................11

      C.    The Government's Attempt To Divine A Tariff Power In
            Congress's Use Of "Regulate" Cannot Be Squared With Statutory
            Context, The Constitution, Or Historical Practice. ....................14

      D.    Nothing In *Yoshida* Compels A Different Reading Of IEEPA...........18

II.   THE WIDESPREAD ECONOMIC HARMS INFLICTED BY THE
      IEEPA TARIFFS UNDERSCORE THEIR ILLEGALITY..........................20

      A.    The IEEPA Tariffs Will Reduce Growth, Lower Incomes, And
            Throttle The American Economy......................................21

      B.    Increased Costs Will Irreparably Harm American Small Businesses
            In Particular. .........................................................25

      C.    Tariff Whiplash Makes Future Planning Impossible And Undercuts
            Any Claimed Long-Term Benefits....................................28

CONCLUSION ...............................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alabama Association of Realtors v. Department of Health & Human Services*,
594 U.S. 758 (2021) .......................................................................12

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......................................................................19

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......................................................11, 12, 13, 14

*Deckers Corp. v. United States*,
752 F.3d 949 (Fed. Cir. 2014) ........................................................19

*FCC v. Consumers' Reseach*,
Nos. 24-354 & 24-422, 2025 WL 1773630 (June 27, 2025) ........14, 16

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .............................................................7, 10, 11

*Fischer v. United States*,
603 U.S. 480 (2024) .......................................................................15

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
561 U.S. 477 (2010) .......................................................................17

*Gibbons v. Ogden*,
22 U.S. 1 (9 Wheat.) 201 (1894) ....................................................16

*Jama v. ICE*,
543 U.S. 335 (2005) .................................................................18, 19

*Kemp v. United States*,
596 U.S. 528 (2022) .................................................................18, 19

*King v. Burwell*,
576 U.S. 473 (2015) .......................................................................12

**Page(s)**

*Loper Bright Enterprises v. Raimondo,*
  603 U.S. 369 (2024)...............................................................17

*Marx v. General Revenue Corp.,*
  568 U.S. 371 (2013)...............................................................11

*McCulloch v. Maryland,*
  17 U.S. (4 Wheat.) 316 (1819) ...................................13, 16

*National Cable Television Association v. United States,*
  415 U.S. 336 (1974)...............................................................16

*National Federation of Independent Business v. Department of Labor,
  Occupational Safety & Health Administration,*
  595 U.S. 109 (2022)...............................................................17

*Printz v. United States,*
  521 U.S. 898 (1997)...............................................................17

*Troy v. Samson Manufacturing Corp.,*
  758 F.3d 1322 (Fed. Cir. 2014) ..........................................19

*United States v. Jacobs,*
  306 U.S. 363 (1939)...............................................................13

*United States v. Powell,*
  379 U.S. 48 (1964).................................................................18

*United States v. Vonn,*
  535 U.S. 55 (2002)...................................................................7

*United States v. Williams,*
  553 U.S. 285 (2008)...............................................................15

*United States v. Yoshida International, Inc.,*
  526 F.2d 560 (C.C.P.A. 1975) ..............................18, 19, 20

*West Virginia v. EPA,*
  597 U.S. 697 (2022).................................................11, 12, 13

*Whitman v. American Trucking Associations, Inc.,*
  531 U.S. 457 (2001)...............................................................11

**Page(s)**

*Wisconsin Gas Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985)..........................................................21

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. art. I, § 8, cl. 1 ...............................................5, 13, 15

U.S. Const. art. I, § 8, cl 3 ......................................................5, 15

15 U.S.C. § 78k(a)(2)(A) .............................................................16

19 U.S.C. § 1338(a) ...................................................................5, 9

19 U.S.C. § 1338(d) ..................................................................5, 9

19 U.S.C. § 1338(e) ...................................................................5, 9

19 U.S.C. § 1862(b)(3)(A) ...............................................................8

19 U.S.C. § 1862(c)(1)(A)(ii) ...........................................................8

19 U.S.C. § 2132(a) .......................................................................5

19 U.S.C. § 2132(a)(1) ...................................................................8

19 U.S.C. § 2132(a)(3)(A) ...............................................................8

19 U.S.C. § 2252(b)(1)(A) ...............................................................9

19 U.S.C. § 2252(c)(3) ...................................................................9

19 U.S.C. § 2252(d)(1)(A)(ii) ...........................................................9

19 U.S.C. § 2253(e)(3) ...................................................................9

19 U.S.C. § 2253(e)(5) ...................................................................9

19 U.S.C. § 2411(c) .......................................................................5

19 U.S.C. § 2411(c)(1) ...................................................................9

19 U.S.C. § 2411(d)(3)....................................................................9

21 U.S.C. § 360bbb-2(a) ................................................................16

**Page(s)**

50 U.S.C. § 1701 ...................................................................................10

50 U.S.C. § 1702.................................................................................5, 6

50 U.S.C. § 1702(a)(1).....................................................................9, 10

50 U.S.C. § 1702(a)(1)(B) ...........................................................7, 13, 14

## OTHER AUTHORITIES

*Black's Law Dictionary* (5th ed. 1979).....................................................15

*Black's Law Dictionary* (12th ed. 2024)..................................................14

Lysle Boller et al., *The Economic Effects of President Trump's Tariffs*, Penn Wharton:  Budget Model (updated Apr. 16, 2025), https://static1.squarespace.com/static/55693d60e4b06d83cf793431 /t/68079ec8840ebc012f2b0d5e/1745329864294/The+Economic+ Effects+of+President+Trump%E2%80%99s+Tariffs.pdf ................................22

Neil Bradley, *Small Businesses, Big Burden: The Cost of Tariffs*, U.S. Chamber of Com. (May 20, 2025), https://www.uschamber.com/ small-business/small-businesses-big-burden-the-cost-of-tariffs .......................25

Elisabeth Buchwald & John Liu, *Trump announces new tariffs of up to 40% on a growing number of countries*, CNN Business (July 8, 2025), https://www.cnn.com/2025/07/07/economy/trump-letters-tariffs ....................................................................................................29

Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* (2024), https://www.congress.gov/ crs-product/R45618 .............................................................5, 10, 17

Economic Policy Uncertainty Index, https://www.policyuncertainty.com/ (last visited July 3, 2025).......................28

Exec. Order No. 14,257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041 (Apr. 7, 2025) ..............................................................7, 8

**Page(s)**

Lazaro Gamio & Ana Swanson, *Trade War Retaliation Will Hit Trump Voters Hardest*, N.Y. Times (Mar. 15, 2025), https://www.nytimes.com/interactive/2025/03/15/business/economy/tariffs-trump-maps-voters.html............................................................24

Ari Hawkins, *Trump team moves goalposts on tariffs again*, Politico (July 6, 2025), https://www.politico.com/news/2025/07/06/bessent-trump-tariffs-deadline-august-00440522 ...........................29

*'A matter of survival': Small Businesses Speak Out on Tariffs*, U.S. Chamber of Com. (June 23, 2025), https://www.uschamber.com/small-business/american-workers-businesses-consumers-trade-tariffs?state=..............................................................25, 26, 27, 28, 30

Erin McLaughlin, *Want to Bring Factories Back? This Is What It Takes*, Barron's Online (Apr. 2, 2025), https://www.barrons.com/articles/trump-tariffs-manufacturing-onshoring-obstacles-a36686cb ............................................................23

Hannah Miao, *China Raises Tariffs on U.S. to 125%, Says More Tit-for-Tat Would Be a Joke*, Wall St. J. (Apr. 11, 2025), https://www.wsj.com/economy/trade/china-raises-tariffs-on-u-s-imports-to-125-as-trade-war-heats-up-371c5723 ...............................24

Masayuki Morikawa, *Trump tariff policy, uncertainty, and the role of economics*, VoxEU (June 14, 2025), https://cepr.org/voxeu/columns/trump-tariff-policy-uncertainty-and-role-economics............................29

John G. Murphy, *How Broad-Based Tariffs Put U.S. Growth, Prosperity at Risk*, U.S. Chamber of Com. (Mar. 27, 2025), https://www.uschamber.com/international/how-broad-based-tariffs-put-u-s-growth-prosperity-at-risk ............................................23

*Oxford English Dictionary* (2d ed. 1989) ...............................................15

Susan Spence, *Manufacturing PMI® at 49%: June 2025 Manufacturing ISM® Report On Business®* (June 2025), https://www.ismworld.org/supply-management-news-and-reports/reports/ism-report-on-business/pmi/june/ ...............................24

**Page(s)**

*State of U.S. Tariffs: June 17, 2025*, Budget Lab at Yale (June 17, 2025), https://budgetlab.yale.edu/research/state-us-tariffs-june-17-2025..................................................................................................22

Chris Wheat, Chi Mac, Ole Agersnap, and Nick Niers, *Exposure to tariffs for midsize firms by metro area*, JPMorganChase Institute (July 2025), https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/exposure-to-tariffs-for-midsize-firms-by-metro-area.pdf..................................................21, 22

*Where We Stand: The Fiscal, Economic, and Distributional Effects of All U.S. Tariffs Enacted in 2025 Through April 2*, Budget Lab at Yale (Apr. 2, 2025), https://budgetlab.yale.edu/research/where-we-stand-fiscal-economic-and-distributional-effects-all-us-tariffs-enacted-2025-through-april ...............................................23

Erica York, *Learning from the First Trade War: Retaliation Hurts US Exporters*, Tax Found. Blog (Mar. 13, 2025), https://taxfoundation.org/blog/tariffs-tax-on-exports/.......................................24

Erica York & Alex Durante, *Trump Tariffs: Tracking the Economic Impact of the Trump Trade War*, Tax Found. (June 2, 2025), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/ ................................................................................................22

## INTEREST OF *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America (Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, to defend the rule of law and raise issues of concern to the nation's business community.

The Consumer Technology Association (CTA) is North America's largest technology trade association. CTA's members are the world's leading innovators— from startups to global brands—helping support more than 18 million American jobs. International trade is vital to the consumer technology sector. CTA's members rely on global supply chains that are intricate and often take decades to develop. CTA therefore frequently advocates in court and before Congress to promote fair and sustainable trade practices, as well as on other significant legal issues for the

---

[1] No party's counsel authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, their members, or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief. This brief is being filed pursuant to this Court's order of June 13, 2025, ECF No. 53.

consumer technology industry. The challenged tariffs pose a grave and existential threat to the businesses of CTA and its members.

This case presents questions of paramount importance to the business community concerning the scope of authority granted under the International Emergency Economic Powers Act (IEEPA), no matter the President or claimed emergency. The current administration's recent use of IEEPA to impose virtually unbounded tariffs is not only unprecedented, but is causing irreparable harm to *amici*'s members and to small businesses in particular, increasing their costs, undermining their ability to plan for the future, and in some cases threatening their very existence. *Amici* are uniquely positioned to inform the Court as to how recent tariffs imposed under IEEPA are impacting the business community and explain why the tariffs exceed congressionally delegated authority.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case presents a legal question that is existential to many American businesses, particularly small businesses. For the first time, a President has invoked the International Emergency Economic Powers Act (IEEPA) to claim virtually unbounded authority to issue tariffs on any country, in any amount, and for any duration, without regard for the traditional limits Congress has imposed on the tariff power. IEEPA does not authorize these sweeping tariffs. The statute does not even mention "tariffs" or any other type of "duty." Nor does IEEPA silently empower

the President to unilaterally impose tariffs of unlimited size, scope, and duration. Such an unbounded tariff authority presents a question of vast political and economic significance—a quintessential "major question."

Congress must speak clearly when it comes to major questions. There is no basis for this Court to infer that IEEPA—which has never before been used to impose tariffs—even implies the delegation of such sweeping authority. Indeed, when Congress has delegated power to the President to impose tariffs in other statutes, it has done so explicitly, and subject to specific limits. Inferring an unbounded tariff power from IEEPA's silence would render these express delegations of tariff authority superfluous and hand the executive a powerful tool to upend the domestic economy. The lower court's injunction is critical to protecting American businesses from tax increases that Congress never authorized, and to ensure that the government is operating within limits imposed by the rule of law.

The economic and political consequences of ratifying the President's broad interpretation of IEEPA are profound and far-reaching, especially for American businesses. If the President's IEEPA tariffs remain in force, American businesses—large and small—will be irreparably harmed. As a result of the 10% universal tariff and even higher tariffs against key trading partners like Canada, Mexico, and China, American businesses have been forced to raise prices, freeze hiring, and postpone investments—risking damage to their reputations and market share. Small

businesses—collectively responsible for a third of the total value of imported goods—are especially at risk. Because these importers typically operate with tight profit margins and limited financial flexibility, even a modest increase in tariffs can have a profound impact on their bottom line. Many businesses now face the difficult choice of raising prices, absorbing the added costs and reducing profits, or cutting back on inventory and personnel. For some small businesses in particular, the decision on how to respond to tariffs is a question of survival.

This threat transcends particular administrations. If the current administration is permitted to invoke IEEPA to impose unlimited tariffs to deal with the asserted "national emergencies" based on trade deficits and drug trafficking, then future administrations will have similarly expansive authority to impose worldwide tariffs based on their own objectives. It is not hard to imagine a future administration declaring its own political priorities constitute a "national emergency," and then invoking IEEPA to impose unlimited tariffs in pursuit of this agenda. Upholding the President's assertion of tariff authority here would transform IEEPA into a bludgeon for implementing a wide range of policy priorities merely by claiming an emergency.

Only a clear delegation of legislative authority could support the exercise of such a power. But nothing in IEEPA's statutory silence comes close to that kind of delegation. Accordingly, the Court should affirm the Court of International Trade's grant of a permanent injunction blocking enforcement of the challenged tariffs.

# ARGUMENT

## I.    THE PRESIDENT'S TARIFF POWERS ARE LIMITED TO THOSE EXPRESSLY GRANTED BY CONGRESS.

The Constitution vests the tariff power in the Legislature.  It grants Congress the power "[t]o lay and collect Taxes, Duties, Imposts and Excises" and "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cls. 1, 3.  In limited circumstances, Congress has delegated these powers by granting the President authority to impose tariffs on imports.  But when delegating the core legislative power to make major taxing and trade policy decisions, Congress has been explicit, not only specifying the power to impose duties but imposing detailed limits on its use.  *See* 19 U.S.C. §§ 1338(a), (d)-(e), 2132(a), 2411(c).

IEEPA contains no such explicit delegation.  It neither mentions "tariffs," "duties," or "import surcharges," nor contains any other language that shows Congress intended to delegate the distinct legislative power of levying taxes on foreign trade.  *See* 50 U.S.C. § 1702.  Instead, IEEPA's text grants the President limited authority to impose sanctions and other non-revenue-generating trade restrictions.  In line with its express terms, every President since IEEPA's enactment has used the statute to impose sanctions and block imports; none has used it to impose any tariff.  *See* Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* 68-82 tbl. A-3 (2024), https://www.congress.gov/crs-product/R45618.

IEEPA's silence as to tariffs, combined with their vast economic and political consequences—which include trillions of dollars in new taxes spread across the American economy—indicate that the President's assertion of tariff authority is a "major question." This means that, for the President's sweeping assertion of such core legislative powers to be lawful, Congress must have spoken clearly when delegating them. Because the President cannot point to any clear delegation of tariff authority in IEEPA, the IEEPA tariffs are unlawful and were properly enjoined. The Court should reject the President's attempt to expand IEEPA beyond its text—and operate outside of the bounds imposed by the rule of law.

### A. IEEPA's Silence On Tariffs Is Deafening When Compared To Congress's Numerous Express Delegations Of Tariff Authority.

Since taking office, President Trump has invoked IEEPA to impose several rounds of tariff hikes. First, the President targeted goods imported from Canada, Mexico, and China, raising duties by up to 25% with the stated purpose of combatting drug trafficking. U.S. Br. 14-18. Next, the President announced a 10% universal tariff on imports from nearly all of the United States's trading partners, and higher reciprocal tariffs on imports from some countries, with the stated purpose of remedying trade imbalances that threaten national security. *Id*. at 18-20. Invoking IEEPA, the President has thus claimed authority to set tariffs of any rate, against goods from any country, and for any duration.

Yet, IEEPA's text does not expressly delegate any authority to the President to impose tariffs—let alone tariffs of this magnitude. *See* 50 U.S.C. § 1702. And while IEEPA does grant the President power to "regulate" imports and exports, that power does not stand alone. Rather, it is set alongside the power to "investigate, block . . . direct and compel, nullify, void, prevent or prohibit" imports of foreign products, *id.* § 1702(a)(1)(B), none of which suggests the authority to impose any form of taxation. The otherwise comprehensive scope of Section 1702 makes this omission particularly striking: Congress's choice to empower the President to "investigate," "compel," or "block" imports and exports, while deliberately excluding the significant authority to impose tariffs, is compelling textual evidence that such authority was intentionally excluded. *Cf. United States v. Vonn*, 535 U.S. 55, 65 (2002) (Under the *expressio unius* canon, "expressing one item of [an] associated group or series excludes another left unmentioned . . . .").

In stark contrast to IEEPA, several other statutes provide express authority for the President to impose tariffs and "duties," albeit with clear limits. These provisions show that Congress will "sp[eak] directly" to the President's tariff authority—and that, when it delegates the power to issue tariffs, it does so expressly and with meaningful guardrails, which are absent in IEEPA. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000).

For example, Congress has enacted various statutes delegating express tariff-setting authority to remedy trade imbalances—one of the President's justifications for the tariffs supposedly authorized by IEEPA. Exec. Order No. 14,257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041, 15044 (Apr. 7, 2025). Section 122 of the Trade Act of 1974 permits the President to impose "temporary import surcharges" when necessary to, among other things, "deal with large and serious . . . balance-of-payments deficits." 19 U.S.C. § 2132(a)(1). But Section 122 imposes precise limits on the President's authority to act unilaterally, capping tariffs at just 15% and limiting their duration to 150 days—unless extended by Congress. *Id.* § 2132(a)(3)(A).

In addition, Section 232 of the Trade Expansion Act of 1962 authorizes the President to impose tariffs on products whose importation "threaten[s] to impair the national security" of the United States, *id.* § 1862(c)(1)(A)(ii)—again, not unlike what President Trump has asserted here. 90 Fed. Reg. at 15045. But before the President can impose such tariffs, the Secretary of Commerce must investigate the "effect of the importation of such article . . . upon the national security," and make a "recommendation[] . . . for action or inaction." 19 U.S.C. § 1862(b)(3)(A).

The Trade Act of 1974 also provides a mechanism for imposing tariffs to protect domestic industry. Section 201 grants the President authority to impose

tariffs if the International Trade Commission (ITC) finds that an article "is being imported into the United States in such increased quantities as to be a substantial cause of serious injury" to the domestic industry. *Id.* § 2252(b)(1)(A), (c)(3), (d)(1)(A)(ii). Even after the ITC makes such a finding, Section 201 limits the increase in tariffs to no more than 50% above existing rates. *Id.* § 2253(e)(3). Like Section 122, Section 201 sets limits on duration, requiring actions in effect for more than one year to be "phased down at regular intervals." *Id*. § 2253(e)(5).

Lastly, Congress has expressly granted the President tools for addressing unfair trade practices. Section 338 of the Tariff Act of 1930 permits the President to "declare new or additional duties" of up to 50% on imports from countries that have imposed "unreasonable" charges, exactions, regulations, or limitations that are "not equally enforced upon the like articles of every foreign country," or that have "[d]iscriminate[d] in fact against the commerce of the United States." *Id.* § 1338(a), (d)-(e). And Section 301 of the Trade Act of 1974 permits the Executive to "impose duties or other import restrictions on the goods of" a foreign country that has been found, after notice and investigation, to have committed unfair trade practices or violated trade agreements with the United States. *Id.* § 2411(c)(1), (d)(3).

In stark contrast, IEEPA contains *none* of the direct language or protective guardrails that these statutes have regarding tariffs. On the front end, IEEPA requires only that the President declare a national emergency. 50 U.S.C.

9

§ 1702(a)(1); *see id.* § 1701.  Here, President Trump has declared an emergency as to trade imbalances and the importation of fentanyl.  But another President might declare an emergency as to climate change, and then use IEEPA to impose tariffs on all imports of oil, gas, and materials necessary for energy production, or on all imports from countries that do not meet certain carbon standards.  There is almost no end to the possible emergencies a President might declare in order to trigger the tariff authority asserted here.  On the back end, IEEPA is even less restrictive, purportedly allowing tariffs to continue at any amount for as long as the national emergency remains in place.  *See id.*  Based on historical practice, those emergencies could last several years, or even decades.  Casey & Elsea, *supra*, at Summary.

Yet, the President now seeks to deploy IEEPA to address many of the same problems Congress empowered him to address through other provisions, while avoiding all the accompanying limitations that Congress imposed on such expressly granted tariff authority.  This assertion of authority under IEEPA does not "make sense" in light of Congress's statutory scheme:  Congress would not have imposed specific, meaningful limitations on the President's tariff authority while allowing the President to circumvent those limitations simply by declaring a "national emergency" of some kind.  *See Brown & Williamson*, 529 U.S. at 143 (citation omitted).  That would render those clear limitations on the President's authority

surplusage—a result courts assume Congress intended to avoid.  *See Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013).

**B.      Because The Tariffs Present A Question Of Major Economic Significance, The Court Should Require A Clear Delegation Of Congressional Authority Under IEEPA.**

The statutory provisions described above show that, when Congress intends to grant the President significant authority to set tariffs and regulate foreign trade, it does so expressly—and with built-in limits.  That the President seeks to achieve the very end of these express statutes—if not a more ambitious one—through a supposedly implicit delegation of tariff authority is another red flag.

The power to reshape the American economy through massive tariff hikes is precisely the sort of "major question" Congress is presumed to approach with care. *See Biden v. Nebraska*, 600 U.S. 477, 505-06 (2023)*.*  When a President suddenly assumes broad power based on a statute that does not expressly provide such power—and has never been invoked to authorize such power—courts "'hesitate before concluding that Congress' meant to confer such authority."  *West Virginia v. EPA*, 597 U.S. 697, 700 (2022) (quoting *Brown & Williamson*, 529 U.S. at 160). After all, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

The question of whether IEEPA authorizes tariffs is plainly one of "deep 'economic and political significance.'" *Biden*, 600 U.S. at 505-06 (quoting *King v. Burwell*, 576 U.S. 473, 485-86 (2015) (citation omitted)).  The tariffs represent one of the largest tax increases in recent history, with the potential to erase trillions of dollars from the GDP.  *See infra* at 21-22.  And in terms of scope, the tariffs affect nearly every aspect of the American economy—from small businesses, to manufacturers, to everyday consumers.  *See infra* at 21-30.

The executive actions addressed in the Supreme Court's other major questions doctrine cases are, by comparison to the authority asserted here, small potatoes.  For example, in *Biden*, the Court applied the doctrine in assessing the Biden administration's student loan waiver, estimated to cost taxpayers around $500 billion.  600 U.S. at 502.  In *Alabama Association of Realtors v. Department of Health & Human Services*, the Court held that HHS's eviction moratorium triggered the major questions doctrine based on an estimated economic impact of around "$50 billion."  594 U.S. 758, 764 (2021).  And in *West Virginia*, the Court held that an EPA rule that would have imposed "billions of dollars in compliance costs" and "reduce[d] GDP by at least a trillion 2009 dollars by 2040" constituted a "major question[]." 597 U.S. at 714-15, 724.  The IEEPA tariffs' financial impact is several times greater, with the estimated revenue (that is, tax) increase reaching $5.2 *trillion*.

The President's assertion of this "highly consequential power" to regulate the economy exceeds "what Congress could reasonably be understood to have granted" when delegating the power to "regulate" imports and exports. *Id.* at 724; 50 U.S.C. § 1702(a)(1)(B). Congress has "[n]o more essential or important power" than "the 'Power to lay and collect Taxes, Duties, and Excises.'" *United States v. Jacobs*, 306 U.S. 363, 370 (1939) (quoting U.S. Const. art. I, § 8, cl. 1). This power to "levy[] taxes," Chief Justice Marshall explained, is "a great substantive and independent power[] which cannot be implied as incidental to other powers," such as the power to regulate commerce with foreign nations. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 411 (1819). And although Congress has expressly delegated the tax power to the President in certain instances, it has always imposed attendant limits on that authority as well, *see supra* at 7-9; tariffs of this "scope" and "political salience" are "not the type that Congress lightly delegates." *Biden*, 600 U.S. at 520 (Barrett, J., concurring). The Constitution's structural commitment of the tax power to Congress is an essential "part of the context" for understanding the scope of delegated powers under IEEPA. *Id.* at 515 (Barrett, J., concurring).

Congress's historical practice of expressly delegating tariff authority in limited circumstances only confirms this understanding. *See supra* at 7-9. These statutes show that, when Congress intends to grant the President authority to impose tariffs with potentially vast consequences for the American economy, it does so in a

targeted manner, imposing meaningful requirements for triggering the tariff authority and restricting the scope and duration of that authority. This past practice provides crucial "context . . . relevant to interpreting the scope of [Congress's] delegation" of tariff authority. *Biden*, 600 U.S. at 513 (Barrett, J., concurring).[2]

### C.    The Government's Attempt To Divine A Tariff Power In Congress's Use Of "Regulate" Cannot Be Squared With Statutory Context, The Constitution, Or Historical Practice.

The government's suggestion that the President's unbounded assertion of tariff authority can be implied based on IEEPA's grant of authority to "*regulate . . . importation . . . of . . . any property*," U.S. Br. 32 (emphasis added) (quoting 50 U.S.C. § 1702(a)(1)(B)), does not withstand scrutiny.

The authority to "regulate . . . importation" does not include the authority to impose unlimited, indefinite tariffs on imports from every country worldwide. The government's dictionary definitions of "regulate" show this: They define "regulate" to mean "[t]o control . . . through the *implementation of rules*," *Regulate*, *Black's Law Dictionary* (12th ed. 2024), "[t]o direct by *rule or restriction*" or "to subject to

---

[2]    The major questions doctrine applies with equal force to interpretations by the President as it does by executive agencies. Agencies are ultimately accountable to the President as part of the executive branch, and the major questions doctrine, at its core, concerns delegations of authority to the Executive. Moreover, because the tariff power is expressly rooted in Article I (*see supra* at 5), the President's Article II authority over foreign affairs generally does not support the imposition of tariffs. *Cf. FCC v. Consumers' Rsch.*, Nos. 24-354 & 24-422, 2025 WL 1773630, at *23 (June 27, 2025) (Kavanaugh, J., concurring).

*governing principles or laws*," *Regulate*, *Black's Law Dictionary* 1156 (5th ed. 1979) (emphasis added). None of the government's dictionary definitions of "regulate" mentions tariffs or the power to assess taxes generally.

And the statutory context refutes such a reading. Under the canon of *noscitur a sociis*, IEEPA's specific delegations of authority to "investigate" and "block" give the vaguely defined power to "regulate" "'more precise content.'" *Fischer v. United States*, 603 U.S. 480, 487 (2024) (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)). Especially when read in light of Congress's use of terms like "investigate" and "block," the power to "regulate" is better understood as authorizing the President to place limits or requirements on certain imports or exports—for example, by imposing sanctions, setting quotas, or requiring inspections. *See Investigate*, *Oxford English Dictionary* (2d ed. 1989) ("To search or inquire into; to examine (a matter) systematically or in detail; to make an inquiry or examination into."); *Block*, *Oxford English Dictionary*, *supra* ("To shut *up* or *in* by obstructing ingress and egress, to prevent access to or exit from").

Like all statutes, IEEPA also must be construed in light of the Constitution. Congress enacted IEEPA against the backdrop of Article I, Section 8, which separately authorizes Congress "[t]o lay and collect Taxes, Duties, Imposts and Excises" and "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cls. 1, 3. As Chief Justice Marshall recognized, "the power to regulate commerce

15

is . . . entirely distinct from the right to levy taxes and imposts." *Gibbons v. Ogden*, 22 U.S. 1 (9 Wheat.) 201 (1824). And critically, the power to impose "duties or imposts on imports or exports" is "considered as a branch of the taxing power," and does not stem from Congress's power to regulate commerce. *Id*. "Taxation is a legislative function, and Congress . . . is the sole organ for levying taxes . . . ." *National Cable Television Ass'n v. United States*, 415 U.S. 336, 340 (1974).

The government's contrary interpretation is untenable. The power to "regulate" plainly does not include the power to tax: To *amici*'s awareness, no person has ever argued and no court has ever held, for example, that the Securities and Exchange Commission, the Food and Drug Administration, or any other agency has the power to impose new taxes merely because of statutory authority to "regulate" or issue "regulations." *See* 15 U.S.C. § 78k(a)(2)(A) (granting SEC power to "regulate" "transactions on a national securities exchange"); 21 U.S.C. § 360bbb-2(a) (granting FDA authority to "regulate" any "drug, biological product, device, or combination product"). As the Supreme Court long ago recognized, "the power to tax involves the power to destroy," and the Constitution does not permit Congress to silently delegate away its arguably most important power. *See FCC v. Consumers' Rsch.,* Nos. 24-354 & 24-422, 2025 WL 1773630, at *30 (June 27, 2025) (Gorsuch, J., dissenting) (quoting *McCulloch*, 17 U.S. at 431).

Likewise, no previous President has interpreted IEEPA as authorizing *any* tariffs, let alone the sweeping tariffs at issue here. This is not for their lack of interest in IEEPA. Since its enactment, IEEPA has been invoked by every President—over 60 times in total—with actions ranging from imposing sanctions against foreign adversaries to prohibiting transactions with narcotics traffickers. *See* Casey & Elsea, *supra*, at 67-86 tbl. A-3. But in no instance during IEEPA's nearly 50-year-history has the statute been invoked to impose tariffs against any country.

That past Presidents have repeatedly invoked IEEPA to achieve diverse ends—without ever asserting the "highly attractive power" to impose import tariffs—provides strong "reason to believe that the power was thought not to exist." *Printz v. United States*, 521 U.S. 898, 905 (1997). After all, "'the longstanding "practice of the government" should "inform [a court's] determination of "what the law is."'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (citation modified) (second alteration in original). The "'lack of historical precedent,' coupled with the breadth of authority that the [President] now claims, is a 'telling indication that' the [tariffs] extend[] beyond the [President's] legitimate reach." *National Fed'n of Indep. Bus. v. Department of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010)).

### D.    Nothing In *Yoshida* Compels A Different Reading Of IEEPA.

The government insists that the term "regulate" in IEEPA includes a virtually unlimited delegation to impose tariffs because Congress presumptively ratified such a reading of other statutory language similar to IEEPA's.  It relies upon *United States v. Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A. 1975), a half-century-old case from the Court of Customs and Patent Appeals (CCPA) that applied an outmoded, purposivist form of statutory interpretation to the Trading With Enemies Act of 1917 (TWEA).  U.S. Br. 50-51.  But Congress's mere awareness of the *Yoshida* decision, without more, provides no proper basis for the Court to assume that Congress ratified its interpretation.  Such a presumption is appropriate only where the interpretation is "well-settled."  *Kemp v. United States*, 596 U.S. 528, 539 (2022) (citation omitted); *see Jama v. ICE*, 543 U.S. 335, 349 (2005) (presumption of congressional ratification applies only when "supposed judicial consensus" at the time of enactment was "broad and unquestioned"); *United States v. Powell*, 379 U.S. 48, 55 n.13 (1964) (requiring "settled judicial construction").

*Yoshida* does not clear this high bar.  Indeed, *Yoshida*—the only case that interpreted TWEA to grant tariff authority—did so based only on a now-disfavored approach. The CCPA failed to engage in any meaningful textual analysis or discussion of the constitutional distinction between regulation and taxation.  Instead, it reasoned that the power delegated in TWEA was "broad and extensive" and that

"it could not have been otherwise if the President were to have, within constitutional boundaries, the flexibility required to meet problems surrounding a national emergency with the success desired by Congress."  526 F.2d at 573.

A single authority, based on such flawed and outmoded reasoning, does not provide sufficient basis to disregard IEEPA's plain text.  *See Kemp*, 596 U.S. at 539; *Jama*, 543 U.S. at 351-52.  The CCPA's textually indifferent, purpose-laden opinion is out of step with modern Supreme Court cases admonishing courts to adhere to the plain meaning of a statute's text—and to avoid reading major asserted delegations into that text.  Indeed, when CCPA decided *Yoshida* in 1975, it did not have the benefit of the Supreme Court's modern statutory-interpretation precedents, including the major questions doctrine.  These precedents—unlike *Yoshida*—are binding on this Court.  *Compare Deckers Corp. v. United States*, 752 F.3d 949, 964 (Fed. Cir. 2014) (court sitting en banc not bound by panel decision), *with Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) ("[L]ower courts are 'bound not only by the holdings of higher courts' decisions but also by their "mode of analysis."'" (citation omitted)); *cf. Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) (refusing to "revert . . . to the understanding of private causes of action that held sway 40 years ago when Title VII was enacted" in considering question anew).  Because *Yoshida*'s mode of analysis is fundamentally at odds with these interpretive developments, it is not persuasive authority regarding IEEPA.

Indeed, the CCPA's analysis of the statutory question in *Yoshida* turns the modern major questions doctrine inside out. The court simply assumed that a far-reaching "emergency" power must exist where Congress did not mention it and found confirmation of that power in the fact that nothing in the *legislative history* reflected an intent to prohibit the imposition of tariffs. *Yoshida*, 526 F.2d at 576-77. This is exactly backwards. Under today's major questions doctrine, a court must assume that Congress did *not* delegate such an extraordinary power absent a clear statement—in the *text* of the statute—that Congress actually intended it.

*Yoshida*, in short, provides no authority for the challenged IEEPA tariffs.

## II.    THE WIDESPREAD ECONOMIC HARMS INFLICTED BY THE IEEPA TARIFFS UNDERSCORE THEIR ILLEGALITY.

The President's asserted "emergency" authority under IEEPA is already imposing vast political and economic consequences across the United States—affecting the entire American economy. The business community, in particular, is already facing irreparable harm from the IEEPA tariffs. Not only have the tariffs dramatically raised prices on imports—many of which have no serviceable domestic replacement—but the constant fluctuation in the application of the President's tariffs has also made planning for the future all but impossible, chilling expansion and growth. If they remain in place, the President's IEEPA tariffs threaten to dampen GDP growth and destroy thousands of jobs. Businesses already face increasing costs, which, in turn, squeeze margins and force them to increase prices. Small

businesses, in particular, may be forced to close, or will face irreparable damage to their customer base and reputation if the IEEPA tariffs remain in effect.

The scope of these economic harms—described below—further confirms that the President's assertion of IEEPA authority poses a "major question" requiring express delegation from Congress. If the major questions doctrine stands for anything, it is that the President cannot wield core legislative powers to reshape the American economy without express delegation from Congress.

The widespread harms resulting from this unlawful assertion of power also support the Court of International Trade's order for immediate relief. Monetary loss can constitute irreparable harm "where the loss threatens the very existence of [a] business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

### A.   The IEEPA Tariffs Will Reduce Growth, Lower Incomes, And Throttle The American Economy.

Whatever their intended purpose, tariffs increase costs for American businesses. For example, following the President's April 2 tariff announcement, the total direct tariff cost to midsize firms grew more than sixfold to $187.7 billion. Chris Wheat, et al., *Exposure to tariffs for midsize firms by metro area* at 4, JPMorganChase Institute (July 2025), https://www.jpmorganchase.com/ content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/exposure-to-tariffs-for-midsize-firms-by-metro-area.pdf. Even if the President were to negotiate agreements with trading partners and lower the rates of reciprocal tariffs, the 10%

universal tariff and higher tariff rates against China, Mexico, and Canada would still directly cost middle-market firms $82.3 billion. *Id.*

These increased costs on American businesses will ripple throughout the economy. According to some economists, the IEEPA tariffs could reduce U.S. GDP by 0.8% and reduce market income by 0.9%. *Id.* Others predict that the President's recent tariffs (including non-IEEPA tariffs) will ultimately shrink the economy by $170 billion annually. *State of U.S. Tariffs: June 17, 2025*, Budget Lab at Yale (June 17, 2025), https://budgetlab.yale.edu/research/state-us-tariffs-june-17-2025.

In addition to these direct costs, the tariffs represent one of the largest tax increases in recent history. The IEEPA tariffs alone are expected to generate $116 billion in tax revenue during 2025; but those revenues come at a cost—over $800 annually for the average American household. Erica York & Alex Durante, *Trump Tariffs: Tracking the Economic Impact of the Trump Trade War*, Tax Found. (June 2, 2025), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/. In terms of revenue generated, the tariffs equate to a 15% increase in the corporate income tax rate. *See* Lysle Boller et al., *The Economic Effects of President Trump's Tariffs*, Penn Wharton: Budget Model (updated Apr. 16, 2025), https://static1.squarespace.com/static/55693d60e4b06d83cf793431/t/68079ec8840 ebc012f2b0d5e/1745329864294/The+Economic+Effects+of+President+Trump%E 2%80%99s+Tariffs.pdf. Because tariffs are a regressive tax, they will hit the poorest

Americans hardest.  *Where We Stand:  The Fiscal, Economic, and Distributional Effects of All U.S. Tariffs Enacted in 2025 Through April 2*, Budget Lab at Yale (Apr. 2, 2025), https://budgetlab.yale.edu/research/where-we-stand-fiscal-economic-and-distributional-effects-all-us-tariffs-enacted-2025-through-april.

One asserted goal of the recent tariffs is to eliminate trade deficits by boosting American industry.  But approximately 56% of all U.S. imports are raw materials, components, and capital goods used by domestic manufacturers—many of which cannot practicably be obtained domestically.  John G. Murphy, *How Broad-Based Tariffs Put U.S. Growth, Prosperity at Risk*, U.S. Chamber of Com. (Mar. 27, 2025), https://www.uschamber.com/international/how-broad-based-tariffs-put-u-s-growth-prosperity-at-risk.  Due to the new tariffs, American manufacturers seeking to produce goods for consumption here or sale abroad will face higher prices for raw materials than their foreign competitors, undercutting whatever comparative advantage the tariffs were meant to create.  And even if some of these raw inputs or component parts can ultimately be produced domestically, it will take years—if not decades—for domestic production to become competitive globally.  Erin McLaughlin, *Want to Bring Factories Back? This Is What It Takes*, Barron's Online (Apr. 2, 2025), https://www.barrons.com/articles/trump-tariffs-manufacturing-onshoring-obstacles-a36686cb (behind paywall).

Tariff-induced price increases are already harming American industry. For example, the manufacturing sector contracted in June for the fourth consecutive month, with manufacturers noting that tariffs are "impact[ing] material pricing," and causing orders to "collapse[]." Susan Spence, *Manufacturing PMI® at 49%: June 2025 Manufacturing ISM® Report On Business®* (June 2025), https://www.ismworld.org/supply-management-news-and-reports/reports/ism-report-on-business/pmi/june/.

Finally, any competitive edge that might result from the President's tariffs depends on a strong market for U.S. exports. But so far, tariffs have reduced foreign demand for American exports, as many countries—including some close trading partners—have implemented significant retaliatory tariffs of their own. *See* Hannah Miao, *China Raises Tariffs on U.S. to 125%, Says More Tit-for-Tat Would Be a Joke*, Wall St. J. (Apr. 11, 2025), https://www.wsj.com/economy/trade/china-raises-tariffs-on-u-s-imports-to-125-as-trade-war-heats-up-371c5723.

China, Canada, and the EU have already announced retaliatory tariffs targeting $190 billion in U.S. exports. Erica York, *Learning from the First Trade War: Retaliation Hurts US Exporters*, Tax Found. Blog (Mar. 13, 2025), https://taxfoundation.org/blog/tariffs-tax-on-exports/. These tariffs alone pose an immediate threat to the millions of American workers in impacted industries. Lazaro Gamio & Ana Swanson, *Trade War Retaliation Will Hit Trump Voters Hardest*,

N.Y. Times (Mar. 15, 2025), https://www.nytimes.com/interactive/ 2025/03/15/business/economy/tariffs-trump-maps-voters.html.

### B.    Increased Costs Will Irreparably Harm American Small Businesses In Particular.

By raising costs and fueling uncertainty, the IEEPA tariffs threaten all businesses.  But small businesses, which collectively account for a third of the total value of imported goods, face the most immediate irreparable harm.  *See* Neil Bradley, *Small Businesses, Big Burden: The Cost of Tariffs*, U.S. Chamber of Com. (May 20, 2025), https://www.uschamber.com/small-business/small-businesses-big-burden-the-cost-of-tariffs.  Over the past several months, the Chamber has been flooded with correspondence from small business owners concerned that "broad tariffs are a tax increase that will raise prices for American consumers and hurt the economy."  *Id*.  The real-life stories of what small businesses are facing in the wake of the President's unprecedented tariffs underscore their irreparable harm.

Because small businesses operate with tight profit margins and limited financial flexibility, even a small increase in tariffs can profoundly affect their bottom line.  Greg Wittreich, a Washington-based footwear CFO, explained that the recent tariffs will cost his company an additional $1.5 million to source materials. *'A matter of survival': Small Businesses Speak Out on Tariffs*, U.S. Chamber of Com. (June 23, 2025), https://www.uschamber.com/small-business/american-workers-businesses-consumers-trade-tariffs?state= ("*Small Businesses Speak Out*").

If the challenged tariffs remain in place, he fears his business will not "have enough cash to last through the summer." *Id.* Andrew Fraser, who runs a children's toy business, similarly warned that "[t]hese tariffs are threatening our survival." *Id.* After decades of hard work, his company recently signed a breakthrough deal with a major retailer, "[b]ut with the cost of goods up 145% overnight due to tariff hikes, [the] buyer has placed the order on hold." *Id.* If the challenged tariffs remain in force, the financial loss for his business "could be catastrophic." *Id.*

Faced with the possibility of shutting down because of the dramatic spike in costs, many small business owners have no choice but to increase prices. *Id.* Donald Modugno, co-owner of an Illinois-based tableware company, fears the downstream consequences of tariff-induced price increases: "How can we tell our customers . . . that we'll be increasing their pricing by 145%?" *Id.* According to Modugno, these increased costs could eventually put him out of business. Other businesses, which are already "seeing customers delay or cancel projects" because of tariff-related price increases, have reported similar concerns. *Id.*

For many small businesses, the only alternative to raising prices is compromising quality. After small business owner Elana Gabrielle had to pay "over $1,000" in IEEPA tariffs on an $8,400 order, she wondered if, with her "already small margins," she could "continue offering [her] handmade goods at the [same] quality and price." *Id.* Ellen Randleman-Eldridge, an appliance store owner,

26

observed, "[t]here is no way for my business to buy cheaper without [lowering] quality, [and] that would risk my business reputation." *Id.* (alterations in original).

While the administration's goal is to increase demand for domestically produced goods and protect American workers, the reality is more complicated. As several of the Chamber's members have explained, even if they would prefer to buy their materials or produce their products domestically, many imported products cannot yet be replicated in the United States. Hanna Scholz, president of a bike manufacturer in Oregon, noted, "[o]ur bikes are only possible through a global supply chain—some bike parts have never been made in the USA, ever." *Small Businesses Speak Out*, *supra*. Ginger Price, the owner of a small oral-care company, explained, "I will have to take out a loan to pay th[e] extra expense [resulting from the tariffs]," while noting that "none of these items are made here in the U.S." *Id.*

Even if the tariffs eventually spur American manufacturing, for many small businesses, such an alternative will not arise until it is too late. For Andrew Fraser's stuffed animal business, "[t]here are no viable alternatives in the U.S. for th[e] kind of high-quality plush production" it requires. *Id.* By limiting access to those materials, the tariffs "are threatening [his] survival." *Id.* Jeffrey Savoca, president of a Pennsylvania footwear company, fears a similar fate: "At the end of this year, my once successful family business is done. Without warning, we may have to close unless the tariffs are taken away." *Id.* While some business owners are willing and

able to switch from international to domestic suppliers, the challenged tariffs are so sudden and steep that they have little runway to make the transition. *Id.*

The prospect of retaliation is particularly concerning to American small businesses that rely heavily on international consumers. For example, Tim Frey runs a small Colorado-based bike company for which exports to Europe and Asia account for "almost 50% of [the company's] annual revenue." *Id.* The potential for IEEPA tariffs to inspire retaliatory tariffs on exported products adds "additional headwinds" against his company. *Id.* Even traditionally strong international relationships are now at risk. Chris Pence, president of a Vermont pottery company, noted that "[d]ue to the tariffs and hostile attitude towards Canada, our Canadian customers are no longer interested in working with us." *Id.* Pence's company has "lost all of [its] market share in Canada and had to downsize [its] business as a result." *Id.*

### C. Tariff Whiplash Makes Future Planning Impossible And Undercuts Any Claimed Long-Term Benefits.

These harms are compounded considerably by the unlimited, unilateral nature of the President's asserted IEEPA tariff authority, which fosters deep uncertainty and makes it extremely difficult for American businesses—large and small—to plan for the future. And in business, uncertainty creates hardship.

Following the President's spate of tariff announcements, the Economic Policy Uncertainty Index has shattered records, revealing greater trade uncertainty in recent months than at any point during the COVID-19 pandemic. Economic Policy

Uncertainty Index, https://www.policyuncertainty.com/ (last visited July 3, 2025). Increased uncertainty depresses demand, as both businesses and consumers adopt a wait-and-see approach, postponing capital investments and withholding purchases. Masayuki Morikawa, *Trump tariff policy, uncertainty, and the role of economics*, VoxEU (June 14, 2025), https://cepr.org/voxeu/columns/trump-tariff-policy-uncertainty-and-role-economics. This doubly harms businesses.

The President's "pause" in enforcing some of these tariffs provides little reprieve for businesses. Because international orders must often be made far in advance, many businesses are holding off making orders fearing that, by the time the order arrives in the United States, tariff enforcement will have resumed. Recent statements by the President and his advisors have only magnified this uncertainty. Just this week, the President announced 25% tariffs against South Korea and Japan if they do not negotiate a trade deal by August 1. Elisabeth Buchwald & John Liu, *Trump announces new tariffs of up to 40% on a growing number of countries*, CNN Business (July 8, 2025), https://www.cnn.com/2025/07/07/economy/trump-letters-tariffs. Meanwhile, Secretary of the Treasury Scott Bessent stated that the paused April 2 tariffs would "boomerang back" on August 1 for countries that do not negotiate a deal. Ari Hawkins, *Trump team moves goalposts on tariffs again*, Politico (July 6, 2025), https://www.politico.com/news/2025/07/06/bessent-trump-tariffs-deadline-august-00440522. For businesses, this uncertainty is crippling.

Uncertainty especially harms small businesses. Judi Brown, the owner of a trophy manufacturer in Washington, explains: "We need to calculate and provide quotes on pretty much anything we need to order in for customers. At this point, it's a guess as to what the true cost will be." *Small Businesses Speak Out*, *supra*. Amanda Haddaway, owner of a Maryland distillery, keeps her company "in a holding pattern." *Id.* "Until there's more certainty that the tariffs are going to stay at the rate during this pause, we're hesitant to take that big of a risk." *Id.*

The irreparable harms already suffered by businesses large and small underscore the vast economic consequences of the President's tariffs and confirms the lower court's decision to issue preliminary relief.

## CONCLUSION

The Court of International Trade's permanent injunction should be affirmed.

Dated: July 8, 2025

Daryl Joseffer
Kevin R. Palmer
U.S. CHAMBER
  LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

Respectfully submitted,

*/s/ Gregory G. Garre*
Gregory G. Garre
Roman Martinez
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

*Counsel for* Amici Curiae

30

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Circuit Rules 29(b) and 32(b) because it contains 6,915 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 with 14-point Times New Roman font.

Dated: July 8, 2025                                        */s/ Gregory G. Garre*
                                                           Gregory G. Garre