Nos. 25-1812, 25-1813

---

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

V.O.S. SELECTIONS, INC., PLASTICS SERVICES AND PRODUCTS, LLC, d/b/a GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNIK, in his official capacity as Secretary of Commerce, UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Defendants-Appellants.*

---

STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF VERMONT,

*Plaintiffs-Appellees,*

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection, UNITED STATES,

*Defendants-Appellants.*

[CAPTION CONTINUED ON FOLLOWING PAGE]

On Appeal from the United States Court of International Trade
Nos. 25-66, 25-77, Judges Katzmann, Reif, and Restani

---

**BRIEF AMICI CURIAE OF ECONOMISTS IN SUPPORT OF
AFFIRMANCE**

---

Holger Spamann
1525 Massachusetts Avenue
Cambridge, MA 02138
(617) 496-6710

Debbie L. Berman
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

Adam G. Unikowsky
Aaron R. Cooper
Alyssa G. Bernstein
JENNER & BLOCK LLP
1099 New York Avenue NW Suite 900
Washington, DC 20001
(202) 639-6000

Counsel for *Amici Curiae* Economists

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | Nos. 25-1812, 25-1813 |
| **Short Case Caption** | V.O.S. Selections, Inc. v. Trump; Oregon v. Trump |
| **Filing Party/Entity** | Amici Curiae Economists |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/08/2025

Signature:　s/ Adam G. Unikowsky

Name:　　Adam G. Unikowsky

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Stan Veuger | | |
| Daron Acemoglu | | |
| Andrew G. Biggs | | |
| Alex Brill | | |
| Daniel Bunn | | |
| James C. Capretta | | |
| Kimberly Clausing | | |
| Steven Davis | | |
| Mihir A. Desai | | |
| Karen Dynan | | |
| Douglas Elmendorf | | |

☑ Additional pages attached

**Represented parties, con't:**

| | |
|---|---|
| Jason Furman | N. Gregory Mankiw |
| Samuel Gregg | Jeffrey Miron |
| Keith Hall | Brent Neiman |
| Kyle Handley | Kyle Pomerleau |
| Douglas Holtz-Eakin | Michael R. Strain |
| Steven B. Kamin | Alan D. Viard |
| Mary E. Lovely | Mark J. Warshawsky |
| Philip A. Luck | Owen Zidar |

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☐    No    ☑    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

IDENTITY AND INTEREST OF AMICI .............................................. 1

SUMMARY OF ARGUMENT ................................................................ 1

ARGUMENT ............................................................................................ 3

I.    Trade Deficits are Not "Unusual and Extraordinary." ................... 4

II.   Trade Deficits are Not A "Threat" Within the Meaning of IEEPA. ................ 7

      A.    Both aggregate and bilateral trade deficits are generally harmless. .......... 7

      B.    Tariffs will not bring back the U.S.'s twentieth-century
            manufacturing economy. ........................................................ 11

III.  The reciprocal tariffs do not "deal with" the aggregate trade deficit or with
      bilateral trade deficits. ................................................................ 13

      A.    While tariffs reduce imports *and* exports, they do not generally
            reduce the overall trade deficit. ............................................. 13

      B.    While the tariffs may reduce trade deficits with specific countries,
            they will increase trade deficits with other countries. ............................ 15

IV.   The reciprocal tariffs implicate the major questions doctrine because they
      will have a vast, significant impact on the U.S. economy .............................. 16

CONCLUSION ........................................................................................ 21

Appendix A: Signatories ................................................................... App. 1

# TABLE OF AUTHORITIES

**CASES**

*Alabama Ass'n of Realtors v. Department of Health and Human Services,* 594 U.S. 758 (2021) (per curiam) ........................................................17

*Biden v. Nebraska*, 600 U.S. 477 (2023) ..................................................17

*V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ........................................................................................................16

*West Virginia v. EPA*, 597 U.S. 697 (2022) ........................................3, 16

**STATUTES**

19 U.S.C. § 1862 ......................................................................................................8

50 U.S.C. § 1701 ..................................................................................................1, 7

50 U.S.C. § 1701(a) ............................................................................................2, 3

50 U.S.C. § 1701(b) ..........................................................................................4, 13

50 U.S.C. § 1702(a) ..................................................................................................3

50 U.S.C. § 1702(a)(1)(B) ............................................................................16, 17

**OTHER AUTHORITIES**

Arnaud Costinot & Iván Werning, *How Tariffs Affect Trade Deficits* (Nat'l Bureau of Econ. Rsch., Working Paper No. 33709, Apr. 2025), https://www.nber.org/papers/w33709 ......................................................15

YiLi Chien & Paul Morris, *Is U.S. Manufacturing Really Declining?*, Fed. Rsrv. Bank of St. Louis (Apr. 11, 2027), https://www.stlouisfed.org/on-the-economy/2017/april/us-manufacturing-really-declining..........................................................................................................................12

Executive Order 14,193, Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9113 (Feb. 1, 2025) ..........................................................................................................................1

Executive Order 14,194, Imposing Duties To Address the Situation at Our Southern Border, 90 Fed. Reg. 9117 (Feb. 1, 2025) ......................................1

Executive Order 14195, Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9121 (Feb. 1, 2025) ......................................................................1

Executive Order 14,257, Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90 Fed. Reg. 15,041 (Apr. 2, 2025).........................................................1, 2, 4, 5, 7, 11, 12

Robert Feenstra & Alan M. Taylor, *International Trade* (5th ed. 2021) ...............10

Davide Furceri et al., *The Macroeconomy After Tariffs*, 36 World Bank Econ. Rev. 361 (2022) ........................................................14

GovInfo, *Historical Tables, Budget of the United States Government, Fiscal Year 2025* (Mar. 2024), https://www.govinfo.gov/app/details/BUDGET-2025-TAB/context ...................................10

Ari Hawkins, *Navarro: Trump Will 'Structurally Shift' American Economy with Tariff Revenue*, Politico (Feb. 4, 2025), https://www.politico.com/news/2025/02/04/navarro-trump-will-structurally-shift-american-economy-with-tariff-revenue-00202344 ...............18

Douglas A. Irwin, *Three Simple Principles of Trade Policy* (1996) ...........10, 13, 14

Thomas Klitgaard, *Liberty Street Economics*, Fed. Rsrv. Bank of N.Y. (May 20, 2025), https://libertystreeteconomics.newyorkfed.org/2025/05/why-does-the-u-s-always-run-a-trade-deficit/ ......................................11

Anne O. Krueger, *International Trade: What Everyone Needs to Know* (2020).........................................................................7, 10, 13

Paul R. Krugman, Maurice Obstfeld & Marc J. Melitz, *International Economics: Theory & Policy* (9th ed. 2012) .........................................9

N. Gregory Mankiw, *Macroeconomics* (7th ed. 2010)...........................................14

N. Gregory Mankiw, *Principles of Economics* (7th ed. 2015) ...............................13

Peter Passel, *Economic Watch; Big Trade Deficit With Japan: Some Think It's No Problem*, N.Y. Times (Feb. 15, 1994), https://www.ny times.com/1994/02/15/business/economic-watch-big-trade-deficit-with-japan-some-think-it-s-no-problem.html .........................................6

Proclamation 10,895, 90 Fed. Reg. 9807 (Feb. 10, 2025).........................8

Proclamation 10,896, 90 Fed. Reg. 9817 (Feb. 10, 2025).........................8

Brian Reinbold & Yi Wen, *Historical U.S. Trade Deficits*, Fed. Rsrv. Bank of St. Louis (May 17, 2019), https://www.stlouisfed.org/on-the-economy/2019/may/historical-u-s-trade-deficits............................................4

Andrés Rodríguez-Clare et al., *The 2025 Trade War: Dynamic Impacts Across U.S. States and the Global Economy* (Nat'l Bureau of Econ. Rsch., Working Paper No. 33792, May 2025), https://www.nber.org/papers/w33792................................................................20

Statement from the Off. of Commc'ns, *FACT: One, Big, Beautiful Bill Cuts Spending, Fuels Growth*, The White House (May 28, 2025), https://www.whitehouse.gov/articles/2025/05/fact-one-big-beautiful-bill-cuts-spending-fuels-growth/ .........................................18

U.S. Bureau of Econ. Analysis, *Interactive Data: Value added by Industry as a Percentage of Gross Domestic Product* (last revised Nov. 16, 2021), https://apps.bea.gov/iTable/?reqid=1603&step= 2&Categories=GDPxIndHist&isURI=1&_gl=1*1r4y3ji*_ga*MTI 2NDIxMDA5Mi4xNzUxOTEzMTY0*_ga_J4698JNNFT*czE3NT E5MTMxNjQkbzEkZzEkdDE3NTE5MTQwMTQkajExJGwwJGg w#eyJhcHBpZCI6MTYwMywic3RlcHMiOlsxLDIsNCw0XSwiZ GF0YSI6W1siY2F0Z.......................................12

U.S. Bureau of Economic Analysis, *International Data: Table 2.1., U.S. Trade in Services, by Type of Service* (release date: July 3, 2025), https://apps.bea.gov/iTable/?reqid=62&step=9&isuri= 1&6210=4#eyJhcHBpZCI6NjIsInN0ZXBzIjpbMSw5LDZdLCJkY XRhIjpbWyJQcm9kdWN0IiwiNCJdLFsiVGFibGVMaXN0IiwiMj Q1Il1dfQ== .........................................5, 6

U.S. Census Bureau, *Monthly Advance Economic Indicators Report, May 2025*, Release Number: CB25-101 (for release June 26, 2025), https://www.census.gov/econ/indicators/advance_report.pdf. ...........15

iv

World Bank Group, *DataBank: World Development Indicators*, https://databank.worldbank.org/source/world-development-indicators (last accessed July 8, 2025) .........................................................................................4

World Integrated Trade Solutions**,** *United States Bananas, including plantains, fresh or dried exports by country in 2023*, https://wits.worldbank.org/trade/comtrade/en/country/USA/year/2023/tradeflow/Exports/partner/ALL/product/080300 (last visited July 8, 2025)................................................................................................5

World Integrated Trade Solutions**,** *United States Bananas, including plantains, fresh or dried imports by country in 2023* (page refreshed July 8, 2025, 21:01 ET), https://wits.worldbank.org/trade/comtrade/en/country/USA/year/2023/tradeflow/Imports/partner/ALL/product/080300 ...........................................5

Yale Budget Lab, *State of U.S. Tariffs: June 17, 2025* (2025), https://budgetlab.yale.edu/research/state-us-tariffs-june-17-2025 ...............14, 19

## IDENTITY AND INTEREST OF AMICI[1]

Amici Curiae are professional economists at leading universities and public policy research organizations.[2] They have dedicated their professional lives to understanding international trade and the economy. Many have put their expertise to use in public service for the U.S. federal government. Amici have an interest that the fundamentals of trade economics are correctly represented in this litigation.

## SUMMARY OF ARGUMENT

Plaintiffs challenge certain import tariffs imposed by President Trump under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq*. The President issued those tariffs to address two asserted crises: (1) tariffs against Mexico, Canada, and China to fight a declared fentanyl crisis; and (2) universal and reciprocal tariffs against all global imports to address a declared economic crisis caused by the United States' trade imbalance, and to address "a lack of reciprocity in [the United States'] bilateral trade relationships."[3] 90 Fed. Reg. at

---

[1] No counsel for any party authored this brief in whole or in part. No party, counsel, or person other than Amici and their counsel contributed money to fund the preparation and submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

[2] A complete list of Amici is included in Appendix A attached hereto.

[3] These include Executive Order 14,193, Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9113 (Feb. 1, 2025); Executive Order 14,194, Imposing Duties To Address the Situation at Our Southern Border, 90 Fed. Reg. 9117 (Feb. 1, 2025); Executive Order 14,195, Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9121 (Feb. 1, 2025); Executive Order 14,257, Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent

1

15,041. Amici focus on the latter "reciprocal tariffs," which the President stated are needed to address U.S. trade deficits with foreign trading partners.

Even assuming that IEEPA permits the issuance of tariffs—an authority that is not clear from IEEPA's plain language—IEEPA has certain requirements that must be met before the President can invoke its authority. First, IEEPA requires the President to declare a national emergency based on an "unusual and extraordinary threat . . . to the national security, foreign policy or economy of the United States." 50 U.S.C. § 1701(a). Trade deficits, however, have existed consistently over the past fifty years in the United States, for extended periods in the United States in the nineteenth century, and in most countries in most years in recent decades. They are thus not "unusual and extraordinary." *See* Part I, *infra*. Second, the existence of these ordinary and recurring trade deficits is not in and of itself a "threat . . . to the national security, foreign policy or the economy" of the United States. *See* Part II, *infra*. Third, even if the current trade deficit constituted an unusual and extraordinary threat to national security or the economy as required by IEEPA, the tariffs imposed under IEEPA by the President do not meaningfully reduce trade deficits and hence do not "deal with" the deficits as IEEPA requires. *See* Part III, *infra*.

---

Annual United States Goods Trade Deficits, 90 Fed. Reg. 15,041 (Apr. 2, 2025), and all modifications and amendments thereto.

Finally, while the President's reciprocal tariffs will not reduce the trade deficits, they will significantly affect other aspects of the economy. These sweeping tariffs, which will apply to almost every good that enters the United States, will have massive budgetary, allocative, and distributive effects across the country. Their impact on government revenue alone is one or two orders of magnitude greater than that of programs that the Supreme Court previously determined triggered the "major questions doctrine," whereby explicit Congressional authorization is required to impose programs of significant economic impact. *See*, *e.g.*, *West Virginia v. EPA*, 597 U.S. 697 (2022). *See* Part IV, *infra.* No such congressional authorization to transform the U.S. economy via tariffs exists here.

Amici, as economists, are well-positioned to provide an economic perspective on the critical questions of this case. Amici here speak to the scale of these effects and the existence, or in fact non-existence, of an economic emergency sufficient to justify the use of IEEPA.

## ARGUMENT

IEEPA grants the President the power to take certain measures, including to issue "instructions, licenses, or otherwise," to "regulate . . . any acquisition . . . importation or exportation of . . . any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . ." 50 U.S.C. § 1702(a). But the

3

President may "*only*" do so "to deal with an unusual and extraordinary threat . . . ." and IEEPA powers "[can]not be exercised for any other purpose." 50 U.S.C. § 1701(b) (emphasis added). The tariffs promulgated by the President under IEEPA fail to meet these requirements.

## I.     Trade Deficits are Not "Unusual and Extraordinary."

There is nothing "unusual" or "extraordinary" about trade deficits. Indeed, *most countries run trade deficits most years*. Over the last fifty years, in any given year, about two thirds of the roughly 150 countries for which the World Bank publishes the relevant data have run a trade deficit.[4]

Even "large and persistent" deficits, as Executive Order 14,257 describes, 90 Fed. Reg. at 15,041, are not "unusual and extraordinary." The United States has run "large and persistent" deficits for the past fifty years, as well as in the past. "From 1800-1870, the United States ran a trade deficit for all but three years and the trade balance averaged about -2.2 percent of GDP."[5] Countries with economies as different as France (since 2005) and India (since 1978) have run persistent trade deficits as well.[6]

---

[4]   World Bank Group, *DataBank: World Development Indicators*, https://databank.worldbank.org/source/world-development-indicators (last accessed July 8, 2025) [hereinafter *DataBank*).

[5] Brian Reinbold & Yi Wen, *Historical U.S. Trade Deficits*,  Fed. Rsrv. Bank of St. Louis   (May   17,   2019),   https://www.stlouisfed.org/on-the-economy/2019/may/historical-u-s-trade-deficits.

[6] *DataBank*, *supra* note 4.

Deficits become even more unremarkable if trade in goods and services are considered separately, *i.e.*, as sector-specific deficits. President Trump refers specifically to "large and persistent annual U.S. *goods* trade deficits." 90 Fed. Reg. at 15,041 (emphasis added). But countries import and export both goods and services, and there is no reason why a country should import the same mix of goods and services as it exports. For example, the United States is a net exporter of software, education, and finance (services) but a net importer of bananas (goods).[7] If the sector-mix of imports is different from the sector-mix of exports, however, the country will run a deficit in one sector (goods or services) and a surplus in the other even if its overall trade is balanced. These sector-specific deficits and surpluses are

---

[7] *Compare* World Integrated Trade Solution, *United States Bananas, including plantains, fresh or dried imports by country in 2023*, (page refreshed July 8, 2025, 21:01 ET), https://wits.worldbank.org/trade/comtrade/en/country/USA/year/2023/tradeflow/Imports/partner/ALL/product/080300 (imports) and World Integrated Trade Solution, *United States Bananas, including plantains, fresh or dried exports by country in 2023*, https://wits.worldbank.org/trade/comtrade/en/country/USA/year/2023/tradeflow/Exports/partner/ALL/product/080300 (last visited July 8, 2025) (exports). U.S. Bureau of Economic Analysis, *International Data: Table 2.1., U.S. Trade in Services, by Type of Service* (release date: July 3, 2025), https://apps.bea.gov/iTable/?reqid=62&step=9&isuri=1&6210=4#eyJhcHBpZCI6NjIsInN0ZXBzIjpbMSw5LDZdLCJkYXRhIjpbWyJQcm9kWN0IiwiNCJdLFsiVGFibGVMaXN0IiwiMjQ1Il1dfQ== "Table 2.1. U.S. Trade in Services, by Type of Service" lines 21, 30, 44 (exports) and 124, 133, 147 (imports) for education, finance, and software licenses, respectively.

likely to be very persistent because the underlying reasons are as well: some countries have a comparative advantage producing goods, while others have a comparative advantage producing services. The United States has the dominant technology sector in the world and as a result, has been running a persistent surplus in trade in services for decades.[8] Conversely, the United States has long run banana trade deficits because the climate in the United States is not good for banana farming.

A similar logic explains why bilateral trade deficits—deficits between the United States and individual countries—are a virtual logical certainty. Nobel prize winner Robert Solow made the point with this quip: "I have a chronic deficit with my barber, who doesn't buy a darned thing from me."[9] There is no reason why the United States—or any country, for that matter—should have balanced trade with every other country. The United States may (only) sell goods to country A, which sells goods to country B, which then sells the same amount of goods to the United States. In this example, U.S. trade may be balanced overall (*i.e.*, with countries A and B combined), but the United States runs a deficit with country B and a surplus with country A. Such country imbalances are to be expected because different countries supply and demand different goods and services, only some of which are

---

[8] U.S. Bureau of Economic Analysis, *International Data, supra* note 7.
[9] Peter Passel, *Economic Watch; Big Trade Deficit With Japan: Some Think It's No Problem,* N.Y. Times (Feb. 15, 1994), https://www.nytimes.com/1994/02/15/business/economic-watch-big-ztrade-deficit-with-japan-some-think-it-s-no-problem.html.

in demand and supply, respectively, in the United States. For economists, because bilateral trade deficits are a virtual logical certainty, it is odd, to say the least, to attempt to rebalance trade on a country-by-country basis, as Executive Orders 14,257 and 14,266 appear to do with their country-specific "reciprocal tariffs." *See, e.g.*, Anne O. Krueger, *International Trade: What Everyone Needs to Know* 81 (2020).

## II. Trade Deficits are Not A "Threat" Within the Meaning of IEEPA.

### A. Both aggregate and bilateral trade deficits are generally harmless.

IEEPA authorizes the President to act to counter only "unusual and extraordinary" threats. 50 U.S.C. § 1701. President Trump purports to "find" a "threat to the national security and economy of the United States" in "underlying conditions . . . as indicated by large and persistent annual U.S. goods trade deficits." 90 Fed. Reg. at 15,041. The challenged tariffs are supposed "to rebalance global trade flows," *i.e.*, to eliminate trade deficits between the United States and other countries. *See id.* at 15,045.

But trade deficits are not only usual and ordinary, they are also generally harmless and not a "threat to the national security and economy of the United States." *Id*. at 15,041.

First, bilateral and sector-specific trade deficits are benign for the same reason that they are ubiquitous. *Cf*. Krueger, *supra*, at 81 ("bilateral trade deficits … mean

nothing"). Just as Robert Solow was not threatened by his trade deficit with his barber, or more generally by his trade deficit in barber services, the United States is not generally threatened by a trade deficit with any individual country, or any individual sector (*e.g.*, goods or bananas). The unequal distribution of trade across trading partners and sectors is mostly a consequence of efficient specialization.

To be sure, specialization can be *strategically* problematic. Thus, trade deficits in particular industries could pose a threat to the United States. For example, the United States may not want to offshore weapons production. But such a threat would be industry- and perhaps country-specific and cannot be measured simply in dollars or percentages of trade deficit.[10]

Second, aggregate trade deficits have numerous causes and may even be a sign of economic strength. The fact that the United States has aggregate trade deficits—*i.e.*, across all of the United States' trading partners and its goods and services combined—is neither good nor bad per se and instead may be a sign of the United States' economic strength. A trade deficit is an excess of imports over exports, nothing more. The word "deficit" has a negative connotation that is

---

[10] These and similar threats are properly addressed under other different statutory schemes, such as Section 232 under the Trade Expansion Act of 1962, which allows the President to adjust imports that threaten to impair U.S. national security. 19 U.S.C. § 1862. The President has used Section 232 to, most recently, impose tariffs on imports of steel and aluminum. Proclamation 10,895, 90 Fed. Reg. 9807 (Feb. 10, 2025); Proclamation 10,896, 90 Fed. Reg. 9817 (Feb. 10, 2025).

misleading in this context. Strictly speaking, the fact that the United States persistently runs a "trade deficit" simply means that the United States persistently receives more goods and services from other countries than those other countries receive from the United States. Everything else equal, a trade deficit is a win for the United States.

To be sure, those excess goods and services are not free. The United States has long been paying for those good and services by attracting more capital from foreign investors than U.S. investors invest abroad. Some might paint this in a negative light, as a sort of "sell out" of the United States. But it is not inherently bad, and framed conversely, it sounds quite positive that foreigners are eager to invest in the United States, raising the productivity of American workers and paying for the privilege with money that Americans can spend on goods and services abroad.

For this reason, many economists interpret the U.S. trade deficit as a sign of U.S. strength, not weakness. There is a reason why the United States has been the preferred destination of capital for many decades. And it is the United States' innovative economy and status as a safe haven. In short, the United States is a superior investment. This is what generates Americans' ability to buy more from the rest of the world than we sell to it (*i.e.*, the trade deficit). *Cf.*, *e.g.*, Paul R. Krugman, Maurice Obstfeld & Marc J. Melitz, *International Economics: Theory & Policy* 507 (9th ed. 2012) ("countries where investment is relatively productive should be net

importers of current output (and have current account deficits)"). Additionally, the trade deficit may be a function of the U.S. *budget* deficit. Empirically, the United States started running a trade deficit at about the same time that it started running a budget deficit.[11] This is not a coincidence. A budget deficit means that the government spends more than it earns. This is offset by U.S. citizens earning more than they spend, but only partly. On net, the United States—government and citizens combined—spends more than it earns. At the national level, spending more than one earns means importing more than one exports, i.e., running a trade deficit.[12] *See, e.g.*, Douglas A. Irwin, *Three Simple Principles of Trade Policy* 18-20 (1996); Robert Feenstra & Alan M. Taylor, *International Trade* 51-53 (5th ed. 2021); Krueger, *supra*, at 81 ("[T]here is virtually complete consensus among economists about trade deficits. Trade deficits (or more correctly current account deficits) are not the result of other countries' tariffs. They are the outcome of a country's domestic macroeconomic monetary and fiscal policies.").

An illustration of the importance of macroeconomic factors (as opposed to microeconomic ones, like tariffs) in determining the aggregate trade deficit comes

---

[11] GovInfo, *Historical Tables, Budget of the United States Government, Fiscal Year 2025* (Mar. 2024), https://www.govinfo.gov/app/details/BUDGET-2025-TAB/context.

[12] Theoretically, a savings deficit can be offset not only by a trade deficit but by other components of the so-called "current account," which are essentially returns to capital. In practice, however, these are much smaller for the United States and thus play only a small role in the overall U.S. balance of payments.

from the dramatic growth in U.S. domestic oil and gas production in the 2010s.[13] In 2011, the U.S. trade deficit in petroleum products peaked at $330 billion, well over half of the entire trade deficit of $558 billion. Then, domestic oil and gas production dramatically increased. The trade deficit in that industry disappeared by 2019. Nevertheless, the overall U.S. trade deficit grew to $617 billion, consistent with the wider saving gap that developed over this period.

Thus, trade deficits have many possible drivers and are the necessary flipside of other phenomena. Many of these, like attracting investments, are generally viewed as positive. That being the case, trade deficits are neither a threat nor a boon per se.

### B. Tariffs will not bring back the U.S.'s twentieth-century manufacturing economy.

Executive Order 14257 incorrectly links the U.S. trade deficit to several other phenomena. *First*, the Order states that: "Large and persistent annual U.S. goods trade deficits have led to the hollowing out of our manufacturing base." 90 Fed. Reg. at 15,041. This cannot be correct. Even if the entire U.S. trade deficits in goods (4% of GDP) were replaced with domestic manufacturing on top of the current U.S. manufacturing GDP share of 10%, U.S. manufacturing today would be only 14% of

---

[13] Thomas Klitgaard, *Liberty Street Economics*, Fed. Rsrv. Bank of N.Y. (May 20, 2025), https://libertystreeteconomics.newyorkfed.org/2025/05/why-does-the-u-s-always-run-a-trade-deficit/.

GDP—half of its peak in the early 1950s.[14] This decline has nothing to do with the trade deficit. Manufacturing as a percentage of GDP has shrunk even in countries that run persistent trade surpluses (*e.g.*, Germany). The underlying driver is a large increase in labor productivity. In fact, the United States does not manufacture less today than it did in the past. Instead, the same manufacturing now employs fewer people and is less expensive relative to other goods.[15]

*Second*, the Executive Order also incorrectly asserts that: "Large and persistent annual U.S. goods trade deficits have . . . inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries." 90 Fed. Reg. at 15,041. Trade deficits, however, are not the same as trade. Trade—the sourcing of goods across borders—may create supply chain vulnerabilities, for example if the goods are defense-related. But this has nothing to do with a trade deficit writ large. A country could be running a persistent trade *surplus* and still face

---

[14] U.S. Bureau of Econ. Analysis, *Interactive Data: Value added by Industry as a Percentage of Gross Domestic Product* (last revised Nov. 16, 2021), https://apps.bea.gov/iTable/?reqid=1603&step=2&Categories=GDPxIndHist&isURI=1&_gl=1*1r4y3ji*_ga*MTI2NDIxMDA5Mi4xNzUxOTEzMTY0*_ga_J4698JNNFT*czE3NTE5MTMxNjQkbzEkZzEkdDE3NTE5MTQwMTQkajExJGwwJGgw#eyJhcHBpZCI6MTYwMywic3RlcHMiOlsxLDIsNCw0XSwiZGF0YSI6W1siY2F0ZW... 

*(truncated — full text: ...czE3NTE5MTMxNjQkbzEkZzEkdDE3NTE5MTQwMTQkajExJGwwJGgw#eyJhcHBpZCI6MTYwMywic3RlcHMiOlsxLDIsNCw0XSwiZGF0YSI6W1siY2F0ZW...)*

[15] YiLi Chien & Paul Morris, *Is U.S. Manufacturing Really Declining?*, Fed. Rsrv. Bank of St. Louis (Apr. 11, 2027), https://www.stlouisfed.org/on-the-economy/2017/april/us-manufacturing-really-declining.

these vulnerabilities if it lacks domestic means of production. Similarly, domestic production of sufficient scale may be hard to achieve when competing with cheaper imports, but then the specific goods imported are the problem, not the general excess of imports over exports (which could be in an entirely different industry and thus not help with scale).

## III.    The Reciprocal Tariffs Do Not "Deal With" the Aggregate Trade Deficit or with Bilateral Trade Deficits.

### A.    While tariffs reduce imports *and* exports, they do not generally reduce the overall trade deficit.

Even assuming that trade deficits constitute an unusual or extraordinary threat under IEEPA, the reciprocal tariffs do not "deal with" the aggregate trade deficit as the text of IEEPA requires. 50 U.S.C. § 1701(b) ("The authorities granted to the President by section 1702 of this title may only be exercised *to deal with* an unusual and extraordinary threat . . . ." (emphasis added)).

The reciprocal tariffs do not meaningfully reduce the aggregate trade deficit. As the standard introductory economics textbook explains: "Trade policies do not affect the trade balance. That is, policies that directly influence exports or imports do not alter net exports." N. Gregory Mankiw, *Principles of Economics* 696 (7th ed. 2015). This is because the trade balance equals national savings minus domestic investment, and trade policies do not directly affect national savings or domestic investment. *Id.*; *see also*, *e.g.*, Irwin, *supra*, at 18; Krueger, *supra*, at 81. Empirical

13

evidence from a large set of countries over the past half century confirms that "the net effects of higher tariffs on the trade balance are small and insignificant;" Davide Furceri et al., *The Macroeconomy After Tariffs*, 36 World Bank Econ. Rev. 361, 368 (2022).

Importantly, trade deficits are not the same as trade. Tariffs unambiguously reduce total trade flows. But they generally do so in both directions—both in and out. Irwin, *supra*, at 2-9; N. Gregory Mankiw, *Macroeconomics* 143 (7th ed. 2010); Furceri et al., *supra*, at 369. Thus, while the volume of trade will fall, the level of the trade deficits may remain unchanged.

Case in point, the trade deficit in goods from the beginning of 2025 through the end of May—the most recent available numbers—has exceeded last year's trade deficit. This has happened despite a very large increase in tariffs from both the reciprocal tariffs discussed here and a range of others. The full set of tariffs imposed this year to date corresponds to a 13.4 percentage point increase in the U.S. average effective tariff rate (12.4 percentage points after accounting for behavioral responses, from a base of 2.4%).[16] Despite those increases, the goods trade deficit

---

[16] Yale Budget Lab, *State of U.S. Tariffs: June 17, 2025* (2025), https://budgetlab.yale.edu/research/state-us-tariffs-june-17-2025 [hereinafter *Yale Budget Lab 2025*).

equaled $649 billion for January through May of 2025, about a 38% increase from last year's $471 billion.[17]

To be sure, at some point, tariffs must reduce the trade deficit. At their extreme, prohibitive tariffs will shut down all trade, reducing the trade deficit (or surplus, for that matter) to zero. For lesser tariffs, however, the theoretical relationship is more complicated. *Cf.* Arnaud Costinot & Iván Werning, *How Tariffs Affect Trade Deficits* (Nat'l Bureau Econ. Rev., Working Paper No. 33709 Apr. 2025), https://www.nber.org/papers/w33709.

### B. While the tariffs may reduce trade deficits with specific countries, they will increase trade deficits with other countries.

The fact that reciprocal tariffs do not meaningfully change the aggregate trade deficit does not mean they do not affect some specific bilateral trade deficits. While the sum of all of the bilateral trade deficits will remain roughly the same, their relative sizes can and likely will change, as both tariffs and demand and supply responses vary across countries and products. This necessarily means reciprocal tariffs, therefore, will reduce some bilateral trade deficits while increasing others.

During the first Trump administration, the United States increased tariffs on imports from China significantly, from about 3% to about 19%. At least partially as

---

[17] U.S. Census Bureau, *Monthly Advance Economic Indicators Report, May 2025*, Release Number: CB25-101 (for release June 26, 2025), https://www.census.gov/econ/indicators/advance_report.pdf.

a result, between 2016 and 2020 imports from China decreased—as did the bilateral trade deficit with China. At the same time, the U.S. trade deficit with a number of other major trading partners *increased*, more than offsetting the decrease in the bilateral deficit with China.

## IV. The Reciprocal Tariffs Implicate the Major Questions Doctrine Because they will have Vast, Significant Impact on the U.S. Economy.

Under the major questions doctrine, agencies must point to "clear congressional authorization when they claim the power to make decisions of vast economic and political significance." *West Virginia*, 597 U.S. at 735 (Gorsuch, J., concurring). These tariffs, of a scale and scope unseen since the 1940s, ensure a massive impact across the United States. The adoption of the tariffs thus appears to be the paradigmatic "decision[] of vast economic and political significance" that requires clear Congressional authorization. *Id.* at 716 (citation omitted).

However, IEEPA, the statute at question here, does not even explicitly mention tariffs; it only provides that the President may "regulate . . . importation." 50 U.S.C. § 1702(a)(1)(B). The court below held that these words do not permit vast, if not unlimited, authority over trade and do not grant "authority to impose unlimited tariffs on goods from nearly every country in the world." *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1358 (Ct. Int'l Trade 2025). Amici agree that, based on their scope of impact and recent Supreme Court precedent, the "regulate .

16

. . . importation" language in IEEPA could not possibly have authorized such extensive tariff authority. 50 USC § 1702(a)(1)(B).

In fact, the economic impact of the reciprocal tariffs is predicted to be far greater than in two programs that the U.S. Supreme Court previously found to trigger the major questions doctrine. In *Alabama Ass'n of Realtors v. Department of Health and Human Services*, the Supreme Court held that the power to impose "$50 billion in … economic impact" was "exactly the kind of power" "of vast economic and political significance" for which it "expect[s] Congress to speak clearly." 594 U.S. 758, 764 (2021) (per curiam) (cleaned up). The Supreme Court explicitly benchmarked against the $50 billion impact in *Alabama Ass'n* the student loan forgiveness program challenged in *Biden v. Nebraska*, 600 U.S. 477 (2023). In *Biden v. Nebraska*, the Court disapproved of a statutory interpretation that would allow the agency to "enjoy virtually unlimited power to rewrite" the enabling statute. *Id.* at 502. It pointed to the "staggering" scope of impact of the program "between $469 billion and $519 billion," which was "ten times the 'economic impact'" in *Alabama Ass'n* that it previously concluded "triggered analysis under the major questions doctrine." *Id.* at 502-03.

The cost estimate for the impact of *Biden v. Nebraska* came from "[a] budget model issued by the Wharton School." *Id.* at 502. The Wharton School's budget model now predicts an economic impact of the reciprocal tariffs that far exceeds

even the "staggering" impact of the latter program. According to this model, the government will collect $3.1 trillion in additional revenue over the budget window without accounting for behavioral responses (the "static score"), and $1.5 trillion in revenue when behavioral responses are taken into account (the "dynamic score"). The government's own estimates are even higher. It has claimed that the tariffs will "generate between $2.3 trillion and $3.3 trillion" in revenue over the same period, reflecting a range of revenue outcomes that depend on changes in demand and "enforcement efficacy."[18]

Moreover, in addition to affecting government income, the tariffs' economic impact is not merely budgetary. They will also "structurally shift" the economy more broadly.[19] For example, the tariffs will affect the economy by reducing the purchasing power of households throughout the income distribution. The Yale Budget Lab estimates that for a household in the second lowest income decile, the tariffs will cost consumers an average of $980 per household. For households in the

---

[18] Statement from the Off. of Commc'ns, *FACT: One, Big, Beautiful Bill Cuts Spending, Fuels Growth*, The White House (May 28, 2025), https://www.whitehouse.gov/articles/2025/05/fact-one-big-beautiful-bill-cuts-spending-fuels-growth/.

[19] Ari Hawkins, *Navarro: Trump Will 'Structurally Shift' American Economy with Tariff Revenue*, Politico (Feb. 4, 2025), https://www.politico.com/news/2025/02/04/navarro-trump-will-structurally-shift-american-economy-with-tariff-revenue-00202344.

middle, the burden rises to $1,700 per household, and for those in the top tenth, it averages $4,600.[20]

The tariffs also will change the behavior of companies and households throughout the economy, which explains the large differences between the static and dynamic scoring that the Wharton School uses to estimate the impact of tariffs on government revenue. In response to the imposition of tariffs, firms and households will make countless changes to their behavior that result in different purchases of consumer goods and services, altered choices of business inputs and capital goods, and shifts of capital and human resources across industries and occupations. As these adjustments reverberate throughout the economy, purchases of imported goods subject to the tariffs generally will decrease, reducing the amount of tariff revenue collected. In the government's assessment, this reduction corresponds to almost a third of the revenue that would have been collected in the absence of behavioral responses, or about $1 trillion.

In addition to changing the distribution and allocation of resources across firms and households, the tariffs will affect states differently, depending, among other factors, on the exposure states have to international trade and the extent to which their industries compete with or rely on foreign producers. A recent analysis

---

[20] *Yale Budget Lab 2025*, *supra* note 16.

by researchers at the University of California, Berkeley, the Federal Reserve Bank of San Francisco, and the London School of Economics and Political Science finds the differential of real income lost in those states that will be most negatively affected by the tariffs as compared to those states that benefit the most will be as much as 5% percentage points.[21]

Amici's view—and that of the economics profession at large—is that trade deficits are not "unusual and extraordinary" or a "threat" to national security or the U.S. economy. Regardless, the reciprocal tariffs do not "deal with" the trade deficits. Instead, they will have trillions of dollars' worth of impact on the economy, an impact that will reverberate across every household and state.

---

[21] Andrés Rodríguez-Clare et al., *The 2025 Trade War: Dynamic Impacts Across U.S. States and the Global Economy* (Nat'l Bureau of Econ. Rsch., Working Paper No. 33792, May 2025), https://www.nber.org/papers/w33792.

## CONCLUSION

For all of these reasons, the court should affirm the decision of the Court of International Trade.

Dated:  July 8, 2025

Respectfully submitted,

/s/ *Adam G. Unikowsky*

Holger Spamann
1525 Massachusetts Avenue
Cambridge, MA 02138
(617) 496-6710

Debbie L. Berman
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

Adam G. Unikowsky
Aaron R. Cooper
Alyssa G. Bernstein
JENNER & BLOCK LLP
1099 New York Avenue NW Suite 900
Washington, DC 20001
(202) 639-6000

Counsel for *Amici Curiae* Economists

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. Cir. R. 21(e) because the brief contains 4,733 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman Font.

*/s/ Adam G. Unikowsky*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of July, 2025, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system, which caused a copy of the foregoing to be delivered by electronic means to counsel of record.

*/s/ Adam G. Unikowsky*

# APPENDIX A: SIGNATORIES

Stan Veuger is Senior Fellow at the American Enterprise Institute.

Daron Acemoglu is Institute Professor at the Massachusetts Institute of Technology. He received the Nobel Prize in Economics in 2024.

Andrew G. Biggs is Senior Fellow at the American Enterprise Institute and serves as a member of the Financial Oversight and Management Board for Puerto Rico. He served as Principal Deputy Commissioner and in other senior positions at the Social Security Administration between 2003 and 2007.

Alex Brill is Senior Fellow at the American Enterprise Institute. He served as Policy Director and Chief Economist of the House Ways and Means Committee between 2003 and 2007, and as Staff Economist at the Council of Economic Advisers from 2001 to 2002.

Daniel Bunn is President and CEO of the Tax Foundation. Between 2013 and 2018 he worked as Senior Policy Advisor to the Senate's Joint Economic Committee and on the policy staff for Senators Mike Lee and Tim Scott.

James C. Capretta is Senior Fellow and the Milton Friedman Chair at the American Enterprise Institute. He served as Associate Director for Human Resource Programs at the Office of Management and Budget from 2001 to 2004.

Kimberly Clausing holds the Eric M. Zolt Chair in Tax Law and Policy at the UCLA School of Law, and is nonresident Senior Fellow at the Peterson Institute for International Economics. She served as Deputy Assistant Secretary of the Treasury for Tax Analysis from 2021 to 2022.

Steven Davis is Thomas W. and Susan B. Ford Senior Fellow and Director of Research at the Hoover Institution, and Senior Fellow at the Stanford Institute for Economic Policy Research.

Mihir A. Desai is Mizuho Financial Group Professor of Finance at Harvard Business School and a Professor of Law at Harvard Law School.

Karen Dynan is Professor of the Practice of Economic Policy at Harvard University, and a nonresident Senior Fellow at the Peterson Institute for International

Economics. She served as Assistant Secretary of the Treasury for Economic Policy from 2013 to 2017.

Douglas Elmendorf is Professor of Public Policy at Harvard University's Kennedy School of Government. He served as Director of the Congressional Budget Office from 2009 to 2015.

Jason Furman is Aetna Professor of the Practice of Economic Policy at Harvard University, and nonresident Senior Fellow at the Peterson Institute for International Economics. He served as chair of the Council of Economic Advisers from 2013 to 2017.

Samuel Gregg is President and Friedrich Hayek Chair in Economics and Economic History at the American Institute for Economic Research.

Keith Hall is Distinguished Visiting Fellow at the Mercatus Center at George Mason University. He served as Director of the Congressional Budget Office from 2015 to 2019 and as Commissioner of the Bureau of Labor Statistics from 2008 to 2012.

Kyle Handley is Professor of Economics, Rafael and Marina Pastor Chancellor's Endowed GPS Faculty Fellow, and Director of the Center for Commerce and Diplomacy at the University of California, San Diego's School of Global Policy and Strategy.

Douglas Holtz-Eakin is President of the American Action Forum. He was Director of the Congressional Budget Office from 2003 to 2005, and served as Chief Economist of the Council of Economic Advisers from 2001 to 2002.

Steven B. Kamin is Senior Fellow at the American Enterprise Institute. He was the Director of the Division of International Finance at the Federal Reserve Board of Governors from 2011 to 2020.

Mary E. Lovely is Anthony M. Solomon Senior Fellow at the Peterson Institute for International Economics and Professor Emerita of Economics at Syracuse University's Maxwell School of Citizenship and Public Affairs.

Philip A. Luck is Director of the Economics Program and Scholl Chair in International Business at the Center for Strategic and International Studies. He served as the Deputy Chief Economist at the Department of State from 2022 to 2025.

N. Gregory Mankiw is Robert M. Beren Professor of Economics at Harvard University. He served as Chair of the Council of Economic Advisers from 2003 to 2005.

Jeffrey Miron is Senior Lecturer and Director of Graduate and Undergraduate Studies in the Department of Economics at Harvard University, and Vice President for Research at the Cato Institute.

Brent Neiman is Edward Eagle Brown Professor of Economics at the University of Chicago Booth School of Business. He served as Counselor to the Secretary of the Treasury and as Deputy Undersecretary of the Treasury for International Finance between 2022 and 2025.

Kyle Pomerleau is Senior Fellow at the American Enterprise Institute.

Michael R. Strain is Director of Economic Policy Studies and Arthur F. Burns Scholar in Political Economy at the American Enterprise Institute, and Professor of Practice in the McCourt School of Public Policy at Georgetown University.

Alan D. Viard is Senior Fellow Emeritus at the American Enterprise Institute. He served as Visiting Scholar at the US Department of the Treasury's Office of Tax Analysis in 2005, and as Senior Economist at the White House's Council of Economic Advisers from 2003 to 2004.

Mark J. Warshawsky is Senior Fellow and Wilson H. Taylor Chair in Health Care and Retirement Policy at the American Enterprise Institute. He served as Assistant Secretary of the Treasury for Economic Policy from 2004 to 2006.

Owen Zidar is Professor of Economics and Public Affairs at Princeton University. He served as Staff Economist at the Council of Economic Advisers from 2010 to 2011.