# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, PETE R. FLORES, Acting Commissioner for United States Customs and Border Protection, in his official capacity as Acting Commissioner of the United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, in his official capacity as Secretary of Commerce, UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Defendants-Appellants*.

Appeal from the United States Court of International Trade
in No. 1:25-cv-00066-GSK-TMR-JAR,
Judge Gary S. Katzmann, Judge Timothy M. Reif, and
Senior Judge Jane A. Restani.

STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF VERMONT,

*Plaintiffs-Appellees*,

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security, in
her official capacity as Secretary of the Department of Homeland Security,
UNITED STATES CUSTOMS AND BORDER PROTECTION, PETE R.
FLORES, Acting Commissioner for United States Customs and Border Protection,
in his official capacity as Acting Commissioner for U.S. Customs and Border
Protection, UNITED STATES,

*Defendants-Appellants.*

———————————————

Appeal from the United States Court of International Trade
in No. 1:25-cv-00077-GSK-TMR-JAR,
Judge Gary S. Katzmann, Judge Timothy M. Reif, and
Senior Judge Jane A. Restani.

---

## BRIEF OF *AMICUS CURIAE* PROTECT DEMOCRACY PROJECT
## IN SUPPORT OF PLAINTIFFS-APPELLEES

---

Jane P. Bentrott
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave NW #163
Washington, DC 20006
Telephone: (202) 579-4582
jane.bentrott@protectdemocracy.org

*Counsel for Amicus Curiae*

July 8, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 25-1812 (consolidated with 25-1813)

**Short Case Caption** V.O.S. Selections, Inc. v. Trump

**Filing Party/Entity** Protect Democracy Project

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/08/2025

Signature: /s/ Jane P. Bentrott

Name: Jane P. Bentrott

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Protect Democracy Project | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑      None/Not Applicable      ☐      Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☐    No    ☑    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑      None/Not Applicable      ☐      Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................i

TABLE OF AUTHORITIES........................................................ iii

INTEREST OF *AMICUS CURIAE* .........................................1

ARGUMENT .............................................................................5

1.  Congress did not intend to grant open-ended delegations of emergency powers to the executive branch.........................................................5
    a.  Congress has recognized that, while necessary, emergency powers are susceptible to abuse. ..................................................5
    b.  The legislative history reflects congressional intent to limit presidential emergency powers.......................................................6

2.  Appellants' argument that emergency actions are effectively nonreviewable is erroneous and, if accepted, would undermine fundamental democratic principles and risk rule by fiat.........................................................8
    a.  History illustrates the dangers of executive abuse of emergency powers. ....8
    b.  Without meaningful judicial review, presidents would have near limitless, unilateral power to act upon by invoking emergencies. ............................11
    c.  Courts must not cede their critical role in guarding against abuse of purported emergency powers.......................................................13
    d.  *Biden v. Nebraska* confirms that an invocation of emergency powers does not override the major questions doctrine ..................................15

3.  Courts should review "emergency" executive actions guided by statutory text, legislative history, and separation of powers principles. ...............................16
    a.  Courts should weigh several factors to determine if executive emergency actions exceed congressional authorization..................................17
        i.  Is the precipitating situation a qualifying emergency? ...........................17
        ii.  How close is the nexus between the emergency and the action taken?....20
        iii.  Does the context of the executive branch's actions suggest the invocation of the emergency is pretextual? ..................................21

iv. Does the action result in longer-term exercise of power or aggrandizement of power to the executive branch? ............................................................22

b. Applying this analysis to the challenged tariff orders indicates that they exceed congressional authorization. ...........................................................24

CONCLUSION .....................................................................................................31

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS....32

CERTIFICATE OF SERVICE..................................................................................33

# TABLE OF AUTHORITIES

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).................23

*Ala. Ass'n of Realtors v. Dep't of Health and Hum. Servs.*, 594 U.S. 758 (2021) ...................................................................................................20, 22

*Arizona v. Mayorkas*, 143 S. Ct. 1312 (2023)...........................................2, 3, 4, 21

*Baker v. Carr*, 369 U.S. 186 (1962) ......................................................................15

*Biden v. Nebraska*, 600 U.S. 477 (2023)

...........................................2, 3, 4, 11, 14, 15, 17, 18, 19, 20, 21, 22

*Clinton v. City of New York*, 524 U.S. 417 (1998) ................................................16

*Dep't of Educ. v. Brown*, 600 U.S. 551 (2023) ...................................................2, 4

*Harmon v. Brucker*, 355 U.S. 579 (1958) .............................................................15

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ........................................15

*Immigr. Naturalization Serv. v. Chadha*, 462 U.S. 919 (1983).............................13

*Korematsu v. United States*, 323 U.S. 214 (1944) ................................................10

*Learning Res., Inc. v. Trump*, (RC), 2025 WL 1525376 (D.D.C. May 29, 2025)

.........................................................................24, 27, 28, 29, 30

*Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985)....................20

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) .............................................15

*New York v. Dept. of Com.*, 588 U.S. 752 (2019) .................................................21

*Sacks v. Off. of Foreign Assets Control*, 466 F.3d 764 (9th Cir. 2006) ................26

*Sebelius v. Cloer*, 569 U.S. 369 (2013)................................................................17

*Taylor v. Bair*, 414 F.2d 815 (5th Cir. 1969) .......................................................18

*Trump v. Hawaii*, 585 U.S. 667 (2018) ................................................................10

*United States v. Virgin Islands*, 363 F.3d 276 (3d Cir. 2003)...............................18

*United States v. Yoshida Int'l Inc.*, 526 F.2d 560, 584 (C.C.P.A. 1975) ...............14

*V.O.S. Selections, Inc. v. United States*,

    772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025).................................19, 24, 29, 30

*West Virginia v. EPA*, 597 U.S. 697 (2022) ...........................................................16

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).................10, 14, 14

## Constitutional Provisions

U.S. Const. art. I § 1 ...........................................................................................30

U.S. Const. art. I § 8 .......................................................................................26, 30

## Statutes

22 U.S.C. § 1631a(c) .............................................................................................19

42 U.S.C. § 247d ....................................................................................................5

50 U.S.C. § 1621 ....................................................................................................5

50 U.S.C. § 1622 ....................................................................................................5

50 U.S.C. § 1701 ..................................................................................................26

50 U.S.C. § 1701(a)..........................................................................................18, 19

50 U.S.C. § 1701(b)......................................................................................18, 19, 26

## Other Authorities

Brennan Center for Justice, *A Guide to Emergency Powers and Their Use*,
    Brennan Ctr. for Just. (last updated July 1, 2025) ...........................................11

Brian Bennett, *Doomsday and Democracy: Former Trump Aides Warn of Secret
    Presidential Crisis Powers*, Time (Oct. 15, 2024) ......................................12, 13

Congressional Research Service, *Regular Vetoes and Pocket Vetoes: In Brief
    (July 18, 2019)*................................................................................................13

*Department of the Interior Implements Emergency Permitting Procedures to
    Strengthen Domestic Energy Supply*, U.S. Dep't of the Interior (Apr. 23,
    2025).................................................................................................................12

*Expert Comment: Why has Trump launched so many tariffs and will it cause a recession?*, U. of Oxford (Apr. 4, 2025) .......................................................27

*Explained: Reliability of the Current Power Grid*, NREL Transforming ENERGY (Jan. 2024) ...................................................................12

Kat Lonsdorf, *President Trump is declaring national emergencies faster than any other president*, NPR (June 20, 2025) ...................................................4, 11

James Madison, Letter to Thomas Jefferson (May 13, 1798) ..................................9

Letter from Michael M. Uhlmann, Assistant Att'y Gen., Off. of Legis. Affs., Dept. of Just., to James T. Lynn, Dir., Off. of Mgmt. and Budget (Sept. 3, 1976) ....................................................................7

Nancy Cook, *White House preps emergency wall plan while Congress negotiates*, Politico (Jan. 30, 2019) ...................................................23

*National Emergencies Act: Hearings on H.R. 3884 Before the Subcomm. on Admin. L. & Gov't Rels. of the H. Comm. on the Judiciary,* 94th Cong. 23 (1975)....................................................................25

Peter Baker, *Trump Declares a National Emergency, and Provokes a Constitutional Clash*, N.Y. Times (Feb. 15, 2019)..........................................10

Presidential Actions, *Declaring a National Energy Emergency*, The White House (Jan. 20, 2025) ...................................................................12

Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits, Exec. Order 14257, 90 Fed. Reg. 15041, 15045 (Apr. 2, 2025).........25

S. Rep. No. 94-922 (1976) ...................................................6, 9, 13, 14, 22

S. Rep. No. 94-1168 (1976) ...................................................................7

*Statement of Elizabeth Goitein*, Before the H. Subcomm. on the Const., Civ. Rts., and Civ. Liberties, H. Judiciary Comm. at 3–4 (May 17, 2022) .......5

Steven Levitsky & Daniel Ziblatt, *Why Autocrats Love Emergencies*, N.Y. Times (Jan. 12, 2019) ...................................................................9

*Test. of Soren Dayton*, Before the H. Subcomm. on the Const., Civ., Rts., and Civ. Liberties, H. Judiciary Comm. (May 17, 2022) ...................................................... 1

*War on Drugs, United States history*, Britannica (Jun. 25, 2025) ........................... 25

Webster's New Collegiate Dictionary 372 (8th ed. 1976) ................................... 6, 18

Protect Democracy Project ("Protect Democracy") files this brief in support of Appellees out of concern over executive branch abuses of emergency powers.

Protect Democracy is a nonpartisan nonprofit organization whose mission is to prevent our democracy from declining into a more authoritarian form of government. As part of that mission, Protect Democracy engages in various forms of advocacy aimed at preventing abuses of executive power, including abuses of emergency powers. Protect Democracy has challenged abuses of emergency powers by presidents of both political parties.

Along with a cross-partisan co-counsel team, Protect Democracy filed a lawsuit on behalf of El Paso County and the Border Network for Human Rights to enjoin President Trump's first-term use of an emergency declaration to access federal funds to build a border wall in contravention of congressional appropriations decisions. It has also provided congressional testimony and otherwise advocated for reforms to the National Emergencies Act. *See Test. of Soren Dayton*, Before the H. Subcomm. on the Const., Civ., Rts., and Civ. Liberties, H. Judiciary Comm. (May 17, 2022).

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amicus* contributed money to fund this brief's preparation or submission.

Protect Democracy previously filed briefs in support of the challengers to the student loan relief plan that relied on emergency authority contained in the HEROES Act of 2003 in *Biden v. Nebraska*, Br. of *Amicus Curiae* The Protect Democracy Project in Supp. of Resp'ts, 600 U.S. 477 (2023) (22–506), and *Dep't of Educ. v. Brown*, Br. of *Amicus Curiae* The Protect Democracy Project in Supp. of Resp'ts, 600 U.S. 551 (2023) (22–535). Protect Democracy also filed an amicus brief in *Arizona v. Mayorkas*, Br. of *Amicus Curiae* The Protect Democracy Project in Supp. of Resp'ts, 143 S. Ct. 1312 (2023) (22–592), in support of the Biden administration in seeking to terminate the use of emergency authorities. In those briefs, Protect Democracy argued that the purpose of the relevant statutory schemes, like the one here, is to give the executive branch the limited tools required to promptly put in place necessary short-term responses to unforeseeable emergencies, but not to supplant Congress's constitutional role in lawmaking to address long-term problems. Consistent with that purpose and related statutory text, Protect Democracy urged the Supreme Court to review emergency action by applying an analytic framework that effectuates this balance.

## SUMMARY OF ARGUMENT

At issue is the President's unprecedented use of emergency authorities—relying on the National Emergencies Act ("NEA") and International Emergency Economic Powers Act ("IEEPA")—to impose tariffs on virtually every country in

the world without congressional authorization. Notwithstanding this seizure of a core congressional power, Appellants largely seek to avoid judicial review of their actions. Appellants' Opening Br. at 58–60.

The challenged tariffs are both unlawful and reviewable, as confirmed by i) the text of and Congress's express intent in adopting the NEA and IEEPA, which aimed to limit presidential emergency powers; ii) the constitutional assignment of tax and trade powers to Congress; iii) the major questions doctrine; and iv) recent Supreme Court precedent confirming that the executive cannot evade searching judicial review of actions taken pursuant to a declared emergency.[2]

True, Congress also intended to preserve a president's broad powers to respond quickly to emergencies, which by their nature are unpredictable and difficult for Congress to address quickly. One way Congress sought to balance these concerns was to maintain broad delegations of emergency authority, but—along with other checks—limit those delegations to the rare instances of unforeseen, sudden crises, i.e., emergencies. This is clear from the text of the NEA and IEEPA and confirmed by the statutes' legislative history. Appellants' capacious view is incorrect: Congress did not intend emergency declarations pursuant to IEEPA to allow end-runs around the standard law-making process or as a means to implement long-term policy

---

[2] *Nebraska*, 600 U.S. 477; *Arizona*, 143 S. Ct. 1312.

goals—and certainly not to address any "major concern." Appellants' Opening Br. at 45.

Emergency powers are a common tool used by autocrats to seize and consolidate power. *Arizona*, S. Ct. at 1314 (2023) (Statement of Gorsuch, J.) ("rule by indefinite emergency edict risks leaving all of us with a shell of a democracy and civil liberties just as hollow."). Sparking concerns of such a trend, President Trump declared a record eight national emergencies during the first 100 days of his second term to undertake unilateral actions typically reserved to Congress.[3] One critical check on presidential overreach is courts' exercise of searching review when considering challenges to executive actions invoking statutory grants of power. *Nebraska*, 600 U.S. 477. *Amicus* therefore proposes a tailored analytic approach[4] rooted in well-accepted doctrine to aid courts in striking the balance Congress intended in the unique context of emergencies: to avoid usurping a president's lawfully delegated discretion to act in true emergencies, while maintaining the judicial role of restraining unlawful aggrandizement of executive authority.

---

[3] Kat Lonsdorf, *President Trump is declaring national emergencies faster than any other president*, NPR (June 20, 2025), https://www.npr.org/2025/06/20/nx-s1-5439550/president-trump-is-declaring-national-emergencies-faster-than-any-other-president.

[4] Br. of *Amicus Curiae* The Protect Democracy Project in Supp. of Resp'ts, *Biden v. Nebraska*, 600 U.S. 477 (2023) (22-506); Br. of *Amicus Curiae* The Protect Democracy Project in Supp. of Resp'ts, *Dep't of Educ. v. Brown*, 600 U.S. 551 (2023) (22–535); Br. of *Amicus Curiae* The Protect Democracy Project in Supp. of Resp'ts, *Arizona v. Mayorkas*, 143 S.Ct. 1312 (2023) (22–592).

# ARGUMENT

**1. Congress did not intend to grant open-ended delegations of emergency powers to the executive branch.**

Emergency authorities are necessary in a well-functioning government, but are also ripe for abuse. Congressional delegations of emergency powers are therefore designed to give the executive branch flexibility to respond quickly to unforeseen events while also limiting their use in key respects: they must be in response to actual emergencies and tailored to Congress's delegation of power pursuant to the text of both the NEA and the relevant authorizing statute(s) (here, IEEPA).

**a. Congress has recognized that, while necessary, emergency powers are susceptible to abuse.**

Congress has long recognized that the legislative process often moves too slowly to address unforeseen disasters and other emergencies, and that some deviation from business as usual—in which Congress passes specific laws and appropriates funds and the president implements those decisions—is necessary. Accordingly, Congress has authorized presidents to declare "national emergencies" and to exercise special powers in a variety of emergency situations. *See, e.g.*, 50 U.S.C. §§ 1621–22; 42 U.S.C. § 247d; *Statement of Elizabeth Goitein*, Before the H. Subcomm. on the Const., Civ. Rts., and Civ. Liberties, H. Judiciary Comm. at 3–4 (May 17, 2022). An emergency, by common understanding, is an "unforeseen

combination of circumstances or the resulting state that calls for immediate action." *See* Webster's New Collegiate Dictionary 372 (8th ed. 1976).

But as Congress has also recognized, emergency executive action—even when taken in good faith—risks shifting legislative authority into the hands of the president, threatening the constitutional separation of powers.

By the mid-1970s, in response to what Congress perceived as rampant abuse of presidential authority following the Vietnam War, Watergate scandal, and violation of the rights of Americans by intelligence agencies, the Senate convened a Special Committee on National Emergencies and Delegated Emergency Powers to examine the scope and extent of the threat. S. Rep. No. 94-922 at 19 (1976).[5] By that time, presidents possessed authorities under hundreds of "emergency statutes" conferring vast powers that outpaced the threats posed by stale "emergencies." A committee report described the "dangerous state of affairs," concluding it "cannot accept any doctrine which holds that a nation *in extremis* must submit to the will of a single individual." S. Rep. No. 94-922 at 1, 19.

### b. The legislative history reflects congressional intent to limit presidential emergency powers.

The legislative history demonstrates that Congress enacted the NEA to limit the use of emergency powers to only those situations "when emergencies actually

---

[5] Available at https://www.senate.gov/about/resources/pdf/report-national-emergencies-1976.pdf.

exist, and then only under safeguards of congressional review." S. Rep. No. 94-1168, at 2 (1976). This is consistent with the executive branch's contemporaneous understanding when signing the bill.[6]

As *Amicus* the Brennan Center explains, the drafters of the NEA did not define "emergency," but rejected the definition "grave national crises," considering this to be too *broad*. Br. of *Amicus Curiae* The Brennan Center in Supp. of Appellees ("Brennan Amicus") at 10. In leaving the term undefined, however, the drafters expected that the statutes specifically delegating emergency powers would include clear parameters to be met—but most do not, *id*. at 11. This leaves courts to interpret presidential exercises of emergency authorities in a way that is consistent with the common understanding of "emergency" and with congressional intent. *See infra* at 17–18. Informing any such interpretation, the legislative history overwhelmingly confirms that Congress did not intend the NEA to delegate unlimited discretion to the president or allow him independently to create policy. Brennan Amicus at 12; *see generally id*. Part II.B.

---

[6] Letter from Michael M. Uhlmann, Assistant Att'y Gen., Off. of Legis. Affs., Dept. of Just., to James T. Lynn, Dir., Off. of Mgmt. and Budget (Sept. 3, 1976) (DOJ's recommending approval, stating: "Emergency laws have often been relied on for ordinary, non-emergency functions."), available at p. 26, https://www.fordlibrarymuseum.gov/sites/default/files/pdf_documents/library/document/0055/1669500.pdf.

Similarly, "[e]nacted one year after the NEA and in response to the same concerns over executive branch overreach, IEEPA was Congress's attempt to rein in presidential power to take emergency economic action." Brennan Amicus at 12; *see generally* Brennan Amicus Part II.C.

In short, the NEA and IEEPA sought to prevent the executive branch from seizing on emergencies to subvert the legislative process and the constitutional separation of powers.

**2. Appellants' argument that emergency actions are effectively nonreviewable is erroneous and, if accepted, would undermine fundamental democratic principles and risk rule by fiat.**

Notwithstanding the text and history of the NEA and IEEPA, Appellants argue that a president's invocations of sweeping emergency powers are effectively immune from judicial review. Appellants' Opening Br. at 58–60. This contention is belied by the original understanding of the constitutional separation of powers, the text of the relevant emergency statutes, and the country's commitment to protect civil liberties from the tyrannical overreach of executive power.

**a. History illustrates the dangers of executive abuse of emergency powers.**

History is replete with examples of ambitious, would-be authoritarians exploiting emergency authority. Aspiring autocrats abroad have often opportunistically seized upon real or manufactured emergencies to consolidate and

aggrandize their power. The drafters of the Constitution,[7] like the drafters of the NEA,[8] expressly warned of that danger, and today's democracy experts are again sounding the alarm.[9]

Democracy scholars Steven Levitsky and Daniel Ziblatt have detailed many recent examples:

> In Peru, a Maoist insurgency and economic crisis enabled [Alberto] Fujimori to dissolve the Constitution and Congress in 1992; in Russia, a series of deadly apartment bombings in 1999 – allegedly by Chechen terrorists – triggered a surge of public support for [Vladimir] Putin, who was then the prime minister, which allowed him to crack down on critics and consolidate his power; and in Turkey, a series of terrorist attacks in 2015, along with a failed 2016 coup attempt, allowed [Recep Tayyip] Erdogan to tighten his grip via a two-year state of emergency.[10]

American history provides its own examples of these dangers, often at the expense of civil liberties and in the interest of concentrating executive power. These examples also illustrate the critical role of courts in reining in any overreach—and

---

[7] Madison warned, "[p]erhaps it is a universal truth that the loss of liberty at home is to be charged to provisions against danger, real or pretended, from abroad." James Madison, Letter to Thomas Jefferson (May 13, 1798), available at https://founders.archives.gov/documents/Madison/01-17-02-0088.

[8] In urging passage of the NEA, the Senate Subcommittee report highlighted the relationship between emergency powers and fascism, referencing "the experience of Germany, where the Constitution had permitted the President to suspend individual rights, and Great Britain and France, where the parliaments had maintained strict control over emergency powers." S. Rep. No. 94-922 at 7.

[9] "Crises present such great opportunities for concentrating power that would-be autocrats often manufacture them . . ." Steven Levitsky & Daniel Ziblatt, *Why Autocrats Love Emergencies*, N.Y. Times (Jan. 12, 2019), https://tinyurl.com/9aez6cnb.

[10] *Id.*

the devastating consequences of overly deferring to executive discretion. The former is exemplified in President Truman infamous use of the exigencies of the Korean War as justification to seize control of the steel industries during a strike in 1952, which the Supreme Court struck down in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("*Steel Seizure*"). The latter is exemplified in a permanent stain on the American conscience: President Roosevelt used the Japanese attack on Pearl Harbor as justification to round up Japanese Americans and place them in internment camps, a move the Supreme Court upheld at the time, *Korematsu v. United States*, 323 U.S. 214 (1944). The Supreme Court has since repudiated this as "gravely wrong the day it was decided." *See Trump v. Hawaii*, 585 U.S. 667, 710 (2018).

The risk of abuse is inherent in broad delegations of sweeping authority subject to limited review—it is not limited to any one actor or political party. For instance, in 2019, President Trump declared a state of emergency at the Southern border to access funding Congress had refused to give him to build a border wall. He admitted he "didn't need to," but just wanted "to get it done faster." *See* Peter Baker, *Trump Declares a National Emergency, and Provokes a Constitutional Clash*, N.Y. Times (Feb. 15, 2019), https://tinyurl.com/3bn8xymy. In August 2022, President Biden invoked emergency powers under the HEROES Act, purportedly triggered by the COVID-19 emergency declared in 2020, to forgive about $430

billion in student loans, only weeks before declaring the emergency over. *Nebraska*, 600 U.S. at 488 (2023).

The risks of potential abuse are magnified when considering that, by declaring an "emergency" under the NEA, a president can unlock dozens of statutes that permit significant intrusions upon fundamental liberties including, *inter alia*, powers to freeze bank accounts, control transportation and communication, seize property, and more—without Congressional action. [11] If, as Appellants argue, the president can take emergency actions such as these with limited statutory restraints and no meaningful judicial review, Appellants' Opening Br. at 37–38, 45, then there is little to prevent rule by fiat pursuant to any declared "emergency."

### b. Without meaningful judicial review, presidents would have near limitless, unilateral power to act upon by invoking emergencies.

The current presidential term has brought an unparalleled expansion of presidential use of emergency powers measured in amount, pace, and scope.

In the first 100 days, President Trump declared eight national emergencies— more than any modern president in the same period. In comparison: in President

---

[11] Brennan Center for Justice, *A Guide to Emergency Powers and Their Use*, Brennan Ctr. for Just. (last updated July 1, 2025), https://www.brennancenter.org/our-work/research-reports/guide-emergency-powers-and-their-use.

Biden's entire four-year term, he declared eleven; President Obama declared twelve in eight years; President George W. Bush declared fourteen in eight years.[12]

The President has also utilized specious declarations of emergency to circumvent regular process and accountability. For instance, President Trump declared a "national energy emergency" purportedly due, in part, to an unreliable power grid,[13]—a conclusion contradicted by government research.[14] Invoking his declared energy emergency, the Department of the Interior announced it would utilize emergency authorities under the National Environmental Policy Act, Endangered Species Act, and the National Historic Preservation Act to expedite environmental permitting procedures (typically a years-long process, instead to be completed in thirty days) for projects involving fossil fuels and mining.[15]

Relatedly, reporting in the last few years has revealed the existence of classified documents available only to a small group within the executive branch— updated by White House occupants of both parties—including pre-drafted

---

[12] Lonsdorf, *supra* note 3.

[13] Presidential Actions, *Declaring a National Energy Emergency*, The White House (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/declaring-a-national-energy-emergency/.

[14] *Explained: Reliability of the Current Power Grid*, NREL Transforming ENERGY (Jan. 2024), https://docs.nrel.gov/docs/fy24osti/87297.pdf.

[15] *Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply*, U.S. Dep't of the Interior (Apr. 23, 2025), https://www.doi.gov/pressreleases/department-interior-implements-emergency-permitting-procedures-strengthen-domestic.

emergency orders, known as the Doomsday Book.[16] Senator Rand Paul sought to review this document, but was denied, commenting: "The idea that we would have emergency orders written up to replace the constitutional republic in times of emergencies, that would alarm anybody." *Id*. President Trump's former aides have warned of the likelihood that he would use the Doomsday Book in non-emergency situations to accomplish his policy goals and consolidate his power. *Id*.

Irrespective of the relative wisdom or folly of any particular executive action, President Trump in his second term has been governing by fiat by claiming a perpetual state of emergency. This contradicts the intent of the NEA. *See* S. Rep. No. 94-922, at 1 (intending the NEA to *correct* the permanent state of "emergency rule," writing: "The legislation represents significant progress in checking the growth of Executive power and returning the United States to normal peacetime processes.").

### c. Courts must not cede their critical role in guarding against abuse of purported emergency powers.

Against this backdrop, courts have a crucial role to play in checking executive branch abuses of emergency powers. This role is especially important today given that, as a result of the Supreme Court's ruling in *Immigr. Naturalization Serv. v.*

---

[16] Brian Bennett, *Doomsday and Democracy: Former Trump Aides Warn of Secret Presidential Crisis Powers*, Time (Oct. 15, 2024), https://time.com/7086057/donald-trump-second-term-emergency-aides/.

*Chadha*, 462 U.S. 919, 954–55 (1983), Congress can only end an emergency by a veto-proof supermajority—an exceedingly high bar to clear.[17] That's not how the NEA was supposed to work: In drafting the statute, Congress intended to retain the power to veto executive abuse of emergency grants of statutory authority. S. Rep. No. 94-922, at 15–16. Given the demise of that crucial statutory safeguard, it is even more imperative that courts exercise meaningful review to maintain any check on otherwise limitless authority concentrated in the hands of one person. *See, e.g.*, *Steel Seizure*, 343 U.S. at 652 (Jackson, J., concurring) ("emergency powers are consistent with free government only when their control is lodged elsewhere than in the Executive who exercises them.")

Courts therefore should reject attempts to improperly cabin this role by gesturing at national security or foreign policy.[18] Every national emergency could be said to implicate national security or foreign policy. And yet, it is undisputed that courts have a role to play in evaluating executive actions based on declarations of emergency, notwithstanding those dynamics. *Nebraska*, 600 U.S. 477; *Steel Seizure*,

---

[17] Since the country's founding, Congress has overridden less than five percent of presidential vetoes. Congressional Research Service, *Regular Vetoes and Pocket Vetoes: In Brief* (July 18, 2019), https://www.congress.gov/crs-product/RS22188# :~:text=Since%20the%20founding%20of%20the,14.5%25)%20of%20these%20vet oes.

[18] Notably, in drafting the NEA, Congress itself "paid close attention to court decisions" and the special committee "was particularly guided by" Justice Jackson's famous concurrence in *Steel Seizure*. S. Rep. 94-922, at 6, 8.

343 U.S. 579. Federal courts have the power and duty to assess the lawfulness of presidential emergency actions.[19] "Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). Indeed, it remains "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). This includes determining whether a government official exceeded his statutory powers. *Harmon v. Brucker*, 355 U.S. 579, 582 (1958) (per curiam).

> **d.** ***Biden v. Nebraska* confirms that an invocation of emergency powers does not override the major questions doctrine.**

Under the "major questions" doctrine, the executive branch must point to "clear congressional authorization" to justify a challenged program when the program involves "a question of deep economic and political significance" and "[t]he basic and consequential tradeoffs" inherent in that program "are ones that Congress would likely have intended for itself." *See Nebraska*, 600 U.S. at 505–06. That doctrine applies when the challenged program is based on a presidentially declared "national emergency." *See id.* at 485–87.

---

[19] Searching judicial review is not precluded by *Yoshida II. United States v. Yoshida Int'l Inc.*, 526 F.2d 560, 584 (C.C.P.A. 1975) ("*Yoshida II*"). Not only was *Yoshida II* decided before Congress passed the NEA, expressly intending to provide meaningful checks on emergency powers, but it also does not negate courts' core duty to interpret statutes, *see infra* at 19, or correct a "manifestly unauthorized exercise of power." *Baker v. Carr*, 369 U.S. 186, 217 (1962).

The government errs in asserting that the major questions doctrine "does not apply to delegations made directly to the President" (Appellants' Opening Br. at 26). The logic of that doctrine is rooted in "separation of powers concerns," *Nebraska,* 600 U.S. at 505, and the concerns raised by executive incursions on legislative authority do not evaporate when the president acts directly or orders subordinates to take the action at issue. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 421 (1998) (invalidating direct presidential exercise of authority under the Line Item Veto Act); *Steel Seizure*, 343 U.S. at 582 (assessing "whether the President was acting within his constitutional power").

### 3. Courts should review "emergency" executive actions guided by statutory text, legislative history, and separation of powers principles.

As described above, in delegating emergency power to the president in the NEA and subsequent emergency authorizations, Congress intended to authorize the executive to act in a *true* emergency—not to license end-runs around the standard lawmaking process by declaring emergencies as a pretext to pursue policies outside the legislative process. To best give effect to Congress's intent, in cases challenging action based upon the invocation of emergency powers, courts should apply a tailored analysis to assess the lawfulness of "emergency" actions. In cases involving separation of powers principles such as this, courts and litigants often invoke various doctrinal tools—e.g., the clear statement doctrine, the major questions doctrine, the

*Steel Seizure* framework—to assist courts' analysis of these weighty issues. *See, e.g.*, *West Virginia v. EPA*, 597 U.S. 697, 722–724 (2022). Consistent with those doctrines, in cases invoking statutory emergency powers, an analysis tailored to the unique concerns of the emergency context will aid in giving effect to the separation of powers principles central to this and other similar cases.[20]

### a. Courts should weigh several factors to determine if executive emergency actions exceed congressional authorization.

Cases involving statutes authorizing the executive to act in an "emergency" often present two related interpretive questions: (i) is there a qualifying emergency, and (ii) if so, is the action taken within the scope of what Congress authorized the executive to do in the event of an emergency? To determine whether an emergency executive action is authorized by the applicable statute and accords with legislative intent, courts should consider a set of factors derived from the unique purpose and history of the NEA and subsequent emergency delegations.

### i. Is the precipitating situation a qualifying emergency?

IEEPA, like the NEA, authorizes the president to take certain actions in the event of an "emergency." As neither statute explicitly defines the term "emergency," the term "emergency" is best construed "in accordance with [its] ordinary meaning."

---

[20] *See* Br. of Jed Handelsman Shugerman as *Amicus Curiae* in Supp. of Resp'ts, *Biden v. Nebraska*, 600 U.S. 477 (2023) (22-506), at 15–17, https://www.supreme court.gov/DocketPDF/22/22-506/253966/20230203145033650_Amicus%20Brief .pdf.

*Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). As described above, under dictionary definitions contemporaneous with the NEA, as well as extensive case law, an "emergency" is "an unforeseen combination of circumstances or the resulting state that calls for immediate action." *See* Webster's New Collegiate Dictionary, *supra*. *See also Nebraska*, 600 U.S. at 496 ("Congress opted to make debt forgiveness available only in a few particular exigent circumstances"); *Taylor v. Bair*, 414 F.2d 815, 821 (5th Cir. 1969) (an "emergency" is "a condition arising suddenly and unexpectedly . . . and which calls for immediate action . . . without time for deliberation."); *United States v. Virgin Islands*, 363 F.3d 276, 289 n.10 (3d Cir. 2003) (wastewater problem was not an "emergency" because it was longstanding and "could not be construed as surprising or unexpected"). *See also* Br. of Sen. Marsha Blackburn and 42 other Members of the U.S. Senate as Amici Curiae in Supp. of Resp'ts, *Biden v. Nebraska*, 600 U.S. 477 (2023) (22-506), at 16 n.8 (describing national emergencies as "unforeseen, transient events").

This understanding is consistent with the title and substance of "The International *Emergency* Economic Powers Act," which provides that the president may exercise emergency powers under the statute only "to deal with any unusual and extraordinary threat." 50 U.S.C. § 1701(a), (b). *See also* Appellants' Opening Br. at 26, 13, (stating that "Congress enacted [IEEPA] to allow the President to deal with emergencies arising abroad" and citing legislative history describing these as

"unforeseen contingencies"). Thus, the first question for courts to consider in emergency powers cases is whether the precipitating event is indeed a true emergency, as Congress had in mind.

Notwithstanding appropriate deference, statutory predicates like "emergency" and "unusual and extraordinary threat" have judicially enforceable outer boundaries, particularly where—as here—Congress has not vested the president with sole and unreviewable discretion to determine that a statutory predicate has been satisfied. *See* 50 U.S.C. § 1701(a), (b); *compare, e.g.*, 22 U.S.C. § 1631a(c) (providing that a "determination . . . shall be within the sole discretion of the President or his designee and shall not be subject to review by any court"). Consistent with the arguments of Plaintiff-Appellees, in analyzing whether the President permissibly took the challenged "emergency" actions, the Court may consider whether the President properly exercised the asserted emergency authorities, including whether applicable statutory requirements have been satisfied. *See* Plaintiffs' Reply in Supp. of Mot. for Summ. J. at 9–13, *V.O.S. Selections, Inc. v. United States*, No. 25-00066, (Ct. Int'l Trade May 6, 2025) (arguing that the challenged "tariffs are [] not supported by IEEPA because there is no national emergency or 'unusual and extraordinary threat,' as required by statute."); *V.O.S. Selections, Inc. v. United States*, 2025 WL 1514124, at *15–21 (Ct. Int'l Trade May 28, 2025).

At minimum, a clear showing that a president has invoked "emergency" powers in the absence of any arguable or recognizable "emergency" underscores the need for meaningful judicial review of whether the challenged emergency action is an appropriately tailored exercise of statutory emergency authorities. *Nebraska*, 600 U.S. at 512 (2023) (Barrett, J., concurring (it "goes without saying" that courts should use "common sense" in statutory interpretation)). This is further consistent with this Court's understanding that, even in international trade controversies of a "highly discretionary kind," courts will intervene to assess and address "a clear misconstruction of the governing statute" or "action outside delegated authority." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985).

## ii. How close is the nexus between the emergency and the action taken?

The history and structure of the NEA and IEEPA, and the plain meaning of the term "emergency," indicate that to give effect to congressional intent, courts must also consider the nexus between the emergency and the executive action. The legislative history reflects concern that a president could point to one emergency as a basis for undertaking ancillary actions. *See supra Section 1; see also Ala. Ass'n of Realtors v. Dep't of Health and Hum. Servs.*, 594 U.S. 758, 764–65 (2021). An important factor in assessing whether an emergency action is within the scope of congressional authorization, then, is the nexus between the executive action and the precipitating emergency. If the nexus is strained—and if the policy is broader in

scope or longer in time than reasonably explained by the emergency—then it is less likely the executive is exercising power consistent with legislative intent. *See, e.g.*, *Nebraska*, 600 U.S. at 504 ("Congress did not unanimously pass the HEROES Act with such power in mind."); Br. of 128 U.S. Reps., Including 25 Members of the H. Comm. on Educ. & the Workforce, as *Amici Curiae* in Supp. of Resp'ts, *Biden v. Nebraska*, 600 U.S. 477 (2023) (22-506), at 9 ( "[i]f such a tangential connection to a long-distant emergency could justify forgiving a trillion dollars in debt, it is difficult to see what true limits would exist on the [executive branch's] power.")). *See also Arizona*, 143 S. Ct. at 479 (Gorsuch, J., dissenting) ("But the current border crisis is not a COVID crisis.").

### iii. Does the context of the executive branch's actions suggest the invocation of the emergency is pretextual?

Courts should consider the administrative and legislative record surrounding emergency executive action to assess whether it was truly the type of "immediate action" required to respond to unforeseen circumstances or, instead, is an attempt to use an emergency to pursue separate policy goals. Thus, for example, if the executive branch has sought statutory authorization to take a particular action and Congress has affirmatively rejected that authority, and the executive then invokes an emergency authority to achieve the same outcome—this could indicate pretext. This was the case when President Trump sought a specific amount of funding from Congress for border wall construction, provoked a prolonged government shutdown

when Congress specifically limited spending to an amount significantly lower than his request, and then issued an emergency proclamation to access the funds he desired. *See New York v. Dept. of Com.*, 588 U.S. 752, 783–85 (2019) ("Accepting contrived reasons would defeat the purpose of the enterprise. If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case."); Br. of Sen. Marsha Blackburn and 42 other Members of the U.S. Senate as *Amici Curiae* in Supp. of Resp'ts, *Biden v. Nebraska,* 600 U.S. 477 (2023) (22-506), at 19 (arguing that the Biden administration's student loan cancellation program was pretextual and "not 'necessary in connection with a . . . national emergency.'") (internal citations omitted).

### iv. Does the action result in longer-term exercise of power or aggrandizement of power to the executive branch?

Courts should presume, based on separation of powers principles and the text and history of the NEA and subsequent statutes, that Congress did not intend for emergency authorizations to enable the executive to take actions that shift significant power away from the legislative branch to the executive branch over the long term. *See Nebraska*, 600 U.S. at 506; *Ala. Ass'n of Realtors*, 594 U.S. 758, 764–65 ("Indeed, the Government's read of §361(a) would give the CDC a breathtaking amount of authority. It is hard to see what measures this interpretation would place outside the CDC's reach."); S. Rep. 94-922, at 1 (in justifying the NEA, the Senate

Special Committee bemoaned that Congress had "in important respects permitted the Executive branch to draft and in large measure to make the law . . . despite the constitutional responsibility conferred on Congress by Article I, Section 8 of the Constitution which states that it is Congress that 'makes all Laws'").

Neither did Congress intend to allow the executive branch to implement a long-term policy agenda. *Cf. A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537–38 (1935) (Congress cannot give the executive branch "unfettered discretion" to act as "needed or advisable for the rehabilitation and expansion of trade or industry"). Longer-term shifting of power to the executive branch in an emergency could present in different ways. It could involve the executive taking an action that has a long or indefinite duration, such as promulgating a permanent regulation, creating permanent physical infrastructure, or placing itself in charge of decisions about government funds for a significant period. For example, discussing President Trump's first term emergency declaration related to a declared emergency at the border, Sen. Ron Johnson (R-Wis.) commented: "We're pretty uniformly opposed to an emergency declaration. That is taking that emergency act beyond where it's ever been before. We don't like it. We don't want to set that precedent."[21]

---

[21] Nancy Cook, *White House preps emergency wall plan while Congress negotiates*, Politico (Jan. 30, 2019), https://www.politico.com/story/2019/01/30/trump-border-national-emergency-immigration-1138308/.

In these types of situations, it is less likely that Congress intended to authorize the executive to act in this way.

***

Each of these factors derives from unique considerations arising from the text and purpose of emergency statutes, as well as Supreme Court precedent and standard approaches to statutory interpretation. As such, they can aid courts in striking the right balance to effectuate the competing interests between executive discretion in times of true emergency while checking abuse of Congressional delegation of powers limited to those narrow circumstances.

### b. Applying this analysis to the challenged tariff orders indicates that they exceed congressional authorization.

"For five decades, across eight presidential Administrations, no President ever invoked IEEPA to impose a tariff or duty." *Learning Res., Inc. v. Trump*, No. 25-1248 (RC), 2025 WL 1525376, at *4 (D.D.C. May 29, 2025). Departing from that longstanding practice, President Trump claims that IEEPA authorized him to issue two kinds of "emergency" tariffs. The "Worldwide and Retaliatory Tariffs" impose duties on "all imports from all trading partners." *V.O.S. Selections, Inc.*, 2025 WL 1514124, at *5–6 (specifying rates and citing relevant executive orders). The "Trafficking Tariffs" impose duties on Canada, China, and Mexico, to address purported national emergencies involving international cartels, problems relating to the sale and use of illegal drugs, and unlawful migration. *Id.* at 1362–64.

All the factors identified above are implicated as to both sets of tariff orders, supporting the conclusions of the Court of International Trade (and of the U.S. District Court for the District of Columbia) that the President lacks statutory authority to impose any of the challenged "emergency" tariffs.

*First*, the executive actions were not precipitated by emergencies as contemplated by the NEA or IEEPA. Quite the opposite, the Worldwide and Retaliatory Tariff Order repeatedly describes the stated emergency as "large and *persistent* annual U.S. goods trade deficits" (emphasis added) beginning in the "post-war" era with the negotiation of international trade agreements starting after 1947.[22] The government's brief concedes: "The President imposed these tariffs . . . to correct decades of trade imbalances and asymmetrical tariffs against American exports," among other systemic reasons. Appellants' Opening Br. at 2. On its own terms, the executive order describes a decades-long problem—not a sudden, unexpected, or emergent one. *See National Emergencies Act: Hearings on H.R. 3884 Before the Subcomm. on Admin. L. & Gov't Rels. of the H. Comm. on the Judiciary,* 94th Cong. 23 (1975) (statement of Sen. Mathias) ("Forty years can, in no way, be defined as a temporary emergency.").[23] Assuming the asserted harm to be true, under no accepted definition does this set of facts qualify as an emergency.

---

[22] Exec. Order 14257, 90 Fed. Reg. 15041, 15045 (Apr. 2, 2025).
[23] Available at https://www.govinfo.gov/content/pkg/CHRG-94hhrg52218/pdf/CHRG-94hhrg52218.pdf.

Similarly, drug trafficking has been a major national concern for decades.[24] The government has not pointed to any data establishing that the nation now confronts "an unusual and extraordinary threat" tied to trafficking-related emergencies that have arisen "suddenly and unexpectedly," such that they could not have been addressed by the branch of government constitutionally empowered "[t]o lay and collect Taxes, Duties, Imposts and Excises," U.S. Const., art. I, § 8, cl. 1; *see* 50 U.S.C. 1701(b).

This conclusion is bolstered by the government's expansive interpretation of IEEPA in general, suggesting it delegates the president unilateral authority to deal with "major concerns" rather than true emergencies or unexpected threats. *Compare* Appellants' Opening Brief at 45 ("IEEPA is on its face all about giving the President major powers to address major concerns.") *with* 50 U.S.C. § 1701 (authority under IEEPA "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared."). The text plainly does not delegate authority to deal broadly with "major concerns," consistent with congressional intent. "The IEEPA was passed by Congress to counter the perceived abuse of emergency controls by presidents to unilaterally sanction foreign

---

[24] *See, e.g.*, *War on Drugs, United States history*, Britannica (Jun. 25, 2025) https://www.britannica.com/topic/war-on-drugs (synopsis of Reagan-era war on drugs and its negative impacts).

governments or interfere with international trade in non-emergency, peacetime situations." *Sacks v. Off. of Foreign Assets Control*, 466 F.3d 764, 776 (9th Cir. 2006). Accordingly, IEEPA delegates to the president unilateral authority only in the rare circumstances of *emergencies*; it remains Congress's role to legislate to address the "major concerns" of this large nation.

The government's "major concerns" argument is undermined by its own brief. Appellants' Opening Br. at 50 (conceding elsewhere that IEEPA applies only with respect to an "unforeseeable" "emergency," as opposed to "other acts designed for continuing use during normal times.") (citing *Yoshida II)*. In justifying the Worldwide and Retaliatory Tariff Order, the government describes only "normal times"—not an emergency or unusual, extraordinary threat.

*Second*, the Worldwide and Retaliatory Tariff Order lacks a close nexus between the asserted emergency and the action taken. The order invokes a national emergency related to annual "trade deficits," that purportedly "constitute[s] an 'unusual and extraordinary threat to the national security and economy of the United States,' especially because of "the recent rise in armed conflicts abroad." *Learning Res., Inc.*, 2025 WL 1525376, at *3 (quoting 90 Fed. Reg. at 15041, 15044–45). But the order imposes "sweeping tariffs on virtually *every* U.S. trading partner," *id.* (emphasis added)—regardless of whether that country is one with whom we have a

trade deficit,[25] whether the tariffed goods are essential for national security, and whether the tariffs mitigate known risks or harms tied to "armed conflicts abroad." *Learning Res., Inc.*, 2025 WL 1525376, at *3 (quoting 90 Fed. Reg. at 15041, 15044–45).

The Trafficking Tariffs, too, lack a close nexus to the purported trafficking-related "emergencies." *See V.O.S. Selections Inc.*, 2025 WL 1514124, at *20 ("The Trafficking Orders do not 'deal with' their stated objectives."). As evidenced by the large swings in the tariffs imposed, those tariffs have not been calibrated to address the stated emergencies. *See, e.g.*, *Learning Res., Inc.*, 2025 WL 1525376, at *4 (noting that tariffs against China went from 145% on most goods to 30% in the span of a few weeks). Those tariffs do not even purport to target lawful goods alleged to facilitate illegal trafficking and do "not evidently" even "relate to foreign governments' efforts 'to arrest, seize, detain, or otherwise intercept' bad actors [involved in trafficking] within their respective jurisdictions." *See V.O.S. Selections Inc.*, 2025 WL 1514124, at *19–21 & n.17.

*Third*, the context of the imposition of sweeping tariffs raises concerns about pretextual invocation of emergency powers. For example, "President Trump has

---

[25] "Trump imposed a 10% baseline tariff on most countries, *even those with whom the U.S. runs a trade surplus instead of a deficit.*" *Expert Comment: Why has Trump launched so many tariffs and will it cause a recession?*, U. of Oxford (Apr. 4, 2025), https://www.ox.ac.uk/news/2025-04-04-expert-comment-why-has-trump-launched-so-many-tariffs-and-will-it-cause-recession. (emphasis added).

stated that the tariffs originating in the Challenged Orders will raise 'billions of dollars, even trillions of dollars' in revenue." *Learning Res., Inc.*, 2025 WL 1525376, at *4.

*Fourth*, and most importantly, the challenged executive action results in long-term seizure of legislative power and significantly and unjustifiably aggrandizes presidential power. *Learning Res., Inc.*, 2025 WL 1525376, at **8, 13 ("IEEPA does not authorize the President to impose tariffs"). Underscoring the end-run around congressional delegations of authority, the President asserts that the massive taxing authority *implicitly* conferred by IEEPA is not subject to the "comprehensive statutory limitations" that Congress *explicitly* imposed in laws specifically authorizing presidential imposition of tariffs. *See id.* at *9. Those assertions fail under ordinary principles of statutory interpretation. *See id. A fortiori*, the President has failed to point to the "clear congressional authorization" that would be required to justify the imposition of global tariffs with "staggering" economic and political consequences. *See Biden*, 600 U.S. at 502; *Learning Res., Inc*. 2025 WL 1525376, at *8 (finding no clear congressional authorization for the challenged tariffs).

Further, if such long-term tariffs may be imposed by executive fiat free from the limits set out in statutes specifically regulating tariffs, they cannot be undone by Congress over the President's objection without a "veto-proof majority of both houses." *See V.O.S. Selections. Inc.*, 2025 WL 1514124, at *12 n.9. That turns the

Constitution's assignment of a core legislative power on its head. *See* U.S. Const. Art. I, §§ 1, 8 (vesting "[a]ll legislative Powers herein granted . . . in a Congress of the United States," the first of which is the "Power To lay and collect Taxes, Duties, Imposts and Excises").

Even worse, the President's unprecedented assertion of emergency authority to impose tariffs under IEEPA could have broad and pernicious implications for the separation of powers. If the President may address important but longstanding problems like drug trafficking by imposing unlimited tariffs on unrelated goods, it stands to reason that other important societal problems may likewise be invoked to justify a wide range of "emergency" tariffs. *See V.O.S. Selections, Inc.*, 2025 WL 1514124, at *20 (explaining that the executive branch's argument "means a President may use IEEPA to take whatever actions he chooses simply by declaring them 'pressure' or 'leverage' tactics that will elicit a third party's response to an unconnected 'threat.'"). Further, a ruling that approves the challenged tariffs based on statutes that do not specifically authorize the imposition of taxes could set broad precedent for similarly worded statutes to permit "emergency" taxes. *See Learning Res., Inc.*, 2025 WL 1525376, at *13 (concluding that "[t]he statutory phrase 'regulate . . . importation,' as used in IEEPA, does not encompass the power to tariff," and explaining that "[t]he plain meaning of 'regulate' is not 'to tax'").

In sum, balancing the four factors set forth in the above framework, both the Worldwide Tariffs and the Trafficking Tariffs are not proper exercises of the President's statutorily limited emergency authorities.

## CONCLUSION

For the foregoing reasons, *Amicus* respectfully urges the Court to affirm.

Dated: July 8, 2025

Respectfully submitted,
Jane P. Bentrott
PROTECT DEMOCRACY
PROJECT
2020 Pennsylvania Ave NW #163
Washington, DC 20006
Telephone: (202) 579-4582
jane.bentrott@protectdemocracy.org
*Counsel for Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 25-1812, 25-1813

**Short Case Caption:** V.O.S. Selections, Inc. v. Trump

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6,979 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 07/08/2025

Signature: /s/ Jane P. Bentrott

Name: Jane P. Bentrott

32

# CERTIFICATE OF SERVICE

The undersigned counsel certifies that on July 8, 2025, she electronically filed the foregoing *amicus curiae* brief with the Clerk of the Court for the Federal Circuit using the CM/ECF system. The undersigned also certifies that all participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Jane P. Bentrott*
Jane P. Bentrott
*Counsel for Amicus Curiae*