# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, DBA GENOVA PIPE, MICROKITS, LLC, FISH USA INC., TERRY PRECISION CYCLING LLC,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, PETE R. FLORES, ACTING COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, IN HIS OFFICIAL CAPACITY AS ACTING COMMISSIONER OF THE UNITED STATES CUSTOMS AND BORDER PROTECTION, JAMIESON GREER, IN HIS OFFICIAL CAPACITY AS UNITED STATES TRADE REPRESENTATIVE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, IN HIS OFFICIAL CAPACITY AS SECRETARY OF COMMERCE, UNITED STATES CUSTOMS AND BORDER PROTECTION,
*Defendants-Appellants.*

---

STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF VERMONT,
*Plaintiffs-Appellees,*

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, IN HIS OFFICIAL CAPACITY AS COMMISSIONER FOR U.S. CUSTOMS AND BORDER PROTECTION, UNITED STATES
*Defendants-Appellants.*

---

On Appeal from the United States Court of International Trade
Nos. 25-00066, 25-00077, Judges Katzmann, Reif, and Restani

---

# BRIEF OF THE BRENNAN CENTER FOR JUSTICE
## AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES

---

Leah J. Tulin
  *Counsel of Record*
Elizabeth Goitein
Katherine Yon Ebright
Hannah James
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
1140 Connecticut Avenue NW,
Suite 1150
Washington, DC 20036
Phone: (202) 650-6397
tulinl@brennan.law.nyu.edu

*Counsel for Amicus Curiae the Brennan Center for Justice*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1812, 2025-1813

**Short Case Caption** V.O.S. Selections, Inc. v. Trump

**Filing Party/Entity** Brennan Center for Justice at NYU School of Law

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/08/2025

Signature: /s/ Leah J. Tulin

Name: Leah J. Tulin

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Brennan Center for Justice at NYU School of Law | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

INTEREST OF AMICUS CURIAE ......................................................... 1

ARGUMENT ............................................................................................ 4

I.   Congress Enacted the NEA and IEEPA to Circumscribe Presidential Use of Emergency Powers. ........................................................................... 4

   A.   Congress's Role in Providing and Regulating Emergency Powers. ...... 5

   B.   The Origins and Purpose of the NEA. .................................................. 7

   C.   The Origins and Purpose of IEEPA. ..................................................... 13

II.  The Executive Orders Are Contrary to Congress's Intent in Enacting the NEA and IEEPA. .................................................................................. 17

   A.   The President's Finding of an Emergency Is an Obvious Mistake. ...... 17

   B.   Longstanding Trade Imbalances Do Not Constitute an "Unusual and Extraordinary Threat." ............................................................................ 21

   C.   IEEPA Does Not Authorize the Imposition of Tariffs. ........................ 25

   D.   Upholding the Executive Orders Would Permit Circumvention of Tariff Laws. ............................................................................................. 27

III. Upholding the Executive Orders Would Create a Dangerous Precedent. ...... 31

CONCLUSION ........................................................................................ 33

# TABLE OF AUTHORITIES

**Cases**

*Atkins v. Virginia*, 536 U.S. 304 (2002)....................................................24

*Baker v. Carr*, 369 U.S. 186 (1962)........................................... 18, 21, 25

*Beacon Prods. Corp. v. Reagan,* 633 F. Supp. 1191 (D. Mass. 1986)....................21

*Bostock v. Clayton Cnty., Georgia,* 590 U.S. 644 (2020)................................. 4, 19

*Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (2020)........................23

*Chastleton Corp. v. Sinclair*, 264 U.S. 543 (1924)....................................18

*Filtration Dev. Co. v. United States*, 60 Fed. Cl. 371 (2004)................................24

*I.N.S. v. Chadha*, 462 U.S. 919 (1983) ....................................................10

*Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221 (1986) .......................22

*Learning Resources v. Trump*, No. 25-1248, 2025 WL 1525376 (D.D.C. May 29, 2025)....................................................................................26

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ..............................27

*Magana-Magana v. Bondi*, 129 F.4th 557 (9th Cir. 2025)....................................24

*Sterling v. Constantin*, 287 U.S. 378 (1932)........................................... 18, 21, 25

*United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975).......................17

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).............................6

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1.........................................................28

U.S. Const. art. II .................................................................6

**Statutes**

10 U.S.C. § 712(a)(3)................................................................32

47 U.S.C. § 606(c) .................................................................32

49 U.S.C. § 114(g)..................................................................32

Act of Dec. 28, 1977, Pub. L. No. 95-223, 91 Stat. 1625 (codified as amended at 50 U.S.C. § 4305(b)(1)) .........................................................13

Emergency Banking Relief Act, Pub. L. No. 73-1, 48 Stat. 1 (March 9, 1933)......12

Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 801, 99 Stat. 405, 448 (1985) (codified at 50 U.S.C. § 1622(a)(1))........9, 15

International Emergency Economic Powers Act, Pub. L. No. 95-223, 91 Stat. 1625 (1977) (codified as amended at 50 U.S.C. §§ 1701–10)......................... 12, 14, 15

National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601-51).................................................................8, 9

S. 977, 94th Cong. (1975)....................................................................................10

Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (codified as amended at 19 U.S.C. §§ 2101-2497b) .......................................................... 25, 27, 28

Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232(b)-(c), 76 Stat. 872, 877 (codified as amended at 19 U.S.C. § 1862(b)-(c))........................................ 27, 28

Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994).....26

**Legislative Materials**

123 Cong. Rec. 424 (1977) (statement of Rep. Jonathan B. Bingham, Chairman, Subcomm. on Int'l Econ. Pol'y and Trade) ........................................................17

H.R. Rep. No. 94-238 (1976).......................................................................... 25, 29

H.R. Rep. No. 95-459 (1977)........................................................................ passim

S. Rep. No. 95-466 (1977)...................................................................................25

S. Res. 242, 93d Cong. (1974)..............................................................................8

**Executive Orders and Proclamations**

Exec. Order No. 14257, 90 Fed. Reg. 15041 (Apr. 2, 2025)...................... 18, 23, 28

Proclamation No. 2039, 48 Stat. 1689 (March 6, 1933).........................................12

**Other Authorities**

2A Norman Singer & Shambie Singer, *Sutherland Statutory Construction* (7th ed. & Nov. 2024 update)..........................................................................................13

*A Guide to Emergency Powers and Their Use*, Brennan Ctr. for Just. (Jan. 23, 2019), https://perma.cc/QQ43-9TVE 15, 29Andrew Boyle, Brennan Ctr. for Just., *Checking the President's Sanctions Powers* (2021), https://perma.cc/V2ZG-573P ....................................................................................................................16

iv

Brief of the Brennan Ctr. for Just. & the Cato Inst. as Amici Curiae, *Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020) (Nos. 19-17501, 19-17501, 20-15044)......26

Chad P. Bown, *Trump's trade war timeline 2.0: An up-to-date guide* (June 16, 2025), https://perma.cc/694L-NBR3....................................................................19

Christopher A. Casey & Cathleen D. Cimino-Isaacs, Cong. Rsch. Serv., IF10038, *Trade Promotion Authority (TPA)* (2024), https://perma.cc/NZ59-PQZ9 ...........27

Comparative Constitutions Project, *Constitutions Database*, https://perma.cc/GER8-2YPX....................................................................6

*Declared National Emergencies Under the National Emergencies Act*, Brennan Ctr. for Just., https://perma.cc/7Z8M-QWEV.......................................................30

*Emergency*, American Heritage Dictionary (1st ed. 1976).....................................18

*Emergency*, Webster's New Collegiate Dictionary (8th ed. 1976) .........................18

*Hearing on Restoring Congressional Oversight over Emergency Powers: Exploring Options to Reform the National Emergencies Act Before the S. Comm. on Homeland Sec. and Governmental Affs.*, 118th Cong. (2024) (statement of Elizabeth Goitein, Brennan Center for Justice), https://perma.cc/4TJL-3QTR........ ........................................................................................................5, 12

John Ferejohn and Pasquale Pasquino, *The Law of the Exception: A Typology of Emergency Powers*, 2 Int'l J. Const. L. 210 (2004)................................................6

L. Elaine Halchin, Cong. Rsch. Serv., 98-505, *National Emergency Powers* (2021), https://perma.cc/NK3V-DLFF ........................................................................7, 8

S. Comm. on Government Operations and the Spec. Comm. on National Emergencies and Delegated Emergency Powers, *The National Emergencies Act (Public Law 94-412), Source Book: Legislative History, Text, and Other Documents* (1976) ........................................................................ *passim*

Saikrishna Prakash, *The Imbecilic Executive*, 99 Va. L. Rev. 1361 (2013).............6

Thomas E. Cronin, *A Resurgent Congress and the Imperial Presidency*, 95 Pol. Sci. Q. 209 (1980) ........................................................................................7

*U.S. Trade Balance*, Macrotrends, https://perma.cc/KN5H-B28G .........................20

# INTEREST OF AMICUS CURIAE[1]

Amicus curiae the Brennan Center for Justice at NYU School of Law ("the Brennan Center") is a not-for-profit, non-partisan think tank and public interest law institute that seeks to improve systems of democracy and justice. The Brennan Center has conducted extensive research on, analysis of, and public education regarding the National Emergencies Act of 1976 (NEA), the International Emergency Economic Powers Act (IEEPA), and the president's emergency powers more generally. The Brennan Center submits this brief to explain why the president's emergency declarations and invocations of IEEPA for the purpose of imposing worldwide tariffs are contrary to the original purpose of both the NEA and IEEPA and, absent judicial intervention, would open the door to presidential misuse of dozens of highly potent emergency powers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Emergency powers have a narrow and specific function in our constitutional system. They are meant to provide presidents with a temporary boost in power to

---

[1] No counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than amicus curiae and counsel made a monetary contribution to its preparation or submission. This brief does not purport to convey the position of New York University School of Law.

deal with sudden, unforeseen crises that require immediate action. They present a significant temptation, however, as they offer a potential means to short-circuit the normal policymaking process in non-emergency circumstances. A pattern of such behavior in the mid-twentieth century led Congress to enact the NEA and IEEPA.

The NEA was intended to rein in presidential use of statutory emergency powers. Although Congress did not define "national emergency," the legislative history of the NEA makes clear that Congress did not intend for the law to provide an affirmative grant of limitless discretion, and that it expected the limits contained within specific emergency powers to be scrupulously observed and enforced. Congress similarly enacted IEEPA to rein in the president's authority—namely, the authority to regulate economic transactions in response to peacetime emergencies. In addition to predicating the exercise of such powers on a declaration of national emergency, Congress specified that the emergency must constitute an "unusual and extraordinary threat" to the country's national security, foreign policy, or economy, and narrowed the powers available under the law. Congress thus sought to prevent the use of IEEPA to engage in the type of routine policymaking that is and should be governed by non-emergency authorities.

President Trump's declaration of a national emergency and invocation of IEEPA to impose tariffs contravene the intent of the NEA and IEEPA in multiple ways. First, President Trump has declared an emergency where none exists, violating the cardinal principal behind the NEA's enactment. Although courts rarely review the determinations of the political branches regarding the existence of emergencies, judicial review is appropriate where, as here, a president has made an "obvious mistake." Second, President Trump invoked IEEPA in the absence of an "unusual and extraordinary threat" to the U.S. national security, foreign policy, or economy, a criterion that Congress intended as a critical safeguard against abuse. Third, given Congress's goal of circumscribing presidential use of emergency powers, IEEPA should not be construed to authorize tariffs absent clear congressional intent to do so. The text and legislative history of the statute evince no such clear intent; indeed, they indicate the opposite. Finally, in using IEEPA to impose tariffs without an emergency, an "unusual and extraordinary threat," or clear authorization in the law, President Trump is bypassing an extensive legislative framework governing the president's imposition of tariffs—a result that the NEA and IEEPA were intended to prevent.

Allowing the president's actions to stand could have far-reaching consequences beyond this case. It would give presidents a green light to use emergency powers as a means of evading the authority of Congress. The Brennan Center has catalogued 137 such powers that become available when the president declares a national emergency, including many that are highly susceptible to abuse. This Court should therefore intervene to stop this abuse of emergency power and to prevent similar abuses from becoming the norm.

## ARGUMENT

### I. Congress Enacted the NEA and IEEPA to Circumscribe Presidential Use of Emergency Powers.

Appellees challenge a raft of executive orders ("Executive Orders") relying on IEEPA, a statute creating a specific set of emergency economic powers, to impose tariffs on every nation in the world. Appellees argue persuasively that the plain language of IEEPA forecloses the President's actions. To the extent there is any ambiguity, however, the legislative history of the NEA and IEEPA strongly favors the same conclusion. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 674 (2020) ("[M]embers of this Court have consulted legislative history when interpreting ambiguous statutory language."). That history makes clear that the NEA and IEEPA were enacted to circumscribe the president's use of statutory emergency

powers and underscores the importance of strictly construing those powers' limits, particularly where the use of emergency powers would circumvent non-emergency laws.

**A.    Congress's Role in Providing and Regulating Emergency Powers.**

Emergency powers play a unique role in our country's constitutional system. By definition, emergencies are sudden and unexpected, and they require immediate action. *See infra* Part II.A. Because they are sudden and unexpected, Congress may not be able to enact authorities in advance that are tailored to address them. And as a deliberative bicameral body, Congress is ill-suited to act with the necessary immediacy once the emergency has occurred. Emergency powers thus are designed to grant the president extraordinary legal leeway to respond to crises that Congress could not have foreseen and that are moving too fast or too unpredictably for Congress to address after the fact. *See Hearing on Restoring Congressional Oversight over Emergency Powers: Exploring Options to Reform the National Emergencies Act Before the S. Comm. on Homeland Sec. and Governmental Affs.*, 118th Cong. 3–5 (2024) (statement of Elizabeth Goitein, Brennan Center for Justice), https://perma.cc/4TJL-3QTR; *see generally* John Ferejohn and Pasquale

Pasquino, *The Law of the Exception: A Typology of Emergency Powers*, 2 Int'l J. Const. L. 210 (2004).

Unlike most other countries' constitutions, the U.S. Constitution does not provide the president with express emergency powers. *Compare* U.S. Const. art. II *with* Comparative Constitutions Project, *Constitutions Database*, https://perma.cc/GER8-2YPX (database search reflecting that at least 165 countries' constitutions have provisions for emergency rule). Accordingly, since the country's founding, presidents have relied on Congress to provide them with enhanced authorities for emergency situations.[2] Throughout the eighteenth and early nineteenth centuries, Congress periodically enacted laws giving presidents standby authorities that they could use during military, economic, or labor crises. *See* L. Elaine Halchin, Cong. Rsch. Serv., 98-505, *National Emergency Powers* 1 (2021), https://perma.cc/NK3V-DLFF.

---

[2] Presidents have, on occasion, claimed that the Constitution gives them broad *inherent* powers to take emergency action without congressional authorization. The Supreme Court has not endorsed such a reading, *see, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–89 (1952) (rejecting President Truman's claim of inherent constitutional authority to seize control of steel mills during the Korean War), and it finds little support in constitutional history, *see* Saikrishna Prakash, *The Imbecilic Executive*, 99 Va. L. Rev. 1361, 1366–68, 1425 (2013).

Beginning in World War I, a new procedure for invoking statutory emergency powers evolved. Presidents would declare a national emergency, which would give them access to statutory authorities that would otherwise lie dormant. *See id.* at 5. That practice continues today. Until the enactment of the NEA, however, there was no overarching statute regulating it, little transparency or congressional oversight with respect to presidents' use of emergency powers, and nothing to prevent states of emergency from lingering indefinitely.

## B.    The Origins and Purpose of the NEA.

In the 1970s, several scandals involving executive branch overreach prompted Congress to investigate the exercise of executive power and to enact several laws aimed at reasserting Congress's role as a check on executive authority. *See generally* Thomas E. Cronin, *A Resurgent Congress and the Imperial Presidency*, 95 Pol. Sci. Q. 209 (1980). It was in this context that the Senate formed the Special Committee on National Emergencies and Delegated Emergency Powers (the "Special Committee") to examine presidential use of emergency powers. *See* S. Res. 242, 93d Cong. (1974); Halchin, *supra*, at 7–8.

The Special Committee was alarmed by what it found. Several clearly outdated emergency declarations remained on the books, in effect creating "virtually

permanent states of emergencies." 120 Cong. Rec. S15784–94 (daily ed. Aug. 22, 1974) (statement of Sen. Frank Church), *reprinted in* S. Comm. on Government Operations and the Spec. Comm. on National Emergencies and Delegated Emergency Powers, *The National Emergencies Act (Public Law 94-412), Source Book: Legislative History, Text, and Other Documents* 71–83 (1976) [hereinafter *NEA Source Book*]. These outdated declarations continued to unlock emergency powers despite the fact that "[l]egislation intended for use in crisis situations is by its nature not well suited to normal, day-to-day government operations." 121 Cong. Rec. H8325–41 (daily ed. Sept. 4, 1975) (statement of Rep. Peter W. Rodino), *reprinted in NEA Source Book*, *supra*, at 244. The committee warned that the proliferation of emergency powers with insufficient limits or congressional oversight had created a "dangerous state of affairs." S. Rep. No. 94-922, at 1 (1976), *reprinted in NEA Source Book*, *supra*, at 33. It counted more than 470 statutory provisions that delegated extraordinary authority to the executive branch in times of national emergency, allowing the president to:

> seize property and commodities, organize and control the means of production, call to active duty 2.5 million reservists, assign military forces abroad, seize and control all means of transportation and communication, restrict travel, and institute martial law, and, in many other ways, manage every aspect of the lives of all American citizens.

S. Rep. No. 93-1170, at 2 (1974), *reprinted in NEA Source Book*, *supra*, at 20.

The Special Committee's work culminated in the introduction and passage of the NEA, which took effect in 1978. *See* National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601–51). The purpose of the law, evident in every facet of its legislative history, was to limit presidential use of emergency powers. As summarized by the committee in urging passage of the Act:

> While much work remains, none of it is more important than passage of the [NEA]. Right now, hundreds of emergency statutes confer enough authority on the President to rule the country without reference to normal constitutional process. Revelations of how power has been abused by high government officials must give rise to concern about the potential exercise, unchecked by the Congress or the American people, of this extraordinary power. The [NEA] would end this threat and insure that the powers now in the hands of the Executive will be utilized only in time of genuine emergency and then only under safeguards providing for Congressional review.

S. Rep. No. 94-922, at 18, *reprinted in NEA Source Book*, *supra*, at 50. The law included several provisions designed to assert a stronger and more active role for Congress in deciding whether states of emergency should continue. Most notably, it allowed Congress to terminate states of emergency at any time through a concurrent

resolution (known as a "legislative veto" because it would take effect without the president's signature). *See* National Emergencies Act § 202, 90 Stat. at 1255.[3]

The NEA does not include a definition of "national emergency." Appellants, relying on hearing statements by the Special Committee's co-chairs, claim that this omission was intended to avoid constraining the president's discretion. *See* Appellants' Br. 10. The relevant committee report, however—a more salient indicator of congressional intent—tells a very different story. *See* 2A Norman Singer & Shambie Singer, *Sutherland Statutory Construction* § 48:6 (7th ed. & Nov. 2024 update) (collecting cases and noting that "courts generally view committee reports as the most persuasive indicia of legislative intent" (internal quotation marks omitted)). An earlier draft of NEA legislation authorized the president to declare a

---

[3] The Supreme Court subsequently held that concurrent resolutions are unconstitutional. *See I.N.S. v. Chadha*, 462 U.S. 919, 954–55 (1983). Congress thus replaced the concurrent resolution mechanism with one for joint resolutions, which must be signed into law by the president. *See* Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 801, 99 Stat. 405, 448 (1985) (codified at 50 U.S.C. § 1622(a)(1)). This development greatly weakened the effectiveness of the NEA as a check on presidential authority, as Congress in most cases will need a veto-proof supermajority to terminate an emergency declaration. *See Hearing on Restoring Congressional Oversight over Emergency Powers*, *supra*, at 8 (statement of Elizabeth Goitein, Brennan Center for Justice). The lack of a ready means for Congress to terminate emergency declarations, as originally envisioned in the law, makes it even more important for the judiciary to fulfill its own role as a check against executive overreach in the cases that come before it.

national emergency "[i]n the event the President finds that a proclamation of a national emergency is essential to the preservation, protection and defense of the Constitution or to the common defense, safety, or well-being of the territory or people of the United States." S. 977, 94th Cong. § 201(a) (1975). One committee report noted that this definition was "deliberately cast in broad terms that makes it clear that a proclamation of a state of national emergency requires a grave national crisis." S. Rep. No. 93-1193, at 2 (1974), *reprinted in NEA Source Book*, *supra*, at 96. The Senate Committee on Government Operations removed this language, not because it was too limiting, but because the committee believed it was too broad. As stated in the committee's report:

> [F]ollowing consultations with several constitutional law experts, the committee concluded that section 201(a) is overly broad, and might be construed to delegate additional authority to the President with respect to declarations of national emergency. In the judgment of the committee, the language of this provision was unclear and ambiguous and might have been construed to confer upon the President statutory authority to declare national emergencies, other than that which he now has through various statutory delegations.
>
> The Committee amendment clarifies and narrows this language. The Committee decided that *the definition of when a President is authorized to declare a national emergency should be left to the various statutes which give him extraordinary powers*. The [NEA] is not intended to

> enlarge or add to Executive power. Rather the statute is an
> effort by the Congress to establish clear procedures and
> safeguards for the exercise by the President of emergency
> powers conferred upon him by other statutes.

S. Rep. No. 94-1168, at 3, *reprinted in NEA Source Book*, *supra*, at 292 (emphasis
added).

The committee's solution proved to be flawed, as most statutes in place today
that confer power on the president during national emergencies do not include
criteria beyond the issuance of the declaration. *See A Guide to Emergency Powers
and Their Use*, Brennan Ctr. for Just. (Jan. 23, 2019), https://perma.cc/QQ43-9TVE.
It is nonetheless significant that Congress believed even a definition limiting
national emergencies to grave national crises would be "overly broad." The notion
that Congress intended the NEA as an affirmative delegation of unlimited
discretion—one that would allow the president to use emergency powers at will
rather than of necessity—is contradicted by this and every other aspect of the
legislative history. Moreover, where statutes granting emergency powers *do* include
criteria beyond the mere declaration of an emergency, this legislative history
underscores the importance of strictly interpreting and enforcing those limitations.

## C.     The Origins and Purpose of IEEPA.

Enacted one year after the NEA and in response to the same concerns over executive branch overreach, IEEPA was Congress's attempt to rein in presidential power to take emergency economic action. In particular, Congress was responding to abuses of the Trading With the Enemy Act of 1917 (TWEA). *See* Appx6–10, Appx31–33. TWEA originally authorized the president to take economic measures against enemy nations, such as blocking enemy property, during times of war. *See* Andrew Boyle, Brennan Ctr. for Just., *Checking the President's Sanctions Powers* 5 (2021), https://perma.cc/V2ZG-573P. In 1933, however, after President Roosevelt invoked TWEA to declare a U.S. bank holiday, *see* Proclamation No. 2039, 48 Stat. 1689 (Mar. 6, 1933), Congress hastily amended it to apply during national emergencies as well as wartime, *see* Emergency Banking Relief Act, Pub. L. No. 73-1, 48 Stat. 1 (Mar. 9, 1933).[4] In doing so, "Congress recognized that it was conferring unusual powers on the President which were justified by the gravity of

---

[4] Appellants state that Congress amended TWEA to extend to national emergencies in 1941. *See* Appellants' Br. 9. In fact, that amendment retained the "national emergency" language added in 1933 and provided additional authority to take many of the specific economic actions that are now a part of IEEPA. *See* 50 U.S.C. § 1702(a)(1)(B).

13

the situation which the country faced, but which should not normally be available to Presidents in peacetime." H.R. Rep. No. 95-459, at 4 (1977).

The NEA originally exempted TWEA from its ambit. Because a small number of emergency powers, including TWEA, were in regular use, Congress temporarily excluded them "to allow for a careful study of how to revise them in accordance with the intent of the [NEA] without disrupting policies currently in effect under their authority." *Id.* at 6. The resulting inquiry, conducted by the committees of jurisdiction in both chambers, confirmed that "[s]uccessive Presidents [had] . . . seized upon" TWEA's open-ended language to turn it "through usage, into something quite different from what was envisioned in 1917." *Id.* at 8–9. Indeed, TWEA had "become essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review." *Id.* at 7. The law's emergency authorities had "in effect become routine authorities used to conduct the day-to-day business of the Government." 123 Cong. Rec. 424 (1977) (statement of Rep. Jonathan B. Bingham, Chairman, Subcomm. on Int'l Econ. Pol'y and Trade).

In response to these findings, Congress amended TWEA to once again limit its application to instances where Congress had declared war. Act of Dec. 28, 1977,

Pub. L. No. 95-223, § 101, 91 Stat. 1625 (codified as amended at 50 U.S.C. § 4305(b)(1)); *see* H.R. Rep. No. 95-459, at 10. At the same time, Congress promulgated a new statute—IEEPA—to provide for a more constrained set of economic powers during peacetime emergencies. Pub. L. No. 95-223, §§ 201–08, 91 Stat. 1625, 1626–29 (1977) (codified as amended at 50 U.S.C. §§ 1701–10).

Congress intended the powers conferred under IEEPA to be subject to significant "substantive restrictions." H.R. Rep. No. 95-459, at 10. The first such restriction was the high bar to invoking the statute. Congress perceived the requirement of declaring a national emergency to be a significant limitation, given that "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems." *Id.* Even so, Congress added a further constraint, providing that IEEPA's authorities may be used only to deal with an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). This language is one of the primary distinctions between IEEPA and the corresponding provisions of TWEA, and thus a critical aspect of Congress's attempt to ensure that presidents would not invoke IEEPA in the absence of real emergencies.

In addition, the authorities provided under IEEPA were "limited to the regulation of international economic transactions" and were "more restricted than those available during time of war." H.R. Rep. No. 95-459, at 10–11. IEEPA specifies a list of powers that the president may exercise over property or transactions under U.S. jurisdiction in which a foreign nation or person has any interest. *See* 50 U.S.C. § 1702(a)(1)(B). Neither that list nor the legislative history includes any mention of the imposition of tariffs.

Finally, IEEPA includes procedural requirements to facilitate strong congressional oversight. The president must consult with Congress "in every possible instance" before invoking IEEPA and must submit reports to Congress on a regular basis. 50 U.S.C. § 1703(a)–(c). Moreover, because IEEPA's powers are exercised pursuant to a national emergency declaration, Congress may block the use of those powers by terminating the declaration on which the IEEPA invocation relies. 50 U.S.C. § 1622(a)(1).

In short, the legislative history of IEEPA—like that of the NEA—reflects a resolute focus on restricting presidential use of emergency powers and ensuring that the law is not used as a substitute for non-emergency legislation.

## II.    The Executive Orders Are Contrary to Congress's Intent in Enacting the NEA and IEEPA.

As set forth in Part I, the legislative histories of the NEA and IEEPA demonstrate that Congress did not intend for the president to have unlimited discretion to declare national emergencies where none exist; that limitations contained within statutes that are available during national emergencies, such as IEEPA, should be strictly construed and enforced; that such statutes should not be read to include powers not clearly granted; and that emergency powers may not be used to displace applicable non-emergency laws absent a genuine emergency and clear authorization. The Executive Orders collectively run afoul of all of these interpretive principles.

### A.    The President's Finding of an Emergency Is an Obvious Mistake.

A presidential determination that an emergency exists might ordinarily be afforded substantial deference. Lower courts have held that such determinations "*normally*" present a "political question[]" more appropriate for a political branch of government than for the judiciary. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 579 (C.C.P.A. 1975) (emphasis added). Even if the "political question" doctrine typically applies to such determinations, however, it should not bar judicial review—and judicial intervention—in this instance.

Determining whether the political question doctrine precludes review demands "discriminating inquiry into the precise facts and posture of the particular case." *Baker v. Carr*, 369 U.S. 186, 217 (1962). When that inquiry reveals an "obvious mistake" or "manifestly unauthorized exercise of power," the courts may intervene. *Id.* at 214, 217; *accord Sterling v. Constantin*, 287 U.S. 378, 399 (1932) (acknowledging "a permitted range of honest judgment" in which executive discretion may be exercised). Similarly, the Supreme Court has recognized that the courts have a role in determining whether "[a] law depending upon the existence of an emergency" remains valid "if the emergency ceases." *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547 (1924) ("[A] Court is not at liberty to shut its eyes to an obvious mistake when the validity of the law depends upon the truth of what is declared.").

This case presents just such an instance. Above all else, what emerges from the legislative histories of both the NEA and IEEPA is that Congress intended to authorize the use of emergency powers to address true emergencies only, and not ordinary problems that presidents mislabel as emergencies. Although Congress did not define "emergency" in either statute, the legislative history includes ample indications of how Congress understood the term—and, in particular, what should

*not* qualify as an emergency under these laws. As described in Part I, Congress believed that genuine emergencies are "rare and brief, and are not to be equated with normal, ongoing problems." H.R. Rep. No. 95-459, at 10.

Even without these indications, the word "emergency" is not a cipher; it has a well-understood definition. Courts "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock*, 590 U.S. at 654. When Congress passed the NEA, the term "emergency" was defined, as it is today, as a sudden, unforeseen circumstance that requires an immediate response. *See* American Heritage Dictionary 427 (1st ed. 1976) ("A situation or occurrence of a serious nature, developing suddenly and unexpectedly, and demanding immediate action."); Webster's New Collegiate Dictionary 372 (8th ed. 1976) ("[A]n unforeseen combination of circumstances or the resulting state that calls for immediate action."). In the absence of an explicit definition provided within the specific emergency power invoked, which would otherwise control, *see supra* Part I.B, courts can and should rely on this common meaning of the term.

The "emergency" cited as the basis for the majority of the challenged tariffs[5] is "persistent" "structural imbalances in the global trading system." Exec. Order No. 14257, 90 Fed. Reg. 15041 (Apr. 2, 2025). A "persistent" set of circumstances, however, is neither sudden nor unforeseen. To the contrary, a "persistent" and "structural" problem is the very definition of a "normal, ongoing" problem, which Congress believed should *not* trigger emergency powers. *See* H.R. Rep. No. 95-459, at 10. Trade imbalances with other nations are indeed commonplace, as the challenged Executive Order affirms, and have been so for decades, *U.S. Trade Balance*, Macrotrends, https://perma.cc/KN5H-B28G. Nor is it the case that such imbalances have become suddenly, unexpectedly worse. To the contrary, as a percentage of the U.S. gross domestic product, the nation's overall trade imbalance is significantly less today than it was twenty years ago. *See id.* Congress passed the NEA and IEEPA precisely to prevent presidents from using emergency powers to address such longstanding and widespread issues.

President Trump's behavior following the issuance of the Executive Orders further undermines any claim of "emergency." By definition, an emergency—

---

[5] Because Appellees V.O.S. *et al.* do not challenge the Executive Orders that are specific to Canada, Mexico, and China and the State Appellees do not address whether the circumstances underlying those orders constitute an "emergency" or an "unusual and extraordinary threat," this brief does not reach those questions.

particularly one posing an "unusual and extraordinary threat"—requires an immediate response. Yet President Trump has repeatedly pulled back from imposing the full tariffs authorized by his Executive Orders. *See* Chad P. Bown, Peterson Inst. for Int'l Econ, *Trump's trade war timeline 2.0: An up-to-date guide* (June 16, 2025), https://perma.cc/694L-NBR3. A circumstance that can be addressed on the president's chosen timeline is not an emergency.

Whatever forbearance courts might ordinarily show in lawsuits challenging declarations of national emergency, President Trump's actions in this case exceed the "permitted range of honest judgment" in which presidents may act without judicial review in areas normally committed to executive discretion. *Sterling*, 287 U.S. at 399. In determining that decades-long, entrenched trade relationships constitute an "emergency," President Trump has made an "obvious mistake" and has acted in a manner "manifestly unauthorized by law." *Baker*, 369 U.S. at 214, 217.

## B. Longstanding Trade Imbalances Do Not Constitute an "Unusual and Extraordinary Threat."

This Court has ample authority to review whether IEEPA's criterion of an "unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States" has been met. Although some courts have held that IEEPA invocations implicate the political question doctrine, *see, e.g.*, *Beacon Prods.*

*Corp. v. Reagan*, 633 F. Supp. 1191, 1194–95 (D. Mass. 1986), the Court of International Trade correctly rejected this argument, *see* Appx40–42. While suggesting (without deciding) that the NEA "may" leave the declaration of a national emergency to the president's discretion, the court held that there is no bar to courts reviewing whether the statutory criteria for invoking IEEPA have been met. *Id*.; *see also Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 229–30 (1986) ("[N]ot every matter touching on politics is a political question," as when a case "calls for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented").

The Court of International Trade's holding on this matter better accords with the NEA and IEEPA's text and legislative histories. As discussed in Part I.C, Congress, in enacting IEEPA, added the "unusual and extraordinary threat" standard to prevent overuse of the law's exceptional powers. Congress believed that the addition of this language would ensure that IEEPA's use would be "both infrequent and extremely important." H.R. Rep. No. 95-459, at 16. Moreover, Congress intended for such limiting language in specific emergency powers to serve as key constraints on the executive power presidents retained under the NEA. *See supra* Part I.B. It is entirely implausible that Congress intended for this critical limitation

to be unenforceable. Indeed, shortly before the Special Committee's formation, one of its co-chairs expressly faulted the "the courts . . . [for] creating a virtually unlimited Executive prerogative" by failing to check presidents' exercises of emergency powers. 118 Cong. Rec. 18367–69 (1972) (statement of Sen. Charles Mathias), *reprinted in NEA Source Book*, *supra*, at 13–18; *see also id.* at 15 (lamenting the fact that "neither Congress nor the courts has set criteria to define the kind of crisis which would justify invocation of these multifarious powers"); *id.* at 16 (noting that courts had upheld exercises of emergency powers that "clearly represent[ed] an unconstitutional encroachment on legislative authority"); *cf. Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2615 (2020) (Kavanaugh, J., dissenting) ("This Court's history is littered with unfortunate examples of overly broad judicial deference to the government when the government has invoked emergency powers . . . . The court of history has rejected those jurisprudential mistakes and cautions us against an unduly deferential judicial approach . . . .").

Even if courts owe substantial deference to a president's assessment of whether particular circumstances constitute a threat to national security, no special expertise or political judgment is required for a court to determine whether those circumstances are "unusual" or "extraordinary"—particularly where the frequency

and extent of such circumstances are a matter of public record. Courts assess whether circumstances are "unusual" or "extraordinary" in an array of constitutional and statutory contexts, *see, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 316 (2002) (holding that criminal punishment is "truly unusual" based on infrequency of its application); *Magana-Magana v. Bondi*, 129 F.4th 557, 570 (9th Cir. 2025) (interpreting "extraordinary circumstances" in immigration code and noting that "courts routinely determine whether 'extraordinary circumstances' exist"), including those explicitly involving national defense considerations, *see, e.g.*, *Filtration Dev. Co. v. United States*, 60 Fed. Cl. 371, 383, 387 (2004) (interpreting "unusual and compelling urgency" in military procurement statute to require time-bounded, not indefinite, exigency).

President Trump's description of trade imbalances as "persistent" and "structural" refutes any claim that they are "unusual and extraordinary" in nature. So, too, does the president's imposition of separate tariffs on every nation. *See* Exec. Order No. 14257. President Trump has even imposed tariffs on the several dozen countries with which the United States runs a trade *surplus*, claiming that the U.S. national security and economy are under threat in those instances because "the accumulation of tariff and non-tariff barriers on U.S. exports may make that surplus

smaller than it would have been without such barriers." *Id*. As the caselaw adjudicating what is "unusual" or "extraordinary" would suggest, a circumstance that persists indefinitely with respect to every single nation on earth simply is not "unusual and extraordinary." Indeed, it is so far from meeting that standard that judicial intervention would be warranted even if the political question doctrine might otherwise apply. A finding that a longstanding and universal circumstance is "unusual and extraordinary" is an "obvious mistake," *Baker*, 369 U.S. at 214, that exceeds "a permitted range of honest judgment," *Sterling*, 287 U.S. at 399, rendering President Trump's tariffs "manifestly unauthorized by law." *Baker*, 369 U.S. at 217.

### C. IEEPA Does Not Authorize the Imposition of Tariffs.

The legislative histories of the NEA and IEEPA bear directly on the proper interpretation of IEEPA's scope. Appellees cite the Supreme Court's admonition that executive actions with major political or economic significance must be clearly authorized by Congress. *See* Appx26–27. There is an independent reason, however, to require clear authorization by Congress when the president takes action under the NEA and IEEPA—laws designed to ensure that emergency powers would be used sparingly and in accordance with their limitations. As Congress recognized in passing the NEA and IEEPA, the powers expressly granted to the president during a

national emergency are extremely potent and vulnerable to exploitation or abuse. Allowing a president to expand these powers beyond their already sweeping scope by inferring powers not clearly conferred would create exactly the kind of danger Congress sought to mitigate. The fact that the powers expressly granted by IEEPA are "broad," as Appellants observe, Appellants' Br. 26, merely underscores the importance of resisting efforts to broaden them even further beyond their textual limits.

IEEPA does not clearly authorize the imposition of tariffs. The long list of presidential actions that it authorizes does not include imposing tariffs or leveling taxes or duties. Construing the word "regulate" to encompass the imposition of tariffs is a strained reading of the term that would render it an outlier from the other actions on the list, all of which relate to requiring or prohibiting transactions rather than taxing them. *See Learning Resources v. Trump*, No. 25-1248, 2025 WL 1525376, at *8–9 (D.D.C. May 29, 2025). The legislative history of IEEPA, which describes intended uses for the law, is similarly devoid of any mention of tariffs. *See* H.R. Rep. No. 95-459, at 14–15; S. Rep. No. 95-466 (1977) at 5. The notion that Congress intended to create a sweeping new emergency tariff power *sub silentio* is all the more unlikely given that Congress had recently enacted broad tariff

legislation. *See* Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (codified as amended at 19 U.S.C. §§ 2101–2497b). Until now, no president had ever used IEEPA for tariffs in its nearly 50-year history, itself a powerful sign that the law does not authorize such a measure. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("'[T]he longstanding practice of the government'—like any other interpretive aid—'can inform [a court's] determination of what the law is.'" (second alteration in original) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014))). In short, far from IEEPA providing the clear authorization that should be required when emergency powers are invoked, multiple factors suggest that Congress did not intend for IEEPA to authorize tariffs.

## D. Upholding the Executive Orders Would Permit Circumvention of Tariff Laws.

In passing the NEA and IEEPA, Congress emphasized that emergency powers should not be used as a stand-in for regular, non-emergency legislation.[6] *See* H.R.

---

[6] Congress *did* contemplate that IEEPA might be used, as a last resort, to control exports in the event of a lapse in non-emergency export control legislation. *See* H.R. Rep. No. 95-459, at 13. There are no such gaps to fill when it comes to non-emergency tariff legislation, as discussed herein. Similarly, while "Congress has for decades acquiesced in the use of IEEPA as a substitute for ordinary *sanctions* legislation," *see* Brief of the Brennan Ctr. for Just. & the Cato Inst. as Amici Curiae at 17, *Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020) (Nos. 19-17501, 19-17501, 20-15044) (emphasis added), there is no such history of acquiescence with respect

Rep. No. 94-238, at 2 (1976) (noting that the NEA "will make it possible for our Government to function in accordance with regular and normal provisions of law rather than through special exceptions and procedures which were intended to be in effect for limited periods during specific emergency conditions"); H.R. Rep. No. 95-459, at 11 (directing that "authority for routine, nonemergency regulation of international economic transactions which has heretofore been conducted under [TWEA] should be transferred to other legislation"). By the same token—and even more importantly—emergency powers should never be used to circumvent restrictions or prohibitions included in non-emergency legislation absent a true emergency and clear authorization.

Here, Congress has established a detailed statutory scheme for tariffs. The authority to impose tariffs is expressly committed to Congress under the Constitution, as the first of its powers. *See* U.S. Const. art. I, § 8, cl. 1. Pursuant to that authority, Congress has passed multiple statutes explicitly authorizing tariffs in a range of circumstances. *See, e.g.*, Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994); Trade Act of 1974 (codified at 19 U.S.C. §§ 2101–2497b). These laws give the president and U.S. trade representative significant

---

to the imposition of tariffs under IEEPA because no previous president has used IEEPA for that purpose.

discretion to impose or adjust tariffs in response to specified circumstances, such as national security threats (19 U.S.C. § 1862(b)–(c)); injury to domestic industry (19 U.S.C. §§ 2251–55); trade agreement violations by other nations (19 U.S.C. §§ 2411–20); discrimination against U.S. commerce (19 U.S.C. § 1338); and serious trade imbalances (19 U.S.C. § 2132). Where presidents have sought to raise or lower tariffs under other circumstances, they have availed themselves of Trade Promotion Authority laws, which provide for expedited congressional approval of trade agreements that meet specified negotiating objectives and consultation/notification requirements. *See* Christopher A. Casey & Cathleen D. Cimino-Isaacs, Cong. Rsch. Serv., IF10038, *Trade Promotion Authority (TPA)* 1 (2024), https://perma.cc/NZ59-PQZ9.

Construing IEEPA to authorize the imposition of tariffs without any of the procedural and substantive restrictions of these laws would allow the president to bypass an elaborate legislative scheme in an area of plenary congressional authority. Such a result would permissible only if a true emergency existed, the criteria for invoking IEEPA were met, and IEEPA clearly permitted the imposition of tariffs. None of those conditions are present here. *See supra* Parts II.A, B, & C.

Moreover, even if IEEPA could be interpreted as authorizing tariffs in some circumstances, it still could not be interpreted as authorizing the tariffs imposed under the challenged Executive Orders. Congress has enacted legislation—Section 122 of the Trade Act of 1974—specifically authorizing the president to impose tariffs in response to "large and serious United States balance-of-payment deficits" (including trade imbalances), but capping the size and duration of those tariffs. *See* 19 U.S.C. § 2132). Congress thus established parameters for tariffs addressing the very circumstances identified in Executive Order 14257.[7] As the Court of International Trade held, construing IEEPA to authorize tariffs in these circumstances would permit circumvention of Section 122 and would render its limitations a nullity. Appx31–35. The Executive Orders imposing tariffs on Canada, Mexico, and China, which cite the protection of national security as a justification, similarly circumvent and nullify the requirements set forth in Section 232 of the Trade Expansion Act of 1962, which governs the adjustment of imports for national-security purposes. *See* 19 U.S.C. §§ 1862(b)–(c). This result violates not only basic

---

[7] Citing *Yoshida*, Appellants argue that Section 122 addresses "*foreseeable* events," while IEEPA is intended for "*unforeseeable* events." Appellants' Br. 50 (emphasis in original). That argument strongly supports *Appellees'* position. There is nothing remotely unforeseeable about "persistent" and "structural" trade imbalances that have existed for decades. Exec. Order No. 14257.

canons of statutory construction, but also Congress's intent, in enacting IEEPA, to end the practice of presidents substituting emergency powers for "regular and normal provisions of law." H.R. Rep. No. 94-238, at 2.

## III. Upholding the Executive Orders Would Create a Dangerous Precedent.

A ruling upholding the challenged Executive Orders would have far-reaching implications. In the future, presidents would know that they could invoke emergency powers to bypass Congress in adopting highly controversial policies, like worldwide tariffs, that Congress might not be willing to support. A veto-proof majority of Congress would then be required to put an end to the contested policy. This would fundamentally upset the balance of power between the president and Congress.

Indeed, if given the green light to declare emergencies to evade Congress, presidents could invoke powers even more potent than the one that President Trump has relied on here. The Brennan Center has catalogued 137 statutory provisions that become available to presidents when they declare a national emergency, the vast majority of which contain no substantive criteria for invocation beyond an emergency declaration. *See A Guide to Emergency Powers and Their Use*, *supra*. Although some of these powers are narrowly crafted, others are sweeping, and their invocation as a means of short-circuiting Congress could have profound

consequences. *See, e.g.*, 47 U.S.C. § 606(c) (permitting the president to take over or shut down certain wireless telecommunications facilities, devices, and equipment during a national emergency); 49 U.S.C. § 114(g) (delegating broad authority over domestic transportation to the Transportation Security Administrator during a national emergency); 10 U.S.C. § 712(a)(3) (allowing the president to detail any member of the U.S. armed forces to "any . . . country that he considers it advisable to assist in the interest of national defense").

If courts uphold President Trump's actions in the current case, such formidable powers could henceforth become available based simply on a president's unilateral claim that he or she needs them, and against the wishes of a majority of Congress. Few presidents would be able to resist such an open invitation to unchecked power. At a minimum, government by presidential emergency order would likely become far more common than it has been in the past. President Trump has already far outpaced the rate at which any previous president has used emergency powers since the enactment of the NEA. *See Declared National Emergencies Under the National Emergencies Act*, Brennan Ctr. for Just. (last updated July 3, 2025), https://perma.cc/7Z8M-QWEV (listing 8 national emergency declarations during President Trump's first 100 days in office). To the extent "rule by emergency power"

32

is becoming a standard feature of U.S. government, it is inconsistent with Congress's intent when it passed the NEA, with the constitutional separation of powers, and with basic democratic principles.

## CONCLUSION

For the reasons stated above, this Court should affirm.

Dated: July 8, 2025

Respectfully submitted,

/s/ *Leah J. Tulin*

Leah J. Tulin
  *Counsel of Record*
Elizabeth Goitein
Katherine Yon Ebright
Hannah James
BRENNAN CENTER FOR JUSTICE AT NYU
SCHOOL OF LAW
1140 Connecticut Ave. NW, Suite 1150
Washington, D.C. 20036
(202) 650-6397 (telephone)
(202) 223-2683 (fax)
tulinl@brennan.law.nyu.edu
goiteine@brennan.law.nyu.edu
ebrightk@brennan.law.nyu.edu
jamesh@brennan.law.nyu.edu

*Counsel for Amicus Curiae the Brennan Center for Justice*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause it to be served on all parties and counsel of record.

*/s/ Leah J. Tulin*
Leah J. Tulin

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>2025-1812, 2025-1813</u>

**Short Case Caption:** <u>V.O.S. Selections, Inc. v. Trump</u>

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes <u>6,974</u> words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>07/08/2025</u>

Signature: <u>/s/ Leah J. Tulin</u>

Name: <u>Leah J. Tulin</u>

Save for Filing