# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

————————————

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Defendants-Appellants.*

————————————

THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF VERMONT,

*Plaintiffs-Appellees,*

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for U.S. Customs and Border Protection, UNITED STATES,

*Defendants-Appellants.*

————————————

On Appeal from the United States Court of International Trade
Nos. 25-66, -77, Judges Katzmann, Reif, and Restani

————————————

## REPLY BRIEF FOR APPELLANTS

————————————

BRETT A. SHUMATE
*Assistant Attorney General*

*Signature block continued
on inside cover*

MICHAEL S. RAAB
BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 4

I.   IEEPA Authorizes The Challenged Tariffs ............................................. 4

    A.   IEEPA Clearly Authorizes The Reciprocal Tariffs ....................... 4

    B.   IEEPA Clearly Authorizes The Trafficking-Related Tariffs ...... 27

II.  The CIT Abused Its Discretion In Entering An Injunction ................... 30

CONCLUSION ................................................................................................... 35

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Babb v. Wilkie*,
  589 U.S. 399 (2020) ..................................................................11

*Baker v. Carr*,
  369 U.S. 186 (1962) ..................................................................23

*Barnes v. United States*,
  2025 WL 1483384 (Ct. Int'l Trade May 23, 2025)........................33

*Beacon Products Corp. v. Reagan*,
  633 F. Supp. 1191 (D. Mass. 1986) ..............................................23

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
  63 F.4th 25 (Fed. Cir. 2023) .........................................................4

*B-West Imports, Inc. v. United States*,
  75 F.3d 633 (Fed. Cir. 1996) .........................................................7

*Center for Biological Diversity v. Trump*,
  453 F. Supp. 3d 11 (D.D.C. 2020) ................................................22

*Chang v. United States*,
  859 F.2d 893 (Fed. Cir. 1988) ................................................22, 23

*Dalton v. Specter*,
  511 U.S. 462 (1994) ..............................................................24, 28

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ..............................................................3, 28

*Department of Agriculture Rural Development Rural Housing Service v. Kirtz*,
  601 U.S. 42 (2024) ..........................................................2, 12, 13

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ..................................................................30

*FCC v. Consumer's Research,*
  2025 WL 1773630 (June 27, 2025)..................................17, 18, 19, 20

*Federal Energy Administration v. Algonquin SNG, Inc.,*
  426 U.S. 548 (1976) ...............................................................4

*Florsheim Shoe Co. v. United States,*
  744 F.2d 787 (Fed. Cir. 1984) ...............................................18

*Georgia v. Public.Resource.Org, Inc.,*
  590 U.S. 255 (2020) ........................................................5, 6, 7

*Gibbons v. Ogden,*
  22 U.S. (9 Wheat.) 1 (1824)...............................................4, 8

*Harisiades v. Shaughnessy,*
  342 U.S. 580 (1952) .............................................................23

*Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.,*
  586 U.S. 123 (2019) ...............................................................6

*Holy Land Foundation v. Ashcroft,*
  333 F.3d 156 (D.C. Cir. 2003) .............................................10

*J.W. Hampton, Jr., & Co. v. United States,*
  276 U.S. 394 (1928) .............................................................20

*Jennings v. Rodriguez,*
  583 U.S. 281 (2018) .............................................................19

*Lorillard v. Pons,*
  434 U.S. 575 (1978) ...............................................................7

*Marshall Field & Co. v. Clark,*
  143 U.S. 649 (1892) .............................................................20

*PrimeSource Building Products, Inc. v. United States,*
  59 F.4th 1255 (Fed. Cir. 2021) ........................................7, 24

*Public Citizen v. Federal Motor Carrier Safety Administration,*
  374 F.3d 1209 (D.C. Cir. 2004) ...........................................29

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ...........................................................................14

*Rakhimov v. Gacki*,
    2020 WL 1911561 (D.D.C. Apr. 20, 2020) ...................................25

*Regan v. Wald*,
    468 U.S. 222 (1984) ...........................................................11, 17, 23

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
    2021 WL 4935539 (D.D.C. Sept. 22, 2021).....................................25

*Trump v. CASA, Inc.*,
    2025 WL 1773631 (June 27, 2025)..............................3, 30, 32, 33, 34

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) .............................................................................11

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011) ................................................. 10-11, 21

*United States v. Arch Trading Co.*,
    987 F.2d 1087 (4th Cir. 1993) .........................................................21

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936) ..........................................................................19

*United States v. Dhafir*,
    461 F. 3d 211 (2d Cir. 2006) ...........................................................21

*United States v. Shih*,
    73 F.4th 1077 (9th Cir. 2023) .....................................................21, 22

*United States v. Yoshida International, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) ..................... 1, 3, 5, 12, 13, 15, 21, 28

*USP Holdings, Inc. v. United States*,
    36 F.4th 1359 (Fed. Cir. 2022) ...................................................3, 24

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014) ..........................................................................17

*Winter v. NRDC*,
   555 U.S. 7 (2008) ..........................................................3, 30

**U.S. Constitution:**

Art. I, § 8, cl. 1 ...............................................................9, 32

Art. I, § 8, cl. 3 ....................................................................9

Art. I, § 8, cl. 4 ..................................................................32

Art. I, § 9, cl. 5 ....................................................................9

**Statutes:**

International Emergency Economic Powers Act (IEEPA):
   50 U.S.C. § 1701 ..........................................................8, 14
   50 U.S.C. § 1701(a) ..........................................20, 22, 28
   50 U.S.C. § 1701(b) ..............................................................20
   50 U.S.C. § 1702 ..............................................................11
   50 U.S.C. § 1702(a)(1)(B) ..........................1, 5, 7, 8, 9, 18
   50 U.S.C. § 1702(b) ..............................................................20
   50 U.S.C. § 1702(c) ..............................................................24

19 U.S.C. § 1862 ....................................................................7

19 U.S.C. § 2132(a) ...........................................................5, 13

50 U.S.C. § 1622 ..................................................................25

50 U.S.C. § 1622(d) ................................................................8

**Executive Branch Materials:**

Exec. Order No. 12,532,
   50 Fed. Reg. 36,861 (Sept. 10, 1985) ...............................27

Exec. Order No. 12,868,
   58 Fed. Reg. 51,749 (Oct. 4, 1993) ...................................27

Exec. Order No. 13,818,
    82 Fed. Reg. 60,839 (Dec. 26, 2017)....................................................27

Exec. Order No. 14,078,
    87 Fed. Reg. 43,389 (July 21, 2022) ..................................................27

Exec. Order No. 14,257,
    90 Fed. Reg. 15,041 (Apr. 7, 2025) ...................................................26

**Legislative Material:**

S. Rep. No. 93-1298 (1974) ........................................................ 13-14, 16

**Other Authority:**

*Regulate*, Black's Law Dictionary (5th ed. 1979) ..................................................4

# INTRODUCTION

The President has declared emergencies regarding the foreign practices that have contributed to America's exploding trade deficit and the implications of that deficit for our economy and national security, as well as a fentanyl crisis that has claimed thousands of American lives. To address those emergencies, the President imposed tariffs using his authority to "regulate … importation" of foreign goods under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1702(a)(1)(B). Those tariffs have led to the adoption of general terms for a new trade agreement with the United Kingdom. They have also spurred ongoing, highly sensitive negotiations with numerous trading partners.

The President's actions are consistent with IEEPA's text and precedents of this Court and the Supreme Court. Plaintiffs seek to neutralize the President's authority, arguing that IEEPA does not allow tariffs at all. But the CIT rightly did not accept that argument. This Court's predecessor held that the phrase "regulate … importation" in IEEPA's predecessor statute authorized the imposition of tariffs. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 576 (C.C.P.A. 1975). And Congress enacted IEEPA against the backdrop

of that holding, reincorporating that same language—further evidence that IEEPA clearly authorizes tariffs among the President's tools.

Plaintiffs' attempts to defend the CIT's actual reasoning—that "regulate … importation" authorizes only some tariffs—likewise fail. Plaintiffs rely on Section 122 of the Trade Act of 1974, but that statute cannot be read to narrow the President's IEEPA authority. The statutes "coexist harmoniously." *Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024). Section 122 authorizes measures to address non-emergency balance-of-payments concerns. And IEEPA supplies a distinct, complementary authority to address balance-of-payments concerns and other issues when they constitute emergencies. Congress commonly provides overlapping authorities, especially in this context, and it is particularly clear that Congress intended these two statutes to buttress each other given that Congress enacted IEEPA *after* Section 122.

Nor do the major-questions and nondelegation doctrines aid plaintiffs. Congress routinely delegates tariff authority to the President to augment his inherent powers over foreign affairs and national security, and the Supreme Court has recognized that broad delegations in that sphere are the norm, not the exception. IEEPA falls well within that tradition.

Plaintiffs' last-ditch assertions that the Court should question the President's declaration of an emergency underlying the reciprocal tariffs, or his determination of an "unusual and extraordinary threat" under IEEPA, flout precedents foreclosing such review, *e.g.*, *Yoshida*, 526 F.2d at 581; *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1362, 1369 (Fed. Cir. 2022), given the separation-of-powers concerns that would arise if federal courts were to second-guess the President's exercise of discretion in the arenas of foreign policy and national security. And as to the trafficking tariffs, plaintiffs do not seriously grapple with the Supreme Court's, and this Court's, recognition that IEEPA actions may "deal with" a declared emergency by creating leverage in negotiations to resolve the emergency, *Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981); *Yoshida*, 526 F.2d at 579.

Finally, plaintiffs cannot sustain the CIT's entry of a universal injunction. Plaintiffs' repeated resort to the merits disregards the rule that an injunction "does not follow from success on the merits as a matter of course." *Winter v. NRDC*, 555 U.S. 7, 32 (2008). And the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 2025 WL 1773631 (June 27, 2025), which establishes that injunctive relief must be limited to the parties before the court, repudiates any argument for universal relief in this case. The impropriety

of the CIT's universal injunction is particularly clear given the enormously disruptive effect that such an injunction would have on the government's ongoing negotiations with trading partners worldwide.

## ARGUMENT

### I.    IEEPA Authorizes The Challenged Tariffs

#### A.    IEEPA Clearly Authorizes The Reciprocal Tariffs

1.    Plaintiffs advance an argument the CIT did not accept: that IEEPA does not authorize *any* tariffs.  That argument is inconsistent with the statute's text and history and with judicial precedents, as well as Congress's ratification of those precedents in enacting IEEPA.

Tariffs are plainly a way of "control[ling]" imports, "adjust[ing]" them "by rule, method, or established mode," or "subject[ing]" them "to governing principles or laws," *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979). The Supreme Court has long described "[t]he right to regulate commerce … by the imposition of duties," *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 202 (1824), and held more recently that license fees are a means of "'adjust[ing] … imports,'" *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976)—a holding this Court applied to "duties" in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25, 34 (Fed. Cir. 2023).

Congress was well aware in enacting IEEPA that *Yoshida* had construed the relevant language as encompassing the power to "impos[e] an import duty surcharge," *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 576 (C.C.P.A. 1975). And Section 122—a provision that all agree allows tariffs—refers to such tariffs as a means of "restrict[ing] imports," 19 U.S.C. § 2132(a), a phrase closely related to "regulat[ing] … importation," 50 U.S.C. § 1702(a)(1)(B). All that overwhelmingly shows the power to "regulate … importation" includes the power to impose tariffs.

Plaintiffs cannot avoid the obvious implication of Congress's choice to incorporate in IEEPA exactly the language this Court's predecessor had construed broadly in the Trading With the Enemy Act (TWEA). The State plaintiffs criticize *Yoshida*'s reasoning (Br. 49-51), but Congress evidently disagreed: Congress knew of *Yoshida* when it enacted, in IEEPA, the same language *Yoshida* had interpreted. The State plaintiffs implausibly suggest (Br. 47-49) that Congress nonetheless meant for the phrase "regulate … importation" to mean different things in IEEPA and TWEA. But "when Congress 'adopt[s] the language used in [an] earlier act,'" as in IEEPA, courts "presume that Congress 'adopted also the construction given'" to that language. *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270 (2020). Had Congress

- 5 -

meant for IEEPA to withhold the power to impose tariffs that existed under TWEA, Congress would surely not have employed TWEA's language authorizing tariffs.

The private plaintiffs seemingly recognize that the key question is whether the congressional ratification doctrine applies, but they err in arguing (Br. 24) against ratification. Their suggestion that *Yoshida* "did not represent a 'broad and unquestioned' judicial 'consensus'" (*id.*) makes little sense given that this Court's predecessor had exclusive appellate jurisdiction in tariff challenges, as this Court now does, Opening Br. 29-31. *See Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 586 U.S. 123, 131 (2019) (finding significant for ratification that the interpretation was by a court with "'exclusive jurisdiction'"). And their point that Congress did not "'simply reenact [TWEA] without change,'" because it "narrowed the statute's reach" (Br. 24), cuts against them. That Congress enacted exactly the relevant "'language'" from TWEA, *Public.Resource.Org*, 590 U.S. at 270, while modifying the statute in other respects, shows Congress knew how to depart from TWEA when it wanted. As for the private plaintiffs' criticism (Br. 25) of the government's invocation of the House committee report on IEEPA, that report simply shows Congress's awareness of *Yoshida* (which would be "presumed"

anyway, *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)); the report does not independently justify the government's position. Plaintiffs have thus failed to rebut the "presum[ption] that Congress 'adopted … the construction given'" to the relevant language in *Yoshida* when it used that language in IEEPA, *Public.Resource.Org*, 590 U.S. at 270. That alone suffices to reject plaintiffs' position.

Plaintiffs' other arguments also lack merit. *First,* plaintiffs argue that in statutes expressly conferring tariff authority, Congress has "use[d] the word 'tariff' or an equivalent" and "imposed substantive, procedural, or durational limits on" that authority. *V.O.S.* Br. 20; *see Oregon* Br. 40-41. But Congress need not use magic words to authorize tariffs; Section 232, for example, does not use the word "tariff," *see* 19 U.S.C. § 1862, even though it authorizes tariffs, *see, e.g., PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1256 (Fed. Cir. 2021). "[S]tatutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed." *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996). So the fact that IEEPA does not expressly use "tariff" or its synonyms is no basis to misconstrue IEEPA's authorization to "regulate … importation," 50 U.S.C. § 1702(a)(1)(B), as excluding tariff authority.

Furthermore, IEEPA and the National Emergencies Act (NEA) *do* impose "substantive," "procedural," and "durational" limits on the President's powers under § 1702(a)(1)(B). The President may exercise those powers only to address a declared emergency that presents an "unusual and extraordinary threat," 50 U.S.C. § 1701; he must follow specified procedures, *see* Opening Br. 11, 13; and such emergencies terminate automatically after a year unless renewed, 50 U.S.C. § 1622(d).

*Second*, plaintiffs suggest that IEEPA's authorization to "regulate" cannot encompass tariffs because federal agencies' authority to "regulate" does not allow them to tax. *V.O.S.* Br. 21-23; *Oregon* Br. 36-37. But IEEPA does not authorize the President to "regulate" in the abstract; it authorizes him to "regulate … importation," 50 U.S.C. § 1702(a)(1)(B). Tariffs are a long-established, standard way of "regulat[ing] commerce" in international trade. *Gibbons*, 22 U.S. at 202. The natural reading of authority to "regulate … importation" thus encompasses the power to impose tariffs, whereas the meaning of an agency's power to "regulate" depends on context. To cite one of the States' examples (*Oregon* Br. 37), the FDA's authority to "'regulate'" drugs would not naturally encompass the power to tax them, but that is not because the word "regulate" inherently excludes taxes; it is because a context-

sensitive interpretation of the Food, Drug, and Cosmetic Act does not suggest Congress conferred that particular power.

*Third*, the private plaintiffs contend that the constitutional distinction between the "Power To lay and collect Taxes, Duties, Imposts and Excises," U.S. Const. art. I, § 8, cl. 1, and the power "To regulate Commerce," *id.* cl. 3, requires a bright-line distinction between the taxing and commerce powers. *V.O.S.* Br. 23-24. But the Supreme Court has never required such a strict differentiation; many laws upheld as a proper exercise of one congressional power could equally be upheld under a different font of authority.

*Fourth*, plaintiffs suggest that the phrase "regulate … importation" cannot be read to allow tariffs on imports because IEEPA also authorizes the President to "regulate … exportation," 50 U.S.C. § 1702(a)(1)(B), and the Constitution forbids export duties, U.S. Const. art. I, § 9, cl. 5. *V.O.S.* Br. 22; *Oregon* Br. 38. But there is a reason plaintiffs did not make this argument in the CIT and it did not arise in *Yoshida*: Given the constitutional bar against export duties, it is natural to read the President's power to "regulate … importation" as encompassing the power to impose tariffs, while reading the power to "regulate … exportation" as excluding that power.

*Fifth*, the State plaintiffs argue that "if the term 'regulate' encompassed authority to impose tariffs, it would be difficult to square with IEEPA's limitation to 'property in which any foreign country or a national thereof *has* any interest'" (as opposed to "'*has had* any interest'"). *Oregon* Br. 38-39. But that argument rests on the premise that a foreign producer no longer "'*has*'" an interest in property it no longer "own[s]" (*id.* at 38). That premise is mistaken: The phrase "any interest" extends beyond possessory interests. In *Holy Land Foundation v. Ashcroft*, 333 F.3d 156, 162-163 (D.C. Cir. 2003), for example, the D.C. Circuit held that IEEPA allowed the government to block the assets of an organization that raised funds for Hamas, even though Hamas had no "legally protected" interest in the funds, because Hamas had an interest in obtaining such funds in the future. *Id.* at 163. Foreign firms that sell merchandise to domestic importers have a similarly obvious interest in the merchandise they are selling, regardless of whether they own a particular item at the point when tariffs are collected on it.

*Finally*, the State plaintiffs claim (Br. 43-47) that IEEPA's legislative history shows it was enacted "to rein in the use of emergency powers in peacetime." IEEPA—and its counterpart, the NEA—did add some constraints on peacetime emergency powers that TWEA lacked. *See United States v.*

*Amirnazmi*, 645 F.3d 564, 577 (3d Cir. 2011); Opening Br. 10-13. But the Supreme Court has recognized that IEEPA's operative provision, 50 U.S.C. § 1702, provides "essentially the same" powers as TWEA had; IEEPA simply specifies different "conditions and procedures for [the] exercise" of those powers. *Regan v. Wald*, 468 U.S. 222, 228 (1984). Plaintiffs ignore that holding.

2.    Plaintiffs also offer no persuasive defense of the CIT's conclusion that, even if IEEPA authorizes *some* tariffs, it does not authorize the reciprocal tariffs.

To start, plaintiffs have no response to the basic incoherence of construing IEEPA to authorize some tariffs but not others. If the power to "regulate … importation" entails the power to impose tariffs, then IEEPA supplies no textual basis for distinguishing authorized from unauthorized tariffs. That should end the matter: "[T]he judicial inquiry is complete" "where, as here, the words of [a] statute are unambiguous," *Babb v. Wilkie*, 589 U.S. 399, 413 (2020) (quotation marks omitted), and courts generally cannot discern "'implied'" exceptions in a statute that, like this one, "'explicitly enumerates certain exceptions,'" *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001).

Plaintiffs' arguments lack merit for other reasons as well.

a.    Plaintiffs' principal argument is that Section 122 supplies the *exclusive* means by which the President may impose tariffs to address balance-of-payments concerns.  *V.O.S.* Br. 26-39; *Oregon* Br. 10-12, 20-23.  But there is no basis to read Section 122 as eliminating, by implication, a power the President would otherwise possess under IEEPA.

Even if Section 122 had been enacted *after* IEEPA, reading it as "'displac[ing]'" part of the President's authority under IEEPA would be improper unless plaintiffs could overcome the "'strong presumption'" that the statutes "can coexist harmoniously." *Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024).  Plaintiffs cannot carry that "'heavy burden,'" *id.*  Indeed, *Yoshida* articulates how the two statutes coexist:  Congress "said what may be done with respect to *foreseeable* events" in various statutes, including Section 122, and "what may be done with respect to *unforeseeable* events in the TWEA," 526 F.2d at 578 (emphases added), and now in IEEPA.  That is, while Section 122 empowers the President to address non-emergency balance-of-payments concerns, IEEPA supplies a distinct, complementary authority to address emergencies, including but not limited to balance-of-payments concerns.  *Yoshida* rejected the view that when giving the President "broad powers … for periodic use during national emergencies,"

Congress nonetheless "intend[ed] that the President, when faced with such an emergency, must follow limiting procedures prescribed in other acts designed for continuing use during normal times." *Id.* The President is not claiming "'to find secreted in the interstices of' other statutes" a "'grant of power which Congress consciously withheld'" (*V.O.S.* Br. 28); IEEPA is on its face a broad delegation of power to address emergencies.

Plaintiffs err in emphasizing (*V.O.S.* Br. 28, 31, 33-34) Section 122's use of the words "[w]henever" and "shall," 19 U.S.C. § 2132(a). Plaintiffs treat "whenever" as meaning "whenever, even in emergency circumstances." But that reading would cause Section 122 to "'displace[]'" part of IEEPA, rather than allowing them to "coexist harmoniously," as the Supreme Court instructs. *See Kirtz*, 601 U.S. at 63. And the word "shall" precedes the actions the President should take when he identifies an "international payments problem[]," 19 U.S.C. § 2132(a), of the sort covered by Section 122—namely, a non-emergency concern. It does not require the President to proceed under Section 122 rather than IEEPA when he identifies an emergency. Nor does it have any obvious application here, where the concerns the President identified in declaring an emergency arise from trade deficits, which are conceptually distinct from balance-of-payments deficits. *See, e.g.*, S. Rep. No. 93-

1298, at 89 (1974) (Senate report on Section 122, recognizing the possibility of "a large *payments* surplus" at the same time as "a large *trade* deficit").

Nor are plaintiffs helped by the "principle that 'general' statutory language cannot overcome an 'express, specific congressional directive'" (*V.O.S.* Br. 34). The specific-governs-the-general canon most often "applie[s] to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). That is obviously not the case here. Nor is this a case where "a general authorization and a more limited, specific authorization exist side-by-side" such that there is a need to "avoid[] … superfluity" from "a specific provision … [being] swallowed by the general one." *Id.* Here, no superfluity exists. Section 122 fully applies to balance-of-payments tariffs when the President has not declared an emergency and identified an "unusual and extraordinary threat," 50 U.S.C. § 1701; IEEPA supplies additional power to address balance-of-payments concerns when those preconditions are met, and to address other concerns.

Plaintiffs rely (*V.O.S.* Br. 29-32, 35; *Oregon* Br. 47) on a footnote in *Yoshida* stating that surcharges "in response to balance of payments problems" after Section 122's enactment "must, of course, comply with" that provision.

526 F.2d at 582 n.33.  But context is critical.  The footnote (which is dicta) followed a sentence stating that "emergencies are expected to be shortlived." *Id.* at 582.  The footnote observed that "[t]hough the surcharge itself was described by the President as a temporary measure, and … was in effect less than five months," the "declared emergency" that precipitated the surcharge had not yet been terminated.  *Id.* at 582 n.33.  The court then described "the failure to terminate the emergency" as "rendered moot by" Section 122's enactment.  *Id.*  The statement that further surcharges "must … comply with" Section 122 thus reflects the understanding that, given the passage of time, such surcharges would no longer be in the context of a true emergency.  Otherwise, it would make no sense for the court to have recognized that if the President were "faced with … an emergency" he would not need to "follow limiting procedures prescribed in other" provisions, like Section 122, "designed for continuing use during normal times."  *Id.* at 578.

In any event, even if the footnote was suggesting (incorrectly) that the TWEA authority had impliedly been limited by the later enactment of Section 122, that is now irrelevant because Congress enacted IEEPA *after* Section 122 (and *Yoshida*).  As discussed above (at 5-6), it defies credulity to suggest that when Congress enacted IEEPA, using the same language that had been

construed to authorize a balance-of-payments surcharge in TWEA, Congress meant to exclude such authority.

Finally, Section 122's legislative history—which the private plaintiffs invoke, Br. 31—does not help them. Plaintiffs inaccurately paraphrase the Senate committee report on the statute containing Section 122 as saying Congress passed that provision "to provide 'explicit statutory authority' to deal with the type of emergency President Nixon declared in 1971." *V.O.S.* Br. 31. In fact, the report says that Congress wanted the President "to have explicit statutory authority to impose certain restrictions on imports for balance of payments reasons," S. Rep. No. 93-1298, at 88—not that Congress meant for the provision to cover "emergenc[ies]" (*V.O.S.* Br. 31). The report describes Section 122 as necessary given "the recent decision by the United States Customs Court" invalidating the Nixon tariffs—which this Court's predecessor later reversed in *Yoshida*. S. Rep. No. 93-1298, at 88. The natural inference is that, had Congress known the Nixon tariffs would be sustained under TWEA, Congress might never have enacted Section 122. That hardly supports plaintiffs' theory that Section 122 *abrogated* the power that TWEA originally granted and IEEPA now enshrines.

b.    Plaintiffs invoke the major-questions doctrine (*V.O.S.* Br. 46-54; *Oregon* Br. 12-18), but it is inapposite here.  The delegation here is to the President, not an agency; the President's exercise of power under IEEPA is not a novel invocation of an apparently narrow statute; and it is particularly inappropriate to construe narrowly a delegation in the arena of foreign affairs and national security, where the President's expertise and independent constitutional authority are at their apex, *see FCC v. Consumer's Research*, 2025 WL 1773630, at *22 (June 27, 2025) (Kavanaugh, J., concurring).

Plaintiffs focus their major-questions objections on the tariffs' economic effects.  *V.O.S.* Br. 48-51; *Oregon* Br. 12-14.  But economic effects alone are no reason to cabin statutory authority.  What matters is whether there is some basis for "skepticism," *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), that Congress meant for the Executive to make the relevant policy choices.  Here, there is not, as discussed above and in our opening brief.

Plaintiffs observe (*V.O.S.* Br. 50; *Oregon* Br. 14) that no President has invoked IEEPA to impose tariffs.  But the Nixon tariffs were sustained under the identical language of a provision affording "essentially the same" power, *Wald*, 468 U.S. at 228.  And these tariffs fall within a long tradition:  Congress has granted the President broad powers in the international trade context,

and Presidents have exercised those powers in significant ways to bolster the Nation's position in international diplomacy, the global economy, and even international conflicts. *See* Opening Br. 45-46.

Finally, plaintiffs misunderstand why it matters that IEEPA affords the President authority in the foreign-affairs and national-security domains. The point is not that these tariffs fall within the President's inherent Article II powers but that Congress routinely delegates power broadly within these domains, because it "intends to give the President substantial authority and flexibility" in areas within the Executive's core competence. *Consumers' Research*, 2025 WL 1773630, at *23 (Kavanaugh, J., concurring); *see Florsheim Shoe Co. v. United States*, 744 F.2d 787, 792-793 (Fed. Cir. 1984) (presidential authority over duty-free treatment was "intimately involved with foreign affairs, an area in which congressional authorizations of presidential power should be given a broad construction").

c.  Plaintiffs' invocation of the nondelegation doctrine (*V.O.S.* Br. 54-62; *Oregon* Br. 18-20) likewise fails.

Plaintiffs make no attempt to justify the CIT's view that nondelegation concerns warrant its chameleon-like interpretation, under which tariffs sometimes count as "regulat[ing] … importation," 50 U.S.C. § 1702(a)(1)(B),

and sometimes do not. The constitutional-avoidance canon can only justify a "plausible construction" of the statute, *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018), and plaintiffs identify no textually plausible basis for treating some tariffs and not others as "regulat[ing] … importation." Underscoring the point, plaintiffs' main interpretation (*V.O.S.* Br. 63; *Oregon* Br. 38) is the untenable view (*see supra* pp. 4-11) that IEEPA allows no tariffs at all.

In any event, plaintiffs' nondelegation concerns lack merit. The Supreme Court has long recognized that when Congress enacts "legislation which is to be made effective through negotiation and inquiry within the international field," it must afford the President "a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved," *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). Thus, Justice Kavanaugh recently observed that "in the national security and foreign policy realms, the nondelegation doctrine (whatever its scope with respect to domestic legislation) appropriately has played an even more limited role in light of the President's constitutional responsibilities and independent Article II authority." *Consumers' Research*, 2025 WL 1773630, at *22 (Kavanaugh, J., concurring). Plaintiffs note (*V.O.S.* Br. 60-61) that the Supreme Court has applied the nondelegation doctrine in

cases involving tariffs, like *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928), and *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892). But those decisions *upheld* broad delegations of tariff power for the very reasons Justice Kavanaugh just explained. *See* Opening Br. 40.

Regardless, IEEPA would satisfy even plaintiffs' version of the operative nondelegation test. As the Supreme Court recently reiterated, even domestic delegations pass muster so long as Congress "ma[k]e[s] clear both 'the general policy' that the [Executive] must pursue and 'the boundaries of [its] delegated authority,'" and "provide[s] sufficient standards to enable both 'the courts and the public [to] ascertain whether the [Executive]' has followed the law." *Consumers' Research*, 2025 WL 1773630, at *8 (majority opinion). IEEPA clears those bars: It allows the President to exercise certain powers for the specified purpose of "deal[ing] with" "unusual and extraordinary threat[s]" from abroad, 50 U.S.C. § 1701(a), and not other purposes, *id.* § 1701(b), while delimiting exceptions, *id.* § 1702(b), and providing for congressional oversight of both IEEPA actions and the declaration of national emergencies, *see* Opening Br. 11, 13. To the extent judicial review is appropriate where Congress vests the President with broad discretion in the foreign-affairs and national-security context, IEEPA allows that as well.

Every court of appeals to have considered the question has thus upheld IEEPA against nondelegation challenges, *see United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (collecting cases), *cert. denied*, 144 S. Ct. 820 (2024)—as this Court's predecessor did, for IEEPA's predecessor, in *Yoshida*, 526 F.2d at 580-581. The private plaintiffs argue that *Shih*, and the cases discussed in *Shih*, dealt with different "powers explicitly granted by IEEPA" (*V.O.S.* Br. 62), but those decisions' reasoning is not limited to specific parts of IEEPA. *See Shih*, 73 F.4th at 1092; *Amirnazmi*, 645 F.3d at 577; *United States v. Dhafir*, 461 F. 3d 211, 216-217 (2d Cir. 2006); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1093-1094 (4th Cir. 1993).

d. Finally, plaintiffs challenge the President's determination that the situation addressed by the reciprocal tariffs constitutes an emergency of the sort that triggers IEEPA. The CIT did not accept that argument, and this Court should reject it.

The private plaintiffs challenge the President's declaration that the circumstances addressed by the reciprocal tariffs constitute an emergency within the meaning of the NEA. But this Court's predecessor held in *Yoshida* that "courts will not review the bona fides of a declaration of an emergency by the President." 526 F.2d at 581 n.32. *Yoshida* accords with this Court's

subsequent recognition that an inquiry into "the President's motives and justifications for declaring a national emergency … would likely present a non-justiciable political question." *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988); *see also, e.g.*, *Shih*, 73 F.4th at 1092 (applying to IEEPA the principle that "courts must be hesitant to review the executive's declaration of a national emergency"). Indeed, "[a]lthough presidential declarations of emergencies … have been at issue in many cases, *no* court," to our knowledge, "has ever reviewed the merits of such a declaration." *Center for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020).

Plaintiffs further argue that the circumstances here do not constitute an "unusual and extraordinary threat" within the meaning of IEEPA, 50 U.S.C. § 1701(a). But that argument is likewise judicially unreviewable, for two closely related reasons.

*First*, like the determination whether circumstances constitute an "emergency," the determination whether those circumstances constitute an unusual and extraordinary threat "would likely present a nonjusticiable political question," *Chang*, 859 F.2d at 896 n.3. The Supreme Court has recognized that "[m]atters relating 'to the conduct of foreign relations … are so exclusively entrusted to the political branches of government as to be largely

immune from judicial inquiry or interference,'" *Wald*, 468 U.S. at 242 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)), and that caution is amply warranted in second-guessing the President's determination of what constitutes an "unusual and extraordinary threat" to the Nation. Such a determination implicates many of the nonjusticiability factors articulated in *Baker v. Carr*, 369 U.S. 186, 217 (1962), including the absence "of judicially discoverable and manageable standards for" reviewing it; "the impossibility of" doing so "without an initial policy determination of a kind clearly for nonjudicial discretion"; and "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government." Applying these factors, a district court recognized—in a decision this Court approvingly cited in *Chang*, 859 F.2d at 896 n.3—that it "would be an imprudent exercise of judicial review" to second-guess the President's determination about whether something "pose[s] an unusual and extraordinary threat to the United States." *Beacon Prods. Corp. v. Reagan*, 633 F. Supp. 1191, 1194-1195 (D. Mass. 1986), *aff'd on other grounds*, 814 F.2d 1 (1st Cir. 1987).

*Second*, regardless of whether the determination of an "unusual and extraordinary threat" is nonjusticiable in the jurisdictional sense, it is

nonreviewable on the merits because courts cannot substitute their exercise of discretion for the President's.  As the Supreme Court has recognized, "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [judicial] review." *Dalton v. Specter*, 511 U.S. 462, 476 (1994).  And this Court, citing *Dalton*, has explained that a comparable determination by the President—whether "he concurs with a determination by" the Secretary of Commerce "'that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security'"—is unreviewable because it is "committed to the President's discretion."  *USP Holdings*, 36 F.4th at 1362, 1369; *see also PrimeSource*, 59 F.4th at 1263 (this Court "may not second-guess the facts found and measures taken by the President to support his adjustment" of imports under Section 232).  If courts cannot assess whether circumstances constitute a national-security threat, as this Court has held, *USP Holdings*, 36 F.4th at 1362, 1369; *PrimeSource*, 59 F.4th at 1263, they certainly cannot assess whether the threat is "unusual" or "extraordinary."

Plaintiffs do not advance their cause by citing 50 U.S.C. § 1702(c), which states that "[i]n any judicial review of a determination made under this section, if the determination was based on classified

information[,] … such information may be submitted to the reviewing court ex parte and in camera." As an initial matter, "this section" is § 1702, not § 1701, which contains the unusual-and-extraordinary-threat requirement. Section 1702(c) also goes on to state that it "does not confer or imply any right to judicial review." In any event, no one doubts that IEEPA actions are reviewable in some respects—for example, in challenges to an agency's determination that an entity "participate[d] in the prohibited transaction providing the basis for … sanctions," *Strait Shipbrokers Pte. Ltd. v. Blinken*, 2021 WL 4935539, at *4 & n.4 (D.D.C. Sept. 22, 2021), or that an individual is "a significant sponsor of a transnational criminal organization," *Rakhimov v. Gacki*, 2020 WL 1911561, at *6 (D.D.C. Apr. 20, 2020)—and in those circumstances the government may justify the determination with classified evidence. But that process hardly implies courts can review the President's determination of an emergency or an unusual and extraordinary threat.

The impropriety of judicial review is bolstered by Congress's provision for its own periodic review of emergencies under the NEA and actions under IEEPA, *see* Opening Br. 11, 13. Congress's choice to reserve for itself the power to terminate emergencies by joint resolution, 50 U.S.C. § 1622, strongly suggests Congress envisioned control by a coordinate political

branch—not by the Judiciary, which is least equipped to address questions of this nature—as the appropriate check on the President's exercise of power in this domain.

Even if plaintiffs' arguments were reviewable, they would lack merit. Plaintiffs claim that the circumstances addressed by the reciprocal tariffs are not an "emergency" (according to the private plaintiffs) or an "unusual and extraordinary threat" (according to all plaintiffs) because trade deficits are "commonplace" and "'persistent.'" *V.O.S.* Br. 40-42; *see Oregon* Br. 25-29. But as the executive order declaring the emergency explains, in a passage plaintiffs fail to mention, "annual U.S. goods trade deficits"—while historically "large and persistent"—"have grown by over 40 percent in the past 5 years alone." Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,044 (Apr. 7, 2025). And the President found that these deficits have "atroph[ied]" our Nation's "domestic production capacity," such that the United States's "military readiness" and "national security posture" are "compromise[d]"—an "especially acute" problem given "the recent rise in armed conflicts abroad." 90 Fed. Reg. at 15,044-15,045. The scope and gravity of the current problem—much worse than before—are what constitutes the emergency and the unusual and extraordinary threat identified by the President.

That comports with past emergency declarations. Across administrations, Presidents have declared emergencies to address conditions that are not new. *See, e.g.*, Exec. Order No. 14,078, 87 Fed. Reg. 43,389, 43,389 (July 21, 2022) (identifying "hostage-taking and the wrongful detention of United States nationals abroad" as an unusual and extraordinary threat and declaring an emergency to deal with it); Exec. Order No. 13,818, 82 Fed. Reg. 60,839, 60,839 (Dec. 26, 2017) (same, as to "serious human rights abuse and corruption around the world"); Exec. Order No. 12,868, 58 Fed. Reg. 51,749, 51,749 (Oct. 4, 1993) (same, as to "the proliferation of nuclear, biological and chemical weapons"); Exec. Order No. 12,532, 50 Fed. Reg. 36,861, 36,861 (Sept. 10, 1985) (same, as to South Africa's decades-old "policy and practice of apartheid"). The determination here is no different.

**B.  IEEPA Clearly Authorizes The Trafficking-Related Tariffs**

The State plaintiffs—the only plaintiffs challenging the trafficking-related tariffs—all but abandon any defense of the CIT's conclusion that those tariffs do not "deal with" the declared emergency. *See Oregon* Br. 29-32. Nor do they explain how courts could meaningfully review whether tariffs "deal

with" a declared emergency—an issue committed to the President's discretion and thus immune from judicial scrutiny, *see Dalton*, 511 U.S. at 476.

Congress and the President have long used their powers to control international trade as indirect means to a host of foreign-relations ends, in contexts ranging from the Non-Intercourse Act of 1809 to the freezing of Iranian assets in response to the hostage crisis at the American Embassy in Tehran. *See* Opening Br. 13-14, 45-46. The Supreme Court explicitly stated that asset-blocking orders under IEEPA "serve as a 'bargaining chip' to be used by the President" "in negotiating the resolution of a declared national emergency," *Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981), and *Yoshida* likewise explained that the Nixon tariffs worked in part by "exert[ing]" "[p]ressure" on other nations, 526 F.2d at 579.

Plaintiffs do not dispute that the trafficking-related tariffs here "deal with" the related emergencies, 50 U.S.C. § 1701(a), in a similar way. They simply suggest the Supreme Court and this Court's predecessor were wrong to think that IEEPA actions can properly serve to exert pressure to enhance the United States's bargaining position in negotiations over the resolution of a foreign threat. But the Supreme Court's understanding of the law cannot properly be disregarded, as plaintiffs suggest, on the ground that the case in

question was "decided on an exceptionally expedited schedule" (*Oregon* Br. 31). Nor do plaintiffs account for the broad meaning of the phrase "deal with" in this context: "'to take action with regard to,'" *Public Citizen v. Federal Motor Carrier Safety Admin.*, 374 F.3d 1209, 1221 (D.C. Cir. 2004).

Plaintiffs also suggest that treating the creation of leverage as a way of "deal[ing] with" an emergency would "essentially read the 'deal with' and 'not … for any other purpose' requirements out of IEEPA." *Oregon* Br. 30. That is difficult to understand. No one suggests the requirement for IEEPA actions to "deal with" the declared concern is not genuine. The question is simply whether actions under IEEPA can "deal with" a concern only through "a direct link between an act and the problem it purports to address," as the CIT concluded, Appx44-45, or whether they can "deal with" a concern by creating leverage in negotiations over its resolution.

Finally, plaintiffs invoke the major-questions and nondelegation doctrines on this point, too. *Oregon* Br. 31. But they fail to explain how the understanding of IEEPA articulated in *Dames & Moore* and *Yoshida*—one that recognizes the creation of leverage as a proper function of actions under IEEPA—would violate those doctrines. It is not difficult to imagine that Congress meant for the President to use his IEEPA powers as a tool to create

leverage, just as Congress and the President have long done in other international-trade contexts, and as discussed above, Congress has sufficiently guided the President's exercise of that power to satisfy the nondelegation doctrine.

## II.  The CIT Abused Its Discretion In Entering An Injunction

The CIT erred in entering a permanent injunction without conducting the equitable analysis required by *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Opening Br. 60-61.  Moreover, the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 2025 WL 1773631 (June 27, 2025), confirms the CIT further erred in entering a universal injunction barring collection of the challenged tariffs based on injuries to five businesses and four States.

Plaintiffs urge the Court to collapse the merits with the equitable factors.  *See Oregon* Br. 52; *V.O.S.* Br. 68-69.  But "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."  *Winter v. NRDC*, 555 U.S. 7, 32 (2008).

Thus, a court must consider not only any irreparable injury to a plaintiff that cannot be remedied by a refund or other legal remedy, but also "the balance of hardships" between the parties and "the public interest."  *eBay*, 547 U.S. at 391.  And here, the equitable case against injunctive relief is

overwhelming. Declarations from four Cabinet officials explain the devastating effect that an injunction would have on the Nation's position in ongoing trade negotiations and, by extension, on foreign policy and national security. Opening Br. 62-63.

Plaintiffs try to cast doubt on those sworn statements by selectively quoting public comments by various administration officials, made after the CIT's decision, that negotiations have continued and that other statutory tariff authorities remain available. *Oregon* Br. 54-55; *V.O.S.* Br. 69-70. But those arguments mischaracterize the statements and largely ignore that this Court *stayed* the CIT's injunction, allowing negotiations to continue. Nor can plaintiffs seriously dispute that a decision affirming the CIT's injunction and terminating the stay would undermine those negotiations, which could fail or produce less favorable terms where trading partners have "reduced incentives to reach meaningful agreements." Appx453. Moreover, as Secretary Lutnick explained (Appx457-460), IEEPA provides the most flexible, effective means for addressing the emergencies the President has declared. *See* Appx466. The President's option to impose tariffs under alternative, more restrictive statutory authorities would not meaningfully mitigate the effects of an injunction against the exercise of his IEEPA powers.

Moreover, plaintiffs fail to justify the CIT's grant of universal relief. The CIT's belief that there was "no question here of narrowly tailored relief" because "if the challenged Tariff Orders are unlawful as to Plaintiffs they are unlawful as to all," Appx48, is repudiated by *CASA*, which explains that "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*," 2025 WL 1773631, at *11.

*CASA* also forecloses plaintiffs' argument (*V.O.S.* Br. 72) that it "would be unconstitutional for a court" to confer party-specific relief because the Constitution requires that "all Duties, Imposts and Excises shall be uniform throughout the United States," U.S. Const. art. I, § 8, cl. 1. Plaintiffs apparently believe a universal injunction is mandatory in *every* case involving tariffs—or, indeed, every case implicating a constitutional requirement of uniformity, *cf. id.* cl. 4 (naturalization, bankruptcy). Plaintiffs cite no authority for that remarkable proposition. The uniformity requirement constrains Congress's legislative powers. Opening Br. 66. By contrast, the federal courts' equitable power derives from the Judiciary Act and is limited to

providing relief to the parties before the court. *CASA*, 2025 WL 1773631, at *6-8.

Plaintiffs alternatively contend that a universal injunction is necessary to give them "complete relief." *V.O.S.* Br. 71; *Oregon* Br. 57. That argument depends on a theory of harm the CIT did not endorse. Plaintiffs' payment of allegedly unlawful tariffs would be completely remedied by a refund or party-specific injunction. To support universal relief, plaintiffs assert the generalized injury that "vendors … will raise prices due to the tariffs" (*Oregon* Br. 57) or that "businesses" of their "customers" will be affected, reducing plaintiffs' sales (*V.O.S.* Br. 71). But the CIT declined to decide whether such assertions were sufficient to establish standing, Appx23, perhaps recognizing that if they were, then *any* business or individual affected by asserted price increases would have standing to challenge the tariffs. And in a related challenge to these tariffs, the CIT concluded that allegations that the plaintiff would "suffer an economic injury" through "an increase in the cost of product prices paid by consumers" failed to establish standing. *Barnes v. United States*, 2025 WL 1483384, at *5 (Ct. Int'l Trade May 23, 2025). Here, the CIT found standing only for plaintiffs who had already paid tariffs, alleged they would do so in the near future, or offered evidence of "the

prohibitively high price of operationally necessary components" or "stoppage of orders and product production" to avoid tariffs. Appx22.

The CIT's misunderstanding of equitable power meant that it never considered whether the sweeping relief it ordered would be necessary to provide plaintiffs with complete relief. But even if it had, and even assuming plaintiffs' more attenuated harms were cognizable, it would have had to confront another principle plaintiffs ignore: that "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *CASA*, 2025 WL 1773631, at *12. Thus, "'the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be.'" *Id.* Even if the harms to the government and the public interest from an injunction were insufficient to preclude an injunction, they would certainly foreclose a universal injunction that covers every importation in the United States based on attenuated claims that those importations might have some downstream effect on the prices plaintiffs pay.

## CONCLUSION

The CIT's judgment should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

MICHAEL S. RAAB
BRAD HINSHELWOOD

*/s/ Daniel Winik*
DANIEL WINIK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*
  *Daniel.L.Winik@usdoj.gov*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Circuit Rule 32(b)(1) because it contains 6,991 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik