## Nos. 2025-1812, -1813

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

————————————

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, UNITED STATES CUSTOMS AND BORDER PROTECTION,

Defendants-Appellants.

————————————

THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF VERMONT,

Plaintiffs-Appellees,

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for U.S. Customs and Border Protection, UNITED STATES,

Defendants-Appellants.

————————————

On Appeal from the United States Court of International Trade
Nos. 25-66, -77, Judges Katzmann, Reif, and Restani

————————————

## JOINT APPENDIX

————————————

BRETT A. SHUMATE
*Assistant Attorney General*

*Signature block continued
on inside cover*

MICHAEL S. RAAB
BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

# TABLE OF CONTENTS

Court of International Trade Opinion.......................................................... Appx1

Court of International Trade Judgment................................................. Appx59

Court of International Trade Order on Stay Motions.......................... Appx62

*VOS v. United States* Docket, No. 25-cv-66 ............................................ Appx67

*Oregon v. DHS* Docket, No. 25-cv-77 ...................................................... Appx85

Complaint, *V.O.S.* Dkt. 2........................................................................ Appx102

Exhibits to Motion for a Preliminary Injunction or Summary
    Judgment, *V.O.S.* Dkt. 10 .................................................................. Appx127

Exhibits to Reply in Support of Motion for a Preliminary
    Injunction or Summary Judgment, *V.O.S.* Dkt. 35........................ Appx154

Notice of Appeal, *V.O.S.* Dkt. 57 .......................................................... Appx162

Complaint, *Oregon* Dkt. 2....................................................................... Appx165

Selected Exhibits to Motion for a Preliminary Injunction,
    *Oregon* Dkt. 14...................................................................................... Appx203

Exhibit to Reply in Support of Summary Judgment,
    *Oregon* Dkt. 47...................................................................................... Appx434

Additional Exhibits to Response in Opposition to Motion
    for a Preliminary Injunction or Summary Judgment,
    *V.O.S.* Dkt. 53...................................................................................... Appx445

Notice of Appeal, *Oregon* Dkt. 67 ........................................................ Appx469

Exhibit to Response to Motion for a Stay Pending Appeal,
    *Oregon* Dkt. 72...................................................................................... Appx472

Slip Op. 25-66

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE; MICROKITS, LLC; FISHUSA INC.; and TERRY PRECISION CYCLING LLC;** | |
| **Plaintiffs,** | |
| **v.** | |
| **THE UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; and HOWARD LUTNICK, in his official capacity as Secretary of Commerce;** | **Before: Gary S. Katzmann, Judge**<br>    **Timothy M. Reif, Judge**<br>    **Jane A. Restani, Judge**<br><br>**Court No. 25-00066** |
| **Defendants.** | |
| **THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE STATE OF ILLINOIS, THE STATE OF MAINE; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; and THE STATE OF VERMONT;** | **Before: Gary S. Katzmann, Judge**<br>    **Timothy M. Reif, Judge**<br>    **Jane A. Restani, Judge** |
| **Plaintiffs,** | **Court No. 25-00077** |
| **v.** | |

> **UNITED STATES DEPARTMENT OF**
> **HOMELAND SECURITY; KRISTI NOEM,**
> **in her official capacity as Secretary of the**
> **Department of Homeland Security; U.S.**
> **CUSTOMS AND BORDER PROTECTION;**
> **PETE R. FLORES in his official capacity as**
> **Acting Commissioner for United States**
> **Customs and Border Protection; and THE**
> **UNITED STATES OF AMERICA;**
>
> **Defendants.**

## OPINION

[ The court grants Plaintiffs' Motions for Summary Judgment and denies Plaintiffs' Motions for Preliminary Injunction as moot. ]

Dated: <u>May 28, 2025</u>

<u>Jeffrey M. Schwab</u>, Liberty Justice Center, of Austin, Tex., argued for Plaintiffs V.O.S. Selections, Inc; Plastic Services and Products, LLC d/b/a Genova Pipe; MicroKits, LLC; FishUSA Inc.; and Terry Precision Cycling LLC. With him on the briefs were <u>Reilly Stephens</u>, <u>James McQuaid</u>, <u>Bridget F. Conlan</u>, and <u>Ilya Somin</u>, Antonin Scalia Law School, George Mason University, of Arlington, Vir.

<u>Brian Simmonds Marshall</u>, Senior Assistant Attorney General, Oregon Department of Justice, of Portland, Or., argued for Plaintiffs The State of Oregon, The State of Arizona, The State of Colorado, The State of Connecticut, The State of Delaware, The State of Illinois, The State of Maine, The State of Minnesota, The State of Nevada, The State of New Mexico, The State of New York, and The State of Vermont. With him on the briefs were <u>Dan Rayfield</u>, Attorney General of State of Oregon, <u>Benjamin Gutman</u>, Solicitor General, <u>Dustin Buehler</u>, Special Counsel, <u>Christopher A. Perdue</u>, <u>Leigh Salmon</u>, and <u>Nina R. Englander</u>, Senior Assistant Attorneys General, <u>YoungWoo Joh</u> and <u>Alexander C. Jones</u>, Assistant Attorneys General, of the State of Oregon; <u>Kristin K. Mayes</u>, Attorney General of the State of Arizona, <u>Joshua D. Bendor</u>, Solicitor General, <u>Syreeta A. Tyrell</u>, Senior Litigation Counsel, of the State of Arizona; <u>Keith Ellison</u>, Attorney General of the State of Minnesota and <u>Peter J. Farrell</u>, Deputy Solicitor General of the State of Minnesota; <u>Philip J. Weiser</u>, Attorney General of the State of Colorado and <u>Sarah H. Weiss</u>, Senior Assistant Attorney General of the State of Colorado; <u>William Tong</u>, Attorney General of the State of Connecticut, and <u>Michael K. Skold</u>, Solicitor General of the State of Connecticut; <u>Kathleen Jennings</u>, Attorney General of the State of Delaware, and <u>Ian R. Liston</u>, Director of Impact Litigation, <u>Vanessa L. Kassab</u>, Deputy Attorney General of the Delaware Department of Justice; <u>Aaron D. Ford</u>, Attorney General of the State of Nevada, and <u>Heidi Parry Stern</u>, Solicitor General

of the Office of the Nevada Attorney General; <u>Raúl Torrez</u>, Attorney General of the State of New Mexico, <u>James W. Grayson</u>, Chief Deputy Attorney General, and <u>Amy Senier</u>, of the New Mexico Department of Justice; <u>Letitia James</u>, Attorney General of the State of New York, <u>Rabia Muqaddam</u>, Special Counsel for Federal Initiatives, and <u>Mark Ladov</u>, Special Counsel, of the State of New York; <u>Kwame Raoul</u>, Attorney General of the State of Illinois, <u>Cara Hendrickson</u>, Assistant Chief Deputy Attorney General, and <u>Gretchen Helfrich</u>, Deputy Chief, Special Litigation Bureau of the Office of the Illinois Attorney General; <u>Aaron M. Frey</u>, Attorney General of the State of Maine, and <u>Vivian A. Mikhail</u>, Deputy Attorney General, of the State of Maine; and <u>Charity R. Clark</u>, Attorney General of the State of Vermont, and <u>Ryan P. Kane</u>, Deputy Solicitor General of the State of Vermont.

<u>Eric J. Hamilton</u>, Deputy Assistant Attorney General, U.S. Department of State, of Washington, D.C., argued for Defendants The United States Of America; U.S. Customs and Border Protection; Pete R. Flores in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; Jamieson Greer, in his official capacity as United States Trade Representative; Office of the United States Trade Representative; and Howard Lutnick, in his official capacity as Secretary of Commerce.  With him on the briefs were <u>Yaakov M. Roth</u>, Acting Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Claudia Burke</u>, Deputy Director, <u>Justin R. Miller</u>, Attorney-in-Charge, International Trade Office, and <u>Sosun Bae</u>, Senior Trial Counsel.  Of counsel, <u>Alexander K. Haas</u>, Director, and <u>Stephen M. Elliott</u>, Assistant Director, U.S. Department of Justice, Civil Division, Federal Programs Branch, of Washington D.C; and <u>Luke Mathers</u> and <u>Blake W. Cowman</u>, Trial Attorneys, U.S. Department of Justice Civil Division, Commercial Litigation Branch, of Washington, D.C.

<u>Brett A. Shumate</u>, Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendants U.S. Department of Homeland Security; Kristi Noem, in her official capacity as Secretary of the Department of Homeland Security; U.S. Customs and Border Protection; Pete R. Flores in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and the United States.  With him on the briefs were <u>Yaakov M. Roth</u>, Acting Assistant Attorney General, <u>Eric J. Hamilton</u>, Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Claudia Burke</u>, Deputy Director, <u>Justin R. Miller</u>, Attorney-in-Charge, International Trade Office, <u>Sosun Bae</u>, Senior Trial Counsel, <u>Luke Mathers</u>, <u>Catherine M. Yang</u>, <u>Blake W. Cowman</u>, and <u>Collin T. Mathias</u>, trial attorneys.  Of counsel, <u>Alexander K. Haas</u>, Director, and <u>Stephen M. Elliott</u>, Assistant Director, U.S. Department of Justice, Civil Division, Federal Programs Branch, of Washington D.C.

 <u>Per Curiam</u>:  The Constitution assigns Congress the exclusive powers to "lay and collect

Taxes, Duties, Imposts and Excises," and to "regulate Commerce with foreign Nations."  U.S.

Const. art. I, § 8, cls. 1, 3.  The question in the two cases before the court is whether the

International Emergency Economic Powers Act of 1977 ("IEEPA") delegates these powers to the

President in the form of authority to impose unlimited tariffs on goods from nearly every country

Court Nos. 25-00066 & 25-00077                                                    Page 4

in the world.  The court does not read IEEPA to confer such unbounded authority and sets aside the challenged tariffs imposed thereunder.

## BACKGROUND

### I.      Legal Background

#### A.      The Constitution

While "Congress . . . may not transfer to another branch powers which are strictly and exclusively legislative . . . Congress . . . may confer substantial discretion . . . to implement and enforce the laws." Gundy v. United States, 588 U.S. 128, 135 (2019) (internal quotation marks and citation omitted).  Thus, courts have consistently upheld statutory delegations as long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise that authority] is directed to conform." Mistretta v. United States, 488 U.S. 361, 372 (1989) (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)). This reflects the idea that in modern government, "[t]he legislative process would frequently bog down if Congress were constitutionally required to appraise before-hand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation." American Power & Light Co. v. SEC, 329 U.S. 90, 105 (1946).

#### B.      Tariffs

Early in the nation's history, tariffs were a key means by which the federal government raised money to pay wages and to fund the national debt.  See John M. Dobson, Two Centuries of Tariffs: The Background and Emergence of the U.S. International Trade Commission 6 (U.S. Int'l Trade Comm'n 1976).  The revenue-raising purpose of tariffs has declined significantly since the ratification of the Sixteenth Amendment in 1913 permitted the imposition of income taxes.  See id. at 1, 70.  Since then, and with the increasing complexity and interconnectedness of the global

Court Nos. 25-00066 & 25-00077                                        Page 5

economic landscape, tariffs have served more diverse purposes including restricting the
importation of certain goods, protecting American industry, and leveraging negotiations with
foreign counterparts.  See, e.g., id. at 80 (describing the use of tariffs to restrict Japanese textile
imports).

    As global economic relations grew in volume and complexity, Congress saw a need for
specialized, nonpartisan assistance in administering tariffs.  See id. at 87.  Congress accordingly
passed legislation creating the United States Tariff Commission, later renamed the United States
International Trade Commission ("ITC").  See id.; Revenue Act of 1916, Pub. L. 64-271,
§§ 700–09, 39 Stat. 756, 795–98.  To provide this assistance, the Commission "shall have the
power to investigate the tariff relations between the United States and foreign countries,
commercial treaties, . . . the volume of importations compared with domestic production and
consumption, and conditions, causes, and effects relating to competition of foreign industries with
those of the United States."  19 U.S.C. § 1332.  The ITC is responsible for maintaining the United
States Harmonized Tariff Schedule ("HTSUS"), which sets tariff rates for all merchandise
imported into the United States.  See id. § 1202.  The HTSUS itself "is indeed a statute but is not
published physically in the United States Code."  Libas, Ltd. v. United States, 193 F.3d 1361, 1364
(Fed. Cir. 1999).  Congress's enactment of the HTSUS provided that its terms "shall be considered
to be statutory provisions of law for all purposes."  Omnibus Trade and Competitiveness Act of
1988, Pub. L. No. 100-418, § 1204(c)(1), 102 Stat. 1107, 1149.

    In addition to forming the ITC, Congress has responded to the growing complexity of
global economic relations by delegating trade authority to the President.  These delegations have
included clear limitations that retain legislative power over the imposition of duties and over

Court Nos. 25-00066 & 25-00077                                          Page 6

foreign commerce.  See, e.g., Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 305

(1933) ("What is done by the Tariff Commission and the President in changing the tariff rates to

conform to new conditions is in substance a delegation, though a permissible one, of the legislative

process.").

> For example, in 1962, Congress delegated to the President the power to take action to adjust

imports when the Secretary of Commerce finds that an "article is being imported into the United

States in such quantities or under such circumstances as to threaten to impair the national security."

Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232(b), 76 Stat. 872, 877 (codified as

amended at 19 U.S.C. § 1862(c)(1)(A)).  This delegation is conditioned upon an investigation and

findings by the Secretary of Commerce, and agreement by the President.  See id.  Section 301 of

the Trade Act of 1974, as amended, requires that the U.S. Trade Representative ("USTR") take

action, which may include imposing tariffs, where "the rights of the United States under any trade

agreement are being denied" or "an act, policy, or practice of a foreign country" is "unjustifiable

and burdens or restricts United States commerce."  19 U.S.C. § 2411(a)(1)(A)–(B).  The USTR

may impose duties also where the USTR determines that "an act, policy, or practice of a foreign

country is unreasonable or discriminatory and burdens or restricts United States commerce."  Id.

§ 2411(b)(1).  This power is conditioned on extensive procedural requirements including an

investigation that culminates in an affirmative finding that another country imposed unfair trade

barriers under § 2411(a)(1)(A) or (B) or § 2411(b), and a public notice and comment period.  See

id. § 2414(b).

Court Nos. 25-00066 & 25-00077                                                Page 7

### C.    *Presidential Authority to Regulate Importation During National Emergencies*

In 1917, Congress passed the Trading with the Enemy Act ("TWEA") to grant the President powers to regulate international transactions with enemy powers following the entry of the United States into World War I.  <u>See</u> Trading with the Enemy Act, Pub. L. No. 65-91, § 2, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. §§ 4301 to 4341); <u>see also</u> Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45168, <u>The International Emergency Economic Powers Act: Origins, Evolution, and Use</u> 2–3 (2024).  The Great Depression then led Congress to expand the President's authority under TWEA to declare states of emergency and exercise authority over international trade even outside times of war.    <u>See</u> Emergency Banking Relief Act, Pub. L. No. 73-1, § 2, 48 Stat. 1, 1–2 (1933) (amending TWEA).  TWEA, as amended, grants the President the broad authority to "regulate . . . importation or exportation of . . . any property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 4305(b)(1)(B).

In 1974, the United States Customs Court, the predecessor to the United States Court of International Trade, heard a challenge to President Nixon's imposition of a supplemental duty on all dutiable merchandise imported into the United States.  <u>See</u> <u>Yoshida Int'l, Inc. v. United States</u>, 378 F. Supp. 1155 (1974) ("<u>Yoshida I</u>"); <u>see also</u> Proclamation No. 4074, <u>Imposition of Supplemental Duty for Balance of Payments Purpose</u>, 85 Stat. 926 (Aug. 15, 1971).  The Government argued that President Nixon's actions were lawfully authorized by TWEA.  <u>Yoshida I</u>, 378 F. Supp. at 1157.  The U.S. Customs Court construed TWEA "so as to preserve its constitutionality" and held that TWEA "precludes the President from laying the supplemental duties provided by [President Nixon]."  <u>Id.</u> at 1173.  The United States Court of Customs and Patent Appeals, the predecessor to the United States Court of Appeals for the Federal Circuit

Court Nos. 25-00066 & 25-00077                                              Page 8

("Federal Circuit"), reversed the lower court's decision, holding that President Nixon's duties were "within the power constitutionally delegated to him." United States v. Yoshida Int'l. Inc., 526 F.2d 560, 584 (C.C.P.A. 1975) ("Yoshida II"). The court reasoned that "Congress, in enacting [TWEA], authorized the President, during an emergency, to exercise the delegated substantive power, i.e., to 'regulate importation,' by imposing an import duty surcharge or by other means appropriately and reasonably related . . . to the particular nature of the emergency declared." Id. at 576.

Shortly after this decision and following a review by a Senate bipartisan special committee, Congress reformed the President's emergency powers. As part of this reform, Congress cabined the President's powers under TWEA to wartime. See Amendments to the Trading with the Enemy Act, Pub. L. No. 95-223, § 101–03, 91 Stat. 1625, 1625–26 (1977) ("[TWEA] is amended by striking out 'or during any other period of national emergency declared by the President' in the text preceding subparagraph (A)."). Congress also enacted a new statute, IEEPA, to confer "upon the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to more procedural limitations, including those of the National Emergencies Act." Comm. on Int'l Rels., Trading with the Enemy Act Reform Legislation, H.R. Rep. No. 95-459, at 2 (1977); see also International Emergency Economic Powers Act, Pub. L. No. 95-223, § 201–08, 91 Stat. 1625, 1626–29 (1977) (codified as amended at 50 U.S.C. §§ 1701–10). Congress drew much of the relevant language in IEEPA from TWEA, including language authorizing the President to "regulate . . . importation . . . of . . . any property in which any foreign country or a national thereof has any interest by any person . . . subject to the jurisdiction of the United States . . . ." 50 U.S.C. § 1702(a)(1)(B). In full, the relevant provision

of IEEPA provides that the President may:

>    (A) investigate, regulate, or prohibit—
>
>    >    (i) any transactions in foreign exchange,
>    >
>    >    (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
>    >
>    >    (ii) the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States;
>
>    (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

Id. § 1702.  IEEPA further provides that these authorities "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose."  Id. § 1701(b).

### D.    The National Emergencies Act

As part of Congress's reform of the President's emergency powers and in addition to amending TWEA and enacting IEEPA, Congress enacted the National Emergencies Act ("NEA") in 1976.  See National Emergencies Act, Pub. L. No. 94-412, § 201, 90 Stat. 1255, 1255–56 (1976) (codified as amended at 50 U.S.C. § 1622).  That act provided for the termination of all existing emergencies in 1978, except those making use of TWEA, and placed new restrictions on the declaration of emergencies.  Id.  First, the NEA requires the President to transmit to Congress a notification of the declaration of a national emergency.  Id.  Second, the act requires a biannual review whereby "each House of Congress shall meet to consider a vote on a . . . resolution to

Court Nos. 25-00066 & 25-00077                                                                    Page 10

determine whether that emergency shall be terminated." Id.  At the time of its enactment in 1976,

the NEA afforded Congress the means to terminate a national emergency by adopting a concurrent

resolution in each chamber.  See id.  However, the Supreme Court later found Congress's use of

unicameral legislative vetoes, which terminated executive determinations without presentment, to

be unconstitutional.  See INS v. Chadha, 462 U.S. 919 (1983).  Congress subsequently amended

the NEA to require a joint resolution rather than a concurrent resolution to align the statutory

scheme with the implicit logic of Chadha.  See Foreign Relations Authorization Act, Fiscal Years

1986 and 1987, Pub. L. No. 99-93, § 801, 98 Stat. 405, 448 (1985) (codified as amended at 50

U.S.C. § 1622).  Following Chadha, congressional action terminating a national emergency is still

subject to presidential veto, making congressional review no more than the ordinary power to

legislate.

## II.     Factual Background

Since taking office on January 20, 2025, the President has declared several national

emergencies and imposed various tariffs in response.  The President has subsequently issued a

number of pauses and modifications to those tariffs, as outlined in detail below.

### A.     Trafficking Tariffs

On the date of his inauguration, the President issued Executive Order 14157, declaring a

national emergency under IEEPA to deal with the threats posed by international cartels that "have

engaged in a campaign of violence and terror throughout the Western Hemisphere that has not

only destabilized countries with significant importance for our national interests but also flooded

the United States with deadly drugs, violent criminals, and vicious gangs."  Executive Order

14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and

Specially Designated Global Terrorists, 90 Fed. Reg. 8439, 8439 (Jan. 20, 2025).  The President

Court Nos. 25-00066 & 25-00077                                                    Page 11

issued Proclamation 10886 on the same day, declaring a national emergency at the southern border caused by "cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans." Proclamation 10886, Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025).

    Shortly thereafter, the President expanded the national emergency "to cover the threat to the safety and security of Americans, including the public health crisis of deaths due to the use of fentanyl and other illicit drugs, and the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." Executive Order 14193, Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9113, 9114 (Feb. 1, 2025) ("Canada Tariff Order"). Similarly, the President expanded the national emergency "to cover the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9121, 9122 (Feb. 1, 2025) ("China Tariff Order").

    In response to these emergencies, the President imposed 25 percent ad valorem duties on articles that are products of Canada and Mexico, see Executive Order 14193, 90 Fed. Reg. at 9114; Executive Order 14194, Imposing Duties to Address the Situation at Our Southern Border, 90 Fed. Reg. 9117, 9118 (Feb. 1, 2025) ("Mexico Tariff Order"), and a 10 percent ad valorem duty on articles that are the products of China, see Executive Order 14195, 90 Fed. Reg. at 9122. The President imposed a lower 10 percent ad valorem rate on energy and energy resources from

Court Nos. 25-00066 & 25-00077                                                      Page 12

Canada.  <u>See</u> Executive Order 14193, 90 Fed. Reg. at 9114.  These duties were to take effect on

February 4, 2025.  <u>See</u> <u>id.</u>  The President later raised the trafficking tariffs on Chinese products

from 10 percent to 20 percent.  <u>See</u> Executive Order 14228, <u>Further Amendment to Duties</u>

<u>Addressing the Synthetic Opioid Supply Chain in the People's Republic of China</u>, 90 Fed. Reg.

11463, 11463 (Mar. 3, 2025).

    On February 3, shortly after imposing the trafficking tariffs, the President issued two

additional executive orders, finding that the governments of Mexico and Canada "ha[ve] taken

immediate steps designed to alleviate the illegal migration and illicit drug crisis through

cooperative actions."  Executive Order 14198, <u>Progress on the Situation at Our Southern Border</u>,

90 Fed. Reg. 9185, 9185 (Feb. 3, 2025); Executive Order 14197, <u>Progress on the Situation at Our</u>

<u>Northern Border</u>, 90 Fed. Reg. 9183, 9183 (Feb. 3, 2025).  As a result, the President imposed a

pause on the 25 percent duties on Mexican and Canadian products and on the 10 percent duties on

Canadian energy and energy resources, moving the effective date of those duties to March 4, 2025.

<u>See</u> <u>id.</u>

    Since the trafficking tariffs took effect on February 4 for China and March 4 for Canada

and Mexico, the President has modified the rates further.  The President lowered the duty rate for

potash[1] from Canada and Mexico to 10 percent.  <u>See</u> Executive Order 14231, <u>Amendment to</u>

<u>Duties To Address the Flow of Illicit Drugs Across Our Northern Border</u>, 90 Fed. Reg. 11785,

11785 (Mar. 6, 2025); Executive Order 14232, <u>Amendment to Duties To Address the Flow of</u>

---

[1] Potash is a soluble source of potassium and is primarily used as an agricultural fertilizer.  <u>See</u>
National Minerals Information Center, <u>Potash Statistics and Information</u>, U.S. Geological Service,
https://www.usgs.gov/centers/national-minerals-information-center/potash-statistics-and-
information (last visited May 28, 2025).

Court Nos. 25-00066 & 25-00077                                                    Page 13

Illicit Drugs Across Our Southern Border, 90 Fed. Reg. 11787, 11787 (Mar. 6, 2025).

Additionally, the President implemented duty-free de minimis treatment for otherwise eligible

covered articles.  See Executive Order 14226, Amendment to Duties to Address the Flow of Illicit

Drugs Across Our Northern Border, 90 Fed. Reg. 11369, 11369 (Mar. 2, 2025); Executive Order

14227, Amendment to Duties to Address the Situation at Our Southern Border, 90 Fed. Reg.

11371, 11371 (Mar. 2, 2025); Executive Order 14200, Amendment to Duties Addressing the

Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9277, 9277 (Feb.

5, 2025).  The President later removed this duty-free de minimis treatment for Chinese products.

See Executive Order 14256, Further Amendment to Duties Addressing the Synthetic Opioid

Supply Chain in the People's Republic of China as Applied to Low-Value Imports, 90 Fed. Reg.

14899, 14899 (Apr. 2, 2025).

        Currently, the trafficking tariffs all remain in place, set at 25 percent for Mexican and

Canadian products and at 20 percent for Chinese products.  The tariffs on Canadian energy and

energy resources remain at the lower 10 percent rate.  All of these tariffs, including the

modifications listed here, are hereafter referred to as the "Trafficking Tariffs."

### B.      Worldwide and Retaliatory Tariffs

        On April 2, 2025, the President issued Executive Order 14257, invoking IEEPA to impose

a general 10 percent ad valorem duty on "all imports from all trading partners," which "shall

increase for" a list of 57 countries to higher rates ranging from 11 percent to as high as 50 percent

ad valorem. Executive Order 14257, Regulating Imports With a Reciprocal Tariff to Rectify Trade

Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90

Fed. Reg. 15041, 15045 (Apr. 2, 2025).  The President imposed these tariffs in response to a

national emergency with respect to "underlying conditions, including a lack of reciprocity in our

Court Nos. 25-00066 & 25-00077                                              Page 14

bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners'

economic policies that suppress domestic wages and consumption, as indicated by large and

persistent annual U.S. goods trade deficits." Id. at 15041.  The President stated that these "large

and persistent annual U.S. goods trade deficits" constitute an "unusual and extraordinary threat to

the national security and economy of the United States," having "its source in whole or substantial

part outside the United States in the domestic economic policies of key trading partners and

structural imbalances in the global trading system." Id.  On April 9, 2025, the President issued

another Executive Order that paused, for all countries but China, the implementation of the higher

country-specific tariffs for 90 days, moving their effective date to July 9, 2025.  See Executive

Order 14266, Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and

Alignment, 90 Fed. Reg. 15625, 15626 (Apr. 9, 2025).

     As China responded to the various country-specific tariff adjustments by adjusting its own

tariff rates on U.S. goods, the President has amended the duty rate on Chinese goods several times

in retaliation.  The President first increased the China-specific duty rate from 34 to 84 percent

effective April 8, see Executive Order 14259, Amendment to Reciprocal Tariffs and Updated

Duties as Applied to Low-Value Imports From the People's Republic of China, 90 Fed. Reg.

15509, 15509 (Apr. 8, 2025), and then from 84 to 125 percent effective April 10, 2025, see

Executive Order 14266, 90 Fed. Reg. at 15626.

     Currently, the worldwide tariffs remain in place at 10 percent for all countries, while the

country-specific higher rates are set to take effect on July 9, 2025.  The China-specific rate is now

Court Nos. 25-00066 & 25-00077                                                    Page 15

also at 10 percent[2] after President Trump lowered the 125 percent retaliatory tariffs in response to

China, taking "a significant step . . . toward remedying non-reciprocal trade arrangements and

addressing the concerns of the United States relating to economic and national security matters."

Executive Order 14298, <u>Modifying Reciprocal Tariff Rates To Reflect Discussions With the</u>

<u>People's Republic of China</u>, 90 Fed. Reg. 21831, 21831 (May 12, 2025).  This lower rate is

effective until August 12, 2025.  <u>See id.</u>  All of these tariffs, including the modifications listed

here, are hereafter referred to as the "Worldwide and Retaliatory Tariffs."

### III.     Procedural Background

        The <u>V.O.S.</u> Plaintiffs brought an action against Defendants the United States, the President,

and certain agencies and officials (collectively, "the Government") on April 14, 2025, challenging

the President's imposition of the Worldwide and Retaliatory Tariffs in Executive Orders 14257

and 14266.  <u>See</u> Compl., <u>V.O.S. v. United States</u>, No. 25-00066, Apr. 14, 2025, ECF No. 2

("<u>V.O.S.</u> Compl."), and subsequently filed an application for a temporary restraining order

alongside motions for preliminary injunction and summary judgment.  <u>See</u> Application for TRO

& Mot. for Prelim. Inj., and or Summ. J., <u>V.O.S. v. United States</u>, No. 25-00066, Apr. 18, 2025,

ECF No. 10 ("Pls.' <u>V.O.S.</u> Mots.").  After the court denied the motion for a temporary restraining

order, <u>see</u> Order Denying TRO, <u>V.O.S. v. United States</u>, No. 25-00066, Apr. 22, 2025, ECF No.

13, the Government filed its combined response, <u>see</u> Resp. in Opp'n to Mot. for Summ. J. and

Prelim. Inj., <u>V.O.S. v. United States</u>, No. 25-00066, Apr. 29, 2025, ECF No. 32 ("Gov't Resp. to

<u>V.O.S.</u> Mots."), and the V.O.S. Plaintiffs replied on May 6, 2025, <u>see</u> Reply in Supp. of Mots. for

---

[2] This 10 percent rate is in addition to the 20 percent Trafficking Tariff addressed above.  The total
rate on Chinese goods is thus currently set at 30 percent (subject to various exemptions not
discussed here).

Court Nos. 25-00066 & 25-00077                                                    Page 16

Prelim. Inj. and Summ. J., <u>V.O.S. v. United States</u>, No. 25-00066, May 6, 2025, ECF No. 35 ("Pls.'

<u>V.O.S.</u> Reply").[3]

      After the <u>V.O.S.</u> Plaintiffs filed their motions and during briefing in that case, the State

Plaintiffs brought a similar action against the Government on April 23, 2025, challenging the

President's Worldwide and Retaliatory Tariffs along with the President's imposition of Trafficking

Tariffs in Executive Orders 14193, 14194, and 14195.  <u>See</u> Compl., <u>Oregon v. United States</u>, No.

25-00077, Apr. 23, 2025, ECF No. 2 ("<u>Oregon</u> Compl.").   The plaintiffs in <u>Oregon</u> ("State

Plaintiffs") filed their own motion for preliminary injunction on May 7, 2025, <u>see</u> <u>Or.</u> Pls.' Mot.,

<u>Oregon v. United States</u>, No. 25-00077, May 7, 2025, ECF No. 14 ("Pls.' <u>Oregon</u> Mot.").  The

court construed the State Plaintiffs' motion for preliminary injunction as a motion for summary

judgment, <u>see</u> Order Construing Mot. for Prelim. Inj. as Mot. for Summ. J., <u>Oregon v. United</u>

<u>States</u>, No. 25-00077, May 8, 2025, ECF No. 18, the State Plaintiffs filed a supplemental brief, <u>see</u>

Supp'l Resp. to Mot. for Summ. J., <u>Oregon v. United States</u>, No. 25-00077, May 13, 2025, ECF

No. 32 ("Pls.' <u>Oregon</u> Supp'l Br."), the Government responded, <u>see</u> Gov't Resp. in Opp'n to Mot.

for Summ. J., <u>Oregon v. United States</u>, No. 25-00077, May 16, 2025, ECF No. 41, and the State

Plaintiffs replied, <u>see</u> Reply in Supp. of Summ. J., <u>Oregon v. United States</u>, No. 25-00077, May

20, 2025, ECF No. 47 ("Pls.' <u>Oregon</u> Reply").  The Government filed an amended response shortly

thereafter.  <u>See</u> Order for Amended Resp., May 17, 2025, <u>Oregon v. United States</u>, No. 25-00077,

ECF No. 42; Amended Resp., <u>Oregon v. United States</u>, No. 25-00077, May 19, 2025, ECF No. 46

---

[3] Several entities filed amicus briefs in support of the Plaintiffs in <u>V.O.S.</u>  <u>See</u> Amici Curiae Br.,
<u>V.O.S. v. United States</u>, No. 25-00066, Apr. 28, 2025, ECF No. 31 ("Legal Scholars Amicus Br.");
Mot. for Leave to File an Amici Curiae Br., <u>V.O.S. v. United States</u>, No. 25-00066, May 12, 2025,
ECF No. 49 ("Princess Awesome Amicus Br."); Amicus Curiae Br., <u>V.O.S. v. United States</u>, No.
25-00066, May 9, 2025, ECF No. 44 ("Inst. for Pol. Integrity Amicus Br.").

Court Nos. 25-00066 & 25-00077                                                    Page 17

("Gov't Resp. to <u>Oregon</u> Mots.").[4]  The court held oral argument in <u>V.O.S.</u> on Tuesday, May 13,

2025, and in <u>Oregon</u> on Wednesday, May 21, 2025.

<div align="center"><b>JURISDICTION</b></div>

The Court of International Trade has exclusive jurisdiction to hear this action under 28

U.S.C. § 1581(i), which gives the court:

> exclusive jurisdiction of any civil action commenced against the United States, its
> agencies, or its officers, that arises out of any law of the United States providing
> for--
>
>> (A) revenue from imports or tonnage;
>>
>> (B) tariffs, duties, fees, or other taxes on the importation of merchandise for
>> reasons other than the raising of revenue;
>>
>> (C) embargoes or other quantitative restrictions on the importation of
>> merchandise for reasons other than the protection of the public health or
>> safety; or
>>
>> (D) administration and enforcement with respect to the matters referred to
>> in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h)
>> of this section.

<u>Id.</u> § 1581(i)(1); <u>see also</u> <u>id.</u> § 1337(c) ("The district courts shall not have jurisdiction under this

section of any matter within the exclusive jurisdiction of the Court of International Trade . . . .").

Here, the plaintiffs in both cases (collectively, "Plaintiffs") challenge tariffs imposed by the

President under IEEPA, which provides that the President, under certain conditions and with some

---

[4] Several entities filed amicus briefs in support of the Plaintiffs in <u>Oregon</u>.  <u>See</u> Amicus Curiae
Br., <u>Oregon v. United States</u>, No. 25-00077, May 16, 2025, ECF No. 40 ("Members of Congress
Amicus Br."); Amicus Curiae Br., <u>Oregon v. United States</u>, No. 25-00077, May 15, 2025, ECF
No. 38 ("Cal. Amicus Br."); Amicus Curiae Br., <u>Oregon v. United States</u>, No. 25-00077, May 20,
2025, ECF No. 53 ("Wash. Amicus Br.").  One party filed an amicus brief in support of the
Government in <u>Oregon</u>.  <u>See</u> Amicus Curiae Br., <u>Oregon v. United States</u>, No. 25-00077, May 20,
2025, ECF No. 51 ("America First Legal Found. Amicus Br.").

Court Nos. 25-00066 & 25-00077                                                Page 18

elsewhere-enumerated exceptions, may:

> investigate, block during the pendency of an investigation, regulate, direct and
> compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding,
> use, transfer, withdrawal, transportation, importation or exportation of, or dealing
> in, or exercising any right, power, or privilege with respect to, or transactions
> involving, any property in which any foreign country or a national thereof has any
> interest by any person, or with respect to any property, subject to the jurisdiction of
> the United States.

50 U.S.C. § 1702(a)(1)(B).  The challenged Executive Orders, in turn, invoke this statute to impose

tariffs (alternatively referred to as "duties") on merchandise from both specific countries and a list

that includes "all trading partners" of the United States.  See, e.g., Executive Order 14266, 90 Fed.

Reg. at 15645.  The Executive Orders made amendments to the HTSUS, which are set forth in

subheading 9903.01.  The HTSUS is the law of the United States setting tariffs.[5]

For the purpose of locating jurisdiction under 28 U.S.C. § 1581(i), an action involving a

challenge to a presidential action that imposes tariffs, duties, or other import restrictions is one that

arises from a "law providing for" those measures.  See Luggage & Leather Goods Mfrs. of Am.,

Inc. v. United States, 7 CIT 258, 267, 588 F. Supp. 1413, 1419–21 (1984); U.S. Cane Sugar

Refiners' Ass'n v. Block, 3 CIT 196, 200–01, 544 F. Supp. 883, 886 (1982), aff'd, 683 F.2d 399

(C.C.P.A. 1982); see also 28 U.S.C. § 255 (contemplating "civil action[s]" falling under this

court's jurisdiction that "raise[] . . . issue[s] of the constitutionality of . . . a proclamation of the

---

[5] This does not mean that Plaintiffs' ultra vires claims must instead route through 28 U.S.C.
§ 1581(a), which provides for "any civil action commenced to contest the denial of a protest" to
"the . . . amount of duties chargeable" on an entry, 19 U.S.C. § 1514(a)(2).  As the Supreme Court
has explained, "protests are not pivotal" in circumstances where Customs operates under a binding
external directive—as where "Customs performs no active role, it undertakes no analysis or
adjudication, issues no directives, imposes no liabilities; instead, Customs merely passively
collects . . . payments."  United States v. U.S. Shoe Corp., 523 U.S. 360, 365 (1998) (internal
quotation marks, alterations, and citation omitted).

Court Nos. 25-00066 & 25-00077                                                Page 19

President or an Executive order"). The Federal Circuit has confirmed that presidential action creates an appropriate basis for (i) jurisdiction, noting without disapproval that there are "numerous cases in which the Court of International Trade has . . . considered challenges to the actions of the President pursuant to the grant of jurisdiction in § 1581(i)." Humane Soc'y of United States v. Clinton, 236 F.3d 1320, 1327 (Fed. Cir. 2001) (citing, inter alia, Luggage & Leather Goods, 7 CIT 258, 588 F. Supp. 1413 and U.S. Cane Sugar Refiners' Ass'n, 3 CIT 196, 544 F. Supp. 883).

This means that Plaintiffs' various challenges to the presidential actions here, successful or not, fall under this court's exclusive jurisdiction. And while "section 1581(i) does not authorize proceedings directly against the President," meaning the President must be dismissed from the two cases before the court, Corus Grp. PLC. v. ITC, 352 F.3d 1351, 1359 (Fed. Cir. 2003), the court retains "jurisdiction to consider challenges to the President's actions in suits against subordinate officials who are charged with implementing the presidential directives," USP Holdings, Inc. v. United States, 36 F.4th 1359, 1366 (Fed. Cir. 2022). That group covers the rest of the named Defendants in both cases. All relief will run against the United States and its "officers," a category which for jurisdictional purposes does not include the President. See 28 U.S.C. § 1581(i).

## STANDING

Article III of the Constitution requires plaintiffs in federal court to have standing to sue.[6] "[T]he plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and

---

[6] The Government does not appear to contest statutory or "prudential" standing, which unlike Article III standing can be waived. See Brooklyn Brewery Corp. v. Brooklyn Brew Shop, 17 F.4th 129, 140 (Fed. Cir. 2021).

likely to be redressed by the lawsuit." <u>Biden v. Nebraska</u>, 600 U.S. 477, 489 (2023) (citing <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560–61 (1992)).  "A plaintiff may establish its injury-in-fact 'in the same way as any other matter on which the plaintiff bears the burden of proof.'" <u>Canadian Lumber Trade All. v. United States</u>, 517 F.3d 1319, 1333 (Fed. Cir. 2008) (quoting <u>Lujan</u>, 504 U.S. at 561).

### I.    *Article III Standing of <u>V.O.S.</u> Plaintiffs*

A non-importer plaintiff may "fairly employ economic logic" to establish a concrete and particularized injury-in-fact that is fairly traceable to a challenged tariff.  <u>Id.</u> at 1333.  A plaintiff that takes that route must show that the challenged tariff is "likely to cause [the plaintiff] an economic injury," and that "this injury would be prevented by a declaratory judgment and injunction" setting that tariff aside.  <u>Id.</u> at 1334.  The <u>V.O.S.</u> Plaintiffs have done so here.

The businesses that bring the <u>V.O.S.</u> action—V.O.S. Selections, Genova Pipe, MicroKits, FishUSA, and Terry Cycling—allege and aver[7] that they have suffered (and will continue to suffer) economic injuries as a result of the Worldwide and Retaliatory Tariffs.  <u>See</u> <u>V.O.S.</u> Compl. ¶¶ 52–56.  V.O.S. alleges that the Worldwide and Retaliatory Tariffs have occasioned difficulties with sourcing and pricing, and also that "[t]he reduction in cash flow caused by increased tariffs also necessarily reduces the company's inventory and the level of business that V.O.S. can conduct, leading to an overall reduction in purchase orders placed with both foreign

---

[7] To establish standing at the summary judgment stage, a plaintiff "must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." <u>Lujan</u>, 504 U.S. at 561 (internal quotation marks and citation omitted).  Executives of the various V.O.S. Plaintiffs have submitted declarations with their companies' motions.  <u>See</u> Pls.' <u>V.O.S.</u> Mots. at Exs. A–E (Decls. of Victor Schwartz, Andrew Reese, David Levi, Dan Pastore, & Nikolaus Holm).

Court Nos. 25-00066 & 25-00077                                                    Page 21

and domestic suppliers." Id. ¶ 52. Its CEO avers in a declaration that "[t]ariffs must be paid by

V.O.S. upon arrival at the Port of New York, putting a large, immediate, strain on its cash flow."

Schwartz Decl. ¶ 25. Genova Pipe alleges major sourcing problems stemming from the

Worldwide Tariffs, and also that "[t]he tariffs will directly increase the cost of raw materials,

manufacturing equipment, and resale goods imported from abroad by Genova Pipe." V.O.S.

Compl. ¶ 53; see generally Reese Decl. MicroKits alleges that "[a]t the current rates" of the

Worldwide and Retaliatory Tariffs it "cannot order parts from China and will have to pause

operations when it runs out of parts," and also that as a result it "will likely be unable to pay its

employees, will lose money, and as a result may go out of business." V.O.S. Compl. ¶ 54; see also

Levi Decl. ¶ 13. FishUSA alleges that "[t]he tariffs have caused [it] to delay shipment of finished

goods from China due to the unpredictability of the tariff rate that will be imposed when the

product arrives, and [that] it has also paused production of some products," and states that these

conditions inhibit its business growth. V.O.S. Compl. ¶ 55; see generally Pastore Decl. Terry

Cycling alleges that it "has already paid $25,000 in unplanned tariffs this year for goods for which

Terry was the importer of record," and "projects that the tariffs will cost the company

approximately $250,000 by the end of 2025." V.O.S. Compl. ¶ 56; see generally Holm Decl.

     These allegations and declarations establish the Article III standing of all V.O.S. Plaintiffs.

While the Government objects that "no plaintiff has offered evidence that it has actually paid tariffs

pursuant to the Executive Orders," Gov't Resp. to V.O.S. TRO Application at 17, Apr. 21, 2025,

ECF No. 12, the Government does not meaningfully contest the "economic logic" tracing the

Worldwide and Retaliatory Tariffs to the V.O.S. Plaintiffs' showings of downstream harm. See

Canadian Lumber, 517 F.3d at 1333.

While the Government further objects that "[a]t the very least, the Court should hold that FishUSA and MicroKits lack standing, given that they do not even allege that they intend to import articles subject to the tariffs within any particular period of time," Gov't Resp. to <u>V.O.S.</u> TRO Application at 18, this point rests on an unsupported import-only rule of standing.[8]  To suffer an economic injury from a tariff it is not necessary to incur direct liability to Customs, or even to directly import an article of dutiable merchandise.  Fair traceability is more flexible than that.  <u>See Invenergy Renewables LLC v. United States</u>, 43 CIT __, __, 422 F. Supp. 3d 1255, 1273 (2019) ("The court determines that this 'economic logic' applies here: the duty on bifacial panels will increase—and, with it, likely Plaintiffs' costs—if the <u>Withdrawal</u> goes into effect.").  Here, injuries like (1) the prohibitively high price of operationally necessary components, <u>see</u> Levi Decl., and (2) the stoppage of orders and product production, <u>see</u> Pastore Decl., are "concrete and imminent harm[s] to a legally protected interest, like property or money—that [are] fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  <u>Biden v. Nebraska</u>, 600 U.S. at 489.

## II.    *Article III Standing of State Plaintiffs*

The standing inquiry is even simpler for the State Plaintiffs.  The State Plaintiffs allege "direct financial harm" from the challenged tariffs' impact on the cost of imported goods that are "essential" to the states' provision of public services, <u>see</u> <u>Oregon</u> Compl. ¶¶ 94–112, and also from

---

[8] Responding to the State Plaintiffs' Motions, the Government argues that "[w]hile importers have standing to challenge tariffs, purchasers of imported goods do not."  Gov't Resp. to <u>Oregon</u> Mots. at 11.  For that proposition the Government quotes <u>Totes-Isotoner Corp. v. United States</u>, where the Federal Circuit held that "purchasers have no remedy to challenge the tariff classification." 594 F.3d 1346, 1352 (Fed. Cir. 2010).  This reference to a lack of a remedy, however, had nothing to do with the purchasers' Article III standing.  It instead had to do with the fact that a purchaser could not have "sought a refund of duties" that it never paid to Customs, a fact that in turn supported an importer's claim of third-party standing on the purchaser's behalf.  <u>See id.</u> at 1350.

Court Nos. 25-00066 & 25-00077                                          Page 23

their impact on "Plaintiff States' ability to procure goods and services and to budget for and audit price adjustments," id. ¶ 114.

The Government implicitly concedes that Oregon, Arizona, Colorado, and Connecticut are "importers who have personally paid tariffs" who thus "have standing to challenge tariffs." Gov't Resp. to Oregon Mots. at 11. The Government is right to make this concession: challenged conduct that "directly injures" a state can also "confer[] standing on that State." Biden v. Nebraska, 600 U.S. at 489. And an importer's allegation that it pays unlawful U.S. duties "typically would satisfy constitutional standing requirements." Totes-Isotoner, 594 F.3d at 1351.

Since "[i]f at least one plaintiff has standing, the suit may proceed," Biden v. Nebraska, 600 U.S. at 489 (citation omitted), there is no need to go further. The State Plaintiffs seek only broad injunctive and declaratory relief. That means that even if the non-importer states among them were to hypothetically lack standing, the contours of available relief would not change. See Oregon Compl. at 35–36.

### STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a).

28 U.S.C. § 2640(e) provides that "[i]n any civil action not specified in this section," which includes actions under 28 U.S.C. § 1581(i), "the Court of International Trade shall review the matter as provided in section 706 of title 5." This references the "[s]cope of review" section of the Administrative Procedure Act ("APA"), codified at 5 U.S.C. § 706, which provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions

Court Nos. 25-00066 & 25-00077                                                              Page 24

found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

        28 U.S.C. § 2640(e) does not address what happens when an action under 28

U.S.C. § 1581(i) challenges actions by the President, which unlike agency actions "are not subject

to [the APA's] requirements." Franklin v. Massachusetts, 505 U.S. 788, 800–01 (1992). But the

court "presume[s] that review is available when a statute is silent," Patel v. Garland, 596 U.S. 328,

346 (2022). Also, "claims that the President's actions violated the statutory authority delegated to

him . . . are reviewable." USP Holdings, 36 F.4th at 1365. The Federal Circuit has observed that

"[i]t is enough to say that some non-APA review remains available for constitutional issues,

questions about the scope of statutory authority, and compliance with procedural requirements."

Am. Inst. for Int'l Steel, Inc. v. United States, 806 F. App'x 982, 991 (Fed. Cir. 2020)

(nonprecedential); see also Florsheim Shoe Co. v. United States, 744 F.2d 787, 795 (Fed. Cir.

1984) ("[T]he Executive's decisions in the sphere of international trade are reviewable only to

determine whether the President's action falls within his delegated authority, whether the statutory

language has been properly construed, and whether the President's action conforms with the

relevant procedural requirements."); Maple Leaf Fish Co. v. United States, 762 F.2d 86, 89 (Fed.

Cir. 1985) ("For a court to interpose, there has to be a clear misconstruction of the governing

statute, a significant procedural violation, or action outside delegated authority."); United States

v. Sears, Roebuck & Co., 20 C.C.P.A. 295, 305 (1932) (reviewing the President's issuance of a

proclamation "for the purpose of determining whether he has exceeded the powers delegated to

him.").

Court Nos. 25-00066 & 25-00077                                                    Page 25

As it undertakes this review function, "[t]he Court of International Trade shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States." 28 U.S.C. § 1585.

## DISCUSSION

Underlying the issues in this case is the notion that "the powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other departments." Federalist No. 48 (James Madison). Because of the Constitution's express allocation of the tariff power to Congress, see U.S. Const. art. I, § 8, cl. 1, we do not read IEEPA to delegate an unbounded tariff authority to the President. We instead read IEEPA's provisions to impose meaningful limits on any such authority it confers. Two are relevant here. First, § 1702's delegation of a power to "regulate . . . importation," read in light of its legislative history and Congress's enactment of more narrow, non-emergency legislation, at the very least does not authorize the President to impose unbounded tariffs. The Worldwide and Retaliatory Tariffs lack any identifiable limits and thus fall outside the scope of § 1702. Second, IEEPA's limited authorities may be exercised only to "deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . and may not be exercised for any other purpose." 50 U.S.C. § 1701(b) (emphasis added). As the Trafficking Tariffs do not meet that condition, they fall outside the scope of § 1701.

### I.    *50 U.S.C. § 1702 Does Not Authorize the Worldwide and Retaliatory Tariffs*

Plaintiffs in both cases argue that the words "regulate . . . importation" do not confer the power to impose tariffs. See Pls.' V.O.S. Reply at 3; Pls.' Oregon Mot. at 15. Any other interpretation, according to Plaintiffs, would run afoul of both the nondelegation doctrine and the major questions doctrine. See Pls.' V.O.S. Mot at 15; Pls.' Oregon Mot. at 18–19. The

Government counters that the words "regulate . . . importation" have the same meaning that they did in TWEA, an older statute that was found to delegate a power to impose tariffs.  See Gov't Resp. to V.O.S. Mots. at 17–19; Gov't Resp. to Oregon Mots. at 17–18.

Plaintiffs are correct in the narrow sense that the imprecise term "regulate . . . importation," under any construction that would comport with the separation-of-powers underpinnings of the nondelegation and major questions doctrines, does not authorize anything as unbounded as the Worldwide and Retaliatory Tariffs.  See Jennings v. Rodriguez, 583 U.S. 281, 286 (2018) ("[W]hen statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead . . . adopt an alternative that avoids those problems.").  The court in Yoshida II recognized that a case involving a claim to such unlimited authority might arise, observing that "[w]hether a delegation of such breadth as to have authorized [the tariffs here] would be constitutionally embraced, is determined . . . by the nature of the particular surcharge herein and its relationship to other statutes, as well as by its relationship to the particular emergency confronted."  526 F.2d at 576–77; see also Proclamation No. 4074, 85 Stat. 926.  That case has arisen here.

### A.    *An Unlimited Delegation of Tariff Authority Would Be Unconstitutional*

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const. art. 1, § 1.  Congress is empowered "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its general powers.  Id. § 8, cl. 18.  The Constitution thus establishes a separation of powers between the legislative and executive branches that the Framers viewed as essential to the preservation of individual liberty.  See, e.g., The Federalist No. 48 (James Madison).  To maintain this separation of powers, "[t]he Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative

functions with which it is thus vested." Pan. Refining Co. v. Ryan, 293 U.S. 388, 421 (1935); see also Marshall Field & Co. v. Clark, 143 U.S. 649, 692 (1892).

The parties cite two doctrines—the nondelegation doctrine and the major questions doctrine—that the judiciary has developed to ensure that the branches do not impermissibly abdicate their respective constitutionally vested powers.   Under the nondelegation doctrine, Congress must "lay down by legislative act an intelligible principle to which the person or body authorized to fix such [tariff] rates is directed to conform." J.W. Hampton, Jr., 276 U.S. at 409 (1928); see also Pan. Refining, 293 U.S. at 429–30.   A statute lays down an intelligible principle when it "meaningfully constrains" the President's authority. Touby v. United States, 500 U.S. 160, 166 (1991); see also Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 559–60 (1976).   Under the major questions doctrine, when Congress delegates powers of "'vast economic and political significance,'" it must "speak clearly." Ala. Ass'n of Realtors v. HHS, 594 U.S. 758, 764 (2021) (quoting Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 324 (2014)); Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst., 448 U.S. 607, 645 (1980).   The doctrine applies in "'extraordinary cases' . . . in which the 'history and the breadth of the authority that [the executive branch] has asserted,' and the 'economic and political significance' of that assertion, provide 'a reason to hesitate before concluding that Congress meant to confer such authority.'" West Virginia v. EPA, 597 U.S. 697, 721 (2022) (quoting FDA v. Brown & Williamson Tobacco Co., 529 U.S. 120, 159–60 (2000)); see also Biden v. Nebraska, 600 U.S. at 501.

Plaintiffs and some Amici argue that the Government's interpretation transforms IEEPA into an impermissible delegation of power because "[t]he President's assertion of authority here has no meaningful limiting standards, essentially enabling him to impose any tariff rate he wants

Court Nos. 25-00066 & 25-00077                                                            Page 28

on any country at any time, for virtually any reason." Pls.' V.O.S. Mots. at 25; see also Pls.'

Oregon Mots. at 19; Pls.' V.O.S. Reply at 22. Similarly, Plaintiffs suggest that Congress's use of

the words "regulate . . . importation" does not indicate the clear mandate necessary to delegate

"such unbounded authority to the President to make such decisions of 'vast economic and political

significance,'" as the wide-scale imposition of tariffs. Pls.' Oregon Mot. at 18; see also Pls.'

V.O.S. Reply at 17; Inst. for Pol. Integrity's Amicus Br. at 16–18. The Government counters that

IEEPA contains sufficient limitations: the President must declare a national emergency, the

emergency expires after one year unless renewed, the emergency must be declared with respect to

an "unusual and extraordinary threat," and the powers must extend only to property in which a

foreign country or foreign national has an interest. Gov't Resp. to V.O.S. Mots. at 28–29.

The separation of powers is always relevant to delegations of power between the branches.

Both the nondelegation and the major questions doctrines, even if not directly applied to strike

down a statute as unconstitutional, provide useful tools for the court to interpret statutes so as to

avoid constitutional problems. These tools indicate that an unlimited delegation of tariff authority

would constitute an improper abdication of legislative power to another branch of government.

Regardless of whether the court views the President's actions through the nondelegation doctrine,

through the major questions doctrine, or simply with separation of powers in mind, any

interpretation of IEEPA that delegates unlimited tariff authority is unconstitutional.

> 1.     **The Words "Regulate . . . Importation" Do Not Authorize the
>         President to Impose Unlimited Tariffs**

With these principles in place, the court turns to the interpretive question at hand. Recall

that both TWEA and IEEPA authorize the President to "regulate . . . importation." See 50 U.S.C.

§ 4305(b)(1)(B); id. § 1702(a)(1)(B). The court in Yoshida II noted that "[t]he express delegation

Court Nos. 25-00066 & 25-00077                                               Page 29

in [TWEA] is broad" and includes the power to "impos[e] an import duty surcharge." Yoshida II,

526 F.2d at 573, 576. While the words "regulate . . . importation" may exist in identical form in

IEEPA, those words do not confer unlimited tariff authority.

In interpreting TWEA, the appellate court in Yoshida II recognized the importance of the

separation of powers, noting the lower court's warning that "a finding that the President has the

power under [TWEA] to impose whatever tariff rates he deems desirable simply by declaring a

national emergency would not only render our trade agreements program nugatory, it would

subvert the manifest Congressional intent to maintain control over its Constitutional powers to

levy tariffs." Yoshida II, 526 F.2d at 577 (quoting Yoshida I, 378 F. Supp. at 1182 (Maletz, J.,

concurring)). Though the appellate court in Yoshida II interpreted TWEA so as to include tariff

authority, the court also repeatedly noted the constitutional concerns that would arise if the

President exercised unlimited tariff authority based on the words "regulate . . . importation." For

example, the court stated that "[t]he mere incantation of 'national emergency' cannot, of course,

sound the death-knell of the Constitution." Id. at 583. Indeed, according to the court, "[t]he

declaration of a national emergency is not a talisman enabling the President to rewrite the tariff

schedules." Id.[9] While the court in Yoshida II ultimately reversed the lower court's decision and

upheld President Nixon's tariffs, it upheld the tariffs on the basis that they were limited, "which is

quite different from imposing whatever tariff rates he deems desirable." Id. at 578 (internal

_____

[9] This concern is even more significant today given the limited nature of Congress's review over
national emergencies. Recall that the NEA originally provided Congress with the means to
terminate a national emergency by adopting a concurrent resolution. See National Emergencies
Act, Pub. L. No. 94-412, § 201, 90 Stat. 1255, 1255–56 (1976) (codified as amended at 50 U.S.C.
§ 1622). Today the NEA is much less restricted, requiring Congress to act with a veto-proof
majority of both houses. See Foreign Relations Authorization Act, Fiscal Years 1986 and 1987,
Pub. L. No. 99-93, § 801, 98 Stat. 405, 448 (1985) (codified as amended at 50 U.S.C. § 1622).

Court Nos. 25-00066 & 25-00077                                                    Page 30

quotation marks omitted).

        The limitations of President Nixon's tariffs were essential to the court's determination that
"regulate . . . importation" permitted the President's actions in Yoshida II.  For example, the court
noted that President Nixon did not "fix[] rates in disregard of congressional will."  Id. at 577.  The
court emphasized that President Nixon "imposed a limited surcharge, as a temporary measure
calculated to help meet a particular national emergency, which is quite different from imposing
whatever tariff rates he deems desirable."  Id. at 578 (internal quotation marks and citation omitted)
(emphasis added).  The court emphasized further that it was not deciding a case in which the
President exerted unlimited tariff authority, and that "presidential actions must be judged in the
light of what the President actually did, not in the light of what he could have done."  Id. at 577.
The court also explicitly stated that its decision did not "approve in advance any future surcharge
of a different nature," id., and its decision did "not here sanction the exercise of an unlimited
power, which, we agree with the Customs Court, would be to strike a blow to our Constitution,"
id. at 583.

        Like the court in Yoshida II, this court does not read the words "regulate . . . importation"
in IEEPA as authorizing the President to impose whatever tariff rates he deems desirable.  Indeed,
such a reading would create an unconstitutional delegation of power.  See id.  Importantly,
President Trump's tariffs do not include the limitations that the court in Yoshida II relied upon in
upholding President Nixon's actions under TWEA.  Where President Nixon's tariffs were
expressly limited by the rates established in the HTSUS, see Proclamation No. 4074, 85 Stat. at
927, the tariffs here contain no such limit.  Absent these limitations, this is exactly the scenario

that the lower court warned of in <u>Yoshida I</u>—and that the appellate court acknowledged in <u>Yoshida II</u>.

In sum, just as the court recognized in <u>Yoshida II</u>, the words "regulate . . . importation" cannot grant the President unlimited tariff authority. Thus, this court reads "regulate . . . importation" to provide more limited authority so as to avoid constitutional infirmities and maintain the "separate and distinct exercise of the different powers of government" that is "essential to the preservation of liberty." The Federalist No. 51 (Alexander Hamilton or James Madison).

### B.    *Congress Delegated Narrower Authority to the President Through IEEPA than It Delegated Through TWEA*

While TWEA and IEEPA both grant the President the power to "regulate . . . importation," <u>see</u> 50 U.S.C. § 4305(b)(1)(B); <u>id.</u> § 1702(a)(1)(B), Congress enacted IEEPA with the intent of limiting presidential power. The legislative history surrounding IEEPA confirms that the words "regulate . . . importation" have a narrower meaning than the power to impose any tariffs whatsoever. <u>Id.</u> § 1702(a)(1)(B). Congress's enactment of Section 122 of the Trade Act of 1974, <u>see</u> Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1987 (codified at 19 U.S.C. § 2132), and Section 301 of the Trade Act of 1974, <u>see</u> Pub. L. No. 93-618, § 301, 88 Stat. 1978, 2041 (codified at 19 U.S.C. § 2411), grants the President authority to impose restricted tariffs in response to "fundamental international payment problems," including "large and serious balance-of-payments deficits," and unfair trading practices, thereby limiting any such authority in the broader emergency powers under IEEPA. Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1987 (1974).

In enacting reform legislation including IEEPA, Representative John Bingham, Chair of the House International Relations Committee's Subcommittee on Economic Policy, described

Court Nos. 25-00066 & 25-00077                                                Page 32

TWEA as conferring "on the president what could have been dictatorial powers that he could have used without any restraint by the Congress." House Committee on International Relations, 95th Cong., <u>Revision of the Trading with the Enemy Act: Markup before the Committee on International Relations</u> 5 (Comm. Print 1977). Similarly, the House report on the reform legislation called TWEA "essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review." Comm. on Int'l Rels., <u>Trading with the Enemy Act Reform Legislation</u>, H.R. Rep. No. 95-459, at 7 (1977).

Congress reformed the President's emergency powers in part by enacting IEEPA to provide "the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to various procedural limitations, including those of the [NEA]." <u>Id.</u> at 2; <u>see also</u> International Emergency Economic Powers Act, Pub. L. No. 95-223, §§ 201–08, 91 Stat. 1625, 1626–29 (1977) (codified as amended at 50 U.S.C. §§ 1701–10). Thus, Congress enacted IEEPA to limit executive authority over international economic transactions, not merely to continue the executive authority granted by TWEA.

      **1.**      **Congress Cabined the President's Authority to Impose Tariffs in Response to Balance-of-Payments Deficits to Non-Emergency Legislation**

When President Nixon imposed in 1971 the tariffs challenged in <u>Yoshida II</u>, he was responding to a monetary crisis—brought on by the peg of the U.S. dollar to a fixed price of 35 dollars per ounce of gold—as reflected in part in growing balance-of-payments deficits. <u>See</u> The Office of the Historian, <u>Nixon and the End of the Bretton Woods System, 1971-1973</u>, U.S. Dep't of State, https://history.state.gov/milestones/1969-1976/nixon-shock (last visited May 28, 2025). External values of foreign currencies were fixed in relation to the U.S. dollar, whose value was in

Court Nos. 25-00066 & 25-00077                                                    Page 33

turn expressed in gold at a congressionally set price.  See id.  A surplus of U.S. dollars threatened

the ability of the United States to meet its obligations and, thereby, the entire Bretton Woods

system, as the United States did not have enough gold to cover the volume of dollars in worldwide

circulation.  See id.  Accordingly, on August 15, 1971, President Nixon immediately cancelled the

direct international convertibility of the U.S. dollar to gold, took a series of other actions such as

the imposition of wage and price controls, and issued Proclamation 4074 in which he declared a

national emergency and introduced a ten percent import surcharge.[10]  See Christopher A. Casey &

Jennifer K. Elsea, Cong. Rsch. Serv., R45168, The International Emergency Economic Powers

Act: Origins, Evolution, and Use 2 (2024).

       In 1974, Congress enacted the Trade Act, including Section 122 dealing with remedies for

balance-of-payments deficits.  See Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978,

1987–89 (codified at 19 U.S.C. § 2132).  Section 122 is titled "[b]alance-of-payments authority"

and specifically addresses Presidential proclamations of "temporary import surcharge[s]" and

"temporary limitations through the use of quotas" in situations of "fundamental international

payments problems."  Id.  Section 122 sets specific limits on the President's authority to respond

to balance-of-payments problems, such as a 15 percent cap on tariffs and a maximum duration of

150 days.  See id.  Congress's enactment of Section 122 indicates that even "large and serious

United States balance-of-payments deficits" do not necessitate the use of emergency powers and

justify only the President's imposition of limited remedies subject to enumerated procedural

constraints.  See id.; see also Yoshida II, 526 F.2d at 578 ("Congress has said what may be done

with respect to foreseeable events in the Tariff Act, the [Trade Expansion Act], and in the Trade

---

[10] Notably, Proclamation 4074 did not mention TWEA.  See generally 85 Stat. 926.

Court Nos. 25-00066 & 25-00077                                    Page 34

Act of 1974 (all of which are in force) and has said what may be done with respect to unforeseeable

events in the TWEA.").  In these ways, Section 122 removes the President's power to impose

remedies in response to balance-of-payments deficits, and specifically trade deficits, from the

broader powers granted to a president during a national emergency under IEEPA by establishing

an explicit non-emergency statute with greater limitations.[11]

The President's imposition of the Worldwide and Retaliatory Tariffs responds to an

imbalance in trade—a type of balance-of-payments deficit—and thus falls under the narrower,

non-emergency authorities in Section 122.  The balance-of-payments is the "[r]ecord of

transactions between U.S. residents and foreign residents during a given time period . . . includ[ing]

transactions in goods, services, income, assets, and liabilities," and always balances to zero.

Balance of Payments, Bureau of Econ. Analysis (last modified Apr. 11, 2018),

https://www.bea.gov/help/glossary/balance-payments.  The term "balance-of-payments deficits"

within Section 122 refers, necessarily, to deficits within the various accounts comprising the

---

[11] The court in Yoshida II recognized that before Section 122 was in effect, the Nixon surcharge "did not run counter to any explicit legislation" and there existed no statute "other than the TWEA, providing procedures for dealing with a national emergency involving a balance of payments problem such as that which existed in 1971."  United States v. Yoshida Int'l, Inc., 526 F.2d 560, 578 (C.C.P.A. 1975) (internal quotation marks omitted).  The court in Yoshida II recognized further that after Section 122 was in effect, Section 122's limits would apply regardless of whether an emergency declared was extant.  Id. at 582 n.33.  The court noted that the balance-of-payments emergency declared by President Nixon had not been terminated, in contradiction with the expectation that "emergencies are expected to be shortlived."  Id. at 582.  However, the court found that "the failure to terminate the emergency has been rendered moot by Congressional enactment of [Section 122], specifically requiring the President, within certain parameters, to impose a surcharge or quotas in response to balance of payments problems."  Id. at 582 n.33.  The court concluded that "[a] surcharge imposed after Jan. 3, 1975 must, of course, comply with the statute now governing such action."  Id.  Thus, the court reasoned that any tariffs imposed in response to the balance-of-payments problem after the enactment of Section 122, including any imposed in response to the balance-of-payments emergency declared by President Nixon, must comply not with a broad emergency statute, but with Section 122.

Court Nos. 25-00066 & 25-00077                                                   Page 35

balance-of-payments (including the trade of goods) rather than to an overall summary deficit, because there cannot be a balance-of-payments deficit per se. Trade deficits are one of the key balance-of-payment deficits and can be directly impacted by mechanisms such as import quotas and tariffs, as authorized by Section 122. As a result, tariffs responding to a trade deficit fit under Section 122 because they "deal with [a] large and serious United States balance-of-payments deficit[]." 19 U.S.C. § 2132(a)(1). Thus, the President's Worldwide and Retaliatory Tariffs, imposed in response to a balance-of-payments deficit, must conform with the limits of Section 122.

The legislative history surrounding IEEPA confirms that Congress cabined any presidential authority to impose tariffs in response to balance-of-payments deficits to a narrower, non-emergency statute. To prevent IEEPA from becoming another "essentially . . . unlimited grant of authority," the House International Relations Committee suggested that "whenever possible, authority for routine, non[-]emergency regulation of international economic transactions which has heretofore been conducted under [TWEA] should be transferred to other legislation," and further stated that IEEPA "does not include authorities more appropriately lodged in other legislation . . . ." H.R. Rep. No. 95-459 at 7, 10–11. This reflects that in enacting Section 122, Congress narrowed the President's emergency authority to impose tariffs in response to balance-of-payments deficits. The words "regulate . . . importation" within IEEPA do not, therefore, permit the President to impose tariffs in response to balance-of-payments deficits.

Because the Worldwide and Retaliatory Tariffs deal with "large and persistent annual U.S. goods trade deficits," Executive Order 14257, 90 Fed. Reg. at 15041, these actions address a balance-of-payments deficit and therefore must comply with the limitations in Sections 122. The

Court Nos. 25-00066 & 25-00077                                            Page 36

Worldwide and Retaliatory Tariffs do not comply with the limitations Congress imposed upon the President's power to respond to balance-of-payments deficits. The President's assertion of tariff-making authority in the instant case, unbounded as it is by any limitation in duration or scope, exceeds any tariff authority delegated to the President under IEEPA. The Worldwide and Retaliatory tariffs are thus <u>ultra vires</u> and contrary to law.

### II.    *50 U.S.C. § 1701 Does Not Authorize the Trafficking Tariffs*

IEEPA does not authorize the Trafficking Tariffs for the separate reason that they do not satisfy the conditions that Congress imposed in 50 U.S.C. § 1701:

> (a) Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

> (b) The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

This provision limits the President's exercise of IEEPA powers to a limited set of situations. <u>Cf.</u> <u>Silfab Solar, Inc. v. United States</u>, 892 F.3d 1340, 1346 (Fed. Cir. 2018) (identifying a statutory "condition necessary for the President to take action"). Under it, IEEPA powers are available only where all of the following conditions pertain: First, there must be a "threat . . . which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Second, this threat must be "unusual and extraordinary." <u>Id.</u> § 1701(b). Third, a national emergency must be declared with respect to the threat. <u>Id.</u> And fourth, the President's exercise of IEEPA authority must "deal with" the threat.

Case: 25-1812    Document: 148    Page: 40    Filed: 07/20/2025

Case 1:25-cv-00066-GSK-TMR-JAR    Document 55    Filed 05/28/25    Page 37 of 49

Court Nos. 25-00066 & 25-00077                                    Page 37

<u>Id.</u>

Both sets of Plaintiffs assert that the orders implementing the Worldwide and Retaliatory Tariffs ("Worldwide and Retaliatory Tariff Orders") do not meet the "unusual and extraordinary" condition[12] imposed by this section, <u>see</u> Pls.' <u>V.O.S.</u> Mots. at 18; Pls.' <u>Oregon</u> Mot. at 20, and the State Plaintiffs argue that the orders implementing the Trafficking Tariffs ("Trafficking Tariff Orders") do not meet the "deal with" condition, <u>see</u> Pls.' <u>Oregon</u> Mot. at 25.

By the Government's telling, the court cannot ever question the President's assertion that his IEEPA authority "deal[s] with an unusual and extraordinary threat." <u>See</u> Gov't Resp. to <u>Oregon</u> Mots. at 33. The Government invokes the "political question doctrine," under which "a controversy is nonjusticiable . . . where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" <u>Nixon v. United States</u>, 506 U.S. 224, 228 (1993) (alteration omitted) (quoting <u>Baker v. Carr</u>, 369 U.S. 186, 217 (1962)). The court concludes, however, that the question of the scope of § 1701 is (1) a justiciable question of statutory construction that (2) resolves in favor of Plaintiffs' contention that the Trafficking Tariff Orders do not "deal with an unusual and extraordinary threat." 50 U.S.C. § 1701(b). Those Orders thus lie outside the bounds of Congress's delegation of authority to the executive branch.

> **A.**    ***The Political Question Doctrine Does Not Preclude Judicial Review of the Trafficking Orders' Compliance with 50 U.S.C. § 1701***

The political question doctrine bars judicial review in a number of different scenarios. The

---

[12] As the court holds that the Worldwide and Retaliatory Tariffs are unlawful for the reasons set forth in Section I of this opinion, the court does not reach the argument that their implementing Orders separately fail to invoke an "unusual and extraordinary threat." 50 U.S.C. § 1701.

Court Nos. 25-00066 & 25-00077                                                    Page 38

Supreme Court has listed them as follows:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker, 369 U.S. at 217; see also Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 195, (2012) (explaining that "a court lacks the authority to decide the dispute before it" when one of the Baker factors pertains).  The Court clarified, however, that this is not a "doctrine . . . of 'political cases,'" Baker, 369 U.S. at 217, and that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," id. at 211.

The Government argues that two Baker factors preclude the court's review of whether the challenged Tariff Orders are permissible under § 1701's "deal with an unusual and extraordinary threat" standard.  The Government asserts "a profound 'lack of judicially discoverable and manageable standards for resolving' the validity of the President's threat assessment," and also the "impossibility of deciding [the question] without an initial policy determination of a kind clearly for nonjudicial discretion."  Gov't Resp. to Oregon Mots. at 30–31 (quoting Baker, 369 U.S. at 217).

This reliance on the political question doctrine is misplaced.  The court can "manage" the standards for applying 50 U.S.C. § 1701's "deal with an unusual and extraordinary threat" language just as it "manages" the standards for any other statutory enactment that constrains independent executive action.  See Feliciano v. Dep't of Transp., 605 U.S. __, __, 145 S. Ct. 1284, 1291 (2025) (listing instances of substantive conditions that federal statutes impose on the exercise

of executive authority).  "[U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones."  Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986).

Even when it goes unmentioned, this principle is a common feature of statutory construction.  In the trade context, for example, the antidumping statute permits the imposition of duties only where "the Commission determines that . . . an industry in the United States . . . is threatened with material injury."  19 U.S.C. § 1673.  The court does not automatically uphold every material injury determination of the ITC on lack-of-manageable-standards grounds simply because "threatened with material injury" is an imprecise term that sounds in foreign affairs.  Instead, the court consults "the traditional tools of statutory construction" to ascertain the term's meaning and applies that meaning to specific cases.  Loper Bright Enters. v. Raimondo, 603 U.S. 369, 403 (2024); see, e.g., Rhone Poulenc, S.A. v. United States, 8 CIT 47, 50–54, 592 F. Supp. 1318, 1322–25 (1984) (citing legislative history for the proposition that while "[i]t is true that threat of material injury may not be based on supposition or conjecture . . . [t]he threat must be real and imminent").  As the Supreme Court explained in Zivotofsky, "[r]esolution of Zivotofsky's claim demands careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute and of the passport and recognition powers.  This is what courts do.  The political question doctrine poses no bar to judicial review of this case."  566 U.S. at 201.

Indeed, that "[t]rade policy is an increasingly important aspect of foreign policy, an area in which the executive branch is traditionally accorded considerable deference . . . is not to

Court Nos. 25-00066 & 25-00077                                              Page 40

say . . . that courts will unthinkingly defer to the Government's view of Congressional

enactments." Fed.-Mogul Corp. v. United States, 63 F.3d 1572, 1581 (Fed. Cir. 1995).  This is

especially so where the relevant congressional enactment is exactly what determines how much

deference the President is entitled to in the first place.  See U.S. Cane Sugar Refiners' Ass'n, 3

CIT at 212, 544 F. Supp. at 895 ("[I]f the President's action is authorized by the statutes relied

upon, the judiciary may not properly inquire or probe into the President's reasoning or into the

existence of the facts calling for the action taken." (emphasis added)).  Either § 1701 entails that

the President invokes IEEPA "pursuant to an express or implied authorization of Congress," which

would mean that "his authority is at its maximum," or § 1701 entails that he invokes it

"incompatibl[y] with the expressed or implied will of Congress," which would mean that "his

power is at its lowest ebb."  Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635–37

(1952) (Jackson, J., concurring).  If a court could never question the President's interpretation of

statutory language to place himself in Justice Jackson's first zone, there would only be one zone.

"[T]he issue here . . . involves the apportionment of power between the executive and legislative

branches," and "[t]he duty of courts to decide such questions has been repeatedly reaffirmed by

the Supreme Court."  Crockett v. Reagan, 558 F. Supp. 893, 898 (D.D.C. 1982), aff'd, 720 F.2d

1355 (D.C. Cir. 1983) (per curiam).

        The Government's position on the unreviewability of § 1701 is also at odds with IEEPA's

text.  Section 1701 is not the particular type of "statute [that] gives a discretionary power to any

person, to be exercised by him upon his own opinion of certain facts," such that "it is a sound rule

of construction, that the statute constitutes him the sole and exclusive judge of the existence of

those facts."  Martin v. Mott, 25 U.S. 19, 31–32 (1827).  That may be true of the NEA, whose

Court Nos. 25-00066 & 25-00077                                    Page 41

operation requires only that the President "specifically declare[] a national emergency." 50 U.S.C. § 1621(b); see also Yoshida II, 526 F.2d at 581 n.32.[13] But IEEPA requires more than just the fact of a presidential finding or declaration: "The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b) (emphasis added). This language, importantly, does not commit the question of whether IEEPA authority "deal[s] with an unusual and extraordinary threat" to the President's judgment. It does not grant IEEPA authority to the President simply when he "finds" or "determines" that an unusual and extraordinary threat exists. Cf., e.g., Silfab Solar, 892 F.3d at 1349 (collecting cases involving "statute[s] authoriz[ing] a Presidential 'determination'"); United States v. George S. Bush & Co., 310 U.S. 371, 376–77 (1940).

Section 1701 is not a symbolic festoon; it is a "meaningful[] constrain[t] [on] the President's discretion," United States v. Dhafir, 461 F.3d 211, 216 (2d Cir. 2006) (internal quotation marks, alteration, and citation omitted). It sets out "the happening of the contingency on which [IEEPA powers] depend," and the court will give it its due effect. The Aurora, 11 U.S. (7 Cranch) 382, 386 (1813).

Congress enacted § 1701, after all, as a substantive addition to TWEA's basic framework. And "[w]hen Congress amends legislation," courts must "presume it intends the change to have real and substantial effect." Ross v. Blake, 578 U.S. 632, 641–42 (2016) (internal quotation marks,

---

[13] The State Plaintiffs confirm that they "are not challenging the President's declaration of an emergency under the National Emergencies Act." Pls.' Oregon Mot. at 21.

Court Nos. 25-00066 & 25-00077                                           Page 42

alteration, and citation omitted).  Thus, although "[w]here a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available," Dalton v. Specter, 511 U.S. 462, 477 (1994), § 1701 is a statute that conditions this commitment on factors that the court retains the power to review.

    In doing so, the court does not ask whether a threat is worth "deal[ing]" with, or venture to "review the bona fides of a declaration of an emergency by the President." Yoshida II, 526 F.2d at 581 n.32; see also United States v. Am. Bitumuls & Asphalt Co., 246 F.2d 270, 276–77 (C.C.P.A. 1957) ("No doubt the courts cannot substitute their discretion for that of the President in proclaiming trade agreements, but where, as here, the President bases his action on an incorrect interpretation of the effect of a law or proclamation, the courts are not bound to accept that interpretation as correct.").

    Indeed, "[t]he question here is not whether something should be done; it is who has the authority to do it." Biden v. Nebraska, 600 U.S. at 501.  The court simply asks whether the President's action "deal[s] with an unusual and extraordinary threat."  Congress provided the necessary standards for resolving this inquiry when it enacted IEEPA, and the court's task is to apply them.  "This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said." United States v. Am. Trucking Ass'ns, 310 U.S. 534, 544 (1940).  The duty does not abate when foreign economic conduct forms part of the issue. See Totes-Isotoner, 594 F.3d at 1352–53.

    According to the Government, there are two ways that the "deal with an unusual and extraordinary threat" provision retains its meaning despite its unreviewability.  The first is that "it . . . binds the President." V.O.S. Oral Arg. Tr. at 47:11–12 (statement of E. Hamilton), May

Court Nos. 25-00066 & 25-00077                                        Page 43

27, 2025, ECF No. 54.  This means, the Government states, that "[t]he President still has to look
at and faithfully apply that statute . . . ."  <u>V.O.S.</u> Oral Arg. Tr. at 47:11–13 (statement of
E. Hamilton).  But what happens if the President does not do so?  Does the court still have no role?
Even if Congress could hypothetically undo the President's invocation of IEEPA powers by
passing a law to that effect (over the President's likely veto, <u>see generally</u> <u>Chadha</u>, 462 U.S. 919),
Congress's inherent power to legislate is no substitute for the "judicial function" of "determining
the limits of statutory grants of authority."  <u>Stark v. Wickard</u>, 321 U.S. 288, 310 (1944).  "The
supremacy of law," moreover, "demands that there shall be opportunity to have some court decide
whether an erroneous rule of law was applied."  <u>St. Joseph Stock Yards Co. v. United States</u>, 298
U.S. 38, 84 (1936) (Brandeis, J., concurring).

    The Government also argues that § 1701 "informs legislative review of any national
emergency declared under IEEPA."  <u>V.O.S.</u> Oral Arg. Tr. at 47:16–18 (statement of E. Hamilton).
But Congress has already legislated on the relevant question by enacting IEEPA "to limit the
President's emergency power in peacetime."  <u>Dames & Moore v. Regan</u>, 453 U.S. 654, 672–73
(1981).  Congress should not have to enact new statutes to enforce the statutory constraints it has
already enacted.

    **B.    *The Trafficking Orders Fall Outside 50 U.S.C. § 1701's Delegation of Authority***

    The court proceeds to adjudicate the justiciable question of whether the Trafficking Orders
satisfy the statutory requirement that IEEPA powers be exercised only to "deal with an unusual
and extraordinary threat."  50 U.S.C. § 1701.

Court Nos. 25-00066 & 25-00077                                            Page 44

The State Plaintiffs[14] do not argue that the Trafficking Orders fail to invoke "unusual and extraordinary threat[s]," as they do regarding the Worldwide and Retaliatory Tariffs (an argument that the court does not reach). Instead, the State Plaintiffs argue that the Trafficking Tariffs do not "deal with" the specific threats[15] they invoke. See Pls.' Oregon Mot. at 25–26; Pls.' Oregon Supp'l Br. at 4. The Government responds that "the President's actions are reasonably related to the desired change in behavior the President seeks from Mexico, Canada, and China because the President's actions pressure those countries to address the crisis." Gov't Resp. to Oregon Mots. at 39.[16]

By this description, and by their own language, the Trafficking Tariff Orders rest on a construction of "deal with" that is at odds with the ordinary meaning of the phrase.

"Deal with" connotes a direct link between an act and the problem it purports to address. A tax deals with a budget deficit by raising revenue. A dam deals with flooding by holding back a river. But there is no such association between the act of imposing a tariff and the "unusual and

---

[14] The V.O.S. Plaintiffs do not seek to enjoin the operation of the Trafficking Tariff Orders. See V.O.S. Compl. at 24.

[15] The Canada Tariff Order purports to "address" an "unusual and extraordinary threat" in the form of "the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." Executive Order 14193, 90 Fed. Reg. at 9113. The Mexico Tariff Order identifies a threat in the form of "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." Executive Order 14194, 90 Fed. Reg. at 9118. And the China Tariff Order refers to the "failure of the PRC government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other TCOs, criminals at large, and drugs." Executive Order 14195, 90 Fed. Reg. at 9122.

[16] Counsel for the Government stated at oral argument that "[t]he purpose of these tariffs is to create pressure, to tariff-pressure other countries to change bad behaviors that the President believes are hurting Americans and our national security." Oregon Oral Arg. Tr. at 31:19–22 (statement of B. Shumate), May 27, 2025, ECF No. 64.

extraordinary threat[s]" that the Trafficking Orders purport to combat.  Customs's collection of

tariffs on lawful imports does not evidently relate to foreign governments' efforts "to arrest, seize,

detain, or otherwise intercept" bad actors within their respective jurisdictions.  The Government's

only suggested connection between these two activities—that "[t]he President's action . . . deters

importation of illicit drugs concealed within seemingly lawful imports," Gov't Resp. to Oregon

Mots. at 40—has no apparent basis in the Trafficking Orders themselves.  The Orders cite the

general problem of a failure to thwart trafficking and other crime as their target "unusual and

extraordinary threat[s]," not the specific problem of drugs smuggled within shipments of dutiable

merchandise.[17]  And if this specific problem were really what the Trafficking Tariff Orders aimed

to "deal with," the Orders would have to "deal with" that specific problem, not create "leverage"

ostensibly to do so.  50 U.S.C. § 1701(b).

    The Trafficking Orders do not "deal with" their stated objectives.  Rather, as the

Government acknowledges, the Orders aim to create leverage to "deal with" those objectives.  See

Oregon Oral Arg. Tr. at 31:19–25, 33:7–16 (statements of B. Shumate).  That approach differs

from what the Yoshida II court identified was Proclamation 4074's "direct effect on our nation's

balance of trade and, in turn, on its balance of payments deficit and its international monetary

reserves."  526 F.2d at 580.  The approach also differs from the relationship identified in Regan v.

Wald, where the Supreme Court sustained on constitutional grounds "the President's decision to

curtail the flow of hard currency to Cuba—currency that could then be used in support of Cuban

adventurism—by restricting travel."  468 U.S. at 243.

---

[17] The Trafficking Tariffs, of course, do not change the effective rate of duty (zero percent ad valorem) for smuggled drugs themselves.

Court Nos. 25-00066 & 25-00077                                            Page 46

The Government's "pressure" argument effectively concedes that the direct effect of the country-specific tariffs is simply to burden the countries they target. It is the prospect of mitigating this burden, the Government explains, that will induce the target countries to crack down on trafficking within their jurisdictions. See Gov't Resp. to Oregon Mots. at 39. But however sound this might be as a diplomatic strategy, it does not comfortably meet the statutory definition of "deal[ing] with" the cited emergency. It is hard to conceive of any IEEPA power that could not be justified on the same ground of "pressure."

The Government's reading would cause the meaning of "deal with an unusual and extraordinary threat" to permit any infliction of a burden on a counterparty to exact concessions, regardless of the relationship between the burden inflicted and the concessions exacted. If "deal with" can mean "impose a burden until someone else deals with," then everything is permitted. It means a President may use IEEPA to take whatever actions he chooses simply by declaring them "pressure" or "leverage" tactics that will elicit a third party's response to an unconnected "threat." Surely this is not what Congress meant when it clarified that IEEPA powers "may not be exercised for any other purpose" than to "deal with" a threat.

The court in Yoshida II explained that "[w]hether a delegation of such breadth as to have authorized Proclamation 4074 would be constitutionally embraced" was a function of the surcharge's "relationship to the particular emergency confronted." 526 F.2d at 576–77. The court further explained that "[a] standard inherently applicable to the exercise of delegated emergency powers is the extent to which the action taken bears a reasonable relation . . . to the emergency giving rise to the action," and that "the nature of the emergency restricts the how of its doing, i.e., the means of execution." Id. at 578–79.

The Government's concept of "leverage" would sap these words of their meaning.  The President's chosen "means of execution" here are tariffs on "[a]rticles that are products of Canada," Executive Order 14193, 90 Fed. Reg. at 9114, "[a]ll articles that are products of Mexico," Executive Order 14194, 90 Fed. Reg. at 9118, and "[a]ll articles that are products of the PRC," Executive Order 14195, 90 Fed. Reg. at 9122.  If leverage were all it took to establish a "reasonable relation" between these means and the "particular emergency" of trafficking, Yoshida II's means-end test would be trivially easy to pass.  See 526 F.2d at 578–79.

In so holding, the court does not pass upon the wisdom or likely effectiveness of the President's use of tariffs as leverage.[18]  That use is impermissible not because it is unwise or ineffective, but because § 1701 does not allow it.  Rather, the Trafficking Orders' "clear misconstruction" of § 1701's "deal with" condition renders them "action[s] outside delegated authority."  Maple Leaf Fish, 762 F.2d at 89.

Soon after joining the Supreme Court, Justice Story declared invalid a proclamation by President Madison that revived an embargo on trade with Britain and France in the Non-Intercourse Act of 1809.  The proclamation lacked statutory authority because it relied on an

---

[18] Another three-judge panel of this court made a similar point in Tembec, Inc. v. United States:

> Consideration of the USTR's authority to order implementation of affirmative section 129(a) determinations does not depend on the court's evaluation of the wisdom of a given implementation. The court is neither called upon to make trade policy, nor to direct the USTR as to whether any section 129 determination should be implemented.  Rather, the court is merely asked to determine the bounds of the USTR's authority to order implementation.

30 CIT 958, 982–83, 441 F. Supp. 2d 1302, 1326–27 (2006), judgment vacated as moot by 31 CIT 241, 251, 475 F. Supp. 2d 1393, 1401–02 (leaving prior decision in place for precedential purposes despite vacatur of judgment).

Court Nos. 25-00066 & 25-00077                                    Page 48

expired embargo provision in the Act.  The young Justice's account of the judicial role in that case

applies undiminished today:

> I take it to be an incontestable principle, that the president has no common law
> prerogative to interdict commercial intercourse with any nation; or revive any act,
> whose operation has expired.  His authority for this purpose must be derived from
> some positive law . . . . For the executive department of the government, this court
> entertain the most entire respect; and amidst the multiplicity of cares in that
> department, it may, without any violation of decorum, be presumed, that sometimes
> there may be an inaccurate construction of a law.  It is our duty to expound the laws
> as we find them in the records of state; and we cannot, when called upon by the
> citizens of the country, refuse our opinion, however it may differ from that of very
> great authorities.  I do not perceive any reasonable ground to imply an authority in
> the president to revive this act, and I must therefore, with whatever reluctance,
> pronounce it to have been, as to this purpose, invalid.

The Orono, 18 F. Cas. 830, 830–31 (C.C.D. Mass. 1812) (No. 10,585).

## CONCLUSION

The court holds for the foregoing reasons that IEEPA does not authorize any of the

Worldwide, Retaliatory, or Trafficking Tariff Orders.  The Worldwide and Retaliatory Tariff

Orders exceed any authority granted to the President by IEEPA to regulate importation by means

of tariffs.  The Trafficking Tariffs fail because they do not deal with the threats set forth in those

orders.  This conclusion entitles Plaintiffs to judgment as a matter of law; as the court further finds

no genuine dispute as to any material fact, summary judgment will enter against the United States.

See USCIT R. 56.  The challenged Tariff Orders will be vacated and their operation permanently

enjoined.

There is no question here of narrowly tailored relief; if the challenged Tariff Orders are

unlawful as to Plaintiffs they are unlawful as to all.  "[A]ll Duties, Imposts and Excises shall be

uniform throughout the United States," U.S. Const. art. I, § 8, cl. 1, and "[t]he tax is uniform when

it operates with the same force and effect in every place where the subject of it is found."  Head

Court Nos. 25-00066 & 25-00077                                    Page 49

Money Cases, 112 U.S. 580, 594 (1884); see also Siemens Am., Inc. v. United States, 692 F.2d

1382, 1383 (Fed. Cir. 1982); Nat'l Corn Growers Ass'n v. Baker, 10 CIT 517, 521, 643

F. Supp. 626, 630–31 (1986) (noting "the statutory and constitutional mandate of uniformity in the

interpretation of the international trade laws").

      Plaintiffs' Motions for Summary Judgment are granted, and their Motions for Preliminary

Injunction are denied as moot.  Judgment will enter accordingly.

<div style="text-align: right">By the panel.</div>

Dated: May 28, 2025
      New York, New York

**Web Pages Cited in the Opinion**



# Potash Statistics and Information

By **National Minerals Information Center**

Statistics and information on the worldwide supply of, demand for, and flow of the mineral commodity *potash*

Potash is used primarily as an agricultural fertilizer (plant nutrient) because it is a source of soluble potassium, one of the three primary plant nutrients; the others are fixed nitrogen and soluble phosphorus.  Potash and phosphorus are mined products, and fixed nitrogen is produced from the atmosphere by using industrial processes.  Modern agricultural practice uses these primary nutrients in large amounts plus additional nutrients, such as boron, calcium, chlorine, copper, iron, magnesium, manganese, molybdenum, sulfur, and zinc, to assure plant health and proper maturation.  The three major plant nutrients have no substitutes, but low  nutrient  content, alternative sources of plant nutrients, such as animal manure and guano, bone meal, compost, glauconite, and "tankage" from slaughterhouses, can be used. Potash denotes a variety of mined and manufactured salts, all containing the element potassium in water  soluble form.

*Subscribe to receive an email notification when a new publication is added to this page. On the Questions tab of the subscriber preferences page, please select "Potash" and any other options in which you may be interested. Please see the list services page for more information.*

# Annual Publications

Mineral Commodity Summaries

- Potash

  PDF Format:

  | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007

Was this page helpful?

- Appx51 -

Case: 25-1812    Document: 148    Page: 55    Filed: 07/20/2025

5/28/25, 10:50 AM    Case 1:25-cv-00066-GSK-TMR-JAR    Potash Statistics and Information | U.S. Geological Survey    Document 55-1    Filed 05/28/25    Page 3 of 9

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| 2020 | 2021 | 2022 | 2023 | 2024 | **2025** |

- Appendixes

## Minerals Yearbook

- Potash
  PDF Format:
  | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |

  XLS Format:
  | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 tables  only release | 2021 tables  only release | 2022 tables-only release | **2023 tables-only release** |

- Archive
  | 1932–1993 |

## Mineral Industry Surveys

- Potash, Crop Year
  PDF Format:
  | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | **2023** | **2024** |

  XLS Format:
  | 2003 | 2004 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | **2023** | **2024** |

# Special Publications

- Earth Mapping Resources Initiative (Earth MRI)    Focus areas for data acquisition for potential domestic resources of 13 critical minerals in the conterminous United States and Puerto Rico — Antimony, barite, beryllium, chromium, fluorspar, hafnium, helium, magnesium, manganese, potash, uranium, vanadium, and zirconium

- Fertilizers    Sustaining Global Food Supplies

- Historical Statistics for Mineral and Material Commodities in the United States Data Series 140

Was this page helpful?

- Potash
  - Potash––A Global Overview of Evaporite-Related Potash Resources, Including Spatial Databases of Deposits, Occurrences, and Permissive Tracts
  - Potash  A Vital Agricultural Nutrient Sourced from Geologic Deposits Open-File Report 2016-1167
  - Technical Announcement: Plenty of Potash, but Some Regions Lack Low Cost Sources for Crop Production

# Contacts

## Stephen Jasinski

**Mineral Commodity Specialist**

National Minerals Information Center
Email: sjasinsk@usgs.gov
Phone: 703-648-7711

---

| SCIENCE | PRODUCTS | NEWS |
|---|---|---|
| Science Explorer | Data | Featured Stories |
| Mission Areas | Maps | News Releases |
| Programs | Publications | Science Snippets |
| Regions | Multimedia Gallery | Technical Announcements |
| Science Centers | Web Tools | Employees in the News |
| Observatories | Software | Get Our News |
| Laboratories | U.S. Board on Geographic Names | Media Contacts |
| Frequently Asked Questions | The National Map | I'm a Reporter |
| Educational Resources | USGS Library | Newsletters |
| Special Topics | USGS Store | |
| | Park Passes | |

Was this page helpful?

- Appx53 -

CONNECT

Headquarters
Locations
Staff Profiles
Social Media
Careers
Contact Us

ABOUT

About Us
Survey Manual
Organization
Key Officials
Congressional
Budget
Careers and Employees
Doing Business
Emergency Management

LEGAL

Accessibility
FOIA
Site Policies
Privacy Policy
Site Map
DOI and USGS link policies apply
No FEAR Act
USA.gov
Vulnerability Disclosure Policy



**U.S. Geological Survey**
U.S. Department of the Interior

## Contact USGS

1-888-392-8545
answers.usgs.gov

Was this page helpful?

- Appx54 -



**MILESTONES: 1969–1976**

> **NOTE TO READERS**
>
> "Milestones in the History of U.S. Foreign Relations" has been retired and is no longer maintained. For more information, please see the full notice.

# Nixon and the End of the Bretton Woods System, 1971–1973

On August 15, 1971, President Richard M. Nixon announced his New Economic Policy, a program "to create a new prosperity without war." Known colloquially as the "Nixon shock," the initiative marked the beginning of the end for the Bretton Woods system of fixed exchange rates established at the end of World War II.



*Secretary of the Treasury John Connally on the day that President Richard Nixon announced his New Economic Policy, August 15, 1971. (Nixon Presidential Library)*

Under the Bretton Woods system, the external values of foreign currencies were fixed in relation to the U.S. dollar, whose value was in turn expressed in gold at the congressionally-set price of $35 per ounce. By the 1960s, a surplus of U.S. dollars caused by foreign aid, military spending, and foreign investment threatened this system, as the United States did not have enough gold to cover the volume of dollars in worldwide circulation at the rate of $35 per ounce; as a result, the dollar was overvalued. Presidents John F. Kennedy and Lyndon B. Johnson adopted a series of measures to support the dollar and sustain Bretton Woods: foreign investment disincentives; restrictions on foreign lending; efforts to stem the

- Appx55 -

official outflow of dollars; international monetary reform; and cooperation with other countries. Nothing worked. Meanwhile, traders in foreign exchange markets, believing that the dollar's overvaluation would one day compel the U.S. government to devalue it, proved increasingly inclined to sell dollars. This resulted in periodic runs on the dollar.

It was just such a run on the dollar, along with mounting evidence that the overvalued dollar was undermining the nation's foreign trading position, which prompted President Richard M. Nixon to act. On August 13, 1971, Nixon convened a meeting of his top economic advisers, including Secretary of the Treasury John Connally and Office of Management and Budget Director George Shultz, at the Camp David presidential retreat to consider a program of action. Notably absent from the meeting were Secretary of State William Rogers and President's Assistant for National Security Affairs Henry Kissinger. After two days of talks, on the evening of August 15, Nixon announced his New Economic Policy in an address to the nation on "The Challenge of Peace." Asserting that progress in bringing an end to U.S. involvement in the war in Vietnam meant that it was time for Americans to turn their minds to the challenges of a post-Vietnam world, Nixon identified a three-fold task: "We must create more and better jobs; we must stop the rise in the cost of living; we must protect the dollar from the attacks of international money speculators." To achieve the first two goals, he proposed tax cuts and a 90-day freeze on prices and wages; to achieve the third, Nixon directed the suspension of the dollar's convertibility into gold. He also ordered that an extra 10 percent tariff be levied on all dutiable imports; like the suspension of the dollar's gold convertibility, this measure was intended to induce the United States' major trading partners to adjust the value of their currencies upward and the level of their trade barriers downward so as to allow for more imports from the United States.

A success at home, Nixon's speech shocked many abroad, who saw it as an act of worrisome unilateralism; the assertive manner in which Connally conducted the ensuing exchange rate negotiations with his foreign counterparts did little to allay such concerns. Nevertheless, after months of negotiations, the Group of Ten (G–10) industrialized democracies agreed to a new set of fixed exchange rates centered on a devalued dollar in the December 1971 Smithsonian Agreement. Although characterized by Nixon as "the most significant monetary agreement in the history of the world," the exchange rates established in the Smithsonian Agreement did not last long. Fifteen months later, in February 1973, speculative market pressure led to a further devaluation of the dollar and another set of exchange parities. Several weeks later, the dollar was yet again subjected to heavy pressure in financial markets; however, this time there would be no attempt to shore up Bretton Woods. In March 1973, the G–10 approved an arrangement wherein six members of the European Community tied their currencies together and jointly floated against the U.S. dollar, a decision that effectively signaled the abandonment of the Bretton Woods fixed exchange rate system in favor of the current system of floating exchange rates.

- Appx56 -

5/28/25, 10:4... Case 1:25-cv-00066-GSK-TMR  Document 55-1  Balance of payments | U.S. Bureau of Economic Analysis (BEA)  Filed 05/28/25    Page 8 of 9

Home (/)  |  Help (/help)  |  Glossary (/help/glossary)  |  Balance of payments

# Balance of payments

## Glossary

**A-Z:**

| - Any - ▾ |
| --- |

**Search Glossary term:**

| |
| --- |

| Apply |
| --- |

Record of transactions between U.S. residents (/help/glossary/us-residents) and foreign residents (/help/glossary/foreign-residents) during a given time period. Includes transactions in goods, services (/help/glossary/services), income, assets, and liabilities. It is broken down into the current accounts (international), capital accounts (international) (/help/glossary/capital-account-international), and financial accounts (international) (/help/glossary/financial-account-international).

Download Acrobat Reader (http://get.adobe.com/reader/)

Page last modified on 4/11/18

**Bureau of Economic Analysis**   4600 Silver Hill Road • Suitland, MD 20746

Contact Us (//www.bea.gov/contact-us)

Working at BEA (//www.bea.gov/about/working-at-bea)

Frequently Asked Questions (//www.bea.gov/help/faq)

Our Policies (//www.bea.gov/about/policies-and-information)

Privacy (/privacy)

Balance of payments | U.S. Bureau of Economic Analysis (BEA)

Commitment to Scientific Integrity (//www.bea.gov/statement-commitment-scientific-integrity-principal-statistical-agencies)

Data Dissemination Practices (//www.bea.gov/about/policies-and-information/data-dissemination)

Open Data (//www.bea.gov/open-data)

USA.gov (https://www.usa.gov/)

Business USA (https://business.usa.gov)

No FEAR Act (http://www.osec.doc.gov/ocr/nofear/nofear.htm)

FOIA (https://www.commerce.gov/opog)

U.S. Department of Commerce (https://www.commerce.gov/)

Emergency Status (https://apps.bea.gov/status/)

The BEA Wire | BEA's Official Blog (//www.bea.gov/news/blog)

News Release Feed (RSS) (https://apps.bea.gov/rss/rss.xml)

Sign up for Email Notifications (/_subscribe/)

(https://www.linkedin.com/company/bureau-of-economic-

- Appx58 -

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE; MICROKITS, LLC; FISHUSA INC.; and TERRY PRECISION CYCLING LLC;**<br><br>          **Plaintiffs,**<br><br>     **v.**<br><br>**THE UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; and HOWARD LUTNICK, in his official capacity as Secretary of Commerce;**<br><br>          **Defendants.** | **Before: Gary S. Katzmann, Judge**<br>          **Timothy M. Reif, Judge**<br>          **Jane A. Restani, Judge**<br><br>**Court No. 25-00066** |
| **THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE STATE OF ILLINOIS, THE STATE OF MAINE; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; and THE STATE OF VERMONT;**<br><br>          **Plaintiffs,**<br><br>     **v.** | **Before: Gary S. Katzmann, Judge**<br>          **Timothy M. Reif, Judge**<br>          **Jane A. Restani, Judge**<br><br>**Court No. 25-00077** |

Court Nos. 25-00066 & 25-00077                                              Page 2

> **UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; and THE UNITED STATES OF AMERICA;**
>
> **Defendants.**

## JUDGMENT

Dated: <u>May 28, 2025</u>

In accordance with the court's opinion of this date, it is hereby

**ORDERED** that Executive Order 14193, <u>Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border</u>, 90 Fed. Reg. 9113 (Feb. 1, 2025); Executive Order 14194, <u>Imposing Duties To Address the Situation at Our Southern Border</u>, 90 Fed. Reg. 9117 (Feb. 1, 2025); Executive Order 14195, <u>Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China</u>, 90 Fed. Reg. 9121 (Feb. 1, 2025); Executive Order 14257, <u>Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits</u>, 90 Fed. Reg. 15041 (Apr. 2, 2025) (collectively, the "Challenged Tariff Orders"); and all modifications and amendments thereto; be, and hereby are, declared to be invalid as contrary to law; it is further

**ORDERED** that the operation of the Challenged Tariff Orders and all modifications and amendments thereto be, and hereby is, permanently enjoined; it is further

- Appx60 -

Court Nos. 25-00066 & 25-00077                                                    Page 3

     **ORDERED** that within 10 calendar days necessary administrative orders to effectuate the

permanent injunction shall issue; and it is further

     **ORDERED** that each party shall bear its own costs.

<u>By the panel.</u>

Dated: <u>May 28, 2025</u>
      New York, New York

### UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE; MICROKITS, LLC; FISHUSA INC.; and TERRY PRECISION CYCLING LLC;** | |
| **Plaintiffs,** | |
| **v.** | |
| **THE UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; and HOWARD LUTNICK, in his official capacity as Secretary of Commerce;** | **Before: Gary S. Katzmann, Judge**<br>**Timothy M. Reif, Judge**<br>**Jane A. Restani, Judge**<br><br>**Court No. 25-00066** |
| **Defendants.** | |
| **THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE STATE OF ILLINOIS, THE STATE OF MAINE; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; and THE STATE OF VERMONT;** | **Before: Gary S. Katzmann, Judge**<br>**Timothy M. Reif, Judge**<br>**Jane A. Restani, Judge**<br><br>**Court No. 25-00077** |
| **Plaintiffs,** | |
| **v.** | |

Court Nos. 25-00066 & 25-00077                                          Page 2

> **UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; and THE UNITED STATES OF AMERICA;**
>
> **Defendants.**

## ORDER

On May 28, the court entered summary judgment against the United States and issued both declaratory and permanent injunctive relief in <u>V.O.S. Selections, Inc. v. United States</u>, Slip Op. 25-66 (May 28, 2025) (per curiam).[1]  This relief included an injunction against the operation of the challenged Tariff Orders and all amendments and modifications thereto.  The injunction issued on account of Plaintiffs' success on the merits and the unavailability under the Uniformity Clause of a complete legal remedy in the form of piecemeal duty refunds to specific plaintiffs.  Intrinsic to this exercise of equitable discretion was the compelling public interest in "ensuring that governmental bodies comply with the law," <u>Am. Signature, Inc. v. United States</u>, 598 F.3d 816, 830 (Fed. Cir. 2010), and the lack of any cognizable hardship borne by the United States in the form of its non-enforcement of orders issued <u>ultra vires</u>.  The court's issuance of injunctive relief did not depend on the wisdom or policy consequences of such non-enforcement.  The principle at work was more straightforward: "[I]njunctive relief is generally available to preclude <u>ultra vires</u> conduct by subordinate executive officials." <u>Kemet Elecs. Corp. v. Barshefsky</u>, 21 CIT 912, 925,

---

[1] As the court explained in its combined opinion, the court also granted summary judgment against the United States in <u>Oregon v. U.S. Dep't of Homeland Security</u>, Case No. 25-00077.

Court Nos. 25-00066 & 25-00077                                                    Page 3

976 F. Supp. 1012, 1024 (1997) (citing <u>Soucie v. David</u>, 448 F.2d 1067, 1072 n.12

(D.C. Cir. 1971)); <u>see also</u> <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579 (1952).

        The court has exclusive jurisdiction to hear this action because the challenged Tariff Orders

are "law[s] of the United States providing for" tariffs. 28 U.S.C. § 1581(i)(1). "[L]aw" is a broader

term than "statutes."  To the extent the challenged Tariff Orders bind Customs to collect duties at

the rates they prescribe, they are laws of the United States.  See <u>Old Dominion Branch No. 496,</u>

<u>Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin</u>, 418 U.S. 264, 273 (1974) (holding for

Supremacy-Clause purposes that "the relevant federal law is Executive Order No. 11491 rather

than the [National Labor Relations Act].").  The challenged Tariff Orders also effect changes to

the Harmonized Tariff Schedule of the United States ("HTSUS").  <u>See, e.g.</u>, Executive Order

14257, 90 Fed. Reg. 15041, 15047 (Apr. 2, 2025) ("In order to establish the duty rates described

in this order, the HTSUS is modified as set forth in the Annexes to this order.").  This means the

Orders are "law[s]" in the additional sense that they modify a statute: The HTSUS "shall be

considered to be statutory provisions of law for all purposes."  19 U.S.C. § 3004(c)(1).

        This jurisdictional conclusion does not hinge on whether IEEPA authorizes tariffs as a

categorical matter—a question this court did not reach in its opinion on May 28.[2]  Nor is it material

---

[2] If jurisdiction followed the merits in this way, the Court of International Trade would have
exclusive jurisdiction to hear only <u>un</u>successful claims of <u>ultra vires</u> presidential tariff orders, with
successful claims left to the federal district courts (or to no court at all).  That would accomplish
the opposite of "remedy[ing] the confusion over the division of jurisdiction between . . . the Court
of International Trade . . . and the district courts and . . . ensur[ing] uniformity in the judicial
decisionmaking process."  <u>K Mart Corp. v. Cartier, Inc.</u>, 485 U.S. 176, 188 (1988) (internal
quotation marks, citation, and parenthesis omitted); <u>see also</u> <u>Conoco, Inc. v. U.S. Foreign-Trade</u>
<u>Zones Bd.</u>, 18 F.3d 1581, 1586 (Fed. Cir. 1994) ("Congress had in mind consolidating this area of
administrative law in one place, and giving to the Court of International Trade, with an already
developed expertise in international trade and tariff matters, the opportunity to bring to it a degree
of uniformity and consistency. Obviously that would not be possible if jurisdiction were spread

Court Nos. 25-00066 & 25-00077                                      Page 4

that some non-tariff-related litigation involving IEEPA takes place in the federal district courts. "The district courts and the Court of International Trade can both have jurisdiction over actions arising out of the same act . . . ." Orleans Int'l, Inc. v. United States, 334 F.3d 1375, 1379 (Fed. Cir. 2003) (USCIT has exclusive jurisdiction over import assessment related to the Beef Promotion and Research Act of 1985).

The Government now moves to stay the court's enforcement of its judgment pending appeal of that judgment to the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"). See V.O.S. Mot. to Stay, May 28, 2025, ECF No. 59; Oregon Mot. to Stay, May 28, 2025, ECF No. 69 (collectively "USCIT Motions to Stay"). The Government has also moved for the same relief from the Federal Circuit, which on May 29 issued an administrative stay of this court's judgment pending consideration of the appellate motion to stay. See Order, No. 2025-1812 (Fed. Cir. May 29, 2025) (per curiam). Plaintiffs in both V.O.S. and Oregon oppose the Government's motions. See Pls.' V.O.S. Resp. to Mot. to Stay, June 2, 2025, ECF No. 62; Pls.' Oregon Resp. to Mot. to Stay, June 2, 2025, ECF No. 72.

Ultimately, the Federal Circuit's impending consideration of the motion to stay before it makes it unnecessary for this court to rule on the USCIT Motions to Stay. The two motions seek identical relief; the Federal Circuit's ruling will control. At the very least, the court cannot determine whether the Government "will be irreparably injured absent a stay" while (1) this court's denial of a stay (if ordered) would leave in place the temporary administrative stay issued by the Federal Circuit and (2) this court's denial of a stay could be immediately superseded by the Federal Circuit's imposition of one. Nken v. Holder, 556 U.S. 418, 426 (2009). It is accordingly

_____

among the district courts throughout the land.").

Court Nos. 25-00066 & 25-00077                                    Page 5

**ORDERED** that the USCIT Motions to Stay are **HELD IN ABEYANCE** pending the

Federal Circuit's consideration of the Government's motion to stay this court's judgment pending

appeal.

<u>By the panel.</u>

Dated: <u>June 3, 2025</u>
     New York, New York

# 1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

US Court of International Trade - New York

New York City

**This case was retrieved on 06/23/2025**

## Header

**Case Number:** 1:25-cv-00066
**Date Filed:** 04/14/2025
**Date Full Case Retrieved:** 06/23/2025
**Status:** Open
**Misc:** (15) Other; Civil

## Summary

**Judge**:  Gary S. Katzmann, Timothy M. Reif, Jane A. Restani
**Jurisdiction**: 28USC  1581(i) Residual Jurisdiction
**Country**: (Not Applicable)
**Jury Demand**: No
**Date Terminated**: 05/28/2025
**Constitutionality Issue**: Y

## Participants

| Litigants | Attorneys |
|---|---|
| FishUSA Inc.<br>**Plaintiff** | Jeffrey      Michael      Schwab<br>Plaintiff<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Bridget      F.      Conlan<br>Plaintiff<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Ilya      Somin<br>Plaintiff<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Reilly      Walsh      Stephens<br>Plaintiff<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| MicroKits, LLC<br>**Plaintiff** | Jeffrey      Michael      Schwab<br>Plaintiff<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Bridget      F.      Conlan<br>Plaintiff<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Litigants | Attorneys |
|---|---|
| | Ilya Somin Plaintiff (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Reilly Walsh Stephens Plaintiff (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Plastic Services and Products, LLC **Plaintiff** doing business as Genova Pipe | Jeffrey Michael Schwab Plaintiff (See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Bridget F. Conlan Plaintiff (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Ilya Somin Plaintiff (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Reilly Walsh Stephens Plaintiff (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Terry Precision Cycling LLC **Plaintiff** | Jeffrey Michael Schwab Plaintiff (See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Bridget F. Conlan Plaintiff (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Ilya Somin Plaintiff (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Reilly Walsh Stephens Plaintiff (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| V.O.S. Selections, Inc. **Plaintiff** | Jeffrey Michael Schwab Plaintiff Liberty Justice Center 7500 Rialto Boulevard Suite 1-250 Austin, TX 78735 (512) 481-4400 Email: jschwab@libertyjusticecenter.org LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Bridget F. Conlan Plaintiff Liberty Justice Center 7500 Rialto Boulevard Suite 1-250 |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Litigants | Attorneys |
|---|---|
| | Austin, TX 78735 (630) 267-9913 Email: bconlan@libertyjusticecenter.org ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Ilya          Somin Plaintiff George Mason University 3301 Fairfax Drive Arlington, VA 22201 (703) 993-8069 Email: isomin@gmu.edu ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Reilly          Walsh          Stephens Plaintiff Liberty Justice Center 7500 Rialto Boulevard Suite 1-250 Austin, TX 78735 (512) 481-4400 Email: rstephens@ljc.org ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Donald J. Trump **Defendant** in his official capacity as President of the United States | Sosun          Bae Defendant U.S. Department of Justice Commercial Litigation Branch - Civil Division P.O. Box 480 Ben Franklin Station Washington, DC 20044 (202) 305-7568 Fax: (202) 514-8624 Email: sosun.bae@usdoj.gov LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Claudia          Burke Defendant U.S. Department of Justice Commercial Litigation Branch - Civil Division P.O. Box 480 Ben Franklin Station Washington, DC 20044 (202) 353-9063 Fax: (202) 307-7965 Email: claudia.burke@usdoj.gov ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Eric          J.          Hamilton Defendant U.S. Department of Justice Federal Programs Branch - Civil Division 950 Pennsylvania Avenue, NW. Washington, DC 20530 (202) 353-2793 Email: eric.hamilton@usdoj.gov ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Justin          Reinhart          Miller Defendant U.S. Department of Justice International Trade Field Office 26 Federal Plaza New York, NY 10278 (212) 264-9241 Fax: (212) 264-1916 Email: Justin.R.Miller@usdoj.gov ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Executive Office of the President **Defendant** | Sosun          Bae Defendant (See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Claudia          Burke Defendant (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Eric          J.          Hamilton Defendant (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Litigants | Attorneys |
|---|---|
| | Justin Reinhart Miller<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Howard Lutnick<br>**Defendant**<br>in his official capacity as Secretary of Commerce | Sosun Bae<br>Defendant<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Claudia Burke<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Eric J. Hamilton<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Justin Reinhart Miller<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Jamieson Greer<br>**Defendant**<br>in his official  capacity as United States Trade Representative | Sosun Bae<br>Defendant<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Claudia Burke<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Eric J. Hamilton<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Justin Reinhart Miller<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Office of the United States Trade Representative<br>**Defendant** | Sosun Bae<br>Defendant<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Claudia Burke<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Eric J. Hamilton<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Justin Reinhart Miller |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Litigants | Attorneys |
|---|---|
| | Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Pete R. Flores<br>**Defendant**<br>in his official  capacity as Acting Commissioner of the United States Customs and Border Protection | Sosun          Bae<br>Defendant<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Claudia          Burke<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Eric          J.          Hamilton<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Justin          Reinhart          Miller<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| United States<br>**Defendant** | Sosun          Bae<br>Defendant<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Claudia          Burke<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Eric          J.          Hamilton<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Justin          Reinhart          Miller<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| United States Customs and Border Protection<br>**Defendant** | Sosun          Bae<br>Defendant<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Claudia          Burke<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Eric          J.          Hamilton<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Justin          Reinhart          Miller<br>Defendant |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Litigants | Attorneys |
|---|---|
| | (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **300 Below, Inc.**<br>**Amicus** | Oliver      James      Dunford<br>Amicus<br>Pacific Legal Foundation 4440 PGA Boulevard Suite 307 Palm Beach Gardens, FL 33410 (916) 503-9060 Fax: (916) 419-7747 Email: odunford@pacificlegal.org LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **Alan Sykes**<br>**Amicus** | John      Bowers      Brew<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel      J.      Cannistra<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika      Bukowski<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **Charles Hagel**<br>**Amicus** | John      Bowers      Brew<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel      J.      Cannistra<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika      Bukowski<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **George Allen**<br>**Amicus** | John      Bowers      Brew<br>Amicus<br>Crowell & Moring, LLP 1001 Pennsylvania Avenue, NW. Washington, DC 20004-2595 (202) 624-2720 Fax: (202) 628-5116 Email: jbrew@crowell.com LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel      J.      Cannistra<br>Amicus<br>Crowell & Moring, LLP 1001 Pennsylvania Avenue, NW. Washington, DC 20004-2595 (202) 624-2902 Fax: (202) 628-5116 Email: dcannistra@crowell.com ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika      Bukowski<br>Amicus<br>Crowell & Moring, LLP Two Manhattan West 375 9th Avenue New York, NY 10001 (212) 530-1930 Email: wbukowski@crowell.com ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **Gerard Magliocca**<br>**Amicus** | John      Bowers      Brew<br>Amicus |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Litigants | Attorneys |
|---|---|
| | (See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel      J.      Cannistra |
| | Amicus |
| | (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika      Bukowski |
| | Amicus |
| | (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **Harold  Hongju Koh** | John      Bowers      Brew |
| **Amicus** | Amicus |
| | (See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel      J.      Cannistra |
| | Amicus |
| | (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika      Bukowski |
| | Amicus |
| | (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **Institute for Policy Integrity** | Max      R.      Sarinsky |
| **Amicus** | Amicus |
| | Institute for Policy at NYU School of Law Wilf Hall 139 MacDougal Street Ste Third Floor New York, NY 10012 (212) 992-8641 Email: max.sarinsky@nyu.edu LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **John C. Danforth** | John      Bowers      Brew |
| **Amicus** | Amicus |
| | (See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel      J.      Cannistra |
| | Amicus |
| | (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika      Bukowski |
| | Amicus |
| | (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **John Daniel Tinder** | John      Bowers      Brew |
| **Amicus** | Amicus |
| | (See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel      J.      Cannistra |
| | Amicus |
| | (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika      Bukowski |
| | Amicus |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Litigants | Attorneys |
|---|---|
| | (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Joshua Claybourn<br>**Amicus** | John    Bowers    Brew<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel    J.    Cannistra<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika    Bukowski<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| KingSeal Corporation<br>**Amicus**<br>doing business as Wesco Enterprises, Inc. | Oliver    James    Dunford<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Michael McConnell<br>**Amicus** | John    Bowers    Brew<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel    J.    Cannistra<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika    Bukowski<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Michael Mukasey<br>**Amicus** | John    Bowers    Brew<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel    J.    Cannistra<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika    Bukowski<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Mischief, LLC<br>**Amicus**<br>doing business as Mischief Toy Store | Oliver    James    Dunford<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Peter Wallison<br>**Amicus** | John    Bowers    Brew<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel    J.    Cannistra |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Litigants | Attorneys |
|---|---|
| | Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika          Bukowski<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Philip Zelikow<br>**Amicus** | John          Bowers          Brew<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel          J.          Cannistra<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika          Bukowski<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Princess Awesome, LLC<br>**Amicus** | Oliver          James          Dunford<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Reclamation Studio, LLC<br>**Amicus**<br>doing business as WitsEnd Mosaic | Oliver          James          Dunford<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Richard Epstein<br>**Amicus** | John          Bowers          Brew<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel          J.          Cannistra<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika          Bukowski<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Rookie Mage Games LLC<br>**Amicus** | Oliver          James          Dunford<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Spielcraft Games, LLC<br>**Amicus** | Oliver          James          Dunford<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Steven Calabresi<br>**Amicus** | John          Bowers          Brew<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Daniel          J.          Cannistra |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Litigants | Attorneys |
|---|---|
| | Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Weronika       Bukowski<br>Amicus<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Stonemaier, LLC<br>**Amicus** | Oliver       James       Dunford<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Tinkerhouse, Inc.<br>**Amicus** | Oliver       James       Dunford<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Upward Glance, LLC<br>**Amicus**<br>doing business as Quent Cordair Fine Art | Oliver       James       Dunford<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| XYZ Game Labs, Inc.<br>**Amicus** | Oliver       James       Dunford<br>Amicus<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |

# Proceedings

| Date | # | Proceeding Text | Details |
|---|---|---|---|
| 04/14/2025 | 1 | Summons . Filed by Jeffrey Michael Schwab of Liberty Justice Center on behalf of All Plaintiffs. (Schwab, Jeffrey) (Entered: 04/14/2025) | |
| 04/14/2025 | 2 | Complaint  against All Defendants. Answer due by 6/13/2025. Filed by Jeffrey Michael Schwab of Liberty Justice Center on behalf of All Plaintiffs.(Schwab, Jeffrey) (Entered: 04/14/2025) | |
| 04/14/2025 | 3 | Form 5 Information Statement . Filed by Jeffrey Michael Schwab of Liberty Justice Center on behalf of All Plaintiffs. (Schwab, Jeffrey) (Entered: 04/14/2025) | |
| 04/14/2025 | 4 | Form 11 Notice of Appearance . Filed by Jeffrey Michael Schwab of Liberty Justice Center on behalf of All Plaintiffs.(Schwab, Jeffrey) (Entered: 04/14/2025) | |
| 04/14/2025 | 5 | Form 13 Corporate Disclosure Statement for all Plaintiffs. Filed by Jeffrey Michael Schwab of Liberty Justice Center on behalf of All Plaintiffs. (Schwab, Jeffrey) (Entered: 04/14/2025) | |
| 04/14/2025 | 6 | Form 11 Notice of Appearance . Filed by Bridget F. Conlan of Liberty Justice Center on behalf of All Plaintiffs.(Conlan, Bridget) (Entered: 04/14/2025) | |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 04/14/2025 | 7 | Certificate of service . Filed by Bridget F. Conlan of Liberty Justice Center on behalf of All Plaintiffs. (Conlan, Bridget) (Entered: 04/14/2025) | |
| 04/16/2025 | 8 | Order entered on 4/16/2025 assigning action to Judges Gary S. Katzmann, Timothy M. Reif and Jane A. Restani.(Swindell, Stephen) (Entered: 04/16/2025) | |
| 04/17/2025 | 9 | Form 11 Notice of Appearance . Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) (Entered: 04/17/2025) | |
| 04/18/2025 | 10 | Application/Motion for temporary restraining order , Application/Motion for preliminary injunction and or Summary Judgment for Permanent Injunction . Responses due by 4/21/2025. Filed by Bridget F. Conlan of Liberty Justice Center on behalf of All Plaintiffs.(Conlan, Bridget) Modified on 4/18/2025 (Swindell, Stephen). (Entered: 04/18/2025) | |
| 04/18/2025 | 11 | Order entered on 4/18/2025 PAPERLESS ORDER - The Defendants are directed to file a response to Plaintiffs' Application for Temporary Restraining Order in the above captioned matter by close of business, Monday April 21, 2025. By the Panel (Swindell, Stephen) (Entered: 04/18/2025) | |
| 04/21/2025 | 12 | Response in Opposition to Motion for Temporary Restraining Order (related document(s) 10 ). Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) (Entered: 04/21/2025) | |
| 04/22/2025 | 13 | Order entered on 4/22/2025: Upon consideration of Plaintiffs' Application for a Temporary Restraining Order, April 18, 2025, ECF No. 10, Defendants' response thereto, April 21, 2025, ECF No. 12, and all other pertinent papers, and upon a determination that Plaintiffs have not clearly shown a likelihood that immediate and irreparable harm would occur before consideration of their Motion for Preliminary Injunction, April 18, 2025, ECF No. 10, it is hereby ORDERED that Plaintiffs' Application is DENIED. Defendants are directed to file a combined response to Plaintiffs' Motions for Preliminary Injunction and Summary Judgment, April 18, 2025, ECF No. 10, no later than close of business on April 29, 2025. This response shall be filed as a single document of no more than 14,000 words, and shall fully set forth all legal arguments relevant to Defendants' opposition to the entry of summary judgment in favor of | |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Plaintiffs. Plaintiffs are directed to file a combined reply of no more than 10,000 words to all of Defendants' responsive filings no later than close of business on May 6, 2025. This reply shall also be filed as a single document. A hearing on all then-pending motions will take place at 11:00 a.m. in Courtroom 1 of the James L. Watson Courthouse on May 13, 2025. (Goell, Geoffrey) (Entered: 04/22/2025) | |
| 04/23/2025 | 14 | Form 11 Notice of Appearance . Filed by George Allen, Steven Calabresi, Joshua Claybourn, John C. Danforth, Richard Epstein, Charles Hagel, Harold Hongju Koh, Gerard Magliocca, Michael McConnell, Michael Mukasey, Alan Sykes, John Daniel Tinder, Peter Wallison, Philip Zelikow of Crowell & Moring, LLP George Allen, Steven Calabresi, Joshua Claybourn, John C. Danforth, Richard Epstein, Charles Hagel, Harold Hongju Koh, Gerard Magliocca, Michael McConnell, Michael Mukasey, Alan Sykes, John Daniel Tinder, Peter Wallison, Philip Zelikow.(Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 15 | Form 13 Corporate Disclosure Statement . Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of George Allen. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 16 | Form 13 Corporate Disclosure Statement . Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of Alan Sykes. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 17 | Form 13 Corporate Disclosure Statement . Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of Charles Hagel. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 18 | Form 13 Corporate Disclosure Statement . Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of Gerard Magliocca. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 19 | Form 13 Corporate Disclosure Statement . Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of Harold Hongju Koh. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 20 | Form 13 Corporate Disclosure Statement . Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of John C. Danforth. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 21 | Form 13 Corporate Disclosure Statement . Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of John Daniel Tinder. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 22 | Form 13 Corporate Disclosure Statement . | |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of Joshua Claybourn. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 23 | Form 13 Corporate Disclosure Statement . Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of Michael Mukasey. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 24 | Form 13 Corporate Disclosure Statement . Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of Michael McConnell. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 25 | Form 13 Corporate Disclosure Statement . Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of Peter Wallison. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 26 | Form 13 Corporate Disclosure Statement . Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of Philip Zelikow. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 27 | Form 13 Corporate Disclosure Statement . Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of Richard Epstein. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 28 | Form 13 Corporate Disclosure Statement . Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of Steven Calabresi. (Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/23/2025 | 29 | Motion to appear as amicus curiae . Responses due by 5/14/2025. Filed by Weronika Bukowski of Crowell & Moring, LLP on behalf of Philip Zelikow, Peter Wallison, John Daniel Tinder, Alan Sykes, Michael Mukasey, Michael McConnell, Gerard Magliocca, Harold Hongju Koh, Charles Hagel, Richard Epstein, John C. Danforth, Joshua Claybourn, Steven Calabresi, George Allen. (Attachments: # 1 Brief)(Bukowski, Weronika) (Entered: 04/23/2025) | |
| 04/28/2025 | 30 | Paperless Order entered on 4/28/2025: Upon consideration of the motion of proposed amici curiae for leave to file a Brief of Amici Curiae Constitutional Scholars, Retired Judges, and Former Public Officials in support of Plaintiffs, April 23, 2025, ECF No. 29 , it is hereby ORDERED by the panel that the motion is granted; and it is further ORDERED that the proposed brief is accepted for filing; and it is further ORDERED that the movants be permitted to participate in these proceedings as amici curiae. By the Panel. (Goell, Geoffrey) (Entered: 04/28/2025) | |
| 04/28/2025 | 31 | Brief of Amici Curiae Constitutional Scholars, Retired Judges, and Former Public Officials | |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | deemed filed. (Goell, Geoffrey) (Entered: 04/28/2025) | |
| 04/29/2025 | 32 | Response in Opposition to Motion for Summary Judgment and Preliminary Injunction (related document(s) 10 ). Replies due by 5/6/2025. Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) Modified on 4/30/2025 (Goell, Geoffrey). (Entered: 04/29/2025) | |
| 04/29/2025 | 33 | The parties are referred to the scheduling order (ECF No. 10) set forth in Oregon v. Trump, CIT No. 25-00077. (Goell, Geoffrey) (Entered: 04/29/2025) | |
| 05/06/2025 | 34 | Paperless Order entered on 5/6/2025: Concerning the hearing scheduled for May 13th, 2025 at 11 AM in Court No. 25-00066, V.O.S. Selections, Inc. et al v. Donald J. Trump et al, the Court is anticipating a fully public proceeding and making provisions to livestream the audio of the proceeding to the public. The parties are to respond to the Case Manager by close of business Wednesday, May 7, 2025 if they anticipate discussing confidential information during the proceeding or have any concerns with audio of the proceeding being livestreamed to the public. By the panel. (Goell, Geoffrey) (Entered: 05/06/2025) | |
| 05/06/2025 | 35 | Reply in support of Motion for Preliminary Injunction and Summary Judgment (related document(s) 32 ). Filed by Jeffrey Michael Schwab of Liberty Justice Center on behalf of All Plaintiffs.(Schwab, Jeffrey) (Entered: 05/06/2025) | |
| 05/08/2025 | 36 | Form 11 Notice of Appearance for Eric Hamilton. Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) (Entered: 05/08/2025) | |
| 05/08/2025 | 37 | Motion for leave to File an Amici Curiae Brief. Responses due by 5/29/2025. Filed by Oliver James Dunford of Pacific Legal Foundation on behalf of 300 Below, Inc., KingSeal Corporation d/b/a Wesco Enterprises, Inc., Mischief, LLC d/b/a Mischief Toy Store, Princess Awesome, LLC, Upward Glance LLC d/b/a Quent Cordair Fine Art, Rookie Mage Games LLC, Spielcraft Games, LLC, Stonemaier, LLC, Tinkerhouse, Inc., Reclamation Studios LLC d/b/a WitsEnd Mosaic, XYZ Game Labs, Inc.. (Attachments: # 1 Brief of Amici Curiae Princess Awesome, LLC, et al.) (Dunford, Oliver) (Entered: 05/08/2025) | |
| 05/08/2025 | 38 | Form 13 Corporate Disclosure Statement . | |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Filed by Oliver James Dunford of Pacific Legal Foundation on behalf of XYZ Game Labs, Inc., Reclamation Studios LLC d/b/a WitsEnd Mosaic, Tinkerhouse, Inc., Stonemaier, LLC, Spielcraft Games, LLC, Rookie Mage Games LLC, Upward Glance LLC d/b/a Quent Cordair Fine Art, Princess Awesome, LLC, Mischief, LLC d/b/a Mischief Toy Store, KingSeal Corporation d/b/a Wesco Enterprises, Inc., 300 Below, Inc.. (Dunford, Oliver) (Entered: 05/08/2025) | |
| 05/08/2025 | 39 | Motion to appear as amicus curiae . Responses due by 5/29/2025. Filed by Max R. Sarinsky of Institute for Policy at NYU School of Law on behalf of Institute for Policy Integrity. (Attachments: # 1 Brief Proposed Amicus Brief)(Sarinsky, Max) (Entered: 05/08/2025) | |
| 05/08/2025 | 40 | Form 11 Notice of Appearance of Oliver J. Dunford, Molly E. Nixon, and Joshua M. Robbins. Filed by Oliver James Dunford of Pacific Legal Foundation on behalf of XYZ Game Labs, Inc., Reclamation Studios LLC d/b/a WitsEnd Mosaic, Tinkerhouse, Inc., Stonemaier, LLC, Spielcraft Games, LLC, Rookie Mage Games LLC, Upward Glance LLC d/b/a Quent Cordair Fine Art, Princess Awesome, LLC, Mischief, LLC d/b/a Mischief Toy Store, KingSeal Corporation d/b/a Wesco Enterprises, Inc., 300 Below, Inc..(Dunford, Oliver) (Entered: 05/08/2025) | |
| 05/08/2025 | 41 | Form 11 Notice of Appearance . Filed by Max R. Sarinsky of Institute for Policy at NYU School of Law on behalf of Institute for Policy Integrity.(Sarinsky, Max) (Entered: 05/08/2025) | |
| 05/08/2025 | 42 | Form 13 Corporate Disclosure Statement . Filed by Max R. Sarinsky of Institute for Policy at NYU School of Law on behalf of Institute for Policy Integrity. (Sarinsky, Max) (Entered: 05/08/2025) | |
| 05/09/2025 | 43 | Order entered on 5/9/2025: Upon consideration of the motion by the Institute for Policy Integrity at New York University School of Law for Leave to File an Amicus Curiae Brief in Support of Plaintiffs' Pending Motion, May 8, 2025, ECF No. 39, it is hereby ORDERED by the panel that the motion is granted; and it is further ORDERED that the proposed brief is accepted for filing. SO ORDERED by the panel (Related Doc # 39 ). (Goell, Geoffrey) (Entered: 05/09/2025) | |
| 05/09/2025 | 44 | Brief of Amici Curiae Institute for Policy Integrity deemed filed. (Goell, Geoffrey) (Entered: 05/09/2025) | |
| 05/09/2025 | 45 | Information concerning public access of the | |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | audio livestream of the hearing scheduled for May 13th, 2025 at 11 AM is available on the Court's website at: https://www.cit.uscourts.gov/upcoming-court-proceedings-accessible-teleconference. (Goell, Geoffrey) (Entered: 05/09/2025) | |
| 05/12/2025 | 46 | Form 11 Notice of Appearance . Filed by Reilly Walsh Stephens of Liberty Justice Center on behalf of All Plaintiffs.(Stephens, Reilly) (Entered: 05/12/2025) | |
| 05/12/2025 | 47 | Form 11 Notice of Appearance . Filed by Ilya Somin of George Mason University on behalf of All Plaintiffs.(Somin, Ilya) (Entered: 05/12/2025) | |
| 05/12/2025 | 48 | Order entered on 5/12/2025: Upon consideration of the motion by Princess Awesome, LLC et al. for Leave to File an Amicus Curiae Brief, May 8, 2025, ECF No. 37, it is hereby ORDERED that the motion is granted; and it is further ORDERED that the proposed brief is accepted for filing. SO ORDERED by the panel (Related Doc # 37 ). (Goell, Geoffrey) (Entered: 05/12/2025) | |
| 05/12/2025 | 49 | Brief of Amici Curiae Princess Awesome, LLC et al deemed filed. (Goell, Geoffrey) (Entered: 05/12/2025) | |
| 05/14/2025 | 50 | Hearing held on May 13, 2025 at 11:00 a.m. in CIT Courtroom 1 . (Goell, Geoffrey) (Entered: 05/14/2025) | |
| 05/16/2025 | 51 | Form 11 Notice of Appearance for Claudia Burke and Justin Miller. Filed by Justin Reinhart Miller of U.S. Department of Justice on behalf of All Defendants.(Miller, Justin) (Entered: 05/16/2025) | |
| 05/21/2025 | 52 | Notice of Supplemental Authority filed. . Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) (Entered: 05/21/2025) | |
| 05/23/2025 | 53 | Notice of Exhibits  (related document(s) 35 , 32 ). Filed by Claudia Burke of U.S. Department of Justice on behalf of All Defendants. (Burke, Claudia) (Entered: 05/23/2025) | |
| 05/27/2025 | 54 | Transcript of Hearing held on 5/13/2025 filed with court. Pursuant to Administrative Order 08-01 re: the redaction of personal data identifiers. Notice of Intent to Redact Deadline due 6/3/2025. Redaction Request due 6/17/2025. Redacted Transcript Deadline set for 6/27/2025. Release of Transcript Restriction set for 8/25/2025. (Goell, Geoffrey) (Entered: 05/27/2025) | |
| 05/28/2025 | 55 | Order entered on 5/28/2025, Slip-Op. 25-66: | |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | The court grants Plaintiffs' Motions for Summary Judgment and denies Plaintiffs' Motions for Preliminary Injunction as moot. By the panel. (related document(s) 13 , 12 , 10 , 54 , 32 ) (Attachments: # 1 Cited Web Page(s)) (Chien, Jason) (Entered: 05/28/2025) | |
| 05/28/2025 | 56 | Judgment to Slip-Op. 25-66 entered on 5/28/2025: In accordance with the court's opinion of this date, it is hereby ORDERED that Executive Order 14193, Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9113 (Feb. 1, 2025); Executive Order 14194, Imposing Duties To Address the Situation at Our Southern Border, 90 Fed. Reg. 9117 (Feb. 1, 2025); Executive Order 14195, Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9121 (Feb. 1, 2025); Executive Order 14257, Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90 Fed. Reg. 15041 (Apr. 2, 2025) (collectively, the "Challenged Tariff Orders"); and all modifications and amendments thereto; be, and hereby are, declared to be invalid as contrary to law; it is further ORDERED that the operation of the Challenged Tariff Orders and all modifications and amendments thereto be, and hereby is, permanently enjoined; it is further ORDERED that within 10 calendar days necessary administrative orders to effectuate the permanent injunction shall issue; and it is further ORDERED that each party shall bear its own costs. By the panel. (related document(s) 55 ) (Chien, Jason) (Entered: 05/28/2025) | |
| 05/28/2025 | 57 | Notice of Appeal of judgment of 05/28/2025 filed. (related document(s) 56 , 55 ). Filed by Claudia Burke of U.S. Department of Justice on behalf of All Defendants.(Burke, Claudia) (Entered: 05/28/2025) | |
| 05/28/2025 | 58 | Appeal of Slip-Op. 25-66 docketed on 5/28/2025 by the CAFC as appeal no. 2025-1812 (related document(s) 57 ). (Chien, Jason) (Entered: 05/28/2025) | |
| 05/28/2025 | 59 | Motion to stay enforcement of judgment pending appeal. Responses due by 6/18/2025. Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) (Entered: 05/28/2025) | |
| 05/29/2025 | 60 | Paperless Order entered on 5/29/2025: ORDERED that by 12 pm ET on May 30, | |

1:25-cv-00066, V.O.S. Selections, Inc. et al v. United States of America

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | 2025, Plaintiffs shall file a brief of no more than 5,000 words responding to the Government's Motion to Stay Enforcement of Judgment Pending Appeal, May 28, 2025, ECF No. 59. (Goell, Geoffrey) (Entered: 05/29/2025) | |
| 05/29/2025 | 61 | Order entered on 5/29/2025 Paperless Order - ORDERED that the courts Order of May 29, 2025, ECF No. 60, is hereby amended; and it is further ORDERED that by 5 pm ET on June 2, 2025, Plaintiffs shall file a brief of no more than 5,000 words responding to the Governments Motion to Stay Enforcement of Judgment Pending Appeal, May 28, 2025, ECF No. 59.(Swindell, Stephen) (Entered: 05/29/2025) | |
| 06/02/2025 | 62 | Response to Motion to Stay Enforcement (related document(s) 59 ). Filed by Jeffrey Michael Schwab of Liberty Justice Center on behalf of All Plaintiffs.(Schwab, Jeffrey) (Entered: 06/02/2025) | |
| 06/03/2025 | 63 | Order entered on 6/3/2025: ORDERED that the USCIT Motions to Stay are HELD IN ABEYANCE pending the Federal Circuit's consideration of the Government's motion to stay this court's judgment pending appeal. (Goell, Geoffrey) (Entered: 06/03/2025) | |
| 06/11/2025 | 64 | Order from CAFC The motions for a stay pending appeal are granted. See Order. (Goell, Geoffrey) (Entered: 06/11/2025) | |
| 06/16/2025 | 65 | Paperless Order entered on 6/16/2025: Upon the Federal Circuit's Order granting a stay of the rulings enjoining certain Executive Orders imposing tariffs, June 11, 2025, ECF No. 64, it is hereby ORDERED that Defendants' Motion to Stay Enforcement of Judgment Pending Appeal, May 28, 2025, ECF No. 59, is DENIED as moot. (Goell, Geoffrey) (Entered: 06/16/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

# 1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

US Court of International Trade - New York

New York City

**This case was retrieved on 06/23/2025**

## Header

**Case Number:** *1:25-cv-00077*
**Date Filed:** 04/23/2025
**Date Full Case Retrieved:** 06/23/2025
**Status:** Open
**Misc:** (206) Tariffs, Duties, Fees, Other Taxes 28USC  1581(i)(2), Embargoes or Other Quantitative Restrictions 28USC  1581(i)(3), Administration and Enforcement 28USC  1581(i)(4); Civil

## Summary

**Judge**: Gary S. Katzmann, Timothy M. Reif, Jane A. Restani
**Jurisdiction**: 28USC  1581(i) Residual Jurisdiction
**Agency**: U.S. Customs and Border Protection
**Country**: (Not Applicable)
**Jury Demand**: No
**Date Terminated**: 05/28/2025
**Constitutionality Issue**: Y

## Participants

| Litigants | Attorneys |
|---|---|
| The State of Arizona<br>**Plaintiff** | Joshua        David Rothenber Bendor<br>Plaintiff<br>Arizona Attorney General's Office 2005 North Central Avenue Phoenix, AZ 85004 (602) 542-8958 Email: joshua.bendor@azag.gov LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Syreeta        Tyrell<br>Plaintiff<br>Arizona Attorney General's Office 2005 North Central Avenue Phoenix, AZ 85004 (602) 542-8310 Email: syreeta.tyrell@azag.gov ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| The State of Colorado<br>**Plaintiff** | Sarah        H.        Weiss<br>Plaintiff<br>Colorado Department of Law Civil Litigation 1300 Broadway Ste 10th Floor Denver, CO 80203 (720) 508-6910 Email: sarah.weiss@coag.gov LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| The State of Connecticut<br>**Plaintiff** | Michael        Kenneth        Skold<br>Plaintiff<br>State of Connecticut Office of the Attorney General Administration 165 Capitol Avenue Suite 5000 Hartford, CT 06106 (860) 808-5316 Fax: (860) 808-5387 Email: |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Litigants | Attorneys |
|---|---|
| | Michael.Skold@ct.gov LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **The State of Delaware**<br>**Plaintiff** | |
| **The State of Illinois**<br>**Plaintiff** | Cara Ann Hendrickson<br>Plaintiff<br>Office of the Illinois Attorney General 115 South LaSalle Street Chicago, IL 60603 (312) 814-3000 Email: cara.hendrickson@ilag.gov ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Gretchen Elizabeth Helfrich<br>Plaintiff<br>Office of the Illinois Attorney General Special Litigation Bureau 115 South LaSalle Street 35th Floor Chicago, IL 60603 (312) 814-1136 Email: gretchen.helfrich@ilag.gov ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **The State of Maine**<br>**Plaintiff** | Vivian A. Mikhail<br>Plaintiff<br>Office of the Maine Attorney General 6 State House Station Augusta, ME 04333 (207) 626-8800 Email: vivian.mikhail@maine.gov LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **The State of Minnesota**<br>**Plaintiff** | Peter J. Farrell<br>Plaintiff<br>Office of the Minnesota Attorney General 445 Minnesota Street Suite 600 St. Paul, MN 55101-2127 (651) 757-1424 Email: peter.farrell@ag.state.mn.us LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **The State of Nevada**<br>**Plaintiff** | Heidi Parry Stern<br>Plaintiff<br>Nevada Attorney General's Office Solicitor General 1 State of Nevada Way Suite 100 Las Vegas, NV 89119 (702) 486-3420 Fax: (702) 486-3768 Email: HStern@ag.nv.gov LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **The State of New Mexico**<br>**Plaintiff** | Amy Senier<br>Plaintiff<br>New Mexico Department of Justice P.O. Drawer 1508 Santa Fe, NM 87504-1508 (505) 490-4060 Email: ASenier@nmdoj.gov LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **The State of New York**<br>**Plaintiff** | Mark H. Ladov<br>Plaintiff<br>NYS Office of The Attorney General 28 Liberty Street New York, NY 10005 (212) 416-8240 Email: mark.ladov@ag.ny.gov LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Rabia C. Muqaddam<br>Plaintiff<br>NYS Office of the Attorney General 28 Liberty Street New York, NY 10005 (212) 416-8883 Email: rabia.muqaddam@ag.ny.gov ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **The State of Oregon**<br>**Plaintiff** | Brian Simmonds Marshall<br>Plaintiff<br>Oregon Department of Justice Trial Division, Special Litigation Unit 100 SW Market Street Portland, OR 97201 |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Litigants | Attorneys |
|---|---|
| | (503) 507-5014 Email: brian.s.marshall@doj.oregon.gov LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | YoungWoo        Joh Plaintiff Oregon Department of Justice Trial Division, Special Litigation Unit 100 SW Market Street Portland, OR 97201 (503) 689-5696 Email: youngwoo.joh@doj.oregon.gov ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| The State of Vermont **Plaintiff** | Ryan        P.        Kane Plaintiff Vermont Attorney General's Office 109 State Street Montpelier, VT 05609 (802) 828-2153 Email: ryan.kane@vermont.gov LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Kristi Noem **Defendant** in her official capacity as Secretary of the Department of Homeland Security | Sosun        Bae Defendant (See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Claudia        Burke Defendant (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Eric        J.        Hamilton Defendant (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Justin        Reinhart        Miller Defendant (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Patricia        M.        McCarthy Defendant (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Peter R. Flores **Defendant** in his official capacity as Acting Commissioner for U.S. Customs and Border Protection | Sosun        Bae Defendant (See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Claudia        Burke Defendant (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Eric        J.        Hamilton Defendant (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Justin        Reinhart        Miller Defendant (See above for address) ATTORNEY TO BE NOTICED Bar |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Litigants | Attorneys |
|---|---|
| | Status: ACTIVE |
| | **Patricia      M.      McCarthy** Defendant (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **President  Donald J. Trump** **Defendant** | **Sosun      Bae** Defendant U.S. Department of Justice Commercial Litigation Branch - Civil Division P.O. Box 480 Ben Franklin Station Washington, DC 20044 (202) 305-7568 Fax: (202) 514-8624 Email: sosun.bae@usdoj.gov LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | **Brett      A.      Shumate** Defendant U.S. Department of Justice Civil Division 950 Pennsylvania Avenue, NW. Washington, DC 20530 (202) 514-2000 Email: brett.a.shumate@usdoj.gov ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | **Claudia      Burke** Defendant U.S. Department of Justice Commercial Litigation Branch - Civil Division P.O. Box 480 Ben Franklin Station Washington, DC 20044 (202) 353-9063 Fax: (202) 307-7965 Email: claudia.burke@usdoj.gov ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | **Eric      J.      Hamilton** Defendant U.S. Department of Justice Federal Programs Branch - Civil Division 950 Pennsylvania Avenue, NW. Washington, DC 20530 (202) 353-2793 Email: eric.hamilton@usdoj.gov ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | **Justin      Reinhart      Miller** Defendant U.S. Department of Justice International Trade Field Office 26 Federal Plaza New York, NY 10278 (212) 264-9241 Fax: (212) 264-1916 Email: Justin.R.Miller@usdoj.gov ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | **Patricia      M.      McCarthy** Defendant U.S. Department of Justice Commercial Litigation Branch - Civil Division P.O. Box 480 Ben Franklin Station Washington, DC 20044 (202) 307-0164 Fax: (202) 514-7969 Email: patricia.mccarthy@usdoj.gov ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| **United States** **Defendant** | **Sosun      Bae** Defendant (See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | **Brett      A.      Shumate** Defendant (See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Litigants | Attorneys |
|---|---|
| | Claudia        Burke<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Eric        J.        Hamilton<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Justin        Reinhart        Miller<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Patricia        M.        McCarthy<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| United States Customs and Border Protection<br>**Defendant** | Sosun        Bae<br>Defendant<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Brett        A.        Shumate<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Claudia        Burke<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Eric        J.        Hamilton<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Justin        Reinhart        Miller<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Patricia        M.        McCarthy<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| United States Department of Homeland Security<br>**Defendant** | Sosun        Bae<br>Defendant<br>(See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Brett        A.        Shumate<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Litigants | Attorneys |
|---|---|
| | Claudia      Burke<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Eric      J.      Hamilton<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Justin      Reinhart    Miller<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Patricia      M.      McCarthy<br>Defendant<br>(See above for address) ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| 148 Members of the United States Congress<br>**Amicus** | William      Fred      Norton<br>Amicus<br>The Norton Law Firm PC 300 Frank H. Ogawa Plaza Suite 450 Oakland, CA 94612 (510) 906-4900 Email: fnorton@nortonlaw.com LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Celine      Georges    Purcell<br>Amicus<br>The Norton Law Firm PC 300 Frank H. Ogawa Plaza Suite 450 Oakland, CA 94612 (510) 906-4900 Email: cpurcell@nortonlaw.com ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Emily      Kirk<br>Amicus<br>The Norton Law Firm PC 300 Frank H. Ogawa Plaza Suite 450 Oakland, CA 94612 (510) 906-4900 Email: ekirk@nortonlaw.com ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Josephine      Kendra    Petrick<br>Amicus<br>The Norton Law Firm PC 300 Frank H. Ogawa Plaza Suite 450 Oakland, CA 94612 (510) 906-4900 Email: jpetrick@nortonlaw.com ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Nathan      Loy      Walker<br>Amicus<br>The Norton Law Firm PC 300 Frank H. Ogawa Plaza Suite 450 Oakland, CA 94612 (510) 906-4900 Email: nwalker@nortonlaw.com ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Rebecca      Kutlow<br>Amicus<br>The Norton Law Firm PC 300 Frank H. Ogawa Plaza Suite 450 Oakland, CA 94612 (510) 906-4900 Email: |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Litigants | Attorneys |
|---|---|
| | rkutlow@nortonlaw.com ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| America First Legal Foundation **Amicus** | R. Trent       McCotter Amicus Boyden Gray PLLC 800 Connecticut Avenue, NW. Suite 900 Washington, DC 20006 (202) 706-5488 Email: tmccotter@boydengray.com LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Bob Ferguson **Amicus** | Steven       W.       Fogg Amicus Corr Cronin LLP 1015 Second Avenue Ste 10th Floor Seattle, WA 98104 (206) 625-8600 Email: sfogg@corrcronin.com LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| | Kathryn       Joy Amicus Corr Cronin LLP 1015 Second Avenue Ste Floor 10 Seattle, WA 98104 (206) 501-3542 Email: kjoy@corrcronin.com ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| Gavin Newsom **Amicus** | Shiwon       Choe Amicus (See above for address) LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |
| The State of California **Amicus** | Shiwon       Choe Amicus California Attorney General's Office Government Law Section 455 Golden Gate Avenue Suite 11000 San Francisco, CA 94102 (415) 510-3835 Email: shiwon.choe@doj.ca.gov LEAD ATTORNEY ATTORNEY TO BE NOTICED Bar Status: ACTIVE |

# Proceedings

| Date | # | Proceeding Text | Details |
|---|---|---|---|
| 04/23/2025 | 1 | Summons . Filed by Brian Simmonds Marshall of Oregon Department of Justice on behalf of The State of Oregon. (Marshall, Brian) (Entered: 04/23/2025) | |
| 04/23/2025 | 2 | Complaint  against All Defendants. Answer due by 6/23/2025. Filed by Brian Simmonds Marshall of Oregon Department of Justice on behalf of All Plaintiffs.(Marshall, Brian) (Entered: 04/23/2025) | |
| 04/23/2025 | 3 | Form 5 Information Statement . Filed by Brian Simmonds Marshall of Oregon Department of Justice on behalf of All Plaintiffs. (Marshall, Brian) (Entered: 04/23/2025) | |
| 04/23/2025 | 4 | Form 13 Corporate Disclosure Statement . Filed by Brian Simmonds Marshall of Oregon Department of Justice on behalf of All Plaintiffs. (Marshall, Brian) (Entered: 04/23/2025) | |
| 04/23/2025 | 5 | Form 11 Notice of Appearance . Filed by | |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) (Entered: 04/23/2025) | |
| 04/24/2025 | 6 | Order entered on 4/24/2025 assigning action to Judges Gary S. Katzmann, Timothy M. Reif and Jane A. Restani. (Swindell, Stephen) (Entered: 04/24/2025) | |
| 04/25/2025 | 7 | Form 11 Notice of Appearance . Filed by YoungWoo Joh of Oregon Department of Justice on behalf of The State of Oregon.(Joh, YoungWoo) (Entered: 04/25/2025) | |
| 04/25/2025 | 8 | Form 11 Notice of Appearance . Filed by Sarah H. Weiss of Colorado Department of Law on behalf of The State of Colorado.(Weiss, Sarah) (Entered: 04/25/2025) | |
| 04/29/2025 | 9 | Form 11 Notice of Appearance . Filed by Rabia C. Muqaddam of New York Office of the Attorney General on behalf of The State of New York.(Muqaddam, Rabia) (Entered: 04/29/2025) | |
| 04/29/2025 | 10 | Paperless Order entered on 4/29/2025: By close of business on May 8, 2025, Plaintiffs may file a brief of no more than 10,000 words setting forth Plaintiffs' position on the Motion for Summary Judgment currently pending in V.O.S. Selections, Inc. v. Trump, No. 25-00066 (USCIT filed Apr. 18, 2025, ECF No. 10). This deadline does not preclude Plaintiffs' filing of their own dispositive or non-dispositive motion at a later date. Plaintiffs' non-filing of a brief by May 8, 2025, will not be construed as a waiver or forfeiture of any claim or argument. Defendants are directed to file a response to the aforementioned brief, of no more than 7,000 words, no later than close of business on May 12, 2025. SO ORDERED by the panel. (Goell, Geoffrey) (Entered: 04/29/2025) | |
| 04/30/2025 | 11 | Form 11 Notice of Appearance . Filed by Michael Kenneth Skold of State of Connecticut Office of the Attorney General on behalf of The State of Connecticut.(Skold, Michael) (Entered: 04/30/2025) | |
| 05/01/2025 | 12 | Form 11 Notice of Appearance . Filed by Gretchen Elizabeth Helfrich of Office of the Illinois Attorney General on behalf of The State of Illinois.(Helfrich, Gretchen) (Entered: 05/01/2025) | |
| 05/01/2025 | 13 | Form 11 Notice of Appearance . Filed by Vivian A. Mikhail of Office of the Maine Attorney General on behalf of The State of Maine.(Mikhail, Vivian) (Entered: 05/01/2025) | |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 05/07/2025 | 14 | Application/Motion for preliminary injunction . Responses due by 5/28/2025. Filed by Brian Simmonds Marshall of Oregon Department of Justice on behalf of All Plaintiffs. (Attachments: # 1 Appendix Index of Attachments, # 2 Declaration of James R. Hines Jr., # 3 Declaration of Brian Simmonds Marshall, # 4 Declaration of Hanna Emerson, # 5 Declaration of Elizabeth Hayes, # 6 Declaration of Robert Jaros, # 7 Declaration of Jenifer Johnson, # 8 Declaration of Jeanette Moy, # 9 Declaration of Amy Ramsdell, # 10 Declaration of Joshua Root, # 11 Declaration of Gregory Shabram, # 12 Declaration of Todd Strole, # 13 Declaration of Kristine Ward, # 14 Declaration of Jake Zelenka)(Marshall, Brian) (Entered: 05/07/2025) | |
| 05/07/2025 | 15 | Brief on V.O.S, Selections' Motion for Summary Judgment (related document(s) 10 ). Filed by Brian Simmonds Marshall of Oregon Department of Justice on behalf of All Plaintiffs. (Marshall, Brian) (Entered: 05/07/2025) | |
| 05/08/2025 | 16 | Form 11 Notice of Appearance . Filed by Ryan P. Kane of Vermont Attorney General's Office on behalf of The State of Vermont.(Kane, Ryan) (Entered: 05/08/2025) | |
| 05/08/2025 | 17 | Form 11 Notice of Appearance . Filed by Amy Senier of New Mexico Department of Justice on behalf of The State of New Mexico.(Senier, Amy) (Entered: 05/08/2025) | |
| 05/08/2025 | 18 | Order entered on 5/8/2025: The court will construe Plaintiffs Motion for Preliminary Injunction, May 7, 2025, ECF No. 14, as a Motion for Summary Judgment. See USCIT R. 56(f). Plaintiffs are therefore directed to file, no later than close of business on May 13, 2025, a supplemental brief of not more than 10,000 words that presents all arguments relevant to establishing Plaintiffs entitlement to judgment as a matter of law. Defendants will file a response of not more than 14,000 words to Plaintiffs Motion and supplemental brief no later than close of business on May 16, 2025. Plaintiffs will file a reply of not more than 7,000 words in further support of their Motion no later than 12:00 p.m. on May 20, 2025. A hearing will take place on May 21, 2025, at 2:00 p.m. EDT in Courtroom 1 in the James L. Watson Courthouse. (SO ORDERED by the panel).(Warner, Scott) (Entered: 05/08/2025) | |
| 05/09/2025 | 19 | Form 11 Notice of Appearance . Filed by Mark H. Ladov of New York Office of the Attorney General on behalf of The State of New York.(Ladov, Mark) (Entered: | |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | 05/09/2025) | |
| 05/12/2025 | 20 | Form 11 Notice of Appearance . Filed by Cara Ann Hendrickson of Office of the Illinois Attorney General on behalf of The State of Illinois.(Hendrickson, Cara) (Entered: 05/12/2025) | |
| 05/12/2025 | 21 | Form 11 Notice of Appearance . Filed by William Fred Norton of The Norton Law Firm PC on behalf of 148 Members of the United States Congress.(Norton, William) (Entered: 05/12/2025) | |
| 05/12/2025 | 22 | Form 11 Notice of Appearance . Filed by Nathan Loy Walker of The Norton Law Firm PC on behalf of 148 Members of the United States Congress.(Walker, Nathan) (Entered: 05/12/2025) | |
| 05/12/2025 | 23 | Form 11 Notice of Appearance . Filed by Josephine Kendra Petrick of The Norton Law Firm PC on behalf of 148 Members of the United States Congress.(Petrick, Josephine) (Entered: 05/12/2025) | |
| 05/12/2025 | 24 | Form 11 Notice of Appearance . Filed by Celine Georges Purcell of The Norton Law Firm PC on behalf of 148 Members of the United States Congress.(Purcell, Celine) (Entered: 05/12/2025) | |
| 05/12/2025 | 25 | Form 11 Notice of Appearance . Filed by Emily Kirk of The Norton Law Firm PC on behalf of 148 Members of the United States Congress.(Kirk, Emily) (Entered: 05/12/2025) | |
| 05/12/2025 | 26 | Form 11 Notice of Appearance . Filed by Rebecca Kutlow of The Norton Law Firm PC on behalf of 148 Members of the United States Congress.(Kutlow, Rebecca) (Entered: 05/12/2025) | |
| 05/12/2025 | 27 | Brief Responding to Plaintiffs' Views on V.O.S. Summary Judgment (related document(s) 15 ). Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants. (Bae, Sosun) (Entered: 05/12/2025) | |
| 05/12/2025 | 28 | Motion for leave to File Amicus Curiae Brief in Support of Plaintiffs. Responses due by 6/2/2025. Filed by William Fred Norton of The Norton Law Firm PC on behalf of 148 Members of the United States Congress. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Norton, William) (Entered: 05/12/2025) | |
| 05/12/2025 | 29 | Form 13 Corporate Disclosure Statement . Filed by William Fred Norton of The Norton Law Firm PC on behalf of 148 Members of the United States Congress. (Norton, William) (Entered: 05/12/2025) | |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 05/13/2025 | 30 | Notice of Form 11 Notice of Appearance Appearance. Filed by Peter J. Farrell of Office of the Minnesota Attorney General on behalf of The State of Minnesota.(Farrell, Peter) (Entered: 05/13/2025) | |
| 05/13/2025 | 31 | Form 11 Notice of Appearance for Eric Hamilton. Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) (Entered: 05/13/2025) | |
| 05/13/2025 | 32 | Supplemental Response to Motion for Summary Judgment (related document(s) 14 ). Filed by Brian Simmonds Marshall of Oregon Department of Justice on behalf of All Plaintiffs. (Attachments: # 1 Appendix Plaintiffs' Statement of Undisputed Material Facts, # 2 Declaration Second Declaration of Brian Simmonds Marshall)(Marshall, Brian) (Entered: 05/13/2025) | |
| 05/13/2025 | 33 | Motion to appear as amicus curiae . Responses due by 6/3/2025. Filed by The State of California, Gavin Newsom The State of California, Gavin Newsom. (Attachments: # 1 Proposed Amici Curiae Brief, # 2 Proposed Order)(Choe, Shiwon) (Entered: 05/13/2025) | |
| 05/13/2025 | 34 | Form 11 Notice of Appearance . Filed by Gavin Newsom, The State of California of California Attorney General's Office Gavin Newsom, The State of California.(Choe, Shiwon) (Entered: 05/13/2025) | |
| 05/13/2025 | 35 | Form 13 Corporate Disclosure Statement . Filed by Gavin Newsom, The State of California Gavin Newsom, The State of California. (Choe, Shiwon) (Entered: 05/13/2025) | |
| 05/15/2025 | 36 | Information concerning public access to the audio livestream for the hearing scheduled for May 21st, 2025 at 2:00 p.m. EDT is available on the Court's website at: https://www.cit.uscourts.gov/upcoming-court-proceedings-accessible-teleconference-or-audio-livestream. (Warner, Scott) (Entered: 05/15/2025) | |
| 05/15/2025 | 37 | Paperless Order entered on 5/15/2025: Upon consideration of the motion by the State of California and Governor Gavin Newsom for Leave to File an Amici Curiae Brief, May 13, 2025, ECF No. 33, it is hereby ORDERED by the panel that the motion is granted; and it is further ORDERED that the proposed brief is accepted for filing. SO ORDERED by the panel (Related Doc # 33 ). (Goell, Geoffrey) (Entered: 05/15/2025) | |
| 05/15/2025 | 38 | Amici Curiae Brief of the State of California | |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | and Governor Gavin Newsom deemed filed (related document(s) 33 ). Filed by Shiwon Choe of the California Attorney General's Office on behalf of The State of California and Governor Gavin Newsom. (Goell, Geoffrey) (Entered: 05/15/2025) | |
| 05/16/2025 | 39 | Paperless Order entered on 5/16/2025: Upon consideration of the motion by 148 Members of the United States Congress for Leave to File an Amici Curiae Brief, May 12, 2025, ECF No. 28, it is hereby ORDERED by the panel that the motion is granted; and it is further ORDERED that the proposed brief is accepted for filing. SO ORDERED by the panel (Related Doc # 28 ). (Goell, Geoffrey) (Entered: 05/16/2025) | |
| 05/16/2025 | 40 | Amici Curiae Brief of 148 Members of Congress deemed filed (related document(s) 28 ). Filed by William Fred Norton of The Norton Law Firm PC on behalf of 148 Members of the United States Congress. (Goell, Geoffrey) (Entered: 05/16/2025) | |
| 05/16/2025 | 41 | Response in Opposition to Motion for Summary Judgment and Preliminary Injunction (related document(s) 14 ). Replies due by 6/6/2025. Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) (Entered: 05/16/2025) | |
| 05/17/2025 | 42 | Order entered on 5/17/2025 Paperless Order: Defendants are directed to re-file their Response in Opposition to Plaintiffs Motion for Preliminary Injunction and Summary Judgment, May 16, 2025, ECF No. 41, in a form that complies with USCIT Rule 56.3(b), no later than close of business on May 19, 2025. (By the panel).(Swindell, Stephen) (Entered: 05/17/2025) | |
| 05/19/2025 | 43 | Unopposed Motion to appear as amicus curiae . Responses due by 6/9/2025. Filed by R. Trent McCotter of Boyden Gray PLLC on behalf of America First Legal Foundation. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Proposed Order)(McCotter, R. Trent) (Entered: 05/19/2025) | |
| 05/19/2025 | 44 | Form 11 Notice of Appearance . Filed by R. Trent McCotter of Boyden Gray PLLC on behalf of America First Legal Foundation.(McCotter, R. Trent) (Entered: 05/19/2025) | |
| 05/19/2025 | 45 | Form 13 Corporate Disclosure Statement . Filed by R. Trent McCotter of Boyden Gray PLLC on behalf of America First Legal Foundation. (McCotter, R. Trent) (Entered: 05/19/2025) | |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 05/19/2025 | 46 | Amended Response in Opposition to Motion for Summary Judgment and Preliminary Injunction (related document(s) 14 ). Replies due by 6/9/2025. Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) (Entered: 05/19/2025) | |
| 05/20/2025 | 47 | Reply in Support of Summary Judgment to Motion  (related document(s) 14 ). Replies due by 6/10/2025. Filed by Brian Simmonds Marshall of Oregon Department of Justice on behalf of The State of Vermont, The State of New York, The State of New Mexico, The State of Nevada, The State of Minnesota, The State of Maine, The State of Illinois, The State of Delaware, The State of Connecticut, The State of Colorado, The State of Arizona, The State of Oregon. (Attachments: # 1 Second Declaration of Professor James R. Hines, Jr.) (Marshall, Brian) (Entered: 05/20/2025) | |
| 05/20/2025 | 48 | Form 11 Notice of Appearance for Patricia McCarthy and Justin Miller. Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) (Entered: 05/20/2025) | |
| 05/20/2025 | 49 | Motion for leave to File Amicus Brief. Responses due by 6/10/2025. Filed by Steven W. Fogg of Corr Cronin LLP on behalf of Bob Ferguson. (Attachments: # 1 Proposed Order, # 2 Brief Washington State Amici Brief)(Fogg, Steven) (Entered: 05/20/2025) | |
| 05/20/2025 | 50 | Paperless Order entered on 5/20/2025 granting Motion to appear as amicus curiae. Upon consideration of the motion by America First Legal Foundation for Leave to File an Amicus Brief, May 19, 2025, ECF No. 43, it is hereby ORDERED by the panel that the motion is granted; and it is further ORDERED that the proposed brief is accepted for filing. (By the panel). (Related Doc # 43 ). (Goell, Geoffrey) (Entered: 05/20/2025) | |
| 05/20/2025 | 51 | Amici Curiae Brief on behalf of America First Legal Foundation deemed filed (related document(s) 50 ). (Goell, Geoffrey) (Entered: 05/20/2025) | |
| 05/20/2025 | 52 | Paperless Order entered on 5/20/2025 granting Motion for leave to file Amicus Brief. Upon consideration of the motion by Washington State Amici Curiae for Leave to File an Amicus Brief, May 20, 2025, ECF No. 49, it is hereby ORDERED by the panel that the motion is granted; and it is further ORDERED that the proposed brief is accepted for filing. (By the panel) (Related | |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Date | # | Proceeding Text | Details |
|------|---|----------------|---------|
| | | Doc # 49 ). (Goell, Geoffrey) (Entered: 05/20/2025) | |
| 05/20/2025 | 53 | Amici Curiae Brief on behalf the State of Washington deemed filed (related document(s) 52 ). (Goell, Geoffrey) (Entered: 05/20/2025) | |
| 05/20/2025 | 54 | Form 11 Notice of Appearance of Kathryn C.M. Joy. Filed by Kathryn Joy of Corr Cronin LLP on behalf of Bob Ferguson.(Joy, Kathryn) (Entered: 05/20/2025) | |
| 05/20/2025 | 55 | Form 11 Notice of Appearance of Steven W. Fogg. Filed by Steven W. Fogg of Corr Cronin LLP on behalf of Bob Ferguson.(Fogg, Steven) (Entered: 05/20/2025) | |
| 05/20/2025 | 56 | Form 13 Corporate Disclosure Statement on behalf of The Washington State Amici. Filed by Steven W. Fogg of Corr Cronin LLP on behalf of Bob Ferguson. (Fogg, Steven) (Entered: 05/20/2025) | |
| 05/20/2025 | 57 | Form 11 Notice of Appearance for Brett Shumate. Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) (Entered: 05/20/2025) | |
| 05/20/2025 | 58 | Notice of Supplemental Authority filed. . Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) (Entered: 05/20/2025) | |
| 05/21/2025 | 59 | Hearing held on May 21, 2025 at 2:00 p.m. in CIT Courtroom 1. . (Goell, Geoffrey) (Entered: 05/21/2025) | |
| 05/22/2025 | 60 | Form 11 Notice of Appearance . Filed by Syreeta Tyrell of Arizona Attorney General's Office on behalf of The State of Arizona.(Tyrell, Syreeta) (Entered: 05/22/2025) | |
| 05/22/2025 | 61 | Form 11 Notice of Appearance . Filed by Joshua David Rothenber Bendor of Arizona Attorney General's Office on behalf of The State of Arizona.(Bendor, Joshua) (Entered: 05/22/2025) | |
| 05/23/2025 | 62 | Consent Motion for errata to correct Amici Curiae Brief document number# 53 filed with the Court electronically on 05/20/2025 (related document(s) 53 ). Responses due by 6/13/2025. Filed by Steven W. Fogg of Corr Cronin LLP on behalf of Bob Ferguson. (Attachments: # 1 Proposed Order, # 2 Brief Redline Amicus Brief, # 3 Brief Amicus Brief (Clean))(Fogg, Steven) (Entered: 05/23/2025) | |
| 05/23/2025 | 63 | Notice of Exhibits  (related document(s) 41 , | |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | 46 ). Filed by Claudia Burke of U.S. Department of Justice on behalf of All Defendants. (Burke, Claudia) (Entered: 05/23/2025) | |
| 05/27/2025 | 64 | Transcript of Oral argument held on 5/21/2025 filed with court. Pursuant to Administrative Order 08-01 re: the redaction of personal data identifiers. Notice of Intent to Redact Deadline due 6/3/2025. Redaction Request due 6/17/2025. Redacted Transcript Deadline set for 6/27/2025. Release of Transcript Restriction set for 8/25/2025. (Cheevers, Casey) (Entered: 05/27/2025) | |
| 05/28/2025 | 65 | Order entered on 5/28/2025, Slip-Op. 25-66: The court grants Plaintiffs' Motions for Summary Judgment and denies Plaintiffs' Motions for Preliminary Injunction as moot. By the panel. (related document(s) 10 , 15 , 64 , 18 , 47 , 41 , 32 , 14 ) (Attachments: # 1 Cited Web Page(s)) (Chien, Jason) (Entered: 05/28/2025) | |
| 05/28/2025 | 66 | Judgment to Slip-Op. 25-66 entered on 5/28/2025: In accordance with the court's opinion of this date, it is hereby ORDERED that Executive Order 14193, Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9113 (Feb. 1, 2025); Executive Order 14194, Imposing Duties To Address the Situation at Our Southern Border, 90 Fed. Reg. 9117 (Feb. 1, 2025); Executive Order 14195, Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9121 (Feb. 1, 2025); Executive Order 14257, Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90 Fed. Reg. 15041 (Apr. 2, 2025) (collectively, the "Challenged Tariff Orders"); and all modifications and amendments thereto; be, and hereby are, declared to be invalid as contrary to law; it is further ORDERED that the operation of the Challenged Tariff Orders and all modifications and amendments thereto be, and hereby is, permanently enjoined; it is further ORDERED that within 10 calendar days necessary administrative orders to effectuate the permanent injunction shall issue; and it is further ORDERED that each party shall bear its own costs. By the panel. (related document(s) 65 ) (Chien, Jason) (Entered: 05/28/2025) | |
| 05/28/2025 | 67 | Notice of Appeal of judgment of 05/28/2025 filed. (related document(s) 65 , 66 ). Filed by Claudia Burke of U.S. Department of Justice on behalf of All Defendants.(Burke, Claudia) | |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | (Entered: 05/28/2025) | |
| 05/28/2025 | 68 | Appeal of Slip-Op. 25-66 docketed on 5/28/2025 by the CAFC as appeal no. 2025-1813 (related document(s) 67 ). (Chien, Jason) (Entered: 05/28/2025) | |
| 05/28/2025 | 69 | Motion to stay enforcement of judgment pending appeal. Responses due by 6/18/2025. Filed by Sosun Bae of U.S. Department of Justice on behalf of All Defendants.(Bae, Sosun) (Entered: 05/28/2025) | |
| 05/29/2025 | 70 | Paperless Order entered on 5/29/2025: ORDERED that by 12 pm ET on May 30, 2025, Plaintiffs shall file a brief of no more than 5,000 words responding to the Government's Motion to Stay Enforcement of Judgment Pending Appeal, May 28, 2025, ECF No. 69. (Goell, Geoffrey) (Entered: 05/29/2025) | |
| 05/29/2025 | 71 | Order entered on 5/29/2025 Paperless Order - ORDERED that the court's Order of May 29, 2025, ECF No. 70, is hereby amended; and it is further ORDERED that by 5 pm ET on June 2, 2025, Plaintiffs shall file a brief of no more than 5,000 words responding to the Governments Motion to Stay Enforcement of Judgment Pending Appeal, May 28, 2025, ECF No. 69.(Swindell, Stephen) (Entered: 05/29/2025) | |
| 06/02/2025 | 72 | Response  to Motion for a Stay of Enforcement of Judgment Pending Appeal (related document(s) 69 ). Filed by Brian Simmonds Marshall of Oregon Department of Justice on behalf of All Plaintiffs. (Attachments: # 1 Declaration of Brian Simmonds Marshall)(Marshall, Brian) (Entered: 06/02/2025) | |
| 06/03/2025 | 73 | Order entered on 6/3/2025: ORDERED that the USCIT Motions to Stay are HELD IN ABEYANCE pending the Federal Circuit's consideration of the Government's motion to stay this court's judgment pending appeal. (Goell, Geoffrey) (Entered: 06/03/2025) | |
| 06/03/2025 | 74 | Form 23 Certification of Filing and Service of Physical Exhibit or Item (flash drive containing media files referenced in the Third Marshall Declaration, ECF Doc. No. 72-1). Filed by Mark H. Ladov of NYS Office of The Attorney General on behalf of The State of New York. (Ladov, Mark) (Entered: 06/03/2025) | |
| 06/04/2025 | 75 | Paperless Order entered on 6/4/2025: The Washington State Amici's consent motion for errata is GRANTED. It is hereby ORDERED that the corrections are deemed made by | |

1:25-cv-00077, The State of Oregon et al v. United States Department of Homeland Security

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | physical substitution of the corrected version of the Joint Brief of Washington State Amici Curiae in Support of Plaintiffs' Motion forPreliminary Injunction and Summary Judgment. (Goell, Geoffrey) (Entered: 06/04/2025) | |
| 06/04/2025 | 76 | Amended Amici Curiae Brief on behalf the State of Washington deemed filed (related document(s) 75 ). Filed by Steven W. Fogg of Corr Cronin LLP on behalf of Bob Ferguson. (Goell, Geoffrey) (Entered: 06/04/2025) | |
| 06/11/2025 | 77 | Order from CAFC The motions for a stay pending appeal are granted. See Order. (Goell, Geoffrey) (Entered: 06/11/2025) | |
| 06/16/2025 | 78 | Paperless Order entered on 6/16/2025: Upon the Federal Circuit's Order granting a stay of the rulings enjoining certain Executive Orders imposing tariffs, June 11, 2025, ECF No. 77, it is hereby ORDERED that Defendants' Motion to Stay Enforcement of Judgment Pending Appeal, May 28, 2025, ECF No. 69, is DENIED as moot. (Goell, Geoffrey) (Entered: 06/16/2025) | |
| 06/18/2025 | 79 | Form 11 Notice of Appearance for Heidi Parry Stern. Filed by Heidi Parry Stern of Nevada Attorney General's Office on behalf of The State of Nevada.(Stern, Heidi) (Entered: 06/18/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE; MICROKITS, LLC; FISHUSA INC.; TERRY PRECISION CYCLING LLC, | Case No. 25-00066 |
| Plaintiffs, | **Complaint** |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, *in his official capacity as Acting Commissioner of United States Customs and Border Protection;* JAMIESON GREER, *in his official capacity as United States Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*, | |
| Defendants. | |

1.  The President of the United States claims the authority to unilaterally levy tariffs on goods imported from any and every country in the world, at any rate, calculated via any methodology—or mere caprice—immediately, with no notice, or public comment, or phase-in, or delay in implementation, despite massive economic impacts that are likely to do severe damage to the global economy.

1

2.  If actually granted by statute, this power would be an unlawful delegation of legislative power to the executive without any intelligible principle to limit his discretion.

3.  But Congress has not delegated any such power. The statute the President invokes—the International Emergency Economic Powers Act ("IEEPA")—does not authorize the President to unilaterally issue across-the-board worldwide tariffs.

4.  And the President's justification does not meet the standards set forth in the IEEPA. His claimed emergency is a figment of his own imagination: trade deficits, which have persisted for decades without causing economic harm, are not an emergency. Nor do these trade deficits constitute an "unusual and extraordinary threat." The President's attempt to use IEEPA to impose sweeping tariffs also runs afoul of the major questions doctrine.

5.  This Court should declare the President's unprecedented power grab illegal, enjoin the operation of the executive actions that purport to impose these tariffs under the IEEPA, and reaffirm this country's core founding principle: there shall be no taxation without representation.

## JURISDICTION

6.  The Court has subject matter jurisdiction under 28 U.S.C. § 1581 because this action is commenced against an officer of the United States and arises out of an executive order providing for tariffs. 28 U.S.C. § 1581(i)(1)(B); *see Silfab Solar, Inc. v. United States*, 296 F. Supp. 3d 1296 (Ct Int'l Trade 2018).

7.  The Court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585. The Court may

2

enter a money judgment for or against the United States in any civil action commenced under 28 U.S.C. § 1581 or 28 U.S.C. § 1582 and may also order any other form of relief that is appropriate in a civil action, including but not limited to declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition.  28 U.S.C. §§ 2643(a)(1), (c)(1).

### PARTIES

8.  Plaintiff V.O.S. Selections, Inc. is a 39-year-old New York-based business, founded by Victor Owen Schwartz, that specializes in the importation and distribution of small-production wines, spirits, and sakes from six continents. V.O.S. Selections has made and makes significant direct purchases of wines, spirits, and sakes from Austria, Italy, Greece, Lebanon, Morocco, Spain, France, Portugal, Mexico, Argentina, Germany, Croatia, Hungary, and South Africa. The products it imports are not reasonably available from a producer in the United States.

9.  Plaintiff Plastic Services and Products, LLC d/b/a Genova Pipe is a Utah-based manufacturer of plastic pipe, conduit, and fittings for plumbing, irrigation, drainage, and electrical applications. Genova Pipe imports raw materials, including plastic resins, from South Korea, Japan, China, Taiwan, Thailand, and Oman; manufacturing equipment from India, Italy, China, and Taiwan; and finished plumbing goods and steel pipe from China, Taiwan, Thailand, Vietnam, and Oman. Genova Pipe has seven facilities across the United States where it manufactures its products, relying on raw materials and equipment from abroad. The products it imports are not reasonably available from a supplier in the United States.

3

10. Plaintiff MicroKits, LLC is a Virginia-based company founded by David Levi in 2020 that makes educational electronic kits and musical instruments. It imports electronic parts from China, Mexico, Thailand, and Taiwan, which are used to assemble kits by Mr. Levi and one part-time employee at its Charlottesville, Virginia location. The electronic parts MicroKits imports are not readily available from United States suppliers at all, without substantial additional costs, or without having to redesign its products.

11. Plaintiff FishUSA Inc., is a 25-year-old retail and wholesale e-commerce business based in Erie County, Pennsylvania, specializing in the production and sale of sportfishing tackle and related gear. FishUSA imports many of its products, including private label products, from foreign countries including Canada, China, South Korea, and Kenya. The imports FishUSA relies on are not readily available from a United States supplier and cannot be obtained from a United States supplier without substantial additional cost and delay in delivery.

12. Plaintiff Terry Precision Cycling, LLC is a Vermont-based brand of women's cycling apparel. It imports finished goods directly from China, Taiwan, Vietnam, Italy, and the Philippines. Its U.S.-based manufacturing partner imports fabrics and trims from several other countries including Guatemala, El Salvador, China, and the European Union to produce products domestically for Terry Cycling. The imports Terry Cycling relies on are not reasonably available from a supplier in the United States.

4

13. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

14. Defendant Executive Office of the President is the federal agency that oversees core functions of the executive branch, including the Office of the United States Trade Representative. It is headquartered in Washington, D.C.

15. Defendant United States of America is the federal government of the United States of America.

16. Defendant United States Customs and Border Protection ("CPB") is a federal agency and a component of the Department of Homeland Security, responsible for, among other things, securing ports of entry and collecting tariffs on imported goods. It is headquartered in Washington, D.C.

17. Defendant Pete R. Flores is the Acting Commissioner of United States Customs and Border Protection. He is sued in his official capacity.

18. Defendant Jameson Greer is the United States Trade Representative and is sued in his official capacity.

19. Defendant Office of the United States Trade Representative is the federal agency responsible for developing United States trade policy. It is headquartered in Washington, D.C.

20. Defendant Howard Lutnick is the United States Secretary of Commerce and is sued in his official capacity.

5

## FACTS

**The Executive Actions**

21. On February 1, 2025, the President issued Executive Order 14195, entitled "Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China" (the "China Executive Order").[1]

22. The China Executive Order declared that a national emergency posed by the influx of illegal aliens and drugs into the United States applied to the Chinese government's failure to "arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other TCOs, criminals at large, and drugs." It declared that China's failure to act constituted "an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States."

23. The China Executive Order imposed an incremental 10% tariff in addition to existing tariffs on all imports from China.

24. On March 3, 2025, the President issued Executive Order 14228, entitled "Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China,"[2] which doubled the incremental tariffs on imports from China to 20%. As justification for the rate increase, it stated that the Chinese government had "not taken adequate steps to alleviate the illicit drug crisis."

_____

[1] Available at https://www.whitehouse.gov/presidential-actions/2025/02/imposing-duties-to-address-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of-china/

[2] Available at https://www.whitehouse.gov/presidential-actions/2025/04/further-amendment-to-duties-addressing-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of-china-as-applied-to-low-value-imports/

6

25. On April 2, 2025, "Liberation Day," the President issued Executive Order 14257, entitled "Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits" (the "Liberation Day Order").[3]

26. The Liberation Day Order imposed sweeping new tariffs at rates not seen since the Great Depression—including a global 10% tariffs on nearly all countries in the world, regardless of whether they impose tariffs on United States products, the rates at which they do so,[4] or the existence of any trade agreements governing the relationship. These tariffs even applied to places with no civilian population or international trade activity, such as the British Indian Ocean Territory, whose only human inhabitants belong to a joint American and British military base on the island of Diego Garcia, and the Heard and McDonald Islands, which are inhabited only by penguins and seals.

27. In addition to the global 10% tariff, the Liberation Day Order levied much higher tariff rates on dozens of countries based on what the administration claimed to be an estimate of "tariff and nontariff barriers," but ultimately turned out to be a

---

[3] Available at https://www.whitehouse.gov/presidential-actions/2025/04/regulating-imports-with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large-and-persistent-annual-united-states-goods-trade-deficits/

[4] Some of the targeted countries, including Israel and Switzerland, impose no tariffs on imports of goods from the United States. See Ilya Somin, *The Tariff Madness Isn't Over*, REASON, Apr.10, 2025, available at https://reason.com/volokh/2025/04/10/the-tariff-madness-isnt-over/; Liz Alderman & Melissa Eddy, *Swiss Indignant to Make the Top 10 of Trump's Tariffs List,* N.Y. TIMES, Apr. 4, 2025, available at https://www.nytimes.com/2025/04/04/business/trump-tariffs-switzerland.html,

simple ratio of the trade deficit in goods (excluding services) as a percentage of total U.S. imports from the given country.

28. The chosen formula is not an accepted methodology for calculating trade barriers and has no basis in economic theory.

29. On April 9, 2025, the President issued an additional Executive Order, entitled "Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation And Alignment,"[5] which paused the elevated tariff rates on most countries for 90 days, while leaving the global 10% tariff in place for all countries.

30. The April 9 Order did not reduce the tariff rate applied to imports from China. Instead, it imposed a new, higher tariff rate of 125% on Chinese goods in retaliation for China's imposition of its own tariffs in response to the President's imposition of elevated tariffs on China. The tariff rate imposed on China was later increased to 145%.

31. On April 11, 2025, the President issued a Memorandum entitled "Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended,"[6] providing clarification of allowable exceptions under the Liberation Day Order. The Memorandum states that "semiconductors," defined as including products classified in various headings and subheadings of Chapters 84 and 85 of

---

[5] Available at https://www.whitehouse.gov/presidential-actions/2025/04/modifying-reciprocal-tariff-rates-to-reflect-trading-partner-retaliation-and-alignment/
[6] Available at https://www.whitehouse.gov/presidential-actions/2025/04/clarification-of-exceptions-under-executive-order-14257-of-april-2-2025-as-amended/

the Harmonized Tariff Schedule of the United States (HTSUS), are exempted from the tariffs imposed by the Liberation Day Order.

32. As a statutory basis, the Liberation Day Order cites the International Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 et seq. ("IEEPA"), the National Emergencies Act, 50 U.S.C. § 1601 et seq., section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483, and section 301 of title 3, United States Code.

33. But none of these statutes grants the President the authority to impose tariffs.

34. The Constitution explicitly reserves to Congress the power to "lay and collect taxes, duties, imposts and excises," and "[t]o regulate commerce with foreign nations." U.S. Const. art. I, § 8 cl.1, 3.

35. Indeed, Title 19 of the United States Code, "Customs and Duties," (as opposed to Title 50, "War and National Defense") is where one would expect to find such presidential authority, but it makes no mention of such authority.

36. Congress knows how to grant the President tariff authority when it wants to.

37. Under 19 U.S. Code § 1862, the President has a clear framework for adjusting duties and import restrictions for the purpose of "safeguarding national security." Yet the President has attempted to avoid that framework by stretching Congress's specific grant of emergency authority into general tariff authority. *See Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.,* 595 U.S. 109, 125 (2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)) (Congress "does not . . . 'hide elephants in mouseholes'").

9

38. Other specific grants of authority for the President to impose tariffs in limited specific circumstances exist. Under 19 U.S.C. § 2411, the President may impose tariffs on other countries that have violated trade agreements. And the President may provide specific, targeted relief to industries that need time to adjust to foreign competition pursuant to 19 U.S.C. § 2251.

39. IEEPA provides that the President may:

    (A)    investigate, regulate, or prohibit—

        (i)    any transactions in foreign exchange,

        (ii)    transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

        (iii)    the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States;

    (B)    investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

50 U.S.C. § 1702.

40. IEEPA further provides that these authorities "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

41. But the word "tariff" does not appear in the IEEPA, nor does any synonym or equivalent.

42. No previous President has used IEEPA to impose tariffs, except for President Trump himself briefly during his first term, in an executive action that was withdrawn before it was fully implemented or subject to judicial review. Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 La. L. Rev. 596, 597 (2023).

43. The "unusual and extraordinary threat" asserted as a "national emergency" by the Liberation Day Order is not an emergency, and is not unusual, extraordinary, new, unexpected, odd, or even surprising.

44. According to the Liberation Day order, the President

> find[s] that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States. That threat has its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system. I hereby declare a national emergency with respect to this threat.

45. In other words, the national emergency claimed to be unusual and extraordinary in this case is the existence of bilateral trade deficits in goods (excluding services, for which the United States runs a trade surplus with the world) with some foreign trading partners.

46. Trade deficits are not unusual or extraordinary—the United States has run a net trade deficit at most times since World War II, and consistently since the 1970s. Brian Reinbold, Yi Wen, *Historical U.S. Trade Deficits*, Federal Reserve Bank of St.

Louis, May 17, 2019.[7] That necessarily includes bilateral trade deficits with many individual nations.

47. Nor are trade deficits an emergency or even necessarily a problem; they simply mean that some other country sells lots of things Americans want to buy, or that its people are unwilling or unable (often because of poverty) to purchase many American goods.[8] Moreover, trade deficits go hand in hand with capital surpluses, which increases investment in the United States. Norbert Michel, *Trade and Investment Are Not a Balancing Act*, Cato Institute, Nov. 9, 2023.[9]

48. Section 604 of the Trade Act of 1974 provides that "[t]he President shall from time to time, as appropriate, embody in the Harmonized Tariff Schedule of the United States the substance of the relevant provisions of this chapter, and of other Acts affecting import treatment, and actions thereunder, including removal, modification, continuance, or imposition of any rate of duty or other import restriction." 19 U.S.C. § 2483.

---

[7] Available at https://www.stlouisfed.org/on-the-economy/2019/may/historical-u-s-trade-deficits

[8] Economists generally agree bilateral trade deficits are not a meaningful problem at all, much less an emergency or an extraordinary and unusual threat. For overviews, *see* James McBride and Andrew Chatzky, *The U.S. Trade Deficit: How Much Does It Matter?,* Council on Foreign Relations (2019), available at https://www.cfr.org/backgrounder/us-trade-deficit-how-much-does-it-matter (noting that most economists recognize bilateral trade deficits do not matter, and the overall trade deficit is determined mainly by macroeconomic forces); Michael Chapman, *Ignore the Politicians: Trade Deficits Don't Really Matter*, Cato Institute (Aug. 29, 2024), available at https://www.cato.org/blog/ignore-politicians-trade-deficits-dont-really-matter (summarizing standard economic analysis showing that trade deficits don't matter).

[9] Available at https://www.cato.org/policy-analysis/trade-investment-are-not-balancing-act

49. Section 604 is a bookkeeping provision: it assigns to the President the task of periodically updating the Harmonized Tariff Schedule to reflect changes in policy that have occurred. It does not set out any power, authority, or process by which the President may unilaterally set such policies.

50. The National Emergencies Act, 50 U.S.C. § 1601 et seq., provides the general framework for declarations of national emergencies. It explicitly disclaims granting any substantive authority itself, instead requiring that "[w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631.

51. And 3 U.S.C. § 301 gives the President "[g]eneral authorization to delegate functions" to subordinate federal officials. It has nothing to do with tariffs or trade regulation.

**The Plaintiffs**

52. V.O.S. Selections, Inc. cannot domestically source the variety of wines, spirits, and sake it offers. Wine produced in different regions of the globe is not fungible due to unique characteristics of taste, texture, and aroma imparted by climate, soil quality, grape varietals, elevation and other factors. V.O.S. works with small artisanal producers who craft products that represent the highest level of authenticity and quality of the place they are from. While there are wines, spirits, and sakes produced in the United States, they are not equivalent substitutes for

13

those that are produced abroad. V.O.S. is on the cutting edge, bringing products to the market from producers and regions that the United States market is not familiar with, and building loyal relationships with these foreign producers that span generations. The uncertainty of the tariff rates is particularly severe for V.O.S. because as a wholesaler of alcoholic beverages it is required to post prices a month in advance of sales and is not permitted to change the prices until the next posting period; this prevents V.O.S. from updating prices to reflect the tariffs charged. This uncertainty also hinders its ability to plan shipments and select products that fall within the correct price points for its customers. The reduction in cash flow caused by increased tariffs also necessarily reduces the company's inventory and the level of business that V.O.S. can conduct, leading to an overall reduction in purchase orders placed with both foreign and domestic suppliers.

53. Genova Pipe cannot domestically source the raw materials, including plastic resins, and manufacturing equipment that are necessary to manufacture its American-made plastic pipe, conduit, and fittings. Of the two U.S. producers of ABS resin suitable for pipe and fittings made by Genova Pipe, one producer is shutting down its only American plant and the other is unavailable to supply Genova Pipe. With over 75% of global ABS resin production concentrated in Northeast Asia, Genova Pipe is dependent on imports to continue its manufacturing operations. The tariffs will directly increase the cost of raw materials, manufacturing equipment, and resale goods imported from abroad by Genova Pipe. And its Canadian

customers may opt for local suppliers who are not subject to the tariffs, potentially resulting in a large loss of revenue.

54. At the current rates, MicroKits cannot order parts from China and will have to pause operations when it runs out of parts. The tariffs on imports from countries other than China will force MicroKits to raise prices—even if the tariffs on Chinese imports didn't force it to pause operations. Because of the Liberation Day Order and the April 9 Executive Order, MicroKits will likely be unable to pay its employees, will lose money, and as a result may go out of business. And the clarification set forth in the April 11 Memorandum exempting semiconductors does not change the threat to MicroKits because many of the components imported by MicroKits needed to fabricate its products are not listed as semiconductors exempt under the Memorandum.

55. FishUSA has spent years working with factories to design and build the products it sells. Shifting production to the United States would mean starting the whole process over again. The tariffs have caused FishUSA to delay shipment of finished goods from China due to the unpredictability of the tariff rate that will be imposed when the product arrives, and it has also paused production of some products. The chaos created by the uncertain tariffs is preventing FishUSA from growing its business, creating more jobs in the United States, and developing new products for its customers.

56. Terry Cycling cannot domestically source its fabrics and finished goods at the quality and price necessary to remain viable in a competitive industry. The impacts

15

of the tariffs on Terry Cycling have been severe and escalating. Terry Cycling has already paid $25,000 in unplanned tariffs this year for goods for which Terry was the importer of record, and Terry projects that the tariffs will cost the company approximately $250,000 by the end of 2025. Looking ahead to 2026, if no changes are made to current trade policy or its supply chain structure, Terry Cycling will face an estimated $1.2 million in tariff costs—an amount that is simply not survivable for a business of its size. To manage these increases, Terry has been forced to pass along costs to its customers and will also decrease product offerings and reduce availability to retail partners. In the short run, these tariffs are an existential threat to Terry Cycling.

57. As these impacts on the Plaintiffs show, the tariffs imposed by the Liberation Day Order are unprecedented, and simply breathtaking in scale.

## COUNT I
**The President's action levying tariffs exceeds his statutory authority.**

58. The preceding paragraphs are incorporated herein by reference.

59. Presidential authority to unilaterally impose worldwide tariffs, if Congress were to grant it at all, must be granted clearly and unmistakably—not through some implication so vague and indeterminate that it went unnoticed by every other President for nearly five decades. *See Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. at 125 (quoting *Whitman*, 531 U.S. at 468) ("Congress does not usually 'hide elephants in mouseholes.'").

60. IEEPA does not mention tariffs or duties, or at any point suggest that it is granting the power to lay and collect such.

16

61. There is no precedent for using IEEPA to impose tariffs. No other President has ever done so or ever claimed the power to do so.

62. The existence of trade deficits in goods with some other countries does not qualify as a national emergency, as required by IEEPA.

63. The existence of trade deficits in goods with some other countries is not an unusual and extraordinary threat, as required by IEEPA.

64. Courts are generally skeptical of newly claimed grants of authority discovered for the first time in decades-old statutes. *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' . . . we typically greet its announcement with a measure of skepticism.") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

65. Indeed, Congress passed IEEPA to *limit* what it saw as presidential abuses of emergency authorities in the years prior to 1977. Peter E. Harrell, *The Case Against IEEPA Tariffs,* Lawfare, Jan. 31, 2025.[10]

66. Congress knows how to grant the President authority to impose or adjust tariffs when it wishes to, and it has done so in more limited statutes contained in Title 19 of the United States Code. But the President has decided to avoid the limits on his authority imposed by Congress by finding a new never-before-seen authority under IEEPA.

---

[10] Available at https://www.lawfaremedia.org/article/the-case-against-ieepa-tariffs

67. The President's interpretation of IEEPA is not entitled to deference—rather, it is the duty of the courts to independently "determine the best reading" of the statute at issue. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024).

68. IEEPA does not grant the President power to impose tariffs at all—it does not mention such a power or imply it. The President's actions exceed the statutory authority Congress granted him.

69. "Courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (quoting *Utility Air Regulatory Group v. EPA*, 573 U. S. 302, 324 (2014)). The assertion that IEEPA grants the President his claimed authority raises a major question that requires Congress to speak clearly in granting such a broad and consequential power to upend the global economy.

70. "In the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the [President] the unprecedented power over American industry that would result from the Government's view." *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 645 (1980). If anything qualifies as a "decision . . . of vast economic and political significance," requiring a clear statement under the major question doctrine, this is it. *West Virginia*, 597 U.S. at 716.

71. The Liberation Day Order would impose an estimated average of almost $1,300 in new taxes per year on American households, for a total tax burden of some $1.4 to 2.2 billion over the next ten years, reducing US gross domestic product by some 0.8% (without accounting for retaliation by foreign states). Erica York &

18

Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War,* Tax Foundation, Apr. 11, 2025.[11]

72. This impact is at least as large—and likely much larger—than executive actions previously found by the Supreme Court to be "major questions," requiring a clear statement by Congress to authorize executive discretion. *See*, *e.g.*, *Biden v. Nebraska*, 600 U.S. 477 (2023) (approximately $400 billion in student loan forgiveness); *West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022) (EPA authority to regulate carbon emissions where the administration had not offered a specific emission reduction plan); *Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. 109 (2022) (pandemic-era vaccination mandate for workers employed by firms with 100 or more employees); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) (temporary pandemic-era nationwide eviction moratorium).

73. The tariffs illegally imposed by the President via IEEPA directly and irreparably harm Plaintiffs, who will face increase costs for the goods they sell, less demand for their higher priced products, and disrupted supply chains, among other threats to their livelihood, up to and including potentially bankrupting otherwise solvent companies.

---

[11] Available at https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war. These estimates include the impact of a few smaller tariff increases adopted by the administration under IEEPA, but most of the effect is from the Liberation Day Order.

**COUNT II**

**If the IEEPA grants broad, unlimited authority to issue tariffs worldwide to the President, it is an unconstitutional delegation of legislative authority.**

74. The preceding paragraphs are incorporated herein by reference.

75. Article I, Section 1 of the Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

76. The nondelegation doctrine is at bottom an attempt to take this provision seriously: there are legislative powers to make laws, and *all* such power resides in the Congress. *See Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 74 (2015) (Thomas, J., concurring) ("[T]he separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise reallocate it.").

77. Implicit in this setup is the premise that neither branch may delegate its sphere of power to any other. "The Vesting Clauses, and indeed the entire structure of the Constitution, make no sense [if there is no limit on delegations]." Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 340 (2002).

78. "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

79. The Court therefore requires that any grant of regulatory authority be provided with an "intelligible principle" that will form the basis of agency action.

*See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935);
*Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935).

80. The basic requirement that derives from the Supreme Court's cases is that
"Congress must set forth standards sufficiently definite and precise to enable
Congress, the courts, and the public to ascertain whether Congress's guidance has
been followed." *Gundy v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J.,
dissenting) (quoting *Yakus v. United States*, 321 U. S. 414, 426 (1944)).

81. IEEPA does not authorize tariffs at all, and this Court should so hold, by
applying the rule of constitutional avoidance if necessary. But even if IEEPA did
grant the President the broad, standardless discretion he claims—which it does
not—and had done so clearly enough to satisfy the major questions doctrine—which
it has not—it would be an unlawful delegation of legislative authority without any
intelligible governing principle.

82. If there are any constitutional limits to delegation at all, they apply here, in a
case where the executive claims virtually limitless authority to impose massive tax
increases and start a worldwide trade war. This is the most "sweeping delegation of
legislative power" claimed by the executive since the Supreme Court invalidated the
National Recovery Act in 1935. *Schechter Poultry*, 295 U.S. at 539; *see id*. at 542
(noting that the NRA gave the "virtually unfettered" discretion to the President "in
approving or prescribing codes, and thus enacting laws for the government of trade
and industry throughout the country").

83. "The Government's theory would give [the President] power to impose enormous costs that might produce little, if any, discernible benefit." *Indus. Union Dep't,* 448 U.S. at 645.

84. This interpretation would render the Act the equivalent of the delegations the Supreme Court previously struck down, "one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474.

85. This interpretation of the IEEPA would constitute a "sweeping delegation of legislative power" of the kind rejected in previous Supreme Court cases. *Indus. Union Dep't,* 448 U.S. at 646 (quoting *Schechter Poultry*, 295 U.S. at 539).

86. If longstanding, perfectly normal, bilateral trade deficits qualify as an "emergency" and as an "unusual and extraordinary threat," the same can be said of virtually any international economic transaction that the President disapproves of for virtually any reason. The President would have the power to impose any level of tariffs on goods or services from any country, for any purpose, pretty much anytime he wants.

87. The sheer breadth of this claimed power—to impose tariffs at any level on any country at any time, at levels that could very well crash the global economy—counsels against reading IEEPA to confer such an extreme delegation of authority. *Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is

raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

88. IEEPA provides no intelligible principle for the imposition of tariffs—indeed, it provides no principle at all by which this Court, or anyone else, might determine whether the guidance Congress provided has been followed.

89. The tariffs illegally imposed by the President via the unconstitutional delegation of authority under IEEPA directly and irreparable harm Plaintiffs, who will face increase costs for the goods they sell, less demand for their higher prices products, and disrupted supply chains, among other threats to their livelihood, up to and including potentially bankrupting otherwise-solvent companies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

a. Declare that IEEPA grants the President no statutory authority to unilaterally impose tariffs;

b. Declare that the President has not identified a valid national emergency as required by IEEPA and that the continued existence of trade deficits in goods is not in and of itself a national emergency;

c. Declare that the President has failed to make any showing of an "unusual and extraordinary threat" as required by IEEPA;

d.  Declare that, if Congress has granted the President unilateral authority to
    impose global tariffs of any amount at his whim, it is an unconstitutional
    delegation of legislative power;

e.  Enjoin the operation of the April 2, 2025, Executive Order entitled
    "Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that
    Contribute to Large and Persistent Annual United States Goods Trade
    Deficits";

f.  Enjoin the operation of the April 9, 2025, Executive Order entitled "Modifying
    Reciprocal Tariff Rates To Reflect Trading Partner Retaliation And
    Alignment";

g.  Award Plaintiffs damages in the amount of any tariffs collected by
    Defendants pursuant to the challenged orders;

h.  Award Plaintiffs other such damages as are appropriate;

i.  Award Plaintiffs their attorneys' fees and costs under the Equal Access to
    Justice Act, 28 U.S.C. § 2412(d), and any other applicable law; and

j.  Grant any such other relief as this Court may deem just or proper.

Dated: April 14, 2025

                                        Respectfully submitted,

                                        /s/ Jeffrey M. Schwab

24

- Appx125 -

Jeffrey Schwab
Reilly Stephens
James McQuaid
Bridget Conlan
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org
bconlan@ljc.org

Ilya Somin
Antonin Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, Virginia 22201
703-993-8069
isomin@gmu.edu

25

# Exhibit

# A

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.*<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>　　　　　　Defendants. | Case No. 25-00066 |

**DECLARATION OF VICTOR SCHWARTZ**

I, Victor Schwartz, state as follows:

　　1.　I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

　　2.　I am the CEO of V.O.S. Selections, Inc. ("V.O.S.").

　　3.　V.O.S.is headquartered in New York. It employs 19 people.

　　4.　V.O.S. imports wines, spirits, and sakes from 16 different countries, including Austria, Italy, Greece, Lebanon, Morocco, Spain, France, Portugal, Mexico, Argentina, Germany, Croatia, Hungary and South Africa.

　　5.　The products V.O.S. imports are not reasonably available from a supplier in the United States.

　　6.　V.O.S. represents small family farmers from around the world with a deep connection to their culture. These farmers rely on V.O.S. as dependable partners to properly market their products.

1

7. V.O.S. works with relatively small, artisanal producers who craft products that represent the highest level of authenticity and quality of the place they are from.

8. V.O.S. is cutting edge, bringing to the market producers and regions that the U.S. market may not be familiar with, in furtherance of its motto "Fearless Importing."

9. V.O.S. carries products from six continents in its highly curated portfolio.

10. V.O.S. works directly with suppliers as much as possible, eschewing middlemen when feasible.

11. V.O.S. has a direct, personal relationship with its suppliers, visiting their operations and hosting them in New York.

12. V.O.S. believes in loyalty and continuity, now working with the daughters and sons of a number of its suppliers.

13. V.O.S. believes the best products can only be produced at a certain quantity level; this philosophy carries over into its portfolio and the size of the company, focusing on human connection.

14. Wine produced in different regions of the globe is not fungible due to unique characteristics of taste, texture, and aroma imparted by climate, soil quality, grape varietals, elevation and other factors.

15. The products V.O.S. carries are integrally and inseparably connected to the geography from where they are produced, that is the concept of "terroir."

2

16. A popular wine like Chianti cannot be replicated domestically because the raw ingredients only exist in that specific geographical location in Tuscany, Italy and the wine can only be raised in the specific climate of that place to produce the qualities that a customer seeks when buying a bottle of said wine.

17. While there are wines, sprits, and sakes produced in the United States, they are not equivalent substitutes for those that are produced abroad.

18. The products V.O.S. carries would not be authentic if they were somehow made elsewhere; its customers know this and know the difference.

19. V.O.S. will suffer irreparable harm from fluctuating tariff rates.

20. As a wholesaler of alcoholic beverages, a heavily regulated business, V.O.S. is required to post product prices with the State Liquor Authority a full month in advance, locking V.O.S. into pricing decisions that don't account for sudden, unpredictable tariffs.

21. These prices cannot be changed until the next price posting period; for instance, the final day of price posting for May, in the state of New York, was Monday, April 7 (before the 90-day pause was instituted on April 9).

22. The flux and unknowable amount of the tariffs made this price posting on April 7 an impossible gamble.

23. Even with a 90-day pause announced on April 9 (where the 10% tariff will still be imposed) V.O.S. is left in a quandary due to the need to plan shipments for after that period.



3

24. The increased tariffs make it impossible for V.O.S. to guarantee customers a price on a wine they would like to use beyond that period, through the spring and summer.

25. Tariffs must be paid by V.O.S. upon arrival at the Port of New York, putting a large, immediate, strain on its cash flow.

26. Even if V.O.S. raises the prices to cover the tariffs, V.O.S. will not see the cash from those sales for months.

27. Increased tariffs impact V.O.S. differently than when a supplier raises prices; suppliers provide substantial notice before instituting a price increase, giving V.O.S. time to adjust and V.O.S. gets terms from its international suppliers which are typically around 90 days ex-cellars or from Port of Arrival.

28. V.O.S. has containers of shipments that are expected to arrive during the 10% pause period; when those containers get to port, V.O.S. will need to lay out the 10% tariff-tax immediately upon arrival, on top of the significant, existing taxes and duties V.O.S. already pays on these goods.

29. The reduction in cash flow caused by increased tariffs also necessarily reduces the company's inventory and the level of business that V.O.S. can conduct, leading to an overall reduction in purchase orders placed with both foreign and domestic suppliers.

30. This is devastating to the company's ability to operate and maintain relationships with the farmers who produce the small-production wines, spirits, and sakes, that V.O.S. specializes in.

4

31. V.O.S. has cultivated relationships with the farmers who produce these wines over the last 39 years, spanning generations in some cases—these relationships will be irreparably harmed by interference from the tariffs.

32. Uncertainty has stopped customers from making buying decisions and caused customers to hold off on orders until the tariff situation has settled.

33. The first quarter of 2025 was one of the worst for V.O.S., with all of its wholesale clients complaining about their weak business level due to uncertainty caused by tariffs. V.O.S. wholesale customers were not buying because their customers were not buying.

34. The uncertainty of the tariffs have caused a constipation in the market at all levels of V.O.S.'s business.

35. This uncertainty also hinders V.O.S.'s ability to plan shipments and select products that fall within the correct price points for its customers.

36. V.O.S. customers have relatively fixed price points for which they seek product. If one of V.O.S.'s products that the customer has been using no longer fits that price point the customer will find something else, and not necessarily a domestic substitute.

37. As a smaller company V.O.S. cannot weather a price war like large companies can.

38. Unexpected increases in tariff rates will wipe out V.O.S.'s profit margin and ultimately make the business inoperable.

5

39. Steep tariffs on foreign-produced wines, spirits and sakes will immediately cause V.O.S. damage to its reputation and goodwill with both its suppliers and customers, as well as lost business opportunities.

Under penalty of perjury, I affirm that the foregoing is true and correct.

Dated: 4/15/25

Victor Schwartz

6

# Exhibit

# B

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Case No. 25-00066 |

**DECLARATION OF ANDREW REESE**

I, Andrew Reese, state as follows:

1.  I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

2.  I am the President of Plastic Services and Products, LLC d/b/a Genova Pipe ("Genova Pipe").

3.  Genova Pipe is headquartered in Salt Lake City, Utah. It employs 234 people.

4.  Genova Pipe makes pipe, conduit, fittings, pipe nipples, and other specialty products for plumbing, irrigation, drainage, and electrical applications.

5.  Geneva Pipe imports raw materials from South Korea, Japan, China, Taiwan, Indonesia, and Oman; manufacturing equipment from India, Italy, China, and Taiwan; and finished plumbing goods and steel pipe from China, Taiwan, Indonesia, Thailand, and Vietnam.

1

6. At this time, Genova Pipe cannot domestically secure the raw materials, including plastic resins, and manufacturing equipment that are necessary to manufacture its American-made plastic pipe, conduit, and fittings.

7. Of the two U.S. producers of ABS resin suitable for pipe and fittings made by Genova Pipe, one producer is shutting down its only American plant and the other has been unavailable to supply Genova Pipe with the required resin since 2021. Because the latter supplier has not supplied Genova Pipe since 2021, it is uncertain whether that supplier would, in the future, become available to supply Genova Pipe under mutually agreeable terms.

8. With over 75% of global ABS resin production concentrated in Northeast Asia, Genova Pipe is dependent on imports to continue its manufacturing operations.

9. The tariffs will directly increase the cost of raw materials, manufacturing equipment, and resale goods imported from abroad by Genova Pipe.

10. Genova Pipe has open orders placed before the tariff announcements which are scheduled to arrive in May and June.

11. The estimated additional cost from tariffs on these resin shipments is $274,087, based on the 10% rate.

12. Genova Pipe already manufactures its products in the United States, but further shifts to domestic suppliers are currently unfeasible due to the closure of Ineos-Styrolution's domestic plant and a lack of competitive equipment suppliers in the U.S.

2

Case: 25-1812     Document: 148     Page: 139     Filed: 07/20/2025

Case: 25-1812    Document: 148    Page: 140    Filed: 07/20/2025

13. Genova Pipe's Canadian customers may opt for local suppliers who are not subject to the tariffs, potentially resulting in a large loss of revenue as well as harm to Genova Pipe's reputation and goodwill with customers and suppliers.

Under penalty of perjury, I affirm that the foregoing is true and correct.

Dated: _04/17/2025_                    _[signature]_

                                             Andrew Reese

3

# Exhibit

# C

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Case No. 25-00066 |

**DECLARATION OF DAVID LEVI**

I, David Levi, state as follows:

    1.  I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

    2.  I am the CEO of MicroKits LLC ("MicroKits").

    3.  MicroKits is headquartered in Charlottesville, Virginia.

    4.  MicroKits makes small educational electronic kits and musical instruments that students and hobbyists can assemble. They are a useful tool to teach students and hobbyists the basics of electrical engineering.

    5.  MicroKits employs one part-time worker in addition to David Levi.

    6.  MicroKits imports electronic parts from China, Mexico, Thailand, and Taiwan, but final assembly takes place in Charlottesville.

    7.  At the current rates, MicroKits cannot order parts from China and will have to pause operations when it runs out of parts.

8.  The tariffs on imports from countries other than China will force MicroKits to raise prices—even if the tariffs on Chinese imports didn't force it to pause operations.

9.  Because of the Liberation Day Order and the April 9 Executive Order, MicroKits will likely be unable to order more parts to make its products, which will cause it to furlough its employees, lose money, and potentially go out of business.

10. MicroKits estimates that it currently has enough parts to continue manufacturing operations as usual for 7 weeks before it will have to shut down its U.S. manufacturing.

11. The length of the shutdown is dependent upon the duration of the tariffs; due to an estimated 10 week delay between ordering and receiving imported parts, if the injunction were granted today MicroKits estimates they would shut down for 3 weeks.

12. MicroKits will not be able to produce enough inventory to stay in stock during the crucial Q4 holiday sales season if more parts are not ordered to continue manufacturing.

13. MicroKits cannot afford to pay higher prices for the component parts it orders from China and cannot source the component parts domestically for a reasonable price.

14. MicroKits is currently fighting to compete with Chinese factories that have stolen its code and designs.

2

15. MicroKits will not be able to compete with copycat versions of its product, made by companies infringing on its intellectual and fully producing their products in China, if it has to pay more for its component parts due to tariffs or if MicroKits runs out of inventory.

16. MicroKits had planned to hire an operations assistant to provide more time for David Levi to design products, but the tariffs have put that plan on hold.

17. MicroKits will suffer irreparable harm to its business absent an injunction due to loss of business opportunities, harm to its reputation and loss of goodwill with consumers.

Under penalty of perjury, I affirm that the foregoing is true and correct.

Dated: _4/16/2025_

_David Levi_

David Levi

3

# Exhibit

# D

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.* | |
| Plaintiffs, | Case No. 25-00066 |
| v. | |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

**DECLARATION OF DAN PASTORE**

I, Dan Pastore, state as follows:

1. I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

2. I am the President of FishUSA, Inc. ("FishUSA").

3. FishUSA is headquartered in Fairview, Pennsylvania. It employs approximately 70 full and part-time employees.

4. FishUSA produces and sells sportfishing tackle and related gear.

5. FishUSA is a direct importer of many products from foreign countries, including from Canada, China, South Korea, and Kenya.

6. The imports FishUSA relies on are not reasonably available from a United States supplier.

7. FishUSA imports some of its product directly from vendors in Canada, whose product is manufactured in Canada and in other countries.

1

8.  FishUSA also produces its own private label products. For private label products FishUSA goes through a multi-year development process with the manufacturer to source, design, and test before going into production. These private label products include fishing rods, fishing nets, tackle storage and fly boxes, terminal tackle and apparel.

9.  FishUSA purchases fishing tacking from major tackle manufacturers and that product is made all over the world. Much of the fishing tackle available in the United States is manufactured in China and other Asian countries.

10. FishUSA also sells tackle, gear and apparel manufactured by hundreds of different suppliers, including U.S.-based companies or the U.S. divisions of international companies that import their products from foreign countries. Much of this gear is produced in foreign countries, especially China. FishUSA anticipates manufacturers will raise the prices on the products FishUSA purchases due to the tariffs; some have already done so.

11. Many if not most of the products that FishUSA purchases from domestic suppliers are sourced in whole or in part from abroad, meaning that almost all of its inventory sources will be impacted by the tariffs at some level.

12. There is currently no alternative source for cost-effective fishing tackle that is made entirely in the United States, and there is not sufficient time for businesses like FishUSA to develop that infrastructure before the business will face dire consequences.

2

13. It takes many months and in many cases years working with a factory to design FishUSA's private label product. FishUSA cannot just shift this production to the US without starting over.

14. The imposition of tariffs that effectively require FishUSA to shift production to the United States will push back delivery of their product at least months and in many cases years, and the cost will be substantially higher.

15. If FishUSA had the ability to source its products in the United States at a competitive price, it would have already done so.

16. FishUSA would be willing to source products manufactured in the United States, if they were competitively priced to make economic sense for the business; to FishUSA's knowledge, this does not exist currently and would take many years to develop. FishUSA is building a private label rod in the United States, but the cost of the rod is significantly higher than having a comparable rod built overseas.

17. The tariffs have caused FishUSA to delay shipment of finished goods from China due to the unpredictability of the tariff rate that will be imposed when the product arrives.

18. The tariffs have also caused FishUSA to pause production of some products.

19. The chaos created by the uncertain tariffs is preventing FishUSA from growing its business, creating more jobs in the United States, and developing new products for its customers.

20. From the time the order is placed it takes 2-3 months for an order to arrive in the United States; the current state of fluctuating tariff rates means that when

3

FishUSA places an order it is unable to predict what tariff rate it will be required to pay when that order arrives.

21. This level of uncertainty is untenable for a for-profit business; FishUSA needs to know the net cost of its imports before placing an order.

22. Without complete information on its costs, FishUSA cannot determine if a product will be profitable and if it is even worth ordering.

23. Due to this uncertainty, FishUSA has decided to pause some of its orders until there is more clarity on the future of tariffs.

24. FishUSA will suffer damage to its reputation and loss of goodwill in its relationships with suppliers if FishUSA is forced to continue pausing orders and becomes unreliable as a purchaser.

25. There is not sufficient time for FishUSA to develop the necessary supply chain infrastructure before the business will face dire consequences from the inability to keep inventory in stock for its customers.

26. FishUSA has a reputation with its customers as a reliable source of fishing tackle and related gear. FishUSA will lose customers if it is unable to keep inventory in stock on its website.

27. FishUSA has also stopped work on a project in China that was slotted to go into production imminently, because the current tariffs would make that project unworkable.

28. The tariffs are directly causing FishUSA the irreparable harm of lost business opportunities.

4

Under penalty of perjury, I affirm that the foregoing is true and correct.


Dated: April 15, 2025

Dan Pastore

5

# Exhibit

# E

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. Selections, Inc., *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>Donald J. Trump, *et al.*,<br><br>Defendants. | Case No. 25-00066 |

## DECLARATION OF NIKOLAUS HOLM

I, Nikolaus Holm, state as follows:

1.  I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

2.  I am the President of Terry Precision Cycling, LLC ("Terry Cycling").

3.  Terry Cycling is a brand of women's cycling apparel, registered in Delaware with its principal place of business in Burlington, Vermont.

4.  Terry Cycling is a family-owned business with 16 employees.

5.  The current IEEPA tariffs represent an existential threat more severe than anything Terry Cycling has faced before.

6.  Today, Terry Cycling imports finished goods directly from China, Taiwan, Vietnam, Italy and the Philippines.

7.  Terry Cycling's US-based manufacturing partner imports fabrics and trims from several other countries including Guatemala, El Salvador, China, and the European Union to produce products domestically for Terry Cycling.

1

8.  Many of the fabric imports Terry Cycling relies on are not reasonably available from a supplier in the United States.

9.  Terry Cycling cannot domestically source its fabrics and finished goods at the quality and price necessary to remain viable in a competitive industry.

10. Terry Cycling has actively explored opportunities to expand its U.S.-based manufacturing. Terry Cycling continues to work with a longstanding domestic partner in Washington State, but despite ongoing efforts, Terry Cycling has not found additional U.S. manufacturers able to meet its product quality standards at a market-competitive price point.

11. Even factoring in the already high tariffs on goods made in China (typically 28–32%), the cost of goods produced abroad has consistently been 30–40% lower than domestic production for Terry Cycling's products.

12. Terry Cycling's saddle products have always been manufactured in Taiwan and Italy, where the expertise, equipment, and quality standards required for this highly technical product exist. Currently, there is no U.S.-based manufacturing for saddles that meets Terry Cycling's performance and quality requirements.

13. U.S. production has always remained part of Terry Cycling's supply chain through a long-standing partnership in Washington State.

14. Terry Cycling would like to expand its domestic manufacturing footprint, but this would require significant time and price increases to its consumers.

15. Over the years, Terry Cycling has absorbed shrinking margins on U.S.-made goods due to ongoing wage inflation with higher margin product from overseas.

2

16. Currently our margins on our US made products are less than the margins of imported goods. U.S. made products would need to generate higher margins to keep the business financially sustainable.

17. Even if Terry Cycling moved all manufacturing to the United States, under the current tariff regime the tariffs on raw material costs needed for U.S. production will still make US production unstainable without a dramatic increase in prices on goods sold to the consumer

18. Terry Cycling expects to implement some level of tariff mitigation, but the nature of these tariffs—both far-reaching and unpredictable—makes long-term planning nearly impossible for a small business to navigate.

19. Terry Cycling's largest wholesale customer, which represents approximately 14% of projected 2025 revenue, is currently requesting confirmation of fall pricing. Due to the uncertainty surrounding the tariffs, Terry Cycling is unable to confirm costs, and may lose this business if it is forced to increase prices to account for the IEEPA duties.

20. Product development in Terry Cycling's product category is complex and time-intensive; it typically takes 1–2 years to develop a new product with an existing supplier or to onboard a new manufacturing partner.

21. The product development process includes fine-tuning fit, engineering prints, building detailed BOMs (Bills of Materials), and developing production-ready patterns.

3

22. The technical components of product development are handled by Terry Cycling's manufacturing partners, as the business is not large enough to support redundant development resources for each supplier, especially given the unique requirements at every factory.

23. While Terry Cycling is actively exploring options to mitigate tariff impacts, a full-scale shift to new sources of production or tariff-free regions is not a quick or simple solution.

24. The impacts of the tariffs on Terry Cycling have been severe and escalating; Terry Cycling has already paid $25,000 in unplanned tariffs this year for goods where Terry was the importer of record.

25. Terry Cycling projects that the tariffs will cost the company approximately $250,000 by the end of 2025.

26. If no changes are made to current trade policy or its supply chain structure, Terry Cycling will face an estimated $1.2 million in tariff costs in 2026; this amount is not survivable for a business of its size.

27. Tariffs will become the single largest line item operating expense on Terry Cycling's Profit & Loss Statement. It would be larger than payroll.

28. To attempt to manage these increases Terry Cycling has already been forced to pass on costs to consumers by increasing some prices by 30% or more.

29. Terry Cycling's newest high-performance product—the Caicos Short—may need to increase in retail price from $165 to $199 to offset nearly $50 in added duty per unit.

4

30. Terry Cycling is raising the price of its best-selling Soleil tops by $5 in its upcoming summer catalog.

31. Current price adjustments were made before the full scope of tariff increases became clear; future pricing will need to be even higher.

32. Terry Cycling sells consumer discretionary products, a category that is highly sensitive to price elasticity, particularly in an inflationary environment.

33. The ripple effects of the tariffs will be felt across the entire business and materialize as a decrease in product offerings, constrained seasonal product lines, and reduced availability of inventory for its retail partners.

34. These tariffs are an existential threat to Terry Cycling, and will cause irreparable harm through lost business opportunities, loss of goodwill, and damage to its reputation as a pioneering brand of women's cycling apparel.

35. In the short run, these tariffs are an existential threat to Terry Cycling.

Under penalty of perjury, I affirm that the foregoing is true and correct.

Dated: 4/10/25

Nikolaus Holm

5

# Exhibit A

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Case No. 25-00066 |

### DECLARATION OF VICTOR SCHWARTZ

I, Victor Schwartz, state as follows:

1. I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

2. I am the CEO of V.O.S. Selections, Inc. ("V.O.S.").

3. V.O.S. imports wines, spirits, and sakes from 14 different countries, including Austria, Italy, Greece, Lebanon, Morocco, Spain, France, Portugal, Mexico, Argentina, Germany, Croatia, Hungary and South Africa.

4. V.O.S. has two containers scheduled to arrive in the next few weeks; Container #1 valued at $49,814 (EUR 43,317.27) and Container #2 valued at $72,420 (EUR 62, 974.48), for a total value of $122,234 (EUR 106, 291.75).

5. The total expected tariffs for these two containers at a 10% rate is $12,223.

6. V.O.S. will pay these tariffs upon the shipment's arrival at the Port of New York.

1

Under penalty of perjury, I affirm that the foregoing is true and correct.

Dated: _5/5/25_

_____
Victor Schwartz

# Exhibit
# B

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.*<br><br>            Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>            Defendants. | Case No. 25-00066 |

### DECLARATION OF NIKOLAUS HOLM

I, Nikolaus Holm, state as follows:

1. I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

2. I am the [position] of Terry Precision Cycling, LLC ("Terry Cycling").

3. Terry Cycling is a brand of women's cycling apparel, registered in Delaware with its principal place of business in Burlington, Vermont.

4. Today, Terry Cycling imports finished goods directly from China, Taiwan, Vietnam, Italy and the Philippines.

5. Terry Cycling's US-based manufacturing partner imports fabrics and trims from several other countries including Guatemala, El Salvador, China, and the European Union to produce products domestically for Terry Cycling.

6. The following table reflects tariff payments made between April 18 and May 2, 2025 by Terry Cycling.

1

| Date | FedEx - Invoice number | Amount | IEEPA Amt. | Paid Date | Payment Reference | ACE Entry |
|---|---|---|---|---|---|---|
| 4/17/2025 | 2-377-41378 | $17,645.71 | $14,953.85 | 5/2/2025 | 36425126 | 799-7564802-4 |
| 4/15/2025 | 2-375-74035 | $1,887.16 | $738.80 | 4/21/2025 | 46869162 | 799-7511957-0 |
| 4/15/2025 | 2-376-24653 | $10,413.15 | $5,049.60 | 5/2/2025 | 36425126 | 799-7439836-5 |
| 4/11/2025 | 2-375-22389 | $11,079.83 | $5,352.10 | 4/18/2025 | 35959337 | 799-7463738-2 |

7.  The attached payment references reflect tariffs paid by Terry Cycling for the invoices in the prior table.

Under penalty of perjury, I affirm that the foregoing is true and correct.

Dated: 5/6/25

Nikolaus Holm

2

**PAYMENT REFERENCE**

35959337

**PAYMENT DETAILS**

Payment Method  EFT

Payment Date  2025-04-18T16:48:45Z

## Payments

| ACCOUNT NUMBER | INVOICE NUMBER | INVOICE DATE | DUE DATE | TRACKING/TRANSACTION ID | TRANSACTION AMOUNT | STATUS |
|---|---|---|---|---|---|---|
| 2574-9372-5 | 2-375-22389 | 04/11/2025 | 04/26/2025 | 237522389 | $11,079.83 | Paid |
| 2574-9372-5 | 8-821-24958 | 04/07/2025 | 04/22/2025 | 882124958 | $32.53 | Paid |
| 2574-9372-5 | 2-373-73033 | 04/08/2025 | 04/23/2025 | 237373033 | $7,330.85 | Paid |

**SUBTOTAL**

Payment Cart Total  $18,443.21

**PAYMENT REFERENCE**

36425126

## Payments

| ACCOUNT NUMBER | INVOICE NUMBER | INVOICE DATE | DUE DATE | TRACKING/TRANSACTION ID | TRANSACTION AMOUNT | STATUS |
|---|---|---|---|---|---|---|
| 2574-9372-5 | 2-377-41378 | 04/18/2025 | 05/03/2025 | 237741378 | $17,645.71 | Paid |
| 2574-9372-5 | 2-378-05408 | 04/22/2025 | 05/07/2025 | 237805408 | $60.43 | Paid |
| 2574-9372-5 | 2-376-24653 | 04/15/2025 | 04/30/2025 | 237624653 | $10,413.15 | Paid |

**SUBTOTAL**

Payment Cart Total  $28,130.29

3

**PAYMENT REFERENCE**

46869162

**PAYMENT DETAILS**

Payment Method   EFT

Payment Date   2025-04-21T14:34:07Z

## Payments

| ACCOUNT NUMBER | INVOICE NUMBER | INVOICE DATE | DUE DATE | TRACKING/TRANSACTION ID | TRANSACTION AMOUNT | STATUS |
|---|---|---|---|---|---|---|
| 2574-9372-5 | 2-375-99007 | 04/15/2025 | 04/30/2025 | 237599007 | $3,422.53 | Paid |
| 2574-9372-5 | 2-375-74035 | 04/14/2025 | 04/29/2025 | 237574035 | $1,887.16 | Paid |
| 2574-9372-5 | 8-828-45766 | 04/14/2025 | 04/29/2025 | 882845766 | $241.55 | Paid |

**SUBTOTAL**

Payment Cart Total   $5,551.24

4

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP in his official capacity, EXECUTIVE OFFICE OF THE PRESIDENT, THE UNITED STATES, U.S. CUSTOMS AND BORDER PROTECTION, PETE R. FLORES in his official capacity, JAMIESON GREER in his official capacity, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, and HOWARD LUTNICK in his official capacity, <br><br> Defendants. | Court No. 25-00066 |

**DEFENDANTS' NOTICE OF APPEAL**

Notice is hereby given that defendants appeal to the United States Court of Appeals for the Federal Circuit from the Court's opinion and final judgment of May 28, 2025. *See* ECF Nos. 55-56.

DATED: May 28, 2025                    Respectfully submitted

OF COUNSEL:                            YAAKOV M. ROTH
                                       Acting Assistant Attorney General
ALEXANDER K. HAAS
Director                               ERIC J. HAMILTON
                                       Deputy Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Sosun Bae
SOSUN BAE
Senior Trial Counsel
LUKE MATHERS
CATHERINE M. YANG
BLAKE W. COWMAN
COLLIN T. MATHIAS
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 305-7568
sosun.bae@usdoj.gov

*Attorneys for Defendants*

2

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on May 28, 2025, I caused the foregoing "NOTICE OF APPEAL"

to be filed and served electronically via the Court's CM/ECF system.


<u>/s/Claudia Burke</u>

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES,<br><br>Defendants. | Case No. 1:25-cv-00077-N/A<br><br>COMPLAINT<br><br>THREE-JUDGE COURT REQUESTED |

## I.    INTRODUCTION

1.    The Constitution assigns to Congress, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises." Art. I, § 8. Yet over the last three months, the President has imposed, modified, escalated, and suspended tariffs by executive order, memoranda, social media post, and agency decree. These edicts reflect a national trade policy that now hinges on the President's whims rather than the sound exercise of his lawful authority. By claiming the authority to impose immense and ever-changing tariffs on whatever goods entering the United States he chooses, for whatever reason he finds convenient to declare an emergency, the President has upended the constitutional order and brought chaos to the American economy.

Page 1 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

2.      The President has no authority to arbitrarily impose tariffs as he has done here. The text and history of the International Emergency Economic Powers Act (IEEPA)—the statute the President has invoked for the most damaging of his tariffs—confirm that the President cannot impose such tariffs under that law. And even if it did, it would not allow the worldwide tariffs he has imposed, which were not a response to an emergency as IEEPA defines it and have no nexus to the circumstances that purported to justify them.

3.      Because these tariffs are unlawful, this Court should declare that they are not in force, enjoin the Defendant agencies and officers from enforcing them, and vacate the agency actions implementing them.

## II.     PARTIES

### A.     Plaintiff States

4.      The State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

5.      The State of Arizona is a sovereign state of the United States. Arizona is represented by Attorney General Kris Mayes. The Attorney General is Arizona's chief law enforcement officer and is authorized to institute this action.

6.      The State of Colorado is a sovereign state in the United States. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

7.      The State of Connecticut is a sovereign state of the United States. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

Page 2 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

8.      The State of Delaware is a sovereign state of the United States. Delaware is represented by and through its Attorney General, Kathleen Jennings. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

9.      The State of Illinois is a sovereign state of the United States. Illinois is represented by Attorney General Kwame Raoul. The Attorney General is Illinois's chief law enforcement officer and is authorized to institute this action. *See* Ill. Const. art. V, § 15; 15 ILCS 205/4.

10.     The State of Maine is a sovereign state of the United States. Maine is represented by Attorney General Aaron Frey. The Attorney General is Maine's chief law enforcement officer and is authorized to institute this action pursuant to 5 Me. Rev. Stat. § 191.

11.     The State of Minnesota is a sovereign state of the United States. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who has common law and statutory authority to sue on Minnesota's behalf.

12.     The State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States. The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

13.     The State of New Mexico is a sovereign state in the United States. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.

14.     The State of New York is a sovereign state in the United States. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

Page 3 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

15.    The State of Vermont is a sovereign state of the United States. Vermont is represented by Attorney General Charity Clark. The Attorney General is the chief legal officer of Vermont and is authorized to institute this action.

**B.    Federal Defendants**

16.    Donald Trump is President of the United States. He is sued in his official capacity for declaratory relief only.

17.    The Department of Homeland Security is an agency of the United States federal government.

18.    Kristi Noem is Secretary of the Department of Homeland Security. She is sued in her official capacity.

19.    U.S. Customs and Border Protection is an agency of the United States federal government and a component of the Department of Homeland Security.

20.    Pete R. Flores is the Acting Commissioner for U.S. Customs and Border Protection. He is sued in his official capacity.

21.    The United States is a statutory defendant under 28 U.S.C. § 1581. That statute also waives the United States' sovereign immunity. *See Humane Soc. of U.S. v. Clinton*, 236 F.3d 1320, 1328 (Fed. Cir. 2001).

### III.    JURISDICTION

22.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1581(i)(1).

23.    The Plaintiff States request the Chief Judge of this Court designate three judges "to hear and determine" this action because it "(1) raises an issue of the constitutionality of an Act of Congress, a proclamation of the President or an Executive order;" and "(2) has broad or significant implications in the administration or interpretation of the customs laws." 28 U.S.C. § 255.

Page 4 -    COMPLAINT – *Oregon, et al. v. Trump, et al.*

## IV.    FACTUAL AND LEGAL BACKGROUND

### A.    Congress's tariff powers

24.    The U.S. Constitution provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States…." Art. I, § 8.

25.    Congress has exercised this authority by providing an extensive statutory structure for "Duties, Imposts and Excises" on imports to the United States, which are codified in Title 19 of the U.S. Code.

26.    For most of the nation's history, Congress directly legislated tariffs.

27.    After the disastrous Smoot-Hawley Tariff Act of 1930, which contributed to the Great Depression, Congress moved to create a two-part structure for the nation's tariffs. Congress delegated to the President the authority to negotiate agreements with foreign countries that would reduce the United States' tariffs in exchange for reductions in other nations' tariffs. Today, the United States is party to more than a dozen such trade agreements that set limited U.S. tariffs. Congress has passed legislation consenting to and implementing these agreements as a matter of federal law. *See, e.g.*, 19 U.S.C. ch. 22 (implementing the Uruguay Round Agreements); 19 U.S.C. ch. 26 (implementing the Dominican Republic-Central America Free Trade Agreement ("CAFTA")); 19 U.S.C. ch. 29 (implementing the United States-Mexico-Canada Agreement ("USMCA")).

28.    Congress has authorized the President to raise duties, more commonly called tariffs, in specific circumstances. For example, the Executive Branch may impose "countervailing duties" when "the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy" of a product imported in the United States in a manner that injures a domestic industry. 19 U.S.C. § 1671(a). To impose such tariffs, however, an agency must investigate and enter a "final determination of

Page 5 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

whether or not a countervailable subsidy is being provided with respect to the subject merchandise," 19 U.S.C. § 1671d(a)(1), among other findings.

29.     Similar prerequisites are required to impose antidumping tariffs, 19 U.S.C. § 1673, *et seq.*; to institute tariffs to address threats to national security, 19 U.S.C. § 1862(b)–(c) (Section 232 of the Trade Expansion Act of 1962); to impose tariffs to protect domestic industries, 19 U.S.C. § 2251 (Section 201 of the Trade Act of 1974); to institute tariffs to respond to violations of international trade agreements, 19 U.S.C. §§ 2411–2420 (Section 301 of the Trade Act of 1974); and to impose a "temporary import surcharge" to "deal with large and serious United States balance-of-payments deficits," 19 U.S.C. § 2132(a)(1) (Section 122(a) of the Trade Act of 1974).

30.     In addition to requiring a finding of certain facts before imposing tariffs, Congress also limited the duration and manner of tariffs imposed under each of these statutes. *See, e.g.*, 19 U.S.C. § 1675(a) (requiring annual review of antidumping and countervailing duty orders); 19 U.S.C. § 2132(a)(3) & (d) (limiting tariffs or other import measures to 150 days and requiring that they be nondiscriminatory). Together, the factual predicates, procedural requirements, and substantive limits established by these statutes ensure that Congress retains control over its "Power to lay and collect Taxes, Duties, Imposts and Excises," U.S. Const., Art. I, § 8, cl. 1, and prevents the President from exercising this power arbitrarily.

31.     None of these prerequisites to impose congressionally authorized tariffs has been met, and the tariffs challenged here do not purport to rest on any of these statutory authorities. Instead, the President relies on IEEPA as the sole substantive legal authority for his orders.

**B.     IEEPA was enacted to restrain the President's powers, not enlarge them.**

32.     Congress enacted IEEPA five decades ago with the goal of restraining the President's emergency powers that were frequently invoked and abused in the preceding decades. *See* H.R. Rep. No. 95-459, at 3–9 (1977).

Page 6 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

33.     By the 1970s, Congress had grown troubled with the proliferation of emergency declarations under laws like the Trading with the Enemies Act (TWEA). Such laws were originally intended to lend the President special or heightened powers during times of crisis but were ultimately used as shortcuts around peacetime constraints on the President's powers. Congress recognized that the exception threatened to swallow the rule. As one House report on efforts to reform TWEA noted, TWEA bestowed upon the President "essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review." H.R. Rep. No. 95-459, at 7 (1977).

34.     One reform Congress made to curb the President's emergency powers was to restrict TWEA to its original purpose, limiting its application to "time[s] of war." 50 U.S.C. § 4305(b)(1). At the same time, Congress enacted IEEPA, which allowed the President to regulate imports and exports in response to certain non-wartime emergencies, while stressing that the triggering event had to be an "*unusual* and *extraordinary* threat." 50 U.S.C. § 1701 (emphasis added). Thus, it is not enough that the President declare a national emergency under the National Emergencies Act (NEA); only those arising from unusual and extraordinary threats originating "in whole or substantial part outside the United States" unlock IEEPA's grant of powers. *Id.* Congress also subjected the President's authority under IEEPA to reporting requirements and reserved for itself the ability to terminate declared emergencies by joint resolution. 50 U.S.C. § 1706.

35.     The powers set forth in IEEPA do not expressly include imposing or collecting tariffs. Rather, the President is empowered to:

>       (A) investigate, regulate, or prohibit—
>
>             (i) any transactions in foreign exchange,
>
>             (ii) transfers of credit or payments between, by, through, or to
>
>             any banking institution, to the extent that such transfers or

Page 7 -    COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

payments involve any interest of any foreign country or a

national thereof,

(iii) the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the

jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation,

regulate, direct and compel, nullify, void, prevent or prohibit, any

acquisition, holding, withholding, use, transfer, withdrawal,

transportation, importation or exportation of, or dealing in, or

exercising any right, power, or privilege with respect to, or

transactions involving, any property in which any foreign country

or a national thereof has any interest by any person, or with respect

to any property, subject to the jurisdiction of the United States….

50 U.S.C. § 1702(a)(1). The President has additional authority to confiscate property "when the

United States is engaged in armed hostilities or has been attacked by a foreign country or foreign

nationals…." 50 U.S.C. § 1702(a)(1)(C).

    36.    Not once has any other President used IEEPA to impose tariffs. In the nearly five

decades since IEEPA was enacted, no other President has imposed tariffs based on the existence

of any national emergency, despite global anti-narcotics campaigns spearheaded by the United

States and longstanding trade deficits. *United States v. Yoshida Int'l,* 526 F.2d 560, 576 (Cust. &

Pat. App. 1975), held that similar language in TWEA authorized the imposition of a limited

import duty surcharge, but that case does not take into account subsequent actions by Congress

to rein in the President's authority, as explained above. And *Yoshida* made clear that even under

TWEA the President lacks authority to impose a surcharge "not reasonably related to the

emergency declared." *Id.* at 577.

Page 8 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

37.     Even in light of *Yoshida*, there is reason to believe that IEEPA does not authorize tariffs. Tariffs on products are not currency exchanges or banking transactions, so subsection (a)(1)(A) should not apply. Subsection (a)(1)(B), which gives the President the power to "regulate," should not authorize the challenged tariffs either because the regulation of imports is not synonymous with and does not include the power to impose tariffs on imports.

38.     Section 1702(a)(1)(B) allows the President to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit" transactions involving the property of a foreign country or national. This is the language of embargoes and sanctions (which is what IEEPA has consistently been used for), and interpreting "regulate" to mean "ad valorem duty" would be incongruous with the context in which it appears. *See McDonnell v. United States*, 579 U.S. 550, 569 (2016) ("Under the familiar interpretive canon *noscitur a sociis*, 'a word is known by the company it keeps.'") (citation omitted). IEEPA is designed to give the President appropriate powers to respond if a hostile power were importing items into the United States for nefarious purposes. It is not clear why under IEEPA that should continue upon payment of an appropriate duty.

39.     It is also noteworthy that IEEPA, in § 1702(a)(1)(B), envisions the President "regulat[ing]" both imports and exports under its authority. Because the export clause of the Constitution, Art. I, § 9, cl. 5, expressly prohibits imposing duties on exports, interpreting "regulate" to mean "impose a duty" would create a facial, and unnecessary, tension with the Constitution. The more natural reading of the statute is that Congress never intended it to be used for tariffs. *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (statutes "must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score") (internal quotations omitted).

40.     Even assuming IEEPA does authorize some tariffs when there is an "*unusual* and *extraordinary* threat," 50 U.S.C. § 1701 (emphasis added), President Trump's unilateral imposition of his tariffs invoking IEEPA are aberrations that fly in the face of history and the

Page 9 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

legislative text. The novelty of citing IEEPA for the carte blanche tariff authority the President has exercised is itself good reason to treat these Orders with suspicion. *See Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (when the executive branch claims "an unheralded power" to regulate 'a significant portion of the American economy'" courts greet such announcements with skepticism because they "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." (citations omitted)).

41.    The powers explicitly set forth by IEEPA "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

**C.    The IEEPA Tariff Orders**

42.    Since February 1, 2025, President Trump has issued a flurry of executive orders imposing sweeping tariffs, interspersed with other orders and memoranda modifying, suspending, and clarifying some of the tariffs he just imposed. The President purported to rely on IEEPA emergency powers as the substantive authority to impose all the tariffs described below. These tariffs—defined below as the Canada Tariff Order, the Mexico Tariff Order, the China Tariff Order, and the Worldwide Tariff Order, each as amended—are herein collectively referred to as "IEEPA Tariff Orders."

43.    The preambles to the IEEPA Tariff Orders also cite other statutes, specifically the NEA, 50 U.S.C. § 1601 *et seq.*; section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483; and 3 U.S.C. § 301. However, none of those statutes grants the President substantive authority: the NEA governs procedures for declaring and ending emergencies but not substantive emergency powers; section 604 of the Trade Act of 1974, as amended, requires the President to memorialize import duties in the Harmonized Tariff Schedule of the United States but does not provide substantive authority to impose tariffs; and 3 U.S.C. § 301 allows the President to

Page 10 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

delegate powers within the Executive Branch. None of the cited statutes authorizes the President to impose tariffs.

### i.      The Canada Tariff Order

44.      On February 1, 2025, President Trump issued Executive Order 14193, 90 Fed. Reg. 9113 ("Canada Tariff Order"), entitled Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border. The Canada Tariff Order imposed an additional 10 percent tariff on energy imports and an additional 25 percent tariff on most other imports from Canada.

45.      The Canada Tariff Order relies only on IEEPA as the basis for its substantive authority to unilaterally institute these sweeping changes to U.S. trade policy toward Canada.

46.      The President's claim of emergency powers was based on "the threat to the safety and security of Americans, including the public health crisis of deaths due to the use of fentanyl and other illicit drugs, and the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." Canada Tariff Order § 1.

47.      The Plaintiff States agree that the fentanyl crisis requires urgent government action, but the imposition of tariffs is neither an effective nor a lawful response to that crisis. The Canada Tariff Order lacks any rationale for the tariff rates imposed and bears no relationship between the goods subject to the Order and the claimed emergency.

### ii.      The Mexico Tariff Order

48.      On February 1, 2025, President Trump issued Executive Order 14194, 90 Fed. Reg. 9117 ("Mexico Tariff Order"), entitled Imposing Duties To Address the Situation at Our Southern Border. The Mexico Tariff Order imposed an additional 25 percent tariff on the import of goods from Mexico.

49.      The Mexico Tariff Order relies only on IEEPA as the basis for its substantive authority to unilaterally institute these sweeping changes to U.S. trade policy toward Mexico.

Page 11 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

50.    The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." Mexico Tariff Order § 1.

51.    As with the Canada Tariff Order, the President provided no justification for which goods would be subject to the Mexico Tariff Order or why he had chosen a 25 percent tariff rate.

### iii.    The China Tariff Order

52.    On February 1, 2025, President Trump issued Executive Order 14195, 90 Fed. Reg. 9121 ("China Tariff Order"), entitled Imposing Duties To Address the Situation at Our Southern Border. The China Tariff Order imposed an additional 10 percent tariff on the import of most goods from China.

53.    The China Tariff Order relies only on IEEPA as the basis for its substantive authority to unilaterally institute these sweeping changes to U.S. trade policy toward China.

54.    The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." China Tariff Order § 1.

55.    And, again, the China Tariff Order contained no rationale for why it was necessary to tariff all products of China, or why the President had chosen 10 percent as the tariff rate, departing from the already unexplained 25 percent rate he had imposed on Mexico and Canada.

### iv.    The Worldwide Tariff Order

56.    On April 2, 2025, President Trump issued Executive Order 14257, 90 Fed. Reg. 15041 ("Worldwide Tariff Order"), entitled Regulating Imports with a Reciprocal Tariff to

Page 12 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits. The Worldwide Tariff Order imposed a 10% baseline tariff on nearly all imports to the United States, effective April 5, and additional "reciprocal" tariffs on 57 countries, effective April 9 (Annex I). The President revised the additional "reciprocal" tariffs in Annex I on April 3.

57.    The Worldwide Tariff Order relies only on IEEPA as the basis for its substantive authority to unilaterally institute these sweeping changes to the trade policy of the United States.

58.    A few years before Congress enacted IEEPA, Congress also enacted Section 122 of the Trade Act of 1974 to give the President explicit power to impose tariffs (temporary import surcharges) in response to balance-of-payments issues but then chose to omit the express power to tariff under IEEPA. Although the Worldwide Tariff Order purports to address the "large and persistent annual U.S. goods trade deficits," it does not rely on Section 122(a) of the Trade Act of 1974, 19 U.S.C. § 2132, which expressly contemplates tariffs to address the related concern of balance-of-payment deficits. That statute provides that "[w]henever fundamental international payments problems require special import measures to restrict imports" in order "(1) to deal with large and serious United States balance-of-payments deficits[,] (2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or (3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium," the President "shall proclaim, for a period not exceeding 150 days … a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties … on articles imported into the United States …." 19 U.S.C. § 2132(a). The Worldwide Tariff Order neither relies on this statutory authority nor abides by its limits on the magnitude and duration of the tariffs it imposes.

59.    In providing tariff powers via Section 122 of the Trade Act of 1974, much like with other tariff statutes, Congress included substantive limitations and procedural safeguards limiting the grant of power to the executive. The President attempts to circumvent these types of substantive limitations and procedural safeguards by imposing tariffs under IEEPA in a

Page 13 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

unilateral, unpredictable, and far-reaching manner that is entirely unlawful. His unlawful actions have in turn caused persistent uncertainty that has resulted in erratic financial markets (*see* § IV., D, below).

60.     In addition, the purported "unusual and extraordinary threats" identified by President Trump as "national emergencies" do not amount to emergencies. Nor are they extraordinary or even unusual.

61.     The Worldwide Tariff Order asserts that "U.S. trading partners' economic policies … suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits," but that does not constitute an "unusual and extraordinary threat" that would allow the President to invoke IEEPA's powers. 50 U.S.C. § 1701(a).

62.     As the Worldwide Tariff Order acknowledges, "annual U.S. goods trade deficits" are "persistent"; thus, by definition, they are not "unusual and extraordinary." The United States has run a persistent trade deficit in goods since the 1970s. Similarly, there is no "unusual and extraordinary" threat to wages or consumption.

63.     The IEEPA Tariff Orders impose, by executive order, the highest tariffs on imports the country has seen since the 1940s. The *baseline* 10 percent tariff imposed by the Worldwide Tariff Order already matches the highest *average* tariff rates on all imports seen toward the end of the 1940s. The Worldwide Tariff Orders even impose tariffs on places that are not involved in international trade, such as the British Indian Ocean Territory, whose only human inhabitants live on a joint American and British military base on the island of Diego Garcia, and the Heard and McDonald Islands, which have no known human inhabitants.

64.     Despite being described as "reciprocal" tariffs, the reciprocal tariffs described in the Worldwide Tariff Order were calculated with the intent of "balanc[ing] bilateral trade deficits between the U.S. and each of our trading partners." Office of the U.S. Trade Rep., *Reciprocal Tariff Calculations*; *see also* Office of the U.S. Trade Rep., *Presidential Tariff Actions*. The U.S. Trade Representative has acknowledged that there are "many causes," including "non-tariff

Page 14 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

economic fundamentals." But the U.S. Trade Representative provided no explanation for why President Trump's calculation entirely ignores a major driver of trade deficits: relative domestic purchasing power. In effect, the reciprocal tariff calculation unreasonably ignores that certain trading partners' populace simply has less aggregate purchasing power.

65.     The tariffs are also not designed to "deal with" the purported emergencies. The Administration published its basis for the country-by-country tariff rates. *See* Office of the United States Trade Representative, Reciprocal Tariff Calculations. The Administration's estimate of a key input of that formula—"the elasticity of import prices with respect to tariffs"—is a fabrication. The country-by-country tariff rates are based on what the administration claims as an estimate of "tariff and nontariff barriers" but are in fact a simple ratio of the trade deficit in goods as a percentage of total U.S. imports from the country arbitrarily subjected to the tariff. The Administration's chosen formula is not an accepted methodology for calculating trade barriers and has no basis in economic theory.

66.     The specific academic work the Administration cites concludes that nearly all of the cost of tariffs (95%) carries over to domestic purchasers, but the Administration falsely claims that only 25% of the cost of tariffs is passed through to domestic customers. As the co-author of the article cited to justify that calculation explained, the Administration's misstatement of the evidence results in vastly higher tariff levels than called for by its own methodology. *See* Brent Neiman, "The Trump White House Cited My Research to Justify Tariffs. It Got It All Wrong." *N.Y. Times* (Apr. 7, 2025).

67.     The U.S. Trade Representative also provided no explanation justifying setting the *baseline* tariff at 10 percent.

68.     The tariffs are also not designed to "deal with" the purported emergencies, because they are intended, at least in part, to raise revenue. *See, e.g.*, The President's News Conference With Prime Minister Keir Starmer of the United Kingdom (Feb. 27, 2025) ("[W]e

Page 15 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

took in hundreds of billions of dollars [with past tariffs]. . . . [I]t's going to make our country rich.").

69.     The tariffs will depress Americans' wages by slowing economic growth, increasing unemployment, and raising inflation. And, instead of reducing threats to Americans' consumption levels, the tariffs will make the goods that Americans (and the Plaintiff States) depend on more expensive and scarce.

### v.     Delaying and adding exceptions to the Canada and Mexico Tariff Orders

70.     On February 3, 2025, President Trump issued Executive Order 14197, 90 Fed. Reg. 9183, entitled Progress on the Situation at Our Northern Border, and Executive Order 14198, 90 Fed. Reg. 9185, entitled Progress on the Situation at Our Southern Border. These executive orders delayed by four weeks implementation of the Canada Tariff Order and the Mexico Tariff Order, respectively.

71.     On March 6, 2025, President Trump issued Executive Order 14231, 90 Fed. Reg. 11785, entitled Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border, and Executive Order 14232, 90 Fed. Reg. 11788, entitled Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border. These orders exempted products originated in Mexico and Canada under the rules of the United States of America, United Mexican States, and Canada Agreement. The orders also reduced the tariff rates on potash imports from both countries from 25 percent to 10 percent.

### vi.     Increasing the tariffs on imports from China

72.     On March 3, 2025, President Trump issued Executive Order 14228, 90 Fed. Reg. 11463, entitled Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China, which increased the additional tariff on nearly all imports imposed by the February 1 China Tariff Order from 10 percent to 20 percent. The justification for this action was his "determin[ation] that the [People's Republic of China] has not taken

Page 16 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions, and that the crisis described in [the China Tariff Order] has not abated."

73.    On April 2, the Worldwide Tariff Order imposed two additional tariffs on imports from China: the 10 percent worldwide tariff, plus a 34 percent "reciprocal tariff" (Annex 1). In aggregate, that raised the overall additional tariffs on nearly all China imports to 64 percent (20 percent from the China Tariff Order, as amended March 3 and April 2, plus 44 percent from the Worldwide Tariff Order).

74.    On April 8, 2025, President Trump issued Executive Order 14259, 90 Fed. Reg. 15509, entitled Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China, which imposed an additional 50 percent tariff on goods from China under the Worldwide Tariffs Order, raising the total level of tariffs to 114 percent. The President's justification was that the People's Republic of China (PRC) imposed a "34 percent tariff … on all goods imported into the PRC originating from the United States." "In [the President's] judgment, this modification [was] necessary and appropriate to effectively address the threat to the national security and economy of the United States."

75.    The next day, April 9, the President again increased the tariffs on imports from China, issuing Executive Order 14266, 90 Fed. Reg. 15625, entitled Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment. That executive order amended the Worldwide Tariff Order to increase the tariff on nearly all imports from China another 31 percent, to a total of 145 percent (20 percent from the China Tariff Order, as amended March 3 and April 2, plus 125 percent from the Worldwide Tariff Order). The executive order again "determined that it is necessary and appropriate to address the national emergency … by modifying the [Harmonized Tariff Schedule of the United States] and taking other actions to increase the duties imposed on the PRC in response to this latest retaliation. In [the President's] judgment, this modification [was] necessary and appropriate to effectively address the threat to U.S. national and economic security posed by the PRC's contribution to the conditions reflected

Page 17 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

in large and persistent trade deficits, including PRC industrial policies that have produced systemic excess manufacturing capacity in the PRC and suppressed U.S. domestic manufacturing capacity, which conditions are made worse by the PRC's recent actions."

76.     The President also changed the administration of tariffs with China by applying tariffs to even low-value imports that had historically been excluded from duties. On April 2, 2025, President Trump issued Executive Order 14256, 90 Fed. Reg. 14899, entitled Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports, which eliminated the de minimis exclusion on low-value imports from China. The President's April 8 order further changed the rates imposed. On April 9, Executive Order 14266 further increased the tariff rate for low-value imports to 120 percent, plus $100 per postal item.

### vii.     Partially suspending the Worldwide Tariff Order

77.     Executive Order 14266, issued on April 9, also delayed the country-specific "reciprocal" tariffs listed in Annex 1 of the Worldwide Tariff Order by 90 days (except for those imposed on China, as described above). Those tariffs are now scheduled to go into effect on July 9.

78.     The April 9 executive order left in place, however, the 10 percent tariff on nearly all goods imported worldwide.

### viii.     Exempting electronics from the Worldwide Tariff Order

79.     On April 11, 2025, President Trump issued a Presidential Memorandum entitled Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended. That memorandum "clarified" that the exclusion in the Worldwide Tariff Order for semiconductors included various other electronic devices, such as smartphones, solid-state storage devices, and monitors.

Page 18 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ix.       **Current tariff rates under the IEEPA Tariff Orders**

80.       Currently, the Canada and Mexico Tariff Orders, as amended, provide for a 25 percent additional tariff on imports from Canada and Mexico (except for imports governed by USMCA, which are subject to no additional tariff, and potash imports from both countries and energy imports from Canada, which are subject to a 10 percent additional tariff). Currently, the China Tariff Order and Worldwide Tariff Order, as amended, impose a 145 percent tariff rate for imports from China (except for electronics, steel, aluminum, automotive, copper, pharmaceutical, lumber, certain minerals, and energy products, and other products listed in Annex II of the Worldwide Tariff Order, which are subject only to the 20 percent rate under the China Tariff Order only). Currently, the Worldwide Tariff Order, as amended, imposes a 10 percent tariff rate for imports from the rest of the world (except for electronics, steel, aluminum, automotive, copper, pharmaceutical, lumber, certain minerals, and energy products, and other products listed in Annex II of the Worldwide Tariff Order, which are not tariffed under the order).

81.       Under the Worldwide Tariff Order, as amended by Executive Order 14266, 90 Fed. Reg. 15625 (Apr. 9, 2025), the Worldwide Tariff Order will impose additional tariffs on 56 trading partners on July 9.

82.       Under the Administration's interpretation of IEEPA, the President can change these tariff policies at any time without notice.

**D.      Collection and enforcement under the IEEPA Tariff Orders**

83.       U.S. Customs and Border Protection is responsible for the collection of tariffs. 6 U.S.C. §§ 211(c)(4), 215(1); 19 U.S.C. § 4301(2)(A). To facilitate the collection of tariffs, Customs and Border Protection uses its Cargo Systems Messaging Service to inform importers of changes to the amount and administration of import duties. The guidance incorporates and imposes the current duties imposed under the IEEPA Tariff Orders.

Page 19 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

84.     Customs and Border Protection enforces the Canada Tariff Order under CSMS # 64297449 - GUIDANCE: Additional Duties on Imports from Canada (issued March 3, 2025), and CSMS # 64336037 - GUIDANCE – Update on Additional Duties on Imports from Canada – USMCA Qualifying Products and Potash (issued March 6, 2025).

85.     Customs and Border Protection enforces the Mexico Tariff Order under CSMS # 64297292 – Guidance: Additional Duties on Imports from Mexico (issued March 3, 2025), and CSMS # 64335789 - GUIDANCE – Update on Additional Duties on Imports from Mexico - USMCA Qualifying Products and Potash (issued March 6, 2025).

86.     Customs and Border Protection enforces the China Tariff Order under CSMS # 64299816 - UPDATE – Additional Duties on Imports from China and Hong Kong (issued March 3, 2025).

87.     Customs and Border Protection enforces the Worldwide Tariff Order under CSMS # 64701128 - UPDATED GUIDANCE – Reciprocal Tariffs – Increase in Rate for China and Reversion of Other Country-Specific Rates, Effective April 10, 2025 (issued April 10, 2025), and CSMS # 64724565 - UPDATED GUIDANCE – Reciprocal Tariff Exclusion for Specified Products; April 5, 2025 Effective Date (issued April 11, 2025).

88.     IEEPA establishes civil and criminal penalties, including up to 20 years in prison, for a violation or attempted violation of an order or regulation issued under its statutory authority. 50 U.S.C. § 1705.

**E.    The IEEPA Tariff Orders' economic destruction**

89.     President Trump has chosen to wield IEEPA to impose tariffs on the world at his whim, muddled by threats, additions, exceptions, exemptions, and pauses. The direct consequence has been an erratic financial market and a destabilized U.S. and global economy.

90.     The IEEPA Tariff Orders will cause a substantial increase in prices for goods within the Plaintiff States and throughout the United States. The U.S. Trade Representative's methodology for calculating the size of the "reciprocal" tariffs assumes that 25 percent of the

Page 20 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

tariffs will be passed on as increases to retail prices on the tariffed goods, and the studies that USTR's analysis cites conclude that the actual figure is 95 percent. The overwhelming consensus of economists is that these price increases will lead to significant inflation and risk recession.

91.     The immediate impact of these predictions can be seen in the capital markets. Between March 3 and April 8, 2025, the S&P 500 lost about 850 points (a 14.5 percent drop), and the Dow Jones Industrial Average lost just over 5,500 points (a 13 percent drop). A substantial majority of those losses from March 3 to April 8—between 70 to 90 precent—occurred after the date of the Worldwide Tariff Order. Between April 2, and April 8, the S&P 500 lost almost 700 points (a 12 percent drop), and the Dow Jones Industrial Average lost about 4600 points (an 11 percent drop).

92.     The effect on the market of the President's partial suspension of the Worldwide Tariff Order further demonstrates the causal relationship. Following the President's announcement that he would suspend the country-specific tariffs for 90 days, the markets partially recovered. On April 9, the S&P 500 recovered by about 480 points, a 9.5 percent gain from April 8 but still down 10 percent from January 21. Likewise, the Dow Jones Industrial Average recovered by about 3,000 points, an 8 percent gain from April 8 but still down 8 percent from January 21.

93.     The market losses are primarily attributable to the IEEPA Tariff Orders. Trade organization publications, expert commentary, and news reporting is replete with evidence that the market losses are largely a reaction to the President's threatened and imposed tariffs.

## V.     THE PLAINTIFF STATES' INTERESTS

**A.     The Plaintiff States will have increased costs when purchasing necessary equipment and supplies essential to their economies.**

94.     The Plaintiff States provide a wide range of public services to their residents and visitors. Essential to the provision of those services is the purchase of equipment, supplies, and parts, many of which are imported from other countries. Other products are manufactured in the

Page 21 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

United States but contain components that are imported from other countries. Because tariffs directly impact the costs of these products, they cause direct financial harm to the Plaintiff States.

95.     For example, the University of Oregon and Oregon State University are public research universities that purchase an array of items to provide educational opportunities for their students and to produce high quality research. The University of Oregon and Oregon State University are two of Oregon's seven public universities established by Or. Rev. Stat. § 352.002, each of which is "a governmental entity performing governmental functions and exercising governmental powers." Or. Rev. Stat. § 352.033. Among other things, the State of Oregon's public universities act for the State of Oregon by ensuring access and affordability to education, fostering an informed citizenry, and creating original knowledge and advancing innovation. *See, e.g.*, Or. Rev. Stat. §§ 352.039, 350.001, 350.005, 350.009.

96.     Among the array of items that the University of Oregon purchases is specialized equipment for scientific research. Because specialized equipment must meet particular specifications and standards for the research group, it is often only reasonably available from a few sources, which are all foreign. Purchasing specialized equipment also often requires an order date several months in advance of delivery. To mitigate the risk of unexpected import costs, purchase-order terms frequently include a term allowing the vendor to make price adjustments before delivery.

97.     That has already occurred. On November 8, 2024, the University of Oregon purchased a cryogenic single-photon counting detector system from ID Quantique, Inc., for its Center of Optics. At that time, the purchase price was $182,733. IDQ shipped the cryogenic system from Switzerland on April 8. At that time, the additional "reciprocal" tariff scheduled to go into effect for imports from Switzerland was 31 percent. The system arrived after the announced pause, resulting in the lower—but still substantial—10 percent worldwide tariff collected at the port by U.S. Customs and Border Protection. As a result of that additional tariff,

Page 22 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

the customs broker required the University of Oregon to pay an additional $18,579 before it would deliver the cryogenic system.

98.    That is only one example of purchases that are awaiting shipment. If left in place, the unlawful IEEPA Tariff Orders will increase the cost of each purchase by, at minimum, an additional 10 percent imposing financial harm to the State of Oregon through the University of Oregon.

99.    Among other goods, Oregon State University purchases scientific supplies for use by its students and researchers. Oregon State University's vendor for these supplies notified Oregon State University that because of the U.S. Government's tariffs on materials imported from China, as well as a tariff on imported steel and aluminum, the vendor was forced to implement a surcharge of 2.3% on products. The cost of this surcharge is passed on directly to Oregon State University. Other vendors are also passing along costs of the IEEPA Tariff Orders to Oregon State University. These surcharges and cost increases have a direct adverse impact on Oregon State University and, in turn, impose financial harm to the State of Oregon.

100.    Another example is the cost of testing kits purchased by the Oregon Health & Sciences University. OHSU is a public corporation that performs functions and services for the benefit of the State of Oregon. It is a "governmental entity performing governmental functions and exercising governmental powers." Or. Rev. Stat. § 353.020. Its purpose is to serve the people of Oregon by "providing education in health, science, [and] engineering"; "[c]onduct[ing] research in health care, engineering, biomedical sciences, and general sciences"; and provide and support healthcare throughout the state. Or. Rev. Stat. § 353.030.

101.    OHSU's pharmacy partner has already seen a 20 percent increase in the price of testing kits, due to both existing and impending tariffs. OHSU reasonably expects the pharmacy partner to pass those costs on to OHSU. Because OHSU requires testing kits on a monthly basis, these tariff impacts will be recurring so long as Tariff Orders—and the continued threatening of tariffs—remain in place.

Page 23 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

102.    The Oregon Department of Transportation is a state agency that provides service, builds infrastructure, and maintains equipment to further transportation safety and efficiency. Or. Rev. Stat. § 184.615. For that purpose, ODOT has a long-term contract with URS Electronics for the purchase of traffic video surveillance equipment. On April 16, 2025, URS Electronics informed ODOT that one of its vendors, Bosch Security division, "announced a 7.9% across the board price increase that will go into effect on May 1st, to help offset some of their cost increases experienced due to current federal government trade policies." Those vendor-price increases will be passed on to ODOT, harming ODOT with increased operations costs for the foreseeable future.

103.    The Arizona Department of Transportation (ADOT) has a long list of procurement contracts for the purchase of equipment, supplies, or parts, many of which are imported from other countries or have component parts imported from other countries. The tariffs are already increasing costs for ADOT. Notably, on March 14, 2025, one contractor requested a price increase, citing the increased duty cost stated "in Executive Order 14228 of March 3, 2025."

104.    Arizona's universities are also directly harmed by the tariffs imposed pursuant to the IEEPA Tariff Orders. For example, Arizona State University, the largest public university in the country, conducts research of national significance that depends on its ability to source specialized equipment not available from domestic sources. Using just one project as an exemplar, the SHIELD USA program spearheaded by Arizona State University faces the prospect of up to $1.4 million in increased costs from fully implemented tariffs. This would be especially counterproductive as SHIELD USA aims to drive innovation in the domestic microchip packaging ecosystem, expand capacity for domestic advanced packaging, and help to regain U.S leadership in microelectronics while strengthening national security.

105.    As a purchaser of imported products from countries subject to one or more of the IEEPA Tariff Orders, the State of Delaware is directly harmed by these tariffs. For example, the

Page 24 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Maintenance and Operations Division of the Delaware Department of Transportation purchases approximately 20 dump trucks per year: both the two-ton bodies of the trucks and truck rims are imported. Maintenance and Operations also purchases John Deere tractor parts that are made in Mexico, and Stihl chainsaws and trimmers that are made in Germany. The Office of Fleet Services of Delaware's Office of Management and Budget provides state agencies with access to vehicles. Fleet Services manages a fleet of about 3,000 vehicles, 25 percent of which are minivans from Stellantis (Chrysler), assembled in Windsor, Ontario. Fleet Services purchases an average of 70 minivans per year. Also, as Delaware moves to electrify its fleet, Fleet Services will purchase vehicles such as the Ford Mach-E, Chevrolet Blazer EV, Chevrolet Equinox EV, and Toyota BZ4x, which are manufactured outside the United States. Even those vehicles in Delaware's fleet assembled in the United States often include parts sourced worldwide. Any increase in tariffs caused by these unlawful tariffs inflicts a direct pecuniary injury to Delaware's finances.

106.    New York's Office of General Services (NYOGS) estimates that tariffs, particularly those on Mexico, Canada, and China, will have significant impacts on bid prices, supply chains, and construction claims. NYOGS's primary responsibilities include managing and leasing real property, designing and building facilities, and contracting for goods, services, and technology for the State of New York.

107.    Energy pricing is particularly threatened. In 2024, New York State imported 7.7 Terawatt-hours of Canadian electricity, valued in the hundreds of millions of dollars. Canada is the number one supplier of energy to the United States generally, including around 85 percent of U.S. electricity imports.

108.    When President Trump imposed tariffs on Canada, the Ontario and Quebec Premiers threatened retaliatory restrictions on electricity exports to the U.S. This would be catastrophic. NYOGS estimates that if Ontario or Quebec restricted electricity exports to New York, prices would soar at a time when the State is facing capacity restraints and is relying more

Page 25 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

heavily on Canadian hydropower than ever. New York cannot simply buy less electricity or buy electricity from other sources.

109.    In the construction context, NYOGS bid about $1 billion in 2024, with approximately half on labor and half on materials. Assuming NYOGS bids a comparable annual portfolio, if even only 37 percent of these materials are subject to tariffs at 25 percent, then the potential cost impact could be between $40 million and $50 million to New York's projects. In NYOGS's experience, these price increases rarely fully recover to pre-event levels. Consequently, the tariffs will likely have a long-term negative effect on project costs and, consequently, agency capital programs.

110.    Outside of the construction context, NYOGS estimates that 50 percent to 75 percent of the products purchased by New York may be manufactured in a tariff-impacted nation. Based on an estimated average total spend of $5 billion, a 25 percent tariff on Mexico and Canada and a 10 percent tariff on China will likely have a portfolio-wide impact of roughly $106 million for New York State agencies.

111.    NYOGS estimates that potential contractual impacts on active construction projects due to imposed tariffs would be similar to what New York experienced during COVID. Unlike during COVID, however, when New York was bidding projects in a soft and uncertain economy, there is no shortage of construction work today. Contractors are very busy despite higher interest rates.

112.    The IEEPA Tariff Orders also injure Plaintiff States by increasing the price of goods and services that they purchase from domestic producers and suppliers that rely on imports. For example, Oregon's largest natural gas utility imports most of its natural gas from Canada. It has already made a regulatory filing to reserve the right to show that the cost of tariffs "should be recovered in rates…." The State of Oregon uses natural gas for most of its building energy use and it would be injured as an electricity ratepayer by any increase in the rates for natural gas.

Page 26 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**B.     The President's imposition, modification, and reinstatement of tariffs by executive order and memoranda forces the Plaintiff States to incur administrative costs.**

113.    The President's invocation of the IEEPA to impose, modify, and reinstate tariffs by executive order, memoranda, social media post, and other means has resulted in national trade policy that reflects the President's whims on a particular day rather than reasoned decision. The President's abrupt policy changes have disrupted the economies of the Plaintiff States. In just March and April, the President has imposed sweeping tariff-rate changes on at least four occasions, with numerous purported clarifications and exemptions made in between, as well as the repeated retaliatory rate-hikes for China.

114.    Those erratic swings in trade policy not only affect the markets, but they also harm the Plaintiff States' ability to procure goods and services and to budget for and audit price adjustments.

115.    For example, the Oregon Department of Transportation builds, maintains, and plans for the State of Oregon's transportation infrastructure. *See, e.g.*, ORS § 184.615. To build and maintain that infrastructure, ODOT frequently requires the work of general contractors. Conditions are currently changing far more quickly than normal. Due to cost volatility, material suppliers and subcontractors are substantially reducing the length of time that they will commit to prices, making it more challenging for ODOT to secure bid extensions from prime contractors. That results in a harm to ODOT by making it more difficult to obtain competitive bids from high-quality prime contractors.

116.    The IEEPA Tariff Orders have also created procurement uncertainty for Oregon State University. Oregon State University regularly issues requests for proposals or solicitations and receives proposals from across the country and internationally. Because of the price uncertainty caused by the IEEPA Tariff Orders, many of the solicitations received are conditional and indicate that costs may change depending on cost fluctuations. For example, Oregon State University recently received a proposal for a robotics system for research from a Swiss manufacturer that stated the total price with the disclaimer that "[p]ricing is based on

Page 27 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

current US tariff regulations for imports from Switzerland. In the event that new or increased tariffs are imposed on the quoted products or their components prior to delivery, [vendor] reserves the right to adjust the prices accordingly." These conditional solicitations necessitated by the IEEPA Tariff Orders make it impossible for Oregon State University to evaluate which solicitation is the lowest bid and budget accordingly.

117.    In Illinois, the Department of Information Technology (DOIT) purchases about 15,000 imported personal computers for state employees each year, along with necessary accessories and support products (screens, docking stations, etc.). Because of the uncertainty surrounding tariffs, DOIT's ability to negotiate future contracts has been seriously hindered, and DOIT's stock of available computers and hardware inventory has dwindled as negotiations dragged on. In the end, DOIT was constrained to accept a contract under which the vendor is explicitly permitted to pass on the cost of any tariff to the State of Illinois.

118.    The potential for tariffs and the chaos around the on-again, off-again tariff policies have also impacted New York already. When contractors experience financial impacts that are beyond their control, they will attempt to identify ways to mitigate their losses and request notices under the contract for relief. New York has already experienced fluctuating prices and delays caused by vendors adjusting to higher risk.

119.    Cost volatility also affects the ability of state agencies and entities to plan their budgets. For example, the University of Oregon is currently setting its budget for fiscal year 2026 (July 1, 2025 through June 30, 2026). Due to the President's purported ability to change tariffs by executive order or memorandum, budgeting for the additional cost of tariffs effectively requires the University of Oregon to predict the President's state of mind at particular times of the fiscal year. As a result, the university must plan its FY 2026 budget with a potential tariff rate on any given item ranging from 10 to 145 percent, which substantially undermines the university's ability to make financial plans and decisions.

Page 28 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

120.    As another example, OHSU is currently setting its budget for its Fiscal Year 2026, with its fiscal years also being July 1 through June 30. OHSU's Board of Directors will formally adopt the budget in May. Given the uncertainties related to tariffs, OHSU is unable to accurately plan its expenses for the next fiscal year. Already in past years, despite increasing revenue, spending has outpaced revenue. The substantial tariffs imposed and threatened by the President will only worsen that problem. If the costs of tariffs cause OHSU to significantly exceed its budget, it creates a serious risk that OHSU will need to cut expenses by scaling back its services and laying off staff, which harms OHSU and the State of Oregon.

121.    Unpredictable tariffs also are already burdening or almost certainly will burden the Plaintiff States by increasing administrative costs. When tariff rates increased in the past, many Plaintiff States saw vendors and contractors claim the rate increases as the basis for price adjustments. Although vendors that ship directly from foreign ports can include documentation from U.S. Customs and Border Protection evidencing the applied tariff rate, that is not possible with most domestic manufacturers that use foreign-sourced components. Whether due to opportunism or avoidance of incurring their own administrative costs, many Plaintiff States have experienced some vendors and contractors attempting to impose price adjustments that are not reasonably based on increased tariff rates.

122.    When a vendor or contractor seeks to impose a price-adjustment based on tariff rates, many Plaintiff States' agencies audit the adjustment to ensure that it is reasonably based on actual costs incurred. That is particularly difficult with regard to domestically produced goods made in part with foreign-sourced components, or contracted services that use some foreign-sourced materials. Due to the President's erratic—and sometimes inconsistent—tariff-rate directives, many of the Plaintiff States' agencies must piece together the applicable tariff for a particular day by reviewing multiple executive orders, memoranda, social media posts, and so on, and *also* investigate how much of those costs were actually incurred by the vendor or contractor. That imposes a substantial and additional administrative cost to many Plaintiff States.

Page 29 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## CAUSES OF ACTION

### Count I
### The IEEPA Tariff Orders are Ultra Vires and Violate the Separation of Powers
### (Against All Defendants)

123.    The Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

124.    The Constitution grants only Congress, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises…." Art. I, § 8, cl. 1.

125.    No statute authorizes the President to issue the IEEPA Tariff Orders. The only statute conveying substantive authority to the President cited in the Orders is IEEPA. But IEEPA does not authorize the imposition of such tariffs, if it authorizes tariffs at all. In addition, the Worldwide Tariff Order does not address an "unusual and extraordinary threat." Moreover, the tariffs the Orders impose are not designed "to deal with"—and thus have an insufficient nexus to—the purported "unusual and extraordinary threat[s]" the Orders identify.

126.    The President's authority under IEEPA may be exercised only to address an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).

127.    The statutory requirement of an "unusual and extraordinary threat" is not met by the President's declaration of emergency accompanying the Worldwide Tariff Order. As the Worldwide Tariff Order acknowledges, "annual U.S. goods trade deficits" are "persistent"; thus, by definition, they are not "unusual and extraordinary." There is no other "unusual and extraordinary threat" addressed by the Worldwide Tariff Order.

128.    The President's emergency powers under the IEEPA "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has

Page 30 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

129.    The tariffs imposed under the Canada and Mexico Tariff Orders do not "deal with" the "unusual and extraordinary threat[s]" they identify: there is no connection between the border security threats the orders identify, including drug trafficking, and the tariffs imposed by the orders.

130.    The tariffs imposed under the China Tariff Order does not "deal with" the "unusual and extraordinary threat" it identifies: there is no connection between the manufacture and trafficking of fentanyl and the tariffs imposed by the order.

131.    The tariffs imposed under the Worldwide Tariff Order do not "deal with" the purported "unusual and extraordinary threat[s]" the Order identifies:

    a.    The nearly worldwide 10 percent tariff level is wholly unconnected to the stated basis of the emergency declaration: it applies without regard to any country's trade practices or purported threat to domestic industries.

    b.    The level of additional tariffs published in Annex I of the Tariff Order exceeds what is necessary "to deal with" the purported emergency.

    c.    The Trump Administration has said that it intends to use the Tariff Order to advance unrelated policy objectives in direct contravention of IEEPA. White House Press Secretary Karoline Leavitt said during an April 8 press briefing that: "The President ... is going to have a custom, tailor-made approach to each and every country, and if that means discussions of foreign aid, of our military presence in these countries, how those troops are paid for ... that could be part of the negotiation." With respect to a potential change to the Tariff Order with respect to South Korea, the President wrote: "I just had a great call with the Acting President of South Korea. We talked about their tremendous and unsustainable Surplus,

Page 31 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

> Tariffs, Shipbuilding, large scale purchase of U.S. LNG, their joint
> venture in an Alaska Pipeline, and payment for the big time Military
> Protection we provide to South Korea…."

    d.    The President's suspension of the country-specific tariffs underscores the lack of nexus between the purported economic threats the Worldwide Tariff Order identifies and the tariffs it imposes.

132.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is unconstitutional and ultra vires.

133.    The IEEPA Tariff Orders are not authorized by the IEEPA or any other statute. As such, they are ultra vires and unlawful.

134.    Further, because the President lacks statutory authority to impose the tariffs in the IEEPA Tariff Orders, the IEEPA Tariff Orders are an exercise of Congressional authority in violation of separation of powers.

<div align="center">

**Count II**

**No statutory authority — 5 U.S.C. § 706(2)(C)**

**(Against U.S. Customs and Border Protection)**

</div>

135.    The Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

136.    U.S. Customs and Border Protection is an "agency" under the Administrative Procedure Act, 5 U.S.C. § 551(1).

137.    The Customs and Border Protection's Cargo Systems Messaging Service (CSMS) # 64297449 - Guidance: Additional Duties on Imports from Canada (as amended by CSMS # 64472173, CSMS # 64514918, and CSMS # 64336037), CSMS # 64297292 – Guidance: Additional Duties on Imports from Mexico (as amended by CSMS # 64335789), and CSMS # 64701128 – Updated Guidance – Reciprocal Tariffs – Increase in Rate for China and Reversion of Other Country-Specific Rates, Effective April 10, 2025 (each, a "Guidance") are each a final

Page 32 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

agency action subject to review under the APA. Each Guidance marks the consummation of its decision-making process because it announces the agency's implementation of the IEEPA Tariff Orders.

138.    Each Guidance is an action by which rights or obligations have been determined or from which legal consequences will flow because it immediately changes tariffs rates charged at importation.

139.    Each Guidance implements a series of tariffs that are without statutory authorization and are contrary to law. *See* Count I, above.

140.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

141.    Plaintiff States are also entitled to vacatur of each Guidance under 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, and a preliminary and permanent injunction preventing U.S. Customs and Border Protection from implementing each Guidance.

## Count III
### Arbitrary and Capricious — 5 U.S.C. § 706(2)(A)
### (Against U.S. Customs and Border Protection)

142.    The Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

143.    U.S. Customs and Border Protection is an "agency" under the Administrative Procedure Act, 5 U.S.C. § 551(1).

144.    The Customs and Border Protection's Cargo Systems Messaging Service (CSMS) # 64297449 - Guidance: Additional Duties on Imports from Canada (as amended by CSMS # 64472173, CSMS # 64514918, and CSMS # 64336037), CSMS # 64297292 – Guidance: Additional Duties on Imports from Mexico (as amended by CSMS # 64335789), and CSMS # 64701128 – Updated Guidance – Reciprocal Tariffs – Increase in Rate for China and Reversion

Page 33 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

of Other Country-Specific Rates, Effective April 10, 2025 (each, a "Guidance") are each a final agency action subject to review under the APA. Each Guidance marks the consummation of its decision-making process because it announces the agency's implementation of the IEEPA Tariff Orders.

145.    Each Guidance is an action by which rights or obligations have been determined or from which legal consequences will flow because it immediately changes tariffs rates charged at importation.

146.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

147.    Agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

148.    Each Guidance is arbitrary and capricious because it relies on factors unrelated to an "unusual and extraordinary threat" as required under IEEPA, it fails to consider the economic consequences of the imposition of tariffs, and is implausible and counter to the evidence.

149.    Plaintiff States are also entitled to vacatur of each Guidance under 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, and a preliminary and permanent injunction preventing U.S. Customs and Border Protection from implementing each Guidance.

Page 34 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff States pray that the Court:

      a.     Declare that the IEEPA Tariff Orders, as amended, are ultra vires and contrary to law;

      b.     Hold unlawful and set aside the Customs and Border Protection's Cargo Systems Messaging Service (CSMS) # 64297449 - Guidance: Additional Duties on Imports from Canada (as amended by CSMS # 64472173, CSMS # 64514918, and CSMS # 64336037), CSMS # 64297292 – Guidance: Additional Duties on Imports from Mexico (as amended by CSMS # 64335789), and CSMS # 64701128 – Updated Guidance – Reciprocal Tariffs – Increase in Rate for China and Reversion of Other Country-Specific Rates, Effective April 10, 2025;

      c.     Preliminarily and permanently enjoin Secretary Noem, Acting Commissioner Flores, the Defendant agencies, their agents, and anyone acting in concert or participation with them from implementing, instituting, maintaining, or giving effect to (i) the IEEPA Tariff Orders, as amended, and (ii) U.S. Customs and Border Protection's Cargo Systems Messaging Service (CSMS) # 64297449 (issued March 3, 2025), CSMS # 64336037 (issued March 6, 2025), CSMS # 64297292 (issued March 3, 2025), CSMS # 64335789 (issued March 6, 2025), CSMS # 64299816 (issued March 3, 2025), CSMS # 64701128 (issued April 10, 2025), and CSMS # 64724565 (issued April 11, 2025), by entering an order consistent with the constitutional requirement that "all Duties, Imposts and Excises shall be uniform throughout the United States," U.S. Const., Art. I, § 8, cl. 1;

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

- Appx199 -

     d.      Award the Plaintiffs States' costs of suit and reasonable attorneys' fees and expenses under any applicable law; and

     e.      Award such additional relief as the interests of justice may require.

DATED: April 23, 2025

Respectfully submitted,

<div style="display:flex">
<div>

**DAN RAYFIELD**
Attorney General
State of Oregon

By: */s/ Brian Simmonds Marshall*
Benjamin Gutman
Solicitor General
Dustin Buehler
Special Counsel
Brian Simmonds Marshall
Christopher A. Perdue*
Nina R. Englander*
Senior Assistant Attorneys General
YoungWoo Joh**
Alexander C. Jones*
Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.oregon.gov
Chris.Perdue@doj.oregon.gov
Nina.Englander@doj.oregon.gov
YoungWoo.Joh@doj.oregon.gov
Alex.Jones@doj.oregon.gov

Attorneys for the State of Oregon

</div>
<div>

**KRISTIN K. MAYES**
Attorney General
State of Arizona

By: */s/ Syreeta A. Tyrell*
Joshua D. Bendor*
Solicitor General
Syreeta A. Tyrell*
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-8310
Joshua.Bendor@azag.gov
Syreeta.Tyrell@azag.gov
ACL@azag.gov

Attorneys for the State of Arizona

</div>
</div>

Page 36 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

**PHILIP J. WEISER**
Attorney General
State of Colorado

By: */s/ Sarah H. Weiss*
Sarah H. Weiss*
*Senior Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Sarah.Weiss@coag.gov

Attorneys for the State of Colorado

**WILLIAM TONG**
Attorney General
State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

Attorneys for the State of Connecticut

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

Attorneys for the State of Delaware

**KEITH ELLISON**
Attorney General
State of Minnesota

By: */s/ Pete Farrell*
Peter J. Farrell*
Deputy Solicitor General
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1424
Peter.Farrell@ag.state.mn.us

Attorneys for the State of
Minnesota

**AARON D. FORD**
Attorney General
State of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney
General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

Attorneys for the State of Nevada

**RAÚL TORREZ**
Attorney General
State of New Mexico

By: */s/ James W. Grayson*
James W. Grayson*
Chief Deputy Attorney General
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
jgrayson@nmdoj.gov

Attorneys for the State of New Mexico

Page 37 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**KWAME RAOUL**
Attorney General
State of Illinois


By: */s/ Gretchen Helfrich*
Cara Hendrickson*
Assistant Chief Deputy Attorney General
Gretchen Helfrich*
Deputy Chief, Special Litigation Bureau
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (312) 814-3000
Cara.Hendrickson@ilag.gov
Gretchen.helfrich@ilag.gov

Attorneys for the State of Illinois



**AARON M. FREY**
Attorney General
State of Maine

By: */s/ Vivian A. Mikhail*
Vivian A. Mikhail*
Deputy Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Vivian.mikhail@maine.gov

Attorneys for the State of Maine



**LETITIA JAMES**
Attorney General
State of New York


By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal
Initiatives
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov

Attorneys for the State of New York



**CHARITY R. CLARK**
Attorney General
State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

Attorneys for the State of Vermont


*Admission application forthcoming*

**Admission application pending*


Page 38 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000
- Appx202 -

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | Case No.  1:25-cv-00077-GSK-TMR-JAR  DECLARATION OF PROFESSOR JAMES R. HINES JR. |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | |
| Defendants. | |

# Table of Contents

I.      Qualifications and methods.................................................................. 1

     A.      Qualifications............................................................................ 1

     B.      Methods.................................................................................... 1

II.     The Economic background. ................................................................ 2

III.    U.S. Current account deficits and U.S. manufacturing....................... 11

IV.     Scope of recent tariff action. ............................................................ 15

V.      Economic impact of tariff action. ..................................................... 18

VI.     Impact of tariffs on prices of imported goods................................... 23

VII.    Exposures of state governments........................................................ 25

VIII.   Evaluation of recent tariff action. .................................................... 32

# I.    Qualifications and methods.

## A.    Qualifications.

1.    I teach at the University of Michigan, where I am the Richard A. Musgrave Collegiate Professor of Economics in the Department of Economics and the L. Hart Wright Collegiate Professor of Law in the law school.  My scholarly work concerns various aspects of government finance.  I have a B.A. and M.A. from Yale University and a Ph.D. from Harvard University, all in economics.

2.    Prior to joining the Michigan faculty, I was a full-time faculty member first at Princeton University and then at Harvard University; additionally, I have held visiting appointments at Columbia University, the London School of Economics, the University of California-Berkeley, the University of Melbourne, and Harvard Law School.  I have testified before Congress on nine occasions, and in 2017 received the National Tax Association's Daniel M. Holland Medal for lifetime achievement in the study of public finance.

3.    I am a past President of the American Law & Economics Association and am the current President of the International Institute of Public Finance.  I am a Research Associate of the National Bureau of Economic Research, Research Director of the International Tax Policy Forum, a Fellow of the CESifo group in Germany, an International Research Fellow of the Centre for Business Taxation at Oxford University, and a Fellow of the Society for Empirical Legal Studies.  I am a former Co-Editor of the American Economic Association's Journal of Economic Perspectives and previously served as an Economist in the Bureau of Economic Analysis of the U.S. Department of Commerce.  Exhibit A provides more details about my experience and publications.

4.    I am being paid $250 per hour for my work on this matter, which represents a significant discount from my usual rate for expert witness or other consulting work.

## B.    Methods.

5.    This report was prepared based on reviews of the available evidence in the economics literature, and analysis of data available from various government documents and websites.

Page 1 -   DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

## II.     The Economic background.

6.      The U.S. economy was performing very well prior to the recent tariff actions of the U.S. government.  In calendar year 2024, U.S. gross domestic product (GDP) was $29.2 trillion, and $85,784 per capita, making the United States by far the world's largest economy, and Americans among the richest people in the world.  World Bank data indicate that, in 2023, and among all the world's countries other than a few small oil producers and tax havens, only Switzerland had a per capita income adjusted for purchasing power parity exceeding that of the United States;[1] the adjusted (in 2021 dollars) U.S. per capita income of $74,578 significantly exceeded the European average of $53,832, and also significantly exceeded the average incomes of Canada ($56,714), Australia ($60,447), the United Kingdom ($52,582), and Japan ($45,915).

---

[1] The World Bank data are available at https://data.worldbank.org/indicator/NY.GDP.PCAP.PP.KD.  In addition to the oil exporting countries Brunei, Norway, and Qatar, five small tax havens – Bermuda, the Cayman Islands, Ireland, Monaco, and Singapore – had reported per capita GDPs that exceeded the United States; but reporting difficulties can make it difficult to compare these GDPs to those of larger countries that are not tax havens.

Page 2 -    DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

7.     U.S. economic affluence is the product of many decades of consistent economic growth.  Figure 1 depicts U.S. per capita income, in real (year 2017) dollars, for the years since World War Two.[2]  The shaded areas in the graph represent economic recession years – and predictably, economic growth falls during these occasional recessions, most recently during the Covid crisis.  The U.S. pattern, however, is that, in the years following these recessions, average U.S. income resumes a consistent upward path.  And that was indeed the experience of the U.S. economy following its recovery from the Covid crisis.

**Figure 1: U.S. Per Capita annual GDP, in Real (2017) Dollars.**



---

[2] The data depicted in this graph come from the U.S. Department of Commerce, Bureau of Economic Analysis, via the FRED website provided by the Federal Reserve Bank of St. Louis, and are available at https://fred.stlouisfed.org/.

Page 3 -   DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

8.    Furthermore, the U.S. economy did not face significant evident headwinds prior to 1 February 2025.  In its January 2025 projections of the budget and economic outlook for 2025-2035,[3] the Congressional Budget Office forecasted consistent annual real (inflation-adjusted) GDP growth of roughly two percent, which matches the U.S. experience over the last 25 years.  Figure 2 presents the Congressional Budget Office data on annual inflation-adjusted GDP growth over the last 25 years, and its projections for 2025-2035.

**Figure 2: U.S. Per Capita Inflation-Adjusted Annual GDP Growth Rates — Historical and CBO Projections.**



9.    High U.S. incomes translate into very high consumption levels for Americans; in 2024, per capital U.S. consumption expenditures were $58,272.  The World Bank international comparisons project indicates that the United States had the highest actual individual consumption per capita of any country in 2021, the last year for which internationally comparable consumption data were available.[4]

---

[3] Congressional Budget Office, The Budget and Economic Outlook: 2025 to 2035 (Washington, DC: Congressional Budget Office, January 2025).

[4] These data are available at https://www.worldbank.org/en/programs/icp.

Page 4 -    DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

10.    Over time, real U.S. consumption levels have exhibited the same consistent growth as has real U.S. GDP.  Figure 3 depicts U.S. per capita consumption, in real (year 2017) dollars, for the years since World War Two.  The pattern in Figure 3 matches that of Figure 1, steadily rising despite occasional dips due to recessions.

**Figure 3: U.S. Per Capita Annual Consumption, in Real (2017) Dollars.**



Page 5 -   DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000
- Appx209 -

11.    The U.S. labor market was similarly well situated.  The January 2025 U.S. unemployment rate of 4.0 percent was quite low by the standards of the last 75 years of U.S. economic history.  Figure 4 depicts monthly seasonally-adjusted U.S. unemployment rates, as calculated by the Bureau of Labor Standards and reported by the Federal Reserve Bank of St. Louis.  Only on brief occasions over the last 50 years has the U.S. unemployment rate been 4.0 percent or below.  While the Congressional Budget Office in January 2025 did not anticipate that the U.S. unemployment rate would remain this low, its 10-year projection was that the U.S. unemployment rate would rise only slightly, settling at a historically-favorable 4.3 percent rate, as depicted in Figure 5.[5]

**Figure 4: U.S. Monthly Unemployment Rate, Seasonally Adjusted.**



---

[5] The data underlying Figure 4 are available at https://fred.stlouisfed.org/series/UNRATE. Figure 5 is drawn from Congressional Budget Office, The Budget and Economic Outlook: 2025 to 2035 (Washington, DC: Congressional Budget Office, January 2025).

Page 6 -   DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

**Figure 5: CBO Projections of U.S. Unemployment.**



Page 7 -   DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000
- Appx211 -

12.     U.S. labor market health is also reflected in steady wage growth.  Since the year 2000, nominal U.S. wages have grown by roughly three percent each year, producing real purchasing power gains given a prevailing inflation rate of somewhat below two percent.  And as of January 2025, the Congressional Budget Office projected U.S. wages to continue growing at a three percent annual rate over the next ten years, while inflation was projected to persist at two percent.  Figure 6 presents these wage projections.[6]

**Figure 6: U.S. Annual Wage Growth — Historical and CBO Projections.**



<hr>

[6] Wage and inflation projections are available in Congressional Budget Office, The Budget and Economic Outlook: 2025 to 2035 (Washington, DC: Congressional Budget Office, January 2025).

Page 8 -   DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

13.     It is also useful to consider the evolution over time of wages earned by workers at the median of the wage distribution.  Figure 7 presents Bureau of Labor Standards calculations of median weekly earnings, in 1982 - 1984 dollars adjusted for changes in the consumer price index.  Median earnings capture not only the labor market opportunities available to workers, but also the extent to which workers with different levels of human capital and labor market experience participate in the labor market.  Figure 7 indicates that median wages kept pace with inflation between 2000 and 2014, but that real wages significantly increased over the following ten years.

**Figure 7: Median Usual Weekly Real Earnings.**



Page 9 -   DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000
- Appx213 -

14.    It is clear from this and other evidence that the U.S. economy was performing at a high level as of January 2025, and indeed had performed at a high level over many years, despite occasional setbacks such as the Covid crisis.  To be sure, there were concerns that U.S. economic performance might be difficult to sustain with an aging workforce, costly entitlement programs, and persistent government budget deficits.  But one of the encouraging aspects of the high level of average U.S. incomes, average wages, average consumption, and high rate of employment is that these features of the U.S. economy were projected to persist strongly into the future, despite potential headwinds from other considerations.  There was no U.S. economic crisis in January 2025.

Page 10 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000
- Appx214 -

## III.   U.S. Current account deficits and U.S. manufacturing.

15.     The United States has run persistent current account deficits since the mid-1970s, which means that imports of goods and services consistently exceed exports.  In 2024, the United States exported goods and services worth $3.1802 trillion, representing 10.9 percent of GDP.  In the same year, the United States imported goods and services worth $4.0833 trillion, representing 14.0 percent of GDP.[7]  The resulting current account deficit of 3.1 percent of GDP is typical of recent years; and imports exceeding exports has been a consistent feature of the U.S. economy since the mid-1970s.  Note that it is standard in such calculations to consider trade in goods and services combined, rather than separating these two categories, in part because traded goods often embody significant service components, and in part because goods and services both have economic value for which importers pay.  The economics literature offers no reasons to focus exclusively on trade in goods or trade in services, instead indicating that what matters for policy and for our evaluation of economic performance is the sum of goods and services.  This is the same reason why goods and services are combined in calculating individual incomes, economic output, and GDP.[8]

---

[7] U.S. Bureau of Economic Analysis, U.S. International Trade in Goods and Services, December and Annual 2024, 5 February 2025, https://www.bea.gov/news/2025/us-international-trade-goods-and-services-december-and-annual-2024.

[8] In calculating its national income, the former Soviet Union used a method that routinely disregarded much of the output of its service sector, thereby focusing official attention on tangible goods and manufacturing.

Page 11 - DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

16.    Figure 8 presents net U.S. exports of goods and services as a fraction of GDP for the last 100 years, as calculated by the Bureau of Economic Analysis and reported by the Federal Reserve Bank of St. Louis.[9]  It is evident from the figure that imports of goods and services have exceeded exports by amounts that are volatile over time, but that has stabilized at roughly three percent of GDP annually for the last 15 years.

**Figure 8: U.S. Net Imports of Goods and Services as Shares of GDP.**



17.    Despite running persistent trade deficits, the U.S. economy has thrived over the 50 years since the mid-1970s.  If trade deficits were damaging to economic performance, there should be ample evidence by now – but instead, the evidence if anything points in the opposite direction, one of a healthy U.S. economy with a current account deficit.

---

[9] See https://fred.stlouisfed.org/series/A019RE1Q156NBEA.

Page 12 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

18.     The Trump administration's 2 April 2025 tariff announcement called attention to low U.S. manufacturing output as a component of a national emergency that warrants the introduction of new tariffs.  It is true that over time U.S. manufacturing has declined as a fraction of the U.S. economy – a pattern that is typical of wealthy countries, and a reflection of structural transformations associated with technology changes and rising economic affluence.[10]  U.S. manufacturing value added – manufacturing output minus the value of inputs purchased from suppliers – was 9.9 percent of U.S. GDP as of the end of 2024, representing a decline from 13.1 percent 20 years earlier.  Figure 9 presents this series as calculated by the Bureau of Economic Analysis and reported by the Federal Reserve Bank of St. Louis.[11]

**Figure 9: U.S. Manufacturing Value Added as a Share of GDP.**



Source: U.S. Bureau of Economic Analysis via FRED®
*Shaded areas indicate U.S. recessions.*

myf.red/g/1IOXL

---

[10] For a comprehensive review of the evidence of long-run structural determinants of the declining manufacturing share of the economy, see Robert Z. Lawrence, *Behind the curve: Can manufacturing still provide inclusive growth?* (Washington DC: Peterson Institute for International Economics, 2024).  Similarly, Timothy J. Kehoe, Kim J. Ruhl, and Joseph B. Steinberg, *Global imbalances and structural change in the United States,* Journal of Political Economy, April 2018, 126 (2), 761-796, presents evidence that no more than 15 percent of the

Page 13 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

19.    Despite recent declines, manufacturing remains an important part of the U.S. economy, with 12.8 million employees as of January 2025.  Figure 10 presents the history of total U.S. employment in manufacturing, as calculated by the Bureau of Labor Statistics and reported by the Federal Reserve Bank of St. Louis.

**Figure 10: U.S. Manufacturing Employment.**



20.    Figure 10 indicates that U.S. manufacturing employment peaked in the 1980s, declined over the subsequent two decades, and then dropped considerably between 2000 and 2010.  Total manufacturing employment has risen somewhat over the last 15 years.

---

decline in U.S. goods-sector employment between 1992 and 2012 is attributable to U.S. trade deficits.

[11] See https://fred.stlouisfed.org/series/VAPGDPMA.

Page 14 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

21.     There is no crisis or emergency in U.S. manufacturing.  Instead, activity levels of U.S. manufacturing firms ebb and flow as they are subject to the forces of supply and demand, within the United States and internationally; the same is true of all other U.S. industries.  And as with other industries, supply and demand in manufacturing can be affected by U.S. and foreign government policies.  Despite or perhaps because of these government policies, it is clearly feasible, and indeed profitable, for U.S. manufacturers to persist and thrive in business, as evidenced by their contribution of 9.9 percent of the U.S. economy and employment of 12.8 million people.

22.     If the U.S. government believes that the U.S. economy would benefit from having additional domestic manufacturing activity, it can offer favorable tax treatment or other subsidies that would encourage greater investment in manufacturing.  Tariffs on imported manufacturing goods are extremely inefficient alternatives to such subsidies.  While such tariffs have the potential to help some domestic firms whose output competes with imported goods, the assistance that tariffs offer is indirect and very costly relative to the benefits they might deliver to U.S. manufacturers.  The economic principle of targeting is that efficiently-designed remedies are directed at the problems they seek to solve.  Imposing costly tariffs to assist domestic manufacturing makes little sense given that governments have access to normal tax and spending policies that are much more cost-effective in subsidizing the activities of specific industries.

## IV.     Scope of recent tariff action.

23.     The Trump administration has announced a series of tariff actions that collectively impose 10 percent across the board tariffs on imported goods, with specific countries and products targeted with higher rates.  There are also limited exceptions to these tariffs.  Automobiles, steel and aluminum are subject to higher tariff rates based on separate tariff authorities but are not subject to IEEPA-based tariffs.  Imports from Canada, Mexico, and China are subject to higher IEEPA-based tariffs, and the administration has announced that imports from a large number of countries will be subject to tariffs at rates significantly exceeding 10 percent in an effort to reduce or eliminate the associated U.S. bilateral trade deficits.

Page 15 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000
- Appx219 -

24.     The 10 percent tariffs are entirely unjustified by U.S. economic conditions, as are the higher rates on specified products, and the higher rates on imports from Canada, Mexico, China, and other countries.  There is no coherent economic theory or model that implies that a 10 percent tariff rate is warranted by economic conditions in the United States; nor that a 10 percent tariff would enhance U.S. wages or U.S. consumption.  Instead, the 10 percent tariff figure appears to be entirely arbitrary.

25.     Bilateral trade deficits are differences between amounts imported from, and exported to, specific foreign countries.  The United States has bilateral trade deficits with many countries, which is why, collectively, U.S. net exports of goods and services look as they do in Figure 8.  Whatever economic significance there may be to the U.S. current account deficits depicted in Figure 8, there is clearly no economic significance to U.S. bilateral trade deficits with individual countries.  In a barter economy, trade between transacting parties is always balanced; in a market economy it is not.  Individuals in their daily lives "import" more from grocery stores than they "export" to them; but there is nothing wrong or undesirable about this trade imbalance, since it is a normal feature of a market economy, and does not prevent individuals (and grocery stores) from balancing their budgets and accounts.  Indeed, attempts to economize on grocery store purchases by growing one's own food, in an effort to shrink a consumer's "trade deficit" with grocery stores, would be highly inefficient and counterproductive to the goal of maximizing economic welfare.

26.     Bilateral international trade deficits are produced by normal trading imbalances. For example, the United States might export airplanes and agricultural products to Italy, and simultaneously import an equal value of clothes from Italy, producing balanced bilateral trade. Or the United States could export airplanes and agricultural products to Italy, Italy could export fabricated metal products to France, and France could export clothes to the United States.  In the second example, the United States has a bilateral trade deficit with France (and a trade surplus with Italy), but the U.S. economic outcomes (exports and imports, treating French fashions to be equivalent in dollar terms to their Italian counterparts) are unchanged from the first example.

Page 16 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

27.     The Trump administration's efforts to impose tariffs on imports from individual countries based on U.S. bilateral trade deficits with those countries do not correspond to any coherent theory of trade.  There is no theory that says that a country's trade should be balanced with each individual trading partner, any more than a customer's "trade" should be "balanced" with a grocery store.  It is of course possible to design tariffs that will ensure that a country does not have bilateral trade deficits; a tariff rate sufficiently high to eliminate all imports will clearly suffice, as would somewhat lower rates.  But tariffs set this way bear no connection to any coherent economic objectives.

28.     The Office of the U.S. Trade Representative provides a document ("Reciprocal Tariff Calculations") explaining the basis on which rates were chosen for the country-specific reciprocal tariffs announced on 2 April 2025.[12]  The lone equation appearing in this document, together with the assumed parameter values, implies that values of country-specific new tariffs will equal to the ratio of net U.S. imports from a country to gross U.S. imports from the same country.  The reciprocal tariffs announced on 2 April 2025 do not, however, correspond to the rates produced by this formula, since instead of being based on net imports and gross imports from individual countries, they are based on net and gross imports of goods only, ignoring services.  Furthermore, the announced reciprocal tariffs are exactly half the rates implied by the formula, with the important exception that the minimum tariff rate is ten percent.

29.     Tariff rates chosen this way bear scant if any connection to the stated objective of balancing bilateral trade.

_____

[12] This document is available at https://ustr.gov/issue-areas/presidential-tariff-actions.

Page 17 - DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

30.    First, bilateral trade includes services as well as goods, but the calculations ignore net and gross service imports.  Second, the assumed 0.25 pass-through of tariffs to import prices (the parameter $\varphi$ in the document) is too low by a factor of four, since the available evidence, including the study cited in the document as the basis of the assumed 0.25 pass-through rate, indicates that pass-through is roughly one for one.  Third, there is no objective-based reason to divide the calculated tariff rate by two, or to impose a minimum ten percent rate.  And fourth and most importantly, it is simply wrong to assume, as the calculations do, that "offsetting exchange rate and general equilibrium effects are small enough to be ignored."

31.    Partial equilibrium is a property of individual markets; general equilibrium is a property of all markets together.  It is well understood that, to the extent that one market affects another, general equilibrium considerations mean that partial equilibrium reasoning delivers misleading answers.  In the present context, the relevant general equilibrium consideration is that trade with one country affects trade with another.  Consequently, when the United States imposes a tariff on trade with country A, the tariff will change the U.S. bilateral trade balance with country B and all other U.S. trading partners, in part by affecting relative currency values, and in part through the usual process of economic substitution.  The "Reciprocal Trade Calculations" document, in assuming away any general equilibrium effects, ignores these important realities.  As a result, even if the reciprocal tariffs were imposed exactly as described in the document, they would not support bilateral trade balance, nor would they advance any other objective.

## V.    Economic impact of tariff action.

32.    The foundation of any modern economic system is trade between market participants.  Trade permits people to work at jobs in which they perform limited numbers of tasks, and nonetheless lead lives in which they consume thousands of different goods and services.  People need not produce everything they consume, because they can trade their services, and anything they might produce, in exchange for purchasing power they can then use to obtain everything else they want and can afford.  Anyone living in the modern world is so accustomed to this system of trade that it can be easy to lose sight of just how pervasive it is.

Page 18 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

33.     This market process of producing one thing and consuming another operates internationally as well as within a country's borders.  International trade has many of the same characteristics as the ordinary economic transactions that take place continually within countries.  Of course there are differences; for example, since transporting things over long distances can be expensive, international transactions are somewhat less common than ordinary domestic transactions.  And since governments control borders, they have the ability to impose tariffs on imported goods.

34.     Tariffs impede the functioning of market economies by inserting additional costs into the operation of supply and demand in international markets.  As a result of these additional costs, market actors forgo transactions that would otherwise be cost-reducing and therefore mutually beneficial.  For example, the introduction of tariffs on goods that firms in an industry use in their production processes will raise production costs, encouraging firms in the industry to do a combination of reducing their production and seeking methods of producing that rely less on imports.  Either of these reactions is costly to firms in the affected industry, for the simple reason that these options were available even prior to the introduction of tariffs – so the fact that the firm had not previously curtailed production or sought alternative production configurations indicates that it was costly to do so.

35.     It is inefficient to induce producers to modify their production plans, since in the absence of such inducement the market gives firms incentives to choose cost-minimizing production configurations.  The economic cost of distorting economic behavior is known as deadweight loss; and the magnitude of deadweight loss generally rises with the square of the tax or tariff rate that induces the behavior change.[13]  This square rule means that the cost of the economic distortion caused by a ten percent tariff is generally four times the cost of a five percent tariff on the same good; and a fifteen percent tariff would produce economic distortions that cost roughly nine times as much as those produced by a five percent tariff.  Notably, the distortions introduced by tariffs apply both to sellers and buyers of traded goods, since given their mutual dependence, both are affected.

---

[13] For a mathematical derivation of the square rule, and references to the extensive associated literature, see Alan J. Auerbach and James R. Hines Jr., Taxation and economic efficiency, in

Page 19 - DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

36.    Tariffs are inefficient because a country could avoid the associated deadweight losses simply by not imposing the tariffs.  Countries that nevertheless persist in imposing significant tariffs do so at their economic peril.  In distorting their own trade patterns, these countries make their economies less productive, and their residents correspondingly less prosperous.  It is true that specific domestic firms that compete with importers can find their market positions improved by higher tariff-inclusive prices charged by their competitors, so firm owners and possibly also their employees can benefit from the market protection afforded by high tariffs.  But it is a mistake to extrapolate this benefit to economic activity as a whole.  Tariffs that protect and therefore benefit individual firms or industries come at an even larger cost to all firms and industries, so the net effect on incomes and employment is negative.  These offsetting effects of specific tariffs on the rest of the economy can materialize even in local markets with unusually high concentrations of firms that stand to benefit from tariffs.  Evidence of the impact of the U.S. tariffs introduced in 2018 shows no discernable employment gains in local commuting zones where firms were particularly exposed to competition from imports that were subject to the tariffs.[14]  Despite the benefits tariffs afforded local firms that compete with imports, the tariffs' accompanying costs of distorting economic activity effectively neutralized any benefits to the local labor market.

---

Alan J. Auerbach and Martin Feldstein, eds. Handbook of Public Economics, volume 3 (Amsterdam: North-Holland, 2002), 1347-1421.

[14] David Autor, Anne Beck, David Dorn, and Gordon H. Hanson, Help for the heartland? The employment and electoral effects of the Trump tariffs in the United States, National Bureau of Economic Research Working Paper No. 32082, January 2024.

Page 20 - DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

37.    In a market economy, workers are paid according to their economic productivities. Those who live and work in a country with a more productive economy are themselves more productive, and therefore receive greater market compensation. In distorting a country's production patterns, tariffs reduce the productivity of firms and workers, and therefore reduce the wages and salaries received by workers, and the personal consumption that labor earnings support. In distorting the economy, and thereby reducing income levels, tariffs also make it more difficult to finance government activities since tax revenue is heavily dependent on incomes. Cross-country comparisons consistently show that government expenditures rise at least proportionately with national incomes, a pattern that holds even for welfare expenditures.[15]

38.    Tariffs also damage economies by increasing the uncertainties and risks faced by firms, investors, workers, and consumers. To the extent that tariffs were unanticipated at the time that important investment decisions were made, the introduction of new tariffs is a major source of uncertainty. Once imposed, tariffs might be increased or reduced; and unilaterally imposed tariffs invite retaliation, though it can be difficult or impossible to anticipate what form any retaliation may take. Consequently, market actors are left guessing what incentives they and their competitors will face, now and in the future. Firms, investors, and other economic actors benefit from being able to plan their activities; and needless sources of uncertainty make everything they do more costly. As a result, firms, investors, and financial markets commonly react adversely to significant uncertainties.[16] Consequently, the economic costs of tariffs consist not only of their distortionary effects on economic incentives, but also the costs of the economic uncertainties that tariffs introduce.

---

[15] See James R. Hines Jr., Will social welfare expenditures survive tax competition? Oxford Review of Economic Policy, Fall 2006, *22* (3), 330-348.

[16] For evidence of the impact of economic uncertainty on economic output, employment, and stock market returns, see Nicholas Bloom, The impact of uncertainty shocks, Econometrica, May 2009, 77 (3), 623-685, and Scott R. Baker, Nicholas Bloom, and Stephen J. Terry, Using disasters to estimate the impact of uncertainty, Review of Economic Studies, March 2024, 91 (2), 720-747.

Page 21 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

39.     As economies have grown, and technological changes have reduced shipping and other transport costs, international trade has risen as a fraction of total economic activity.  Higher trade levels bring with them greater potential for tariff distortions to damage economic performance.  Research indicates that, even in the 1930s, with much lower levels of international trade relative to (then depressed) economic output, the distortions produced by tariffs significantly reduced U.S. investment and GDP.[17]  More recently, cross-country evidence for 151 countries between 1963 and 2014 suggests that higher tariff levels are associated with higher unemployment and declines in domestic output and productivity.[18]

40.     Tariffs announced by the Trump administration will distort the U.S. economy and reduce productivity accordingly.  There is considerable scope for economic damage, given that, in 2024, U.S. imports of goods and services were $4.0833 trillion, representing 14.0% of GDP.  A recent study by Mary Amiti, Stephen Redding, and David Weinstein estimates that the deadweight losses produced by the U.S. tariffs introduced in 2018 were roughly half the magnitude of the revenue collected.[19]  The 2018 tariffs that they analyze were much smaller in magnitude than the IEEPA-based tariffs, estimated to raise just $3.2 billion per month in revenue by the end of 2018.  Since deadweight loss rises with the square of the tariff rate, and the 2025 tariffs are so much larger, the lost economic value associated with the 2025 tariffs should be much more than half of the projected tariff revenue, representing a significant drag on the U.S. economy.

---

[17] See Mario J. Crucini and James Kahn, Tariffs and aggregate economic activity: Lessons from the Great Depression, Journal of Monetary Economics, December 1996, 38 (3), 427-467.

[18] See Davide Furceri, Swarnali A. Hannan, Jonathan D. Ostry, and Andrew K. Rose, Macroeconomic consequences of tariffs, NBER Working Paper No. 25402, December 2018.

[19] Mary Amiti, Stephen J. Redding, and David E. Weinstein, The impact of the 2018 tariffs on prices and welfare, Journal of Economic Perspectives, Fall 2019, 33 (4), 187-210,

Page 22 - DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

# VI.   Impact of tariffs on prices of imported goods.

41.     Tariffs are taxes on imports.  Consequently, in the absence of other price changes, tariffs increase per-unit costs of providing imported goods.  In a competitive market, goods are priced at cost, including any relevant economic opportunity costs, and certainly including the costs of taxes and tariffs.  It follows that, in a competitive market setting, tariffs will increase the net-of-tariff prices of imported goods on a one-for-one basis, unless the tariffs induce changes in prices or other components of production costs.  Since the world economy is large, with many buyers of traded goods, and many (competitive) sellers, there is ample reason to expect the competitive paradigm to offer an informative guide to the likely impact of tariffs.

42.     It is useful to consider possible exceptions to the rule of complete tariff pass-through to prices in competitive markets.  Since tariffs change trade and production levels and patterns, these changes can themselves affect factor prices and costs.  In a competitive export industry with rising marginal costs, tariff-induced output reductions will also reduce average costs, and these cost reductions can somewhat mitigate the effect of tariffs on final prices paid by importing firms and consumers.  Furthermore, it may be the case that some important exporters or importers have little market competition and therefore market power, which generally will mean that higher production costs are passed through to consumers on less than a one-for-one basis.  As a result, it is possible that a country might introduce or increase its tariffs without its own firms and consumers bearing the full costs of the tariffs.  The more economically competitive the scenario for firms and countries, particularly once enough time has elapsed for economic actors to react to any tariff changes, the less likely it is that tariff pass-through to final prices will be incomplete; but the impact of tariffs on import prices remains an empirical question.

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

43.     Evidence from recent tariff experiences strongly supports the conclusion that higher tariffs increase the costs of imported goods to the end customer on close to a one-to-one basis.  Several studies consider effect of 2018 U.S. tariff increases on prices of U.S. imports, using variation in tariff intensity across goods and sectors to identify price effects.  These studies consistently find that import prices rose one-for-one with the tariffs.[20]  This evidence is consistent with the implications of the competitive-market model, which holds that importers, including the United States, are unable to obtain price discounts from foreign suppliers simply by imposing tariffs on them.  Instead, importing countries that introduce or raise tariffs impose costs on themselves in the form of the economic distortions introduced by their own tariffs.

---

[20] See Mary Amiti, Stephen J. Redding, and David E. Weinstein, The impact of the 2018 tariffs on prices and welfare, Journal of Economic Perspectives, Fall 2019, 33 (4), 187-210; Mary Amiti, Stephen J. Redding, and David E. Weinstein, Who's paying for the US tariffs? A longer term perspective, American Economic Review, Papers and Proceedings, May 2020, 110, 541-546; Alberto Cavallo, Gita Gopinath, Brent Neiman, and Jenny Tang, Tariff pass-through at the border and at the store: Evidence from US trade policy, American Economic Review: Insights, 2021, 3 (1), 19-34; Pablo D. Fajgelbaum, Pinelopi K. Goldberg, Patrick J. Kennedy, and Amit K. Khandelwal, The return to protectionism, Quarterly Journal of Economics, February 2020, 135 (1), 1-55.  Similarly, Mumtaz Ahmad and Imtiaz Ahmad, Tariff pass-through and implications for domestic markets: Evidence from U.S. steel imports, Journal of International Trade & Economic Development, 2024, 33 (3), 482-496, finds that imported steel prices rose one-for-one with the 2018 U.S. tariffs.  The study by Alberto Cavallo, Gita Gopinath, Brent Neiman, and Jenny Tang is occasionally misinterpreted to imply that tariff costs are not fully passed through to importers – which is not what the study finds.  Instead, a portion of the study considers evidence of prices charged to final consumers by two companies that sell imported goods, attempting to identify their pricing practices in response to higher supplier prices, and finding less than complete pass-through in the short run.

Page 24 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

# VII. Exposures of state governments.

44.     Direct expenditures by state and local governments represent significant portions of total U.S. consumption and income every year.  For example, in 2022, the last year for which comprehensive data are available from the Census of Governments, direct expenditures by U.S. state and local governments summed to $4.296 trillion, representing 16.4 percent of U.S. GDP. Of these, the state governments of the 12 states that are parties to this action collectively had direct expenditures of $460 billion, representing 10.7 percent of the country's total subnational government spending.[21]  Notably, of this $4.296 trillion of total expenditures, $1.135 trillion, or 26 percent, represented wage and salary expense.  The remaining $3.161 trillion of direct expenditure represented a combination of payments to business entities for goods and services, and transfer payments to individuals.

45.     State government expenditures can be divided into two categories of potential exposure to tariff-related price increases.  The first category is higher purchase prices faced by state governments.  In order to understand the likely scope of tariff effects, it is helpful to review government purchasing patterns.  The Census of Governments provides information on direct expenditures by category; figures for 2022, including totals for the 12 states that are parties to this action, appear in Table 1.[22]

### Table 1: 2022 State and Local Government Direct Expenditures ($ billions)

| Expenditure Classification | S/L Total | 12 States | State% | S/L% |
|---|---|---|---|---|
| Total direct expenditure | 4,296.3 | 459.6 | 10.7 | 23.3 |
| Direct general expenditure | 4,027.0 | 444.0 | 11.0 | 23.3 |
| Capital outlay | 371.3 | 22.0 | 5.9 | 21.8 |
| Other direct general expenditure | 3,655.7 | 422.0 | 11.5 | 23.4 |

---

[21] These states are Arizona, Colorado, Connecticut, Delaware, Illinois, Maine, Minnesota, Nevada, New Mexico, New York, Oregon, and Vermont.

[22] Information in Table 1 is drawn from
https://www.census.gov/data/datasets/2022/econ/local/public-use-datasets.html.

Page 25 - DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

| | | | | |
|---|---|---|---|---|
| **Education services:** | | | | |
| Education | 1,264.4 | 76.9 | 6.1 | 22.4 |
|    Capital outlay | 118.0 | 4.5 | 3.8 | 21.5 |
| Higher education | 340.4 | 53.2 | 15.6 | 19.3 |
|    Capital outlay | 32.6 | 4.3 | 13.3 | 15.9 |
| Elementary & secondary | 832.7 | 6.3 | 0.8 | 23.9 |
|    Capital outlay | 84.8 | 0.1 | 0.0 | 23.6 |
| Other education | 91.3 | 17.3 | 19.0 | 20.6 |
| Libraries | 14.1 | 0.1 | 0.6 | 26.9 |
| | | | | |
| **Social services and income maintenance:** | | | | |
| Public welfare | 971.0 | 216.4 | 22.3 | 25.4 |
| Hospitals | 261.2 | 19.6 | 7.5 | 17.5 |
|    Capital outlay | 11.2 | 1.1 | 10.1 | 19.6 |
| Health | 154.3 | 16.4 | 10.6 | 17.5 |
| Employment security administration | 5.9 | 1.2 | 19.7 | 21.8 |
| Veterans' services | 1.5 | 0.1 | 9.1 | 9.9 |
| | | | | |
| **Transportation:** | | | | |
| Highways | 210.6 | 21.7 | 10.3 | 20.3 |
|    Capital outlay | 115.5 | 13.2 | 11.4 | 18.9 |
| Air transportation (airports) | 31.3 | 0.2 | 0.6 | 29.1 |
| Parking facilities | 2.1 | 0 | 0.2 | 17.8 |
| Sea and inland port facilities | 6.9 | 0 | 0.4 | 10.7 |
| | | | | |
| **Public safety:** | | | | |
| Police protection | 139.9 | 4.0 | 2.9 | 22.8 |
| Fire protection | 64.0 | 0 | 0 | 22.3 |
| Correction | 91.3 | 11.3 | 12.4 | 21.1 |
|    Capital outlay | 2.5 | 0.3 | 12.6 | 19.9 |
| Protective inspection and regulation | 19.1 | 1.6 | 8.4 | 15.3 |
| | | | | |
| **Environment and housing:** | | | | |
| Natural resources | 40.8 | 4.2 | 10.3 | 17.4 |
|    Capital outlay | 7.3 | 0.3 | 3.6 | 16.5 |
| Parks and recreation | 50.8 | 1.6 | 3.2 | 25.5 |
|    Capital outlay | 11.4 | 0.4 | 3.1 | 26.9 |
| Housing & community development | 74.0 | 3.2 | 4.3 | 24.7 |
| Sewerage | 70.2 | 0.1 | 0.2 | 18.1 |
|    Capital outlay | 23.5 | 0 | 0.1 | 23.2 |
| Solid waste management | 29.8 | 0.2 | 0.8 | 20.9 |

Page 26 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

| | | | |
|---|---|---|---|
| Capital outlay | 2.0 | 0 | 0.4 | 33.5 |

| | | | | |
|---|---|---|---|---|
| Governmental administration: | | | | |
|    Financial administration | 70.7 | 10.4 | 14.7 | 21.4 |
|    Judicial and legal | 56.8 | 7.6 | 13.5 | 23.8 |
|    General public buildings | 18.0 | 0.6 | 3.6 | 23.1 |
|    Other governmental administration | 47.3 | 2.2 | 4.7 | 19.7 |
| Interest on general debt | 104.3 | 10.9 | 10.4 | 31.0 |
| | | | | |
| General expenditure, n.e.c.: | | | | |
|    Miscellaneous commercial activities | 4.6 | 0 | 0.6 | 7.5 |
|    Other and unallocable | 221.9 | 33.2 | 15.0 | 34.2 |
| | | | | |
| Utility expenditure | 258.4 | 14.8 | 5.7 | 24.0 |
|    Capital outlay | 57.6 | 1.7 | 2.9 | 23.3 |
|    Water supply | 83.0 | 0.1 | 0.1 | 18.9 |
|    Electric power | 84.0 | 7.3 | 8.9 | 19.9 |
|    Gas supply | 7.2 | 0 | 0 | 9.1 |
|    Transit | 84.1 | 7.4 | 8.8 | 34.2 |
| | | | | |
| Liquor store expenditure | 11.0 | 0.8 | 7.6 | 8.9 |

46.     The first column in Table 1 is direct expenditures by all U.S. state and local governments, while the second column is direct expenditures by the state governments of the 12 states that are parties to this action.  The third column is the fraction of total U.S. state and local government spending represented by the 12 state governments that are parties to this action; and the fourth column is the fraction of total U.S. state and local government spending represented by the 12 states that are parties to this action, inclusive of both their state and local components.

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

47.     The data in Table 1 indicate that the largest categories of state government expenditure are education; public welfare; hospitals and health; highways; corrections; financial and legal administration; electric utilities; and transit expenditures.  While states vary in their distributions of these expenditures, the third column of Table 1 shows that the 12 states that are parties to this action have spending patterns that are broadly typical of U.S. state and local governments as a group.  Thus for example, these 12 state governments represented 10.7 percent of all state and local government direct expenditures in 2022, including 6.1 percent of education spending, 10.3 percent of highway spending, and 8.9 percent of electric utility spending.

48.     Tariffs directly affect the prices paid by state governments for imported goods. They also affect the prices paid for goods that are produced domestically but that rely, either directly or indirectly, on imported components.  For example, imported steel may be used by a U.S. domestic vehicle manufacturer to produce a garbage truck purchased by a local government. And imported plastics may be used by a robot company to produce robots that are in turn purchased by the vehicle manufacturer and used to produce garbage trucks ultimately purchased by local governments.  Since tariffs raise the costs of imported production inputs, they have effects on all of the prices along the production chain.

49.     In order to trace the likely impact of tariffs on prices faced by state governments, it is necessary to identify the extent to which the goods that they purchase rely directly and indirectly on imports.  Fortunately, it is possible to do so using the input-output matrix information on the U.S. economy produced by the Bureau of Economic Analysis of the U.S. Department of Commerce.  These calculations use detailed information from periodic industrial censuses, updated with annual surveys, to identify the extent to which production of different commodities and industries rely on intermediate purchases from others.  It is possible to use this information to infer how much steel production is required in garbage truck manufacture, taking account of the reality that many of the components of a garbage truck, and the equipment used in the manufacture of a garbage truck, themselves contain steel.

Page 28 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

50.     Importantly for the present purpose, it is possible to use the input-output matrix information to identify the extent to which goods that are consumed in the United Sates rely directly and indirectly on imports.  What is known as the import matrix identifies the values of imports, distinguished by category, that are used directly and indirectly by different sectors of the U.S. economy.  To the extent that tariffs increase the net costs of imported goods, the import matrix entries should indicate how much these higher costs are passed on to different sectors of the U.S. economy.

51.     Table 2 presents import matrix entries for U.S. state and local government activities in 2023.[23]  The table indicates that purchases by state and local governments incorporated $123.0 billion of imported goods.  Taking the 12 states that are parties to this action to be typical of others, and applying their 10.7 percent of total direct spending, it follows that their 2023 expenditures incorporated imports worth $13.2 billion.  Instead applying the 23.3 percent of total direct combined spending of state plus local governments in these 12 states, it follows that their 2023 expenditures incorporated imports worth $28.7 billion.

---

[23] The import matrix is available at https://www.bea.gov/industry/input-output-accounts-data. Table 2 uses the input matrix after redefinitions, and combines different categories of state/local operations into a total figure for state and local government.  Input matrix data are available only for combined state and local government purchases.  Service imports are omitted from Table 2.

Page 29 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

**Table 2: 2023 State and Local Government Purchases Import Requirements**

| Import product category | S/L government requirement ($ billions) |
| --- | --- |
| Farms | 0.5 |
| Forestry, fishing, and related activities | 0.7 |
| Oil and gas extraction | 2.2 |
| Mining, except oil and gas | 0.9 |
| Utilities | 0.04 |
| Wood products | 0.9 |
| Nonmetallic mineral products | 1.0 |
| Primary metals | 0.3 |
| Fabricated metal products | 2.4 |
| Machinery | 10.5 |
| Computer and electronic products | 5.6 |
| Electrical equipment, appliances, and components | 3.0 |
| Motor vehicles, bodies and trailers, and parts | 41.8 |
| Other transportation equipment | 0.06 |
| Furniture and related products | 1.3 |
| Miscellaneous manufacturing | 2.5 |
| Food and beverage and tobacco products | 6.7 |
| Textile mills and textile product mills | 1.2 |
| Apparel and leather and allied products | 0.7 |
| Paper products | 1.6 |
| Printing and related support activities | 0.3 |
| Petroleum and coal products | 21.1 |
| Chemical products | 12.6 |
| Plastics and rubber products | 5.2 |
| | |
| Total | $ 123.0 |

Page 30 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000
- Appx234 -

52.      This information makes it possible to estimate changes in the costs of goods purchased by state governments due to tariffs announced by the Trump administration citing its authority under the International Emergency Economic Powers Act (IEEPA).  The Yale Budget Lab estimates that the Trump administration's IEEPA-based February 1, 2025 orders for tariffs on Canada, Mexico, and China together impose burdens equivalent to an across the board 7.5 percent tariff on all U.S. imports.  The Yale Budget Lab also estimates that the Trump administration's IEEPA-based April 2, 2025 order for worldwide tariffs imposes burdens equivalent to an across the board 11.5 percent additional tariff, making the combined burden of the tariffs under these two IEEPA-based orders equivalent to a 19 percent tariff.[24]  Of course the actual burden on state governments depends on the extent to which these tariffs are fully enforced, as well as the extent to which state government purchases are concentrated on goods subject to high tariff rates.  Table 2 indicates that imports embedded in purchases by state and local governments are particularly concentrated in motor vehicles, which represent one-third of the total.  Many (though not all) of these motor vehicle imports are not subject to IEPPA-based tariffs.  Using the conservative assumption that the average IEEPA-based tariff rate on imports embedded in state government purchases is just 12 percent, and applying a 100 percent pass-through rate, it follows that the tariffs announced under IEEPA authority raise the costs of direct purchases by the governments of the 12 states that are parties to this action by $1.6 billion per year.  Adding local government purchases in these 12 states increases the tariff-induced burden to $3.4 billion per year.

[24] See https://budgetlab.yale.edu/research/fiscal-economic-and-distributional-effects-20-tariffs-china-and-25-tariffs-canada-and-mexico and https://budgetlab.yale.edu/research/where-we-stand-fiscal-economic-and-distributional-effects-all-us-tariffs-enacted-2025-through-april.

Page 31 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

53.     The second category of potential state and local government exposure to tariff-related price increases lies in their responsibilities to provide income support to their populations. Table 1 indicates that state and local governments collectively spent $971 billion on public welfare in 2023, of which the state governments of the 12 states that are parties to this action spent $216.4 billion.  Tariffs that raise prices faced by consumers erode the value of these welfare payments, requiring additional government expenditures simply to keep beneficiaries whole.  Applying the 2024 U.S. ratio of imports to GDP (14.0 percent) to the $216.4 billion welfare expenditure, it follows that, with full pass-through of tariffs to prices, and again very conservatively taking the average tariff rate to be 12 percent, the 12 state governments that are parties to this action would need to increase their welfare spending by $3.6 billion to maintain their real values.  Adding local government welfare expenditures increases this total to $4.1 billion.  Consequently, incorporating the need to maintain the real purchasing power of welfare expenditures more than doubles the implied burden on state governments because of the IEEPA-related tariffs.

## VIII.  Evaluation of recent tariff action.

54.     The IEEPA tariffs announced by the Trump administration will significantly impair the performance of the U.S. economy.  This action is entirely unwarranted by prevailing economic conditions, since far from facing an economic emergency, the U.S. economy in January 2025 was the envy of the world.  Indeed, the tariffs that the administration announced have the potential to create a significant economic crisis where one did not previously exist.

55.     The IEEPA tariffs will reduce U.S. incomes, including U.S. real wages and consumption.  They will impose costs on U.S. consumers, including state governments, without delivering economic benefits in return.  The rates at which the tariffs are imposed – 10 percent in some cases, 25 percent in others, and based on U.S. bilateral trade deficits in still others – are unrelated to economic conditions or consequences for the U.S. economy, instead being entirely arbitrary.

Page 32 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000
- Appx236 -

      **I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.**

**Executed on May 6, 2025, at Chicago, Illinois.**

_____

JAMES R. HINES Jr.

Page 33 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

# JAMES R. HINES JR.

Curriculum Vitae
April 2025

**ECONOMICS OFFICE**

Department of Economics
University of Michigan
343 Lorch Hall
611 Tappan Avenue
Ann Arbor, MI  48109-1220
jrhines@umich.edu

**LAW OFFICE**

University of Michigan Law School
964 Legal Research
801 Monroe Street
Ann Arbor, MI  48109-1210
jrhines@umich.edu

**EDUCATION**

Harvard University, Ph.D., Economics, 1986.
Yale University, M.A., Economics, 1980.
Yale College, B.A., *cum laude*, Economics, 1980.

**TEACHING POSITIONS**

L. Hart Wright Collegiate Professor of Law, University of Michigan Law School, 2009-present. Professor of Law, 2006-present.  Visiting Professor, 2005-2006.

Richard A. Musgrave Collegiate Professor of Economics, College of Literature, Science, and the Arts, University of Michigan, 2006-present.  Professor of Economics, 2001-present.

Visiting Professor of Economics and Visiting Professor of Law, University of California-Berkeley, 2008-2009.

Visiting Professor of Law, Harvard Law School, 2005.

Professor of Business Economics, Stephen M. Ross School of Business, University of Michigan, 1999-2005.  Professor by courtesy, 2005-present.  Associate Professor, 1997-1999.

Professor of Public Policy, Gerald R. Ford School of Public Policy, University of Michigan, 2001-2005.

Associate Professor of Public Policy, John F. Kennedy School of Government, Harvard University, 1992-1997.  Visiting Assistant Professor, 1991-1992.

Assistant Professor of Economics & Public Affairs, Department of Economics and School of Public and International Affairs, Princeton University, 1986-1991.
Visiting Lecturer, Department of Economics, Harvard University, 1988-1989.

Visiting Assistant Professor, Department of Economics, Columbia University, 1988.

Teaching Fellow, Department of Economics, Harvard University, 1982-1985.

**RESEARCH AFFILIATIONS**

Research Associate, National Bureau of Economic Research, 1997-present.  Faculty Research Fellow, 1986-1997.

Research Director, Office of Tax Policy Research, Stephen M. Ross School of Business, University of Michigan, 1997-present.

Research Director, International Tax Policy Forum, 2001-present.

Co-Director, Program in Law & Economics, University of Michigan Law School, 2009-present.

Distinguished Fellow, CESifo Group, Germany, 2014-present.  Research Fellow, 1999-2014.

International Research Fellow, Centre for Business Taxation, Oxford University, 2007-present.

Eminent Research Scholar, University of Melbourne, Australia, 2024.  Academic Guest, 2023.

Becker Friedman Visiting Fellow, University of Chicago, 2013.

International Research Fellow, Institute for Fiscal Studies, London, United Kingdom, 2007-2010.

Visiting Research Associate, STICERD, London School of Economics, London, United Kingdom, 2003-2004.

Visiting Scholar, Institute for International Integration Studies, Trinity College, Dublin, Ireland, 2003.

Associate Director, John M. Olin Program for the Study of Economic Organization and Public Policy, Princeton University, 1989-1991.


**EDITORIAL BOARDS**

Editorial Board, *American Law and Economics Review*, 2013-present.

Editorial Advisory Board, *National Tax Journal*, 2019-present.

Editorial Advisory Board, *Journal of Risk and Financial Management*, 2020-present.

Editorial Advisory Board, *The Economists' Voice*, 2012-2020.  Co-Editor, 2010-2012.

Co-Editor, *Journal of Public Economics*, 2010-2013.

Co-Editor, *Journal of Economic Perspectives*, 2004-2010.

Editor, *FinanzArchiv*, 2000-2003.

Editor, *National Tax Association Proceedings*, 2001.

Associate Editor, *Journal of International Financial Markets, Institutions and Money*, 1997-2013.

Editorial Board, *B.E. Journal of Economic Analysis & Policy*, 2001-2016.

Associate Editor, *Journal of Regional Science*, 2003-2010.

Associate Editor, *New Palgrave Dictionary of Economics*, 2nd edition (Basingstoke, UK: Palgrave Macmillan, 2008).

Associate Editor, *Quarterly Journal of Economics*, 1997-2001.

Associate Editor, *International Tax and Public Finance*, 1993-1998.

Board of Editors, *World Politics*, 1992-1998.  Associate Editor, 1990-1991.


### PROFESSIONAL BOARDS

President, International Institute of Public Finance, 2024-present.  President-Elect, 2023-2024; Board of Management, 2020-2023.

President, American Law & Economics Association, 2023-2024.  Vice President, 2022-2023; Secretary-Treasurer, 2021-2022.

Fellow, Society for Empirical Legal Studies, 2019-present.  Board of Directors, 2016-2019.  Co-President, Conference on Empirical Legal Studies, 2018.

Scientific Advisory Board, MannheimTaxation ScienceCampus, Germany, 2014-present.

Scientific Advisory Board, Ifo Institute and CESifo Council, Germany, 2016-2024.

Board of Directors, National Tax Association, 2010-2013. Program Chair, National Tax Association annual conference, 2000.


### GOVERNMENT SERVICE

Panel of International Academic Expertise on Business Tax, Her Majesty's Revenue and Customs, United Kingdom, 2008-2012.

Academic Advisory Panel, Massachusetts Special Commission on Business Tax Policy, 1992-1993.

Panel of Technical Experts, Social Security Advisory Council, U.S. Social Security Commission, 1990.

Economist, Bureau of Economic Analysis, United States Department of Commerce, 1980-1981.


### RESEARCH AWARDS

Daniel M. Holland Medal, National Tax Association, 2017.

Richard A. Musgrave Visiting Professorship, International Institute of Public Finance and CESifo, 2014.

Researcher of the Year Award, University of Michigan Ross School of Business, 2005.

Contribution to the Research Environment Award, University of Michigan Ross School of Business, 2000.

### TEACHING PRIZES

Michigan Economics Society Outstanding Professor Award, University of Michigan, 2010.

Dean's Teaching Honor Roll, Ford School, University of Michigan, 2001, 2002, 2003 and 2005.

Dean's Teaching Award, Kennedy School, Harvard University, 1996 and 1997.

Manuel Carballo Award for Excellence in Teaching, Kennedy School, Harvard University, 1994.

Teaching Prize, Woodrow Wilson School Graduate Student Association, Princeton University, 1990.

Honorable Mention, Allyn Young Teaching Prize, Harvard University, 1983.

Harvard-Danforth Certificate for Excellence in Teaching, Harvard University, 1982.


**KEYNOTE ADDRESSES**

Max Planck Institute for Tax Law and Public Finance Conference, Berlin, Germany, 2024.

RSIT Conference, University of Tübingen, Germany, 2024.

Inaugural Global Wealth Management Lecture, George Mason University, 2023.

Presidential Address, American Law & Economics Association, Boston MA, 2023.

RIDGE May Forum, Workshop on Public Economics, Montevideo, Uruguay, 2018.

Werner Sichel Lecture, Western Michigan University, Kalamazoo MI, 2017.

MannheimTaxation Annual Conference, Mannheim, Germany, 2017.

Urban Economic Policy Annual Conference, Drexel University, Philadelphia PA, 2016.

Royal Society Lecture, Institute for Fiscal Studies, London, United Kingdom, 2014.

Bank of France Conference on Competitiveness and Corporate Taxation, Paris, France, 2014.

Richard Musgrave Lecture, CESifo Group, Munich, Germany, 2014.

Canadian Public Economics Group Annual Conference, Edmonton, Canada, 2013.

International Institute of Public Finance Annual Conference, Dresden, Germany, 2012.


**BOOKS**

***Global Goliaths: Multinational Corporations in the 21st Century Economy***, edited, with C. Fritz Foley and David Wessel (Washington, DC: Brookings, 2021). ISBN 978-0-815-73855-8.

***International Taxation***, edited (Cheltenham, UK: Edward Elgar, 2007). ISBN 981-1-84376-446-5.

***Comparative Fiscal Federalism: Comparing the European Court of Justice and the U.S. Supreme Court's Tax Jurisprudence***, edited, with Reuven S. Avi-Yonah and Michael Lang (Alphen aan den Rijn, The Netherlands: Kluwer Law International, 2007). ISBN 978-90-411-2552-1.

***Taxing Corporate Income in the 21st Century***, edited, with Alan J. Auerbach and Joel Slemrod (Cambridge, UK: Cambridge University Press, 2007). ISBN 978-0-521-87022-1.

***International Taxation and Multinational Activity***, edited (Chicago: University of Chicago Press, 2001). ISBN 0-226-34173-9.

***Rethinking Estate and Gift Taxation***, edited, with William G. Gale and Joel Slemrod (Washington, DC: Brookings, 2001).  ISBN 0-8157-0069-5.

***The Effects of Taxation on Multinational Corporations***, edited, with Martin Feldstein and R. Glenn Hubbard (Chicago: University of Chicago Press, 1995).  ISBN 0-226-24095-9.

***Taxing Multinational Corporations***, edited, with Martin Feldstein and R. Glenn Hubbard (Chicago: University of Chicago Press, 1995).  ISBN 0-226-24094-0.


ARTICLES AND BOOK CHAPTERS

Risky trust investments, ***Michigan State Law Review***, forthcoming.

Capital gains realizations, (with Daniel Schaffa), ***Economics Letters***, November 2024, *244* (111990), 1-4.

Martin Feldstein (1939-2019), in Robert A. Cord, ed. ***The Palgrave Companion to Harvard Economics***, volume 2 (Cham, Switzerland: Palgrave Macmillan, 2024), 667-685.

The role of trusts in taxing the rich, ***Oxford Review of Economic Policy***, Autumn 2023, *39* (3), 460-477.

Digital tax arithmetic, ***National Tax Journal***, March 2023, *76* (1), 119-143.

Corporate taxes and union wages in the United States, (with R. Alison Felix), ***International Tax and Public Finance***, December 2022, *29* (6), 1450-1494.

Certain effects of random taxes, (with Michael J. Keen), ***Journal of Public Economics***, November 2021, *203* (104412), 1-13.

Multinational activity in the modern world, (with C. Fritz Foley, Raymond J. Mataloni Jr., and David Wessel), in C. Fritz Foley, James R. Hines Jr., and David Wessel, eds. ***Global Goliaths: Multinational Corporations in the 21st Century Economy*** (Washington, DC: Brookings, 2021), 1-32.

Principles for policymakers, (with C. Fritz Foley and David Wessel), in C. Fritz Foley, James R. Hines Jr., and David Wessel, eds. ***Global Goliaths: Multinational Corporations in the 21st Century Economy*** (Washington, DC: Brookings, 2021), 537-546.

Taxes as pandemic controls, (with Ashley C. Craig), ***National Tax Journal***, December 2020, *73* (4), 969-986.

Income inequality, progressive taxation, and tax expenditures, in Sisay Asefa and Wei-Chiao Huang, eds. ***The Political Economy of Inequality: U.S. and Global Dimensions*** (Kalamazoo, MI: Upjohn Press, 2020), 145-166.

Inter vivos transfers of ownership in family firms, (with Niklas Potrafke, Marina Riem, and Christoph Schinke), ***International Tax and Public Finance***, April 2019, *26* (2), 225-256.

Investment ramifications of distortionary tax subsidies, (with Jongsang Park), *Journal of Public Economics*, April 2019, *172* (1), 36-51.

Perils of tax reform, *National Tax Journal*, June 2018, *71* (2), 357-376.

Business tax burdens and tax reform, *Brookings Papers on Economic Activity*, Fall 2017, *48* (2), 449-471.

Multinational firms and tax havens, (with Anna Gumpert and Monika Schnitzer), *Review of Economics and Statistics*, October 2016, *98* (4), 713-727.

Are PILOTs property taxes on nonprofits? (with Fan Fei and Jill R. Horwitz), *Journal of Urban Economics*, July 2016, *94* (1), 109-123.

Taxing sales of depreciable assets, *Michigan Business & Entrepreneurial Law Review*, Spring 2016, *5* (2), 161-172.

Trade credit and taxes, (with Mihir A. Desai and C. Fritz Foley), *Review of Economics and Statistics*, March 2016, *98* (1), 132-139.

Delegating tax, (with Kyle D. Logue), *Michigan Law Review*, November 2015, *114* (2), 235-274.

Corporate taxation, in James D. Wright, ed. *International Encyclopedia of the Social & Behavioral Sciences, 2nd Edition*, volume 4 (Oxford, UK: Elsevier, 2015), 946-948.

Understanding the AMT, and its unadopted sibling, the AMxT, (with Kyle D. Logue), *Journal of Legal Analysis*, Winter 2014, *6* (2), 367-408.

How serious is the problem of base erosion and profit shifting? *Canadian Tax Journal*, June 2014, *62* (2), 443-453.

The redistributive potential of wealth transfer taxes, *Public Finance Review*, November 2013, *41* (6), 885-903.

How important are perpetual tax savings? in Jeffrey R. Brown, ed. *Tax Policy and the Economy*, volume 27 (Chicago: University of Chicago Press, 2013), 101-124.

Who offers tax-based business development incentives? (with R. Alison Felix), *Journal of Urban Economics*, May 2013, *75* (1), 80-91.

Income and substitution effects of estate taxation, *American Economic Review*, Papers and Proceedings, May 2013, *103* (3), 484-488.

The tax revenue capacity of the U.S. economy, in Franklin Allen, Anna Gelpern, Charles Mooney and David Skeel, eds. *Is U.S. Government Debt Different?* (Philadelphia, PA: FIC Press, 2012), 113-125.

Tax policy and the efficiency of U.S. direct investment abroad, (with Mihir A. Desai and C. Fritz Foley), *National Tax Journal*, December 2011, *64* (4), 1055-1082.

U.S. defense contracts during the tax expenditure battles of the 1980s, (with Susan J. Guthrie), *National Tax Journal*, June 2011, *64* (2), 731-752.

Peter Mieszkowski and the general equilibrium revolution in public finance, *Proceedings of the National Tax Association Annual Conference*, 2010, *102*, 213-216.

State fiscal policies and transitory income fluctuations, *Brookings Papers on Economic Activity*, Fall 2010, *41* (2), 313-337.

Treasure islands, *Journal of Economic Perspectives*, Fall 2010, *24* (4), 103-126.

The last best hope for progressivity in tax, (with Edward J. McCaffery), *Southern California Law Review*, July 2010, *83* (5), 1031-1098.

International capital taxation, (with Rachel Griffith and Peter Birch Sørensen), in James Mirrlees, Stuart Adam, Timothy Besley, Richard Blundell, Stephen Bond, Robert Chote, Malcolm Gammie, Paul Johnson, Gareth Myles and James Poterba, eds. *Dimensions of Tax Design: The Mirrlees Review* (Oxford, UK: Oxford University Press, 2010), 914-996.

The attack on nonprofit status: A charitable assessment, (with Jill R. Horwitz and Austin Nichols), *Michigan Law Review*, May 2010, *108* (7), 1179-1220.

Income misattribution under formula apportionment, *European Economic Review*, January 2010, *54* (1), 108-120.

Taxing inheritances, taxing estates, *Tax Law Review*, Fall 2009, *63* (1), 189-207.

Which countries become tax havens? (with Dhammika Dharmapala), *Journal of Public Economics*, October 2009, *93* (9-10), 1058-1068.

    Reprinted in Dhammika Dharmapala, ed. *The Economics of Tax Avoidance and Evasion* (Cheltenham, UK: Edward Elgar, 2017).

How globalization affects tax design, (with Lawrence H. Summers), in Jeffrey R. Brown and James M. Poterba, eds. *Tax Policy and the Economy*, volume 23 (Chicago: University of Chicago Press, 2009), 123-157.

Domestic effects of the foreign activities of U.S. multinationals, (with Mihir A. Desai and C. Fritz Foley), *American Economic Journal: Economic Policy*, February 2009, *1* (1), 181-203.

Reconsidering the taxation of foreign income, *Tax Law Review*, Winter 2009, *62* (2), 269-298.

Foreign income and domestic deductions, *National Tax Journal*, September 2008, *61* (3), 461-475.

Capital structure with risky foreign investment, (with Mihir A. Desai and C. Fritz Foley), *Journal of Financial Economics*, June 2008, *88* (3), 534-553.

Excess burden of taxation, in Steven N. Durlauf and Lawrence E. Blume, eds. *The New Palgrave Dictionary of Economics*, 2nd ed., volume 3 (Basingstoke, UK: Palgrave Macmillan, 2008), 75-77.

Excise taxes, in Steven N. Durlauf and Lawrence E. Blume, eds. *The New Palgrave Dictionary of Economics*, 2nd ed., volume 3 (Basingstoke, UK: Palgrave Macmillan, 2008), 103-105.

Tax havens, in Steven N. Durlauf and Lawrence E. Blume, eds. *The New Palgrave Dictionary of Economics*, 2nd ed., volume 8 (Basingstoke, UK: Palgrave Macmillan, 2008), 173-175.

Taxation of foreign income, in Steven N. Durlauf and Lawrence E. Blume, eds. *The New Palgrave Dictionary of Economics*, 2nd ed., volume 8 (Basingstoke, UK: Palgrave Macmillan, 2008), 192-194.

Market reactions to export subsidies, (with Mihir A. Desai), *Journal of International Economics*, March 2008, *74* (2), 459-474.

Corporate taxation and international competition, in Alan J. Auerbach, James R. Hines Jr., and Joel Slemrod, eds. *Taxing Corporate Income in the 21st Century* (Cambridge, UK: Cambridge University Press, 2007), 268-295.

> Reprinted in Vito Tanzi and Howell H. Zee, eds. *Recent Developments in Public Finance*, volume 2 (Cheltenham, UK: Edward Elgar, 2011), 346-373.

Dividend policy inside the multinational firm, (with Mihir A. Desai and C. Fritz Foley), *Financial Management*, Spring 2007, *36* (1), 5-26.

The internal markets of multinational firms, (with Mihir A. Desai and C. Fritz Foley), *Survey of Current Business*, March 2007, *87* (3), 42-48.

Taxing consumption and other sins, *Journal of Economic Perspectives*, Winter 2007, *21* (1), 49-68.

Capital controls, liberalizations, and foreign direct investment, (with Mihir A. Desai and C. Fritz Foley), *Review of Financial Studies*, Winter 2006, *19* (4), 1433-1464.

> Reprinted in Vihang Errunza, ed. *Finance in Emerging Markets*, volume 2 (London, UK: Routledge, 2016).

Will social welfare expenditures survive tax competition? *Oxford Review of Economic Policy*, Fall 2006, *22* (3), 330-348.

The demand for tax haven operations, (with Mihir A. Desai and C. Fritz Foley), *Journal of Public Economics*, March 2006, *90* (3), 513-531.

Reprinted in Dhammika Dharmapala, ed. *The Economics of Tax Avoidance and Evasion* (Cheltenham, UK: Edward Elgar, 2017).

Taxation and multinational activity: new evidence, new interpretations, (with Mihir A. Desai and C. Fritz Foley), *Survey of Current Business*, February 2006, *86* (2), 16-22.

Do tax havens divert economic activity? (with Mihir A. Desai and C. Fritz Foley), *Economics Letters*, February 2006, *90* (2), 219-224.

Foreign direct investment and the domestic capital stock, (with Mihir A. Desai and C. Fritz Foley), *American Economic Review*, Papers and Proceedings, May 2005, *95* (2), 33-38.

Shortfalls in the long run: predictions about the social security trust fund, (with Timothy Taylor), *Journal of Economic Perspectives*, Spring 2005, *19* (2), 3-9.

Do tax havens flourish? in James M. Poterba, ed. *Tax Policy and the Economy*, volume 19 (Cambridge, MA: MIT Press, 2005), 65-99.

A multinational perspective on capital structure choice and internal capital markets, (with Mihir A. Desai and C. Fritz Foley), *Journal of Finance*, December 2004, *59* (6), 2451-2487.

Reprinted in Stijn Claessens and Luc Laeven, eds. *A Reader in International Corporate Finance*, volume 2 (Washington, DC: World Bank, 2006), 243-279.

Reprinted in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), 215-251.

Foreign direct investment in a world of multiple taxes, (with Mihir A. Desai and C. Fritz Foley), *Journal of Public Economics*, December 2004, *88* (12), 2727-2744.

Reprinted in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), 143-160.

Old rules and new realities: corporate tax policy in a global setting, (with Mihir A. Desai), *National Tax Journal*, December 2004, *57* (4), 937-960.

Might fundamental tax reform increase criminal activity? *Economica*, August 2004, *71* (283), 483-492.

The costs of shared ownership: evidence from international joint ventures, (with Mihir A. Desai and C. Fritz Foley), *Journal of Financial Economics*, August 2004, *73* (2), 323-374.

On the timeliness of tax reform, *Journal of Public Economics*, April 2004, *88* (5), 1043-1059.

Sensible tax policies in open economies, *Journal of the Statistical and Social Inquiry Society of Ireland*, 2003/2004, *33*, 1-36.

Evaluating international tax reform, (with Mihir A. Desai), *National Tax Journal*, September 2003, *56* (3), 487-502.

Reprinted in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), 496-511.

Perfect taxation with imperfect competition, (with Alan J. Auerbach), in Sijbren Cnossen and Hans-Werner Sinn, eds. *Public Finance and Public Policy in the New Century* (Cambridge, MA: MIT Press, 2003), 127-153.

Chains of ownership, regional tax competition, and foreign direct investment, (with Mihir A. Desai and C. Fritz Foley), in Heinz Herrmann and Robert Lipsey, eds. *Foreign Direct Investment in the Real and Financial Sector of Industrial Countries* (Berlin: Springer-Verlag, 2003), 61-98.

Michigan's flirtation with the Single Business Tax, in Charles L. Ballard, Paul N. Courant, Douglas C. Drake, Ronald C. Fisher, and Elisabeth R. Gerber, eds. *Michigan at the Millennium* (East Lansing, MI: Michigan State University Press, 2003), 603-628.

Applied public finance meets general equilibrium: The research contributions of Arnold Harberger, *Proceedings of the National Tax Association Annual Conference*, 2002, *94*, 1-8.

Expectations and expatriations: Tracing the causes and consequences of corporate inversions, (with Mihir A. Desai), *National Tax Journal*, September 2002, *55* (3), 409-440.

Reprinted in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), 272-303.

Excerpted in Michael J. Graetz, ed. *Foundations of International Income Taxation* (New York: Foundation Press, 2004), 114-118.

International taxation, (with Roger H. Gordon), in Alan J. Auerbach and Martin Feldstein, eds. *Handbook of Public Economics*, volume 4 (Amsterdam: North-Holland, 2002), 1935-1995.

Excerpted in Michael J. Graetz, ed. *Foundations of International Income Taxation* (New York: Foundation Press, 2004), 525-526.

Taxation and economic efficiency, (with Alan J. Auerbach), in Alan J. Auerbach and Martin Feldstein, eds. *Handbook of Public Economics*, volume 3 (Amsterdam: North-Holland, 2002), 1347-1421.

Repatriation taxes and dividend distortions, (with Mihir A. Desai and C. Fritz Foley), *National Tax Journal,* December 2001, *54* (4), 829-851.

Reprinted in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), 304-326.

Another look at whether a rising tide lifts all boats, (with Hilary W. Hoynes and Alan B. Krueger), in Alan B. Krueger and Robert M. Solow, eds. *The Roaring Nineties: Can Full Employment Be Sustained?* (New York: Russell Sage, 2001), 493-537.

Corporate taxation, in Neil J. Smelser and Paul B. Baltes, eds *International Encyclopedia of the Social & Behavioral Sciences*, volume 4 (Oxford, UK: Elsevier, 2001), 2810-2812.

Exchange rates and tax-based export promotion, (with Mihir A. Desai), *Proceedings of the National Tax Association Annual Conference*, 2001, *93*, 275-285.

The uneasy marriage of export incentives and the income tax, (with Mihir A. Desai), in James M. Poterba, ed. *Tax Policy and the Economy*, volume 15 (Cambridge, MA: MIT Press, 2001), 41-94.

International taxation and the location of inventive activity, (with Adam B. Jaffe), in James R. Hines Jr., ed. *International Taxation and Multinational Activity* (Chicago: University of Chicago Press, 2001), 201-226.

"Tax sparing" and direct investment in developing countries, in James R. Hines Jr., ed. *International Taxation and Multinational Activity* (Chicago: University of Chicago Press, 2001), 39-66.

   Reprinted in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), 95-122.

What is benefit taxation? *Journal of Public Economics*, March 2000, *75* (3), 483-492.

The case against deferral: A deferential reconsideration, *National Tax Journal*, September 1999, *52* (3), 385-404.

Excess capital flows and the burden of inflation in open economies, (with Mihir A. Desai), in Martin Feldstein, ed. *The Costs and Benefits of Price Stability* (Chicago: University of Chicago Press, 1999), 235-268.

Nonprofit business activity and the unrelated business income tax, in James M. Poterba, ed. *Tax Policy and the Economy*, volume 13 (Cambridge, MA: MIT Press, 1999), 57-84.

Lessons from behavioral responses to international taxation, *National Tax Journal*, June 1999, *52* (2), 305-322.

Three sides of Harberger triangles, *Journal of Economic Perspectives*, Spring 1999, *13* (2), 167-188.

"Basket" cases: Tax incentives and international joint venture participation by American multinational firms, (with Mihir A. Desai), *Journal of Public Economics*, March 1999, *71* (3), 379-402.

Tax policy and the activities of multinational corporations, in Alan J. Auerbach, ed. *Fiscal Policy: Lessons from Economic Research* (Cambridge, MA: MIT Press, 1997), 401-445.

International taxation and corporate R&D: Evidence and implications, in James M. Poterba, ed. ***Borderline Case: International Tax Policy, Corporate Research and Development, and Investment*** (Washington, DC: National Academy Press, 1997), 39-52.

Reprinted (with minor changes) as Doing R&D in the right places, ***Chemtech***, August 1998, *28* (8), 12-17.

Altered states: Taxes and the location of foreign direct investment in America, ***American Economic Review***, December 1996, *86* (5), 1076-1094.

Reprinted in James R. Hines Jr., ed. ***International Taxation*** (Cheltenham, UK: Edward Elgar, 2007), 52-70.

Dividends and profits: Some unsubtle foreign influences, ***Journal of Finance***, June 1996, *51* (2), 661-689.

Fundamental tax reform in an international setting, in Henry J. Aaron and William G. Gale, eds. ***Economic Effects of Fundamental Tax Reforms*** (Washington, DC: Brookings, 1996), 465-502.

From each according to his surplus: Equi-proportionate sharing of commodity tax burdens, (with John C. Hlinko and Theodore J. F. Lubke), ***Journal of Public Economics***, November 1995, *58* (3), 417-428.

The flypaper effect, (with Richard H. Thaler), ***Journal of Economic Perspectives***, Fall 1995, *9* (4), 217-226.

Taxes, technology transfer, and the R&D activities of multinational firms, in Martin Feldstein, James R. Hines Jr., and R. Glenn Hubbard, eds ***The Effects of Taxation on Multinational Corporations*** (Chicago: University of Chicago Press, 1995), 225-248.

Interest allocation rules, financing patterns, and the operations of U.S. multinationals, (with Kenneth A. Froot), in Martin Feldstein, James R. Hines Jr., and R. Glenn Hubbard, eds. ***The Effects of Taxation on Multinational Corporations*** (Chicago: University of Chicago Press, 1995), 277-307.

Taxes, technology transfer, and R&D by multinational firms, in Martin Feldstein, James R. Hines Jr., and R. Glenn Hubbard, eds. ***Taxing Multinational Corporations*** (Chicago: University of Chicago Press, 1995), 51-62.

The tax treatment of interest and the operations of U.S. multinationals, (with Kenneth A. Froot), in Martin Feldstein, James R. Hines Jr., and R. Glenn Hubbard, eds. ***Taxing Multinational Corporations*** (Chicago: University of Chicago Press, 1995), 81-93.

No place like home: Tax incentives and the location of R&D by American multinationals, in James M. Poterba, ed. ***Tax Policy and the Economy***, volume 8 (Cambridge, MA: MIT Press, 1994), 65-104.

Credit and deferral as international investment incentives, ***Journal of Public Economics***, October 1994, *55* (2), 323-347.

Fiscal paradise: Foreign tax havens and American business, (with Eric M. Rice), *Quarterly Journal of Economics*, February 1994, *109* (1), 149-182.

    Reprinted in Dhammika Dharmapala, ed. *The Economics of Tax Avoidance and Evasion* (Cheltenham, UK: Edward Elgar, 2017).

    Reprinted in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), 18-51.

On the sensitivity of R&D to delicate tax changes: The behavior of US multinationals in the 1980s, in Alberto Giovannini, R. Glenn Hubbard, and Joel Slemrod, eds. *Studies in International Taxation* (Chicago: University of Chicago Press, 1993), 149-187.

Budget spillovers and fiscal policy interdependence: Evidence from the states, (with Anne C. Case and Harvey S. Rosen), *Journal of Public Economics*, October 1993, *52* (3), 285-307.

    Erratum, *Journal of Public Economics*, February 1994, *53* (2), 325.

    Reprinted in Harvey S. Rosen, ed. *The Fiscal Behavior of State and Local Governments* (Cheltenham, UK: Edward Elgar, 1997), 3-25.

    Reprinted in Wallace E. Oates, ed. *The Economics of Fiscal Federalism and Local Finance* (Cheltenham, UK: Edward Elgar, 1998), 535-557.

Arm's-length pricing: Some economic perspectives, (with Charles H. Berry and David F. Bradford), *Tax Notes*, 10 February, 1992, *54* (6), 731-740.

The flight paths of migratory corporations, *Journal of Accounting, Auditing and Finance*, Fall 1991, *6* (4), 447-479.

Capital flight and tax competition: Are there viable solutions to both problems? (with Alberto Giovannini), in Alberto Giovannini and Colin Mayer, eds. *European Financial Integration* (Cambridge, UK: Cambridge University Press, 1991), 172-210.

Coming home to America: Dividend repatriations by U.S. multinationals, (with R. Glenn Hubbard), in Assaf Razin and Joel Slemrod, eds. *Taxation in the Global Economy* (Chicago: University of Chicago Press, 1990), 161-200.

Investment tax incentives and frequent tax reforms, (with Alan J. Auerbach), *American Economic Review*, Papers and Proceedings, May 1988, *78* (2), 211-216.

Taxation and U.S. multinational investment, in Lawrence H. Summers, ed. *Tax Policy and the Economy*, volume 2 (Cambridge, MA: MIT Press, 1988), 33-61.

The tax treatment of structures, in Martin S. Feldstein, ed. *Taxes and Capital Formation* (Chicago: University of Chicago Press, 1987), 37-50.

Anticipated tax changes and the timing of investment, (with Alan J. Auerbach), in Martin S.

Feldstein, ed. *The Effects of Taxation on Capital Accumulation* (Chicago: University of Chicago Press, 1987), 163-196.

Notes on the tax treatment of structures, (with Roger H. Gordon and Lawrence H. Summers), in Martin S. Feldstein, ed. *The Effects of Taxation on Capital Accumulation* (Chicago: University of Chicago Press, 1987), 223-254.

National accounting for non-renewable natural resources in the mining industries, (with J. Steven Landefeld), *Review of Income and Wealth*, March 1985, *31* (1), 1-20.

REVIEWS AND MISCELLANEOUS PUBLICATIONS

Comment on "Fiscal federalism and the role of the income tax," in David R. Agrawal, James M. Poterba, and Owen M. Zidar, eds. *Policy Responses to Tax Competition* (Chicago: University of Chicago Press, forthcoming).

Foreword: The 2018 Conference on Empirical Legal Studies, (with J.J. Prescott and Sonja Starr), *Journal of Empirical Legal Studies*, December 2019, *16* (4), 692.

Comment on "Fundamental tax reform: A comparison of three options," in Alan J. Auerbach and Kent Smetters, eds. *The Economics of Tax Policy* (New York: Oxford University Press, 2017), 369-374.

Reply to Becker and Fuest, *National Tax Journal*, June 2010, *63* (2), 278-280.

*International Financial Centers and the World Economy*, STEP Report 2009 (London, UK: Society of Trust and Estate Practitioners, 2009).

Tax policy experts express views on California's proposed tax plan, (with Joseph Bankman, Arnold C. Harberger, Walter Hellerstein, Charles E. McLure Jr., Steven M. Sheffrin, Kirk Stark, John A. Swain, and George Zodrow), *State Tax Notes*, 28 September, 2009, *53* (13), 916-918.

Protectionist pitfalls in U.S. tax reform, in Robert Goulder, ed. *Toward Tax Reform: Recommendations for President Obama's Task Force* (Falls Church, VA: Tax Analysts, 2009), 48-50.

Comment on "Capital levies and the transition to a consumption tax," in Alan J. Auerbach and Daniel Shaviro, eds. *Institutional Foundations of Public Finance: Economic and Legal Perspectives* (Cambridge, MA: Harvard University Press, 2008), 147-153.

Review of Jonathan Jones and Colin Wren, *Foreign Direct Investment and the Regional Economy*, *Journal of Regional Science*, October 2007, *47* (4), 845-847.

Introduction, in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), xi-xviii.

Preface, (with Alan J. Auerbach and Joel Slemrod), in Alan J. Auerbach, James R. Hines Jr., and Joel Slemrod, eds. ***Taxing Corporate Income in the 21st Century*** (Cambridge, UK: Cambridge University Press, 2007), xi-xiii.

Introduction, in Reuven S. Avi-Yonah, James R. Hines Jr., and Michael Lang, eds. ***Comparative Fiscal Federalism: Comparing the European Court of Justice and the U.S. Supreme Court's Tax Jurisprudence*** (Alphen aan den Rijn, The Netherlands: Kluwer Law International, 2007), xix-xxiv.

Harmful tax competition and its harmful remedies, ***British Tax Review***, 2006, *50* (2), 209-212.

More tax decadence: A review of C. Eugene Steuerle's *Contemporary U.S. Tax Policy*, ***Journal of Policy Analysis and Management***, Summer 2005, *24* (3), 624-627.

Reply to Grubert, (with Mihir A. Desai), ***National Tax Journal***, June 2005, *58* (2), 275-278.

Introduction to international tax competition, ***Tax Notes International***, 28 June, 2004, *34* (13), 1295-1297.

Review of Andreas Haufler, *Taxation in the Global Economy*, ***Journal of Economic Literature***, March 2004, *41* (1), 193-194.

Venture out alone, (with Mihir A. Desai and C. Fritz Foley), ***Harvard Business Review***, March 2004, *82* (3), 22.

Comment on "An overview of international issues affecting U.S. tax administration," in Henry Aaron and Joel Slemrod, eds. ***The Crisis in Tax Administration*** (Washington, DC: Brookings, 2004), 57-60.

Corporate inversions: Stanley Works and the lure of tax havens, (with Mihir A. Desai and Mark F. Veblen), Harvard Business School Case 9-203-008, October 2002.

Comment on "Charitable giving in life and death," in William G. Gale, James R. Hines Jr., and Joel Slemrod, eds. ***Rethinking Estate and Gift Taxation*** (Washington, DC: Brookings, 2001), 370-373.

Comment on "Asset price effects of fundamental tax reform," in Kevin A. Hassett and R. Glenn Hubbard, eds. ***Transition Costs of Fundamental Tax Reform*** (Washington, DC: American Enterprise Institute, 2001), 92-95.

Introduction, in James R. Hines Jr., ed. ***International Taxation and Multinational Activity*** (Chicago: University of Chicago Press, 2001), 1-8.

Comment on "Portfolio responses to taxation: Evidence from the end of the rainbow," in Joel B. Slemrod, ed. ***Does Atlas Shrug? The Economic Consequences of Taxing the Rich*** (Cambridge, MA: Harvard University Press, 2000), 324-328.

Comment on "The influence of income tax rules on insurance reserves," in Kenneth A. Froot, ed. ***The Financing of Catastrophe Risk*** (Chicago: University of Chicago Press, 1999), 304-306.

Introduction, (with Martin Feldstein and R. Glenn Hubbard), in Martin Feldstein, James R. Hines Jr., and R. Glenn Hubbard, eds. *The Effects of Taxation on Multinational Corporations* (Chicago: University of Chicago Press, 1995), 1-6.

Introduction, (with Martin Feldstein and R. Glenn Hubbard), in Martin Feldstein, James R. Hines Jr., and R. Glenn Hubbard, eds. *Taxing Multinational Corporations* (Chicago: University of Chicago Press, 1995), 1-5.

Review of Gary Clyde Hufbauer, *U.S. Taxation of International Income*, **National Tax Journal**, March 1993, *46* (1), 69-71.

Comment on "State and federal tax equity:  Estimates before and after the Tax Reform Act of 1986," **Journal of Policy Analysis and Management**, Winter 1993, *12* (1), 44-47.

Review of David Newbery and Nicholas Stern, eds. *The Theory of Taxation for Developing Countries*, **Journal of Economic Literature**, December 1989, *27* (4), 1698-1700.

Comment on "Decentralization in the public sector," in Harvey S. Rosen, ed. **Fiscal Federalism: Quantitative Studies** (Chicago: University of Chicago Press, 1988), 29-32.

More than its own reward (review of Charles T. Clotfelter's *Federal Tax Policy and Charitable Giving* and Arthur Andersen & Co.'s *Tax Economics of Charitable Giving*), **Foundation News**, September/October 1986, *27* (5), 7l-72.


### GOVERNMENT TESTIMONY

Testimony before the Committee on the Budget, United States Senate, 17 January, 2024, Washington, DC.  Hearings on international taxation.

Testimony before the Committee on Finance, United States Senate, 25 March, 2021, Washington, DC.  Hearings on international taxation.

Testimony before the Committee on Finance, United States Senate, 26 April, 2016, Washington, DC.  Hearings on business tax reform.

Testimony before the Committee on Finance, United States Senate, 8 September, 2011, Washington, DC.  Hearings on international tax reform.

Testimony before the Committee on Ways and Means, United States House of Representatives, 12 May, 2011, Washington, DC.  Hearings on comprehensive tax reform.

Testimony before the Committee on Ways and Means, United States House of Representatives, 22 July, 2010, Washington, DC.  Hearings on international transfer pricing.

Testimony before the State of California Commission on the 21st Century Economy, 12 February, 2009, Los Angeles, CA.  Hearings on new revenue sources.

Testimony before the Committee on Finance, United States Senate, 26 June, 2008, Washington, DC.  Published in *Foundation of International Tax Reform: Worldwide, Territorial, and Something in Between* (Washington DC: U.S. Government Printing Office, 2008), 3-4, 10, 12, 15-16, 19, 21-23, 61-75.

Testimony before the Standing Committee on Finance, House of Commons, Canadian Parliament, 10 May, 2007, Ottawa, Canada.  Hearings on tax havens and tax avoidance.

Testimony before the Committee on Ways and Means, Select Revenue Measures Subcommittee, United States House of Representatives, 22 June, 2006, Washington, DC.  Hearings on the impact of international tax reform on U.S. competitiveness.

Testimony before the Presidential Advisory Panel on Federal Tax Reform, 12 May, 2005, Washington, D.C.  Hearings on exempting foreign-source dividends from U.S. taxation.

Testimony before the Committee on Finance, United States Senate, 15 July, 2003, Washington, DC.  Published in *An Examination of U.S. Tax Policy and Its Effect on the International Competitiveness of U.S.-Owned Foreign Operations* (Washington DC: U.S. Government Printing Office, 2004), 28-29, 41, 65-75.

## UNPUBLISHED PAPERS

Is C-SALT harmful to economic health? April 2025.

Tax reform and the Laffer curve, (with Ana Gamarra and José Félix Sanz-Sanz), February 2025.

How large is the government? February 2025.

Evaluating minimum taxation, NBER Working Paper No. 33140, November 2024.

Banks and tax-exempt debt arbitrage, (with Emily Horton), NBER Working Paper No. 32647, July 2024.

The effects of the reverse charge mechanism on the VAT gap, (with Albrecht Bohne, Antonios M. Koumpias, and Annalisa Tassi), February 2024.

Evaluating tax harmonization, NBER Working Paper No. 31900, November 2023.

Quality-aware tax incentives for charitable contributions, (with Zachary Halberstam), CESifo Working Paper No. 10250, January 2023.

Corporate taxation and the distribution of income, NBER Working Paper No. 27939, October 2020.

Random policies in federations, June 2020.

Rational choice and the rule against perpetuities, March 2020.

James R. Hines Jr.                                                                Page 18 of 18

Rational intestacy and probate reform, December 2019.

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | Case No. 1:25-cv-00077-GSK- TMR-JAR |
| | DECLARATION OF HANNA EMERSON |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | |
| Defendants. | |

I, Hanna Emerson, declare as follows:

    1.    I am over the age of 18, competent to testify as to the matters herein, and testify based on personal knowledge, records kept in the ordinary course of business at Oregon State University ("OSU"), and information I learned from OSU personnel whose work I rely upon and who have assisted me in gathering this information from our institution.

    2.    I am the Director & Chief Procurement Officer in OSU's Office of Procurement, Contracts and Material Management. In this role, I lead the team that is responsible for stewarding OSU's many resources. This includes the Procurement team, which manages the competitive processes and establishment of contracts and purchases and goods and services that are critical to OSU's ability to fulfill its mission of teaching, research, outreach and engagement.

Page 1 -   DECLARATION OF HANNA EMERSON – *Oregon, et al. v. Trump, et al.*

3.      Oregon State University is a public land grant institution committed to teaching, research, outreach and engagement that promotes economic, social, cultural, and environmental progress for the people of Oregon, the nation and the World. OSU enrolls more than 37,000 students and employs more than 6,000 individuals on a full-time equivalent basis. OSU has two campuses, 11 colleges, 12 experimental stations, and extension programs in all 36 Oregon counties. OSU receives the most research funding of Oregon's public research universities and specializes in cutting edge research in fields such as engineering, earth, ocean and atmospheric sciences, and agriculture.

4.      On average, OSU spends approximately $400M annually ($403.6M for the fiscal year ending on June 30, 2024) on goods and services that are critical to fulfilling its teaching, research, outreach and engagement mission.

**A.      The IEEPA Tariff Orders have increased costs on goods that OSU procures for its students and researchers.**

5.      In the regular course of its operations, OSU routinely purchases many goods that originate from sources outside the United States. The IEEPA Tariff Orders have already increased costs for OSU. As one example, one of OSU's vendors for scientific supplies that are used by its students and researchers notified OSU that because of the U.S. Government's tariffs on materials imported from China, as well as a tariff on imported steel and aluminum, the vendor was forced to implement a surcharge of 2.3% on products that was passed on directly to OSU.

6.      In the past 12 months, OSU has spent approximately $18.1M on scientific supplies. Even a 2.3% surcharge (which is significantly lower than any of the IEEPA tariff rates) would significantly increase the costs to OSU of purchasing needed scientific supplies. If implemented as written, the increased costs resulting from the IEEPA Tariff Orders are likely to put OSU in the difficult position of having to forego purchasing goods and services that are critical to its mission. These surcharges and cost increases have a direct adverse impact on Oregon State University and, in turn, impose financial harm to the State of Oregon.

Page 2 -   DECLARATION OF HANNA EMERSON – *Oregon, et al. v. Trump, et al.*

**B.     The IEEPA Tariff Orders have created procurement uncertainty for OSU**

7.     The IEEPA Tariff Orders have also created budgeting uncertainty for Oregon State University.  OSU regularly issues requests for proposals or solicitations and receives proposals from across the country and internationally. Because of the price uncertainty caused by the IEEPA Tariff Orders, many of the solicitations received are conditional and indicate that costs may change depending on cost fluctuations. For example, in response to a solicitation, OSU recently received a proposal for a robotics system needed for research from a Swiss manufacturer that stated the total price but with the condition that "[p]ricing is based on current US tariff regulations for imports from Switzerland. In the event that new or increased tariffs are imposed on the quoted products or their components prior to delivery, [vendor] reserves the right to adjust the prices accordingly." These conditional solicitation responses necessitated by the IEEPA Tariff Orders make it impossible for Oregon State University to evaluate which solicitation response is the lowest bid and budget accordingly.

     **I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.**

     **Executed on May 5, 2025, at Corvallis, Oregon**

Hanna W.
Emerson

Digitally signed by
Hanna W. Emerson
Date: 2025.05.05
12:14:18 -07'00'

Hanna Emerson
Director & Chief Procurement Officer
Procurement, Contracts & Materials Management
Oregon State University

Page 3 -   DECLARATION OF HANNA EMERSON – *Oregon, et al. v. Trump, et al.*

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, AND THE STATE OF VERMONT<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES,<br><br>Defendants. | Case No. 1:25-cv-00077-GSK-TMR-JAR<br><br>DECLARATION OF ELIZABETH HAYES, ASSISTANT COMMISSIONER FOR THE MINNESOTA DEPARTMENT OF ADMINISTRATION AND CHIEF PROCUREMENT OFFICER FOR THE STATE OF MINNESOTA<br><br>(In support of Plaintiffs' Motion for Preliminary Injunction) |

I, ELIZABETH Hayes, declare as follows:

1.    I am over the age of 18, competent to testify as to the matters herein, and testify based on personal knowledge, records received and kept in the ordinary course of business at the Minnesota Department of Administration, and information I learned from Minnesota Department of Administration personnel whose work I rely upon and who have assisted me in gathering this information from our department.

2.    I work as the Chief Procurement Officer for the Minnesota Department of Administration and as an Assistant Commissioner for Procurement and Community Services. Within those roles, I manage and oversee the Office of State Procurement (an Office within the

Department of Administration comprised of lawyers, and other personnel responsible for procurement oversight and assisting state agencies as they go through the solicitation and contracting process) as well as other teams within the Department of Administration.

3.      The Office of State Procurement oversees approximately $2.1 billion in annual purchases of goods and services by the State of Minnesota through its various executive agencies. The Office of State Procurement manages approximately 1,600 goods and general service contracts. These contracts focus on serving the executive branch of state government.

4.      In addition to State of Minnesota agencies using these contracts for their direct purchasing needs, many cities and other political subdivisions located within the State of Minnesota also rely on the Office of Procurement's contracts for their purchases of goods and services.  Though this cooperative primarily consists of other governmental entities within State of Minnesota, it also includes other entities from across the country.

5.      In addition to the Office of State Procurement, the Minnesota Department of Administration is tasked with overseeing and managing a number of other administrative functions for the State of Minnesota, including, but not limited to:

    a.  Maintaining and operating 21 state-owned buildings, including the State Capitol, plus parking facilities, monuments, and associated grounds;

    b.  Managing more than 320 construction projects and 650 property leases annually;

    c.  Managing fleet services related to vehicles leased or acquired for official state business; and

    d.  A variety of other functions related to data practices, grants, strategic planning, disability access, and more.

6.      In the regular course of its operations, the Department of Administration routinely negotiates enterprise contracts on behalf of other Minnesota state agencies and for its cooperative

purchasing venture members to purchase goods that originate from sources outside the United States.

7.  The range of goods purchased pursuant to contracts falling under the Department of Administration's oversight is broad, and includes but is not limited to: raw materials related to roadway projects (such as salt, sand and aggregates); fire suppression products; a broad range of vehicles, including boats, helicopters, and planes for use in state public safety and law enforcement; plow blades and other vehicle attachments; furniture, office supplies, cables, copiers, audio visual equipment, and information technology including desktop/laptop computers, server/storage, and networking equipment for governmental activities; dental products, electrical supplies, fencing, filters, fuel, medical products and supplies, paint, radio communication equipment, repair parts, equipment and containers related to waste and recycling management, safety equipment to respond to fire management and pollution events; body-worn cameras, body armor, and other equipment used by state law enforcement and public safety officials; highway traffic counters and related accessories for state highway management; lab equipment to support labs within the Minnesota Department of Health, Minnesota Pollution Control Agency air laboratory, Minnesota Department Agriculture, and the Minnesota Department of Natural Resources; and numerous other types of goods that may originate in whole or in part from sources outside the United States.

8.  The full impact of the President's tariffs on pricing for goods purchased by the State of Minnesota is still emerging, and it may be difficult to ever fully capture: some suppliers and vendors may have sourced their materials or goods sufficiently in advance as to delay the impact of the tariffs on their direct consumers; other vendors and suppliers may increase their pricing without expressly explaining what percentage of the price increase is attributable to tariffs. However, in recent weeks, the Office of Procurement has already begun receiving notice from some vendors and suppliers indicating that they are increasing their prices or adding surcharges due to tariffs. The paragraphs and accompanying exhibits highlight several examples

of these types of notifications, or contract amendments which have already been initiated by suppliers as a result of increased costs attributable to tariffs:

9.    Attached as **Exhibit A** is a true and correct copy of e-mail correspondence received by the Office of Procurement indicating a tariff-related price increase on traffic monitoring equipment. Continuing to purchase a compliant product that meets the agency's business needs will be important to compatibility with existing investments and infrastructure. Moreover, in this instance, the vendor was the only respondent to a related competitive bid process. In the correspondence, the vendor indicates, "These increases are directly related to current tariffs."

10.    Attached as **Exhibit B** is a true and correct copy of e-mail correspondence received by the Office of Procurement and a record attached to that e-mail correspondence which appears to be a Customs and Border Protection record. The correspondence relates to a supplier requesting to amend the State's contract to pass through a $2,500 tariff surcharge added to the price of each school bus.

11.    Attached as **Exhibit C** is a true and correct copy of a contract amendment which was initiated by a vendor for air quality and sound monitoring safety equipment. Pursuant to the amendment, the vendor may add a tariff surcharge of up to 5% of the original negotiated pricing.

12.    Attached as **Exhibit D** is a true and correct copy of a contract amendment which was initiated by a vendor for waste recycling and sorting containers. Pursuant to the amendment, the vendor may pass through all increased tariff costs, up to 25% of the original negotiated pricing.

13.    Attached as **Exhibit E** is a true and correct copy of a contract amendment which was initiated by a vendor for playground equipment. Pursuant to the amendment, the vendor may add a tariff surcharge of up to 9% of the original negotiated pricing.

14.    Attached as **Exhibit F** is a true and correct copy of e-mail correspondence received by the Office of Procurement from a supplier of network technology. The e-mail

provided notice that, "Effective today, HPE has implemented a price increase due to the impact of U.S. tariffs." The vendor acknowledged that the precise extent of the increase was under review and that the situation created by the tariffs was "fluid."

15. Based on my experience and familiarity with the Department of Administration's contracting activities, I expect that additional vendors and suppliers will pursue amendments to existing contracts or will announce price increases and surcharges similar to those highlighted in the examples attached hereto. Particularly where tariff price increases affect entire industries of goods, or affect instances where there is a need to purchase specific products, the Department of Administration does not anticipate being able to find alternate sources for goods to mitigate against the price increases attributable to tariffs.

16. The President's tariffs accordingly impose a financial harm to the State of Minnesota by increasing the cost of procurement.

17. With regard to all of the purchasing made by the State of Minnesota, the vendors and suppliers or their subcontractors would most typically be the importers of record, rather than the State of Minnesota. Accordingly, the State of Minnesota would not be entitled to reimbursement from U.S. Customs and Border Protection if the vendors were to successfully challenge the tariff imposed.

18. If the Plaintiff States were to prevail in this case, it would not be administratively feasible for the Department of Administration to re-review every single purchase made under every agreement since the imposition of tariffs to determine whether the purchases were affected by tariffs, what the amount of the applicable tariff was, and what amount should be reimbursed to the purchasing agencies. Although that may be more feasible for certain agreements where vendors are transparent and precise in their own communication of tariff costs and their relationship to price increases, it is highly unlikely that will be the case in every instance considering the state's broad purchasing and procurement. By way of example, I am aware of at least one supplier which has announced a forthcoming surcharge to be passed on to downstream

purchasers, but has asked its suppliers to keep the specific calculations related to tariff-attributable amounts of that surcharge confidential.

19.     Further, because different vendors will pass along the additional cost of the new tariffs in different ways, it is highly unlikely that the State of Minnesota will be able to engage in negotiations with each vendor for each purchase to determine an appropriate amount of reimbursement if the Plaintiff States were to prevail in this case.

20.     Accordingly, the State of Minnesota is unlikely to be able to recoup additional amounts paid due to tariffs directly from vendors, or precisely calculate the extent of those costs after the fact for recovery in damages.

**I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.**

**Executed on May 6, 2025, at Saint Paul, Minnesota**

Elizabeth Hayes    Digitally signed by Elizabeth Hayes
                    Date: 2025.05.06 16:49:57 -05'00'
_____
Elizabeth Hayes

| | |
|---|---|
| **From:** | Youngquist, Allyson (She/Her/Hers) (ADM) |
| **To:** | Jannett, Luke (ADM) |
| **Subject:** | FW: Mn State Contract 244144 Traffic Counters, Software, and Accessories |
| **Date:** | Tuesday, April 22, 2025 12:52:19 PM |

I wanted to share this message from vendor since they reference tariffs as one of the causes for increase in pricing. This is for T-795(5), Contract 244144, with High Leah Electronics, Inc., dba Diamond Traffic Products.

Let me know if you have any questions.

Thank you,

*Allyson*

---

**From:** Beth Ritz <beth@diamondtraffic.com>
**Sent:** Friday, April 18, 2025 10:54 AM
**To:** Youngquist, Allyson (She/Her/Hers) (ADM) <allyson.youngquist@state.mn.us>
**Subject:** RE: Mn State Contract 244144 Traffic Counters, Software, and Accessories

> **This message may be from an external email source.**
> Do not select links or open attachments unless verified. Report all suspicious emails to Minnesota IT Services Security Operations Center.

---

The price for the Omega G 2RT will be $665.00.  The price for the Omega X3A-4RT will be $890.00.  These increases are directly related to current tariffs.
The price for each CENT-CC license will be reduced to $450.00.
Please advise if you require any additional information.

Beth Ann Ritz, Vice President of Sales
Diamond Traffic Products
a division of High Leah Electronics, Inc.
P.O. Box 1455
76433 Alder St
Oakridge, OR 97463
Office: 541.782.3903
beth@diamondtraffic.com
http://diamondtraffic.com

---

**From:** Youngquist, Allyson (She/Her/Hers) (ADM) <allyson.youngquist@state.mn.us>
**Sent:** Wednesday, April 16, 2025 11:01 AM
**To:** Beth Ritz <beth@diamondtraffic.com>
**Subject:** Mn State Contract 244144 Traffic Counters, Software, and Accessories

Good afternoon, Beth,

My name is Allyson Youngquist. I work with Bonnie Lundgren and assisting her with this contract. It looks like it expired at the end of March. The State would like to extend if you agree. I can process the paperwork to extend the contract. Can you let me know if there will be any changes to the price schedule (included below). If you could let me know as soon as possible, that would be greatly appreciated.

### EXHIBIT D, SUPPLEMENT 2, PRICE SCHEDULE

| Item | Description | Contract Pricing |
|------|-------------|------------------|
| CV2-CC | Centurion City/County Software License | $650.00/license |
| OMEGA G 2RT | Omega G 2RT Traffic Counter/Classifier | $650.00/ea. |
| OMEGA X3A | Omega X3A Traffic Counter/Classifier | $875.00/ea. |
| 700-C-Lith | C Cell Lithium, 3.6 Volt Battery | $17.00/ea. |
| 700-D-Lith | D Cell Lithium, 3.6 Volt Battery | $24.00/ea. |
| 600-X3-BRASS | Omega G Air Switches, Brass Nozzle ONLY* | $6.00/ea. |
| 600-MEGA G FIN | Finished OMEGA G Air Switch | $35.00/ea. |
| 706-OMEGA G | Finished Omega G Case | $27.00/ea. |
| | Annual Maintenance or support costs. | $0.00 |
| CV2-CC | Centurion City/County Software License ("Additional Licenses") | $650.00/ea. |

Best,
Allyson



**Allyson Youngquist | Buyer II**
50 Sherburne Avenue, Suite 112
Saint Paul, MN 55155

**From:**          Burns, Dustin (ADM)
**Sent:**          Wednesday, April 23, 2025 3:35 PM
**To:**            Jannett, Luke (ADM)
**Subject:**       FW: School Bus Contract-Tariff
**Attachments:**   7501_MCC_Canada_031825 Sample.pdf

Hello Luke,

Attached and below is a Tariff/surcharge request from Northcentral regarding the B-346 School bus contract.

We can discuss in our 1:1 next week.

Dustin

**From:** Sandy Kiehm <sandyk@northcentralinc.com>
**Sent:** Friday, April 11, 2025 3:18 PM
**To:** McIntyre, Karen (ADM) <karen.mcintyre@state.mn.us>
**Subject:** School Bus Contract-Tariff

> **This message may be from an external email source.**
> Do not select links or open attachments unless verified. Report all suspicious emails to Minnesota IT Services Security Operations Center.

Hi Karen...below is an email and attachment North Central received from Blue Bird after the State of Minnesota asked for more information to help better understand and clarify the $2,500 tariff charge Blue Bird is adding to all Blue Bird buses with delivery dates of March 17, 2025, and later.

Based on units ordered, we have a total of 22 buses that have been ordered via the State School Bus Contract and will have the $2,500 tariff charge assessed. Blue Bird has already invoiced these specific tariff charges as a separate line item. Many of these buses have been ordered, but have not been built yet, so they will definitely contain materials impacted by the increased tariffs.

We have two requests:

1. NC is requesting that the contract be amended to allow us to charge a $2,500 tariff charge on the 22 School Buses that have been ordered off the State School Bus Contract. We can provide a list of the entity who ordered the bus, the order date, and the expected completion date at Blue Bird.
2. NC is requesting that going forward on all new orders that we can pass through the $2,500 tariff charge on all School Buses ordered until the tariff is either rescinded or the contract expires.

We understand these are volatile times and this is a highly unusual request. We greatly appreciate your consideration of this request. Please let us know if you have any questions or would like to set up a call to discuss further.

Thanks,
Sandy


**From:** Burleigh, Albert <albert.burleigh@blue-bird.com>
**Sent:** Thursday, April 10, 2025 11:08 AM
**To:** Paul Gauerke <paulg@northcentralinc.com>
**Cc:** Gordon, Tim <Tim.Gordon@blue-bird.com>; Murphy, Richard <Richard.Murphy@blue-bird.com>
**Subject:** Customs invoice


Attached you will see that these goods are initially sourced from China, by a Canadian manufacturer, and imported to the USA by Blue Bird. **For a value of goods of $39k we paid $28k in tariffs, or effectively 70% rate**. The breakdown is as follows:

| | | |
|---|---|---|
| 10016092 | | |
| CN/HK EO 20% DUTY | | |
| 9903.01.24          1,633 KG | | 20% |
| ARTICLE OF CHINA,US NTE 20(F) | | |
| 9903.88.03 | | 25% |
| DERIV STL, NT16(L),(M) FTZ PFS | | |
| 9903.81.93 | | 25% |

**9903.01.24 NEW: Additional duties on products of China and Hong Kong** pursuant to the International Emergency Economic Powers Act (IEEPA): For products of China and Hong Kong entered **on or after March 4, 2025**, heading **9903.01.24** provides for an **additional 20 percent ad valorem tariff** and applies in addition to all other applicable duties, taxes, fees, exactions, and charges, including those of headings1 under section 301 of the Trade Act of 1974 (19 U.S.C. 2411); *For products of China and Hong Kong entered **on or after February 5, 2025, and prior to March 4, 2025**, previous heading 9903.01.20 provided for **an additional 10 percent ad valorem tariff (the 10% was replaced by the 20% on March 4, 2025)***

**9903.88.03 OLD - Previous China tariffs at 25% since 2018**, we have been covering these since then, they are not part of the current calculation on price increase.

**9903.81.93 NEW - 25% tariffs on Steel:** The **President issued Proclamation 10896** "Adjusting Imports of Steel into the United States," (Steel Presidential Proclamation) on February 10, 2025, imposing specified rates of duty on imports of steel. In Proclamation 10896, the President authorized and directed the Secretary of Commerce to publish modifications to the **Harmonized Tariff Schedule of the United States (HTSUS)** so that it conforms to the amendments and effective dates in the proclamation. The duties set out in the annex to this document are effective with respect to certain products that are entered for consumption, or withdrawn from warehouse for consumption, **on or after 12:01 a.m. Eastern Time on March 12, 2025**.

Thanks,



**Albert Burleigh**
VP, North America Bus Sales
Blue Bird
3920 Arkwright Rd. Ste. 200
Macon, Georgia 31210
Cell 478.919.7311/Fax 478.822.3552
Albert.Burleigh@blue-bird.com

PAPERLESS

OMB APPROVAL NO. 1651-0022
EXPIRATION DATE 03/31/2025

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

## ENTRY SUMMARY

| 1. Filer Code/Entry Number 97G-0353710-6 | 2. Entry Type 01 ABI/A | 3. Summary Date 03/28/25 CBA | 4. Surety Number 001 | 5. Bond Type 8 | 6. Port Code 3801 | 7. Entry Date 03/18/25 |
|---|---|---|---|---|---|---|

| 8. Importing Carrier DLQN | 9. Mode of Transport 30 | 10. Country of Origin CN  CHINA | 11. Import Date 03/18/25 |
|---|---|---|---|

| 12. B/L or AWB Number DLQN 002084 | 13. Manufacturer ID XOMOBGLI7540ONT | 14. Exporting Country CA  CANADA | 15. Export Date 03/18/25 |
|---|---|---|---|

| 16. I.T. Number | 17. I.T. Date | 18 Missing Docs | 19. Foreign Port of Lading | 20. U.S. Port of Unlading 3801 |
|---|---|---|---|---|

| 21. Location of Goods/G.O. Number H726 | 22. Consignee Number 58-081315600 | 23. Importer Number 58-081315600 | 24. Reference Number |
|---|---|---|---|

| 25. Ultimate Consignee Name (Last, First, M.I.) and Address | 26. Importer of Record Name (Last, First, M.I.) and Address |
|---|---|
| BLUE BIRD BODY COMPANY<br>Street: 3920 ARKWRIGHT RD<br>SUITE 200 | BLUE BIRD BODY COMPANY<br>Street: 3920 ARKWRIGHT RD<br>SUITE 200 |
| Destination: GA<br>City: MACON          Customer Reference # DLQN002084<br>State: GA Zip: 31210-1779 | City: MACON          State: GA Zip: 31210-1779 |

| 27. Line No. | 28. Description of Merchandise | | | 32. A. Entered Value B. CHGS C. Relationship | 33. A. HTSUS Rate B. AD/CVD Rate C. IRC Rate D. Visa Number | 34. Duty and IR Tax |
|---|---|---|---|---|---|---|
| | 29. A. HTSUS No. B. AD/CVD No. | 30. A. Gross Weight B. Manifest Qty. | 31. Net Quantity in HTSUS Units | | | Dollars   Cents |
| | | | 9 PKGS | | | |
| 001 | 10016092<br>CN/HK EO 20% DUTY<br>9903.01.24<br>ARTICLE OF CHINA,US NTE 20(F)<br>9903.88.03<br>DERIV STL, NT16(L),(M) FTZ PFS<br>9903.81.93<br>OTH AIR HEATERS.N/ELEC HEATED<br>7322.90.0015 | 1,633 KG | 50.00 NO<br>1,469.70 KG | $39,333<br>C $800<br>N | 20%  NEW<br>25%  2018<br>25%  NEW<br>FREE | $7,866.60<br>$9,833.25<br>$9,833.25<br>$0.00 |
| | | | 499 - Merchandise Processing Fee | | 0.3464% | $136.25 |
| | Totals for Invoice SO-0350580 | | Invoice Value 39,333.00 USD | +/- MMV | Exchange 1.00000 | Entered Value 39,333.00 USD |

| Other Fee Summary (for Block 39) | 35. Total Entered Value | CBP USE ONLY | | TOTALS |
|---|---|---|---|---|
| 499 - MPF          $136.25 | $ 39,333 | A. LIQ Code | B. Ascertained Duty | 37. Duty $27,533.10 |
| | Total Other Fees | REASON CODE | C. Ascertained Tax | 38. Tax |
| | $ 136.25 | | | |

| 36. Declaration of Importer of Record (Owner or Purchaser) or Authorized Agent | | D. Ascertained Other | 39. Other $136.25 |
|---|---|---|---|
| I declare that I am the ☐ Importer of record and that the actual owner,<br>purchaser, or consignee for CBP purposes is as shown above, OR ☒ owner | | E. Ascertained Total | 40. Total $27,669.35 |

or purchaser or agent thereof. I further declare that the merchandise ☒ was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoices are true, OR ☐ was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoices as to value or price are true to the best of my knowledge and belief. I also declare that the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed.
I will immediately furnish to the appropriate CBP officer any information showing a different statement of facts.

| 41. Declarant Name (Last, First, M.I.) Jose M. Guerrero | Title | Signature | Date 03/18/25 |
|---|---|---|---|

| 42. Broker/Filer Information Name (Last, First, M.I.) and Phone Number | 43. Broker/Importer File Number |
|---|---|
| Transplace Mexico, LLC<br>13166 South Unitec Drive<br>Laredo, TX 78045   9562291448 | 0353710 / DLQN002084 |

CBP Form 7501 (5/22)

Page 1 of 1

- Appx269 -

Docusign Envelope ID: 9C966E07-4E3D-4631-82CE-7CF3AE95ADE8



Office of State Procurement
112 Administration Building
50 Sherburne Avenue
St. Paul, MN 55155
Voice: 651.296.2600
Fax: 651.297.3996

March 21, 2025

Ms. Linda Kimber
Clarey's Safety Equipment
1725 Hwy 14 E.
Rochester, MN 55904

Dear Ms. Kimber:

The following document is enclosed for you to complete and return:

- Amendment No. 4 to SWIFT Contract No. 191518, Release No. S-852(5).

- Contractor is required to furnish annual Contract usage data (usage reports) by March 31, 2025, at the following email address: jeffrey.combs@state.mn.us. Contract usage reports must consist of the total dollars spent by State agencies.  A final usage report is required at the expiration or termination the Contract. Failure to provide usage reports may result in contract cancellation. This term survives the expiration or termination of the Contract.

---

Please sign and return **all documents**, **via email**, to
**Jeffrey Combs at jeffrey.combs@state.mn.us** by **March 25, 2025**.

---

If the Amendment is not properly executed it will be returned to you. Upon receipt of the properly executed document, and after signatures are obtained from the appropriate State authorities, a copy of the completed Amendment will be sent to your company.

If you have any questions, please feel free to contact me.

Sincerely,

*Jeffrey Combs*

Jeffrey Combs
AMS
Enclosure

**AMENDMENT NO. 4 TO CONTRACT NO. 191518, RELEASE NO. S-852(5)**

**THIS AMENDMENT** is by and between the State of Minnesota, acting through its commissioner of Administration ("State"), and Clarey's Safety Equipment, 1725 Hwy 14 E., Rochester, MN 55904 ("Contractor").

**WHEREAS**, the State has a Contract with the Contractor identified as Contract No. 191518, May 1, 2021 through February 28, 2025 ("Contract"), to provide Air Quality and Sound Level (Dosimeter) Safety Equipment; and

**WHEREAS**, Minn. Stat. § 16C.03, subd. 5, affords the commissioner of Administration, or delegate pursuant to Minn. Stat. § 16C.03, subd. 16, the authority to amend contracts; and

**WHEREAS**, the terms of the Contract allow the State to amend the Contract as specified herein, upon the mutual agreement of the Office of State Procurement and the Contractor in a fully executed amendment to the Contract.

**NOW, THEREFORE,** it is agreed by the parties to amend the Contract as follows:

1. That Contract No. 191518 is extended through February 28, 2026. The Original Contract and any previous amendments are incorporated into this amendment by reference.

2. The Exhibit D: Price Schedule for Honeywell Analytics RAE Portable Gas 2022 Price List – US, dated October 15, 2022, is DELETED in its entirety and REPLACED with the Honeywell RAE Portable Gas 2025 Price List – US, dated November 15, 2024, which is attached and incorporated herein.

3. The Exhibit D: Price Schedule - RKI Premier Portables: Price List, dated July 15, 2022 is DELETED in its entirety and REPLACED with Exhibit D: Price Schedule - RKI Premier Portables: 2024 Price List, dated March 1, 2024, which is attached and incorporated herein.

4. The Exhibit D: Price Schedule - Environics, Inc. 2023 Chempro Price List dated April 2023 is DELETED in its entirety and REPLACED with Exhibit D: Price Schedule - Environics, Inc. 2025 Chempro Price List which is attached and incorporated herein.

5. The Exhibit D: Price Schedule Honeywell, Portable Gas Detection Price List USD dated 2022, is DELETED in its entirety and REPLACED with Exhibit D: Price Schedule Honeywell, Portable Gas Detection Price List USD dated November 15, 2024, which is attached and incorporated herein.

6. Up to 5% tariff surcharge pass-through mark-up will be allowed on RAE Systems and BW Technologies by Honeywell. The Contractor must identify the applicable tariff surcharge as a separate line item on both the quote and invoice. In addition, the Contractor must submit third-party documentation from the supplier in writing to the State's Authorized Representative or delegate and the Ordering Entity. The Contractor must document a clear correlation between the surcharge amount and the third-party documentation.

   If a tariff surcharge is lessened or removed at any time, the Contractor must contact the State's Authorized Representative or delegate and the Ordering Entity in writing and the tariff surcharge is to be removed immediately from any applicable pending or future orders.

7. All other terms, conditions and specifications remain the same.

This Amendment is effective beginning March 1, 2025 or upon the date that the final required signatures are obtained, whichever occurs later, and shall remain in effect through contract expiration, or until the Contract is canceled, whichever occurs first.

Except as herein amended, the provisions of the Original Contract and all previous amendments between the parties hereto are expressly reaffirmed, are incorporated by reference, and remain in full force and effect.

**IN WITNESS WHEREOF,** the parties have caused this Amendment to be duly executed intending to be bound thereby.

**1. CLAREY'S SAFETY EQUIPMENT**

The Contractor certifies that the appropriate person(s) have executed this Amendment on behalf of the Contractor as required by applicable articles, bylaws, resolutions, or ordinances.

By: _____
Signature

_Linda Kimber_
Printed Name

Title: _Controller_

Date: _3/24/25_

By: _____
Signature

_____
Printed Name

Title: _____

Date: _____

**2. OFFICE OF STATE PROCUREMENT**

In accordance with Minn. Stat. § 16C.03, subd. 3.

By: **Jeffrey Combs**
E44FDC452C8431

Title: _Acquisition Management Specialist / Buyer_

Date: _3/25/2025_

**3. COMMISSIONER OF ADMINISTRATION**

Or delegated representative.

By: _Dustin Burns_
76753267149D441...

Date: _3/25/2025_

Case: 25-1812    Document: 148    Page: 276    Filed: 07/20/2025

Docusign Envelope ID: 9EA4DA03-0873-4489-AD7D-DED14B5A3B8C    Case 1:25-cv-00077-GSK-TMR-JAR    Document 14-5    Filed 05/07/25    Page 15 of 37



Office of State Procurement
112 Administration Building
50 Sherburne Avenue
St. Paul, MN 55155
Voice: 651.296.2600
Fax: 651.297.3996

April 11, 2025

Michaela Nagy
Busch Systems International Inc.
81 Rawson Avenue
Barrie ON Canada L4N 6E5

Dear Ms. Nagy,

The following document is enclosed for you to complete and return:

- Amendment to SWIFT Contract No 211305, Release No. W-212(5)
- Amendment No. 3 – Attachment A: Price Schedule effective April 11, 2025
- Amendment No. 3 – Exhibit D: Pricing

> Please sign and return the documents, **VIA DocuSign or Email** to Nicole Fuller at the following email address: **Nicole.Fuller@mn.state.us**, by **April 14, 2025**.

If the Amendment is not properly executed, it will be returned to you. Upon receipt of the properly executed document, and after signatures are obtained from the appropriate State authorities, a copy of the completed Amendment will be sent to your company.

If you have any questions, please feel free to contact me.

Sincerely,

*Nicole Fuller*

Nicole Fuller
Buyer II
Enclosure

**AMENDMENT NO. 3 TO CONTRACT NO. 211305 RELEASE NO. W-212(5)**

**THIS AMENDMENT** is by and between the State of Minnesota, acting through its Commissioner of Administration ("State"), and Busch Systems International Inc., 81 Rawson Avenue, Barrie ON Canada L4N 6E5 ("Contractor").

**WHEREAS**, the State has a Contract with the Contractor identified as Contract No. 211305, April 1, 2024, through March 31, 2025 ("Contract"), to provide Waste Recycling Containers and Sort Stations; and

**WHEREAS**, Minn. Stat. § 16C.03, subd. 5, affords the Commissioner of Administration, or delegate pursuant to Minn. Stat. § 16C.03, subd. 16, the authority to amend contracts; and

**WHEREAS**, the terms of the Contract allow the State to amend the Contract as specified herein, upon the mutual agreement of the Office of State Procurement and the Contractor in a fully executed amendment to the Contract.

**NOW, THEREFORE,** it is agreed by the parties to amend the Contract as follows:

1. That Contract No. 211305 is extended through March 31, 2026.The Original Contract and any previous amendments are incorporated into this amendment by reference.

2. The Sample Contract, Exhibit D: Pricing has been <u>DELETED</u> in its entirety and <u>REPLACED</u> with Amendment No. 3 – Exhibit D: Pricing. The following language is added under section 1.2 Tariffs:

   1.2 Tariffs.

   1.2.1. Applicability. When an imported contracted product value is above $800 or the current posted De Minimis value on the U.S. Customs and Border Protection website on any one shipment, the Contractor may quote the applicable tariff for those products identified under the current Price Schedule as a separate line item. If the quote does not include the tariff, the tariff shall not be invoiced.

   1.2.2. Tariff Rate. The amount invoiced for the tariff shall be less than or equal to the amount paid to U.S. Customs and Border Protection for the products purchased based on Country of Origin and applicable HTS Code. The amount of the tariff passed onto the ordering entity shall not exceed 25% of the Amendment No. 3 – Attachment A: Price Schedule. Shipping & handling costs must be removed when applying the cost of the Tariff. An itemized statement must be provided upon request of the state showing the product cost, shipping and handling, and the calculation of any applicable tariff including the Tariff Rate applied.

   1.2.3. Potential Tariff Increases. In the event tariff rates increase beyond the "not to exceed" limit defined herein for a period of more than 30 calendar days, the Contractor may request the State's contract manager to review proposed price increases caused by increasing or additional imposed tariffs with third-party supporting documentation. Additional price increases are not authorized without a mutually agreed upon and duly executed amendment.

      1.2.3.1 Harmonized Tariff Schedule (HTS) Codes. The Contractor must provide third-party documentation in the form of a supplier letter, invoice, bill of lading or other state approved document to verify imposed tariffs passed onto the Contractor. Applicable HTS Codes must be noted for the State to verify any documentation presented.

3. The current Price Schedule is <u>DELETED</u> in its entirety and <u>REPLACED</u> with Amendment No. 3 – Attachment A: Price Schedule, which is attached and incorporated herein. Updates to the Price Schedule includes deletions of discontinued items and the additions of new products.

   3.1 Columns G - J are added to identify line items that are eligible to include imposed tariff costs along with their applicable Country of Origin and HTS Code.

4. All other terms and conditions remain unchanged.

This Amendment is effective beginning April 11, 2025, or upon the date that the final required signatures are obtained, whichever occurs later, and shall remain in effect through contract expiration, or until the Contract is canceled, whichever

occurs first.

Except as herein amended, the provisions of the Contract between the parties hereto are expressly reaffirmed and remain in full force and effect.

**IN WITNESS WHEREOF**, the parties have caused this Amendment to be duly executed intending to be bound thereby.

| | |
|---|---|
| **1. BUSCH SYSTEMS INTERNATIONAL INC.** | **2. OFFICE OF STATE PROCUREMENT** |
| The Contractor certifies that the appropriate person(s) have executed this Amendment on behalf of the Contractor as required by applicable articles, bylaws, resolutions, or ordinances. | In accordance with Minn. Stat. § 16C.03, subd. 3. |
| By: _Michaela Nagy_ | By: _Cassandra Jensen_ |
| Signature | |
| 1A4937EBF5F84A6... | 4G9880BDA69B46D... |
| Michaela Nagy | Title: Acquisition Management Specialist / Buyer |
| Printed Name | Date: 4/14/2025 |
| Title: Contracts Specialist | **3. COMMISSIONER OF ADMINISTRATION** |
| Date: 4/11/2025 | Or delegated representative. |
| | By: _Justin Patrick_ |
| | D8547CF0A9864F3... |
| | Date: 4/14/2025 |

Docusign Envelope ID: 9EA4DA03-0873-4489-AD7D-DFD14B542B8C

# Amendment No. 3 – Attachment A: Price Schedule

**Effective April 11, 2025**

**Busch Systems International Inc.**

**Contract Number 211305**

## Tier 1 Products

| Product | Model | Size | Color | Discount Quantity | Price | Eligible for Tariff Invoicing? | Country of Origin | HTS Code | Tariff Rate - Percentage of Sell Price (Not to exceed) |
|---|---|---|---|---|---|---|---|---|---|
| Waste or Recycling Container | Aristata Select | 15 gallon | Composite & Steel designer style single stream waste container w/hinged lid & full opening. Includes label & rigid liner. **Color: Slate/Glacier** | Different container types can be combined to reach MOQ. | $409.70 / MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Select | 30 gallon | Composite & Steel designer style two stream waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. **Color: Slate/Glacier** | Different container types can be combined to reach MOQ. | $615.60 / MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Select | 45 gallon | Composite & Steel designer style three stream waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. **Color: Slate/Glacier** | Different container types can be combined to reach MOQ. | $763.72 / MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Select XL | 28 gallon | Composite & Steel designer style single XL stream waste container w/hinged lid & full opening. Includes label & rigid liner. **Color: Slate/Glacier** | Different container types can be combined to reach MOQ. | $636.18 / MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Select XL | 56 gallon | Composite & Steel designer style two stream XL waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. **Color: Slate/Glacier** | Different container types can be combined to reach MOQ. | $819.75 / MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Select XL | 84 gallon | Composite & Steel designer style three stream XL waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. **Color: Slate** | Different container types can be combined to reach MOQ. | $1,040.98 / MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Premium | 15 gallon | Composite & Steel designer style single stream waste container w/hinged lid & full opening. Includes label & rigid liner. **Color: Mid-Summer Flame** | Different container types can be combined to reach MOQ. | $486.30 / MOQ: 25 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Premium | 30 gallon | Composite & Steel designer style two stream waste container w/hinged lid. Full & recycling openings. Includes | Different container types can be combined to reach MOQ. | $671.25 | No | Canada (CA) | 9403.60.8 | n/a |

Docusign Envelope ID: 9EA4DA03-0873-4489-AD7D-DED44B542B8C

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Container | | | labels & rigid liners. **Color: Mid-Summer flame** | to reach MOQ. | MOQ: 4 units | | | | |
| Waste or Recycling Container | Aristata Premium | 45 gallon | Composite & Steel designer style three stream waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. **Color: Mid-Summer Flame** | Different container types can be combined to reach MOQ. | $832.70 / MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Elite | 15 gallon | Composite & Steel designer style single stream waste container w/hinged lid & full opening. Includes label & rigid liner. **Color: Western Breeze** | Different container types can be combined to reach MOQ. | $486.30 / MOQ: 25 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Elite | 30 gallon | Composite & Steel designer style two stream waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. **Color: Western Breeze** | Different container types can be combined to reach MOQ. | $671.25 / MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Elite | 45 gallon | Composite & Steel designer style three stream waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. **Color: Western Breeze** | Different container types can be combined to reach MOQ. | $832.70 / MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Boka Double | 52 gallon | Stainless Steel two stream locking recycling & waste container. Includes labels & bag retention ring. | Different container types can be combined to reach MOQ. | $1,756.11 / MOQ: 4 units | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Waste or Recycling Container | Boka Triple | 78 gallon | Stainless Steel three stream locking recycling & waste container. Includes labels & bag retention ring. | Different container types can be combined to reach MOQ. | $2,404.34 / MOQ: 4 units | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Waste or Recycling Container | Evolve Cube | 50 gallon | LDPE Bodies w/ABS brushed pewter lids - body color black. Multiple opening styles. Includes opening labels. | Project, standardization, or order-specific discounts at $5,000 and $10,000 etc. may be available. Please contact your Busch rep. | $482.31 | No | Canada (CA) | 3926.90.9 | n/a |
| Waste or Recycling Container | Evolve Cube Slim | 23 gallon | LDPE Bodies w/ABS brushed pewter lids - body color black. Multiple opening styles. Includes opening labels. | Project, standardization, or order-specific discounts at $5,000 and $10,000 etc. may be available. Please contact your Busch rep. | $369.38 | No | Canada (CA) | 3926.90.9 | n/a |

| Products | Model | Size | Color | Discount Quantity | Price | Eligible for Tariff Invoicing? | Country of Origin | HTS Code | Tariff Rate - Percentage of Sell Price (Not to exceed) |
|---|---|---|---|---|---|---|---|---|---|
| Waste or Recycling Container | Evolve Cube Waste or Recycling Container | 50 gallon | LDPE Bodies w/ABS brushed pewter lids - body colors: grey, blue, green. Multiple opening styles. Includes opening labels. | n/a | $539.20 | No | Canada (CA) | 3926.90.9 | n/a |
| Waste or Recycling Container | Evolve Cube Slim Waste or Recycling Container | 23 gallon | LDPE Bodies w/ABS brushed pewter lids - body colors: grey, blue, green. Multiple opening styles. Includes opening labels. | n/a | $397.50 | No | Canada (CA) | 3926.90.9 | n/a |
| Waste or Recycling Container | Spectrum Cube | 24 gallon | Powder-coated steel square recycling or waste container. Includes body, lid, rigid liner, label. Multiple opening styles. Color: silver lid, white, blue, green, black or grey body | n/a | $339.30 | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Waste or Recycling Container | Spectrum Cube Slim | 10 gallon | Powder-coated steel rectangular recycling or waste container. Includes body, lid, rigid liner, label. Multiple opening styles. Color: silver lid, white, blue, green, black or grey body | n/a | $293.80 | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Waste or Recycling Container | Spectrum Ellipse | 22 gallon | Powder-coated steel elliptical recycling or waste container. Includes body, lid, rigid liner, label. Multiple opening styles. Color: silver lid, white, blue, green, black or grey body | n/a | $398.80 | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Waste or Recycling Container | Spectrum Ellipse Slim | 8 gallon | Powder-coated steel elliptical recycling or waste container. Includes body, lid, rigid liner, label. Full opening. Color: silver lid, white, blue, green, black or grey body | n/a | $342.50 | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Waste or Recycling Container | Spectrum Cube XL | 32 gallon | Powder-coated steel square recycling or waste container. Includes body, lid, rigid liner, label. Multiple opening styles. Color: silver lid, white, blue, green, black or grey body | n/a | $477.30 | Yes | Canada (CA) | 9403.20.0 | Up to 25% |

## Tier 2 Products

| Products | Model | Size | Color | Discount Quantity | Price | Eligible for Tariff Invoicing? | Country of Origin | HTS Code | Tariff Rate - Percentage of Sell Price (Not to exceed) |
|---|---|---|---|---|---|---|---|---|---|

Docusign Envelope ID: 9E44DA03-0873-4489-AD7D-PED14B542B8C

| Waste or Recycling Container | Aristata Select | 15 gallon | Composite & Steel designer style single stream waste container w/hinged lid & full opening. Includes label & rigid liner. **Color: Slate/Glacier** | Different container types can be combined to reach MOQ. | $409.70 — MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Select | 30 gallon | Composite & Steel designer style two stream waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. **Color: Slate/Glacier** | Different container types can be combined to reach MOQ. | $615.60 — MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Select | 45 gallon | Composite & Steel designer style three stream waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. **Color: Slate/Glacier** | Different container types can be combined to reach MOQ. | $763.72 — MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Select XL | 28 gallon | Composite & Steel designer style single XL stream waste container w/hinged lid & full opening. Includes label & rigid liner. **Color: Slate/Glacier** | Different container types can be combined to reach MOQ. | $636.18 — MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Select XL | 56 gallon | Composite & Steel designer style two stream XL waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. **Color: Slate/Glacier** | Different container types can be combined to reach MOQ. | $819.75 — MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Select XL | 84 gallon | Composite & Steel designer style three stream XL waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. Color: **Slate** | Different container types can be combined to reach MOQ. | $1,040.98 — MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Premium | 15 gallon | Composite & Steel designer style single stream waste container w/hinged lid & full opening. Includes label & rigid liner. Color: **Mid-Summer Flame** | Different container types can be combined to reach MOQ. | $486.30 — MOQ: 25 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Premium | 30 gallon | Composite & Steel designer style two stream waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. Color: **Mid-Summer Flame** | Different container types can be combined to reach MOQ. | $671.25 — MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Premium | 45 gallon | Composite & Steel designer style three stream waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. Color: **Mid-Summer Flame** | Different container types can be combined to reach MOQ. | $832.70 — MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Elite | 15 gallon | Composite & Steel designer style single stream waste container w/hinged lid & full opening. Includes label & | Different container types can be combined to reach MOQ. | $486.30 | No | Canada (CA) | 9403.60.8 | n/a |

Docusign Envelope ID: 9EA4DA03-0873-4489-AD7D-PED14B542B8C

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Container | | | rigid liner. Color: **Western Breeze** | to reach MOQ. | MOQ: 25 units | | | | |
| Waste or Recycling Container | Aristata Elite | 30 gallon | Composite & Steel designer style two stream waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. Color: **Western Breeze** | Different container types can be combined to reach MOQ. | $671.25 <br><br> MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Aristata Elite | 45 gallon | Composite & Steel designer style three stream waste container w/hinged lid. Full & recycling openings. Includes labels & rigid liners. Color: **Western Breeze** | Different container types can be combined to reach MOQ. | $832.70 <br><br> MOQ: 4 units | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Courtside Single | 32 gallon | Powder-coated Steel single stream station with front door. Includes label, rigid liner, casters and food tray collection area. Color: grey with black accents | Different container types can be combined to reach MOQ. | $1,401.85 <br><br> MOQ: 2 units | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Waste or Recycling Container | Courtside Double | 64 gallon | Powder-coated Steel two stream station with front door. Includes label, rigid liner, casters and food tray collection area. Color: grey with black accents | Different container types can be combined to reach MOQ. | $1,634.80 <br><br> MOQ: 2 units | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Waste or Recycling Container | Sessanta Double | 64 gallon | Composite and steel station for office cafeterias, restaurants, food courts w/ front doors. Two stream. Order with sign frame or tray holder option. Color: slate body, grey top | Different container types can be combined to reach MOQ. | $1,213.76 <br><br> MOQ: 2 | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Sessanta Triple | 69 gallon | Composite and steel station for office cafeterias, restaurants, food courts w/ front doors. Three stream. Order with sign frame or tray holder option. Color: slate body, grey top | Different container types can be combined to reach MOQ. | $1,269.73 <br><br> MOQ: 2 | No | Canada (CA) | 9403.60.8 | n/a |
| Waste or Recycling Container | Summit Double | 30 gallon | Powder-coated steel two stream recycling & waste station with front doors, rigid liners, labels. Flat or sloped top with rectangular openings. Color: grey body, silver lid. | Different container types can be combined to reach MOQ. | $1,364.30 <br><br> MOQ: 4 units | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Waste or Recycling Container | Summit Triple | 45 gallon | Powder-coated steel three stream recycling & waste station with front doors, rigid liners, labels. Flat or sloped top with rectangular openings. Color: grey body, | Different container types can be combined to reach MOQ. | $1,677.70 | Yes | Canada (CA) | 9403.20.0 | Up to 25% |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | MOQ: 4 units | | | | |
| Waste or Recycling Container | Summit Double XL | 64 gallon | Powder-coated steel two stream recycling & waste station with front doors, rigid liners, labels. Flat or sloped top with rectangular openings. Color: grey body, silver lid. | Different container types can be combined to reach MOQ. | $1,824.79 <br><br> MOQ: 4 units | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Waste or Recycling Container | Summit Triple XL | 96 gallon | Powder-coated steel three stream recycling & waste station with front doors, rigid liners, labels. Flat or sloped top with rectangular openings. Color: grey body, silver lid. | Different container types can be combined to reach MOQ. | $2,361.80 <br><br> MOQ: 4 units | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Waste or Recycling Container | Mezzo Double | 30 gallon | Powder-coated steel two stream recycling & waste station with hinged lids, rigid liners, labels. Flat top with rectangular openings. Color: white body, black, blue, or green lids. | Different container types can be combined to reach MOQ. | $1,078.30 <br><br> MOQ: 4 units | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Waste or Recycling Container | Mezzo Triple | 45 gallon | Powder-coated steel three stream recycling & waste station with hinged lids, rigid liners, labels. Flat top with rectangular openings. Color: white body, black, blue, or green lids. | Different container types can be combined to reach MOQ. | $1,234.63 <br><br> MOQ: 4 units | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Waste or Recycling Container | Mosaic Single | 32 gallon | Aluminum-HDPE-Sintra single stream waste or recycling container w/four body surfaces that can be labelled. Includes colored lid, labels, rigid liner and stock signs. | Different container types can be combined to reach MOQ. | $397.76 <br><br> MOQ: 4 units | No | Canada (CA) | 3926.90.9 | n/a |
| Waste or Recycling Container | Mosaic Double | 32 gallon | Aluminum-HDPE-Sintra two stream waste or recycling container w/four body surfaces that can be labelled. Includes colored lid, labels, rigid liner and stock signs. | Different container types can be combined to reach MOQ. | $754.95 <br><br> MOQ: 4 units | No | Canada (CA) | 3926.90.9 | n/a |
| Waste or Recycling Container | Mosaic Triple | 32 gallon | Aluminum-HDPE-Sintra three stream waste or recycling container w/four body surfaces that can be labelled. Includes colored lid, labels, rigid liner and stock signs. | Different container types can be combined to reach MOQ. | $ 1,136.88 - <br><br> MOQ: 4 units | No | Canada (CA) | 3926.90.9 | n/a |

Docusign Envelope ID: 9EA4DA03-0873-4482-AD7D-DFD14B542B8C

Case 1:25-cv-00077-GSK-TMR-JAR     Document 14-5     Filed 05/07/25     Page 24 of 37

| Hanging Basket with Lid | BC1500 | .75 gallon | Heavy Duty HD Plastic - color green. Stock-stamped or plain lid. **100% PCR Content** | Different container types can be combined to meet minimum order. | $7.49 / Minimum Order: 5 | No | Canada (CA) | 3926.90.9 | n/a |
| Hanging Basket with Lid | BC1500 | .75 gallon | Heavy Duty HD Plastic - color black. Stock-stamped or plain lid **100% PCR Content** | Different container types can be combined to meet minimum order | $7.49 / Minimum Order: 5 | No | Canada (CA) | 3926.90.9 | n/a |

| Tier 3 Products | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Products** | **Model** | **Size** | **Color** | **Discount Quantity** | **Price** | **Eligible for Tariff Invoicing?** | **Country of Origin** | **HTS Code** | **Tariff Rate - Percentage of Sell Price (Not to exceed)** |
| 14 Quart | Depends on options chosen | 14 quarts | HDPE rectangular deskside recycling or waste baskets. Colors: blue, green, grey, black **100% PCR Content** | Different container types can be combined to reach MOQ. | $6.05 / MOQ: 10 units | No | Canada (CA) | 3926.90.9 | n/a |
| 28 Quart | Depends on options chosen | 28 quarts | HDPE rectangular deskside recycling or waste baskets. Colors: blue, green, grey, black **100% PCR Content** | Different container types can be combined to reach MOQ. | $7.45 / MOQ: 10 units | No | Canada (CA) | 3926.90.9 | n/a |
| 41 Quart | Depends on options chosen | 41 quarts | HDPE rectangular deskside recycling or waste baskets. Colors: blue, green, grey, black **100% PCR Content** | Different container types can be combined to reach MOQ. | $11.75 / MOQ: 10 units | No | Canada (CA) | 3926.90.9 | n/a |
| Battery Recycler | Depends on options chosen | 2.25 gallon | HDPE rectangular desk/countertop container for collection of small batteries for recycling. With hinged lid that has a hole for battery deposit and carry handle. Pre-stamped. Colors: brown or natural w/orange. | Different container types can be combined to reach MOQ. | $15.80 / MOQ: 10 units | No | Canada (CA) | 3926.90.9 | n/a |
| Deskside Recycling Bin | BC1001 | 3 gallon | HDPE low profile rectangular deskside recycling bin. Pre-stamped. Colors: blue, green, grey | Different container types can be combined to reach MOQ. | $7.24 / MOQ: 20 units | No | Canada (CA) | 3926.90.9 | n/a |
| Kitchen Composter | KC2000 | 2.25 gallon | HDPE rectangular countertop container for collection of organics for composting. With hinged lid and carry handle. Colors: green. **100% PCR Content** | Different container types can be combined to reach MOQ. | $14.30 / MOQ: 10 units | No | Canada (CA) | 3926.90.9 | n/a |

Docusign Envelope ID: 9EA4DA03-0873-4489-A97D-PED14B542B8C

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Kitchen Composter | KC2000VF | 2.25 gallon | HDPE rectangular countertop container for collection of organics for composting. With hinged vented lid, filter cage, filter and carry handle. Colors: green. **100% PCR Content** | Different container types can be combined to reach MOQ. | $16.90<br><br>MOQ: 10 units | No | Canada (CA) | 3926.90.9 | n/a |
| Multi-Recycler | Depends on options chosen | 6 gallon | HDPE basket style stackable recycling bin with handle. Pre-stamped. Colors: blue, red, green | Different container types can be combined to reach MOQ. | $12.80<br><br>MOQ: 5 units | No | Canada (CA) | 3926.90.9 | n/a |
| Multi-Recycler - Yellow | Depends on options chosen | 6 gallon | HDPE basket style stackable recycling bin with handle. Pre-stamped. Color: yellow | Different container types can be combined to reach MOQ. | $13.10<br><br>MOQ: 5 units | No | Canada (CA) | 3926.90.9 | n/a |
| PDC | Depends on options chosen | 9 gallon | HDPE Personal Document Container with locking, slotted lid for desk-side/under-desk collection of confidential documents for shredding etc. Color: grey | n/a | $46.81 | No | Canada (CA) | 3926.90.9 | n/a |
| Rise Recycling or Waste Bin | Depends on options chosen | 15 gallon | HDPE Single Unit Mountable (No extrusion). Color: grey or white | n/a | $82.46 | No | Canada (CA) | 3926.90.9 | n/a |
| Rise Recycling or Waste Bin | Depends on options chosen | 15 gallon | HDPE Single w/wall bracket (extrusion). Color: grey or white | n/a | $110.29 | No | Canada (CA) | 3926.90.9 | n/a |
| Rise Recycling or Waste Bin | Depends on options chosen | 30 gallon | HDPE Double w/wall bracket (extrusion). Color: grey or white | n/a | $218.50 | No | Canada (CA) | 3926.90.9 | n/a |
| Rise Recycling or Waste Bin | Depends on options chosen | 45 gallon | HDPE Triple w/wall bracket (extrusion). Color: grey or white | n/a | $318.60 | No | Canada (CA) | 3926.90.9 | n/a |
| Rise Recycling or Waste Bin | Depends on options chosen | 60 gallon | HDPE Quad w/wall bracket (extrusion). Color: grey or white | n/a | $410.50 | No | Canada (CA) | 3926.90.9 | n/a |
| Rise Recycling or Waste Bin | Depends on options chosen | 15 gallon | HDPE Single w/wall bracket and Sign Extrusions. Color: grey or white | n/a | $171.20 | No | Canada (CA) | 3926.90.9 | n/a |
| Rise Recycling or Waste Bin | Depends on options chosen | 30 gallon | HDPE Double w/wall bracket and Sign Extrusions. Color: grey or white | n/a | $277.70 | No | Canada (CA) | 3926.90.9 | n/a |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rise Recycling or Waste Bin | Depends on options chosen | 45 gallon | HDPE Triple w/wall bracket and Sign Extrusions. Color: grey or white | n/a | $394.20 | No | Canada (CA) | 3926.90.9 | n/a |
| Rise Recycling or Waste Bin | Depends on options chosen | 60 gallon | HDPE Quad w/wall bracket and Sign Extrusions. Color: grey or white | n/a | $503.30 | No | Canada (CA) | 3926.90.9 | n/a |
| Waste Watcher XL | Depends on options chosen | 32 gallons | HDPE Waste Watcher XL 30" Body only. Stock colors: Grey, Black, Blue, Green | n/a | $108.98 | No | Canada (CA) | 3926.90.9 | n/a |
| Waste Watcher XL | Depends on options chosen | 24 gallons | HDPE Waste Watcher XL 24" Body only. Stock colors: Grey; **MOQ for Black, Blue, Green** | n/a | $107.60 | No | Canada (CA) | 3926.90.9 | n/a |
| Waste Watcher XL | Depends on options chosen | 28 gallons | HDPE Waste Watcher XL 27" Body only. Stock colors: Grey; **MOQ for Black, Blue, Green** | n/a | $107.60 | No | Canada (CA) | 3926.90.9 | n/a |
| Diaper Pail | Depends on options chosen | 7 gallons | HDPE diaper pail w/vented lid, filter cage & filter. Color: white | n/a | $53.59 | No | Canada (CA) | 3926.90.9 | n/a |
| Diaper Pail | Depends on options chosen | 14 gallons | HDPE diaper pail w/vented lid, filter cage & filter. Color: white | n/a | $63.25 | No | Canada (CA) | 3926.90.9 | n/a |
| Smart Sort | Depends on options chosen | 22 gallon | HDPE waste or recycling container with angled lid and shaped opening. Color: grey body & lid w/black, blue or green opening | n/a | $101.44 | No | Canada (CA) | 3926.90.9 | n/a |
| Outlaw | Depends on options chosen | 50 gallon | 100% Post Consumer Recycled HDPE Bodies w/ABS brushed pewter look lids - body color black or blue. Two opening style options. | Different container types can be combined to reach MOQ. | $326.50  MOQ 4 units | No | Canada (CA) | 3926.90.9 | n/a |

## Tier 4 Products

| Products | Model | Size | Color | Discount Quantity | Price | Eligible for Tariff Invoicing? | Country of Origin | HTS Code | Tariff Rate - Percentage of Sell Price (Not to exceed) |
|---|---|---|---|---|---|---|---|---|---|
| Waste Watcher | Quad system 30" | 23 gallon per stream | HD plastic- color: grey bodies. Includes bodies, standard lids, sign frames, signs, lid labels | | $569.20 | No | Canada (CA) | 3926.90.9 | n/a |
| Euro Waste or Recycling Container | Depends on options chosen | 36 gallon | LDPE round waste or recycling container with integral caNopy and locking front door. Includes rigid liner and label. Color: greystone | Different container types can be combined to reach MOQ. | $ 760.04 -  MOQ: 4 units | No | Canada (CA) | 3926.90.9 | n/a |

Docusign Envelope ID: 9EA4DA03-0973-4489-AD7D-DED14B542B8C

| Expression Waste & Recycling Container | Depends on options chosen | Single - 45 gallon Double - 40 gallon | LDPE square waste and recycling container with integral caNopy and locking front door. Single or two stream capacity. Includes opening inserts, rigid liners and labels. Colors: Greystone. Stocked or custom body signage available at additional cost. | Different container types can be combined to reach MOQ. | $905.02 | | | | |
| | | | | | MOQ: 4 units | No | Canada (CA) | 3926.90.9 | n/a |
| Octo Standard | Depends on options chosen | 32 gallon | LDPE single stream waste or recycling container w/eight body surfaces that can be labelled.  Includes colored lid, labels and rigid liner. Colors: Greystone body with blue, green or black lid | Different container types can be combined to reach MOQ. | $429.60 | | | | |
| | | | | | MOQ: 4 units | No | Canada (CA) | 3926.90.9 | n/a |
| Octo CaNopy | Depends on options chosen | 32 gallon | LDPE single stream waste or recycling container w/eight body surfaces that can be labelled.  Includes domed lid with front opening, labels and rigid liner. Colors: Greystone body with blue, green or black trim. | Different container types can be combined to reach MOQ. | $500.28 | | | | |
| | | | | | MOQ: 4 units | No | Canada (CA) | 3926.90.9 | n/a |
| Toronto Single | Depends on options chosen | 32 gallon | Powder-coated round heavy duty steel mesh recycling or waste container with rigid liner. Color: black body, blue or black liner | Different container types can be combined to reach MOQ. | $1,311.64 | | | | |
| | | | | | MOQ: 4 units | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Toronto Double | Depends on options chosen | 45 gallon | Powder-coated round heavy duty steel mesh recycling or waste container with two rigid liners. Color: black body, blue and black liners | Different container types can be combined to reach MOQ. | $ 1,429.50 - | | | | |
| | | | | | MOQ: 4 units | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Portland Single | Depends on options chosen | 45 gallon | Powder-coated round heavy duty steel recycling or waste container with rigid liner. Color: silver body, blue or black lid and liner. | Different container types can be combined to reach MOQ. | $1,200.25 | | | | |
| | | | | | MOQ: 4 units | Yes | Canada (CA) | 9403.20.0 | Up to 25% |
| Renegade | Depends on options chosen | 50 gallon | 100% Post Consumer Recycled HDPE Body, and CaNopy with open sides. Color black or blue.  Two opening style options. | Different container types can be combined to reach MOQ. | $232.48 | | | | |
| | | | | | MOQ 4 units | No | Canada (CA) | 3926.90.9 | n/a |
| Curbside TRUE 14 Blue | Depends on options chosen | 14 gallon | HDPE rectangular curbside recycling container. Color: blue | Different container types can be combined to reach MOQ. | $13.10 | | | | |
| | | | | | MOQ: 10 units | No | Canada (CA) | 3926.90.9 | n/a |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Curbside TRUE 18 Blue | Depends on options chosen | 18 gallon | HDPE rectangular curbside recycling container. Color: blue | Different container types can be combined to reach MOQ. | $14.88<br><br>MOQ: 10 | No | Canada (CA) | 3926.90.9 | n/a |
| Super Sorter 2-in-1 | Depends on options chosen | 64 gallon | LDPE rectangular two stream unit with angled hinged lid, rigid liners, two stamped openings of desired configuration. Color: greystone or sandstone | Different container types can be combined to reach MOQ. | $873.50<br><br>MOQ: 4 units | No | Canada (CA) | 3926.90.9 | n/a |
| Super Sorter 3-in-1 | Depends on options chosen | 96 gallon | LDPE rectangular three stream unit with angled hinged lid, rigid liners, two stamped openings of desired configuration. Color: greystone or sandstone | Different container types can be combined to reach MOQ. | $1,129.30<br><br>MOQ: 4 units | No | Canada (CA) | 3926.90.9 | n/a |
| Uptown Double | Depends on options chosen | 64 gallon | LDPE two stream station with sloped top, front door, rigid liners, two colored shaped openings of desired configuration. Color: greystone | Different container types can be combined to reach MOQ. | $1,348.39<br><br>MOQ: 4 units | No | Canada (CA) | 3926.90.9 | n/a |
| Wave Single or Double | Depends on options chosen | 40 gallon | LDPE rectangular single or two stream unit with hinged lid, rigid liners, one or two stamped openings of desired configuration. Color: greystone | | $682.53 | No | Canada (CA) | 3926.90.9 | n/a |
| Wire Event Container Pack of 2 | Depends on lids chosen | 32 gallon | Galvanized steel wire frame with HD plastic lid. Wire frames are stackable for storage. Two different lid openings. | | $341.00/ pack | Yes | Canada (CA) | 7326.90.8 | Up to 25% |
| Wire Event Container Pack of 5 | Depends on lids chosen | 32 gallon | Galvanized steel wire frame with HD plastic lid. Wire frames are stackable for storage. 5 x one type of lid opening. | | $350.56/ pack | Yes | Canada (CA) | 7326.90.8 | Up to 25% |
| Waste Watcher | Quad system 23" | 16 gallon | HD plastic- color: grey bodies. Includes bodies, standard lids, sign frames, signs, lid labels | | $578.00 | No | Canada (CA) | 3926.90.9 | n/a |
| Waste Watcher | Triple system 30" | 23 gallon | HD plastic- color: grey bodies. Includes bodies, standard lids, sign frames, signs, lid labels | n/a | $426.90 | No | Canada (CA) | 3926.90.9 | n/a |
| Waste Watcher | Triple system 23" | 16 gallon | HD plastic- color: grey bodies. Includes bodies, standard lids, sign frames, signs, lid labels | n/a | $434.10 | No | Canada (CA) | 3926.90.9 | n/a |
| Waste Watcher | Double 30" | 23 gallon | HD plastic- color: grey bodies. Includes bodies, standard lids, sign frames, signs, lid labels | n/a | $284.60 | No | Canada (CA) | 3926.90.9 | n/a |

| Waste Watcher | Double 23" | 16 gallon | HD plastic- color: grey bodies. Includes bodies, standard lids, sign frames, signs, lid labels | n/a | $289.40 | No | Canada (CA) | 3926.90.9 | n/a |
| Waste Watcher | Single 30" | 23 gallon | HD plastic- color: grey bodies. Includes bodies, standard lids, sign frames, signs, lid labels | n/a | $142.30 | No | Canada (CA) | 3926.90.9 | n/a |
| Waste Watcher | Single 23" | 16 gallon | HD plastic- color: grey bodies. Includes bodies, standard lids, sign frames, signs, lid labels | n/a | $144.70 | No | Canada (CA) | 3926.90.9 | n/a |
| Billi Box | Single 16" | 7 Gallon | HD plastic- color: grey, black, green, blue. Includes body, lid, frame opening insert label | n/a | $19.60 <br> MOQ 5 units | No | Canada (CA) | 3926.90.9 | n/a |
| Billi Box | | 10 gallon | HD plastic-color: grey, black, green, blue. Includes body, lid, frame opening insert and label | n/a | $31.20 <br> MOQ 5 units | No | Canada (CA) | 3926.90.9 | n/a |
| Signage Kits | all models | all sizes | all finishes | n/a | Sign Frame & Sign for Waste Watcher 35.66 / Billi Box Labels 1.00 | No | Canada (CA) | 3926.90.9 & 4911.99.6 | n/a |

## Busch Systems Accessories

| Products | Model | Size | Color | Discount Quantity | Price | Eligible for Tariff Invoicing? | Country of Origin | HTS Code | Tariff Rate - Percentage of Sell Price (Not to exceed) |
|---|---|---|---|---|---|---|---|---|---|
| Bag Hooks | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Doors | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Signage Pins | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Blank Labels | Billi Box, Evolve | depends on selection | Single Label | 1/ea | $5.00 | No | Canada (CA) | 3919.90.9 | n/a |
| Blank Labels | Waste Watcher | depends on selection | Single Label | 1/ea | $5.00 | No | Canada (CA) | 3919.90.9 | n/a |
| CaNopy Lid | Toronto or Portland Dome for outdoor containers | | Single unit | 1/ea | $220.11 <br> MOQ: 4 units | No | Canada (CA) | 3926.90.9 | n/a |
| Casters | Aristata | | Kit of 4 casters | 1/ea | $130.20 ea. | Yes | Canada (CA) | 8716.90.5 | Up to 25% |
| Casters | Aristata XL Single and Two Steam Containers | | Kit of 4 casters | 1/ea | $147.80 ea. | Yes | Canada (CA) | 8716.90.5 | Up to 25% |

Docusign Envelope ID: 9EA4DA03-0973-4480-A07D-PFD14B542B8C

| Casters | Aristata XL Triple Steam Containers | | Kit of 4 casters | 1/ea | $219.10 | Yes | Canada (CA) | 8716.90.5 | Up to 25% |
|---|---|---|---|---|---|---|---|---|---|
| Caster Kit | Mosaic | | Kit of 4 casters | 1/ea | $25.90 | No | Canada (CA) | 3923.10.0 | n/a |
| Casters | Spectrum containers | | Kit of 4 casters | 1/ea | $48.76 | No | Canada (CA) | 3923.10.0 | n/a |
| Connector Kit Connects 2 Evolve units together | Evolve | Grey | Single unit | 1/ea | $68.31 | No | Canada (CA) | 3926.90.9 | n/a |
| Connector Kit | Mosaic | | Single Kit | 1/ea | $80.40 | Yes | Canada (CA) | 7326.90.8 | Up to 25% |
| Connector Kit | Renegade Connector Kit | | Single Kit | 1/ea | $7.90 | No | Canada (CA) | 3926.90.9 | n/a |
| Connector Kit Connects 2 Waste Watcher units together | Waste Watcher | Grey | Single Unit | 1/ea | $15.66 | No | Canada (CA) | 3926.90.9 | n/a |
| Dollies | Waste Watcher Single powder coated steel frame with 4 wheels | Grey | Single unit | 1/ea | $108.15 | Yes | Canada (CA) | 8716.90.5 | Up to 25% |
| Dollies | Waste Watcher Double powder coated steel frame with 4 wheels | Grey | Single set of two | 1/ea | $199.50 | Yes | Canada (CA) | 8716.90.5 | Up to 25% |
| Dollies | Waste Watcher | Grey | Single set of three | 1/ea | $284.80 | Yes | Canada (CA) | 8716.90.5 | Up to 25% |
| Dollies | Waste Watcher | Grey | Single set of four | 1/ea | $375.11 | Yes | Canada (CA) | 8716.90.5 | Up to 25% |
| Extra Bodies 30" Body only HDPE 23 gallon | Waste Watcher | Grey, Black, Blue, Green | Single Unit | 1/ea | $75.40 | No | Canada (CA) | 3926.90.9 | n/a |
| Extra Bodies 27" Body only HDPE 20 gallon | Waste Watcher | Grey, Black, Blue, Green | Single Unit | 1/ea | $77.80 | No | Canada (CA) | 3926.90.9 | n/a |
| Extra Bodies 24" Body only HDPE 16 gallon | Waste Watcher | Grey, Black, Blue, Green | Single Unit | 1/ea | $77.80 | No | Canada (CA) | 3926.90.9 | n/a |

Docusign Envelope ID: 9EA4DA03-0873-4480-A97D-PFD14B542B8C

| Extra Lids | Waste Watcher Standard Lid HDPE | Grey, Black Blue, Green | Single unit | 1/ea | $35.70 | No | Canada (CA) | 3926.90.9 | n/a |
|---|---|---|---|---|---|---|---|---|---|
| Extra Lids | Waste Watcher Solid Lift | Grey, Black Blue, Green | Single unit | 1/ea | $47.20 | No | Canada (CA) | 3926.90.9 | n/a |
| Extra Lids | Waste Watcher Vented Lift | Grey, Black Blue, Green | Single unit | 1/ea | $52.90 | No | Canada (CA) | 3926.90.9 | n/a |
| Extra Lids | Waste Watcher Swing | Grey, Black Blue, Green | Single unit | 1/ea | $52.80 | No | Canada (CA) | 3926.90.9 | n/a |
| Hard ground mount kit | Euro, Expression, Galaxy containers | | 1 Kit | 1/ea | $11.80 | Yes | Canada (CA) | 7326.90.8 | Up to 25% |
| Set of 2 Dolly | Waste Watcher XL | Grey | Single set of 2 | 1/ea | $204.20 | Yes | Canada (CA) | 8716.90.5 | Up to 25% |
| Set of 3 Dolly | Waste Watcher XL | Grey | Single set of 3 | 1/ea | $301.20 | Yes | Canada (CA) | 8716.90.5 | Up to 25% |
| Set of 4 Dolly | Waste Watcher XL | Grey | Single set of 4 | 1/ea | $379.80 | Yes | Canada (CA) | 8716.90.5 | Up to 25% |
| Sign Frame | Aristata-double | Steel | Single unit | 1/ea | $124.20 | Yes | Canada (CA) | 7326.90.8 | Up to 25% |
| Sign Frame | Aristata-triple | Steel | Single unit | 1/ea | $142.20 | Yes | Canada (CA) | 7326.90.8 | Up to 25% |
| Sign Frame | Evolve | depends on selection | Single, with stock sign | 1/ea | $89.02 | Yes | Canada (CA) | 7326.90.8 | Up to 25% |
| Sign Frames | Waste Watcher | depends on selection | Single, with stock sign | 1/ea | $31.20 | No | Canada (CA) | 3926.90.9 & 4911.99.6 | n/a |
| Single Dolly | Waste Watcher XL | Grey | Single Unit | 1/ea | $112.20 | Yes | Canada (CA) | 8716.90.5 | Up to 25% |
| Solid Lift Lid – Full rectangular opening with lift lid | Waste Watcher XL | Grey, Black, Blue, Green | 1 Lid | 1/ea | $57.11 | No | Canada (CA) | 3926.90.9 | n/a |

| Standard Lid-multiple opening styles | Waste Watcher XL | Grey, Black, Blue, Green | 1 Lid | 1/ea | $44.90 | No | Canada (CA) | 3926.90.9 | n/a |
|---|---|---|---|---|---|---|---|---|---|
| Stock Labels | Billi Box, Evolve, Waste Watcher | depends on selection | Single Label | 1/ea | $1.00 | No | Canada (CA) | 3919.90.9 | n/a |
| Stock Labels | Waste Watcher | depends on selection | Single Label | 1/ea | $1.00 | No | Canada (CA) | 3919.90.9 | n/a |
| Vented Lift Lid-HDPE. Full rectangular opening with vented lift led and filter. | Waste Watcher XL | Grey, Black, Blue, Green | 1 Lid | 1/ea | $68.08 | No | Canada (CA) | 3926.90.9 | n/a |
| Wheels | Evolve | depends on selection | Pack of four | 1/ea | $25.90 | No | Canada (CA) | 3923.10.0 | n/a |
| Lid Tether | Renegade Outdoor CaNopy Tether | | Single Kit | 1/ea | Included with purchase of bin | n/a | Canada (CA) | n/a | n/a |
| Body Sign Narrow | Mosaic | | Custom single sign | 1/ea | To be Quoted | No | Canada (CA) | 3926.90.9 | n/a |
| Body Sign Wide | Mosaic | | Custom single sign | 1/ea | To be Quoted | No | Canada (CA) | 3926.90.9 | n/a |

## Busch Systems Services

| Service Item | Count (each) | Discount Quantity | Price | Eligible for Tariff Invoicing? | Country of Origin | HTS Code | Tariff Rate - Percentage of Sell Price (Not to exceed) |
|---|---|---|---|---|---|---|---|
| Customized Labels | 1 label | Project, standardization, or order-specific discounts at $5,000 and $10,000 etc. may be available. Please contact your Busch rep. | To be quoted | No | Canada (CA) | 3919.90.9 | n/a |
| Additional Signage | 1 sign | Project, standardization, or order-specific discounts at $5,000 and $10,000 etc. may be available. Please contact your Busch rep. | To be quoted | No | | 3926.90.9 & 4911.99.6 | n/a |
| Customized Signs | 1 sign | Project, standardization, or order-specific discounts at $5,000 and $10,000 etc. may be available. Please contact your Busch rep. | To be quoted | No | | 3926.90.9 & 4911.99.6 | n/a |
| Custom Stamping per plate | 1 plate | Project, standardization, or order-specific discounts at $5,000 and $10,000 etc. may be available. Please contact your Busch rep. | To be quoted | n/a | n/a | n/a | n/a |
| Custom Stamping per side | 1 stamp fee | Project, standardization, or order-specific discounts at $5,000 and $10,000 etc. may be available. Please contact your Busch rep. | Up to $350.00 | n/a | n/a | n/a | n/a |

Docusign Envelope ID: 9EA4DA03-0873-4489-AD7D-PED14B542B8C
Case 1:25-cv-00077-GSK-TMR-JAR   Document 14-5   Filed 05/07/25   Page 33 of 37

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Custom Colors | Per project | Project, standardization, or order-specific discounts at $5,000 and $10,000 etc. may be available. Please contact your Busch rep. | To be quoted | n/a | n/a | n/a | n/a |
| Extra holes | Per container | Project, standardization, or order-specific discounts at $5,000 and $10,000 etc. may be available. Please contact your Busch rep. | To be quoted | n/a | n/a | n/a | n/a |
| Label Application | Per container | Project, standardization, or order-specific discounts at $5,000 and $10,000 etc. may be available. Please contact your Busch rep. | To be quoted | n/a | n/a | n/a | n/a |

Case: 25-1812    Document: 148    Page: 295    Filed: 07/20/2025

Docusign Envelope ID: 9E5A4DA03-0973-4482-AD7D-PED14B5423B8C Case 1:25-cv-00077-GSK-TMR-JAR    Document 14-5    Filed 05/07/25    Page 34 of 37

**Amendment No. 3 – Exhibit D: Pricing**

1. **Contract Pricing.**

   1.1    **In General.** Prices listed take into consideration all inherent costs of providing the requested goods and services. The Contractor agrees to pay any and all fees, including, but not limited to: duties, custom fees, permits, brokerage fees, licenses and registrations, government taxes, overhead, profit, parking permits, proper disposal of materials, insurance payments. The State will not pay any additional charges beyond the price(s) listed, unless otherwise provided for by law or expressly allowed by the Contract. Prices listed within Exhibit D are maximum prices. These maximum prices shall remain firm for the initial term of the Contract. The Price List may not include any additional terms or conditions. A unit price and a total for the quantity must be stated for each item quoted. Prices must be quoted in United States currency. Any increase to Contract pricing requires a duly executed amendment to this Contract. Contractor may provide lower pricing at its discretion without requiring a duly executed amendment to the Contract.

   **1.2 Tariffs.**

      1.2.1. Applicability. When an imported contracted product value is above $800 or the current posted De Minimis value on the U.S. Customs and Border Protection website on any one shipment, the Contractor may quote the applicable tariff for those products identified under the current Price Schedule as a separate line item. If the quote does not include the tariff, the tariff shall not be invoiced.

      1.2.2. Tariff Rate. The amount invoiced for the tariff shall be less than or equal to the amount paid to U.S. Customs and Border Protection for the products purchased based on Country of Origin and applicable HTS Code. The amount of the tariff passed onto the ordering entity shall not exceed 25% of the Amendment No. 3 – Attachment A: Price Schedule. Shipping & handling costs must be removed when applying the cost of the Tariff. An itemized statement must be provided upon request of the state showing the product cost, shipping and handling, and the calculation of any applicable tariff including the Tariff Rate applied.

      1.2.3. Potential Tariff Increases. In the event tariff rates increase beyond the "not to exceed" limit defined herein for a period of more than 30 calendar days, the Contractor may request the State's contract manager to review proposed price increases caused by increasing or additional imposed tariffs with third-party supporting documentation. Additional price increases are not authorized without a mutually agreed upon and duly executed amendment.

         1.2.3.1 Harmonized Tariff Schedule (HTS) Codes. The Contractor must provide third-party documentation in the form of a supplier letter, invoice, bill of lading or other state approved document to verify imposed tariffs passed onto the Contractor. Applicable HTS Codes must be noted for the state to verify any documentation presented.

**Price Schedule(s)**.
The following price schedule(s) are hereby attached and incorporated into this Exhibit D as follows:

   2.1 Exhibit D Price Schedule

3. **Prompt Payment Terms.**
Contractor's payment terms are Net 30.

Docusign Envelope ID: 9F5A4DA03-0873-4482-AD7D-PFD14B543B8C

4.   **Label Services.** Price of container and sorting stations must include label services as specified in Exhibit C: Specifications, duties, and scope of work.

5.   **Delivery.** Contractor must deliver the ordered goods 15 calendar days after receipt of order (ARO) or an alternate calendar date as specified in Exhibit C: Specifications, Duties and Scope of Work 6.1.

6.   **Transportation.**
All prices must be FOB Destination, prepaid and allowed (with freight included in the price), to the ordering entity's receiving dock or warehouse, or as otherwise instructed on the purchase order by the ordering entity. In those situations, in which the "deliver-to" address has no receiving dock or agents, the Contractor must be able to deliver to the person specified on the purchase order.

7.   **Taxes.**
Do not add sales tax to the prices being offered. State Agencies hold a Direct Payment Authorization Letter which is used to pay applicable taxes directly to the Department of Revenue. Contractors may go to http://www.revenue.state.mn.us to learn about the applicable sales tax (search "Fact Sheet 142").

Case: 25-1812    Document: 148    Page: 297    Filed: 07/20/2025

Docusign Envelope ID: 09428691-F0C4-43E9-BBDE-3AA093B78714
Case 1:25-cv-00077-GSK-TMR-JAR    Document 14-5    Filed 05/07/25    Page 36 of 37

## AMENDMENT NO. 7 TO CONTRACT NO. 218090, RELEASE NO. P-949(5)

**THIS AMENDMENT** is by and between the State of Minnesota, acting through its Commissioner of Administration ("State"), and St. Croix Recreation Fun Playgrounds, Inc., 1826 Tower Drive W, Stillwater, MN 55082 ("Contractor").

**WHEREAS**, the State has a Contract with the Contractor identified as Contract No. 218090, October 1, 2022, through September 30, 2025 ("Contract"), to provide park and playground equipment and installation; and

**WHEREAS**, Minn. Stat. § 16C.03, subd. 5, affords the Commissioner of Administration, or delegate pursuant to Minn. Stat. § 16C.03, subd. 16, the authority to amend contracts; and

**WHEREAS**, the terms of the Contract allow the State to amend the Contract as specified herein, upon the mutual agreement of the Office of State Procurement and the Contractor in a fully executed amendment to the Contract.

**NOW, THEREFORE,** it is agreed by the parties to amend the Contract as follows:

1. That Contract No. 218090 is revised to allow, at maximum, a 9% tariff surcharge pass-through markup for National Recreation Systems 2025 pricing. The Contractor must identify the applicable tariff surcharge for National Recreation Systems products as a separate line item on both the quote and invoice. In addition, the Contractor must submit third party documentation from National Recreation Systems in writing to the ordering entity. The Contractor must document a clear correlation between the surcharge amount and the third party documentation.

   If the tariff surcharge is lessened or removed at any time, the Contractor must contact the State's Authorized Representative or delegate, and the ordering entity in writing, and the tariff surcharge is to be removed immediately from any applicable pending or future orders for National Recreation Systems products.

2. All other prices, terms, and conditions remain the same.

This Amendment is effective upon the date that the final required signatures are obtained, and shall remain in effect through contract expiration, or until the Contract is canceled, whichever occurs first.

Except as herein amended, the provisions of the Contract between the parties hereto are expressly reaffirmed and remain in full force and effect.

**IN WITNESS WHEREOF**, the parties have caused this Amendment to be duly executed intending to be bound thereby.

| 1. ST. CROIX RECREATION FUN PLAYGROUNDS, INC. | 2. OFFICE OF STATE PROCUREMENT |
|---|---|
| The Contractor certifies that the appropriate person(s) have executed this Amendment on behalf of the Contractor as required by applicable articles, bylaws, resolutions, or ordinances. | In accordance with Minn. Stat. § 16C.03, subd. 3. |
| By: *Christopher W Johnsen* | By: *Mandy Flum* |
| Signature | Title: Buyer III |
| Christopher W Johnsen | Date: 4/3/2025 |
| Printed Name | |
| Title: President | 3. COMMISSIONER OF ADMINISTRATION |
| Date: 1/April/2025 | Or delegated representative. |
| By: _____ | By: *Mary Nelson* |
| Signature | Date: 4/3/2025 |
| Printed Name | |
| Title: _____ | |
| Date: _____ | |

| | |
|---|---|
| **From:** | Jannett, Luke (ADM) |
| **To:** | Doran, Andy (ADM) |
| **Subject:** | FW: HPE QUOTES - U.S. TARIFF PRICE INCREASES |
| **Date:** | Tuesday, April 29, 2025 1:33:00 PM |
| **Attachments:** | image006.png |
| **Importance:** | High |

**From:** Jessica Fredrickson <jess.fredrickson@highpointnetworks.com>
**Sent:** Wednesday, March 12, 2025 12:45:30 PM
**To:** Jaeger, Brent (MNIT) <brent.jaeger@state.mn.us>
**Subject:** HPE QUOTES - U.S. TARIFF PRICE INCREASES

> **This message may be from an external email source.**
> Do not select links or open attachments unless verified. Report all suspicious emails to Minnesota IT Services Security Operations Center.

Hi Brent; I know we have several quotes out there, so wanted you to be aware of this!

Effective today, HPE has implemented a price increase due to the impact of U.S. tariffs. HPE is going through *all 'active' quotes* right now updating the pricing to reflect this increase. Their plan is to update them all by Friday 3/14.

If we order after they touch the quote, there will be an increase. I have no idea by how much.
They are going through these as I type, so when they will touch yours is unknown. [VERY hard to plan, I know]

If you are ready to order it would be in our best interest to get this in today, if possible, to avoid any price increases.

The situation is fluid, so I will keep you posted as I learn more!
Let me know your thoughts.

Thank you! -Jess


**Jessica Fredrickson**
Account Manager, High Point Networks
**p:** 952-715-3491
**e:** jess.fredrickson@highpointnetworks.com
**w:** www.highpointnetworks.com

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | Case No.  1:25-cv-00077-GSK-TMR-JAR  DECLARATION OF ROBERT JAROS |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | |
| Defendants. | |

I, Robert Jaros, declare as follows:

1.      I am over the age of 18, competent to testify as to the matters herein, and testify based on personal knowledge, records kept in the ordinary course of business at the Office of the State Controller (OSC) for the State of Colorado, and information I learned from OSC personnel whose work I rely upon and who have assisted me in gathering this information from our institutions.

2.      I am employed by the State of Colorado as the Colorado State Controller. The OSC is a state government office, housed within the Department of Personnel & Administration and responsible for managing the finances and financial affairs of the State of Colorado.

3.      My duties as State Controller include coordinating all procedures for financial administration and financial controls, including establishing accounting forms, records, and procedures for all state agencies, as well as other duties and functions established in C.R.S. § 24-30-201 *et seq.*

4.      In my capacity as Controller, I am responsible for overseeing the following units within the Office of State Controller: Reporting and Analysis, Internal Audit, Central Payroll, Central Accounting, Colorado Operations Resource Engine (CORE) Operations, Purchasing and Contracts, Grants, and Risk Management. I lead a staff of 106 OSC employees, who perform duties that include preparing all State financial reports, paying employees, paying contractors, running the State's financial, budgeting and payroll systems, approving price agreements and contracts, developing policies and procedures and providing statewide oversight for financial reporting, procurement, payroll, vendor management, grants administration , and risk management.

5.      In recent months, one of my responsibilities has become the monitoring, reporting, and budget adjustments for contracts procured across the state at its agencies, higher education

institutions, and other State entities that have been impacted by tariffs imposed by the current Presidential administration.

**A. Institutes of Higher Education**

6.      Multiple institutions of higher education around the state have reported that their purchasing and procurement departments are in the process of addressing change orders and price increases related to bids and ongoing contracts. In order to monitor the rapidly changing nature of these developments, institutions including the University of Colorado, Colorado State University, and the Colorado School of Mines are monitoring and tracking the budgetary impact of tariffs in instances where the vendor or merchant identifies tariff-specific changes to costs or expenses. Doing so requires special analysis given that, despite the significant impact across institution budgets, contracts and associated communications related to tariffs must be analyzed and negotiated on a near contract-by-contract and vendor-by-vendor basis.

7.      In the case of Colorado State University, several equipment contracts have already been impacted. In the regular course of its operations, Colorado State University (CSU) routinely purchases many goods that originate from sources outside the United States. These goods include specialized equipment for scientific work that must meet particular specifications and standards for the research group. Such equipment is often available only from a few sources, all of which are foreign, and often requires an order date several months in advance of delivery.

8.      For example, on January 15, 2025, CSU purchased high power diode laser components from Coherent NA, Inc (Coherent) for its Advanced Beam Laboratory. According to the documentation and my understanding, Coherent is based in the United States, but the product at issue originates from Germany. Following the enactment of the tariffs, the vendor notified CSU that it will only process the order if CSU agrees to pay the tariffs in effect at the time of

import. In doing so, the vendor cited the shifting nature of the tariffs (then between 10% and 20%, depending on the day), and stated: "This is not something that we [Coherent] have any control over. This is not something that we can absorb, that charge has to be passed on to the customer." The fact that vendors, much less the State, are unable to even determine what tariffs will be in effect in the immediate future underscores the degree of uncertainty imposed on State procurement efforts as a result of the new, ever-shifting tariff regime.

9.     Appended as **Attachment 1 is** a true copy of email correspondence between CSU and Coherent.

10.     Similarly, CSU is attempting to purchase a Hafnium sputtering target used for coating optics from a Chinese company, Changsha Advanced Engineering Materials, LTD (Changsha). The initial quote for the equipment was for $36,564. However, the vendor informed CSU on April 16 and 17, 2025 that it will only process the order once CSU agrees to pay the tariffs in effect at the time of the import, which the vendor estimated at that time "could be as high as 245%." If imposed at that rate, CSU's cost for this equipment would increase by $43,717.

11.     Appended as **Attachment 2** is a true copy of email correspondence between CSU and Changsha and the initial quote.

12.     As another example, CSU is attempting to purchase electric switchgear equipment from Canadian company Myers Powers Products Inc (Myers). This equipment plays a crucial role in distributing electricity from a source to various loads across campus and is worth over $1.5 million according to a proposal provided on April 11, 2025. The vendor estimated a lead time for the equipment of as much as 76 weeks, and could not estimate possible tariffs at that point in time. As a result, CSU was forced to agree when signing the contract in late April 2025

to an open encumbrance without limit for this order due to the critical nature of the purchase (reflected in the escalation clause). This uncertainty has already complicated CSU's budgeting process and will continue to do so until delivery.

13.     Appended as **Exhibit 3** is a true copy of purchase order, proposal, and execution documentation related to this project.

14.     The President's tariffs accordingly impose financial harm to Colorado State University by increasing the cost of procurement.

**B. Department of Personnel & Administration (DPA)**

15.     The Department of Personnel & Administration (DPA) provides a range of services to state government agencies to enable these entities to focus their resources on delivering quality services to Coloradans. DPA collaborates with employees, agencies, vendors, and Coloradans to develop innovative, cost-effective solutions that further the State's ability to conduct its business. In the regular course of its procurement operations, DPA routinely purchases many goods that originate from outside the United States.

16.     In addition to standard procurement contracts, DPA also utilizes State Price Agreements, which are contracts for goods and services that are commonly purchased by multiple state agencies and/or local governments. State Price Agreements allow for streamlined procurement of common items by satisfying requirements of the Colorado Procurement Code without requiring additional solicitation.

17.     Among other examples, DPA uses State Price Agreements to procure office supplies for State agencies. Under this arrangement, the State has a contract with ODP Business Solutions, and individual agencies spend their own budget against the contract as needed to procure a wide range of items subject to the State Price Agreement.

18.     On February 26, 2025, ODP Business Solutions informed DPA that in response to the newly announced tariffs imposed on China, it would be "implementing a price adjustment on those products sourced from China." It further explained that "all price adjustments for affected products will be calculated based on the tariff's specific impact on each product's customer selling price" and attached a list of the "impacted core list SKUs" for the office supplies State Price Agreement.

19.     This list specified price increases caused by the tariffs for over 7800 items subject to the State Price Agreement. Several examples include: a 48x36 glass dry erase board, formerly priced at $225.42, increased to $247.96 (a 10% increase); a high back mesh chair, formerly priced at $342.08, increased to $376.29; (also a 10% increase); and black printer toner, formerly priced at $166.47, increased to $183.12 (also a 10% increase).

20.     Although the final cost of these increases remains to be determined given the open-ended nature of procurements made via State Price Agreements, DPA Procurement Officials believe that these new prices caused by the tariffs will increase the cost of this contract by $350,000–$400,000 over the remaining two years of the State Price Agreement. These costs will only rise if tariffs are further increased.

21.     Appended as **Attachment 4** is a true copy of correspondence from ODP Business Solutions notifying DPA of the price increases caused by the tariffs.

22.     The State Price Agreement for office supplies purchases is just one of many such agreements that will be impacted by the tariffs. DPA has already received indication that other Price Agreements will also be subjected to price increases, including ones in place for the procurement of body armor. Body armor is of course mission-essential to the safety of law

enforcement officers across Colorado, and the State puts the utmost importance on ensuring that it has a ready supply of this equipment.

23.    The President's tariffs accordingly impose a financial harm to DPA—and the State—by increasing the cost of procurement.

**C. History Colorado State Historical Fund Restoration Project**

24.    The History Colorado State Historical Fund awards grants for significant buildings, structures, objects, districts, or archaeology sites, or for preservation of historic resources in Colorado. Among other things, these grants fund historic restoration projects, which regularly require the purchase of goods that originate from outside the United States.

25.    For example, the History Colorado State Historical Fund awarded a grant to an entity who engaged a contractor to perform restoration repairs at a historic house of worship in southeastern Colorado that is designated as a location of social importance to the community by History Colorado and included on the National Register of Historic Places. Summit Sealants and Restoration was contracted to complete a restoration and to install protective glazing on the church's historical stained glass windows. This project required the use of lead came, which is used to fabricate stained glass. The project was originally slated to cost $181,915.

26.    Six months after submitting its original bid, Summit Sealants and Restoration informed the grantee who informed History Colorado that its lead came vendor was impacted by the recently imposed tariffs. The vendor did not provide further information on the country of origin for the product at issue. As a result of this tariff being imposed on the project's vendors, the price of the bid increased by $3,700.

27.     Appended as **Attachment 5** is a true copy of the Change Order submitted by Summit Sealants and Restoration Services to History Colorado detailing the price increase caused by the tariffs.

28.     The President's tariffs accordingly impose a financial harm to History Colorado by increasing the cost of essential services and construction.

**D. Department of Local Affairs–Fort Lyon Supportive Residential Community Roof Repair Project**

29.     Colorado's Department of Local Affairs (DOLA) serves as the primary interface between the State and local communities. Among DOLA's myriad functions, it provides funding for the Fort Lyon Supportive Residential Community, which provides recovery-oriented transition for homeless individuals at a repurposed correctional facility. In addition to funding the services provided at the facility, DOLA funds the maintenance and facilities management required to ensure that it can continue providing essential support to vulnerable populations.

30.     For example, DOLA recently awarded a bid to repair roofing at the Fort Lyon Supportive Residential Community following a severe hail damage event.

31.     The contractor, 7 Summit Exteriors, was engaged to install metal roofing, shingle roofing, and to replace broken tiles. Their bid needed approval by the insurance carrier prior to contracting. Between the bid award and the contract approval, DOLA received correspondence declaring an increase on roofing materials.

32.     In each of the instances described above, vendors were express and transparent in naming the recently-enacted tariffs as the cause of the price increase passed on to the State. However, in other instances, it has been my experience that vendors offer more vague language referring to recent market volatility to justify the price increase. In some instances, the location of the vendors or the source material indicated what country's tariffs would apply. In others, the

vendors were less forthcoming with those details. All of this further complicates vendor

negotiations and detracts from officers' procurement efforts because they must follow up with

these vendors to obtain more specific information about the increases.

33.    For example, returning to the DOLA roofing contract, after the winning bid had

been selected, 7 Summits Exteriors notified DOLA that it was submitting "revised price

estimates due to April 1st, 2025 supplier increases." Two of 7 Summits Exteriors' suppliers

increased their prices, citing general market factors. ABC Supply Co. Inc. explained that

"extreme volatility in the market" required it to apply a 10% price increase to all existing orders,

and warned that "we could see up to 25% increases in the next few months." Similarly, Viking

Metals increased the price of its panels by 9-25%, and explained that its trims, fasteners,

secondary framing, and accessories "may be increased accordingly," citing "significant

volatility" in both global and domestic raw materials markets and "price increases from all of our

major suppliers of steel, paint, and coatings." As a result of these supplier price increases, 7

Summits Exteriors' revised bid for the roofing project increased by over $110,000.

34.    Appended as **Attachment 6** is a true copy of the revised bid from 7 Summits

Exteriors, along with correspondence from its suppliers explaining the price increases.

**E. The President's constantly shifting tariff policy impairs OSC's ability to accurately budget for its yearly costs**

35.    To ensure responsible financial planning, the Colorado General Assembly sets a

budget every year for the next fiscal year. Setting a reliable budget is an important aspect of

protecting the public funds.

36.    The OSC books (meaning enters) the budget approved by the General Assembly

in the State's financial system for each agency and institution of higher education.  The budget

includes line item detail for each funding source.

37.     The President's repeated imposition, modification, suspension, and threatening of various tariffs has created substantial uncertainty regarding the expected cost of a wide range of goods and services.

38.     Small cost fluctuations alone create budgeting challenges. For example, the Colorado State budget for fiscal year 2025-26 is $44 billion. An unexpected 5 to 10 percent increase in costs will result in over-expenditures of $2 million to $4 million, requiring action by agencies, the OSC, and the General Assembly. The State of Colorado Constitution requires that the State have a balanced budget, so agencies must cut costs to remain within their budget. The individual line item budgets will need to be constantly revised as tariffs change.   As a result, the budget will no longer be a reliable financial and internal control.

39.     Agencies and institutions of higher education will need to amend their agreements with their contractors and subrecipients. This will cause increased workload and challenge in monitoring grants and contracts with different price levels. These challenges will persist for planned and future projects, should circumstances persist.

40.     Tariffs result in higher prices of goods and services resulting in a slowdown in economic growth. Reduced economic activity will result in reduced income tax and sales tax revenue. To maintain a balanced budget, the State will need to cut expenses to compensate for the decline in State revenue. These reductions will drive additional workload and reduced reliability on the budget as well as negatively impact the services the State is able to provide residents.

41.     I am confident that I could provide upon request additional examples of increased financial and time burdens imposed on the state of Colorado as a result of the tariffs' increases to

the costs of products purchased by the State, its agencies, and its higher education institutions to provide public services to the State's residents and visitors.

42.    Due to the scope of tariffs, the administrative cost of reviewing each transaction to determine what portion was tariffed and what tariffs apply, the State's time and cost of negotiating a reasonable reimbursement with the vendor would be substantial.

43.    The President's use of emergency powers to repeatedly impose and change tariffs harms the ability of State agencies and institutions of higher education to accurately plan their budgets for the upcoming fiscal year.

**I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.**

**Executed on May 6, 2025, at Denver, Colorado.**

Robert Jaros
Digitally signed by Robert Jaros
Date: 2025.05.06 12:42:33
-06'00'
_____
Robert Jaros, State Controller, State of Colorado

# Attachment 1

Phone: 970 491 7751

> On Apr 14, 2025, at 9:53 AM, Stuart,Jeb
> <Jeb.Stuart@colostate.edu> wrote:
>
> Thanks Aaron,
>
> CSU is reviewing internally and I will follow up as soon as possible.
>
> **Jeb Stuart**
> Scientific Sourcing Specialist
> Colorado State University
> |  P: (970) 491-6194  |
> ***Please join our informational sessions on Doing Business with
> CSU. Sessions held monthly***
> <image001.png>
>
> ---
>
> **From:** Aaron Johnson <Aaron.Johnson@coherent.com>
> **Sent:** Friday, April 11, 2025 11:58 AM
> **To:** Stuart,Jeb <Jeb.Stuart@colostate.edu>; Douglas Jahn
> <Douglas.Jahn@coherent.com>
> **Cc:** Bullis,Ryan <Ryan.Bullis@colostate.edu>; Yost,Dylan
> <Dylan.Yost@colostate.edu>; Loeser,Krysta
> <Krysta.Loeser@colostate.edu>
> **Subject:** RE: Purchase Order 937172 Colorado State University Quote
> COHR-335604-1
>
> ** Caution: EXTERNAL Sender **
> Hi Jeb,
>
> Thanks for getting back to me.  I do have one correction, as things are
> becoming more clear (again, it didn't really matter to anyone where
> the product was made until this week).  This product actually
> originates from Germany, which could potentially have a different
> tariff rate than either Thailand or Singapore.
>
> Unfortunately I cannot quote a fixed dollar amount or guarantee a
> maximum tariff rate, since this is entirely out of our control.  With the
> constant changes by the US government over the past week there is a
> lot of uncertainty on what will happen in 16 weeks when this product
> is ready to ship.  It could be 10% like it is today, it could be 20% like it
> was on Monday (EU had a reciprocal tariff of 20% until the 90 day

pause earlier this week) or it could (hopefully) go away completely by then.  This is not something that we have any control over.  This is not something that we can absorb, that charge has to be passed on to the customer.

So to answer the other part of your question, we can absolutely accept the PO as it is.  Section 2 clause c of the previously negotiated terms and conditions says that the Buyer is responsible for any taxes or duties, which is what this ultimately is.  Rather than accepting the order and potentially surprising you with a tariff fee added to your final invoice, we are being a good partner and reaching out to let you know about the potential charges ahead of time, as at the time the order was placed neither of us could have guessed that things would go this way.  So we will wait to process the order until you can figure out how you want to handle this from your side.

I look forward to hearing back from you.

Best Regards,

Aaron

**Aaron Johnson**
Senior Field Sales Engineer
Scientific Sales

m: 408-892-8232
e: aaron.johnson@coherent.com

<image002.png>

www.coherent.com

---

**From:** Stuart,Jeb <Jeb.Stuart@colostate.edu>
**Sent:** Friday, April 11, 2025 9:41 AM
**To:** Aaron Johnson <Aaron.Johnson@coherent.com>
**Cc:** Bullis,Ryan <Ryan.Bullis@colostate.edu>; Yost,Dylan <Dylan.Yost@colostate.edu>; Loeser,Krysta <Krysta.Loeser@colostate.edu>
**Subject:** [EXTERNAL]: RE: Purchase Order 937172 Colorado State University Quote COHR-335604-1

Hi Aaron,

Thanks for your email. The only way CSU can accept a possible increase under PO 937172 is to have an exact dollar value to review or have language stating the tariff amount cannot exceed 10% of the product value based on CSU not being able to accept an unknown encumbrance amoint. Please let me know if either is possible or if Coherent can accept the PO as is, so we can work out next steps?

**Jeb Stuart**
Scientific Sourcing Specialist
Colorado State University
| P: (970) 491-6194 |
***Please join our informational sessions on Doing Business with CSU. [procurement.colostate.edu] Sessions held monthly***

<image001.png>

---

**From:** Aaron Johnson <Aaron.Johnson@coherent.com>
**Sent:** Thursday, April 10, 2025 5:28 PM
**To:** Stuart,Jeb <Jeb.Stuart@colostate.edu>
**Cc:** Bullis,Ryan <Ryan.Bullis@colostate.edu>
**Subject:** RE: Colorado State University Quote COHR-335604-1

**\*\* Caution: EXTERNAL Sender \*\***
Hello Jeb, and Ryan,

Circling back to this Verdi order, as it has not yet been booked in our system.  Due to the recent administrative actions regarding tariffs, we need to point out that we are quoting DDP terms as a courtesy to the customer, so we remain importer of record and you do not need to contract with a customs broker in order to get the laser through the customs process, but we cannot be responsible for any tariffs.  As this is a product of Singapore (I think I mistakenly listed Thailand, as it didn't really matter for us until this week) the import tariff is currently at 10%, but final charges will be determined on the day the product is imported (could be 0% by then, or could be higher than 10%, but there is no guarantee either way).  In order to book and schedule this order, I just need an email confirmation from you that CSU understands that they are responsible for any import duties.  We will add those duties to the invoice as a separate line item once the product ships and the invoice is generated.

Please let me know if you have any questions.

# Attachment 2



**From:** Peter Jiang <sales@aemdeposition.com>
**Sent:** Thursday, April 17, 2025 7:23 PM
**To:** Stuart,Jeb <Jeb.Stuart@colostate.edu>
**Subject:** Re: Colorado State University Quote 20250213CSU

**\*\* Caution: EXTERNAL Sender \*\***

Dear Stuart. jeb,

The HS code is 8112390010.
Tariffs could be as high as 245%, presenting substantial challenges for importers.

Best Regards,

Peter Jiang
CEO

**Changsha Advanced Engineering Materials Limited**

C3-1725, Building C1-C4,
Forte Financial Center, No. 751 Xiaoxiang North Road,
Yuelu District, Changsha, Hunan 410013
China
Tel: +86-0731-89578196-811
    +86-18175985920
Skype: peter.jiang81
www.aemdeposition.com
Email: sales@aemdeposition.com

On Thu, Apr 17, 2025 at 11:52 PM Stuart,Jeb <Jeb.Stuart@colostate.edu> wrote:

> Thanks Peter,
>
> Do you have an estimate for duties and tariffs for the Hafnium target and if not an HTS code?
>
> **Jeb Stuart**
> Scientific Sourcing Specialist

Colorado State University
| P: (970) 491-6194 |
***Please join our informational sessions on Doing Business with CSU. Sessions held monthly***


PROCUREMENT SERVICES
COLORADO STATE UNIVERSITY

---

**From:** Peter Jiang <sales@aemdeposition.com>
**Sent:** Wednesday, April 16, 2025 7:59 PM
**To:** Stuart,Jeb <Jeb.Stuart@colostate.edu>
**Subject:** Re: Colorado State University Quote 20250213CSU

**\*\* Caution: EXTERNAL Sender \*\***

Dear Stuart. jeb,

Sorry, we cannot accept post-payment. U.S. policies toward China are changing too
rapidly, and hafnium targets are quite expensive. We cannot afford to take on such a
high risk.

Best Regards,

Peter Jiang
CEO

**Changsha Advanced Engineering Materials Limited**

C3-1725, Building C1-C4,
Forte Financial Center, No. 751 Xiaoxiang North Road,
Yuelu District, Changsha, Hunan 410013
China
Tel: +86-0731-89578196-811
    +86-18175985920
Skype: peter.jiang81
www.aemdeposition.com
Email: sales@aemdeposition.com

On Wed, Apr 16, 2025 at 10:10 PM Stuart,Jeb <Jeb.Stuart@colostate.edu> wrote:

  Hello Changsha Advanced Engineering Materials,

I hope all is well. I work in Procurement at Colorado State University and received a purchase request for the attached quote. Based on the date of the quote can I get an updated version with the below as shipping address so I can review for a purchase order? CSU issues a purchase order as guarantee with net 30 day payment terms is this acceptable to Changsha Advanced Engineering Materials?

Colorado State University
Attn Carmen Menoni
200 West Lake Street
1320 Campus Delivery
Fort Collins , CO  80523-1320
United State

Thank you,

Jeb Stuart
Scientific Sourcing Specialist
Colorado State University
| P: (970) 491-6194  |
***Please join our informational sessions on Doing Business with CSU. Sessions held monthly***

 PROCUREMENT SERVICES
COLORADO STATE UNIVERSITY

# AEM

Web: www.aemdeposition.com
Email: sales@aemdeposition.com
Tel: +86-731-84472418

# Quotation

Changsha Advanced Engineering Materials Limited
Building 1, No. 31, Yinshan Road
Yuelu District, Changsha, Hunan 410013
China

| | |
|---|---|
| Quote # | 20250213CSU |
| Date | 2/13/2025 |
| Valid for | 30 days |

This Quote Has Been Prepared For:

Colorado State University
3831 HARBOR WALK LANE, Carmen Menoni
United States
Contact:  Carmen S. Menoni
Tel: +1 9704918659
Email:     carmen.menoni@colostate.edu

| | |
|---|---|
| D.A.P | Carmen Menoni, United States |
| Payment Terms | WT, in advance |
| Lead Time | 5-6 weeks |
| Shipping Method | UPS or DHL or FedEx |
| Transport Time | 5-8 days |

| Item | Description | Quantity | Unit | Price (USD) | Total (USD) |
|---|---|---|---|---|---|
| 1 | Hafnium Sputtering Targets (Hf)<br>Purity: 99.95%, Zr<0.5%<br>Size: 14" diameter x 0.25" thickness | 1 | pc | $ 36,304.00 | $ 36,304.00 |
| | | | | Subtotal | $ 36,304.00 |
| | | | | Shipping | $ 260.00 |
| | | | | **Total** | **$ 36,564.00** |

Please reference this Quote number when placing your order.
Unless otherwise stated, the above quotation reflects standard tolerances, practices, terms and conditions of Advanced Engineering Materials

Attachment 3



**COLORADO STATE UNIVERSITY**
— S Y S T E M —
Colorado State University • Colorado State University–Pueblo • CSU–GlobalCampus

| Purchase Order | | |
|---|---|---|
| Purchase Order Date | PO/Reference No. | Revision No. |
| **Apr 29, 2025** | **914490** | **0** |
| **Purchaser Information** | | |
| Requestor Name | Jeanette E Nicodemus | |
| Requestor Email | jeanette.nicodemus@colostate.edu | |
| Requestor Phone | +970 5682833 | |

Colorado State University
Procurement Services
(970) 491-5105

Colorado State University-Pueblo
Procurement Services
(719) 549-2355

Order acceptance instructions:

**PO Terms & Conditions: https://procurement.colostate.edu/purchase-order-terms-and-conditions/**

| Supplier Information | | Delivery Information | |
|---|---|---|---|
| Myers Power Products Inc | | **Delivery Address** | |
| | | Colorado State University | |
| Address | 2950 E Philadelphia St | Name | Brown, Tanner Alan |
| City/State/Zip | Ontario, CA 91761 | ContactEmail | Jeanette.Nicodemus@colostate.edu |
| Fax | +1 909-923-1806 | Phone | 970-568-2833 |
| F.O.B. | | Building | FACILITIES MANAGEMENT NORTH – Rm 000 |
| Payment Terms | | | |
| | | 6030-1 | |
| | | 200 West Lake Street | |
| | | 6030 Campus Delivery | |
| | | Fort Collins, CO 80523-6030 | |
| | | United States | |
| | | ShipTo Address Code | 6030-1 |
| | | **Delivery Information** | |
| | | Delivery | |
| | | Expedite | No |
| | | Ship Via | Best Carrier-Best Way |

| Shipping Instructions | |
|---|---|
| Note to Supplier | (1) Executed Purchase Proposal Revsion #9 |
| Attachments for supplier | |
| Myers Power Produ... | |
| Supplier Terms and Conditions | |

- Appx317 -

Line Item Details: **Total lines ordered 1**

| Line No. | Product Description | Catalog No. | Size / Packaging | Unit Price | Quantity | Ext. Price |
|---|---|---|---|---|---|---|
| 1 of 1 | PROJECT: REPLACE PITKIN S EAST SWITCHGEAR - PROJECT #: 21-031 - FURNISH AND DELIVER GENERAL PURPOSE POWER DISTRIBUTION CENTER, MEDIUM VOLTAGE METAL-CLAD SWITCHGEAR, 48VDC BATTERY SYSTEM & FIELD SERVICES PER PROPOSAL 50032-TX1 Rev 9 | | LOT | 1,503,042.00 USD | 1 LOT | 1,503,042.00 USD |
| | Taxable | No | | | | |
| | Capital Expense | No | | | | |
| | PO Clauses | Refer below | | | | |
| | | | | Total | | **1,503,042.00 USD** |

| Purchasing Information | | Billing Address | |
|---|---|---|---|
| Contract | *no value* | Company | COLORADO STATE UNIVERSITY |
| Quote number | | Phone | 970-491-1429 |
| Purchasing Agent | Greg Smith (970) 491-5105 Colorado State University | ACCOUNTS PAYABLE | |
| 970-491-5105 | *no value* | 6003 CAMPUS DELIVERY | |
| | | FORT COLLINS, CO 80523-6003 | |
| | | United States | |

| PO Terms |
|---|
| There are no clauses associated with this Purchase Order. |



# Power Delivery Solutions for . . .

**Utility**        **Oil & Gas**        **Industrial**        **Transit**



## 50032-TX1 Rev 9
## Pitkin East Switchgear Replacement

**April 11, 2025**
**Gregory Smith**
Gregory.Smith@colostate.edu

**Prepared For:**

**CSU**

Prepared By:  Donald Norris / 713.644.8182 / dnorris@mielectric.com

## The Myers Power Products Family of Companies

      

## Empowering Energy Since 1946



## Commercial Summary

**Base Price includes the following equipment & services**          $   1,503,042USD
- Climate Controlled, 41' x 15' x 10'h ID Power Distribution Center
- HVAC System with no Redundancy
- Smoke Detectors with alarm contacts
- 48VDC Battery System
- Medium Voltage Metal-Clad Switchgear
- Training
- Field Services – Offloading and Installation Supervision only.
- Engineering, Design, Project Management, O&M Manuals, and Technical Literature

### Optional Adders:
- Circuit Breaker Elements for Future and Cap Bank feeder          $     29,674 USD
- State Certification          $     64,299 USD

*Bonds of any type are not included in our proposal unless specifically noted above.*

*Sales Tax is Not Included and shall be borne by Buyer if applicable*

**Estimated Freight Pricing as follows:**
- Estimated as FOB Destination, Freight Prepaid and Charge per Domestic Terms.
- Offloading, craneage, traffic control etc. is not included.
- Fuel Prices are subject to change based on time of shipment.
- Delivery is based on **Free and clear unfettered access by common carrier and any/all necessary traffic control to be secured by the customer. Freight charges in excess of this estimate below shall be borne by Buyer; surcharges and excess charges beyond the control of Supplier shall be borne by Buyer.**

**Freight to (Fort Collins, CO) estimated at**          **$56,250 USD (Included in above Price)**

**Bid Validity**
30 Days

**Estimated Delivery**
*Standard Lead Times:*
Approval Drawings* 16-20 weeks ARO
Customer Approval: 2 weeks
Estimated Delivery 52-56 weeks ARAD

*Actual lead times may vary based on factory loading at time of order*

* *Initial submittals shall be based solely on the scope of work provided at time of quotation; no Request For Information (RFI) or revised drawings will be accepted, reviewed or considered during the initial submittal process. Any RFI's, updated drawings or change orders will ONLY be considered after initial approval of submittals based on those provided at time of quotation.*



**Progress Payments (payable per unit)**

| 1) | 15% | Upon Submission of Submittals |
| 2) | 15% | Approval of Submittals |
| 3) | 25% | Release for Purchasing of Material |
| 4) | 45% | Shipment Upon Receipt of CSU Written Notification of Funds Availability |
| | | (Payment Predicated on Photographic Evidence from Myers of Equipment Ready to Ship) |

**Terms of Payment**
Net 30 Days - Progress Payment Terms Apply – Pending Credit Verification; No Retentions Allowed; No Cash / Early Pay Discounts

**Purchase Order**
Purchase Order shall be addressed to Myers Power Products, Inc.

**Factory Location**
Myers Power Products has three (3) factory locations (Ontario, CA, Beaumont, TX, North Canton, OH) Final Factory location will be determined at time of PO which will be based on current shop loadings from each facility.

**Customer Inspection and Factory Acceptance Testing**
• Customer inspection and Factory FAT of equipment at Myers Power Products, Inc. is included in the quoted base price.

**Escalation - Material, Delay & Storage**
**Escalation:** All orders are subject to potential escalation ordered after the expiration of this quotation or; if shipped later than originally quoted or; in the event of force majeure or unforeseen market pressures caused by delays in the supply chain or; delays in the shipping schedule requested or caused by customer or customers end-user or; due to events otherwise outside of the control of supplier.

**Customer Delay:** Should customer place a purchase order on hold, or delay any critical path item (e.g. drawing approval, owner furnished equipment arrival, acceptance testing delay, shipment, etc.), price escalation may apply, as determined by the company at the time of delay and/or release from hold.

**Storage:** Should storage be required and unless included in the above quoted scope of work, storage costs shall be based on space availability and on the full purchase order value including all change orders; customer shall be required to insure such equipment while in storage and customer shall name Supplier (Myers) as an additional insured and shall provide proof thereof while in storage; Customer shall be required to pay for all equipment in full as if supplied to the job site after 30 days of storage; storage fees shall be in addition to and are not included in sell price.

Pricing and delivery detailed in this proposal is based on current costs and lead times for the quoted scope of work and pursuant only to the quoted scope. Pricing and lead times for all future orders (including options quoted in this proposal, but not selected at time of order) may increase after the expiration date of this proposal; lead times shall be adjusted to factory loading at time of receipt of order.

**Documentation Control**
Shall be per Myers standard procedures and protocols unless specified otherwise herein.



**Project Documentation**
Myers Power Products, Inc. standard engineering documentation includes the following where applicable:

General:
- Equipment Data Sheets
- Bill of Materials and nameplate information
- Recommended Startup and Spare parts

Mechanical:
- Plan, arrangement, front and sectional views
- Equipment weight and anchoring locations
- Center of gravity and lifting details for E-Houses/PDC's

Electrical:
- Single line and three-line diagrams
- Protection and relay control schematics for electrically operated devices
- AC/DC distribution and equipment utility diagrams (space heater circuits, lighting, small power, etc)
- Wiring Diagrams
- Panel and cable schedules

**Warranty Period**
Extended warranty 18 months after delivery. Myers Power Products, Inc. standard terms and conditions of sale shall apply.

**LD's / Backcharges**
Myers Power Products, Inc. does not accept any Liquidated Damages or Back Charges

**For FBO Equipment (Furnished by others)**
Myers Power Products, Inc. is to be provided a current Certificate of Insurance and shown as additional insured prior to our company receiving any/all customer furnished material. The Certificate of Insurance is due two (2) weeks after order placement; however, prior to our receipt of FBO (furnished by others) material. If FBO material is shipped to Myers prior to our receipt of the Certificate of Insurance showing Myers Power Products, Inc. as additional insured, the material will be turned away at the dock.

**Other Terms and Conditions**
Unless otherwise noted, Myers Power Products, Inc. standard Terms & Conditions or those applicable to a signed and active Master Service Agreement (MSA) apply to the scope of work outlined in this proposal, including equipment, services, pricing, availability, etc. If additional Terms & Conditions are required, the company reserves the right to update any or all aspects of the proposed scope of work.



## General Purpose Power Distribution Center

Configuration Details

| Nominal Dimensions | Ft. | In. |
|---|---|---|
| Length | 41 | 0 |
| Width | 15 | 0 |
| Ceiling Height | 10 | 0 |

| Nominal Overall Exterior Dimensions | Ft. | In. |
|---|---|---|
| Length | 41 | 0 |
| Width | 15 | 0 |
| Height | 12 | 3 |
| SQFT | 615.0 | |
| Estimated Empty Weight | 53,177 | lbs. |
| Estimated Equipment Weight | 41,085 | lbs. |
| Estimated Total Weight | 94,262 | lbs. |

Design Information

| | |
|---|---|
| Location | North America |
| Elevation | > 3200 ft. |
| Installation | Concrete Slab |
| Area Classification | General Purpose Non-Hazardous |
| Roof Load - IBC (Latest Revision) in psf | 35 |
| Ceiling Load - IBC (Latest Revision) in psf | 20 |
| Floor Loading - DL + LL in psf | 250 |
| Wind Load - IBC (Latest Revision) in mph, Exp C min | 125 |
| Seismic | Per applicable IBC Code |
| Base Deflection | L/240 |
| Roof Slope | Center Peak Roof 1/4 inch per foot slope |
| Estimated Interior Heat Load (Watts) | 13,283 |
| Construction Type | Interlocking - Onshore |

Engineering / Calculation Requirements

| Standard drawing package which includes the following: |
|---|
| Elevation Views |
| Base Detail |
| Floor Plan View |
| Electrical Plan View |
| Cable Tray Plan View |
| HVAC Details |
| AC Electrical Details |
| DC Electrical Details |
| Miscellaneous Details |
| Floor Cutout Detail |
| Grounding Plan View |

- Appx323 -



| Lift Lug Detail | yes |
|---|---|
| Structural PE Calculations & Drawings | yes |
| Electrical PE Stamped Drawings | no |
| Center of Gravity Design Calculations | yes |
| Foundation Load Chart | yes |
| Anchoring Calculations | no |

Inspections
- Water Test — no
- Welding Inspection — no
- NRTL / UL Label — none

HVAC Design Information
- Exterior Design Temperatures — 105 ° F (Summer)
- -30 ° F (Winter)
- Interior Design Temperatures — 80 ° F (Max)
- 55 ° F (Min)
- HVAC Redundancy — none

Construction
- Perimeter channels — MC12 x 35.0 — Structural "C" ASTM-36
- Cross Beam — C10 x 15.30 — Structural "C" ASTM-36
- Flat Bar — As Required
- Pre-Galvanized Structural Steel Upgrade — no
- Floor Plate — 0.25 in. hot rolled steel plate
- Lift Lugs — Yes

Material - Walls, Ceiling & Roof
- A60 Galvanneal Sheet Metal — 11 gauge — Exterior Walls
- A60 Galvanneal Sheet Metal — 14 gauge — Interior Liners
- A60 Galvanneal Sheet Metal — 11 gauge — Roof
- A60 Galvanneal Sheet Metal — 14 gauge — Ceiling
- A60 Galvanneal Sheet Metal — 14 gauge — Interior partition Wall
- Interior Partition Wall — 3.75 ft.

Finish
Paint Colors
- Skid-Floor — Customer Choice
- Skid-Base — Customer Choice
- Exterior Walls — Customer Choice
- Exterior Roof — Customer Choice
- Interior Liners and Ceiling — White
- HVAC Units — MFG Standard



**Insulation**

| Location | Type | Rating |
|---|---|---|
| Walls (Cavity) | Rigid Board, flame spread less than 25 | R-26.2 |
| Roof (Cavity) | Rigid Board, flame spread less than 25 | R-30 |
| Floor | Spray Foam, flame spread less than 25 | R-38 w/1/2" gypsum board |

**Electrical Design Parameters**

| | |
|---|---|
| Interior Conduit Type | EMT |
| Exterior Conduit Type | RGS |
| Wire Type | THHN (B/W/G) |
| Perimeter Internal Wireway (6"x 6") | yes |
| Perimeter Ground Bus (1/4" x 2" Copper Bar) | 1/4x2 Bare Copper Bar Ground Loop mounted on wall just above the floor |
| Lighting Level - @ 3' Above Floor (Foot Candles) | 30 |
| Interior Lighting Fixture Type | LED |

**Accessories**

| | |
|---|---|
| Belly Pans | no |
| Cable Tray | no |
| Gutters & Downspouts | no |

**Personnel / Equipment Doors**

2     4080 DOOR KIT GALVANIZED
- UL or NRTL Listed, 3 Hour Fire Rating
- DKS 1654   4080 16GA GALVANIZED DOOR
- CUSTOM 4080 14GA GALVANIZED FRAME WITH 12" TRANSOM
- CR801 ALUM CLOSER
- SH140US32D SPRING HINGE
- BB31-4.5X4.5US32D HINGE
- 9800EO36US32D RIM EXIT
- NESC9800US26D ESCUTHEON TRIM
- 806 DOOR SWEEP

**Rear Access Doors**

14     Equipment Doors

**Door Accessories**

2     Door Window 12"x 12"  (View Area)
- Window Frame Kit 12"x12"

**Cutouts**

20     Floor cutouts with 12 Gauge Galvanized Cover plate
2      HVAC Wall cutout
1      Exhaust Fan Wall cutout

**MYERS**
**Power Products, Inc.**

Grounding
| | |
|---|---|
| 1 | 1/4x2 Bare Copper Bar Ground Loop 3" mounted on wall just above the floor |
| 4 | SS ground pad |
| 9 | Ground Drops from Ground Loop to Small Equipment |
| | • Ground Circuit (Sized as required ≤ #8) Copper Wire |
| 2 | Ground Drops from Ground Loop to Large Equipment |
| | • Ground Circuit 4/0 Bare Copper Cable |
| 2 | Ground Drops from Ground Loop to Ground Pads |
| | • Ground Circuit 4/0 Bare Copper Cable |

Equipment Installation Only
| | |
|---|---|
| 12 | Sections, 15kV Switchgear |
| 1 | MV Breaker Test Cabinet |
| 1 | Battery System (Battery Rack, Charger, Disconnect) |

***Batteries will ship directly to jobsite from battery manufacturer facility and installed by others***

Interior Lighting
| | | |
|---|---|---|
| 5 | Premium LED Wraparound Fixture, 48", 4000 Lumen, 120V, 4000K | Metalux #4WSNLED-LD4-40SL-F-UNV-L840-CD-U |
| | 72 | 3/4 in dia. EMT Conduit (FT) |
| | 1 | #12 awg THWN-THHN Power Circuit |
| 2 | Combination Emergency Light / Exit Sign | Sure-lite # LPX70RWH-DH |
| | 20 | 3/4 in dia. EMT Conduit (FT) |
| | 1 | #12 awg THWN-THHN Power Circuit |

Switches & Receptacles
| | | |
|---|---|---|
| 3 | 1-way switch NEMA 5-20R, 20 amp, 125v, spec grade | Leviton # 1201-I |
| | 30 | 3/4 in dia. EMT Conduit (FT) |
| | 1 | #12 awg THWN-THHN Power Circuit |
| 2 | 3-way switch NEMA 5-20R, 20 amp, 125v, spec grade | Leviton # 1203-I |
| | 20 | 3/4 in dia. EMT Conduit (FT) |
| | 1 | #12 awg THWN-THHN Power Circuit |
| 4 | GFCI duplex receptacle, NEMA 5-20R, 20 amp, 125v, spec grade | Leviton # 7899-R |
| | 40 | 3/4 in dia. EMT Conduit (FT) |
| | 1 | #12 awg THWN-THHN Power Circuit |
| 2 | Outdoor GFI duplex receptacle, NEMA 5-20R, 20 amp, 125VAC | |
| | 20 | 3/4 in dia. RGS Conduit (FT) |
| | 1 | #12 awg THWN-THHN Power Circuit |

Exterior Lighting
| | | |
|---|---|---|
| 2 | 20W, 120V, LED - Outdoor Fixture | Lumark |
| | • With Internal Photocell | |
| | 20 | 3/4 in dia. RGS Conduit (FT) |
| | 1 | #12 awg THWN-THHN Power Circuit |

- Appx326 -



### Automatic Transfer Switches

1      CH Automatic Transfer Switch
        Wall Mount, Open type, Switched neutral.
        200A, 120/240V, 1PH, 3W, 3P, 60HZ.
        With standard features: 1, 2, 3, 4, 5j, 6b, 7, 12c, 12d, 12g, 12h, 14l,
        14m, 15e, 15f, 23a, 26p, 32f, 42
        DEV. ATS
        20      2 in dia. EMT Conduit (FT)
        2        4/0 awg THWN-THHN Power Circuit

### AC Panelboards

1      CH Panelboard
        AC Panel Board Type 1 Surface Mount, 30 Circuits
        225A, 120/240VAC, 1PH, 3W, 10KAIC
        1 - 200A/2P ED Main breaker at top
        2 - 90A/2P BAB Branch breaker
        2 - 35A/2P BAB Branch breaker
        2 - 30A/2P BAB Branch breaker
        4 - 30A/1P BAB Branch breaker
        2 - 20A/2P BAB Branch breaker
        10 - 20A/1P BAB Branch breaker
        BOX: 42"H x 20"W x 5.75"D
        10      2 in dia. EMT Conduit (FT)
        1        4/0 awg THWN-THHN Power Circuit

### DC Panelboards

1      Ch Panelboard
        DC Panelboard Type 1 Surface mount, 42 Circuits
        225A, 125V Operated @48VDC, 2W, 10KAIC
        1 - 200A/2P FD Main breaker at top
        1 - 80A/2P GHB Branch breaker
        0 - 70A/2P GHB Branch breaker
        1 - 50A/2P GHB Branch breaker
        13 - 30A/2P GHB Branch breaker
        3 - 20A/2P GHB Branch breaker
        6 - 1P GHB Branch provision
        BOX: TBD
        10      1 in dia. EMT Conduit (FT)
        1        #2 awg THWN-THHN Power Circuit

- Appx327 -



HVAC Units
2          Bard 4 ton, 208/230/1/60, 10kW heat
           Each unit shall consist of the following features:
           A)     Built in disconnect switch
           B)     (9kW Heat for 6 ton and smaller) (15kW Heat for 7.5 ton and larger)
           C)     High pressure switch
           D)     Low pressure switch
           E)     Compressor anti-short cycle timer
           F)     Fan cycle switch for low ambient to 20° F
           G)     Set of NO contacts for customer alarm
           H)     Phase monitor for three phase units
           I)     Copper tube, Aluminum fins on both coils
           J)     2" Pleated Filter
           K)     Brushed aluminum supply air register
           L)     Brushed aluminum return air filter grille
           M)     Electronic auto changeover thermostat
           20     3/4 in dia. EMT Conduit (FT)
           2      #6 awg THWN-THHN Power Circuit
2          External Disconnect
           20     3/4 in dia. EMT Conduit (FT)
           2      #8 awg THWN-THHN Power Circuit

Exhaust Fans
1          10" Shutter Mount Exhaust Fan
           • 600cfm @ 0.0 SP                                 Dayton   1HLA1
           10     3/4 in dia. EMT Conduit (FT)
           1      #10 awg THWN-THHN Power Circuit

Fire Detection
2          Photoelectric Detector with alarm contacts         Gentex   9123TF
           20     3/4 in dia. EMT Conduit (FT)
1          Indoor Horn/Strobe                                 Notifier  P2R
           10     3/4 in dia. EMT Conduit (FT)
           2      #12 awg THWN-THHN Power Circuit
2          20 lb. CO2 Handheld Fire Extinguisher              Ansul    431556 aluminum

Control Wiring                                                Destination
13         #14-2 cond. Type TC cable                          Estimated control terminations

Interconnect Power Wiring (Single Cond.) - (Conduit)         Destination
2          #12 awg THWN-THHN Power Circuit                    FROM SWGR TO METER SOCKETS
           20     3/4 in dia. EMT Conduit (FT)
1          #10 awg THWN-THHN Power Circuit                    FROM AC PNL TO BATTERY CHARGER
           10     3/4 in dia. EMT Conduit (FT)
1          1/0 awg THWN-THHN Power Circuit                    FROM DC PNL TOP BATTERIES
           10     1.25 in dia. EMT Conduit (FT)



Misc.
1        Structural PE Stamped drawings
1        Center of Gravity Design Calculations
1        Foundation Load Chart
1        36"X24" Utility Table - Foldable
1        Gravity Fed Eyewash Station- Wall Mounted 6 gal
2        Meter Socket Form 9S

**Myers Power Products, Inc. standard PDC FAT**

Integrated Power Distribution Center
Physical Inspection
•        Verify all equipment is installed per project documentation.
•        Verify all equipment has proper nameplates.
•        Verify cutouts match plans and that wire ways are acceptable.
•        Verify gutters and cable trays are properly installed.
•        Verify that all equipment is properly grounded and building ground bus and pads are installed
correctly.
•        Verify internal PDC power connections are installed correctly per drawings (conductor size, routing,
labeling, and termination).
•        Review insulation resistance and/or voltage withstand test reports for power cabling.
•        Apply voltage to equipment and perform a functional test on each piece of equipment provided.
•        Provide a continuity check on Myers Power Products, Inc. provided cables
•        **Owner furnished equipment (OFE) and/or vender supplied equipment shall not be energized
during standard FAT.

Building Utilities and Subsystems
HVAC
•        Verify that HVAC is the proper size and nameplate information per project documentation.
•        Verify that power conductors and control circuit and are terminated correctly.
•        Verify HVAC operation.

Lighting and Receptacles
•        Verify that all receptacles operate and are connected to the proper circuits.
•        Verify all interior lights and switches operate and are connected to the proper circuits.
•        Verify all emergency lights operate and are connected to the proper circuits.
•        Verify all exterior lights operate and are connected to the proper circuits.
•        Verify photo detector(s) and building lighting contactor box operate and are connected to the
proper circuits.

Panel boards
•        Verify that the correct breakers are present and are sized per project documentation.
•        Verify wiring is sized correctly.
•        Verify panel schedule is installed and correct.
•        Verify panel terminations.



- Verify branch circuits are operational.
- Verify transformer(s) are the proper size and nameplate information per project documentation.

UPS and DC Power Systems (If applicable)
- Verify that the correct breakers are present and are sized per project documentation.
- Verify wiring is sized correctly.
- Verify UPS and DC system topology.
- Verify that battery charger input voltage and output voltage when applicable.

Communications (If applicable)
- Verify connectivity of communication network.
- *Verify data transfer across communication network.



## Medium Voltage Metal-Clad Switchgear (5-27KV)

1.0     SCOPE

This scope of supply includes the basic design and functional features for medium voltage metal-clad switchgear with vacuum circuit breakers as outlined herein and as further described in accompanying sections of this proposal.

2.0     STANDARDS/REFERENCES

The metal-clad switchgear and all components shall be manufactured and tested in accordance with the latest applicable standards of NEMA SG-4 and SG-5, and IEEE C37.20.2.

3.0     GENERAL DESIGN FEATURES/RATINGS

The switchgear shall have a voltage rating of 15KV with breakers and auxiliary compartments are described in the bill of materials of this proposal. The switchgear is supplied in one high and two high configurations with indoor sections that are typically 95" x 36" wide. Depth of the equipment is adjusted to the application. End dress panels are provided on each end of the lineup. The switchgear is designed for operation on a 13,200V, three phase, three wire, 60 hertz system. The circuit breakers are designed with vacuum technology and incorporate a spring-operated mechanism.

Switchgear Ratings

| | |
|---|---|
| Rated Maximum Voltage | 15KV |
| Operating Voltage | 13,200V |
| Main Bus Continuous Rating | 1200 Amps |
| Basic Impulse Level | 95KV BIL |
| Control Bus AC/DC Voltage (nominal) | 48VDC |
| Circuit Breaker Continuous Rating | 1200 Amps |
| Circuit Breaker Interrupting | 25KA |
| Breaker Interrupting Time | 3 cycles. |

Temperature rise of the switchgear will meet the intent of latest revisions of ANSI C37.20.2 for metal clad switchgear.

4.0     BILL OF MATERIALS

**Pitkin East Medium Voltage Switchgear - 13.2kV - 1200A - 25Ka**

**Unit No. 1 - Future Capacitor Bank Feeder/Data Line Compartment**

| | |
|---|---|
| 0 | Eaton VCP-WC Breaker Element, 15kV 1200A 25kA 3 cycle |
| 1 | Eaton VCP-W Breaker Compartment Kit, 1200A, with polyester supports |
| 1 | Eaton VCP-W MOC and TOC Switch |
| 3 | Current Transformers |

**MYERS**
***Power Products, Inc.***

| | |
|---|---|
| 1 | Schweitzer SEL-751A relay |
| 1 | Circuit Breaker Control Switch |
| 2 | Circuit Breaker Status Lights |
| 2 | ABB Test Switch |
| 1 | Set, arc flash detection fiber optic and/or point sensors |
| 3 | Station Class Lightning Arrestors |
| 1 | Section, indoor, metal-clad vertical housing |
| 1 | Section, 1200A main copper silverplated insulated buswork |
| 1 | Set, bus components for 1200A breaker compartment |
| 1 | Cabinet Space Heater |
| 1 | Cabinet Thermostat |
| 1 | Cabinet Interior Light and Switch |
| 1 | Cabinet Duplex Outlet |

**Unit No. 2 - Future City Line Incomer**

| | |
|---|---|
| 0 | Eaton VCP-W Breaker Element, 15kV 1200A 25kA 3 cycle |
| 1 | Eaton VCP-W Breaker Compartment Kit, 1200A, with polyester supports |
| 1 | Eaton VCP-W MOC and TOC Switch |
| 1 | Voltage Transformer Drawout Tray w/porcelain supports |
| 3 | Voltage Transformers |
| 3 | Current Transformers - Relaying Class |
| 3 | Current Transformers - Metering Class |
| 1 | Schweitzer SEL-751A relay |
| 1 | Circuit Breaker Control Switch |
| 2 | Circuit Breaker Status Lights |
| 2 | ABB Test Switch |
| 1 | Device 86 Lockout Relay |
| 1 | Device 86 Healthy Circuit Light |
| 1 | Set, arc flash detection fiber optic and/or point sensors |
| 3 | Station Class Lightning Arrestors |
| 1 | Section, indoor, metal-clad vertical housing |
| 1 | Section, 1200A main copper silverplated insulated buswork |
| 1 | Set, bus components for 1200A breaker compartment |
| 1 | Set, power cabling and supports for VT auxiliary |
| 1 | Cabinet Space Heater |
| 1 | Cabinet Thermostat |
| 1 | Cabinet Interior Light and Switch |
| 1 | Cabinet Duplex Outlet |

**Unit No. 3 - Feeder E and Control Power Transformer Auxiliary**

| | |
|---|---|
| 1 | Eaton VCP-W Breaker Element, 15kV 1200A 25kA 3 cycle |
| 1 | Eaton VCP-W Breaker Compartment Kit, 1200A, with polyester supports |
| 1 | Eaton VCP-W MOC and TOC Switch |
| 1 | Control Power Transformer Primary Fuse Drawout Tray with porcelain supports |
| 2 | Control Power Transformer Primary Fuses |
| 1 | Control Power Transformer, 37.5kVA, single phase, 13200V-120/240VAC |

- Appx332 -

**MYERS**
*Power Products, Inc.*

| | |
|---|---|
| 1 | Control Power Transformer Secondary Breaker |
| 1 | Control Power Transformer Key Interlock |
| 3 | Current Transformers - Relaying Class |
| 1 | Schweitzer SEL-751A relay |
| 1 | Circuit Breaker Control Switch |
| 2 | Circuit Breaker Status Lights |
| 2 | ABB Test Switch |
| 1 | Set, arc flash detection fiber optic and/or point sensors |
| 3 | Station Class Lightning Arrestors |
| 1 | Section, indoor, metal-clad vertical housing |
| 1 | Section, 1200A main copper silverplated insulated buswork |
| 1 | Set, bus components for 1200A breaker compartment |
| 1 | Set, power cabling and supports for CPT auxiliary |
| 1 | Cabinet Space Heater |
| 1 | Cabinet Thermostat |
| 1 | Cabinet Interior Light and Switch |
| 1 | Cabinet Duplex Outlet |
| 1 | CPT Indicating Light |

**Unit No. 4 - North Tie Feeder**

| | |
|---|---|
| 1 | Eaton VCP-W Breaker Element, 15kV 1200A 25kA 3 cycle |
| 1 | Eaton VCP-W Breaker Compartment Kit, 1200A, with polyester supports |
| 1 | Eaton VCP-W MOC and TOC Switch |
| 3 | Current Transformers |
| 1 | Schweitzer SEL-751A relay |
| 1 | Circuit Breaker Control Switch |
| 2 | Circuit Breaker Status Lights |
| 2 | ABB Test Switch |
| 1 | Set, arc flash detection fiber optic and/or point sensors |
| 3 | Station Class Lightning Arrestors |
| 1 | Section, indoor, metal-clad vertical housing |
| 1 | Section, 1200A main copper silverplated insulated buswork |
| 1 | Set, bus components for 1200A breaker compartment |
| 1 | Cabinet Space Heater |
| 1 | Cabinet Thermostat |
| 1 | Cabinet Interior Light and Switch |
| 1 | Cabinet Duplex Outlet |

**Unit No. 5 - Future Feeder**

| | |
|---|---|
| 1 | Eaton VCP-W Breaker Element, 15kV 1200A 25kA 3 cycle |
| 1 | Eaton VCP-W Breaker Compartment Kit, 1200A, with polyester supports |
| 1 | Eaton VCP-W MOC and TOC Switch |
| 3 | Current Transformers |
| 1 | Schweitzer SEL-751A relay |
| 1 | Circuit Breaker Control Switch |
| 2 | Circuit Breaker Status Lights |

- Appx333 -



| | |
|---|---|
| 2 | ABB Test Switch |
| 1 | Set, arc flash detection fiber optic and/or point sensors |
| 3 | Station Class Lightning Arrestors |
| 1 | Section, indoor, metal-clad vertical housing |
| 1 | Section, 1200A main copper silverplated insulated buswork |
| 1 | Set, bus components for 1200A breaker compartment |
| 1 | Cabinet Space Heater |
| 1 | Cabinet Thermostat |
| 1 | Cabinet Interior Light and Switch |
| 1 | Cabinet Duplex Outlet |

**Unit No. 6 - Bus Tie**

| | |
|---|---|
| 1 | Eaton VCP-W Breaker Element, 15kV 1200A 25kA 3 cycle |
| 1 | Eaton VCP-W Breaker Compartment Kit, 1200A, with polyester supports |
| 1 | Eaton VCP-W MOC and TOC Switch |
| 3 | Current Transformers - Relaying Class |
| 1 | Schweitzer SEL-751A relay |
| 1 | Circuit Breaker Control Switch |
| 2 | Circuit Breaker Status Lights |
| 4 | ABB Test Switch |
| 2 | Device 86 Lockout Relay |
| 1 | Set, arc flash detection fiber optic and/or point sensors |
| 1 | Section, indoor, metal-clad vertical housing |
| 1 | Section, 1200A main copper silverplated insulated buswork |
| 1 | Set, bus components for 1200A breaker compartment |
| 1 | Cabinet Space Heater |
| 1 | Cabinet Thermostat |
| 1 | Cabinet Interior Light and Switch |
| 1 | Cabinet Duplex Outlet |
| 1 | Remote Automation Controller, Schweitzer SEL-3530 |

**Unit No. 7 - Feeder C**

| | |
|---|---|
| 1 | Eaton VCP-W Breaker Element, 15kV 1200A 25kA 3 cycle |
| 1 | Eaton VCP-W Breaker Compartment Kit, 1200A, with polyester supports |
| 1 | Eaton VCP-W MOC and TOC Switch |
| 3 | Current Transformers |
| 1 | Schweitzer SEL-751A relay |
| 1 | Circuit Breaker Control Switch |
| 2 | Circuit Breaker Status Lights |
| 2 | ABB Test Switch |
| 1 | Set, arc flash detection fiber optic and/or point sensors |
| 3 | Station Class Lightning Arrestors |
| 1 | Section, indoor, metal-clad vertical housing |
| 1 | Section, 1200A main copper silverplated insulated buswork |
| 1 | Set, bus components for 1200A breaker compartment |
| 1 | Cabinet Space Heater |



| 1 | Cabinet Thermostat |
| 1 | Cabinet Interior Light and Switch |
| 1 | Cabinet Duplex Outlet |

**Unit No. 8 - South Tie Feeder**

| 1 | Eaton VCP-W Breaker Element, 15kV 1200A 25kA 3 cycle |
| 1 | Eaton VCP-W Breaker Compartment Kit, 1200A, with polyester supports |
| 1 | Eaton VCP-W MOC and TOC Switch |
| 3 | Current Transformers |
| 1 | Schweitzer SEL-751A relay |
| 1 | Circuit Breaker Control Switch |
| 2 | Circuit Breaker Status Lights |
| 2 | ABB Test Switch |
| 1 | Set, arc flash detection fiber optic and/or point sensors |
| 3 | Station Class Lightning Arrestors |
| 1 | Section, indoor, metal-clad vertical housing |
| 1 | Section, 1200A main copper silverplated insulated buswork |
| 1 | Set, bus components for 1200A breaker compartment |
| 1 | Cabinet Space Heater |
| 1 | Cabinet Thermostat |
| 1 | Cabinet Interior Light and Switch |
| 1 | Cabinet Duplex Outlet |

**Unit No. 9 - Feeder G and Control Power Transformer Auxiliary**

| 1 | Eaton VCP-W Breaker Element, 15kV 1200A 25kA 3 cycle |
| 1 | Eaton VCP-W Breaker Compartment Kit, 1200A, with polyester supports |
| 1 | Eaton VCP-W MOC and TOC Switch |
| 1 | Control Power Transformer Primary Fuse Drawout Tray with porcelain supports |
| 2 | Control Power Transformer Primary Fuses |
| 1 | Control Power Transformer, 37.5kVA, single phase, 13200V-120/240VAC |
| 1 | Control Power Transformer Secondary Breaker |
| 1 | Control Power Transformer Key Interlock |
| 3 | Current Transformers - Relaying Class |
| 1 | Schweitzer SEL-751A relay |
| 1 | Circuit Breaker Control Switch |
| 2 | Circuit Breaker Status Lights |
| 2 | ABB Test Switch |
| 1 | Set, arc flash detection fiber optic and/or point sensors |
| 3 | Station Class Lightning Arrestors |
| 1 | Section, indoor, metal-clad vertical housing |
| 1 | Section, 1200A main copper silverplated insulated buswork |
| 1 | Set, bus components for 1200A breaker compartment |
| 1 | Set, power cabling and supports for CPT auxiliary |
| 1 | Cabinet Space Heater |
| 1 | Cabinet Thermostat |
| 1 | Cabinet Interior Light and Switch |

- Appx335 -

**MYERS**
*Power Products, Inc.*

| | |
|---|---|
| 1 | Cabinet Duplex Outlet |
| 1 | CPT Indicating Light |

**Unit No. 10 - Future Feeder**

| | |
|---|---|
| 1 | Eaton VCP-W Breaker Element, 15kV 1200A 25kA 3 cycle |
| 1 | Eaton VCP-W Breaker Compartment Kit, 1200A, with polyester supports |
| 1 | Eaton VCP-W MOC and TOC Switch |
| 3 | Current Transformers |
| 1 | Schweitzer SEL-751A relay |
| 1 | Circuit Breaker Control Switch |
| 2 | Circuit Breaker Status Lights |
| 2 | ABB Test Switch |
| 1 | Set, arc flash detection fiber optic and/or point sensors |
| 3 | Station Class Lightning Arrestors |
| 1 | Section, indoor, metal-clad vertical housing |
| 1 | Section, 1200A main copper silverplated insulated buswork |
| 1 | Set, bus components for 1200A breaker compartment |
| 1 | Cabinet Space Heater |
| 1 | Cabinet Thermostat |
| 1 | Cabinet Interior Light and Switch |
| 1 | Cabinet Duplex Outlet |

**Unit No. 11 - City Line Incomer**

| | |
|---|---|
| 1 | Eaton VCP-W Breaker Element, 15kV 1200A 25kA 3 cycle |
| 1 | Eaton VCP-W Breaker Compartment Kit, 1200A, with polyester supports |
| 1 | Eaton VCP-W MOC and TOC Switch |
| 1 | Voltage Transformer Drawout Tray with porcelain supports |
| 3 | Voltage Transformers |
| 3 | Current Transformers - Relaying Class |
| 3 | Current Transformers - Metering Class |
| 1 | Schweitzer SEL-751A relay |
| 1 | Circuit Breaker Control Switch |
| 2 | Circuit Breaker Status Lights |
| 2 | ABB Test Switch |
| 1 | Device 86 Lockout Relay |
| 1 | Device 86 Healthy Circuit Light |
| 1 | Set, arc flash detection fiber optic and/or point sensors |
| 3 | Station Class Lightning Arrestors |
| 1 | Section, indoor, metal-clad vertical housing |
| 1 | Section, 1200A main copper silverplated insulated buswork |
| 1 | Set, bus components for 1200A breaker compartment |
| 1 | Set, power cabling and supports for VT auxiliary |
| 1 | Cabinet Space Heater |
| 1 | Cabinet Thermostat |
| 1 | Cabinet Interior Light and Switch |
| 1 | Cabinet Duplex Outlet |

- Appx336 -



**Unit No. 12 - Capacitor Bank Feeder**

| | |
|---|---|
| 1 | Eaton VCP-WC Breaker Element, 15kV 1200A 25kA 3 cycle |
| 1 | Eaton VCP-W Breaker Compartment Kit, 1200A, with polyester supports |
| 1 | Eaton VCP-W MOC and TOC Switch |
| 3 | Current Transformers |
| 1 | Schweitzer SEL-751A relay |
| 1 | Circuit Breaker Control Switch |
| 2 | Circuit Breaker Status Lights |
| 2 | ABB Test Switch |
| 1 | Set, arc flash detection fiber optic and/or point sensors |
| 3 | Station Class Lightning Arrestors |
| 1 | Section, indoor metal-clad vertical housing |
| 1 | Section, 1200A main copper silverplated insulated buswork |
| 1 | Set, bus components for 1200A breaker compartment |
| 1 | Cabinet Space Heater |
| 1 | Cabinet Thermostat |
| 1 | Cabinet Interior Light and Switch |
| 1 | Cabinet Duplex Outlet |

**System Components**

| | |
|---|---|
| 1 | Set, circuit breaker standard accessories |
| 1 | Circuit breaker lift truck and lifting yoke |
| 1 | Pendant style remote breaker control station |
| 12 | Door-mounted receptacle to accept breaker remote control station umbilical |
| 1 | Circuit breaker test cabinet |
| 1 | Circuit breaker test jumper |
| 1 | Circuit breaker electrical levering-in device |
| 2 | Test Plug |

5.0 FACTORY TESTING

5.1 The control circuits shall be tested at the normal voltage per ANSI and IEEE standards as applicable.

NOTE: There will be no medium voltage applied and the testing will be conducted in the low voltage test area.

6.0 ENGINEERING DATA PROVIDED

Myers Power Products, Inc. standard engineering document packages depict the equipment as specified and ordered. Standard drawing packages from Myers Power Products, Inc. shall be provided.

- Appx337 -



## 48VDC Battery System

1)      GNB Absolyte GP Series 20 Year VRLA Lead Calcium with absorbed glass matt electrolyte stabilization.
125VDC 20 Year VRLA (AGM) Lead Calcium Station Battery sized per the below parameters:

| | |
|---|---|
| Number of Cells: 24 | Minimum Temperature: 77 °F |
| Number of Jars: 24 | Design Margin: 1.10 |
| Final volts per cell: 1.75 vpc (average) | Aging Factor: 1.25 |
| Parallel Strings: 1 | |

Profile: Step Load
Step 1: 198.5 amps for 1 minutes
Step 2: 6.5 amps for 478 minutes
Step 3: 198.5 amps for 1 minutes
Random Amp: N/A
Random Time: N/A
Total Time: 480 minutes
AH Removed: 58.40

Battery:
Model: 90G-09

Specific Gravity: 1.300
C8 Rating to 1.75ECV @ 77f: 344Ah
C8 Rating to 1.75ECV @ 77f: 36.12Ah
% of Requirement: 126.26%

Number of Cells: 24
Number of Jars: 24
Number of Plates: 9

System Weight: 1584 bs.
System Number: 1 Stack | 4 High

System Dimensions:
Length 26.19 in
Width 23.56 in
Height 34.12 in

Battery String Information:
Float vDC: 54.24 vDC Nominal Float (2.26vDC per cell)
Max vDC: 56.4.8 vDC Nominal Equalize (Equalize not recommended for VRLA product)

Electolyte Volume
Per cell: 1.01 gal



Per string: 24.24 gal. (24 cells in the string)

Heat Generation@ 6.5-amp discharge:
Discharge: 187 Watts/hr/string
Float: 5 Watts/hr

Hydrogen Evolution:
at Volts per Cell: 2.25
at Temperature: 77.00 °F
Per String: 0.0006 cu. Ft. per hour (24 cells in the string)

Cell Resistance & Short Circuit:
Short Circuit Current: 2594 max. amps. Maximum calculated Short Circuit Current in Amperes
Cell Resistance: 0.000771 ohms. Resistance expressed in ohms, for Cell + 1 Connector.
Optional Jar: Flame retardant, UL94 V-0/28% L.O.I.
Safety Vent: Safety valve consisting of a pressure release vent and flame arrester. 3-10 psi opening
pressure, self-resealing.
Terminals: Solid copper insert

2)      Spill Containment System:
Enviroguard Hawk System – HWK-27-30
Length 30 in.
Width 27 in.
Weight 29 lbs

3)      Primax P4600 Series 1Φ Charger
120v 1Ph input | 48VDC 20-amp output | Single Charger Configuration

Charger capacity calculations: 1.1 X 58.4Ah removed/8 hr. recharge + 6.5 amps continuous = 14.53 amps.
Use 20-amp charger.

Model: P4600T-1-125-20   (T designates Battery Eliminator Filtration)
Input=120 Volts +10/-12%, 1 Phase, 60 Hertz, 19 A
Output voltage=48 VDC Nominal:   Min VDC: 5.76    Max VDC: 57.6
Output current=20 Amp Nominal:   Min IDC: 0    Max IDC: 20
Input circuit breaker=30A - 120V ac - 10KA IC
Output circuit breaker=25A - 48V dc - 10KA IC
CABINET = 50-ARM 350-1, 30Hx17Wx12D (in) 762Hx431.8Wx304.8D (mm) 16GA/1.5mm STEEL, GREY ANSI
61 NEMA1, IP20,Weight 100lbs/45kg

Dimensions and Weight Single Charger
Height 30 in
Width 17 in
Depth 12 in
Weight 161 lbs
Floor Mount | top cable entry



Heat Loss 563 Btu/Hr. or .16 kW at 100% charger capacity
Input Amps required @ 120V – 19 amps.



## Field Service

Scope:                  Offloading and Assembly Supervision only

Number of Techs:        1 tech to supervise for 2 days.

## Training

Scope:                  Will provide personnel & equipment to perform (1) day of on-site training



## Clarifications, Comments, and Exceptions

NOTE: THE FOLLOWING CLARIFICATIONS, COMMENTS AND EXCEPTIONS MUST BE ACKNOWLEDGED AND RESOLVED IN WRITING PRIOR TO ANY PROJECT AWARD.

Rev.9:
1. Price Adjustment Update.
2. *Due to the recent increase in Tariffs, prices are subject to change for new and existing orders, if applicable. There may also be impacts to the supply chain for raw material and components, which may further impact our ability to ship orders in a timely manner. Myers Power Products, Inc. will do everything in our power to maintain the best pricing and shipment schedules pursuant to Market conditions during these uncertain times*

Rev. 8:
1. Price Refresh Update.

Rev. 7:
1. Price Refresh and Progress Payment Changes. No changes to the BOM have been made.

Rev. 6:
1. Price Refresh only. No changes to the BOM have been made.

Rev. 5:
1. Price Refresh only. No changes to the BOM have been made.

Rev. 4:
1. Per Teams meeting on 7/12/23, the following changes have been made:
   o MV Switchgear quoted identical to lineup previously sold Except for the sections for the Future and Cap Bank feeder sections that are offered as prepared spaces.
   o Future and Cap Bank feeder breakers are offered as an adder.
   o Some changes were made to PDC to match previously sold one.
   o State Certification was not required on previous order but has been provided this time as an optional adder if needed.
   o Field testing has been removed.
2. Note that HVAC units will be shipped separately and will require field installation by others.

Rev. 3
1. Per Invitation to Negotiate #ITN-2023-066-GS and Section 26 13 13P dated 4.6.2023, the following changes have been made:
   o Per 2.2.C.2: Doors changed to 4070 (48"x 84").
   o Per 2.2.D.4: An indoor horn/strobe has been included.
   o Per 2.2.D.3: 2 3-way switches for emergency lighting have been included.
   o Per 2.2.D.5: An additional switch to control photocell has been added.
   o A preliminary schedule has been added. Note that an award date has not been provided. Myers has assumed start date. Actual lead times may vary based on factory loading at the time of order.

- Appx342 -



Rev. 2:

1. The following changes were made based on previous PDC and switchgear sold to CSU.
   - o  Switchgear quoted as 1-high breaker sections.
   - o  Battery Section in switchgear has been removed. Batteries housed in the PDC battery compartment.
   - o  PDC dimensions resized per dimensions provided.



Rev. 1:
1. As requested in email dated 2/27/23, the following changes have been made:
   - PDC resized per specifications.
   - Switchgear lineup changed to a 2-high configuration.
2. Independent Services Contract: If we are awarded the contract and services are required, we will negotiate those terms at that time.

Rev. 0:
Power Distribution Center (PDC)
1. Reference Specification Section 26 13 13P dated 12.7.2022.
   a. Par. 1.8.B: O&M Manuals submitted 30 days after shipment in digital form.
   b. Par. 2.2.B.1: Insulation per BOM.
   c. Par. 2.3.A: Rear section of the SWGR is of welded design. The front section of the Switchgear is of bolted design.
   d. Par. 2.18: Exception taken to heat pump. Myers is offering a variable capacity air conditioner with electric strip heat. Units are rated to operate from -40ºF to +131ºF.
2. UL listed/labeled components will be supplied where possible. No 3rd Party Certifications are included in base price.
3. All Power Distribution Center load weights and dimensions are approximations for quotation purposes only. Actual load weights and dimensions must be verified by structural calculations.
4. Control and Power wiring is included as detailed in our proposal. Additional circuits can be provided upon receipt of detailed information for an additional cost.
5. If required, an equipment interconnect wiring/cable list will be produced for subsequent use in the field. In the event of interfacing with customer equipment (whether internally installed CFEs or interfaces with external equipment), all pertinent information for such interfaces must be provided by the customer in the form of either customer provided wiring diagrams or wiring/cable schedules. The information to be included shall include source, destination, terminal#, wire/cable size, wire/cable type, and tagging requirements. If the information provided is not complete prior to release to manufacturing an adder will be provided to account for additional engineering resources to help determine the correct interconnect requirements.
6. If structural PE calculations are included in our proposal, please note the following: Preliminary calculations are provided for the approval process. Calculations sealed by the P.E. will be furnished after customer's final approval and release for construction. Any changes to the PEC affecting layout or design will result in added cost.
7. Customer Furnished Equipment (CFE): All CFE will be addressed during the project kickoff along with a schedule and letter submitted for due dates. At that time, all information (Drawings, Dimensions, Heat/Loss, Interconnect, Storage Requirements) regarding any CFE being issued by purchaser, to be installed by Myers Power Products, Inc. is required. If any information related to CFE is received after the release to manufacturing, Myers Power Products, Inc. has the right to place the project on hold, review the supplied information and issue a schedule revision and/or change order for incorporation of the delinquent information if capacity allows. Similarly, if the information required to properly install, wire, interconnect or test the CFE is not provided in a clear concise manner thereby requiring additional time to extract, extrapolate or coordinate with external parties to obtain relevant, applicable and pertinent information, Myers Power Products, Inc. reserves the right to issue a schedule revision and/or change order for such additional time. All CFE needs to be labeled and sent per instructions. If



shipments cannot be identified at Myers Power Products, Inc. receiving department, all trucks will be rerouted back to shipper until proper documentation is complete.

8. Due to hazardous cargo considerations, batteries will ship directly to the jobsite from the battery manufacturer facility for installation in the field by others. Additional cost may ensue if battery storage is required.

Medium Voltage Switchgear
1. Reference Specification Section 26 13 13P
   a. Paragraph 2.7.B. – Relays and controls are quoted to match the previous project supplied to CSU in 2018.
   b. Paragraph 2.9 – Current transformers with C800 accuracy class are not available, as these CTs are too large to fit around the circuit breaker primary bushings. C400 accuracy class CTs are quoted where only one set of CTs are required. C200 accuracy class CTs are quoted where more than one set of CTs are required, as the mounting space on the circuit breaker primary bushings limit the physical size of current transformers that can be positioned on the bushings.

Battery System
1. Battery systems sized per switchgear loads.
2. A Certified Production Test Data per NEMA PE-5 is provided. Production test data report submitted before shipment.
3. Approval drawings in PDF supplied via email.

Training:
1. Attendees will utilize the manufacturer's O&M Manuals.
2. One day, one 8hr. session is included. Any more days or sessions will incur a change order.
3. Not included are:
   - Video recording of training sessions.
   - Testing and commissioning.

General
1. Initial submittals shall be based on this quotation and the information provided at time of quotation.
2. Standard Myers Power Products, Inc. inspection and test procedures will be performed on all Myers Power Products, Inc. furnished equipment in an ISO 9001 certified facility. Myers Power Products, Inc. standard documentation package is quoted.
3. Commissioning and two-year spare parts list will be finalized after BOM acceptance.
4. Welding will be per AWS D1.1.
5. Material origins were not specified and shall be determined by Myers Power Products, Inc. and our sub-vendors.
6. Drawings shall be provided in electronic (.DWG & .PDF) format, or B-Size 11x17" prints.
7. Customer shall be responsible for any applicable taxes or fees.
8. Seller shall not be responsible for any failure to perform, or delay in performance of, its obligations resulting from the COVID-19 pandemic or any future epidemic.
9. Our proposal is based on the above bill of material. Any items, material or work, which are not specifically addressed in this quotation are not included. Changes can be provided if required for an additional cost.

- Appx345 -

COLORADO STATE UNIVERSITY
GENERAL CONDITIONS
INVITATION FOR BID / DOCUMENTED QUOTE

1.  This solicitation is governed by the following General Conditions and the Colorado State University Procurement Rules. Responding to this solicitation constitutes acceptance of these General Conditions. The CSU Procurement Rules, which can be viewed at http://www.purchasing.colostate.edu/pages/documents/ProcurementRules8-24-09.pdf, may differ from the State of Colorado Procurement Code and Rules. All inquiries regarding this solicitation should be directed to: Colorado State University, Office of Procurement Services, 6010 Campus Delivery, Fort Collins, CO 80523-6010; 970-491-5105.

2.  The bidder agrees to comply with all applicable state and federal laws relating to discrimination and unfair employment practices.

3.  The bidder certifies that prices and other terms in the Bid or Quote have been arrived at independently without consultation, communication, agreement with or knowledge of the contents of a Bid or Quote by any other competing bidder other than prices or terms gained through price lists or catalogs made available to the public by a competing bidder.

4.  Bidders are expected to examine CSU provided drawings, specifications, schedule of delivery and all instructions associated with this solicitation; failure to do so will be at the bidder's risk.

5.  Each bidder shall furnish all information required by the solicitation; the unit price for each item bid must be shown and a total for each item bid must be entered. In case of error in the extended price, the unit price prevails. Failure to provide requested information may result in disqualification.

6.  Specifications are provided to identify the product/service required and to establish an acceptable quality level. Bids or Quotes for products/services of equal quality and usability will normally be considered unless otherwise stated in the solicitation. The University will be the sole judge in determining "equals" in regard to price, quality and performance.

7.  All products shall be new and of the manufacturer's current model unless otherwise specified.

8.  Intentionally omitted.

9.  Colorado State University reserves the right to reject any and all Bids or Quotes and to waive formalities pursuant to the bidding, and to accept any portion of a Bid or Quote or all items bid, if deemed in the best interest of Colorado State University.

10. This Invitation for Bid or Documented Quote does not obligate the University to pay any costs incurred in the preparation or the submission of such solicitation, or to purchase or contract for materials or services from such Invitation for Bid or Documented Quote if not in the best interests of Colorado State University in the sole judgment of the University.

11. Treatment of any Confidential Information submitted in response to this solicitation will be governed by the Colorado State University Procurement Rules.

12. A contract or purchase order will be awarded to the responsive and responsible bidder whose bid, conforming to the Invitation for Bid or Documented Quote, will be most advantageous to Colorado State University, price and other factors considered. Any purchase order issued as a result of this solicitation will be governed by the CSU Purchase Order Terms and Conditions (attached to the solicitation). Any contract executed between CSU and the successful bidder must contain certain required provisions for doing business with the State of Colorado, labeled "Special Provisions" (attached to the solicitation). The Special Provisions are required by law to be contained in every state contract without modification or exception. NOTWITHSTANDING ANY OTHER PROVISION CONTAINED IN THE SOLICITATION, QUOTE OR BID, OR ANY CONTRACT DOCUMENT ARISING FROM THIS SOLICITATION, THE UNIVERSITY IS PROHIBITED BY COLORADO LAW FROM AGREEING TO "INDEMNIFY," "DEFEND," OR "HOLD THE CONTRACTOR HARMLESS" WITH RESPECT TO THIRD-PARTY CLAIMS THAT MAY BE BROUGHT AGAINST THE CONTRACTOR, WHERE PROVEN THE CONTRACTOR WAS AT FAULT. NO EXCEPTIONS TO THIS PROHIBITION ARE POSSIBLE AND ANY DOCUMENT PURPORTING TO CREATE SUCH INDEMNITY OBLIGATIONS SHALL BE REJECTED.

13. No Bid shall be withdrawn for a period of 30 days subsequent to the submission of bids without the consent of the Colorado State University, Department of Procurement and Contracting Services.

14. In its acceptance of any Bid or Quote, the University is relying on the delivery date and/or installation as material and basic to its acceptance, unless otherwise indicated. In the event of seller's failure to deliver, the University reserves the right to cancel its purchase order or contract, or any part thereof. Seller shall not be responsible for any failure to perform, or delay in performance of its obligations resulting from the COVID-19 pandemic or any future pandemic.

15. In the event any item to be sold or delivered hereunder is covered by any patent, copyright, trademark, or application therefor, the seller will indemnify and hold harmless the University from directly related, verifiable costs, expenses, and reasonable attorney's fees on account of any claims, legal actions, or judgements on account of manufacturer, sale, or use of such item in violation, infringement or the like of rights, under such patent, copyright, trademark, or application.

16. It is the responsibility of the bidder to ensure that the Bid or Quote, signed by an individual authorized to bind the bidder, arrives by the date and time and at the place indicated on the Invitation for Bid or Documented Quote. LATE BIDS WILL NOT BE ACCEPTED OR CONSIDERED. Receipt of a Documented Quote by the submission date and time is not an absolute criterion in determining responsiveness and Quotes received prior to the time of award may be considered, at the discretion of the University. The bidder is responsible for submitting its response to either an Invitation for Bid or Documented Quote as directed by the solicitation.

17. The bid or quoted price shall be exclusive of any federal, state or local taxes from which Colorado State University is exempt. Our Federal Excise Tax Exemption Certificate of Registry Number is 84-730-123K. Our Colorado State and Local Sales Tax Exemption Number is 98-02381.

- Appx346 -

18. ANTI-KICKBACK ACT of 1986. Bidder represents that they have not provided or attempted to provide any kickback to any employee or agent of Colorado State University. All reports of possible kickbacks shall be submitted in writing to the Internal Auditing Department, Colorado State University System, Fort Collins, CO 80523-0019. Reports may also be made by telephone to 970- 491-6176.

19. Insurance. If required by the solicitation, the Contractor shall obtain and maintain at all times during the performance of any contract or purchase order, insurance as specified. If insurance requirements are not specified in the solicitation, the Contractor represents that at the time of acceptance of any contract or purchase order, the Contractor maintains comprehensive general liability insurance in an amount not less than $1,000,000, combined single limit; worker's compensation insurance as required by law; and automobile liability insurance for all vehicles to be used by Contractor in the performance of the specified work. Upon request, Contractor shall provide proof of such coverages. Self-insurance programs do not meet the state's or the University's insurance requirements unless the Contractor provides satisfactory evidence of a loss reserve fund of not less than the minimum coverage amount specified in the solicitation, plus excess liability coverage as appropriate to the industry; financial statements of the business; and proof of Department of Labor certification of self-insurance program for worker's compensation.

20. SMALL, WOMEN-OWNED, AND MINORITY-OWNED PARTICIPATION. It is the policy of the University to contribute to the establishment, preservation, and strengthening of small businesses and businesses owned by women, minorities, veteran, service-disabled veterans, and disadvantaged small business concerns, and to encourage their participation in State procurement activities. The University encourages Contractors to provide for participation of these businesses through subcontracts or other contractual opportunities in connection with the performance of the contract awarded under this solicitation. Submission of a report of past efforts to utilize the goods and services of such businesses and plans for involvement on this contract are not required, but may be considered by the evaluation committee reviewing the proposals.

21. Cooperative Purchasing. It is the intent of this solicitation and any resulting Agreement to allow for cooperative purchasing. Accordingly, any public body (to include government/state agencies, political subdivisions, etc.), cooperative purchasing organizations, public or private health or educational institution, or any University related foundation may access the Agreement if authorized by the Selected Supplier(s). The Selected Supplier(s) will notify the University in writing of any participating entities who were denied access to this Agreement and why. Participation in this cooperative procurement is strictly voluntary. If authorized by the Selected Supplier(s), the Agreement may be extended to the entities indicated above to purchase goods and services in accordance with the Agreement. As a separate contractual relationship, the participating entity will place its own orders with the Selected Supplier(s) and will fully and independently administer its use of the Agreement to include contractual disputes, invoicing and payments without direct administration from the University. No modification of the Agreement or execution of a separate agreement is required to participate; however, the participating entity and the Selected Supplier(s) may modify the terms and conditions of the Agreement to accommodate specific governing laws, regulations, polices, and business goals required by the participating entity. Any such modification will apply solely between the participating entity and the Selected Supplier(s). The Selected Supplier(s) will notify the University in writing of any such entities accessing the Agreement. The Selected Supplier(s) will provide semi-annual usage reports for all entities accessing the Agreement. The University will not be held liable for any costs or damages incurred by any other participating entity as a result of any authorization by the Selected Supplier(s) to extend the Agreement. It is understood and agreed that the University is not responsible for the acts or omissions of any entity and will not be considered in default of the Agreement no matter the circumstances. Use of the Agreement does not preclude any participating entity from using other agreements or competitive processes as needed.

SPECIFIC FOR MYERS POWER PRODUCTS

PURCHASE ORDER TERMS AND CONDITIONS

**FOR PURCHASE OF GOODS**

1. This Purchase Order constitutes the entire contract between the Board of Governors of the Colorado State University System, acting by and through Colorado State University or Colorado State University-Pueblo (both Institutions referred to hereafter as "University"), and the named Vendor. The terms and conditions set forth herein may not be altered, deleted or added to without the express written consent of the University. Any terms and conditions contained in any attachment or other extraneous document shall be null and void unless expressly accepted by the University. Commencement of performance by Vendor constitutes agreement to the terms and conditions set forth herein regardless of whether or not Vendor has countersigned this Purchase Order.

2. Payment: To ensure prompt payment, mail invoices in duplicate for each shipment. Invoices not mailed as directed may delay payment or become lost. Reference the purchase order number on the invoice(s) and mail invoice(s) to the appropriate institution: Colorado State University, Accounts Payable, 6003 Campus Delivery, Fort Collins, CO 80523 or Colorado State University-Pueblo, Accounts Payable, 2200 N. Bonforte Blvd., Administration Building Room #212, Pueblo, CO 81001. The University's standard payment term is Net 30. Cash Discount Period (if applicable) will start from date of receipt of acceptable invoice or from date of receipt of acceptable merchandise at destination, whichever is the later.

3. The laws of the State of Colorado, U.S.A., shall govern in connection with the formation, performance and the legal enforcement of this purchase order. Further, Procurement Rules established by each University, available at http://procurement.colostate.edu/policy/documents/CSU%20Proc%20Rules.pdf for Colorado State University or https://www.csupueblo.edu/purchasing/ doc/procurement-rules-2019.pdf, govern this procurement. Unless otherwise specified in the solicitation or this order, venue for any judicial action arising out of or in connection with this purchase order shall be in the county wherein the applicable University is located. Vendor shall exhaust administrative remedies as set forth in the Procurement Rules, prior to commencing any judicial action against the University. All references in this purchase order to the Uniform Commercial Code shall mean the Uniform Commercial Code as adopted by the State of Colorado at Title 4, C.R.S., as amended.

4. None of the terms or specifications stated in this purchase order may be added to, superseded or otherwise altered except in writing, signed by an authorized procurement representative of either University. Each shipment received by the University from Vendor shall be deemed to be only upon the terms contained in this purchase order and any signed contract of the parties, notwithstanding any terms that may be contained in any acknowledgement, invoice form or other document of Vendor and notwithstanding the acceptance or payment by the University.

5. This purchase order is an acceptance of your offer as summarized in your quotation. When this purchase order is an offer to buy, your acceptance must show promised delivery date and method of shipping including routing and names of carriers. This purchase order shall not be deemed valid unless it is executed by a Purchasing Agent for either University. The University shall have no responsibility or liability for products or services delivered or performed prior to proper execution hereof.

6. Please advise Purchasing Agent immediately if you cannot make complete shipment to arrive on your promised delivery date as noted, or if services cannot be commenced or completed as promised.
   a. Acknowledgement of purchase order (if required) must be signed and returned.
   b. Your acknowledgement must show expected shipping date and method of shipping. Routing and names of carriers to be provided prior to shipping.
   c. In the event of Vendor's failure to deliver specifically for reasons not related to any delays caused by the University, upon advanced written notice, the University reserves the right to cancel its purchase order or contract. In the event the delay to deliver is not the sole fault of the Seller, Seller's Cancellation Policy, attached herein, shall apply.

7. This order is made of the following express terms:
   a. Goods are subject to University inspection upon arrival.
   b. Goods rejected due to failure to meet specifications, either when shipped or due to defects or damage in transit, may be returned to you for credit, and are not to be replaced except upon receipt of written instructions from the University. Seller shall make all transportation arrangements for the return of any goods. Free and unfettered access by common carrier shall be secured by the University.
   c. Additional charges for packing will not be accepted.
   d. A packing list must accompany each shipment.
   e. Intentionally Omitted
   f. Shipments must be F.O.B., Colorado State University, Fort Collins, Colorado or F.O.B., Colorado State University-Pueblo, Pueblo, Colorado unless otherwise specified on this order. If permission is given to prepay freight and charge separately, original freight bill must accompany invoice.
   g. Colorado State University (CSU) and Colorado State University-Pueblo (CSU-P), agencies of the State of Colorado, are by statute exempt from state and local taxes. CSU Exemption Number is 98-02381and its Federal Excise Tax Exemption Certificate of Registry #84-730123K is on file with the Internal Revenue Service, Ogden,

Utah. CSU-P Exemption Number is 98-00585 and its Federal Excise Tax Exemption Certificate of Registry #84-0517947 is on file with the Internal Revenue Service, Denver, Colorado.

8.   Vendor certifies that it meets prevailing wage rates in its area and warrants compliance with the provisions of the Davis-Bacon Act when applicable.

9.   Quality.  The University will be the sole judge in determining "equals" with regard to quality, price and performance.  All products delivered shall be newly manufactured and of the manufacturer's current model, unless otherwise specified.

10.  Safety Information.  All chemicals, equipment and materials proposed and/or used in the performance of this purchase order must conform to the standards required by the Occupational Safety and Health Act of 1970.  Bidders must furnish Safety Data Sheets (SDS) for any regulated chemicals, equipment or hazardous materials at the time of delivery.

11.  Rights in Data, Documents, and Computer Software or Other Intellectual Property. Unless otherwise agreed in writing, any software, research, reports, studies, data, photographs, negatives or other documents, drawings or materials delivered by Vendor in the performance of its obligations under this purchase order shall be the exclusive property of the University.  The ownership rights described herein shall include, but not be limited to, the right to copy, publish, display, transfer, prepare derivative works, or otherwise use the works.

12.  Indemnification. The Vendor shall indemnify, save and hold harmless the Board of Governors of the Colorado State University System acting by and through Colorado State University and Colorado State University-Pueblo, divisions of the State of Colorado, their employees and agents, against actual claims, damages, liability and court awards including verifiable, directly related costs, expenses, and reasonable attorney fees incurred as a result of any act or omission by the Vendor, or its employees, agents, subcontractors or assignees pursuant to the terms of this purchase order. In the event any article sold or delivered under this purchase order is covered by any patent, copyright, trademark, or application therefore, the vendor will indemnify and hold harmless the Board of Governors of the Colorado State University System acting by and through Colorado State University and Colorado State University-Pueblo, divisions of the State of Colorado, from actual liability, verifiable and directly related cost, expenses and reasonable attorney's fees incurred on account of any claims, legal actions, or judgments arising out of manufacture, sale or use of such article in violation, infringement or the like of rights under such patent, copyright, trademark or application.

13.  Termination.  Termination for Default/Cause.
    a.  Except as otherwise agreed, the Uniform Commercial Code shall govern in the case of transactions in goods. In the case of services, if the Vendor refuses or fails to timely perform any of the provisions of this purchase order, with such diligence as will ensure its completion within the time specified in this purchase order, as mutually agreed between the Parties, the Purchasing Agent may notify the Vendor in writing of the non-performance, and if commence to cure is not within the time specified, such Agent may terminate the Vendor's right to proceed with the work or such part of the work as to which there has been delay or a failure to properly perform. The Vendor shall continue performance of the purchase order to the extent it is not terminated and may be liable for excess reasonable, verifiable and mutually agreed costs incurred in procuring similar goods or services elsewhere. Payment for completed services performed and accepted shall be at the purchase order price. Acceptance shall occur within five (5) days after delivery.
    b.  In the case of remedies exercised under this paragraph for services, or analogous remedies exercised under the Uniform Commercial Code for transactions in goods, upon advanced written notice and agreement by the Vendor, the University may withhold amounts due to the Vendor as reasonably necessary and as mutually agreed between the University and Vendor to reimburse the University for excess costs incurred in curing, completing or procuring similar goods and services.
    c.  The Vendor shall not be in default by reason of any failure in performance of this purchase order in accordance with its terms if such failure arises out of acts of God; acts of the public enemy; acts of the State and any governmental entity in its sovereign or contractual capacity; fires; floods; epidemics; quarantine restrictions; strikes or other labor disputes; freight embargoes; or unusually severe weather; provided, however, that such causes may entitle the University to terminate this order for convenience. In the event of termination, CSU shall pay vendor for all work in-process or completed prior to termination pursuant to the Vendor's Cancellation Policy included with this proposal. In no case will the payment exceed the value of the purchase order.
    d.  If after rejection, revocation, or other termination of the Vendor's right to proceed under the provisions of the Uniform Commercial Code (in the case of transactions in goods) or this clause (in the case of services), it is determined for any reason that the Vendor was not in default under the provisions of this clause, or that the delay was excusable, the rights and obligations of the parties shall be the same as if the notice of termination had been issued pursuant to the termination for convenience clause.

14.  Termination for Convenience.
    a.  Cancellation Prior to Contract Formation. When this purchase order is not accepted by written acknowledgment, this purchase order may be canceled by written notice to the Vendor prior to beginning of performance of services.
    b.  Termination after Contract Formation. Unless otherwise agreed in writing, in addition to the rights and remedies governing transactions in goods in the Uniform Commercial Code, the Purchasing Agent may, when the interests of the University so require, terminate this purchase order in whole or in part, for the convenience of the University. The Purchasing Agent shall give written notice of the termination to the Vendor specifying the part of the purchase order terminated and when termination becomes effective. Upon receipt of the notice of termination, the Vendor shall incur no further obligations except to the extent necessary to mitigate costs of performance. In the case of

PURCHASE ORDER TERMS AND CONDITIONS FOR PURCHASE OF GOODS                                   Revised September 23, 2021

services or specially manufactured goods, the University shall pay reasonable settlement expenses, the contract price or rate for supplies and services delivered and accepted, the reasonable costs of performance on unaccepted supplies and services, and a reasonable profit for that unaccepted work, in accordance with the cost principles promulgated under each University's respective Procurement Rules, as amended. In the case of existing goods, the University shall pay reasonable settlement expenses, the contract price for goods delivered and accepted, reasonable costs incurred in preparation for delivery of the undelivered goods, and a reasonable profit for that preparatory work. The amount of the termination liability under this paragraph shall not exceed the amount of the purchase order price plus a reasonable cost for settlement expenses. The Vendor agrees to submit a termination proposal as well as reasonable supporting documentation, cost and pricing detail upon request of the Purchasing Agent. Vendors Cancellation Policy is attached for review and acceptance. CSU will confirm acceptance of Vendor's Cancellation Policy prior to the start of Work under this agreement.

15. Receipt of merchandise, services or equipment in response to this order shall result in authorized payment on the part of the University.  However, it is to be understood that final acceptance, which such final acceptance shall not exceed 90 days after delivery of equipment, is dependent upon completion of all applicable required inspection procedures. Should the service rendered or merchandise furnished fail to meet all inspection requirements, the University reserves the right to reject all or some of the goods and services or exercise any other remedies provided by law during the warranty period. Vendor shall be notified in writing within 24 hours of such rejections with reason for rejection.

16. Assignment and Successors. Neither the Vendor or CSU shall assign rights or delegate duties under this purchase order or subcontract any part of the performance required under the purchase order, without the express written consent of the other Party, which shall not be unreasonably withheld. This purchase order shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. In the event of assignment of accounts receivable, Seller shall notify the University in writing.

17. All provisions and remedies of the Uniform Commercial Code relating to both implied and expressed warranties are herewith referred to and made part of this agreement.

18. All parties to this purchase order agree that the representatives named herein are, in fact, bona fide and possess full and complete authority to bind said parties.

19. Compliance with Laws.  Vendor agrees to comply with all applicable federal and state laws, regulations and policies, as amended, including those regarding discrimination, unfair labor practices, anti-kick-back and collusion.

20. Sensitive Data:  To the extent Vendor comes in contact with individual personal data owned or otherwise held by the University as a result of performing under the purchase order ("Data"); Vendor agrees to use such Data, if at all, only to the extent required to perform its obligations under this purchase order and to abide by the requirements of any federal, state and local laws that address the protection and/or use of such Data.

21. Americans with Disabilities Act (ADA) Requirements.  If this purchase order includes the provision of university services to the public, the Vendor shall, in addition to any other requirements under Title 11 of the Americans with Disabilities Act, comply with the requirements of the Americans with Disabilities Act regarding the accessibility of the University's services and programs, as an explicit requirement.  The Vendor assures that, at all times during the performance of this purchase order, no qualified individual with a disability shall, by reason of that disability, be excluded from participation in, or be denied benefits of, services, programs, or activities performed by the Vendor for the benefit of the University.

22. Vendor acknowledges that providing goods and services under this purchase order is subject to compliance with laws that relate to the export of technical data or equipment, such as International Traffic in Arms Regulations ("ITAR") and/or Export Administration Act/Regulations ("EAR").  Vendor agrees to comply with all such laws, regulations and orders as currently in effect or hereafter amended.  Vendor shall not disclose any export-controlled information, or provide any export-controlled equipment or materials to the University without prior written notice.  In the event that the University agrees to receive such export-controlled information, equipment or materials, Vendor shall (i) include the Export Control Classification Number (ECCN) or ITAR notice on the packing documentation, and (ii) send an electronic copy of the ECCN number and packing documentation to the Office of the General Counsel at Colorado State University or Colorado State University - Pueblo.

23. Fund Availability; Federal Funds Contingency. Financial obligations of the University, as a division of the State of Colorado, payable after the current fiscal year are contingent upon funds for that purpose being appropriated, budgeted and otherwise made available. If this purchase order is funded in whole or in part with federal funds, this purchase order is subject to and contingent upon the continuing availability of federal funds for the purposes hereof. If this purchase order contemplates the purchase of goods to be delivered in a single installment, the University represents that it has set aside sufficient funds to make payment under this purchase order in accordance with its term.

24. Vendor Offset. Pursuant to CRS 24-30-202.4, as amended, the State Controller may withhold payment for debts owed to state agencies under the vendor offset intercept system for: (a) unpaid child support debt or child support arrearages; (b) unpaid balance of tax, accrued interest, or other charges specified in Article 21, Title 39, CRS; (c) unpaid loans due to the Student Loan Division of the Department of Higher Education; (d) owed amounts required to be paid to the unemployment compensation fund; and (a) other unpaid debts owing to the state or any agency thereof, the amount of which is found to be owing as a result of final agency determination or reduced to judgment as certified by the State Controller. In the event University must withhold payments for debts owed under this provision, University will notify Vendor in advance of withholding as early as possible.

PURCHASE ORDER TERMS AND CONDITIONS FOR PURCHASE OF GOODS                    Revised September 23, 2021

25. Insurance. The Vendor shall obtain and maintain at all times during the term of this purchase order, insurance as specified in the solicitation or order. If insurance requirements are not specified in the solicitation or order, the Vendor represents that at the time of acceptance of this order the Vendor maintains comprehensive general liability insurance in an amount not less than $1,000,000, combined single limit; worker's compensation insurance as required by law; and automobile liability insurance for all vehicles to be used by Vendor in the performance of services under this order. Upon request, Vendor shall provide proof of such coverages. Self-insurance programs do not meet the state's or the University's insurance requirements unless the Vendor provides satisfactory evidence of a loss reserve fund of not less than the minimum coverage amount specified in the solicitation, plus excess liability coverage as appropriate to the industry; financial statements of the business; and proof of Department of Labor certification of self-insurance program for worker's compensation.

26. INDEPENDENT CONTRACTOR.  4 CCR 801-2.  Vendor shall perform its duties hereunder as an independent contractor and not as an employee.  Neither Vendor nor any agent or employee of Vendor shall be or shall be deemed to be an agent or employee of the university.  Vendor shall pay when due all required employment taxes and income taxes and local head taxes on any monies paid by the university pursuant to this contract.  Vendor acknowledges that Vendor and its employees are not entitled to unemployment insurance benefits unless Vendor or a third party provides such coverage and that the University will not pay for or otherwise provide such coverage.  Vendor shall have no authorization, express or implied, to bind the University to any agreement, liability or understanding, except as expressly set forth herein.  Vendor shall provide and keep in force workers' compensation (and provide proof of such insurance when requested by the University) and unemployment compensation insurance in the amounts required by law and shall be solely responsible for its acts and those of its employees and agents.

27. PUBLIC CONTRACTS FOR SERVICES. CRS §8-17.5-101. [*Not Applicable to agreements relating to the offer, issuance, or sale of securities, investment advisory services or fund management services, sponsored projects, intergovernmental agreements,  or information technology services or products and services*] Vendor certifies, warrants, and agrees that it does not knowingly employ or contract with an illegal alien who will perform work under this contract and will confirm the employment eligibility of all employees who are newly hired for employment in the United States to perform work under this contract, through participation in the E-Verify Program or the Department program established pursuant to CRS §8-17.5-102(5)(c), Vendor shall not knowingly employ or contract with an illegal alien to perform work under this contract or enter into a contract with a subcontractor that fails to certify to Vendor that the subcontractor shall not knowingly employ or contract with an illegal alien to perform work under this contract. Vendor (a) shall not use E-Verify Program or Department program procedures to undertake pre-employment screening of job applicants while this contract is being performed, (b) shall notify the subcontractor and the university within three days if Vendor has actual knowledge that a subcontractor is employing or contracting with an illegal alien for work under this contract, (c) shall terminate the subcontract if a subcontractor does not stop employing or contracting with the illegal alien within three days of receiving the notice, and (d) shall comply with reasonable requests made in the course of an investigation, undertaken pursuant to CRS §8-17.5-102(5), by the Colorado Department of Labor and Employment.  If Vendor participates in the Department program, Vendor shall deliver to the university a written, notarized affirmation, affirming that Vendor has examined the legal work status of such employee, and comply with all of the other requirements of the Department program. If Vendor fails to comply with any requirement of this provision or CRS §8-17.5-101 et seq., the University may terminate this purchase order for breach and, if so terminated, Vendor shall be liable for damages.

28. PUBLIC CONTRACTS WITH NATURAL PERSONS. CRS §24-76.5-101. Vendor, if a natural person eighteen (18) years of age or older, hereby swears and affirms under penalty of perjury that he or she (a) is a citizen or otherwise lawfully present in the United States pursuant to federal law, (b) shall comply with the provisions of CRS §24-76.5-101 et seq., and (c) has produced one form of identification required by CRS §24-76.5-103 prior to the effective date of this purchase order.



**Cancellation Policy**

An order may be canceled by the purchaser only upon the written notice and upon payment to the company of reasonable and proper cancellation charges. The expenses to be covered by these charges would include an unrecoverable cost incurred by the company. In addition, a one-time charge will be made to compensate for lost profits, disruptions in schedules, planned production and other indirect costs. It is recognized that it is impossible to determine exactly these indirect costs. As such, it is agreed that the one-time charge is acceptable and proper. Total cancellation charges will be calculated as follows:

**Order Entry:**

After receipt of an order at the factory and order processing, but prior to the start of engineering, there will be a one-time 5 percent charge, with a minimum of $1,000.00 for any one order.

**Release for Engineering:**

After an order has been released for engineering, there will be a one-time 10 percent charge for cancellation plus any actual costs incurred including vendor cancellation charges, engineering labor expended plus costs associated with engineering overhead, selling, general and administrative expenses.

**Release for Manufacture:**

After an order has been released for manufacture and scheduled for production, there will be a one-time 10 percent charge for cancellation plus any actual costs incurred including, but not limited to, vendor cancellation charges, all materials received or expended, shop and engineering labor plus costs associated with manufacturing and engineering overhead, selling, general and administrative expenses.

**Cancellation Scheduled as follows:**

- **5% of Contract Value After Receipt of Order**
- **Plus 10% After Release to Engineering for Submittals**
- **Plus 50% After Release to Purchasing**
- **Plus 25% After Release to Production**
- **Up to 100% of Contract Value based on POC (percentage of completion)**

In addition to the above charges, a reasonable profit of 10 percent will be allowed and payable against all identified costs incurred by the time of cancellation. Cancellation costs will be due and payable within 30 days of submittal of a proper invoice for such costs. Any amount not paid within 30 days will be subject to late charges of 1 percent per month for each fraction of a month that payment is received late at MPP.

**IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED THIS AMENDMENT**

*Persons signing for Contractor hereby swear and affirm that they are authorized to act on Contractor's behalf and acknowledge that Colorado State University is relying on their representations to that effect and accept personal responsibility for any and all damages the University may incur for any errors in such representation.

| **CONTRACTOR:** | **STATE OF COLORADO** |
|---|---|
| Myer's Power Products Inc. | **Jared Polis, GOVERNOR** |
| | Board of Governors of the Colorado State University System, acting by and through Colorado State University |

CONTRACTOR:

Myer's Power Products Inc.

By: _PATRICE dAVEZAN_
pATRICE dAVEZAN (Apr 25, 2025 14:48 PDT)

Name: PATRICE dAVEZAN

Title: Director, Contracts Management

Date: Apr 25, 2025

STATE OF COLORADO
Jared Polis, GOVERNOR
Board of Governors of the Colorado State University System, acting by and through Colorado State University

By: _B. Hanlon_
Brendan Hanlon (Apr 28, 2025 09:08 MDT)

Name: Brendan Hanlon

Title: Vice President for University Operations

Date: Apr 28, 2025

**REQUIRED APPROVALS:**

By: _Sandra Sheahan_

Name: Sandy Sheahan

Title: AVP of Facilities Operations

Account No: _____

**LEGAL REVIEW**
Philip J. Weiser, Attorney General

By: _Brian Anderson_
Brian Anderson (Apr 22, 2025 11:08 MDT)

Brian Anderson, Esq.
Associate Legal Counsel
Office of the General Counsel

**ALL EXPENDITURE CONTRACTS REQUIRE APPROVAL by the UNIVERSITY CONTROLLER**

CRS §24-30-202 and University policy require the University Controller to approve all expenditure contracts. This Amendment is not valid until signed and dated below by the University Controller or delegate. Contractor is not authorized to begin performance until such time. If Contractor begins performing prior thereto, the University is not obligated to pay Contractor for such performance or for any goods and/or services provided hereunder.

**COLORADO STATE UNIVERSITY CONTROLLER**

By: _David Ryan_
David Ryan (Apr 29, 2025 09:31 MDT)

Date: Apr 29, 2025

- Appx353 -

# Attachment 4

4/30/25, 8:34 AM                    State.co.us Executive Branch Mail - Fwd: Tariff Impact and Price Adjustments



Chapman - DPA, John <john.chapman@state.co.us>

---

## Fwd: Tariff Impact and Price Adjustments

**Swift - DPA, Brian** <brian.swift@state.co.us>                    Mon, Apr 28, 2025 at 11:14 AM
To: John Chapman - DPA <john.chapman@state.co.us>

Passing your way.


Regards,
Brian Swift
**State Procurement Administrator**
State Purchasing and Contracts Office



1525 Sherman St., Denver, CO 80203
brian.swift@state.co.us  |  www.colorado.gov/osc/spo

With Canary for State Price Agreements, you can now provide feedback on the suppliers that you've worked with!
Please visit our Canary for State Price Agreements webpage for more information.



---------- Forwarded message ---------
From: **OfficeDepot PricingCompliance** <OfficeDepotPricingCompliance@officedepot.com>
Date: Wed, Feb 26, 2025 at 3:21 PM
Subject: Tariff Impact and Price Adjustments
To: brian.swift@state.co.us <brian.swift@state.co.us>



2/26/2025

Dear Brian Swift,

As you may be aware, the U.S. government has announced that it will be imposing tariffs on goods imported from China, Mexico, and Canada. These tariffs will increase the cost of the products from these countries, and we simply are unable to absorb the entire financial burden.

Therefore, effective on March 1, 2025, we will be implementing a price adjustment on those products sourced from China. All price adjustments for affected products will be calculated based on the tariff's specific impact on each product's customer selling price. Attached to this letter is a list of your impacted core list SKUs.

Going forward, we will continuously monitor the imposition of any additional tariffs on products imported from Canada and Mexico, as well as on any other country supplying products to our business, and as a result, we may need to make further price adjustments as may be necessary.

Please know that we are actively exploring ways to mitigate the financial impact of these tariffs and as always, despite these extreme global economic challenges, our commitment to providing you with high-quality products and exceptional service remains unwavering. We believe that these price adjustments are critical to ensuring both the continued sustainability of our business as well as our ability to deliver the utmost value you expect from ODP Business Solutions.

Your service representative will be reaching out with additional details and information so please let them know should you have questions. We appreciate your understanding as we navigate this situation.

4/30/25, 8:34 AM                              State.co.us Executive Branch Mail - Fwd: Tariff Impact and Price Adjustments

Thank you for your valued partnership,

**Tom Riccio**
SVP of Sales
ODP Business Solutions

***CONFIDENTIALITY NOTICE: The information contained in this email and attached document(s) may contain confidential information that is intended only
for the addressee(s). If you are not the intended recipient, you are hereby advised that any disclosure, copying, distribution or the taking of any action in
reliance upon the information is prohibited. If you have received this email in error, please immediately notify the sender and delete it from your system.

TArifFs2025NA

---

**2 attachments**



**Logo.jpg**
5K

**NASPO State of Colorado +1% - 1459 - 2025 Tariffs.xlsx**
368K

# Attachment 5



**DENVER OFFICE**
2000 W. Quincy Ave
Englewood, CO 80110
P: 720-389-8633
F: 720-242-9276

**MAIN OFFICE/ACCOUNTING**
2450 N. Townsend Ave
Montrose, CO 81401
P: 970-240-5971
F: 970-240-0951

**SEATTLE OFFICE**
4210 B St NW, Ste A
Auburn, WA 98001
P: 253-243-6172
F: 253-243-6194

April 11, 2025                    Email:    geoffry@formworksdesigngroup.com

Formworks Design Group                    Re:    ██████████
P.O. Box 476 | Eastlake, CO 80614              <mark>LEADED GLASS PANEL CHANGE ORDER</mark>

We are providing this Change Order for review and approval. All work will be performed as directed by the FormWorks+ Design Group. All materials will be installed in accordance with the manufacturer's written recommendations.

## Leaded Glass Panel Material Change Order

Due to the most recent tariffs imposed on our vendors, we are providing this Change Order for review and approval. Denver Art Glass has notified Summit that the cost of the lead came is affected and therefore is requesting additional funding.

## Change Order Total:                    $3,700.00

Upon review and approval Summit Sealants and Restoration Services Inc. will submit all necessary schedules, mock-ups, samples, technical data sheets etc.

Sincerely,

*Derek L. Cole*

Summit Sealants and Restoration Services Inc.

Derek L. Cole
Project Manager
970-964-8056
derekc@summitsealants.com

---

*April 11, 2025*                                                        *Page: 1/1*

*"AT THE TOP OF THE INDUSTRY IN THE WESTERN UNITED STATES FOR OVER 20 YEARS"*



**DENVER OFFICE**
2000 W. Quincy Ave
Englewood, CO 80110
P: 720-389-8633
F: 720-242-9276

**MAIN OFFICE/ACCOUNTING**
2450 N. Townsend Ave
Montrose, CO 81401
P: 970-240-5971
F: 970-240-0951

**SEATTLE OFFICE**
4210 B St NW, Ste A
Auburn, WA 98001
P: 253-243-6172
F: 253-243-6194

September 19, 2024                          Email: ███████████@gmail.com

███████████████████              Re: ██████████████ PHASE 5 -WINDOW
██████████████                          RESTORATION AND PROTECTIVE
                                              GLAZING

In accordance with Formworks design group request to perform Historic Restoration repairs at the above-mentioned property, we are providing our proposal for review and approval. All work will be performed as directed by the Formworks design group. All materials approved and specified will be installed in accordance with the manufacturer written recommendations.

**Task A: East Monumental and Select North and East Window Restoration      $95,881.00**

- East Sanctuary Monumental #113, North and East tilt windows #'s 105, 106, 107 and 111.
- Coordinate with DAG for stained glass panel restoration. Frame and Sash restoration follow Preservation Brief 9. Glass panel restoration from DAG included in line-item pricing.

**Task B: East Monumental and Select North and East Window Protective Glazing      $25,133.00**

- East Sanctuary Monumental #113, North and East tilt windows #'s 105, 106, 107 and 111.
- ¼" Clear Tempered protective glazing including venting foam tape.

**General Conditions                                                    $38,345.00**

**Bonding                                                                $5,484.00**

**Overhead & Profit                                                     $17,072.00**


**Total for all line items listed above                            $181,915.00**

---

*September 19, 2024*                                                    *Page: 1/3*



**SUMMIT**
RESTORATION · INSULATION
WATERPROOFING · STONE

| <u>DENVER OFFICE</u> | <u>MAIN OFFICE/ACCOUNTING</u> | <u>SEATTLE OFFICE</u> |
|---|---|---|
| 2000 W. Quincy Ave | 2450 N. Townsend Ave | 4210 B St NW, Ste A |
| Englewood, CO 80110 | Montrose, CO 81401 | Auburn, WA 98001 |
| P: 720-389-8633 | P: 970-240-5971 | P: 253-243-6172 |
| F: 720-242-9276 | F: 970-240-0951 | F: 253-243-6194 |

**\*\*\* ADD/ALTERNATE\*\*\***                                                    **$6,378.00**
Owner Funded Glass panel restoration with religious iconography/connotation, #113 Bottom
Center.

**Total for all line items listed above including Alternate**          **$188,293.00**

**Recommended to include a contingency minimum of 10%.**
The proposed work is to be completed during regular working hours M-F, 7:00 am – 3:30 pm.

Payment Terms: "Net 30 Days. Price is valid for 30 days."
This proposal is proprietary and confidential, intended only for the recipients addressed above.

Due to the rapid change in cost associated with materials and labor Summit Sealants reserves the
right to adjust the pricing accordingly. Pricing is based on current material costs and labor rates.
Any change in pricing will be executed with a written Change Order and authorized prior to
execution.

General Exclusions: Adequate- water, power, sanitation, staging/laydown area, notifying
tenants/public of noise associated with work, landscaping, temporary storage, uninterrupted
access to work location, Removal or replication of any interior furnishings, including window
treatments and coverings, multiple mobilizations/demobilizations, Fencing, abatement, Parking,
any scope of work outside of what is mentioned in this proposal.

*September 19, 2024*                                                              *Page: 2/3*



| **DENVER OFFICE** | **MAIN OFFICE/ACCOUNTING** | **SEATTLE OFFICE** |
|---|---|---|
| 2000 W. Quincy Ave | 2450 N. Townsend Ave | 4210 B St NW, Ste A |
| Englewood, CO 80110 | Montrose, CO 81401 | Auburn, WA 98001 |
| P: 720-389-8633 | P: 970-240-5971 | P: 253-243-6172 |
| F: 720-242-9276 | F: 970-240-0951 | F: 253-243-6194 |

Summit Sealants and Restoration Services Inc. proposal is based on its review of the Form+Works Construction Documents Dated March 26, 2024 and on our experience in the industry performing similar scopes of work. Should work reveal hidden problems or defects, changes may be required in the scope of work with additional costs associated with this new work.

Upon review and approval, Summit Sealants and Restoration Services Inc. will submit all necessary schedules, mock-ups, samples, technical data sheets etc.

Sincerely,
Summit Sealants and Restoration
**Derek Cole**
Project Manager
970-964-8056
derekc@summitsealants.com

*"AT THE TOP OF THE INDUSTRY IN THE WESTERN UNITED STATES FOR OVER 20 YEARS"*
- Appx361 -

# Attachment 6

**7 Summits Exteriors, DBA: 7 Summits Roofing LLC**

Ft Lyon Hail Damage Roofing Repairs – P051036          melani.burcham@state.co.us     720-668-0377

4775 Suite 104 Centennial Blvd; Colorado Springs, CO 80907

Phone: (719) 432-8619 FAX: (719) 447-0606 EMAIL: geoffb@7summitsexteriors.com

We hereby submit revised price estimates due to April 1st 2025  supplier increases for the Fort Lyon Supportive Residential Community:

SCOPE OF WORK:

Colorado Department of Local Affairs          Melani Burcham          **PROPOSAL**          4-1-25

- Shingle Roofs (2286 sq)
  o Install shingles per scope of work detailed by UBS in pre-bid documents: $1,310,306.00

**PROPOSAL SUBMITTED TO:**          **EMAIL:**     **CONTACT:**          **PHONE:**     **DATE**

- Metal Roofs (Corrugated, Standing Seam, R-Panel)
  o Install metal roofs per scope of work detailed by UBS in pre-bid documents: $531,020.00
- Tile Repair (4206 tiles to repair)
  o Replace broken Ludowici tiles on buildings as detailed by UBS in the pre-bid documents: $159,333.00
- Flat Roofs (110 sq)
  o Replace the low slope roofs per scope of work detailed by UBS in the pre-bid documents $348,000.00

Taxes are not included.

Anything not included in the UBS scope of work will be excluded from contract.

All work will be done according to the manufacturer's specifications and procedures. All work will have a 1-yr. workmanship warranty per the warranty requirements as published by the Colorado Department of Local Affairs

**Base Estimate as Written in UBS Scope of work as of April 1st, 2025. Includes all material, labor, overhead and profit:**

**Two Million Three Hundred and Forty Eight Thousand, Six Hundred and Fifty Nine Dollars and Zero Cents ($2,348,659.00)**

Payment Terms: Materials Billed when Purchased and on Site, remaining billing as written in DBB contract with 10% retainage held until final completion.

All material is guaranteed to be as specified. All work is to be completed in a workmanlike manner according to standard practices. Any alteration or deviation from the above specifications involving extra costs will be charged accordingly. Not responsible for roof leaks in areas other than those worked on.  Under no circumstance is 7 Summits Roofing and Exteriors responsible for existing damages to the building, its contents or roof deck.

Accepted By:

_____ Date_____

**Geoffrey Bray**. Vice President Residential and Steep Slope Roofing

SPECIAL CONDITIONS:  The following provisions are incorporated into the foregoing proposal (the "Proposal") by this reference:

1.) Either party may request additions and/or alterations to the Proposal.  Any such proposed alterations and/or modification must be in writing and approved by both parties in order to be binding.

2.) Any work not included within this Proposal will be performed only upon written work order approved by both parties at the additional cost of $90.00 per hour for labor and materials and/or other costs plus 15%.

4.) Any HVAC condenser units that have Freon lines going through the roof through pitch pans or some type of flashing box must have the existing sealant cleaned and new sealant applied as a part of the re-roofing process.  Rarely, but occasionally, these Freon lines are damaged or weak resulting in breakage and/or loss of the Freon causing problems for the unit.  This is an inevitable result of this cleaning process and both parties agree that if this happens it will be the owner or building tenant's responsibility to have these lines and any resulting consequences repaired at no cost to 7 Summits Roofing.

5.) The customer agrees to pay 7 Summits Roofing upon receipt of their invoice.  Invoices due, which are unpaid, shall bear interest from the date payment is due, at the rate of 14% per annum, simple interest.  Payment shall be considered to be in default 30 days after the date of the invoice, unless otherwise specified in writing.

6.) In the event the customer's account is in default, the customer agrees to pay all reasonable attorney fees, court costs or cost of collection incurred by 7 Summits Roofing in connection with this Proposal.

CUSTOMER AWARENESS:

1.) Before job commencement, it is the customer's responsibility to remove all breakable objects from interior walls and to cover all interior items where previous leaks have occurred.

2.) A precautionary walk-through of the building will be necessary, and is strongly recommended, by contractor and owner's representative, prior to the commencement of work, in order to ensure protection of all breakable objects and possible leak areas.

WORK/MATERIAL NOT INCLUDED:

1.) Repair of roof for damage caused by others or catastrophic damage due to natural catastrophe are not encompassed by the work in this Proposal.

2.) Other than those items specifically described in the foregoing Proposal, no corrections, replacement, or repair of any structural defects, vents, or mechanical equipment, or any electric related work including any required disconnection and re-connection of existing roof top equipment will accommodate the new roofing installation.

All roofing removed and job site waste will be removed from site and disposed of in an EPA State approved landfill



571 Colorado Springs CO
2675 Akers Dr.
Colorado Springs, CO 80922-1502
719-380-9911

February 21st, 2025

To our valued Customers,

Due to manufacturer's price increases and extreme volatility in the market, ABC Supply will have a 10% increase as of April 1st, 2025. This increase will apply to all new and existing orders. All existing orders that are shipped prior to this date will be honored, however any orders placed but not shipped will be subject to the price increase. Future increases are possible and we could see up to 25% increases in the next few months. Please consider factoring these increases into your quotes moving forward. We thank you for your business and look forward to working with you in the future.

Regards,

Jake Hayden

Office: 719-380-9911

Fax: 719-380-9907

Cell:719-243-4574

Jake.hayden@abcsupply.com

2675 Akers Dr.

Colorado Springs, CO 80922



1120 Elkton Dr. Suite H
Colorado Springs, CO 80907
O: 719-203-4803
vikingmetalsoffice@gmail.com

www.vikingmetalsupply.com

Date: March 14, 2025

To: Valued Viking Metals Customer

Re: Price Increase - Effective March 16, 2025

Dear Valued Customer,

We appreciate and value your continued trust in Viking Metals and thank you for your partnership. Although Viking Metals only deals in domestic steel, both the global and domestic markets for raw materials have experienced significant volatility since the beginning of 2025. In recent weeks, we have received price increases from all of our major suppliers of steel, paint, and coatings. Furthermore, ongoing inflation pressures on lumber, packaging, maintenance and labor have further impacted costs. Despite our efforts to mitigate these increases, it has been become necessary to to implement a price adjustment to ensure we maintain the service, reliability and quality we strive to provide to our customers.

**Effective on all orders received after March 16th, 2025:**

• Panels: Increase of 9-25%

• Trims, fasteners, secondary framing, and accessories: May be increased accordingly

Viking Metals is committed to transparency, and will continue to keep our customers informed of any other developments or changes. If you have any questions regarding these adjustments, please feel free to reach out to your sales representative or the Viking Metals office for any additional details.

We profoundly appreciate your understanding and support. Viking Metals is committed to our slogan: "Our mission is to deliver top-notch metal products to our customers at a competitive price, accompanied by exceptional service, setting a unique standard unmatched by any other company in the industry." And we look forward to our continuing partnership.

Sincerely,

Justin Evenson
Owner of Viking Metals

4/28/25, 12:21 PM                                         State.co.us Executive Branch Mail - Materials Budget Follow-up

  **STATE OF COLORADO**

**Burcham - DOLA, Melani <melani.burcham@state.co.us>**

---

## Materials Budget Follow-up

7 messages

---

**Burcham - DOLA, Melani** <melani.burcham@state.co.us>                    Thu, Apr 3, 2025 at 10:58 AM
To: Geoff Bray <geoffb@7summitsroofing.com>
Cc: Tana Lane - DPA <tana.lane@state.co.us>

Hi Geoff,

After reviewing your documentation, we have found that the materials increase to the budget does not have manufacturer
or supplier documentation to support this price increase.

It is possible you have sent this to DOLA. Will you please resend if that is the case? I have lost some things in our staffing
change over the past week.

Thank you,
Melani
--
**Melani Burcham, MA**
**Acting Campus Manager**
**Office of Homeless Initiatives**
She/Her | They/Them*
*Learn more about why my pronouns are displayed here

**Hours M-F 8-4:30**
**Upcoming out of office -** May 12-13, June 13 & 16

**We're Hiring!** We're excited to expand the Division of Housing team. Click here for our newest job postings.



**COLORADO**
**Department of Local Affairs**
Division of Housing

1313 Sherman St., Room 320 Denver, CO 80203
melani.burcham@state.co.us | P 720-668-0377 | www.colorado.gov/dola

*- Click here to sign-up for DOH email notifications.*

*Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public
disclosure.*

---

**Geoff Bray** <geoffb@7summitsroofing.com>                                Thu, Apr 3, 2025 at 11:27 AM
To: Burcham DOLA Melani <melani.burcham@state.co.us>
Cc: Tana Lane DPA <tana.lane@state.co.us>

Hi Melani,

Yes, I previously sent them to Brett, but I would be happy to pass them along this afternoon.
Sincerely,

Geoff

4/28/25, 12:21 PM                          State.co.us Executive Branch Mail - Materials Budget Follow-up

On Apr 3, 2025, at 10:58 AM, Burcham - DOLA, Melani <melani.burcham@state.co.us> wrote:

[Quoted text hidden]

---

**Burcham - DOLA, Melani** <melani.burcham@state.co.us>                          Thu, Apr 3, 2025 at 12:57 PM
To: Geoff Bray <geoffb@7summitsroofing.com>
Cc: Tana Lane DPA <tana.lane@state.co.us>

Thank you, Geoff

[Quoted text hidden]
[Quoted text hidden]

---

**Geoff Bray** <geoffb@7summitsroofing.com>                          Thu, Apr 3, 2025 at 1:50 PM
To: "Burcham - DOLA, Melani" <melani.burcham@state.co.us>
Cc: Tana Lane DPA <tana.lane@state.co.us>

Hi Melani and Tana,

Please see the attached documents from our two suppliers addressing the April 1st price increases we are using for the Ft Lyons project.  In the case of the Viking Metals letter, their increase was effective on March 16th.

Thank you!

**Geoff Bray**
Vice President of Residential Roofing

C: 719-757-0708
O: 719-432-8619



---

**From:** Burcham - DOLA, Melani <melani.burcham@state.co.us>
**Sent:** Thursday, April 3, 2025 12:57 PM
**To:** Geoff Bray <geoffb@7summitsroofing.com>
**Cc:** Tana Lane DPA <tana.lane@state.co.us>
**Subject:** Re: Materials Budget Follow-up

[Quoted text hidden]

---

**2 attachments**

📄 **ABC Supply Increase notice 4.1.2025.pdf**
82K

4/28/25, 12:21 PM                           State.co.us Executive Branch Mail - Materials Budget Follow-up

 **PRICE INCREASE NEWSLETTER - Viking Metals.pdf**
172K

---

**Geoff Bray** <geoffb@7summitsroofing.com>                          Thu, Apr 3, 2025 at 1:56 PM
To: "Burcham - DOLA, Melani" <melani.burcham@state.co.us>
Cc: Tana Lane DPA <tana.lane@state.co.us>

Hello,

My apologies, I just received the following communication from ABC Supply this morning. It addresses the
current market and updates on how prices could be volatile in the future with short notice. Obviously, the
outcomes of this communication are not in effect just yet, but these increases would be on top of our
current increase. It underscores the importance for us to move quickly to secure pricing.

Thank you.

**Geoff Bray**
Vice President of Residential Roofing

C: 719-757-0708
O: 719-432-8619



---

**From:** Geoff Bray <geoffb@7summitsroofing.com>
**Sent:** Thursday, April 3, 2025 1:50 PM
**To:** Burcham - DOLA, Melani <melani.burcham@state.co.us>

[Quoted text hidden]

[Quoted text hidden]

---

 **ABC Supply Tarrif Notification.pdf**
47K

---

**Burcham - DOLA, Melani** <melani.burcham@state.co.us>                Mon, Apr 7, 2025 at 8:31 AM
To: Geoff Bray <geoffb@7summitsroofing.com>
Cc: Tana Lane DPA <tana.lane@state.co.us>

Hi Geoff-

Wanted to provide you with status on this contract. I sent your additional information on to our insurance adjuster. I am
hoping to hear back from him today. I'll keep you posted.

[Quoted text hidden]
[Quoted text hidden]

---

**Geoff Bray** <geoffb@7summitsroofing.com>                          Mon, Apr 7, 2025 at 8:34 AM
To: "Burcham - DOLA, Melani" <melani.burcham@state.co.us>

- Appx369 -

4/28/25, 12:21 PM                    State.co.us Executive Branch Mail - Materials Budget Follow-up

Good morning! Thank you! Looking forward to getting this thing moving.


GEoff

[Quoted text hidden]

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, AND THE STATE OF VERMONT, | Case No.  1:25-cv-00077  DECLARATION OF JENIFER JOHNSON |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | |
| Defendants. | |

I, Jenifer Johnson, declare as follows:

1.      I am over the age of 18, competent to testify as to the matters herein, and testify based on personal knowledge, records kept in the ordinary course of business at the Illinois Department of Innovation and Technology ("DOIT"), and information I learned from DOIT personnel whose work I rely upon and who have assisted me in gathering this information from our institution.

2.      I am the Chief of Staff at DOIT. As Chief of Staff, I am the principal advisor to the DOIT Secretary to ensure that DOIT operations are aligned with DOIT's strategic goals and that

DOIT is delivering technology solutions that enhance efficiency and effectiveness for state government.

3.    DOIT is a state agency responsible for providing a wide range of information technology services to numerous agencies, boards, and commissions organized under the Governor of Illinois, as well as other state entities. 120 ILCS 1370.

**A.    Need to Equip State Employees with Computers**

4.    In its role as the information technology service provider for agencies, boards, and commissions under the Governor, DOIT regularly needs to supply personal computers, along with necessary accessories and support products (monitors, docking stations, and peripherals such as mice, keyboards, memory, hard drives, etc.), to state employees. This may occur at various times: including when new state employees are onboarded, as needed to fix or replace damaged or malfunctioning devices, or as part of scheduled rolling replacements of older devices that are currently in use.

5.    DOIT deploys over 20,000 new computers to state employees each year, including an average of about 300 computers deployed each month to new hires. While DOIT generally tries to maintain some amount of inventory for these products on hand, we frequently must place additional orders for these products to keep up with state needs.

6.    Under Illinois law, competitive source selection methods are often required for state contracts, such that many state contracts are awarded to vendors following a competitive solicitation, with the expectation that terms such as pricing will remain relatively stable across the life of the contract.

7.    Many of the computer products we purchase are imported by our vendors from China and Mexico. The vendor the state relies on to provide most of its laptops had to scramble to shift some of its production to Vietnam in response to the tariff announcements.

8.    DOIT has experienced difficultly in placing orders with its vendors on existing contracts for these products starting from late January of 2025, in expectation of tariffs and as the tariff announcements began. As a result, DOIT generally has not received new shipments of these

products during that time, and has now mostly (or, in many cases, entirely) exhausted its on-hand inventory of new products.

9.    Due to these product shortages, DOIT has paused its ongoing, rolling efforts to replace older devices in use by state employees, despite there being over 16,000 such computers currently eligible for replacement. The continued use of outdated technology by state workers will result in slower processing times for some computer transactions, increased down time for support and repair of older systems, greater security risks including the possibility of becoming unsupported by vendors, and related impacts to Illinois residents and the state government services they rely upon.

10.    As a result of these circumstances, it is already unavoidable that DOIT will soon need to begin deploying older computer devices to state workers to meet its onboarding needs for new hires, as well as to fix or replace any damaged or malfunctioning devices for current state employees. In addition to the risks of outdated technology, the impact of continued delays also means that DOIT technical teams will need to do double the work for all these deployments, as they will eventually need to replace any temporary devices deployed with new devices, when those eventually become available, and also wipe all temporary devices received back.

11.    Other impacts include delays to ongoing efforts to deploy new operating system software to many state computers, ahead of the current deadline to complete the transition for all systems—currently set by the software vendor for October 2025. Apart from older computers eligible for replacement, numerous other devices require upgraded memory or hard drive capacity to support the transition to the new operating system, but those upgrades have now been delayed. This is because DOIT  was unable to resolve tariff concerns with its vendors on existing contracts over product pricing during February and March, and as a result was unable to place any orders during that time. As a consequence of tariffs, these upgrades are expected to cost significantly more to provide once the component orders can eventually be filled. This transition needs to be done on a rolling basis to ensure sufficient support for state end users; the ongoing delays caused by the tariff announcements will place greater demands on our staff and make it less and less likely

that the state will be able to accomplish the transition in the remaining time. The longer the delays go on, the greater the pressure will become on DOIT's staff, and the less realistic it will be that the deadline can be met with available resources. To the extent the state ultimately cannot meet the software vendor's deadline, caused by these tariff-related delays in receiving needed computer equipment, DOIT expects significantly higher support costs for impacted devices.

12.    Beginning in late January of this year, DOIT worked with vendors that provide some of these products to amend the contracts at issue to allow for the possibility of price increases due to extreme cost increases outside of the vendors' control. This was needed in part because those contracts would not allow vendors to separately bill the State for any applicable tariffs. DOIT then agreed to an amendment that would allow for 20% price increases on a key contract, in response to tariffs that had at that point been applied to China.

13.    Despite DOIT agreeing to those changes, problems remained as contract amendments simply could not keep up with additional tariff announcements that have since occurred, as well as their unpredictability. As a result, DOIT has continued to experience difficulties in getting its vendors to issue quotes that would allow DOIT to place the orders it needs for these products.

14.    Given those ongoing difficulties, DOIT has now pivoted to negotiate and put in place a new contract that will allow it more flexibility, with a goal of obtaining these products. DOIT has had to agree that orders placed against that contract will provide that any legally required tariffs will be passed on to and paid by DOIT and the State of Illinois, with the applicable tariffs listed as separate line items on the invoice the vendor will submit for payment in connection with each order placed. In the interest of quickly getting this contract in place to provide an alternate path forward, DOIT also has had to agree to forgo the inclusion of updated contract language on topics including security issues and protections for data loss and data breach issues—which would have required a longer period of negotiation.

15.    However, ongoing uncertainty surrounding the tariffs—their actual magnitude and when they would be in effect—seriously hindered DOIT's ability to negotiate the initial attempts

at contract amendments, as well as this new contract. And as the negotiations dragged on, DOIT's stock of available computers and equipment dwindled.

16.    DOIT has faced similar problems in attempting to negotiate other contracts with technology vendors during this time period—which has included some vendors: (1) attempting to substantially increase quoted prices prior to contract execution, (2) walking away from contract negotiations, or (3) insisting on including unusual language to protect them against the application of tariffs (either by ensuring those costs are passed on to the state, or to excuse related non-performance by the vendor under the contract).

17.    DOIT's staff has also expended considerable effort and numerous work hours during the past several months in connection with these tariff-related challenges, in assessing, reacting, and responding to the unavailability and/or increased costs of needed products from our vendors, and in attempting to find new ways to nonetheless obtain those products in order to continue to provide our services to client agencies.

18.    The President's tariffs accordingly impose a financial harm to DOIT in multiple different ways.

**B.    Need to Budget for Expenditures and Charge-Back Costs to Client Agencies**

19.    DOIT utilizes a charge-back method when delivering its services to client agencies, billing them for the cost of the technology products and services DOIT deploys, which allows DOIT to pay its own bills to vendors.

20.    The President's repeated imposition, modification, suspension, and threatening of various tariffs has created substantial uncertainty regarding the expected cost of a wide range of goods and services, which impacts not only DOIT's ability to predict and budget for its own costs, but also its client agencies' ability to predict and budget for the invoices they will in turn receive from DOIT for the products and services they receive.

21.    The President's use of emergency powers to repeatedly impose and change tariffs thus harms DOIT's ability to accurately plan its budgets for the upcoming fiscal year and to pass on predictable costs to its client agencies.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on May 2, 2025, at Springfield, IL

_____
Jenifer Johnson

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | Case No.  1:25-cv-00077-GSK-TMR-JAR  DECLARATION OF JEANETTE MOY  (In support of Plaintiffs' Motion for Preliminary Injunction) |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | |
| Defendants. | |

I, Jeanette Moy, declare as follows:

1.     I am over the age of 18, competent to testify as to the matters herein, and testify based on personal knowledge and records kept in the ordinary course of business at New York's Office of General Services (OGS).

2.     I am the Commissioner of OGS. As Commissioner, I oversee and manage agency operations that include the management and leasing of real property owned by the State of New York, design and build of such properties, the contracting of goods, services and technology on behalf of the State, and the delivery of broad scope critical services for New York State agencies.

Page 1 -    DECLARATION OF JEANETTE MOY

3.     OGS was established in 1960 to provide essential support services for the operations of the New York State government. Since its inception, OGS has developed expertise in centralizing critical support and service functions leading to a cost-effective government. Among other things, OGS is the centralized procurer of many major goods and services for New York State agencies and authorized users.  OGS facilitates and administers approximately 1,500 centralized procurement contracts for goods, services, and technology needed by state agencies, municipal governments, and educational institutions.  OGS also performs architectural, engineering, and construction management services for buildings statewide.

4.     On April 2, 2025, President Trump signed Executive Order 14257, 90 Fed. Reg. 15041 (the "Worldwide Tariff Order"). The Worldwide Tariff Order imposed a 10% tariff on most imports to the United States, effective April 5, and additional "reciprocal" tariffs on 57 countries, effective April 9. The President revised the additional "reciprocal" tariffs on April 3.

5.     On February 1, 2025, President Trump issued Executive Order 14193, 90 Fed. Reg. 9113 (the "Canada Tariff Order") and Executive Order 14194, 90 Fed. Reg. 9117 (the "Mexico Tariff Order"). The Canada and Mexico Tariff Orders, as amended later by the President, impose a 25% additional tariff on imports from Canada and Mexico. The President has now modified these tariffs twice, including by exempting some products from Mexico and Canada from additional tariffs and temporarily reducing the tariff rate for fertilizer from Canada and Mexico and energy from Canada to the 10% rate implemented through the Worldwide Tariff Order, as amended.

6.     The President has imposed, paused, and reimposed an escalating series of tariffs on goods from China. On February 1, 2025, President Trump issued the first round of these through Executive Order 14195, 90 Fed. Reg. 9121 (the "China Tariff Order"). Currently, the China Tariff Order and Worldwide Tariff Order, as amended, impose a 145% tariff rate for imports from China (except for electronics, steel, aluminum, automotive, copper,

Page 2 -   DECLARATION OF JEANETTE MOY

pharmaceutical, lumber, certain minerals, and energy products, among other products, which are only subject to a 20% rate under the China Tariff Order).

7.      The imposition of these tariffs threatens severe economic consequences for New York State.

8.      When President Trump imposed tariffs on Canada, the Ontario and Quebec Premiers threatened retaliatory tariffs on electricity to the U.S.[1] This would have severe consequences for New York. The State is facing capacity restraints and is more heavily reliant on Canadian hydropower than ever. Based on information from the New York Independent System Operator (NYISO), which manages New York's electric grid and its wholesale electric marketplace, New York State imported approximately 7.7 Terawatt-hours of Canadian electricity.[2] Canada is the number one foreign supplier of energy to the United States generally, including around 85% of U.S. electricity imports.[3] OGS anticipates that if Ontario or Quebec imposed restrictions on electricity exports to New York, prices would soar. New York cannot simply buy less electricity or buy electricity from other sources.

9.      Canadian electricity generators located in Quebec and Ontario export electricity into the NYISO hourly, wholesale energy markets. New York State load-serving entities (LSEs), such as the six investor-owned utilities (IOUs) and OGS, purchase power directly from the same NYISO hourly, wholesale markets. These LSEs in turn provide electricity directly to end users, including households, businesses, and government agencies. Additionally, Hydro-Quebec, the

---

[1] Max Saltman, *Ontario premier threatens to 'shut off electricity completely' for US if trade war escalates*, CNN Business (Mar. 11, 2025), https://www.cnn.com/2025/03/10/business/canada-electricity-us-tariffs-doug-ford/index.html; The Canadian Press, *Quebec considering surcharge on electricity exports to 2 U.S. states amid trade war*, CTV News (Mar. 11, 2025), https://www.ctvnews.ca/montreal/article/quebec-considering-surcharge-on-electricity-exports-to-2-us-states-amid-trade-war/.

[2] New York Independent System Operator, *How Electricity Imports from Canada, Neighboring States Support Grid Reliability* (Mar. 24, 2025), https://www.nyiso.com/-/how-electricity-imports-from-canada-neighboring-states-support-grid-reliability.

[3] Government of Canada, Connect 2 Canada, *Powering our Nations*, https://connect2canada.com/canada-u-s-relationship/energy-and-the-environment/.

Page 3 -    DECLARATION OF JEANETTE MOY

electricity generation entity owned by the Province of Quebec, bids capacity into the NYISO Installed Capacity strip, monthly and through spot auctions. LSEs purchase Installed Capacity from the same auctions. There are no contracts that exist between Canadian generators and NY-based utilities or LSEs. All power flows through the NYISO markets. Imports of both electricity and installed capacity from these two Canadian provinces, particularly from Quebec, are significantly important to reducing electricity costs to consumers and for grid reliability through the capacity market.

10.    The OGS NYISO purchasing program, which serves the 100 largest electrical accounts for 21 state agencies including OGS, averages roughly 680,000 megawatt-hours annually. OGS and other New York State agencies will need to pay far more for these electricity purchases if Canada increases the costs of its energy exports in response to President Trump's tariffs. Assuming a cost of 20 cents per kilowatt-hour,[4] which is close to the estimate of recent prices in New York State, and 680,000 megawatt-hours purchased annually, the OGS NYISO program would spend $136 million for a year. In that scenario, a 10% cost increase imposed by Canada in response to President Trump's tariff could thus impose a $13.6 million increase on OGS. In such a situation, we expect tariff costs to be built into the hourly price that the Canadian generators bid into the NYISO market where New York State purchases its electricity, so that state agencies will be subject to the higher prices being bid by the Canadian generators.

11.    Outside of the construction context, if it is assumed that 50%-75% of the products purchased by New York are manufactured in a tariff-impacted nation and there is an estimated

---

[4] The New York State Energy Research and Development Authority (NYSERDA) has published approximate prices per kilowatt-hour in 2025 for New York State-wide commercial and residential usage.  For January of 2025, the approximate price for commercial purchasers (including OGS) was around $.20.  NYSERDA, *Monthly Average Retail Price of Electricity-Commercial* (last updated Apr. 9, 2025), https://www.nyserda.ny.gov/Energy-Prices/Electricity/Monthly-Avg-Electricity-Commercial. The approximate price for residential purchasers was $.24. NYSERDA, *Monthly Average Retail Price of Electricity-Residential* (last updated April 9, 2025), https://www.nyserda.ny.gov/Energy-Prices/Electricity/Monthly-Avg-Electricity-Residential.

Page 4 -    DECLARATION OF JEANETTE MOY

average total spend of $5 billion, a 25% tariff on Mexico and Canada and a 10% tariff on China will likely have a portfolio-wide impact of roughly +$106 million for New York State agencies.

12.    In the construction context, OGS bid approximately $1 billion in 2024, with approximately half on labor and half on materials. Assuming OGS bids a comparable annual portfolio, if even only 37% of these materials are subject to tariffs at 25%, then the potential cost impact could be between $40 and $50 million to New York's projects within OGS' portfolio. In OGS's experience, these price increases rarely fully recover to pre-event levels. Consequently, the tariffs will likely have a long-term negative effect on project costs and, in turn, agency capital programs.

13.    OGS anticipates that potential contractual impacts on active construction projects due to imposed tariffs would be similar to what New York experienced during COVID, when shutdowns depressed the construction market and delayed construction projects. Unlike during COVID, however, when New York was bidding projects in a soft and uncertain economy, there is no shortage of construction work today. Contractors are very busy despite higher interest rates.

14.    In OGS' experience, when contractors experience financial impacts that are beyond their control, they will attempt to identify ways to mitigate their losses and request notices under the contract for relief which leads to fluctuating prices and delays caused by vendors adjusting to the higher risk. Accordingly, we anticipate receiving contractor requests across our portfolio, which includes over 170+ active construction projects, for contractual relief due to price increases, and also for extensions in contract duration and delay damages, especially if tariffs cause supply chain delays and/or the unavailability of specified products. Thus, the State faces significant uncertainty with respect to how much tariffs will cause costs to increase for construction, goods and services procured by the State, and the likely budgetary impacts. In addition, there is uncertainty around whether such increases will cause delays to receiving goods and supplies, and delays in the completion of projects, including delays caused when contractors submit change orders to the state for higher prices and longer timelines than originally agreed to.

Page 5 -    DECLARATION OF JEANETTE MOY

**I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.**

**Executed on May 6, 2025, in Albany, New York**

_____
JEANETTE MOY

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | Case No.  1:25-cv-00077-GSK-TMR-JAR<br><br>DECLARATION OF AMY RAMSDELL<br><br>(In support of Plaintiffs' Motion for Preliminary Injunction) |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | |
| Defendants. | |

I, Amy Ramsdell, declare as follows:

1.      I am over the age of 18, competent to testify as to the matters herein, and testify based on personal knowledge, records kept in the ordinary course of business at the Oregon Department of Transportation, and information I learned from ODOT personnel whose work I rely upon and who have assisted me in gathering this information from our institution.

2.      I am the Delivery and Operations Division Administrator at ODOT. As the Delivery and Operations Division Administrator, I am responsible for the maintenance and operations of the highway as well as the delivery of our capital investment program. In this role, I oversee maintenance and capital projects that require a variety of equipment and materials.

3.      We are responsible for the state highways and administer the duties and functions described in ORS chapter 366 as delegated to the Director and the Division by the Oregon Transportation Commission.

4.      In the regular course of its operations, ODOT routinely purchases many goods that originate from sources outside the United States. Examples include our equipment for maintenance such as our snow blows and snow blowers, traffic signal components, bridge bearings, steel, etc. In order to repair our roadways and bridges, we hire contractors who also procure a variety of materials and equipment. Items that we have identified that are potentially subject to tariffs include our snow blowers, which we purchase from Canada, fly ash which is utilized in concrete to improve its durability and sustainability, cement, bridge and traffic signal components. We have identified these through conversations with our contractors and maintenance and design teams. In discussions with one vendor that supplies our snow-blowers they indicated to staff that any tariffs added beyond the current 25 percent tariff we pay will be added to the cost of the equipment.

5.      ODOT is currently setting its budgets for its Maintenance and Project Delivery programs. The budgeting process happens every two years within May and June. Our maintenance budgets cover labor, equipment and supplies. We break the available budget between our headquarters functions and 14 maintenance districts. This budget includes over 200 different labor categories and a wide variety of supplies from 10-yard vehicles, mowers, various types of de-icer, pesticides, paint and more. Our capital improvement plan covers the projects delivered through the federally mandated Statewide Transportation Investment Program required by 49 U.S.C. 5304(g). This is a four-year plan that is currently updated every two years. We program design and construction phases based upon our cost estimates the information available at the time of programming.

6.      ODOT has a specified amount of funds granted by the legislature that it must efficiently distribute. Further, accurate budgeting is necessary to ensure responsible and fair spending across the department and its districts.

7.      Increased tariffs are categorized as a risk to the project budget. There is a significant level of cost uncertainty that will require us to program fewer projects to set aside funds within our projects for the anticipated costs. The results of this could put the agency into a position where we either a) didn't set aside enough funds to pay for the increased costs and subsequently cancel projects or b) over-program the costs and potentially lose federal funding if we do not quickly reallocate the funding to projects on the wait list. Either one provides a level of uncertainty and risk to the capital improvement plan.

8.      As part of the current budgeting process, ODOT is budgeting out for the purchase of two types of snow blowers, which are required for the removal of snow.  The snow blowers are manufactured in Canada, and ODOT's vendor for snow blowers has recently indicated that it intends to pass on increased tariff costs. These snow blowers are specialty equipment that are not reasonably available from domestic manufacturers.

9.      The first type of snow blower is a T-80 self-propelled blower, which was originally priced at $870,297. With the added cost of the 25 percent tariff levied against Canada, the blower will cost an additional $217,574.

10.      The second type of snow blower is a D-65 "loader mounted blower," which can be affixed to the back of a truck. The original price for that blower was $289,362. The 25 percent tariff will add an additional $72,340 to the price.

11.      There is further uncertainty about tariff costs due to the President's repeated use of his emergency powers to change tariff policies with very little notice and lead time. Additionally, it is not even clear what tariff rates will apply when ODOT ultimately purchases the snow blowers. That uncertainty impairs ODOT's ability to accurately budget its limited funding.

Page 3 -   DECLARATION OF AMY RAMSDELL
        BM2/rn1/ODOT A. Ramsdell Declaration FINAL

12.     ODOT anticipates a large number of other procurement and services (including construction) will see increases in price due to passed-through tariff costs, because many of those goods and the materials used for services are sourced from outside of country. That will necessarily result in increased costs to ODOT for the same amount of procurement and services.

13.     The increased costs due to tariffs will further impair ODOT by reducing the services it is able to provide. For example, to address the unexpected costs of increased tariffs for procurement, the most likely result is that ODOT will need to buy fewer units of a tariffed good, such as the snow blowers, which will reduce the level of service ODOT can provide to the public.

**I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.**

**Executed on May 6, 2025, at Salem, Oregon**

Amy RAMSDELL (May 6, 2025 13:58 PDT)

Amy Ramsdell

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, AND THE STATE OF VERMONT, | Case No. 25-CV-77 <br><br> DECLARATION OF JOSHUA ROOT, DEPUTY CHIEF COUNSEL AND CHIEF DATA OFFICER FOR THE MINNESOTA DEPARTMENT OF TRANSPORTATION |

                    Plaintiffs,

          v.

DONALD J. TRUMP, in his capacity as
President of the United States;
DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her official
capacity as Secretary of the Department of
Homeland Security; UNITED STATES
CUSTOMS AND BORDER PROTECTION;
PETER R. FLORES, in his official capacity as
Acting Commissioner for U.S. Customs and
Border Protection; and THE UNITED
STATES,

                    Defendants.

I, Joshua Root, declare as follows:

        1.      I am over the age of 18, competent to testify as to the matters herein, and testify

based on personal knowledge, records kept in the ordinary course of business by the Minnesota

Department of Transportation (MnDOT), and information I learned from various MnDOT

personnel whose work I rely upon and who have assisted me in gathering this information from

our institution.

        2.      I am the Deputy Chief Counsel and Chief Data Officer. In my role, I oversee the

records management, data dissemination, and general legal strategy for the agency's information

management practices.

3.      The Minnesota Department of Transportation (MnDOT) is a multimodal transportation system entity responsible for planning, building, operating, and maintaining a safe, accessible, and reliable transportation network for the State of Minnesota. MnDOT's mission is to connect and serve all people in Minnesota through a safe, equitable, and sustainable transportation system.

4.      MnDOT's strategic direction focuses on maximizing the health of people, the environment, and the economy. The department's values include safety, service, equity, sustainability, innovation, and collaboration. MnDOT is committed to creating a comprehensive transportation system that serves Minnesotans now and into the future, including enhancing pedestrian safety, reducing greenhouse gas emissions, and cultivating a diverse transportation industry and workforce.

5.      MnDOT provides statewide construction and maintenance services for the State of Minnesota's state roads as generally authorized by Minnesota Statutes chapter 162.  MnDOT constructs new roads, ensures roads are travelable in various weather conditions, and manages roads throughout their life cycle.

6.      MnDOT has a duty to monitor roads using scientific and non-scientific tools, test construction materials, conduct research on road-related equipment or materials, and to improve the ability of people to get from one location to another by sharing operating conditions and options to complete trips.

7.      MnDOT annually expends $3 - $5 billion to conduct its work.  MnDOT expenditures include staff salaries, consultant or other professional services costs and hundreds of millions of dollars on tangible goods purchasing.   In the regular course of its operations, MnDOT routinely purchases many goods that happen to originate from sources outside the United States, be assembled outside the United States, or only exist in other countries. Tangible goods purchasing can be generically broken into three buckets: (i) electronic equipment, (ii) physical assets, and (iii) raw materials or commodities.

***Electronic Equipment***

8.        MnDOT purchases electronic equipment such as sensors, dynamic signs, cameras, computers, electronic cabinets, and voluminous other types of lights, cables, or technical equipment.  As required by state and federal procurement laws MnDOT utilizes the "low bid" contracting method to acquire the various goods it needs to meet the agency's mission.  Under that method, the lowest bidder related to an anticipated procurement is presumed to be the entity MnDOT will contract with for the goods.  MnDOT and the low bidder will typically enter into a contract for a duration of time with fixed costs for series of identified goods.  One example of this arrangement is over-road dynamic signs.  Over-road dynamic signs are large signs that exist above the travel lanes on a roadway and have the ability to change the message they convey.  Tolls, safety messages, lane conditions, warnings, are all examples of the types of things these signs are used for.  The signs come in a wide range of sizes and shapes but all generally contain some form of illumination to display information the travelling public would benefit from knowing.

9.        In 2024, MnDOT completed a request for proposal (RFP) for these types of signs and received multiple bidders.  The lowest bidder was a manufacturer in Canada.  The Canadian firm currently under contract has informed MnDOT prices will increase by 5% to 30% depending on the sign.  In analyzing the alternative low bidders to the last RFP, the alternative bidders to the contract solicitations had prices in their proposals that were up to 350% higher than the low bidder Canadian firm.  Attached as Exhibit A is an accurate analysis of the 2024 RFP responses for dynamic sign pricing.  The analysis defines the specific type of sign the current vendor costs as well as the two other proposing vendors costs for those same items.  The analysis was completed for the purpose of picking which vendor was the lowest bidder based on the type and volume of sign MnDOT procures and identifies each vendors pricing above the lowest price.

10. The bid result analysis demonstrating the bid prices for all proposers. Given the anticipated price increases, MnDOT now has three options: (i) find a mechanism to pay the prices which exceed the contract allowance; (ii) enforce the contract assuming the vendor breaches its contractual obligation; or (iii) switch to a higher priced vendor.

11. In any scenario, MnDOT will be spending more money to acquire the same items as a result of the tariffs placed on the Canadian manufacturer. The outcome of a contractual dispute is very uncertain, and its most likely outcome is a mediated increase in our contractual prices. A higher-priced, US-based vendor—or simply paying the tariff related increases—all result in higher costs for MnDOT, and they result in higher costs without a designated source for MnDOT to cover the difference in price. The tariff-related increased costs are not theoretical as the agency has, over the last decade purchased approximately 40 dynamic signs per year (since 2015 MnDOT has never purchased fewer than 10 and has never purchased more than 92). This year MnDOT expects to be a bit higher than our 10-year average with about 50 signs expected. There are several large construction projects underway which require them as well as several replacement signs needed in locations where the older sign has malfunctioned and is beyond repair.

12. Additionally, under the electronic equipment category are the communication tools utilized by MnDOT and other first responders. The Allied Radio Matrix for Emergency Response (ARMER) is a statewide radio network managed by MnDOT. The radio network is a series of 335 towers in every corner of Minnesota with specialized equipment which makes it possible for first responders to communicate with their various departments. Significantly this system also allows everyone one to talk to each other. MnDOT had the tragic need to test the functionality of this system in 2007 when a large bridge collapsed in Minnesota and there were Emergency Medical Services, Minneapolis Firefighters, Minneapolis Police, State Troopers, United State Coast Guard and various other federal partners all on the same network communicating with each other at the same time.

13.    The statewide ARMER network has hundreds of components that regularly reach the end of their lifespan. Each of these components can only be sourced from selected specialists and the components come from around the world.  The consumable nature of the vast network, the criticality of the network being operational, and the cost of having additional components on hand means this is one of the first tariff impacts MnDOT has received invoices for.  There is not an option of going to a different vendor, the components are extremely specialized with very few vendors and in most instances there is only one source as the market does not support competition.  MnDOT cannot pick a Beta tape for VHS player. The tariffs on the purchases invoiced to date are generally 20% higher than the same item prior to the tariff increases. Attached as Exhibit B are true copy of invoices received for various radio components. These documents clearly identify the country of origin for the component and the amount of additional tariff costs.   Also Attached as Exhibit C is a price quotation from a vendor for actual products with the anticipated tariff impacts for the items MnDOT needs to keep the ARMER system operations.

14.    The multinational nature of the products MnDOT receives raises additional concerns about how likely the products will be received at all let alone within the timeline promised, will the products be double tariffed (directly or indirectly), will the logistics firms be able to manage the changing tariff landscape to ensure accurate accounting. Attached as Exhibit D is a true copy of the type of communication MnDOT has received from various vendors who anticipate increased costs related to tariff changes.  The impact those changes will have on our contractual relationship and what the conditions of those changes will have on MnDOT's purchases.

***Physical Assets***

15.    MnDOT also purchases large, high cost, pieces of equipment.  These physical assets are typically complex multicomponent items.  Plow trucks are a prime example. MnDOT purchases approximately 57 plow trucks a year.  Each truck begins as a chassis.  The chassis is

the building block of a truck (basically the engine and the part a person rides in bolted onto the undercarriage on which the tires are mounted). MnDOT receives the chassis and then adds plow systems, computer systems, dump truck beds, radio networks, sensors, cameras, GPS equipment, and many other pieces of technology.

16. Plow construction is an iterative process where numerous components are installed from various manufacturers over many weeks. Each item is from a different vendor and is itself made of many components.

17. MnDOT has been informed that the 57 plow chassis we have scheduled for build this year will have a price increase of $3,000.00 per unit. There are likely additional increases for the technology or steel however those stages are later in the build process an no costs have been shared with MnDOT.

***Raw Materials***

18. Raw materials and commodities are the third category of tariff-related price impacts. Raw materials consist of cement, fly ash, steel, glass beads, and the many types of materials that go into the creation of roads and bridges.

19. The two most significant commodities purchased by MnDOT are fuel and salt. Of these two, salt is currently the most variable. Most salt in Minnesota is sourced from within the United States; however, northern Minnesota has existing agreements with vendors that purchase from Canadian mines. MnDOT also uses specific salt in the road pre-treatment brine process. As with all specialty purchases, the availability from a vendor impacts the source location and the requirement to adhere to a low bid purchase may require sourcing from outside of the United State. As with most commodities salt is subject to broad price influences typically impacted by exchanges. However, when the salt is ultimately sent from Canada, there will now also be an added tariff costs. MnDOT typically buys salt in the summer months with delivery at the convenience of the supplier, so hard costs have not been determined but early indications from typical sources are that the low bid provider expects 15%-25% increases.

20.     The President's tariffs accordingly impose a financial harm to MnDOT by increasing the cost of procurement.

**Executed on May 6, 2025, at Minneapolis, Minnesota**

Joshua Root

Digitally signed by
Joshua Root
Date: 2025.05.06
13:08:03 -05'00'

Joshua Root

| DYNAMIC SIGN TYPE | | Current Vendor | Bidder B | | Bidder C | |
|---|---|---|---|---|---|---|
| W18C3-20  (walk in 18ft color 3 line) | each | $60,000.00 | $65,754.00 | 109.59% | $63,085.00 | 105.14% |
| W18C4-20  (walk in 18ft color 4 line) | each | $76,000.00 | $78,461.00 | 103.24% | $75,185.00 | 98.93% |
| W24C3-20  (walk in 24ft color 3 line) | each | $78,000.00 | $78,814.00 | 101.04% | $76,985.00 | 98.70% |
| W30C3-20  (walk in 30ft color 3 line) | each | $99,750.00 | $91,950.00 | 92.18% | $90,285.00 | 90.51% |
| W30C4-20  (walk in 30ft color 4 line) | each | $129,000.00 | $112,052.00 | 86.86% | $113,285.00 | 87.82% |
| W40C3-20  (walk in 40ft color 3 line) | each | $141,000.00 | $126,606.00 | 89.79% | $128,185.00 | 90.91% |
| W40C4-20  (walk in 40ft color 4 line) | each | $182,000.00 | $154,596.00 | 84.94% | $158,885.00 | 87.30% |
| | | | | | | |
| F8C1-20  (front access 8ft color 1 line) | each | $15,500.00 | $42,250.00 | 272.58% | $24,285.00 | 156.68% |
| F8C2-20  (front access 8ft color 2 line) | each | $22,500.00 | $36,627.00 | 162.79% | $30,385.00 | 135.04% |
| F14C1-20  (front access 14ft color 1 line) | each | $21,000.00 | $49,250.00 | 234.52% | $30,585.00 | 145.64% |
| F14C2-20  (front access 14ft color 2 line) | each | $35,100.00 | $47,941.00 | 136.58% | $41,385.00 | 117.91% |
| F14C3-20  (front access 14ft color 3 line) | each | $50,400.00 | $52,460.00 | 104.09% | $48,185.00 | 95.61% |
| F18C1-20  (front access 18ft color 1 line) | each | $24,200.00 | $51,900.00 | 214.46% | $39,585.00 | 163.57% |
| F18C2-20  (front access 18ft color 2 line) | each | $42,400.00 | $52,696.00 | 124.28% | $49,785.00 | 117.42% |
| F18C3-20  (front access 18ft color 3 line) | each | $60,600.00 | $58,044.00 | 95.78% | $56,585.00 | 93.37% |
| | | | | | | |
| R8C1-20   (rear access 8ft color 1 line) | each | $13,000.00 | $45,250.00 | 348.08% | $33,385.00 | 256.81% |
| R8C2-20   (rear access 8ft color 2 line) | each | $20,100.00 | $39,701.00 | 197.52% | $38,785.00 | 192.96% |
| R14C1-20   (rear access 14ft color 1 line) | each | $20,000.00 | $53,750.00 | 268.75% | $39,285.00 | 196.43% |
| R14C2-20   (rear access 14ft color 2 line) | each | $31,700.00 | $52,213.00 | 164.71% | $48,885.00 | 154.21% |
| R14C3-20   (rear access 14ft color 3 line) | each | $44,800.00 | $57,509.00 | 128.37% | $55,485.00 | 123.85% |
| R18C1-20   (rear access 18ft color 1 line) | each | $22,800.00 | $56,750.00 | 248.90% | $41,885.00 | 183.71% |
| R18C2-20   (rear access 18ft color 2 line) | each | $38,400.00 | $57,764.00 | 150.43% | $52,985.00 | 137.98% |
| R18C3-20   (rear access 18ft color 3 line) | each | $52,000.00 | $63,286.00 | 121.70% | $60,685.00 | 116.70% |
| | | | | | | |
| ILCS  (4 foot high by 4 foot wide) | each | $9,250.00 | $31,900.00 | 344.86% | $23,185.00 | 250.65% |
| ILCS  (5 foot high by 5 foot wide) | each | $13,300.00 | $34,200.00 | 257.14% | $26,385.00 | 198.38% |
| | | | | | | |
| SIGN CONTROLLER | each | $4,600.00 | $4,100.00 | 89.13% | $4,385.00 | 95.33% |
| COLOR DISPLAY MODULE | each | $750.00 | $660.00 | 88.00% | $735.00 | 98.00% |

| | | | | | | |
|---|---|---|---|---|---|---|
| ILCS COLOR DISPLAY MODULE | each | $750.00 | $660.00 | 88.00% | $585.00 | 78.00% |
| TRAINING | Per occu | $4,200.00 | $4,000.00 | 95.24% | $3,390.00 | 80.71% |
| COMMISSIONING PER WALK-IN SIGN | each | $850.00 | $900.00 | 105.88% | $1,495.00 | 175.88% |
| COMMISSIONING PER NON-WALK-IN SIGN | each | $700.00 | $900.00 | 128.57% | $1,495.00 | 213.57% |
| COMMISSIONING TRIP | each | $3,200.00 | $1,500.00 | 46.88% | $1,695.00 | 52.97% |
| STATIC SIGN MOUNT | Ln FT | $195.00 | $400.00 | 205.13% | $385.00 | 197.44% |

# DigiKey

701 Brooks Ave South
PO Box 677
Thief River Falls, MN 56701-0677
USA

Global Customer Support
1-800-344-4539 or 218-681-6674
www.digikey.com

**Invoice # 111416537**
**Completed Salesorder USD $**

| Bill To: | MN DOT & COMM<br>3487 HADLEY AVE N<br>OAKDALE MN 55128 | Ship To: | GERALD SCHWARTZ<br>MN DOT SW RADIO COMM<br>7694 INDUSTRIAL PARK RD<br>ATTN RADIO<br>BAXTER MN 56425-8266 |
|---|---|---|---|

| Purchase Order: | 3000812760 |
|---|---|
| Salesorder / Packlist: | 91834272 / PL1 |
| Account: | 3311 |
| Customer: | 15858179 |
| Payment Terms: | Net 30 Days |
| Shipping Method: | XGT |
| Tracking #: | 452445515550 |

| Buyer: | KELLY LEPINSKI<br>STATE OF MN/DEPARTMENT OF TRANSPORTATION<br>STATEWIDE RADIO COMMUNICATIONS<br>3487 HADLEY AVE N<br>OAKDALE MN 55128-3307 | Ship From: | DIGI-KEY ELECTRONICS<br>701 BROOKS AVE. SOUTH<br>P.O. BOX 677<br>THIEF RIVER FALLS MN 56701-0677 |
|---|---|---|---|

*R— 615204*
*4.9.25*
*KL.*

| Order Source: | Order Date: | Invoice Date: | Ship Date: | Document Date: |
|---|---|---|---|---|
| INTERNET | 31-Mar-2025 | 31-Mar-2025 | 31-Mar-2025 | 31-Mar-2025/AUTO |

| Line Item | Ordered | Cancelled | Shipped | Item Number/ Description | Unit Price USD $ | Amount USD $ |
|---|---|---|---|---|---|---|
| 1 | 10 | 0 | 10 | PART: 123-A-M04/4-SF-ND          DESC: CONN MOD PLUG 4P4C UNSHIELDED<br>MFG : Assmann WSW Components / A-MO 4/4-SF<br>COO : CHINA              ECCN: EAR99          HTSUS: 8536.69.8000<br>ROHS3 COMP REACH UNAFFECTED Jun-2024<br>Mercury: Cert on File. For more information contact Environmental@DigiKey.com<br>Section 301 Tariff | 0.22200 | 2.22 |
| | | | | | | 0.22 |
| 2 | 10 | 0 | 10 | PART: 123-A-M06/6-F50-ND          DESC: CONN MOD PLUG 6P6C UNSHIELDED<br>MFG : Assmann WSW Components / A-MO 6/6-F50<br>COO : CHINA              ECCN: EAR99          HTSUS: 8536.69.8000<br>ROHS3 COMP REACH UNAFFECTED Jun-2024<br>Mercury: Cert on File. For more information contact Environmental@DigiKey.com<br>Section 301 Tariff | 0.18900 | 1.89 |
| | | | | | | 0.19 |
| 3 | 5 | 0 | 5 | PART: 1873-1030-ND          DESC: DESOLDER BRAID ROSIN 0.055" 5'<br>MFG : Techspray / 1809-5F<br>COO : UNITED STATES OF AMERICA      ECCN: EAR99          HTSUS: 7413.00.5000<br>ROHS3 COMP REACH UNAFFECTED Jun-2022 | 4.38000 | 21.90 |

| | | |
|---|---|---|
| | Sales Amount | 26.01 |
| | Tariff Amount | 0.41 |
| | Total Sales and Tariff | 26.42 |
| | Shipping charges applied | 6.99 |
| | ** Charges subtotal ** | 33.41 |
| | Total due – Pay from this invoice | 33.41 |
| | | USD $ |
| | Tax Exempt | |

DUNS No: 05 760 2120 FEI No: 41-1234968 Any applicable sales tax not collected on this invoice is the responsibility of the customer.

Page 1 of 2

**DigiKey**

701 Brooks Ave South,
PO Box 677
Thief River Falls, MN 56701-0677
USA

www.digikey.com
Global Customer Support
1-800-344-4539 or 218-681-6674

| Ship Method: | XGT | 272/A4C9 | Packlist # | 1 |
|---|---|---|---|---|
| Customer PO: | | 3000812760 | | AUTO |

Sold To:
KELLY LEPINSKI
STATE OF MN/DEPARTMENT OF TRANSPORTATION
STATEWIDE RADIO COMMUNICATIONS
3487 HADLEY AVE N
OAKDALE MN 55128-3307

Ship To:
GERALD SCHWARTZ
MN DOT SW RADIO COMM
7694 INDUSTRIAL PARK RD
ATTN RADIO
BAXTER MN 56425-8266

| | |
|---|---|
| Sales Order: | 91834272 |
| Invoice: | 111416537 |
| Order Date: | 31-Mar-2025 |
| Document Date: | 31-Mar-2025 |
| Shippable Items: | 3 |

THE ORDER IS COMPLETE

| Ordered | Line Item | Location | Item Number / Description | Shipped | Backordered |
|---|---|---|---|---|---|
| 10 | 1 | | PART: 1I3-A-MO4/4-SF-ND      DESC: CONN MOD PLUG 4P4C UNSHIELDED      ECCN: EAR99<br>MFG#: A-MO 4/4-SF      HTSUS: 8536.69.8000      CAGE: C3189<br>MFG : Assmann WSW Components<br>ROHS3 COMP      REACH UNAFFECTED Jun-2024<br>COO: CHINA      LOT QTY: 10      DATE CODE: Aug-2022  LOT CODE: 2232501657610001000<br>Mercury: Cert on File For more information contact Environmental@DigiKey.com<br>QTY: | 10 | 0 |
| 10 | 2 | | PART: 1I3-A-MO6/6-FS0-ND      DESC: CONN MOD PLUG 6P6C UNSHIELDED      ECCN: EAR99<br>MFG#: A-MO 6/6-FS0      HTSUS: 8536.69.8000      CAGE: C3189<br>MFG : Assmann WSW Components<br>ROHS3 COMP      REACH UNAFFECTED Jun-2024<br>COO: CHINA      LOT QTY: 10      DATE CODE: Aug-2024  LOT CODE: 2435501671600003000<br>Mercury: Cert on File For more information contact Environmental@DigiKey.com<br>QTY: | 10 | 0 |
| 5 | 3 | | PART: 1673-1030-ND      DESC: DESOLDER BRAID ROSIN 0.055" 5'      ECCN: EAR99<br>MFG#: 1809-SF      HTSUS: 7413.00.5000      CAGE: 21267<br>MFG : Techspray<br>ROHS3 COMP      REACH UNAFFECTED Jun-2022<br>COO: UNITED STATES OF AMERICA      LOT QTY: 5      DATE CODE: Oct-2023 LOT CODE: 23303<br>QTY: | 5 | 0 |

General - WEB ORDER ID: 355932476

* These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. Government or as otherwise authorized by U.S. law and regulations.

RECEIVED
4/8/25


91834272, 1, 111416537

Page 1 of 2

# DigiKey

701 Brooks Ave South,
PO Box 677
Thief River Falls, MN 56701-0677
USA

www.digikey.com
Global Customer Support
1-800-344-4539 or 218-681-6674

(B)

**Invoice # 111416534**
Completed Salesorder USD $

| Bill To: | | Ship To: | |
|---|---|---|---|
| MN DOT & COMM<br>3487 HADLEY AVE N<br>OAKDALE MN 55128 | | GERALD SCHWARTZ<br>MN DOT SW RADIO COMM<br>7694 INDUSTRIAL PARK RD<br>ATTN RADIO<br>BAXTER MN 56425-8266 | |
| Buyer: KELLY LEPINSKI<br>STATE OF MN/DEPARTMENT OF TRANSPORTATION<br>STATEWIDE RADIO COMMUNICATIONS<br>3487 HADLEY AVE N<br>OAKDALE MN 55128-3307 | | Ship From: E-Z-HOOK<br>5108 AZUSA CANYON ROAD<br>IRWINDALE CA 91706-0000 | |

| Purchase Order: | 3000812760 |
|---|---|
| Salesorder / Packlist: | 91834271 / PL1 |
| Account: | 3311 |
| Customer: | 15858179 |
| Payment Terms: | Net 30 Days |
| Shipping Method: | MPG |
| Tracking #: | 9405530109355127151866 |

R—615205
4·9·25
K·L·

| Order Source: | Order Date: | Invoice Date: | Ship Date: | Document Date: |
|---|---|---|---|---|
| INTERNET | 31-Mar-2025 | 01-Apr-2025 | 01-Apr-2025 | 01-Apr-2025/AUTO |

| Line Item | Ordered | Cancelled | Shipped | Item Number/Description | Unit Price USD $ | Amount USD $ |
|---|---|---|---|---|---|---|
| 1 | 1 | 0 | 1 | PART: 461-1164-ND          DESC: MINI HOOK TO MINI HOOK 16" 10PC<br>MFG : E-Z-Hook / 684XR-10-S<br>COO : UNITED STATES OF AMERICA     ECCN: EAR99     HTSUS: 8544.42.9090<br>ROHS NONC REACH UNAFFECTED Jan-2022<br>Mercury: Cert on File. For more information contact Environmental@DigiKey.com | 76.50000 | 76.50 |

| | |
|---|---|
| Sales Amount | 76.50 |
| Shipping charges applied | 10.50 |
| ** Charges subtotal ** | 87.00 |
| Total due - Pay from this invoice | 87.00 |
| | USD $ |
| Tax Exempt | |

ACH/Wire Trans:
Digi-Key Electronics
Northern State Bank
201 East Third Street
Thief River Falls MN 56701

Swift Code: NSBTUS44
Account #: 11-596-7
ABA No: 091216146

* These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. Government or as otherwise authorized by U.S. law and regulations.

DUNS No: 0576D 2120 FEI No: 41-1234968 Any applicable sales tax not collected on this invoice is the responsibility of the customer.

Page 1 of 2

- PICK TICKET -

Ⓑ

E-Z-HOOK DIV TEKTEST INC
5108 AZUSA CANYON ROAD
IRWINDALE, CA 91706
FAX: 626-446-0972
626-446-6175

ORDER NO.    DATE    CUSTOMER NO.    PAGE
94290    03/31/25    000000318500

CUSTOMER PO NUMBER    JOB NO.
3000812760

SHIP VIA
USPS MAIL

SHIP DATE
A.S.A.P.

SHIPPING INSTRUCTIONS
SHIP ON 04/14/2025 OR SOONER
SM FLAT RATE BOX

TERMS
NET 30 DAYS

WHSE. LOCATION
ARCADIA

BILL TO:
DIGI-KEY MP
701 BROOKS AVENUE SOUTH
INVOICE ON https://apth.digikey.com/
THIEF RIVER FALLS, MN 56701
USA

SHIP TO:
MN DOT SW RADIO COMM
7694 INDUSTRIAL PARK RD
ATTN GERALD SCHWARTZ RADIO
BAXTER, MN 56425-8266
USA

| QTY. ORDERED | REQ. DATE | ITEM NUMBER/DESCRIPTION | UOM | PICK SEQ. | QTY. TO SHIP | QTY. PICKED |
|---|---|---|---|---|---|---|
| | | ***Warning: Duplicate Picking Ticket*** | | | | |
| 1.00 | 03/31/25 | 604XR-18-S | EA | | 1.00 | .1... |
| | | SET,10, 1 EA 10 COLORS | | | | |
| | | DIGKEY PART# 461-1164-ND | | | | |
| | | All Line Items Picked | | | | |

RXD 4/7/2025

Shipped

APR 9 1 2025

E-Z-Hook

MISCELLANEOUS CHARGES
.00

FREIGHT CHARGES
.00



# MINNESOTA Purchase Order

**Transportation Department**
**Statewide Radio Communications**

| CHANGE ORDER | | | Dispatch Via Email |
|---|---|---|---|
| Purchase Order T7901-3000812760 | Date 03/31/2025 | Revision 1 - 04/09/2025 | Page 1 of 2 |
| Payment Terms Net 30 | Freight Terms FOB Destination, Prepd & Add | Ship Via GROUND | Event ID |
| Buyer Lepinski,Kelly J | Phone 651/366-4407 | Currency USD | Agency Reference 445789 |

| Supplier: | Ship To: | Attention: | Bill To: |
|---|---|---|---|
| 0000202529 | MNDOT SW RADIO COMM | See Detail Below | MNDOT SW RADIO COMM OAKDALE |
| DIGI KEY CORP | BAXTER | | OAKDALE |
| 521 1ST ST E | BAXTER | | 3487 HADLEY AVE N (4W) |
| THIEF RIVER FLS MN 56701-0677 | 7694 INDUSTRIAL PARK RD | | OAKDALE MN 55128-3307 |
| United States | BAXTER MN 56425-8266 | | United States |
| | United States | | |

**Tax Exempt?**      **Tax Exempt ID:**

| Line - Sch | Item/Description Mfg Item ID | Manufacturer Name | Replenishment Option: Standard Quantity | UOM | PO Price | Extended Amt | Due Date |
|---|---|---|---|---|---|---|---|
| 1 - 1 | Digi key #461-1164-ND Mfr# 604XR-18-S MINI HOOK TO MINI HOOK 18" 10PC | B | 1.0000 | EA | 76.50000 | 76.50 | 03/31/2025 |
| | 445789 Bax | | | | | | |
| | | | | MISC Attention: Gerald Schwartz | | 10.91 | |
| | | | | Schedule Total | | 87.41 | |
| | | | | Item Total | | 87.41 | |
| 2 - 1 | Digi-key # 123-A-MO4/4-SF-ND MFR# A-MO 4/4-SF CONN MOD PLUG 4P4C UNSHIELDED | A | 10.0000 | EA | 0.22200 | 2.22 | 03/31/2025 |
| | 445789 Bax | | | | | | |
| | | | | FREIGHT Attention: Not Specified | | 0.60 | |
| | | | | Schedule Total | | 2.82 | |
| | | | | Item Total | | 2.82 | |
| 3 - 1 | Digi Key # 123-A-MO6/6-F50-ND Mfr#A-MO 6/6-F50 CONN MOD PLUG 6P6C UNSHIELDED | A | 10.0000 | EA | 0.18900 | 1.89 | 03/31/2025 |
| | 445789 Bax | | | | | | |
| | | | | FREIGHT Attention: Not Specified | | 0.51 | |
| | | | | Schedule Total | | 2.40 | |
| | | | | Item Total | | 2.40 | |
| 4 - 1 | Digi-key # 1809-5F MFR# 809-5F DESOLDER BRAID ROSIN 0.055" 5 Techspray | A | 5.0000 | EA | 4.38000 | 21.90 | 03/31/2025 |
| | 44579 Bax | | | | | | |
| | | | | FREIGHT Attention: Not Specified | | 5.88 | |
| | | | | Schedule Total | | 27.78 | |
| | | | | Item Total | | 27.78 | |

| Issuer certifies that funds have been encumbered and appropriate approvals have been obtained. | Issued By: *Kelly J Lepinski* |
|---|---|



**MINNESOTA**  Purchase Order

**Transportation Department
Statewide Radio Communications**

| CHANGE ORDER | | | Dispatch Via Email |
|---|---|---|---|
| Purchase Order T7901-3000812760 | Date 03/31/2025 | Revision 1 - 04/09/2025 | Page 2 of 2 |
| Payment Terms Net 30 | Freight Terms FOB Destination, Prepd & Add | Ship Via GROUND | Event ID |
| Buyer Lepinski,Kelly J | Phone 651/366-4407 | Currency USD | Agency Reference 445789 |

**Supplier:**
0000202529
DIGI KEY CORP
521 1ST ST E
THIEF RIVER FLS MN 56701-0677
United States

**Ship To:**
MNDOT SW RADIO COMM
BAXTER
BAXTER
7694 INDUSTRIAL PARK RD
BAXTER MN 56425-8266
United States

**Attention:**
See Detail Below

**Bill To:**
MNDOT SW RADIO COMM OAKDALE
OAKDALE
3487 HADLEY AVE N (4W)
OAKDALE MN 55128-3307
United States

**Tax Exempt?**

**Tax Exempt ID:**

Replenishment Option: Standard

Total PO Amount           120.41

1. Show the purchase order number on invoice and all tags, packages and correspondence.
2. This purchase order incorporates by reference all terms, conditions, and specifications in the Contract.
In case of a conflict in terms, the order of precedence shall be: First this P.O. and second the Contract.
3. If this purchase order is awarded from a solicitation, it incorporates by reference all terms, conditions and specifications of the Sample Contract attached to the SWIFT Event.
In case of a conflict in terms, the order of precedence shall be: First this P.O. and second the Sample Contract.
4. All deliveries hereunder shall comply with all applicable State of Minnesota and Federal laws.
5. Invoicing must match line items on the purchased order.
6. DO NOT COLLECT SALES TAX on this order unless instructed to do so on this Purchase Order or the solicitation document. Effective July 1, 1995, Minnesota State agencies use a Direct Pay Authorization to pay the applicable sales and use tax directly to the Department of Revenue under Minnesota Tax ID 4405717. The Department of Revenue does not require State agencies to complete the ST3 Form with this order.
7. Payment terms are Net 30 unless a discount is offered for early payment.

| Issuer certifies that funds have been encumbered and appropriate approvals have been obtained. | Issued By: *Kelly J Lepinski* |
|---|---|

**DigiKey**

701 Brooks Ave South,
PO Box 677
Thief River Falls, MN 56701-0677
USA

www.digikey.com
Global Customer Support
1-800-344-4539 or 218-681-6674

Invoice # 111737153
Completed Salesorder USD S

| | |
|---|---|
| **Bill To:** MN DOT & COMM<br>3487 HADLEY AVE N<br>OAKDALE MN 55128 | **Ship To:** MNDOT SW RADIO<br>SW RADIO COMM ST CLOUD<br>MNDOT<br>3725 12TH ST N<br>PETER NIERENGARTEN<br>SAINT CLOUD MN 56303-2107 |
| **Buyer:** KELLY LEPINSKI<br>STATE OF MN/DEPARTMENT OF TRANSPORTATION<br>STATEWIDE RADIO COMMUNICATIONS<br>3487 HADLEY AVE N<br>OAKDALE MN 55128-3307 | **Ship From:** DIGI-KEY ELECTRONICS<br>701 BROOKS AVE. SOUTH<br>P.O. BOX 677<br>THIEF RIVER FALLS MN 56701-0677 |

| | |
|---|---|
| Purchase Order: | 3000814538 |
| Salesorder / Packlist: | 92028280 / PL1 |
| Account: | 3311 |
| Customer: | 15858179 |
| Payment Terms: | Net 30 Days |
| Shipping Method: | XGT |
| Tracking #: | 454109991879 |

*(handwritten) R-616144 4.17.25 K.L.*

| Order Source: | Order Date: | Invoice Date: | Ship Date: | Document Date: |
|---|---|---|---|---|
| INTERNET | 10-Apr-2025 | 10-Apr-2025 | 10-Apr-2025 | 10-Apr-2025/AUTO |

| Line Item | Ordered | Cancelled | Shipped | Item Number/ Description | Unit Price USD $ | Amount USD $ |
|---|---|---|---|---|---|---|
| 1 | 10 | 0 | 10 | PART: 732-61802524823-ND          DESC: CONN D-SUB PLUG 25POS SOLDER CUP<br>MFG : Wurth Elektronik / 61802524823<br>COO : CHINA                    ECCN: EAR99          HTSUS: 8536.69.8000<br>ROHS3 COMP REACH UNAFFECTED Nov-2024<br>Section 301 Tariff | 2.13300 | 21.33<br><br>2.13 |
| 2 | 10 | 0 | 10 | PART: WM1030-ND                DESC: CONN PLUG HSG 2POS VERT DUAL<br>MFG : Molex / 0039013023<br>COO : UNITED STATES OF AMERICA   ECCN: EAR99          HTSUS: 8536.69.8000<br>ROHS3 COMP REACH UNAFFECTED Jul-2017<br>Mercury: Cert on File. For more information contact Environmental@DigiKey.com | 0.28400 | 2.84 |
| 3 | 25 | 0 | 25 | PART: WM2500-ND                DESC: CONN PIN 18-24AWG CRIMP TIN<br>MFG : Molex / 0039000041<br>COO : UNITED STATES OF AMERICA   ECCN: EAR99          HTSUS: 8536.90.4000<br>ROHS3 COMP REACH UNAFFECTED Jul-2017<br>Mercury: Cert on File. For more information contact Environmental@DigiKey.com | 0.12160 | 3.04 |
| 4 | 6 | 0 | 6 | PART: WM1927-ND                DESC: CONN RCPT HSG 2POS 10.00MM<br>MFG : Molex / 0428160212<br>COO : INDIA                    ECCN: EAR99          HTSUS: 8536.69.8000<br>ROHS3 COMP REACH UNAFFECTED Jul-2017<br>Mercury: Cert on File. For more information contact Environmental@DigiKey.com | 1.52000 | 9.12 |

DUNS No: 05 760 2120 FEI No: 41-1234968 Any applicable sales tax not collected on this invoice is the responsibility of the customer.

**DigiKey**

701 Brooks Ave South,
PO Box 677
Thief River Falls, MN 56701-0677
USA

www.digikey.com
Global Customer Support
1-800-344-4539 or 218-681-6674

**Invoice # 111737153**
**Completed Salesorder USD $**

| Line Item | Ordered | Cancelled | Shipped | Item Number/ Description | Unit Price USD $ | Amount USD $ |
|---|---|---|---|---|---|---|
| 5 | 12 | 0 | 12 | PART: WM9167CT-ND     DESC: CONN SOCKET 8AWG CRIMP GOLD<br>MFG : Molex (VA) / 0428150032<br>COO : UNITED STATES OF AMERICA   ECCN: EAR99    HTSUS: 8536.90.4000<br>ROHS3 COMP REACH UNAFFECTED Jul-2017<br>Mercury: Cert on File. For more information contact Environmental@DigiKey.com | 1.27200 | 15.26 |
| 6 | 6 | 0 | 6 | PART: CP-1453-ND     DESC: CONN RCA PLUG MONO 2COND<br>CUST: ROC-95177-3<br>MFG : Same Sky (Formerly CUI Devices) / RCP-021<br>COO : TAIWAN, PROVINCE OF CHINA   ECCN: EAR99    HTSUS: 8536.69.8000<br>ROHS3 COMP REACH UNAFFECTED Jan-2021 | 1.58000 | 9.48 |
| 7 | 5 | 0 | 5 | PART: APP-001-15AMP-ND     DESC: AUTO PWR PLUG 12V 15A W/LED BLK<br>MFG : MPD (Memory Protection Devices) / APP-001-15AMP<br>COO : TAIWAN, PROVINCE OF CHINA   ECCN: EAR99    HTSUS: 8536.69.8000<br>ROHS COMP REACH UNAFFECTED Jan-2023 | 5.42000 | 27.10 |

| | |
|---|---|
| Sales Amount | 88.17 |
| Tariff Amount | 2.13 |
| Total Sales and Tariff | 90.30 |
| Shipping charges applied | 6.99 |
| ** Charges subtotal ** | 97.29 |
| Total due - Pay from this invoice | 97.29 |
| | USD $ |

Tax Exempt

ACH/Wire Tran:

Digi-Key Electronics
Northern State Bank
201 East Third Street
Thief River Falls MN 56701

Swift Code: NSBTUS44
Account #: 11-596-7
ABA No: 091216146

* These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. Government or as otherwise authorized by U.S. law and regulations.

| Box | Ship Method | Tracking | Weight | Line Item | Part | Quantity |
|---|---|---|---|---|---|---|
| 1 | XGT | 454109991879 | 0.60 kgs / 1 lbs 5 oz | 1 | 732-61802524823-ND | 10 |
| | | | | 2 | WM1030-ND | 10 |
| | | | | 3 | WM2500-ND | 25 |
| | | | | 4 | WM1927-ND | 6 |

DUNS No: 05 760 2120 FEI No: 41-1234968 Any applicable sales tax not collected on this invoice is the responsibility of the customer.

**DigiKey**

701 Brooks Ave South,
PO Box 677
Thief River Falls, MN 56701-0677
USA

www.digikey.com
Global Customer Support
1-800-344-4539 or 218-681-6674

| Ship Method: | XGT | 280/A7U9 | Packlist # | 1 |
| Customer PO: | 3800814538 | | AUTO | |

Sold To:
KELLY LEPINSKI
STATE OF MN/DEPARTMENT OF TRANSPORTATION
STATEWIDE RADIO COMMUNICATIONS
3487 HADLEY AVE N
OAKDALE MN 55128-3307

Ship To:
MNDOT SW RADIO
SW RADIO COMM ST CLOUD
MNDOT
3725 12TH ST N
PETER NIERENGARTEN
SAINT CLOUD MN 56303-2107

Sales Order:       92028280
Invoice:           111737153
Order Date:        10-Apr-2025
Document Date:     10-Apr-2025
Shippable Items:   7

THE ORDER IS COMPLETE

| Ordered | Line Item | Location | Item Number / Description | | | Shipped | Backordered |
|---|---|---|---|---|---|---|---|
| 10 | 1 | | PART: 732-61802524823-ND<br>MFG#: 61802524823 | DESC: CONN D-SUB PLUG 25POS SLDER CUP<br>HTSUS: 8536.69.8089 | ECCN: EAR99<br>CAGE: 86P22 | 10 | 0 |
| | | | MFG : Wurth Elektronik<br>ROHS3 COMP      REACH UNAFFECTED Nov-2024<br>COO: CHINA          LOT QTY: 10          DATE CODE: Nov-2022 LOT CODE: RC3820012248009<br>QTY: | | | | |
| 10 | 2 | | PART: WM1936-ND<br>MFG#: 0039013023 | DESC: CONN PLUG HSG 2POS VERT DUAL<br>HTSUS: 8536.69.8089 | ECCN: EAR99<br>CAGE: 1UX99 | 10 | 0 |
| | | | MFG : Molex<br>ROHS3 COMP      REACH UNAFFECTED Jul-2017<br>COO: UNITED STATES OF AMERICA      LOT QTY: 10          DATE CODE: Feb-2025 LOT CODE: R61480878<br>Mercury: Cert on File. For more information contact Environmental@DigiKey.com<br>QTY: | | | | |
| 25 | 3 | | PART: WM2908-ND<br>MFG#: 00398000041 | DESC: CONN PIN 18-24AWG CRIMP TIN<br>HTSUS: 8536.90.4000 | ECCN: EAR99<br>CAGE: 1UX99 | 25 | 0 |
| | | | MFG : Molex<br>ROHS3 COMP      REACH UNAFFECTED Jul-2017<br>COO: UNITED STATES OF AMERICA      LOT QTY: 25          DATE CODE: Feb-2025 LOT CODE: R61734967<br>Mercury: Cert on File. For more information contact Environmental@DigiKey.com<br>QTY: | | | | |
| 6 | 4 | | PART: WM1927-ND<br>MFG#: 0428169212 | DESC: CONN RCPT HSG 2POS 10.00MM<br>HTSUS: 8536.69.8009 | ECCN: EAR99<br>CAGE: 1UX99 | 6 | 0 |
| | | | MFG : Molex<br>ROHS3 COMP      REACH UNAFFECTED Jul-2017<br>COO: INDIA          LOT QTY: 1          DATE CODE: Oct-2024 LOT CODE: R61102171 | | | | |

**DigiKey**

701 Brooks Ave South,
PO Box 677
Thief River Falls, MN 56701-0677
USA

www.digikey.com
Global Customer Support
1-800-344-4539 or 218-681-6674

| Ship Method: | XGT | 200/A7U9 | Packlist # | 1 |
|---|---|---|---|---|
| Customer PO: | | 3000014538 | | AUTO |

| Ordered | Line Item | Location Location | Item Number / Description | | Shipped | Backordered |
|---|---|---|---|---|---|---|
| | | | COO: INDIA    LOT QTY: 5    DATE CODE: Oct-2024  LOT CODE: 861182171 | | | |
| | | | Mercury: Cert on File. For more information contact Environmental@DigiKey.com | | | |
| | | | QTY: | | | |
| 12 | 5 | | PART: WM9167CT-ND    DESC: CONN SOCKET 8AWG CRIMP GOLD    ECCN: EAR99 | | 12 | 0 |
| | | | MFG#: 0428150032    HTSUS: 8536.90.4000    CAGE: 1UX99 | | | |
| | | | MFG : Molex (VA) | | | |
| | | | ROHS3 COMP    REACH UNAFFECTED Jul-2017 | | | |
| | | | COO: UNITED STATES OF AMERICA    LOT QTY: 12    DATE CODE: Oct-2022  LOT CODE: 000847908346 | | | |
| | | | Mercury: Cert on File. For more information contact Environmental@DigiKey.com | | | |
| | | | QTY: | | | |
| 6 | 6 | | PART: CP-1453-ND    DESC: CONN RCA PLUG MONO 2COND    ECCN: EAR99 | | 6 | 0 |
| | | | CUST: ROC-95177-3    HTSUS: 8536.69.8000    CAGE: 8FVV8 | | | |
| | | | MFG#: RCP-021 | | | |
| | | | MFG : Same Sky (Formerly CUI Devices) | | | |
| | | | ROHS3 COMP    REACH UNAFFECTED Jan-2021 | | | |
| | | | COO: TAIWAN, PROVINCE OF CHINA    LOT QTY: 6    DATE CODE: Mar-2025  LOT CODE: 2516 | | | |
| | | | QTY: | | | |
| 5 | 7 | | PART: APP-001-15AMP-ND    DESC: AUTO PWR PLUG 12V 15A W/LED BLK    ECCN: EAR99 | | 5 | 0 |
| | | | MFG#: APP-001-15AMP    HTSUS: 8536.69.8000    CAGE: 6S249 | | | |
| | | | MFG : MPD (Memory Protection Devices) | | | |
| | | | ROHS COMP    REACH UNAFFECTED Jan-2023 | | | |
| | | | COO: TAIWAN, PROVINCE OF CHINA    LOT QTY: 5    DATE CODE: Feb-2025  LOT CODE: 4640697 | | | |
| | | | QTY: | | | |

General - WEB ORDER ID: 356241482

* These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. Government or as otherwise authorized by U.S. law and regulations.

Received    received 4-14-25

Peter Nierengarten

Page 2 of 3

 MINNESOTA     Purchase Order



### Transportation Department
### Statewide Radio Communications

| | | | Dispatch Via Email |
|---|---|---|---|
| Purchase Order<br>T7901-3000814538 | Date<br>04/10/2025 | Revision | Page<br>1 of 3 |
| Payment Terms<br>Net 30 | Freight Terms<br>FOB Destination,<br>Prepd & Add | Ship Via<br>GROUND | Event ID |
| Buyer<br>Lepinski,Kelly J | Phone<br>651/366-4407 | Currency<br>USD | Agency Reference<br>447054 |

**Supplier:**
0000202529
DIGI KEY CORP
521 1ST ST E
THIEF RIVER FLS MN 56701-0677
United States

**Ship To:**
MNDOT SW RADIO COMM ST
CLOUD
ST CLOUD
3725 12TH ST NORTH
ST CLOUD MN 56303-2107
United States

**Attention:**
See Detail Below

**Bill To:**
MNDOT SW RADIO COMM OAKDALE
OAKDALE
3487 HADLEY AVE N (4W)
OAKDALE MN 55128-3307
United States

| Tax Exempt?<br>Line - Sch | Item/Description<br>Mfg Item ID | Tax Exempt ID: | Manufacturer<br>Name | Replenishment Option: Standard<br>Quantity | UOM | PO Price | Extended Amt | Due Date |
|---|---|---|---|---|---|---|---|---|
| 1 - 1 | DIGIKEY P/N 732-61802524823-ND<br>MFG P/N 61802524823<br>Wurth Elektronik<br>D-Sub Standard Connectors WR-DSUB<br>Male 25Pin Solder Bucket | | | 10.0000 | EA | 2.13300 | 21.33 | 04/10/2025 |
| | 447054 St Cl | | | | | | | |

|  |  |
|---|---|
| FREIGHT | 1.69 |
| MISC | 2.13 |
| Attention: Peter Nierengarten | |
| Schedule Total | 25.15 |
| Item Total | 25.15 |

| 2 - 1 | DIGIKEY P/N WM1030-ND<br>MFG P/N 39-01-3023<br>MOLEX<br>2 CIRCUIT PLUG HOUSING | | | 10.0000 | EA | 0.28400 | 2.84 | 04/10/2025 |
| | 447054 St Cl | | | | | | | |

|  |  |
|---|---|
| FREIGHT | 0.23 |
| Attention: Not Specified | |
| Schedule Total | 3.07 |
| Item Total | 3.07 |

| 3 - 1 | DIGIKEY P/N WM2500-ND<br>MFG P/N 39-00-0041<br>MOLEX<br>WIRE HEADER MALE PIN | | | 25.0000 | EA | 0.12160 | 3.04 | 04/10/2025 |
| | 447054 St Cl | | | | | | | |

|  |  |
|---|---|
| FREIGHT | 0.26 |
| Attention: Not Specified | |
| Schedule Total | 3.30 |
| Item Total | 3.30 |

| 4 - 1 | DIGIKEY P/N WM1927-ND<br>MFG P/N 0428160212<br>MOLEX<br>CONN RCPT HSG 2POS 10.00MM | | | 6.0000 | EA | 1.52000 | 9.12 | 04/10/2025 |
| | 447054 St Cl | | | | | | | |

|  |  |
|---|---|
| FREIGHT | 0.72 |

| Issuer certifies that funds have been encumbered and appropriate approvals have been obtained. | Issued By:<br>*Kelly J Lepinski* |
|---|---|

# m̃ MINNESOTA   Purchase Order



**Transportation Department**
**Statewide Radio Communications**

| Purchase Order | Date | Revision | Dispatch Via Email |
|---|---|---|---|
| T7901-3000814538 | 04/10/2025 | | Page 2 of 3 |
| Payment Terms | Freight Terms | Ship Via | Event ID |
| Net 30 | FOB Destination, Prepd & Add | GROUND | |
| Buyer | Phone | Currency | Agency Reference |
| Lepinski,Kelly J | 651/366-4407 | USD | 447054 |

| Supplier: | Ship To: | Attention: | Bill To: |
|---|---|---|---|
| 0000202529 | MNDOT SW RADIO COMM ST CLOUD | See Detail Below | MNDOT SW RADIO COMM OAKDALE |
| DIGI KEY CORP | ST CLOUD | | OAKDALE |
| 521 1ST ST E | 3725 12TH ST NORTH | | 3487 HADLEY AVE N (4W) |
| THIEF RIVER FLS MN 56701-0677 | ST CLOUD MN 56303-2107 | | OAKDALE MN 55128-3307 |
| United States | United States | | United States |

Tax Exempt?          Tax Exempt ID:

Replenishment Option: Standard

Attention: Not Specified

| | | Schedule Total | 9.84 |
|---|---|---|---|
| | | Item Total | 9.84 |

| 5 - 1 | DIGIKEY P/N WM9167CT-ND | 12.0000 | EA | 1.27200 | 15.26 | 04/10/2025 |
|---|---|---|---|---|---|---|
| | MFG P/N 0428150032 | | | | | |
| | MOLEX | | | | | |
| | CONN SOCKET 8AWG CRIMP GOLD | | | | | |
| | 447054 St Cl | | | | | |

| | FREIGHT | 1.21 |
|---|---|---|
| | Attention: Not Specified | |
| | Schedule Total | 16.47 |
| | Item Total | 16.47 |

| 6 - 1 | DIGIKEY P/N CP-1453-ND | 6.0000 | EA | 1.58000 | 9.48 | 04/10/2025 |
|---|---|---|---|---|---|---|
| | MFG P/N RCP-021 | | | | | |
| | SAME SKY | | | | | |
| | CONN RCA PLUG MONO 2 CONDUCTOR | | | | | |
| | 447054 St Cl | | | | | |

| | FREIGHT | 0.75 |
|---|---|---|
| | Attention: Not Specified | |
| | Schedule Total | 10.23 |
| | Item Total | 10.23 |

| 7 - 1 | DIGIKEY P/N APP-001-15AMP-ND | 5.0000 | EA | 5.42000 | 27.10 | 04/10/2025 |
|---|---|---|---|---|---|---|
| | MFG P/N APP-001-15AMP | | | | | |
| | MPD | | | | | |
| | AUTO PWR PLUG 12V 15A W/LED BLK | | | | | |
| | 447054 St Cl | | | | | |

| | FREIGHT | 2.13 |
|---|---|---|
| | Attention: Not Specified | |
| | Schedule Total | 29.23 |
| | Item Total | 29.23 |

| | Total PO Amount | 97.29 |
|---|---|---|

1. Show the purchase order number on invoice and all tags, packages and correspondence.
2. This purchase order incorporates by reference all terms, conditions, and specifications in the Contract.
In case of a conflict in terms, the order of precedence shall be: First this P.O. and second the Contract.

| **Issuer certifies that funds have been encumbered and appropriate approvals have been obtained.** | Issued By: *Kelly J Lepinski* |
|---|---|

**DigiKey**

701 Brooks Ave South,
PO Box 677
Thief River Falls, MN 56701-0677
USA

www.digikey.com
Global Customer Support
1-800-344-4539 or 218-681-6674

**Invoice # 111900013**
**Completed Salesorder USD $**

Bill To:
MN DOT & COMM
3487 HADLEY AVE N
OAKDALE MN 55128

Ship To:
MICAH SPINELLI
SW RADIO COMM
101 HOOVER RD N
VIRGINIA MN 55792-3412

Purchase Order: 3000815560
Salesorder / Packlist: 92129478 / PL1
Account: 3311
Customer: 15858179
Payment Terms: Net 30 Days
Shipping Method: XGT
Tracking #: 454755149489

Buyer:
KELLY LEPINSKI
STATE OF MN/DEPARTMENT OF TRANSPORTATION
STATEWIDE RADIO COMMUNICATIONS
3487 HADLEY AVE N
OAKDALE MN 55128-3307

Ship From:
DIGI-KEY ELECTRONICS
701 BROOKS AVE. SOUTH
P.O. BOX 677
THIEF RIVER FALLS MN 56701-0677

*(handwritten)* A-616953 4-24-25 K.L.

| Order Source: | Order Date: | Invoice Date: | Ship Date: | Document Date: |
|---|---|---|---|---|
| INTERNET | 16-Apr-2025 | 16-Apr-2025 | 16-Apr-2025 | 16-Apr-2025/AUTO |

| Line Item | Ordered | Cancelled | Shipped | Item Number/ Description | Unit Price USD $ | Amount USD $ |
|---|---|---|---|---|---|---|
| 1 | 20 | 0 | 20 | PART: PB309-ND     DESC: RELAY GEN PURPOSE SPDT 20A 24V<br>MFG : TE Connectivity Potter & Brumfield Relays / T9ASD22-24<br>COO : CHINA     ECCN: EAR99     HTSUS: 8536.41.0050<br>ROHS3 COMP REACH AFFECTED Jan-2021<br>Section 301 Tariff | 5.56000 | 111.20<br><br>24.48 |

Sales Amount 111.20
Tariff Amount 24.46
Total Sales and Tariff 135.66
** Charges subtotal ** 135.66
Total due - Pay from this invoice 135.66
USD $
Tax Exempt

ACH/Wire Tran:
Digi-Key Electronics
Northern State Bank
201 East Third Street
Thief River Falls MN 56701

Swift Code: NSBTUS44
Account #: 11-596-7
ABA No: 091216146

* These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. Government or as otherwise authorized by U.S. law and regulations.

DUNS No: 05 760 2120 FEI No: 41-1234968 Any applicable sales tax not collected on this invoice is the responsibility of the customer.

Page 1 of 2

**DigiKey**

701 Brooks Ave South,
PO Box 677
Thief River Falls, MN 56701-0677
USA

www.digikey.com
Global Customer Support
1-800-344-4539 or 218-681-6674

| Ship Method: | X6T | 478/A2CF | Packlist # | 1 |
|---|---|---|---|---|
| Customer PO: | 3000815560 | | AUTO | |

**Sold To:**
KELLY LEPINSKI
STATE OF MN/DEPARTMENT OF TRANSPORTATION
STATEWIDE RADIO COMMUNICATIONS
3487 HADLEY AVE N
OAKDALE MN 55128-3307

**Ship To:**
MICAH SPINELLI
SW RADIO COMM
101 HOOVER RD N
VIRGINIA MN 55792-3412

Sales Order:     92129478
Invoice:         111900013
Order Date:      16-Apr-2025
Document Date:   16-Apr-2025
Shippable Items:  1

THE ORDER IS COMPLETE



| Ordered | Line Item | Location | Item Number / Description | Shipped | Backordered |
|---|---|---|---|---|---|
| 20 | 1 | | PART: PB309-ND       DESC: RELAY GEN PURPOSE SPDT 20A 24V        ECCN: EAR99 | 20 | 0 |
| | | | MFG#: T9AS5D22-24    HTSUS: 8536.41.0050        CAGE: 77342 | | |
| | | | MFG : TE Connectivity Potter & Brumfield Relays | | |
| | | | ROHS3 COMP     REACH AFFECTED Jan-2021 | | |
| | | | COO: CHINA           LOT QTY: 20       DATE CODE: Jan-2022 LOT CODE: 3S08S908143394 | | |
| | | | QTY: | | |

General - WEB ORDER ID: 356485001

* These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein
identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s),
either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. Government or as otherwise authorized by U.S. law and
regulations.

CERTIFICATE OF COMPLIANCE:
The Digi-Key or supplier direct ship products included in the above shipment were purchased from the original manufacturer or through the manufacturer's authorized distribution. The original manufacturer warrants and certifies that the products they produce meet their
specifications. Test reports (chemical, physical, electrical, etc.) supporting their certification are on file (either at Digi-Key, the supplier or in the plant of the manufacturer) and will be made available upon request. This document is evidence of Conformity that this shipment meets
the requirements of Digi-Key's Quality Management System and/or Purchase Order requirements agreed on between the customer and Digi-Key. This certification is valid only to the original customer and is not transferable.

Pam Aaland, Senior Manager, Customer Resolution - Americas

All transactions with DigiKey, including its affiliates, are subject to DigiKey's Terms of Use and Conditions of Order.

Micah Smith
4-22-25

 MINNESOTA    Purchase Order



**Transportation Department
Statewide Radio Communications**

Dispatch Via Email

| Purchase Order T7901-3000815560 | Date 04/16/2025 | Revision | Page 1 of 1 |
| --- | --- | --- | --- |
| Payment Terms Net 30 | Freight Terms FOB Destination, Prepd & Add | Ship Via GROUND | Event ID |
| Buyer Lepinski,Kelly J | Phone 651/366-4407 | Currency USD | Agency Reference 447910 |

| Supplier: | Ship To: | Attention: | Bill To: |
| --- | --- | --- | --- |
| 0000202529 | MNDOT SW RADIO COMM | Micah Spinelli | MNDOT SW RADIO COMM OAKDALE |
| DIGI KEY CORP | VIRGINIA | | OAKDALE |
| 521 1ST ST E | VIRGINIA | | 3487 HADLEY AVE N (4W) |
| THIEF RIVER FLS MN 56701-0677 | 101 NORTH HOOVER RD | | OAKDALE MN 55128-3307 |
| United States | VIRGINIA MN 55792-3412 | | United States |
| | United States | | |

Replenishment Option: Standard

| Tax Exempt? Line - Sch | Item/Description Mfg Item ID | Tax Exempt ID: | Manufacturer Name | Quantity | UOM | PO Price | Extended Amt | Due Date |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 1 - 1 | PB309-ND T9AS5D22-24 TE Connectivity Potter & Brumfield Relays RELAY GEN PURPOSE SPDT 20A 24V | | | 20.0000 | EA | 5.56000 | 111.20 | 04/16/2025 |
| | 447910 Vir | | | | | | | |

| | |
| --- | --- |
| MISC | 24.46 |
| Schedule Total | 135.66 |
| Item Total | 135.66 |
| Total PO Amount | 135.66 |

1. Show the purchase order number on invoice and all tags, packages and correspondence.
2. This purchase order incorporates by reference all terms, conditions, and specifications in the Contract.
In case of a conflict in terms, the order of precedence shall be: First this P.O. and second the Contract.
3. If this purchase order is awarded from a solicitation, it incorporates by reference all terms, conditions and specifications of the Sample Contract attached to the SWIFT Event.
In case of a conflict in terms, the order of precedence shall be: First this P.O. and second the Sample Contract.
4. All deliveries hereunder shall comply with all applicable State of Minnesota and Federal laws.
5. Invoicing must match line items on the purchased order.
6. DO NOT COLLECT SALES TAX on this order unless instructed to do so on this Purchase Order or the solicitation document. Effective July 1, 1995, Minnesota State agencies use a Direct Pay Authorization to pay the applicable sales and use tax directly to the Department of Revenue under Minnesota Tax ID 4405717. The Department of Revenue does not require State agencies to complete the ST3 Form with this order.
7. Payment terms are Net 30 unless a discount is offered for early payment.

| | |
| --- | --- |
| Issuer certifies that funds have been encumbered and appropriate approvals have been obtained. | Issued By: *Kelly J Lepinski* |

# DigiKey

701 Brooks Ave South,
PO Box 677
Thief River Falls, MN 56701-0677
USA

www.digikey.com
Global Customer Support
1-800-344-4539 or 218-681-6674

**Invoice # 110428414**
**Completed Salesorder USD $**

| | |
|---|---|
| **Bill To:** MN DOT & COMM<br>3487 HADLEY AVE N<br>OAKDALE MN 55128 | **Ship To:** JOE SIKES<br>SW RADIO COMM<br>2055 LILAC DR N<br>SW RADIO<br>MINNEAPOLIS MN 55422-4038 |
| **Buyer:** KELLY LEPINSKI<br>STATE OF MN/DEPARTMENT OF TRANSPORTATION<br>STATEWIDE RADIO COMMUNICATIONS<br>3487 HADLEY AVE N<br>OAKDALE MN 55128-3307 | **Ship From:** DIGI-KEY ELECTRONICS<br>701 BROOKS AVE. SOUTH<br>P.O. BOX 677<br>THIEF RIVER FALLS MN 56701-0677 |

| | |
|---|---|
| Purchase Order: | 3000807136 |
| Salesorder / Packlist: | 91215860 / PL1 |
| Account: | 3311 |
| Customer: | 15858179 |
| Payment Terms: | Net 30 Days |
| Shipping Method: | XGT |
| Tracking #: | 446162869785 |

*R - 609707*
*2-27-25*
*R.L.*

| Order Source: | Order Date: | Invoice Date: | Ship Date: | Document Date: |
|---|---|---|---|---|
| INTERNET | 24-Feb-2025 | 24-Feb-2025 | 24-Feb-2025 | 24-Feb-2025/AUTO |

| Line Item | Ordered | Cancelled | Shipped | Item Number/ Description | Unit Price USD $ | Amount USD $ |
|---|---|---|---|---|---|---|
| 1 | 14 | 0 | 14 | PART: A144221-ND          DESC: CONN RCPT HSG MULTI-BEAM 2POS<br>MFG : TE Connectivity AMP Connectors / 1600798-2<br>COO : CHINA          ECCN: EAR99          HTSUS: 8538.90.6000<br>ROHS3 COMP REACH NOT AVAILABLE Jan-2021<br>Section 301 Tariff | 6.29643 | 88.15<br><br>8.82 |
| 2 | 30 | 0 | 30 | PART: A108864CT-ND          DESC: CONTACT BLADE SCKT PWR 12-16AWG<br>MFG : TE Connectivity AMP Connectors (VA) / 1-1600961-8<br>COO : CHINA          ECCN: EAR99          HTSUS: 8536.90.4000<br>ROHS3 COMP REACH UNAFFECTED Jun-2023<br>Section 301 Tariff | 1.92800 | 57.84<br><br>5.78 |
| 3 | 30 | 0 | 30 | PART: A107484-ND          DESC: SECONDARY LOCK PWR RECEP MBXL<br>CUST: DUL-158780-3<br>MFG : TE Connectivity AMP Connectors / 1600903-1<br>COO : CHINA          ECCN: EAR99          HTSUS: 8538.90.6000<br>ROHS COMP REACH NOT AVAILABLE Jan-2021<br>Section 301 Tariff | 0.25520 | 7.66<br><br>0.77 |

| | |
|---|---|
| Sales Amount | 153.65 |
| Tariff Amount | 15.37 |
| Total Sales and Tariff | 169.02 |
| ** Charges subtotal ** | 169.02 |
| Total due - Pay from this invoice | 169.02 |
| | USD $ |

Tax Exempt

DUNS No: 05 760 2120 FEI No: 41-1234968 Any applicable sales tax not collected on this invoice is the responsibility of the customer.

Page 1 of 2

**DigiKey**

701 Brooks Ave South,
PO Box 677
Thief River Falls, MN 56701-0677
USA

www.digikey.com
Global Customer Support
1-800-344-4539 or 218-681-6674

| Ship Method: | XGT | 860/A949 | Packlist # | 1 |
|---|---|---|---|---|
| Customer PO: | 3006807136 | | | AUTO |

**Sold To:**
KELLY LEPINSKI
STATE OF MN/DEPARTMENT OF TRANSPORTATION
STATEWIDE RADIO COMMUNICATIONS
3487 HADLEY AVE N
OAKDALE MN 55128-3307

**Ship To:**
JOE SIKES
SW RADIO COMM
2055 LILAC DR N
SW RADIO
MINNEAPOLIS MN 55422-4038

| | |
|---|---|
| Sales Order: | 91215860 |
| Invoice: | 110428414 |
| Order Date: | 24-Feb-2025 |
| Document Date: | 24-Feb-2025 |
| Shippable Items: | 3 |

THE ORDER IS COMPLETE

| Ordered | Line Item | Location | Item Number / Description | | | Shipped | Backordered |
|---|---|---|---|---|---|---|---|
| 14 | 1 | | PART: A144221-ND | DESC: CONN RCPT HSG MULTI-BEAM 2POS | ECCN: EAR99 | (14) | 0 |
| | | | MFG#: 1600798-2 | HTSUS: 8538.90.6000 | CAGE: 00779 | RCVD | |
| | | | MFG : TE Connectivity AMP Connectors | | | | |
| | | | ROHS3 COMP     REACH NOT AVAILABLE Jan-2021 | | | | |
| | | | COO: CHINA          LOT QTY: 14 | DATE CODE: Oct-2020 LOT CODE: 314057847 | | | |
| | | | QTY: | | | | |
| 30 | 2 | | PART: A108864CT-ND | DESC: CONTACT BLADE SCKT PWR 12-16AWG | ECCN: EAR99 | (30) | 0 |
| | | | MFG#: 1-1600961-8 | HTSUS: 8536.90.4000 | CAGE: 00779 | RCVD | |
| | | | MFG : TE Connectivity AMP Connectors (VA) | | | | |
| | | | ROHS3 COMP     REACH UNAFFECTED Jun-2023 | | | | |
| | | | COO: CHINA          LOT QTY: 30 | DATE CODE: Nov-2023 LOT CODE: 23446M | | | |
| | | | QTY: | | | | |
| 30 | 3 | | PART: A107484-ND | DESC: SECONDARY LOCK PWR RECEP MBXL | ECCN: EAR99 | (30) | 0 |
| | | | CUST: DUL-158780-3 | HTSUS: 8536.90.6000 | CAGE: 00779 | RCVD | |
| | | | MFG#: 1600903-1 | | | | |
| | | | MFG : TE Connectivity AMP Connectors | | | | |
| | | | ROHS COMP     REACH NOT AVAILABLE Jan-2021 | | | | |
| | | | COO: CHINA          LOT QTY: 30 | DATE CODE: Jan-2024 LOT CODE: 200229088144 | | | |
| | | | QTY: | | | | |

General - WEB ORDER ID: 354920785

· These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. Government or as otherwise authorized by U.S. law and regulations.

received
4/26/25

91215860,1,110428414

Page 1 of 2

 **MINNESOTA**  Purchase Order



**Transportation Department
Statewide Radio Communications**

| | Dispatch Via Email |
|---|---|
| Purchase Order | Date | Revision | Page |
| T7901-3000807136 | 02/24/2025 | | 1 of 2 |
| Payment Terms | Freight Terms | Ship Via | Event ID |
| Net 30 | FOB Destination, Prepd & Add | GROUND | |
| Buyer | Phone | Currency | Agency Reference |
| Lepinski,Kelly J | 651/366-4407 | USD | 441263 |

**Supplier:**
0000202529
DIGI KEY CORP
521 1ST ST E
THIEF RIVER FLS MN 56701-0677
United States

**Ship To:**
MNDOT SW RADIO COMM GV
GOLDEN VALLEY
2055 NORTH LILAC DR
ATTN DOOR 7
GOLDEN VALLEY MN 55422-4038
United States

**Attention:**
See Detail Below

**Bill To:**
MNDOT SW RADIO COMM OAKDALE
OAKDALE
3487 HADLEY AVE N (4W)
OAKDALE MN 55128-3307
United States

| Tax Exempt? | | Tax Exempt ID: | | Replenishment Option: Standard | | | | |
|---|---|---|---|---|---|---|---|---|
| Line - Sch | Item/Description Mfg Item ID | | Manufacturer Name | Quantity | UOM | PO Price | Extended Amt | Due Date |
| 1 - 1 | DigiKey# A144221-ND Manufacture# 1600798-2 CONN RCPT HSG MULTI-BEAM 2POS | | | 14.0000 | EA | 6.29643 | 88.15 | 02/24/2025 |
| | 441263 GV | | | | | | | |
| | | | | | MISC | | 8.82 | |
| | | | | | Attention: Joe Sikes | | | |
| | | | | | Schedule Total | | 96.97 | |
| | | | | | Item Total | | 96.97 | |
| 2 - 1 | DigiKey # A108864CT-ND - Cut Tape (CT) Manufacture # 1-1600961-8 CONTACT BLADE SCKT PWR 12-16AWG | | | 30.0000 | EA | 1.92800 | 57.84 | 02/24/2025 |
| | 441263 GV | | | | | | | |
| | | | | | MISC | | 5.79 | |
| | | | | | Attention: Not Specified | | | |
| | | | | | Schedule Total | | 63.63 | |
| | | | | | Item Total | | 63.63 | |
| 3 - 1 | DigiKey # A107484-ND Manufacturer # 1600903-1 SECONDARY LOCK PWR RECEP MBXL | | | 30.0000 | EA | 0.25520 | 7.66 | 02/24/2025 |
| | 441263 GV | | | | | | | |
| | | | | | MISC | | 0.76 | |
| | | | | | Attention: Not Specified | | | |
| | | | | | Schedule Total | | 8.42 | |
| | | | | | Item Total | | 8.42 | |
| | | | | | Total PO Amount | | 169.02 | |

1. Show the purchase order number on invoice and all tags, packages and correspondence.
2. This purchase order incorporates by reference all terms, conditions, and specifications in the Contract.
In case of a conflict in terms, the order of precedence shall be: First this P.O. and second the Contract.
3. If this purchase order is awarded from a solicitation, it incorporates by reference all terms, conditions and specifications of the Sample Contract attached to the SWIFT Event.
In case of a conflict in terms, the order of precedence shall be: First this P.O. and second the Sample Contract.

**Issuer certifies that funds have been encumbered and appropriate approvals have been obtained.**

| Issued By: |
|---|
| *Kelly J Lepinski* |



# Quotation

| Customer |
|---|
| MNDOT SW RADIO COMM OAK |
| 3487 HADLEY AVENUE N (4W) |
| SAINT PAUL MN  55128 |
| USA |

| Ship-To-Party |
|---|
| MNDOT SW Radio |
| Jon Thompson |
| 2505 Transportation Rd |
| WILLMAR MN  56201 |
| USA |

| Information | |
|---|---|
| Quote Number | 2124562 |
| Quote Date | 04/18/2025 |
| Customer No. | 131417 |
| Currency | USD |
| Validity Start Date | 04/18/2025 |
| Validity End Date | 05/18/2025 |
| Sales Rep | JASON DARDA |
| Customer Name | |
| Customer Email | |
| Customer Phone | |

**Header Information**

Terms of payment:        Net due in 30 days
** PAYMENT TERMS ARE SUBJECT TO CHANGE PENDING CREDIT APPROVAL **
Incoterms:                FOB PPD Destination

Kelly Lepinski
Mn/Dot Statewide Radio
651 366 4407
kelly.lepinski@state.mn.us

EQUIPMENT LEAD TIME IS 5-10 BUSINESS DAYS
QUOTE INCLUDEs FREIGHT
APPLICABLE TAXES ARE BASED ON THE ACTUAL SHIP TO ADDRES

| Item | Material Number / Cat. Num / Description | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| 10 | F1403411/ ASSY RC 101 NETWORK ALL FLASHHEAD | 16  EA | 33.90 | 542.40 |
| 20 | F1403412/ ASSY RC 102 NETWORK FH 306 307 308 | 16  EA | 33.90 | 542.40 |
| 30 | F8288200/ ASSY COUPLING AND TRIGGER TRANSFORMERS | 10  EA | 143.51 | 1,435.10 |
| 40 | FT0-FLSH-310/ Flash Tube PC310 Replaces OEM | 5  EA | 348.50 | 1,742.50 |
| 50 | FT0-FLSH-312/ Flash Tube PC312 Replaces OEM | 5  EA | 348.50 | 1,742.50 |
| 60 | F1884301/ ASSY TUBE SOCKET & INSERT FH 324 | 12  EA | 25.62 | 307.44 |

*Item 70 on next page*

**SPX Aids to Navigation**

332 Nichol Mill Lane
Franklin, TN 37067 USA
Phone: 615-503-2000
Fax:615-261-2600
TAX ID: 88-3567996

Page 1 of 2



# Quotation

**Quote Number** 2124562          **Quote Date** 04/18/2025          **Customer No.** 131417

| Item | Material Number / Cat. Num / Description | Quantity | Unit Price | Amount |
|------|------------------------------------------|----------|-----------|--------|
| 70 | 91000260/ OBS-Tariffs | 1 EA | | |
| | | | Tariffs291.70/ 1 EA | 291.70 |
| | | | Tariffs | 291.70 |
| | | | Freight | 30.00 |
| | | | Net Before Tax | 6,634.04 |
| | | | Total Tax | |
| | | | **Final amount:** | 6,634.04 |

ACCEPTANCE:

By execution below, or by sending a Purchase Order referencing this proposal, the undersigned accepts this proposal to furnish equipment and/or services on this schedule subject to the

SPX Aids to Navigation ("SPX AtoN") Terms and Conditions of Sale (the "SPX AtoN Terms"), which are incorporated by reference herein and shall solely and exclusively govern this transaction, and authorizes SPX AtoN to proceed with the procurement and fabrication of this equipment.  Our acceptance and performance of any order is expressly conditioned upon your acceptance of the SPX AtoN Terms and your agreement to be bound by and comply with them.  Any conflicting or additional terms or conditions set forth in a Purchase Order or other document from you are expressly rejected and not binding upon SPX AtoN.

Signature _____ Date _____

Requested Ship Date: _____

**SPX Aids to Navigation**
332 Nichol Mill Lane
Franklin, TN 37067 USA
Phone: 615-503-2000
Fax:615-261-2600
TAX ID: 88-3567996

**Rob Gorman**
VP, GM
SPX Aids to Navigation



m: +1.913.406.6452
e:  rob.gorman@spx.com

April 11, 2025

Dear Valued Customer,

I'm reaching out to share an important update regarding our pricing policy considering ongoing and newly implemented government trade actions. Recent tariffs taking effect in Q1 2025—primarily impacting materials imported from Canada, Mexico, China, and other countries—have introduced significant cost pressures across the global supply chain.

While SPX has absorbed some of these cost increases, the scale and scope of these trade measures now require us to implement corresponding pricing adjustments. In the near term, this includes a line-item surcharge on all invoices for products and sub-assemblies containing affected components. These adjustments will be applied as of the effective date of the applicable government orders.

Going forward, this policy will also apply to any future tariffs or trade remedies imposed by the U.S. or foreign jurisdictions. Our intent is to communicate with any changes as quickly and transparently as possible. Where feasible, we will provide tariff classifications and support documentation.

We understand the challenges these developments pose and deeply appreciate your support and partnership. Please feel free to contact your sales representative or reach out to me directly with any questions.

Thank you again for your continued trust in SPX Aids to Navigation. We remain committed to working closely with you as we adapt to the evolving global trade environment.

Sincerely

_____
Rob Gorman
VP, GM
SPX AtoN

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT,<br><br>        Plaintiffs,<br><br>   v.<br><br>DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES,<br><br>        Defendants. | Case No.  1:25-cv-00077-GSK-TMR-JAR<br><br>DECLARATION OF GREGORY SHABRAM<br><br>(In support of Plaintiffs' Motion for Preliminary Injunction) |

I, Gregory Shabram, declare as follows

    1.    I am over the age of 18, competent to testify as to the matters herein, and testify based on personal knowledge, records kept in the ordinary course of business at the University of Oregon, and information I learned from university personnel whose work I rely upon and who have assisted me in gathering this information from our institution.

    2.    I am the Chief Procurement Officer at the University of Oregon. As the Chief Procurement Officer, I oversee all transactions for non-construction related goods and services purchased by the University.

3.      In this role I manage a team authorized by University of Oregon Policy to sign contracts and issue purchase orders for goods and services, including goods and equipment manufactured overseas and then delivered directly to the University.

**A.      Tariff impacts to specially ordered scientific equipment**

4.      In the regular course of its operations, the University of Oregon routinely purchases many goods that originate from sources outside the United States. One category of those goods is specially ordered scientific equipment. The following is an example of purchased equipment that has been impacted by tariffs.

5.      First, the University of Oregon's Center of Optics purchased a cryogenic single photon counting detector system from ID Quantique, Inc., a company based in Switzerland. The University issued the purchase order on November 8, 2024, at which time there was no tariff against imports from Switzerland.

6.      IDQ shipped the cryogenic system from Switzerland on April 8, and the cryogenic system arrived on April 10. At arrival, the tariff rate for imports from Switzerland was 10 percent.

7.      For import purposes, the value of the cryogenic system was $185,798. As the importer of record, the University was assessed an import duty of $18,579, which was paid on its behalf by its customs broker to allow release and delivery of the cryogenic system.

8.      Attached as **Exhibit A** is a true copy of the entry summary provided by the U.S. Customs and Border Protection to the University's customs broker for the cryogenic system.

9.      That is only one example of tariffs that the University expects to pay under the tariff orders issued by the President. Attached as **Exhibit B** is a spreadsheet of large purchases currently in process that will likely be subject to those new tariffs, should they remain in place. For each of those purchases, the tariffs are an unexpected additional cost that the University could not reasonably expect when it initially budgeted for those items.

10.     As indicated in that spreadsheet, many of the goods involved in those purchases have not yet arrived at a port of entry. It is likely, either because the University of Oregon is the importer of record, or because vendor will pass on costs to the University of Oregon, that the University of Oregon will be required to pay the new tariff costs to have U.S. Customs and Border Protection release those goods.

11.     The purchases described in **Exhibit B** are only a selection of the purchases that will be impacted by tariffs. The university is still assessing the impact of tariffs and expects to identify additional similar purchases in the coming months.

12.     For some of those purchases, the substantial increase in costs due to tariffs will require departments to identify additional funds to ensure delivery of the purchased items.

13.     For example, the University's Materials Science Institute is purchasing a transmission electron microscope from Corrected Electron Optical Systems GmbH, a German manufacturer. The purchase price of the equipment is about $1 million. At the current 10 percent tariff levied against goods from Germany, the import duty will be about $100,000. The Materials Science Institute is still attempting to identify funding to cover those additional tariff costs.

**B.     The President's constantly shifting tariff policy impairs the University of Oregon's ability to accurately budget for critical research equipment and other goods for Fiscal Year 2026.**

14.     To ensure responsible financial planning, each department at the University of Oregon sets a budget every fiscal year. These budgets are used, not only to ensure fiscal responsibility, but also to apply for grants from both public and private sources to fund this critical research equipment.

15.     The University is currently setting the budget for Fiscal Year 2026 and University researchers are regularly applying for grants based on that budget.

16.     The President's repeated imposition, modification, suspension, and threatening of various tariffs has created substantial uncertainty regarding the expected cost of a wide range of

goods and services making it much harder allocate resources and make investments in the University's research equipment and represent budgets accurately when applying for grants.

17.     For example, the University of Oregon's Robert and Beverly Lewis Center for Neuroimaging is a core service that operates two MRI machines used by many University researchers conduct research in humans. These MRI machines are made by Siemens in Germany. One of these MRI machines is reaching its end of life. The Lewis Center makes long-term investments in these machines, expecting them to support research over more than a decade. The lead time for a new MRI machine is at least three to six months. Given the variability and uncertainly in the President's tariff policies, the Lewis Center is unable to budget for this purchase and may need to operate a reduced capacity if the end-of-life MRI machine is decommissioned. Such a reduction in capacity would slow University researchers' ability to conduct their research and meet the requirements of their grant contracts.

18.     The President's use of emergency powers to repeatedly impose and change tariffs thus makes it difficult for the university to accurately plan its budgets for research equipment for the upcoming fiscal year. To account of the uncertainty of future tariff costs, the university and its departments will need to increase the amount of funding set aside for tariff contingencies. As a result, the university will necessarily need to reduce investments in some research equipment, reducing the capabilities and productivity of our researchers.

**I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.**

**Executed on May 5, 2025, at Eugene, Oregon**

Digitally signed by Greg Shabram
Date: 2025.05.05 13:04:52 -07'00'

Gregory Shabram
Chief Procurement Officer
University of Oregon



ACE  Version: 001.00
HBS

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection
R       MM  R

OMB APPROVAL NO. 1651-0022
EXPIRATION DATE 03/31/2025

| 1. Filer Code/Entry No. 9PS  1163908-9 | 2. Entry Type 01 ABI/A | 3. Summary Date 04/10/2025 | 4. Surety No. 054 | 5. Bond Type 8 | 6. Port Code 2910 | 7. Entry Date 04/10/2025 |
|---|---|---|---|---|---|---|

| 8. Importing Carrier LH | 9. Mode of Transport 40 | 10. Country of Origin CH | 11. Import Date 04/10/2025 |
|---|---|---|---|

| 12. B/L or AWB No. 02035564605 | 13. Manufacturer ID CHIDQSA3CAR | 14. Exporting Country CH | 15. Export Date 04/08/2025 |
|---|---|---|---|

| 16. I.T. No. 02035564605 | 17. I.T. Date 04/10/2025 | 18. Missing Docs | 19. Foreign Port of Lading | 20. U.S. Port of Unlading 3029 |
|---|---|---|---|---|

| 21. Location of Goods/G.O. No. WBU8 FLT: 490 | 22. Consignee No. SAME | 23. Importer No. 46-472780000 | 24. Reference No. |
|---|---|---|---|

| 25. Ultimate Consignee Name and Address | 26. Importer of Record Name and Address UNIVERSITY OF OREGON 1505 FRANKLIN BLVD |
|---|---|
| City          State OR       Zip | City EUGENE          State OR    Zip 97403 |

| 27. Line No. | 28. Description of Merchandise | | | 32. A. Entered Value B. CHGS C. Relationship | 33. A. HTSUS Rate B. AD/CVD Rate C. IRC Rate D. Visa No. | 34. Duty and I.R. Tax |  |
|---|---|---|---|---|---|---|---|
| | 29. A. HTSUS No. B. AD/CVD Case No. | 30. A. Gross Weight B. Manifest Qty. | 31. Net Quantity in HTSUS Units | | | Dollars | Cents |
| | M 02035564605  H 4001150333 | | | | | 2 CTN | |
| 001 | INVOICE 00001 OTHR N/EL INST:USING OPT R 9903.01.25 | | | NOT RELATED | | | |
| | 9027.50.8060 | 179 | 17NO | 175798 | 10% | 17579.80 | |
| | | | | C426 | | | |
| | MERCHANDISE PROCESSING FEE | | | | 0.3464% | 608.96 | |
| | | | | ------- | | ---------- | |
| | | | | 175798 CARRIED FORWARD | | 18188.76 | |

| Other Fee Summary for Block 39 MPF          499    634.62 | 35. Total Entered Value $          185,798.00 | | TOTALS | |
|---|---|---|---|---|
| | Total Other Fees $          634.62 | A. LIQ CODE | B. Ascertained Duty 18579.80 | 37. Duty 18579.80 |
| | | REASON CODE | C. Ascertained Tax | 38. Tax |

| 36. DECLARATION OF IMPORTER OF RECORD (OWNER OR PURCHASER) OR AUTHORIZED AGENT | D. Ascertained Other | 39. Other 634.62 |
|---|---|---|

I declare that I am the ☐ importer of record and that the actual owner, purchaser, or consignee for CBP purposes is as shown above,  R ☒ owner or purchaser or agent thereof.  I further declare that the merchandise ☒ was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoices are true,  R ☐ was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoices as to value or price are true to the best of my knowledge and belief.  I also declare that the statements in the documents herein filed fully disclose to the be of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed. I will immediately furnish to the appropriate CBP officer any information showing a different statement of facts.

| | E. Ascertained Total | 40. Total 19214.42 |
|---|---|---|

| 41. DECLARANT NAME Clearpoint International | TITLE A.I.F. | SIGNATURE | DATE 04/10/2025 |
|---|---|---|---|

| 42. Broker/Filer Information (Name, address, phone number) Clearpoint International 1111 Corporate Center Drive # 103 Monterey Park, CA  91754  310-488-8458 | 43. Broker/Importer File No. 1163908 |
|---|---|
| | CBP Form 7501 (5/22) |

EDITRADE

RECORD

- Appx421 -

Page:    2

OMB APPROVAL NO. 1651-0022
EXPIRATION DATE  03/31/2025

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

R        MM  R

| 1. Filer Code/Entry No. 9PS 1163908-9 | | | | | | |
|---|---|---|---|---|---|---|
| 27. | 28. Description of Merchandise | | | 32. | 33. | 34. |
| Line No. | 29. A. HTSUS No. B. AD/CVD Case No. | 30. A. Gross weight B. Manifest Qty. | 31. Net Quantity in HTSUS Units | A. Entered Value B. CHGS C. Relationship | A. HTSUS Rate B. AD/CVD Rate C. IRC Rate D. Visa No. | Duty and I.R. Tax Dollars        Cents |
| | BROUGHT FORWARD | | | 175798 | | 18188.76 |
| 002 | AIR COMPRESRS,TURBO/SPR CHARGE 9903.01.25 | | | | | |
| | 8414.80.0500 | 10 | 1NO | 10000 C24 | 10% | 1000.00 |
| | MERCHANDISE PROCESSING FEE | | | | 0.3464% | 34.64 |
| | TOTAL EV INV. 00001 | 185798.00 | | | | |
| | | | TEV$ | 185798 | | 19223.40 |

EDITRADE                                      RECORD                                              r

| Contract/ PO Date | Contractor | PCS Number | Value/Budget | Description | Department | Originating Country | Ad Varlorem Rates | On Pause Rate | HTS Code | Estimated Anticipated Additional | Exception | Date of Entry | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/19/2024 | Corrected Electron Optical Systems GmbH | 600000-05818 | $1,044,095.00 | Transmission Electron Microscope Energy Filtering and Imaging Device | Research - Materials Science Institute | Germany | 20% | 10% | 9012.90.00 | $104,409.50 | No | N/A | Dept has not yet identifed funding for all of additional tariff costs. |
| 4/14/2025 | Andor Technology / Oxford Instruments America Inc | 600000-06465-PO | $20,718.00 | ZL41 5.5 CaneraLink | Research - Materials Science Institute | Northern Ireland/UK | 20% | 10% | 8525.80.40 | $2,071.80 | No | N/A | |
| N/A | N/A | 110400-01742-PO | $357,510.00 | Reactive Ion Etcher | Knight Campus | Japan | 24% | 10% | 8486.20.00 | $35,751.00 | Maybe | N/A | Awarded, but PO has not been issued. |
| 11/21/2024 | ID Quantique Inc. | 600000-06214-PO | $182,733.00 | Superconducting Nanowire Single Photon Detector System | Research - Center for Optical Molecular & Quantum Science | Switzerland | 31% | 10% | 9027.50.8060 | $18,273.30 | | 4/10/2025 | Paid to clear customs 4/14/2025 |
| N/A | N/A | 600000-06340-RFP | $473,700.00 | Sputtering System | Research - Materials Science Institute | Canada | | 10% | | $47,370.00 | Unclear | N/A | Awarded but PO has not been issued. |
| N/A | N/A | 110400-01721-RFQ | $73,860.00 | Stylus Profilometer | Knight Campus | | | 10% | | $7,386.00 | | N/A | |
| N/A | N/A | 110400-01724-RFP | $375,000.00 | Direct Write Lithography Tools | Knight Campus | | | 10% | | $37,500.00 | | N/A | |
| N/A | N/A | 110400-01727-RFP | $400,000.00 | Manual Mask Aligner | Knight Campus | | | 10% | | $40,000.00 | | N/A | |
| N/A | N/A | 110400-01735-RFQ | $200,000.00 | Semiconductor Parameter Analyzer | Knight Campus | | | 10% | | $20,000.00 | | N/A | |
| 4/15/2025 | Datrose, Inc. | 470000-00928-O (Ame | $315,000.00 | Automated Package Locker System | UO Housing | China | 145% | 145% | Varies | $456,750.00 | No | N/A | Tariff rates to be at actuals when delivered and only for the components that have those charges. |
| | | | | | | | | | | $769,511.60 | | | |

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, AND THE STATE OF VERMONT, | Case No. 1:25-cv-00077<br><br>DECLARATION OF TODD STROLE |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | |
| Defendants. | |

I, Todd Strole, declare as follows:

      1.    I am over the age of 18, competent to testify as to the matters herein, and testify based on personal knowledge, records kept in the ordinary course of business at the Illinois Department of Natural Resources ("IDNR"), and information I learned from IDNR personnel whose work I rely upon and who have assisted me in gathering this information from our institution.

      2.    I am the Assistant Director of IDNR. IDNR's mission is to manage, conserve and protect Illinois' natural, recreational, and cultural resources, further the public's understanding and appreciation of those resources, and promote the education, science, and

Page 1 - DECLARATION OF TODD STROLE

public safety of Illinois' natural resources for present and future generations. In my role, I provide executive level oversight for the Department as part of a leadership team.   My responsibilities include leadership and/or coordination with all aspects of the agency such as budget, human resources, legal, legislation, law enforcement, site management and natural resource management.

## A.  IDNR Annual Purchases

3.      In the regular course of its operations, IDNR makes annual purchases of a variety of goods that originate from sources outside the United States or which have component parts that originate from such sources.

4.      This year, IDNR will have to purchase drones, utility terrain vehicles (UTVs), Tractors, Lift Station parts, electronic parts (for HVAC, elevator, and other facility repairs), golf carts, cameras for multiple purposes, boats, automated external defibrillators (AEDs), radios and radar for law enforcement, excavators, multifunction printers, GPS units, parts for fire alarms, EV charging stations, and uniforms for staff and IDNR law enforcement. All of these products are imported or have component parts imported to the United States and are subject to the new tariffs.

5.      In addition, a significant part of IDNR's responsibilities is managing nearly 500,000 acres of land in Illinois which includes State Parks, State Fish and Wildlife Areas, State Recreational Areas, State Forests, and State Historic Sites. To carry out its land management tasks, IDNR purchases, and will have to purchase this year, numerous pieces of equipment containing small engines.  This year, for example, IDNR will purchase mowers, chain saws, weed-eaters, leaf blowers, and pumps for fire protection and for spraying pesticides. Small engines and other component parts for equipment of this type are almost entirely manufactured overseas. This means that even when IDNR purchases this equipment domestically, the engines or other parts originate outside the United States and are subject to tariffs.

6.      The President's tariffs accordingly impose a financial harm on IDNR by increasing the cost of procurement.

Page 2 -   DECLARATION OF TODD STROLE

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on May 2, 2025, at Springfield, Illinois

_____
Todd Strole

## IN THE UNITED STATES COURT
## OF INTERNATIONAL TRADE

| | |
|---|---|
| STATE OF OREGON; et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States; et al., <br><br> Defendants. | Case No. 1:25-cv-00077-GSK-TMR-JAR |

### DECLARATION OF KRISTINE WARD

Pursuant to 28 U.S.C. § 1746, I, Kristine Ward, declare as follows:

1.      I am a resident of the State of Arizona. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed by the Arizona Department of Transportation (ADOT) as Deputy Director/Chief Financial Officer.  ADOT provides highway infrastructure and transportation services for Arizona with the aim of safely connecting people and empowering Arizona's economy. Particularly, ADOT is responsible for planning, designing, constructing, maintaining, and operating the state's highway transportation system, and procures numerous goods and services to meet this responsibility. In addition, ADOT provides driver's license and

1

registrations services, is responsible for commercial vehicle enforcement and registration compliance, operates the Grand Canyon National Park Airport, and maintains the state fleet.

3.      As ADOT's Chief Financial Officer, I oversee financial management services, budget and research, procurement and ADOT's information technology group. I oversee the financial administration of a significant portion of Arizona's transportation budget. This includes directing the financial management of Arizona's Five-Year Facilities Construction Program, ADOT's annual operating budget and the ADOT's debt portfolio.

4.      ADOT is currently working to advance its 2025-2029 Strategic Plan. This strategic plan focuses on making significant enhancements in safety, mobility and connectivity in Arizona's transportation system, including implementing the State Transportation Board's $8.1 billion Five-Year Transportation Facilities Program.

5.      If not reversed, the series of Executive Orders imposing tariffs that President Trump has issued will cause significant harm to ADOT's ability to serve the State of Arizona. At a minimum, the tariffs will increase costs, and likely have a chilling effect on Arizona's economy and the revenues supporting its transportation infrastructure.

6.      Indeed, Arizona is already experiencing increasing costs as a result of the tariffs. As of April 21, 2025, ADOT has already received requests for price increases to pass on costs stemming from the tariffs to the State. One contractor has requested the maximum contractual increase available to it "due to the 20% increase in duty costs as stated in Executive Order 14228 of March 3, 2025." President Trump proclaimed Executive Order 14228 as "Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China."

7.      Other vendors have informed ADOT that they anticipate increasing costs that will affect prices they charge the State. But, the extent of the impact of the tariffs is still to be determined due to the unpredictability of the President issuing tariffs and then pausing some of them for a certain period of time.  However, even in preliminary conversations, contractors have indicated that ADOT should expect high increases in price. For example, an irrigation system supplier anticipates a 17% increase in prices for their materials coming from Israel.

8.      Based on conversations with vehicle and heavy equipment suppliers, ADOT estimates that over 160 currently established operating and maintenance contracts could be impacted by the tariffs.

9.      ADOT's budget for its operations, maintenance and capital program, are predicated on revenue forecasts. ADOT has a very robust forecasting methodology that has proven quite accurate over the years. The number of bridges repaired, the number of highway miles maintained, the number of safety improvements completed are bound by the amount of revenue available. The forecasts and subsequent revenues dictate the degree to which Arizona's transportation system will advance or decline.

10.      The implementation of tariffs has introduced considerable uncertainty into ADOT's operations and financial forecasting.  Inherent in any forecasting process, is a review of historical revenues and economic events. It has been nearly 100 years since the last time wide-spread tariffs were imposed. With no recent historical precedents to draw from, a highly interconnected global economy, and the reactions of impacted countries, U.S. industry, and consumers in question, accurately forecasting the revenue available for Arizona's transportation infrastructure is nearly impossible.

11.     Arizona's highway maintenance program utilizes a wide range of materials that are impacted by tariffs. Although ADOT is working with existing contractors and vendors to assess the tariff impacts, what remains to be seen are the impacts to future solicitations and pricing as the tariffs become realized throughout the global economy.

12.     As a result of the tariffs, ADOT must now grapple with the consequences of potentially not having adequate suppliers, and trying to figure out how to remediate impacts to overall bid pricing, and the ability of selected contractors to obtain essential materials and services to help ADOT complete its work, including to maintain and enhance Arizona's highway system.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on May 6, 2025, at Phoenix, Arizona.

Kristine Ward     Digitally signed by Kristine Ward
Date: 2025.05.06 15:04:34 -07'00'

Kristine Ward, ADOT
Deputy Director/Chief Financial Officer

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | Case No. 1:25-cv-00077-GSK-TMR-JAR<br><br>DECLARATION OF JAKE ZELENKA<br><br>(In support of Plaintiffs' Motion for Preliminary Injunction) |
|         Plaintiffs, | |
|     v. | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | |
|         Defendants. | |

I, Jake Zelenka, declare as follows:

    1.    I am over the age of 18, competent to testify as to the matters herein, and testify based on personal knowledge, records kept in the ordinary course of business at the Oregon Water Resources Department, and information I learned from OWRD personnel whose work I rely upon and who have assisted me in gathering this information from our institution.

    2.    I am the Fiscal Manager. As Fiscal Manager, I oversee the accounting, budgeting, and procurement activities of OWRD.

    3.    OWRD is the state agency tasked by law with managing the state's water resources, administering the state's water-rights programs, and enforcing the state's water laws.

OWRD's mission is to serve the public by practicing and promoting responsible water management.

4.    To serve that purpose, OWRD employs and equips 23 watermasters across the state. Watermasters ensure the distribution of water in accordance with existing water rights, gather information and data to understand the state of water resources in their district, and investigate potential water-right violations and concerns.

5.    It is essential that watermasters are properly equipped to carry out their duties. To that end, OWRD is currently purchasing stream measuring meters for watermasters. These meters are necessary for watermasters to accurately measure the amount of water in streams and rivers, as these supply water for diversion from streams.

6.    The meters are required to replace existing and aging equipment or to provide to new staff. At this time, OWRD estimates that it will need to purchase two meters over the next few months.

7.    Accurate measurement of water being diverted is required for the Department to evaluate whether regulation is required. Additionally, measurements of streamflow provide foundational data for quantifying water supplies.

8.    The budget for purchasing meters was set based on pre-tariff price expectations. However, on April 7, 2025, the vendor for the equipment, which is supplied from Canada, indicated that it would need to increase prices by at least 7 percent due to the impacts of tariffs. An updated price agreement with the vendor was then signed on May 2, 2025. As a result, the cost of purchasing each meter will now be between $7,305 and $7,615 instead of the originally expected $6,070 to $6,545.

9.    Even if the tariffs were declared unlawful, it would not be administratively feasible to recover the tariff surcharge from the vendor. OWRD is unable to force the vendor to challenge the tariff. And even if the vendor were to do so, OWRD would need to spend disproportionate resources to try to negotiate a reimbursement amount.

10.    For those reasons, the tariffs will cause irreparable financial harm to OWRD.

**I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.**

**Executed on May 7, 2025, at Salem, Oregon.**

Jake Zelenka
Digitally signed by Jake Zelenka
Date: 2025.05.07 10:44:30 -07'00'

Jake Zelenka

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | Case No.  1:25-cv-00077-GSK-TMR-JAR<br><br>SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | |
| Defendants. | |

## TABLE OF CONTENTS

I.      SCOPE. ........................................................................................................... 1

II.     TRADE DEFICITS ......................................................................................... 1

III.    TARIFF PASS-THROUGH TO PRICES. ....................................................... 4

IV.     IMPACT OF TARIFFS ON THE ECONOMY ................................................ 6

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

- Appx435 -

# I.    Scope.

1.    I have reviewed Defendants' response in opposition to Plaintiffs' motion for preliminary injunction and summary judgment.  Counsel invited me to comment on three issues raised in the response: the history of trade deficits; pass-through of tariffs to prices; and two studies cited in the response regarding the economic impact of tariffs.

# II.    Trade Deficits.

2.    Page 35 of Defendants' response concedes that "Trade deficits are not new," but immediately thereafter adds "…but the United States's trade deficit has increased by 40 percent over the last five years.  The scope and gravity of the trade deficit and trade barriers – along with the acuity of their effects – built up over time, constitute the unusual and extraordinary threat." Section III of my prior declaration, including the accompanying Figure 8, presents data indicating that the United States has experienced persistent trade deficits for the last 50 years.  It is, therefore, useful to consider what the data say about the extent to which the last five years might represent a break from prior experience.

3.    There are mild seasonal cycles in international trade patterns, and occasional temporary events such as natural disasters, armed conflicts, and foreign financial crises that cause unusual short-term movements in actual and recorded trade deficits.  As a result, in evaluating the trade performance of the economy it is customary and helpful to consider data over periods longer than a day, week, month, or quarter.  Table 3 below presents annual U.S. trade deficits, as a fractions of GDP, for years starting in 2000.  As the table reports, the U.S. trade deficit from January-December 2024 was 3.1 percent of GDP.  The U.S. trade deficit in 2019 was 2.7 percent of GDP, which is the smallest annual U.S. trade deficit of the last 25 years; but despite that, the 2024 figure of 3.1 percent is less than 15 percent higher than the corresponding annual deficit five years earlier.

Page 1 -   SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## Table 3[1]

## Annual U.S. Trade Deficits as Percentages of GDP

| Year | Trade Deficit |
|------|---------------|
| 2000 | 3.7 |
| 2001 | 3.6 |
| 2002 | 4.0 |
| 2003 | 4.6 |
| 2004 | 5.2 |
| 2005 | 5.7 |
| 2006 | 5.7 |
| 2007 | 5.1 |
| 2008 | 5.0 |
| 2009 | 2.9 |
| 2010 | 3.5 |
| 2011 | 3.7 |
| 2012 | 3.4 |
| 2013 | 2.8 |
| 2014 | 2.9 |
| 2015 | 2.9 |
| 2016 | 2.7 |
| 2017 | 2.8 |

---

[1] Tables are numbered continuously from my first declaration. The figures in Table 3 represent annual averages of U.S. quarterly trade deficits to GDP, constructed from data provided by the U.S. Bureau of Economic Analysis, and as reported by the Federal Reserve Bank of St. Louis in https://fred.stlouisfed.org/series/A019RE1Q156NBEA.

Page 2 -     SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

| | |
|---|---|
| 2018 | 2.9 |
| 2019 | 2.7 |
| 2020 | 2.9 |
| 2021 | 3.6 |
| 2022 | 3.7 |
| 2023 | 2.9 |
| 2024 | 3.1 |

4.     It is also useful to consider longer time windows.  Over the 5-year period from January 2020 to December 2024, the U.S. trade deficit averaged 3.2 percent of U.S. GDP.[2] Table 4 below presents average trade deficits, as a fraction of GDP, for recent 5-year periods starting in January 2000.  It is clear from these data that the U.S. economy during the five years ending in December 2024 did not have trade deficits that were abnormally high by the standards of recent U.S. experience.  In fact, an average trade deficit of 3.2 percent of GDP is well below the 25-year average (2000-2024) of 3.7 percent of GDP.   It is true that the 3.2 percent of GDP trade deficit from January 2020 to December 2024 is somewhat higher than the 2.7 percent of GDP trade deficit from January 2015 to December 2019; but it is noteworthy that the 2015-2019 trade deficit was unusually low compared to other five-year periods in this millennium.

**Table 4**

**Five-Year Average U.S. Trade Deficits as Percentages of GDP**

| 2000-2004 | 2005-2009 | 2010-2014 | 2015-2019 | 2020-2024 |
|---|---|---|---|---|
| 4.2 | 4.9 | 3.3 | 2.7 | 3.2 |

---

[2] This 3.2 percent number, and the figures in Table 4, represent 5-year averages of U.S. quarterly trade deficits to GDP, constructed from data provided by the U.S. Bureau of Economic Analysis, and as reported by the Federal Reserve Bank of St. Louis in https://fred.stlouisfed.org/series/A019RE1Q156NBEA.

Page 3 -     SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

## III.  Tariff Pass-Through to Prices.

5.    The text of page 12 of Defendants' response offers the observation that "Prices are set by independent private actors and informed by multiple, complex market forces. Plaintiffs cannot reasonably infer that importers will uniformly pass on not just these costs but also any savings (like duty refunds or post-tariff price decreases) to consumers – let alone onto these specific plaintiffs."  Economic understanding informed by decades of theory and evidence takes a contrary position.  While it is correct that prices are set by independent private actors in large markets, it is these very market forces that ensure that costs imposed by tariffs will be borne by consumers.  Competition in large markets disciplines firms to behave in certain predictable ways, lest they be driven out of business by their competitors.  As a result, in standard competitive markets, consumer prices rise one-for-one with tariffs.  And indeed the evidence from the recent U.S. tariff experience, reviewed in Section VI (pp. 24–25) of my prior declaration, is entirely consistent with this standard economic proposition.

6.    In a separate section of their reply (p. 38), Defendants rely on a recent International Trade Commission report for the proposition that tariffs have only small effects on prices: "In 2023, the International Trade Commission issued a report analyzing the effects of the President's previous tariffs, imposed under Sections 232 and 301, on more than $300 billion of U.S. imports.  U.S. Int'l Trade Comm'n, Economic Impact of Section 232 and 301 Tariffs on U.S. Industries, Inv. No. 332-591, USITC Pub. No. 5405 (May 2023).  This analysis revealed that the tariffs…had very minor effects on U.S. prices.  Id. at 21-22."  This is an entirely inaccurate reading of the findings of the International Trade Commission study, which instead repeatedly finds that that costs imposed by the tariffs were passed on to consumers one-for-one. *See, e.g.*, Economic Impact of Section 232 and 301 Tariffs, USITC Pub. No. 5405, at 124 (of the International Trade Commission study: "The delivered price of covered steel imports increasing by nearly the full value of the tariff is consistent with the chapter 6 econometric results and the academic literature, which both estimate that tariffs under sections 232 and 301 [are] passed through fully into U.S. importer prices.").

Page 4 -   SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

7.      The confusion that appears in Defendants' reading of the International Trade Commission report arises because imports are only a fraction of the U.S. market, so higher tariff-inclusive import prices are reflected not only in the prices of imported goods, but also in the prices of the domestic goods with which they compete in the market.  In such a setting, tariffs whose costs are borne one-for-one by consumers will nonetheless raise observed market prices by less than one-for-one, because the market itself consists not solely of imports.  For example, if imports represent ten percent of the goods in a market, then a $10 tariff whose cost is entirely borne by consumers will raise the average market price of all goods, imported and domestic combined, by (approximately) $1, not $10.  Market prices must be carefully analyzed to draw accurate inferences about the degree to which consumers bear the cost of tariffs, since even with full pass-through of tariff costs to consumers, average market prices may exhibit small reactions to tariff changes.[3]  Furthermore, in the cases of the tariffs considered by the report Defendants cited, it is clear that consumers bore the entire cost of the tariffs.  The analysis in Section VII of my prior declaration, which analyzes the costs that the IEEPA-based tariffs imposed on state governments, relies on a methodology that accurately captures the effects of tariffs in settings where imported goods compete with domestic goods in the same markets, so can draw reliable inferences in settings where naïve readings of price responses would be entirely misleading.

_____

[3] This is a standard proposition in the theory of tax incidence. *See, e.g.*, Laurence J. Kotlikoff & Lawrence H. Summers, Tax incidence, in 2 Handbook of Public Economics, 1043, 1043–1092 (Alan J. Auerbach and Martin Feldstein, eds.1987).

Page 5 -   SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

## IV.    Impact of Tariffs on the Economy.

8.    Defendants claim (p. 38) that "plaintiffs ignore the evidence that supports the President," drawing attention to the International Trade Commission report cited in Section II above, maintaining that "this analysis revealed that the [earlier Sections 232 and 301] tariffs reduced imports from China, were effective in stimulating increased U.S. production of steel and aluminum, and had very minor effects on U.S. prices."  Defendants' response adds that "the Coalition for a Prosperous America released an economic model simulating a worldwide 10 percent tariff on U.S. imports and found that the 'tariff makes imports less competitive and domestic production of manufactured and other goods rise to take advantage of the opportunities' leading to 'more jobs and more capital investment.'"  It is useful to consider whether the calculations offered by these two studies in fact support the President's position.

9.    As noted in Section V of my original declaration, tariffs impede the functioning of market economies, making their firms and workers less productive, with accompanying reductions in national output, firm profits and individual incomes.  It clearly follows that it is not possible to introduce significant tariffs that would have the effect of "improving this nation's 'domestic production capacity'" (Defendants' report, at 37 (quoting Executive Order 14257).) Because domestic production capacity consists of many sectors and industries, it is necessary to look beyond just those industries that most closely compete with imports, in order to obtain a comprehensive view of the impact of tariffs on domestic production.  In the cases of tariffs on steel and aluminum, the U.S. industries that use steel and aluminum as inputs to production will be adversely affected by the tariffs, as will other industries for which their outputs are subsequently used as inputs.  These adverse effects must then be considered along with any expansions of import-competing industries in evaluating the impact of tariffs on domestic production capacity.

Page 6 -    SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000
- Appx441 -

10.    The International Trade Commission report on which Defendants rely documents a wealth of negative effects of the earlier steel and aluminum tariffs on output by industries that rely, directly or indirectly, on steel and aluminum inputs.  For example, Appendix Table F.13 (p. 303) reports that the tariffs were responsible for a 3.35 percent reduction in output by the U.S. Industrial Machine Manufacturing industry, a 1.38 percent reduction in output by the Engine and Turbine Manufacturing industry, a 0.83 percent reduction in output by the Electrical Equipment Manufacturing industry, a 0.71 percent reduction in output by the Household Appliance Manufacturing industry, and significant output declines in countless other manufacturing industries.  Unfortunately, the International Trade Commission does not display its findings in a way that makes it possible for an external analyst to summarize what the report claims to be the impact of the earlier Section 232 and 301 tariffs on aggregate U.S. manufacturing production capacity; but it is clear from the appendix tables that appear in the report that significant predicted negative effects on U.S. production levels are strewn across the manufacturing sector.

Page 7 -   SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

11.     The policy brief circulated by the Coalition for a Prosperous America does not claim to analyze the impact of higher tariffs on the U.S. economy, but instead considers a simultaneous combination of higher tariffs and reduced average and marginal tax rates in the U.S. individual income tax.  The model used by the Coalition for a Prosperous America is constructed in a way that ensures that lower tax rates will produce model predictions of greater economic activity, greater employment, and higher levels of aggregate investment.[4]  Because the simulation described by the policy brief includes both higher tariffs and lower taxes, it is not possible to identify which if any of the economic effects described by the brief are the consequences of tariffs that would appear without the specific individual income tax changes also included in the simulation.  Indeed, the significantly negative manufacturing output effects described by the International Trade Commission report on which Defendants also rely suggest that any positive aggregate output effects appearing in the Coalition for a Prosperous America's simulation exercise are likely due to the tax cuts, not the tariffs.  Though it is important also to not that the policy simulation offered by the Coalition for a Prosperous America is not grounded in modern economic theory, nor does it use carefully calibrated empirical evidence to obtain its predictions.

12.     A correct reading of the International Trade Commission report, together with the Coalition for a Prosperous America policy brief, reinforces the conclusion that significant tariffs will significantly impair the performance and productive capacity of the U.S. economy.

---

[4] The model and simulation used by the Coalition for a Prosperous America is itself an idiosyncratic exercise informed by its understanding that "traditional international economic models are based on unrealistically rigid assumptions which bias the model to favor free trade," so as a corrective matter, the Coalition for a Prosperous America adopts a framework in which the U.S. economy is assumed to have access to unlimited resources. This innovative approach certainly distinguishes the Coalition for a Prosperous America's framework from all of modern economics, this inconsistency coming at the cost of relying on an entirely unrealistic and untenable assumption.

Page 8 -   SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

    **I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.**

**Executed on May 19, 2025, at Ann Arbor, Michigan.**


                              *s/ James R. Hines, Jr.*

                              JAMES R. HINES Jr.


Page 9 -   SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

### UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., PLASTIC ) <br> SERVICES AND PRODUCTS, LLC d/b/a ) <br> GENOVA PIPE, MICROKITS, LLC, ) <br> FISHUSA INC., TERRY PRECISION ) <br> CYCLING LLC, ) <br> ) <br>      Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> DONALD J. TRUMP in his official capacity, ) <br> EXECUTIVE OFFICE OF THE PRESIDENT, ) <br> THE UNITED STATES, U.S. CUSTOMS AND ) <br> BORDER PROTECTION, PETE R. FLORES ) <br> in his official capacity, JAMIESON GREER ) <br> in his official capacity, OFFICE OF THE ) <br> UNITED STATES TRADE ) <br> REPRESENTATIVE, and HOWARD ) <br> LUTNICK in his official capacity, ) <br> ) <br>      Defendants. ) | Court No. 25-00066 |

### NOTICE OF ADDITIONAL EXHIBITS

Defendants respectfully submit the attached declarations in support of their response in opposition to plaintiffs' motion for a preliminary injunction and summary judgment.  The declarations were made by four members of the President's cabinet: Marco Rubio, Secretary of State; Scott K. H. Bessent, Secretary of the Treasury; Howard W. Lutnick, Secretary of Commerce; and Jamieson Lee Greer, United States Trade Representative.  They provide up-to-date information on sensitive negotiations with trading partners and describe the catastrophic harm to American foreign policy and national security that would ensue from granting the relief

requested in plaintiffs' motions.  These facts establish the unavailability of preliminary or

permanent injunctive relief, which requires showings on both the balance of the equities and

public interest.


DATED: May 23, 2025                              Respectfully submitted,

OF COUNSEL:                                      YAAKOV M. ROTH
                                                 Acting Assistant Attorney General

ALEXANDER K. HAAS
Director                                         ERIC J. HAMILTON
                                                 Deputy Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Director                               PATRICIA M. McCARTHY
U.S. Department of Justice                       Director
Civil Division
Federal Programs Branch                          /s/ Claudia Burke
                                                 CLAUDIA BURKE
                                                 Deputy Director

                                                 /s/ Justin R. Miller
                                                 JUSTIN R. MILLER
                                                 Attorney-In-Charge
                                                 International Trade Field Office

                                                 /s/ Sosun Bae
                                                 SOSUN BAE
                                                 Senior Trial Counsel
                                                 LUKE MATHERS
                                                 CATHERINE M. YANG
                                                 BLAKE W. COWMAN
                                                 COLLIN T. MATHIAS
                                                 Trial Attorneys
                                                 U.S. Department of Justice
                                                 Civil Division
                                                 Commercial Litigation Branch
                                                 PO Box 480, Ben Franklin Station
                                                 Washington, DC 20044
                                                 (202) 305-7568
                                                 sosun.bae@usdoj.gov


                                                 *Attorneys for Defendants*

# ATTACHMENTS

Case: 25-1812     Document: 148     Page: 451     Filed: 07/20/2025

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
               THE HONORABLE TIMOTHY M. REIF, JUDGE
               THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC,         Plaintiffs, <br><br> v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, <br><br>         Defendants. | Court No. 25-00078 |

## DECLARATION OF HOWARD W. LUTNICK, UNITED STATES SECRETARY OF COMMERCE

I, HOWARD W. LUTNICK, hereby state and declare as follows:

1.   I am the Secretary of Commerce for the United States and the head of the United States Department of Commerce, an Executive Department of the United States. *See* 5 U.S.C. § 101. The purpose of this declaration is to assert, in my official capacity and opinion, the

1

irreparable harm that a ruling for plaintiffs in this case will have on President Donald J. Trump's constitutional power to conduct foreign affairs. Such a ruling will fundamentally impede President Trump's foreign-policymaking abilities to address national emergencies that threaten the national-security and economic-security interests of the United States and the American people. The statements made herein are based on my personal knowledge and on information provided to me in my official capacity as Secretary of Commerce.

2.    I have been tasked by President Trump to lead his tariff and trade agenda. *See* Statement by President-elect Donald J. Trump Announcing the Nomination of Howard Lutnick as Secretary of Commerce, The American Presidency Project, https://www.presidency.ucsb.edu/node/375586. As part of my duties as Secretary of Commerce, I have strategized with President Trump and members of his cabinet, including United States Trade Representative Jamieson Greer, on policies to conduct trade diplomacy and address grave national emergencies. Many of these national emergencies, ranging from the hollowing out of our defense-industrial and manufacturing base to the illicit flow of narcotics and the national-security threats posed by authoritarian regimes, are caused by our foreign-trading partners.

3.    For example, on February 1, 2025, President Trump found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal immigrants across our southern and northern borders is a national emergency, threatening the lives of our citizens.

4.    Likewise, on the same day, President Trump found in Executive Order 14,195 that the People's Republic of China has encouraged Chinese businesses to export illegal drugs and

2

precursors for manufacturing those drugs to the United States, which constitutes a national emergency that threatens the lives of our citizens.

5. Then, on April 2, 2025, President Trump found in Executive Order 14,257 that our foreign-trading partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have produced persistent annual U.S. goods trade deficits, which has hollowed out our domestic manufacturing and defense-industrial base and has resulted in a lack of advanced domestic manufacturing capacity, a defense-industrial base dependent on inputs from foreign adversaries, vulnerable domestic supply chains, and a sensitive geopolitical environment. President Trump found the persistent annual U.S. goods trade deficits have resulted in a national emergency, threatening our national and economic security.

6. President Trump determined that it was in the foreign-policy interests of the United States to levy a 10 percent tariff for all trading partners. In addition, depending on the significance of the trade imbalances with foreign-trading partners, President Trump determined that some trading partners would receive higher duties.

7. Following President Trump's April 2, 2025, announcement, scores of countries immediately reached out to the Department of Commerce and the Office of the United States Trade Representative. President Trump's 10 percent tariffs for all trading partners went into effect at 12:01 a.m. on April 5, 2025—over two days after President Trump announced them. The country-specific tariff rates went into effect at 12:01 a.m. on April 9, 2025—nearly a week after they were announced. The vast majority of these countries saw it in their own national interests not to retaliate against the United States, as a matter of their own foreign-policy objectives. In short, the preliminary U.S. foreign-policy objectives of the tariffs worked—foreign-trading partners that have run trade deficits in

3

goods for years, and helped hollow out the American manufacturing base, immediately came to the negotiating table.

8. On April 9, 2025, after consultation with me and other members of his cabinet, President Trump announced a 90-day pause and lowered the country-specific tariffs on most countries to a temporary flat rate of 10 percent. *See* Exec. Order No. 14,266, 90 Fed. Reg. 15625. In that same announcement, President Trump declared that the tariff rate on China would increase to 125 percent. In doing this, President Trump furthered the foreign-policy objectives of the United States in two important ways.

9. *First*, countries that had approached his administration, including the Department of Commerce, without retaliating received the benefit of a pause designed to allow for substantive negotiations to remedy the national emergency. The pause has been a success.

10. On May 8, 2025, President Trump and Prime Minister Keir Starmer of the United Kingdom announced the terms of the first trade deal—a deal that had been illusory for years—which directly benefits the U.S. manufacturing base. These terms—which I helped construct—reflect extensive diplomatic effort to align United States and allied supply chains and eliminate foreign dependencies in sensitive sectors. The deal would not have happened but for the International Emergency Economic Powers Act tariffs.

11. Further, because of the IEEPA tariffs and the 90-day pause, I am, together with Ambassador Greer, participating in dozens of ongoing negotiations with foreign-trading partners. Again, such negotiations would not have happened but for the IEEPA tariffs.

12. *Second*, the increased tariff rate against China applied additional pressure to achieve the foreign-policy objective of bringing China- the greatest contributor to the national emergency and a well-known strategic adversary—to the negotiating table. In 2024 alone,

4

the United States had a trade deficit of $295 billion with China, and China's total trade surplus of nearly $1 trillion created excess export capacity that flooded the United States through other countries, as well. Yet, because of the IEEPA tariffs, the United States and China reached a 90-day agreement on May 12, 2025, to reduce China's tariffs on U.S. exports while the Trump administration works to address longstanding disputes with China. Under that asymmetrical agreement, reached because of the pressures of the IEEPA tariffs, China lowered its universal tariff rate on U.S. goods to 10 percent, while the United States maintained a higher rate of 30 percent.

13. An adverse ruling by this Court, enjoining the implementation of these IEEPA tariffs or circumscribing the President's authority to act in this domain, threatens all of these foreign-policy accomplishments and objectives. IEEPA gives the President of the United States a pivotal tool to express his foreign policy promptly and decisively to address national emergencies that manifest through economic and commercial channels. An adverse ruling would take away one of the most important tools the President possesses that is broad, immediate, and adaptable enough to counter emergency threats in real time.

14. IEEPA is a necessary tool given to the President to broadly and swiftly respond to national emergencies caused by the economic and commercial machinations of our foreign-trading partners. Other tools afforded to the President are not designed for national emergencies. For example, while Section 232 of the Trade Expansion Act of 1962 and Section 301 of the Trade Act of 1974 are iudispensable tools of U.S. trade law, they are procedurally time-consuming and do not allow for immediate action, as IEEPA does. Under Section 232, the Department of Commerce has up to 270 days to conduct an investigation and submit a report to the President, who then has up to 90 additional days to decide whether to act, and

5

up to 15 additional days to implement that action.   19 U.S.C. §§ 1862(b)(3)(A), (c)(1)(B).   Similarly, under Section 301, the United States Trade Representative must complete an investigation within 12 months, with additional time to implement any retaliatory action.   19 U.S.C. §§ 2414(a)(2)(B), 2415(a)(1).   IEEPA is different and authorizes the President to take immediate action to protect national interests where all of IEEPA's conditions are satisfied.   Without this tool, the President's foreign-policymaking abilities would be severely constrained and our national security would be threatened.

15. Beyond the practical effects that enjoining or circumscribing the President's IEEPA authority would have on addressing ongoing national emergencies, the real-world foreign-policy effects on this set of IEEPA tariffs would be monumental.   For one, an adverse ruling would undermine the United States-United Kingdom trade deal that was negotiated in reliance on the President's emergency tariff authority.   In addition, an adverse ruling would jeopardize the dozens of similar arrangements with foreign-trading partners that I am negotiating.   Each of these negotiations is premised on the credible threat of enforcement of the IEEPA tariffs.   If this Court limits that authority, foreign counterparts will have reduced incentives to reach meaningful agreements—resulting in the status quo that led to the national emergency.   It would destroy the carefully crafted China trade agreement, which is asymmetric in America's favor, in order to address the emergency of our persistent goods trade deficit.

16. What's more, an adverse ruling by this Court also will affect President Trump's authority to invoke IEEPA to address other national emergencies of significant concern.   For example, on February 1, 2025, President Trump invoked IEEPA to impose tariffs on China, Mexico, and Canada, respectively, due to the national emergency caused by "the sustained

6

- Appx453 -

influx of synthetic opioids," which "kill[] approximately two hundred Americans per day." Exec. Order No. 14,195, 90 Fed. Reg. 9121; Exec. Order No. 14,194, 90 Fed. Reg. 9117; Exec. Order No. 14,193, 90 Fed. Reg. 9113. And, on March 24, 2025, President Trump invoked IEEPA to place "secondary" tariffs on countries that purchase oil from the Maduro regime in Venezuela, given the threat that the regime's policies pose to U.S. national security. Exec. Order No. 14,245, 90 Fed. Reg. 13829. Without IEEPA, the President could not quickly and effectively address grave national emergencies—caused by foreign actors—that directly threaten the lives of Americans.

17. The imposition of IEEPA tariffs signals to foreign governments that certain conduct—whether economic predation, trade manipulation, or narcotics trafficking—will incur serious consequences. Diluting this authority would not only unravel the current IEEPA actions but also would undermine future deterrence. Allies and adversaries alike monitor U.S. courts for signs of constraint on presidential power. A ruling that narrows IEEPA would have ripple effects across every domain in which economic instruments are used for strategic effect.

18. For example, India and Pakistan—two nuclear powers engaged in combat operations just 13 days ago—reached a tenuous ceasefire on May 10, 2025. This ceasefire was only achieved after President Trump interceded and offered both nations trading access with the United States to avert a full-scale war. An adverse ruling that constrains presidential power in this case could lead India and Pakistan to question the validity of President Trump's offer, threatening the security of an entire region and the lives of millions.

19. All told, an invalidation of President Trump's ability to use IEEPA would dismantle a cornerstone of President Trump's national security architecture, irreparably harm the

7

government's ability to respond to evolving foreign threats, and severely disrupt the Department of Commerce's coordination of foreign policy-related economic actions on behalf of the President. It would jeopardize vital trade agreements, collapse ongoing negotiations, allow for Chinese aggression during a period of strategic competition, leave the American people exposed to predatory economic practices by foreign actors, and threaten national security. It also would come after the democratically elected United States Senate failed to garner the necessary votes to revoke President Trump's IEEPA emergency declaration on April 30, 2025.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 23 day of May, 2025, in the City of Washington, District of Columbia.

Howard W. Lutnick
41st United States Secretary of Commerce

8

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, <br><br>          Plaintiffs, <br><br>          v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, <br><br>          Defendants. | Court No. 25-00078 |

## DECLARATION OF SECRETARY OF STATE MARCO RUBIO

I, Marco Rubio, hereby state as follows:

1.  I am the Secretary of State of the United States and head of the United States Department of State, an Executive Department of the United States. *See* 22 U.S.C. § 2651. As Secretary of State, I am the President's chief foreign affairs advisor. I carry out the

1

President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2. The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, State Department employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3. The purpose of this Declaration is to confirm, in my capacity as Secretary of State and head of the Department of State, that a ruling for the plaintiffs in this case would cause significant and irreparable harm to U.S. foreign policy and national security. Such a ruling would derail critical ongoing negotiations with our foreign trading partners and threaten broader U.S. strategic interests internationally.

4. In the International Emergency Economic Powers Act (IEEPA), *see* 50 U.S.C. § 1701 *et seq.*, Congress granted to the President dynamic, flexible authority to respond to crises on a global scale. President Trump has exercised that authority to impose tariffs in response to crises threatening America's national security.

5. In particular, the President found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal aliens across our southern and northern borders is an emergency for the United States and its citizens.

6. Likewise, the President found in Executive Order 14,195 that the encouragement by the People's Republic of China (PRC) of PRC businesses to export illegal drugs and precursors

2

for manufacturing those drugs in the United States is an emergency for the United States and its citizens.

7.  Last, the President found in Executive Order 14,257 that our trade partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, and resulting large and persistent annual U.S. goods trade deficits have given rise to acute national security threats driven by our hollowed-out manufacturing base, lack of advanced domestic manufacturing capacity, vulnerable supply chains, a defense-industrial base that depends on foreign adversaries, and the sensitive geopolitical environment.

8.  The United States is presently pursuing potential trade deals with Mexico, Canada, PRC, and dozens of other countries. These negotiations could address the urgent threats of mass migration at our northern and southern borders, the flow of fentanyl into our country, and the erosion of our domestic production capacity caused in substantial part by the large and persistent annual U.S. goods trade deficient stemming from our trade partners' non-reciprocal trading practices.

9.  The negotiations are currently in a delicate state, with discussions ongoing and final deals not yet reached. In some cases, we have reached frameworks with our trading partners, while we continue to negotiate on details. In other cases, we have not yet reached a framework agreement or arrangement.

10. These negotiations have been one of the country's top foreign policy priorities since the reciprocal tariffs were announced on April 2. Reflecting the urgency of the emergency, much of U.S. global diplomacy in the last six weeks has been focused on these negotiations.

11. In each case, the negotiations are premised on the ability of the President to impose tariffs under IEEPA. If the President is enjoined or limited from exercising his authority under

3

IEEPA to impose tariffs to address these urgent threats, that would cause irreparable harm to our efforts to secure the U.S. production and manufacturing base through our ongoing negotiations and other diplomatic efforts.

12. For example, if the Court were to enjoin the President from imposing tariffs, our trade partners would likely believe that the President lacks power under IEEPA to promptly respond to their actions during the ongoing negotiations. They may also perceive such a ruling as a vulnerability and encourage them to retaliate against the United States for attempting to impose tariffs and negotiate agreements to protect our national security. *See* Executive Order 14,266, § 3. Notably, other countries declined to retaliate against the United States after the President made clear he would exercise his authority under IEEPA to impose additional tariffs, as he did with PRC.

13. The political branches, not the courts, are appropriately situated to handle and intervene in matters of foreign policy and national security. This case and the real-world diplomacy inherent in it exemplify why the courts must not interfere in such foreign affairs. U.S. foreign policy has an exceptional need for consistent implementation of the decision the President has already made under IEEPA. A conflicting pronouncement by this Court on the same issue would lead to embarrassment of the United States on a global stage.

14. Beyond diplomatic embarrassment, which itself is dangerous as it emboldens allies and adversaries alike, the Court's interference would perpetuate the United States' industrial decline and unsustainable trade deficits. The President found in Executive Order 14,257 that the United States' large and persistent trade deficits are a structural imbalance in the global trading system that has hollowed out a number of critical industries. Without robust domestic production capacity, the United States will not be able to produce the weapons

4

and other resources necessary to defend itself or support the critical industries necessary to avoid being held hostage by foreign adversaries. That weakened position will have a direct impact on the President's ability to conduct foreign policy and advance the United States' interests.

15. Congress has reserved for itself the power to review the President's exercise of his powers under IEEPA. Exercising that role, Congress considered whether to terminate the President's emergency declaration, and it has appropriately declined to do so, recognizing the appropriateness of the President's exercise of powers and the delicate, ongoing international diplomacy that is unfolding as a result.

16. It is critical to the foreign policy and national security of the United States for the Court to decline to enjoin or restrain the President from exercising his power under IEEPA to impose tariffs in recognition of the unusual and extraordinary threats at issue in this litigation.


I declare, under penalty of perjury, that the foregoing is true and correct.


Executed on this 23rd day of May, 2025.


_____

Marco Rubio
Secretary of State

5

Filed: 07/20/2025     Page: 464     Document: 148     Case: 25-1812

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, <br><br> Defendants. | Court No. 25-00078 |

## DECLARATION

I, Scott K. H. Bessent, hereby state as follows:

1.   I am the Secretary of the Treasury. I have been the Secretary of the Treasury since January 28, 2025.

1

2. President Trump has exercised his IEEPA authority to impose tariffs in response to crises threatening America's national security and economy.

3. In particular, the President found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal immigrants across our southern and northern borders is an emergency for the Nation and its citizens.

4. The President also found in Executive Order 14,257 that our trading partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have given rise to a presently acute national security threat of large and persistent annual U.S. goods trade deficits, which have led to the hollowing out of our manufacturing base, lack of advanced domestic manufacturing capacity, vulnerable supply chains, and a defense-industrial base that depends on foreign adversaries.

5. Tariffs are a crucial tool for protecting America's national security and advancing American foreign policy by addressing the unusual and extraordinary threats the President has identified.

6. The tariffs have proven to be well-tailored to bring trading partners to the table to address these urgent threats. The United States is presently negotiating agreements with Mexico, Canada, PRC, and many of our key trading partners, in order to address the urgent threats at our northern and southern borders, posed by illegal drugs, and to our domestic production capacity caused in substantial part by the large and persistent annual U.S. goods trade deficient stemming from our trade partners' non-reciprocal trading practices.

7. There are currently ongoing negotiations to address this emergency with dozens of countries. Those negotiations are presently in a delicate state, with discussions ongoing

2

and formal, final deals not yet reached. In some cases, we have reached framework agreements with our trading partners, while we continue to negotiate on details. In other cases, we have not yet reached a framework agreement.

8. For example, on May 8, 2025, the United States and the United Kingdom announced a framework agreement as a result of such negotiations. The U.S.-UK framework agreement will bolster U.S. economic and national security by enhancing market access for American exporters and lowering tariff and non-tariff barriers.

9. These negotiations have been one of the country's top foreign policy priorities since the reciprocal tariffs were announced on April 2.

10. In each case, those ongoing, delicate negotiations are premised on the President's tariffs at issue in this case. If the President is enjoined from imposing these tariffs, it could shatter our negotiations with dozens of countries.

11. If the Court were to enjoin the President from imposing tariffs, our trading partners may feel a renewed boldness to take advantage of that new vulnerability by retaliating against the United States for attempting to impose tariffs and negotiate agreements to protect our national security.

12. In short, the maintenance of the tariffs is crucial to the President's ability to conduct real-world diplomacy and his ability to protect the national security and economy of the United States.

13. Congress considered whether to terminate the President's emergency declaration, and declined to do so. *See* H.J.Res. 72 (2025); H.J.Res.73 (2025). It is critical to the national security and economy of the United States for the Court to decline to block the President from imposing these tariffs as well.

3

Case: 25-1812    Document: 148    Page: 467    Filed: 07/20/2025

I declare, under penalty of perjury, that the foregoing is true and correct.


Executed on this day of May 23, 2025.


/s/_____

Scott K. H. Bessent
Secretary
Department of the Treasury

4

Case: 25-1812          Document: 148          Page: 468          Filed: 07/20/2025

### UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Court No. 25-00078

### **DECLARATION**

I, Ambassador Jamieson Lee Greer, hereby state as follows:

1.  I am the United States Trade Representative.  I have been the United States Trade

    Representative since February 26, 2025.  In this capacity, I serve as the principal advisor

1

to the President on international trade policy and the chief representative for the United States in international trade negotiations. *See* 19 U.S.C. § 2171(c)(1)(B)(C).

2. In IEEPA, Congress granted to the President dynamic, flexible authority to respond to crises on a global scale.

3. President Trump has exercised that authority to impose tariffs in response to crises threatening America's national security and the economy.

4. The President found in Executive Order 14,257 that our trade partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have been an important driver of large and persistent annual U.S. goods trade deficits, which have grown over 40 percent in the past five years, and created a presently acute threat to national security and the economy. The President found that structural asymmetries in our bilateral trade relationships significantly constrain U.S. exports and artificially incentivize foreign production. The President found further that these conditions have led to a hollowing out of the U.S. manufacturing and defense-industrial base, leaving the United States dependent upon foreign supply chains for national-security-sensitive products and with insufficient domestic manufacturing capacity to remain competitive in the global economy.

5. Tariffs imposed under IEEPA are a crucial tool for protecting America's national security and advancing American foreign policy by addressing the unusual and extraordinary threats the President has identified.

6. This case does not present an abstract question of law. The Court's ruling will have a concrete and immediate effect on United States national security and foreign policy.

2

7. The tariffs have proven to be well tailored to address these urgent threats. The United States is presently negotiating with Mexico, Canada, and the PRC in order to address the urgent threats at our northern and southern borders.

8. Furthermore, on April 9, the President issued a 90-day pause of the country-specific reciprocal tariffs so that he might negotiate with trading partners who are willing to take significant steps to remedy their non-reciprocal trading practices and align with the United States on national and economic security matters.

9. The United States is currently negotiating with dozens of countries regarding the terms of that alignment. Those negotiations are presently in a delicate state, with discussions ongoing and final deals not yet reached. For example, on May 8, President Trump and United Kingdom (UK) Prime Minister Keir Starmer announced the general terms of an agreement that will provide U.S. companies with more than US$5 billion in expanded access to the UK market while bolstering United States national security. Similarly, on May 12, President Trump reached an agreement with China to reduce retaliatory tariffs and non-tariff barriers imposed after his April 2 Executive Order and set a path for future discussions to open the Chinese market to more U.S. exports. In many other cases, the United States continues to negotiate agreements in principle to structure final deals.

10. These negotiations have been one of the country's top foreign policy priorities since the tariffs were announced on April 2. Reflecting the urgency of the emergency, much of U.S. global diplomacy in the last six weeks has been focused on these negotiations.

11. In each case, those ongoing, delicate negotiations are premised on the ability of the President to impose tariffs under IEEPA. If the President is enjoined from exercising his

3

authority under IEEPA to impose tariffs to address these urgent threats, the premise of these important negotiations will be eliminated.

12. A decision enjoining the President from imposing tariffs under IEEPA would create a foreign policy disaster scenario.

13. If the Court disrupts U.S. trade policy imperatives by enjoining the President from imposing tariffs, the United States' ability to address national and economic security matters would suffer serious damage.

14. If the Court were to enjoin the President from imposing tariffs, it will signal to our trading partners that the President *lacks* power to promptly respond to future emergencies under IEEPA, and they may feel emboldened to further distort the conditions of competition for U.S. exporters.

15. It is critical to the national security of the United States for the Court to decline to enjoin the President from exercising his power under IEEPA to impose tariffs in recognition of the unusual and extraordinary threats at issue in this litigation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 23rd day of May, 2025.

/s/

Ambassador Jamieson Lee Greer
United States Trade Representative

4

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
           THE HONORABLE TIMOTHY M. REIF, JUDGE
           THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )  Court No. 25-00077 |
| v. | )<br>) |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

**DEFENDANTS' NOTICE OF APPEAL**

Notice is hereby given that defendants appeal to the United States Court of Appeals for the Federal Circuit from the Court's opinion and final judgment of May 28, 2025. *See* ECF Nos. 65-66.

DATED: May 28, 2025                          Respectfully submitted

OF COUNSEL:                                  YAAKOV M. ROTH
                                             Acting Assistant Attorney General

ALEXANDER K. HAAS
Director                                     ERIC J. HAMILTON
                                             Deputy Assistant Attorney General
STEPHEN M. ELLIOTT
Assistant Director                           PATRICIA M. McCARTHY
U.S. Department of Justice                   Director
Civil Division
Federal Programs Branch                      /s/ Claudia Burke
                                             CLAUDIA BURKE
                                             Deputy Director

                                             /s/ Justin R. Miller
                                             JUSTIN R. MILLER
                                             Attorney-In-Charge
                                             International Trade Field Office

                                             /s/ Sosun Bae
                                             SOSUN BAE
                                             Senior Trial Counsel
                                             LUKE MATHERS
                                             CATHERINE M. YANG
                                             BLAKE W. COWMAN
                                             COLLIN T. MATHIAS
                                             Trial Attorneys
                                             U.S. Department of Justice
                                             Civil Division
                                             Commercial Litigation Branch
                                             PO Box 480, Ben Franklin Station
                                             Washington, DC 20044
                                             (202) 305-7568
                                             sosun.bae@usdoj.gov


                                             *Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on May 28, 2025, I caused the foregoing "NOTICE OF APPEAL" to be filed and served electronically via the Court's CM/ECF system.

<u>/s/ Claudia Burke</u>

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | Case No.  1:25-cv-00077-GSK-TMR-JAR<br><br>THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | |
| Defendants. | |

I, Brian Simmonds Marshall, declare under penalty of perjury as follows:

1.     I am employed as an assistant attorney general with the Oregon Department of Justice. I represent the State of Oregon in this case. I previously executed two declarations in this case (ECF 14-3, ECF 32-2), which attached exhibits A–M to my declarations.

2.     On May 29, 2025, before the U.S. Court of Appeals for the Federal Circuit issued its administrative stay of this Court's decision, National Economic Council Director Kevin Hassett was interviewed on Mornings With Maria on Fox Business, a recording of which is available by video at https://youtu.be/Z5-laLH84oU?si=w07U730F3U9uChQi. The States will

Page 1 -   THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ATTACHMENT 1, Page 1 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

- Appx472 -

conventionally file a copy of this video on hard media and label the file Exhibit N to this

declaration.

        3.      I personally reviewed Exhibit N and verify that this is an accurate transcription of

2:56–6:29:

> **Q:** Well, I mean, that's the thing. I mean the International Emergency Economic Powers Act of 1977 is what the courts are deeming to say, look, this does not, this does not equate to an emergency under this Act of 1977. I know that the lawyers for the Administration immediately appealed. But what do you want to say about this, right now, strike down of these global tariffs? What happens in the interim now, Kevin?

> **Kevin Hassett:** Well, what's going to happen is, first, we're going to see what happens on appeal, and we're very confident in our success there, because after all, hundreds and hundreds of thousands of Americans have died because of mostly Chinese fentanyl and Chinese fentanyl coming in from Mexico and Canada. And the idea that having more people die from fentanyl than died in the Vietnam War, and that's not an emergency—that we need to use every power that we have to try to address—is ludicrous to me. But the second thing is, the trade law is very complex, and this part of the trade law is the thing that was most accurately used, very precisely used, by USTR Trade Representative, Jamieson Greer, because this is the one that where we actually have the most authority for doing what we're exactly doing. But there are three or four other ways to do it, and we don't have to go into the numbers right now. I think everybody will go back to sleep, Maria. But the fact is that there are things that measures that we can take with different numbers that we can start right now. There are different approaches that would take a couple of months to put these in place and using procedures that have been approved in the past or approved in the last administration. But we're not planning to pursue those right now because we're very, very confident that this really isn't correct.

> **Q:** Kevin, I guess the threat here is, what does this do to any negotiations that are currently pending, right? I mean, you and Scott Bessent have been saying that we're going to see more deals happening. You've already locked up a new deal with the U.K. You were talking about potentially India being close. And, of course, the President has, has put the China 90-day changes in place. Does this ruling from these judges put a crimp in anything that you're working on currently?

> **Kevin Hassett:** No, it doesn't at all. And you know, we'll have to get Jamieson out here, who's the trade lawyer, to go through the play-by-play.

Page 2 -   THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ATTACHMENT 1, Page 2 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

- Appx473 -

> But if we put our eyes on the horizon, that what's going to happen is that
> in a month or two, you're going to look ahead and see that countries have
> opened their markets to American products, they've lowered their non-
> tariff barriers, they've lowered their tariffs, and all of the countries that
> have done that are being treated very respectfully and well by the U.S. The
> countries that don't do that are going to see some form of reciprocal tariff
> that's higher than what the people who are acting well get. And that's
> what you're going to see on the horizon. And if there are little hiccups
> here or there because of decisions that activist judges make, then it
> shouldn't just concern you at all, and it's certainly not going to affect the
> negotiations. Because, in the end, people know President Trump is 100%
> serious, and they also have seen that President Trump always wins.
>
> **Q:** So you, so you said that we're going to see probably more deals—and
> Scott Bessent, the Treasury secretary, said the same thing—in the coming
> weeks. Do you still believe that?
>
> **Kevin Hassett:** Yes, I do. Yes, I do. And I saw last week at the end of the
> week three that were basically ready for the President's decision. I don't
> know if people have had that conversation with him yet. But yes, there are
> many, many deals coming and there were three that are basically look like
> they're done.

4.      On May 29, 2025, before the U.S. Court of Appeals for the Federal Circuit issued its

administrative stay of this Court's decision, White House Senior Counselor for Trade and

Manufacturing Peter Navarro was interviewed on Bloomberg Television, a recording of which is

available by video at https://youtu.be/8DnUddNeVTY?si=4WJyhZCwyarIReoG. The States will

conventionally file a copy of this video on hard media and label the file Exhibit O to this

declaration.

5.      I personally reviewed Exhibit O to verify that this is an accurate transcription of 1:22–

3:50:

> **Peter Navarro:** So we think we have a strong case. Yes, we will
> immediately appeal and try to stay the ruling. But, at the same time, the
> court, interestingly enough, basically said we were right, just use different
> rules and laws. So nothing has really changed here in that sense. We're
> still, as we speak, having countries call us and tell us they want a deal. So
> these deals are going to happen. So that's kind of where we're at. And it's
> troublesome here because if you look broadly at the pattern, we've got

Page 3 -   THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v.
           Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ATTACHMENT 1, Page 3 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

- Appx474 -

courts in this country who are basically engaged in attacks on the American people. The President ran on stopping the fentanyl poisoning, stopping international trade unfair practices from stealing our factories and jobs. And courts keep getting in the way of that. The courts get in the way of our trying to deal with the border issues. Now they're getting in the way of our trying to deal with the fentanyl crisis. And that's where we stand here. And I think, I think part of what's going to be important about this ruling -- demonstrates yet again to the American people that the judiciary in this country has been weaponized in ways which are contrary to their interests.

**Q:** Well, Peter, you would have heard a lot of people come on this program and ultimately say you still have tons of options and you've alluded to one of them.

**Peter Navarro:** Yes.

**Q:** You will, of course, appeal. But could you describe what you might do in the interim, the way you might pursue your ultimate objective any way with the tools you have still available to you?

**Peter Navarro:** I'm going to let Jamieson Greer, the USTR, inform you on that and you'll be hearing from him soon on that. But I mean look, any trade lawyer knows it's just a number of different options we can take. If you look at the kind of things we've already done, it kind of give you a roadmap on that. There's all sorts of numbers out there. There's 122, there's 301, there's 232, there's 338. There's all sorts of things we can do well within the law. But look, we think that what we've done already is is perfectly appropriate. So that's why the appeal will take case. …

6.      I personally reviewed Exhibit O to verify that this is an accurate transcription of 7:10–

9:08:

**Q:** But if the court said, if the ruling said, Peter, and we've been talking about this page 34, 35, they say basically you are in your right if you use Section 122. Why didn't you guys do that from the beginning?

**Peter Navarro:** Well, Section 122 only gives you 150 days. So there's your answer right there.

**Q:** (interrupting) So are Section 122, if you use this now for 150 days (crosstalk), could it be a bridge to 301 or a bridge to 232? What are you thinking more long term?

Page 4 -   THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ATTACHMENT 1, Page 4 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

**Peter Navarro:** You can be the strategist on that, but those are the kinds of thoughts. And look, look, if anybody thinks this caught the administration by surprise, think again. Okay. Because you could see in the oral arguments where those judges were going and that the lead judge in this. I mean, the problem with that court, it's so such an obscure court, but it's consistently been globalist, pro-importer, giving us bad rulings. The lead judge there ruled against the 232s originally and had to get overturned by the appeals court. So that gives you an idea of the, the bias against the President's tariff policy right on that court. But I think the big picture here is we've got a very strong case with IEEPA, but the court basically tells us if we lose that we just do some other thing. So nothing's really changed. I want to say this to the world. You're cheating us. We're coming after you. Deal. And let's make this right. Because ultimately what's at stake here is the global international environment -- getting it in a way where it's fair to America and thereby if it's fair to America and we structure this thing in a way we'll have just more stability in terms of financial flows and capital and everything like that.

**Q:** (interrupting) Dr. Navarro.

**Peter Navarro:** It's wildly out of balance now.

7.     On May 29, 2025, after the U.S. Court of Appeals for the Federal Circuit issued its administrative stay of this Court's decision, Mr. Navarro spoke to reporters outside at the White House, a recording of which is available by video at https://www.youtube.com/watch?v=JnFplVEpGkI. The States will conventionally file a copy of this video on hard media and label the file Exhibit P to this declaration.

8.     I personally reviewed Exhibit P to verify that this is an accurate transcription of 7:03–8:39:

**Q:** Thank you so much, Peter. And just given this appeals court temporarily reinstating the tariffs, what does that mean for you and your position? And does it buy the administration more time in your view?

**Peter Navarro:** "Me and my?" You're not talking about me personally, you're talking about the Administration?

**Q:** The Administration, of course.

Page 5 -   THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ATTACHMENT 1, Page 5 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

- Appx476 -

**Peter Navarro:** So, look, the the tariff the tariffs remain in place. The court told us—they didn't all but tell us—they they told us go do it another way. So you can assume that even if we lose we will do it another way. And I can assure the American people that the Trump tariff agenda is alive, well, healthy and will be implemented to protect you, to save your jobs and your factories, and to stop shipping foreign wealth -- our wealth into foreign hands.

**Q:** You are working on a plan B right now?

**Peter Navarro:** Of course, there's no plan B. It's plan A. Okay. Plan A encompasses all strategic options. And when we move forward, we had a full view of what the battlefield looks like. We, we are not naive about rogue justices in the judiciary and Democrats filing lawsuits. This has got to stop, by the way. This, this, this weaponization of the judiciary to stop the Trump, President Trump from doing what he promised the American people. This has got to stop. It's, the people of America have the lowest level of of confidence in the American judiciary they've had in a hundred years. And, and it's getting close to what they think about Congress and that's a low bar to hit.

9.     I personally reviewed Exhibit P to verify that this is an accurate transcription of 8:59–9:49:

**Q:** Peter, I want to ask you what do the conversations look like right now with other countries as you're seeing the courts pushing back here in the United States?

**Peter Navarro:** Well, great question. In fact, that is the question in many ways. This morning, we were getting plenty of phone calls from countries saying, "We saw the ruling. So, what? We're going to continue to negotiate in good faith because we understand that there's a problem. And based on that court decision, we understand that that court decision is not going to stop you from doing what you need to do. So, we're going to work with you." So, I can assure you—and by the way there's going to be within the next I don't know say few days because that puts me too much on the spot—but you will see a cascade of new deals coming out in the near future and these will all be good for the American people.

10.     On May 30, 2025, the U.S. Trade Representative, Ambassador Jamieson Greer, appeared on CNBC, a recording of which is available by video at

Page 6 -     THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ATTACHMENT 1, Page 6 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

- Appx477 -

https://www.youtube.com/watch?v=M_crUiRBDb8. The States will conventionally file a copy of this video on hard media and label the file Exhibit Q to this declaration.

11.     I personally reviewed Exhibit Q to verify that this is an accurate transcription of 0:17–2:25:

> **Q:** I guess we'll start with with some of your comments about that -- the rulings yesterday and the prospects for what is likely to happen. I know there's a lot of things that are being discussed right now. Do you think if you were to get emergency relief from the Supreme Court, do you think they'd come down on on the president's side? Do you think you have a strong case, or will it stand the way it is right now?
>
> **Ambassador Greer:** Well, I think we have a very strong case. Congress clearly delegated to the President the ability to take action when there's a national emergency. We've declared a national emergency. We've taken action. We have a stay from the circuit court right now. All the other countries I'm dealing with in negotiations are treating this as just kind of a bump in the road rather than any fundamental change. So, I feel pretty confident about the case. And if the case, you know, goes the other way, we have other tools as well.
>
> **Q:** Yeah, I was -- I've expressed that sentiment earlier that you don't know what you've got until it's gone. I, you know, as a pure conservative and a markets-type guy, tariffs, I think they can be effective. But there's times when you kind of wish that we would just maybe not be doing as many. But then we've we've come along so far, Mr. Ambassador, that to pull the rug out from the negotiating ability by making all these countries we're negotiating with think that the tariffs might not stick, that's frustrating. But you're telling me, again, that none of those countries expressed any -- they weren't saying, all right, we're going to pull out of these negotiations because we don't need to anymore?
>
> **Ambassador Greer:** It's actually the opposite. You know, when I woke up, you know, the morning after the initial ruling—before we had the stay—you know, I had emails and texts from foreign officials saying, you know, we're just going to keep negotiating with you as before. You know, we understand these are, you know, this is litigation. Things go up and down. We understand the U.S. policy going forward. And we're negotiating with you as before. So that's what's happening.

Page 7 -   THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ATTACHMENT 1, Page 7 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

- Appx478 -

12.     On June 1, 2025, Secretary of Commerce Howard Lutnick was interviewed on Fox News Sunday, a recording of which is available by video at https://youtu.be/t0UtSmEWhbw?si=YvCa5tGe3iGkyoD2. The States will conventionally file a copy of this video on hard media and label the file Exhibit R to this declaration.

13.     I personally reviewed Exhibit R to verify that this is an accurate transcription of the interview:

> **Q:** And now back to the uncertain future of President Trump's vast tariffs, and what's next after a flurry of court rulings. Joining me now, Commerce Secretary Howard Lutnick, welcome back to the show.
>
> **Secretary Lutnick:** Great to be back.
>
> **Q:** Okay, so we want to start here with the Court of International Trade. This is a decision that went against the President days ago. They said, "Because of the Constitution's express allocation of the tariff power to Congress … an unlimited delegation of tariff authority [to the President] would constitute an improper abdication of legislative power to another branch of government." Just to boil that down, they said he can't do it, but that decision is on hold for now. What is the backup plan?
>
> **Secretary Lutnick:** Well, think about how silly that is, right? So, Congress gives the President, under this IEEPA authority, the ability to take on other countries who are creating a national emergency, and the $1.2 trillion trade deficit and all the underlying implications of that is a national emergency. It's gutting our manufacturing base. The President takes that on, and Congress lets him do it—specifically, does not vote to take it away, calls a vote and says he can keep it. So, what's going to happen is we're going to take that up to higher courts. The President's going to win, like he always does. But rest assured, tariffs are not going away. He has so many other authorities that even in the weird and unusual circumstance where this was taken away, we just bring on another or another or another. Congress has given this authority to the President, and he's going to use it.
>
> **Q:** Okay. So you know that these two federal courts have so far said the use of that law as emergency power is not proper, it is on appeal. So we'll see what they—potentially Supreme Court—has to say about it. But in the meantime, it sparks this question about whether, if other countries think that our court system is potentially going to shut down these bigger, more

Page 8 -     THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ATTACHMENT 1, Page 8 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

- Appx479 -

sweeping tariffs, you're losing some kind of advantage in negotiations. Reuters quotes an E.U. official saying this. Quote, the uncertainty as to the legality of the reciprocal tariffs certainly gives us meaning them extra leverage. Here is how Jonathan Turley put it.

> **Jonathan Turley:** Trump has been saying, you know, using these tariffs like a gun to the head of these other countries, and the court just removed the bullets.

**Q:** So, have you lost leverage? And where are we on the talks with the EU?

**Secretary Lutnick:** All right, so the President said he was going to put a 50% tariff on the EU, and as I said, not only does he have this authority under IEEPA, but he has many, many other authorities. The European Union sent in—after this—their first offer. So they are at the table. They are negotiating. You can't listen to silly people making silly comments. All of the countries that are negotiating with us understand the power of Donald Trump and his ability to protect the American worker. And so what they're doing is they're negotiating with us. I think it cost us a week—maybe cost us a week—but then everybody came right back to the table. Everybody is talking to us. You're going to see over the next couple of weeks, really first-class deals for the American worker, opening their markets and setting on tariffs to make sure that we are treated fairly around the world.

**Q:** Well, I know you and Secretary Bessent are talking to a lot of these countries trying to get those deals across the finish line. He has said talks with China are stalled. What's the latest?

**Secretary Lutnick:** Well, I think, what happened is Secretary Bessent and Ambassador Greer went to Geneva, they made a deal with the Chinese. And really the right way to say it is they're just slow rolling the deal. So, I think slow rolling is the right way to say it, and I think Donald Trump is on it. We are taking certain actions to show them what it feels like on the other side of that equation. But my view is Donald Trump and President Xi—you know, our President understands what to do. He's going to go work it out and, and I am confident that this is going to work out either way. The President understands the power of our economy. He said it over and over again: we are the consumer of the world. We are the consumer of Chinese goods. If we don't open our markets to them, their economy is in really, really tough shape. So I think -- I love having all of this power in the President's hands. He knows how to wield it correctly for the benefit of the American worker.

Page 9 -   THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ATTACHMENT 1, Page 9 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

- Appx480 -

**Q:** Okay, quickly, because we got to go, the 90-day pause on the major tariffs is due to expire at the beginning of July. You get a lot of deals to get done. Will the President extend that pause?

**Secretary Lutnick:** I think we're going to get a lot, a lot of deals done. I think they're all being set up. We could sign lots of deals now, but I think we're trying to make them better and better and better. And, as the President said, or he'll just set rates and he'll set the terms of the deal. So I don't see today that an extension is coming. In fact, I think that's the deadline and the President's just going to determine what rates people have. If they can't get a deal done, President Trump is going to determine what deal there's going to be.

**Q:** Okay, Secretary Lutnick, great to see you. Thanks for your time.

**Secretary Lutnick:** Great to be here.

**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED on June 2, 2025, in Portland, Oregon.

*s/ Brian Simmonds Marshall*
BRIAN SIMMONDS MARSHALL
Senior Assistant Attorney General

Page 10 -  THIRD DECLARATION OF BRIAN SIMMONDS MARSHALL – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ATTACHMENT 1, Page 10 of 10
to States' Response to Motion for a Stay
of Enforcement of Judgment Pending Appeal
US CIT No. 1:25-cv-00077-GSK-TMR-JAR

- Appx481 -