**U.S. Department of Justice**

*Washington, DC 20044*

August 29, 2025

Jarrett B. Perlow
Clerk of the Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, DC 20439

Re: Rule 28(j) Letter in *V.O.S. Selections, et al. v. Trump, et al.*, Nos. 25-1812, 25-1813 – Pertinent and Significant Authority Arising Since Our Briefs Were Filed

Dear Mr. Perlow:

Since oral argument was completed, negotiations seeking to resolve the national emergencies underlying the challenged tariffs have continued to unfold. These recent developments continue to strongly support our request for a stay of this Court's mandate to allow the government to seek Supreme Court relief in the event the Court issues any adverse judgment in these cases, given the serious harms that an unstayed adverse judgment would inflict.

The attached Congressional Budget Office projection and supplemental declarations detail these recent developments.  For instance:

- The Congressional Budget Office projection, on which many government decisionmakers will rely, indicates that tariffs will reduce federal deficits by $4 trillion in the coming years.

- Secretary Lutnick explains: "[A] ruling suspending the effectiveness of the tariffs that President Trump imposed under IEEPA would cause massive and irreparable harm to the United States and its foreign policy and national security both now and in the future.  Such a ruling would threaten broader U.S. strategic interests at home and abroad, likely lead to retaliation and the unwinding of agreed-upon deals by foreign-trading partners, and derail critical ongoing negotiations with foreign-trading partners.  The stakes have only grown higher since May 23, 2025."

- Secretary Bessent emphasizes that recent negotiations and framework agreements "have been one of the country's top foreign policy priorities for the last several months" and that "[s]uspending the effectiveness of the tariffs would lead to dangerous diplomatic embarrassment" and "expose the United States to the risk of retaliation."

- Secretary Rubio states that the President's recent exercise of his IEEPA authority "in connection with highly sensitive negotiations he is conducting to end the conflict between the Russian Federation and Ukraine" could be jeopardized, with "severe consequences for ongoing peace negotiations and human rights abuses."

- Ambassador Greer details framework agreements with the European Union, the Republic of Korea, and Vietnam and observes that "the United States and these trading partners are working quickly and diligently to turn these framework agreements into legally binding instruments," and none "would be possible without the imposition of tariffs to regulate imports and bring other countries to the table."

Sincerely,

*D. John Sauer*
D. John Sauer
Solicitor General


*/s/ Brett Shumate*
Brett Shumate
Assistant Attorney General

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

No. 25-1812

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, in his official capacity as Secretary of Commerce, UNITED STATES CUSTOMS AND BORDER PROTECTION,

Defendants-Appellants.

No. 25-1813

THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF VERMONT,

Plaintiffs-Appellees,

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for U.S. Customs and Border Protection, UNITED STATES,

Defendants-Appellants.

## <u>DECLARATION OF HOWARD W. LUTNICK,<br>UNITED STATES SECRETARY OF COMMERCE</u>

I, HOWARD W. LUTNICK, hereby state and declare as follows:

1.      I am the United States Secretary of Commerce and the head of the United States

Department of Commerce, an Executive Department of the United States.  *See* 5 U.S.C. § 101.

1

I have been tasked by President Donald J. Trump to lead his tariff and trade agenda. *Statement by President-elect Donald J. Trump Announcing the Nomination of Howard Lutnick as Secretary of Commerce*, THE AMERICAN PRESIDENCY PROJECT (Nov. 19, 2024), https://www.presidency.ucsb.edu/node/375586 ("I am thrilled to announce that Howard Lutnick, Chairman & CEO of Cantor Fitzgerald, will join my Administration as the United States Secretary of Commerce.  He will lead our Tariff and Trade agenda.").

2.     The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, Department of Commerce employees, and information portals maintained and relied upon by the United States government in the regular course of business, and on my evaluation of that information.

3.     President Trump has asked me, along with Ambassador Jamieson Greer, to negotiate trade deals directly with foreign-trading partners, and Secretary Scott Bessent has primary responsibility for China and participated in high-level, trade-deal discussions with certain other countries.  As relevant here, President Trump has asked me to structure the terms of potential deals so that he can decide whether such terms remedy the conditions underlying and arising from the $1.2 trillion annual U.S. goods trade deficit, *see* Exec. Order. No. 14,257, 90 Fed. Reg. 15,041 (Apr. 7, 2025), and the influx of illicit drugs and illegal aliens from Canada, Mexico, and China, *see* Exec. Order. No. 14,193, 90 Fed. Reg. 9,113 (Feb. 7, 2025) (illicit drugs from Canada); Exec. Order. No. 14,194, 90 Fed. Reg. 9,117 (Feb. 7, 2025) (illicit drugs and illegal aliens from Mexico); Exec. Order. No. 14,195, 90 Fed. Reg. 9,121 (Feb. 7, 2025) (illicit drugs from China).

4.     For decades, the United States has been subjected to massive trade imbalances that have hollowed out our industrial base and imposed enormous costs on American workers, families,

and producers. Our current annual $1.2 trillion goods trade deficit is equivalent to approximately 4 percent of U.S. gross domestic product being exported abroad every year in the form of lost production and lost opportunity. This is not merely an accounting figure; it represents the systematic transfer of American wealth overseas.

5.    Our persistent goods trade deficits have enabled foreign nations—including adversaries—to accumulate U.S. debt, equity, and physical assets. In 1984, Americans owned roughly $140 **billion** more of the rest of the world's assets than foreigners owned of U.S. assets. Today, the reverse is true: by the end of 2024, foreigners owned approximately $26 **trillion** more of U.S. assets than Americans owned of foreign assets. This catastrophic reversal is the direct result of trade deficits that have financed foreign control of American manufacturing, supply chains, and economic life, weakening the independence of our Nation.

6.    Most notably, on the back of our failed industrial policy, China has created an export-driven economy to generate annual growth rates triple the size of ours on average, using trade surpluses with the United States as the engine of its rise. China imposes this imbalance on the United States through numerous trade channels. For example, the European Union illogically has an annual $235.87 billion goods trade surplus with the United States, but at the same time it has an annual goods trade deficit with China estimated to be over $300 billion. Therefore, the European Union has become another entry point for China to impose a massive trade imbalance on the United States, serving as both a direct and indirect channel for the erosion of America's economic strength. While the European Union serves as the starkest example, it is only one of many in this regard. Members of the Association of Southeast Asian Nations like Vietnam also run massive trade surpluses with the United States. Vietnam enjoyed an estimated $123.46 billion trade surplus with the United States but an estimated $82.8 billion deficit with China in 2024. This

is telling because in 2018—before Section 301 tariffs were placed on China during President Trump's first term—Vietnam had a $39.46 billion surplus with the United States and a $24.15 billion deficit with China. This drastic shift in Vietnam's balances—to the benefit of China and detriment of the United States—coinciding with the United States imposing Section 301 tariffs on China is no mere coincidence and reflects concerted effort to divert foreign goods into and flood the U.S. market. It also demonstrates why a strong and global approach is needed to rectify the large and persistent U.S. global trade deficit and the conditions that arise from it.

7.      The national emergency caused by the conditions underlying and arising from our persistent goods trade deficits is urgent and undeniable. The trade imbalance is not a benign feature of globalization but rather a structural weakness that has allowed other nations to grow at our expense and denigrate critical U.S. manufacturing capacity and supply chains. A persistent and continuing $1.2 trillion trade deficit represents American factories not built, American ships not launched, American workers not employed. It represents U.S. supply chains becoming dangerously dependent on adversary nations, causing foreign choke points and gifting leverage over our Nation.

8.      For far too long, American politicians tolerated this inequity. That ended when President Trump took bold and decisive action to address this emergency. By invoking his clear authority under the International Emergency Economic Powers Act, President Trump imposed reciprocal tariffs that finally level the playing field for American manufacturers and producers and provide the leverage to bring about fairer, more balanced trade relationships. This is not ordinary policymaking—it is the urgent use of emergency powers to counteract an ongoing economic emergency of historic proportions.

9.     President Trump's use of reciprocal tariffs under IEEPA has brought foreign powers to the negotiating table to fundamentally change these intolerable dynamics in ways that no other president came close to achieving.  In this sense, both the imposition of the IEEPA tariffs themselves and the asymmetric, U.S.-advantaged deals made with foreign-trading partners are pivotal to revitalizing America and correcting this national emergency.

10.     On May 23, 2025, I provided a declaration to the Court of International Trade, attesting to the devastating and irreparable effects that a ruling for plaintiffs would have on President Trump's constitutional authority to conduct foreign affairs and to address national emergencies through the powers afforded to the Chief Executive under IEEPA.  *See* Howard W. Lutnick, Decl., *Princess Awesome, LLC* v. *U.S. Customs and Border Protection*, No. 1:25-cv-00078-GSK-TMR-JAR (Ct. Int'l Trade, May 23, 2025), ECF No. 16-3.

11.     As I described in that declaration, President Trump invoked IEEPA after finding that our foreign-trading partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have produced enormous, persistent annual U.S. goods trade deficits, which have hollowed out our domestic manufacturing and defense-industrial base and have resulted in a lack of advanced domestic manufacturing capacity, a defense-industrial base dependent on inputs from foreign adversaries, vulnerable domestic supply chains, and a sensitive geopolitical environment. Lutnick, Decl. at ¶ 5.  President Trump also invoked IEEPA after finding that " 'the sustained influx of synthetic opioids . . . kill[s] approximately two hundred Americans per day,' " *id.* at ¶ 16 (citations omitted), and to address the influx of illegal aliens crossing our southern border.

12.     As I explained in that declaration, the imposition of President Trump's IEEPA tariffs directly led to the announcement of the asymmetric terms of the first trade deal, which I negotiated.  *See* Lutnick, Decl. at ¶ 10.  Specifically, in that deal, the United Kingdom agreed to a

10 percent tariff on its exports to the United States while reducing or eliminating its tariffs on U.S. imports and providing historic access to its market for U.S. producers.[1]  These tariffs also led to an asymmetric agreement with China—the greatest contributor to the U.S. goods trade deficit on its own and through transshipment—whereby China lowered its universal tariff rate on U.S. goods to 10 percent while the United States maintained a higher rate of 30 percent on Chinese goods. *See id.* at ¶ 12.  But for the IEEPA tariffs, the deals with the United Kingdom and China would never have happened.

13.    The prompt stays of the decisions of the Court of International Trade and the District Court for the District of Columbia prevented the catastrophic effects of an unstayed order worsening the national emergency, potentially unwinding these deals, and preventing the United States from continuing negotiations with foreign-trading partners to address the conditions underlying our persistent deficits and the illicit flow of drugs and illegal aliens into the United States.

14.    I now provide a new declaration to reaffirm, in light of the developments since May, the devastating effects that an adverse ruling would have on President Trump's foreign and economic policy agenda, as well as on the foreign and economic policymaking abilities of President Trump and future presidents.  Indeed, a ruling suspending the effectiveness of the tariffs that President Trump imposed under IEEPA would cause massive and irreparable harm to the United States and its foreign policy and national security both now and in the future.  Such a ruling would threaten broader U.S. strategic interests at home and abroad, likely lead to retaliation and

---

[1] As part of its deal with the United States, the United Kingdom agreed to eliminate or reduce tariffs on various beef, fruit, vegetable, animal feed, tobacco, soft drink, shellfish, textile, chemical, machinery, and ethanol products, as well as many other products.

the unwinding of agreed-upon deals by foreign-trading partners, and derail critical ongoing negotiations with foreign-trading partners.  The stakes have only grown higher since May 23, 2025.

15.     Since my prior declaration, the Congressional Budget Office has projected that tariff collections will decrease primary deficits by $3.3 trillion over the next decade and will reduce federal outlays for interest by an additional $0.7 trillion, meaning that tariffs will reduce total deficits by an estimated $4.0 trillion.[2]  A reduction of the national debt by $4 trillion—which is an incidental consequence of the tariffs that President Trump imposed—is manifestly in the public interest.  Moreover, Congress and the Executive Branch rely on Congressional Budget Office estimates in carrying out their duties, and they will rely on this estimate, like other estimates, going forward.  A decision suspending the tariffs would undermine that estimate and decisions made in reliance on it.

16.     Since my prior declaration and the deals with the United Kingdom and China, President Trump has determined and set his tariff and trade agenda to address the national emergency associated with our persistent goods trade deficits.  On July 31, 2025, President Trump set the tariff rates for all foreign-trading partners.  *See* Exec. Order. No. 14,326, 90 Fed. Reg. 37,963 (July 31, 2025).  Today, 138 trading partners, representing approximately 55.1 percent of global non-U.S. GDP, are subject to a reciprocal tariff of 10 or 15 percent.  17 partners, representing approximately 13.8 percent of global non-U.S. GDP, are subject to IEEPA tariffs between 15 and 30 percent.  12 trading partners, representing approximately 28.5 percent of global non-U.S. GDP, are subject to IEEPA tariffs at a rate of 30 percent or greater.  All the while, the United States has not been subject to retaliation for this restructured and rebalanced tariff regime, outside of singular actions taken by Canada (which, on August 22, 2025, Canada largely dropped).

---

[2] *See* Exhibit 1.

17.     What's more, since my May 23, 2025, declaration, President Trump announced the terms of six customized deals with some of the largest contributors to the conditions underlying the U.S. goods trade deficit, including the European Union, Japan, the Republic of Korea, the Philippines, Indonesia, and Vietnam.  In all of these deals, the countries have not only provided unprecedented market access for American producers and committed to transformational levels of investment within the United States, but they also have accepted asymmetric, double-digit reciprocal tariffs on top of these commitments. These countries have done so because they recognize the legitimacy of the emergency the United States faces and the necessity of President Trump's decisive measures.  But for the IEEPA tariffs, these deals would never have occurred.  I declare this because I personally negotiated these deals.

18.     For example, on July 27, 2025, I joined President Trump in Scotland as his lead negotiator for a trade meeting with the European Union.  Prior to this meeting, I had structured the terms of a potential deal through my personal meetings with European representatives, including French President Emmanuel Macron, Italian Prime Minister Giorgia Meloni, and European Commission President Ursula von der Leyen.

19.     In Scotland, President Trump reached a historic deal with the second largest market in the world, representing an estimated 23.9 percent of global non-U.S. GDP.  Despite the similar comparative production costs in the European market, the similar regulatory and environmental laws, and the absence of any significant production or industrial advantages over the United States, the European Union ran a $235.87 billion goods trade surplus with the United States in 2024.  President Trump's deal with the European Union addresses that deficit head on and remedies the problems associated with and arising from that deficit.

20.    As part of the deal, the European Union agreed to an asymmetric trading relationship, whereby the United States will impose a minimum 15 percent tariff on European imports and the European Union will drop its tariffs on U.S. industrial exports to 0 percent, including for passenger automobiles.[3]  The European Union further promised $750 billion in U.S. energy purchases to be completed by the end of 2028, which will directly increase U.S. exports and ensure domestic energy manufacturing resiliency.  Additionally, the European Union committed to eliminate detrimental non-tariff barriers on U.S. industrial products.  Prior tariff and non-tariff barriers had otherwise impeded U.S. access to the robust European market.  Removing them will create a more level playing field for American companies to manufacture in the United States and to sell their products into the European Union, alleviating many of the structural impediments that gave rise to the $235.87 billion trade deficit in the first place and directly remedying the results of the deficit.

21.    In reaching this deal, European Commission President Von der Leyen stated that the "starting point" for the negotiations between the European Union and the United States was the trade "imbalance, a surplus on [the EU] side and a deficit on the U.S. side." *President Trump Meets with European Union President*, C-SPAN (July 27, 2025), https://www.c-span.org/program/white-house-event/president-trump-and-european-commission-president-von-der-leyen-announce-trade-deal/663409.  She then went further, explaining that the deal was a success because the European Union "hit exactly the point [the European Union] wanted to find, rebalance [the deficit], but enable trade on both sides," which "means prosperity on both sides of

---

[3] Under the deal, products of the European Union subject to the U.S. reciprocal rate will pay the greater of a product's Most Favored Nation tariff rate or 15 percent.  For example, a product with a 4 percent MFN tariff rate will be subject to an additional 11 percent reciprocal tariff for a combined rate of 15 percent, whereas a product subject to a 20 percent MFN tariff rate will not be subject to an additional reciprocal rate.

the Atlantic." *Id.* President Von der Leyen's statement is clear. The chief representative of the union comprised of twenty-seven member countries, which together are the second largest economy in the world at $20 trillion GDP, recognized that such a prolific trade deficit with the United States and the conditions underpinning that deficit cannot remain unremedied. The economic and industrial vitality of the United States demands that trade is fair and balanced. Other countries have reached similar determinations because of the IEEPA tariffs.

22.    On July 22, 2025, President Trump announced the terms of a deal with Japan. I served as the principal negotiator and devised a structure for President Trump to remedy the conditions undergirding Japan's $69.39 billion goods trade deficit with the United States. Like the European Union, Japan committed to an asymmetric deal with the United States, whereby the United States will levy a minimum 15 percent tariff on Japanese imports and Japan will increase market access for U.S. exports.[4] Japan also committed to addressing structural trade barriers that have kept U.S. products out of the Japanese market, including by recognizing U.S. automotive standards so American cars can more freely enter the Japanese market. Further, the deal contains direct purchasing commitments that will immediately and fundamentally reduce the U.S. goods trade deficit. Specifically, Japan committed to purchasing 100 U.S.-made aircraft, a 75 percent increase in U.S. rice imports, and $8 billion of purchases in U.S. goods like corn, soybeans, fertilizer, bioethanol, and aviation fuel.

23.    The Japanese went much further to rectify the conditions resulting from the goods trade deficit by committing to invest $550 billion in sectors that the United States deems to be

---

[4] As of the date of this declaration, the 15 percent reciprocal tariff on Japan applies on top of the applicable MFN tariff rate. The United States has expressed its willingness to adjust this tariff to the combined 15 percent reciprocal tariff structure secured by the European Union, should Japan make sufficient progress towards implementing the terms of the deal.

critical to its national and economic security. These sectors include semiconductors, pharmaceuticals, metals, critical minerals, shipbuilding, energy (including pipelines), and artificial intelligence/quantum computing. Investments in these sectors are vital to U.S. industrial resiliency and, therefore, the national security and economic health of the United States.

24.     The Republic of Korea took a similar tack in its deal with the United States, which I structured for President Trump's consideration. On July 30, 2025, President Trump announced the terms of the deal, which will mitigate the $65.97 billion goods trade deficit, and the conditions underlying it, between the United States and Korea. Like the European Union and Japan, Korea agreed to an asymmetric trading relationship, whereby the United States will levy a minimum 15 percent tariff on Korean imports and Korea will allow for near-total market access for all U.S. goods. Korea also committed to purchasing $100 billion of American energy products through 2028. These purchases will directly increase U.S. exports to Korea, while boosting critical American manufacturing and lowering the bilateral deficit. All told, Korea's commitments will remove key structural impediments to U.S. exports. And, mirroring Japan, Korea agreed to invest $350 billion in sectors that the United States deems to be critical to national and economic security, such as shipbuilding, energy, semiconductors, pharmaceuticals, critical minerals, and artificial intelligence/quantum computing.

25.     Beyond the European Union, Japan, and Korea, other countries with significant goods trade deficits entered into tailored deals with President Trump, structured and negotiated by me and Ambassador Greer for his consideration. These countries include Vietnam and Indonesia—two countries that are significant destinations for the transshipment of Chinese goods—and the Philippines. In 2024, the U.S. goods trade deficits with these countries measured $123.46 billion, $17.89 billion, and $4.92 billion, respectively. Like our deals with the European

Union, Japan, and Korea, these deals adopt an asymmetric trading structure, whereby the United States will impose double-digit tariffs on imports from these countries, and these countries will drop their tariffs on U.S. exports. These deals also include terms that will open these nations' markets to American exports through both tariff and non-tariff barrier elimination. This will allow American industries to grow and American supply chains to become more resilient, as American products now have greater market access across the globe.

26.     While the bespoke deals reached since President Trump's April 2, 2025, announcement of IEEPA tariffs represent unprecedented triumphs to address the conditions that underlie and arise from the persistent annual U.S. goods trade deficits, the IEEPA tariffs on the remaining countries are critical, as well. The imposition and maintenance of these tariffs in and of themselves seeks to rectify President Trump's declared national emergency. For example, President Trump imposed a 25 percent reciprocal IEEPA tariff on India, which runs a $45.8 billion goods trade deficit with the United States and implements a suite of tariff and non-tariff barriers to disfavor American exports.

27.     Further, the imposition of IEEPA tariffs on these foreign-trading partners provides an incentive for partners to continue to offer even more favorable trading terms to the United States, with a goal of reaching their own deals with President Trump. Indeed, the Department of Commerce and the Office of the United States Trade Representative, on behalf of President Trump, continue to have active discussions with numerous foreign-trading partners that do not have customized trade deals.

28.     Under either scenario, the United States benefits and the severity of the national emergency is lessened. If foreign-trading partners choose not to negotiate with the United States, then American industry benefits from enhanced competitiveness attributed to President Trump's

IEEPA tariffs on foreign goods, addressing the national emergency.  If partners choose to negotiate, then they might lessen their tariff burdens in exchange for favorable terms to address the national emergency.  Countries may achieve this through opening their markets, removing tariff and non-tariff barriers, making investment commitments in key sectors, or a combination thereof.

29.     In short, the progress made since President Trump's April 2, 2025, announcement of reciprocal IEEPA tariffs has directly addressed the national emergency.  President Trump is pursuing the solution to the emergency conditions arising from the persistent annual goods trade deficits, caused by nonmarket practices like governmental subsidies, unfair labor practices, and dumping, through a combination of global tariff rates and individual country deals—all of which asymmetrically favor the United States.  He has addressed the issue of transshipment, where a country like China uses third-party countries to export its goods, through the global, asymmetric tariff regime, which calls for 40 percent tariffs on items shipped to the United States that are not made up of a significant majority of inputs from the exporting country.  And he has created a system through structured deals that I negotiated with certain countries, where foreign capital is directed to vital sectors like shipbuilding, energy, metals, semiconductors, pharmaceuticals, critical minerals, and artificial intelligence/quantum computing.  Indeed, Japan and Korea alone have committed nearly $1 **trillion** dollars to sectors that have been decimated as part of the national emergency.

30.     All told, the case before this Court does not present an abstract question of law.  It is not academic.  A decision suspending the effectiveness of the IEEPA tariffs would have concrete and immediate effects on American national security and economic vitality.  An adverse decision would unwind President Trump's fundamental restructuring of global trading relationships,

decimating the progress President Trump has made to remedy the national emergency.  Even more troubling, an adverse decision would incentivize countries to retaliate against the United States through the imposition of their own tariffs and reneging on agreed-upon deals.  This would not return the United States to the status quo before President Trump's imposition of IEEPA tariffs; it would worsen the national emergency that led us here in the first place.

31.    Moreover, the constitutional authority of President Trump and future presidents to conduct foreign affairs and address national emergencies through IEEPA would be drastically diminished.  An adverse decision by this Court would lead countries to question the strength of the Executive Branch and the word of the President.  *See* Lutnick Decl. at ¶¶ 17-18.  More immediately, an adverse decision would take away a broad and quickly adaptable tool in the form of IEEPA tariffs to respond swiftly to national emergencies caused by the unsustainable economic and commercial machinations of our foreign-trading partners, exemplified by the tariff and non-tariff barriers that countries have imposed against the United States for decades and their promotion of the flow of illegal drugs and aliens into our Nation.  *See id.* at ¶¶ 13-14, 16-17.  Curtailing presidential authority now would be catastrophic.  It would pull the rug out from American producers and send a signal to the world that the United States lacks the resolve to defend its own economic and national security both now and in the future.

32.    To be sure, President Trump has numerous tariff authorities, but IEEPA provides the agility and speed necessary to immediately address national emergencies like those at issue in this litigation.  This is because these emergencies are global in nature.  Further, IEEPA provides the President with a tool to counter retaliatory measures taken by foreign-trading partners quickly and effectively.  Without the viability of IEEPA tariffs, the United States would be weakened and lose the essential tool to address this national emergency most efficiently.

33.     It remains vital to the foreign policy, economy, and national security of the United States for this Court to reverse the decision below or, at a bare minimum, stay its mandate and permit the tariffs to remain in effect.  A decision to the contrary would have devastating and dire consequences.  It would effectively consign American producers to the back of the line, resign the United States to permanent dependency on foreign supply chains, and accelerate the drift toward America's decline into a vassal state to global manufacturing powers that include our geopolitical rivals.

34.     President Trump's decisive use of IEEPA is America's last chance to turn the tide, to restore our industrial base, and to secure economic might for generations to come.  This authority is not optional; it is essential.  To strip it away now would be to surrender America's economic future to those who have for decades profited off of our weakness—our open markets exploited without reciprocity, our industries undercut by predatory trade practices, and our workers left behind while adversaries have grown rich off our consumption.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 29 day of August, 2025, in the City of Washington, District of Columbia.

*/s/ Howard W. Lutnick*

Howard W. Lutnick
41st United States Secretary of Commerce

15

Exhibit 1

# CBO | Blog

 Blog

# An Update About CBO's Projections of the Budgetary Effects of Tariffs

*Posted by Phill Swagel on  August 22, 2025*

The Congressional Budget Office routinely provides information to the Congress about the budgetary effects of tariffs. Analysis of tariffs is our responsibility rather than the responsibility of the staff of the Joint Committee on Taxation because the laws that set tariffs are not part of the Internal Revenue Code. As tariffs changed frequently throughout 2025, we have regularly updated the Congress about projected tariff revenues; this blog post is the latest in that series. This time, we have updated our estimates of tariff revenues as part of developing the short-term economic forecast (covering 2025 to 2028) that we will be publishing on September 12.

As of August 19, we estimate that the effective tariff rate for goods imported into the United States has increased by about 18 percentage points when measured against 2024 trade flows. We project that increases in tariffs implemented during the period from January 6, 2025, to August 19 will decrease primary deficits (which exclude net outlays for interest) by $3.3 trillion if the higher tariffs persist for the 2025-2035 period. By reducing the need for federal borrowing, those tariff collections will also reduce federal outlays for interest by an additional $0.7 trillion. As a result, the changes in tariffs will reduce total deficits by $4.0 trillion altogether.

8/29/25, 11:21 AM    An Update About the Budget: Projections of the Budgetary Effects of Tariffs | Congressional Budget Office

Case: 25-1812    Document 158    Page: 20    Filed: 08/29/2025

Because of recent changes in tariffs, those estimates are larger than the $2.5 trillion decrease in primary deficits and $0.5 trillion reduction in interest outlays that we projected in early June in a report that examined the effects of the tariffs implemented between January 6 and May 13, 2025. Both the current and earlier estimates use the same methods to generate the projections of tariff revenues, which are mainly based on data from the Census Bureau, Customs and Border Protection, and the Treasury. The methods account for a diversion of trade from countries facing high tariff rates to other countries facing lower tariff rates. The estimates are subject to significant uncertainty, largely owing to questions about timing, possible exceptions, and a lack of precedents.

We have incorporated the estimated effects of tariffs currently in place in our baseline, as we usually do when the Administration uses its authority to change tariff rates. Those estimates do not account for effects on the size of the economy. The additional budgetary effect of those economic changes will be incorporated in early 2026 when we publish updated economic and baseline budget projections in *The Budget and Economic Outlook: 2026 to 2036*.

### How Have Tariffs Changed in 2025?

Since January, tariff rates have increased for many goods, including these:

- Imports from China and Hong Kong (https://tinyurl.com/2w3h9xpv), by 30 percent of the value of the goods;

- Certain imports from Mexico (https://tinyurl.com/52sk9p5d), by 25 percent of the value of the goods;

- Certain imports from Canada (https://tinyurl.com/5n795erd), by 35 percent of the value of the goods;

- Certain imports from the European Union (https://tinyurl.com/3fddcu25), so that the total tariff rate on those imports is equal to 15 percent of the value of the goods;

- Most imports from other countries (https://tinyurl.com/3fddcu25), by at least 10 percent of the value of the goods, with imports from many countries facing higher increases beginning on August 7;

- Imports of automobiles and automobile parts (https://tinyurl.com/yfxk86kc), by up to 25 percent of the value of the goods;

- Most imports of steel and aluminum (https://tinyurl.com/43saf6bw), by 50 percent of the value of the steel and aluminum in the goods; and

- Imports of copper products (https://tinyurl.com/3nph3dku), by 50 percent of the value of the copper in the goods.

Exemptions and interactions between those increases in tariff rates are also reflected in CBO's analysis. In addition, on May 2, imports from China and Hong Kong lost eligibility to use the de minimis exemption, which allows commercial packages worth less than $800 to enter the United States duty-free.

The 2025 reconciliation act (Public Law 119-21) more broadly modified de minimis rules for commercial shipments, ending duty-free treatment of those imports effective July 1, 2027.

### What Assumptions Does CBO Make When Projecting Tariff Revenues?

When the Administration modifies tariffs through an administrative action, we assume that the tariffs then in effect will continue permanently without changes. We incorporate changes announced by the Administration after they are implemented. Thus, our projection of revenues from tariffs in effect as of August 19, 2025, does not include the changes in tariff rates announced in an August 21 joint statement with the European Union, the scheduled August 27 increase in the tariff rate on imports from India (by an additional 25 percent), or the August 29 suspension of duty-free entry for commercial shipments of less than $800.

In accordance with provisions of the Balanced Budget and Emergency Deficit Control Act of 1985, our baseline reflects the scheduled expiration of legislative tariff programs. For example, the trade preference programs under the U.S.-Caribbean Basin Trade Partnership Act are scheduled to expire at the end of September 2030.

### How Have Customs Revenues Collected in Fiscal Year 2025 Differed From Amounts That CBO Projected in January?

As a result of the increases in tariff rates, revenues have been greater than we projected in January. Through July, the Treasury reports that duties have totaled $136 billion, with $28 billion collected in July alone. On the basis of tariffs in place on January 6, we projected that customs duties would total $80 billion in fiscal year 2025—an amount near the average of the previous five years.

CBO projects further increases in tariff revenues in the coming months. If there are no further changes in tariff rates, we project that customs duties from new and existing tariffs will total about $200 billion this fiscal year. However, that estimate is subject to uncertainty because of variability between when the rates are implemented and when the Treasury receives the related revenues.

Revenues can lag the implementation of changes in tariff rates by several months. Typically, once tariff rates go into effect, they are not applied to goods already in transit to the United States, which can take as long as two months. In addition, importers have the option to delay payments by up to six weeks by participating in Customs and Border Protection's Periodic Monthly Statement program.

### What Additional Effects Will Be Reflected in CBO's Next Economic Forecast?

The short-term economic forecast we are publishing next month will reflect the effects of increases in tariffs on U.S. imports implemented between January 6 and August 19. The forecast will also reflect the effects of changes in tariffs on U.S. exports made by other countries.

We estimate that the changes in tariffs, both by the United States and its trading partners, will reduce the size of the U.S. economy. That reduction in output reflects both negative and positive effects: the negative effects of higher tariffs through channels such as reduced investment and productivity, and the positive effects of additional revenues from tariffs on U.S. imports, which would reduce federal borrowing and increase the funds available for private investment.

The increases in tariffs will make consumer goods and capital goods (the physical assets that businesses use to produce goods and services) more expensive, which will reduce the purchasing power of U.S. consumers and businesses. Those increases in costs will put temporary upward pressure on inflation.

Our short-term economic forecast will also reflect the interactions between the changes in tariffs and other changes, including those stemming from provisions of the 2025 reconciliation act. Then, our next 10-year economic forecast and budget baseline will fully reflect the economic and budgetary effects of changes implemented through legislative and administrative actions.

### What Sources of Uncertainty Are Related to the Estimates?

The Administration could change how tariff policies are administered. The projections described here reflect the assumption that the tariffs will be collected on all affected imports, with no exemptions beyond those currently specified. If mechanisms for additional exemptions were implemented, the tariff duties collected could decline substantially.

Moreover, the United States has not implemented increases in tariffs of this size in many decades. As a result, there is little empirical evidence about their long-term effects. Consumers and businesses could be more or less responsive to increases of tariffs of this size, which would cause revenues to diverge from projected amounts.

We will continue to assess how businesses and consumers respond to the tariff changes and will incorporate that information in future analyses.

*Phillip L. Swagel is CBO's Director.*

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 25-1812

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, UNITED STATES CUSTOMS AND BORDER PROTECTION,

Defendants-Appellants.

No. 25-1813

THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF VERMONT,

Plaintiffs-Appellees,

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for U.S. Customs and Border Protection, UNITED STATES,

Defendants-Appellants.

## **DECLARATION**

I, Marco Rubio, hereby state as follows:

1.     I am the Secretary of State.  I have been the Secretary of State since January 20,

2025.  As Secretary of State, I am the President's chief foreign affairs advisor.  I carry out the

1

President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2.      The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, State Department employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3.      The purpose of this declaration is to confirm, in my capacity as Secretary of State, that a ruling suspending the effectiveness of the tariffs the President imposed under the International Emergency Economic Powers Act (IEEPA) would cause significant and irreparable harm to the foreign policy and national security of the United States. Such a ruling would derail critical ongoing negotiations with our foreign trading partners and threaten broader U.S. strategic interests internationally.

4.      I previously submitted a declaration on May 23, 2025, regarding the status of negotiations and potential effects of a ruling at that time. This declaration updates and supplements that declaration.

5.      Since my declaration of May 23, 2025, negotiations with our trading partners have continued to unfold rapidly. These negotiations seek to obtain our trading partners' agreement to eliminate or reduce their tariff and non-tariff barriers to exports from the United States, thereby addressing the trade deficit and the consequences of that trade deficit that the President identified when declaring the national emergency in Executive Order 14257. Negotiations with Mexico, Canada, and China are also ongoing in order to address the urgent threats posed by those countries' failure to do more to arrest, seize, detain, or otherwise stop the actions of drug trafficking

2

organizations, other drug or human traffickers, and criminals at large, including these organizations' importation of fentanyl and other illicit drugs in the United States.

6.     Two recent examples make clear the grave harm that would result from a ruling against the President's authority in this case. This harm would not be limited to the United States, but could also have severe consequences for ongoing peace negotiations and human rights abuses.

7.     First, the President is exercising his IEEPA authority in connection with highly sensitive negotiations he is conducting to end the conflict between the Russian Federation and Ukraine. The President identified in Executive Order 14329, dated August 6, 2025, that the actions of the Russian Federation in the Ukraine conflict continue to pose an unusual and extraordinary threat to the national security of the United States. The President also found that the Government of India is currently directly or indirectly importing Russian Federation oil, thereby providing financial support to the Russian Federation's actions in Ukraine.

8.     The President accordingly imposed an additional *ad valorem* duty (tariff) of 25 percent on articles of India imported into the United States. The President also directed me to recommend additional actions as to other countries that import Russian Federation oil, including whether to impose additional tariffs of 25 percent. These tariffs will reduce demand for Russian Federation oil by India and other countries and increase the President's leverage to secure peace and resolve the national emergency with respect to the Russian Federation's actions in Ukraine, a critical negotiation that remains ongoing.

9.     Second, the President has imposed tariffs under IEEPA to address the national emergency he identified with respect to the Government of Brazil's violations of human rights and targeting of U.S. citizens. In Executive Order 14323, dated July 30, 2025, the President identified that that Government of Brazil was taking actions to "compel United States online platforms to

censor the accounts or content of United States persons, . . . block the ability of United States persons to raise money on their platforms; change their content moderation policies, enforcement practices, or algorithms in ways that may result in the censorship of the content and accounts of United States persons; and provide the user data of accounts belonging to United States persons, facilitating the targeting of political critics in the United States." He also identified that the Government of Brazil is "politically persecuting a former President of Brazil, which is contributing to the deliberate breakdown in the rule of law in Brazil, to politically motivated intimidation in that country, and to human rights abuses."

10.    The President accordingly imposed an additional tariff of 40 percent on articles imported from Brazil and directed me to recommend additional action if Brazil persists in its actions.

11.    The prompt stays of the decisions of the Court of International Trade and the District Court for the District of Columbia prevented the potentially catastrophic effects of an unstayed order on the ongoing negotiations for these foreign policy matters.

12.    The United States is actively negotiating with dozens of countries to reach agreements to address the emergencies declared by the President. Like the negotiations that have produced framework agreements, these other negotiations remain in a delicate state and will be directly affected by a ruling suspending the effectiveness of the tariffs.

13.    The President could invoke other tariff authorities to place pressure on countries, but the President has found that those authorities—which do not offer the same agility or scope as IEEPA—are inadequate to efficiently and effectively deal with the declared national emergencies.

14.    These trade negotiations have been one of the country's top foreign policy priorities for the last several months. Reflecting the urgency of the emergencies, much of U.S. global diplomacy in the last several months has been focused on these negotiations.

15.    Additionally, ending the conflict between the Russian Federation and Ukraine is one of the President's most critical foreign policy objectives.

16.    Suspending the effectiveness of the tariffs would lead to dangerous diplomatic embarrassment, which emboldens allies and adversaries alike, such as undermining the terms of finalized or framework agreements. Suspending the effectiveness of the tariffs would likewise interrupt ongoing negotiations midstream, and that discontinuity cannot be remedied by a stay or reversal at a later date.

17.    Requiring the President to rely on other tariff authorities would expose the United States to the risk of retaliation by other countries based on a perception that the United States lacks the capacity to respond rapidly to retaliation.

18.    It remains vital to the foreign policy, economy, and national security of the United States for the Court to stay its mandate and permit the tariffs to remain in effect in light of the ongoing sensitive negotiations and the unusual and extraordinary threats to the United States at issue in this litigation.


I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 29th day of August, 2025.


_____

Marco Rubio
Secretary of State

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

No. 25-1812

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, UNITED STATES CUSTOMS AND BORDER PROTECTION,

Defendants-Appellants.

No. 25-1813

THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF VERMONT,

Plaintiffs-Appellees,

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for U.S. Customs and Border Protection, UNITED STATES,

Defendants-Appellants.

## **DECLARATION**

I, Scott K. H. Bessent, hereby state as follows:

1.      I am the Secretary of the Treasury.  I have been the Secretary of the Treasury since January 28, 2025.

1

2.       The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, discovered through reasonable inquiry, and obtained from Treasury Department employees and from various records, systems, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3.       The purpose of this declaration is to confirm, in my capacity as the Secretary of the Treasury, that the maintenance of the tariffs the President imposed under the International Emergency Economic Powers Act (IEEPA) is crucial to the President's ability to conduct real-world diplomacy and his ability to protect the national security and economy of the United States. Judicial removal of this tool would derail critical ongoing negotiations with our foreign trading partners and threaten broader U.S. strategic interests internationally.

4.       I previously submitted a declaration on May 23, 2025, regarding the status of negotiations and potential effects of a ruling at that time. This declaration updates and supplements that declaration.

5.       Also, since my declaration of May 23, 2025, the Congressional Budget Office has projected that tariff collections will decrease primary deficits by $3.3 trillion over the next decade, and will reduce federal outlays for interest by an additional $0.7 trillion, meaning that tariffs will reduce total deficits by an estimated $4.0 trillion. A reduction of the national debt by $4 trillion is manifestly in the public interest. Moreover, Congress and the Executive Branch rely on Congressional Budget Office estimates in carrying out their duties, and they will rely on this estimate, like other estimates, going forward. A decision suspending the tariffs would undermine this estimate and decisions made in reliance on it.

6.      Since my declaration of May 23, 2025, negotiations with our trading partners have continued to unfold rapidly. These negotiations seek to have our trading partners eliminate or reduce their tariff and non-tariff barriers to exports from the United States, thereby addressing the trade deficit and the consequences of that trade deficit that the President identified when declaring the national emergency in Executive Order 14257. Negotiations with the governments of Mexico, Canada, and the People's Republic of China are also ongoing in order to address the urgent threats posed by those countries' failure to do more to arrest, seize, detain, or otherwise intercept drug trafficking organizations, other drug or human traffickers, and criminals at large.

7.      As of the date of this declaration, the United States has announced frameworks (with Japan, Indonesia, the United Kingdom, the Philippines, Vietnam, South Korea, and the European Union). These frameworks set the parameters for continued negotiation regarding binding, final terms of agreements with these foreign trading partners. The President has found that these frameworks align these foreign trading partners with the national security and economic interests of the United States and help address the trade deficit.

8.      The pressure of tariffs is crucial in bringing other countries to the table and in the President's ability to respond to other countries' efforts to slow-walk negotiations or to change their bargaining positions by further distorting the conditions of competition for U.S. exporters, including by imposing retaliatory tariffs. The success of the negotiations depends on the credible threat of prompt imposition of tariffs.

9.      In addition to the frameworks already reached, and which continue to be negotiated towards binding agreements, the United States is actively negotiating with many other countries to reach ways forward to address the emergencies declared by the President. These negotiations

remain in a delicate state and will be directly and adversely affected by a ruling suspending the effectiveness of the tariffs.

10.     These trade negotiations have been one of the country's top foreign policy priorities for the last several months.

11.     Suspending the effectiveness of the tariffs would lead to dangerous diplomatic embarrassment, which emboldens allies and adversaries alike. Suspending the effectiveness of the tariffs would likewise interrupt ongoing negotiations midstream, undermining our ability to protect the national security and economic welfare of the American people.

12.     Suspending the effectiveness of the tariffs would expose the United States to the risk of retaliation by other countries based on a perception that the United States lacks the capacity to respond rapidly to retaliation.

13.     It remains vital to the foreign policy, economy, and national security of the United States for the Court to stay its mandate and permit the tariffs to remain in effect in light of the ongoing sensitive negotiations and the unusual and extraordinary threats to the United States at issue in this litigation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this __ day of August, 2025.

/s/ _____

Scott K. H. Bessent
Secretary
Department of the Treasury

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

No. 25-1812

V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, dba Genova Pipe, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for United States Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, UNITED STATES CUSTOMS AND BORDER PROTECTION,

Defendants-Appellants.

No. 25-1813

THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF VERMONT,

Plaintiffs-Appellees,

v.

PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, Secretary of Homeland Security, in her official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, Commissioner for United States Customs and Border Protection, in his official capacity as Commissioner for U.S. Customs and Border Protection, UNITED STATES,

Defendants-Appellants.

## **DECLARATION**

I, Ambassador Jamieson Lee Greer, hereby state as follows:

1.      I am the United States Trade Representative.  I have been the United States Trade Representative since February 26, 2025.

1

2.    The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, component employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3.    The purpose of this declaration is to confirm, in my capacity as the principal advisor to the President on international trade policy and the chief representative for the United States in international trade negotiations, that a ruling suspending the effectiveness of the tariffs the President imposed under IEEPA would cause significant and irreparable harm to the foreign policy, trade policy, and national security of the United States. Such a ruling would derail critical ongoing negotiations with our foreign trading partners and threaten broader U.S. strategic interests internationally.

4.    I previously submitted a declaration on May 23, 2025, regarding the status of negotiations and potential effects of a ruling at that time. This declaration updates and supplements that declaration.

5.    This case does not present an abstract question of law. A ruling suspending the effectiveness of the tariffs would have a concrete and immediate effect on United States foreign policy, trade policy, and national security.

6.    Since my declaration of May 23, 2025, negotiations with our trading partners have accelerated rapidly. These negotiations seek to obtain our trading partners' agreement to eliminate or reduce their tariff and non-tariff barriers to exports from the United States, thereby addressing the trade deficit and the consequences of that trade deficit that the President identified when declaring the national emergency in Executive Order 14257. Negotiations with Mexico, Canada,

and China are also ongoing in order to address the urgent threats posed by those countries' failure

to do more to arrest, seize, detain, or otherwise stop the actions of drug trafficking organizations,

other drug or human traffickers, and criminals at large, including these organizations' importation

of fentanyl and other illicit drugs in the United States.

7.     The prompt stays of the decisions of the Court of International Trade and the

District Court for the District of Columbia prevented the potentially catastrophic effects of an

unstayed order on the ongoing negotiations.   Indeed, the stays provided ample room for the

President to conduct meaningful trade negotiations and secure substantial concessions to address

the U.S. trade deficit and conditions arising from it.

8.     As of the date of this declaration, the United States has announced trade deals with

the European Union (EU), Indonesia, the Philippines, Vietnam, Japan, South Korea, and the United

Kingdom (U.K.). The President has found that these framework agreements will reverse the

crippling effects of our exploding trade deficit by increasing tariffs on imports, while significantly

lowering tariffs and non-tariff barriers that inhibit the sale of American exports in these key export

markets. Pursuant to the terms of the framework agreements, these foreign trading partners also

have committed to align with the United States on national security and economic matters

including by taking complementary actions to address non-market policies of third-countries that

have significantly reduced manufacturing capacity in the United States. Furthermore, pursuant to

those framework agreements, our foreign trading partners have committed to invest $1.5 trillion

in the United States and purchase hundreds of billions of dollars in products from American

companies.

9.     For example, in exchange for reductions in tariff rates imposed by President Trump

pursuant to various IEEPA and Section 232 of the Trade Enforcement Act of 1962 actions, the EU

has agreed to reduce or eliminate tariffs on U.S. exports and buy $750 billion in U.S. energy exports. The EU has already started the process of eliminating those tariffs. The EU also has agreed to invest $600 billion in the United States by 2028. In the framework agreement, the EU also has committed to eliminate certain non-tariff barriers that restrict the sale of industrial goods, digital, and agricultural products in European markets.

10.     Pursuant to the terms of its framework agreement, Indonesia has agreed to completely eliminate tariffs on 99 percent of U.S. industrial and agricultural products in exchange for a reduced IEEPA tariff rate. Furthermore, Indonesia will address a range of long-standing non-tariff barriers including by exempting U.S. companies from Indonesia's local content requirements and accepting vehicles built to U.S. federal motor vehicle safety and emissions standards. Indonesia also has agreed to exempt U.S. food and agricultural products from all of Indonesia's import licensing regimes. Importantly, Indonesia has agreed to reverse its long-standing determination to impose duties on goods delivered digitally and to support a permanent moratorium on such duties at the World Trade Organization (WTO). Additionally, Indonesia has committed to join the Global Forum on Steel Excess Capacity, take effective action to prevent duty evasion, and cooperate with the United States on export controls and investment security. All of these actions are intended to combat threats from non-market economies in national-security sensitive sectors.

11.     In exchange for a reduced reciprocal tariff rate, the Philippines will reduce or eliminate trade barriers against U.S. exports while also increasing its defense cooperation with the United States, and Vietnam will open up its market to American autos, industrial goods, and agricultural products.

12.     Pursuant to the terms of the framework agreement with Japan, Japan will invest $550 billion in the United States to revitalize American industry, with 90 percent of the profits accruing to the U.S. government.  Japan has also committed to buy billions of American energy, aircraft, and military hardware.  South Korea has agreed to provide historic market access to U.S. autos and agricultural products; to purchase $100 billion in American energy by 2028; and to invest $350 billion at the President's direction to revitalize American industry, with 90% of the profits accruing to the U.S. government, in exchange for the same lowered reciprocal tariff rate that Japan and the EU received.

13.     Finally, because of President Trump's framework agreement with the United Kingdom, American companies will secure unprecedented access to U.K. markets.  Since the United States and the United Kingdom agreed to the General Terms of this deal, the Starmer Government has introduced legislation to create a tariff-rate-quota that will allow $700 million in U.S. ethanol exports and $250 million in U.S. agricultural exports, including beef, to enter the U.K. market duty-free.  The U.K. also has committed to close loopholes and expand competitive opportunities for U.S. companies in its procurement market.  In exchange for these commitments, the President agreed to assign the U.K. a 10 percent reciprocal tariff rate and to modify the Section 232 tariffs on autos, steel, and aluminum for U.K. imports.

14.     As of the date of this declaration, the United States and these trading partners are working quickly and diligently to turn these framework agreements into legally binding instruments. The President expects to conclude these agreements on a rolling basis in the coming months.

15.     None of these agreements would be possible without the imposition of tariffs to regulate imports and bring other countries to the table, including the President's ability to respond

to other countries' efforts to slow-walk negotiations or to change their bargaining positions by further distorting the conditions of competition for U.S. exporters. The success of the negotiations depends on the credible threat of prompt enforcement of tariffs.

16.    In addition to the framework agreements already reached, the United States is actively negotiating with dozens of countries to address the emergencies declared by the President. Like the negotiations that have produced framework agreements, these other negotiations remain in a delicate state and will be directly affected by a ruling suspending the effectiveness of the tariffs.

17.    The President has invoked other tariff authorities to address threats to national security arising from overreliance on specific imports, as well as unreasonable and discriminatory foreign trading partner measures that alter the conditions of competition for American companies. But the President has found that those authorities—which do not offer the same agility or scope as IEEPA—are inadequate to efficiently and effectively deal with the declared national emergencies. Only IEEPA provides the flexibility and impact needed.

18.    These trade negotiations have been one of the Trump Administration's top foreign and trade policy priorities for the last several months. Reflecting the urgency of the emergencies, much of U.S. global diplomacy in the last several months has been focused on these negotiations.

19.    Suspending the effectiveness of the tariffs would embolden allies and adversaries alike and undermine this once-in-a-generation opportunity to protect national security by expanding the U.S. defense-industrial base. Suspending the effectiveness of the tariffs would likewise interrupt ongoing negotiations to memorialize these framework agreements midstream, and that discontinuity cannot be remedied by a stay or reversal at a later date.

20.    Requiring the President to rely on other tariff authorities would expose the United States to the risk of retaliation by other countries based on a perception that the United States lacks the capacity to respond rapidly to retaliation.

21.    It remains vital to the foreign policy, economy, and national security of the United States for the Court to stay its mandate and permit the tariffs to remain in effect in light of the ongoing sensitive negotiations and the unusual and extraordinary threats to the United States at issue in this litigation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this ___ day of August, 2025.

/s/ _____

Jamieson Greer
United States Trade Representative
Office of the United States Trade Representative